The Arbitration Tribunals of the
American Arbitration Association
Dallas, Texas

---

*In the Matter of the Arbitration between:*

**Tricon Energy, Ltd.,**
      **Claimant,**

    **-against-**

**Vinmar International, Ltd.,**
      **Respondent.**

**Case No. 70 198  00168  09**


**AWARD OF ARBITRATORS**

---

## AWARD OF ARBITRATORS

      We, the undersigned Arbitrators, were designated and/or duly selected by the parties in the above styled matter to serve as Arbitrators, pursuant to the rules of the American Arbitration Association.  An initial conference was held on November 16, 2009, with the evidentiary hearing held on September 20 and 21, 2010, and the final hearing held on October 28, 2010.  The record was closed on October 29, 2010.  A reasoned award was requested by the parties.

      The arbitration proceeding is between Tricon Energy, Ltd. as claimant (referred to as Tricon) and Vinmar International, Ltd. as respondent (referred to as Vinmar).

      This arbitration proceeding presents the issue of whether a broker's bid confirmation to the Traders for Tricon and Vinmar for the sale of 5,000 metric tons (+ or - 5%) of mixed xylene at $1,310 per MT for delivery to Asia in the first half of September 2008, followed by a series of emails by the Special Operations employees of each company concerning additional terms, constitute an enforceable agreement, including an agreement to arbitrate any dispute arising out of the transaction.



**PLAINTIFF'S EXHIBIT**

A

We find that the Amended Broker's Confirmation issued July 23, 2008, confirming a July 22, 2008, trade between Tricon and Vinmar, is an enforceable agreement requiring Vinmar to purchase 5,000 metric tons of mixed xylene from Tricon, which Vinmar breached by failing to designate a discharge port by August 8, 2008. We further find that additional terms agreed to by the parties' Special Operations employees are enforceable terms, including an agreement to arbitrate any dispute.

## I. DISCUSSION

### 1.   The mechanics of the trading market.

Mixed xylene is an aromatic which is bought and sold by traders making a commodities market for the product through the bids to buy and sell the product. Traders seek to anticipate market price fluctuations, seeking to buy product at a lower price and reselling to other traders or end users for a higher price. Similarly, traders will seek to anticipate market price movement by tying in a firm price from a buyer and then seeking to obtain the product to meet the sales agreement or by tying in a firm price from a seller and then seeking to obtain a buyer at a profit. These trades which involve bids offered and accepted without a firm product to sell or firm customer to buy are risky ventures entered into by skilled traders for the purpose of making a profit for the trader who correctly anticipates market pricing.

Aromatics are commonly bought and sold in a brokered aromatic commodity market through negotiated sales using the services of a broker, whereby a Trader for the seller and a Trader for the buyer deal anonymously through a broker, with the bidders not being advised of the identity of the negotiating parties until a deal is struck as to the terms of the sale. These terms of sale are referred to in the industry as "commercial" terms of sale. The broker confirms the commercial terms of a sale to the Traders with a Broker's Confirmation, which is frequently transmitted electronically to the parties.

After the "deal is struck" as to the commercial terms of the sale by the Traders for each side and confirmed by the broker, the trade is turned over to the Operations Specialists, who act

as facilitators to "pass paper," which is the term of art used in the trade market to mean the exchange of written terms of sale, generally by email, which provide the details of the sale and delivery. Operations Specialists are schedulers whose job is to make sure the deal is completed. Both the buyer and seller will have Operations Specialists to work out the additional terms of the sale necessary to accomplish the trade as agreed. An Operations Specialist does not negotiate commercial terms and cannot change the commercial terms agreed to by the Traders. Disagreement by the Operations Specialists does not cancel a trade.

## 2.     **The Tricon-Vinmar Trade.**

Witnesses with personal knowledge of the Tricon-Vinmar trade and the actions of the Traders and the Operation Specialists testified in person and by deposition. Copies of email and instant message communications were admitted into the record. The testimony of expert witnesses was admitted which detailed the customs of the aromatics trading market.

The aromatics broker for the transaction between Tricon and Vinmar was Edward Leyman of MOAB Oil Inc. Brad Lockwood was the Trader who negotiated the trade in question for Tricon, the seller of mixed xylene. Dr. Rick Wilson was the Trader for Vinmar, the buyer. After negotiations on July 22, 2008, through the broker, Mr. Leyman, the broker issued his Broker's Confirmation on July 22, 2008, which confirmation was amended once at Vinmar's request to change payment terms and once at Tricon's request to correct an error in the confirmation terms. The final Amended Broker's Confirmation was issued on July 23, 2008, at 8:28 am. No objections were made to the terms set out in the Amended Broker's Confirmation.

