American Arbitration Association
Dallas, Texas

-------------------------------------------------------X

Tricon Energy, Ltd.,                                    :

             Claimant,                     :

     - against -                                  :        Case No. 70 198Y 00168 09

Vinmar International, Ltd.,                              :

           Respondent.              :

-------------------------------------------------------X

### TRICON ENERGY, LTD.'S
### PRE-HEARING BRIEF

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and the December 2, 2009 Scheduling Order (as revised on March 31, 2010) that governs this arbitration, claimant Tricon Energy Ltd. ("Tricon") hereby submits its pre-hearing brief setting forth the factual and legal grounds on which Tricon bases its claim for breach of contract against Vinmar International, Ltd. ("Vinmar").

As detailed more fully below, in late July 2008, Tricon and Vinmar entered into a binding contract by which Tricon agreed to sell Vinmar 5,000 metric tons, plus or minus 5% at Tricon's option, of mixed xylene ("MX"), a petrochemical known in the industry to have a volatile price. After the contract was formed, the price of the MX began to fall precipitously and so Vinmar twice sought to sell the MX back to Tricon. When Tricon refused Vinmar's second resale attempt, Vinmar attempted to renege on the deal altogether by making a new demand that the MX originate from the U.S. That term having never been part of its contract with Vinmar, Tricon was not legally obligated to satisfy Vinmar's new demand and indeed could not have satisfied it and at the same time satisfied the other contract terms. Eventually, Vinmar materially



PLAINTIFF'S
EXHIBIT

breached the parties' contract by refusing to declare a discharge port by the date identified in the contract, and as a result, Tricon was forced to resell the MX to a third party at a loss of $1,391,672 plus interest.  Tricon now seeks recovery of these damages as well as the interest, attorneys' fees and costs to which it is contractually and statutorily entitled.

## FACTUAL BACKGROUND

This case centers on a contract for the sale of mixed xylene, a petrochemical that is known in the oil and gas industry to have a volatile price.  Accordingly, contracts for the sale of MX are executed quickly in order to capture the going market price, which can change significantly from day to day.  Tricon and Vinmar are two of the many players in the international market for MX.

On July 22, 2008, Brad Lockwood on behalf of Tricon and Rick Wilson on behalf of Vinmar entered into negotiations for Tricon's sale of 5,000 metric tons, plus or minus 5% at seller's option, of MX to Vinmar.  Consistent with industry custom and practice, the parties' negotiations were facilitated by a third-party broker, Ed Leyman of MOAB Oil, Inc. (the "Broker").  Thus, the parties did not communicate directly with each other but instead, through a series of instant messages and telephone calls, each party communicated its respective requirements to the Broker, who in turn relayed the information to the other party.

By mid-afternoon on the same day that they began negotiations, the parties reached an agreement on the material terms of their contract.  Less than two hours later, the Broker sent both parties a confirmatory memorandum memorializing the parties' contract (the "Broker's Confirmation").  The Broker's Confirmation began: "We are pleased to confirm the following transaction as per our telecon on: 7/22/2008." It then set forth the material terms of the parties' contract, including product, price, quantity, and quality, as well as payment, inspection, title, commission, and delivery terms.  With respect to the delivery terms in

{00099923.DOC; 4}

particular, the parties agreed that Vinmar would declare a discharge port no later than August 8, 2008 and Tricon would deliver the MX to Vinmar from the identified discharge port between September 1 and 15, 2008. Notably absent among the material terms set forth in the Broker's Confirmation was any guarantee as to the origin of the product. The Broker's Confirmation concluded: "If there is anything outlined contrary to your understanding of our agreement, please notify us immediately by facsimile. Many thanks for allowing us, as brokers, to arrange this transaction for you."

Shortly thereafter, Vinmar requested to change the payment terms from 30 days after the bill of lading date to an on-site letter of credit. After Tricon agreed to this change, the Broker sent out an "Amended Contract" reflecting the amended payment terms. This revised contract similarly concluded: "If there is anything outlined contrary to your understanding of our agreement, please notify us immediately by facsimile. Many thanks for allowing us, as brokers, to arrange this transaction for you."

Consistent with this provision, Tricon immediately notified the Broker that the Broker's Confirmation and Amended Contract contained a typo regarding the agreed-upon price. Thus, the next morning the Broker sent both parties an amended confirmatory memorandum that was identical to the original except that it identified the correct price (the "Amended Broker's Confirmation"). The Amended Broker's Confirmation concluded: "If there is anything outlined contrary to your understanding of our agreement, please notify us immediately by facsimile. Many thanks for allowing us, as brokers, to arrange this transaction for you." Neither Tricon nor Vinmar notified the Broker of any error in the Amended Broker's Confirmation or otherwise objected to any part of it.

{00099923.DOC; 4}

According to industry custom and practice, a contract for the sale of MX is formed no later than when the broker provides both parties a confirmation setting forth the material terms of the contract and neither party objects to it.

On July 23, 2008, shortly after receiving the Amended Broker's Confirmation, Tricon sent Vinmar a letter "confirm[ing] this agreement between Brad Lockwood of Tricon Energy, Ltd. (Seller) and Rick Wilson of Vinmar International, LTD (Buyer) on July 22, 2008" (the "Tricon Letter"). The Tricon Letter did not conflict with any part of the Amended Broker's Confirmation. Rather, it merely repeated the same material terms as those set forth in the Amended Broker's Confirmation and otherwise proposed additional terms regarding matters such as interest on nonpayment, invoicing, and taxes, as well as a choice-of-law provision selecting the application of Texas law to govern any disputes that might arise and a clause requiring all such disputes to be resolved in arbitration. Like the Broker's Confirmation and the Amended Broker's Confirmation, the Tricon Letter did not include any provision regarding product origin.

