

| S c h i r r m e i s t e r | D i a z - A r r a s t i a | B r e m  l l p |

November 3, 2010

GEORGE R. DIAZ-ARRASTIA
gdarrastia@sdablaw.com
461.001

**Via Email and Hand Delivery**
Hon. Levi James Benton
Benton Massey PLLC
1001 Texas Ave., Suite 1400
Houston, TX 77002

Hon. Mark Davidson
Judge, 11th District Court
201 Caroline, 9th Floor
Houston, Texas 77002

Hon. Sharolyn Wood
8714 Hardeman Court
Houston, TX 77064

      RE:    Case No. 70 198 Y 00168 09, *Tricon Energy, Ltd. v. Vinmar Int'l Ltd.*

To the Honorable Panel:

      I write this letter to respond to Mr. Lee's November 2, 2010 letter submitted on behalf of Vinmar International, Ltd. ("Vinmar's Letter"). Vinmar's Letter addresses only whether Tricon is a "lost volume seller" entitled to recover the profit lost on the breached Vinmar contract under Section 2.708(b) of the Texas UCC. Whether Tricon is a lost volume seller is relevant only to damages under Section 2.708(b).

      First, it is important to point out that recovery of lost profit under Section 2.708(b) is a *second alternative* measure of damages for Tricon. Tricon has always maintained that its damages should be measured under Section 2.706 as "the difference between the resale price and the contract price." As an alternative, Tricon also provided evidence of its damages measured under Section 2.708(a), "the difference between the market price at the time and place of tender and the unpaid contract price." At the evidentiary hearing *Vinmar* presented evidence of the profit Tricon would have made if Vinmar had performed and the profit that Tricon made on the resale to KP Chemical. Tricon has consistently maintained that the profit that it would have made if Vinmar had performed and the profit that was made on the resale are irrelevant to Tricon's damages under either Section 2.706 or Section 2.708(a). (*See* Tr. 214:5-9). However, both at the evidentiary hearing and in its Closing Statement and Post-hearing Brief Tricon presented evidence that Tricon could have supplied both Vinmar (if Vinmar had performed) and KP Chemical (which was obligated to buy under a long term contract executed in January 2008), and argued that if the Panel is inclined to consider Vinmar's lost profit evidence, then Tricon is a lost volume seller and, as a second alternative, can recover Section 2.708(b) damages. Using

PENNZOIL PLACE - NORTH TOWER

700 Milam, 10th Floor | Houston, Texas 77002
713-221-2500 phone | 713-228-3510 fax
www.sdablaw.com

{00113978.DOC;1}



PLAINTIFF'S EXHIBIT N



Section 2.708(b) and the evidence presented by Vinmar to measure damages happens to result in the highest recovery by Tricon. Tricon could not have made this argument before the evidentiary hearing because Vinmar did not present the lost profit evidence until the evidentiary hearing.

Vinmar's suggestion that Tricon suffered no loss under any measure of damages because it may have made a profit on the resale to KP Chemical is not supported by any authority and as an economic matter makes no sense. At the time the Vinmar contract was made in July 2008, KP Chemical was already contractually obligated to buy MX from Tricon. If Vinmar had performed, Tricon would have made two profitable sales instead of just one (to KP Chemical). Under any economic or common sense perspective this is a loss. This is true whether or not Tricon is a "lost volume seller" for the purposes of Section 2.708(b).

Ample evidence was introduced at the evidentiary hearing that Tricon could have supplied both the Vinmar sale and the KP sale. On direct examination, Mr. Lockwood testified unequivocally that he would have been able to supply both Vinmar and KP Chemical:

> Q. Okay. Back in July, August, September of 2008, could Tricon have easily found enough mixed xylene to supply both the KP sale and the Vinmar sale?
>
> A. Everyone in the world wanted to sell so it would be no problem to find it.

(Tr. 106:3-7). Vinmar chose not to cross-examine Mr. Lockwood on this testimony, instead attempting to establish that Tricon ultimately profited on its replacement sale to KP Chemical.[1] *See* Tr. 207-222. On re-direct, Mr. Lockwood again testified that Tricon could have supplied both contracts:

> Q. Mr. Lockwood, first let me ask you this. The KP Chem sale, was that pursuant to a long-term contract?
>
> A. The September FOB Korea average?
>
> Q. Yes.
>
> A. Yes, it was.
>
> Q. And that was a contract where Tricon had the option to compel KP to purchase. Correct?

---

[1] As addressed in Tricon's Closing Argument and Post-Hearing Brief, the profit realized on a resale is irrelevant to the calculation of damages under the UCC. To the contrary, TEX. BUS. & COMM. CODE § 2.706 permits Tricon to recover "the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this chapter (Section 2.710), but less expenses saved in consequence of the buyer's breach." Here, the resale price of $995.50 per metric ton was significantly lower than the contract price of $1310 per metric ton. *See* Exs. J4, J5, T4.



