# APPENDIX TAB I (Part 1)

## Hearing Transcript

1

AMERICAN ARBITRATION ASSOCIATION

DALLAS, TEXAS

TRICON ENERGY, LTD.,            )
                                )
          Claimant,             )
                                )         CASE NO.
     - against -                )     70 198Y 00168 09
                                )
VINMAR INTERNATIONAL, LTD., )
                                )
          Respondent.           )

TRANSCRIPT OF PROCEEDINGS

BE IT KNOWN THAT the above-entitled matter came on for
arbitration at 8:50 a.m. on the 20th day of September,
2010, at the Houston Club, 811 Rusk, 10th Floor, Travis
Room, Houston, Texas, before the Honorable Levi Benton,
Presiding, the Honorable Sharolyn Wood and the Honorable
Mark Davidson, Arbitrators, and the following
proceedings were had:

ARBITRATION HEARING - SEPTEMBER 20, 2010

2

```
 1    A P P E A R A N C E S :
 2
 3    THE PANEL OF ARBITRATORS:
          Honorable Levi Benton, Chair
 4        Honorable Sharolyn Wood
          Honorable Mark Davidson
 5
 6    FOR THE CLAIMANT, TRICON ENERGY, LTD.:
          Mr. George R. Diaz-Arrastia
 7        Ms. Tracy D. Larson
          SCHIRRMEISTER, DIAZ-ARRASTIA & BREM, LLP
 8        700 Milam, 10th Floor
          Houston, Texas  77002
 9        Tel: (713) 221-2500
          FAX: (713) 228-3510
10        gdarrastia@sdablaw.com
          tlarson@sdablaw.com
11
12    FOR THE RESPONDENT, VINMAR INTERNATIONAL, LTD.:
          Mr. Stephen H. Lee
13        Mr. R. Blake Runions
          PORTER & HEDGES, LLP
14        1000 Main Street, 36th Floor
          Houston, Texas  77002-6336
15        Tel: (713) 226-6000
          FAX: (713) 226-6286
16        slee@porterhedges.com
          brunions@porterhedges.com
17
18    ALSO PRESENT:
          Mr. Mark S. Antonvich
19        Ms. Dana Hedges
          Mr. Brad Lockwood
20        Ms. Myra Mendez
          Ms. Petrice Podlesny
21
22
23
24
25
```

3

```
 1              I N D E X
                             PAGE
 2
      Appearances........................ 2
 3
      Opening Remarks on Behalf of The Respondent..... 20
 4
      Opening Remarks on Behalf of The Claimant........ 26
 5
      Opening Remarks on Behalf of The Respondent..... 49
 6
 7    PRESENTATION ON BEHALF OF THE CLAIMANT

 8    BRAD JASON LOCKWOOD
          Direct Examination by Mr. Diaz-Arrastia..... 54
 9        Cross-Examination by Mr. Lee................ 106
          Redirect Examination by Mr. Diaz-Arrastia... 222
10    EDWARD LEYMAN (VIA VIDEOTAPE PLAYBACK)........... 238
11    VUK RAJEVAC
          Direct Examination by Mr. Diaz-Arrastia..... 288
12
      Reporter's Certificate Page...................... 310
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1                JOINT EXHIBITS
 2    NUMBER AND DESCRIPTION              PAGE
 3    Exhibit 1....................... --
          12-11-07 Contract between Tricon
          Energy and KP Chemical Corp.
          TRI 286-290
 5
 6    Exhibit 2....................... --
          7-22-08 Fax to Rick Wilson attaching
          first MOAB Confirmation
 7        VIN 21-23, Exhibit 2
      Exhibit 3....................... --
 8        7-22-08 Fax to Rick Wilson attaching
          second MOAB Confirmation
 9        VIN 19-20, Exhibit 3
10
11    Exhibit 4....................... --
          7-23-08 Fax to Rick Wilson attaching
12        third MOAB Confirmation
          VIN 17-18, Exhibit 4
13    Exhibit 5....................... --
          7-23-08 Email string between Brad
14        Lockwood and Rick Wilson, cc'ing
          others and attaching letter from
15        Tricon Energy
          TRI 6-10, Exhibit 15
16
      Exhibit 6....................... --
17        7-24-08 Email from Rick Wilson to
          Laurentiu Pascu, cc'ing Brad Lockwood,
18        attaching letter from Tricon Energy
          VIN 85-89, Exhibit 29
19
      Exhibit 7....................... --
20        7-22-08 Vinmar's SAP Data
          VIN 91-A-VIN 91-B, Exhibit 32-33
21
      Exhibit 8....................... --
22        7-25-08 Email string between Eduard
          Anaya and Rick Wilson, cc'ing others
23        VIN 90, Exhibit 31
24
25
```

5

```
 1          JOINT EXHIBITS (Continued)
 2    NUMBER AND DESCRIPTION              PAGE
 3    Exhibit 9....................... --
          7-29-08 Email from Laurentiu Pascu to
 4        Rick Wilson
          VIN 98-99, Exhibit 36
 5
      Exhibit 10...................... --
 6        7-22-08 - 7-31-08 Instant message
          communications between Brad Lockwood
 7        and Ed Leyman
          MOAB 4-14, Exhibit 1
 8
      Exhibit 11...................... --
 9        7-22-08 - 7-31-08 Instant message
          communications between Ed Leyman and
10        Rick Wilson
          MOAB 15-16, Exhibit 6, 43
11
      Exhibit 12...................... --
12        7-31-08 Instant message communications
          between Brad Lockwood and Rick Wilson
13        VIN 24, Exhibit 42
14    Exhibit 13...................... --
          7-31-08 Email from Laurentiu Pascu to
15        Rick Wilson, forwarding edits to
          letter from Tricon Energy
16        VIN 3-8, Exhibit 35
17    Exhibit 14...................... --
          7-31-08 Email from Laurentiu Pascu to
18        Rick Wilson, forwarding email from Vuk
          Rajevac
19        VIN 9-10, Exhibit 37
20    Exhibit 15...................... --
          7-31-08 Email string between Vuk
21        Rajevac, Rick Wilson and Laurentiu
          Pascu, cc'ing others
22        TRI 17-18, Exhibit 17
23    Exhibit 16...................... --
          7-31-08 E-mail from Rick Wilson to
24        Devang Mehta
          VIN 65, Exhibit 44
25
```

2  (Pages 2 to 5)

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

**6**

JOINT EXHIBITS (Continued)
NUMBER AND DESCRIPTION                          PAGE

Exhibit 17............................... --
    8-6-08 Email string between Vuk
    Rajevac, Rick Wilson and Laurentiu
    Pascu, cc'ing others
    VIN 81-82

Exhibit 18............................... --
    8-6-08 Email from Ed Leyman to Brad
    Lockwood, forwarding email from Rick
    Wilson
    TRI 21, Exhibit 9

Exhibit 19............................... --
    8-6-08 Email from Ed Leyman to Brad
    Lockwood, forwarding email from Rick
    Wilson
    MOAB 62

Exhibit 20............................... --
    8-8-08 Email from Ed Leyman to Brad
    Lockwood, forwarding email from Rick
    Wilson
    MOAB 64

Exhibit 21............................... --
    8-9-08 Email string between Brad
    Lockwood, Mark Antonvich and Vuk
    Rajevac, cc'ing others
    VIN 40-42

Exhibit 22............................... --
    8-11-08 Email from Brad Lockwood to
    individuals at KP Chemical Corp.
    TRI 291

Exhibit 23............................... --
    8-12-08 Email string between Brad
    Lockwood and Mark Antonvich, cc'ing
    others
    VIN 49-50

---

**8**

TRICON EXHIBITS (Continued)
NUMBER AND DESCRIPTION                          PAGE

Exhibit 4................................ --
    7-20-08 Contract between Tricon Energy
    and KP Chemical Corp., attaching
    average MX price for September
    TRI 36-40

Exhibit 5................................ --
    7-22-08 - 8-6-08 Instant message
    communications between Brad Lockwood
    and Ed Leyman
    TRI 43-51, Exhibit 5, 8

Exhibit 6................................ --
    7-22-08 - 7-23-08 Instant message
    communications between Brad Lockwood
    and Ed Leyman
    TRI 30-33

Exhibit 7................................ --
    7-23-08 Fax to Rick Wilson attaching
    letter from Tricon Energy
    VIN 12-16

Exhibit 8................................ --
    7-23-08 Email string between Jason
    Luoh and Rick Wilson, cc'ing others
    VIN 138-139, Exhibit 40

Exhibit 9................................ --
    7-23-08 Email string between Jason
    Luoh and Rick Wilson, cc'ing others
    VIN 140

Exhibit 10............................... --
    7-24-08 Vinmar International Purchase
    Order
    VIN 95-97, Exhibit 34

Exhibit 11............................... --
    7-24-08 Vinmar International SAP Data
    VIN 91a-91b, Exhibit 32-33

Exhibit 12............................... --
    7-24-08 Vinmar International SAP Data
    VIN 91, Exhibit 30

---

**7**

JOINT EXHIBITS (Continued)
NUMBER AND DESCRIPTION                          PAGE

Exhibit 24............................... --
    9-22-08 Contract between Tricon Energy
    and J&J Chemtrading Co.
    TRI 98-100

Exhibit 25............................... --
    10-2-08 E-mail string between Gigi Ren
    and W.S. Shim, cc'ing others
    TRI 2544-2548

Exhibit 26............................... --
    10-6-08 Email from Brad Lockwood to
    Rick Wilson and Mark Antonvich,
    attaching invoice
    TRI 41-42

Exhibit 27............................... --
    10-20-08 Commercial Invoice from
    Tricon to Lotte Bussan for sale of MX
    TRI 316-318

Exhibit 28............................... --
    11-4-08 Job Transaction Summary Report
    of Tricon Energy purchase of MX
    TRI 319-322

TRICON EXHIBITS
NUMBER AND DESCRIPTION                          PAGE

Exhibit 1................................ --
    10-23-07 MOAB Confirmation
    TRI 259

Exhibit 2................................ --
    10-23-07 MOAB Confirmation
    TRI 260

Exhibit 3................................ --
    10-29-07 MOAB Confirmation
    TRI 257

---

**9**

TRICON EXHIBITS (Continued)
NUMBER AND DESCRIPTION                          PAGE

Exhibit 13............................... --
    7-29-08 Email string between Vuk
    Rajevac and Laurentiu Pascu, attaching
    edits to letter from Tricon Energy
    VIN 27-31

Exhibit 14............................... --
    7-29-08 Email string between Rick
    Wilson and Laurentiu Pascu
    VIN 116-117, Exhibit 41

Exhibit 15............................... --
    8-4-08 Email string between Rick
    Wilson and Devang Mehta
    VIN 58

Exhibit 16............................... --
    8-6-08 Email string between Brad
    Lockwood, Ed Leyman and Rick Wilson,
    cc'ing others
    MOAB 25-26

Exhibit 17............................... --
    8-6-08 Email from Rick Wilson to
    Hemant Goradia, cc'ing others
    VIN 59, Exhibit 45

Exhibit 18............................... --
    8-7-08 Email from Rick Wilson to Mark
    Antonvich, forwarding email string
    between Rick Wilson, Vuk Rajevac and
    Laurentiu Pascu
    VIN 35-37, Exhibit 46

Exhibit 19............................... --
    8-10-08 Email string between TS Kim
    and Rick Wilson, cc'ing others
    VIN 156-158

Exhibit 20............................... --
    9-3-08 Email string among Sa Uk Chang,
    W.S. Shim and Gigi Ren, cc'ing others
    TRI 2555-2558

---

3   (Pages 6 to 9)

**10**

TRICON EXHIBITS (Continued)
NUMBER AND DESCRIPTION          PAGE

Exhibit 21............................   --
      9-3-08 Email from Brad Lockwood to
      Sa Uk Chang
      TRI 2559

Exhibit 22............................   --
      9-4-08 Email from Sa Uk Chang to Brad
      Lockwood, forwarding email from
      MJ Hwang
      TRI 2553-2554

Exhibit 23............................   --
      10-2-08 Email string between WS Shim
      and Gigi Ren, cc'ing others
      TRI 2618-2628

Exhibit 24..............................
      10-20-08 Invoices, inspection reports,
      bills of lading, and certifications
      reflecting purchase of MX by Tricon
      Energy
      TRI 303-315

Exhibit 25..............................
      10-20-08 Bill of lading and
      certificates of inspection reflecting
      transfer of MX
      TRI 2557-2584

Exhibit 26..............................
      12-1-08 MX price quotations
      TRI 35

Exhibit 27..............................
      2-10-09 MOAB Confirmation
      TRI 209

Exhibit 28..............................
      2-20-09 MOAB Confirmation
      TRI 207

Exhibit 29..............................
      3-9-09 Letter from George
      Diaz-Arrastia to Stephen Lee
      N/A

**11**

TRICON EXHIBITS (Continued)
NUMBER AND DESCRIPTION          PAGE

Exhibit 30...............................
      11-11-09 MOAB Confirmation
      TRI 186
Exhibit 31...............................
      11-25-09 MOAB Confirmation
      TRI 179
Exhibit 32...............................
      12-16-09 Email from Ben Morse to Brad
      Lockwood, attaching daily MX pricing
      TRI 58-61

Exhibit 33...............................
      6-15-10 Email string between Benjamin
      Morse and Chuck Matthews
      N/A
Exhibit 34...............................
      6-21-10 Vinmar's Responses to Tricon's
      Fourth Requests for Production
      N/A

Exhibit 35...............................
      6-21-10 Vinmar's Responses to Tricon's
      Fourth Interrogatory Requests
      N/A
Exhibit 36...............................
      7-12-10 Expert Report of Steve Simpson
      N/A
Exhibit 37...............................
      1-22-09 - 8-16-10 Tricon's Attorneys'
      Fees Invoices
      TRI 2791-2859

Exhibit 38...............................
      9-13-10 Tricon's August Attorneys'
      Fees Invoices
      TRI 2878-2885

**12**

TRICON EXHIBITS (Continued)
NUMBER AND DESCRIPTION          PAGE

Exhibit 39............................   --
      9-13-10 Amended Expert Report of Chuck
      Matthews
      N/A

Exhibit 40............................   --
      C.V. of Chuck Matthews
      N/A

Exhibit 41............................   538
      Handwritten calculations made during
      the arbitration

VINMAR EXHIBITS

NUMBER AND DESCRIPTION          PAGE

Exhibit 1...............................
      7-22-08 MOAB's Handwritten Note
      MOAB 1, Depo Ex. 7

Exhibit 2...............................
      7-22-08 Email from R. Wilson to
      N. Smith regarding MX
      VIN 118-VIN 119
Exhibit 3...............................
      7-22-08 Email from B. Lockwood to
      H. Chapa regarding Vinmar/Rick Wilson
      TRI 1-TRI 2, Depo Ex 13

Exhibit 4...............................   --
      7-24-08 Vinmar's SAP Data
      VIN 91, VIN 93-VIN 94

Exhibit 5...............................   --
      7-29-08 Email from R. Wilson to
      L. Paseu with V. Rajevac contact
      information
      VIN 116-VIN 117

**13**

VINMAR EXHIBITS (Continued)
NUMBER AND DESCRIPTION          PAGE

Exhibit 6...............................
      7-31-03 Email from D. Mehta to
      E. Leyman regarding US origin MX
      MOAB 20-MOAB 21

Exhibit 7...............................
      8-6-08 Email from R. Wilson to
      H. Goradia regarding Tricon
      Communication:  Draft to discuss
      VIN 59

Exhibit 8...............................
      8-6-08 Email from R. Wilson to
      B. Lockwood re Vinmar MX Purchase Sale
      VIN 180-VIN 181
Exhibit 9...............................
      8/25/08 Email from B. Lockwood to
      B. Lockwood regarding Yahoo
      correspondence between E. Leyman and
      B. Lockwood
      TRI 43-TRI 51

Exhibit 10...............................
      8-8-08 Email from B. Lockwood to
      M. Antonvich regarding Vinmar/Tricon
      MX Contract
      TRI 22-TRI 23

Exhibit 11...............................   --
      8-11-08 Email from B. Lockwood to
      M. Antonvich regarding vessel
      nomination
      VIN 43-VIN 48

Exhibit 12...............................   --
      8-22-08 Email from B. Lockwood to
      M. Antonvich regarding Vessel
      Nomination 5000 MT MX under Contract
      SA1230-0708HOU
      TRI 27-TRI 29

4  (Pages 10 to 13)

ARBITRATION HEARING - SEPTEMBER 20, 2010

14

```
 1          VINMAR EXHIBITS (Continued)
 2   NUMBER AND DESCRIPTION          PAGE
 3   Exhibit 13...........................  --
         7-23-08 - 9-30-08 Tricon redacted
 4       Inventory Log
         TRI 355-TRI 391
 5
     Exhibit 14...........................  --
 6       6-15-10 Letter from T. Larson to
         S. Lee re: Discovery
 7       N/A
 8   Exhibit 15...........................  --
         7-22-08 MOAB Oct. 2, 2008 invoice
 9       TRI 97
10   Exhibit 16...........................  --
         8-11-08 - 2-4-09 Lockwood/Leyman IMs
11       TRI 277-TRI 285
12   Exhibit 17...........................  --
         7-20-08 Tricon/KP Chemical Corp.
13       contract
         TRI 299-TRI 302
14
     Exhibit 18...........................  --
15       9-24-08 Email from J. Lee to
         B. Lockwood, S. Chang re Sales
16       confirmation for MX SKT in 2H October
         TRI 780-TRI 784
17
     Exhibit 19...........................  --
18       9-23-08 Email from P. Kyle to G. Ren,
         V. Rajevac, A. Bansal, B. Lockwood,
19       S. Chang regarding Ship nomination
         request
20       TRI 2549
21   Exhibit 20...........................  --
         10-20-08 Commercial Invoice from J&J
22       Chemtrading to Tricon for 3,200 MT of
         Mixed Xylene
23       TRI 2199
24
25
```

15

```
 1          VINMAR EXHIBITS (Continued)
 2   NUMBER AND DESCRIPTION          PAGE
 3   Exhibit 21...........................  --
         10-20-08 Commercial Invoice from J&J
 4       Chemtrading to Tricon for 570.042 MT
         of Mixed Xylene
 5       TRI 2203
 6   Exhibit 22...........................  --
         10-23-08 Commercial Invoice from J&J
 7       Chemtrading to Tricon for 950.010 MT
         of Mixed Xylene
 8       TRI 2204
 9   Exhibit 23...........................  --
         10-27-08 Email from W. Shim to G. Ren,
10       V. Rajevac, C. Trammell, B. Lockwood &
         S. Chang re Vessel nomination SKT MX
11       TRI 2585-TRI 2590
12   Exhibit 24...........................  --
         2-22-10 Tricon Energy, Ltd.'s
13       Objections and Responses to Vinmar
         International, Ltd.'s First Request
14       for Admissions
         N/A
15
     Exhibit 25...........................  --
16       2-22-10 Tricon Energy, Ltd.'s
         Objections and Responses to Vinmar
17       International, Ltd.'s First
         Interrogatory Requests
18       N/A
19   Exhibit 26...........................  --
         Blank July 2008 Calendar
20       N/A
21   Exhibit 27...........................  214
         Handwritten calculations made during
22       the arbitration
23   Exhibit 28...........................  219
         Handwritten calculations made during
24       the arbitration
25
```

16

```
 1          (8:50 a.m.)
 2       JUDGE BENTON:  Let's go ahead and go on
 3   the record.  We're now on the record in the arbitration
 4   matter of Tricon Energy, Limited, Claimant, versus
 5   Vinmar International, Limited, Respondent.
 6       I am Levi Benton, the panel chair, joined,
 7   of course, this morning by two other arbitrators.  To my
 8   right, Judge Sharolyn Wood, to my left, Judge Mark
 9   Davidson.
10       Before we get into other housekeeping
11   matters, Mr. Diaz-Arrastia, you are -- you represent the
12   claimant.  Why don't you announce yourself on the record
13   and tell us who's with you?
14       MR. DIAZ-ARRASTIA:  Thank you, Judge
15   Benton.  I am George Diaz-Arrastia.  I represent the
16   claimant, Tricon Energy, Limited.  With me is Tracy
17   Larson from my office, Mr. Brad Lockwood, who is the
18   representative of Tricon, and Ms. Dana Hodges and
19   Ms. Myra Mendez from my office.
20       JUDGE BENTON:  Okay.  Mr. Lee?
21       MR. LEE:  Yes, Your Honor.  And do you
22   mind if we -- okay.  I want to make sure we do it right.
23   Stephen Lee on behalf of Vinmar.
24       And I need to go ahead and make sure that
25   the record is clear.  I think we've objected to
```

17

```
 1   arbitration from the very beginning.  Our presence here
 2   is subject to and without waiver of that arbitration
 3   objection.
 4       JUDGE BENTON:  Right.
 5       MR. LEE:  I would really like to dispense
 6   with having to object all the way through if I could get
 7   the panel's acknowledgment that we've at least filed an
 8   objection and that everybody is aware of that.
 9       JUDGE BENTON:  It is so acknowledged and
10   we're going to address that in just a few minutes.
11       MR. LEE:  Thank you.  Stephen Lee.  I'm
12   lead counsel for Vinmar.  Blake Runions from my office
13   is an associate, will be helping us.  And Mark
14   Antonvich, who is the general counsel at Vinmar, is here
15   as a representative.
16       JUDGE BENTON:  Yeah.  And I'll -- whatever
17   happens following the hearing of your motion to dismiss
18   in the event that -- I'm going to say this now because I
19   might forget.  In the event that we conclude that your
20   motion to dismiss is without merit, you have a running
21   objection throughout these proceedings so that you need
22   not continue to assert it.  And you are fine with that.
23   Correct, Mr. Diaz-Arrastia?
24       MR. DIAZ-ARRASTIA:  Yes, Your Honor.
25   That's fine.
```

5  (Pages 14 to 17)

ARBITRATION HEARING - SEPTEMBER 20, 2010

18

1       JUDGE BENTON:  All right.  Just kind of --
2   I guess I'll call it housekeeping.  To give you a sense
3   of where we want to go this morning, we do want to first
4   hear argument.  And if you -- if it's your desire to put
5   on evidence, I guess we want to hear that related to the
6   motion to dismiss.
7       I don't know whether you intend to put on
8   any evidence to support your motion to dismiss, but
9   whatever time it takes for -- well, let's assume that we
10  will --
11      MR. DIAZ-ARRASTIA:  Your Honor, if I may
12  interject, it is our intention to put on evidence to
13  address the jurisdiction of this panel.  The problem
14  that we have, as we have pointed out various times, is
15  that in order for us to put on the evidence to address
16  jurisdiction really requires putting on all of the
17  evidence on the merits of the case excepting the damages
18  evidence and that's why we have believed that the
19  jurisdictional issue should be carried with the merits
20  and decided together.
21      JUDGE BENTON:  I understand that.
22      MR. DIAZ-ARRASTIA:  Now, we do have
23  argument -- and I can show you some of the documents
24  that we think are important and I'm prepared to do that
25  this morning.

19

1       JUDGE BENTON:  I understand your
2   perspective.  Let me tell you how we're going to
3   proceed.  We're going to -- inasmuch as it's their
4   motion to dismiss, we're going to give Vinmar the
5   opportunity to put on their motion to dismiss.
6       It is their motion to dismiss.  And so to
7   the extent they wish to put on evidence in support of
8   their motion to dismiss, we'll afford them the
9   opportunity to do that.  When they rest on their motion
10  to dismiss, you in turn will have the right to put on
11  evidence of -- or evidence in opposition to their motion
12  to dismiss.
13      I understand now that it may well be -- or
14  we understand now that it may well be that your desire
15  is to put on the entire case -- your entire case on the
16  merits.  We need not answer now as to liability --
17      (Brief discussion off the record.)
18      JUDGE BENTON:  Right.  The merits of the
19  case less liability.
20      On the other hand, at the conclusion of
21  the presentation -- or their presentation on their
22  motion to dismiss, you might change your mind about
23  whether or not you want to put on your entire case.  We
24  shall see.
25      MR. DIAZ-ARRASTIA:  Okay.

20

1       JUDGE BENTON:  It's almost 9:00 o'clock.
2   We would like to take a restroom break about 10:30
3   unless we have taken a break before then.  We'll
4   likely -- depending on how the day goes, we'll likely
5   break for lunch around noon and then we'll just see
6   where we are from there.
7       Judge Wood, anything you want to add?
8       Judge Davidson?
9       JUDGE DAVIDSON:  Let's go.
10      JUDGE BENTON:  Okay.  Do you want to make
11  a brief open relating to your motion to dismiss,
12  Mr. Lee, or do you just want to roll your sleeves up and
13  get going?
14      And, by the way, it's a little warm to me
15  in here.  You're welcome to remove coats at any time.
16  You need not ask our permission.
17      OPENING REMARKS ON BEHALF OF THE RESPONDENT
18      MR. LEE:  Thank you, Your Honor.  I
19  would -- I think instead of just giving you a brief
20  opening, I'm prepared to argue the motion.
21      I think the evidence that I need is
22  already before the panel.  Tricon bases its claim in
23  this case -- a breach of contract case against Vinmar
24  and their entire case is based on the argument that an
25  agreement was formed on July the 22nd, 2008.

21

1       A broker by the name of Ed Leyman -- this
2   is sort of an unusual situation in that the parties
3   never talked.  All of the communications were done
4   through a broker, a gentleman by the name of Ed Leyman,
5   MOAB Oil.  And Mr. Leyman purported to arrange a deal
6   between the parties.
7       It's our contention that he missed a
8   crucial term and that the terms didn't match and there
9   was, in fact, no mutual assent.  But importantly for the
10  motion to dismiss is the fact that Mr. Leyman claimed
11  that a contract existed between the parties.  He sent
12  out a written confirmation of that agreement and Tricon
13  bases claim on that document.
14      The request for admission responses say
15  that the -- they believe that the confirmation is a
16  binding contract.  Their pleadings, the specification of
17  claims that's before the panel says that the
18  confirmation is a binding contract.
19      The confirmation itself does not contain
20  an arbitration agreement and everybody's admitted that.
21  There is no arbitration agreement in the four corners of
22  the broker confirmation that Tricon bases its entire
23  case upon.  Texas law is clear.  If you claim that a
24  contract was formed at the time the contract is formed,
25  there -- you can't supplement that document with

6  (Pages 18 to 21)

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

22

1    additional contract claims.
2            Tricon's position is we have a
3    confirmation but then we sent a sales contract and the
4    sales contract contained an arbitration provision and so
5    we're going to supplement the confirmation with our
6    terms of the sales contract.
7            And there's a couple of big problems with
8    that. One, 2-207, which is the first argument that
9    Tricon put out there, which is the battle that forms UCC
10   provision, Texas law, there's a number of cases that we
11   cite in our motion to dismiss that say that you cannot
12   resort to Section 2-207, the battle forms section if, in
13   fact, there is already an agreement.
14           And Tricon's case is and claim is that
15   there was already an agreement that was documented by
16   the broker. They claim that that broker confirmation
17   satisfies the statute of fraud. So if they're correct
18   and that's what their case is based on, the contract
19   claim is the broker confirmation without an arbitration
20   provision.
21           In addition to that, you cannot read the
22   sales contract that Tricon sent in conjunction with the
23   broker confirmation because the sales contract itself on
24   its face says, "This document cancels and supersedes the
25   broker confirmation."

---

23

1            So if -- you can't read them together.
2    They cannot be read as a -- the sales contract as a
3    supplement to the confirmation. But the jurisdictional
4    problem that we have is Texas case law makes it clear
5    that gateway matters such as whether there is an
6    arbitration agreement or not is a matter that is
7    reserved exclusively for the Courts.
8            A Court has to make a decision, Is there a
9    contract? And if there is, is there an arbitration
10   provision? And those decisions must be made before a
11   panel has arb -- has jurisdiction to hear this claim.
12   And that's -- it goes back to the fundamental premise of
13   arbitration, which is that it's an -- it's a breach of
14   contract.
15           The parties have to agree to arbitrate and
16   you can't force arbitration upon somebody that hasn't
17   agreed to that. And so the question under Texas law --
18   and we've cited a number of cases that deal with this
19   issue, when the question is whether there is an
20   agreement in the first place. That question is for the
21   Courts to decide.
22           And even if there's an agreement, then the
23   next question is, what is -- what does the agreement
24   include? Does it include an arbitration provision or
25   not? And in this case, it's really a fairly -- it's a

---

24

1    fundamental question for the panel and certainly
2    something that first must be decided by a Court because
3    the case is entirely based on a broker confirmation --
4    an agreement on July the 22nd between the parties orally
5    that was confirmed by a broker confirmation. That's
6    what the case is based upon.
7            There's no arbitration provision. And so
8    I don't even think they get to the question of, well,
9    you include the sales contract? Do you include other
10   terms? Well, that's a matter for a Court to decide.
11           We've been very clear about this from the
12   beginning, that we objected to arbitration. Texas law
13   provide -- and we've been clear about our remedies, too,
14   that if they wanted to proceed in arbitration they were
15   doing so at the risk of our ability to move to vacate
16   the panel's award if it was against us because there was
17   never jurisdiction in the first place.
18           And so I think that the fundamental
19   question here and where we are is Tricon puts the cart
20   before the horse. They want to run into arbitration and
21   try the whole case and see if they can get the panel to
22   give them relief when the question of whether the panel
23   has jurisdiction or not has not been decided.
24           And so I think, Your Honors, with the
25   specification of claims making it clear that their case

---

25

1    is based on broker confirmation, all of the testimony
2    from their witnesses, their request for admission
3    responses, their interrogatory answers all say, "Yes, we
4    believe the broker confirmation" -- the one-page broker
5    confirmation that they say outlines the terms of the
6    deal is a binding contract and there is no arbitration
7    agreement in that document.
8            And I would just point you to -- it's
9    already in the record in their pleadings, but if you
10   were to look at Joint Exhibit No. 4 in your binders,
11   this is the final confirmation from the broker and we
12   can all look at it. There is no arbitration provision
13   in that document.
14           So we believe that the appropriate remedy
15   here is for the panel to dismiss this case until Tricon
16   deals with the jurisdictional question. And because the
17   Court is going to decide a number of issues that may or
18   may not be -- that will impact arbitration one way or
19   the other -- either the Court decides there is no
20   agreement and there never was an agreement so there's no
21   arbitration or the Court may define what the contract is
22   and if that contract includes an arbitration provision,
23   then we will have an arbitration hearing.
24           But what you try in arbitration, how it's
25   tried and the scope of that all needs to be decided

---

7  (Pages 22 to 25)

ARBITRATION HEARING - SEPTEMBER 20, 2010

26

1    first by a Court and otherwise I don't see how you can
2    get to a point where you can come to an award that is
3    based on jurisdiction.
4            JUDGE BENTON:  Judge Wood, any questions
5    for Mr. Lee?
6            JUDGE WOOD:  Not at this time.
7            JUDGE BENTON:  Judge Davidson?
8            JUDGE DAVIDSON:  Not now.
9            JUDGE BENTON:  Mr. Lee, do you suppose
10   therefore rest on your motion to dismiss?
11           MR. LEE:  Yes, Your Honor.
12           JUDGE BENTON:  Mr. Diaz-Arrastia?
13           MR. DIAZ-ARRASTIA:  Thank you, Your Honor.
14      OPENING REMARKS ON BEHALF OF THE CLAIMANT
15           MR. DIAZ-ARRASTIA:  Let me first address
16   the question of jurisdiction.  There is no question
17   under Texas law that this panel has the authority to
18   decide its own jurisdiction.  That is clearly stated in
19   the Triple A rules and it is also the Texas law.
20           If Vinmar had filed a motion to stay this
21   arbitration, then Mr. Lee is correct that the Court
22   would decide whether this case was subject to
23   arbitration, but Vinmar has chosen not to do that.  It
24   is very clearly not the law in Texas that where the
25   opponent to arbitration chooses not to go to Court to

27

1    seek a stay, the proponent, Tricon in this case, has an
2    obligation to seek an order compelling it.
3            This case was actually -- this issue was
4    specifically addressed just in July by the Corpus
5    Christi Court of Appeal in the In Re: Rio Grande Xarine
6    case, which was cited in our brief in response to the
7    motion to arbitration and we've actually done a
8    supplemental brief to the panel that I will hand to you
9    right now, but it's mostly based on the Rio Grande case.
10           And the conclusion of the Rio Grande case
11   with regard to the argument that Mr. Lee is making -- I
12   hate to say it, but it's one word.  They said it was
13   nonsensical.
14           MR. LEE:  Do you have --
15           JUDGE WOOD:  Does Mr. Lee have a copy?
16           MR. LEE:  -- a copy for me?
17           MR. DIAZ-ARRASTIA:  Oh, I'm sorry.
18           What they said is it was nonsensical.
19   This panel can decide its own jurisdiction and this
20   panel does not have to wait for a Court to tell it it
21   has jurisdiction.  Tricon as the proponent of
22   arbitration has no obligation to first institute
23   litigation in a Court to get an order compelling the
24   arbitration.
25           Let me address now the merits of Mr. Lee's

28

1    argument.  If we could turn on the projector, I will be
2    showing the panel some of the documents.  This is a very
3    simple UCC breach of contract case.
4            What happened here is that Vinmar bought
5    mixed xylenes, which we've referred to as MX, betting
6    that the price would go up, but what happened instead is
7    that the price went into a long and precipitous decline.
8    By the delivery date that was negotiated in the
9    contract, the price of MX had fallen more than
10   25 percent.
11           By the end of the year of 2008, the price
12   of MX had fallen to more than 65 percent.  It was really
13   a precipitous decline.  And the price fell almost every
14   day.  MX tends to track the price of crude oil and we
15   all know what happened to crude oil in the second half
16   of 2008.
17           Vinmar refused to accept the MX on a very
18   bad deal and they didn't perform, but that's a breach of
19   contract.  Let's look at the -- at the arguments.  And
20   it is correct, first of all, the UCC very much favors
21   the sale -- the formation of contracts and this favors
22   formality.
23           If you could take a look at 2-204(A).  And
24   there it says it very clearly.  This is the policy of
25   the UCC with regard to contract formation.  A contract

29

1    for the sale of goods may be made in any manner
2    sufficient to show agreement, including conduct by both
3    parties which recognizes the existence of such a
4    contract.
5            Mr. Lee is right.  Here the contract was
6    made through a broker and the parties did not
7    communicate with each other prior to the deal being
8    made.  That is not unusual in petrochemicals trading and
9    there will be evidence of that from testimony.
10           In this case, the agent was the
11   broker -- the broker, I'm sorry, was the agent for both
12   sides.  And we have actually cited in our prehearing
13   briefing the Den Norske case, which was a decision by
14   Judge Hughes in the Southern District of Texas, where he
15   said that's exactly right.
16           And what that means is that when the
17   broker says that there's a deal there's a deal and
18   that's an enforceable contract.  The broker in this case
19   was Mr. Ed Leyman.  We're going to see him by a video
20   deposition.  He is probably the leading MX trader in the
21   United States.
22           On July 22, 2008, through instant message
23   communications and telephone communications, Mr. Leyman
24   brokered a deal.  The terms of the deal was that Tricon
25   was going to sell MX to Vinmar.  Both of these parties

8  (Pages 26 to 29)

ARBITRATION HEARING - SEPTEMBER 20, 2010

30

1  are trading companies.  It was 5,000 metric tons of MX
2  at the price of 1310 -- $1,310 per metric ton, a tight
3  delivery window, some -- in the first half of September,
4  between September 1st and September 15th, CFR Korea or
5  Taiwan with Vinmar to declare the discharge port,
6  meaning where in Korea or Taiwan the MX was going to be
7  unloaded by the 8th of August.
8          And the evidence that you're going to hear
9  from Mr. Leyman and Mr. Lockwood is the delivery window
10  was particularly important, particularly important.
11  That is important because it takes 30 to 45 days to move
12  a vessel from the Gulf of Mexico to Korea or Taiwan and
13  can take longer than that if you have delays in the
14  Panama Canal, if you have bad weather.
15          So if you're going to be declaring your
16  discharge port and you have a guaranteed delivery by the
17  15th of September, you have a very tight window, and
18  that is why we believe that we had to keep the option to
19  substitute Asian origin if our vessel slipped.
20          This is an extension of frauds case.  It
21  involves more than $500, and that means that we need a
22  writing and we need a signature.  As we know, a writing
23  is not required under the law to be a single document
24  and here we have several documents that form all of the
25  contracts.

31

1          Second is the signature, but under the UCC
2  signature is very, very broad.  If we can take a look at
3  2-201, Comment 1, please.  Let's see.  It must be
4  signed.  It must be signed, a word which includes any
5  authentication which identifies the party to be charged.
6          Let's look at 1201(37).  This is the
7  definition of signed under the UCC.  Signed includes
8  using any symbol executed or adopted with present
9  intention to adopt or accept a writing.
10          Now let's take a look at Comment 37.
11  There you go -- Signed does not require a complete
12  signature.  The symbol may be printed, stamped or
13  written.  And in an appropriate case, it may be found on
14  a billhead or letterhead.
15          So it's very, very clear that for the UCC
16  a signature doesn't mean that somebody took a pen and
17  wrote his name down on a piece of paper.  It can be even
18  just a letterhead.  Let's take a look at some of the key
19  documents here.
20          Let's first look at Joint Exhibit No. 2.
21  Is there any way so that we can get that on the screen
22  all at once?  Fit to page.  There you go.
23          That is the principal document.  That is
24  the initial confirm that was --
25          MS. LARSON:  Your Honors, they're in the

32

1  binders as well under Joint Exhibit 2.  It's difficult
2  to read the copy.
3          MR. DIAZ-ARRASTIA:  It is the initial
4  confirm that was sent by Mr. Leyman to both Vinmar and
5  Tricon on July 22nd after the deal was made.  It
6  contains all of the essential terms of the contract,
7  quantity, quality, delivery, payment, terms and a number
8  of other things, everything required to make a deal.
9          I will point out on the top right-hand
10  corner there's the MOAB letterhead.  That's a signature
11  under the UCC.  Under the UCC, a signature may be
12  anywhere on a piece of paper and it can be a billhead or
13  a letterhead and MOAB was the agent for both sides so
14  that is official.
15          That was Judge Hughes' decision in the Den
16  Norske case, exactly that.  Nothing in here talks about
17  U.S. origin.  And there will be evidence that if
18  U.S. origin was a critical term of the deal it would be
19  in the confirm, it would be in the firm bid given by
20  Vinmar and it would be in the deal.
21          And let me just give you an example of a
22  case where that is done.  If we can look at Tricon
23  Exhibit 1 quickly, please.
24          MR. LEE:  If I may just make one
25  statement.  I hate to interrupt his presentation, but we

33

1  do have some objections to their exhibits, including
2  this one.  I just want to note that for the panel.  I
3  don't think this has anything to do with this
4  proceeding, but I didn't want him to show that without
5  at least noting the objection.
6          JUDGE BENTON:  All right.
7          MR. DIAZ-ARRASTIA:  Okay.  And if you --
8  Tracy, if you could highlight during quality and maybe
9  zoom in on that.
10          Product to be U.S. origin.  That's the way
11  it's done if origin is important.  It is important -- if
12  origin is important to the buyer it would be put up
13  front because it affects delivery.  As I said before, if
14  you were loading a vessel on August the 8th in the Gulf
15  and you needed to get it to Taiwan by September 15th,
16  you might not make it.
17          Now, there are actually three confirms in
18  this case.  Let's first take a look at Joint Exhibit 3.
19  The evidence is going to be that after the first confirm
20  on July 22nd, on the same day, Mr. Wilson, the trader
21  for Vinmar, requested a change in the payment terms from
22  a 30-day to an at site letter of credit.  That was
23  agreed to by Mr. Lockwood and the deal was modified.
24          JUDGE BENTON:  Yeah, let me -- let me
25  interrupt just for a second.  Providing -- I don't

9  (Pages 30 to 33)

ARBITRATION HEARING - SEPTEMBER 20, 2010

34

1   know -- I don't -- I don't want to prejudice your
2   presentation, but to the extent you could partition
3   these issues of the merits and the jurisdictional
4   argument, it would really help us to focus.
5        MR. DIAZ-ARRASTIA:  Well, Your Honor, the
6   problem that we have is that it's very hard to do that.
7   One of the reasons why Vinmar claims that a contract was
8   never made is because U.S. origin was a material term of
9   that contract that was not agreed to so I have to
10  address it.
11       JUDGE BENTON:  All right.  Very good.
12       MR. DIAZ-ARRASTIA:  And I'm trying to go
13  in chronological order through the documentation.
14       JUDGE BENTON:  Okay.
15       MR. DIAZ-ARRASTIA:  But in any event,
16  there was one modification on July 22nd to change the
17  payment terms, but even on this second confirm that was
18  again sent to both sides, again there's no mention of
19  U.S. origin.
20       Then let's go to Joint Exhibit No. 4, and
21  this is the last confirm, which is the one that was
22  referred to by Mr. Lee, also exchanged by both parties.
23  And what happened here is that Mr. Lockwood noticed that
24  there was a mistake on the price term.
25       The price on the initial two confirms

35

1   said -- was 1110 a metric ton when everybody agreed that
2   it was 1310.  Mr. Lockwood called Mr. Leyman and said,
3   "Hey, there's a mistake on the price.  Can you fix
4   that?"  And it was fixed and that resulted in the third
5   confirm.
6        Three confirms exchanged between the
7   parties on July 22nd.  They contain all of the essential
8   terms of the deal.  And it is our position that the
9   contract was initially made on July 22nd and it is
10  memorialized in writing with a signature in these
11  documents, but it is not true that once that happens the
12  parties are bound or are prevented by Texas law from
13  modifying the contract or adding additional terms.
14       If we could take a look at UCC 2-209.  And
15  there you go.  An agreement -- Under the UCC, an
16  agreement modifying the contract within this chapter
17  needs no consideration to be binding.  So under the UCC,
18  the parties can modify their contract at any time and
19  there's no requirement for consideration or any other
20  formality.  The policy of the US -- UCC disfavors
21  formality.
22       What happens in this case is that
23  additional terms were negotiated and there were
24  modifications made and certainly one of the
25  modifications made was that Vinmar requested for a

36

1   change in the payment terms and that was agreed to.
2   There's nothing that says that the parties can't agree
3   to modifications if that's what they want to do.
4        And this is what happened.  On
5   July 23rd -- let's go to Exhibit J 5, please, Joint
6   Exhibit 5, and actually let's start there on that page
7   there towards the bottom of it where it Brad's e-mail to
8   Rick Wilson.
9        On July 23rd, the day after the deal was
10  initially made, Tricon sends its sale contract -- and we
11  have been referring to that in the briefing as Tricon
12  letter, but sends this to Rick Wilson.  There's the
13  cover e-mail that we're looking at right now.  And I am
14  just pointing that out to you to show the date and to
15  also show you that it is signed.  There's an e-mail
16  signature that is a sufficient signature under the UCC.
17       Let's go to the first page after that.
18  Here it contains the essential terms.  And it does not
19  change the essential terms of the contract, the price,
20  quantity, delivery, payment, et cetera.  It does not
21  change that from the MOAB confirms.  It's the same
22  thing.
23       We'll go to the next page.  It does
24  contain the general terms and conditions of sale,
25  additional terms to the contract.  There is going to be

37

1   evidence that this is a very common thing to do in
2   petrochemicals trading, that after you do the confirm
3   and you have a deal you pass paper between yourselves.
4   You send the terms and conditions of sale.  Arbitration
5   is contained here, Paragraph 9 of the terms and
6   conditions of sale.
7        On July 24th, the following day,
8   Mr. Wilson gives this letter to Laurentiu Pascu who
9   we'll hear from a video.  He was Vinmar's operations
10  specialist.  They take care of the deal once the trader
11  makes it to free up the trader to do more deals.
12       Take a look at Exhibit J 9, Joint
13  Exhibit 9.  This is Mr. Pascu's e-mail to Rick Wilson in
14  the morning of July 29th, a few days after he received
15  the terms and conditions containing arbitration.  He is
16  informing Mr. Wilson of his comments on the additional
17  terms.
18       JUDGE WOOD:  Give me that exhibit number
19  again.
20       MR. DIAZ-ARRASTIA:  It's Joint Exhibit 9.
21       A few hours later, Mr. Pascu sends his
22  comments to Vuk Rajevac, who we will also hear from.
23  Mr. Rajevac is Tricon's operations specialist in this
24  period, Mr. Pascu's counter-partner.
25       We can look at Joint Exhibit 13 now.  And

10  (Pages 34 to 37)

ARBITRATION HEARING - SEPTEMBER 20, 2010

38

1   that's what Mr. Pascu tells Mr. Rajevac.  Please enclose
2   our comments under sale confirmation.  We shall revert
3   soon with our purchase order for your review.
4           Now, there's going to be evidence that no
5   one prepares and sends a pur -- says, "I'll send a
6   purchase order," if they didn't think they had a deal.
7   Obviously Mr. Rajevac thinks they had a deal.  Let's
8   take a look at what Mr. Rajevac enclosed with this
9   e-mail on July 29.
10          What -- I would also point out that -- I'm
11  sorry.  Mr. Pascu.  I would also point out that
12  Mr. Pascu's e-mail is signed.  That's that signature
13  within the UCC.  If we could put it full -- so that we
14  can see it on the full page.
15          And we're going to go over this during the
16  evidence phase, but there is evidence that all -- that
17  that handwriting that you see on the Tricon letter on
18  the additional terms and conditions is Mr. Pascu's
19  handwriting.  As you can see, he is scratching some
20  things out.  He is asking for some things to be changed.
21          Look in the next page.  Again,
22  more changes and comments that Mr. Pascu makes on the
23  Tricon terms and conditions.  If you will look at the
24  next page on Paragraph 9, nothing on arbitration.  He
25  does not have a problem with it.  And nowhere in here is

39

1   there any mention of origin.
2           About 30 minutes later we get to
3   exhibit -- Joint Exhibit 14.  And this is their response
4   that Mr. Rajevac sends to Mr. Pascu.  And that is it.
5   He says, "Your comments on the contract are well noted
6   and accepted except for demurrage time bar which is 90
7   days."  And, again, it's signed.
8           So at this moment, what we have is we have
9   a contract that was initially made on July 22nd and
10  which was modified by agreement of the parties on
11  July 29th.  Some of the things that are contained in it
12  were requested by Tricon.  Some of the things were
13  requested by Vinmar, but everything was agreed to with
14  the sole exception being demurrage.  There was no
15  agreement on the demurrage time bar, but that is not
16  relevant in this case.  There was never any demurrage.
17          Let's talk about 2-207, if you could go
18  back to that for a moment, just UCC 2-207.  If you could
19  look at 2-207(B), additional terms are to be construed
20  as proposals for addition to the contract.  Let's look
21  at 2-207(C), beginning Conduct by both parties which
22  recognizes the existence of a contract is sufficient to
23  establish a contract for sale although the writings of
24  the parties do not otherwise establish a contract.  In
25  such case, the terms of the particular contract consist

40

1   of those terms on which the writings of the parties
2   agree, but not the ones you don't agree to.
3           So as of July 29th, 2008, there was a
4   contract that consisted of all of the terms that the
5   parties agreed to and not the terms that they did not
6   agree to.  Nowhere in there was there an agreement about
7   U.S. origin.  There absolutely was an agreement about
8   arbitration.  And the only term that the parties
9   discussed that they didn't agree to was demurrage time
10  bar.  That's just not part of the contract, but that
11  doesn't mean that there is no contract.
12          As I said, Your Honor, I have alluded to
13  some of the evidence that is going to be heard.  It is
14  intertwined with the merits of this case in a way
15  they -- if we want to create a full record of how this
16  contract was made, we're going to have to hear all of
17  the evidence except for my damages evidence, but this is
18  a preview of what you're going to hear.
19          JUDGE BENTON:  All right.  Any questions,
20  Judge Wood, for Mr. Diaz-Arrastia?
21          JUDGE WOOD:  Not at this time.
22          JUDGE BENTON:  Judge Davidson?
23          JUDGE DAVIDSON:  Nope.
24          JUDGE BENTON:  Mr. Diaz-Arrastia, do
25  you -- excuse me -- for the purposes of the record, rest

41

1   on your response to their motion to dismiss?
2           MR. DIAZ-ARRASTIA:  Your Honor, if you
3   want to hear evidence on how this contract was formed,
4   then I have to put my witnesses on.  I have given you a
5   preview of what I am going to say, but I am not able to
6   present my evidence on jurisdiction --
7           JUDGE BENTON:  Okay.
8           MR. DIAZ-ARRASTIA:  -- without
9   simultaneously presenting my underlying merits.
10          JUDGE BENTON:  I think what we would like
11  to do then is take a short recess for ten to 15 minutes
12  to deliberate upon the arguments that you each have
13  made.  And then depending what the two or three of us
14  agree to, we'll come back and announce how we'll --
15          JUDGE DAVIDSON:  Could I ask a question of
16  Mr. Lee?
17          JUDGE BENTON:  Certainly.  Excuse me.
18          JUDGE DAVIDSON:  You've indicated it's
19  your client's position that this panel has no
20  jurisdiction.  Correct?
21          MR. LEE:  Yes, Your Honor.
22          JUDGE DAVIDSON:  Which, if I -- as I
23  understand the laws of jurisdiction therefore, that
24  would mean that should we go through the entire hearing
25  on the merits and determine that you win, make a

11  (Pages 38 to 41)

ARBITRATION HEARING - SEPTEMBER 20, 2010

42

1  determination on the merits that your client owes
2  nothing to Tricon, your argument would be that this
3  panel was without jurisdiction to make such a ruling?
4          MR. LEE:  No, Your Honor, because -- well,
5  actually what I would say is the award is enforceable
6  against Tricon because they elected to proceed in this
7  forum.
8          JUDGE DAVIDSON:  But jurisdiction isn't
9  something that can be given to anybody by conduct, can
10 it?
11         MR. LEE:  I agree, Your Honor, with the
12 exception of it's really two issues.  One, it's invited
13 error.  I mean, they initiated this proceeding and
14 insisted that it go forward in Triple A.  And so if -- I
15 think they're precluded from arguing against an award
16 that the panel might render against them.
17         It doesn't deal -- I don't think it does
18 away with the jurisdiction issue.  I think we have a
19 jurisdiction issue that stays with the case throughout,
20 but certainly from Tricon's perspective I think a Court
21 would be fair in saying, "You elected this forum.  You
22 invited the panel to make the error.  You have to live
23 with that error" --
24         JUDGE DAVIDSON:  Okay.
25         MR. LEE:  -- as opposed to us -- may I

43

1  make one other just quick comment before we break
2  because I think that the question was summed up at the
3  very end of Tricon's presentation, how the contract was
4  formed.  That's what counsel said.
5          That question is fundamentally a question
6  for a Court to decide, how the contract was formed.  Is
7  there a contract and what terms are included?  That's a
8  decision that is for a Court.  There are a number of
9  cases that have addressed that.  The Rio Grande case is
10 distinguishable for two reasons.
11         Number one, there was no question there
12 was an arbitration agreement in the document that both
13 parties signed.  The issue that the complaining party
14 raised is that that document had lapsed.  And the Court
15 first found that the arbitration panel had that power to
16 make that decision and then secondly said but, you know,
17 you didn't have to go to Court first.
18         Here we have a separate issue, the
19 fundamental question.  Most of the presentation was we
20 had an agreement on July 22nd.  The broker confirm
21 satisfies the statute of frauds.  That's what we're
22 suing on.
23         This modification argument, by the way,
24 has never -- it's not in any of the pleadings.  It's
25 something that came up when we moved to dismiss, but

44

1  modification requires all of the elements of contract
2  formation, offer and acceptance to form a modification.
3  Whether there's consideration or not, the UCC says
4  that's not required, but it does require an offer and
5  acceptance.
6          And that question, whether there was an
7  acceptance, whether you could modify the agreement and,
8  two, whether there was an acceptance, that is an issue
9  for a Court to decide.
10         JUDGE WOOD:  What is the -- is there a
11 joint exhibit number or where in the exhibits is the
12 document that your client sent on their letterhead?
13         MR. LEE:  There is no document.
14         JUDGE WOOD:  Was there one that Vinmar
15 sent?
16         MR. DIAZ-ARRASTIA:  Your Honor, there is a
17 purchase order that Vinmar --
18         JUDGE WOOD:  Purchase order.
19         MR. DIAZ-ARRASTIA:  -- prepared but did
20 not send.
21         JUDGE WOOD:  Thank you.
22         MR. DIAZ-ARRASTIA:  Now, if we could look
23 at that because we do have it and we do intend to
24 present it.
25         JUDGE WOOD:  That's in somebody's

45

1  exhibits?
2          MR. DIAZ-ARRASTIA:  Let's take a look at
3  the Vinmar purchase order.  Do you remember what that
4  is?
5          JUDGE WOOD:  I remember reading -- I
6  remember reading it.
7          MR. DIAZ-ARRASTIA:  Let's look at it.
8          JUDGE WOOD:  My second question,
9  Mr. Lee --
10         MR. DIAZ-ARRASTIA:  Now, there was -- and
11 Mr. Lee talked about the offer and acceptance.  When the
12 Tricon letter was sent by Mr. Lockwood and Mr. Wilson,
13 that's the proposal for a modification.  Then when
14 Mr. Pascu commented on that, he accepted some of those
15 terms and made a proposal for modification on other
16 terms.  And then when Mr. Rajevac said "Your comments
17 are all accepted," you have an acceptance.
18         JUDGE WOOD:  My second question for
19 Mr. Lee goes to -- and I apologize for not finding the
20 case.  Okay?  But are you familiar with the case that's
21 been decided -- and I thought it was this year.  Y'all
22 can figure out probably why.  That was in the probate
23 cases.  But a recent holding in Texas is that the
24 arbitration panel has to determine whether or not the
25 person that is alleged to contract who may be deceased

12 (Pages 42 to 45)

ARBITRATION HEARING - SEPTEMBER 20, 2010

46

1  now or may now be incompetent, whether that person had
2  capacity to contract by law in Texas now is decided by
3  the arbitrators and not a probate court.  I don't know
4  if you would have ran into that case and I don't know
5  where it's even reported.  I just -- I just happen to
6  know it was decided.
7          MR. DIAZ-ARRASTIA: Your Honor --
8          JUDGE WOOD: And y'all can figure out why
9  so you can probably find the Court and then find it --
10         MR. DIAZ-ARRASTIA: Your Honor --
11         JUDGE WOOD: It's out of Probate Court
12  No. 2 and it's Houston Court of Appeals.  I don't
13  remember the first --
14         MR. DIAZ-ARRASTIA: Well --
15         JUDGE WOOD: But I just didn't know if
16  anybody had been following these cases that -- you know,
17  trying to go back and forth maybe something will --
18         MR. DIAZ-ARRASTIA: I don't know that
19  case, Your Honor, but the Vinmar purchase order --
20         JUDGE WOOD: There it is.
21         MR. DIAZ-ARRASTIA: -- which was prepared
22  but not sent is Tricon Exhibit 10.  And if you could
23  look -- Tracy, go down to the dispute resolution
24  provision.  I think it is significant that it has the
25  law and arbitration -- and arbitration provision

47

1  essentially like the one we're here before you-all.
2          JUDGE WOOD: My question got answered as
3  to why I had read that document and nobody had talked
4  about it.  I appreciate that.  I think that's it.
5          MR. LEE: I wanted to address real quick.
6  As counsel said, that document was never sent, but I
7  think, Your Honor -- I'm not familiar with the specific
8  case on the probate, but I do understand there is a lot
9  of cases --
10         JUDGE WOOD: And I haven't read it either.
11         MR. LEE: -- that talk about if your issue
12  is to the capacity or to duress, that's one issue as
13  opposed to basic contract formation.  So there is a
14  distinction that the cases recognize.
15         JUDGE BENTON: I have 9:35 so let's --
16  let's just say at 9:50 we'll resume and see where we go
17  from there.  All right?
18         (Recess from 9:34 a.m. to 9:51 a.m.)
19         JUDGE BENTON: Okay.  We are back on the
20  record.
21         The panel has arrived at a unanimous
22  determination and that determination will be announced
23  by Judge Davidson.
24         JUDGE DAVIDSON: The panel will decline to
25  grant the motion to dismiss.  We find that the issues of

48

1  contract formation and what the terms of any contract
2  are will require presentation of evidence to the panel.
3          We make this determination without
4  prejudice to a later determination that either there was
5  no contract or that the contract did not contain an
6  arbitration clause.  Given that finding, it will be
7  necessary for us to proceed to hear evidence.
8          JUDGE BENTON: And with that,
9  Mr. Diaz-Arrastia, we are prepared to proceed.  As I
10  alluded to earlier this morning, our schedule -- I guess
11  it's almost 10:00 o'clock now.  Rather than break at
12  about 11:30, which would be an hour and a half, maybe
13  we'll go to noon and then break for lunch then unless we
14  need a break sooner.
15         And if we -- so do you wish to make
16  further opening or are you prepared to make -- call your
17  first witness?  And if your answer is you're prepared to
18  call your first witness, I want you to pause because I
19  want to address Mr. Lee.
20         MR. DIAZ-ARRASTIA: I think you have
21  mostly heard my opening.  I have something sort of
22  previewing what our measure of damages is going to be,
23  but I don't know if that's really that necessary to
24  present.  So it probably would make more sense just to
25  go ahead with my first witness.

49

1          JUDGE BENTON: Okay.  Do you want to make
2  further opening, Mr. Lee, or do you want to reserve
3  until they rest?
4          MR. LEE: I think it would be helpful if I
5  made just a couple of brief comments because I addressed
6  just the motion to dismiss, but if you would indulge me.
7  I'll keep it very short, but I do think there's a couple
8  of things I want to say.
9          Just so I can keep the record clear, I
10  appreciate the running objection.  I just want to note
11  that we obviously respectfully disagree, but we're going
12  to continue to participate subject to the objection to
13  the panel's jurisdiction.  And as I framed it, I do
14  not need to continue from here to raise that and waste
15  time doing that all day and every day?
16         JUDGE BENTON: That's correct.
17         MR. LEE: Okay.  Thank you.
18  OPENING REMARKS ON BEHALF OF THE RESPONDENT
19         MR. LEE: If I can just make a couple of
20  quick comments.  The contract requires a number of
21  elements, but two very key ones are you must have mutual
22  assent, in other words, you must agree on what it is
23  that is the subject of the contract and you must have
24  mutual intent to be bound.
25         We think both of those are lacking in this

13  (Pages 46 to 49)

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

**50**

1    case.  There was never an agreement on the terms of a
2    contract.  This deal was all done through a broker,
3    Mr. Leyman.  You are going to hear testimony from
4    Mr. Wilson at Vinmar who said that his firm terms of the
5    deal included U.S. origin MX.
6              Apparently Tricon's witness will say that
7    their term was open origin MX.  Those two terms do not
8    match up.  Nevertheless, Mr. Leyman, acting as a broker
9    and without authority to match the parties, went ahead
10   and matched the parties, told each side, "You have an
11   agreement."
12             Vinmar reasonably believed it did have an
13   agreement and an agreement on its terms.  And so yes,
14   there is action within Vinmar on the days following the
15   discussion with Mr. Leyman where there's contract
16   discussions.  There are things put in SAP.  There are
17   actions taken in furtherance of what Vinmar believed to
18   be a deal.
19             The evidence will show you that on
20   July 31st, several days after the discussions with
21   Mr. Leyman, a Tricon representative informed Vinmar that
22   it very well may supply Asian origin mixed xylenes.  And
23   the immediate response from Vinmar was, No, no, no, no.
24   This is a U.S. origin deal.  You must supply U.S. origin
25   MX.

---

**51**

1              And so if there -- there never was mutual
2    assent between the parties.  Tricon refused to give
3    U.S. origin.  Vinmar demanded U.S. origin.  Mr. Leyman
4    and all the witnesses agree that if the broker does not
5    have identical deal terms then there is no agreement and
6    so we believe that the evidence that we will present to
7    you will show that there was a lack of mutual assent on
8    the key term of the agreement, what is the product?
9              The other issue is mutual intent to be
10   bound.  Both parties must intend to be bound by an
11   agreement and the fact that we're here today I think
12   demonstrates very clearly that Tricon never intended to
13   be bound by the broker confirmation, the document sent
14   by Mr. Leyman which does not have an arbitration
15   provision.  They didn't intend to be bound by it.
16             They're here in arbitration.  What they're
17   saying is, "No, no, no.  Our sales contract is the
18   document that governs this relationship now.  The sales
19   contract makes it clear that it must be signed and it's
20   signed by both parties."  Mr. Lockwood never signed the
21   agreement for Tricon.  Mr. Wilson never signed the
22   agreement for Vinmar and there never was agreement on
23   all of the terms of the sales contract.
24             So you don't have mutual assent from the
25   very get-go, in which case you never have an agreement.

---

**52**

1    And certainly, the way that Tricon has approached this
2    case, they didn't -- they evidenced their intent not to
3    be bound by the broker confirmation and the sales
4    contract never resulted in an agreement on all of the
5    terms and it was never signed.
6              We also -- we'll get in -- I'll wait on
7    the damages, but we certainly have a position on the
8    damages.  We don't believe that Tricon has been damaged
9    in this case.  It didn't have mixed xylenes in
10   inventory.  It didn't do anything in furtherance of this
11   agreement when Vinmar told them, Wait a minute.  We've
12   had a misunderstanding.
13             And at the end of the day, that's really
14   what this is all about, it's a misunderstanding.  The
15   broker messed up on the communications.  There are no
16   notes from the broker.  There are no tape recordings,
17   although he testified and told our trader that he, in
18   fact, recorded tape -- phone conversations.  Those are
19   missing.  We don't have anything from the broker except
20   for a handwritten confirmation that he said he prepared
21   and that's wrong.
22             It makes a million dollar mistake on the
23   price.  And so it's our contention that the broker
24   mangled the terms.  He told us, "You have a deal on your
25   terms."  He told Tricon they had a term on their -- or a

---

**53**

1    deal on their terms.  There was some interaction between
2    the parties, both sides believing that their agreement
3    was the agreement.
4              And as soon as it became an issue, as soon
5    as Tricon -- Vinmar was aware that Vinmar had a
6    different understanding, had been told something else by
7    the broker, within six or seven business days, depending
8    upon how you count it, Tricon -- or Vinmar said, "We
9    don't have a deal.  We never came to shore on the
10   principal product."
11             And so with that, I will rest at this
12   point.
13             JUDGE BENTON:  Okay.  Mr. Diaz-Arrastia,
14   you want to call your first witness?
15             MR. DIAZ-ARRASTIA:  Yes, Your Honor.
16   I will call Mr. Brad Lockwood.
17             JUDGE BENTON:  Mr. Lockwood.  If you will
18   raise your right hand.
19             (At this time the witness was duly sworn
20   by Judge Benton.)
21             JUDGE BENTON:  All right.  Very good.
22   Mister --
23             MR. DIAZ-ARRASTIA:  It's
24   Mr. Diaz-Arrastia.
25             JUDGE BENTON:  Diaz-Arrastia.  Did I make

---

14  (Pages 50 to 53)

ARBITRATION HEARING - SEPTEMBER 20, 2010

54

1    that mistake earlier?
2         MR. DIAZ-ARRASTIA:  Yes, but that's all
3    right.  You know, when you have a name like mine, you
4    respond to most noises.
5         JUDGE BENTON:  All right,
6    Mr. Diaz-Arrastia.
7         MR. DIAZ-ARRASTIA:  I knew you meant me.
8         JUDGE BENTON:  I was looking at you when I
9    said it.
10        MR. DIAZ-ARRASTIA:  Yes.  I knew you meant
11   me.
12        JUDGE BENTON:  Very good.
13        BRAD JASON LOCKWOOD,
14   having been first duly sworn, testified as follows:
15        DIRECT EXAMINATION (10:00 a.m.)
16   BY MR. DIAZ-ARRASTIA:
17   Q.  Good morning, Mr. Lockwood.
18   A.  Good morning.
19   Q.  Could you state your full name for the record,
20   please?
21   A.  Sure.  Brad Jason Lockwood.
22   Q.  Okay.  And please tell the panel a little bit
23   about your education and background.
24   A.  Okay.  I got a marketing degree from Texas A&M
25   in College Station.  I graduated in May of 1997.

55

1    Q.  And, sir, are you now employed by Tricon
2    Energy?
3    A.  Yes, I am.
4    Q.  And what is your position at Tricon?
5    A.  I am both one of the owners of the company and
6    a partner as well as the trader -- a trader.
7    Q.  And how long have you been a trader, sir?
8    A.  Full time since January of 2005.  Part time as
9    I was transitioning out of my operations specialist role
10   at the end of 2004.
11   Q.  Okay.  And is it normal at Tricon that people
12   start out as operations specialists and then go on to
13   become traders if they're successful?
14   A.  Yes.
15   Q.  And what materials or products do you trade,
16   sir?
17   A.  I handle -- on the aromatics side, I trade
18   both mixed xylene, paraxylene, orthoxylene and toluene.
19   Q.  And how many trades have you personally made
20   in your career?
21   A.  900.
22   Q.  Now, that's a very precise number.  Did you
23   look that up over the weekend?
24   A.  Yes, I did.
25   Q.  And tell me, Mr. Lockwood, how many trades

56

1    have you been personally involved in with a U.S.
2    counterparty where the trade has not been performed in
3    the end?
4    A.  One.
5    Q.  Is it this trade?
6    A.  Yes, it is.
7    Q.  Tell me a little bit about mixed xylenes,
8    sometimes referred to as MX.  Correct, sir?
9    A.  Yes.
10   Q.  Is that a commodity product?
11   A.  Yes, it is.
12   Q.  What are the principal places in the world
13   where mixed xylenes are produced?
14   A.  It's produced in the U.S.  It's produced in
15   Asia.  It's produced in Europe, the Middle East.  It's
16   basically produced all over the world.
17   Q.  And is it correct, sir, that within a certain
18   specification, since it's a commodity, MX produced in
19   the U.S., is it the same as MX produced in Asia or
20   Europe or wherever?
21   A.  Yes, it is.
22   Q.  When Tricon trades on MX and sells MX, does it
23   take title to the product before it sells it?
24   A.  Yes, we do.
25   Q.  Okay.  And I understand that there will be

57

1    testimony that you could enter into a contract to sell
2    MX before you own it?
3    A.  Yes.  That's when we're selling short.
4    Q.  But do you have to take title before you can
5    actually deliver it?
6    A.  Yes, you do.
7    Q.  Okay.  So Tricon is not just a middle man
8    then?
9    A.  That's correct.
10   Q.  Is Tricon exposed to market risk?
11   A.  Every day.
12   Q.  If you're buying and the price falls, you can
13   make money.  If you're buying and the price rises, you
14   lose money?
15   A.  You need to rephrase that, please.
16   Q.  I'm sorry.  I said it backwards.
17   A.  You were incorrect in what you said.
18   Q.  Yeah.  If you -- in this case we're the
19   seller.  If you sell MX and the price falls, you've made
20   a good deal.  You've made money?
21   A.  That's correct.
22   Q.  And selling in this deal -- if after you sell
23   the price rises you've lost money because you have to go
24   get it?
25   A.  That's correct.

15  (Pages 54 to 57)

ARBITRATION HEARING - SEPTEMBER 20, 2010

58

1   Q.  That's the market risk?
2   A.  That's correct.
3   Q.  Let's talk about the transaction that is the
4   subject of our dispute.  Did you deal through a broker,
5   sir?
6   A.  Yes, I did.
7   Q.  And was that broker Ed Leyman?
8   A.  Yes, he was.
9   Q.  Did you know Mr. Leyman before the Vinmar
10  transaction?
11  A.  Yes, I did.
12  Q.  Had you made deals with Mr. Leyman before?
13  A.  I have.
14  Q.  Tell us, sir, how many brokers in the U.S.
15  deal in MX?
16  A.  I'd say as of today there are three, Ed Leyman
17  at MOAB, Kevin Kilkeary at a company called Blue Ocean
18  and -- I'm forgetting the third name, but he works at a
19  company called Fusion.  So those are the three that
20  trade MX or broker MX.
21  Q.  And do you deal with all of them, sir?
22  A.  Yes, I do.
23  Q.  Tell me, what is Mr. Layman's reputation in
24  the industry as a broker?
25  A.  He -- I think he's one of the most senior

59

1   brokers, having the most experience, so I think
2   everybody counts on him as being one of the most
3   reliable and senior brokers in the industry.
4   Q.  In your personal dealings with Mr. Leyman,
5   have you found that reputation to be deserved?
6   A.  Definitely.
7   Q.  Now, who was the trader on the Vinmar side of
8   the transaction in this deal?
9   A.  Dr. Rick Wilson.
10  Q.  And did you know Rick Wilson before this
11  transaction?
12  A.  Yes, I did.
13  Q.  How did you know him before this transaction?
14  A.  Once he joined Vinmar, we took him to lunch to
15  discuss opportunities that we could do together on
16  business.
17  Q.  And was this your first deal with Mr. Wilson?
18  A.  Yes, it was.
19  Q.  Before the deal was made, did you communicate
20  directly with Mr. Wilson or did you communicate only
21  through Mr. Leyman, the broker?
22  A.  Only through Mr. Leyman.
23  Q.  Is that commonly the way things are done in MX
24  trading?
25  A.  Yes.

60

1   Q.  When that happens, does the broker work for
2   both sides of the deal?
3   A.  Yes, he does.
4   Q.  When you were working on this deal, had you
5   requested that Mr. Leyman keep your name confidential?
6   A.  I did.
7   Q.  And why is that, sir?
8   A.  The market was starting to become weak and I
9   did not want to have my name out there as being one of
10  the sellers.
11  Q.  Are you the only trader who does this?
12  A.  No.
13  Q.  Is that a common request that's made to
14  brokers?
15  A.  Yes, it is.
16  Q.  Do you sometimes not request confidentiality?
17  A.  Yes, I do.
18  Q.  If you do not request confidentiality, do you
19  expect that your identity will not be disclosed?
20  A.  Can you --
21  Q.  If you -- if you do not request
22  confidentiality, what do you think is going to happen?
23  A.  I think if the other side asks who's on the
24  other side that they'll tell them by name.
25  Q.  And do you think that happens even if the

61

1   other side requested confidentiality but you did not?
2   A.  Sure.
3   Q.  And has it ever happened to you that
4   Mr. Leyman has refused to disclose the identity of a
5   counterparty in the deal?
6   A.  All the time.
7   Q.  Now, even if he disclosed your identity
8   because you did not request --
9   A.  That's correct.
10  Q.  -- confidentiality?
11  A.  That's correct.
12  Q.  Now, let me ask you, Mr. Lockwood, during the
13  negotiation of this deal when you were working with
14  Mr. Leyman and Mr. Wilson was working with Mr. Wilson,
15  was there any mention or discussion of the mixed xylene
16  having to be of U.S. origin?
17  A.  No, there wasn't.
18  Q.  What did you-all discuss during the
19  negotiation of the deal?
20  A.  We discussed the price, the quality, the
21  quantity, the fact that Vinmar needed flexibility on the
22  discharge port, wanting both Korea or Taiwan.  He wanted
23  that in his option.  We discussed the Incoterms being
24  CFR and we discussed the payment terms.
25  Q.  Okay.  Was there specific discussion of the

16  (Pages 58 to 61)

ARBITRATION HEARING - SEPTEMBER 20, 2010

62

1  delivery window?
2      A.  Yes, there was.
3      Q.  Okay.  And that was Mr. Wilson was asking for
4  first half of September?
5      A.  Yes.  He needed a very narrow window, first
6  half of September.
7      Q.  Was that term very important to Mr. Wilson?
8      A.  Yes, it was.
9          MR. LEE:  Objection.  Calls for
10  speculation.
11      Q.  (BY MR. DIAZ-ARRASTIA)  Well, did Mr. Leyman
12  tell you that was very important to Mr. Wilson?
13          MR. LEE:  Objection.  Leading.
14      A.  Yes, he did.
15          JUDGE BENTON:  It's overruled.
16      A.  He did.
17      Q.  (BY MR. DIAZ-ARRASTIA)  Mr. Lockwood, you have
18  some notebooks in front of you and they are labeled
19  Joint Exhibits, Tricon Exhibits and Vinmar Exhibits.  If
20  you will take a look at the joint exhibits and go to
21  No. 2, Joint Exhibit No. 2.  That's at the second page.
22          MR. DIAZ-ARRASTIA:  Tracy, could you put
23  that in full page?
24      Q.  (BY MR. DIAZ-ARRASTIA)  And, Mr. Lockwood, is
25  that the confirm that you received from Ed Leyman after

63

1  the deal was made?
2      A.  This was the initial confirm, yes.
3      Q.  Did you learn that after this initial confirm
4  was sent out Mr. Wilson requested through Mr. Leyman for
5  a change in the payment terms?
6      A.  Yes, I did.
7      Q.  And what was that change that was requested?
8      A.  We had agreed to 30 days from loading as the
9  payment terms and he requested to be changing to LC
10  documentary -- or a documentary letter of credit at site
11  for payment terms.
12      Q.  Okay.  And did you agree to that modification?
13      A.  After a discussion internally, I did agree to
14  it, yes.
15      Q.  Okay.  And you heard about it from Mr. Leyman.
16  Is that correct?
17      A.  That's correct.
18      Q.  And you told Mr. Leyman, "Yes, we're okay with
19  that"?
20      A.  Yes.
21      Q.  Okay.  Could we now turn the page?  Go to
22  Joint Exhibit No. 3.  Okay.  And is this the confirm
23  that you received after that modification in the payment
24  terms?
25      A.  That's correct.

64

1      Q.  Okay.  And let me ask you, Mr. Lockwood, did
2  you think it was unusual to receive an amended confirm
3  when there was a modification in the terms?
4      A.  I expected it.
5      Q.  Now, if you could take a look at the note near
6  the bottom.
7          MR. DIAZ-ARRASTIA:  Tracy, see if you can
8  zoom in on that, please.
9      Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  And it says,
10  "If there is anything outlined contrary to your
11  understanding of our agreement, please notify us
12  immediately by facsimile."  Did you see that when you
13  received these two confirms?
14      A.  Yes, I did.
15      Q.  And, sir, do traders review confirms as soon
16  as they get them?
17      A.  They're required to.
18      Q.  Okay.  And why is that important?
19      A.  Because you must review what the broker is
20  saying you agreed to.
21      Q.  Now, when you reviewed Joint Exhibits 2 and 3,
22  did you find something that was contrary to your
23  understanding?
24      A.  Definitely.
25      Q.  And what was that?

65

1      A.  The price was shown $1 million below what I
2  agreed to.
3      Q.  And let's take a look at it.  If you just look
4  at -- well, if we can go to J 2 first.  There you go.
5  We went over it.  Price -- that's right.  I'm sorry.
6  1,110 per metric ton.
7          And what had -- what was the price that
8  had been agreed to?
9      A.  1310 a metric ton.
10      Q.  Okay.  Did you communicate that to Mr. Leyman?
11      A.  I did even prior to him requesting the payment
12  change.  So when I received the second confirmation, I
13  pointed out to Ed Leyman that that price is still shown
14  as incorrect.
15      Q.  Okay.  And can we go over and see joint --
16  look at Joint Exhibit 4?  And if we could look at the
17  price term.
18          MR. DIAZ-ARRASTIA:  And if you could zoom
19  in on that, Tracy.
20      Q.  (BY MR. DIAZ-ARRASTIA)  And here Mr. Leyman
21  corrected the price term?
22      A.  Yes.
23      Q.  And Mr. Wilson agreed with this.  Correct?
24      A.  That's correct.
25      Q.  Mr. Lockwood, in any of these three

17  (Pages 62 to 65)

ARBITRATION HEARING - SEPTEMBER 20, 2010

66

1  confirms -- and let me ask you something.  Were all of
2  these confirms delivered by Mr. Leyman to the parties on
3  July 22nd?
4      A.  The 22nd or the morning of the 23rd, but I
5  believe it was the 22nd.
6      Q.  And do any of these three confirms mention
7  anything about the origin of the product?
8      A.  No, they do not.
9      Q.  And when we talk about origin of the product,
10  what does that mean?
11      A.  Where the product was produced.
12      Q.  Okay.  Where it's manufactured?
13      A.  That's correct.
14      Q.  Okay.  Now, Mr. Lockwood, does it ever happen
15  that sometimes a trader may specify a particular product
16  origin in his deal?
17      A.  I have done so myself.
18      Q.  Okay.  And tell me about that or tell the
19  panel about that.  Excuse me.
20      A.  Okay.  When I've had product that I've sold
21  into Mexico, I've had to buy U.S. origin specifically so
22  that I could comply with NAFTA Treaty because the U.S.
23  is given preferential treatment delivering product into
24  Mexico to avoid duties going into Mexico.
25          So if you have product that was produced

67

1  in the U.S. when you deliver it to Mexico, you avoid a
2  certain duty on the import into Mexico because of the
3  NAFTA treaty between the two countries.
4      Q.  Okay.  Now, if you need a product with a
5  particular origin, is that something that has to be
6  dealt with up front in your negotiations?
7      A.  Definitely.
8      Q.  And why is that, sir?
9      A.  It's impossible to negotiate with people after
10  the facts.  If you -- if you need something up front,
11  you have to ask for it so the producer knows that they
12  have to guarantee something that was produced in the
13  U.S. versus giving you some other supply.
14      Q.  If you have to guarantee the origin of the
15  product, can that affect your ability to meet a delivery
16  date?
17      A.  Can you repeat that?
18      Q.  If you have to guarantee the origin of a
19  product, can that -- can that affect your ability to
20  meet a specific delivery date that you guarantee?
21      A.  Definitely, because it limits your ability to
22  substitute the cargo with other origins.
23      Q.  Okay.
24          JUDGE DAVIDSON:  This is going to sound
25  simple.  Maybe I should have looked it up before we came

68

1  here.  Would somebody please tell me and get on the
2  record what MX is actually used for --
3          THE WITNESS:  Sure.
4          JUDGE DAVIDSON:  -- what its everyday
5  usage is?
6          MR. DIAZ-ARRASTRIA:  Excuse me.  That's a
7  good thing to talk about.
8          JUDGE BENTON:  Everybody knows that, Mark.
9          JUDGE DAVIDSON:  Okay.  Well --
10      Q.  (BY MR. DIAZ-ARRASTRIA)  Mr. Lockwood, could
11  you explain to the panel --
12      A.  Sure.
13      Q.  -- what MX is used for?
14      A.  Mixed xylene has two primary uses.  The first
15  is going into making paraxylene which then goes into
16  making -- I'll just say paraxylene is used in the making
17  of polyester.
18          It goes into making polyester, which is
19  obviously a substitute for cotton.  So the number one
20  use is predominantly in Asia to produce polyester.
21          JUDGE DAVIDSON:  Okay.
22      A.  The number two use is to go into gasoline
23  blending.  Mixed xylene has an octane rating of 104 so
24  sometimes when people are trying to blend up gasolines
25  so that you have an octane of 87, 89 or 93 at your pump,

69

1  they can add mixed xylene to the gasoline which blends
2  up the octane to meet the rating at the pump.
3          JUDGE DAVIDSON:  Thank you.
4      Q.  (BY MR. DIAZ-ARRASTRIA)  Now, Mr. Lockwood, if
5  you would take a look at the notebook that is marked as
6  the Tricon Exhibits.
7      A.  Yes.
8      Q.  First look at Tricon Exhibit No. 1.
9          MR. LEE:  And if I may, I object to the
10  relevance of this document.  It has nothing to do with
11  this transaction and Vinmar certainly was not a party to
12  whatever this document purports to be.
13          JUDGE BENTON:  Is this used for
14  demonstrative --
15          MR. DIAZ-ARRASTRIA:  It is for
16  demonstrative purposes, Your Honor.  The purpose is to
17  show what a confirm looks like when the parties required
18  origin in the negotiations.
19          JUDGE BENTON:  I'm going to -- we're going
20  to allow it.  It's received.
21      Q.  (BY MR. DIAZ-ARRASTRIA)  Now, Mr. Lockwood, if
22  you would look at Tricon Exhibit 1.  And this is a MOAB
23  confirm in another deal that Tricon has done with
24  mister -- with MOAB.  Correct?
25      A.  Yes.

18  (Pages 66 to 69)

ARBITRATION HEARING - SEPTEMBER 20, 2010

70

1    Q.  And if you would look in the quality portion
2  of this document, does it specifically say product to be
3  of U.S. origin?
4    A.  Yes, it does.
5    Q.  And that is what you would expect to see in
6  the confirm if origin was discussed during the initial
7  negotiation leading to the confirm?
8    A.  Yes, I would.
9    Q.  If origin is important to you as a buyer,
10 would you put that in the firm bid that you submit to
11 the broker?
12   A.  You would have to.
13   Q.  Now, let's take a look at Exhibit T 2, Tricon
14 Exhibit No. 2.  And this is another similar MOAB
15 confirm?
16       MR. LEE:  I have the same objection.
17       JUDGE BENTON:  Same objection?
18       Yeah.  We're going to -- we'll allow it.
19   Q.  (BY MR. DIAZ-ARRASTIA)  And this is another
20 MOAB confirm in another deal that Tricon did with MOAB.
21 Correct, sir?
22   A.  Yes, it is.
23   Q.  And on the quality term, what does that say
24 about origin?
25   A.  99.70 minimum paraxylene purity.  Product must

71

1  be non-Iranian or Chinese origin.
2    Q.  And let's just take another look -- quick look
3  at T 3, Tricon Exhibit 3.
4        And, again, sir, this is another example
5  of what happens when origin is discussed in negotiation
6  and this one says, "No Iranian or Chinese origin."
7  Correct, sir?
8    A.  Yes, that's correct.
9    Q.  If you would now go back to the Joint Exhibit
10 notebook, Mr. Lockwood, and open up Joint Exhibit No. 5.
11       JUDGE BENTON:  And just a second.  I
12 thought I understood Mr. Runions to have objected
13 earlier to something.  Am I -- did I make a mistake?
14 Have you -- during a question I thought Mr. Runions had
15 objected earlier on this witness.
16       Have you had this witness this whole time?
17 Are you going to have -- are you going to do the cross
18 on this witness?
19       MR. LEE:  Yes.
20       JUDGE BENTON:  Okay.  I thought it was
21 Mr. Runions' witness.
22       MR. LEE:  No.  I'm sorry.  No, no, no,
23 Your Honor.  I believe it was me and I just was
24 objecting the --
25       JUDGE BENTON:  Now, there was a question

72

1  earlier in the examination and I thought Mr. Runions had
2  piped up.
3        MR. LEE:  No, no.  That was me.  I think I
4  objected to speculation but --
5        JUDGE BENTON:  All right.  Thanks.  Let's
6  proceed.
7    Q.  (BY MR. DIAZ-ARRASTIA)  And let's look in
8  the -- at the bottom part of the first page of Joint
9  Exhibit 5.  Tell us what this is, Mr. Lockwood.
10   A.  I attached our sales letter to Rick Wilson
11 with a copy to my colleagues and just telling him,
12 "Thank you for the business and here's a copy of our
13 letter for proposing additional terms."
14   Q.  Okay.  And if you could turn to the second
15 page of Joint Exhibit 5, that is what you referred to as
16 your sales letter?
17   A.  That's correct.
18   Q.  And does this sales letter -- beginning on
19 the -- first let's talk about the first page.  Are the
20 terms spelled out in the first page of this Tricon
21 letter the same terms that were contained in the MOAB
22 confirm?
23   A.  They are, yes.
24   Q.  And let's now look at the second page.  And
25 beginning with the second page, Mr. Lockwood, are these

73

1  Tricon's terms and conditions of sale?
2    A.  They are, yes.
3    Q.  In your industry, is it common that after a
4  deal is made you send a letter with your terms and
5  conditions of sale to your counterparty?
6    A.  Yes.  Both sides typically pass paper as they
7  call it.
8    Q.  It's sometimes called passing paper?
9    A.  Yes.
10   Q.  When you sent Exhibit 5, was it your intention
11 to say, "The deal that we had before with Ed Leyman,
12 that's canceled.  This is the new deal"?
13   A.  Not at all.
14       MR. LEE:  Objection.  Leading.
15       JUDGE BENTON:  It's overruled.
16   Q.  (BY MR. DIAZ-ARRASTIA)  What were you doing
17 with Exhibit 5?
18   A.  Just proposing additional terms, which is
19 standard for people to do.
20   Q.  Does it sometimes happen in the industry that
21 you propose additional terms but some of those
22 additional terms are not agreed to?
23   A.  Yes.  It happens quite often actually.
24   Q.  Does it sometimes happen in the industry that
25 you propose additional terms and none of the additional

19  (Pages 70 to 73)

ARBITRATION HEARING - SEPTEMBER 20, 2010

74

1  terms are agreed to?
2      A.  I would say that would be pretty rare because
3  some -- most of the time these are pretty boilerplate
4  additional terms that both sides usually do, but I guess
5  in theory it's possible.
6      Q.  And does that mean that you don't have a deal?
7      A.  Not at all.
8      Q.  Let's take a look at the last page of this
9  letter.  Well, first of all, let's look at Paragraph 9
10 on this J 5.  Is that the arbitration provision, sir?
11     A.  Yes, it is.
12     Q.  Now, let's look at the last page.  And there
13 are a couple of signature lines.  Correct, sir?
14     A.  Yes, there are.
15     Q.  Did you expect that Exhibit 5 would be signed
16 by you and Mr. Wilson?
17     A.  No.  I never sign my contracts.
18     Q.  Okay.  Are these documents ever signed?
19     A.  Unless they're a long-term contract with the
20 company over a period of a year usually, then they're
21 usually never signed.
22     Q.  Okay.  They're treated differently whether
23 you're dealing with a long-term contract or a spot
24 contract.  Is that what you mean?
25     A.  In theory, once you agree to all the material

75

1  terms even on a long-term contract you don't have to
2  sign it.  It's just that people like the formality on a
3  long-term contract of signing it, but on spot deals I
4  rarely ever see those signed, ever.
5      Q.  Have you ever signed Tricon's terms and
6  conditions of sales in a spot deal?
7      A.  When I've been asked to, I have.
8      Q.  Have you -- has that actually happened?
9      A.  Yes, it has.
10     Q.  What did you do in this transaction,
11 Mr. Lockwood, after you sent Exhibit 5 to Mr. Wilson?
12     A.  It's standard practice for me, once I've
13 agreed to all the material terms, to pass it to my
14 operations specialist who then takes care of everything
15 from Point A to Z afterwards.
16     Q.  Okay.  And who is that operations specialist?
17     A.  At the time it was Mr. Vuk Rajevac.
18     Q.  And why do you turn the transaction over to
19 the op specialist?
20     A.  It's a -- it's a matter of time and
21 efficiency.  It allows me to focus on making more deals
22 while he takes care of what I've already done.
23     Q.  Does the operations specialist negotiate
24 contract terms?
25     A.  Yes, he does.

76

1      Q.  Give me some examples of the contract terms
2  that an operation specialist would negotiate.
3      A.  Inspection fees, interest, demurrage, law and
4  jurisdiction, title and risk, those kind of things.
5      Q.  Would the operations specialist negotiate the
6  dispute resolution provisions?
7      A.  Sure.
8      Q.  And what about credit terms, what needs to be
9  in the letter of credit, things like that?
10     A.  Yes, definitely.
11     Q.  Mr. Lockwood, what happened to the price of
12 mixed xylenes after July 22nd, 2008?
13     A.  Through what time period?
14     Q.  Well, let's say for the rest of that year.
15     A.  It was a historical fall.
16     Q.  Okay.  Can we -- can you take a look at
17 Exhibit 32 in the Tricon exhibit book, Exhibit
18 Tricon 32.  And if you could go to the next page.
19         Mr. Lockwood, is this information about
20 the price of MX that you obtained from Platts?
21     A.  Yes, I did.
22     Q.  Tell us what Platts is.
23     A.  Platts is a recording agency that basically
24 assesses the market price at the end of each day in
25 whatever region they're covering.  So at the end of each

77

1  day, they'll look at either deals that were done and if
2  there's no -- if there are no deals that are done, they
3  assess the average of the bid and the offer for the day
4  that day.
5      Q.  And, Mr. Lockwood, what does this chart tell
6  you about what happened to the price of MX after
7  July 22nd, 2008?
8      A.  A rapid decline in the price.
9      Q.  If you will take a look at the price that
10 Platts reports on July 22.
11     A.  Yes.
12     Q.  And then take a look at the price on
13 July 31st, 2008.
14     A.  Okay.
15     Q.  Can you tell me by how much the price had
16 declined between July 22 and July 31st?
17     A.  Around a hundred dollars a metric ton.
18     Q.  That's about 7 percent?
19     A.  Yes, that's correct.
20     Q.  And then take a look at the price that Platts
21 reports for September 15th, which was the last delivery
22 date under the contract with Vinmar.
23     A.  Okay.
24     Q.  And can you tell me by how much that price had
25 declined from July 22 to September 15th?

20  (Pages 74 to 77)

ARBITRATION HEARING - SEPTEMBER 20, 2010

78

1    A.  It looks like around $360 a metric ton.
2    Q.  That's about 28 percent?
3    A.  I think roughly, yes.
4    Q.  And now take a look at the -- at the very end.
5  I think the last day on this chart is the 16th of
6  December.
7    A.  Yes.
8    Q.  Tell us what had happened to the price of MX
9  by the 16th of December of 2008.
10   A.  It had just collapsed.
11   Q.  Okay.  About a 62 percent decline?
12   A.  Yeah.  It was a huge collapse.
13   Q.  From 1354 to 501?
14   A.  That's correct.
15   Q.  Does mixed -- does the price of mixed xylene
16  tend to track the price of crude oil?
17   A.  Yes, it does.
18   Q.  What happened to the price of crude oil after
19  July 22nd, 2008?
20   A.  At some point in July, the crude oil hit a
21  record high of $147 a barrel and it proceeded to drop
22  all the way down into the 30's, $30 a barrel.
23   Q.  Now, Mr. Lockwood, after you sold the MX to
24  Vinmar on July 22nd, 2008, did Mr. Wilson approach you
25  to sell it back to you?

79

1    A.  Yes, he did.
2    Q.  Can we take a look at Joint Exhibit No. 15,
3  please?  And if we could go -- did I get that right?
4         It looks like we have the wrong exhibit.
5  Excuse me for a moment.  Could we -- I'm sorry.  It's
6  Joint Exhibit No. 12, Mr. Lockwood.
7    A.  Okay.
8    Q.  Mr. Lockwood, Joint Exhibit 12 is -- at the
9  top of Joint Exhibit 12 is an e-mail that you're sending
10  yourself.  Correct?
11   A.  That's correct.
12   Q.  But if you look down, there's some -- are
13  those instant messages that we see?
14   A.  They are, yes.
15   Q.  Okay.  And they are between you and
16  Mr. Wilson?
17   A.  Yes.
18   Q.  And what is the date of those instant
19  messages?
20   A.  July 31st, 2008.
21   Q.  Okay.  And if you will go down at the instant
22  message that Mr. Wilson sends you at 9:41 and 27 seconds
23  into the morning.
24   A.  Okay.
25   Q.  And what does Mr. Wilson tell you?

80

1    A.  Brad, if you want to wipe the slate clean, we
2  could do that.  Otherwise, I have contract obligations
3  I'll supply into.
4    Q.  And what is Mr. Wilson referring to?
5    A.  He's saying that he'll --
6         MR. LEE:  Calls for speculation.
7         JUDGE BENTON:  Why don't you rephrase your
8  question?
9    Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Mr. Lockwood,
10  at the time that you were having these instant messages
11  with Mr. Wilson, what were you and discussing?
12   A.  This instant message is actually Rick Wilson
13  following up with me directly after we tried to conclude
14  another deal through Ed Leyman.
15   Q.  Okay.  And were you discussing the MX that he
16  had bought from you on July 22nd?
17   A.  Yes, I was.
18   Q.  Okay.  And what was your understanding of what
19  Mr. Wilson said when he said "We could wipe the slate
20  clean"?
21   A.  He was offering to sell the material back to
22  me at the same price that he purchased, which was at
23  1310 a metric ton.
24   Q.  And did you accept that?
25   A.  No way.

81

1    Q.  And why not?
2    A.  The market had already fallen 450,000 or $90 a
3  metric ton at the time that he was talking to me.
4    Q.  And, sir -- if you'll go down to Joint
5  Exhibit No. 14, sir.  Did you later learn that
6  Mr. Rajevac had sent this e-mail to Mr. Wilson on
7  July 29th?
8    A.  Yes, I did.
9    Q.  I'm sorry.  Mr. Rajevac had sent that e-mail
10  to Mr. Pascu on July 29th?
11   A.  Yes.
12   Q.  And if we could look at No. 3, is this where
13  Mr. Rajevac is telling Mr. Pascu that they may supply --
14  that Tricon may supply an Asian origin cargo?
15   A.  That's correct.
16   Q.  Okay.  And why does he say that an Asian
17  origin cargo may have to be supplied?
18   A.  Well, he's saying that we guaranteed an
19  arrival of September 1 through 15, so in case the vessel
20  incurs any delays which would cause the estimated time
21  of arrival to be outside of the 15th of September, which
22  we guaranteed, then we would have to substitute it with
23  an Asian origin cargo which would have a two to
24  three-day delivery timing to be able to meet the
25  guarantee that we gave.

21  (Pages 78 to 81)

ARBITRATION HEARING - SEPTEMBER 20, 2010

82

1    Q.  Okay.  Mr. Brad Lockwood, how much -- let's
2  look at the date of this e-mail.  It's July 29th, 2008,
3  about 5:00 in the afternoon.
4    A.  Okay.
5    Q.  Let's go back to Joint Exhibit 12.  That
6  interchange that you had with Mr. Wilson was on July the
7  31st, 2008, in the morning?
8    A.  That's correct.
9    Q.  How much time had passed between Exhibit 14
10 when Mr. Rajevac says, "We may need to substitute Asian
11 origin" and the conversations that you are having with
12 Mr. Wilson on July 31st?
13   A.  Around a day and a half.
14   Q.  In the course of these conversations, did
15 Mr. Wilson ever tell you, "Hey, we can't take Asian
16 origin MX"?
17   A.  Never mentioned it.
18   Q.  In fact, what he did say is, "Can I sell it
19 back -- can I sell it back to you?"
20   A.  That's correct.
21   Q.  What happened after July 31st or let -- or
22 what happened later on July 31st?
23   A.  After I would not agree to buy back the
24 product at the same price that I sold it to them for, in
25 the afternoon I was called by Ed Leyman to say that we

83

1  have a problem.
2    Q.  Okay.  Can we look at Joint Exhibit No. 15?
3  You later learned that Mr. Rajevac received this e-mail
4  from Mr. Wilson.  Is that --
5    A.  That's correct.
6    Q.  And what's the date on that?
7    A.  July the 31st in the afternoon.
8    Q.  Okay.  At 1:43 p.m.?
9    A.  Yes.
10   Q.  About how many hours after the IM exchange
11 that you had had that morning?
12   A.  I'd say around four to five hours.
13   Q.  Okay.  And Mr. Wilson says, "Vuk, we cannot
14 accept open origin.  It must be from the USA."
15   A.  That's correct.  That's what he says.
16   Q.  Is this the first time that Tricon heard
17 anything about the MX having to have U.S. origin?
18   A.  Yes, it was.
19   Q.  Mr. Lockwood, you told me earlier that when we
20 talk about the origin of a product, if mixed xylene is
21 of U.S. origin that means it was manufactured in the
22 U.S.?
23   A.  That's correct.
24   Q.  Do you remember that?
25       Is there a difference between referring to

84

1  MX being of your U.S. origin and MX having a United
2  States loading port?
3    A.  Definitely there's a difference.
4    Q.  What is the difference between origin and
5  loading port?
6    A.  Loading port is just exactly that.  It's just
7  the port that it was actually loaded from for export.
8  Origin is actually where it was manufactured.
9    Q.  Is it possible for mixed xylene to be loaded
10 in the U.S. Gulfport but not be of U.S. origin?
11   A.  Yes.  Somebody could import material from a
12 foreign country and store it in a bonded tank, therefore
13 maintaining its foreign origin status.  And when it's
14 loaded from that port, it will still be known as the
15 foreign origin status.
16   Q.  Okay.  Now, after Mr. Wilson informed
17 Mr. Rajevac and Mr. Leyman that he would not accept
18 U.S. origin, did you try to negotiate a resolution with
19 Vinmar?
20   A.  I tried, yes.
21   Q.  Take a look at Joint Exhibit No. 18, sir.  I
22 got on the wrong exhibit again.  Here it is.  I'm sorry.
23 Excuse me.
24       Now, Mr. Lockwood, did you -- is this a
25 proposal for a resolution that was -- that you received

85

1  from Mr. Wilson?
2    A.  Yes, it is.
3    Q.  And he dealt through Mr. Leyman.  Correct?
4    A.  That's correct.
5    Q.  And he is essentially saying, "I will do the
6  deal that was negotiated on July 22 provided that you
7  guarantee U.S. origin and guarantee first half of
8  September delivery."  Correct?
9    A.  But there is one noticeable change.  He's
10 asking for another seven days for him to be able to
11 declare the discharge port.
12       JUDGE DAVIDSON:  To declare the what?
13       THE WITNESS:  The discharge port, whether
14 or not they would like the product discharged in either
15 Korea or Taiwan.  He's asking for another seven days
16 because contractually we had agreed to August 8th and
17 he's asking for another seven days to declare where he
18 wants the product discharged.
19   Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Did you accept
20 this proposal?
21   A.  No, I did not.
22   Q.  Why did you not accept this proposal?
23   A.  It was clearly not a good faith proposal based
24 on the fact that he was asking for another seven days to
25 declare the discharge port.  And if he's asking for USA

22  (Pages 82 to 85)

ARBITRATION HEARING - SEPTEMBER 20, 2010

86

1    product guaranteed in the first half with a 30 to 45-day
2    transit time, there was a very high likely possibility
3    that I would not be able to perform on this contract as
4    he -- as he proposed.
5        Q.  If you will now look at Tricon Exhibit No. 16,
6    Mr. Lockwood.  Was this a proposal that you made to
7    Mr. Wilson trying to come to resolution of the matter?
8        A.  Yes, it was.
9        Q.  And what did you propose?
10       A.  I tried to give him two options, hopefully --
11   hoping that one of them he would choose.  The first is
12   that I was saying that I would be giving you a vessel
13   that had U.S. origin.  The ETA to Korea was September
14   the 6th.  The ETA to Taiwan was September 12-13th.
15       So the estimated time of arrival was
16   exactly within the window that he had requested of one
17   through 15.  And although I would not guarantee a first
18   half September arrival, I was giving him something that
19   had been estimated time of arrival during the window he
20   wanted.
21       JUDGE WOOD:  What's this exhibit number
22   again?
23       MR. DIAZ-ARRASTIA:  It is Tricon
24   Exhibit --
25       JUDGE DAVIDSON:  16.

87

1        MR. DIAZ-ARRASTIA:  -- No. 16.
2        Q.  (BY MR. DIAZ-ARRASTIA)  Did Mr. Wilson accept
3    these proposals?
4        A.  No, he did not.
5        Q.  Did Vinmar declare a discharge port on August
6    the 8th?
7        A.  No.  They failed to do so.
8        Q.  What did you do then?
9        A.  I tried to find other buyers in the market.
10       Q.  Take a look at Joint Exhibit No. 21, beginning
11   there and going on to the next page.  And this is an
12   e-mail that Mr. Rajevac sent to Mr. Wilson on August the
13   8th at 3:42.  Is that correct, sir?
14       A.  That's correct.
15       Q.  Did you instruct Mr. Rajevac to send this to
16   Mr. Wilson?
17       A.  Yes, I did.
18       MR. DIAZ-ARRASTIA:  And, Tracey, if you
19   could zoom in on the highlighted section.
20       Q.  (BY MR. DIAZ-ARRASTIA)  And Mr. Rajevac says,
21   "Furthermore, if your discharge port declaration is not
22   given by 5:00 p.m. CST today, Vinmar will be in breach
23   of the contract and we reserve the right to resell the
24   cargo in the open market and will hold Vinmar liable for
25   all damages, including but not limited to the difference

88

1    between the price at which we sold to Vinmar and the
2    price obtained for the cargo in the open market."
3        A.  That's correct.
4        Q.  Okay.  And that is what you had instructed
5    Mr. Rajevac to say?
6        A.  Yes, I did.
7        Q.  Okay.  And if you will look in the first page
8    of exhibit -- Joint Exhibit No. 21.  Later on
9    August 8th, did you also send an e-mail to
10   Mr. Antonvich?
11       A.  Yes, I did.
12       Q.  And if you will look at where it says,
13   "Therefore."  "Therefore, Vinmar is in breach of
14   contract and we reserve our right as a result of this
15   breach."
16       A.  That's correct.
17       Q.  That's what you told Mr. Antonvich on July the
18   8th --
19       A.  Yes.
20       Q.  -- at 5:13 p.m.?
21       A.  Yes.
22       Q.  I'm sorry.  On August the 8th at 5:13 p.m.?
23       A.  That's correct.
24       Q.  Okay.  And did you also set -- tell
25   Mr. Antonvich that you reserve your right to resell the

89

1    cargo?
2        A.  Yes, I did.
3        Q.  Mr. Lockwood, after Vinmar said that they
4    would not perform the contract, did Tricon still hope
5    that it would perform?
6        A.  Of course.
7        Q.  When was it that Tricon decided that Vinmar
8    probably would not perform?
9        A.  I think it was most evident when we gave a
10   vessel nomination showing that you had U.S. origin for a
11   product that would be ETA arriving in the first half and
12   they rejected it as a new proposal when all we were
13   trying to do was to get a vessel nomination as per the
14   contract.
15       Q.  And y'all notified Vinmar that you considered
16   the contract null on August 8th when the discharge
17   port was not declared per the contract?
18       A.  That's correct.
19       Q.  Did you then try to find a replacement sale?
20       A.  I tried.
21       Q.  And what happened?
22       A.  It was impossible to find buyers with the
23   market falling as fast as it was.
24       Q.  And does it sometimes happen that when the
25   price is falling rapidly it's very difficult to

23  (Pages 86 to 89)

ARBITRATION HEARING - SEPTEMBER 20, 2010

90

1   impossible to find spot buyers?
2       A.  Sure.
3       Q.  Okay.  Is that called the market freezes?
4       A.  Yes, because if -- from a buyer's point of
5   view if I don't buy today and I wait until tomorrow most
6   likely the price will continue to fall so why buy today
7   what you can get cheaper tomorrow?  So the buyers don't
8   do anything.
9       Q.  Okay.  Did you eventually select a replacement
10  sale --
11      A.  Yes, I did.
12      Q.  -- for the Vinmar sale?
13          And what was that sale?
14      A.  I exercised my option under my long-term
15  contract with KP where I forced them to take a 5,000
16  metric ton cargo because it was in my option.
17      Q.  Okay.  You -- and to back up, you sold -- you
18  selected a sale to KP Chemical --
19      A.  That's correct.
20      Q.  -- as the replacement sale?
21      A.  That's correct.
22      Q.  What is KP Chemical?
23      A.  KP Chemical is the largest mixed xylene buyer
24  in the world.  They're based in Korea with their main
25  discharge in Ulsan.

91

1           JUDGE WOOD:  What exhibit number is that?
2           MR. DIAZ-ARRASTIA:  It is first -- Your
3   Honor, we're going to show those now.  It is Tricon
4   Exhibit 4.
5           JUDGE WOOD:  The one that's up now?
6           MR. DIAZ-ARRASTIA:  That would be Joint
7   Exhibit --
8           MS. LARSON:  1.
9           MR. DIAZ-ARRASTIA:  -- 1.
10          JUDGE WOOD:  Thank you.
11          MR. DIAZ-ARRASTIA:  Is the one that is up
12  now.
13      Q.  (BY MR. DIAZ-ARRASTIA)  And, Mr. Lockwood,
14  calling your attention to Joint Exhibit No. 1, take a
15  copy of the contract with KP Chemical Company?
16      A.  Yes, it is.
17      Q.  Now, take also a look, Mr. Lockwood, at Tricon
18  Exhibit 4 --
19      A.  Okay.
20      Q.  -- which also appears to be a copy of the KP
21  contract, but this one is dated July the 20th, 2008,
22  whereas Joint 1 is dated December 11th, 2007.
23      A.  That's correct.
24      Q.  Do you know why we have two of these?
25      A.  I believe somebody internally mistakenly

92

1   entered the contract again not realizing it had already
2   been entered in the system in December of '07.
3       Q.  Was the KP contract in place during all of
4   2008?
5       A.  Yes, it was.
6       Q.  And describe to me what the KP contract
7   required.
8       A.  KP was basically given the option in their
9   option to show up and load FOB from the U.S., meaning
10  they have to load it, they have to pick it up themself,
11  but if the price did not make sense for them to load in
12  the U.S. against a U.S. based price and add freight to
13  then take it to their port in Asia, if it did not make
14  financial sense, they would not exercise their right to
15  load the product.
16          However, I negotiated the option to have a
17  couple CFR options in my option so that regardless of
18  the fact that either KP did not want to load the cargo
19  or if they wanted to load it FOB I could override them
20  and force them to take the cargo on a CFR basis.
21      Q.  So under the KP contract, if you were -- if
22  you were willing to sell on a CFR basis KP would be
23  obligated to take MX every month of the year?
24      A.  No.  I believe I was only given three or four
25  options a year to be able to do a CFR.

93

1       Q.  Did you have -- in July and September -- in
2   July and August of 2008, was there an option available
3   to be exercised?
4       A.  Yes, there was.
5       Q.  And did you exercise that option?
6       A.  I did, yes.
7       Q.  Okay.  And the Vinmar sale was also a CFR sale
8   to Asia.  Correct?
9       A.  That's correct.
10      Q.  Can you tell me when you selected the KP
11  contract as the replacement contract?
12      A.  After Vinmar failed to declare the discharge
13  port on August 8th, my option with KP, I exercised it
14  either on August the 10th or the 11th.  I'm not sure
15  which.
16      Q.  If you will take a look at Joint Exhibit
17  No. 22.  And is that where you made your selection, sir?
18      A.  That's correct.
19      Q.  And that is dated August 11th, 2008, at
20  3:02 a.m.?
21      A.  That's correct.
22      Q.  Why did you select the K -- the sale under the
23  KP contract as the replacement sale?
24      A.  Based upon my contract with KP, it was the
25  average price of September, which was the same time I

24  (Pages 90 to 93)

ARBITRATION HEARING - SEPTEMBER 20, 2010

94

1  was supposed to be delivering to Vinmar, so I knew that
2  whatever the price was that I was selling to KP it would
3  be a market-based price at the time of delivery to
4  Vinmar.
5      Q.  Okay.  And let's just go over a couple of
6  things.  Under the KP contract, you were selling mixed
7  xylenes.  Correct?
8      A.  That's correct.
9      Q.  And they were going to be delivered in Asia?
10     A.  That's correct.
11     Q.  In Korea?
12     A.  In Korea.
13     Q.  And the quantity that they were required to
14  take was 5,000 metric tons?
15     A.  That's correct.
16     Q.  The same as under the Vinmar contract?
17     A.  That's correct.
18     Q.  And, as you said, it was -- the price was the
19  average Platts price in September?
20     A.  It was the September FOB Korea Platts average
21  for the month of September.
22     Q.  Okay.  And why did you think that made it a
23  particularly suitable sale?
24     A.  With my delivery window being September 1
25  through 15, I knew that the average price for the month

95

1  would be included in that sales price to KP so that it
2  would be a fair price.
3      Q.  Okay.  Was there a difference in the MX
4  specification between the KP contract and the Vinmar
5  contract?
6      A.  They were very similar.
7      Q.  Okay.  There was a slight difference?
8      A.  There was, yes.
9      Q.  Were they nonetheless very similar?
10     A.  They were.
11     Q.  Did that difference in the spec affect the
12  price of the MX being sold to KP versus that being sold
13  to Vinmar?
14     A.  No.
15     Q.  Can you tell me whether the MX that you used
16  to supply the KP contract, did that ultimately meet the
17  Vinmar spec?
18     A.  Yes, it did.
19     Q.  Was -- did Tricon make any other sales to
20  Asia -- of mixed xylenes to Asia in the September to
21  October 2008 timeframe?
22     A.  Make any sales at what time?
23     Q.  That means -- well, let me do it this way.
24  Did Tricon deliver any other MX in Asia in the September
25  to October timeframe?

96

1      A.  Yes, we did.
2          MR. LEE:  I'm going to object to this
3  question and the next -- where I think he's going.  One
4  of the -- one of the issues that the panel may recall,
5  we asked for position sheet information about -- that
6  would disclose Tricon's inventory.
7          Mr. Lockwood, in his deposition, was
8  unable to answer anything about what Tricon actually had
9  in inventory and they refused to produce any
10 documentation for their position sheets.
11         And so I think it's un -- improper and --
12 for him to testify now that he had other MX in avail --
13 in availability to sell someplace else.  They have
14 refused to produce the documents.  He testified in his
15 deposition he was unable to answer those questions so we
16 should stick with the record that we have.
17         MR. DIAZ-ARRASTIA:  Your Honor, this is
18 not MX that they had in inventory.
19         JUDGE BENTON:  This is not a what?
20         MR. DIAZ-ARRASTIA:  This is not MX that
21 they had in inventory.  What I am referring to is
22 delivery of MX that was made to KP in October of 2008.
23 Documents about those were produced and Mr. Runions
24 questioned Mr. Matthews about those documents in his
25 deposition.

97

1          And I just wanted Mr. Lockwood to explain
2  although that was delivered in October at a price of I
3  think around 1320 per metric foot that was based on a
4  contract that was made in July.  And that's the only
5  thing that I want to --
6          MR. LEE:  And I mis -- with that -- I
7  misunderstood the question.  I thought he was going
8  someplace else.  I have no problem with this line.  I
9  apologize.
10     Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Mr. Lockwood,
11 what my question to you just is, were there other MX
12 deliveries that Tricon made to Asia in September to
13 October 2008?
14     A.  Yes, there were.
15     Q.  Okay.  And this was that October delivery that
16 I just mentioned?
17     A.  We had two deliveries, one of which was
18 done -- it was buy-sell agreement done prior to the
19 Vinmar transaction and the other one was the one that
20 you mentioned, yes.
21     Q.  Okay.  Which was based on a contract that had
22 been made in July at the price in July?
23     A.  That's correct.
24     Q.  Do you remember what date in July?
25     A.  I believe the buy-sell agreement was done on

25  (Pages 94 to 97)

ARBITRATION HEARING - SEPTEMBER 20, 2010

98

1    July the 21st, the day before the Vinmar deal, and the
2    other deal that you're referring to was done on July the
3    23rd, the day after the Vinmar deal.
4        Q.   Okay.  And why would a buy-sell deal not be an
5    appropriate resell contract?
6        A.   When you're buying and selling at the same
7    price, you're making a buy-sell agreement for logistics
8    reasons saying, "I give it to you now and you give it to
9    me later."
10       The price is arbitrary.  You could choose
11   any price that you want.  I can sell it to you for a
12   dollar a metric ton and you could sell it back to me for
13   a dollar a metric ton or you could sell it to me for a
14   million dollars a metric ton and I'll buy it back from
15   you.  The market price is irrelevant to what price you
16   choose on a buy-sell.
17       Q.   And you said you might do a buy-sell for
18   logistics reasons.  What might be some of these
19   logistics reasons?
20       A.   If the end user is really tight on inventory
21   and he's asking you to please let him borrow some now,
22   he'll give it back to you later in the future when it's
23   more convenient for him to do so.
24       Q.   Might there also be a situation where you use
25   it just as a way to store material for a while?

99

1        A.   For sure.
2        Q.   Does Vinmar own any storage capacity?
3        A.   Does Vinmar --
4        Q.   I'm sorry.  Does Tricon own any storage
5    capacity?
6        A.   We do on other products, yes.
7        Q.   But not on MX?
8        A.   Not on MX.
9        Q.   Now, we've talked about the price under the KP
10   contract was the average Platts price in September.
11   What would have happened to the price under the MX --
12   under the KP contract if instead of continuing to go
13   down through September the price of MX had turned around
14   and started to go up?
15       A.   As high as the price went, the damages would
16   go down.  The higher the price would go, the lower the
17   damages would go.
18       Q.   When the KP contract was selected, did you
19   know what was going to happen to the price of MX in
20   September?
21       A.   If I did, I would already be retired.
22       Q.   At what point, sir, did KP request a reduction
23   in the volume that was going to be sold under their
24   contract?
25       A.   It wasn't really a request.  They kind of

100

1    forced it upon me.
2        Q.   And why did they make a request for a lower
3    volume?
4        A.   KP had already had other deliveries scheduled
5    from me to them and it became obvious to everyone in the
6    market that every day the market would fall in price so
7    that because I was selling them at an average price the
8    average was always going to be higher than the next
9    day's price because in a trailing -- in a falling
10   market, the average is always going to be higher than
11   the next day's price.  So they knew if they could force
12   me to reduce the volume that I owed them under the
13   contract they would have less exposure to the market
14   falling.
15       Q.   Okay.  Did KP want to buy any volume at all?
16       A.   They begged me not to exercise the option.
17       Q.   Okay.  But they had a contractual obligation
18   to do it?
19       A.   Yes, they did.
20       Q.   Now, why did you agree to let them reduce
21   their volume?
22       A.   I had had a contract with them since 2006 and
23   sometimes in subtle ways the consumer will say, "If you
24   don't agree to help us, then it may make it more
25   difficult to have a contract for next year."  So based

101

1    on that, I took the subtle hint and agreed to reduce the
2    volume.
3        Q.   Okay.  And what did you reduce the volume to?
4        A.   I reduced it to either 3200 or 3400 because we
5    had around 1600 metric tons or 1800 metric tons at that
6    buy-sell agreement where I had taken delivery -- I had
7    delivered in to them earlier and they were giving it
8    back to me -- or excuse me.
9        I had taken it earlier and then I was
10   giving it back to them at the price so that they were
11   taking the volume, which I believe was 16 or 1800 metric
12   tons at the high price and then adding that to the 32 or
13   the 3400 tons at the September price to come up with a
14   volume of 5,000 because they did not want me to deliver
15   64 or 68, you know.  They wanted to reduce the overall
16   volume to 5,000 tons.
17       Q.   Mr. Lockwood, even after you designated the KP
18   contract, did you continue to look for other possible
19   replacement mixed xylene sales in the spot market?
20       A.   Sure.
21       Q.   And what happened?
22       A.   As you stated earlier, the market was frozen
23   and the buyers had just disappeared.
24       Q.   Take a look at Joint Exhibit No. 26,
25   Mr. Lockwood.

26  (Pages 98 to 101)

ARBITRATION HEARING - SEPTEMBER 20, 2010

102

1    A.  Okay.
2    Q.  Tell us what that is.
3    A.  Is this the repudiation invoice?
4    Q.  Yes, sir.
5    A.  Okay.  Basically what we had done is we took
6  the volume of 5,000 metric tons, which we had the option
7  to give them 5,000 tons plus or minus 5 percent.  I took
8  these September FOB Korea Platts average once that was
9  finally calculated, which I believe came out to around
10  $995 a metric ton.
11           I took the price that I sold Vinmar at
12  1310.  I subtracted the 995.  I took that difference and
13  multiplied it by the quantity.
14           JUDGE BENTON:  Mr. Diaz-Arrastia, I said
15  we'd go until about noon before we took a break, but
16  let's take a very short break now and then we'll come
17  back.  How much more do you have of this witness?
18           MR. DIAZ-ARRASTIA:  Not very much, Your
19  Honor, if you --
20           JUDGE WOOD:  Let's give the witness five
21  minutes.
22           JUDGE BENTON:  Let's take about a
23  five-minute break and then we'll come back and finish.
24           MR. DIAZ-ARRASTIA:  That's fine.
25           JUDGE BENTON:  We're off the record.

103

1           (Recess from 10:58 a.m. to 11:06 a.m.)
2           JUDGE BENTON:  Okay.  We're back on the
3  record.  Let's proceed.
4    Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  And,
5  Mr. Lockwood, I guess my question is, is Joint
6  Exhibit 66, is that a demand for payment on Vinmar?
7    A.  Yes, it is.
8    Q.  And what is the date on it?
9    A.  The date was October the 6th, 2008.
10    Q.  Has Vinmar paid?
11    A.  Not at all.
12    Q.  And has Tricon had to hire an attorney --
13    A.  Yes.
14    Q.  -- to pursue this matter?
15    A.  Yes, we have.
16           MR. DIAZ-ARRASTIA:  And I would also just
17  like to point out to the panel that Tricon Exhibit 29 is
18  a letter that I delivered to Mr. Lee.  It's also a
19  demand.  And this is for purpose of satisfying the
20  requirement of Chapter 38 with regard to attorneys'
21  fees.
22           And actually I don't recall if the parties
23  have advised the panel, but the parties have reached an
24  agreement that we will submit our attorneys' fee
25  evidence in writing so that we don't have to take up

104

1  hearing time on it, but I just did want to point that
2  out to the panel while we were on the subject.
3    Q.  (BY MR. DIAZ-ARRASTIA)  Now, Mr. Lockwood,
4  later in the hearing we're going to hear from Chuck
5  Matthews regarding the calculation of Tricon's damages.
6  But can you tell the panel who Mr. Matthews is?
7    A.  He is the controller of Tricon.
8    Q.  And did you ask him the calculate the amount
9  of Tricon's damages in this case?
10    A.  Yes, I did.
11    Q.  Did Mr. Matthews have any involvement in the
12  transaction with Vinmar back in July, August,
13  September 2008?
14    A.  No, he did not.
15    Q.  Were you the person who gave Mr. Matthews the
16  information on the facts of the transaction that he
17  needed to make his calculations?
18    A.  Yes, I was.
19    Q.  Now, Mr. Matthews, as we will see later, made
20  his calculation based not on 5,000 metric tons but on
21  5,250 metric tons.  Were you the person who told him to
22  do that?
23    A.  Yes, I was.
24    Q.  And why did you tell him to do that?
25    A.  Because when you have a sale and the plus or

105

1  minus 5 percent that's in the seller's option, when the
2  market is in your favor you also always maximize to the
3  highest drop to get the most value out of your sale.
4    Q.  And to sort of go back on that, the deal that
5  was made with Vinmar was 5,000 metric tons plus or minus
6  5 percent?
7    A.  In the seller's option, that's correct.
8    Q.  Okay.  And the 250 is 5 percent of 5,000?
9    A.  That's correct.
10    Q.  Do you believe that it is appropriate to use
11  5,250 metric tons as the correct amount to calculate
12  damages?
13    A.  Yes, I do.
14    Q.  And why is that?
15    A.  Since it was in our option, we have -- we have
16  every right to be able to deliver as much as we can
17  under the contract.  And since we were making money
18  against the sale, we wanted to maximize the sale.
19    Q.  The price of the material was going down?
20    A.  That's correct.
21    Q.  You had made a very good deal?
22    A.  That's correct.
23    Q.  And if you could maximize your material, you
24  would make an even better deal?
25    A.  That's correct.

27  (Pages 102 to 105)

ARBITRATION HEARING - SEPTEMBER 20, 2010

106

1    Q.  And you had the option to do it?
2    A.  That's correct.
3    Q.  Okay.  Back in July, August, September of
4  2008, could Tricon have easily found enough mixed xylene
5  to supply both the KP sale and the Vinmar sale?
6    A.  Everyone in the world wanted to sell so it
7  would be no problem to find it.
8          MR. DIAZ-ARRASTIA:  I pass the witness.
9          JUDGE BENTON:  Mr. Lee, cross-examination?
10         MR. LEE:  Thank you.
11         CROSS-EXAMINATION (11:10 a.m.)
12  BY MR. LEE:
13   Q.  Mr. Lockwood, let me start by asking, do you
14  still have a bonus payment hinging on the outcome of
15  this case?
16   A.  I do.
17   Q.  The alleged deal that was negotiated on
18  July 22nd, 2008, just to be clear, you talked only to Ed
19  Leyman.  Correct?
20   A.  That's correct.
21   Q.  You did not speak directly to Rick Wilson on
22  July 22nd, 2008?
23   A.  No, I did not.
24   Q.  And you didn't speak to Dr. Wilson at Vinmar
25  anytime between July 22nd and August the -- let's say

107

1  12th, 2008.  Correct?
2    A.  That's not correct.
3    Q.  You did speak to him?
4    A.  Oh, through the Yahoo when he contacted me.
5    Q.  Okay.  Other than the instant message exchange
6  that you've testified about earlier today, you never
7  spoke directly to Dr. Wilson between July 22nd, 2008,
8  and August 12th, 2008.  Correct?
9    A.  You mean like over the phone?
10   Q.  Yes, sir.
11   A.  No, I did not.
12   Q.  Okay.  And the only exchange that you had with
13  Dr. Wilson any -- at any point this time between
14  July 22nd, 2008, and mid August of 2008 was either
15  through this one instant message exchange on July 31th.
16  Correct?
17   A.  Or e-mail.
18   Q.  Or an e-mail?
19   A.  That's correct.
20   Q.  All right.  You weren't a party to any of the
21  conversations between Mr. Leyman and Mr. Wilson.
22  Correct?
23   A.  That's correct.
24   Q.  And you don't know what Ed Leyman told
25  Dr. Wilson on July the 22nd, 2008, do you?

108

1    A.  I was not on the phone with him, no.
2    Q.  Okay.  And you don't know -- other than what
3  Mr. Leyman has told you, you don't know what Dr. Wilson
4  may have said to Ed Leyman.  Correct?
5    A.  Only what Ed told me.
6    Q.  Is there one document in this case that you
7  believe accurately reflects the agreement that
8  Mr. Leyman was authorized to accept on behalf of Tricon?
9    A.  Can you re --
10         MR. DIAZ-ARRASTIA:  I object to the
11  question to the extent it's asking, is there one
12  document that contains the contract?  Mr. Lockwood's not
13  a lawyer and the law is that several documents
14  constitute a contract.
15         JUDGE BENTON:  I'm going to let him ask
16  the question.
17   Q.  (BY MR. LEE)  Just to be clear, my question,
18  Mr. Lockwood, is there one single document that you're
19  aware of that you believe accurately reflects the
20  agreement that you authorized Ed Leyman to accept on
21  behalf of Tricon?
22   A.  Are you talking about only what I authorized
23  Ed or the agreement in general?
24   Q.  I'm asking, is there a document that you are
25  aware of that you claim contains the terms of the deal

109

1  that you authorized Mr. Ed -- Mr. Leyman to accept on
2  behalf of Tricon?
3    A.  I would say it would be the final confirmation
4  for holdout.
5    Q.  And is that -- let's take a look at that.  Is
6  that Joint Exhibit No. 4?
7    A.  That's correct.
8    Q.  And it's your testimony that this Joint
9  Exhibit 4 accurately reflects the agreement that you
10  authorized Mr. Leyman to accept on Tricon's behalf?
11   A.  That's correct.
12   Q.  All the terms?
13   A.  All the terms that were important.
14   Q.  Well, did you agree that Mr. Leyman had the
15  authority on behalf of Tricon to agree to all of the
16  terms that are contained in Joint Exhibit No. 4?
17   A.  Yes, he did.
18   Q.  Okay.  Everything that's written on this piece
19  of paper.  Correct, sir?
20   A.  That's correct.
21   Q.  Now, you do agree that when you use a broker
22  the broker must match all of the essential terms of a
23  firm bid with a firm offer before he can tell the
24  parties they have a deal.  Correct?
25   A.  Yes, he does.

28  (Pages 106 to 109)

ARBITRATION HEARING - SEPTEMBER 20, 2010

110

1    Q. And if the firm bid and the firm offer don't
2 match up, then you don't have a deal, do you?
3    A. That's correct.
4    Q. And in this -- in the negotiations with
5 Mr. Leyman, you were the only person at Tricon who
6 negotiated that deal. Correct?
7    A. That's correct.
8    Q. And you did not guarantee U.S. origin mixed
9 xylenes to Vinmar. Is that right?
10    A. I guaranteed mixed xylenes, just not delivery
11 of U.S. origin in the first half of September.
12    Q. My question was, you did not guarantee
13 U.S. origin mixed xylenes to Vinmar. Correct?
14    A. I didn't hear you say the word U.S. origin
15 initially in the first question. So, no, I did not
16 guarantee U.S. origin.
17    Q. Okay. And you don't believe that U.S. origin
18 was a term of the deal with Vinmar. Correct?
19    A. Most definitely.
20    Q. Now, you -- obviously you know that Vinmar
21 claims that U.S. origin was a required term?
22    A. Nine days after the deal, yes.
23    Q. Okay. You don't agree with that, do you?
24    A. That's correct.
25    Q. If Vinmar had told Mr. Leyman on July 22nd,

111

1 2008, in its firm bid that U.S. origin was required, we
2 don't have a deal, do we?
3    A. He would have relayed that to me and then it
4 would have been my decision at that time to accept it or
5 not.
6    Q. If Vinmar had told Ed Leyman --
7    A. That's correct.
8    Q. -- on July 22nd that U.S. origin was required,
9 we wouldn't have a deal, would we?
10    A. I can't answer that because I was never given
11 the option to choose whether or not to accept that as a
12 bid.
13    Q. Okay. But it's not -- it was not a firm offer
14 that you had made. Correct? You did not make a firm
15 offer to Mr. Leyman to supply U.S. origin MX?
16    A. I accepted Vinmar's firm bid is what I did.
17    Q. As you understood it when it was communicated
18 by Mr. Leyman to you?
19    A. That's correct.
20    Q. We don't have a record of that prior to it
21 being communicated to you, do we?
22    A. I do not, no.
23    Q. The negotiations or your conversations with
24 Mr. Leyman started on July 22nd through instant
25 messages. Correct?

112

1    A. That's correct.
2    Q. But then it went to telephone conversations?
3    A. Correct.
4    Q. And when the deal that you claim was
5 consummated between Tricon and Vinmar, those
6 negotiations at that time were done entirely by phone
7 between you and Mr. Leyman. Correct?
8    A. Correct.
9    Q. And is it your understanding that Mr. Leyman
10 was also talking to Dr. Wilson by phone during that
11 period of time?
12    A. Definitely.
13    Q. Do you believe that a broker like Mr. Leyman,
14 that he has a responsibility to ensure that both sides
15 to the deal have a clear understanding of the agreed
16 upon terms?
17    A. Yes. That's why I use him.
18    Q. Okay. And if the broker knows that one party
19 has a different understanding of the terms, you would
20 agree with me that the broker ought to do something
21 about that. Right?
22    A. That's correct.
23    Q. Now, you say that product origin was not
24 discussed on July 22nd, 2008. I believe you testified
25 to that just a few minutes ago. Correct?

113

1    A. It was not discussed during the time of the
2 deal. I was asked the question after the deal was done,
3 What was the origin? And I said, Most likely U.S. but I
4 can't guarantee it because I'm already guaranteeing the
5 first half September window. And Ed went and talked to
6 Mr. Wilson and then he said, No problem.
7    Q. Okay. So hang on a second. Let's make --
8 let's make sure we understand this. Is it -- it's your
9 testimony that U.S. origin did come up on July 22nd --
10    A. No.
11    Q. -- 2008?
12    A. No.
13    Q. It did not?
14    A. No.
15    Q. Okay. So on July 22nd, 2008, when Mr. Leyman
16 was talking to you and Mr. Leyman was talking to
17 Dr. Wilson, it's your testimony that at no point in time
18 did U.S. origin come up in those discussions?
19    A. No. Like I said, after the deal was done I
20 was asked, What is the origin? It was not specified
21 U.S. It was just, What is the origin, as a question.
22    Q. Well, was that on July 22nd --
23    A. Yes.
24    Q. -- 2008?
25    A. Yes, it was.

29 (Pages 110 to 113)

ARBITRATION HEARING - SEPTEMBER 20, 2010

114

1    Q.  Okay.  What time did that come up?
2    A.  That was after the deal.
3    Q.  What time was the deal done --
4    A.  I don't remember.
5    Q.  -- according to you?
6    A.  I don't have the exact time.
7    Q.  Well, when you say it came up after the deal
8    was done, what do you mean by that?
9    A.  When I accepted this firm bid and Rick -- Ed
10   went back to close everything with Rick, saying that I
11   had accepted his firm bid, he called me back and asked,
12   What is the origin of the product?
13        I said, "Most likely the U.S. but I can't
14   guarantee it since I'm already guaranteeing the first
15   half of September delivery window."
16        He went and called Rick Wilson.  Rick
17   Wilson said, "Okay."  And Ed came back and said, "Okay.
18   Everything's done."
19   Q.  Okay.  First of all, let's make something
20   clear.  You don't know what Dr. Wilson said to
21   Mr. Leyman.  Correct?
22   A.  That's correct.
23   Q.  You don't know what Mr. Leyman said to
24   Dr. Wilson?
25   A.  That's correct.

115

1    Q.  Okay.  So it's your testimony that at some
2    point in time on -- during the day on July 22nd, 2008,
3    Mr. Leyman called you and said, You have a deal?
4    A.  That's correct.
5    Q.  And at that point in time, it is your belief
6    that a contract existed between Vinmar and Tricon.
7    Correct?
8    A.  Definitely.
9    Q.  And then after this discussion but at a time
10   when you believe that Mr. Leyman went to Dr. Wilson and
11   talked to him, Mr. Leyman came back to you and
12   said, What is the origin of the product?  Correct?
13   A.  Let me correct.  It was before Ed had said,
14   Everything is all done.  He had asked me what the origin
15   is.  I had accepted the firm bid as it was presented to
16   me.
17        He said, "Okay.  Let me call Rick and tell
18   him everything is done."
19        When he called Rick Wilson, he came back
20   to me then with the question, "What is the origin of the
21   product?"  And I said, "Most likely U.S. Gulf, but I
22   can't guarantee it since I'm already guaranteeing the
23   first half window."
24        And he probably said, "Okay."  He went and
25   called Rick Wilson and he calls me back and he said,

116

1    "Everything is all done."
2        So it's semantics in the sense that I
3    accepted the firm bid as it was presented to me.  So in
4    my mind, everything was done at that point.  But when
5    the question was raised to me, "What is the origin,"
6    that's when I answered it like I've just told you.  And
7    then after him speaking to Rick Wilson he calls me back
8    and said, "Everything is all done."
9    Q.  Is it possible that Mr. Leyman didn't
10   communicate the terms of Vinmar's firm bid accurately to
11   you?
12   A.  The odds are extremely low.
13   Q.  Is it possible?
14   A.  In theory, yes.
15   Q.  What you do know is that in the -- in the
16   conversations around the time at which Mr. Leyman had
17   said that you had a deal there was also a question about
18   U.S. origin.  Correct?
19   A.  No.  As I stated, the answer is no to that
20   question.  I was asked, "What is the origin?"  That's a
21   big difference from saying, "Was it U.S. origin?"  What
22   is the origin is a different question.
23   Q.  And so did you understand that to be a
24   question requesting a guarantee of U.S. origin?
25   A.  Not at all.  It was more of an inquiry basis.

117

1    What is the origin of the product?  If I had guaranteed
2    something or a guarantee was a part of the firm bid, he
3    would never have asked the question.
4    Q.  Mr. Leyman would never have asked you that
5    question?
6    A.  That's correct.
7    Q.  Okay.  So let's -- okay.  Let me ask you to
8    take a look at Vinmar Exhibit 9, which is in the
9    Vinmar -- you should have a notebook.
10        Now, do you recognize Vinmar Exhibit 9 as
11   instant message exchanges between you and Ed Leyman from
12   July 22nd, 2008, through August 6th, 2008?
13   A.  That's correct.
14   Q.  Okay.  And this is not a complete copy of all
15   of the instant message communications that you had with
16   Mr. Leyman concerning this alleged deal, is it?
17   A.  I gave everything I could find.
18   Q.  But you've seen that Mr. Leyman has additional
19   instant messages --
20   A.  Yes.
21   Q.  -- that you didn't produce.  Correct?
22   A.  That's correct.
23   Q.  All right.  So this isn't a complete set; it's
24   just what you had?
25   A.  That's correct.

30  (Pages 114 to 117)

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

**118**

1     Q.  All right.  Let me ask you to look at the page
2   labeled -- down at the right-hand corner of the Bates
3   label, it's TRI 48, which would also be Page 6 of the
4   document.
5     **A.  Okay.**
6     Q.  And about midway down the page, you'll see
7   there's a -- where it starts with August 6th, 2008?
8     **A.  Okay.**
9     Q.  Do you see that?
10    **A.  Yes.**
11    Q.  Okay.  Now, this is at a point where by August
12  the 6th, 2008, you know that Vinmar has taken the
13  position that this alleged deal required Tricon to
14  supply U.S. origin MX.  Correct?
15    **A.  That's correct.  I'm sorry.  I was reading**
16  **while I was listening to you.  Can you repeat that**
17  **question?**
18    Q.  Sure.  By August the 6th, 2008, you knew that
19  Vinmar claimed that the alleged deal required Tricon to
20  produce or supply --
21    **A.  That's correct.**
22    Q.  -- U.S. origin MX?
23    **A.  That's correct.**
24    Q.  Okay.  And on August the 6th, you're having a
25  series of communications with Mr. Leyman about that

---

**119**

1  fact.  Correct?
2    **A.  That's correct.**
3    Q.  And, now, at 2:39 on August the 6th, which is
4  about five or six lines down, you ask Mr. Leyman, The
5  first time he -- and that's Dr. Wilson.  Correct?
6    **A.  Correct.**
7    Q.  The first time he raised this origin issue was
8  on July 29th, and you have a question mark.  Correct?
9    **A.  That's correct.**
10   Q.  Okay.  Were you asking him that, Mr. Leyman?
11   **A.  Yes.**
12   Q.  Okay.  And then you go on to say, "Outside of
13  when he asked for it at the time of the deal and we did
14  not agree to give it to him."  Do you see that?
15   **A.  Yes.**
16   Q.  Okay.  So is it your testimony that Vinmar
17  specifically asked for in its firm bid U.S. origin and
18  you did not agree to that?
19   **A.  Absolutely not.**
20   Q.  Okay.  Well, that's what it says.  Right?
21  Outside of when he asked for it at the time of the deal
22  and we did not agree to give it to him?
23   **A.  That's not what I was saying.**
24   Q.  Well, does that -- did I read that correctly?
25   **A.  You read the words correctly --**

---

**120**

1    Q.  Okay.
2    **A.  -- but not the meaning.**
3    Q.  And you knew as of August the 6th -- I mean,
4  certainly you knew prior to August 6th that Vinmar
5  needed U.S. origin?
6    **A.  That's correct.**
7    Q.  And you knew that on July the 22nd, 2008?
8    **A.  That's not correct.**
9    Q.  Okay.  So just to be clear, your testimony is
10  that there, in fact, was no U.S. origin guarantee?
11   **A.  Definitely.**
12   Q.  And if Mr. Leyman didn't tell that to
13  Dr. Wilson, then Mr. Leyman didn't do his job, did he?
14   **A.  And he wouldn't be in business today.**
15   Q.  Now, you're the -- you're Tricon's
16  representative in this case.  Correct?
17   **A.  Yes, I am.**
18   Q.  Okay.  And it's your understanding that Tricon
19  claims that Vinmar breached a contract?
20   **A.  That's correct.**
21   Q.  And you're the person that's most familiar
22  with Tricon's claims in the case.  Correct?
23   **A.  Definitely.**
24   Q.  Can you tell us from your understanding, sir,
25  what document or documents set forth the terms of the

---

**121**

1  contract that Tricon bases its claim upon?
2    **A.  I'm not a lawyer to be able to know which**
3  **documents specifically to point to, but I know what the**
4  **terms were that were agreed to.**
5    Q.  Well, I mean, I'm just curious as to what your
6  belief is as to what is the contract?  What's the
7  document or documents that set forth the claim that
8  Tricon is suing upon in this case?
9    **A.  I think if you'll look at our Tricon letter as**
10  **well as the MOAB confirmation, all the key terms match**
11  **up so you can choose whichever one you prefer.**
12   Q.  So it's either one?
13   **A.  The same.  The key terms that were agreed to,**
14  **they both match up, so I don't know which one you would**
15  **prefer me to choose.**
16   Q.  Well, I'm asking you.  I mean, you're Tricon's
17  representative and you're suing Vinmar for breach of
18  contract.
19   **A.  That's correct.**
20   Q.  What is the document -- what's the contract
21  that Tricon bases its claims on?
22   **A.  Since I'm not a lawyer, I can't tell you which**
23  **one is most accurate.  I just know that the first page**
24  **with all the material terms on our letter match the MOAB**
25  **confirmation so in my mind there's no difference.**

---

31  (Pages 118 to 121)

ARBITRATION HEARING - SEPTEMBER 20, 2010

122

1    Q.  What if there's a difference between the
2  term -- one of these as you say essential terms in the
3  MOAB letter and the Tricon letter?  Which one controls?
4    A.  Again, I'm not a lawyer so I don't know.
5    Q.  What if there's a difference in the Tricon --
6  in the terms that Tricon submitted to Vinmar after the
7  MOAB confirmation came out?  Is there still an agreement
8  in your opinion?
9    A.  Definitely.
10    Q.  Okay.  But you can't tell me which document
11  would control in that situation?
12    A.  The material terms are the material terms.
13  Anything we proposed afterwards was proposed for
14  additional terms which Pascu agreed to.  So, again, it's
15  your call on which you want to use.
16    Q.  Well, but if there's a change in the
17  material -- if there's a difference in the material
18  terms between the confirmation and this sales letter
19  that Tricon sent --
20    A.  Please show me -- please show me the
21  difference in --
22    Q.  I'm just asking the question.  Which document
23  do you think this controls?
24    A.  There are no differences so it's a moot
25  question.

123

1    Q.  If there was, do you have an opinion on that?
2    A.  I'm not a lawyer so I don't have an opinion.
3    Q.  Now, you believe that an agreement was formed
4  at the time that Mr. Leyman told you you're all done?
5    A.  That's correct.
6    Q.  And when Mr. Leyman told you that a deal had
7  been concluded, there had been no discussion between
8  Tricon and Vinmar about arbitrating a dispute.  Correct?
9    A.  That is correct.
10    Q.  And, in fact, we can go through it, but I
11  think you'll agree with me there's no agreement to
12  arbitrate in any of the correspondence that you received
13  from Ed Leyman.  Correct?
14    A.  Only the one from Vinmar, not from MOAB.
15    Q.  You didn't receive a document from Vinmar?
16    A.  I'm saying receiving it after the fact through
17  legal proceedings, seeing that they had the arbitration
18  association clause in their purchase order, not --
19  that's the only time I've seen it.
20    Q.  Okay.  But that wasn't my question.  My
21  question was, the confirmation letters that you obtained
22  from MOAB did not contain an agreement to arbitrate?
23    A.  No.
24    Q.  Correct?
25    A.  He never includes arbitration in his clauses.

124

1    Q.  Okay.  And this purchase order that you've
2  referred to, that was never sent to you.  Correct?
3    A.  It was, but it was after the fact through
4  legal matters.
5    Q.  Right.  You got it -- you obtained it through
6  discovery in this case?
7    A.  That's correct.
8    Q.  You -- Vinmar never sent that document to you?
9    A.  No.  They promised they would, but they didn't
10  come through on that promise.
11    Q.  Okay.  Let's go through -- I want to ask you a
12  couple of questions about the documentation if we can.
13  I'll start with -- there may be -- I may jump around
14  just a little bit.  But if we take a look at Vinmar
15  Exhibit No. 1.
16    A.  Okay.
17    Q.  Now, you recognize this exhibit as the -- as
18  Mr. Leyman's handwritten confirmation on -- that he
19  filled out on July 22nd, 2008.  Correct?
20    A.  This is my first time to have ever seen one of
21  these, but, yes, I know it's from Ed.
22    JUDGE BENTON:  Did you say Vinmar 1?
23    MR. LEE:  Yes, Your Honor.
24    JUDGE BENTON:  It has Chemicals on it?
25    MR. LEE:  Yes.

125

1    JUDGE BENTON:  All right.
2    THE WITNESS:  The word MOAB I believe was
3  cut off on the fax.
4    JUDGE DAVIDSON:  The first letter.
5    THE WITNESS:  Yeah.
6    Q.  (BY MR. LEE)  Now, does this handwritten
7  document, does that accurately reflect the agreement
8  that you claim exists between Tricon and Vinmar?
9    A.  Not even close.
10    Q.  Why do you say that?
11    A.  The price is $1 million too low.
12    Q.  Okay.  Okay.  Anything else?
13    A.  Yes.
14    Q.  What's that?
15    A.  I'm just saying it looks correct.
16    Q.  Okay.  And just to be clear, the price, the
17  1110, is not the price that you authorized Ed Leyman to
18  accept on Tricon's behalf?
19    A.  Right.  When I say 1 million, I'm using 1310
20  minus 1110 is 200.  200 times 5,000 equals 1 million so
21  it should be 1310.
22    Q.  Okay.  So he made -- Mr. Leyman made a
23  million-dollar mistake in his handwritten note.
24  Correct?
25    A.  That's correct.

ARBITRATION HEARING - SEPTEMBER 20, 2010

126

1   Q.  Have you seen any other notes from Mr. Leyman
2   other than this one document?
3   A.  No.
4   Q.  Now, at the bottom of this exhibit, Vinmar
5   Exhibit No. 1, Mr. Leyman states that "As agreed, a
6   commission of USD .50 per metric ton shall be paid to
7   MOAB Oil, Inc., by both Tricon and Vinmar."  Is that
8   correct?
9   A.  That's correct.
10  Q.  Is that correct, that both Tricon and Vinmar
11  were obligated to pay MOAB a commission of basically
12  50 cents per metric ton?
13  A.  That's correct.
14  Q.  And, in fact, MOAB sent Tricon a commission
15  invoice for this alleged transaction, didn't it?
16  A.  That's correct.
17  Q.  And that's Vinmar Exhibit 15.  Take a look at
18  that tab.  Is that the commission invoice that MOAB sent
19  to Tricon?
20  A.  That's correct.
21  Q.  Now, you refused to pay MOAB's commission.
22  Correct?
23  A.  No, that's not correct.  I said the moment
24  Vinmar performs we'll pay it.
25  Q.  So you refused to pay this commission

127

1   statement.  Correct?
2   A.  No.  I said we're postponing it until Vinmar
3   performs.  There's a difference in refusing to pay
4   versus saying, "We'll pay once we get performance."
5   Q.  Okay.  You haven't paid?
6   A.  That's correct.
7   Q.  And you don't intend to pay unless Vinmar is
8   ordered to perform on the contract?
9   A.  If Vinmar performs, I'll gladly pay it.
10  Q.  What do you mean by perform?
11  A.  If Vinmar was to have performed on the
12  contract.  So in this case I guess if we win the
13  arbitration then I would be happy to pay his commission.
14  That would be in affect the same as Vinmar compensating
15  for their non-performance is what I imagine.
16  Q.  So it's your view that Mr. Leyman did not do
17  what he was authorized to do on your behalf?
18  A.  No.  He did.
19  Q.  So he earned a commission?
20  A.  He did.
21  Q.  You just don't want to pay it unless Vinmar
22  performs?
23  A.  He brought the buyer and seller together, but
24  the seller -- the buyer ran away so --
25  Q.  Okay.  And unless the buyer is ordered to do

128

1   something, you don't intend to pay Mr. Leyman.  Correct?
2   A.  I guess that's correct.
3   Q.  Did you know Mr. Leyman did not send an
4   invoice to Tricon -- to Vinmar?
5   A.  That's news to me.
6   Q.  Does that surprise you?
7   A.  It could be a clerical error.  I don't know.
8   Q.  You would have expected that he would have
9   sent an invoice to Vinmar if he believed that he had
10  done his job and concluded a deal between Vinmar and
11  Tricon.  Right?
12  A.  I don't think Ed actually sends out invoices.
13  I'm sure he's got an accounting person to do that.
14  Q.  You would have expected somebody at MOAB to
15  have sent an invoice to Vinmar if Mr. Leyman had done
16  his job and put Vinmar and Tricon together in a deal?
17          MR. DIAZ-ARRASTIA:  I object that he
18  doesn't know what MOAB does.
19          MR. LEE:  I'm just asking for his
20  expectation.
21          JUDGE BENTON:  We're going to allow it.
22  Let's proceed.
23  A.  I expected him to send a confirmation, which
24  he told me he did.  Beyond that, I don't have any idea.
25  Q.  (BY MR. LEE)  Okay.  Let's look then at Joint

129

1   Exhibit 2.
2          MR. LEE:  And to everybody, I apologize
3   for jumping back and forth.  I really did try not to do
4   that, but there's no easy way to do this so...
5   Q.  (BY MR. LEE)  We've looked at Joint Exhibit 2
6   earlier today.  Correct?
7   A.  That's correct.
8   Q.  And this is the first confirmation letter that
9   Mr. Leyman sent out.  Correct?
10  A.  That's correct.
11  Q.  And if we look at the terms of this first
12  confirmation, does this document accurately set forth
13  the terms that you believe have been agreed to between
14  Vinmar and Tricon?
15  A.  Not at all.
16  Q.  What's wrong with it?
17  A.  The price is $200 a metric ton shown too low.
18  Q.  So we have this price discrepancy.  Correct?
19  A.  That's correct.  Which I notified him
20  immediately after receiving this document.
21  Q.  Okay.  Everything else do you agree with?
22  A.  Appears so.
23  Q.  And other than the price, is it your testimony
24  that Mr. Leyman had the authority on Tricon's behalf to
25  agree to the terms that are contained in Joint Exhibit

33  (Pages 126 to 129)

ARBITRATION HEARING - SEPTEMBER 20, 2010

130

1  No. 2?
2      A.  Yes.
3      Q.  Now, if we look at Joint Exhibit 3, this is
4  the second confirmation letter sent by MOAB.  Correct?
5      A.  That's correct.
6      Q.  And as we see, the price is still USD 1110.
7  Correct?
8      A.  Which I pointed out immediately.
9      Q.  Okay.  That's what the document says.
10  Correct?
11      A.  That's correct.
12      Q.  And that's not right?
13      A.  That's correct.
14      Q.  So this document, Joint Exhibit No. 3, does
15  not contain the agreement that you believe exists
16  between Vinmar and Tricon?
17      A.  That's correct.
18      Q.  Now, when did you point out to Mr. Leyman that
19  his price term was incorrect?
20      A.  Within seconds of receiving both documents.
21      Q.  Did you ask him how he got the price wrong?
22      A.  No.  He just apologized for the error.
23      Q.  So he had made a mistake.  Correct?
24      A.  That's correct.
25      Q.  It's certainly possible for Mr. Leyman, as

131

1  good as you say he is, to make mistakes.  Correct?
2      A.  Anybody that types in a keyboard can hit a 1
3  instead of a 3 at any point in time, so, yes, that's
4  possible for anybody to make a mistake like that.
5      Q.  Well, the mistake wasn't a keyboard mistake,
6  was it?  I mean, you saw --
7      A.  It was --
8      Q.  -- in the handwritten confirmation it was
9  actually Mr. Leyman's written mistake.  Right?
10      A.  That's correct.
11      Q.  Okay.  It's possible for somebody like
12  Mr. Leyman, even if he's a good broker, to make
13  mistakes?
14      A.  No one's perfect.
15      Q.  Now, let's look at Joint Exhibit 4.  That
16  would be the next document in the -- in your binder
17  there now.  Does this -- I think you've already told me
18  that this document, Joint Exhibit 4, does, in fact,
19  accurately set forth the agreement that you claim exists
20  between Tricon and Vinmar?
21      A.  These have all the material terms that I
22  agreed to, yes.
23      Q.  And you agree that every provision set forth
24  in Joint Exhibit 4 is binding on Tricon.  Correct?
25      A.  Can you repeat the question?

132

1      Q.  Sure.  Every provision set forth in Joint
2  Exhibit No. 4 is binding on Tricon.  Correct?
3      A.  Anything I agree to is always binding.  So as
4  long as these are the terms that I agreed to, I'm always
5  bound by them.
6      Q.  Did you agree to all of the terms contained in
7  Joint Exhibit 4?
8      A.  Yes, I did.
9      Q.  And did you intend to honor all of those terms
10  on Tricon's behalf?
11      A.  I always honor my contracts, yes.
12      Q.  You were asked earlier today if you were aware
13  of a situation where Tricon had a U.S. counterparty in a
14  deal you had done through the broker where you had
15  had a dispute with a U.S. counterparty.  Do you remember
16  that testimony?
17      A.  That's correct.
18      Q.  You've had disputes with non-U.S.
19  counterparties in broker deals.  Correct?
20      A.  That's correct.
21      JUDGE BENTON:  Did you say "nine"?
22      MR. LEE:  Non-U.S. counterparties --
23      JUDGE BENTON:  Oh, non.
24      MR. LEE:  Yes.
25      JUDGE BENTON:  N-O-N?

133

1      MR. LEE:  Yes.
2      JUDGE BENTON:  Okay.
3      Q.  (BY MR. LEE)  Now, this final confirmation
4  letter was not sent out until Wednesday, July the 23rd.
5  Correct?
6      A.  I don't know if it was the afternoon of the
7  22nd or early on the 23rd.  I'm not sure.
8      Q.  Well, if we -- Joint Exhibit No. 4 at least
9  indicates that it was sent to Rick Wilson on Wednesday,
10  July 23rd, 2008?
11      A.  Right, at 8:23.
12      Q.  Okay.  Are you aware of it going out before
13  that?
14      A.  I don't know when it was sent to me.  I don't
15  know.
16      Q.  And after you received Joint Exhibit No. 4,
17  which as you said finally had all of the terms that you
18  agreed to on Tricon's behalf, you then prepared a sales
19  contract.  Correct?
20      A.  I believe we prepared it prior to even
21  receiving this amended confirmation.
22      Q.  You didn't send it to Vinmar until after you
23  had received the amended confirmations.  Correct?
24      A.  Yeah, it appears so.  You're correct.
25      Q.  Okay.  And earlier -- let's take a look at, if

34  (Pages 130 to 133)

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

**134**

1  we could, Joint Exhibit No. 5. Now, you talked about
2  this document earlier today and I think you referred to
3  it as a sales letter. But isn't this a sales contract?
4     A.  That's the word that I used here in this
5  e-mail.
6     Q.  Okay. I'm just -- okay. So you prepared the
7  sales contract because that's something that is in
8  keeping with Tricon's standard practice. Correct?
9     A.  It's standard industry practice, not just for
10  Tricon.
11    Q.  But it's Tricon's standard practice. Correct?
12    A.  We are a participant in the industry so, yes,
13  we go by industry standards.
14    Q.  But I just asked you about your standards.
15  Okay?
16    A.  Okay.
17    Q.  You're not here testifying on behalf of
18  anybody else, are you?
19    A.  No, sir.
20    Q.  You're Tricon's representative?
21    A.  That's correct.
22    Q.  Okay. So let me ask you about Tricon's
23  standard practice.
24    A.  Okay.
25    Q.  It was Tricon's standard practice to prepare a

---

**135**

1  sales contract. Correct?
2     A.  We pass sales letters to companies, yes.
3     Q.  This is passed as a sales contract?
4     A.  Or an e-mail. Yes.
5     Q.  Is there a difference between a contract and a
6  letter to you?
7     A.  I'm not a lawyer so I don't know the answer to
8  that.
9     Q.  Well, I'm just curious. You keep referring to
10  a letter. Your e-mail said contract. Are you trying to
11  make a distinction between the two?
12    A.  I'm not trying to make any distinctions, no.
13    Q.  Tricon's procedures, in fact, require a sales
14  contract. Correct?
15    A.  On any deal that you do with a counterparty,
16  you should pass some paper to the other side on either a
17  purchase or a sale, but whether you do so you still have
18  a deal.
19    Q.  And the deal is as set forth in that
20  confirmation. Correct?
21    A.  If you and I were to do a deal on a napkin
22  right now, we would have a deal.
23    Q.  Okay. My question was, the deal would be the
24  deal as it's set forth in the confirmation, correct, in
25  this case?

---

**136**

1     A.  That's correct.
2     Q.  Okay. But my original question was, Tricon's
3  procedures require a sales contract. Correct?
4     A.  We're supposed to pass paper to the other
5  side, that's correct.
6     Q.  And the paper that you passed was a sales
7  contract in this case?
8     A.  It's here in Vinmar No. 5.
9     Q.  And, you know, in fact, Mr. Leyman knew that
10  you would be sending a sales contract as well, didn't
11  he?
12    A.  It's standard industry practice, yes.
13    Q.  You didn't intend to conclude a deal with
14  Vinmar until your sales contract was in place and
15  signed. Correct?
16    A.  That's definitely incorrect.
17    Q.  Okay. You prepared the sales contract?
18    A.  I believe in this case -- I'm not sure if I
19  did or Vuk did.
20    Q.  I believe that you testified that you prepared
21  it.
22    A.  I don't remember, but --
23    Q.  It wouldn't surprise you if you did?
24    A.  Not at all.
25    Q.  You included a signature blank for yourself.

---

**137**

1  Correct?
2     A.  That's what's printed from our system.
3     Q.  And it's got your name on it? If we turn to
4  Joint Exhibit 5, the last page, it's got -- you filled
5  in the date, July 22nd, 2008, didn't you?
6     A.  The system generated that date, yes.
7     Q.  And then put your name, Brad Lockwood. Right?
8     A.  Again, generated by the system, yes.
9     Q.  And your signature blank?
10    A.  That's correct.
11    Q.  Which you didn't sign. Correct?
12    A.  That's correct.
13    Q.  You never signed this sales contract.
14  Correct?
15    A.  That's correct.
16    Q.  It also had a spot for Rick Wilson at Vinmar
17  to sign. Correct?
18    A.  That's correct.
19    Q.  And he didn't -- he's never signed it, has he?
20    A.  That's correct.
21    Q.  Now, I just want to be clear. I want to make
22  sure I understand what your testimony is, Mr. Lockwood,
23  about this document and the MOAB confirmation because
24  you had -- you are Tricon's representative in this case.
25        What document contains the contract that

---

35  (Pages 134 to 137)

ARBITRATION HEARING - SEPTEMBER 20, 2010

138

1   Tricon sues upon in this case?
2       A.  I believe, again, like I said earlier, if you
3   look at the Tricon letter and MOAB confirmation, the key
4   points of product, quantity, quality, price, Incoterms,
5   delivery period and payment terms all match, which are
6   the material terms of any deal.
7           So when we have the letter here having
8   additional terms, that's why Mr. Rajevac asked for Pascu
9   to agree to all those terms, which he later did.  So the
10  material terms are here shown on the first page and the
11  additional terms are what Mr. Pascu agreed to later.
12          MR. LEE:  I'll object.  Nonresponsive.
13      Q.  (BY MR. LEE)  My question is, what document --
14          MR. LEE:  I object to the question -- the
15  answer as nonresponsive and ask that it be stricken.
16          JUDGE BENTON:  It's overruled.
17      Q.  (BY MR. LEE)  What document contains the
18  contract that Tricon bases its claim on?
19      A.  Again, I'm not a lawyer so all I can say is
20  that anything that lists the product, quantity, quality,
21  price, Incoterm, delivery period and payment terms,
22  that's what the contract is.  So if Ed had been at a
23  restaurant writing my firm offer or Rick Wilson's firm
24  bid on a napkin and walking it over to my table and me
25  accepting it on a napkin, it wouldn't matter what kind

139

1   of piece of paper it's on.  As long as the material
2   terms are shown, that's the -- that's the deal.  And,
3   again, when you're saying which one, I'm not a lawyer so
4   I don't know which one to point to.  I just know that
5   the material terms on our letter match the confirmation.
6       Q.  Well, but you -- you've asked the panel to
7   award Tricon money on a contract.  Correct?
8       A.  That's correct.
9       Q.  And is it -- you can't tell the panel which
10  document you're asking them to enforce?
11      A.  Well, the beautiful thing is that Pascu
12  accepted all of our additional terms so really it's a
13  moot point in my opinion.
14      Q.  So is it -- is it your testimony that the
15  document that Tricon seeks to enforce in this case is
16  this sales contract, Joint Exhibit 5, that you sent to
17  Vinmar?
18      A.  You'd have to direct that question to a
19  lawyer.  I'm not a lawyer so...
20      Q.  Well, do you know?
21          MR. DIAZ-ARRASTIA:  Your Honor, this
22  question has been asked five times.  I think
23  Mr. Lockwood has given the same answer every time.
24          JUDGE BENTON:  That is -- that is a fair
25  observation, but I'm going to give Mr. Lee some leeway

140

1   so let's proceed.
2           MR. LEE:  Thank you.
3       Q.  (BY MR. LEE)  And if you don't know the
4   answer -- I mean, the question is --
5       A.  I'm not sure.
6       Q.  -- do you have -- I mean, do you know what
7   document that you as Tricon's representative are asking
8   the panel to enforce in this case?
9       A.  I'm not an expert on damages or a lawyer so I
10  don't know the answer to that question.
11      Q.  Why did you include a signature blank for
12  yourself?
13      A.  That's generated by our system for any deal
14  that's done so it's automatically generated, whether or
15  not I planned to sign it or not.
16      Q.  So it's just something that's automatically
17  generated?
18      A.  That's correct.
19      Q.  And you chose not to sign it in this case?
20      A.  That's correct.
21      Q.  The reason you didn't sign it is so that you
22  could later claim that there was no agreement if the
23  price went against you.  Isn't that right?
24      A.  That's absolutely false.
25      Q.  Why have the signature blank for Brad Lockwood

141

1   on a sales contract unless you intended to sign it?
2       A.  As I testified earlier, when asked by other
3   counterparties on spot deals to sign deals, if it's
4   really important to them, then I've signed it, but
5   otherwise there's no point in signing it if it's not
6   necessary from the other person's side.
7       Q.  Okay.  What if there are inconsistencies
8   between the confirmation from MOAB, Joint Exhibit No. 4,
9   and the sales contract that you sent on July 23rd, which
10  is Joint Exhibit 5?
11      A.  Please show me the inconsistencies.
12      Q.  I just said if there -- if there are any
13  inconsistencies or inconsistent terms, do you know how
14  that would be interpreted in this case?
15      A.  I guess you would have to show me what you're
16  referring to.
17      Q.  Okay.  Is it your testimony that there are no
18  terms that are inconsistent between the sales contract
19  and the MOAB sales confirmation?
20      A.  Can you repeat the question or rephrase the
21  question?
22      Q.  Sure.  Is it your testimony that there are no
23  inconsistent provisions between the MOAB letter and the
24  sales contract you sent?
25      A.  If you look at the product, the quantity, the

36 (Pages 138 to 141)

ARBITRATION HEARING - SEPTEMBER 20, 2010

142

1  quality, the price, the Incoterm, the delivery period
2  and the payment terms, they all match. So if you're
3  wanting to point out something else, you'll have to be
4  more specific or show me what you're referring to.
5      Q.  Well, I mean, I think my question was a little
6  broader than that. I just said are you -- do you think
7  there are any inconsistent provisions between the MOAB
8  letter and the sales contract?
9      A.  And your broad question was asked to be more
10 specific so you'd have to show me what you're referring
11 to.
12     Q.  So you can't answer that question?
13     A.  I can't answer that broad a question, no.
14     Q.  Okay. Well, let's take a look then at --
15 let's look at both of them. Okay?
16     A.  Okay.
17     Q.  Joint Exhibit 4 is the MOAB letter. Right?
18 And -- correct?
19     A.  That's correct.
20     Q.  Now, MOAB's confirmation under quantity says,
21 "5,000 metric tons plus or minus 5 percent, seller's
22 option." Do you see that?
23     A.  That's correct.
24     Q.  That means, as you've testified earlier, that
25 Tricon in this case would have the option to increase

143

1  the quantity or reduce the quantity as it sees fit
2  within that 5 percent leeway. Correct?
3      A.  That's correct.
4      Q.  All right. Now, if we look at Exhibit 5,
5  which is the document you prepared, under the quantity
6  that says, "5,000 metric tons plus or minus 5 percent,
7  vessel's option," does it not?
8      A.  That's correct.
9      Q.  So in that case, it would be the ship owner
10 who is shipping the product who would decide whether the
11 quantity loaded would be 5,000 or whether it would be
12 plus or minus 5 percent. Correct?
13     A.  That's incorrect.
14     Q.  Isn't that what that says?
15     A.  It says, "the vessel's option," but I had to
16 charter a vessel on a CFR so I would never fix the
17 vessel giving that option to the vessel.
18     Q.  But my question on the document itself is,
19 this says, "vessel's option." Correct?
20     A.  It says that, yes.
21     Q.  And that's different than seller's option.
22 Correct?
23     A.  In the case that I am the seller, what matters
24 is that I am the one that's going to be chartering the
25 vessel and I have the option whether or not to give it

144

1  to the vessel. So from the buyer's perspective, there
2  is no difference. They're not in control of the plus or
3  minus 5 percent.
4      Q.  That wasn't my question. My question is,
5  there is a difference between seller's option and
6  vessel's option. Correct?
7      A.  Right. And since I would be chartering the
8  vessel, there would be no difference.
9          JUDGE BENTON: I think the panel
10 understands each of you. Let's --
11     Q.  (BY MR. LEE) Now, let's take a look at the
12 title and risk provision on the MOAB confirmation. Now,
13 that says, "Title and risk to pass from seller to buyer
14 as the product passes the barge/vessel's flange at load
15 port." Do you see that?
16     A.  That's correct.
17     Q.  Okay. Now, in your sales contract, if we
18 looked at Page 2, what you -- what you put under
19 Paragraph 7, it says, "Transfer title and risk.
20 Transfer title of the product will pass from seller to
21 buyer upon payment in full of the total price and
22 then -- and interest, if any." Right?
23     A.  That's correct.
24     Q.  Okay. So not until Vinmar pays for it will
25 they get title under this document. Correct?

145

1      A.  That's the proposal for additional terms.
2      Q.  Okay. Well, that's different than what
3  Mr. Leyman had put in his confirmation. Correct?
4      A.  And that's why we proposed it as an additional
5  term.
6      Q.  Okay. So -- and that's an inconsistency
7  between the two documents, is it not?
8      A.  It's a difference on the proposal for the
9  additional term, yes.
10     Q.  That's a different term of the deal. Correct?
11     A.  It's a proposal for an additional term.
12         JUDGE DAVIDSON: Can I ask a question?
13         MR. LEE: Sure.
14         JUDGE DAVIDSON: Under -- do you mind?
15 It's right on this.
16         MR. LEE: Absolutely.
17         JUDGE DAVIDSON: On Paragraph 7 of
18 Exhibit 5, there seems -- there are two different
19 risk -- transfer of risk provisions. There's that first
20 sentence and then there's that second paragraph with the
21 A and B. You see where I'm going?
22         MR. LEE: Yes.
23         JUDGE DAVIDSON: And I don't understand in
24 the trade the difference between those two separate
25 provisions. I mean, I can read them. I just -- it

37  (Pages 142 to 145)

ARBITRATION HEARING - SEPTEMBER 20, 2010

146

1  seems to be two different provisions for transfer of
2  risk.  If somebody could --
3         JUDGE BENTON:  Let the witness -- let the
4  witness explain it.
5         JUDGE DAVIDSON:  -- explain it.
6         THE WITNESS:  Okay.  Sure.  If the look at
7  the MOAB confirmation, it says, "Title and risk to pass
8  from seller to buyer as the product passes the
9  barge/vessel's flange at load port."  What that means is
10 that I'm loading the vessel for Vinmar because I've
11 agreed to pay the freight to move it to Asia.  That's
12 what CFR means.
13        So I'm going to pull the vessel up to
14 let's say hypothetically Exxon's dock to load.  The
15 moment I start to pump that product onto the vessel, the
16 moment it's crossed over the vessel's railing onto the
17 vessel, it's Vinmar's product, but I'm still obligated
18 to move it for him to the discharge port.  I'm paying
19 the freight, but they have the title on the risk of the
20 product once it's on board the vessel.
21        So, for example, if the vessel was to sink
22 when it's out on the way -- on the way to Asia, Vinmar
23 would have to be the one claiming the damages to their
24 insurance company because they owned the product once it
25 was on the vessel.

147

1         JUDGE DAVIDSON:  Okay.  I just picked it
2  up.  There's a distinction between transfer of title and
3  transfer of risk.  That's the key, I didn't --
4         THE WITNESS:  Right.
5         JUDGE DAVIDSON:  I didn't pick up the
6  distinction between them.
7         THE WITNESS:  On the CFR, it says, "Risk
8  of damage to or loss of product shall pass from seller
9  to buyer at the flange connection between the loading
10 hose."
11        JUDGE DAVIDSON:  But there's two different
12 transfer types in this -- on this -- in Exhibit 5.  The
13 first is for transfer of title and the second is for
14 transfer of risk and they would appear to be at two
15 different times.
16        THE WITNESS:  Right.  And that's just our
17 proposal.  It's standard for additional terms, just
18 passing that as a proposal.
19        JUDGE DAVIDSON:  Okay.
20        THE WITNESS:  So I guess you would say the
21 risk matches with MOAB.  They're just -- the title
22 proposal is different than MOAB's.
23        JUDGE DAVIDSON:  Got it.
24        THE WITNESS:  That's probably clarifying
25 what you're saying.

148

1         JUDGE DAVIDSON:  Yeah.
2         JUDGE BENTON:  Mr. Lee, is this a good
3  time?  I know --
4         MR. LEE:  Sure.
5         JUDGE DAVIDSON:  1:00 --
6         JUDGE DAVIDSON:  1:00 o'clock?
7         JUDGE BENTON:  Okay.  1:00 o'clock work or
8  do you need more time?
9         MR. DIAZ-ARRASTIA:  1:00 o'clock is fine.
10        JUDGE BENTON:  Very good.  We're off the
11 record.
12        (Recess from 11:59 a.m. to 1:01 p.m.)
13        JUDGE BENTON:  Okay.  We're back on the
14 record.
15        Do you-all have an agreement on the
16 exhibits coming into evidence save and except for those
17 that you specifically object to or is there an agreement
18 only on the joint exhibits?
19        MR. LEE:  I think from my perspective
20 certainly the joint exhibits we've agreed to.  On the
21 individual exhibits, there are a few that I have an
22 objection to.  I think I've raised a couple of those.
23        I think the bigger issue with the
24 individual exhibits is there's some duplication that
25 we've noticed over the weekend.  I think we probably

149

1  want to pull some of that out when it's over, but --
2         MR. DIAZ-ARRASTIA:  There -- I know
3  there's at least one of the Vinmar exhibits that -- we
4  have an objection in this sense.  I think in an
5  arbitration the panel will see the evidence and will
6  give it the proper weight.
7         JUDGE DAVIDSON:  The question is, do
8  you-all need to make a formal tender or offer of
9  documents in order for it to be --
10        MR. DIAZ-ARRASTIA:  I would.
11        JUDGE DAVIDSON:  -- before us because
12 nobody -- you've been using exhibits as if they were
13 already in evidence.  We can assume that -- y'all can
14 keep doing that and we'll --
15        MR. DIAZ-ARRASTIA:  Yeah.  I --
16        JUDGE DAVIDSON:  -- and we'll consider
17 them or not.
18        MR. DIAZ-ARRASTIA:  I have thought that's
19 what would be done.  There is one -- two documents, and
20 I don't know if Mr. Lee tends to present them or not,
21 where if he does I would just like to point out what I
22 think are some shortcomings in the documents if he does.
23        I don't know that he will.  But I -- it --
24 I don't -- I was not contemplating that we would be
25 sifting through the exhibits and hear objections on

38  (Pages 146 to 149)

ARBITRATION HEARING - SEPTEMBER 20, 2010

150

1    them.
2           JUDGE DAVIDSON:  Okay.
3           JUDGE WOOD:  I think our concern is just
4    so that you know that if y'all reference a document
5    we're going to read the document.  Okay.
6           MR. LEE:  Correct.  And I think that's --
7    I guess the joint exhibits, I certainly think they
8    should be admitted.  I guess the only thing I would say
9    about the -- each individual set of exhibits is if
10   they're not used during the arbitration then they
11   probably shouldn't come in, but to the extent they're
12   used and there's no objection they ought to -- I mean, I
13   don't --
14          JUDGE WOOD:  So maybe we can at the end
15   reconcile everybody's list.
16          JUDGE BENTON:  That's what I was going to
17   do.
18          MR. DIAZ-ARRASTIA:  That would be fine.
19          JUDGE BENTON:  Okay.  Let's see.  We'll
20   try to go until about 2:30 before we take a break, but
21   if any one of you needs a break before that time, just
22   let us know.
23          And anything else, Judge Davidson?
24          JUDGE DAVIDSON:  Let's do it.
25          JUDGE BENTON:  Judge Wood?

151

1           JUDGE WOOD:  No.
2           JUDGE BENTON:  Mr. Lee?
3           MR. LEE:  Thank you.
4    Q.  (BY MR. LEE)  Mr. Lockwood, let me just -- a
5    couple of other quick questions on this -- the
6    difference between the MOAB confirmation and the sales
7    contract, which are in your joint book, Exhibit 4 and
8    Exhibit 5.
9           I think I'll just ask you one more
10   question as opposed to going through all of them.  In
11   the Joint Exhibit No. 4, the MOAB confirmation, there's
12   a provision for inspection.  Correct?
13   A.  That's correct.
14   Q.  Now, what the confirm says is that the
15   inspection cost will be paid equally between buyer and
16   seller.  Correct?
17   A.  That's correct.
18   Q.  So those would be shared.  Right?
19   A.  That's correct.
20   Q.  The sales contract from -- that you sent to
21   Mr. Wilson or Dr. Wilson actually says on the cost of
22   inspection that it will be 100 percent to Tricon.
23   Correct?
24   A.  That's correct.
25   Q.  And is that what you intended, that Tricon

152

1    would pay 100 percent of the inspection cost?
2    A.  Yes, I did.
3    Q.  Is that so that Tricon could supply product
4    that had already been shipped?
5    A.  It was simply -- the industry standard that
6    I've seen on the CFR deals has been a hundred percent
7    seller at load and the buyer pays at discharge.  So if
8    Vinmar wanted to share in the cost 50/50, I would
9    welcome them paying 50 percent of it, but I thought they
10   would be happy with me paying a hundred percent.
11   Q.  Okay.  That's different.  Right?
12   A.  It's different than Ed Leyman's, yes.
13   Q.  Okay.  And my question, is that so that Tricon
14   would have the right to supply product under this
15   contract that was already on the water?
16   A.  It had no bearing on product on the water.  It
17   was simply me offering to pay a hundred percent of the
18   costs.
19   Q.  You do agree it was possible for Tricon
20   to under this contract go ahead and ship MX to Asia
21   prior to the time that Vinmar had declared a discharge
22   port.  Correct?
23   A.  Of course.
24   Q.  And you could have arranged with your shipping
25   company a guaranteed arrival.  Correct?

153

1    A.  That never happens.
2    Q.  Is it possible for you to have arranged that?
3    A.  If a ship owner would be crazy enough to
4    guarantee it, yes, but that never happens.
5    Q.  So it's possible to arrange a guaranteed
6    delivery date?
7    A.  In theory, yes.
8    Q.  Now, you've said -- and I want to just move on
9    to another point.  But you've said several times today
10   that Mr. Pascu from Vinmar accepted Tricon's sales
11   contract?
12   A.  He --
13   Q.  You testified to that?
14   A.  He accepted it except for three points.
15   Q.  Have you testified to that?
16   A.  I believe that's what I said earlier.
17   Q.  Okay.  And when you say he accepted Tricon's
18   sales contract, what you're referring to is an e-mail
19   that Mr. Pascu sent to Vuk Rajevac.  Correct?
20   A.  That's correct.
21   Q.  I mean, you've never talked to Mr. Pascu?
22   A.  Never talked to him.
23   Q.  And you don't know whether he's ever talked to
24   Mr. Rajevac, do you?
25   A.  I'm sure he must have spoken to him, but I

39 (Pages 150 to 153)

ARBITRATION HEARING - SEPTEMBER 20, 2010

154

1  don't know when.
2      Q.  And we can turn to the exhibit, but I just --
3  let me ask you.  The e-mail that you're talking about is
4  an e-mail where Mr. Pascu says, "Here are some comments.
5  We'll revert with our purchase order."  Correct?
6      A.  Which exhibit is that?
7      Q.  How about Joint Exhibit 13?  Okay.  Mr. Pascu
8  says to Mr. Rajevac, "Please find enclosed our comments
9  on your sales confirmation."  Correct?
10     A.  That's correct.
11     Q.  And then he says, "We shall revert soon with
12  our purchase order for your review"?
13     A.  That's correct.
14     Q.  All right.  And the purchase order never was
15  sent, was it?
16     A.  That's correct.
17     Q.  Is this the document that you claim is the
18  acceptance of Tricon's sales contract?
19     A.  Again, I'm not a lawyer.  I'm just looking at
20  the fact that on Exhibit 13 on Tricon's sales letter the
21  purchase order from Vinmar's number has been written at
22  the top.
23         You have different checkmarks written on
24  there.  You have the LC -- letter of credit opening
25  date, the expiring date, the cost for them to open a

155

1  letter of credit and all of the different checkmarks on
2  our letter.  That's what I'm referring to.
3      Q.  Okay.  But I guess my question was, is this
4  what you claim to be an acceptance?
5      A.  I'm claiming their comments and changes and
6  checkmarks on our letter as being what he said he was
7  writing on our sales letter.
8      Q.  But you don't know whether that's an
9  acceptance or not, do you?
10     A.  I'm not aware, no.
11     Q.  Okay.  Now, you do know that Mr. Rajevac
12  responded to Mr. Pascu's e-mail.  Correct?
13     A.  That's correct.
14     Q.  And, by the way, you never heard from
15  Dr. Wilson, who was the person at Vinmar who you
16  understood had negotiated this alleged deal.  Right?
17     A.  Other than him trying to sell it back, no.
18     Q.  Okay.  And Mr. Rajevac -- it's the next
19  exhibit, Joint Exhibit 15.
20     A.  14?
21     Q.  I'm sorry.  14.
22     A.  Okay.
23     Q.  Now, Mr. Rajevac says that "Your comments on
24  the contract well noted and accepted except for
25  demurrage time bar, which is 90 days as per industrywide

156

1  standard."  Do you see that?
2      A.  That's correct.
3      Q.  Okay.  And there never was an agreement on the
4  demurrage time bar.  Correct?
5      A.  That's correct.
6      Q.  And you never signed the sales contract?
7      A.  That's correct.
8      Q.  And mister -- Dr. Wilson never signed the
9  sales contract.  Correct?
10     A.  That's -- if you're talking about a written
11  signature, no.
12     Q.  Now, you became aware on July 31st -- by the
13  way, you were asked some questions earlier about an
14  exchange between you and Dr. Wilson on the morning of
15  July 31st and the -- that exchange followed -- you first
16  went to Ed Leyman on the morning of July 31st and asked
17  if there was any MX available.  Correct?
18     A.  That's correct.
19     Q.  And, in fact, you suggested to Mr. Leyman that
20  "You might be interested in buying back the MX that you
21  believe you had sold to Vinmar"?
22     A.  That's correct.
23     Q.  And you even indicated a price of around
24  1230 metric tons?
25     A.  I think it was 1220.

157

1      Q.  Okay.  And an indication to Mr. Leyman that
2  you'd be interested in buying this Vinmar -- this MX
3  that you believe you had sold to Vinmar back --
4      A.  That's correct.
5      Q.  -- around that price range.  Correct?
6      A.  That's correct.
7      Q.  And that's why -- and you understand that
8  Mr. Leyman picked up a conversation with mister -- or
9  Dr. Wilson on that -- on the morning of July 31st.
10  Correct?
11     A.  That's correct.
12     Q.  And it was following those discussions that
13  Rick Wilson then sent you an instant message.  And we
14  had a conversation about that.  Correct?
15     A.  That's correct.
16     Q.  All right.  That all took place on the morning
17  of July 31st?
18     A.  That's right.
19     Q.  Prior to -- if you'll just take a look at
20  Joint Exhibit 14, the top e-mail is from Mr. Pascu to
21  Rick Wilson on July 31, 2008.  That's at 1:39 p.m.
22  Correct?
23     A.  That's correct.
24     Q.  Your exchange with Dr. Wilson occurred prior
25  to 1:39 p.m. on July 31st.  Correct?

40 (Pages 154 to 157)

ARBITRATION HEARING - SEPTEMBER 20, 2010

158

1    A.  Yes, it did.
2    Q.  And you don't know when it is that Dr. Wilson
3  was informed that Tricon had a different version of the
4  contract than he did, do you?
5    A.  No, I don't.
6    Q.  Okay.  What you do know is that according to
7  Joint Exhibit No. 15, some four minutes after receiving
8  an e-mail from Laurentiu Pascu, Dr. Wilson wrote to Vuk
9  Rajevac, "Vuk, we cannot accept open origin for this
10  material.  It must be from the USA."  Correct?
11    A.  That's correct.
12    Q.  All right.  So by July the 31st in the
13  afternoon, you were aware that there was a disagreement
14  between Tricon and Vinmar about the terms of this
15  alleged deal?
16    A.  Which I believe that is two days after Vuk
17  told Laurentiu, yes, that's correct.
18    Q.  Well, if you want to do that, let's just go
19  back.  It's five minutes after Mr. Pascu sent Mr. Wilson
20  Vuk Rajevac's e-mail.  Correct?  Take a look at Joint
21  Exhibit 14.
22    A.  That's correct.
23    Q.  So as of 1:43 p.m. on July 31st, you were
24  aware that Vinmar -- there was a disagreement between
25  Vinmar and Tricon as to the terms of this alleged deal?

159

1    A.  That would be assuming that Vuk told me at the
2  same time.
3    Q.  Well, you learned it that day.  Correct?
4    A.  Well, that would mean that Rick Wilson learned
5  it on the 29th as well.
6    Q.  No.  That's not my question, Mr. Lockwood.  My
7  question is, did you not learn on July 31st that there
8  was a disagreement between Vinmar and Tricon about the
9  terms of the alleged deal?
10    A.  I'm saying if I apply the same logic that I
11  learned on an e-mail that I was not copied on the same
12  day that it was sent, then that would mean Rick Wilson
13  learned on the 29th as well on an e-mail he was not
14  copied on.
15    MR. LEE:  Object as nonresponsive to my
16  question.
17    JUDGE BENTON:  That is sustained.  Ask the
18  question again, please.
19    MR. LEE:  Yes, sir.
20    Q.  (BY MR. LEE)  Mr. Lockwood, my question is,
21  isn't it true that on July 31st, 2008, you learned that
22  there was a disagreement between Tricon and Vinmar as to
23  the terms of the alleged deal?
24    A.  Yes, because my scheduler told me immediately.
25    Q.  Now, let's go to Vinmar Exhibit No. 9.  And I

160

1  want to focus on the page that's labeled at the bottom
2  right-hand corner TRI 48.
3    A.  48?
4    Q.  Yes.
5    A.  This is Vinmar -- okay.  Vinmar exhibits.
6  Sorry.  14?
7    Q.  9.
8    A.  9.
9    Q.  And it's TRI 48.  It's Page 6 of 9.
10    A.  Okay.  I have it.
11    Q.  Now, you've done at least 300 deals
12  with Ed Leyman?
13    A.  Approximately, yes.
14    Q.  Has that number increased since the time you
15  were deposed?
16    A.  Yes, it has.
17    Q.  You've done a number of deals using Mr. Leyman
18  as a broker.  Correct?
19    A.  Since I was deposed.
20    Q.  Just in general.
21    A.  Oh, yes.
22    Q.  A large number?
23    A.  Over the course of my career, around 300 or
24  so.
25    Q.  Paid him substantial commissions.  Correct?

161

1    A.  Whatever the market price was I paid him.
2    Q.  You told -- let's start on August the 6th
3  there.  You asked Mr. Leyman -- these are again instant
4  message conversations.
5    JUDGE DAVIDSON:  What exhibit?
6    MR. LEE:  I'm sorry.  It's Vinmar
7  Exhibit 9.
8    JUDGE DAVIDSON:  Okay.
9    MR. LEE:  The -- Page 6 of 9.  It's
10  TRI 48.  I'm sorry.
11    JUDGE DAVIDSON:  No.  I'm just -- okay.
12  Got it.
13    MR. LEE:  And it's TRI 48.
14    A.  At the bottom you have to see TRI 48.
15    Q.  (BY MR. LEE)  And I want to start midway down
16  there on August the 6th, 2008.  You see that?  You pick
17  up a conversation with Mr. Leyman at 2:36 p.m.?
18    A.  Okay.
19    Q.  You see that?
20    And you -- the first thing you say is,
21  "July 22nd."
22    He responds, "Phone."
23    Now, what you were asking Mr. Leyman is
24  whether he had any notes or instant messages with Vinmar
25  that would document the terms of the deal that you

41  (Pages 158 to 161)

ARBITRATION HEARING - SEPTEMBER 20, 2010

162

1    believe he had negotiated. Correct?
2       A. Let me read the context of that response.
3    Okay. Can you repeat the question for me?
4       Q. Sure. You started by saying, "July 22nd," and
5    he responded, "Phone." And what you wanted to know is
6    were there any notes or recordings or anything that
7    might contain the terms of the deal that Mr. Leyman had
8    been authorized by Vinmar to accept?
9       A. Where did I ask that? I don't see --
10      Q. I'm just asking, isn't that what you're asking
11   him about here?
12      A. I have no idea. I can't -- I don't see
13   anything that says that.
14      Q. Okay. Well, you respond -- when he says,
15   "Phone," you respond and say, "It's okay. You know the
16   truth. You know what was agreed in your confirmation
17   and my contracts prove that." You see that?
18      A. I see that sentence, yes.
19      Q. And weren't you first asking him, do you have
20   anything in paper between you and Mr. Wilson that will
21   demonstrate what terms he authorized you to accept?
22      A. No. Actually I think I was referring to the
23   fact when the deal was done and I said, "July 22nd."
24          He said, "On the phone."
25      Q. Okay.

163

1       A. So that's what I was referring to.
2       Q. And then you tell him that you're glad you
3    would vouch for me -- you meaning Ed Leyman -- if it
4    comes to that. Right?
5       A. That's correct.
6       Q. And you -- several times throughout these
7    instant messages beginning on July 31st and throughout
8    August the 6th you made several references to the fact
9    that you would -- you were very glad that Mr. Leyman is
10   there and that he'll vouch for you. Right?
11      A. That's correct.
12      Q. Were you trying to make it clear to him that
13   you expected him to support Tricon's position?
14      A. I just knew that he knew the truth as long as
15   I did -- as well as I did so I was glad that somebody
16   else knew the truth. That's all.
17      Q. Let me ask you to -- you can keep this
18   notebook open. I'm going to come back to it, but I
19   wanted to make a jump real quick to -- actually I'm
20   sorry. No, no, no. Same notebook. I've got three of
21   those. Vinmar exhibits, let's go to 16.
22          Now, Vinmar Exhibit 16 contains a number
23   of instant messages between you and Ed Leyman starting
24   on August 11th and going through February 4, 2009.
25   Correct?

164

1       A. Through when did you say?
2       Q. Through February. I think the last one in
3    here is February 4th, 2009.
4       A. It looks like February the 11th is out of
5    order. February the 11th, 2010.
6       Q. I'm sorry. The February 11th reference,
7    though, is not between you and Mr. Leyman. That -- it
8    was produced -- if you'll see the Bates labels in the
9    bottom right-hand corner, they're produced in that order
10   but your conversation on February 11th was not with
11   Mr. Leyman.
12      A. Okay. Yeah, you're right. February 4th,
13   you're correct.
14      Q. Okay. Now, if you go to -- let's see the
15   page -- TRI 282.
16      A. Okay.
17      Q. And this is an instant message exchange
18   between you and Mr. Leyman on October 17th, 2008.
19   Correct?
20      A. That's correct.
21      Q. All right. And you tell Mr. Leyman, "Be
22   prepared. Somehow you will be needed to help me get my
23   money from Vinmar." Do you see that?
24      A. I do.
25      Q. Okay. And what you were referring to when you

165

1    said "my money," is that a reference to the bonus that
2    you expect to receive?
3       A. No. It meant for the company for Vinmar to
4    perform on the deal.
5       Q. You wanted to make sure that Mr. Leyman knew
6    that you'd need his help. Right?
7       A. It looks like I was saying that the invoice we
8    had invoiced Vinmar for repudiation was due on Wednesday
9    and surely they probably won't pay so be ready because
10   we'll be going through arbitration and we'll want him to
11   speak the truth.
12      Q. What you said was, "Somehow you will be needed
13   to help me get my money from Vinmar." Right?
14      A. That's correct.
15      Q. Okay. And if you go to the next page, now,
16   you did -- you called Rick Wilson several months after
17   he had left Vinmar's employment. Right?
18      A. I don't know the exact time, but, yes, I did
19   call him.
20      Q. You called him after he had left Vinmar's
21   employment?
22      A. That's correct.
23      Q. And, in fact, here on IM -- on Page 238 -- I'm
24   sorry, 283, these are instant message exchanges again
25   between you and Mr. Leyman, this time on January 30,

42  (Pages 162 to 165)

ARBITRATION HEARING - SEPTEMBER 20, 2010

166

1  2009.  Right?
2      A.  Yeah.
3      Q.  And you ask Mr. Leyman, "Where did Rick Wilson
4  go?"
5      A.  That's correct.
6      Q.  And what you tell Mr. Leyman is, "I really
7  want to try and contact him again today," him being
8  Dr. Wilson.  Right?
9      A.  That's right.
10     Q.  And you say, "Since he's no longer with
11 Vinmar, I'm hoping that he would admit that he thought
12 we had a deal"?
13     A.  That's correct.
14     Q.  Okay.  So were you hoping that -- were you
15 under the impression that Vinmar had told Dr. Wilson
16 that he needed to take the position that there was no
17 deal?
18     A.  I had no way -- no understanding of why
19 somebody would not perform, if it was by his own
20 volition or the company pressuring him, but my hope was
21 that by contacting him outside of the company that was
22 not performing that he would be able to speak the truth.
23     Q.  You were hoping that maybe he had an axe to
24 grind against Vinmar.  Right?
25     A.  No.  I just wanted the truth.

167

1      Q.  Didn't -- when you called him, didn't you
2  suggest to him that Vinmar wasn't a great place for him
3  to work?
4      A.  Not at all.
5      Q.  No?  Didn't you suggest to Dr. Wilson that he
6  could help you get his bonus back?
7      A.  No.  That's not what I said.
8      Q.  You did ask him if he thought that the deal
9  required U.S. origin.  Right?
10     A.  I did.
11     Q.  And he told you yes, that was his
12 understanding?
13     A.  That's what he said.
14     Q.  And he's never wavered from that, has he?
15     A.  That's the only time I've spoken to him.
16     Q.  Now, when you -- you had told Mr. Leyman on
17 July 31st that you would need his help and you've
18 continued that throughout.  At what point in time did
19 you ask Mr. Leyman to preserve his records relating to
20 this alleged transaction?
21     A.  I don't ever remember discussing his records.
22     Q.  You know that MOAB records phone
23 conversations.  Correct?
24     A.  I did not know that until this deal.
25     Q.  Okay.  You have never asked Mr. Leyman about

168

1  that before?
2      A.  Never had a need to.
3      Q.  Did you ask him after the transaction came
4  into dispute?
5      A.  I thought my lawyers had asked, if I remember.
6      Q.  Okay.  Do you remember at any point in time
7  between July 22nd, 2008, and -- at any point after that
8  where you asked Mr. Leyman for his records?
9      A.  I may have tried to help gather documents for
10 the lawyers, but I don't remember.
11     Q.  Okay.  You don't remember approaching
12 Mr. Leyman requesting documents?
13     A.  Not specifically, no.
14     Q.  The last page of your instant messages, this
15 is on TRI 285.
16     A.  Okay.
17     Q.  Again, this is Vinmar Exhibit 16.
18     A.  Okay.
19     Q.  And on February 4th, 2009, if you'll look
20 midway down, you said, "Did you ever tell Rick Wilson or
21 Vinmar that your hard drive crashed?"
22         Do you see that?
23     A.  Yes, I do.
24     Q.  And then you say, "I.e., did they ever ask you
25 to produce information/communication regarding our

169

1  deal?"
2      A.  Okay.
3      Q.  Why did you put that in parentheses?  Does
4  that have some special meaning in an instant message?
5      A.  Not really, no.
6      Q.  All right.  When did Mr. Leyman tell you that
7  his hard drive had crashed?
8      A.  I don't remember if he told me or our lawyers
9  directly, but we found out that his hard drive had
10 crashed.
11     Q.  And what did you find out?
12     A.  That whatever he had on his hard drive had
13 been overwritten or something to that effect.
14     Q.  Okay.  And you said, "Meaning Rick Wilson
15 never asked you to reproduce Yahoo communications,
16 et cetera," and then you said, "Like when I asked him
17 but you said your hard drive crashed"?
18     A.  Okay.
19     Q.  When did you ask him?
20     A.  I have no idea.
21     Q.  Okay.  And you had -- you reminded him that he
22 had told you his hard drive crashed.  Right?
23     A.  That's right.
24     Q.  And then you told him later, "Hey, there's a
25 chance that Vinmar may try to call you today."

43  (Pages 166 to 169)

ARBITRATION HEARING - SEPTEMBER 20, 2010

170

1      A.   Where do you see that?
2      Q.   A little bit further down at 16:10:34,
3   "There's a chance Vinmar may try to call you now from
4   our mediation session." Do you see that?
5      A.   Right. I see that.
6      Q.   Is there a reason why you felt the need to
7   tell -- to remind Mr. Leyman that his hard drive had
8   crashed before telling him that Vinmar might be calling
9   him?
10      A.   No.
11      Q.   Let's go back to Vinmar Exhibit 9.
12      A.   Okay.
13      Q.   And, again, these are the additional instant
14   message communications between you and Mr. Leyman and I
15   want to go to the page that's marked TRI 50 --
16      A.   Okay.
17      Q.   -- which is Page 8 of 9 in the exhibit.
18      A.   Okay.
19      Q.   And at 5:50:35 p.m., so it's about a quarter
20   of the way down the page, you start with the statement,
21   "Let me ask you a question." Do you see that?
22      A.   Uh-huh.
23      Q.   And you said -- this is, again, to Mr. Leyman.
24   Right?
25      A.   Right.

171

1      Q.   You said, "Let me ask you a question. Here
2   was my original offer to you on Yahoo."
3      A.   Right.
4      Q.   And then you mentioned a deal that was a CFR
5   meeting ISO -- "Asia isomer spec 843." Do you see that?
6      A.   I do.
7      Q.   And then you ask, "How did we go from that
8   quality to 5211?"
9      A.   Right.
10      Q.   Right. Now, what you're referring to there is
11   that you -- in your instant message exchanges with
12   Mr. Leyman back on July 22nd you had made an offer to
13   sell mixed xylenes with a ASTM quality 843.
14      A.   With the additional parameters, yes.
15      Q.   Okay. And that was -- that is different than
16   the quality that ended up in the confirmation. Correct?
17      A.   People make firm offers and bids all the time
18   that are not accepted. This is a perfect example.
19      Q.   I'm sorry. My question was, isn't that
20   different than what ended up in the confirmation?
21      A.   And I just said I made a firm offer that was
22   not accepted so this is a perfect example of that
23   situation.
24           JUDGE DAVIDSON: So the answer is "Yes"?
25      A.   The answer is yes.

172

1      Q.   (BY MR. LEE) Okay. And so the offer that you
2   had made started with a quality of 843?
3      A.   That's correct.
4      Q.   Right. And the ASTM, the 5211, is a different
5   quality mixed xylene. Correct?
6      A.   That's correct.
7      Q.   Okay. Now, were you confused about what had
8   transpired on July 22nd?
9      A.   Not at all.
10      Q.   You asked him, how did we go from our original
11   offer to something different?
12      A.   I remember it very clearly.
13      Q.   Okay. And Mr. Leyman then responded to you
14   and he said, "Look, the negotiations were for only 5211
15   so the quality that Vinmar was interested in was always
16   the ASTM 5211 quality." Correct?
17      A.   That's correct.
18      Q.   And you -- in fact, you even asked, "Basically
19   he bid on 5211 only basis, I guess"?
20      A.   That's correct.
21      Q.   And Mr. Leyman said, "Yes. Never bid or
22   showed any interest for 843 spec"?
23      A.   That's correct.
24      Q.   Right. Okay. You testified earlier today
25   that Vinmar on August the 6th went back to Mr. Leyman.

173

1   And even though the price had fallen of mixed xylenes
2   Vinmar went back and said, "Recommitted to the deal at
3   the same price." Correct?
4      A.   Can you show me that exhibit?
5      Q.   Sure. It's Joint Exhibit 18. I think we
6   looked at that this morning. And I'm going to come back
7   to these instant messages so if you keep your hand
8   there, but this is the Joint Exhibit No. 18 which I
9   believe you looked at this morning.
10      A.   Okay. I see it now.
11      Q.   And all I want you to see here, Mr. Lockwood,
12   is that, in fact -- I understand that you testified this
13   morning that Mr. Wilson made or Dr. Wilson made
14   additional changes that you didn't agree with, but he
15   did tell Mr. Leyman on August the 6th he recommitted the
16   price of 1310. Right?
17      A.   With additional changes of the declaration
18   date, yes.
19      Q.   I understand that. And I just -- I just
20   wanted to acknowledge here that it was the same price
21   even though the mixed xylene market had fallen by this
22   time. Right?
23      A.   This is the non-good faith offer that I
24   referred to because of the change in declaration.
25      Q.   Got you. And you said -- you testified this

44  (Pages 170 to 173)

ARBITRATION HEARING - SEPTEMBER 20, 2010

174

1  morning that you responded.  You gave a proposal to
2  Vinmar to supply two different types of mixed xylene.
3  Correct?
4      A.  I did, yes.
5      Q.  And we can look at it, but don't you remember
6  the first option that you presented, this one that you
7  testified this morning that was mixed xylenes that would
8  have an ETA of the first half of September, the quality
9  in that mixed xylene was the 843 and not the 5211?
10 Correct?
11     A.  With the additional parameters that met the
12 standard Asia spec, that's correct.
13     Q.  It was 843 spec, not 5211?
14     A.  You cannot say 843 by itself.  You have to
15 point out the additional parameters as well.
16     Q.  Okay.  Well, it says 843 and additional
17 parameters versus the 5211 that was in the confirmation.
18 Correct?
19     A.  That's correct.
20     Q.  Okay.  And then the second offer that you made
21 on August the 6th was to deliver U.S. origin MX, meaning
22 the 5211 quality standard, but it wouldn't arrive in
23 Asia until mid October.  Correct?
24     A.  That's correct, but one thing to point out in
25 the first one it also was U.S. origin as well.

175

1      Q.  Sure, but it was a different quality.
2  Correct?
3      A.  Right, but you mentioned U.S. origin in the
4  second so I just wanted to point that out.
5      Q.  I'm sorry.  I didn't mean to omit that.
6  You're correct.
7          Now, if you go back to Vinmar Exhibit
8  No. 9, which again is instant message exchanges between
9  you and Mr. Leyman again.
10         MR. LEE:  And I apologize for jumping back
11 and forth but --
12         JUDGE DAVIDSON:  I'm up to the challenge
13 and I know they are.
14     Q.  (BY MR. LEE)  Now, what you pick up with --
15 here again, this is the -- the discussion that's really
16 going on here -- and this is TRI 50, it's Page 8 of 9 on
17 August the 6th in the late afternoon.  What you're
18 discussing with Mr. Leyman is the fact that Vinmar
19 didn't accept the proposals that you had offered.
20 Correct?
21     A.  Which part are you saying?
22     Q.  Well, I'm just saying that that -- isn't that
23 what's really happening here, that you were questioning
24 hey, didn't I originally bid 843 and Mr. Leyman is
25 saying, "Yes, but Vinmar has never shown an interest in

176

1  anything other than mixed xylenes meeting the ASTM 5211
2  standard"?
3      A.  Okay.
4      Q.  We just went through that.  I'm just trying to
5  get a placeholder.  Is that what you recall as sort of
6  the general --
7      A.  I can't remember the general conversation.  I
8  can read the words, but tell me what you're asking
9  specifically.
10     Q.  Well, isn't that what you start this
11 conversation off with on -- I mean, we can go back to
12 the question you said at 5:51 p.m., "How did we go from
13 that quality to 5211?"
14         And Mr. Leyman says, "The negotiations
15 were only for 5211."
16     A.  That's correct.
17     Q.  Okay.  And -- now, what Mr. Leyman -- at 6:02
18 on August the 6th, it's about three quarters of the way
19 down, 6:02:57 p.m., Mr. Leyman says, "If he doesn't have
20 it sold." He's talking about Dr. Wilson.  Correct?  Are
21 you with me?
22     A.  I see that, yes.
23     Q.  Okay.  "If he doesn't have it sold." That's
24 Dr. Wilson.  Right?
25     A.  That's right.

177

1      Q.  "Why would they reconfirm today a desire to
2  buy first half September U.S. origin at 1310 a metric
3  ton?"
4      A.  I see that.
5      Q.  And you responded, "He's only changing the
6  terms of the deal.  That's all he's trying to do."
7  Right?
8      A.  I do.
9      Q.  Okay.  And Mr. Leyman responds to that at
10 6:07 p.m. and says, "But if the MX market is lower than
11 on July 22nd, and it is, why would he send in writing a
12 firm proposal to buy at 1310?"
13     A.  Okay.  I see that.
14     Q.  Okay.  And, again, you respond and say, "You
15 can't change the terms of the deal."  Right?
16     A.  Yes, that's correct.
17     Q.  Okay.  And at the top of the next page at
18 6:12, Page 9 of 9, Mr. Leyman again says to you, "The
19 fact that Vinmar is still willing to pay 1310 in a
20 market that is much lower suggests that they are not
21 just walking or running away from the deal."  Right?
22     A.  That's what Ed wrote, that's correct.
23     Q.  Okay.  You don't agree with that, do you?
24     A.  That's why Ed's a broker, not a trader.
25     Q.  Okay.  In fact, he says a little bit further

45  (Pages 174 to 177)

178

1  down at 6:13 p.m., "They didn't come back with an
2  argument that there is no deal, but they would still buy
3  the 5 KT but at 1250 or 1225 or whatever.  They repeated
4  1310."  Right?
5      A.  That's what he wrote, yes.
6      Q.  Okay.  And you said, "Well, I don't understand
7  why they wouldn't accept No. 1 alternative"?
8      A.  Uh-huh.
9      Q.  And what you're referring to there is the
10  offer that you made in your letter on October -- on
11  August the 6th in which you offered ASTM 843 MX.  Right?
12      A.  With the additional parameters, yes.
13      Q.  Okay.  And Mr. Leyman responded, "Don't know
14  enough about Asia buyers to answer.  However, Vinmar's
15  interest in the USGC, any with U on CFR was also 5211."
16  Do you see that?
17      A.  I did.
18      Q.  And USGC, that's -- you understand that to be
19  U.S. Gulf Coast.  Right?
20      A.  That's correct.
21      Q.  And then Mr. Leyman at 6:18 again comes back
22  to you and says, "Given the fact that they will still
23  pay 1310 in a falling market, even if you perceive it as
24  changing the deal after the fact, it commercially makes
25  sense to you if you can supply the U.S. origin cargo for

179

1  first half September."  You see that?
2      A.  I do.
3      Q.  Okay.  You didn't agree with Mr. Leyman, did
4  you?
5      A.  Because he obviously is not taking into
6  account the risk of the shipping so that's again why I
7  say he's a broker, not a trader.
8      Q.  And we see that on August the 8th, 2008, you
9  testified this morning that you declared Vinmar in
10  breach of the contract.  Correct?
11      A.  On which date?
12      Q.  August the 8th.
13      A.  I believe you're correct, yes.
14      Q.  Okay.  And so at that point you said, "Vinmar,
15  you've breached the agreement and we have the right to
16  resell it."
17      A.  That's correct.
18      Q.  And if I understand your testimony correctly,
19  your claim is that you on August the 11th identified the
20  mixed xylene that you intended to supply to Vinmar, you
21  identified that to a separate contract?
22      A.  That's correct.
23      Q.  Okay.  And that was on the morning of August
24  the 11th?  And let's go to Joint Exhibit 22.  I'm sorry.
25  Yeah, Joint Exhibit 22.  So --

180

1      A.  Oh, joint.  Okay.
2      Q.  Monday, August 11th at 3:02 a.m.  Right?
3      A.  That's right.
4      Q.  Now, is this the document that you claim
5  constitutes the notice of a replacement sale?
6      A.  This was me declaring the option under my
7  contract at that time.  I'm not sure if that was the
8  replacement sale or not, but that was me exercising the
9  option.
10          JUDGE BENTON:  22?
11          MR. LEE:  I'm sorry.  It's Joint
12  Exhibit 22.
13          JUDGE BENTON:  Got it.
14      Q.  (BY MR. LEE)  Okay.  So this was not
15  necessarily you identifying this mixed xylene that you
16  believe you had sold to Vinmar to a separate contract?
17      A.  Once I didn't declare the discharge port as
18  per the contract on August the 8th, I knew I needed to
19  exercise the option to at least give myself a chance.
20      Q.  Okay.  And is that what you were doing here?
21      A.  Yes, I was.
22      Q.  Okay.
23          JUDGE BENTON:  Just a second.  Who's this
24  e-mail to?
25          THE WITNESS:  The problem is with the

181

1  Koreans, their e-mail addresses don't show up in
2  English.  It shows up as question marks.  So if you
3  double-click on those question marks --
4          JUDGE BENTON:  Okay.
5          THE WITNESS:  -- you would see their
6  Korean e-mail addresses.
7          JUDGE BENTON:  Okay.
8          THE WITNESS:  So those are -- those are
9  individuals at KP Chemical.
10          JUDGE BENTON:  All right.  Very good.
11      Q.  (BY MR. LEE)  Okay.  So just to be clear,
12  Vinmar wasn't copied on this e-mail.  Correct?
13      A.  Definitely not.
14      Q.  And, in fact, Vinmar isn't even mentioned
15  anywhere in it?
16      A.  No, they weren't.
17      Q.  And -- but is this the replacement sale?  Is
18  this the identification of the replacement sale?
19      A.  Yes, it was.
20      Q.  All right.  Let's talk about that, your
21  agreement with KP Chem.
22      A.  Okay.
23      Q.  And if we go to Joint Exhibit No. 1.  Okay.  I
24  want to make sure I understand this.  Joint Exhibit 1 is
25  the contract between Tricon and KP Chem?

46  (Pages 178 to 181)

ARBITRATION HEARING - SEPTEMBER 20, 2010

182

1    A.  That's right.
2    Q.  And it's your testimony, if I wrote it down
3  correctly this morning, that you -- there was an option
4  in the document that allowed the parties to -- let me
5  make sure I understood this correctly.  That KP Chem was
6  given an option to load material whenever it wanted?
7    A.  KP -- if you look on Exhibit A at the end
8  of -- at the end of Exhibit 1, the first clause in that
9  says, "Tricon to declare FOB or CFR on or by the 10th of
10  the prior month."
11    Q.  Right.
12    A.  And KP -- I don't know if that's actually
13  written correctly because KP is really the one that
14  decided whether or not they wanted to load FOB.  I was
15  really only deciding whether or not I would exercise my
16  CFR option.
17    Q.  Okay.  Well, but you don't see anywhere in
18  this contract that there -- that there's an option for
19  KP Chem to decide whether they wanted to take product or
20  not?
21    A.  "Resale policy on FOB Shipments:  KP Chemicals
22  has the right to resell the barrels on the condition of
23  giving Tricon Energy the first right of refusal."
24       I don't think it's spelled out clearly,
25  no.

183

1    Q.  Okay.  In fact, if you look at the first page
2  of the Joint Exhibit No. I, it says the Incoterm is,
3  "FOB Texas Gulf coast or Lake Charles, L -- Louisiana or
4  CFR Ulsan, Korea, all in supplier's option."  Right?
5    A.  That's correct.
6    Q.  That's you?  That's Tricon?
7    A.  That's right.
8    Q.  And the contract says that it requires Tricon
9  to supply KP Chem with 5,000 metric tons of MX every
10  month for 12 months.  Correct?
11    A.  That's correct.
12    Q.  All right.  There is no option in this
13  contract.  Correct?
14    A.  I've had this contract with them since 2006
15  and every year we change certain clauses so I'm not sure
16  if this was written correctly at the time, but I'm
17  pretty sure that I recall for the year of 2008 the whole
18  reason they had the contract was they had the
19  flexibility whether to load or not.
20       And if it isn't spelled out correctly
21  here, I'm sure we changed it later.  It doesn't show
22  that here, but I know that's what occurred.
23    Q.  Okay.  So what we have here doesn't show that
24  option.  Correct?
25    A.  I think so.  You're right.

184

1    Q.  All right.  And, in fact, as you pointed out
2  in Exhibit A to the contract, it says that Tricon has
3  the right to declare FOB or CFR?
4    A.  That's correct.
5    Q.  I think this morning you had testified that it
6  was -- that Tricon only had the right to declare CFR but
7  KP Chem had the right to declare FOB deals?
8    A.  I said that we had the right to trump their
9  FOB no matter what.  If they want the product FOB, we
10  can still trump that with the CFR option.
11    Q.  Okay.  But this document, as I read it, says
12  that it's all up to Tricon as to whether they want --
13  Tricon wants to declare an FOB or a CFR option.
14  Correct?
15    A.  Right.
16    Q.  Now, this document, this sales contract
17  between KP Chem and Tricon is very similar in format to
18  the sales contract that Tricon sent to Vinmar.  Correct?
19    A.  I believe so.
20    Q.  And in this one, we see that you actually
21  signed the document, Page 4.  Right?
22    A.  Yes, I did.
23    Q.  Okay.  Tricon does not make mixed xylenes?
24    A.  That's correct.
25    Q.  So in order to supply -- in order to supply MX

185

1  to Vinmar under the alleged transaction, Tricon would
2  have had to get that from someplace.  Correct?
3    A.  By September 15th, yes.
4    Q.  Okay.  And the same thing for this KP Chem
5  contract.  In order for Tricon to supply mixed xylenes
6  to KP Chem under this contract, Tricon would have to go
7  purchase it from someplace else?
8    A.  Just like Vinmar.  You can sell before you
9  buy.  So, yes, this is what this is.
10    Q.  Okay.  So, again, you have to buy it before
11  you could deliver it.  Right?
12    A.  But not before you sell it.
13    Q.  I understand.  That wasn't my question.  My
14  question was, in order to actually deliver product under
15  this contract or under the alleged deal with Vinmar
16  Tricon would have to purchase it from someplace.
17  Correct?
18    A.  That's correct.
19    Q.  Because you don't make it?
20    A.  That's correct.
21    Q.  And just so that I make sure I understand how
22  this KP Chem contract works, if you declare a -- if you
23  nominate cargo for CFR delivery, the nomination would be
24  in August.  I mean, let's just use the August --
25    A.  Okay.

47  (Pages 182 to 185)

ARBITRATION HEARING - SEPTEMBER 20, 2010

186

1      Q.  -- we have in front of us.  The nomination
2  would be in August?
3      A.  That's correct.
4      Q.  The mixed xylenes would actually be delivered
5  in October but they would be priced in September?
6      A.  That's exactly right.
7      Q.  Okay.
8      A.  That's what they preferred.
9      Q.  Okay.  Now, the alleged deal between Vinmar
10 and Tricon required Tricon to deliver mixed xylenes to
11 Vinmar on or before September 15th, 2008?
12     A.  That's correct.
13     Q.  And so to supply that contract, Tricon would
14 have had to go out someplace to get the mixed xylenes.
15 Correct?
16     A.  That's correct.
17     Q.  And that would have to be done before
18 September 15th, 2008?
19     A.  That's correct.
20     Q.  Now, even if we assume that under Tricon's
21 alleged version of the contract, which means you could
22 supply it from anywhere.  Is that correct?
23     A.  That's correct.
24     Q.  Isn't it true that you would have certainly
25 purchased it sometime prior to September 15th, 2008?

187

1      A.  No, that's not correct.
2      Q.  So you might have waited until September 15th,
3  2008, to supply that?
4      A.  If I was feeling particularly risky, yes, I
5  could have.
6      Q.  Okay.  And -- but certainly by September 15th,
7  2008, you would have had to have MX in your hands to
8  deliver to Vinmar?
9      A.  I would have had to purchase it at least by
10 that day.
11     Q.  Okay.  Now, I believe your testimony this
12 morning was that Tricon only delivered 3400 metric tons
13 of mixed xylenes to KP Chem under this September CFR?
14     A.  32 or 3400.  I don't remember exactly.
15     Q.  I'll say 34.  I think the invoice was less
16 5 percent, but I'm going to show you some documents in a
17 minute --
18     A.  Okay.
19     Q.  -- that talk about 3400 metric tons.
20     A.  Okay.
21     Q.  So it's your testimony then that the actual
22 delivery was 3,230 metric tons?
23     A.  I have no idea.  I just know it was around
24 3400.
25     Q.  Okay.  And it's your testimony that KP Chem is

188

1  the one that requested the decreased volume?
2      A.  That's correct.
3      Q.  Okay.  And that Tricon elected to agree to
4  that request?
5      A.  After being forced to, yes.
6      Q.  Well, isn't -- isn't it the case that Tricon
7  was actually behind on its volume requirements to
8  KP Chem?
9      A.  What are you referring to?
10     Q.  Well, I'm just asking, isn't it the case that
11 it wasn't KP Chem forcing you to deliver less, that
12 actually as of September of 2008 Tricon was behind on
13 the volume it was required to supply to KP Chem under
14 this contract?
15     A.  Not at all.
16        JUDGE BENTON:  Just a second.  I thought
17 you said that you reduced it not because you were forced
18 to but you just made a business decision to -- in order
19 to please a long-term customer.
20        THE WITNESS:  But I was saying that there
21 was a lot of subtle pressure for them to push me to
22 reduce it because they said if I did not agree then that
23 would -- could affect negatively next year's contract
24 beyond that.
25        JUDGE BENTON:  Okay.

189

1        THE WITNESS:  So KP knew that by me
2  reducing the volume that was beneficial for them because
3  that meant they were taking less product in a falling
4  market.
5        JUDGE BENTON:  Okay.  But you really
6  weren't forced to?  I mean, you could have stood on the
7  contract?
8        THE WITNESS:  Nobody held a gun to me
9  but --
10        JUDGE BENTON:  You could have stood on the
11 contract?
12        THE WITNESS:  I could have -- I could have
13 stayed, yes.
14        JUDGE BENTON:  Okay.  All right.  Mr. Lee,
15 you may proceed.
16        MR. LEE:  Thank you.
17     Q.  (BY MR. LEE)  I document -- the question I had
18 asked you just a second ago, Mr. Lockwood, was, isn't it
19 true that Tricon was behind on its volume under the
20 contract?
21     A.  And, again, I believe I answered no, that's
22 not correct.
23     Q.  Why don't we take a look at -- now we're in
24 Tricon's exhibit notebook.
25     A.  Okay.

48  (Pages 186 to 189)

ARBITRATION HEARING - SEPTEMBER 20, 2010

190

1    Q.   And we're going to turn to Tricon Exhibit 20.
2   So Tricon Exhibit 20.  You with me?
3    A.   I am, yes.
4    Q.   Now, this is four pages of e-mails between
5   some folks at Tricon and people at KP Chem.  Correct?
6    A.   That's correct.
7    Q.   And if we start with the second page, which is
8   the 2556 down in the right-hand column.
9    A.   Okay.
10   Q.   The e-mail at the bottom of the page from
11  Chang S at Tricon Energy --
12   A.   Okay.
13   Q.   And this is Monday, September -- I'm sorry.
14  Yeah, Monday, September 1, 2008.
15   A.   Okay.
16   Q.   And Mr. Chang, that's Sa Uk Chang, he's a
17  Tricon employee.
18   A.   Employee.
19   Q.   Right?
20   A.   That's correct.
21   Q.   And he is writing an e-mail to Min Way -- or
22  Min Jae Hwang who is with KP Chem?
23   A.   That's correct.
24   Q.   All right.  And what Mr. Chang says is -- he
25  says, "We -- Tricon would like to request to divide

191

1   quantity as below."  All right.
2    A.   That's correct.
3    Q.   And he says, "We wish you" -- and that's
4   "Tricon wishes that KP Chem understand our situation we
5   are forced to request in our sincere efforts to meet our
6   commitment to you in the last month"?
7    A.   Okay.
8    Q.   Okay.  You see that?
9    A.   Uh-huh.
10   Q.   And then it talks about the fact that there's
11  a number of shipments that need to be provided to
12  KP Chem.  Correct?
13   A.   Okay.
14   Q.   And, in fact, I think there's handwriting out
15  here that shows 15,771.  That's metric tons.  Correct?
16   A.   That's correct.
17   Q.   And then it talks about how those shipments
18  from that volume will be supplied to KP Chem?
19   A.   Okay.
20   Q.   Correct?
21   A.   That's correct.
22   Q.   Okay.  And isn't that an indication that
23  Tricon was, in fact, behind on its contract with
24  KP Chem?
25   A.   How do you figure?

192

1    Q.   I'm asking you, sir.  Isn't it -- isn't that
2   the case, there are -- they have 15,000 metric tons as
3   of September 1, 2008?
4    A.   Not if we're delivering it when we said we
5   would so how -- where do you see the delivery date that
6   we owed?
7    Q.   I'm asking you under the contract, sir, that
8   by September the 1st, 2008, if you're 15,000 metric tons
9   behind, why are you -- you're behind, aren't you?
10   A.   My point to you is no, we were not behind.  We
11  were delivering right when we said we were.
12   Q.   Okay.  So it's your testimony you were not
13  behind?
14   A.   That's correct.
15   Q.   Now, at the bottom of that e-mail, it says,
16  "Bow Pride:  Parcel 2:  5,000 metric tons plus or minus
17  5 percent at Platts September FOB Korea average."  Do
18  you see that?
19   A.   I do.
20   Q.   Now, that's the 5,000 metric tons that you
21  claim was originally earmarked for Vinmar?
22   A.   That's correct.
23   Q.   All right.  So at September 1st, it's 5,000
24  metric tons?
25   A.   That's correct.

193

1    Q.   Okay.  And on the first page of Tricon
2   Exhibit 20, go to the very top e-mail.
3    A.   Okay.
4    Q.   And, again, this is Mr. Chang, who's a Tricon
5   employee.  Right?
6    A.   Okay.
7    Q.   And he asks his counterparty at KP Chem, he
8   says, "We'd like to adjust our request to declare
9   quantities."  Do you see that?
10   A.   I do.
11   Q.   He says, "Because there are no buyers anywhere
12  for MX, both in Asia and in USA, and our customer,
13  KP" -- that's KP Chem -- "is selling into the market, we
14  needed to take drastic measures to reduce to fixed price
15  exposure."  Right?
16   A.   Okay.
17   Q.   That's a reference to Tricon.  Correct?
18   A.   That's correct.
19   Q.   And then it's Tricon that suggests a change in
20  the way that the product would be delivered.  Correct?
21   A.   I don't think that's correct because if you
22  look right below it -- let's see.  We don't have a --
23  you don't have all the e-mails between KP directly to
24  Tricon.
25   Q.   Well, sir, I have what your -- what y'all

                                    49  (Pages 190 to 193)

ARBITRATION HEARING - SEPTEMBER 20, 2010

194

1   produced in this case. So what I'm asking you is, based
2   on this document, is it not true that Mr. Chang is the
3   one that reduces the metric tons on Parcel 2 from 5,000
4   to 3400 metric tons?
5       A. It must have been a phone conversation from KP
6   to Sa Uk so in that sense he was responding in writing
7   with what they requested over the phone.
8       Q. Okay. Well, what Mr. Chang said in his e-mail
9   is that Tricon needed to take drastic measures to reduce
10  fixed price exposure. So "We," Tricon, "are hoping,
11  based on our supplier's idea, that KP Chem would be able
12  to load other contract cargo from your U.S. supplier in
13  Baton Rouge on to the Bow Pride in order to utilize our
14  space to prevent dead freight and allow us to not face
15  further price down on September MX sales price versus
16  fixed price purchase." Do you see that?
17      A. I do.
18      Q. So it's Tricon's response to KP Chem to adjust
19  the volumes, is it not?
20      A. That's what it appears here.
21      Q. Okay. And, in fact, you wrote this e-mail
22  from Mr. Chang, didn't you?
23      A. No, because that would not have been my
24  language.
25      Q. Well, look at Exhibit 21 in the same document,

195

1   the very next document. This is an e-mail from you to
2   Mr. Chang, Wednesday, September 3rd, at 2:49 a.m.,
3   some --
4       A. Where is that?
5       Q. Well, it's the very next document, right,
6   Tricon Exhibit 21? You see that?
7       A. Okay.
8       Q. And you sent that to Mr. Chang on Wednesday,
9   September 3rd, at 2:49 a.m. Mr. Chang sent his e-mail
10  to KP Chem at 3:01 a.m. Right?
11      A. That's right.
12      Q. And you're the one that suggested to Mr. Chang
13  the quantities and even gave him the language based on
14  there being no buyers anywhere for MX -- and we can read
15  the whole paragraph, but it's virtually identical to the
16  paragraph that Mr. Chang sent to KP Chem later that day.
17  Right?
18      A. Okay. You're right. I'm still reading.
19      Q. So it certainly appears, according to these
20  documents, that it's -- that it's Tricon that reduced
21  the volume from 5,000 metric tons to 3,400 metric tons?
22      A. That's what the document suggests, yes.
23      Q. And also, though, what Tricon did in
24  that same document is they increased -- they reduced the
25  amount to be supplied at the September Platts FOB price

196

1   but increased the amount of MX to be supplied to KP Chem
2   at the higher price of 1235 a metric ton. Isn't that
3   right?
4       A. Where do you see that?
5       Q. I'm looking at Bow Pride Parcel 1,
6   1595.665 metric tons at 1235, and then 3400 metric tons
7   at the September price. That's 5,000 metric tons more
8   or less. Correct?
9       A. I believe you're incorrect because if you look
10  at -- on --
11      Q. Well, hang on.
12      A. -- Page 25 --
13      Q. Stay with me. My question, Mr. Lockwood, is,
14  isn't 3400 plus 1595 close to 5,000?
15      A. I'm just saying you said that we increased the
16  1235 and I'm saying you're incorrect in that statement.
17      Q. No. I said you increased the volume to be
18  supplied at the price of 1235 on the Bow Pride.
19      A. But you have to look at both shipments
20  together. So if you look on Page 2556 and you take the
21  Selendang Sarl, you get 5,021. And you add it to a
22  thousand, that's 6,021 metric tons at 1235.
23          If you flip back the page to 2555 and you
24  add 4154 to 1595, that comes out to around 5700, so it
25  was actually reduced --

197

1       Q. So --
2       A. -- so you are incorrect.
3       Q. So to prevent the -- one of the drastic
4   measures that Tricon took to reduce the fixed price
5   measure or exposure was to ask KP Chem to reduce the
6   total volume that Tricon was obligated to supply KP Chem
7   from the 15,771 to now it's down to 14,000. Right?
8       A. No. What you're saying makes zero sense and
9   the reason why is because these are all sales. So any
10  sale that you had at that time you would want to
11  maximize.
12          We would never want to minimize in a
13  falling market. You would want to maximize. So the
14  fact that we were changing it from 15,771 to 14,267,
15  that actually hurt us by selling less in a falling
16  market. So what you're saying is absolutely incorrect.
17      Q. So were you not telling the truth to KP Chem?
18      A. Not at all. Where did I not tell the truth?
19      Q. I just asked. Are you not telling the truth
20  to KP Chem when you said we needed to take drastic
21  measures to reduce fixed priced exposure?
22      A. Talking about what I had on the purchase side
23  versus what I had on the sales side are two different
24  things.
25      Q. All right.

50  (Pages 194 to 197)

ARBITRATION HEARING - SEPTEMBER 20, 2010

198

1      A.   This is dealing with the sales side.
2      Q.   Well, let me come back to my original question
3  on this e-mail here.  Is it not true that on the Bow
4  Pride, at least as of September 3rd, Tricon would be
5  supplying close to 5,000 metric tons of mixed xylene,
6  1600 of it at 1235 a metric ton and 3400 at the
7  September price?
8      A.   Again, I guess I'm not understanding your
9  question.
10      Q.   Well, according to Tricon Exhibit 20, the
11  e-mail from Mr. Chang, does it not say that on the Bow
12  Pride -- that's a ship.  Correct?
13      A.   That's correct.
14      Q.   Parcel 1, I just rounded up to 1600 so I don't
15  have to read all the numbers, but it's close to
16  1600 metric tons to be sold at 1235 a metric ton.
17  Correct?
18      A.   That's right.
19      Q.   And then 3400 metric tons to be sold at the
20  September price.  Correct?
21      A.   That's correct.
22      Q.   The two of those together add up to close to
23  5,000 metric tons?
24      A.   That's correct.
25      Q.   Okay.

199

1      A.   And what's the question?
2      Q.   That was the question.
3      A.   Okay.  I just didn't understand the point.
4      Q.   Now -- okay.  I hate to make you switch to
5  another binder, but now we're going to go to Vinmar
6  Exhibit Binder number -- and it's going to be
7  Exhibit 23.
8           Now, did the ship that was nominated to
9  deliver product to KP Chem, did that change from the Bow
10  Pride to the Crystal Sambu?
11      A.   I believe so, yes.
12      Q.   Okay.  Now, the -- Vinmar Exhibit 23 is a
13  series of e-mails again between folks at Tricon and
14  people at KP Chem.  Right?
15      A.   Exhibit 23?
16      Q.   Yes, sir.
17      A.   Yes, it is.
18      Q.   Okay.  And if you'll look at Page 4 of 6,
19  which is TRI 2588.
20           JUDGE BENTON:  2596?
21           MR. LEE:  TRI 2588, which is Page 4 of 6.
22           JUDGE BENTON:  Got it.
23      Q.   (BY MR. LEE)  The e-mail at the bottom of that
24  page is from someone at KP Chem to Gigi Ren and others,
25  including you, at Tricon.  Right?

200

1      A.   That's correct.
2      Q.   Now, this is October 1, 2008.  Right?
3      A.   That's correct.
4      Q.   And it says, "Re:  Vessel nomination for the
5  5 KT of MX."  Right?
6      A.   That's correct.
7      Q.   Now, this is again the 5 KT of MX that is
8  being supplied to KP Chem under the CFR designation that
9  was made in August.  Correct?
10      A.   That's correct.
11      Q.   All right.  And so now what KP Chem says is --
12  to Tricon, "Regarding your vessel nomination, I'd like
13  to check unit price and quantity for each shipment."
14  Correct?
15      A.   That's correct.
16      Q.   "As I know, shipments should be separated as
17  below."  You see that?
18      A.   Okay.
19      Q.   Then it says, "Spot 1600 metric tons at 12 --
20  at 1235 a metric ton."
21      A.   That's correct.
22      Q.   "And then 3400 metric tons at this September
23  price."  Correct?
24      A.   That's correct.
25      Q.   That's 5,000 metric tons?

201

1      A.   That's correct.
2      Q.   And at the top of that page, Gigi at Tricon
3  confirmed both the unit price and the quantity.
4  Correct?
5      A.   I don't see the unit price for the September.
6      Q.   It says at the top, "We are pleased to confirm
7  below unit price and quantity."
8      A.   Right.  I understand.  I don't see the FOB
9  Korea price mentioned anywhere.
10      Q.   Okay.  Well, she's certainly confirming that
11  1600 metric tons are to be delivered at 1235 a metric
12  ton.  Right?
13      A.   That's correct.
14      Q.   And that the other 3,400 metric tons are going
15  to be delivered at the FOB Korea monthly average?
16      A.   That's correct.
17      Q.   All right.  And you agreed to that.  Correct?
18      A.   That's correct.
19      Q.   And that's, in fact, what was delivered to
20  KP Chem.  Correct?
21      A.   I believe so, yes.
22      Q.   So there was 3400 metric tons delivered at the
23  contract price and 1600 metric tons delivered at the
24  1235 a metric ton?
25      A.   Which was the buy-sell price we had agreed to.

51 (Pages 198 to 201)

ARBITRATION HEARING - SEPTEMBER 20, 2010

202

1   Q.  Now, if you look at Joint Exhibit 27.
2       JUDGE BENTON:  Joint 27?
3       MR. LEE:  Joint 27.
4   Q.  (BY MR. LEE)  Now, this is the invoice that
5   Tricon sent to KP Chem for the delivery of the contract
6   slip?
7   A.  That's correct.
8   Q.  And just so that we're clear on this, the --
9   where it says, "Sold To: Lotte Bussan," that was an
10  agent of -- receiving agent for KP Chem?
11  A.  No.  That's the parent company, I guess their
12  name Lotte.  It's part of the parent company so it's the
13  same company.
14  Q.  All right.  It's the same company.  The name
15  is different but it's all the same?
16  A.  That's correct.
17  Q.  Okay.  And so this is -- now, we saw on the
18  prior e-mail it was 4300 metric tons.  What was actually
19  delivered was the 3230.  Correct?
20  A.  Okay.
21  Q.  Which is the -- you can do the math if you
22  want.  I've got a calculator, but it's the 5 percent --
23  it's 3400 less 5 percent?
24  A.  Okay.
25  Q.  Is that your understanding is?

203

1   A.  I don't have a calculator but that seems
2   right.
3   Q.  And that was priced at 995.50?
4   A.  That's correct.
5   Q.  For a total of 3,215,465?
6   A.  That's correct.
7   Q.  That's what Vinmar -- I mean Tricon was paid
8   for the 3200 -- 3230 metric tons that were delivered to
9   KP Chem?
10  A.  That's correct.
11  Q.  Now, we don't have the invoice for the
12  delivery of the other 1600 metric tons, but it was
13  delivered.  Correct?
14  A.  That's correct.
15  Q.  And the delivery price was 1235 a metric ton?
16  A.  That was the buy-sell price, yes.
17  Q.  Okay.  And the -- we can do the math.  I can
18  give you a calculator, but if you do 1600 metric tons
19  times 1235 a metric ton, you get 1,976,000?
20  A.  Okay.
21  Q.  You think that's right?
22  A.  I -- like I said, the buy-sell price earlier
23  is immaterial.  It could be $1.  It wouldn't really
24  matter.
25  Q.  Well, but the fact is that there is an e-mail

204

1   and you've already told me that, in fact, Tricon
2   delivered 1600 metric tons of MX to KP Chem at the price
3   of $1235 a metric ton.  Right?
4   A.  Which we also bought from KP at the same
5   price.  That's why I'm saying it doesn't matter what
6   price you chose.  If they were willing to sell us at a
7   dollar a metric ton earlier, then we have to return it
8   at a dollar a metric ton.  If they wanted --
9   Q.  Where is that documentation?
10  A.  It was not -- it is not part of this deal.
11  Q.  We don't have any documentation showing that
12  there was, in fact, an agreement that they would buy it
13  back from you at the same price that you sold it?
14  A.  No.  We took delivery prior to the Vinmar deal
15  ever being done.
16  Q.  Took delivery of what?
17  A.  The sale side from KP to Tricon.  This is
18  returning the cargo at the same price.
19  Q.  But we don't have those documents, do we?
20  A.  I'm not sure whether the lawyers passed it to
21  you.
22  Q.  You haven't seen it in any of the documents
23  that you've looked at in preparing for this hearing,
24  have you?
25  A.  Not today, no.

205

1   Q.  Well, in preparing for the hearing, have you
2   seen those documents?
3   A.  Well, of course.  I was the one that did the
4   agreement of the buy-sell.
5   Q.  Have you seen them in any of the exhibits?
6   A.  I haven't looked for them.  No.
7   Q.  Didn't Tricon buy 5,000 metric tons of mixed
8   xylenes from J & J Chemical or Chemtrading on
9   September 22nd, 2008?
10  A.  That's correct.
11  Q.  And that's Joint Exhibit 24.  Right?
12  A.  That's correct.
13  Q.  Now, this agreement with J & J Chemtrading was
14  at least seven days after the date -- the latest date
15  that Tricon could have purchased MX to supply the
16  alleged deal with Vinmar.  Right?
17  A.  I wasn't supplying Vinmar at this point.  I
18  was supplying KP.
19  Q.  That wasn't my question.  My -- I think my
20  question is pretty simple, Mr. Lockwood.  Isn't
21  September 22nd, 2008, seven days later than the very
22  last day that Tricon could have purchased MX to supply
23  to Vinmar under the alleged deal?
24  A.  Sure.
25  Q.  Okay.  This purchase from J & J Chemtrading on

52  (Pages 202 to 205)

ARBITRATION HEARING - SEPTEMBER 20, 2010

206

1  September 22nd, 2008, the 5,000 metric tons of MX mixed
2  xylenes that Tricon bought from J & J Chemtrading was
3  actually delivered to KP Chem.  Correct?
4      A.  Yes, it was.
5      Q.  And 3400 of those metric tons was at the
6  995.50 price.  The other 1600 metric tons was to supply
7  this 1235 metric ton price.  Correct?
8      A.  That's correct.
9      Q.  Okay.  So just to be clear about this then, on
10  the 22nd of September, you on behalf of Tricon entered
11  into a deal with J & J Chemtrading to obtain 5,000
12  metric tons?
13      A.  That's correct.
14      Q.  That you then turned around and supplied to
15  KP Chem under the -- what you claim is a replacement
16  sale in this case?
17      A.  That's correct.
18      Q.  Okay.  And all 5,000 metric tons that you
19  purchased from J & J Chemtrading was delivered to
20  KP Chem?
21      A.  That's correct.
22      Q.  All right.  And 3230 or 3400 -- we can look at
23  the documents, but it's that plus or 5 -- plus or minus
24  5 percent that we get hung up on, but it's basically
25  3400 metric tons was at one price and the remainder was

207

1  at the other price.  Correct?
2      A.  That's correct.
3      Q.  And if you look at --
4          JUDGE BENTON:  We're off the record.
5          (Recess from 2:12 p.m. to 2:25 p.m.)
6          JUDGE BENTON:  All right.  Let's proceed.
7          MR. LEE:  Do you mind if I stand up?  I
8  want to --
9          JUDGE BENTON:  I don't mind --
10          MR. LEE:  Thank you.
11          JUDGE BENTON:  -- because I've got to
12  stand up from time to time just to keep my blood going.
13      Q.  (BY MR. LEE)  Okay.  Mr. Lockwood, I want to
14  see if we can't get a couple of these things on the --
15  on the board.  So we talked -- before we took a break,
16  we talked about Tricon's sale to KP Chem.  Right?
17      A.  That's correct.
18      Q.  And what we saw was that the -- we had an
19  invoice for 3,230 metric tons at 995.50?
20      A.  That's correct.
21      Q.  Do you remember that?
22          Okay.  So we did it at 995.50.  Right?
23      A.  That's right.
24      Q.  And you can look at the invoice, but I'll
25  represent to you that the amount was 3,215,465.  Does

208

1  that sound right?
2      A.  I trust your math so that's fine.
3      Q.  3,215,465.  Now, we know that -- we also saw
4  where another 1600 metric tons was sold at 1235 a metric
5  ton?
6          (Brief interruption.)
7          JUDGE BENTON:  Hold on a second, Mr. Lee.
8  The witness --
9          MR. DIAZ-ARRASTIA:  Yes, Your Honor.  That
10  is Vuk Rajevac.  And I just told him to please wait
11  outside.
12          JUDGE BENTON:  He wasn't -- he hadn't been
13  in the room 30 seconds.  Okay.
14          JUDGE WOOD:  He was checking in.
15      Q.  (BY MR. LEE)  We also saw 1600 metric tons
16  were sold at 1235 a metric ton.  Right?
17      A.  And generally we don't refer to as sold when
18  it's a buy-sell, but the price was 1235.
19      Q.  Okay.  And do you think that it was
20  actually -- instead of the 1600 that you delivered it
21  was 1600 less 5 percent?
22      A.  I have no idea.
23      Q.  Okay.  Well, we do know that the amount that
24  was bought from J & J was sent to KP Chem.  Correct?
25      A.  Yes.

209

1      Q.  Okay.  And I'll -- when we get to those
2  invoices, I'll tell you I think it's 1520 so I'm going
3  to --
4      A.  Okay.
5      Q.  So if you're all right -- so that's actually
6  less than the 1600.  Right?
7      A.  That's correct.
8      Q.  And that price was 1235.
9      A.  What is --
10      Q.  Right?
11      A.  What is 1520 of 1600?  Do you know the
12  percent?  Is it minus 5?
13      Q.  It's minus 5 percent.
14      A.  Okay.
15      Q.  I'm happy to do the math or let you do it.
16      A.  I trust you.
17      Q.  And that -- if I --
18      A.  That makes sense because if you add the two
19  together it's 4750, so 5,000 minus 5 percent.  That
20  makes sense.
21      Q.  If I do 1,520 times 1235, I get 1,877,200?
22      A.  Okay.
23      Q.  And would you agree with me that 1,877,200
24  plus 3,215,465 equals 5,092,665?
25      A.  That looks correct.

53 (Pages 206 to 209)

210

1    Q.   Okay.  And so that's the almost 5,000 metric
2  tons of MX that were supplied to KP Chem in October.
3  Correct?
4    A.   That's correct.
5    Q.   And before we broke, we were talking about
6  J & J Chemtrading.  Tricon purchased 5,000 metric tons
7  from J & J Chemtrading on September 22nd, 2008, and all
8  of that volume was sent to KP Chem to supply the 3230
9  and the 1520?
10   A.   That's correct.
11   Q.   All right.  Okay.  So if we look at Vinmar
12 exhibit -- this is back in my Vinmar exhibit book.
13 Let's first take a look at Vinmar Exhibit 20.  That's an
14 invoice that J & J Chemtrading sent to Tricon.  Correct?
15   A.   That's correct.
16   Q.   And we see here that the party that actually
17 received the material was this Lotte International,
18 which is KP Chem?
19   A.   That's correct.
20   Q.   Okay.  And this is the first -- this is the
21 3,320 metric tons.  Right?
22   A.   That's correct.
23   Q.   That was supplied by Tricon.  You sold it to
24 KP Chem at 995.50?
25   A.   That's correct.

211

1    Q.   You actually purchased it from J & J
2  Chemtrading at 676.63 a metric ton.  Right?
3    A.   That's correct.
4    Q.   So if we do 3,230 metric tons at -- and that
5  was 676.63.
6    A.   676.63, that's correct.
7    Q.   For a total of 2,185,515.  Right?
8    A.   That's correct.
9         JUDGE DAVIDSON:  514.90 to be exact.
10        MR. LEE:  Correct.
11   Q.   (BY MR. LEE)  Do you mind if I round up,
12 Mr. Lockwood?
13   A.   No problem.
14   Q.   Okay.  So that's the purchase that Tricon made
15 from J & J for the first 3200 --
16   A.   That's correct.
17   Q.   -- 30 metric tons?
18        If you take a look at the next exhibit,
19 Vinmar Exhibit 21, this is yet another invoice from
20 J & J Chemtrading to Tricon.  This is for 570.042 metric
21 tons.  Correct?
22   A.   That's correct.
23   Q.   And this is part of that total 5,000 metric
24 tons that Tricon purchased from J & J.  Correct?
25   A.   That's correct.

212

1    Q.   And, again, this price was 676.63?
2    A.   That's correct.
3    Q.   And the invoice is 385 -- the invoice amount
4  is 385,707.52?
5    A.   That's correct.
6    Q.   Is that right?
7    A.   That's correct.
8    Q.   So that's 570.042 metric tons at again 676.63.
9  And this one was for 385,708 if we round up?
10   A.   That's fine.
11   Q.   Right?
12   A.   That's correct.
13   Q.   And then if we take a look at Tricon -- Vinmar
14 Exhibit No. 22, this is yet another invoice from J & J
15 Chemtrading to Tricon for the remaining balance of the
16 5,000 metric tons of mixed xylenes that Tricon had
17 purchased from J & J Chemtrading.  Correct?
18   A.   That's correct.
19   Q.   And that's -- this 950 metric tons was also
20 supplied to KP Chem?
21   A.   That's correct.
22   Q.   Okay.  And so if we -- so that was 950.010
23 metric tons.  And, again, that price is 676.63.
24 Correct?
25   A.   That's correct.

213

1    Q.   For a total of 642,805 if we round -- we're
2  going to round down this time.  Right?
3    A.   That's correct.
4    Q.   Okay.  So if we add -- this is what -- the
5  three of these would represent what Tricon paid J & J to
6  obtain the mixed xylenes that it supplied to KP Chem as
7  the replacement sale.  Right?
8    A.   That's correct.
9    Q.   So we take the 2,185,515 plus 385,708 plus
10 642,805, we get -- I get 3,214,028.  Would you like to
11 check that or does that sound right?
12   A.   That sounds fine.
13   Q.   Okay.  So you supplied it for $5 million.  You
14 paid 3.2 million.  Correct?
15   A.   That's correct.
16   Q.   That's a million -- that's a difference of
17 1,878.637?
18   A.   That looks correct.
19   Q.   Is that right?
20   A.   It looks correct, yes.
21   Q.   Okay.  That would be the amount that Tricon
22 realized on its sale to KP Chem and supplying it from
23 J & J Chemtrading.  Correct?
24   A.   That's correct.
25   Q.   Now, do these numbers look right to you?

54 (Pages 210 to 213)

ARBITRATION HEARING - SEPTEMBER 20, 2010

214

1    A.   That's correct.
2         (Vinmar Exhibit 27 marked.)
3         MR. LEE:  I would offer this as Vinmar
4    Exhibit 27.
5         MR. DIAZ-ARRASTIA:  The panel -- the panel
6    has seen it so I guess we'll consider it, but I will
7    point out that the profit made on the replacement sale
8    is not the measure of damages.  It's totally irrelevant
9    to this case.
10        JUDGE BENTON:  Okay.  We understand.  And
11   I'm sure we'll hear --
12        MR. DIAZ-ARRASTIA:  But I understand the
13   panel has seen it and will consider it.
14        JUDGE BENTON:  Okay.
15        MR. LEE:  Do you mind if I write Vinmar
16   Exhibit 27 or --
17        JUDGE BENTON:  Sure.  It's your exhibit.
18        MR. LEE:  Okay.
19   Q.   (BY MR. LEE)  Now, if we take the -- as I
20   understand the claim here, Tricon says it sold 5,000
21   metric tons of mixed xylenes to Vinmar at 1310 a metric
22   ton?
23   A.   That's correct.
24   Q.   And I believe that Mr. Matthews will testify
25   that he's going to increase the amount of mixed xylenes

215

1    by 5 percent?
2    A.   That's correct.
3    Q.   Now, I don't agree with that, okay, but I'm
4    going to -- we're going to use that number.
5    A.   Okay.
6    Q.   I just see what the numbers look like here.
7    So if we increase 5,000 metric tons by 5 percent, that's
8    another 250.  Right?
9    A.   Okay.
10   Q.   Is that right?
11   A.   It sounds right.
12   Q.   So I'm just going to put Vinmar over here so
13   you and I don't get in an argument about what I call the
14   chart so we're just going to call it Vinmar.  Okay?
15   A.   Sure.
16   Q.   And if we say, 5,250 metric tons at the claim
17   price of 1310 a metric ton, that would have been -- and
18   we can do the math, but it's 6,877,500?
19   A.   Okay.
20   Q.   Is that --
21   A.   Sounds right.
22   Q.   Do you agree with that?
23   A.   I don't have a calculator but it looks right.
24   Q.   And Tricon would have had to purchase MX on or
25   before September 15th, 2008, to supply Vinmar.  Correct?

216

1    A.   That's correct.
2    Q.   And you looked at some MX pricing data from
3    Platts, I believe, earlier today.  And I think that is
4    Tricon Exhibit 32.
5    A.   Okay.
6    Q.   And it's your testimony that the -- Tricon
7    Exhibit 32 presents evidence of the market price for
8    mixed xylenes during the relevant time period?
9    A.   That's correct.
10   Q.   And we're going to look at dates I guess
11   really from -- the claim is that the deal was done on
12   July the 22nd, 2008.  Correct?
13   A.   That's correct.
14   Q.   And it's your testimony that if you were
15   feeling really risky you could have waited all the way
16   to September 15th, 2008, to buy the mixed xylenes to
17   supply the alleged contract.  Right?
18   A.   That's correct.
19   Q.   So if you want to look at prices from July
20   22nd, 2008, all the way to September 15th, 2008, I think
21   you will agree with me that the lowest price that is
22   shown on Tricon Exhibit 32 would be 957.50?
23   A.   Through the 15th?
24   Q.   Yes.
25   A.   957.50, that looks correct, yes.

217

1    Q.   Do you agree with that?
2    A.   That's correct.
3    Q.   That's the lowest possible market price for
4    mixed xylenes during the period of time that Tricon
5    would have had to act to supply Vinmar?
6    A.   That's correct.
7    Q.   So that's 957.50.  Correct?
8    A.   Correct.
9    Q.   So if you had purchased 5,250 metric tons to
10   supply Vinmar -- you had to buy it.  Right?
11   A.   Right.
12   Q.   And you had purchased it at the lowest
13   possible price during that period of time --
14   A.   Lowest published price.  There's a difference.
15   Q.   Okay.  Well, the lowest price that's available
16   to the panel, you've testified that these are
17   the records of market pricing of mixed xylenes?
18   A.   This is where Platts assesses the market at.
19   It's not necessarily what deals can be done.
20   Q.   Do you not agree with this data?
21   A.   I agree this is Platts data, no doubt, but I'm
22   saying deals don't necessarily transact at what they
23   assess the market at.
24   Q.   Is it your testimony that Tricon Exhibit 32
25   does not reflect the market price of mixed xylenes

55 (Pages 214 to 217)

ARBITRATION HEARING - SEPTEMBER 20, 2010

218

1 during the relevant time period?
2    **A. No. This definitely reflects the market.**
3    Q. Okay. So the --
4    **A. In theory I could have bought cheaper is all**
5 **I'm saying.**
6    Q. Well, the data that we have in front of us
7 reflects a market price -- the lowest possible market
8 price for mixed xylenes during this period of time at
9 957.50. Correct?
10    **A. That's correct.**
11    Q. And so if Tricon had purchased mixed xylenes
12 to supply Vinmar -- and I'm going to give you the lowest
13 price. According to the data you have, that would have
14 been 5,250 metric tons times 957.50. Right?
15    **A. Uh-huh.**
16    Q. And I'll show you. My calculator says that's
17 5,026.875.
18    **A. Okay.**
19    Q. Do you agree with that?
20    **A. Yes.**
21    Q. So if we just take what the sale price was
22 according to Tricon and we subtract what -- the
23 possibility of what it might cost to obtain the mixed
24 xylenes to supply here, we get a profit of -- or a
25 difference of 1,850,625?

219

1    **A. Okay.**
2    Q. Is that -- do you agree with that?
3    **A. I do.**
4    Q. And do you agree this is a possible -- this is
5 representative of a possible scenario that Tricon could
6 have employed to supply this alleged deal with Vinmar?
7    **A. Definitely possible.**
8    Q. Okay. I would move for -- hang on. Let me
9 figure out what number I'm on.
10    (Vinmar Exhibit 28 marked.)
11    MR. LEE: I would move for admission of
12 this document as Vinmar Exhibit 28.
13    JUDGE BENTON: Okay.
14    MR. DIAZ-ARRASTIA: The panel has seen it
15 and will consider it, but it is an irrelevant issue.
16    JUDGE WOOD: It's helpful to put that
17 number on these exhibits that have gone into the record.
18    MR. DIAZ-ARRASTIA: Let me --
19    JUDGE WOOD: It's helpful to put those
20 exhibit numbers on there.
21    JUDGE BENTON: By the measure of
22 damages --
23    MR. DIAZ-ARRASTIA: My point is that the
24 UCC tells us how you measure the damages in a situation
25 like this and it is not by comparing the profits.

220

1    JUDGE WOOD: He's marking the sheets of
2 paper and we all see that --
3    MR. DIAZ-ARRASTIA: I understand that.
4    JUDGE WOOD: And that's helpful so we can
5 refer back to it later.
6    THE WITNESS: Would the --
7    JUDGE BENTON: Yes, sir.
8    THE WITNESS: When he is done, would the
9 panel allow me to draw some things on a piece of paper
10 as well?
11    JUDGE DAVIDSON: No, but I'll let you come
12 up --
13    JUDGE WOOD: I think your lawyer --
14    JUDGE DAVIDSON: I think we'll let you
15 have your own piece of paper that you can start with a
16 blank piece of paper and you can copy everything he
17 wrote and then you can write whatever you want on your
18 piece of paper.
19    THE WITNESS: Just tell me when I'm --
20    JUDGE WOOD: Your lawyer will let you do
21 it.
22    THE WITNESS: Tell me when I'm allowed to
23 do that.
24    JUDGE DAVIDSON: I shall. We'll let --
25    JUDGE BENTON: Mr. Diaz-Arrastia will lead

221

1 you to --
2    JUDGE WOOD: He'll let you know.
3    JUDGE BENTON: He'll guide you through.
4    JUDGE WOOD: Okay. We've got that marked.
5    MR. LEE: Okay. Thank you.
6    Q. (BY MR. LEE) And, Mr. Lockwood --
7    JUDGE BENTON: What's that movie?
8 Everything that guy said, I disagree with.
9    JUDGE DAVIDSON: No, no, that isn't what
10 the line from the movie was.
11    JUDGE BENTON: Yeah.
12    MR. LEE: Okay. I watch that movie before
13 I try every case. I love it.
14    JUDGE WOOD: We love it.
15    JUDGE BENTON: I got the line wrong, but
16 that's okay.
17    Q. (BY MR. LEE) So if we -- if we just compare
18 the numbers that we came up with on Vinmar Exhibit 27,
19 we've got a million 878,637. Right?
20    **A. That's correct.**
21    Q. On the sale to KP Chem and the purchase from
22 J & J.
23    On what you've agreed is a representative
24 example of how Tricon could have supplied this alleged
25 deal, we show 1 million 850. Correct?

56 (Pages 218 to 221)

ARBITRATION HEARING - SEPTEMBER 20, 2010

222

1    A.  That's correct.
2    Q.  Okay.  So this number on Exhibit 27 is greater
3  than the number on Exhibit 28.  Correct?
4    A.  Correct.
5    MR. LEE:  Pass the witness.
6    JUDGE BENTON:  Mr. Diaz-Arrastia?
7    MR. DIAZ-ARRASTIA:  Thank you.
8    JUDGE BENTON:  Any redirect?
9    MR. DIAZ-ARRASTIA:  Yes, there is, brief.
10    REDIRECT EXAMINATION (2:45 p.m.)
11  BY MR. DIAZ-ARRASTIA:
12    Q.  Mr. Lockwood, first let me ask you this.  The
13  KP Chem sale, was that pursuant to a long-term contract?
14    A.  The September FOB Korea average?
15    Q.  Yes.
16    A.  Yes, it was.
17    Q.  And that was a contract where Tricon had the
18  option to compel KP to purchase.  Correct?
19    A.  That's correct.
20    Q.  Okay.  And I think you testified earlier that
21  given the conditions on the market Tricon could have
22  easily supplied both the KP contract and the Vinmar
23  contract?
24    A.  As many sales as I could make I could find
25  product to cover it.

223

1    Q.  If Vinmar had performed on this contract,
2  would Tricon have been able to make both the KP sale and
3  the Vinmar sale?
4    A.  Definitely, and that's what I wanted to be
5  able to have the opportunity to write on a piece of
6  paper.
7    Q.  Okay.  And you'll get that opportunity in a
8  moment, but if I could approach the panel.  What that
9  means -- the board.  What that means is that if Vinmar
10  had performed on its contract Tricon would have made
11  both the 1.878 million dollars that it made with KP and
12  the 1.85625 that it could have made on the Vinmar sale
13  under a potential scenario if they had performed?
14    A.  That's correct.
15    Q.  Okay.  Now, you wanted to write something on
16  the board and I'm not sure what that was, but I'll
17  invite you to do that.
18    THE WITNESS:  Okay.  Could I borrow your
19  calculator?  Does anybody --
20    JUDGE WOOD:  But not -- as Judge Davidson
21  said, not on that piece of paper.
22    JUDGE DAVIDSON:  Not on their board.  He
23  can start with a fresh piece of paper and write anything
24  he wants.
25    THE WITNESS:  Do you have a calculator I

224

1  can borrow?
2    JUDGE WOOD:  I've got one.
3    MR. DIAZ-ARRASTIA:  You know, my --
4    JUDGE WOOD:  No.  I've got one if I have
5  it with me.
6    MR. DIAZ-ARRASTIA:  The BlackBerry has a
7  calculator.  I'll be happy to run the numbers.
8    JUDGE WOOD:  And I think it will turn on
9  when you punch a button or something.
10    THE WITNESS:  Okay.  Thank you.
11    JUDGE BENTON:  Yeah.  Don't write on --
12    THE WITNESS:  I'm not going to write on
13  that one.  Don't worry.
14    What your -- what my counsel was saying I
15  think is exactly correct.  The one thing that I would
16  point out is that you can't consider the 1235 price
17  because, like I said, it could have been one dollar a
18  metric ton.
19    So the fact that I was only able to
20  deliver 3230 at 995 and a half, I think what we have to
21  do is say 3230 at 995 and a half, subtract the 3230 I
22  bought from J & J at 676.63.  995.5 minus 676.3 times
23  3230 equals 1,031,016.
24    Then, as my counsel suggested, if Vinmar
25  had performed, 1310 per metric ton minus 5250 at 957.50,

225

1  so 1310 minus 99 -- or excuse me.  1310 minus 957.5
2  times 5,250, 1,850,625.
3    Adding that to the number up above plus
4  1,031,016, what my counsel was saying was accurate
5  except for the fact that I don't think it's fair to
6  include the buy-sell because had I included the buy-sell
7  it could have been at one million dollars a metric ton,
8  which would greatly overstate the damages.  Or if I had
9  bought it at -- if I had sold it at $1 a metric ton, the
10  damages would be a lot more.
11    So the point is you can only really
12  consider what I was able to deliver against the contract
13  price versus what I bought.  Here's how much I could
14  have made in addition to this amount right here had
15  Vinmar performed.  So you add the two together.  It's
16  2,881,641 that could have been possibly made.  Thank you
17  very much.
18    Q.  (BY MR. DIAZ-ARRASTIA)  And, Mr. Lockwood, we
19  talked a lot about KP's request or demand for a
20  reduction of their volume?
21    A.  That's correct.
22    Q.  Now, you have seen the damage calculation of
23  Chuck Matthews prepared, have you not?
24    A.  That's correct.
25    Q.  And that's in the report that Mr. Matthews --

57 (Pages 222 to 225)

ARBITRATION HEARING - SEPTEMBER 20, 2010

226

1    that's what we submitted to the panel and he can talk
2    about it later in this hearing.  Do you know what was
3    the effect on the measure of damages for Tricon of the
4    reduction of the KP volume?
5        A.  It hurt very bad.
6        Q.  Okay.  It reduced the damages.  Correct, sir?
7        A.  You're saying --
8        Q.  Because KP Chemicals did not take the 5,000
9    they were obligated to take under the contract, did that
10   increase or decrease our measure of damages in this
11   case?  It decreased it, did it not?
12       A.  Can you rephrase the question?  I'm sorry.
13       Q.  My question to you was, what was the
14   consequence on the damages measured by Mr. Matthews for
15   Tricon in this case of the fact that KP only took 3220
16   metric tons?
17       A.  Yeah.  That hurt.  That hurt Tricon, yeah.
18       Q.  It reduced the damages that we could claim?
19       A.  That's correct.
20           JUDGE DAVIDSON:  Well, wait a minute.  If
21   it reduced the damages you can claim, then it helped
22   Tricon.
23           JUDGE WOOD:  No.  It helped Vinmar.
24           MR. DIAZ-ARRASTIA:  No.  If -- no, no.  If
25   KP had taken the entire 5,000 our measure of damages

227

1    calculation would have been a larger number.
2            JUDGE DAVIDSON:  Right, because your
3    damages weren't as great.
4            MS. LARSON:  No, but we would have made
5    both sets.
6            MR. DIAZ-ARRASTIA:  No, but we would have
7    made both sets.
8            JUDGE DAVIDSON:  Okay.
9            MR. DIAZ-ARRASTIA:  You'll see that when
10   Mr. Matthews testifies.
11       Q.  (BY MR. DIAZ-ARRASTIA)  Could you -- let's
12   take a look at Vinmar 23.  And let's see.  Let's go down
13   a little bit.  Right there.  A couple of pages further.
14   At this point here.
15           JUDGE DAVIDSON:  What exhibit?
16           MR. DIAZ-ARRASTIA:  Vinmar 23.
17       Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Mr. Lockwood,
18   looking at Vinmar 23, Mr. Lee asked you a lot of
19   questions about this specific with regard to the 1600
20   metric tons?
21       A.  That's correct.
22       Q.  Okay.  And the price for those 1600 metric
23   tons were 1235 per metric ton.  Correct?
24       A.  That's correct.
25       Q.  And your testimony has been that that was a

228

1    buy-sell?
2        A.  That is correct.
3        Q.  And that is why it does reflect an accurate
4    market price?
5        A.  That's correct.
6        Q.  Okay.  It also says that that's a spot deal.
7    Correct?
8        A.  That's what his word was, yes.
9        Q.  And can you tell me, when was the deal, the
10   sale involving those 1600 metric tons made?
11       A.  Prior to the Vinmar transaction.
12       Q.  Okay.  Which is the reason why the price was
13   high?
14       A.  That's right.
15       Q.  Go to Joint Exhibit 21.  It's the --
16           JUDGE WOOD:  21?
17           MR. DIAZ-ARRASTIA:  Joint Exhibit 21.
18       Q.  (BY MR. DIAZ-ARRASTIA)  And Mr. Lee made --
19   asked you questions about Joint Exhibit 22 and just
20   where -- I think that's correct if I'm looking at the
21   correct right book.  Yeah.
22           Mr. Lee also asked you questions about
23   Joint Exhibit 22 where -- is where you notified KP that
24   you were going to sell them their 5,000 metric tons in
25   the month of September?

229

1        A.  That's correct.
2        Q.  But, now, Joint Exhibit -- and Mr. Lee asked
3    you whether Vinmar had been given a copy of that and
4    they had not.  Correct?
5        A.  That's what he said, yes.
6        Q.  Now, Joint Exhibit 23 is where Mr. Rajevac
7    tells Mr. Wilson that if they don't perform the material
8    will be resold on the open market?
9        A.  That's correct.
10       Q.  That is notice of intent to resell.  Correct?
11       A.  That is correct.
12       Q.  And if we scroll up to the e-mail that you
13   sent to Mr. Antonvich later that same day, you again
14   tell Mr. Antonvich that if Vinmar does not perform
15   Tricon intends to resell.
16       A.  That's correct.
17       Q.  And these e-mails were sent to Vinmar?
18       A.  That's correct.
19       Q.  Go to Joint Exhibit No. 10, please.  And if --
20   let's go to the page that you have at MOAB 13.  These are instant
21   messages between you and Mr. Leyman?
22       A.  That's correct.
23       Q.  And since this is indicated as a MOAB
24   document, is it your understanding that that's a
25   document that was produced by Mr. Leyman?

58  (Pages 226 to 229)

ARBITRATION HEARING - SEPTEMBER 20, 2010

230

1    A.  Yes.
2    Q.  So these are his records?
3    A.  That's correct.
4    Q.  Okay.  Take a look at 1:15:27 p.m.
5        MR. DIAZ-ARRASTIA:  Can you focus in on
6    that, please?
7    A.  What exhibit -- what exhibit are we on?
8    Q.  (BY MR. DIAZ-ARRASTIA)  It is Joint Exhibit
9    No. 10, Page MOAB 13 --
10   A.  Okay.
11   Q.  -- which is just a few pages in.
12   A.  Okay.
13   Q.  1:15:27 p.m.
14   A.  That's correct.
15   Q.  Can you see where Mr. Leyman is telling you,
16   "You have a problem with Vinmar"?
17   A.  Yes.
18   Q.  Is this where Mr. Wilson -- where Mr. Leyman
19   told you that Mr. Wilson had informed him that he
20   required U.S. origin?
21   A.  That's correct.
22   Q.  Okay.  Now, Mr. Leyman's office is in
23   Connecticut.  Correct?
24   A.  That's correct.
25   Q.  So his IM records would reflect eastern time.

231

1    Correct?
2    A.  That's correct.
3    Q.  Okay.  Now, let's look at Joint Exhibit
4    No. 15.  And this is where we have an e-mail that
5    Mr. Wilson is telling Mr. Rajevac, "We must have" -- no,
6    that's not the one I want.  Excuse me.
7        MR. DIAZ-ARRASTIA:  Which is the one --
8    no.  I'm looking for the one where Laurentiu forwards
9    Wilson --
10       THE WITNESS:  Exhibit 13?
11       MR. DIAZ-ARRASTIA:  Hold on a second.  No,
12   this isn't the one.
13       (Brief discussion off the record.)
14       MR. DIAZ-ARRASTIA:  Excuse me a moment.
15   I'm looking for another exhibit.
16   Q.  (BY MR. DIAZ-ARRASTIA)  That's right.  Joint
17   Exhibit 13.  Excuse me.  And this is the e-mail where
18   Mr. Rajevac tells Mr. Pascu that Asian origin might be
19   supplied.  Correct?
20   A.  Which e-mail are you referring to?
21   Q.  Joint Exhibit No. 13.  No, this isn't it
22   either.
23   A.  That's not it.
24   Q.  Where is that?  Oh, here it is.  It's Joint
25   Exhibit 14.  I apologize.  I apologize.  It's Joint

232

1    Exhibit No. 14.  And that is the e-mail -- that is the
2    e-mail where Mr. Rajevac informs Mr. Pascu that Asian
3    origin might be supplied?
4    A.  I think you're wrong again.  I think it's 15.
5    Q.  No.  It's -- no.  It's 14?
6        MS. LARSON:  No. 3.
7    A.  14?
8    Q.  (BY MR. DIAZ-ARRASTIA)  14.
9    A.  Vinmar what at the bottom?
10   Q.  Right.  Vuk Rajevac to Laurentiu Pascu on
11   July 29th, 2008.  Are you in the Joint Exhibit book?
12   A.  Okay.  Yeah, I'm in the Joint Exhibit book.
13   Q.  Okay.
14   A.  On No. 009 at the bottom?
15   Q.  009 at the bottom.
16   A.  Okay.  Yes.  I'm on No. 3 at the bottom.
17   Q.  That's right.
18   A.  Okay.  I see it.
19   Q.  Okay.  You see that.  And during Mr. Lee's
20   questioning, he pointed out that on top of that there is
21   an e-mail from Mr. Pascu to Mr. Wilson forwarding
22   Mr. Rajevac's e-mail?
23   A.  That's correct.
24   Q.  And I think your testimony was that we do not
25   know when Mr. Rajevac -- when Mr. Pascu would have

233

1    informed Wilson of Pascu's comments?
2    A.  That's correct.
3    Q.  Let me ask you something, Mr. Lockwood.  If
4    the operations specialist learned of something that was
5    considered a critical term of your deal, how long should
6    it take for them to report that to the trader?
7        MR. LEE:  Objection.  Calls for
8    speculation.
9        JUDGE BENTON:  It's overruled.
10   Q.  (BY MR. DIAZ-ARRASTIA)  What do you do -- what
11   do you do within Tricon?
12   A.  Within two seconds.
13   Q.  Okay.  And let me point out to you the e-mail
14   to -- Mr. Pascu sent to Mr. Wilson.  Let's look at the
15   date on that.  It was July 31st, 2008, at 1:39 p.m.
16   Correct?
17   A.  That's correct.
18   Q.  Now, at 1:00 -- and that would be central time
19   because both Vinmar and Tricon are located in Houston.
20   Right?
21   A.  That's correct.
22   Q.  If we go back to Joint Exhibit 10, MOAB 13,
23   where we were earlier, Mr. Leyman is telling you that
24   you have a problem regarding origin at 1:15:27 p.m.
25   eastern time --

59 (Pages 230 to 233)

234

1   A.  That's correct.
2   Q.  -- on the same day?
3   A.  That's correct.
4   Q.  So Mr. Wilson had told Mr. Leyman that he
5   wanted U.S. origin and Mr. Leyman had told it to you
6   about an hour and 15 minutes before Mr. Pascu forwarded
7   Mr. Rajevac's e-mail to Mr. Wilson?
8   A.  That's very surprising that you point that
9   out, but, yes, you're correct.
10  Q.  So there's no way that Mr. Wilson first found
11  out about Mr. Rajevac's communication at 1:39 p.m.
12  central time on July 31st?
13  A.  You're exactly right.
14      (The time is 3:03 p.m.)
15      MR. DIAZ-ARRASTIA:  I pass the witness.
16      JUDGE BENTON:  Mr. Lee, anything else for
17  Mr. Lockwood?
18      MR. LEE:  I don't think so.
19      JUDGE BENTON:  Okay.  You may step down,
20  Mr. Lockwood.
21      Call your next witness, Mr. Diaz-Arrastia.
22      MR. DIAZ-ARRASTIA:  The next witness is
23  going to be Ed Leyman who will be presented through
24  video.
25      JUDGE BENTON:  Okay.  How long is that?

235

1       MR. DIAZ-ARRASTIA:  It's an hour and two
2   minutes.
3       JUDGE BENTON:  Okay.  Let's see here.
4       JUDGE DAVIDSON:  Why don't we watch it for
5   a half an hour since we're used to watching television
6   in half-hour segments and then take a break and then
7   watch the last part.
8       MR. DIAZ-ARRASTIA:  And something to
9   inform the panel.  We ended up with different exhibit
10  numbers in the depositions than in the books that we
11  have been referring to so far.
12      What we have tried to do to resolve that
13  is you also have a book in front of you that has each
14  deposition transcript with the exhibits attached as
15  numbered in the depositions.  So if you would follow in
16  that, that would help.  Have y'all -- have y'all found
17  that?
18      JUDGE BENTON:  That's nice to know.
19      MR. LEE:  I don't think we need to take --
20      JUDGE BENTON:  About a half hour.
21      MR. LEE:  -- have her take it down.  Do
22  we?
23      MR. DIAZ-ARRASTIA:  Well, we have a
24  transcript.
25      JUDGE WOOD:  So the A's have the -- one on

236

1   the witness and it has the exhibit numbers behind it?
2       MR. DIAZ-ARRASTIA:  Correct.  The --
3       JUDGE WOOD:  These have the second
4   witness --
5       MR. DIAZ-ARRASTIA:  That's correct.
6       JUDGE WOOD:  -- and it has the exhibits
7   behind it.
8       MR. DIAZ-ARRASTIA:  There will be three
9   witnesses who will be presented by video.
10      JUDGE BENTON:  Okay.
11      MR. DIAZ-ARRASTIA:  A should be
12  Mr. Leyman's deposition and you'll have both the
13  transcript of the deposition I think with the cuts
14  marked in it and then the exhibits will be numbered as
15  they were referred to in the deposition.
16      JUDGE BENTON:  Okay.
17      MR. LEE:  And if I could make one other
18  comment about the depositions.  What we have done is we
19  exchanged designations and agreed that it would be a lot
20  easier for everyone involved if we just play it all the
21  way through from beginning to end so this would include
22  our offer of Mr. Leyman's testimony as well.
23      MR. DIAZ-ARRASTIA:  That is correct.
24      MR. LEE:  I think we've got it all right.
25  There may be a glitch here and there, but I think

237

1   that --
2       MR. DIAZ-ARRASTIA:  We -- mistakes can
3   always be made, but they have been reviewed by several
4   eyes.
5       MR. LEE:  Yes.  And we took out the
6   objections.  I don't know that it makes a whole lot of
7   sense for us to interrupt for objections.  I think that
8   the panel is all experienced lawyers and judges and
9   understands --
10      JUDGE WOOD:  Thank y'all so much.
11      MR. LEE:  I don't think you need to take
12  it down.  We have --
13      JUDGE DAVIDSON:  We have this.
14      JUDGE WOOD:  Sometimes the reporters like
15  to go ahead and take it down if they're going to have to
16  type it later and it just depends on your preference.
17  Because if you have to prepare this, you will have to
18  include this.
19      JUDGE DAVIDSON:  Yeah, but if you have --
20  if this is on a disk, all you've got to give her is the
21  disk and she can go --
22      JUDGE WOOD:  This is true.
23      JUDGE DAVIDSON:  -- copy, paste, insert.
24      MR. LEE:  Yeah.
25      THE REPORTER:  It's up to y'all.

60  (Pages 234 to 237)

ARBITRATION HEARING - SEPTEMBER 20, 2010

238

1      MR. DIAZ-ARRASTIA:  It is not necessary
2  for you to write it down.
3      (At this time the edited version of the
4  videotaped deposition of Richard Leyman that was
5  originally taken on April 29, 2010, was played in the
6  arbitration.  The court reporter at the arbitration
7  reported such proceedings and this is her transcription
8  of same.)
9      MR. LEE:  George, before you get started,
10  I have just an objection for the record.
11      Vinmar is participating in this deposition
12  subject to and without waiver of its continuing
13  objection to Triple A's jurisdiction in this case.  As
14  we've made it clear, we don't think there's an
15  arbitration agreement, but -- so our participation is
16  subject to and without waiver of that objection.
17          RICHARD LEYMAN,
18  having been first duly sworn, testified as follows:
19          EXAMINATION
20  BY MR. DIAZ-ARRASTIA:
21      Q.  Could you state your full name for the record,
22  please?
23      A.  It's Edward Leyman.
24      Q.  Okay.  Mr. Leyman, I am George Diaz-Arrastia.
25  I am the lawyer that represents Tricon in this case.

239

1  Now, have you and I ever met before today?
2      A.  No.
3      Q.  Have we ever had any conversations?
4      A.  No.
5      Q.  I think that you have had one telephone
6  conversation with a lawyer in my office called Christi
7  Guerrini.  Do you recall that?
8      A.  I believe so.  I'm not sure.  I think she
9  called to see -- well, let me rephrase that.  No, I
10  don't really --
11      Q.  Do you --
12      A.  I really don't remember her calling, but I
13  assume she did because she made contact with John.
14      Q.  Okay.  Have you ever spoken with Mr. Lee?
15      A.  No.
16      Q.  Have you ever spoken with anyone in his
17  office?
18      A.  No.
19      Q.  Sir, how long have you been employed by MOAB,
20  Inc.?
21      A.  I've been associated with MOAB for
22  approximately six years.
23      Q.  You say you're associated with MOAB.  What's
24  the nature of that association?
25      A.  I have my own company, and it's associated

240

1  with MOAB Oil.
2      Q.  Your company has a contract with MOAB Oil?
3      A.  Yes.
4      Q.  And basically it involves that you broker
5  deals and you get commissions, that sort of thing?
6      A.  Yes.  And they provide telephone service,
7  computer service, administrative service.
8      Q.  How would you describe what you do with MOAB?
9      A.  Brokering is bringing a buyer and seller
10  together.  My area of specialty is petrochemicals and
11  gasoline blend stocks.  There are other people in MOAB
12  that do other products.  I speak to potential buyers,
13  potential sellers, and then negotiate an agreement where
14  one purchases a product from the other.
15      Q.  Okay.  It would be fair to say that what you
16  do -- your mode of employment is that you broker deals
17  in petrochemicals and gas blend stocks?
18      A.  Yes.
19      Q.  And how long have you been doing that, sir?
20      A.  I've been doing it for over 20 years.
21      Q.  And before that July 22nd, 2008, deal, had you
22  brokered deals with Tricon before?
23      A.  Yes.
24      Q.  Many?  A few?
25      A.  I don't know how to best answer that.

241

1      Q.  Okay.  Had you also brokered deals with
2  Vinmar?
3      A.  Yes.
4      Q.  With what --
5      A.  My answer -- I guess a less frequent number of
6  deals with Vinmar than with Tricon.
7      Q.  Okay.  Before July 22, 2008, did you know Brad
8  Lockwood?
9      A.  Yes.
10      Q.  Did you also know Rick Wilson before --
11      A.  Yes.
12      Q.  -- July 22, 2008?
13      Had you brokered deals with both of them
14  before July 22, 2008?
15      A.  Yes.
16      Q.  And I guess the way that you knew them is
17  through brokering deals.  Would that be correct?
18      A.  Yes.
19      Q.  It was not a personal friendship?  You knew
20  them in your business?
21      A.  Yes.
22      Q.  And what was your educational background, sir?
23  How far did you get in school?
24      A.  I have a degree in chemical engineering and an
25  MBA in marketing.

61 (Pages 238 to 241)

ARBITRATION HEARING - SEPTEMBER 20, 2010

242

1    Q.   And when did you get your chem-E degree?
2    A.   1967.
3    Q.   Where did you get it?
4    A.   New York University School of Engineering.
5    Q.   And your MBA, when did you get that?
6    A.   Approximately 1972.
7    Q.   And what institution granted it?
8    A.   And it was Iona College.
9    Q.   Sir, is there a -- is it common or customary
10   in your industry for the parties in a commodity
11   transaction of this kind, like mixed xylene, not to
12   speak directly with each other, but to have their
13   communications happen through a broker such as yourself?
14   A.   Both are common.  Some companies deal directly
15   with each other.  Others deal through brokers.
16   Q.   When a broker is involved in the transaction,
17   is it common for the communications to always be through
18   the broker instead of directly between the buyer and
19   seller?
20   A.   Yes.
21   Q.   Is that what happened in the transaction
22   regarding mixed xylene on July 22nd, 2008, between
23   Vinmar and Tricon?
24   A.   Yes.  When the deal was negotiated on
25   July 22nd, I was speaking to both parties and, to my

243

1    knowledge, they were not speaking to each other.
2    Q.   In a transaction where the parties do not
3    speak to each other but speak only through the broker,
4    does the broker then communicate the terms of the deal
5    to each of the parties?
6    A.   Yes.
7    Q.   And does the broker have authority from each
8    of the parties to do that?
9    A.   Yes.
10   Q.   In the July 22nd, 2008, transaction between
11   Tricon and Vinmar, did you have authority from Rick
12   Wilson and Vinmar to communicate with Tricon and Brad
13   Lockwood?
14   A.   Yes.
15   Q.   How did you get that authority?
16   A.   Mr. Wilson gave me a firm bid over the phone
17   to purchase the mixed xylenes.
18   Q.   So it was given to you over the telephone?
19   A.   Yes.
20   Q.   And when you say that Mr. Wilson gave you a
21   firm bid, what does that mean?
22   A.   He specified the product, the price, the
23   quality, the timing of what he was looking to purchase,
24   and all those commercial terms were incorporated in a
25   firm bid, which I then called and showed to Brad

244

1    Lockwood at Tricon.
2    Q.   Okay.  I guess what I'm trying to find out is
3    what is -- what do you mean when you use the words "firm
4    bid"?
5    A.   That means it is a commitment in this case by
6    the buyer.  It's not an indication.  In the brokering
7    business, you can get an indication, which is just, as
8    stated, an indication.  I'd like to buy this product at
9    this price, but there's no firm commitment to do so.  A
10   firm bid is that firm commitment to do so.
11   Q.   So it would be fair to say that a firm bid is,
12   "If these terms are met, we have a deal"?
13   A.   Yes.
14   Q.   Did Rick Wilson give you authority to
15   communicate that firm bid to Brad Lockwood at Tricon?
16   A.   Yes.
17   Q.   And he gave that to you over the telephone?
18   A.   Yes.
19   Q.   And did you also have authority from Brad
20   Lockwood and Tricon to communicate with Rick Wilson --
21   A.   Yes.
22   Q.   -- at Vinmar?
23        And how did Brad give you that authority?
24   A.   Brad gave me a firm offer on mixed xylenes,
25   again specifying quantity, quality, delivery time,

245

1    price.
2    Q.   Was this firm offer in response to the firm
3    bid?
4    A.   No.  I think the offer came first, and then
5    the bid was the reply to it.
6    Q.   Okay.  And did Mr. Lockwood also communicate
7    this authority to you over the telephone?
8    A.   Yes.
9    Q.   And you had authority from Mr. Lockwood to
10   make this firm offer?
11   A.   Yes.
12   Q.   And that is a -- is that normal and typical
13   way that you do business?
14   A.   Yes.
15   Q.   Does that, in general, describe the way you do
16   business in all of the transactions you have done here
17   at MOAB?
18   A.   Yes.
19   Q.   Mr. Leyman, I'd like to call your attention to
20   what has been marked as Exhibit No. 1 to your
21   deposition.  It is a document that was given to me by
22   your counsel.  That's why at the bottom it has the
23   legend MOAB.  And this document begins with MOAB No. 4
24   and ends with MOAB No. 14.  Do you see that, sir?
25   A.   Yes.

DepoTexas
888.893.3767

ARBITRATION HEARING - SEPTEMBER 20, 2010

246

1      Q.  Do you recognize what this document is?
2      A.  It's the IM communication between myself and
3  Brad Lockwood.
4      Q.  Okay.  And on top of the first page, it
5  says, "Brad Lockwood."  And that would indicate that
6  these were communications with Mr. Lockwood?
7      A.  Yes.
8      Q.  And then right under that, there's the date
9  7-22-08.
10     A.  Yes.
11     Q.  Do you see that, sir?
12     A.  Yes.
13     Q.  And does that indicate that these are instant
14 messages between you and Mr. Lockwood that took place on
15 July 22, 2008?
16     A.  Yes.
17     Q.  If you would turn to the page -- to MOAB 5 and
18 go towards the bottom of the page, really the last line
19 on that page, which says "10:48:31 a.m."  Do you see
20 that, sir?
21     A.  Yes.
22     Q.  Okay.  And I suppose that that refers to this
23 is a communication that is happening at 10:48 and 31
24 seconds in the morning on July 22, 2008.  Would that be
25 the right way to read that?

247

1      A.  Yes.
2      Q.  And it is an instant message being sent to you
3  by Mr. Lockwood?
4      A.  Yes.
5      Q.  Because it says "Brad" right after the time.
6  Correct?
7      A.  Correct.
8      Q.  Okay.  And it says, "I'd like to show
9  you" -- "I'd like to show Vinmar the offer and bring in
10 a firm bid."  Do you see that, sir?
11     A.  Yes.
12     Q.  Is this when Mr. Lockwood gave you the firm
13 offer that you talked about a moment ago?  Would this --
14 it appear to be at about this time?
15     A.  It was shortly thereafter.  This particular
16 offer was not acceptable to Vinmar because of the
17 quality, and there was a subsequent offer made to Vinmar
18 with a different xylene quality.
19     Q.  Okay.  So at the time while there were IM
20 discussions going on between you and Mr. Lockwood, there
21 were also telephone discussions going on between you and
22 Mr. Lockwood?
23     A.  Yes.
24     Q.  And at this same time, there were also IM
25 discussions going on between you and Mr. Wilson and also

248

1  telephone discussions between you and Mr. Wilson?
2      A.  Yes.
3      Q.  If you would look at 12:09:39 where it says,
4  "Ed."  And that would be you?
5      A.  Yes.
6      Q.  Okay.  So this would be a communication -- an
7  IM communication that you sent to Mr. Lockwood at
8  12:09:39 p.m.?
9      A.  Yes.
10     Q.  And it said, "All done but call me"?
11     A.  Yes.
12     Q.  What do you mean "All done but call me"?
13     A.  That there was an agreement of Vinmar -- with
14 Vinmar that Tricon had made a proposal.  Vinmar had
15 countered the proposal and Brad accepted the proposal.
16 And going back to Mr. Wilson at Vinmar, there was
17 acceptance and a summary of all the terms and conditions
18 being discussed by me with both parties.
19     Q.  Okay.  When you say "All done," do you mean
20 the deal is all done?
21     A.  Yes.
22     Q.  Okay.  So by 12:09:39 p.m., in your mind there
23 had been a firm offer from Tricon, Brad Lockwood, and a
24 firm bid from Rick Wilson at Vinmar?
25     A.  Yes.

249

1      Q.  Let me put it to you this way.  At
2  12:09:39 p.m., had Mr. Wilson given you a firm bid to
3  take to Tricon?
4      A.  Yes.
5      Q.  And by 12:09:39 p.m., had Mr. Wilson
6  authorized you to make that firm bid?
7      A.  Yes.
8      Q.  And, similarly, by 12:09:39 p.m., had Brad
9  Lockwood given you a firm offer to take to Vinmar?
10     A.  Yes.
11     Q.  And by 12:09:39 p.m., had Mr. Lockwood
12 authorized you to communicate that firm offer to Vinmar?
13     A.  Yes.
14     Q.  You say, "But call me."  Why did you want
15 Mr. Lockwood to call you?
16     A.  To go over all the terms and conditions that
17 both parties had just agreed to.
18     Q.  Okay.  Right after the next entry from you on
19 Exhibit 1, you say, "Vinmar is asking to declare
20 discharge port no later than August 15th."  Do you see
21 that, sir?
22     A.  Yes.
23     Q.  What happened here?
24     A.  After the deal was negotiated, two points were
25 not discussed during the negotiation.  One was at what

DepoTexas
888.893.3767

ARBITRATION HEARING - SEPTEMBER 20, 2010

250

1  point does the buyer declare to the seller where he
2  wants the product to be delivered.  And Rick Wilson
3  proposed nominating August 15th as that day of
4  notification.
5      Q.  Okay.  And, sir, if you will go down a few
6  lines.  Look at 12:39:24 p.m. "Ed."
7      A.  Yeah.
8      Q.  And there are a few lines ahead of that, and
9  there's some back and forth on the dates for the
10  declaration of discharge port?
11     A.  Yes.
12     Q.  Do you see that?
13     A.  Yes.
14     Q.  But at 12:39:24 p.m., it says, "Ed," which is
15  you.  Correct?
16     A.  Yes.
17     Q.  It says, "Friday, the 8th, is okay"?
18     A.  Yes.
19     Q.  And just a few seconds later is it Brad
20  saying, "Okay"?
21     A.  Yes.
22     Q.  Does this reflect an agreement on Friday, the
23  8th of August, as the date to declare the discharge
24  port?
25     A.  Yes.

251

1      Q.  Okay.  And, again, had Mr. Lockwood authorized
2  you to communicate to Mr. Wilson that the 8th was okay
3  with him?
4      A.  Yes.
5      Q.  And had Mr. Wilson authorized you to
6  communicate to Mr. Lockwood that the 8th was okay with
7  him?
8      A.  Yes.
9      Q.  Was an agreement reached on the 8th?
10     A.  Yes.
11     Q.  Just a few lines down after that, if you look
12  at 1:06:31 p.m., again, Ed, it says, "Vinmar asking if
13  you are agreeable to do LC site."  Do you see that, sir?
14     A.  Yes.
15     Q.  Do you recall what that was about?
16     A.  Yes.  The second point that was not negotiated
17  initially was the payment terms.  Subsequent to being
18  all done, the parties agreed on 30 days after a bill of
19  lading date.
20         Subsequently Rick came back requesting
21  that payment be made with a documentary LC, to do LC at
22  site, and I communicated that to Brad at Tricon.
23     Q.  So there had -- there had been a
24  discussion between you and Mr. Lockwood and you and
25  Mr. Wilson regarding a 30-day payment period?

252

1      A.  Yes.
2      Q.  And that would be over the telephone; it's not
3  reflected in the IM's?
4      A.  That's correct.
5      Q.  And Mr. Lockwood had agreed you -- had
6  authorized you -- let me put it this way.  Had
7  Mr. Lockwood authorized you to agree on the 30-day
8  payment period?
9      A.  Yes.
10     Q.  And had Mr. Wilson similarly authorized you to
11  agree on the 30-day payment period?
12     A.  Yes.
13     Q.  And was it after that that Mr. Wilson
14  said, "Can we change it to an on site LC"?
15     A.  Yes.
16     Q.  And did he authorize you to communicate that
17  to Mr. Lockwood?
18     A.  Yes.
19     Q.  And that's what you did --
20     A.  Yes.
21     Q.  -- here in this IM?
22         If you will go to the next page, sir, if
23  you would look just a little below the middle of the
24  page at 4:12:27 p.m. from Brad.
25     A.  Yes.

253

1      Q.  Where it says -- again, immediately before
2  that at 4:11:52 p.m., Ed, you, is saying, "Vinmar asking
3  again on payment terms.  LC site, question mark."
4  Correct?
5      A.  Yes.
6      Q.  Then Brad's response at 4:12:27 p.m. is that,
7  "Yes, we accept LC at site"?
8      A.  Yes.
9      Q.  Okay.  Is this where Mr. Lockwood told you,
10  "Yes, it's okay with me to change the payment terms to a
11  letter of credit on site"?
12     A.  Yes.
13     Q.  And did Mr. Lockwood authorize you to
14  communicate that to Mr. Wilson?
15     A.  Yes.
16     Q.  And did you do that?
17     A.  Yes.
18     Q.  And did Mr. Wilson accept that?
19     A.  Yes.
20     Q.  Mr. Leyman, after -- is it your custom after a
21  deal is made the way we've been talking about to send
22  some kind of written confirmation to the parties?
23     A.  Yes.
24     Q.  Is that something you always do?
25     A.  Yes.

64 (Pages 250 to 253)

ARBITRATION HEARING - SEPTEMBER 20, 2010

254

1    Q. I show you what's marked as Exhibit 2 to your
2  deposition, sir. Do you recognize that document?
3    A. Yes.
4    Q. Is this the confirmation that you sent on
5  July 22, 2008 -- or I should say the first confirmation
6  that you sent?
7    A. Yes.
8    Q. And this reflects the 30-day payment term that
9  was initially agreed to?
10   A. Yes.
11   Q. If you would look at the first page of
12 Exhibit 2, it appears to have been e-mailed to Rick
13 Wilson?
14   A. Okay. Yes. **This would have been sent to**
15 **Vinmar.**
16   Q. If you look at Exhibit 2, second page, is
17 that -- it says "MOAB Oil, Inc.," on top. Is this MOAB
18 Oil's letterhead? I just want to find out if that's
19 MOAB Oil's letterhead.
20   A. **Oh, I'm sorry. Yes.**
21   Q. Is this a form that you always use for these
22 transactions?
23   A. Yes.
24   Q. Let me ask you this. In the -- initially
25 there was an -- you said there was an agreement on

255

1  30-day term, which was later changed, and then there was
2  discussion about discharge port as well?
3    A. Yes.
4    Q. And was it your testimony that both of these
5  discussions occurred after you believed that there was a
6  deal made, that a firm bid had been made and a firm
7  offer had been made?
8    A. Yes.
9    Q. In the industry, can deals be made although
10 there may be some terms that are left to be negotiated
11 between the parties?
12   A. Yes, sometimes.
13   Q. I'm showing you now what's Exhibit 3. Do you
14 recognize that document, Mr. Leyman?
15   A. Yes.
16   Q. Is this also a confirmation?
17   A. Yes.
18   Q. And did you send this confirmation to both
19 Rick Wilson and Brad Lockwood?
20   A. Yes.
21   Q. Okay. And is it also on MOAB's letterhead?
22   A. Yes.
23   Q. And if you would look sort of a third of the
24 way down where it says "Amended payment terms." Do you
25 see that, sir?

256

1    A. Yes.
2    Q. Okay. Is this the confirmation that was sent
3  after agreement was reached on the letter of credit as
4  opposed to the 30 days?
5    A. Yes.
6    Q. Sir, does either Exhibit 2 or Exhibit 3
7  refer -- actually on the -- on the delivery side, both
8  of these refer to the August 8th declaration of
9  discharge port. Correct, sir?
10   A. Yes.
11   Q. Is Exhibit 3 also on MOAB's letterhead?
12   A. Yes.
13   Q. With regard to both Exhibit 2 and Exhibit 3,
14 sir, did you draft them?
15   A. Yes.
16   Q. Did you draft them on behalf of both parties,
17 Vinmar and Tricon?
18   A. Yes.
19   Q. And did you draft them to represent the terms
20 of the deal that you had negotiated for them?
21   A. Yes.
22   Q. At the bottom of both Exhibit 2 and Exhibit 3,
23 there is a statement that says, "If there is anything
24 outlined contrary to your understanding of our
25 agreement, please notify us immediately." Do you see

257

1  that, sir?
2    A. Yes.
3    Q. That's in both Exhibit 2 and Exhibit 3?
4    A. Yes.
5    Q. Is that always in the confirmation memos that
6  you send?
7    A. Yes.
8    Q. And why do you include that?
9    A. **Well, everyone is human. And on a rare case**
10 **where there is a misunderstanding or miscommunication,**
11 **it gives everyone the opportunity to see if there's any**
12 **mistakes and to correct them immediately.**
13   Q. Okay. And would it be your expectation that
14 if you made a mistake one of the parties would call it
15 to your attention?
16   A. **Yes. Or I would notice the mistake as well.**
17   Q. And, in fact, someone did call you to point
18 out a mistake on Exhibit 2 and Exhibit 3. Isn't that
19 so?
20   A. Yes.
21   Q. And what was that mistake?
22   A. **It was the price.**
23   Q. Who pointed out a mistake on the price to you?
24   A. **Brad Lockwood advised me of the price**
25 **difference.**

65  (Pages 254 to 257)

ARBITRATION HEARING - SEPTEMBER 20, 2010

258

1    Q.  Did Mr. Wilson also advise you that there was
2  a mistake on the price?
3    A.  No.
4    Q.  If you would turn back to Exhibit 1, the IM's,
5  sir.  And look at Page MOAB 9.
6    A.  Yes.
7    Q.  If you would look just a little bit below the
8  middle of the page at 10:41:09 a.m., a message from
9  Brad, where it says, "Please correct that Vinmar thing."
10    A.  Yes.
11    Q.  And right afterwards you reply, "Was sent out
12  this a.m."?
13    A.  Yes.
14    Q.  Is he referring to the mistake on the price?
15    A.  Yes.
16    Q.  And what you're saying was sent out this a.m.
17  is the correction?
18    A.  Yes.
19    Q.  Okay.  Mr. Leyman, after getting our papers
20  straight, let me now hand you what is the real
21  Exhibit 4.  And is that the confirmation that reflects
22  the corrected price?
23    A.  Yes.
24    Q.  And about a third of the way down on Exhibit 4
25  you see the legend Amended Price?

259

1    A.  Yes.
2    Q.  And this is the correct price that was agreed
3  to between the parties?
4    A.  Yes.
5    Q.  And, again, is Exhibit 4 on MOAB letterhead?
6    A.  Yes.
7    Q.  And was Exhibit 4 drafted by you?
8    A.  Yes.
9    Q.  Was it drafted by you on behalf of both
10  parties?
11    A.  Yes.
12    Q.  And was it drafted to reflect the terms of
13  their agreement?
14    A.  Yes.
15    Q.  The agreement that the parties authorized to
16  communicate to each other?
17    A.  Yes.
18    Q.  Now, Mr. Leyman, do Exhibits 2, 3 or 4 say
19  anything about whether the product needed to have --
20  needed to be made of U.S. origin?
21    A.  No.
22    Q.  Why do not they -- why do they not say
23  anything about that?
24    A.  Because it was not discussed in negotiations.
25    Q.  If you will turn back to Exhibit 1, the IM's.

260

1  And look again at MOAB 9, near the bottom of the page of
2  MOAB 9.  Do you see at 1:39:30 p.m. where it
3  says "Ed" -- and that would be you.  Correct?
4    A.  Yes.
5    Q.  It says, "Yep.  Would you have any interest in
6  buying back the 5 KT MX you sold to Vinmar"?
7    A.  Yes.
8    Q.  Tell me what that's about.
9    A.  That's just being a broker.  Sometimes on a
10  Monday someone would sell.  On Tuesday they would buy
11  back.  I was just inquiring there if Tricon was still on
12  a sale side or possibly buying.
13    Q.  Did Mr. Wilson or anybody at Vinmar contact
14  you to tell you that you might be -- that they might be
15  interested in selling the MX they had just bought?
16    A.  I don't have any recollection of Mr. Wilson
17  asking me to try to sell -- resell his cargo.  In fact,
18  I don't recall speaking to Mr. Wilson that day, but I
19  assume that I did because being a broker -- he had been
20  the buyer on Monday.  I would see if he would be a
21  potential buyer on Tuesday.  But I don't have any
22  recollection of actually speaking to him.
23    Q.  Okay.  And, Mr. Leyman, is Exhibit 4 the last
24  confirmatory memoranda that you sent to the parties on
25  this deal?

261

1    A.  Yes.
2    Q.  And you sent it to both Vinmar and Tricon?
3    A.  Yes.
4    Q.  If you would now go to Page MOAB 12 in
5  Exhibit 1.  On the top of that page is the date 7-31-08.
6  Do you see that, sir?
7    A.  Yes.
8    Q.  Are these instant messages between you and
9  Mr. Lockwood on July 31st?
10    A.  Yes.
11    Q.  A little over a week after the transaction?
12    A.  Yes.
13    Q.  If you would look at about the middle of the
14  page where it says 10:19:09 a.m.?
15    A.  Yes.
16    Q.  It says, "Ed."  That is you.  It
17  says, "Vinmar's MX still available but has no interest
18  in selling anywhere close to your price ideas."
19    A.  Yes.
20    Q.  Do you see that, sir?
21    A.  Yeah.
22    Q.  What are you referring to when you say that?
23    A.  After these earlier messages, I called Rick
24  Wilson, asked him if the cargo that he bought from
25  Tricon was still available.  He said it was.  I told him

66  (Pages 258 to 261)

ARBITRATION HEARING - SEPTEMBER 20, 2010

262

1   that Tricon is indicating interest in buying xylenes.
2   I gave him the indicated price. He
3   indicated that he would look to resell the barrels but
4   at a profit, and indicated 1350 as the sales price.
5   Q.   Okay.  And that is -- when you say -- in the
6   next line where you say, "Ed, at 1300 plus he would
7   consider"?
8   A.   Yes.
9   Q.   "He" being Mr. Wilson?
10   A.   Yes.
11   Q.   And these are communications you are having
12   with Mr. Lockwood?
13   A.   Yes.
14   Q.   These were telephone conversations that you
15   had with Mr. Wilson about whether they would sell the MX
16   they had just bought?
17   A.   Yes.
18   Q.   And Mr. Wilson communicated to you that he
19   would at that price where they would make a profit?
20   A.   Yes.
21   Q.   Would Mr. Wilson be able to sell mixed xylene
22   if he had not bought it?
23   A.   Theoretically you can sell, sure.  That was
24   not the purpose of the call, though.
25   Q.   Okay.  Well, what was the purpose of the call?

263

1   A.   To see if he specifically wanted to resell the
2   barrels he bought from Tricon.
3   Q.   And his response was?
4   A.   He indicated that he would sell the barrels if
5   he could obtain a price of 1350.
6   Q.   And he -- and he couldn't sell those barrels
7   unless he had bought them.  Would that be right?
8   A.   Again, just a point of clarification.  One --
9   in commodity trading, one can sell a product that they
10   don't necessarily own.
11   Q.   Mr. Leyman, when did you first hear that
12   Vinmar was saying that the mixed xylene had to be of
13   U.S. origin?
14   A.   On the afternoon of the 31st of July.
15   Q.   Okay.  And how did you hear that?
16   A.   Mr. Wilson sent me an instant message asking
17   me to call him.  I called him.  And he told me that the
18   xylenes he purchased from Tricon needed to be of U.S.
19   origin.
20   Q.   Okay.  And what was your response to him?
21   A.   I told him that that was not what was
22   negotiated, that it was not discussed, and the sale was
23   based on a delivered CFR first half September basis with
24   no origin guarantee.
25   Q.   Okay.  Well, look then -- let's go back to

264

1   Exhibit 1 then, which is the MOAB document.  And take a
2   look at Page MOAB 14, which is the last page in the
3   exhibit.
4   A.   Okay.
5   Q.   Okay.  And if you would flip back a couple of
6   pages, this appears to still be the IM's between you and
7   Mr. Lockwood --
8   A.   Right.
9   Q.   -- on July 31st?
10   A.   Yes.
11   Q.   That's correct?
12   A.   Yes.
13   Q.   And at the top of MOAB 14 at 4:45:59 p.m., is
14   that a message from you that says, "Ed, got a call from
15   Vinmar"?
16   A.   Uh-huh.
17   Q.   Is this the call that you were talking about a
18   moment ago that Mr. Wilson gave you about the U.S.
19   origin?
20   A.   Yes.
21   Q.   Okay.  And was this when you let Mr. Lockwood
22   know that you had received that call?
23   A.   Yes.
24   Q.   Had you received that call close in time to
25   4:45:59 p.m. on July 31st?

265

1   A.   There were one or two calls that afternoon.
2   They would probably be close to that time.
3   Q.   On 4:46:42 p.m., you say, "Ed, want any
4   discussions to go through MOAB since we brokered the
5   deal?"  Do you see that, sir?
6   A.   Yes.
7   Q.   Tell me what that was about.
8   A.   Vinmar requested that any discussions
9   regarding the U.S. origin be done through MOAB, that
10   they preferred speaking through MOAB than speaking
11   directly to Tricon.
12   Q.   So they wanted to do it just the way the deal
13   had originally been put together?
14   A.   Yes.
15   Q.   Where you would be an agent for both sides?
16   A.   Yes.
17   Q.   About halfway down the page,
18   4:50:34 p.m., "Ed, I repeated that that was not
19   negotiated and a guarantee of U.S. origin only was not
20   agreed upon."  Do you see that, sir?
21   A.   Yes.
22   Q.   You're telling Mr. Lockwood what you had told
23   Mr. Wilson over the telephone.  Is that right?
24   A.   That is correct.
25   Q.   And that's at 4:50, just a few minutes after

67 (Pages 262 to 265)

ARBITRATION HEARING - SEPTEMBER 20, 2010

266

1    the IM's at the top of the page. Correct?
2        A. Yes.
3        Q. So the best of your recollection is that these
4    IM's are occurring a short time after your conversation
5    with Mr. Wilson --
6        A. Yes.
7        Q. -- over the telephone?
8        A. Yes.
9        Q. Mr. Leyman, do you still broker deals with
10   Vinmar today?
11       A. Yeah. I haven't done anything recently, but I
12   still deal with Vinmar.
13       Q. Did you broker deals with Vinmar after the
14   July 22, 2008, deal with Tricon?
15       A. No.
16       Q. Do you still deal with them to see if there
17   are deals to be made?
18       A. Yes.
19       Q. Do you have any problem with working with
20   Vinmar?
21       A. No.
22            EXAMINATION
23   BY MR. LEE:
24       Q. Okay. Mr. Leyman, it's my turn to ask you
25   some questions. I introduced myself a little bit

267

1    earlier. My name is Stephen Lee. I represent Vinmar.
2    You and I have never met. Correct?
3        A. That's correct.
4        Q. Do you recognize Exhibit 6?
5        A. Yes.
6        Q. What is it, sir?
7        A. It's IM messages between myself and Rick
8    Wilson.
9        Q. Okay. And the first page of Exhibit 6 are IM
10   messages between you and Mr. Wilson on July 22, 2008.
11   Correct?
12       A. Yes.
13       Q. And then the second page would be instant
14   message exchanges between you and Mr. Wilson on July 31,
15   2008?
16       A. Yes.
17       Q. As I read these instant messages -- and it
18   starts with you talking to Mr. Wilson around 9:19 in the
19   morning on July the 22nd where Rick is asking you if
20   there's any MX available. Correct?
21       A. Yes.
22       Q. And then if you pick up on Exhibit 1, which is
23   your instant message exchanges with Mr. Lockwood
24   starting at 9:25. Do you see that? Right here, sir.
25       A. Yeah.

268

1        Q. You tell Mr. Lockwood, "See possible 5 KT FOB
2    H/TC any August. MX buyer indicated paying 4 to 402
3    range." Right?
4        A. Yes.
5        Q. Now, was that a reference to your conversation
6    with Mr. Wilson that he may be willing to buy 5 KT of MX
7    FOB H/TC?
8        A. Yes.
9        Q. Okay. "H" being Houston?
10       A. Yes.
11       Q. And "TC" being Texas City?
12       A. Yes.
13       Q. First of all, at 9:29:04 a.m., Mr. Lockwood
14   says he would offer 5 KT FOB Houston, Texas City,
15   Corpus, any August at $4.10 a gallon. P and C basis not
16   reported.
17       A. Yes.
18       Q. Now, is that a -- is that a firm offer?
19       A. Yes.
20       Q. All right. Where did the -- you mentioned to
21   Mr. Wilson in his -- in your instant message to him at
22   9:34 that the quality would be 52 -- that's 5211/20 BR,
23   which I take it is -- 5211 would be the reference to the
24   ASTM --
25       A. Yes.

269

1        Q. -- standard?
2            And then 20 would be a maximum of 20
3    bromine?
4        A. Bromine index.
5        Q. Bromine index. Okay. Is that an indication
6    of max 20?
7        A. Yes.
8        Q. Where did that quality reference come from?
9        A. How best to answer that? That was Vinmar's
10   requirement for the quality and that's one of the
11   standard qualities of mixed xylenes in the Gulf Coast.
12       Q. And so you made -- you made the firm offer to
13   Vinmar at 9:34 on July the 22nd. Correct?
14       A. Yes.
15       Q. And that would be for FOB. Explain what FOB
16   Houston, Texas City, Corpus means.
17       A. Houston, Texas City, Corpus would be the
18   possible load ports of the product, Houston, Texas City,
19   or Corpus Christi, Texas. FOB I guess -- I'm not
20   totally aware of what the Incoterms mean, but I think
21   it's free on board or something similar to that.
22       Q. In other words, the product would be delivered
23   to Vinmar or to the buyer at one of those locations and
24   the buyer would be responsible for freight? Is that
25   your understanding?

68  (Pages 266 to 269)

ARBITRATION HEARING - SEPTEMBER 20, 2010

270

1    A.  Yes.  The buyer would be responsible for --
2  if -- yeah, to load a vessel.
3    Q.  Okay.  And Mr. Wilson doesn't respond with a
4  "Yes" or "No."  Correct?
5    A.  Yes, that's correct.
6    Q.  All right.  He says he's on the phone.  He's
7  talking with his salesperson.  And at 9:57 you tell
8  Mr. Wilson that energy is moving lower; the seller is
9  asking for a counterbid.  Correct?
10    A.  Yes.
11    Q.  The seller in this instance would be Tricon?
12    A.  Yes.
13    Q.  At 10:00 o'clock you tell Mr. Wilson that
14  there's a second MX seller asking if buyer would
15  purchase CFR main Asian ports, arrival basis loading
16  USGC first half of August?
17    A.  Yes.
18    Q.  Do you know who that second MX seller was that
19  you were referring to?
20    A.  That was also Tricon.
21    Q.  And where did you get that information?  From
22  Mr. Lockwood?
23    A.  Yes.
24    Q.  Loading USGC, is that a reference to the U.S.
25  Gulf Coast?

271

1    A.  Yes.
2    Q.  All right.  And the CFR, that's a different
3  freight term than the FOB.  Correct?
4    A.  Yes.
5    Q.  CFR -- is it your understanding that CFR means
6  that the seller is responsible to ship the product even
7  though the buyer is still paying for shipping?
8    A.  Yes.
9    Q.  First of all, this back and forth that we see
10  on Exhibit 1 and Exhibit 6, is this fairly typical of
11  how your day might go when you're working a deal?
12    A.  Yes.
13    Q.  All right.  And there may be various offers
14  and various bids that may take -- it may take days, it
15  may take hours, it may take minutes to bring two parties
16  together?
17    A.  Yes.
18    Q.  And sometimes you're successful and sometimes
19  you're not.  Right?
20    A.  Yes.
21    Q.  Okay.  And when I'm -- sir, if I'm looking
22  back then I guess at Exhibit 1, which is Mr. Lockwood's
23  exchanges with you, and we see that -- we first started
24  off talking about 5 KT FOB and now we're talking about
25  selling 5 -- KT is metric tons.  Correct?

272

1    A.  Yes.
2    Q.  All right.  Now we're talking about selling
3  5 metric tons on a FCC basis.  At least that's what you
4  reported to Mr. Wilson at 10:00 o'clock, that there was
5  somebody that was interested in that.  Correct?
6    A.  Yes.
7    Q.  At the 10:00 o'clock instant message to
8  Mr. Wilson, is that what you would call an indication of
9  an offer or is it actually a firm offer at that point?
10    A.  The --
11    Q.  Where you say, "Second MX seller asking if
12  buyer would purchase"?
13    A.  That's an indication.
14    Q.  All right.  And then you ask Mr. Wilson at
15  10:05 whether he has any bid.  Correct?
16    A.  Yes.
17    Q.  Are you asking him if he wants to bid against
18  this indication -- or make a bid against the indication
19  for the CFR delivery?
20    A.  Yes.  Prior to that, I spoke to Rick by
21  telephone and he did not have any interest any longer in
22  buying FOB the Gulf Coast.  His preference was to buy
23  something on a delivered CFR basis to either Korea or
24  Taiwan.  He indicated that he had two possible buyers
25  and he would prefer seeing offers on a delivered basis.

273

1    Q.  Okay.
2    A.  I spoke to Tricon and he said he would be able
3  to sell or offer on a CFR basis.
4    Q.  All right.  And did Tricon -- is this
5  Mr. Lockwood?  He also told you that it would be loading
6  out of the U.S. Gulf Coast, at least what you reported
7  to mister -- correct?
8    A.  That was his indication, that he can load
9  barrels first half August out of the Gulf Coast and sell
10  it on a delivery basis to Asia.  That was not acceptable
11  to Wilson.  He indicated the timing was very important,
12  that he needed a guarantee arrival of September 15.
13    Q.  All right.
14    A.  So that offer was not pursued on that basis.
15    Q.  And then if we go all the way down to 10:38
16  where you see Mr. Lockwood saying, "Show Vinmar" --
17    A.  Yes.
18    Q.  -- "I can sell" --
19    A.  Yes.
20    Q.  -- "1360 a metric ton."
21        And he goes on to report a very -- a
22  number of different aspects of an offer.  Correct?
23    A.  Yes.
24    Q.  Is that a firm offer?
25    A.  Yes.

69  (Pages 270 to 273)

ARBITRATION HEARING - SEPTEMBER 20, 2010

274

1    Q.  All right.  What Mr. Lockwood was offering was
2    a product quality that met the ASTM D843?
3    A.  That's correct.
4    Q.  All right.  And you've already told us this
5    morning that Vinmar was not interested in that
6    particular quality.  Correct?
7    A.  That's correct.
8    Q.  They wanted the ASTM 5211?
9    A.  Yes.
10   Q.  All right.  At -- so then as I look at this,
11   Mr. Leyman, there's a couple of different exchanges
12   between you and Mr. Lockwood, but I don't see anything
13   else really until 12:09:39, where you say, "All done but
14   call me."
15   A.  Yes.
16   Q.  And there's nothing between you and Mr. Wilson
17   after 10:00 o'clock before 12:49.  Correct?
18   A.  Yes.
19   Q.  All right.  Were you talking to Mr. Wilson by
20   telephone?
21   A.  Yes.
22   Q.  Were you talking to Mr. Lockwood by phone as
23   well?
24   A.  Yes.
25   Q.  Does MOAB record phone conversations?

275

1    A.  They do, but the system apparently doesn't
2    allow -- or doesn't work.  I know John told me there was
3    a request --
4    Q.  Okay.  Don't --
5    A.  -- and there was a possible --
6    Q.  Don't tell me what counsel said.  I guess the
7    question is, have you looked for or has somebody at MOAB
8    looked to determine --
9    A.  Yes.
10   Q.  -- whether there are any phone recordings?
11   A.  My understanding, they did.
12   Q.  All right.  And you haven't been able to find
13   any?
14   A.  That's correct.
15        MR. CANNAVINO:  On the record.  We were
16   requested to check for phone records.  We had the IT
17   people do that, And anything that may have existed was
18   overridden so there was nothing.  But we did check that
19   as part of our response to the subpoena.
20   Q.  (BY MR. LEE)  So the -- just to be clear then,
21   the deal that you negotiated was done over the phone?
22   A.  Yes.
23   Q.  In separate conversations with Mr. Wilson on
24   one hand and Mr. Lockwood on the other?
25   A.  Yes.

276

1    Q.  All right.  Mr. Leyman, I've handed you what's
2    been marked as Exhibit 7.  Could you tell us what that
3    is, please, sir?
4    A.  That's the confirmation I sent out to both
5    parties concerning this transaction.
6    Q.  Okay.  This looks to me like it's the -- it's
7    your internal worksheet.
8    A.  Yes, it is.
9    Q.  All right.  This document, Exhibit 7, wasn't
10   actually sent to the parties.  Correct?
11   A.  That's correct.  It's a draft that I sent to
12   someone who's responsible for sending out the
13   confirmations.
14   Q.  Okay.  So -- and I -- that was -- you
15   anticipated one of the questions I had for you.  You
16   were asked earlier if you actually prepared the
17   typewritten confirmations that were sent to the parties.
18        And is it your practice to prepare this
19   handwritten sheet and then give it to someone else who
20   would actually input the information --
21   A.  Yes.
22   Q.  -- to be sent?
23   A.  Yes.
24   Q.  All right.  Do you know when Exhibit 7 was
25   prepared?

277

1    A.  Sometime in the afternoon of the 22nd.
2    Q.  Where did you get the price of 1110 a metric
3    ton?
4    A.  Well, 1110 is incorrect.  What was agreed to
5    after the negotiation was 1310.  That is a typo.
6    Q.  And I'm just curious if you recall where
7    that -- where you came up with that number.
8    A.  It was something that just was a mistake that
9    was put down on the paper.  No idea where it came from.
10   Q.  All right.  It's your understanding that all
11   of the terms that are listed on Exhibit 4 on your
12   confirmation were agreed terms?
13   A.  Yes.
14   Q.  There's no arbitration provision in that
15   clause -- in that confirmation.  Correct?
16   A.  Correct.
17   Q.  Did you ever discuss with Mr. Wilson
18   arbitration?
19   A.  No.
20   Q.  Did you discuss with Mr. Lockwood arbitration?
21   A.  No.
22   Q.  Well, what did Mr. Wilson tell you on July
23   the 31st when he said he had a problem with the deal?
24   A.  He said that he needed a guarantee of U.S.
25   origin on the xylenes.

70  (Pages 274 to 277)

ARBITRATION HEARING - SEPTEMBER 20, 2010

278

1    Q.  Now, when you -- when you broker a deal,
2  Mr. Leyman, do the offer and the bid -- in order for
3  them to have a deal between the parties, the offer and
4  the bid need to match.  Correct?
5    A.  Yes.
6    Q.  Okay.  And if -- I'm going to ask you to make
7  an assumption with me for a minute, Mr. Leyman.  If
8  Mr. Wilson -- if the evidence shows that Mr. Wilson
9  believed he was purchasing a guaranteed MX U.S. origin
10  but Tricon wasn't willing to sell that, you don't have a
11  deal, do you?
12    A.  That's correct.
13    Q.  Okay.  Because you've got to match a bid with
14  an offer on those terms.  Correct?
15    A.  Well, the terms must stay the same.
16    Q.  Okay.  Let me ask you to turn to the second
17  page of this -- of Exhibit 8.  At the very -- near the
18  top, Mr. Leyman, there's a reference at 2:55:25 p.m.
19  from you.
20        It says, "Again, is it possible for you to
21  substitute a U.S. origin cargo in order to avoid a legal
22  hassle?"  Do you see that?
23    A.  Yes.
24    Q.  Do you recall asking Mr. Lockwood that
25  question?

279

1    A.  Yes.
2    Q.  All right.  And did he ever explain to you why
3  it was not possible for Tricon to substitute a U.S.
4  origin cargo?
5    A.  I don't know if it was specifically at this
6  time, but in the period between July 31st and August 6th
7  Mr. Lockwood proposed or came up with the ideas of
8  several things to try to keep the deal in place.
9        One was a different quality xylene.  One
10  was a U.S. origin cargo with a guarantee of arriving by
11  September 30th.  Even though it had an ETA prior to the
12  15th, it was not a guaranteed delivery by the 15th.  And
13  I guess this was another possibility that he was
14  throwing out to satisfy Vinmar's request for the cargo.
15    Q.  Okay.  But did -- I guess my question, did he
16  ever -- did Mr. Lockwood ever explain to you why he
17  would not provide U.S. origin MX --
18    A.  Oh, no.  I'm sorry.
19    Q.  -- for a guaranteed first half of September
20  delivery?
21    A.  No --
22    Q.  Okay.
23    A.  -- other than the fact that it was not
24  negotiated and that was not part of the original
25  agreement.

280

1    Q.  That was Mr. Lockwood's position.  Correct?
2    A.  Yes.
3    Q.  Okay.  If you'll go to the next page of
4  Exhibit 8.
5    A.  Okay.
6    Q.  At about 5:51:31 p.m., there's a message from
7  Mr. Lockwood.  Do you see that?
8    A.  Yes.
9    Q.  No.  He was.  Right?  I mean, he asked you,
10  "How did we go from that quality, being the D843, to
11  5211"?
12    A.  The only thing I ever discussed -- there was a
13  buying interest by Vinmar, but it was only for 5211
14  spec.
15    Q.  Right.  And that's what you told him.  I
16  guess -- I'm just asking you -- I mean, certainly he
17  asked the question, correct, how did we go from that
18  quality, being a reference to the D43, to 5211?
19  Correct?
20    A.  Yeah.
21    Q.  And you told him the negotiations were for
22  only 5211/20 bromine?
23    A.  Yes.
24    Q.  Okay.  And Mr. Lockwood even asked you a
25  couple of lines down, "Basically he bid on 5211 only

281

1  basis, I guess," with a question mark?
2        And you answered, "Yes.  Never bid or
3  showed any interest for 843 spec"?
4    A.  That's correct.
5    Q.  Let me -- let me approach it this way.  When
6  this issue arose between Vinmar and Tricon, is it your
7  recollection, Mr. Leyman, that Tri -- that Vinmar was
8  willing to proceed with the deal at the price, 1310 a
9  metric ton, so long as Tricon guaranteed U.S. origin MX
10  for first half delivery in September?
11    A.  Vinmar sent an e-mail proposing that they go
12  forward with the deal on the original negotiated terms
13  and conditions.  In the e-mail, there was also -- which
14  I didn't understand -- the phraseology "contract
15  form," acceptable contract form, whatever that meant,
16  but that is what they proposed on August 6th.
17    Q.  Okay.  I mean, I -- and so my question,
18  Mr. Leyman, was it your understanding in the days
19  following July 31st that Vinmar was still willing to
20  purchase MX at the 1310 a metric ton price if this U.S.
21  origin issue had been resolved?
22    A.  Yes.
23    Q.  Before we leave Exhibit 8, I just want
24  to ask you about -- on the last page.  You had mentioned
25  you weren't clear as to the price, and I just wanted to

71  (Pages 278 to 281)

ARBITRATION HEARING - SEPTEMBER 20, 2010

282

1   ask you -- at the very top, you make the statement on
2   August the 6th, 2008, "The fact that Vinmar is still
3   willing to pay 1310 in a market that is much lower
4   suggests that they are just not walking or running away
5   from the deal."  Do you see that?
6       A.  Yes.
7       Q.  Does that refresh your recollection that as of
8   August the 6th, the price of MX was less than the
9   price that was originally negotiated?
10      A.  Yes.
11      Q.  If somebody refers in an -- in an instant
12  message exchange to "USG," does that have a meaning to
13  you?
14      A.  It means U.S. Gulf.
15      Q.  Have you talked to Brad Lockwood about this
16  case?
17      A.  No, not recently.
18      Q.  Okay.  When is the last time you talked to him
19  about this dispute between Tricon and Vinmar?
20      A.  I don't have a specific date.  But somewhere
21  since August 8th or maybe August 15th, he told me in
22  part of other conversations that the dispute was going
23  to arbitration and that was the extent of the
24  conversation.
25      Q.  Have you talked to anybody at Tricon other

283

1   than Mr. Lockwood about this dispute?
2       A.  No.
3       Q.  Exhibit 1 is the instant message exchanges
4   between you and Mr. Lockwood over the course of several
5   days.  We've obviously looked at it already a few times
6   today, but I wanted to ask a couple of questions just
7   for my own understanding.
8           At Page 3, which is MOAB 6, midway down at
9   12:21:51, do you see that?
10      A.  Yes.
11      Q.  You write to Mr. Lockwood, "He is concerned if
12  MX on water and near Panama" -- it should be canal.
13  "We will not have enough time to declare discharge
14  port.  He has more than potential customer."  Do you
15  see that?
16      A.  Yes.
17      Q.  Are you referring to Mr. Wilson and Vinmar in
18  that instant message exchange?
19      A.  Yes.
20      Q.  All right.  And what was the concern?  That it
21  would be hard to get it through the Panama Canal in
22  time?
23      A.  No.  That was part of the discussion in
24  declaring the date of the discharge port.  After we
25  concluded the transaction, Mr. Wilson asked me what --

284

1   the origin of the xylenes, and this was after I recapped
2   and summarized all the terms and conditions.
3           I subsequently called Brad, also recapped
4   the terms and conditions, and asked him that question.
5   And his response, "The origin was most likely U.S.
6   origin."
7           I in turn called back Rick, passed that
8   information on to him, and then we got into a discussion
9   of when to declare the discharge port.
10      Q.  Let me ask you so we're -- I'm sorry.  Back to
11  Exhibit 1, Mr. Leyman, if you could go to MOAB 12.  And
12  this is July 31, 2008, at the top.  You see that?
13      A.  Yes.
14      Q.  And this is an exchange -- at the very top an
15  exchange between you and Mr. Lockwood where it looks to
16  me like Mr. Lockwood is now in the market to buy MX.  Is
17  that correct?
18      A.  Yes.
19      Q.  And, in fact, one of the things he asked you
20  is, "Could you go back to Vinmar and see if I could buy
21  some MX from them"?
22      A.  Yes.
23      Q.  All right.  Did Mr. Lockwood tell you why he
24  was interested in buying MX on July 31, 2008?
25      A.  No.

285

1               EXAMINATION
2   BY MR. DIAZ-ARRASTIA:
3       Q.  Mr. Leyman, I have just a few questions.  You
4   had talked to Mr. Lee about Exhibits 2, 3 and 4 for a
5   little while and there were some terms from those
6   documents that I think you referred to as boilerplate.
7   Do you recall that --
8       A.  Yes.
9       Q.  -- back and forth?
10      A.  Yes.
11      Q.  I think you had told me that you had brokered
12  a deal with Mr. Wilson and Mr. Lockwood before
13  July 22nd, 2008?
14      A.  Yes.
15      Q.  Had you -- in those deals, had you sent
16  confirming memos like the ones --
17      A.  I did.
18      Q.  -- that are Exhibit 2, 3 and 4?
19      A.  I did.
20      Q.  Did those also contain the same boilerplate?
21      A.  Yes.
22      Q.  Mr. Lockwood and Mr. Wilson knew your
23  boilerplate?
24      A.  I assume so.
25      Q.  They had seen it before --

72 (Pages 282 to 285)

ARBITRATION HEARING - SEPTEMBER 20, 2010

286

1    A.  Yes.
2    Q.  -- from prior transactions?
3    A.  Yes.
4    Q.  During the back and forth of the negotiations
5  on the July 22nd deal, was it important to Vinmar and
6  Mr. Wilson that delivery be in Asia between
7  September 1st and September 15th?
8    A.  Yes.
9    Q.  Did Mr. Wilson tell you that that was an
10 important part of the deal for him?
11   A.  Yes.  And he bid accordingly.
12   Q.  I think your testimony was in the course of
13 discussions the FOB H/TC became no longer a major
14 concern for Mr. Wilson.  Is that right?
15   A.  He had no interest in buying on that basis.
16   Q.  All right.  You testified that there was some
17 discussion between you and Mr. Lockwood that the MX
18 Tricon would sell was likely U.S. Gulf origin.  Do you
19 remember that?
20   A.  Yes.
21   Q.  And you conveyed that to Mr. Wilson?
22   A.  Yes, I did.
23   Q.  Did Mr. Wilson ever say that it was necessary
24 to guarantee U.S. origin?
25   A.  No, he did not.

287

1    Q.  On August the 6th and thereafter when there
2  were discussions between Tricon and Vinmar that you were
3  copied on or listened in on and -- at that time did
4  Mr. Lockwood ever tell you that he could not guarantee
5  U.S. origin and also guarantee delivery in Asia between
6  September 1st and September 15th?
7    A.  I don't recall him saying that.  Only that
8  that was not what the original agreement was.
9      (This is the end of the playback of the
10 edited version of the videotaped deposition of Richard
11 Leyman that was originally taken on April 29, 2010.)
12     (The time is 4:26 p.m.)
13     JUDGE BENTON:  Would that be the complete
14 offer of both parties?
15     MR. DIAZ-ARRASTIA:  Yes.
16     JUDGE BENTON:  Call your next witness.
17     MR. DIAZ-ARRASTIA:  The next witness
18 is Vuk Rajevac.  He's waiting outside.
19     JUDGE BENTON:  Vuk Rajevac.  Do you know
20 if the traditional oath is going to be appropriate?
21     MR. DIAZ-ARRASTIA:  Excuse me?
22     JUDGE BENTON:  The traditional oath, will
23 it be appropriate?
24     JUDGE DAVIDSON:  Does he need to be sworn,
25 affirmed or does he have a problem with being sworn or

288

1  affirmed?
2      MR. DIAZ-ARRASTIA:  He did it in his
3  deposition.
4      JUDGE BENTON:  Mr. Rajevac, if you'll
5  raise your right hand, please, sir.
6      (At this time the witness was duly sworn
7  by Judge Benton.)
8      JUDGE BENTON:  All right.  You may be
9  seated.
10     Mr. Lee, you may proceed.
11     JUDGE DAVIDSON:  Mr. Diaz-Arrastia?
12     JUDGE BENTON:  I'm sorry.  That is the
13 third time and it won't happen again.
14     MR. DIAZ-ARRASTIA:  Okay.
15         VUK RAJEVAC,
16 having been first duly sworn, testified as follows:
17     DIRECT EXAMINATION (4:26 p.m.)
18 BY MR. DIAZ-ARRASTIA:
19   Q.  Mr. Rajevac, good afternoon.  Could you state
20 your full name for the record, please?
21   A.  First name, Vuk, V-U-K, last name, Rajevac,
22 R-A-J-E-V-A-C.
23   Q.  Okay.  Can you tell us a little bit about your
24 background and education, sir?
25   A.  I hold a bachelor's degree, double major from

289

1  Rice University, one in economics and one in psychology.
2    Q.  Okay.  And you have an unusual name.  Can you
3  tell us a little bit about your name?
4    A.  I come from Serbia.  I moved here in 1999.
5  Played tennis for Rice on a scholarship and then got a
6  job at Tricon right after I graduated in 2004.
7    Q.  Okay.  And you are still employed by Tricon?
8    A.  That is correct.
9    Q.  What is your position at Tricon today?
10   A.  I am currently a trader.
11   Q.  Okay.  And back in July 2008, what was your
12 position?
13   A.  I was an operations specialist.
14   Q.  And did you work on the Vinmar transaction?
15   A.  I did.
16   Q.  Excuse me?
17   A.  I did.
18   Q.  Okay.  Tell me what an operations specialist
19 does.
20   A.  After the trader does the deal, the
21 transaction moves over to us, gets to free up the trader
22 to do more trades and worry about other stuff.  So we
23 become the face of the company and deal with the
24 counterparties on both sides, purchase and sales side,
25 to bring the transaction to an end basically.

73  (Pages 286 to 289)

ARBITRATION HEARING - SEPTEMBER 20, 2010

290

1     Q.   And does the operations specialist negotiate
2  contract terms?
3     A.   We're allowed to, yes, negotiate the general
4  terms and conditions, correct.
5     Q.   Are some of these contract terms that the ops
6  specialists negotiate, are they important to whether
7  Tricon can make or lose money on a deal?
8     A.   Oh, very much, yes, sir.
9     Q.   Tell me, sir, when you first became involved
10 in the Vinmar transaction.
11    A.   When I found out that Brad had done a deal
12 with Vinmar, sold, and that's -- I don't recall exactly
13 the date and time but --
14    Q.   You have some notebooks on the table in front
15 of you.  There's a Joint Exhibit notebook, a Tricon
16 Exhibit notebook and a Vinmar Exhibit notebook.
17    A.   Right.
18    Q.   Let me ask you to take out the Joint Exhibit
19 notebook --
20    A.   Got it.
21    Q.   -- and turn to Exhibit J 5.  And let's look at
22 the second page of Exhibit J 5.
23    A.   Okay.
24    Q.   Is that Tricon's sales slip?
25    A.   Yes, that is.

291

1     Q.   Did you receive a copy of Exhibit J 5 from
2  Mr. Lockwood?
3     A.   Yes, I did.
4     Q.   And if you will look at the second page of
5  that sales letter, are those Tricon's standard terms and
6  conditions of sale?
7     A.   Yes.
8     Q.   Let me tell you to take a look also at J 4.
9     A.   Joint 4?
10    Q.   Oh, I'm sorry.  Second page.  And that is a
11 copy of the last MOAB confirm for this transaction.
12 Mr. Rajevac, did you also receive a copy of Joint
13 Exhibit No. 4?
14    A.   I don't specifically remember receiving it,
15 but I'm pretty certain I would have because it's part of
16 the file and it usually goes behind our letter in the --
17 in the file folder.
18    Q.   Okay.  And I will ask you if you can turn
19 again to the first page of the letter, TRI 7.  And if
20 you would compare that --
21    A.   Oh, that's on --
22    Q.   Exhibit 5.
23    A.   Okay.
24    Q.   Compare that to the second page of Joint
25 Exhibit 4, which is VIN 18.  And tell me, sir, if the

292

1  essential terms of the deal in Joint Exhibit 5, which
2  was a Tricon letter, and Joint Exhibit 4, the last
3  MOAB -- 4, the last MOAB confirm, are the essential
4  terms the same in both?
5     A.   Yes.  As far as I can tell, they are.
6     Q.   Is it your job as the operations specialist at
7  Tricon to negotiate the terms and conditions of sale?
8     A.   Yes.  That's part of -- part of my job, the
9  general terms and conditions of the sale, yes.
10    Q.   Take a look at the last page of exhibit --
11 Joint Exhibit No. 5.  Do you see where there are
12 signature lines on that page?
13    A.   I do.
14    Q.   Have your ever seen these lines signed on a
15 spot deal?
16    A.   No.  I can't recall ever seeing them signed on
17 a spot deal, no.  On a term deal -- on a longer term
18 deal I have in the past but not on a spot deal.
19    Q.   Okay.  Let me ask you also, Mr. Rajevac, when
20 Vinmar sends its terms and conditions to its
21 counterparty, is it its intention to cancel the deal
22 that was made with the broker?
23            MR. LEE:  I think the question was did
24 Vinmar.  I think --
25            MR. DIAZ-ARRASTIA:  I'll ask the

293

1  question --
2            MR. LEE:  I object, but I think you messed
3  up.
4            MR. DIAZ-ARRASTIA:  Excuse me.  I
5  apologize.
6            JUDGE BENTON:  It's like calling him
7  Mr. Lee.
8            MR. DIAZ-ARRASTIA:  Like calling me
9  Mr. Lee.  I apologize.  Let me rephrase.
10    Q.   (BY MR. DIAZ-ARRASTIA)  Mr. Rajevac, when
11 Tricon sends its terms and conditions of sale to its
12 counterparty, is it its intention to cancel the deal
13 that had been made with the broker?
14    A.   No.
15    Q.   What is the intention?
16    A.   The intention is to expand on the terms that
17 are -- that have been agreed already between the trader
18 and propose the new terms and conditions.
19    Q.   To propose additional terms?
20    A.   Right.
21    Q.   And does it sometimes happen that some of the
22 additional terms are not agreed to?
23    A.   It happens, yes.
24    Q.   Does it sometimes happen that none of the
25 original -- none of additional terms are agreed to?

74  (Pages 290 to 293)

ARBITRATION HEARING - SEPTEMBER 20, 2010

294

1    A.  Very rarely.  I can't recall where none of
2  them had been agreed to.
3    Q.  But in any event, does that mean that there's
4  no deal?
5    A.  No.  The deal is still in place.
6    Q.  Let's turn now to Joint Exhibit No. 13.  I
7  will call your attention to the bottom half.  It's an
8  e-mail from Laurentiu Pascu to you on July 29th, 2008.
9  Do you see that, sir?
10    A.  I do.
11    Q.  Do you know who Laurentiu Pascu is?
12    A.  Yes.  He is my counterparty at Vinmar.
13    Q.  So he would have been ops specialist at
14  Vinmar?
15    A.  Correct.
16    Q.  And if we can focus in on that, what is
17  Mr. Pascu telling you in his cover e-mail?
18    A.  "Find enclosed our comments on your sale
19  confirmation.  We shall revert soon with our -- we
20  should soon -- revert soon with our purchase order for
21  your review.  Please advise.  Advising bank where the
22  LC" --
23    Q.  Okay.
24    A.  -- "should be open."  Do you want me to read
25  the whole thing?

295

1    Q.  No.  I think that's enough.  Now, let me ask
2  you something.  As an operations specialist, do you
3  prepare a purchase order if you think your deal has just
4  been canceled?
5    A.  No.
6    Q.  Turn to the next page on Joint Exhibit 13.
7  Actually another couple of pages.  Did you receive this
8  document attached to the e-mail that you just looked at?
9    A.  Yes, I did.
10    Q.  And it contains some changes on the letter
11  that was sent --
12    A.  Correct.
13    Q.  -- by Mr. Lockwood.  Correct?
14    A.  Correct.
15    Q.  Let's go over a couple of the changes.
16    A.  Okay.
17    Q.  Where it says "Ship Period," do you see that
18  ship has been scratched out and words have been written
19  in?
20    A.  Right.
21    Q.  Where it says, "Arrival at destination"?
22    A.  Correct.
23    Q.  Do you see that, sir?
24    A.  Yes, I do.
25    Q.  That was something that you received from

296

1  Mr. Pascu?
2    A.  Yes.
3    Q.  Now, although he has changed that,
4  Mr. Rajevac, in your mind does ship period and arrival
5  at destination really mean the same thing?
6    A.  Yes, in this case it does.  It's just -- it's
7  just language of our system calls it ship period.
8    Q.  Okay.  Let's go down to where it says credit
9  terms.  Do you see that, sir?
10    A.  Yes.
11    Q.  And that's referring to the on -- at site
12  letter of credit that was supposed to be prepared?
13    A.  Correct.
14    Q.  And do you see where Mr. Rajevac -- Mr. Pascu
15  scratched out the words "and confirmed"?
16    A.  I do see that.
17    Q.  Okay.  Is -- whether the letter of credit
18  needs to be confirmed, is that a logistics issue?
19    A.  That's a credit issue.
20    Q.  And do operations specialists negotiate credit
21  issues?
22    A.  Yes, amongst others.
23    Q.  Okay.  Let's turn to the next page.  And let's
24  go down to Paragraph No. 7 first and I'll jump around
25  here a little bit.

297

1    A.  No. 7?
2    Q.  No. 7.
3    A.  Okay.
4    Q.  And first Transfer of Title and Risk.  Do you
5  see that, sir?
6    A.  I do.
7    Q.  And Mr. Pascu has made a few changes.  He has
8  scratched out a few words in the second line and added
9  "As per Incoterm 2000."
10    A.  Yes.
11    Q.  And under the A section under that, there's
12  also places where he has scratched out some language?
13    A.  Yes.
14    Q.  Do you see that, sir?
15    A.  Yes, I do.
16    Q.  Again, let me ask you, is transfer of title
17  and risk a logistics issue?
18    A.  No, I wouldn't call it a logistics issue, no.
19    Q.  Okay.  Let's also look at some of the other
20  marks that Mr. Pascu has made.  He -- first, No. 3, law
21  and jurisdiction.  Do you see where there's a checkmark
22  there?
23    A.  Yes, I do.
24    Q.  Is law and jurisdiction a logistics issue?
25    A.  No.

75  (Pages 294 to 297)

ARBITRATION HEARING - SEPTEMBER 20, 2010

298

1    Q.  It involves the law.  Correct?
2    A.  Correct.
3    Q.  Is that the sort of provision that an ops
4  specialist would negotiate?
5    A.  Absolutely.
6    Q.  Let's take a look at additional collateral,
7  No. 4?
8    A.  Uh-huh.
9    Q.  There's also a checkmark there?
10    A.  Right.
11    Q.  Is additional collateral a logistics issue?
12    A.  No.  That's another credit/finance issue.
13    Q.  Okay.  And he does mention up in No. 2
14  demurrage.  He wants to change it from 90 days to
15  60 days.  Correct?
16    A.  Yes.
17    Q.  Let's also come to the next page and
18  look at Paragraph No. 9.
19    A.  Okay.
20    Q.  That's the dispute resolution provision.
21  Correct, sir?
22    A.  Yes.
23    Q.  And that's what provides for arbitration and
24  that why we're here today?
25    A.  Right.

299

1    Q.  Is dispute resolution one of the terms that an
2  operations specialist would negotiate?
3    A.  Yeah, it is.
4    Q.  Now, Mr. Pascu, have you subsequently learned
5  that the terms and conditions of Vinmar's standard
6  purchase order also contain essentially the same
7  arbitration clause?
8    A.  I have learned since, yes.
9    Q.  I am sorry.  I keep calling you Pascu.  I
10  guess it's because Rajevac -- Pascu is easier to say
11  than Rajevac.
12    A.  Right.
13    Q.  I apologize for that.  But you have
14  subsequently learned that, have you not, sir?
15    A.  Yes, I have.  I have subsequently learned
16  that.
17    Q.  Take a look at Tricon Exhibit folder, No. 10.
18    A.  No. 10?
19    Q.  No. 10.  Do you see that, sir?
20    A.  I do.
21    Q.  And I will represent to you that that is the
22  Vinmar purchase order for this transaction.
23    A.  Okay.
24    Q.  Will you take a look at -- on the upper
25  right-hand corner, you see where the purchase order

300

1  number is found?
2    A.  4529980?
3    Q.  Yes, sir.
4    A.  Yeah.
5    Q.  If you would now flip back to Joint Exhibit
6  No. 13, the second page -- third page actually.  Now, is
7  that the same number that you see handwritten on top of
8  Joint Exhibit 13?
9    A.  Yes, sir.
10      JUDGE BENTON:  Hold on a second.  What
11  exhibit number is that right there?
12      MR. DIAZ-ARRASTIA:  That is joint -- that
13  would be Tricon Exhibit No. 10.
14      JUDGE BENTON:  Okay.  All right.
15    Q.  (BY MR. DIAZ-ARRASTIA) If we could go down on
16  Tricon Exhibit No. 10 to where it says law and
17  arbitration.  Tell me when you find it.  There you go.
18      And that is something that you have seen
19  since this matter started being arbitrated, correct --
20    A.  Yes, since.
21    Q.  -- with Mr. Rajevac?
22    A.  This is correct.
23    Q.  It provides for arbitration before the
24  Triple A pretty much like we're doing right now?
25    A.  That's what it says here.

301

1    Q.  Okay.  And let me also just scroll up a little
2  bit.  There's a place in this purchase order for origin.
3  Correct, sir?
4    A.  Yes, I do see that.
5    Q.  And it is left blank?
6    A.  Correct.
7    Q.  Okay.  Let's take a look now at Joint Exhibit
8  No. 14.  And look at the lower half of this first page.
9  Tell us which one Exhibit No. 14 is.
10    A.  It is my answer to Mr. Pascu's e-mail that we
11  just looked at in one of the other exhibits where he was
12  requesting some changes.
13    Q.  Okay.  This is your response to Joint
14  Exhibit 13.  Correct?
15    A.  Yes, that's correct, 13.
16    Q.  And you sent it on July 29, 2008, at
17  4:43 p.m.?
18    A.  Yep.  That's what it says here.
19    Q.  And your statement on No. 1 is "Your comments
20  on the contract are well noted and accepted except for
21  demurrage time bar, which is 90 days as per industrywide
22  standard."  Is that correct, sir?
23    A.  Yes, that is correct.
24    Q.  Was it your intention to tell Mr. Pascu that
25  you were in agreement with all of his proposed changes

76  (Pages 298 to 301)

ARBITRATION HEARING - SEPTEMBER 20, 2010

302

1  except for demurrage time bar?
2      A.  Yes.  That was my full intention.
3      Q.  And that's, in fact, what you said?
4      A.  Yes, exactly.
5      Q.  Okay.  Now, later on down in No. 3, this is
6  where you state -- specifically state to Mr. Pascu that
7  Asian origin cargo might be used to supply this
8  contract?
9      A.  Yes, that is correct.
10     Q.  Okay.  And what it says is, "As far as the
11 ship details, we sold on a CFR basis with arrival
12 window.  So once you declare the discharge port by
13 August 8th, we will be able to decide whether to give
14 you a deep sea cargo, which at that point will most
15 likely be on the water, or an Asian origin cargo."
16         And then at the very end, you say, "Since
17 we guarantee the arrival window, we always have to keep
18 a few options open in order to perform."
19     A.  That is correct.
20     Q.  Now, when you say "deep sea cargo," sir, what
21 does that mean?
22     A.  It just means the cargo.  In this case it's --
23 Asia is the final destination.  It means it's not coming
24 from Asia.  It will be coming from the U.S. or Europe
25 or --

303

1      Q.  When you refer to deep sea cargo, was that
2  most likely to be U.S. origin cargo?
3      A.  Yes.
4      Q.  And actually what you tell Mr. Pascu is,
5  "Unfortunately, with deep sea Asia trade, it is not
6  always possible to know which cargo will be delivered
7  since the ETA's are hard to keep due to Panama
8  crossing," meaning the Panama Canal.  Correct?
9      A.  Correct.
10     Q.  "Weather in the Pacific, et cetera."  And then
11 you say, "And since we guarantee the arrival window, we
12 always have to keep a few options open in order to
13 perform."  Correct?
14     A.  That is correct.
15     Q.  Was it your understanding when you sent this
16 e-mail on July 29th, 2008, at 4:43 p.m. that Tricon and
17 Vinmar have now agreed on all the additional terms
18 except for demurrage?
19         MR. LEE:  Objection.  Leading.
20         JUDGE BENTON:  Overruled.
21     A.  Yes, it was my understanding.
22     Q.  (BY MR. DIAZ-ARRASTIA)  Does the Tricon terms
23 and conditions say anything about the origin of the
24 material?
25     A.  No.

304

1      Q.  Do any of Mr. Pascu's comments on Joint
2  Exhibit 13 say anything about origin of material?
3      A.  I'm uncertain.  Let me look real quick.  No.
4      Q.  When was the first time that you were told
5  that Vinmar required U.S. origin material?
6      A.  I don't remember specifically.  It was a
7  couple of years ago but it was --
8      Q.  Well, let's look at the document.  Let's look
9  at Joint Exhibit No. 15.
10     A.  Joint --
11     Q.  If you will look at it in the book, sir.
12     A.  Joint 15.
13     Q.  Okay.  Here we're looking at an e-mail that
14 Mr. Wilson sends you on July 31st, 2008, at 1:43 p.m.
15     A.  Uh-huh.  I see that.
16     Q.  Okay.  And that's where he says, "Vuk, we
17 cannot accept open origin for this material"?
18     A.  Yes.
19     Q.  Was that the first time you were told that
20 Vinmar required U.S. origin?
21     A.  I'm pretty certain that was the first time,
22 yes.
23     Q.  Okay.  And how long after your communication
24 with Mr. Pascu on Exhibit 14 did this come to you?  Take
25 a look at Exhibit 14.

305

1      A.  Okay.  Exhibit 14, I replied on July 29th.
2      Q.  At 4:43 p.m.?
3      A.  Right.  And Mr. Wilson replied to me two days
4  later on the 31st.
5      Q.  Okay.  As an operations specialist,
6  Mr. Rajevac, if you were informed by a counterparty that
7  they were not necessarily going to meet something that
8  was of critical importance to Tricon in the deal, when
9  would you inform your trader?
10     A.  Can you repeat that?
11     Q.  As an operations specialist -- operations
12 specialists work with the traders.  Correct?
13     A.  Right.
14     Q.  Traders make the deals, the operations
15 specialists complete the transaction.  Correct?
16     A.  Right.
17     Q.  As an operations specialist, if you had just
18 learned from your counterparty that something that your
19 employer, Tricon, considered to be -- and this is a
20 hypothetical question, something that Tricon considered
21 to be a very important thing that they needed in the
22 deal and the counterparty just told you that they would
23 not necessarily meet that, how much time would it take
24 you to report that to your trader?
25     A.  I would do it immediately.

77  (Pages 302 to 305)

ARBITRATION HEARING - SEPTEMBER 20, 2010

306

1    Q.  Take a look now -- well, first of all, did
2  Tricon -- did Vinmar, I'm sorry, declare a discharge
3  port on August the 8th?
4    A.  No, it did not.
5    Q.  Okay.  And what happened after that?
6    A.  I believe I sent an e-mail telling them
7  they're in a breach of contract.
8    Q.  Okay.  Take a look at Joint Exhibit 21 towards
9  the end of that exhibit.  It begins on Page VIN 41 at
10  the bottom.
11    A.  Okay.
12      MR. DIAZ-ARRASTIA:  Run up a little bit so
13  he can see the e-mail.  There you go.
14    Q.  (BY MR. DIAZ-ARRASTIA)  And this is an e-mail
15  that you --
16      MR. DIAZ-ARRASTIA:  Oh, you lost it.
17    Q.  (BY MR. DIAZ-ARRASTIA) -- you are sending to
18  Mr. Wilson on August the 8th at 3:42 p.m.?
19    A.  Uh-huh.  I see that.
20    Q.  And it says, "Will you remind him that he has
21  to declare a discharge port that day?"
22    A.  Yes.
23    Q.  Okay.  And let's take a look at the following
24  page at the very bottom.  And you tell Mr. Wilson,
25  "Furthermore, if your discharge port declaration is not

307

1  given by 5:00 p.m. CST today, Vinmar will be in breach
2  of the contract and we reserve the right to resell the
3  cargo in open market and will hold Vinmar liable for all
4  damages, including but not limited to the difference
5  between the price at which we sold to Vinmar and the
6  price obtained for the cargo in the open market."
7    A.  Right.
8    Q.  And did Mr. Lockwood ask you to send this
9  notice?
10    A.  I don't specifically remember if he did or
11  not, but I would assume we discussed it.
12      JUDGE BENTON:  I would assume -- I'm
13  sorry.  I would assume what?
14      THE WITNESS:  That we discussed --
15      JUDGE BENTON:  Okay.
16      THE WITNESS:  -- the fact that it was the
17  8th, almost 4:00 o'clock, and we haven't heard from
18  Vinmar.
19      MR. DIAZ-ARRASTIA:  I pass the witness.
20      JUDGE BENTON:  You want to go for about
21  five, ten minutes or do you want to just pick up in the
22  morning?  What's your pleasure?
23      MR. LEE:  It may be easier to pick up in
24  the morning.  I can get my notes.
25      JUDGE BENTON:  Okay.

308

1      MR. LEE:  I don't think I have a terribly
2  long cross-examination but it may be a lot more
3  efficient if we do it that way.
4      JUDGE BENTON:  All right.
5      MR. LEE:  Besides, my back is killing me.
6      JUDGE BENTON:  Very good.  Just a little
7  note.  Who you calling next after Mr. Rajevac?
8      MR. DIAZ-ARRASTIA:  After Mr. Rajevac, we
9  will play the deposition of Mr. Pascu.
10      JUDGE BENTON:  Okay.
11      MR. DIAZ-ARRASTIA:  We will then play the
12  deposition of Mr. Wilson.  Then we will call Mr. Steve
13  Simpson who is an expert on customs and practices in the
14  industry and then we will call Mr. Matthews to go over
15  the calculation of the damages.
16      JUDGE BENTON:  Okay.
17      MR. DIAZ-ARRASTIA:  And that will be our
18  evidence.
19      JUDGE BENTON:  Let's --
20      JUDGE DAVIDSON:  Can we leave our stuff
21  here overnight or do we need to take it or do we need
22  to --
23      MR. DIAZ-ARRASTIA:  We have the room.  I
24  intended to leave my binders and things here.
25      JUDGE DAVIDSON:  Then I'll do the same.

309

1      JUDGE BENTON:  Very good.  We'll be in
2  recess until tomorrow morning.
3      We're off the record.
4      (Proceedings recessed at 4:50 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

78  (Pages 306 to 309)

ARBITRATION HEARING - SEPTEMBER 20, 2010

310

1   STATE OF TEXAS    )
2   COUNTY OF HARRIS  )
3
4         I, Diana Ramos, a Certified Shorthand Reporter
5   in and for the State of Texas, do hereby certify that
6   the above and foregoing pages contain a full, true and
7   correct transcription of my shorthand notes taken upon
8   the occasion set forth in the caption hereof, as reduced
9   to writing by me and under my supervision.
10        I further certify that the transcription of my
11  notes truly and correctly reflects the exhibits offered
12  into evidence, if any; that I am neither counsel for nor
13  related to any party in this cause and am not
14  financially interested in the outcome.
15        Certified to by me on this 28th day of
16  September, 2010.
17
18
19        _____
          Diana Ramos CSR
          Texas CSR No. 3133
20        Expiration Date: 12-31-2010
          DEPOTEXAS
21        Firm Registration No. 95
          13101 Northwest Freeway, Suite 210
22        Houston, Texas  77040
          Tel: (281) 469-5580
23        FAX: (713) 460-2525
24
25

79 (Page 310)