After the Amended Broker's Confirmation, the transaction became the responsibility of the Operations Specialists, Vuk Rajavac for Tricon and Laurentiu Pascu for Vinmar, to negotiate additional terms to accomplish the trade. Eduardo Anaya assisted Mr. Pascu.

At the time the Amended Broker's Confirmation issued, Tricon did not own the product to be delivered as designated by Vinmar. Common industry practice was for a trader such as Tricon to purchase product to meet the contract requirements of the sale, by either loading a ship

with the product for delivery or designating a cargo already aboard a tanker ship to be delivered to complete the trade.

At the time of the Amended Broker's Confirmation, Vinmar did not have a customer to purchase the product that Vinmar had purchased from Tricon. Common industry practice was for a purchaser involved in a trade with no guaranteed sale at the time of the trade to seek to match a customer with the product that was the subject of the trade, and with that information, provide the seller with the destination of the cargo.

Vinmar was unable to obtain a purchaser for the 5,000 MT of mixed xylene that was the subject of the trade with Tricon. On July 23, 2008, Dr. Wilson was predicting that mixed xylene "is getting tight in USA, and will make entire globe tight." [Tricon Ex. 8, Wilson email, July 23, 2008, 10:41 am] After the broker confirmed the trade to Tricon and Vinmar, Dr. Wilson lost a Formosa sale for mixed xylene. See: Tricon Ex. 8, Jason Luoh email, July 23, 2008, 11:48 am; Tricon Ex. 9, Jason Luoh email, July 23, 2008, 3:14 pm.

The aromatics market for mixed xylene entered a period referred to as a "buyer's market" following the Tricon-Vinmar trade. Prices fell on the Asian market from a high of 1325 on July 23rd, the day after the Tricon-Vinmar trade. The prices shown in Tricon's Exhibit 26 reflect a precipitous decline during the days involved in this dispute rather than the "tight market" predicted by Dr. Wilson when he made the July 22 trade on behalf of Vinmar.

| Date | Price | Event in Tricon-Vinmar trade |
|------|-------|------------------------------|
| July 23 | 1325 | date of Broker's Amended Confirmation |
| July 31 | 1235 | date of "US Origin" email by Dr. Wilson |
| Aug 6 | 1230 | date of Dr. Wilson's "we do not have a deal" email |
| Aug 8 | 12 15 | date discharge port designation due |

[Tricon Ex. 26]

No buyer would bid to purchase the product under contract to Vinmar. Vinmar had no customer. With no customer to purchase the product, Vinmar had no discharge port destination for the mixed xylene.

**3.**     <u>**Need to declare discharge port and the issue of product origin.**</u>

      One highly negotiated provision of the trade was the date by which Vinmar was to designate the Asian discharge port for the cargo which was to be delivered in the first half of September, 2008.  The date of August 8, 2008, was agreed to by the parties as the date by which Vinmar would designate the discharge port.  This date was crucial to allow timely performance by Tricon, as sufficient transit time was necessary to deliver the product by the first half of September delivery deadline set out in the Amended Broker's Confirmation.

      With Tricon contractually obligated to deliver 5,000 MT of mixed xylene to Asia in the first half of September, Tricon sent an email on Tuesday, July 29 at 4:43 to Vinmar seeking to have Vinmar declare a discharge port.  [Joint Ex-14]  All parties to the transaction understood that transit from the Texas Gulf Coast to an Asian destination was at least thirty-five days.  The timely designation of the discharge port was necessary for Tricon to meet the delivery deadline to deliver the 5,000 MT of mixed xylene to either of two possible Asian destinations.

      Eight days prior to the deadline to designate a discharge port, Vinmar's Dr. Wilson sought to renegotiate the trade with Tricon.  In *Instant Message* communication on July 31st between 6:20 am and 9:42 am, Dr. Wilson approached Mr. Lockwood, ending with the offer "brad if u want to wipe the slate clean we could do that, otherwise I have contract obligations Ill supply into."  Mr. Lockwood responded "no worries, I'll supply then, no prob."  [Joint Ex. 12] With Mr. Wilson not accepting Dr. Wilson's July 31st morning request to set aside the July 22nd trade, Dr. Wilson introduced the issue of "US Origin" in his afternoon email to Mr. Rajevac. [Joint Ex. 15]

      As part of the Operations Specialists work to "pass paper" for the trade, Tricon's email of July 29 at 4:43 pm requesting a discharge port declaration was forwarded by Vinmar's Mr. Pascu to Vinmar's Trader, Dr. Wilson, on July 31 at 1:39 pm.  [Joint Ex-14]  The record clearly establishes that Vinmar had no customer for the mixed xylene at that time and, hence, was not able to declare a discharge port.