The same day as it received the Amended Broker's Confirmation and the Tricon Letter, Vinmar acknowledged that it had an enforceable contract with Tricon when it attempted to sell the 5,000 metric tons of MX it had just purchased back to Tricon. Specifically, the Broker asked Tricon via instant message whether it would "have any interest in buying back the 5kt mx u sold to vinmar." Notably, in the one day that had passed since Vinmar's purchase of the MX and its resale offer, the market price of MX had dropped significantly. Tricon rejected Vinmar's resale offer.

One day later, Mr. Wilson notified his colleague at Vinmar, Laurentiu Pascu, that he had "bough[t] MX from Tricon" and asked Mr. Pascu to "please contact them [Tricon] and make

4

necessary arrangements." Later that same day, another colleague at Vinmar, Eduardo Anaya, informed Messrs. Pascu and Wilson that he would "do the follow up from the logistics point of view of this operation." Mr. Anaya told Mr. Wilson that "[t]o complete order we just need the port of origin of this product," to which Mr. Wilson responded, "Re Origin, We wont [sic] know until we declare discharge port. Most likely USG [U.S. Gulf Coast]." Mr. Anaya replied: "Ok, that is what we wrote on the PO."

The purchase order to which Mr. Anaya was referring was P.O. 4529980 dated July 24, 2008 (the "Vinmar P.O.").[1] The Vinmar P.O. began: "We are pleased to acknowledge the following purchase transaction" for the sale of 5,000 metric tons of MX from Tricon to Vinmar. The Vinmar P.O. then repeated the same material terms as those set forth in the Amended Broker's Confirmation and the Tricon Letter. Notably, the Vinmar P.O. included a section for designating product "ORIGIN," but Vinmar left that section blank.

Pursuant to Mr. Wilson's direction to Mr. Pascu to "please contact [Tricon] and make necessary arrangements," on July 29, 2008, Mr. Pascu sent Tricon an email setting forth Vinmar's "comments" to the additional terms proposed by Tricon in the Tricon Letter, which Vinmar referred to as the "Sale Confirmation." Those comments consisted of a few handwritten notes proposing minor changes to the overall transaction, as well as a handwritten reference to "4529980," the Vinmar P.O. number. Other than these minor edits, Vinmar did not object to any of the proposed terms and promised to "revert soon with our Purchase Order for your review."

Only a few hours later, Tricon responded by email to Vinmar's "comments." Specifically, Tricon rejected Vinmar's request to change the demurrage time bar from 90 to

[1] Although the Vinmar P.O. is relevant to Vinmar's understanding of the terms of the parties' contract, Vinmar did not subsequently send the Vinmar P.O. to Tricon and so the Vinmar P.O. is not part of the contract documentation.

{00099923.DOC; 4}

60 days since 90 days is the industry standard. In all other respects, however, Tricon noted that "[y]our comments on the contract [are] well noted and accepted. . . ." Tricon concluded its email by reminding Vinmar of its contractual obligation, as set forth in both the Amended Broker's Confirmation and the Tricon Letter, to declare a discharge port by August 8, 2008.

Tricon next heard from Vinmar two days later when Vinmar again asked to resell to Tricon the MX it had just purchased from Tricon. Specifically, in a July 31, 2008 instant message sent from Vinmar's Rick Wilson directly to Tricon's Brad Lockwood, Vinmar offered to sell back the MX it had bought from Tricon and thereby "wipe the slate clean." Notably, in the time that had passed since Vinmar's purchase of the MX and its second resale offer, the market price of MX had dropped approximately $100 per metric ton. As before, Tricon rejected Vinmar's resale offer.

Only a few hours after Tricon rejected Vinmar's second resale attempt, Vinmar *for the first time* demanded a guarantee that the MX it had purchased from Tricon be USA origin. In a response sent the same day, Tricon reminded Vinmar that it had never made any guarantee with respect to origin and, in any event, that it could not as a practical matter guarantee USA origin and at the same time satisfy the material delivery terms set forth in the Amended Broker's Confirmation and repeated in the Tricon Letter.

Six days then passed during which Tricon did not hear from Vinmar. Finally, on August 6, 2008, Vinmar, through the Broker, sent Tricon an email (with copy to Vinmar's General Counsel) reiterating its new demand for a guarantee of USA origin. In its email, Vinmar also asserted for the first time that the parties did not have a deal. Vinmar did not attempt to square its new position with its earlier resale attempts and execution of a purchase order, all of which evidenced Vinmar's understanding that the deal had in fact long ago been finalized.

{00099923.DOC; 4}

Pursuant to the Amended Broker's Confirmation and the Tricon Letter, Vinmar was required to declare a discharge port on August 8, 2008. By late afternoon that day, however, Vinmar still had not declared a discharge port and so Tricon sent an email reminding Vinmar of its contractual obligation. Tricon also informed Vinmar that if it did not make its declaration by the end of the day, Tricon would hold Vinmar in breach of contract and reserve the right to resell the product on the open market. Although Vinmar acknowledged receipt of Tricon's email, it refused to declare a discharge port and instead continued to assert that the parties did not have a contract.