Hon. Levi James Benton
November 3, 2010     - 3 -

> A. That's correct.
>
> Q. Okay. And I think you testified earlier that given the conditions on the market, Tricon could have easily supplied both the KP contract and the Vinmar contract?
>
> A. As many sales as I could make I could find product to cover it.
>
> Q. If Vinmar had performed on this contract, would Tricon have been able to make both the KP sale and the Vinmar sale?
>
> A. Definitely, and that's what I wanted to be able to have the opportunity to write on a piece of paper.
>
> Q. Okay. And you'll get that opportunity in a moment, but if I could approach the panel. What that means -- the board. What that means is that if Vinmar had performed on its contract Tricon would have made both the 1.878 million dollars that it made with KP and the 1.85625 that it could have made on the Vinmar sale under a potential scenario if they had performed?
>
> A. That's correct.

(Tr. 222:12-223:14). Mr. Lockwood then demonstrated that, had Vinmar performed, Tricon could have realized a total profit of $2,881,641. (Tr. 224:14-225:17; *see also* Ex. T41). Again, Vinmar chose not to cross-examine Mr. Lockwood on this issue. *See* Tr. 234:16-18.

This unrebutted and unchallenged testimony is sufficient to show both that Tricon suffered a real economic loss and that it is a lost volume seller if the section 2.708(b) measure of damages is used. In a case errantly relied upon by Vinmar, *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279 (9th Cir. 1985), the court refused to "impose rigid and complex burdens of proof" and held that the seller needs to show only that it *could have* supplied both the breaching purchaser and the resale purchaser."[2] *Id.* at 1290 (emphasis in original). It was unnecessary for the plaintiff to prove that its inventory exceeded demand. *Id.* at 1289-90. The sole case cited in Vinmar's Letter is not to the contrary. There, the court simply held that, where the product "could not have been sold *but for* [the] breach," the plaintiff was not a lost volume seller. *See In re El Paso Refinery, L.P.*, 196 B.R. 58, 66 (W.D. Tex. 1996). Indeed, the licenses at issue were "unit specific" and the plaintiff's own witness testified that "it has not and would not happen" that an additional sale could have been made. *Id.* Here, in contrast, MX is a commodity, so the MX sold to KP Chemical in the replacement sale did not necessarily consist of the same

---

[2] *Islamic Republic of Iran* is a section 2.708(b) lost volume seller case. It shows both that Tricon presented sufficient evidence to qualify as a lost volume seller and that it suffered a real economic loss.

{00113978.DOC; 1}



molecules that would have been sold to Vinmar, and Mr. Lockwood testified that both sales could have been made.

Tricon satisfied this flexible test. The testimony at the hearing established that, at the time of Vinmar's breach, there were effectively no *buyers* for MX due to the precipitously falling price, but there were many sellers. (Tr. 89:19-90:8; 101:17-23; 458:23-459:19; Ex. T18; *see also* Tr. 488-90). As discussed above, Mr. Lockwood unquestionably could have found sufficient MX to supply both contracts, as suppliers were desperate to sell.[3] Tricon's inventory records are entirely irrelevant to whether Tricon could have supplied both contracts. Tricon—a trading company—does not hold MX in inventory. (Tr. 487:25-488:1). Instead, it would have acquired MX for the two contracts from its suppliers, such as J&J Chemtrading Co. Indeed, Tricon had located MX that it would have used to supply to Vinmar absent Vinmar's breach, and notified Vinmar of this in its vessel nominations. *See* Exs. J21, J23, V11. Moreover, the price of MX had fallen to approximately $983 per metric ton by September 15, 2008, the time by which Tricon was to have supplied Vinmar. *See* Ex. T32. It is absurd to suggest Tricon could not have financed the purchase of MX from a supplier for that amount[4] when it would have been immediately reselling that MX for $1310 per metric ton.

Vinmar had the opportunity at the hearing to cross-examine Mr. Lockwood regarding whether he could have supplied both the KP Chemical and Vinmar contracts. It defies economic logic and common sense to think that Tricon could not have supplied both the KP Chemical and Vinmar contracts.

Very truly yours,

George R. Diaz-Arrastia

cc:  Stephen H. Lee
     Blake Runions

     Alyson S. DiGiuseppe
     Manager of ADR Services
     American Arbitration Association
     13455 Noel Road, Suite 1750
     Dallas, Texas 75240

---

[3] Vinmar disingenuously points to the fact that Tricon chose not to purchase the MX back from Vinmar in July 2008, due to Vinmar's unrealistic price expectations. *See* Vinmar Letter at 2 (citing Exs. J10, J12). Plainly, the fact that Tricon chose not to purchase MX from Vinmar in July is irrelevant to whether it could have found MX to supply to Vinmar by mid-September.

[4] In fact, Tricon likely could have acquired the MX even more cheaply, given the "discount" off of the published price that sellers generally must offer in a falling market. (Tr. 489:8-13).

{00113978.DOC;1}