Four minutes later, with the discharge port not yet designated, on July 31st at 1:43, Vinmar's Trader, Dr. Wilson, advised Tricon that Vinmar "can not (sic.) Accept open origin . . . it must be from USA." [Joint Ex 15]  Mr. Rajevac, Operations Specialist for Tricon responded at 4:11 pm,

> "We did not guarantee USA origin.
> Also, since I don't have your disport declaration, I don't know which cargo will be assigned to Vinmar.
> Furthermore, whichever cargo we nominate we reserve the right to substitute it in order to meet the contractual delivery window."

[Joint Ex. 15]

Custom in the industry is that "origin" means "point of manufacture" and "loading port" refers to the port where the product will be loaded on the ship.  Point of manufacture is a commercial term in aromatics trading which can be a term included in the bid confirmation process.  Whereas, identifying the loading port is important to the Operations Specialist of the purchaser, whose responsibility it is to arrange the inspection at the port of loading to ensure that the product meets the agreed quality specifications.

Testimony from industry expert witness Steve Simpson was clear that industry custom for aromatics traded as a commodity is that if product origin is "open," no mention of product origin is made in the broker's confirmation and that if a specific product origin is required by the purchaser, such product origin is included in the confirmation.   The Amended Broker's Confirmation in the Tricon-Vinmar trade does not specify product origin.

The Texas Gulf Coast is the common loading port for "U.S. Origin" product.  To deliver Texas Gulf Coast product to Asia transit through the Panama Canal is necessary.   With a contractual timetable for the Tricon-Vinmar July 22nd trade requiring delivery in Asia by the first half of September, in the afternoon of July 31st, in the 1:43 pm email to Mr. Rajevac which is part of Joint Ex 15, Vinmar's Dr. Wilson asserted "U. S. origin" product as a negotiated commercial term of the trade—knowing that the window to ship to Asia from the Texas Gulf Coast was closing,  See Joint Ex. 15.

Mr. Lockwood and Mr. Leyman acknowledge that Dr. Wilson discussed U. S. origin product, and each denies that this was a negotiated term of the trade. Seeking to impose this "US Origin" condition as a term of the trade was one avenue for Vinmar to undo the trade which had become a substantial financial liability for Vinmar.

Exchanges continued between the parties after July 31st concerning the dispute as to the US Origin issue, with Vinmar seeking an August 15th discharge port declaration date. [Joint Ex. 18]

On August 6th at 2:41 pm, an email was sent by Vinmar's Dr. Wilson through the broker, Mr. Lyman, couched in the terms of continued negotiations, stated "we do not have a deal." [Joint Ex. 18] In his email to Mr. Leyman, copied to senior officials of Vinmar, Dr. Wilson set out the Vinmar's requirement of an "Origin USA" product and an August 15th date to declare a discharge port, thereby allowing an additional 7 days for Vinmar to find a buyer for the mixed xylene and making Tricon's delivery for first half of September in Asia more problematic.

Mr. Leyman forwarded Vinmar's email to Mr. Lockwood who responded on behalf of Tricon directly to Dr. Wilson on August 6th at 4:15 pm, stating,

> "We reject your new assertions that there is no contract . . . and we will hold you to that contract," and concluding, "your declaration of discharge berth remains due as per the original contract on this Friday, August 8th."

[Tricon Ex. 16]

Dr. Wilson reaffirmed a "US Origin" requirement in his email to Mr. Leyman on August 6th at 6:22 pm. [Joint Ex. 19] Again on August 8th at 2:31 pm, in an email to Mr. Leyman, Dr. Wilson cited "US origin as a key material term of our original proposal," setting a deadline of 5 pm on that date by which Tricon was to agree to U. S. origin product.

Other evidence is available to analyze whether "US origin" was a commercial term of the agreed trade. On July 24th and 25th, before Dr. Wilson was facing the deadline to declare a port with no buyer in sight, communications inside Vinmar between Eduardo Anaya and Rick

Case 4:10-cv-05260  Document 1-1  Filed on 12/13/10 in TXSD  Page 8 of 22

Case No. 70 198 00168 09; Tricon Energy, Ltd. v. Vinmar International Ltd.

Wilson, clearly demonstrate that U. S. origin was not a commercial term of the trade as agreed to between Tricon and Vinmar. [Joint Ex. 8] Mr. Pascu's efforts to facilitate the trade did not raise any issue of product origin. See Joint Ex. 13. Preparation of Vinmar's purchase order customarily generated as part of "passing paper" was Mr. Anaya's responsibility. Anaya's prepared purchase order for the Tricon trade is in the record as Tricon Ex. 10, with the origin space "open." Dr. Wilson's testimony concerning "US Origin" to the contrary is not credible.