Accordingly, Tricon attempted to find another buyer for the MX it had sold Vinmar. No buyer materialized, however, due to the steadily declining price of MX. On August 11, 2008, three days after Vinmar breached the contract by failing to declare a discharge port, Tricon decided to use the product to satisfy an existing contract it had with a third party, KP Chemicals. Under this contract, Tricon was obligated to deliver 4,998.995 metric tons of the MX to KP Chemicals for the weekly average of the daily price postings during the month of September. This amount ended up being $995.50 per metric ton. Because the price of MX continued to drop, however, KP Chemicals subsequently requested, and Tricon agreed, to reduce the amount of MX KP Chemicals was obligated to purchase to 3,230 metric tons.[2] Due to the ongoing price decline, Tricon was unable to sell the remaining MX in that same time period, causing it to suffer a further loss for the additional 2,020 metric tons.[3]

Thus, as a result of Vinmar's breach, Tricon suffered a loss of $1,015,835, the amount of

---

[2] Tricon agreed to the reduction as a concession to a party with whom it frequently does business. KP's request for this accommodation highlights the extreme difficulty of finding any buyers for MX during this time of precipitous decline in price.
[3] The Amended Broker's Confirmation obligated Vinmar to purchase "5,000 MT plus/minus five percent, seller's option." Similarly, the Tricon Letter referred to "5,000 Metric Tons +/- 5% (Vessel's Option)." Given the favorable price of the Vinmar contract relative to the steadily falling market price of MX, Tricon undoubtedly would have exercised its contractual right to sell Vinmar the full 5,250 metric tons.

{00099923.DOC; 4}

the difference between the price under the contract with Vinmar and the resale price under the contract with KP Chemicals, for the 3,230 metric tons of MX that it ultimately sold. Additionally, Tricon suffered a loss of $375,837 for the remaining 2,020 metric tons of MX that Tricon was unable to sell, the difference between the price at which it contracted to sell MX to Vinmar and the market price of the MX at the time and place of tender to Vinmar. In the alternative, Tricon suffered a loss of $976,803, the difference between the price at which it contracted to sell MX to Vinmar and the market price of the MX at the time and place of tender to Vinmar for the entire 5,250 metric tons. Finally, by Vinmar's breach, Tricon became entitled to recover interest on its damages as provided by the parties' contract, as well as its attorneys' fees and costs as provided by both the parties' contract and TEX. CIV. PRAC. REM. CODE § 38.001.

LEGAL ANALYSIS

According to the parties' contract, the legal issues in this case are to be determined in accordance with Texas law. Specifically, the parties agreed:

> This contract and the rights and duties of the parties arising out of this contract shall be governed by and construed, enforced, and performed in accordance with the laws of the state of Texas, including, without limitation, the Uniform Commercial Code as in effect in the state of Texas, as the same may be amended from time to time, without regard to principles of conflicts of Law. The parties agree that this agreement shall be accepted and formed in the state of Texas according to the procedures herein set forth.

Accordingly, the Texas Uniform Commercial Code ("Texas U.C.C.") governs this dispute.

I.   **The Parties Had an Enforceable Contract that Satisfied the Statute of Frauds**

A.   The parties had an enforceable contract no later than July 23, 2008.

As an initial matter, the parties formed a contract no later than July 23, 2008, the date the Broker sent each of the parties a copy of the Amended Broker's Confirmation.

As recognized by Texas courts, the Texas U.C.C. represents a practical approach to

{00099923.DOC; 4}

contract formation that reflects how parties deal with each other in the real world. *See, e.g., Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 198 (Tex. App.–Austin 1992, no writ) ("One policy goal of the UCC is to liberalize the formation of contracts so that the parties' intentions are not frustrated by the difficulties of fitting a transaction into the traditional common-law model of offer and acceptance."). This practical approach is reflected in TEX. BUS. & COM. CODE § 2.204(a), which provides that a contract for the sale of goods "may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *See also* TEX. BUS. & COM. CODE § 2.207(c) ("Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale . . . ."). Further, Section 2.204 provides that a contract is enforceable even if the precise "moment of its making" is undetermined and even if it leaves open one or more terms so long as there is a "reasonably certain basis for giving an appropriate remedy." *Id.* § 2.204(b)-(c).

In *Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*, 992 F. Supp. 913 (S.D. Tex. 1998), the District Court for the Southern District of Texas applied these provisions of the Texas U.C.C. in a case remarkably similar to the instant dispute. There, following a series of negotiations brokered by Gasteam USA, defendant Hydro agreed to sell 10,000 barrels of propane to plaintiff Statoil for future delivery in February. *Id.* at 914. After another set of negotiations also brokered by Gasteam, the parties later agreed to trade February propane deliveries. *Id.* Following the conclusion of each deal, the broker telephoned the parties and sent each of them a confirming fax, which began "Further to recent conversations, we are pleased to confirm the following transaction . . . ." and set forth material terms regarding quality, quantity, delivery, price and payment. *Id.* When the time

9

{00099923.DOC; 4}

came for Hydro's performance of the first deal, however, the price of propane had dropped, and so even though Hydro had never objected to either fax, it repudiated both contracts on grounds that the faxes were mere offers. *Id.* Relying on Section 2.204(a), the court held that "[t]he only reasonable interpretation of the facts is that contracts were formed. Gasteam conveyed Statoil's offers to Hydro and Hydro's acceptance to Statoil. It then confirmed the transactions by telephone and fax. That is simple contract formation—offer and acceptance—occurring through a broker and documented in faxes." *Id.* at 915. Moreover, even if the faxes were mere offers, the court noted, Hydro did not object to them and thereby accepted them, as "Hydro's silence in the face of 'confirming telefaxes' is acceptance." *Id.* The court thus concluded that Hydro breached the contracts by refusing to perform under them. *Id.*