If Dr. Wilson was successful in obtaining "US origin" as a commercial term, Tricon would be put in a delivery bind; thereby lending support to Dr. Wilson's offer to Mr. Lockwood to "wipe the slate clean". [Tricon Ex. 19]

One series of emails illustrates Dr. Wilson's unsuccessful efforts to secure an Asian purchaser for the contracted for mixed xylene at the same time Dr. Wilson was raising the "US origin" as a contractual issue. While pursuing potential buyers in Asia, Mr. Wilson was advised on August 6th,

> "I have checked Korean buyer's situation, inventory level is very high bcs (name redacted) booked many cargos to protect and retain contract price in Korea . . . they are reluctant to bid . . . (name redacted) has no intention to buy due to low operations . . ."

[Tricon Ex. 19, Kim email, August 6, 2008, 8:20 pm]

Korea was one of the two Asian markets where Dr. Wilson had expected to sell the mixed xylene from the Tricon-Vinmar trade of July 22nd. In an early morning August 8th email, Mr. Wilson was advised

> "current market situation not proper for your business, I will stop talking MX (mixed xylene) business with buyers in Korea."

[Tricon Ex. 19, Kin email, August 8, 2008, 12:31 am]

No credible evidence supports Dr. Wilson's position that he had negotiated a "U.S. origin" product as a commercial term of the trade. Dr. Wilson had no purchaser seeking U. S. origin mixed xylene. Edward Leyman, the broker, testified that product origin was not one of the commercial terms negotiated. Mr. Lockwood disputes Dr. Wilson's assertion that U. S. organ was a term of the trade.

**4.      Failure to declare discharge port.**

Vinmar did not designate a discharge port by August 8, 2008.

Communications between Tricon and Vinmar failed to result in a discharge port being declared by Vinmar.   On Friday, August 8th at 5:13 pm, Mr. Lockwood of Tricon advised Vinmar "[w]e did not receive your declaration of discharge port by COB today.  Therefore, Vinmar is in breach of contract."  [Joint Ex. 21]   With communications continuing, past the deadline to designate a discharge port, on August 11th, Tricon offered to meet Vinmar's demand for U. S. origin product and requested a discharge port designation.  [Joint Ex 23]

In late July and early August of 2008, Vinmar had no buyer and no destination for the mixed xylene, Vinmar failed to designate a discharge port for the 5,000 MT of mixed xylene which was the subject of the July 22 trade.

**5.      Agreement as to additional terms.**

Witnesses, including the Operations Specialists and the expert witness Steve Simpson, testified as to industry custom for the Operations Specialists to "pass paper" to agree to additional terms for the agreed trade.

Tricon's sales contract was included in an email from Brad Lockwood, Tricon's Trader, to Rick Wilson, Vinmar's Trader, at 10:57 am, shortly after the Amended Broker's Confirmation was received on July 23rd.  Dr. Wilson acknowledged that Lockwood's email with the sales contract that afternoon at 3:28 pm. [Joint Ex. 5] Tricon's Operations Specialist Mr. Rajevac was copied on the email.

Dr. Wilson informed Vinmar's Operations Specialist Laurentiu Pascu of the mixed xylene trade on July 24th at 10:15 am, advising Mr. Pascu "Laurientin, I bought XM (mixed xylene) from Tricon please contact them and made necessary arrangements." [Joint Ex. 6]

The Tricon sales contract transmitted to Vinmar on July 23rd contained a signature block. Testimony by Mr. Simpson was that customary practice in the trading market was not to sign contracts and that it would be unusual to sign a contract unless it was a long term contract. There was no credible testimony that the custom in the industry was that the presence of a signature block required execution to be valid. The credible testimony was to the contrary.

Tricon's sending its sales contract by email to Vinmar began the process of "passing paper." Clause number "9" in the July 23rd sales contract provides for arbitration of disputes under the "Commercial Arbitration Rules of the American Arbitration Association." [Joint Exhibit 5] Vinmar's Operations Specialist, Mr. Pascu, sent his "comments" to the July 23rd sales contract on July 29th at 4:08 pm requesting Tricon's prompt feedback, and advising Tricon that Vinmar would shortly issue its Purchase Order for review. [Joint Ex. 13] Vinmar's "comments" were accepted by Tricon's Operations Specialist, Mr. Rajavac, on July 29th at 4:43 pm, except for the demurrage provision. [Joint Ex. 14] No agreement was reached as to the demurrage provision and Vinmar did not seek additional terms of sale through its purchase order, as other developments overtook the completion of detailing the shipping terms. In this process of "passing paper," the agreed additional terms, including an arbitration clause, became part of the Tricon – Vinmar trade.