Similarly, here, the parties negotiated a contract for the sale of MX via a broker, who on July 22, 2008, the same date that the parties entered the contract, memorialized it by faxing both parties a memorandum "confirm[ing] the . . . . transaction as per our telecom on: 7/22/2008" and setting forth a number of the material terms of the parties' contract, including product, price, quantity, and quality, as well as payment, inspection, title, commission, and delivery terms. Although the memorandum contained a typo as to price, the parties notified the Broker of the error, and he corrected it in the Amended Broker's Confirmation that he faxed both parties the next day. As in *Den Norke*, these facts demonstrate "simple contract formation—offer and acceptance—occurring through a broker and documented in faxes." Because Vinmar never objected to the Amended Broker's Confirmation, the parties had an enforceable contract no later than July 23, 2008, the date that Vinmar received it.

{0009 9923.DOC; 4}

Indeed, Vinmar's own conduct demonstrated its understanding that the parties had an enforceable contract as of July 23, 2008. Specifically, on that day, Vinmar asked Tricon to buy back the very MX that Vinmar had just purchased from Tricon. Simply put, Vinmar would not have attempted to sell the product unless it believed that it was already the rightful owner of it. Further, only one day later, Rick Wilson, who had negotiated the purchase on behalf of Vinmar, acknowledged to a colleague that he had "bough[t] MX from Tricon," and also that day Vinmar executed a purchase order recognizing the parties' contract. *Accord Crest Ridge Constr. Group, Inc. v. Newcourt Inc.*, 78 F.3d 146, 150 (5th Cir. 1996) (finding that parties had a valid contract for the sale of wall paneling following their exchange of a price quotation and purchase order, as confirmed by the fact that the parties subsequently engaged in extensive discussions concerning the details of the project). Given these facts, it is clear that Vinmar's later claim that no such contract had been formed was merely a pretext for avoiding that contract when it became less profitable to Vinmar.

Finally, the Tricon Letter does nothing to alter the conclusion that the parties' contract was formed no later than July 23, 2008, because the Tricon Letter merely proposed terms to add to the parties' already-formed contract. Indeed, there is an entire section of the Texas U.C.C. devoted to just this type of situation where the parties have an agreement although they might later dicker over certain terms. *See* TEX. BUS. & COM. CODE § 2.207.[4]

---

[4] "Additional Terms in Acceptance or Confirmation. (a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms. (b) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (1) the offer expressly limits acceptance to the terms of the offer; (2) they materially alter it; or (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received. (c) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title."

{00099923.DOC; 4}

The Tricon Letter in no way conflicted with the material terms set forth in the Amended Broker's Agreement but rather repeated those terms and otherwise proposed additional terms regarding matters such as invoicing and taxes. As such, the parties' contract date is unaffected by the Tricon Letter.

Moreover, most of the additional terms became part of the parties' agreement when Vinmar returned the letter to Tricon with objections only to a few minor items. It was unnecessary for Vinmar to explicitly manifest its assent to all of the terms in the Tricon Letter for them to become part of the contract. Under Texas law, in a contract between merchants, additional terms in a proposal "become part of the contract unless: (1) the offer expressly limits acceptance to the terms of the offer; (2) they materially alter it; or (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." TEX. BUS. & COM. CODE § 2.207(b). Thus, Vinmar's silence regarding certain terms is construed as acceptance. *See id.* cmt. 6 ("If no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to."); *see also Westech Eng'g*, 835 S.W.2d at 201 ("[W]hen WesTech signed the purchase agreement it consented to Clearwater's 'filled-in' terms unless Wright specifically excepted to them in his letter [setting forth objections to certain additional terms]."); *Ceco Corp. v. Steves Sash & Door Co., Inc.*, 714 S.W.2d 322, 327 (Tex. App.—San Antonio 1986), *mod'd and rev'd in part on other grounds by*, 751 S.W.3d 473 (Tex. 1988) ("Since the purchase order was Ceco's confirmation of the prior agreement, it contained no objection to additional terms proposed by Steves. Under . . . § 2.207(b) the 'no charge-back' term would become part of the contract.").

{00099923.DOC; 4}

B.    <u>In the alternative, the parties had an enforceable contract no later than July 29, 2008.</u>

Under industry custom and applicable Texas law, the parties' contract was memorialized in the Amended Broker's Confirmation, and the Tricon Letter merely proposed additional terms to the contract. *See, e.g.*, TEX. BUS. & COM. CODE § 2.207(b). To the extent the Tricon Letter stated that it "set[] forth the entire agreement of the parties" and "cancel[ed] and supersede[d]" related broker correspondence, at least one Texas court disregarded almost identical language in a subsequent writing in holding that the parties had formed a contract prior to that writing's circulation. *See Axelson, Inc. v. McEvoy-Willis*, 7 F.3d 1230, 1231-33 (5th Cir. 1993) (finding that contract was formed prior to circulation of a purchase order purporting to be the parties' "entire contract" and limiting acceptance to only its terms).