The sales terms for both parties to the trade required arbitration, as shown by Vinmar's intended purchase order. Vinmar has a standard purchase order which Vinmar customarily issues as part of "passing paper." Vinmar's standard purchase order which was being prepared by Vinmar's Operations Specialists on July 24th, before Dr. Wilson raised the "US origin" issue, is consistent with requiring arbitration for disputes.

> All disputes arising in connection with the present contract shall be finally settled under the Rules of Conciliation and Arbitration of the American Arbitration Association by one or more arbitrators appointed in accordance with the said Rules.

[Tricon Ex. 10]

### 6.   Tricon's proof of damages and the amount of reasonable attorney's fees.

Case 4:10-cv-05260   Document 1-1   Filed on 12/13/10 in TXSD   Page 11 of 22

Case No. 70 198 00168 09; Tricon Energy, Ltd. v. Vinmar International Ltd.

Testimony was offered concerning the elements of the measure of damages sought by Tricon. When Vinmar refused to designate the discharge port for the 5,000 MT of mixed xylene, Tricon did not load product on a ship for the Vinmar sale. Tricon's evidence was sufficient to establish damages using Tricon's sale to KP Chemical as a replacement sale method for calculating damages for 3,230 MT and using a market average price from August 11, 2009, to September 15, 2009, for the 1770 MT for which Tricon was unable to obtain a replacement sale. [Tricon Ex. 39]

Clause 12 of the agreed additional terms provides for interest at the rate of 8.5% in the event the amount due under the contract is not timely paid.

Testimony was that sufficient product was available on the market for Tricon to purchase product to complete the KP Chemical sale, as well as the Vinmar sale. That position is credible as the "buyer's market" from August through December in 2008 gave any purchaser a ready supply of mixed xylene at an ever decreasing price. [Tricon Ex. 26]

Evidence concerning reasonable attorney's fees was submitted and accepted into the record on Tricon's claim for attorney's fees and expenses.   The guidelines from *Arthur Anderson v. Perry Equipment Company*, 945 S.W. 2d 182 (Texas. 1997), as well as Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct, are to be applied to the evidence in the record. Claimant Tricon seeks $388,312.50 in attorney's fees through the end of the evidentiary hearing on September 21, 2010, and $20,000 as reasonable and necessary fees for attorneys' services after the evidentiary hearing. Evidence was also submitted seeking a contingent finding of reasonable attorney's fees at each stage in state or federal court, in the event the award must be confirmed or is challenged.

Evidence concerning expenses was submitted; including deposition costs of $4,224.19, travel expenses of $4,781.73 for out of state depositions, hearing venue expense of $972.81 for the evidentiary hearing, and Westlaw, photocopies and other expenses of $10,522.55. Expenses

of arbitration administrative and services in the amount of $38,300, the filing fee of $8,000, and expert witness fees of $ 40,363.35 were also submitted.

## II. RULINGS

### 1.   Jurisdiction.

1.1   Respondent Vinmar's Motion to Dismiss asserts that there is no jurisdiction to arbitrate the dispute.

1.2   Respondent Vinmar's motion is denied as to the procedural ground asserting the necessity of prior suit in district court. An order compelling arbitration from a trial court is not required for this arbitration panel to consider the issues presented, including the issue of arbitration.

1.3   Whether there was an agreement by the parties to arbitrate rests with the panel's decision as to whether there was an enforceable agreement between the parties and as to the terms of the agreement, if any.

### 2.   Agreement.

2.1   In the aromatic trade market, a broker's confirmation is an enforceable agreement setting out the economic terms of the sale, with additional trade terms to effectuate the trade as agreed upon by the parties.

2.2   The Amended Broker's Confirmation is an enforceable agreement between the parties, setting out the terms of the trade between Claimant Tricon and Respondent Vinmar as agreed to by the Traders for sale of 5,000 metric tons of mixed xylene to Respondent Vinmar at $1, 310.00 per MT for delivery to the designated discharge port by the first half of September, 2008.

2.3     "Product origin" was open and is not a commercial term of the agreement set out in the Amended Broker's Confirmation of July 23, 2008.

2.4     Custom in the aromatics market is for the Operations Specialists to agree to the additional terms to affect the actual delivery of the contracted for product. When these additional terms are agreed to, the additional terms become part of the terms of sale.

2.5     Additional terms were agreed upon by the Operations Specialists for Tricon, Vuk Rajevac, and Operations Specialist for Vinmar, Laurentiu Pascu, to accomplish the agreed trade.

2.6     Tricon proposed certain additional terms to complete the trade in the sales contract sent to Vinmar. The return "comments" by Vinmar's Operations Specialist, Mr. Pascu, were accepted by Tricon's Operations Specialist, Mr. Rajevac, providing the additional terms to the original agreement set out in the Amended Broker's Confirmation. There was no agreement reached as to the terms for demurrage before the anticipatory breach of the agreement occurred.