Even if the Tricon Letter could be construed to negate the Amended Broker's Confirmation and the parties' conduct evidencing their understanding that they had a contract no later than its receipt, however, the parties still had an enforceable contract no later than July 29, 2008. Applying TEX. BUS. & COM. CODE § 2.207(a), which states that a party may accept an offer and thereby form a contract even if the acceptance states terms additional to or different from those offered or agreed upon, the Tricon Letter would be construed as the offer and Vinmar's July 29, 2008 email agreeing to all but one of the terms set forth in the Tricon Letter would be construed as the acceptance.[5] To the extent Vinmar's July 29, 2008 email proposed any changes to the terms of the Tricon Letter, those proposed changes are relevant only in identifying the final terms of the contract under TEX. BUS. & COM. CODE § 2.207(b). They do not alter the conclusion that a contract already had been formed. *See*

---

[5] The one term on which the parties did not agree concerned the demurrage time bar, which is not at issue in this

{00099923.DOC; 4}

*Westech Eng'g*, 835 S.W.2d at 198-99 (finding that a contract had been formed, at the latest, when the plaintiff sent its purchase agreement to the defendant, and to the extent that any terms in the purchase agreement were new or different from those in the parties' previously exchanged documents, those terms were merely proposed additions to the parties' already-existing contract); *see also Tri-State Petroleum Corp. v. Saber Energy, Inc.*, 845 F.2d 575, 578 (5th Cir. 1988) (where a written contract sent by the first party is returned by the second party, but altered by additional or different terms, § 2.207(a) allows the return of the contract to act as acceptance of the offer with the alterations as proposals for additions to the contract).

Indeed, Vinmar's own conduct again demonstrated its understanding that the parties had an enforceable contract by July 29, 2008. Only two days later, Vinmar once again offered to sell back the MX it had bought from Tricon and thereby "wipe the slate clean." Of course, there would be no slate to "wipe clean" by a resale unless Vinmar actually believed that it owned the product it sought to resell. *Accord Crest Ridge*, 78 F.3d at 150.

Finally, the fact that neither party's signature appears in that signature block contained in Tricon's Letter does not alter the conclusion that Vinmar entered into a binding contract as to all of the terms of the Tricon Letter on which the parties agreed. *Accord Gilmore v. Transit Grain & Comm'n Co.*, 213 S.W.2d 880, 881-82 (Tex. Civ. App.–Fort Worth 1944, no writ) (finding an enforceable contract based on the written confirmation sent by the plaintiff to the defendant notwithstanding the fact that the defendant did not sign the accompanying transmittal letter, as requested by the plaintiff). It also is consistent with industry custom and practice that the purchase confirmations for "spot buys" generally are not signed. In any event, Vinmar effectively "signed" the Tricon Letter when it emailed its acceptance of it to Tricon on July 29, 2008. *See* TEX. BUS. & COM. CODE § 1.201(b)(37)

---

arbitration.

{00099923.DOC; 4}

(defining "signed" broadly as "using any symbol executed or adopted with present intention to adopt or accept a writing"); *see also id.* cmt. 37 ("[A]s the term 'signed' is used in the Uniform Commercial Code, a complete signature is not necessary. The symbol may be printed, stamped or written; it may be by initials or by thumbprint. It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead."). Thus, at the very latest, the parties had an enforceable contract by July 29, 2008.

  C.  <u>The statute of frauds is satisfied</u>.

   Both the Amended Broker's Confirmation and the Tricon Letter satisfy the Statute of Frauds. TEX. BUS. & COM. CODE § 2.201(a) provides that the statute of frauds is satisfied if the writing is a "contract for sale" that is "signed by the party against whom enforcement is sought or by his authorized agent or broker." The writing "need not contain all the material terms of the contract" to satisfy the statute of frauds and those material terms that are stated do not even need to be correctly stated so long as the writing sets forth the quantity of the goods at issue. TEX. BUS. & COM. CODE § 2.201(a); *see also id.* cmt. 1.

   Here, if the relevant writing is the Amended Broker's Confirmation, it easily satisfies the requirements of § 2.201(a). As explained in Part I(A), *supra*, the Amended Broker's Confirmation is a contract for sale, and it both identifies the quantity of MX to be sold and was signed by Vinmar's "authorized agent or broker." *See Den Norske*, 992 F. Supp. at 915 (holding that a broker's facsimile transmissions to each party confirming the terms of their contract satisfied § 2.201(a) because the broker "acted with the authority of both parties" and "[t]he statute of frauds requires nothing more" than that the broker send "signed, confirming faxes to the parties"); *see also* TEX. BUS. & COM. CODE § 1.201(b)(37); *id.* cmt. 37 (noting that a signature "may be printed, stamped or written" or found, among other places, on

{00099923.DOC; 4}

"letterhead"). Accordingly, the statute of frauds is satisfied by the Amended Broker's Confirmation and the parties had an enforceable contract as of July 23, 2008.

In the alternative, the statute of frauds is satisfied by the Tricon Letter and Vinmar's July 29, 2008 email accepting it, and the parties had an enforceable contract as of July 29, 2008. In particular, the Tricon Letter identifies the quantity of goods to be sold and, as explained in Part I(B), *supra*, the Tricon Letter and Vinmar's July 29, 2008 email accepting it together constitute a contract for sale. Moreover, Vinmar's email qualifies as a signed writing under § 2.201(a). *See* TEX. BUS. & COM. CODE § 1.201(b)(37); *id.* cmt. 37. Thus, the statute of frauds is satisfied by Vinmar's July 29, 2008 email accepting all but one of the terms of the Tricon Letter, and the parties had an enforceable contract at the very latest as of July 29, 2008.