2.7     The Amended Broker's Confirmation with the additional terms agreed to by the Traders is a mutually enforceable agreement.

2.8     The argument that there is no enforceable agreement created by the broker's confirmation is rejected. The Arbitrators are confident that if the market price for mixed xylene had risen after the July 22 Amended Broker's Confirmation, Respondent Vinmar would have insisted that Claimant Tricon comply with the sale per the Amended Broker's Confirmation. Failure to legally enforce the terms of a broker's confirmation when a confirmed sale is not completed would undermine the product trading market.

2.9     Pursuant to the terms of the agreement, Respondent Vinmar was required to designate the discharge port by August 8, 2008.

2.10     The additional terms agreed to by Claimant Tricon and Respondent Vinmar included an arbitration provision. Arbitration was an additional term proposed by Tricon's Operations

Case No. 70 198 00168 09; Tricon Energy, Ltd. v. Vinmar International Ltd.

Specialists, accepted in the comments reply from Vinmar's Operations Specialists, and confirmed by the acceptance of Tricon's Operations Specialists.

2.11   The dispute between Tricon and Vinmar is properly before the Arbitration Panel. Vinmar's Motion To Dismiss For Lack Of Jurisdiction is denied.

2.12   The lack of signatures on the exchanged documents does not alter the enforceability of the agreement at issue.  Custom in the trading of aromatics relies on electronically transmitted bids and confirmations, which electronic writings are enforceable without actual papers being signed.  The inclusion of unexecuted signature blocks does not defeat the enforceability of the agreement.

## 3.    Performance by Vinmar.

3.1   Respondent Vinmar breached the agreement by failing to designate a discharge port by August 8, 2008.

3.2   Respondent Vinmar's attempt to insert product origin as a term of the Amended Broker's Confirmation, after Respondent Vinmar failed to obtain a purchaser and after the resale market for aromatics disappeared, was a thinly veiled attempt to escape the trade to which Respondent Vinmar's Trader had agreed.

3.3   Respondent Vinmar's failure to designate a discharge port was an anticipatory breach of its agreement to purchase 5,000 metric tons of mixed xylene for delivery in the first half of September, 2008.

3.4   Vinmar wrongfully rejected and repudiated the contract to purchase of 5,000 MT (+ or - 5%) mixed xylene, § 2.706, Texas Business & Commerce Code.

## 4.    Performance by Tricon.

Case No. 70 198 00168 09; Tricon Energy, Ltd. v. Vinmar International Ltd.

4.1    Claimant Tricon was not required to purchase product to meet the agreement or to load product for delivery as no discharge port was provided by Respondent Vinmar by the deadline of August 8, 2008.

4.2    The replacement sale Claimant Tricon made will be used for a damage model.  Damages for failure to perform a sale pursuant to a Broker's Confirmation are appropriate or such trade bids will be meaningless and become merely a method to game the trading market with false bids.

4.3    Tricon conducted a replacement sale after Vinmar's anticipatory breach of the sales contract after notice to Vinmar.  The KP Chemical replacement sale was a commercially reasonable replacement sale for 3,230 MT mixed xylene.

**5.      Damages.**

5.1    Claimant Tricon, as the non-breaching party, is entitled to damages.

5.2    Respondent Vinmar, as the breaching party, is not entitled to a credit for any profit on the sale to Tricon's buyer who was under agreement for a like sale.  Claimant Tricon, in such a commodity market, was clearly able to supply both the sale to Respondent Vinmar and the sale to KP Chemical.

5.3    The volume of product for computing damages is 5,000 metric tons.  The over/under percentage term does not come into play as speculative--as the product was never loaded for delivery to Respondent Vinmar.

5.4    Under § 2.706, Texas Business & Commerce Code, Tricon may resell as commercially reasonable and recover its damages under 2.706 for the volume of the resale and may recover damages for non-acceptance under 2.708 for the additional volume of the contract.

Case No. 70 198 00168 09; Tricon Energy, Ltd. v. Vinmar International Ltd.

5.4.1     Tricon is entitled to recover market replacement damages for 3,230 MT mixed xylene, the volume of product sold in good faith in a commercially reasonable manner.  § 2.706, Texas Business & Commerce Code.

5.4.1.1     Tricon's sale of 3,230 MT to KP Chemical at $995.50 MT was a commercially reasonable sale.

5.4.1.2     Vinmar is entitled to a credit against a total contract price of $6,550,000 in the amount of $ 3,215,465.

5.4.1.2     Tricon's monetary damages from the replacement sale of 3,230 MT are $1,015,835.

5.4.2     Tricon is entitled to recover damages for the 1770 MT mixed xylene balance of the 5,000 MT contract based on the market price for the time and place of tender.  § 2.708, Texas Business & Commerce Code.