D.   The parties agreed to arbitrate all disputes.

The additional terms proposed by Tricon in the Tricon Letter and agreed to by Vinmar included the parties' agreement to arbitrate any and all disputes that might arise from their contract. In particular, the parties agreed: "Any and all differences and disputes of whatsoever nature arising out of this Agreement shall be put to arbitration in Houston, Texas, in English pursuant to the laws relating to arbitration there in force, and, to the extent not inconsistent with this Agreement, the Commercial Arbitration Rules of the American Arbitration Association, or under the rules of such other arbitration association as the parties may mutually agree, before a board of three persons, consisting of one arbitrator to be appointed by Seller, one by Buyer and one by the two so chosen." Notably, the Vinmar P.O. included a similar arbitration provision, stating that "[a]ll disputes arising in connection with the present contract shall be finally settled under the Rules of Conciliation and Arbitration of the American Arbitration Association and by one or more arbitrators appointed in accordance with the said rules."

16                                                    {00099923.DOC; 4}

Although Vinmar did not subsequently send the Vinmar P.O. to Tricon and it is not part of the contract documentation, it plainly is relevant to Vinmar's understanding of the terms of the parties' contract, including their agreement to arbitrate. Thus, this dispute is properly before this Honorable Tribunal.

## II.    The Parties' Contract did not Include a Guarantee of U.S. Origin

The parties' contract, whether formed on July 23 or July 29, 2008, did not include any guarantee of U.S. origin. TEX. BUS. & COM. CODE § 2.207(b) provides that, once a contract is formed, a proposed additional term or change to an agreed-upon term does not become part of the contract if, *inter alia*, (1) a party objects to it within a reasonable time or (2) it materially alters the contract.

Here, Vinmar did not propose a new USA-origin guarantee until July 31, 2008, which was after the parties' contract had been formed under both of the alternative formation dates set out above. Thus, Vinmar's proposed new term did not become a part of the contract if Tricon timely objected to it or it materially altered the contract. *See* TEX. BUS. & COM. CODE § 2.207(b). Vinmar's proposal failed for both reasons. First, Tricon unequivocally objected to Vinmar's proposal within hours of hearing about it. Second, as Tricon explained to Vinmar at the time, Tricon could not as a practical matter guarantee USA origin and at the same time satisfy the material delivery terms upon which the parties had agreed. Thus, if the guarantee was included in the contract, it would materially alter the contract, in violation of TEX. BUS. & COM. CODE § 2.207(b). Accordingly, the parties' contract did not include a guarantee of USA origin.

{00099923.DOC; 4}

III.   **Vinmar Materially Breached the Contract by Failing to Declare a Discharge Port, thus Entitling Tricon to Damages, Interest and its Attorneys' Fees and Costs**

Unlike a guarantee of USA origin, the parties' contract indisputably included a discharge port declaration date of August 8, 2008.  That term was set out in both the Amended Broker's Confirmation and the Tricon Letter, and Vinmar accepted that term in its July 29, 2008 email to Tricon by operation of TEX. BUS. & COM. CODE § 2.207(b).  Because Tricon could not timely deliver the MX to Vinmar between September 1 and 15, 2008 as required by the contract without being told by August 8, 2008 where to deliver that MX, Vinmar's failure to declare a discharge port constituted a material breach of the contract, thereby entitling Tricon to damages, pre-judgment and post-judgment interest, and its attorneys' fees and costs.

A.   Tricon is entitled to damages.

According to TEX. BUS. & COM. CODE § 2.703, where a buyer "wrongfully rejects or revokes acceptance of goods . . . or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract [], then also with respect to the whole undelivered balance, the aggrieved seller may," *inter alia*, "resell and recover damages as hereafter provided (Section 2.706) [or] recover damages for non-acceptance (Section 2.708). . . ."  Under Section 2.706, a seller may resell the rejected or repudiated goods in a private sale, including sale by way of "identification to an existing contract of the seller." TEX. BUS. & COM. CODE § 2.706(b).  In so doing, "it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach" so long as the resale is done "in good faith and in a commercially reasonable manner" and the seller has given the buyer reasonable notice of his intention to resell. *Id.* § 2.706 (b)-(c), cmt. 2.  When a seller has satisfied these resale requirements, he may recover in damages the difference between the resale price and the contract price plus any incidental damages. *Id.* § 2.706(a).