5.4.2.1     The market price at the time and place of performance will be used to calculate the amount of credit for the 1770 MT balance of the 5,000 MT contract.

5.4.2.2     The market price is determined using the average price for mixed xylene from August 11, 2008, (the first business day after the deadline to designate a discharge port) and September 15, 2008, (the last day for Tricon to deliver the product under the contract).

5.4.2.3     Using the market price method, the average price to be applied to the 1770 MT balance of the 5,000 MT contract is $1,123.94 MT.

5.4.2.4     Vinmar is entitled to a credit against a total contract price of $6,550,000 in the amount of $1,989,377.34.

5.4.2.5     Tricon's monetary damages from the market price method are $329,322.66.

5.4.3     Expenses which would have been paid by Tricon in connection with the mixed xylene trade with Vinmar which were avoided as a result of the breach by Vinmar are to be deducted from Tricon's monetary damages.

5.4.3.1     Expenses avoided by Tricon due to Vinmar's breach are $4,628.95, letter of credit fee, and $1,751.99, saved cargo insurance expense.

5.4.3.2    Vinmar is entitled to a credit for avoided expenses in the sum of $6,380.94.

5.4.4    Tricon's monetary damages under the replacement sale method of damages, after crediting the avoided expenses, total $1,338,776.72.

5.5    The additional terms agreed to by Claimant Tricon and Respondent Vinmar provide for interest at the rate of 8.5% in the event the amount due under the contract is not timely paid.

5.5.1    Tricon is entitled to pre-award interest on $1,338,776.72 at the rate of 8.5% per annum, at $311.77 per diem, from October 15, 2008, thirty days after September 15, 2008, to the date of this Award.

5.5.2    The amount of pre-award interest due Tricon is $246,298.30.

5.6    Tricon's monetary damages, plus interest, total $1,585,074.02.

## 6.    Attorney's fees and attorney's expenses.

6.1    Claimant Tricon, as the prevailing party, is entitled to recover reasonable attorney's fees, together with all allowed attorney's expenses incurred by Tricon, in connection with this arbitration and any further proceedings to confirm the award or defend any proceeding to vacate the award.

6.1.1    The amount of Tricon's reasonable attorney's fees through the Award in this proceeding is $403,212.50.

6.1.2    Allowed expenses are found to be $20,481.28.

6.1.3    Expert witness fees are not allowed as recoverable expenses.

Case No. 70 198 00168 09; Tricon Energy, Ltd. v. Vinmar International Ltd.

6.1.4   Reasonable attorneys' fees and allowed expenses for the attorney's of Claimant Tricon are the sum of $423,793.78.

6.2   In the event of further proceedings to enforce or vacate this Award, Tricon is entitled to its reasonable attorney's fees in the event Tricon is the prevailing party.

6.2.1   In the event it is necessary for Tricon to file a motion to confirm this award or Vinmar seeks to have this award vacated and Tricon ultimately prevails, an additional $50,000.00 is a reasonable attorneys' fee.

6.2.2   In the event there is an appeal to an intermediate appellate court and Tricon ultimately prevails, an additional $50,000.00 is a reasonable attorneys' fee.

6.2.3   In the event a petition for review of the appellate court ruling is filed by either party and Tricon ultimately prevails, an additional $15,000.00 is a reasonable attorneys' fee.  If petition for review is granted and Tricon ultimately prevails, an additional $35,000.00 is a reasonable attorneys' fee.

## 7.    **Arbitration fees and expenses.**

7.1   Claimant Tricon filed this arbitration claim with American Arbitration Association

7.2   Claimant Tricon, as the prevailing party, is entitled to recover all fees and expenses incurred by Tricon in connection with the arbitration proceeding, including the administrative filing and service fees of the American Arbitration Association and the fees and expenses of the Arbitrators , all of which shall be borne entirely by Vinmar.

## 8.    **Post-award interest.**

Case No. 70 198 00168 09; Tricon Energy, Ltd. v. Vinmar International Ltd.

8.1    In order for Tricon to be fully compensated for its damages, Tricon is awarded post-award interest on the total sum of the Award in the amount of $2,008,867.80, at the rate of 8.5% per annum, at $467.82 per diem, from November 29, 2010, the date of this Award, until paid.