{00099923.DOC; 4}

Here, Tricon satisfied each of the resale requirements of Section 2.706. First, on August 8, 2008, Tricon clearly and specifically informed Vinmar in writing that if Vinmar did not declare a discharge port for the MX it had purchased, Tricon reserved the right to resell the product on the open market and would hold Vinmar liable for any losses. Thus, Tricon gave Vinmar "reasonable notice of [its] intention to resell" in satisfaction of Section 2.706(c). Tricon also resold the MX in good faith and in a commercially reasonable manner. Specifically, Tricon tried in good faith to find another buyer for the MX it had sold Vinmar. However, the price of MX was steadily dropping and so, as is typically the case with a commodity losing value, no buyer materialized. Rather than do nothing and let the price continued to decline, Tricon prudently accounted for the rejected MX by using it to satisfy an existing contract for MX it had with third party KP Chemicals, as is specifically allowed by Section 2.706. See id. § 2.706(b) (resale may be made by "identification to an existing contract of the seller."). Thus, Tricon contracted to sell KP Chemicals 4,998.995 metric tons of MX having similar quality specifications as that identified in the Vinmar contract, thereby sufficiently identifying the rejected MX to the KP Chemicals contract. When the price of MX continued to drop precipitously, Tricon agreed to KP Chemical's request to reduce the amount of MX that KP Chemicals was obligated to purchase to 3,230 metric tons as a concession to a longstanding business partner. Because of the ongoing price decline, there were no available buyers willing to purchase the remaining 2,020 metric tons. The price at which Tricon sold the MX to KP Chemicals – the weekly average of the daily price postings during the month of September, which turned out to be $995.50 per metric ton – was reasonable given that a monthly price average would soften any major price swings that might occur during the course of that month. Moreover, Tricon could not have known at that time whether the price of MX would

19

{00099923.DOC; 4}

increase or continue to decline. It was entirely possible that the price could have ended up being *higher* than the price at which Tricon contracted with Vinmar. Calculating damages in accordance with TEX. BUS. & COM. CODE § 2.706, then, Tricon suffered a loss in the amount of $1,015,835 for the 3,230 metric tons that Tricon sold to KP Chemicals.

Because the market for MX continued to be extremely weak, Tricon was unable to sell the remaining 2,020 metric tons in a timely manner. Thus, Tricon's remaining damages should be calculated in accordance with TEX. BUS. & COM. CODE § 2.708. *See* TEX. BUS. & COM. CODE § 2.706 cmt. 2 (noting that a seller may recover under Section 2.708 if Section 2.706 damages are unavailable to him); *see also Serna, Inc. v. Harman*, 742 F.2d 186 (5th Cir. 1984) (combining § 2.706 damages for portion of good aggrieved seller resold with § 2.708 damages for goods the seller retained). Pursuant to this provision, Tricon is entitled to recover from Vinmar the difference between the price under the contract with Vinmar and the market price of the MX at "the time and place for tender." TEX. BUS. & COM. CODE § 2.708(a). According to the comments to Section 2.708, the time and place for tender is determined by reference to Section 2.503, as well as the other Texas U.C.C. provisions regarding international sales terms developed by the International Chamber of Commerce, known as "Incoterms," such as "F.O.B." *Id*. cmt. 1.

Section 2.503 provides that "[t]ender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." *See* TEX. BUS. & COM. CODE § 2.503(a). "[S]uch performance by the tendering party . . . puts the other party in default if he fails to proceed in some manner." *Id*. cmt. 1. The manner, time and place for tender are determined in accordance with the contract at issue as supplemented by the provisions of Chapter 2. *See id*. § 2.503(a).

{00099923.DOC; 4}

Here, the contract required Tricon to make 5,000 metric tons, plus or minus 5% at Tricon's option, of MX available to Vinmar on a "C.F.R. Ulsan/Taiwan" basis. As defined by Incoterms 2000, which controlled the contract,[6] "C.F.R." is shorthand for "Cost and Freight" and means that the seller delivers when the goods at issue pass the ship's rail at the port of shipment.[7] Thus, for purposes of Section 2.708, the time and place of tender here is the date that Tricon would have loaded the MX for Vinmar at the port of shipment, which would have been either Ulsan, South Korea or Taiwan, depending on the discharge port that Vinmar identified. Because Vinmar was not required to identify the discharge port until the close of business on Friday, August 8, 2008, the earliest date that Tricon would have been able to load the MX for Vinmar would have been Monday, August 11, 2008, although for logistical reasons the loading probably would not have occurred until later that week. The latest Tricon could have loaded the MX would have been September 15, 2008. Thus, using the average daily price of MX in both Ulsan and Taiwan during this time period, or $1,123.942 per metric ton, under Section 2.708, Tricon suffered an additional loss in the amount of $375,837 for the 2,020 metric tons it was unable to sell.

In the alternative, if for some reason this Tribunal finds that Tricon did not satisfy all the prerequisites of Section 2.706 as to the 3,230 metric tons sold to KP Chemicals, Tricon's

---

[6] The Broker's Confirmation and Amended Broker's Confirmation provided for delivery on a "CFR basis one safe berth/port major ports Taiwan or Ulsan Korea, at buyer's option," the Tricon Letter provided for "Incoterm: CFR Ulsan/Taiwan," and paragraph 5 of the Tricon Letter stated that "[a]ny situations not specifically addressed by this confirmation will be governed by Incoterms 2000 or latest published Incoterms (to the extent applicable) as in effect at the time of this agreement is entered into." (Exs. A-F, A ¶ 5) Because Incoterms 2000 was in effect in 2008 when the contract was entered into, see http://www.iccwbo.org/incoterms/id3042/index.html, Incoterms 2000 governs the contract.

[7] See, e.g., http://www.iccwbo.org/incoterms/id3038/index.html; B.P. Oil Int'l, Ltd. v. Empresa Estatal Petoleos de Ecuador, 332 F.3d 333, 338 (5th Cir. 2003). This meaning is also consistent with paragraph 7 of the Tricon Letter, which provides that risk of damage and loss would pass to Vinmar "at the flange connection" between the ship and the loading hose at the loading terminal. Further, it is consistent with the definition of "C.I.F." provided in the Texas U.C.C., which requires the seller to deliver the goods into the possession of a carrier at the port of shipment and further provides that "[d]elivery to the carrier is delivery to the buyer for purposes of risk and 'title.'" See TEX. BUS. & COM. CODE § 2.320(b) & cmt. 1; see also China North Chem. Indus. Corp. v. Beston Chem. Corp., 2006 WL 295395, at *6 (S.D. Tex. Feb. 7, 2006) (noting that the Incoterms "C.I.F." and "C.F.R." are virtually identical).