## 9.    **Damage award**

9.1    Tricon is awarded damages against Vinmar in the amount of $2,008,867.80, calculated as follows:

9.1.1    Damages of $1,015,835.00, from the replacement sale of 3,230 MT of mixed xylene;

9.1.2    Damages of $329,322.66, for the market value of 1,770 MT of mixed xylene;

9.1.3    Credit of $6,380.94, Tricon's avoided costs;

9.1.4    Pre-award interest of $246,298.30 to date of this Award; and

9.1.5    Reasonable attorney's fees and expenses of $423,793.78.

9.2    In addition, Tricon is awarded damages against Vinmar as follows:

9.2.1    Post-award interest at $467.82 per diem from the date of this Award until paid;

9.2.2    The administrative case filing and service fees of the American Arbitration Association and the fees and expenses of the Arbitrators incurred by Tricon as set out below.

9.3    In addition, Tricon is conditionally awarded damages against Vinmar for such additional reasonable attorney's fees found to be reasonable in Section 6.2 in the event of further proceedings, as follows: $50,000 for suit to enforce or vacate this Award; $50,000 for an appeal

Case No. 70 198 00168 09; Tricon Energy, Ltd. v. Vinmar International Ltd.

to the intermediate appellate court; $15,000.00 if a petition for review is filed; and $35,000 if petition for review is granted.

## III. CONCLUSION AND AWARD

As Arbitrators we hereby conclude and award as follows:

(1) Claimant Tricon Energy, Ltd. shall have judgment against Respondent Vinmar International, Ltd., in the amount of TWO MILLION EIGHT THOUSAND EIGHT HUNDRED SIXTY-SEVEN AND 80/100 ($2,008,867.80) DOLLARS, together with interest thereon at the rate of 8.5% per annum, $467.82 per diem, from November 29, 2010, until paid; and all Tricon's costs as administrative filing and case service fees of the American Arbitration Association and fees and expenses of the Arbitrators.

(2) The Respondent Vinmar International, Ltd. shall bear all costs and expenses of arbitration.

This Award is intended to be a conclusive final ruling on all claims submitted to arbitration, which necessarily includes all claims asserted by all parties before the Arbitrators. Vinmar shall pay to Tricon the sum of $2,008,867.80, together with interest thereon at the rate of 8.5% per annum, at $467.82 per diem, from November 29, 2010, until paid, with such Award to be paid within thirty (30) days of the date of this Award. The administrative fling and case service fees of the American Arbitration Association totaling $11,250.00, and the fees and expenses for the Arbitrators totaling $54,780.48 shall be borne entirely by Vinmar. Therefore, Vinmar shall reimburse Tricon within thirty (30) days of the date of this Award the additional sum of $35,495.00 representing the portion of the fees and expenses in excess of the apportioned costs previously incurred by Tricon. Vinmar shall bear its own attorneys' fees and costs.

This Award is in full settlement of all claims and counterclaims, if any, presented to the Arbitrators.   All claims not expressly granted are hereby denied.

Case No. 70 198 00168 09; Tricon Energy, Ltd. v. Vinmar International Ltd.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

Signed this 29th day of November, 2010.

Hon. Levi J. Benton

Hon. Mark Davidson

Hon. Sharolyn Wood

**AMERICAN ARBITRATION ASSOCIATION**

In the Matter of the Arbitration Between:

Re: 70 198 Y 00168 09
    Tricon Energy, Ltd.
    and
    Vinmar International Ltd.
    - Houston, Texas
    Claim: $1,600,000.00

## CERTIFICATION

State of    _Texas_
                 } SS:
County of   _Dallas_

Jason Patlan being duly sworn deposes and says:

1.          He is the Assistant Vice President of the Central Case Management Center of the American Arbitration Association, Inc. (hereinafter referred to as the AAA), a not-for-profit corporation organized under the Laws of the State of New York, having its principal offices at 1633 Broadway, New York, NY 10019.

2.          In such capacity, he is in general charge of all arbitrations conducted pursuant to the rules of the AAA in its Central Case Management Center.

3. He has reviewed the AAA's file pertaining to the above-captioned arbitration administered by the AAA as case # 70 198 168 09.

4. He hereby certifies that the following documents, as listed below and attached, are true and exact copies of the same documents contained in said file # 70 198 168 09.
    **Document List:**
       o     *Award of Arbitrators*

5.     He hereby certifies that the subject arbitration was governed by the Rules of the AAA, as amended and in effect September 1, 2007. A copy of such Rules is attached hereto.

DATED:     _12/10/10_                                           
                                                                Signature



On this _10th_ day of _Dec_ , 20 _10_ before me personally came and appeared _Jason Patlan_ to me known to me to be the individual described in and who executed the foregoing instrument and he/she acknowledged to me that he/she executed the same.

DATED: _Dec. 10, 2010_

                                        _Shenna Lively_
                                               Notary Public
              _February 29, 2012_
                                                 My Commission Expires

```
SHENNA R. LIVELY
Notary Public, State of Texas
My Commission Expires
February 29, 2012
```