{00099923.DOC; 4}

damages as to all 5,250 metric tons should be calculated in accordance with TEX. BUS. & COM. CODE § 2.708. *See* TEX. BUS. & COM. CODE § 2.706 cmt. 2 ("Failure to act properly under this section deprives the seller of the measure of damages here provided and relegates him to that provided in Section 2-708."); *see also Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 139 (Tex. App.—Houston 14th Dist.] 2000, pet. dism'd) ("[F]ailure to comply with the procedural provisions of [section 2.706] still leaves the seller its remedy under UCC section 2.708."). Thus, using the average daily price of MX during the time period when Tricon could have loaded the MX, or $1,123.942 per metric ton, under Section 2.708, Tricon suffered $976,803 in damages.

     B.    <u>Tricon is entitled to interest.</u>

In addition to its damages under TEX. BUS. & COM. CODE §§ 2.706 and 2.708, Tricon also is entitled to interest. One of the additional terms proposed in the Tricon Letter concerned Vinmar's agreement to pay interest in the event of Vinmar's non-payment. That provision provides:

> If the Total Price or any other amounts due by Buyer to Seller under this Contract are not paid when due, the Interest shall accrue and shall be paid on all amounts outstanding until payment in full is received by the Seller in its designated bank. Seller reserves the right to charge the maximum allowable interest as per U.S. law for all late payments. . . . In the event the Buyer fails to make payment on the due date as expressed on Tricon's invoice, the Buyer is subject to an additional interest expense calculated at 8.5% per annum, beginning on the due date listed on the invoice.

Because Vinmar accepted this provision in its July 29, 2008 email to Tricon, it became part of the parties' contract under TEX. BUS. & COM. CODE § 2.207(b). Tricon is thus entitled to interest on its damages. *See Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 123-24 (Tex. App.–Corpus Christi 1999, pet. denied).

{00099923.DOC; 4}

On Oct. 6, 2008, Tricon sent Vinmar an invoice for an amount described as "DAMAGES BASED ON VINMAR'S REPUDIATION OF OUR SALES CONTRACT." Payment on the invoice was due on Oct. 15, 2008. To date, however, Vinmar has not made any payment toward this invoice. Thus, by operation of paragraphs 11-12 of the Tricon Letter, Tricon is entitled to pre-judgment and post-judgment interest on its damages in the amount of 8.5% per annum since Oct, 15, 2008. This comes to $201,259 if Tricon's damages are calculated in accordance with Section 2.706 for the 3,230 metric tons sold to KP Chemicals and 2.708 for the remaining 2,020 metric tons, and $141,262 if Tricon's damages are calculated in accordance only with Section 2.708.[8]

C.   <u>Tricon is entitled to its attorneys' fees and costs.</u>

Finally, pursuant to Texas law, Tricon is entitled to its attorneys' fees and costs incurred in litigating this dispute. TEX. CIV. PRAC. REM. CODE §§ 38.001-38.002 allows for the recovery of reasonable attorneys' fees and costs with respect to a claim for an oral or written contract where the party is represented by an attorney and presented the claim to his opponent, and his opponent has not yet paid the amount due although it has been over 30 days since the claim was presented. Tricon is represented in this matter by George Diaz-Arrastia, an attorney at law. On March 9, 2009, Mr. Diaz-Arrastia presented Vinmar's attorney, Stephen Lee, with Tricon's claim under the contract. To date, well over 30 days since Tricon presented its claim to Vinmar, Vinmar has not tendered payment for the just amount owed. Thus, Tricon is statutorily entitled to recover both its attorneys' fees and costs incurred in litigating this dispute.

In addition to its statutory entitlement to damages, the parties' contract explicitly allows the arbitrators in this action to "grant any relief which they, or a majority of them, deem just and

---

[8] For purposes of this Prehearing Brief, interest is calculated as of June 28, 2010. Interest continues to accrue on a daily basis, and these calculations will be updated at the hearing.

{00099923.DOC; 4}

equitable and within the scope of the agreement of the parties," including costs and "a reasonable allowance for attorney's fees. . . ."  Thus, Tricon also is contractually entitled to an award of attorneys' fees.

## CONCLUSION

For the reasons stated above, Tricon respectfully requests a ruling from this Tribunal that Vinmar breached its July 23, 2008 contract with Tricon for the purchase of 5,250 metric tons of mixed xylene and an award to Tricon of its damages resulting from the breach, pre-judgment and post-judgment interest on its damages, and its attorneys' fees and costs incurred in litigating this dispute, as well as any other relief that this Tribunal deems appropriate.

Respectfully submitted,

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP

By: _____
George R. Diaz-Arrastia
Tracy D. Larson
Pennzoil Place, North Tower
700 Milam St., 10ᵗʰ Floor
Houston, Texas 77002
Tele: (713) 221-2500
Fax: (713) 228-3510
Email: gdarrastia@sdablaw.com

ATTORNEYS FOR CLAIMANT TRICON ENERGY, LTD.

Dated: June 28, 2010

{00099923.DOC; 4}