# APPENDIX TAB I (Part 2)

## Hearing Transcript

311

AMERICAN ARBITRATION ASSOCIATION

DALLAS, TEXAS

TRICON ENERGY, LTD.,            )
                                )
         Claimant,              )
                                )        CASE NO.
    - against -                 )    70 198Y 00168 09
                                )
VINMAR INTERNATIONAL, LTD.,     )
                                )
         Respondent.            )


TRANSCRIPT OF PROCEEDINGS




BE IT KNOWN THAT the above-entitled matter came on for

arbitration at 8:47 a.m. on the 21st day of September,

2010, at the Houston Club, 811 Rusk, 10th Floor, Travis

Room, Houston, Texas, before the Honorable Levi Benton,

Presiding, the Honorable Sharolyn Wood and the Honorable

Mark Davidson, Arbitrators, and the following

proceedings were had:

ARBITRATION HEARING - SEPTEMBER 21, 2010

312

```
1   A P P E A R A N C E S :
2
3   THE PANEL OF ARBITRATORS:
       Honorable Levi Benton, Chair
4      Honorable Sharolyn Wood
       Honorable Mark Davidson
5
6   FOR THE CLAIMANT, TRICON ENERGY, LTD.:
       Mr. George R. Diaz-Arrastia
7      Ms. Tracy D. Larson
       SCHIRRMEISTER, DIAZ-ARRASTIA & BREM, LLP
8      700 Milam, 10th Floor
       Houston, Texas 77002
9      Tel: (713) 221-2500
       FAX: (713) 228-3510
10     gdarrastia@sdablaw.com
       tlarson@sdablawl.com
11
12  FOR THE RESPONDENT, VINMAR INTERNATIONAL, LTD.:
       Mr. Stephen H. Lee
13     Mr. R. Blake Runions
       PORTER & HEDGES, LLP
14     1000 Main Street, 36th Floor
       Houston, Texas  77002-6336
15     Tel: (713) 226-6000
       FAX: (713) 226-6286
16     slee@porterhedges.com
       brunions@porterhedges.com
17
18  ALSO PRESENT:
       Mr. Mark S. Antonvich
19     Ms. Angie Gossen
       Mr. Brad Lockwood
20     Ms. Petrice Podlesny
21
22
23
24
25
```

313

```
1              I N D E X
                              PAGE
2
    Appearances.....................................  312
3
    PRESENTATION ON BEHALF OF THE CLAIMANT (Continued)
4
    VUK RAJEVAC
5      Cross-Examination by Mr. Lee...............  314
       Redirect Examination by Mr. Diaz-Arrastia ...  336
6      Recross-Examination by Mr. Lee...........  340
7   LAURENTIU PAUL PASCU (VIA VIDEOTAPE PLAYBACK)...  345
8   RICHARD W. WILSON, Ph.D. (VIA VIDEOTAPE PLAYBACK)  384
9   STEVE SIMPSON
       Direct Examination by Mr. Diaz-Arrastia.....  462
10     Cross-Examination by Mr. Lee...............  492
       Redirect Examination by Mr. Diaz-Arrastia...  508
11     Recross-Examination by Mr. Lee............  512
12  GARY COFRAN (VIA DEPOSITION EXCERPTS READBACK)...  529
13
14  PRESENTATION ON BEHALF OF THE RESPONDENT
15
    LAURENTIU PAUL PASCU
16     Direct Examination by Mr. Diaz-Arrastia.....  542
       Cross-Examination by Mr. Diaz-Arrastia......  554
17
    Reporter's Certificate Page.....................  574
18
19
20
21
22
23
24
25
```

314

```
1          (8:47 a.m.)
2          JUDGE BENTON:  We're on the record now.
3   When we left, I believe we were ready to begin the
4   cross-examination by Mr. Lee.
5          If you're ready, you may proceed, sir.
6          MR. LEE:  Thank you.
7              VUK RAJEVAC,
8   having been previously duly sworn, testified as follows:
9          CROSS-EXAMINATION (8:47 a.m.)
10  BY MR. LEE:
11      Q.  Mr. Rajevac, how are you this morning?
12      A.  Good.  Yourself?
13      Q.  I'm doing fine.  Thank you.  Yesterday when
14  you testified about your role as an operations
15  specialist, you were describing that role that you
16  perform at Tricon.  Correct?
17      A.  Yes.
18      Q.  And your only experience is working at Tricon?
19      A.  This is correct.
20      Q.  Okay.  So what you've told us yesterday is how
21  you handled your job at Tricon?
22      A.  Yes.
23      Q.  Okay.
24      A.  That's correct.
25      Q.  Okay.  You were not involved in the
```

315

```
1   negotiations between the traders and the broker for the
2   transaction at issue, were you?
3       A.  No, I was not.
4       Q.  And you first heard about the alleged deal
5   through Mr. Lockwood.  Is that correct?
6       A.  Yes, that would be correct.
7       Q.  Would you take a look at -- in the joint
8   exhibit notebook, Exhibit No. 5.  And do you
9   recognize -- well, we'll give everybody a chance to get
10  to that.  We've got so many notebooks.
11          Do you recognize the second page through
12  the rest of the exhibit as Tricon's sales contract?
13      A.  I recognize the document, yes.
14      Q.  Is that Tricon's sales contract?
15      A.  That's -- we call it Tricon's letter.
16      Q.  Okay.  Well --
17      A.  It includes the main terms and the proposed
18  additional terms on it.
19      Q.  Okay.  Mr. Lockwood referred to it as a
20  contract in his e-mail to Mr. Wilson on the first page,
21  is that right, the first e-mail at the bottom?
22      A.  Yes, he did.
23      Q.  Okay.  So I'm just -- that's what this
24  document is.  Correct?
25      A.  I -- you can make that decision.  One says
```

2  (Pages 312 to 315)

ARBITRATION HEARING - SEPTEMBER 21, 2010

316

1  e-mail.  I call it differently but --
2      Q.  You testified about terms and conditions
3  yesterday?
4      A.  Yes.
5      Q.  But does Joint Exhibit 5 contain Tricon's
6  terms and conditions?
7      A.  Yes, it does.
8      Q.  And so yesterday when you said that -- you
9  testified that the terms and conditions are very
10  important to Tricon and to a deal, you were referring to
11  the terms and conditions contained within Joint
12  Exhibit 5.  Correct?
13      A.  Yes, correct.
14      Q.  And, in fact, I think you said that the terms
15  and conditions -- Tricon's terms and conditions have
16  significant economic impact to a deal.  Correct?
17      A.  I wasn't referring specifically to Tricon's
18  conditions.  Just general terms and conditions of any
19  deal have a significant economic impact on that specific
20  transaction, yeah.
21      Q.  And certainly the additional terms and
22  conditions that are included in Joint Exhibit 5 would
23  have some economic benefit to Tricon potentially.
24  Correct?
25      A.  Potentially, yes, correct.

317

1      Q.  You consider them to be valuable terms and
2  conditions?
3      A.  I do.
4      Q.  You're a trader now?
5      A.  I am.
6      Q.  Have you ever done a deal through Ed Leyman?
7      A.  I have.
8      Q.  Would you take a look at Joint Exhibit 4?  And
9  if you'll take a look at the second page of that
10  exhibit.
11      A.  Yes.
12      Q.  Do you recognize this as a confirmation that
13  Mr. Leyman might send out?
14      A.  I do.
15      Q.  You do?
16      A.  Yes.
17      Q.  You've seen these before?
18      A.  Yes, I have.
19      Q.  Have you ever done a deal while you've been at
20  Tricon solely on the broker confirmation?
21      A.  I'm not sure how you mean.  The broker
22  confirmation comes in first when you're dealing with a
23  broker.
24      Q.  Correct.
25      A.  And then it's expanded upon with the other,

318

1  with the letter.
2      Q.  Okay.  Has Tricon to your knowledge ever
3  performed a transaction solely on the basis of a
4  confirmation like we see in Exhibit 4?
5      A.  Can you repeat that?  Has Tricon ever --
6      Q.  To your knowledge, has Tricon ever performed a
7  transaction solely on the basis of a confirmation like
8  we see in Joint Exhibit No. 4?
9      A.  I mean, I don't know how to answer that
10  question yes because it's -- that's what -- that's where
11  the deal is agreed to.  So everything that's agreed to,
12  that's where it started so it is based on that.
13          Now, if your question is has the -- has a
14  transaction ever happened without other documents being
15  passed, I wouldn't be able to recall that, but this is
16  the essence of the transaction, so, yes, it's based on
17  that.
18      Q.  And --
19      A.  That's where the deal was agreed to.
20      Q.  Okay.  In every transaction that you have
21  brokered through a broker where Tricon was selling a
22  product to somebody else --
23      A.  Okay.
24      Q.  -- isn't it the case that you always have
25  Tricon's sales contract in place?

319

1      A.  I -- personally with my trades, yes, I do.
2      Q.  All right.  And the sales contract would be?
3      A.  Similar to this.
4      Q.  Similar to Joint Exhibit 5?
5      A.  Correct.
6      Q.  All right.  I believe your testimony is that
7  you've never seen one of Tricon's sales contracts
8  signed?
9      A.  On the spot deals, yes, that's correct.
10      Q.  And you'll agree with me that Joint Exhibit
11  No. 5, the last page, contains places for both
12  Mr. Lockwood and Mr. Wilson to sign.  Correct?
13      A.  Correct, correct.
14      Q.  But it's your testimony that those signature
15  blanks are meaningless?
16      A.  I never said they're meaningless.  I'm just
17  saying that I don't see them signed in spot deals.
18      Q.  And you've never seen them signed?
19      A.  On spot deals, I don't recall ever seeing them
20  signed.
21      Q.  And do you know why signature blanks are in
22  there?
23      A.  I can only speculate it's an industry
24  standard -- not standard but industry I guess a custom.
25  I can speculate that because whoever sends it I guess

3  (Pages 316 to 319)

DepoTexas
888.893.3767

ARBITRATION HEARING - SEPTEMBER 21, 2010

320

1  doesn't sign it first, waits for the other people's
2  comments and probably the signatures get lost somewhere
3  in that process, but that hasn't stopped the deal from
4  happening in the past.
5      Q.  The answer is you don't know why --
6      A.  No, I don't know exactly why, no.
7      Q.  Okay.  And did I -- did you testify yesterday
8  that the Tricon sales contract was not intended to
9  cancel the confirmation letter that had been sent by the
10 broker?
11     A.  Yes, I did.
12     Q.  Would you take a look at Page 3 of Joint
13 Exhibit 5?  This is Page 3 of the sales contract.
14     A.  Okay.
15     Q.  And at the bottom -- and, again, this is the
16 sales contract that Tricon sent to Vinmar.  Correct?
17     A.  Correct.
18     Q.  At the very bottom, there's a statement in the
19 sales contract.  It says, "Broker."  Do you see that?
20     A.  Yes, I do.
21     Q.  Okay.  It says, "This cancels and supercedes
22 any broker correspondence in relation to this
23 transaction and shall be for the sole purpose of
24 documenting commission, if any."  Do you see that?
25     A.  Yes, I do.

321

1      Q.  Okay.  So the -- so the sales contract says it
2  cancels and supercedes any broker correspondence?
3      A.  Yes, it does.  It says that.
4      Q.  Okay.  It's your testimony that that
5  profession has no meaning?
6      A.  My testimony is that I understand that
7  provision as that this is a document that is re --
8  replaces -- it doesn't cancel the deal.  It replaces the
9  documentation or the correspondence that a broker in
10 this case, MOAB, would send and obviously expands
11 upon with some terms that the brokers don't deal with.
12         Brokers deal with the main terms of the
13 deal.  So I understand this here is a document that
14 expands upon and replaces the document that MOAB sent
15 so...
16     Q.  Okay.  But it says --
17     A.  It doesn't say that it cancels the deal.  I
18 don't see that if that's what you mean.
19     Q.  Well, that's not.  My question was, doesn't it
20 say that it cancels and supercedes the broker
21 confirmation?
22     A.  Broker correspondence.
23     Q.  Which would include the confirmation.
24 Correct?
25     A.  The document, yes.

322

1      Q.  Okay.  Now, some of these terms in the sales
2  contract that Tricon sent, I just want to ask a couple
3  of things about the -- these provisions.  If you take a
4  look at Page 2 of the sales contract, Paragraph No. 8
5  under taxes.
6      A.  Uh-huh, yes.
7      Q.  Do you see that, sir?
8      A.  Yes.
9      Q.  Now, what this provision says is that if there
10 are any taxes that are imposed as a part of this
11 transaction that the buyer will pay for those taxes.  Is
12 that correct?
13     A.  Let me read through it real quick.  Yes.
14     Q.  Okay.  And it says that if the -- if the taxes
15 are for the seller -- so that would be Tricon.  So if
16 Tricon is required to pay any taxes on this transaction,
17 then Tricon has the right to pass those taxes on to
18 Vinmar in this situation.  Correct?
19     A.  Yes.
20     Q.  All right.  That type of provision is not
21 included in the confirmation from the broker.  Correct?
22     A.  I would assume that's correct.
23     Q.  And it's certainly possible under this
24 situation or any other situation that there might be
25 taxes that would increase the amount that Vinmar was

323

1  required to pay under this deal?
2      A.  Yes.
3      Q.  The force majeure provision at Paragraph 6, is
4  that something that Tricon considers to be important?
5      A.  Yes.
6      Q.  What about Page 3 of the sales contract under
7  product use?  Now, what this provision in the sales
8  contract says is that Vinmar in this case that we're
9  talking about, something that was sent to Vinmar, so if
10 we assume Vinmar's the buyer.
11         It says, "Vinmar represents and warrants
12 that the product purchased hereunder shall be used for
13 other than gasoline blending purposes in the United
14 States."
15     A.  Uh-huh.
16     Q.  Do you see that?
17     A.  Yes, I do.
18     Q.  Now, that was not included in the broker
19 confirmation.  Correct?
20     A.  No.
21     Q.  And, in fact, as you understand the
22 transaction, Vinmar had used -- if it purchased the
23 mixed xylenes, it could use that product for whatever
24 reason it wanted to.  Correct?
25     A.  As far as I understood, yes.

4  (Pages 320 to 323)

ARBITRATION HEARING - SEPTEMBER 21, 2010

324

1    MR. LEE:  Do you need to take a --
2    JUDGE BENTON:  No.  I'm fine.
3    Q.  (BY MR. LEE)  And, in fact, if that's going to
4  happen, Vinmar under this contract is required to notify
5  Tricon as soon as possible.  Correct?
6    A.  This is correct.
7    Q.  And is that because -- I mean, that has some
8  benefit to Tricon.  Correct?  They want to make sure
9  that the product is not being used for other than
10  gasoline blending purposes in the United States?
11    A.  Tricon has no -- I believe -- I'm not sure.
12  You would know that better as a lawyer.  I believe there
13  was some kind of a provision about not using
14  petrochemicals or aromatics and gasoline for gasoline
15  blending purposes.  This has nothing to do with Tricon.
16    Tricon doesn't really care what Vinmar
17  uses the product for.  I think this is a problem with
18  either state or federal law or some kind of a provision.
19    Q.  Okay.  But it's included in the form of a
20  sales contract?
21    A.  It's a form of protection --
22    Q.  Right.
23    A.  -- for Tricon, that's correct.
24    Q.  Yesterday you were asked to look at Joint
25  Exhibit No. 4 and Joint Exhibit No. 5 so that's the

325

1  confirm and the sales contract.  And the question that
2  you were asked is, are all of the essential terms
3  identical?
4    A.  Yes.
5    Q.  Do you remember that question?
6    A.  Yes.
7    Q.  What were the essential terms that you were
8  referring to between the two documents?
9    A.  I was talking about the purchasing party,
10  Vinmar in this case, the product, the quantity, the
11  quality, the price.  In this case, there was a promised
12  delivery window, which was the first half of September
13  in either Ulsan or Taiwan, and that's about it.
14    Q.  Okay.  So just to make sure, you said
15  purchasing party, product, quality, quantity, price and
16  delivery window?
17    A.  Correct.
18    Q.  And you've identified those as the essential
19  terms?
20    A.  Yes.  I would say those are the essential
21  terms.
22    Q.  Okay.  Now, you'll agree with me that if you
23  look at the confirmation and the sales contract and you
24  compare those provisions they're not identical, are
25  they?

326

1    A.  As far as I can see yesterday, they were, but
2  did you want to tell me --
3    Q.  Well, I mean, let's just, for instance, look
4  at the quantity.  In the Joint Exhibit 4, the quantity
5  says that it's "5,000 metric tons plus or minus
6  5 percent, seller's option."  Right?
7    A.  Correct.
8    Q.  That's the language in the --
9    A.  In the MOAB confirmation.
10    Q.  -- MOAB confirmation.
11    Now, if you look at the Tricon's sales
12  contract under quantity, it says, "5,000 metric tons
13  plus or minus 5 percent, vessel's option"?
14    A.  This is correct.
15    Q.  It's not the same language, is it?
16    A.  You're right, it's not the same language.
17    Q.  Okay.  And then if we look at the delivery
18  term under the confirmation, which is Joint Exhibit 4,
19  so flip back to MOAB's letter.  It says -- well, it's
20  got three paragraphs there.  Correct?
21    A.  Tell me which one you're looking at.
22    Q.  Under delivery.
23    A.  Okay.  Yes, I do.
24    Q.  "CFR basis one safe berth/port major ports
25  Taiwan or Ulsan Korea."

327

1    A.  Uh-huh.
2    Q.  Okay.  Now, the terms in the Tricon sales
3  contract, they're not the same completely, are they?
4    A.  That's just the verbiage that we have.  In the
5  Ulsan Taiwan, we have all these set ports in our system
6  that we can pick from.  You can't just type in.  And
7  Ulsan Taiwan versus Taiwan or Ulsan Korea, I don't see a
8  big difference there.
9    Q.  Well --
10    A.  Actually, in fact, Ulsan Taiwan versus Taiwan
11  Ulsan so --
12    Q.  Well, I'm just -- is it your testimony that
13  the delivery term in the confirmation is identical to
14  the delivery terms in the sales contract?
15    A.  Essentially it is.  I mean, the wording,
16  obviously there's three lines here and it expands upon
17  it a little more versus ours is just one line, but
18  essentially they're the same as far as I can see, yes.
19    Q.  The -- you understand that Mr. Lockwood told
20  you that there was a guaranteed first half of September
21  delivery into Asia.  Correct?
22    A.  Yes, this is correct.
23    Q.  And you will not find anything in the Tricon
24  sales contract that guarantees delivery first half of
25  September?

5 (Pages 324 to 327)

ARBITRATION HEARING - SEPTEMBER 21, 2010

328

1    A.  I think -- I think we've already touched upon
2  this.  Ship period in our system means when -- in a CFR
3  case, especially for Asia when there is a guaranteed
4  window, that means -- it says here, "September 1 to
5  September 15th."
6       That means what the delivery window is,
7  between September 1st and September 15th SO --
8    Q.  That's Tricon's system.  I'm just asking, will
9  I see any -- is there anything in the contract itself
10 that says that it is guaranteed first half September?
11   A.  Yes, the ship period.
12   Q.  Okay.  Do you see anywhere -- the confirmation
13 required Tricon to give Vinmar a minimum of five working
14 days notice of actual discharge date.  Do you see that?
15   A.  Do you want to point it out to me?
16   Q.  Under the delivery term.
17   A.  "Minimum of five working days notice of actual
18 discharge date," yes.
19   Q.  Okay.  And do you see that in Tricon's sales
20 contract?
21   A.  No, I did not see that in Tricon's sales
22 contract.
23   Q.  Let me ask you now about Joint Exhibit 14.
24 And I think you testified about this document yesterday.
25 And this was your response to Mr. Pascu's e-mail of the

329

1  same day.  Correct?
2    A.  This is correct.
3    Q.  Did you -- you know that Laurentiu Pascu was
4  Vinmar's logistics person?
5    A.  I did know he was, yes.
6    Q.  Okay.  And you also knew that Mr. Pascu did
7  not negotiate any of the terms of this alleged agreement
8  through Ed Leyman?
9    A.  I didn't know that.  I could have assumed --
10   Q.  Okay.
11   A.  -- but I didn't know that he didn't.
12   Q.  Did you ever talk to Mr. Pascu in the days
13 between July 22nd and July 31, 2008?
14   A.  I don't recall ever talking to him on the
15 phone.  I believe the only correspondence between him
16 and I were -- were -- they're in the e-mails.
17   Q.  Okay.  Now, in your first point on your e-mail
18 to Mr. Pascu, you say, "Your comments on the contract
19 well noted and accepted."  Right?
20   A.  That's correct.
21   Q.  And you were referring to some handwritten
22 comments that Mr. Pascu had sent you on this sales
23 contract?
24   A.  Yes, I was.
25   Q.  Now, we can look at it, but I think you'll

330

1  remember, didn't Mr. Pascu tell you in his e-mail, which
2  is on this next page, that he would send you Vinmar's
3  purchase order?
4    A.  Yeah, I believe he did mention that.
5    Q.  So he sent you an e-mail, said, "Here's some
6  comments on the sales contract.  I will be sending you a
7  purchase order"?
8    A.  Yes, I believe that's what he says.
9    Q.  The purchase order was never sent to you.
10 Correct?
11   A.  I never received it, no.
12   Q.  Before the purchase order was sent, you heard
13 from Rick Wilson that he understood the deal required
14 U.S. origin mixed xylenes.  Correct?
15   A.  Yeah.  I believe a couple of days after my
16 e-mail to Pascu he did say something about believing it
17 would be U.S. origin, yes.
18   Q.  All right.  And my question was, before you
19 every received a purchase order from Vinmar you heard
20 from Mr. Wilson that his understanding of the deal was
21 it required Tricon to supply U.S. origin?
22   A.  Yeah, but it's different.  We never received
23 the first order so everything -- any correspondence
24 would be before then so --
25   Q.  Okay.  And you had responded to Mr. Wilson's

331

1  e-mail by saying, "No, we didn't guarantee U.S. origin
2  mixed xylenes"?
3    A.  Correct.
4    Q.  And it's your understanding that Tricon never
5  intended to supply U.S. origin mixed xylenes?
6    A.  Absolutely.
7    Q.  Okay.  Now, you didn't accept all of
8  Mr. Pascu's comments on the sales contract.  Correct?
9    A.  Correct.
10   Q.  In fact, you say, "We don't agree to the
11 demurrage time bar"?
12   A.  Yes.
13   Q.  And that was never resolved, was it?
14   A.  Yes.  Never heard back from Mr. Pascu.
15   Q.  And you've never seen a signed copy of the
16 sales contract?
17   A.  This is correct.
18   Q.  Now, on Joint Exhibit 4 under the inspection
19 provision, this confirmation says that "The quantity and
20 quality of the mixed xylenes will be inspected at the
21 load port by an independent inspector mutually agreed
22 upon with costs to be shared equally between buyer and
23 seller"?
24   A.  Uh-huh.
25   Q.  What that means is that before the mixed

6  (Pages 328 to 331)

ARBITRATION HEARING - SEPTEMBER 21, 2010

332

1  xylenes is loaded onto a ship, Vinmar has the right to
2  ensure that the quality and the quantity comply with the
3  proposed agreement?
4      A.  No.  It says that they can pay for half of the
5  inspector and agree to it together with us.
6      Q.  Right.  But it's supposed to be done before
7  it's loaded.  Right?
8      A.  Correct, in an ideal situation, yes.
9      Q.  Right.  And the purpose of that is to ensure
10  that the product that is delivered meets the quality
11  specification.  Correct?
12      A.  Having an inspector there, yes, that is the --
13  that is the purpose.
14      Q.  Right.  I mean, the inspector is the one that
15  tests the product to confirm that it meets this
16  ASTM 5211 standard?
17      A.  Right.  And issues a certificate of analysis,
18  correct.
19      Q.  Right.  And also the inspector would quantify
20  or test the quantity, make sure that it met the proposed
21  contract?
22      A.  Yes, this is correct.
23      Q.  And, again, that's to be done at the load port
24  prior to loading onto the ship?
25      A.  Correct.

333

1      Q.  Now, I'm going to ask you to flip back to
2  Joint Exhibit 14.  And if we look at the second page of
3  that e-mail, it's Mr. Pascu's e-mail to you on
4  July 29th, 2008.  And he -- in the second paragraph, he
5  asks a couple of questions.  Correct?
6          He says, "Please advise."  First he asks
7  about the advising bank.  But then the second question
8  he asks is, "Advise when shipment is expected."  Right?
9      A.  Uh-huh.
10      Q.  "Be informed that no shipment can take place
11  without us being informed for insurance purpose and
12  without presence of an independent surveyor" --
13      A.  Uh-huh.
14      Q.  -- "in this order.  Please let us have vessel
15  details and port of loading."  Right?
16      A.  Uh-huh.
17      Q.  And so what he's asking for is we need to know
18  where you're going to load it and when it's going to be
19  loaded so we can inspect it?
20      A.  Correct.
21      Q.  Now, if -- but Tricon didn't necessarily
22  intend to allow Vinmar to inspect the quality before it
23  was loaded?
24      A.  Oh, we would have been more than happy to let
25  Vinmar inspect the -- before the loading.  What you have

334

1  to keep in mind is that we promised a window of 15 days
2  arrival in Asia.  And in order to comply with that
3  promise in performing our deal, we had to leave
4  ourselves -- give ourselves option where -- you also
5  have to keep in mind August 8th was the day that -- by
6  which Vinmar was supposed to declare their discharge
7  port.
8          Well, there is a minimum of 35 days of
9  sailing time between the U.S. Gulf and Asia.  Well, by
10  the time you find a vessel, load it and leave after the
11  8th declaration, there's a huge chance we wouldn't have
12  made it to Korea, Taiwan, whatever the -- whatever
13  Vinmar had declared.
14          So we had to leave ourselves with the
15  option to either give the cargo that would be on the
16  water already or give the cargo of a closer origin, i.e.
17  Asian origin.  That doesn't mean that we wouldn't have
18  given Vinmar all the documentation that would have been
19  issued by an independent inspector at that load port,
20  including quality and quantity.
21          That's just the nature of the business.
22  When you're asking for a guaranteed window, you have to
23  realize that, especially with declaration, it's so close
24  to the -- to the potential loading date, say the
25  U.S. Gulf, that you can't always be present and be able

335

1  to have your inspector and all that if you're going to
2  require that window so that's what happened here.
3      Q.  So, I mean, if the deal required Vinmar or
4  gave Vinmar the opportunity to inspect it prior to
5  loading, you didn't necessarily intend to give them that
6  right.  Correct?
7      A.  Correct.
8      Q.  Okay.  And that's what you're referring to
9  in -- when you answered this question on the
10  page before, Joint Exhibit No. 14, No. 3, where you
11  said, "Hey, we may give you a deep sea cargo"?
12      A.  Correct.
13      Q.  "We may even give you something of Asian
14  origin"?
15      A.  Correct, in which case if it was Asian origin
16  we would have been more than happy to let Vinmar
17  participate in the inspection.  There would have been
18  plenty of time to do so.
19      Q.  Okay.
20      A.  It was only deep sea cargo which would --
21  which would likely -- in which case we would likely have
22  to give them already issued certificates of quality and
23  quantity for the -- for the xylene load.
24      MR. LEE:  Pass the witness.
25      JUDGE BENTON:  Mr. Diaz-Arrastia?

7  (Pages 332 to 335)

ARBITRATION HEARING - SEPTEMBER 21, 2010

336

1    MR. DIAZ-ARRASTIA:  Thank you, Your Honor.
2    REDIRECT EXAMINATION (9:13 a.m.)
3    BY MR. DIAZ-ARRASTIA:
4    Q.  I have a few questions.  Mr. Pascu, let me
5    just pick up with this inspection issue that you -- I'm
6    sorry.  Mr. Rajevac.
7    JUDGE BENTON:  Okay.  You're ahead of me.
8    MR. DIAZ-ARRASTIA:  I'm ahead of you now,
9    Judge.
10   Q.  (BY MR. DIAZ-ARRASTIA)  Mr. Rajevac, on this
11   inspection issue we just finished talking about -- and I
12   think it's what you just finished saying.  Now, if after
13   Mr. Pascu had seen your note that said, "We could give
14   you a deep sea cargo already on the water" or "We could
15   give you Asian origin," if Mr. Pascu had said, "Look, we
16   absolutely, positively have to be there at the
17   inspection," what would you have done?
18   A.  I would have said, "You're going to have to
19   declare your discharge port earlier so that we can
20   arrange for that."
21   Q.  Or you could have said, "We'll give you Asian
22   origin if you can inspect" --
23   A.  Exactly.  Those are the two options.
24   Q.  Okay.  Now, a moment ago I think Mr. Lee asked
25   you that Tricon never intended to deliver U.S. origin MX

337

1    and you agreed with that.  Now, is that completely
2    right?  Is it that you were not going --
3    A.  I didn't understand --
4    Q.  -- that you absolutely --
5    A.  -- it as didn't intend to.  I understood it as
6    at this point -- we didn't guarantee.  Maybe I misheard.
7    Q.  Yeah.
8    A.  There was no intention to deliver any specific
9    or no intention to deliver -- there was no -- at that
10   point there was no specific decision on what's going to
11   be delivered.
12   Q.  There was no -- there was no guarantee of U.S.
13   origin?
14   A.  Right, exactly.  There was no guarantee.
15   Q.  But you might supply U.S. origin?
16   A.  Oh, absolutely.
17   Q.  And, in fact, when you told Mr. Pascu that you
18   may provide a deep sea cargo, you meant something that
19   would most likely be U.S. origin?
20   A.  Correct.
21   Q.  Or you would do Asian origin?
22   A.  Correct.
23   Q.  Now, with regard to Joint Exhibit 5, if you
24   could take a look at that, sir.  And that is the Tricon
25   terms and conditions.  Mr. Lee asked you about

338

1    Paragraph 8 that had -- has to do with taxes --
2    A.  Uh-huh.
3    Q.  -- Paragraph 6 that has to do with force
4    majeure, I think Paragraph 10 that has to do with
5    product use.
6    A.  Correct.
7    Q.  Now, let me ask you, sir, could -- after
8    looking at Joint Exhibit 6, with regard to any of those
9    paragraphs, could Mr. Pascu have just told you, "Well, I
10   don't agree to that" or "I want to change it"?
11   A.  He could have.
12   Q.  Okay.  And, in fact, that's what he did with
13   transfer of title and risk?  He asked for that to be
14   changed?
15   A.  Correct.
16   Q.  So if he doesn't ask to be changed, that means
17   it's okay with him.  Right?
18   A.  That's how I understood it, yes.
19   Q.  Okay.  Now, let's take a look at the language
20   that you talked about when you compared Joint Exhibit 4
21   to Joint Exhibit 5 and Mr. Lee asked you about seller's
22   option versus vessel's option, different words.
23   A.  Right.
24   Q.  As a practical matter in this deal, did
25   that -- does that have the same effect?

339

1    A.  In a CFR deal, yes, it does, because we're the
2    ones selecting the vessel and negotiating the quantity
3    to be loaded on the vessel.
4    Q.  And, similarly, with regard to ship period
5    versus arrival at destination, isn't that exactly what
6    Mr. Pascu asked to be changed?
7    A.  Yeah.  He asked to change the wording that we
8    had that our system used and I believe I agreed to it.
9    Q.  Yeah, I think you agreed to it and that's
10   because you thought it meant the same thing?
11   A.  Yeah, absolutely.
12   Q.  Mr. Rajevac, have -- when you used to work as
13   an ops specialist, did you ever have occasion where you
14   loaded material from a U.S. Gulf port that had been
15   stored with foreign materials stored in a bonded tank?
16   A.  Yes, I have.
17   Q.  Okay.  Can you tell me about that experience?
18   A.  I had an instance of a different product, MEG,
19   where the product was of Mexican origin and it was
20   intended for sale in Europe.  And there was a -- there
21   was no vessel directly sailing from Mexico to Europe so
22   what we did is we took a vessel that met the timing that
23   we agreed to with the supplier, brought it into the U.S.
24   Gulf, stored it in a bonded tank, which preserved the
25   Mexican origin.

8  (Pages 336 to 339)

ARBITRATION HEARING - SEPTEMBER 21, 2010

340

1       We stored it for probably three or four
2   days and then a different vessel from U.S. Gulf to
3   Europe loaded it and sent it to Europe and we still got
4   the benefit of bringing the Mexican origin cargo into
5   Europe.
6       Q.  And that is because on that second vessel,
7   that second vessel loaded it in a U.S. port.  That was
8   the load port?
9       A.  Correct.
10       Q.  But the material was still of Mexican origin,
11   not U.S. origin?
12       A.  Correct.
13           MR. DIAZ-ARRASTIA:  Pass the witness.
14           JUDGE BENTON:  Mr. Lee?
15           MR. LEE:  Just a few follow-up questions,
16   if I may.
17           RECROSS-EXAMINATION (9:18 a.m.)
18   BY MR. LEE:
19       Q.  Looking at this Joint Exhibit No. 5, the sales
20   contract, if the counterparty -- and let's look at
21   Page 2 of 4.  If a counterparty struck through the
22   provision law and jurisdiction, instead of saying "Texas
23   law" they put the "law of Singapore," that's something
24   that you could agree to on behalf of Tricon?
25       A.  Yes.

341

1       Q.  Okay.  If the counterparty struck through the
2   provision additional collateral requirement, that's
3   something that you could accept on Tricon's behalf?
4       A.  Yes.
5       Q.  Same thing for the Incoterms?
6       A.  Correct.
7       Q.  Same thing for force majeure?
8       A.  Correct.
9       Q.  Same thing for transfer title and risk?
10       A.  Correct.
11       Q.  Taxes?
12       A.  Correct.
13       Q.  Arbitration on the next page?
14       A.  Yes.
15       Q.  Product use?
16       A.  Yes.
17       Q.  Price and payment?
18       A.  Yes.
19       Q.  Interest?
20       A.  Yes.
21       Q.  So if a counterparty -- what if a counterparty
22   struck every one of these provisions?  Do you have the
23   authority to accept that on behalf of Tricon?
24       A.  Well, I have the authority, yes.  Whether I
25   would do it, the answer is probably not.  I would have

342

1   to talk to somebody.  I've never -- I've never been in
2   such a situation so I don't really know how to answer
3   that.
4       Q.  Okay.  What if somebody came back -- and let's
5   go back to my example then on number -- let's look at
6   No. 3 on Page 2.  If they struck through Texas law and
7   said Singapore law, would you have to ask -- would you
8   ask somebody within Tricon as to whether that was
9   acceptable?
10       A.  More than likely what I would do at first is,
11   yes, I would check with somebody and, say, "Hey, they're
12   asking for Singapore instead of Texas."  And I would
13   say, "The transaction has nothing to do with Singapore
14   so there's no reason to accept that," but if somebody --
15   if Brad agreed to accept it, I would be happy to go back
16   and accept it.
17       Q.  So you would go back to the trader in that
18   situation and ask him?
19       A.  If he was available.
20       Q.  You'd ask somebody within Tricon.  Correct?
21       A.  More than likely, yes.
22       Q.  And that would be true with all of these
23   provisions if somebody struck through them.  Correct?
24       A.  No, it wouldn't be.
25       Q.  Certainly with force majeure?

343

1       A.  If somebody struck out force majeure
2   completely?
3       Q.  Yes.
4       A.  Yes.  I would probably check with somebody on
5   that one.
6       Q.  What about on the taxes?
7       A.  Probably.
8       Q.  Arbitration?
9       A.  Same thing.
10       Q.  You'd check with somebody first?
11       A.  Yeah.
12       Q.  And is that because you understand that that
13   might have an impact on how the deal was carried out?
14       A.  Correct.
15           (The time is 9:21 a.m.)
16           MR. LEE:  I'll pass the witness.
17           JUDGE BENTON:  Mr. Diaz-Arrastia?
18           MR. DIAZ-ARRASTIA:  I have no further
19   questions.
20           JUDGE BENTON:  Mr. Rajevac, bad news.
21   You're excused.
22           THE WITNESS:  Okay.  Thank you very much.
23           JUDGE BENTON:  Your next witness is a
24   depo, I understand.
25           MR. DIAZ-ARRASTIA:  The next witness is

9 (Pages 340 to 343)

ARBITRATION HEARING - SEPTEMBER 21, 2010

344

1    the depo of Mr. Pascu.
2         JUDGE BENTON:  And it lasts how long?
3         MR. DIAZ-ARRASTIA:  It's 45 minutes.
4         JUDGE BENTON:  Okay.  Perfect.  All right.
5    Very good.
6         MR. LEE:  And just to -- we have not
7    included -- we did not at this point intend to bring
8    Mr. Pascu to testify.
9         JUDGE BENTON:  Okay.  Very good.
10        MR. LEE:  He will testify live so this
11   would be their --
12        JUDGE BENTON:  Very good.
13        MR. LEE:  -- their submissions.
14        JUDGE BENTON:  Understood.
15        MR. LEE:  Thank you.
16        JUDGE BENTON:  All right.  Let's proceed.
17        MR. LEE:  And we expect to have our -- I
18   think the next thing is the video --
19        MR. DIAZ-ARRASTIA:  The incomes video is
20   Mr. Wilson, who will also be by video.
21        MR. LEE:  And somebody from my office is
22   going to help us.  We did those cuts so she should be
23   here, but we might want to take a break after this so
24   that she can set it up.  It shouldn't take very long,
25   but if we can sit through this if that's okay and then

345

1    take a break.
2         JUDGE BENTON:  Okay.  Yeah, that's what
3    our plan is to break after this one.
4         MR. LEE:  I apologize.
5         JUDGE BENTON:  No problem.
6         MS. LARSON:  Is it possible to take a
7    three-minute recess?
8         JUDGE BENTON:  Perfect.  We're off the
9    record for a short break.
10        (Recess from 9:25 a.m. to 9:29 a.m.)
11        JUDGE BENTON:  Let's proceed.
12        (At this time the edited version of the
13   videotaped deposition of Laurentiu Paul Pascu that was
14   originally taken on May 27, 2010, was played in the
15   arbitration.  The court reporter at the arbitration
16   reported such proceedings and this is her transcription
17   of same.)
18             LAURENTIU PAUL PASCU,
19        having been first duly sworn, testified as follows:
20             EXAMINATION
21   BY MR. DIAZ-ARRASTIA:
22        Q.  Sir, could you state your full name for the
23   record, please?
24        A.  Laurentiu Paul Pascu.
25        Q.  Tell me where you went to school, sir.

346

1         A.  I went to school in Romania.  I did my high
2    school in Romania and then I done university studies in
3    Romania.  I've done my master's study in Houston at
4    University of Houston.
5         Q.  Are you a native of Romania?
6         A.  Correct, yes.
7         Q.  And you attended university in Romania?
8         A.  Yes.
9         Q.  Okay.  Where did you attend university in
10   Romania?
11        A.  Academy of Academic Studies.
12        Q.  And where is that; what city?
13        A.  In Bucharest.
14        Q.  Did you get a degree?
15        A.  Yes.
16             MR. DIAZ-ARRASTIA:  Can you possibly --
17        A.  Bachelor degree.
18             (This is the end of the playback of the
19   edited version of the videotaped deposition of Laurentiu
20   Paul Pascu that was originally taken on May 27, 2010.)
21             MR. DIAZ-ARRASTIA:  Are you able --
22             JUDGE BENTON:  Yeah, we can hear.
23             JUDGE DAVIDSON:  We need more volume.
24             MR. DIAZ-ARRASTIA:  Well, that's the
25   problem we're having.  The speakers aren't working.

347

1    It's coming from the computer.
2         JUDGE DAVIDSON:  You need another minute
3    or two to work on the speakers?
4         MR. DIAZ-ARRASTIA:  Yes, I think we do
5    probably.
6         JUDGE DAVIDSON:  Then take -- I mean --
7         MR. DIAZ-ARRASTIA:  My apologies.
8         JUDGE BENTON:  All right.  We're off the
9    record again for a short break.
10        (Recess from 9:30 a.m. to 9:36 a.m.)
11        JUDGE BENTON:  All right.  We're back on
12   the record.  Let's proceed.
13        (At this time the edited version of the
14   videotaped deposition of Laurentiu Paul Pascu that was
15   originally taken on May 27, 2010, was played in the
16   arbitration.  The court reporter at the arbitration
17   reported such proceedings and this is her transcription
18   of same.)
19             LAURENTIU PAUL PASCU,
20        having been first duly sworn, testified as follows:
21             EXAMINATION
22   BY MR. DIAZ-ARRASTIA:
23        Q.  Okay.  Tell me where you went to school, sir.
24        A.  I went to school in Romania.  I did my high
25   school in Romania and then I done the university studies

10  (Pages 344 to 347)

ARBITRATION HEARING - SEPTEMBER 21, 2010

348

1  in Romania.  I done my master's study in Houston at the
2  University of Houston.
3       Q.  Are you a native of Romania?
4       A.  Correct, yes.
5       Q.  You attended university in Romania?
6       A.  Yes.
7       Q.  Okay.  Where did you attend university in
8  Romania?
9       A.  Academy of Economic Studies.
10      Q.  And where is that, what city?
11      A.  In Bucharest.
12      Q.  Did you get a degree?
13      A.  Yes.
14      Q.  What was that degree?
15      A.  Bachelor degree.
16      Q.  In what year?
17      A.  2001.
18      Q.  Did you have an area of concentration in your
19  studies?
20      A.  Yes.
21      Q.  And what was that?
22      A.  Merchandise science and quality management.
23      Q.  Okay.  And you said you have a master's degree
24  from the University of Houston?
25      A.  Yes.

349

1       Q.  Okay.  What master's degree is that?
2       A.  Master's of Business Administration.
3       Q.  Okay.  And when did you get that degree?
4       A.  In 2009.
5       Q.  Okay.  Are you currently employed by Vinmar?
6       A.  Yes.
7       Q.  Okay.  How long have you worked for Vinmar?
8       A.  Starting end of January 2006.
9       Q.  And when you went to work for Vinmar, what did
10  you do for them?
11      A.  What is my position?
12      Q.  Well, what is your position at Vinmar today?
13      A.  Supply chain specialist.
14      Q.  How long have you worked at Vinmar as a supply
15  chain specialist?
16      A.  From end of January 2006.
17      Q.  So that's the only job you have had at Vinmar?
18      A.  Yes.
19      Q.  Do you remember when Rick Wilson was a trader
20  at Vinmar?  Rick Wilson?
21      A.  Do I remember if when —
22      Q.  Do you remember him?
23      A.  I do remember him.
24      Q.  Okay.  And He was a trader at Vinmar?
25      A.  I don't know his position.  He -- he -- I

350

1  think that he was a trader in Vinmar.  I am not -- I am
2  not sure, but from my perspective, I think that he was a
3  trader at Vinmar.
4       Q.  All right.  He worked at Vinmar?
5       A.  He worked at Vinmar.
6       Q.  You're not sure whether he was a trader, but
7  you think he was?
8       A.  He was having commercial responsibilities.
9       Q.  Okay.  What does that mean to you?
10      A.  I'm not sure.
11      Q.  Well, I think you said earlier that you
12  believed that Rick Wilson was a trader.  Is that
13  correct?
14      A.  Yes, I said that.
15      Q.  Was Rick Wilson located -- when he worked at
16  Vinmar, was Rick Wilson located in the same office where
17  you were?
18      A.  As a job perspective?
19      Q.  Well, is that where he -- well, did he work in
20  the same office where you worked?
21      A.  Yes.
22      Q.  Okay.  Are you aware that a dispute has arisen
23  between Tricon and Vinmar regarding a sale of mixed
24  xylenes that occurred in July of 2008?
25      A.  Can you repeat that?

351

1       Q.  Are you --
2       A.  Sorry.
3       Q.  Are you aware that there is a dispute between
4  Tricon and Vinmar about a transaction involving mixed
5  xylenes in July of 2008?
6       A.  I'm aware that I have entered data for a
7  business in 2008 about mixed xylene and the entity was
8  Tricon.  I'm not sure whether there is a dispute or not.
9       Q.  Mr. Pascu, if you would please look at the
10  document that has been marked as Exhibit 29, which
11  appears to be, if you'll look at the top, an e-mail sent
12  by Rick Wilson to you.
13      A.  Okay.
14      Q.  And I think it says, "Laurentiu, I bought MX
15  from Tricon.  Please contact them and make the necessary
16  arrangements.  Rick."
17          Did I read that correctly, sir?
18      A.  This phrase is saying what you read, yes.
19      Q.  Do you remember getting this e-mail from
20  Mr. Wilson?
21      A.  Yes.
22      Q.  Do you understand that MX refers to mixed
23  xylenes?
24      A.  Yes.
25      Q.  And is this the -- is this the first time that

11  (Pages 348 to 351)

ARBITRATION HEARING - SEPTEMBER 21, 2010

352

1  you became involved in this -- with these mixed xylenes
2  that Mr. Wilson bought from Tricon? Is this when you
3  first heard about it?
4       A.  Might have been, yes.
5       Q.  You say it might have been. Might you have
6  heard about it before?
7       A.  I don't think that I've heard about it before,
8  but it was two years ago so --
9       Q.  Okay. If you had heard about it before, how
10 would you have heard about it before?
11      A.  By e-mail, phone or person-in-person.
12      Q.  Well, this is the only e-mail like this that I
13 have seen. Is it your -- well, let me put it this way.
14          Is it your testimony that the best that
15 you can remember today, this is the first time you heard
16 about this transaction?
17      A.  Yes, sir.
18      Q.  Okay. Is this the typical way that you were
19 told about transactions for which data needed to be
20 entered?
21      A.  It is not unusual.
22      Q.  Okay. And when he says "make the necessary
23 arrangements," what does Mr. Wilson mean by that?
24      A.  I don't know. From my perspective as a
25 logistic person, it is to get the data entered into the

353

1  system, making sure that the ship or the shipment gets
2  arranged, and all the necessary, like the inspection,
3  payment terms were -- all the items are in place for
4  this shipment to go.
5       Q.  Okay. Is that what you understand by "the
6  necessary arrangements"?
7       A.  From my point of view as a logistic
8  dispatching specialist, yeah.
9       Q.  And that is entering the data in the ERB
10 system?
11      A.  Correct, into SAP. Let's put it SAP.
12      Q.  Okay.
13      A.  It's called SAP.
14      Q.  Okay. And that would include price?
15      A.  Any data that is required by the system,
16 correct.
17      Q.  And that data would include price?
18      A.  Among the multiple data is the price.
19      Q.  Okay. It would also include quantity?
20      A.  The quantity, correct.
21      Q.  Would it include date of delivery?
22      A.  Correct.
23      Q.  Quality of the material?
24      A.  Correct.
25      Q.  Payment method?

354

1       A.  Correct.
2       Q.  Payment terms?
3       A.  Correct.
4       Q.  Okay.
5       A.  But besides these are datas required for a
6  purchase order as the system is calling to be entered.
7       Q.  Okay. Excuse me. Can you repeat that?
8       A.  Besides the terms that you have mentioned --
9       Q.  Yes.
10      A.  -- there are other datas that the system
11 requires to be entered.
12      Q.  Okay. And what would that be?
13      A.  There are — there are many.
14      Q.  Give me some of them.
15      A.  It is the -- it is called seller into the
16 system, if we are buying.
17      Q.  So the name of the seller?
18      A.  Right.
19      Q.  Or for the name of the buyer, if you are
20 selling?
21      A.  If -- so if I'm entering the purchase
22 confirmation, it's -- the name of the seller is a
23 requirement is the company -- is the -- so the company
24 that is --
25      Q.  Okay. And did you understand that in this

355

1  case Mr. Wilson was telling you about a transaction
2  where Tricon -- Vinmar would be buying?
3       A.  In this one, I understand that there is going
4  to be a shipment of MX from Tricon to Vinmar.
5       Q.  Okay. Tricon is the seller; Vinmar is the
6  buyer?
7       A.  That we are going to have a shipment from
8  Tricon of MX --
9       Q.  Okay.
10      A.  -- to Vinmar.
11      Q.  And did you understand that Mr. Wilson was
12 telling you that Tricon would be the seller and Vinmar
13 would be the buyer?
14      A.  For that, yes, as the process system.
15      Q.  In this transaction?
16      A.  As the process system, yes.
17      Q.  Now, if you would turn to the second page of
18 Exhibit 29, Mr. Pascu, this document -- these documents
19 were produced to us by Vinmar in this order. And my
20 question to you is, did you receive the documents that
21 follow the first page of Exhibit 29 as an attachment to
22 the e-mail that is the first page?
23      A.  Should have been.
24      Q.  Okay. You believe that you received all of
25 these documents together?

12  (Pages 352 to 355)

ARBITRATION HEARING - SEPTEMBER 21, 2010

356

1    A.  Yes.
2    Q.  Mr. Pascu, can you tell me what Exhibit No. 30
3  is?
4    A.  This is a view of our SAP data entry.
5    Q.  Okay.  Did you enter the data that is in this
6  document?
7    A.  I don't remember at that point of time.  I
8  think that might not have been me, but I don't remember.
9    Q.  Okay.  But if you look at the very top where
10 it says "Standard PO 4529980, created by Laurentiu"?
11   A.  Right.
12   Q.  Is that you when it is referring --
13   A.  Correct.
14   Q.  -- to Laurentiu?
15   A.  Correct.
16   Q.  So this says that this document is created by
17 you?
18   A.  Okay.  The initial input -- I'm not sure how
19 this system works, but most likely the initial input at
20 the time that the PO was created initially was created
21 by me.
22   Q.  Well, I'm asking you just about what we see in
23 this document, Exhibit 30 that you have in front of you.
24 Did you enter this data in the system?
25   A.  If this is correct, "Created by Laurentiu,"

357

1  I have entered the initial data, correct.
2    Q.  Okay.  Do you have any reason to think anybody
3  changed it after it was first entered by you?
4    A.  I don't remember.  Should not be.
5    Q.  Would it be fair to say that in Exhibit 29,
6  this document, Mr. Wilson was giving you the attachment
7  so that you would know what data needed to be entered
8  and what arrangements needed to be made?
9    A.  As a supply chain specialist, whenever I am
10 receiving a document, and as we see here, I would start
11 the necessary arrangements, which is including the data,
12 so most likely it would have been that I seen this
13 document and I have entered the data in SAP.
14   Q.  Okay.  Would Mr. Wilson tell you that he had
15 bought MX from Tricon if he had not?
16   A.  I don't know.
17   Q.  Mr. Pascu, who is Eduardo Anaya?
18   A.  At that time, he was a commercial trainee.
19   Q.  And by "the time," you mean in July of 2008?
20   A.  At the time of July 24th, 2008.
21   Q.  Commercial trainee?
22   A.  He was at that time a commercial trainee, but
23 he was in his period of getting the logistic training as
24 part of this part of training.
25   Q.  Okay.  Tell me, what is a commercial trainee?

358

1    A.  I don't know.
2    Q.  Okay.  You said Mr. Anaya was a commercial
3  trainee, but you don't know what that means?
4    A.  He was introduced to me as commercial trainee.
5  I don't know what that means.
6    Q.  Okay.  Did you work with Mr. Anaya?
7    A.  Right.
8    Q.  What work did you and Mr. Anaya do together?
9    A.  At this point of time, he was getting the
10 logistic training.  As a part of that logistic training,
11 he was working under my supervision to get the logistic
12 of the shipment going on.
13   Q.  So you were showing him how to do the
14 logistical side of the business?
15   A.  Correct.
16   Q.  And with that work, you would give him certain
17 assignments to do and then you would see how he did
18 them?  You would supervise his work?
19   A.  I would supervise his logistic work, yes.
20   Q.  Mr. Pascu, if you would look at Exhibit 31.
21 Let's start from the bottom of the document going up.
22 And at the bottom, does that appear to be an e-mail from
23 Mr. Anaya to Mr. Wilson and you and Ana Campos?
24   A.  You are asking me whether this e-mail is
25 addressed to me?

359

1    Q.  Well, yes.  Is it addressed to you and Ms. --
2  well, is it -- let me put it this way.
3        At the bottom, does that appear to you to
4  be an e-mail from Eduardo Anaya that is addressed to
5  Mr. Wilson, to you and to Ana Campos?
6    A.  Correct.
7    Q.  Do you remember receiving this e-mail?
8    A.  Should have been.
9    Q.  Okay.  By the way, who is Ana Campos?
10   A.  Is -- she is our logistic -- I don't know the
11 exact function that she -- but she is working with me
12 for this project, logistic duties.
13   Q.  Okay.  Is she your superior or somebody who
14 works under you or at the same level?
15   A.  I think that we are on the same level, but she
16 is still under my supervision.
17   Q.  So Ms. Campos is under your supervision?
18   A.  Yes.
19   Q.  In this e-mail, at the bottom is dated also
20 July 24th at 4:03 in the afternoon.
21   A.  Okay.
22   Q.  Is that correct?
23   A.  It seems that it was transmitted, was recorded
24 as 4:03 in the afternoon.
25   Q.  Okay.  So it is in the same day as Exhibit 29,

13  (Pages 356 to 359)

ARBITRATION HEARING - SEPTEMBER 21, 2010

360

1   but while Exhibit 29 is at 10:15 in the morning,
2   Exhibit 31 is about 4:00 in the afternoon?
3       **A.   Seems to be recording July 24th.**
4       Q.   Okay.  Did you instruct Mr. Anaya to get in
5   touch with Mr. Wilson to get information?
6       **A.   I don't remember, but most likely.**
7       Q.   Okay.  And Mr. Anaya tells Mr. Wilson, "Rick,
8   I will do the follow-up from the logistics point of view
9   of this operation."
10          Did you give Mr. Anaya that assignment, to
11  do the follow-up from the logistics --
12      **A.   Yes.**
13      Q.   -- point of view of this operation?
14          And then he says, "To complete the order,
15  we just need the port of origin of this product."  Do
16  you see where it says that?
17      **A.   Yes.**
18      Q.   Is that information that would be entered into
19  this ERB or SAP system we've talked about?
20      **A.   It is -- the port of origin is required for
21  our arrangements for the shipments.**
22      Q.   Okay.  And if you will look at the note, the
23  next note above, which appears to be a note from
24  Mr. Wilson addressed to Mr. Anaya and to you and to
25  Ms. Campos.

361

1       **A.   Okay.**
2       Q.   And it appears to be a reply to the e-mail
3   from Mr. Anaya that we were just talking about.
4   Correct?
5       **A.   Correct.**
6       Q.   Dated on July 25 at 10:33 in the morning, the
7   next morning, after the e-mail at the bottom of
8   Exhibit 31.  Correct?
9       **A.   Correct.**
10      Q.   And all -- and all of these are referring
11  PO 459980, which is the same PO referred to in
12  Exhibit 30.  Correct?
13      **A.   Correct.**
14      Q.   So all of this appears to be relating to the
15  sale by Tricon to Vinmar.  Would that be correct?
16      **A.   It appears to be related to this purchase
17  confirmation.**
18      Q.   Okay.  And Mr. Wilson says to -- well, first,
19  do you remember receiving this e-mail from Mr. Wilson,
20  the one from July 25th, 2008, at 10:33 a.m.?
21      **A.   I should have --**
22      Q.   Okay.
23      **A.   -- received it.**
24      Q.   Okay.  And he tells Mr. Anaya, "Re: Origin, We
25  won't know until we declare discharge port."

362

1       **A.   Okay.**
2       Q.   "Most likely USG"?
3       **A.   Okay.**
4       Q.   Do you remember getting that?
5       **A.   I should have got this e-mail.**
6       Q.   So just to be clear, Exhibits 30, 33 and 32
7   are all different parts of the same document that would
8   appear on your computer screen?
9       **A.   Yes, sir.**
10      Q.   That -- and in order to see the entire
11  document, you would have to scroll from left to right on
12  your computer screen?
13      **A.   This screen, yes.**
14      Q.   Am I correct?
15      **A.   Yes.**
16      Q.   And the image that you would see on the
17  left-hand side of your computer screen would be
18  Exhibit 30.  Correct?
19      **A.   This would be the first screen.**
20      Q.   Okay.
21      **A.   And then you have to roll -- scroll to get to
22  the 32 and 33.**
23      Q.   All right.  So Exhibit 30 would be on the
24  left-hand side of your computer screen.  And then as you
25  scroll to the right, you would first see Exhibit 32 and

363

1   eventually you would get to Exhibit 33?
2       **A.   Correct.**
3       Q.   Is there anything in Exhibits 30, 32 or 33
4   that indicate the origin of the product?
5       **A.   It shows here.**
6       Q.   Yes.  In this document --
7       **A.   In these documents?**
8       Q.   In these documents, is there anything that
9   indicates the origin of the product?
10      **A.   In these three papers?**
11      Q.   In these three papers.
12      **A.   Nothing.**
13      Q.   Mr. Pascu, where did you get the information
14  that you would input into Exhibits 30, 32 and 33?
15      **A.   Might have been from these (indicating).**
16      Q.   Exhibit 29?
17      **A.   Paperwork, yes.**
18      Q.   Would it have come from Rick Wilson in any
19  case?
20      **A.   Might have been from this paperwork.**
21      Q.   Would the information that was put into things
22  like Exhibits 32, 33 and -- Exhibits 30, 32 and 33
23  generally come from the trader?
24      **A.   Correct.**
25      Q.   And in this transaction, Mr. Wilson was the

14  (Pages 360 to 363)

ARBITRATION HEARING - SEPTEMBER 21, 2010

364

1  trader?
2      A.  In my perspective, yes.
3      Q.  Mr. Pascu, have you seen Exhibit 34 before
4  today?
5      A.  Yes.
6      Q.  Okay.  What is Exhibit 34?
7      A.  It is a purchase confirmation.
8      Q.  Okay.  And it relates to PO No. 4529980.
9  Right?
10     A.  Correct.
11     Q.  Which we have established is the purchase
12  order for the transaction between Tricon and Vinmar that
13  we're here about.  Correct?
14     A.  It is the data as entered as -- in the SAP for
15  the purchase confirmation.
16     Q.  Did you prepare Exhibit 34?
17     A.  I don't remember.
18     Q.  How was Exhibit No. 34 or documents like --
19  how are Vinmar's purchase order confirmations prepared?
20     A.  What do you mean?
21     Q.  Well, generally, how are they prepared?
22     A.  Data is entered in this case.
23     Q.  And that automatically generates a purchase
24  order confirmation?
25     A.  Upon printing this document.

365

1      Q.  So Exhibit 34 is Vinmar's purchase order
2  confirmation for the mixed xylenes that Rick Wilson
3  bought that are the subject of the July 24th e-mail to
4  you that's Exhibit No. 29?
5      A.  I know there is a paperwork called purchase
6  confirmation that is issued by SAP system whenever we
7  press the print button.
8      Q.  Okay.  And you say purchase confirmation, but
9  the title of this document actually says Purchase Order
10  Confirmation, does it not, sir?
11     A.  Okay.  Sorry.
12     Q.  Am I right?
13     A.  We name it as PO.
14     Q.  Okay.
15     A.  But the name of the document as shows here
16  Purchase Order Confirmation or the data that you are
17  referring is named Purchase Order Confirmation.
18     Q.  Okay.  But within Vinmar, this is the document
19  that you refer to as your PO?
20     A.  Correct.
21     Q.  And what I am asking you -- what I asked you a
22  moment ago was whether this PO, Exhibit 34, is the PO
23  that was generated in connection with the transaction
24  where Rick Wilson bought MX from Tricon that he informed
25  you about in Exhibit 29?

366

1      A.  It was the document that was generated based
2  on the input on the exhibit.
3      Q.  For this transaction?
4      A.  Basis of the input that Rick Wilson has
5  provided to us.
6      Q.  Well, my question is, Exhibits 29 and 34
7  relate to the same transaction?
8      A.  I don't know.  I'm saying that the data
9  entered into SAP relates to the attachment that Rick
10  Wilson has sent to us and was processed through SAP.
11  This is what I know.
12     Q.  And the attachment that Rick Wilson sent to
13  you is the attachment that is in Exhibit 29.  Correct?
14     A.  Right.
15     Q.  And Exhibit 34 relates to the attachment that
16  is part of Exhibit 29?
17     A.  It is based on the -- on the input data from
18  Exhibit 29.
19     Q.  29?
20     A.  Yes.
21     Q.  So if -- within Vinmar if you wanted to print
22  a PO, what would you do?
23     A.  You first have to get the approval of the
24  trader that that data is correct.
25     Q.  Okay.  And then what do you do?

367

1      A.  We send these for his review and approval.
2      Q.  Well, physically what do you do?  Is there
3  some buttons in your computer that you have to push to
4  print a PO?
5      A.  Yes, you have to push a button.
6      Q.  That says like "Print PO" or something like
7  that?
8      A.  Yes.
9      Q.  Okay.  And before you do that, you have to get
10  approval from the trader that the information is
11  correct?
12     A.  Correct.
13     Q.  And it is the practice of Vinmar not to print
14  a purchase order until the logistics people confirm with
15  the trader that the information is correct?
16     A.  I would say yes.
17         MR. LEE:  May I have --
18     Q.  Would you --
19         MR. LEE:  -- one moment to --
20     Q.  (BY MR. DIAZ-ARRASTIA)  If you would take a
21  look at --
22         (Playback of videotaped was stopped at
23  this time.)
24         MR. LEE:  I just want to make an offer of
25  optional completeness at this point.  There was a skip.

15  (Pages 364 to 367)

ARBITRATION HEARING - SEPTEMBER 21, 2010

368

1  And if -- for the record, I think to understand the
2  testimony, it's helpful just on Page 52 of Mr. Pascu's
3  deposition at Line 19 through Line 25, that little
4  section was omitted where the question was, "Was that
5  done before Exhibit 34 was printed?"
6       Answer: "I don't remember."
7       Question: "Okay.  You don't remember if
8  you printed it?"
9       Answer: "I don't remember if I printed
10 it, yes, sir."
11      Question: "If it was not you who printed
12 it, who would have?"
13      "Anyone that has access to the
14 information."
15      JUDGE BENTON: Okay.  Very good.
16      MR. LEE: Thank you.
17      (Playback of videotape was started again
18 at this time.)
19   Q.  (BY MR. DIAZ-ARRASTIA) -- Exhibit 34, like I
20 said again -- I think we have already established that
21 it relates to PO 4529980?
22   A.  Correct.
23   Q.  And the date next to it is July 24, 2008.
24      What late -- what date does that refer to?
25   A.  I don't know.  I think that is the date when

369

1  the data into SAP was entered and the date where the
2  save button was pressed.
3     Q.  I understand that the docu -- that no one
4  actually gets down and writes or types in all of this
5  information.  It's automatically created by the system?
6     A.  Okay.
7     Q.  And when you hit the "Print PO" button, it
8  just generates this, depending on what information was
9  entered?
10    A.  Okay.
11    Q.  Is that all correct?
12    A.  Yes.
13    Q.  Fine.  Look at the second page of Exhibit 34.
14    A.  Okay.
15    Q.  Do you see where there is a line that says
16 "Origin"?
17    A.  Yes.
18    Q.  And it is blank.  Correct?
19    A.  Yes.
20    Q.  And would that be because no origin was
21 entered into the system prior to this being printed?
22    A.  It would have been that the word here was not
23 entered into the system, yes.
24    Q.  Before this was printed?
25    A.  Before this was printed.

370

1     Q.  Okay.  If you will look at the bottom --
2     A.  Okay.
3     Q.  Well, let me ask you.  Is this a standard form
4  that Vinmar uses for all its PO's?
5     A.  As far to my knowledge, yes.
6     Q.  All right.  You've seen a lot of PO's that
7  Vinmar has generated, have you not, sir?
8     A.  Yes.
9     Q.  Okay.  And they all look pretty much like
10 this?  That's their standard form?
11    A.  For chemical, I would say yes.
12    Q.  And if you would look at the bottom of Page 2.
13    A.  Okay.
14    Q.  You see where it says, "Law and arbitration"?
15    A.  Okay.
16    Q.  Okay.  Well, what I'm trying to figure out,
17 sir, it's the language that we find, and let me read it
18 for you and please confirm that I've read it correctly.
19      It says, "Law and arbitration:  Law of the
20 State of Texas, USA, to apply.  All disputes arising in
21 connection with the present contract shall be finally
22 settled under the Rules of Conciliation and Arbitration
23 of the American Arbitration Association by one or more
24 arbitrators appointed in accordance with the said
25 rules."

371

1       Did I read that correctly, sir?
2     A.  You read what is -- what is written here, yes.
3     Q.  Now, Mr. Pascu, if you would look at
4  Exhibit 35.  And I would call your attention to the
5  bottom half of the first page of Exhibit 35.
6     A.  Okay.
7     Q.  Okay.  And that is an e-mail from you to
8  somebody at Tricon Energy whose address is
9  vuk@triconenergy.com.  Is that correct, sir?
10    A.  It appears to be, yes.
11    Q.  Okay.  I believe that gentleman is Vuk
12 Rajevac.  Are you familiar with that name?
13    A.  I think that -- yes.
14    Q.  Okay.  And it's an e-mail dated July 29th,
15 2008, which you are sending at 4:08?
16    A.  It seems to be this way.
17    Q.  Okay.  And it says, "Dear Vuk, Please find
18 enclosed our comments on your sale confirmation.  We
19 shall revert soon with our purchase order for your
20 review."  Did I read that correctly, sir?
21    A.  You stated this way, yes.
22    Q.  Now, if you would turn a couple of pages, the
23 page at the bottom says VIN 5.  Do you see that, sir?
24    A.  VIN 00 --
25    Q.  Several zeroes and 5.

16  (Pages 368 to 371)

ARBITRATION HEARING - SEPTEMBER 21, 2010

372

1  A.  Okay.
2  Q.  Okay.  That is the -- what you are enclosing
3  on the e-mail to Mr. Rajevac, is it not, to Vuk?
4  A.  Whatever this document it is here --
5  Q.  It says you are enclosing and sending to Vuk?
6  A.  I know that I have attached document.  It
7  seems like it could be this one.  Now, but you are
8  asking me this one.  I don't know.
9  Q.  Okay.  If you would compare, sir, this
10 document, beginning on Page VIN 5, to the document that
11 is on the second page of Exhibit 29.
12 A.  Okay.
13 Q.  Okay.  And, in particular, if you will look at
14 the top of both documents where there is a fax line.
15 A.  Okay.
16 Q.  They both say, "July 23, 2008, 10:53 a.m.,
17 Tricon Energy, 713-963-9030."
18 A.  Correct.
19 Q.  Okay.  And does it appear that except for some
20 handwriting that there is an Exhibit 35 -- the
21 attachment to Exhibit 35 and the attachment to
22 Exhibit 29 are the same document?
23 A.  Now, without checking line by line, it seems
24 that it could be the same document, yes.
25 Q.  Okay.  Do you think they are the same

373

1  document?
2  A.  If you allow me to check line by line, yes.
3  Q.  Sure.  Go ahead.
4  A.  Then it appears to be the same document.
5  However, I'm not yet in my state of mind to check each
6  line to make sure, but it seems to be the same document,
7  yes.
8  Q.  Okay.  You don't have any reason to think they
9  are different documents?
10 A.  I would -- I would not have reason.
11 Q.  Okay.  Do you recognize the handwriting that
12 is on Exhibit 35 -- on the attachment on Exhibit 35?
13 A.  Yes.
14 Q.  Is it yours?
15 A.  I recognize that this modification, this
16 handwriting here is mine.
17 Q.  Okay.
18 A.  That this one -- the top one and the bottom
19 one are not mine.  And on the second page, seems that it
20 is mine, mine and yes.
21 Q.  Okay.  Just to make the record clear, on the
22 first page some writing that is on the left margin of
23 the document that says, "Arrival at destination" --
24 A.  Okay.
25 Q.  -- you believe that is your handwriting?

374

1  A.  Yes.
2  Q.  Okay.  But the numbers that appear on the top
3  right-hand corner you think are not yours?
4  A.  I think they are not mine.
5  Q.  Do you know whose handwriting that is?
6  A.  No.
7  Q.  Okay.  The numbers on the top right-hand
8  corner are 4529980.  Correct?
9  A.  Correct.
10 Q.  Which is the same as the PO number that we
11 have been looking at?
12 A.  Correct.
13 Q.  Okay.  And you also think that the numbers on
14 the lower left-hand corner are not yours?
15 A.  Correct.
16 Q.  Okay.  And do you know whose handwriting that
17 is?
18 A.  No.
19 Q.  If you will look under the credit terms.
20 A.  Okay.
21 Q.  It's a little hard to see, but there is some
22 words that were scratched out.  Do you see that?
23 A.  Yes.
24 Q.  Did you do that?
25 A.  Yes.

375

1  Q.  Then on the second page under No. 2,
2  Demurrage, there is the word -- someone wrote in "Time
3  bar is 60 days."
4  A.  Correct.
5  Q.  Is that your handwriting?
6  A.  Yes.
7  Q.  Okay.  Under 7, Transfer of Title and Risk, it
8  says, "As per Incoterms 2000."  Is that your
9  handwriting?
10 A.  Correct, yes.
11 Q.  Okay.  And, again, there are on paragraphs --
12 on Page 2 of the document, which is VIN No. 6, there are
13 checkmarks by Paragraphs 1, 2, 3, 4 and 5.  Correct?
14 A.  I can see those checkmarks, yes.
15 Q.  Are those yours?
16 A.  Seems to be, yes.
17 Q.  Okay.  And on 7 and 7-A there again is some
18 language that has been crossed out.  Do you see that,
19 sir?
20 A.  Yes, I do see.
21 Q.  Did you do that?
22 A.  I might have done, yes.
23 Q.  Okay.  Does that look like your mark?
24 A.  Yes.
25 Q.  And I think that is all the handwriting on the

17  (Pages 372 to 375)

ARBITRATION HEARING - SEPTEMBER 21, 2010

376

1  document.  Is that correct?
2      A.  Yes, seems to be.
3      Q.  Okay.  So -- are the -- is the handwriting
4  that we have been looking at, is that what you referred
5  to as your comments on the sale confirmation?
6      A.  Correct.
7      Q.  But my question, sir, was, if you didn't
8  scratch anything out, if you didn't make a
9  Mark, if you didn't write anything, that meant that you
10  had no comment about that.  Is that so?
11      A.  As the ones mentioned before, on all the other
12  ones I did not have any comment from a logistic point of
13  view.
14      Q.  Okay.  All right.  And you sent this to Vuk at
15  Tricon on July 29th at 4:08 in the afternoon.  Correct?
16      A.  Seems to be, yes.
17      Q.  Okay, Mr. Pascu, let's take a look now at
18  Exhibit 36.
19      A.  Okay.
20      Q.  It appears to be an e-mail from you to Rick
21  Wilson.  Is that correct, sir?
22      A.  It appears to be, yes.
23      Q.  And it's dated July 29th, 2008, at 11:54 a.m.?
24      A.  Okay.
25      Q.  And the subject is PO 4529980, 5,000 metric

377

1  tons of MX.  Correct?
2      A.  Correct.
3      Q.  That is, by the way, the same subject line as
4  you used in Exhibit 34, the e-mail to mister to -- Vuk
5  Rajevac.  Correct?
6      A.  You are asking me whether the same subject --
7      Q.  Same subject line?
8      A.  -- line as -- okay.  Yes.
9      Q.  Okay.  And you tell Mr. Wilson, "Please find
10  my comments on this sale contract."  Correct?
11      A.  Correct.  It's written this way, yes.
12      Q.  Yes.  It appears to me that what you are
13  sending Mr. Wilson with your e-mail at -- on July 29th,
14  2008, at 11:54 is what you also sent Mr. Rajevac later
15  in that day, is that correct, your comments on this
16  sales contract?
17      A.  It appears to be, yes.
18      Q.  Okay.  So just before noon on July 29th, you
19  had shown Mr. Wilson the comments that you later gave to
20  Vuk Rajevac at 4:00 in the afternoon the same day?
21      A.  Appears to be, yes.
22      Q.  Now, in your comments on Exhibit 35, is there
23  anything in there that talks about the origin of the
24  product or the material?
25      A.  You are asking me whether this document is --

378

1      Q.  Yeah.  Do your comments in Exhibit 35 say
2  anything about the origin of the MX?
3      A.  My comments are referring strictly to a
4  shipment.
5      Q.  Okay.  Do they say anything about the origin
6  of the MX?
7      A.  My comments do not say anything about the
8  origin.
9      Q.  Okay.  Going back to Exhibit 36, if you will
10  look right before the sign-off on your e-mail to
11  Mr. Wilson, it says, "If you have a right contact person
12  would be great.  I can make contact and discuss.  Thank
13  you."
14      A.  Okay.
15      Q.  You are asking Mr. Wilson to tell you who the
16  contact person at Tricon should be?
17      A.  Logistic person, yes.
18      Q.  Yeah.  And that would have been Mr. Rajevac?
19      A.  I have been told that Mr. Rajevac is going to
20  handle the logistics.
21      Q.  Okay.  So did Mr. Wilson tell you that you
22  should be contacting Vuk Rajevac?
23      A.  I don't remember whether it was Rick or -- but
24  it might have been Rick.  I don't remember how I got to
25  know that Mr. Rajevac is the logistics person.

379

1      Q.  But somebody had to tell you that?
2      A.  Right.
3      Q.  Okay.  And so somebody had to respond to your
4  e-mail at 11:54 a.m. -- that's Exhibit 36 -- to tell
5  you, "Contact Vuk Rajevac"?
6      A.  There is a way that I got information that Vuk
7  is the logistics person, yes, you are correct.
8      Q.  You don't remember how?
9      A.  I don't remember how.
10      Q.  But somebody had to give you that information?
11      A.  Somebody gave me that information.
12      Q.  And somebody gave you that information after
13  you sent Exhibit 36?
14      A.  Appears to be, yes.
15      Q.  Because you need to send it to Mr. Rajevac at
16  4:00 that afternoon?
17      A.  Correct.
18      Q.  Okay.  If you would look now, Mr. Pascu, at
19  Exhibit No. 37.  And, again, I would call your attention
20  to the bottom half of the first page --
21      A.  Okay.
22      Q.  -- which appears to be an e-mail from Vuk
23  Rajevac to you.  Correct?
24      A.  Correct.
25      Q.  Dated July 29th, 2008, at 4:43 p.m.?

18  (Pages 376 to 379)

ARBITRATION HEARING - SEPTEMBER 21, 2010

380

1    A.  Appears to be recorded this way, yes.
2    Q.  It's about -- oh, just a little over a
3  half-hour after you sent him Exhibit 35.  Correct?
4    A.  Seems to be this way, yes.
5    Q.  And the subject line is the same as in
6  Exhibit 35 and in Exhibit 36.  Correct?
7    A.  Seems to be, yes.
8    Q.  Re: PO 4529980, 5,000 metric tons of MX.
9  Correct?
10    A.  Appears to be, yes.
11    Q.  Okay.  And it says, "Hi Laurentiu, to answer
12  your questions: No. 1, your comments on the contract
13  well noted and accepted except for demurrage time bar,
14  which is 90 days as per industrywide standard."
15        Did I read that correctly, sir?
16    A.  Yes.
17    Q.  Did you understand that to mean that
18  Mr. Rajevac was agreeing to all of your comments except
19  for the demurrage time bar period?
20    A.  I don't know what he meant.  I'm not Vuk to
21  state this.
22    Q.  Do you have an understanding of what it means
23  when somebody says, "Your comments on the contract well
24  noted and accepted"?
25    A.  No, I don't.

381

1    Q.  Okay.  You received Exhibit 37, didn't you,
2  sir?
3    A.  Appears to be, yes.
4    Q.  Let's look at the item that is numbered 3 --
5    A.  Okay.
6    Q.  -- on Exhibit 37 near the bottom of the page.
7    A.  Okay.
8    Q.  And Mr. Rajevac tells you, "As far as the
9  shipment details, we sold on CFR basis with arrival
10  window.  So once you declare the discharge port, by
11  August 8, we will be able to decide whether to give you
12  a deep sea cargo, which at that point will most likely
13  already be on the water, or an Asian origin cargo."
14        Did I read that correctly, sir?
15    A.  You read what appears to be here, yes.
16    Q.  Okay.  If you would look at Exhibit 31
17  quickly.
18    A.  31.
19    Q.  There you go.  Right in the middle of the page
20  where Mr. Wilson is responding to Mr. Anaya and you.
21    A.  Okay.
22    Q.  He says, "Re: Origin.  We won't know until we
23  declare discharge port."
24    A.  Okay.
25    Q.  Doesn't that mean exactly what Mr. Rajevac is

382

1  telling you?  "We will know origin when discharge port
2  is discharged (sic)"?
3        Aren't Mr. Rajevac and Mr. Wilson saying
4  the same thing?
5    A.  Now, again, you are asking me to comment on
6  something that I'm not involved with again.  And,
7  therefore, I would be cautious in understanding your
8  question.  But you are asking me -- let me put it this
9  way.
10        You are asking me whether Rick has
11  answered to Eduardo's and my message, and I can tell you
12  it appears to be, yes.  Eduardo and I have asked Rick
13  Wilson, "What is the port of origin?"
14        And he asked -- "I don't know.  Most
15  likely it is going to be US Gulf Coast."
16    Q.  Okay.  Before July 29th, the date of
17  Exhibits 35, 36 and 37, before that date, did anyone
18  ever tell you that Vinmar had to have MX of U.S. origin?
19    A.  Tell me again.  I'm sorry.
20    Q.  Before July 29th, 2008, did anyone ever tell
21  you that the MX that Vinmar was buying from Tricon had
22  to be of U.S. origin?
23    A.  As mentioned, as a supply chain specialist, we
24  are handling the data that is provided by the commercial
25  person.  We have entered the data and the data is --

383

1  appear exactly what you see here in these -- in this
2  (indicating).
3    Q.  And what we saw is that no data was ever
4  entered about the origin of the material?
5    A.  Right.
6    Q.  So my question to you is, does that mean that
7  no one ever told you that the MX had to be U.S. origin?
8    A.  Should be the case.  Whatever data we get, we
9  are inputting it into the system.
10    Q.  The only thing that you were told about the
11  origin of the material is that you would know it once
12  the discharge port was declared.  Right?
13    A.  Again, whenever we are inputting, yes, the
14  data, we want to make sure that the data is correct.
15  We -- most likely, we did not get information about the
16  date of origin; therefore, we did not input.
17        (This is the end of the playback of the
18  edited version of the videotaped deposition of Laurentiu
19  Paul Pascu that was originally taken on May 27, 2010.)
20        JUDGE BENTON:  Okay.  Let's take about a
21  ten-minute break.  With that, we're off the record.
22        (Recess from 10:30 a.m. to 10:46 a.m.)
23        MR. DIAZ-ARRASTIA:  Okay.  We're on the
24  record.  Let's proceed.
25        (At this time the edited version of the

19  (Pages 380 to 383)

ARBITRATION HEARING - SEPTEMBER 21, 2010

384

1  videotaped deposition of Richard W. Wilson, Ph.D., that
2  was originally taken on August 30, 2010, was played in
3  the arbitration.  The court reporter at the arbitration
4  reported such proceedings and this is her transcription
5  of same.)
6           RICHARD W. WILSON, Ph.D.,
7     having been first duly sworn, testified as follows:
8                EXAMINATION
9  BY MR. LEE:
10    Q.   Good morning, Dr. Wilson.  How are you today?
11    A.   Just fine.
12    Q.   Good.  Would you mind giving us your full
13 name, sir?
14    A.   Richard W. Wilson.
15    Q.   Okay.  And how old are you?
16    A.   51.
17    Q.   What is it that you do today?
18    A.   I'm the CEO of Cobalt Technologies & Renewable
19 Fuels & Chemicals Business.
20        THE REPORTER:  Renewable fuels and what?
21        THE WITNESS:  Chemicals Business.
22    Q.   (BY MR. LEE)  Do you mind telling me just a
23 little bit about what it is that Cobalt Technologies
24 does?
25    A.   Well, the companies develop the technology to

385

1  make bio fuels and biochemicals out of wood waste.  And
2  my role is to commercialize that technology globally.
3     Q.   Great.  How long have you been the CEO of
4  Cobalt Technologies?
5     A.   Two years.
6     Q.   And you live here in California?
7     A.   Palo Alto, California.
8     Q.   Where is Cobalt Technologies headquartered?
9     A.   Mountain View, California.
10    Q.   I'll ask you a little bit about your
11 background, Dr. Wilson.  Where did you grow up?
12    A.   I grew up in Philadelphia, Pennsylvania.
13    Q.   Where did you go to college?
14    A.   Undergrad chemistry degree, UC San Diego,
15 Ph.D. chemical engineering, Lehigh.  MBA, University of
16 Chicago.
17    Q.   When did you graduate from UC San Diego?
18    A.   1981.
19    Q.   And then there was another stop after UC in
20 San Diego?
21    A.   Lehigh, Ph.D. chemical engineering, '89.
22    Q.   And then what about after that?
23    A.   University of Chicago, 1997.
24    Q.   Was that an MBA or --
25    A.   MBA.

386

1     Q.   When were you first employed by Amoco?
2     A.   Hired in 1989.  And right around the merger
3  time in 19 -- in 2000 -- 1999, 2000, I -- I went into my
4  first trading role.
5     Q.   And that was with BP?
6     A.   BP.
7     Q.   And can you just generally describe what it
8  was that you were responsible for in your trading role
9  at BP?
10    A.   My first role was a -- I was -- I was
11 responsible for midback office.  Think accounting.
12 Think logistics.  And then I went into a trading role.
13 And then I was put in charge of all the trading
14 operations in Australasia for products that came out of
15 BP's refineries or BP's joint ventures.
16    Q.   When you served in the trading role, what
17 products were you buying, selling?
18    A.   Mostly blended gasolines and diesel fuel.
19 There was -- we did some exporting of blend stocks into
20 the U.S. West Coast.
21    Q.   Okay.  How long were you in a trading role at
22 BP?
23    A.   In trading roles, I went into trading 1999,
24 2000.
25    Q.   So from 1999 to about 2001, you were an

387

1  individual trader at BP?
2     A.   I first had a responsibility around midback
3  offices.  So the way you get into trading is you learn
4  the -- the ebbs and flows of the paperwork.
5     Q.   Okay.  And after you spent a few months in the
6  back office, then you went into trading.  Is that right?
7     A.   That's right.
8     Q.   And you served in that role until sometime in
9  2001?
10    A.   That's right.
11    Q.   So approximately two years of sort of
12 individual trading?
13    A.   Rating -- supporting individual trading.
14        THE REPORTER:  I'm sorry.  I didn't hear
15 you.
16        THE WITNESS:  Supporting individual
17 trading.
18    Q.   (BY MR. LEE)  And then after that two-year
19 stent as either logistics or trading, you then --
20    A.   Management.
21    Q.   -- went into management.  And you had a
22 trading operation that you were managing?
23    A.   That's right.
24    Q.   How many traders were you responsible for?
25    A.   18.

20  (Pages 384 to 387)

ARBITRATION HEARING - SEPTEMBER 21, 2010

388

1    Q.   And was this primarily products in Asia?
2    A.   In Australasia, so Singapore, New Zealand and
3  Australia.
4    Q.   What were your basic management
5  responsibilities?
6    A.   I was -- I was responsible for P&L.  I was
7  responsible for control.
8    Q.   And how long were you in the -- in a
9  management role of the trading operation of BP?
10   A.   Well, I went -- it was circa 2001 into 2003.
11 And then at that point I moved back from -- I was in
12 Australia at the time.  I moved back to the United
13 States.  I went into the chemicals business.
14       My goal there was -- and my remit was to
15 bring trading skills to a part of the business that was
16 very dominated by technologists.  And I was chosen for
17 that role because of my technology and my trading
18 background.
19   Q.   Okay.  So the -- at least the concept was that
20 you would bring your trading skill set over to the
21 United States and --
22   A.   Well, into the chemical business and they were
23 a global chemical business.
24   Q.   Okay.  You mentioned you started at Vinmar in
25 December of 2006?

389

1    A.   I think that's right, yeah.
2    Q.   And how long were you there?
3    A.   Until October 2008.
4    Q.   What were you responsible for at Vinmar?
5    A.   Well, that changed over time.  I'd say that it
6  was really a business development role.  Before -- I
7  think before I went into -- before I went into aromatics
8  trading or before I had the remit of developing
9  aromatics trading, I was actually buying and selling
10 enzymes.
11       So these are renewable replacements for
12 chemicals.  And it was a variety of countries, Brazil,
13 Turkey, China and leveraged some of the supply resources
14 that Vijay Goradia had.
15   Q.   And then I think you mentioned you were put in
16 charge of the aromatics trading?
17   A.   That's right.
18   Q.   How did that happen?
19   A.   It was -- well, the enzyme business didn't
20 generate a multimillion dollar P&L fast enough so we
21 decided that we would progress aromatics trading.  And
22 that was, I mean, roughly late 2007.
23   Q.   And what -- what's included in the aromatics
24 family?
25   A.   Well, it was a remit to do anything.  I

390

1  focused on MX right away because the economics of MX are
2  closely tied to gasoline and I had experience in
3  understanding the value of gasolines given my experience
4  in Australia.
5    Q.   You said you left in October of 2008.  Why did
6  you leave Vinmar?
7    A.   Well, I had an opportunity to run a Silicon
8  Valley renewable chemical business as a CEO so I was
9  very much attracted to the opportunity to work on
10 something that had social impact.
11   Q.   I want to talk to you about the summer of
12 2008.  And I guess really to get into this, let me ask
13 you, where were you officing in the summer of 2008?
14   A.   The summer of 2008, I was at the home office
15 in Chicago.
16   Q.   Had that always been the case?
17   A.   No.
18   Q.   All right.
19   A.   I spent a year commuting to Houston.
20   Q.   So your first year at Vinmar, you --
21   A.   Commuted.
22   Q.   -- were in the Houston office but your family
23 was in Chicago?
24   A.   That's right.
25   Q.   Obviously, Dr. Wilson, I'm here to talk to you

391

1  about a dispute that exists between Tricon and Vinmar.
2  And I take it that you're aware that Tricon has sued
3  Vinmar over an alleged contract involving the sale of
4  MX?
5    A.   That's right.
6    Q.   Okay.  How were you involved in the events
7  leading up to this alleged contract?
8    A.   I was the trader responsible for the Vinmar
9  side of that trade.
10   Q.   Why were you interested in purchasing MX?
11   A.   Because I was -- well, first of all, the
12 trading that I was attempting to build was based on
13 purchasing in the United States and have MX into Asia.
14 Particularly, the arrangement I had was that Formosa, a
15 Taiwanese company, was frustrated that they were a big
16 buyer of MX and the Asian traders -- well, what happens
17 is Asia is the suppliers will sell to certain traders
18 and those traders essentially will collectively push the
19 price up.
20       And my trading activity is all about
21 essentially breaking the back of that monopoly, and what
22 that did was that gave me privileged access to sell
23 material to Formosa in Taiwan, buy in the U.S., sell
24 to -- sell to Formosa and hopefully expand that to other
25 consumers of MX.

21  (Pages 388 to 391)

ARBITRATION HEARING - SEPTEMBER 21, 2010

392

1    Q.  Right.  And so how was the U.S. origin aspect
2  of the MX, how is that essential to doing business with
3  Formosa?
4    A.  Well, Formosa wanted material that didn't
5  originate in Asia.
6    Q.  Do you know why?
7    A.  Because they wanted to reduce their exposure
8  to Asian material so that they weren't subject to the --
9  to the dominant -- the dominant supply control of the
10  Asian traders.
11    Q.  Can you tell us why the -- why you approached
12  Ed Leyman to assist in the purchase of MX?
13    A.  Two reasons.  The first reason that -- was
14  that I recognized that through transacting with Ed I
15  would over time get exposure to all the supply sources
16  that were available in MX and -- number one.
17        So it was essentially an opportunity to
18  learn about what's really out there, recognizing that MX
19  is used in gasoline and also chemicals so it could
20  physically be anywhere.
21        The second reason I engaged Ed Leyman is
22  that Vinmar's control environment did not include
23  recorded tape recordings and Ed Leyman assured me that
24  recordings were taped so I saw that as my opportunity to
25  have some controlled environment over my activities.

393

1    Q.  Why was that important?
2    A.  Well, so there's no misunderstandings.
3    Q.  What -- I guess tape-recorded conversation, is
4  that something that you had had experience with at BP?
5    A.  It's BP best practice.
6    Q.  Was it your understanding that Mr. Leyman
7  would function as a neutral broker?
8    A.  Yes.
9    Q.  What does that -- what does that mean to you?
10    A.  That means he'll treat each party the same.
11  He will keep me anonymous should I require that.
12    Q.  And I guess the -- what I want to focus in on
13  today is this -- the discussions that you had with
14  Mr. Leyman on July the 22nd, 2008.  Okay?
15        And do you remember that on that day you
16  were in the market to purchase MX?
17    A.  That's right.
18    Q.  Okay.  What did you tell Mr. Leyman about the
19  origin of the MX that you wanted to purchase?
20    A.  I told Ed that I needed U.S. origin material
21  and that my customer would only accept U.S. origin
22  material.
23    Q.  And I think you told us earlier about your
24  experience with Formosa.  Was -- was this intended
25  Formosa?

394

1    A.  It was -- at the -- at the time that I was
2  originally doing the deal, I -- Formosa actually was
3  actively looking for product.  So my first hope was that
4  I can essentially do a back-to-back transition so --
5  transaction so that I buy and sell simultaneously so I
6  don't expose myself to market price moves.
7        But as the evening in Taiwan played out,
8  that was no longer a possibility.  It was the end of the
9  day.  I decided to buy anyway.  And the reason I decided
10  to buy was that there was particular tightness in the
11  United States at least in terms of gasoline blend
12  stocks.  So I was generally long and there were some
13  signs of weakness in Asia.
14    Q.  Did you have any interest in purchasing open
15  origin MX?
16    A.  No, because I had no place to sell it.
17    Q.  Were you willing to purchase MX if it wasn't
18  of U.S. origin?
19    A.  No.
20    Q.  Did you ever authorize Ed Leyman to purchase
21  anything but U.S. origin MX?
22    A.  Not that I remember.
23    Q.  If you had wanted -- let me ask you this.  If
24  you had wanted open origin MX, would you have gone to Ed
25  Leyman?

395

1    A.  If I wanted material from Asia, I would not
2  have gone to Ed Leyman, no.
3    Q.  Why?
4    A.  I would have went to an Asian broker who was
5  better aware of what the deal opportunities were so I
6  could have got a better price.
7    Q.  Where was Mr. Leyman located?
8    A.  I believe New York.
9    Q.  Do -- does Exhibit 6, does that appear to be
10  instant message exchanges between you and Ed Leyman?
11    A.  Appears to be, yes.
12    Q.  Having looked at that, does that -- do you
13  recall any of these discussions that you had with
14  Mr. Leyman on July 22nd, 2008?
15    A.  Vaguely.
16    Q.  Okay.  And I guess it's 9:34 a.m.
17  Mr. Leyman tells you that he's got a firm offer for 5 KT
18  MX FOB H/TC Corpus, 5 KT any August at 4:10, 5211/20 BR.
19  Could you tell us what that meant to you?
20    A.  FOB means that I'm purchasing a parcel that's
21  at the port and that port is Houston, Texas City or
22  Corpus Christi, all which are in the United States,
23  5,000 metric tons.  I believe the -- any August refers
24  to the shipping date.  4.10 is the price.  5 -- 5211/20
25  is the specification.

22  (Pages 392 to 395)

ARBITRATION HEARING - SEPTEMBER 21, 2010

396

1    Q.   The -- what is the significance of his
2   reference to FOB H/TC or Corpus?
3    A.   It means that I'm buying material out of
4   Houston that originates out of Houston, Texas City or
5   Corpus Christi.
6    Q.   Would you consider that to be U.S. origin
7   material?
8    A.   Yes.
9    Q.   And was that consistent with your discussions
10   with Mr. Leyman?
11    A.   That's right.
12    Q.   I'm sorry.  What was your understanding on
13   July 22nd or at least at this point in time as to that
14   Formosa's interest in?
15    A.   They were -- they were looking to buy.
16    Q.   If you look down a couple of lines at
17   10:00 a.m., Mr. Leyman mentions a second MX seller
18   asking if the buyer would purchase CFR main Asian ports,
19   5 KT MX, arrival basis loading USGC.
20    A.   Uh-huh.
21    Q.   Again, what is -- first of all, did you ask
22   Mr. Leyman for CFR opportunities?
23    A.   No.  He proposed that as a counter.
24    Q.   What is -- what's a CFR offer?
25    A.   CFR means that you purchase it on a delivery

397

1   basis so you're incurring a price that includes shipping
2   costs, which means that you don't need to actually do
3   the shipping yourself.
4    Q.   What was the significance of -- if any, of
5   Mr. Leyman's comment about loading USGC?
6    A.   That indicated that the origin of this
7   material was the U.S. Gulf Coast and that pick-up
8   essentially the first half of August.
9    Q.   Did you believe that Mr. Leyman had the
10   authority to accept on Vinmar's behalf terms that were
11   different than those that you had authorized him to
12   accept?
13    A.   Mr. Leyman had specific instructions to buy
14   U.S. origin material only on my behalf.
15    Q.   Okay.  What was your understanding of the
16   origin of the MX for the deal that Mr. Leyman had
17   supposedly brokered?
18    A.   It was always that it was U.S. origin but that
19   it could come from a variety of different ports in the
20   United States.
21    Q.   What do you mean by that?
22    A.   The M -- the MX would need to be in a tank at
23   some port.  And I had afforded him the flexibility of
24   determining what port in the United States that material
25   could be picked up at.

398

1    Q.   When -- at that point in time did you learn
2   that the potential seller was Tricon?
3    A.   I believe after the deal was done.
4    Q.   Did you -- did you know anything about Tricon
5   before then?
6    A.   Yes.
7    Q.   What had you -- or what did you know about
8   Tricon?
9    A.   I had been advised by other traders to avoid
10   Tricon.
11    Q.   By other traders at Vinmar or outside of
12   Vinmar?
13    A.   Outside of Vinmar.
14    Q.   Okay.  And then were there also, though,
15   discussions about where Vinmar would want the MX
16   delivered?
17    A.   At some point -- well, in general -- so what
18   I -- I can't say specifically and I don't remember the
19   details, but what I do know, my agenda was to not
20   disclose who the seller was because of my concerns that
21   Vinmar was -- that, excuse me, Tricon was actually part
22   of the -- we'll call it the Asia trade of MX.
23    Q.   And the Asian trade being what we discussed
24   earlier, the folks that were --
25    A.   Cornering the market.

399

1    Q.   -- involving in trying to build the market
2   price in Asia up --
3    A.   That's right.
4    Q.   -- to artificial level?
5    A.   That's right.
6    Q.   "Ed, given Brad is selling out of USG, am I
7   getting 45 days from BL or 30, hopefully 45?"  Could you
8   tell us what that means, sir?
9    A.   What we're discussing are the payment terms
10   and the issue is that when you pick a material up in the
11   U.S. Gulf the clock starts ticking in terms of when you
12   have to make payment.  So it's a working capital issue.
13   So I was attempting to negotiate longer terms, I
14   believe.
15    Q.   And what did -- what did you mean by your
16   reference to USG?
17    A.   U.S. Gulf.
18    Q.   Was that your understanding of the purported
19   deal?
20    A.   The origin of the -- of material was -- my
21   understanding -- my understanding was that it was U.S.
22   origin and that doesn't necessarily mean U.S. Gulf.
23    Q.   Do you recall Mr. Leyman or anyone else
24   telling you on July 22nd that the product -- that the
25   product would likely originate from the Gulf Coast or

23  (Pages 396 to 399)

ARBITRATION HEARING - SEPTEMBER 21, 2010

400

1    anything to that effect?
2        A.  He said that the port in the U.S. was still
3    open.
4        Q.  Where did you get your understanding that
5    Tricon would be selling out of at least at that time
6    USG?
7        A.  They would be loaded -- the origin -- my
8    understanding was that the origin that called -- the
9    origin of the cargo was United States --
10       Q.  Okay.
11       A.  -- which may be the U.S. Gulf.
12       Q.  If Mr. Leyman had told you that Tricon was not
13   guaranteeing U.S. origin, what would you have done?
14       A.  I wouldn't have bought the cargo.  I had no
15   place to sell it.  I couldn't count on the Asian traders
16   taking it.
17           MR. LEE:  I'm going to mark Exhibit 39.
18       Q.  (BY MR. LEE)  Take a look at that, if you
19   would, sir.
20           MR. LEE:  I had two of those.  Sorry.
21           (The following was a comment made by
22   Mr. Lee during the playback.)
23           MR. LEE:  That's also Vinmar Exhibit 2.
24           (End of comment made by Mr. Lee.)
25       Q.  (BY MR. LEE)  Do you recognize Exhibit 39?

401

1        A.  Yeah.
2        Q.  And are those e-mails that you exchanged with
3    a gentleman named Nicholas Smith?
4        A.  That's right.
5        Q.  Who is Nicholas Smith?
6        A.  I believe he's a ship charterer.  I just don't
7    remember the name of the company that he dealt with.
8        Q.  Was -- how was Mr. Smith aware that you were
9    in the market to buy MX on July 22nd, 2008?
10       A.  Well, because the first thing you need to do
11   if you're guaranteeing a physical delivery is to make
12   sure that you have the ship.  So before you tell a
13   customer, "I'm going to deliver on such and such date,"
14   you'd be better be able to deliver it.
15           So essentially what I did was I put on
16   hold a ship that could pick up material in the United
17   States.
18       Q.  Let me approach it this way, mister -- or
19   Dr. Wilson.  Why would you have been in contact with
20   Mr. Smith on July 22nd to arrange shipping?
21       A.  So that I could ship MX to Asia from the
22   United States.
23       Q.  At the last e-mail, which is at the top of
24   Exhibit 39, you mentioned to Mr. Smith that the seller
25   is handling freight?

402

1        A.  Uh-huh.  That's right.
2        Q.  And was that -- what's that based on?
3        A.  If -- a CFR deal means that the seller
4    arranges freight so I didn't need to.
5        Q.  Then you went on to tell him lifting is first
6    week of August.  So they already had shipping arranged.
7    What do you mean they -- the lifting was to be the first
8    week of August?
9        A.  I meant that the -- my understanding of the
10   deal with Tricon was that the material is going to be
11   U.S. origin and that the pick-up was going to be in
12   August.
13           And the reason that was important was that
14   I knew that Formosa had two windows of opportunity.  The
15   first -- I believe the first in September so I needed to
16   ensure that the material actually arrived in September.
17   It takes time to sail from the United States to Taiwan.
18       Q.  Just so that we're all clear, I want to make
19   sure I understand the terminology.  What do you mean by
20   lifting?
21       A.  I mean the pick-up at the -- pick-up at the
22   port, the lifting by the ship of the cargo, moving it
23   from the tank into the cargo hold.
24       Q.  Who had told you that Tricon had already
25   arranged the shipping?

403

1        A.  I think that was part of the CFR deal.
2        Q.  What does this -- Exhibit 39, what does that
3    tell us about your understanding of the deal that you
4    thought had been concluded between Tricon and Vinmar?
5        A.  My understanding was it was U.S. origin.
6        Q.  Let me show you what's previously been marked
7    as Exhibit 15.
8            (The following was a comment made by
9    Mr. Lee during the playback.)
10           MR. LEE:  It's Joint Exhibit 5.
11           (End of comment made by Mr. Lee.)
12       Q.  (BY MR. LEE)  Do you recognize this e-mail
13   exchange between you and Mr. Lockwood?
14       A.  Yes, vaguely.
15       Q.  Okay.  What I want to ask you about right now
16   is the e-mail that you sent to Mr. Lockwood there on
17   July 23rd at about 3:28, so it's the one in the middle.
18       A.  Uh-huh.
19       Q.  And you asked, "Brad, could you please send me
20   the RCAP for the shipping you arranged for this cargo?"
21   What is -- what do you mean by RCAP?
22       A.  RCAP.  So what that means is that the broker
23   will supply, "Here's the ship.  Here's the details."
24   And I did that on the belief that the material was
25   loading very soon in order for it to get to Asia in

24  (Pages 400 to 403)

ARBITRATION HEARING - SEPTEMBER 21, 2010

404

1   time.
2       Q.  Now, Mr. Lockwood's response is that "We have
3   a couple of different options to use."  Do you see that?
4       A.  Yeah.
5       Q.  Was that consistent with your understanding of
6   the deal as it had been relayed to you on July 22nd,
7   2008?
8       A.  There is nothing in the statement that
9   contradicts my understanding of the deal, and that was
10  that he was going to provide to me U.S. origin material,
11  but there was flexibility, specifically at what port in
12  the United States that MX would be picked up at.
13      Q.  As of July 23rd, 2008, what was your
14  understanding of the deal that purportedly had been
15  concluded between Tricon and Vinmar?
16      A.  My understanding was that purchasing U.S.
17  origin material of MX to arrive in Taiwan in
18  September -- to arrive in Asia in September.  I don't
19  remember the details.  I may not have nominated the port
20  because I was reluctant to -- I was reluctant to
21  disclose who my buyer was.
22      Q.  Let me show you what's previously been marked
23  as Exhibit 31.  And this is a -- an e-mail exchange
24  between you and a gentleman by the name of Eduardo
25  Anaya.  Correct?

405

1       A.  That's right.
2       Q.  And who is Mr. Anaya?
3       A.  I believe he was the gentleman responsible for
4   entering the terms of the deal into the SAP system.
5       Q.  In the first e-mail down at the bottom of the
6   page from Mr. Anaya to you at 4:03 p.m., he asked you --
7   first of all, he tells you he's going to do the
8   follow-up from the logistics point of view.
9           And then he says, "To complete the order,
10  we just need the port of origin of this product."  Do
11  you see that?
12      A.  Uh-huh.
13      Q.  What was your understanding of what he was
14  asking you?
15      A.  He needed the specific port where the material
16  would load out of.
17      Q.  Do you know why?
18      A.  Because the SAP system requires it.
19      Q.  Okay.  And when you say "specific port," you
20  mean actually where the product would be picked up?
21      A.  That's right.
22      Q.  You responded the next day to Mr. Anaya's
23  e-mail and said, "Re: Origin.  We won't know until we
24  declare discharge port.  Most likely USG."  Do you see
25  that?

406

1       A.  That's right.
2       Q.  Okay.  And what is it that you were saying to
3   Mr. Anaya at that time?
4       A.  That I didn't know the port that the material
5   was going to load out of.
6       Q.  Was this a comment on the origin of the
7   material?
8       A.  Yeah.  I -- what I said was most likely a port
9   in the U.S. Gulf.  That's correct.
10      Q.  Had Tricon provided to you any information
11  about the port where this product would be loaded as of
12  July 25th, 2008?
13      A.  No, I don't believe so.
14      Q.  And when you responded to Mr. Anaya's
15  question -- I just want to be clear on this.  What --
16  what question were you responding to?
17      A.  The question I was responding to was, "We need
18  the port of origin of this product," and I didn't know.
19      Q.  What was your understanding as of July 25th
20  about the origin of the product?
21      A.  My understanding of the origin, it was from
22  the United States and that it could be picked up at any
23  port at the choice of Tricon in the United States.
24      Q.  I don't want to -- I don't want to pry into
25  your personal details, Dr. Wilson, but as I understand

407

1   it in the summer of 2008, in addition to your work
2   responsibilities, you were also dealing with some family
3   medical issues.  Is that correct?
4       A.  Several family issues, yes.
5       Q.  Do you recall during this period of time
6   between the 22nd of July and the end of July that you
7   were, in fact, dealing with some of those medical --
8       A.  Yes, I was actually.
9       Q.  Okay.
10      A.  I may have actually let one of the secretaries
11  know that I wasn't very available.
12      Q.  And how did that impact your day-to-day work
13  routine?
14      A.  I think I unfortunately became completely
15  unplugged from the day-to-day operations of my -- of my
16  job.
17      Q.  And that was during this period of time in
18  late July?
19      A.  That's right.
20      Q.  If you look at the e-mail from Vuk Rajevac to
21  Laurentiu down at the bottom of the third page, in
22  Item 3, Paragraph No. 3 there, Mr. Rajevac makes the
23  comment, "As far as the shipment details, we sold on a
24  CFR basis with arrival windows.  So once you declare the
25  discharge port by August 8th, we will be able to decide

25  (Pages 404 to 407)

408

1    whether to give you a deep sea cargo, which at that
2    point will mostly already be on the water, or on Asian
3    origin cargo." Do you see that?
4        A.   Yes.
5        Q.   What does that mean to you, that Tricon might
6    provide a deep sea or Asian origin cargo?
7        A.   That they were not going to necessarily
8    deliver the U.S. origin material that I required in
9    order to execute the sale that I was able to sell.
10       Q.   And receiving this e-mail from Mr. Pascu, is
11   that when you first learned that Tricon was claiming
12   that it required -- that it was not required to sell
13   Vinmar U.S. origin MX?
14       A.   I don't remember the exact moment of my
15   discovery, no.
16       Q.   Was it around July 31st?
17       A.   I believe it was in this timeframe, yeah.
18       Q.   What did you mean when you said, "We cannot
19   accept open origin for this material.  It must be from
20   the USA"?
21       A.   I meant that the material had to originate in
22   the United States --
23       Q.   And --
24       A.   -- for us to accept the deal.  That's my
25   understanding of the deal.

409

1        Q.   Why did you go back to Mr. Leyman on the 31st
2    and tell him that there was an issue with Tricon?
3        A.   I don't remember my thinking at the time.  I
4    can only infer what I would do if I had to do it today,
5    which would be to go bring the issue up to the broker
6    who made the mistake.
7        Q.   Okay.  Do you remember that in the days
8    following July 22nd, 2008, that the price for MX fell
9    fairly considerably?
10       A.   I do remember that.  It was actually a big
11   surprise to me.
12       Q.   Why was that?
13       A.   Because the U.S. was tight.
14       Q.   Let me I guess ask from the -- in the first
15   perspective, were the terms that you mentioned in this
16   e-mail to Mr. Leyman the terms that you had originally
17   expressed to him on July 22nd, 2008?
18       A.   That's right.
19       Q.   Why is it that Vinmar was still willing to buy
20   U.S. origin MX at 1310 a metric ton on August the 6th,
21   2008?
22       A.   Well, I don't know that it was Vinmar.  It was
23   Rick Wilson.
24       Q.   Okay.
25       A.   And the way I saw this was I knew I was on the

410

1    losing side of a trade, but I thought I was very clear
2    what the terms were and that I recognized that while I
3    would suffer the consequence in terms of my compensation
4    and my relationship with the owners of Vinmar, I decided
5    that I was better off in the long run sticking to what I
6    originally thought were the terms of this agreement,
7    taking a loss, in the interest of preserving my
8    relationship and my reputation.
9        Q.   Did Tricon ever accept the terms that you put
10   forward --
11       A.   No.
12       Q.   -- on Exhibit 9?
13       A.   I don't believe they did.
14       Q.   And do you agree that there was no origin
15   guarantee on the MX?
16       A.   No.
17       Q.   Now, there are two alternatives that are
18   presented in this e-mail by Mr. Lockwood to you.  The
19   first one is U.S. origin at 843 spec.  Is that a
20   different spec than 5211?
21       A.   It is a different spec, yes.
22       Q.   Okay.  And then there is the second
23   alternative, which is U.S. origin, but it wouldn't
24   arrive until October 15th, 2008.  Were either one of
25   these alternatives acceptable to you?

411

1        A.   No.
2        Q.   Why not?
3        A.   Because the only -- the only sales I knew I
4    could actually make were in September.  And, number one,
5    in terms of the timing of the second -- the 843, also, I
6    didn't -- I wasn't aware of any customers willing to
7    accept that specification.  I believe it's a lesser
8    specification, less stringent quality.
9        Q.   Is Exhibit 10 in response to Mr. Lockwood's
10   e-mail which was Exhibit 18?
11       A.   I don't remember specifically the e-mail, but
12   the -- but it would appear that's the case, yes.
13       Q.   Let me show you Exhibit 11 and ask if that is
14   an e-mail that you sent to Mr. Leyman on August the 8th,
15   2008.
16       A.   I don't remember sending e-mails from two
17   years ago, but it would appear that this was an e-mail
18   from me.
19       Q.   Do you believe --
20       A.   Certainly this is in the spirit of my
21   understanding of what would have happened in the course
22   of this trade.  Yes.  As soon as there was an issue, you
23   will let all parties know.  You would have been clear
24   about your rejection to the offer.
25       Q.   Okay.  Is it your understanding that Tricon

26 (Pages 408 to 411)

ARBITRATION HEARING - SEPTEMBER 21, 2010

412

1    never agreed to meet Vinmar's terms for this post sale?
2        A.  That's my understanding.  Tricon never agreed
3    to the terms that I thought were in place.
4        Q.  After you left Vinmar's employment, did you
5    receive a call from Brad Lockwood at Tricon?
6        A.  I did.
7        Q.  What did Mr. Lockwood say to you?
8        A.  He called me and questioned whether there was
9    an issue about this trade.  And he asked me about the
10   nature of my employment with Vinmar.  He asserted that
11   it's a very difficult place to work.  He said that it
12   would be very beneficial for him if he could -- if I
13   could side on the side of Tricon, it would be my
14   opportunity to get back at Vinmar.
15       Q.  Why would it be beneficial to him; did he tell
16   you?
17       A.  He said because his bonus is based on it and
18   he has a family to support.
19       Q.  And what did you say to Mr. Lockwood?
20       A.  I think my response to him was that I
21   agreed -- I agreed that the reality is Vinmar is a very
22   difficult place to work, but I actually thought it was a
23   go ahead experience for me, from a professional
24   perspective, and I couldn't help him.
25       Q.  Did you explain to Mr. Lockwood in that

413

1    conversation that it was your view that the deal
2    required U.S. origin MX?
3        A.  I believe so, yes.
4               EXAMINATION
5    BY MR. DIAZ-ARRASTIA:
6        Q.  My name is a George Diaz-Arrastia.  I am the
7    Laurentiu that represents Tricon in this matter.  Have
8    you and I ever met before?
9        A.  I don't believe so, no.
10       Q.  Have we ever spoken on the telephone?
11       A.  No.
12       Q.  Okay.  Have you ever spoken on the telephone
13   with anybody from my office?
14       A.  Yes.
15       Q.  Do you remember who you spoke with on the
16   telephone?
17       A.  It was a woman.
18       Q.  Do you remember what you-all talked about?
19       A.  She called me and threatened to subpoena me at
20   her convenience.  Yes.
21       Q.  Okay.  Was there any discussion about the
22   facts of this case?
23       A.  I believe I told her that I did not believe
24   there was a deal to purchase non-U.S. origin MX.
25       Q.  Did you meet Mr. Lee before this morning?

414

1        A.  Yes.
2        Q.  Okay.  When did you meet Mr. Lee?
3        A.  Yesterday.
4        Q.  Okay.  And about what time yesterday?
5        A.  1:00 p.m.
6        Q.  Okay.  Did you and he talk about what was
7    going to happen during the deposition?
8        A.  What we did was we went through the documents
9    and he familiarized me with them.
10       Q.  Okay.  And how long did that meeting last?
11       A.  Till roughly 3:30, 4:00 o'clock.
12       Q.  Okay.  So two and a half to three hours?
13       A.  That's right.
14       Q.  Okay.  Mr. Lee sometime in the past asked you
15   to sign an affidavit in this case, did he not?
16       A.  He did.
17       Q.  And you did not sign the affidavit?
18       A.  That's correct.
19       Q.  Why did you not sign the affidavit?
20       A.  My wife reminded me that she didn't think that
21   Vinmar could be trusted and that I shouldn't sign any
22   document that they presented me without first seeking
23   legal counsel and that we didn't want to spend the money
24   on legal counsel so we ignored it.
25       Q.  Okay.  Mr. Wilson, when you -- Dr. Wilson,

415

1    when you bought MX from Tricon in this transaction
2    that's the subject of this matter, was there a specific
3    buyer that you were going to sell that MX to?
4        A.  Yes.
5        Q.  Okay.  And what was that buyer?
6        A.  Formosa.
7        Q.  Okay.  And Formosa is the name of a company?
8        A.  That's right.
9        Q.  Okay.  And what's the full name of that
10   company?
11       A.  I don't remember.
12       Q.  Okay.  Dr. Wilson, if you would take a look at
13   Exhibit No. 40.  If you would look at the second page of
14   Exhibit 40, sir.
15       A.  Okay.
16       Q.  And it is an e-mail between you and Jason
17   Luoh?
18       A.  That's right.
19       Q.  You have to say -- he is the -- Vinmar's agent
20   in Asia?
21       A.  That's right.
22       Q.  Okay.  And is the firm offer for 1325 CFR
23   Taiwan or Korea, is that referring to the sale that you
24   had in mind when you bought the Tricon MX?
25       A.  Well, apparently I never bought this, but that

27  (Pages 412 to 415)

ARBITRATION HEARING - SEPTEMBER 21, 2010

416

1    was the sale I was trying to make, yes.
2        Q.   Okay.  And if you will look at the -- and
3    given the price was 1325 and you were paying 1310 to
4    Tricon if this sale had been made, you would have turned
5    a profit on the deal?
6        A.   That's right.
7        Q.   Okay.  And if you will look at the first page
8    of Exhibit 40.
9        A.   Uh-huh.
10       Q.   And at the bottom of the page, Mr. Luoh is
11   telling you, "We can't join -- blank -- tender."  It was
12   redacted.  "We didn't present our firm offer in time."
13   So you lost that sale?
14       A.   Yes.
15       Q.   That is because you didn't get your firm offer
16   in on time?
17       A.   That's right.  Jason was not able to get into
18   the offices of Formosa in time, that's correct.
19       Q.   Was this an -- if you'll look at the very top
20   of Exhibit 40, sir, Mr. Luoh is again telling you in
21   this case what the winning bid was.  Correct?
22       A.   That's correct.
23       Q.   It was 1305?
24       A.   That's correct.
25       Q.   And that is less than the price that Tricon

417

1    was going to sell you?
2        A.   That's right.
3        Q.   And you learned that you were not going to
4    make the 13.5 sale to Formosa on July 23rd at about
5    11:48 a.m.  Is that correct?
6        A.   Yep.
7        Q.   That's -- sir, did you already have your job
8    offer from Cobalt Technologies when you left Vinmar?
9        A.   No.
10       Q.   When did you get the job offer from Cobalt?
11       A.   It was very close to the time that I started.
12       Q.   And when did you start?
13       A.   The very end of October.
14       Q.   And you left Vinmar October the 3rd?
15       A.   I believe that was the date, yes.
16       Q.   Did you spend maybe about three weeks where
17   you didn't have a job lined up?
18       A.   That's right.
19       Q.   You had done deals using Ed Leyman as a broker
20   prior to the deal that's the subject matter of this
21   case.  Correct?
22       A.   Yes.
23       Q.   Okay.  About how many?
24       A.   Small number.  Less than five.
25       Q.   Okay.  Well, I think you did say that he was a

418

1    mutual broker.  Didn't you say that, sir?
2        A.   I'd say he was a broker doing a deal between
3    two counterparties.
4        Q.   Okay.  And the counterparties did not speak to
5    each other; they communicated only through the broker.
6    Correct, sir?
7        A.   That was the nature of the relationship, yes.
8        Q.   And that meant that Mr. Leyman represented
9    both sides to the transaction.  Is that your
10   understanding.
11       A.   That's my understanding.
12       Q.   If you can look at Exhibit No. 2, Mr. Wilson,
13   do you remember getting this document on July 22nd from
14   MOAB Oil?
15       A.   I remember seeing it before.  I don't remember
16   specifically getting it on that date.
17       Q.   Okay.  Ed Leyman worked for MOAB Oil.
18   Correct?
19       A.   That's right.
20       Q.   Now, the purpose of Exhibit No. 2 is to
21   confirm the transaction that Mr. Leyman had brokered
22   between Tricon and Vinmar.  Correct?
23       A.   Yes.
24       Q.   And you saw Exhibit No. 2.  Correct?
25       A.   Yes.

419

1        Q.   Did you see it on July 22nd?
2        A.   I do not remember the exact date that I saw
3    it.
4        Q.   Okay.  Did you find Mr. Leyman to be a
5    competent broker, sir, when you used him?
6        A.   Yes.
7        Q.   If you would take a look at the second page of
8    Exhibit No. 2, sir, near the -- near the bottom, right
9    above where it says Page 1 of 2 on the right hand --
10   lower right-hand corner.
11            It says, "If there is anything outlined
12   contrary to your understanding of our agreement, please
13   notify us immediately."
14       A.   I see that, yes.
15       Q.   Did you see that back on July 22nd?
16       A.   This is -- I don't remember seeing it.
17       Q.   Had you seen that in the prior confirms that
18   Mr. Leyman had sent you in other deals?
19       A.   I don't remember seeing it, no.
20       Q.   Now, Mr. Leyman, after receiving this initial
21   confirm, you requested a change on the payment terms for
22   this transaction.  Do you recall that, sir?
23       A.   Yes.
24       Q.   The payment terms on Exhibit 2 refer to
25   30 days.  Correct, sir?

28  (Pages 416 to 419)

ARBITRATION HEARING - SEPTEMBER 21, 2010

420

1   A.  That's what's represented.  That's correct.
2   Q.  And you had -- you had required to change
3   that to an on site letter of credit.  Do you remember
4   that?
5   A.  I believe originally I was seeking 45-day
6   terms.  And then once there was a CFR deal, there --
7   there was some changes.  I don't remember the details.
8   Q.  Okay.  And was it an on site letter of credit?
9   A.  I believe one of the documents you provided me
10  indicated that it was.  That was a request, but I don't
11  remember making that request.
12  Q.  Okay.  Let me show you what's been previously
13  marked as Exhibit No. 6.  And these appear to be instant
14  messages between yourself and Ed Leyman --
15  A.  That's correct.
16  Q.  -- on July 22, 2008?
17  A.  That's right.
18  Q.  Okay.  And if you look towards the bottom of
19  the page at 4:09:37 p.m.  Do you see that, sir?
20  A.  That's right.
21  Q.  Where it says Rick -- I guess that's you --
22  asking Mr. Leyman, "Did you get the LC site terms?"
23  A.  That's correct.
24  Q.  And then Mr. Leyman says, "Not yet.  We'll
25  recheck."  And then at 4:18:07 he says that "Tricon okay

421

1   with LC site.  Will send out amendment."  Did I read
2   that correctly, sir?
3   A.  That's right.
4   Q.  I'll show you what has been previously marked
5   as Exhibit 3, two of these.  And that is another MOAB
6   confirm.  Correct?
7   A.  That's correct.
8   Q.  It's also dated July 22, 2008?
9   A.  That's correct.
10  Q.  And if you will take a look at the second
11  page, the payment terms have been changed to payment
12  outside by document or letter of credit?
13  A.  That's correct.
14  Q.  Did you receive Exhibit No. 3, sir?
15  A.  I don't remember receiving it, but the e-mail
16  evidence would suggest that's the case.
17  Q.  Now, if we look at the same place near the
18  bottom of the second page of Exhibit 3, it also contains
19  the statement, "If there is anything outlined contrary
20  to your understanding of our agreement, please notify us
21  immediately by facsimile."
22  A.  I see that.  Yes.
23  Q.  And, Mr. Wilson, do you recall that there was
24  also an issue about a mistake made on the price term in
25  these first two confirms?

422

1   A.  I do remember that, yes.
2   Q.  Okay.  Had you noticed that mistake in the
3   price term -- in the price term?
4   A.  At some point -- at some point in the -- at
5   some point in this I did recognize there was an error in
6   the price, yes.
7   Q.  Okay.  And did you notify Mr. Leyman about it?
8   A.  I don't remember that.
9   Q.  I'll show you now what has previously been
10  marked as Exhibit 4.  If you'll look in the second page
11  of Exhibit 4, the price term has been changed from 1110
12  per metric ton to 1310 per metric ton.  Is that right,
13  sir?
14  A.  Yes.
15  Q.  And 1310 was the correct price.  Isn't that
16  so?  That was agreed to?
17  A.  I believe so.
18  Q.  And, again, on Exhibit 4, near the bottom in
19  the same place where we saw it in the other two
20  exhibits, it also contains the statement, "If there is
21  anything outlined contrary to your understanding of our
22  agreement, please notify us immediately by facsimile."
23  A.  That's right.
24  Q.  Nowhere in Exhibits 2, 3 or 4 is there a term
25  that says "U.S. origin must be guaranteed for this MX."

423

1   Isn't that right?
2   A.  The -- all these confirms are silent on the
3   issue of origin.
4   Q.  They don't say anything about it?
5   A.  They don't say anything.
6   Q.  Okay.  Did you ever call Mr. Leyman to
7   say, "Hey, this doesn't say that it has to be U.S.
8   origin"?
9   A.  At some point I did call Mr. Leyman and tell
10  him that.
11  Q.  Okay.  But you did not do it on July 22nd?
12      MR. BERGESON:  Objection.
13  Q.  (BY MR. DIAZ-ARRASTIA)  You didn't do that on
14  July 22nd, did you, sir?
15  A.  No.
16  Q.  And you didn't do it on July 23rd?
17  A.  No.
18  Q.  You didn't do it until July 31st.  Right, sir?
19  A.  This was a delay.  That's right.
20  Q.  And on July 22nd, you told Mr. Leyman you
21  wanted the payment terms changed?
22  A.  That's right.
23  Q.  You did do that.  Correct, sir?
24  A.  That's right.
25  Q.  And there was also a change in the price term,

29  (Pages 420 to 423)

ARBITRATION HEARING - SEPTEMBER 21, 2010

424

1    an amendment.  Correct, sir?
2        A.  That's correct.
3        Q.  During all these iterations of Exhibits 2, 3
4    and 4, you never said, "Hey, U.S. origin is not part of
5    the terms of this deal that's written out"?
6        A.  I never objected to a term that wasn't
7    included on these confirms.  It was -- in retrospect, I
8    should have, but it was MOAB's mistake, not mine.
9        Q.  Is it your belief that on July 22nd, 2008, you
10   did buy MX from Tricon, you meaning in your capacity as
11   the representative of Vinmar?
12       I'm just asking --
13       MR. BERGESON:  I understand.
14       Q.  (BY MR. DIAZ-ARRASTIA) -- what your
15   understanding is.
16       A.  I do not believe there was ever a deal with
17   Tricon.  We never agreed on the terms.  I required U.S.
18   origin.  Tricon didn't want U.S. origin.  There was
19   never an agreement.
20       Q.  If you could take a look at Exhibit 39 from
21   this stack, sir.  And you talked about this with Mr. Lee
22   about the middle of the page your writing to
23   Mr. Nicholas Smith, you say, "I bought CFR so I don't
24   need to arrange shipping."
25       A.  That's right.

425

1        Q.  When you say you bought CFR, you're referring
2    to the Tricon transaction.  Correct?
3        A.  That's right.
4        Q.  So you're telling Mr. Smith that you bought MX
5    from Tricon.  Correct, sir?
6        A.  That's what I told them, yes.
7        Q.  I'm going to show you now what's been
8    previously marked as Exhibit 29.  Do you recognize that
9    document, sir?
10       A.  No.
11       Q.  Okay.  Well, it appears to be an e-mail that
12   you're sending to Laurentiu Pascu.
13       A.  That's right.
14       Q.  And you've already talked about Mr. Pascu.  He
15   worked with you at Vinmar.  Correct?
16       A.  That's correct.
17       Q.  Okay.  And it is dated on July 24th, 2008, at
18   10:15.  Correct?
19       A.  That's correct.
20       Q.  And you tell Mr. Pascu, "Laurentiu, I bought
21   MX from Tricon.  Please make -- please contact them and
22   make the necessary arrangements.  Rick."  Did I read
23   that correctly, sir?
24       A.  That's correct.
25       Q.  And you're attaching to Mr. Pascu a letter

426

1    that you received from Mr. Lockwood that's dated
2    July 22nd.  Correct, sir?
3        A.  I don't remember if this was attached.
4        Q.  Do you remember receiving the letter from
5    Mr. Lockwood?
6        A.  I don't remember, no.
7        Q.  I think Mr. Pascu's job at Vinmar was a supply
8    chain specialist.  Is that correct?
9        A.  It's one way you could describe his work, yes.
10       Q.  What is the job of a supply chain specialist?
11       A.  He is -- his role is to make sure that the
12   terms of the agreement -- that the terms of the
13   agreement are consistent with what we've agreed to.
14       Q.  Okay.  Once a trader makes a deal, is it the
15   job of the supply chain specialist to complete the
16   transaction?
17       A.  Yes.
18       Q.  And this frees the trader to do more deals.
19   Correct?
20       A.  That's right.
21       Q.  Okay.  The trader's job is to make deals and
22   the supply chain specialist, or whatever you want to
23   call that person, their job is to complete the
24   transaction.  Is that correct, sir?
25       A.  Well, that's a -- there's many elements of

427

1    completing a transaction.  Clearly they're not engaged
2    in shipping or chartering but all the financial and
3    contractual agreements, you know, it's their
4    responsibility to execute them.
5        Q.  They complete the financial and contractual
6    agreements?
7        A.  That's right.  Where they enter them into the
8    system, right.
9        Q.  Let me now show you what's been previously
10   marked as Exhibit 15, and if I could call your attention
11   to the bottom of the page.  It's an e-mail from Brad
12   Lockwood to you dated July 23, 2008, at 10:57 in the
13   morning.
14       A.  Uh-huh.
15       Q.  And Mr. Brad Lockwood says, "Rick, I am
16   pleased to attach a copy of our sales contract to you
17   for the mixed xylenes."
18       A.  That's right.
19       Q.  And if you would look at the second page of
20   Exhibit No. 15, it appears to be the same letter that
21   was in Exhibit 29.  Is that correct?
22       A.  I'm not sure.  Okay.  They appear to be the
23   same.
24       Q.  Does this refresh your recollection about
25   receiving Mr. Lockwood's July 22, 2008, letter?

30  (Pages 424 to 427)

ARBITRATION HEARING - SEPTEMBER 21, 2010

428

1     A.  I remember seeing this contract before.
2     Q.  Does this refresh your recollection that
3  Mr. Lockwood sent it to you on July 23rd, 2008?
4     A.  That's the time stamp on this, that's correct.
5     Q.  And Exhibit 29 indicates that you forwarded it
6  to Mr. Pascu on July 24th at 10:15 a.m.?
7     A.  Again, I don't remember forwarding it, but I
8  believe its accurate.
9     Q.  Sir, if you would, take a look at Exhibit 15,
10  which is the last one that we were talking about.
11     A.  Okay.
12     Q.  And the second page, I think it's the one you
13  have in front of you.
14     A.  Yeah.
15     Q.  And if you would then pull out Exhibit 4 and
16  look at the second page of that.
17     A.  Okay.
18     Q.  And I would like to compare the two on some of
19  the essential terms of the deal.  First, you see where
20  it says "Product" on Exhibit 15?
21     A.  Yep.
22     Q.  And it says "Mixed xylenes."  Correct?
23     A.  That's correct.
24     Q.  And it says -- and that is the same as what it
25  says on Exhibit 4.  Correct?

429

1     A.  That's correct.
2     Q.  Let's look where it says "Quantity" on
3  Exhibit 15.  And it says, "5,000 metric tons plus or
4  minus 5 percent."  Correct, sir?
5     A.  That's right.
6     Q.  And quantity on Exhibit 4 also says, "5,000
7  metric tons plus or minus 5 percent."  So they're the
8  same?
9     A.  Yes.
10     Q.  Let's go to the next.  Quality is the next one
11  on Exhibit 15.  And it says, "ASTM D-5211 with BL max
12  20."  Correct?
13     A.  That's correct.
14     Q.  And over on Exhibit 4, you have to skip a
15  line.  There's also a quality line and it says, "Mixed
16  xylenes meeting ASTM D-5211, latest revisions with 52
17  maximum bromide index," which is the same thing.
18  Correct?
19     A.  That's right.
20     Q.  Price on Exhibit 15, it says, "USD 1310.00 per
21  metric ton."  Correct, sir?
22     A.  That's right.
23     Q.  And on Exhibit 4 price, that's the same,
24  "USD 1310 per metric ton, CFR basis."  Correct, sir?
25     A.  I don't see CFR basis.  Oh, yeah, I do.  Yes.

430

1     Q.  It's the same?
2     A.  Yes.
3     Q.  On delivery in Exhibit 15, there is a line
4  that says "Incoterm."  That says, "CFR Ulsan/Taiwan."
5  You understand that to be referring to the delivery.
6  Correct?
7     A.  That's correct.
8     Q.  And the delivery on Exhibit 4 says, "CFR basis
9  Taiwan or Ulsan Korea."  Correct, sir?
10     A.  That's right.
11     Q.  In -- in Exhibit 15 there's a line that says,
12  "Ship period, September 1, 2008, to September 15, 2008,"
13  correct, sir, on Exhibit 15?
14     A.  Yes.
15     Q.  Okay.  And if you look under the delivery
16  terms in Exhibit 4, second line -- starting from the end
17  of the first line, second line, it says, "At buyer's
18  option via barge/vessel provided seller 9-1-2008 to
19  9-15-2008, seller's option."  Correct?
20     A.  That's correct.
21     Q.  They're the same again?
22     A.  Uh-huh.
23     Q.  So all of these terms that we have talked --
24  and -- excuse me.
25          Finally, if you'll look at the payment

431

1  term and credit terms, they both talk about a payment by
2  an on site letter of credit.  Correct, sir?
3     A.  That's correct.
4     Q.  So those -- all of these terms that we have
5  discussed are the same in Exhibit 15 and in Exhibit 4?
6     A.  That's correct.
7     Q.  Okay.  And Exhibit 15, Mr. Lockwood's letter,
8  again, does not say anything about the origin of the
9  material?
10     A.  It does not.
11     Q.  Although Exhibit 15 contains terms that are
12  not included in Exhibit 4, it doesn't contain any terms
13  that are different from the ones on Exhibit 4.  Is that
14  correct, sir?
15          Is that right?
16     A.  There is nothing on the confirm that is not
17  included in the contract, that's correct.
18     Q.  And Exhibit 15 has more terms than the
19  confirm?
20     A.  That's right.
21     Q.  But nothing in the -- Exhibit 15 contradicts
22  something that's in the confirm.  Isn't that right, sir?
23     A.  Say that again.
24     Q.  Nothing that -- nothing that is in Exhibit 15
25  contradicts a term that's stated on Exhibit 4?

31  (Pages 428 to 431)

ARBITRATION HEARING - SEPTEMBER 21, 2010

432

1    A.  No, except that there's additional terms.
2    Q.  Okay.  If you would take a look at Exhibit 31,
3    sir.  We looked at that earlier.
4        (Playback of videotaped was stopped at
5    this time.)
6        MR. LEE:  Stop there.
7        JUDGE BENTON:  Why don't you stop?  Let's
8    go ahead and stop it and we'll go to lunch.
9        MR. DIAZ-ARRASTIA:  I think this is a good
10   place to break.
11       JUDGE BENTON:  We'll break for lunch until
12   about 1:00 o'clock.  We're at lunch.  We're off the
13   record.
14       (Recess from 11:56 a.m. to 1:03 p.m.)
15       JUDGE BENTON:  We're back on the record.
16   And we'll -- let's see.  We have about an hour -- about
17   45 minutes left.  Right?
18       MR. RUNIONS:  That's what I've got, about
19   45 minutes.
20       Let's pick up with the deposition
21   testimony.
22       (Playback of videotape was started again
23   at this time.)
24   Q.  (BY MR. DIAZ-ARRASTIA)  If you would take a
25   look at Exhibit 31, sir.  We looked at that earlier.

433

1    It's your e-mail chain with Mr. Anaya.
2    A.  31 did you say?
3    Q.  31, yes, sir.
4    A.  All right.
5    Q.  And on July 24th, Mr. Anaya tells you, "To
6    complete the order, we just need the port of origin for
7    this product."
8        Do you remember talking about that with
9    Mr. Lee?
10   A.  That's right.
11   Q.  And your response was, "Re: Origin, we won't
12   know until we declare discharge port.  Most likely USG,"
13   meaning U.S. Gulf?
14   A.  That's correct.
15   Q.  Okay.  And you understand that most likely
16   doesn't mean a guarantee?
17   A.  I didn't need a guarantee from the U.S. Gulf.
18   I needed a guarantee from the USA.
19   Q.  Sir, my question to you was, in your mind, if
20   something says, "Something is most likely of a certain
21   origin," that is different from saying, "It's guaranteed
22   to be of that origin."  Would you agree me about that?
23   A.  That's correct.
24   Q.  And Mr. Anaya responds to you saying, "Okay.
25   That is what we wrote on the PO," meaning purchase

434

1    order.  Correct, sir?
2    A.  That's right.
3    Q.  And then you respond to him a few minutes
4    later saying, "There is also a .5 per -- I guess that's
5    MT -- broker charge."  Right, sir?
6    A.  That's correct.
7    Q.  And you say, "And I may not sell it in
8    Taiwan"?
9    A.  That's right.
10   Q.  And that's because you already knew at the
11   sale that you had in your mind you had lost.  Correct,
12   sir?
13   A.  That's right.
14   Q.  And then you say in your last line,
15   "Otherwise, it's fine."  Do you see that, sir?
16   A.  Yeah.
17   Q.  Okay.  And -- well, what I'm trying to
18   understand, sir, is when you say, "Otherwise, it's
19   fine," are you saying that the purchase order that
20   Mr. Anaya prepared is fine other than the --
21   A.  I don't remember the details of what I was
22   thinking at the time.  I'm sorry.
23   Q.  Before you wrote the e-mail at the top of
24   Exhibit 31, had you seen the purchase order that
25   Mr. Anaya had prepared?

435

1    A.  I don't remember seeing it.
2    Q.  Okay.  Mr. Wilson, I am showing you what's
3    been previously marked as Exhibit 34.  Is that the
4    purchase order that was prepared for the Tricon deal at
5    Vinmar?
6    A.  I don't remember it, no.
7    Q.  You don't know if you had seen that before you
8    replied to Mr. Anaya, "Otherwise, it's fine"?
9    A.  I just don't remember reviewing it.  I'm
10   sorry.
11   Q.  Is this the standard purchase order form that
12   Vinmar used around July 24th, 2008?
13   A.  I can't comment on if every line here is
14   consistent, which usually is.
15   Q.  I'm sorry.  I didn't hear the last part of
16   your answer.
17   A.  I'm sorry that you couldn't hear me.  My point
18   was that I can't comment and I can't say without doubt
19   that every -- every term that is typically on a purchase
20   order from Vinmar is on this specific example.
21   Q.  Okay.  I understand.  It was not your job as a
22   trader to prepare purchase orders?
23   A.  That's right.
24   Q.  That was either Mr. Anaya or Mr. Pascu's job?
25   A.  That's right.

32  (Pages 432 to 435)

ARBITRATION HEARING - SEPTEMBER 21, 2010

436

1  Q. They took care of that part of the
2  transaction?
3  A. That's right.
4  Q. If you would take a look at the second page of
5  Exhibit 34, sir. That's the one we were just looking at
6  right there. You see near the top where there's a place
7  for origin?
8  A. That's right.
9  Q. Okay. And it's left blank?
10  A. That's right.
11  Q. And if you'll look at the bottom of the second
12  page, do you see where it says, "Law and arbitration"?
13  A. Yes, I see that.
14  Q. Now, it says, "Law of the state of Texas, USA,
15  to apply. All disputes arising in connection with the
16  present contract shall be finally settled under the
17  rules of conciliation and arbitration of the American
18  Arbitration Association by one or more arbitrators
19  appointed in accordance with the said rules." Did I
20  read that correctly, sir?
21  A. You did read that correctly.
22  Q. Okay. Is that law and arbitration provision
23  one that was contained in the purchase orders that
24  Vinmar was using on or around July 2008?
25  A. I don't remember.

437

1  Q. Again, that's because that's not your job,
2  it's Mr. Pascu's and Mr. Anaya's job?
3  A. I just don't remember.
4  Q. But dealing with that part of the transaction
5  was not your job as the trader; it was the job of
6  Mr. Anaya or Mr. Pascu as the specialists?
7  A. I don't remember the detailed roles and
8  responsibility. I'm sorry.
9  Q. Dr. Wilson, let me show you what was
10  previously marked as Exhibit 36. And this is an e-mail
11  from Mr. Pascu to you dated July 29th, 2008?
12  A. Yes, sir. I've read it.
13  Q. Well, that's what it is. It's an e-mail from
14  Mr. Pascu to you dated July 29th, 2008?
15  A. That's correct.
16  Q. And Mr. Pascu says, "Rick, please find my
17  comments on this sales contract." Do you understand
18  that to be a reference to Exhibit 15, the letter from
19  Mr. Lockwood to you? Let me repeat my question.
20  A. Yeah. Could you, please?
21  Q. My question was, is it your understanding,
22  sir, that when Mr. Pascu says, "Please find my comments
23  on this sales contract," Mr. Pascu is referring to
24  Exhibit 15, the letter from Mr. Lockwood to you with the
25  additional terms?

438

1  A. I can't confirm that. May be.
2  Q. And at the bottom of the text of this e-mail,
3  Mr. Pascu says, "If you have a right contact person
4  would be great. I can make contacts and discuss that."
5  Do you see that, sir?
6  A. Yes, I see that.
7  Q. And, Mr. Wilson, Exhibit 36 was July 29th,
8  2008, at 11:54 a.m. Correct?
9  A. That's correct.
10  Q. And the document we have just marked
11  Exhibit 41 is an e-mail from you to Mr. Pascu on
12  July 29th, 2008, at 11:59 a.m., just a few minutes
13  later. Correct?
14  A. That's correct.
15  Q. And essentially you tell him, "Laurentiu, the
16  contact is Vuk Rajevac."
17  A. That's correct.
18  Q. And you gave him his e-mail address and
19  cellphone number. Correct, sir?
20  A. That's what's in the e-mail, yes.
21  Q. Okay. If you would take a look at Exhibit 15,
22  again, sir, the first page of that exhibit. In
23  Mr. Lockwood's e-mail to you at the bottom of that first
24  page, in the second sentence, he tells you, "Please let
25  Vuk know the contact details for your logistics

439

1  colleague." Do you understand that Vuk means Vuk
2  Rajevac?
3  A. Do I understand now? Yes. I don't -- I'm not
4  sure I understand at that time.
5  Q. Well, how did you know to tell Mr. Pascu that
6  the contact person he needed to get ahold of us was Vuk
7  Rajevac?
8  A. I don't remember.
9  Q. All right. Mr. Lockwood had to have told you.
10  Right?
11  A. I don't remember.
12  Q. Let me bring your attention now, sir, to what
13  has been previously been marked as Exhibit 35. And if
14  you'll look at the bottom half of the first page of
15  Exhibit 35, it appears to be an e-mail from Mr. Pascu to
16  Mr. Rajevac dated July 29th, 2008, at 4:08 in the
17  afternoon. Is that correct, sir?
18  A. That's correct.
19  Q. Okay. And Mr. Pascu says, "Please enclose our
20  comments on your sale confirmation. We shall revert
21  soon with our purchase order for your review." Did I
22  read that correctly?
23  A. You did.
24  Q. And the purchase order that he's
25  referring to would be what we saw as Exhibit 34?

33 (Pages 436 to 439)

ARBITRATION HEARING - SEPTEMBER 21, 2010

440

1   A. Maybe.
2   Q. You don't get involved with purchase orders?
3   A. No. I think that -- I don't remember the
4   details of what happened over two years ago.
5   Q. Okay. If you will look over on the third page
6   of Exhibit 35, sir. And this appears to be a copy of
7   Mr. Lockwood's letter like what we have on Exhibit 15
8   except that there's some handwriting on it. Do you see
9   that, sir?
10  A. That's correct.
11  Q. Is that Mr. Raj -- Mr. Pascu's handwriting?
12  A. I don't know.
13  Q. If you would look at the top right-hand
14  corner, there's a number handwritten in there.
15  A. That's correct.
16  Q. Do you see that it's 4529980?
17  A. That's correct.
18  Q. If you will take a look at Exhibit 34, sir.
19  That's the purchase order.
20  A. Okay.
21  Q. There's a purchase order number on Exhibit 34.
22  Correct, sir?
23  A. That's right.
24  Q. And that's also 4529980. Correct, sir?
25  A. 452 -- that's correct.

441

1   Q. Okay. So this handwritten number appears to
2   be a reference to the Vinmar purchase order. Will you
3   agree with that?
4   A. It does.
5   Q. I'm sorry. Did Mr. Pascu discuss with you his
6   comments before he sent them to Mr. Rajevac?
7   A. I don't remember.
8   Q. Well, did you see this document with the
9   handwritten notes --
10  A. On what date?
11  Q. -- before Mr. Pascu forwarded it to
12  Mr. Rajevac?
13  A. I don't remember.
14  Q. Some of the changes that are made in
15  handwriting on Exhibit 34 -- for example, where you see
16  the credit terms, there is something scratched out. Do
17  you see that, sir?
18  A. That's right.
19  Q. And what's scratched out I think is where he
20  says, "Irrevocable and confirmed." He scratched out
21  "and confirmed"?
22  A. I can't even read this but --
23  Q. Let's take a look at Exhibit 15, which is
24  clearer, the second page of Exhibit 15.
25  A. "Irrevocable and confirmed" document, I see

442

1   that's right.
2   Q. So "and confirmed" is scratched out?
3   A. That's right.
4   Q. Take a look at Exhibit 36 again, Mr. Pascu's
5   e-mail to you. And if you will look -- I think it's the
6   second sentence. He says, "Also, we do not have to open
7   a confirmed LC." Do you see where he says that?
8   A. Yes.
9   Q. And that's making a reference to scratching
10  out "and confirmed." Correct?
11  A. It would appear to be the case.
12  Q. Okay. And that's the sort of thing that
13  Mr. Pascu would take care of; that's part of his job?
14  A. Yes.
15  Q. If you will look at the next page on
16  Exhibit 35. It's VIN No. 6, 00006.
17  A. 6. All right. Five, six. Yeah.
18  Q. Okay. Do you see under Demurrage, Mr. Rajevac
19  wants to change the demurrage time bar. Correct?
20  A. Right.
21  Q. Yes, sir?
22  A. That's what it says.
23  Q. And that's also part of what mister -- I said
24  Mr. Rajevac. Mr. Pascu says that he wants to change the
25  demurrage time bar. Correct?

443

1   A. That's apparently the case.
2   Q. And that's also part of Mr. Pascu's job?
3   A. That's correct.
4   Q. Otherwise, would Mr. Pascu have the authority
5   to go forward and complete the transaction as part of
6   his job?
7   A. He can't change the terms, no.
8   Q. But he can negotiate things like not needing a
9   confirmed letter of credit?
10  A. He would have to propose it and -- you know, a
11  demurrage letters of credit are commercial terms. He
12  would normally bring those to my attention.
13  Q. Okay. And do you think he did in this case?
14  A. And I think he did or didn't?
15  Q. Do you think he did in this case?
16  A. I don't remember him doing, it, no.
17  Q. In looking again at Exhibit 35, none of the
18  handwritten notations on Mr. Lockwood's letter say
19  anything about origin of the material. Correct?
20  A. And which page is that? It's exhibit --
21  Q. Exhibit 35.
22  A. 35.
23  Q. We have a part where we have handwritten
24  notations on Mr. Lockwood's July 22nd letter.
25  A. Okay.

34  (Pages 440 to 443)

ARBITRATION HEARING - SEPTEMBER 21, 2010

444

1    Q.  None of those handwritten notations relate to
2  the origin of the material?
3    A.  No.
4    Q.  And, similarly, in the cover e-mail from
5  Mr. Pascu to Mr. Rajevac, there's no mention of origin
6  on the material either?
7    A.  That's correct.  But as a point of
8  clarification, this deal -- they would not have notified
9  the port of origin because they wanted us to nominate a
10  discharge port and time first so you wouldn't have that
11  information on these contracts at this point.
12    Q.  Is it your testimony, sir, that if U.S. origin
13  was an essential term of the deal that you wanted to
14  make, it would not be mentioned in any of the
15  documentation?
16    A.  My point is that if it was open origin it
17  would have been in the contract.  It was not.
18    Q.  Your testimony is that if you make a deal
19  where the origin of the material from the United States
20  is an essential term of what you wanted, it would be a
21  normal thing for you to see no mention of that in any of
22  the paperwork?  Is that your testimony?
23    A.  My testimony is once the origin has been
24  determined, the specific port, not the origin, the
25  specific port, it will on the contract and it will be in

445

1  the purchase order system.
2    Q.  But your testimony is that if you believed
3  origin from the U.S. was essential to what you wanted,
4  it would be a normal thing for you to see no mention of
5  it in any of your paperwork.  Is that what you believe?
6    A.  I believe the communications were silent on
7  origin and I expected that once the exact port has been
8  identified that they would appear on the contract.
9         So in retrospect, you know, it's easy to
10  see that had I gone back in time I didn't catch it, and
11  that was my mistake.  It's actually Tricon's mistake,
12  but I didn't catch it.  And -- but that doesn't change
13  the fact that I never asked for non-U.S. material.  I
14  never gave Ed Leyman the authority to purchase non-U.S.
15  material.
16    Q.  Let's take a look at exhibit -- what's been
17  previously marked as Exhibit 37.  And the bottom is an
18  e-mail from Mr. Rajevac to Mr. Pascu dated July 29th,
19  2008, at 4:43.  Correct?
20    A.  That's right.
21    Q.  And that is, oh, just a little -- just a
22  little over 30 minutes after Mr. Pascu's e-mail to him
23  that was in Exhibit 35.  Correct?
24    A.  Say that again.  I'm sorry.
25    Q.  Exhibit 37 is dated July 29th, 2008, at 4:43.

446

1  That's just a little over 30 minutes after Mr. Pascu's
2  July 29, 2008, 4:08 p.m. e-mail that was in Exhibit 35?
3    A.  It is.
4    Q.  Did you see this e-mail on July 29th?
5    A.  I don't remember exactly.
6    Q.  Is this something that would have been part of
7  Mr. Pascu's job to take care of?
8    A.  I think it would have been Mr. Pascu's
9  responsibility to bring up any issues he saw as a result
10  of this communication --
11    Q.  Okay.
12    A.  -- which I believe he did.
13    Q.  And it says -- on No. 1, Mr. Rajevac tells
14  Mr. Pascu, "Your comments on the contract are well noted
15  and accepted except for demurrage time bar, which is
16  90 days as per industry standard."  Correct, sir?
17    A.  That's what it says.
18    Q.  Let's go back to Exhibit 37.  Near the bottom
19  of that page in Mr. Rajevac's e-mail under Point No. 3
20  on the first page, Mr. Rajevac says, "As far as the
21  shipment details, we sold on CFR basis with arrival
22  window.  So once you declare the discharge port by
23  August 8, we will be able to decide whether to give you
24  a deep sea cargo, which at that point will most likely
25  be in the water, or an Asian origin cargo."  Did I read

447

1  that correctly, sir?
2    A.  That's what I see.
3    Q.  And it is not uncommon to sell cargo that's
4  already in the water.  Correct?
5    A.  It's not uncommon.
6    Q.  And that's what he means by a deep sea cargo?
7    A.  That's right.
8    Q.  But certainly, sir, this is a clear statement
9  on Mr. Rajevac's part that they may -- would not
10  necessarily give you U.S. origin material.  Correct?
11    A.  Yes, it is.
12    Q.  Did Mr. Pascu inform you of this when he got
13  it?
14    A.  At some point I -- it was brought to my
15  attention.  And it appears here that Laurentiu forwarded
16  this to me on July 31st because there was some period of
17  discovery.  I just don't remember the details.
18    Q.  Do you recall telling Mr. Pascu that you had
19  to have U.S. origin before July 29th?
20    A.  Yes.
21    Q.  Mister -- Dr. Wilson, calling your attention
22  to Exhibit 42, that appears to be a series of instant
23  messages between you and Brad Lockwood?
24    A.  Appears to be.
25    Q.  Okay.  And in this set of instant messages,

35 (Pages 444 to 447)

ARBITRATION HEARING - SEPTEMBER 21, 2010

448

1   you're asking Mr. Lockwood whether Tricon would be
2   interested in buying back the MX that Vinmar had bought.
3   Correct?
4       A.   I don't remember if that's what it was about.
5       Q.   Okay.  Well, take a look at the last entry
6   from Rick Wilson at the bottom, which is the next from
7   the last.  It says, "RickWilson@sbcglobal.net,
8   7-31-2008, 9:41:27 a.m."
9           And it said, "Brad, if you want to wipe
10  the slate clean, we can do that.  Otherwise, I have
11  contract obligations.  I supply info."  Did I read that
12  correctly, sir?
13      A.   Yes.
14      Q.   Okay.  So when you say, "wipe the slate
15  clean," that means buy back what you sold me.  Correct?
16      A.   I don't know that that's what this was in
17  reference to --
18      Q.   What --
19      A.   -- in essence so --
20      Q.   What does "wipe the slate clean" mean when you
21  said that?
22      A.   I don't remember.
23      Q.   Now, you state that you have other contractual
24  obligations that you can use the material to satisfy.
25  Correct?

449

1       A.   That's what this says.
2       Q.   The communication between Mr. Rajevac and
3   Mr. Pascu is July 29, isn't it, sir?
4       A.   That's correct.
5       Q.   Okay.  Two days later, you're telling
6   Mr. Lockwood that you would buy the material back and
7   that you have other contracts you can fulfill?
8       A.   That's what the IM suggests, yes.
9       Q.   I'll show you now what's previously marked as
10  Exhibit 17.  And near the bottom of it is an e-mail
11  communication from you to Mr. Rajevac.  Correct?
12      A.   That's correct.
13      Q.   Okay.  And that is where you say, "Vuk, we
14  cannot accept open origin from this -- for this
15  material.  It must be from the USA"?
16      A.   That's right.
17      Q.   Is this the first time that you made that
18  communication to Mr. Rajevac?  Let me put it this way.
19  Is this the first --
20      A.   To Mr. Rajevac I believe this is the first
21  time I personally communicated that to him.
22      Q.   Okay.  And this is also the first time that
23  you had communicated to anybody at Tricon -- you
24  yourself had communicated to anybody at Tricon that the
25  material had to be from the USA?

450

1       A.   I don't remember.
2       Q.   Do you remember telling Mr. Lockwood before
3   July 31st at 1:43 p.m. that the material had to be from
4   the USA?
5       A.   I don't remember.
6       Q.   And that is at 1:43 p.m., several hours after
7   you had offered to buy the material back and told
8   Mr. Lockwood that you had other obligations you could
9   fulfill.  Correct?
10      A.   I don't know if this IM is in relation --
11  necessarily in relation to this refusal.
12      Q.   I'll show you now, Dr. Wilson, what's
13  previously marked as Exhibit No. 12.  If you would take
14  a look a few pages in to the page marked TRI 00045, near
15  the bottom of the page.
16          It appears to be communications between
17  Mr. Leyman and Mr. Lockwood by instant message.
18      A.   Yes.
19      Q.   If you will look at the first line on the day
20  7-23 of 9:28 a.m. 53.  It's a communication by
21  Mr. Leyman.  He says, "No MX or NPX buyers yet.  Asia
22  got beaten up last night."
23          Do you recall that the price for MX and
24  NPX in Asia started to fall in the night of July 22nd?
25      A.   I know it is a historical fact.  I don't

451

1   remember if I recognized it at the time.
2       Q.   But it did happen?
3       A.   Yes.
4       Q.   And that's what Mr. Leyman means when he says,
5   "Asia got beaten up last night"?  Well, is that what you
6   understand it says?
7       A.   "Asia got beaten up."  That's a term that
8   would suggest that prices went down but it's not -- it's
9   not specific in terms of what prices.
10      Q.   Okay.  I think you testified earlier that was
11  a surprise to you; you actually expected the price of MX
12  in Asia to go up?
13      A.   That's right.
14      Q.   Okay.  Dr. Wilson, if I can call your
15  attention to Exhibit 43, which appears to be in --
16  instant message communications between you and
17  Mr. Leyman.  Is that what it appears to be?
18      A.   That's correct.
19      Q.   On July 31st, 2008, between 9:30 and about
20  10:18 in the morning or about 1:00 -- well, beginning at
21  9:26:08 a.m. and ending at 1:02 in the afternoon.
22  Correct?
23      A.   That's -- that's correct.
24      Q.   If you will look at the second line at
25  9:26:42 a.m., Mr. Leyman is asking you, "Is your 5 KT

36  (Pages 448 to 451)

ARBITRATION HEARING - SEPTEMBER 21, 2010

452

1   CFR I H Sept BBLS still available?"  Do you see that,
2   sir?
3       A.  Yes.
4       Q.  Is that referring to the five metric tons
5   purchased from Tricon?
6       A.  I don't know.
7       Q.  Well, at 10:16:43 a.m., you asked Mr. Leyman,
8   "Price for 1H September MX."  Do you see that, sir?
9       A.  Yes.
10      Q.  And he responds, "Seller had indicated 1250
11  early this morning."
12          Your response is, "I'll wait."
13          Then Mr. Leyman says, "What price will you
14  be looking for?"
15          And your response is, "It would be nice to
16  profit."
17          Did I read that all correctly, sir?
18      A.  That's correct.
19      Q.  Calling your attention now to Exhibit 44,
20  Dr. Wilson, this appears to be an e-mail from you to
21  Devang Mehta on July 31st at 9:30 -- 2008 at 9:31 p.m.
22  Is that correct sir?
23      A.  Yep.
24      Q.  Who is Devang Mehta?
25      A.  Devang is in charge of chemicals trading.

453

1       Q.  Okay.  He would have been your boss?
2       A.  That's right.
3       Q.  What was the purpose of this e-mail that you
4   sent Mr. Mehta?
5       A.  I think they were at -- Vinmar I imagine was
6   asking me what was going on so I was advising them.
7       Q.  Okay.  If you'll look at the very last two
8   lines on Exhibit 44, sir.  See where it says, "7:30,
9   Rick note to Vuk operations.  We cannot accept open
10  origin for this material.  It must be from USA.  Surely
11  you own this product.  Please advise regarding shipment
12  details."
13      A.  Shipping, yeah.
14      Q.  Shipping details.  That appears to be a
15  quotation from Exhibit 17.
16      A.  I believe it's a -- I believe it was a copy
17  from an e-mail, yeah.
18      Q.  Okay.  And the reason that I ask, sir, is
19  because if you note on Exhibit 44, the date that you put
20  on that is 7:30, but Exhibit 17 is dated July 31.  My
21  question is, did you just make a mistake and put 7:30
22  when it should have been 7:31?
23      A.  I don't remember.
24      Q.  You agree that your e-mail to Mr. Rajevac that
25  is at the bottom of Exhibit 17 is dated July 31?

454

1       A.  That's correct.
2       Q.  And the statement that appears on the last two
3   lines of Exhibit 44 is just a quotation from that
4   e-mail?
5       A.  I believe that was the intent.
6       Q.  Okay.  And if you would look at the first
7   written time, 7:22.  You say, "Devang, here is a summary
8   of the communications with Tricon I had -- here is a
9   summary of the communications with Tricon that I had
10  had."
11          On the first line it says, "7:22."  Do you
12  see that, sir?
13      A.  Uh-huh.
14      Q.  And is -- and that's a "yes"?
15      A.  I see that, yes.
16      Q.  Okay.  And that is July 22, which is the day
17  that the deal was originally made?
18      A.  If that's the fact.
19      Q.  Let's take a look at all the way back in the
20  beginning.  I think it was 2.  Yeah, take a look at
21  Exhibit 2.
22      A.  Okay.  No, it's not there.  3, 4, 6, 9, 10,
23  15, 18, 17.  Oh, here we go.  Okay.  Can you repeat
24  that, please?
25      Q.  Yeah.  If you would just look at Exhibit 2,

455

1   that is the first MOAB confirm.  Correct?
2       A.  I believe so.
3       Q.  Okay.  The date on that is July 22 --
4       A.  That's right.
5       Q.  -- 2008?
6       A.  That's right.
7       Q.  So my question to you is, when you write to
8   Mr. Mehta, "7-22, MOAB confirm," you're making a
9   reference to Exhibit No. 2?
10      A.  I believe that was the intent.
11      Q.  Okay.  I think even the amended confirms are
12  all also dated July 22.  Correct, sir?
13      A.  July 22.
14      Q.  3 and --
15      A.  No. 3.
16      Q.  No. 3 and No. 4 are the amended MOAB confirms
17  and they're also dated July 22.  Correct?
18      A.  Yes.
19      Q.  And when you tell Mr. Mehta, "7-22, MOAB
20  confirm, P equals 110 CFR" -- P meaning price.  Correct?
21      A.  That's right.
22      Q.  T -- "T/C 30 days, 1 to 15 September, seller's
23  option."  What does -- is it TIC or T -- or TK probably?
24  I'm having a hard time reading what it says, but that's
25  referring to the payment terms.  Correct, sir?

37  (Pages 452 to 455)

ARBITRATION HEARING - SEPTEMBER 21, 2010

456

1      THE REPORTER: To the what? Excuse me.
2      MR. DIAZ-ARRASTIA: Payment terms.
3   A. Actually I'm not sure.
4   Q. (BY MR. DIAZ-ARRASTIA) You're not sure.
5   Okay. "Seller's option declared by August 8th," and
6   then you write in parentheses, "No requirement for load
7   port." You see that, sir?
8   A. Uh-huh.
9   Q. Okay. Is that a "yes"?
10  A. Yes. Load port.
11  Q. Yeah. And it is true that you could load --
12  that there could be foreign MX in storage at a U.S. port
13  and you could load MX in a U.S. port that was not of
14  U.S. origin. Is that correct?
15  A. The origin is determined at the point of -- at
16  the load point so where the physical balance coming --
17  came from. I've never seen that happen, but in concept
18  it could.
19  Q. Calling your attention to Exhibit 45,
20  Dr. Wilson. It's an e-mail communication from you to
21  Hermant Goradia, is that correct, sir --
22  A. That's right.
23  Q. -- on August the 6th?
24      And the subject is Tricon communication
25  draft to discuss. Correct?

457

1      "Yes," sir? I'm sorry.
2   A. That's correct.
3   Q. Who is Mr. Goradia?
4   A. He is one of the owners of Vinmar.
5   Q. Okay. What was the purpose of this e-mail?
6   A. The purpose of the e-mail was -- what we
7   wanted to do was stick to the original terms of the
8   deal. And at this point in time, doing so was going to
9   incur considerable loss to Vinmar. So I was notifying
10  the owners.
11  Q. What's going on in Exhibit 45 is you are
12  drafting an e-mail. Correct?
13  A. Yes.
14  Q. Okay. And you were going to send the e-mail
15  to Ed Leyman?
16  A. Or Tricon, yeah.
17  Q. Why were you running a draft of your
18  communication by Mr. Goradia, Mr. Antonvich and
19  Mr. Mehta?
20  A. Because it's their company.
21  Q. Did they ask you to draft that communication?
22  A. No.
23  Q. It was your idea to send this communication?
24  A. Yes.
25  Q. And did you actually send that communication?

458

1   A. I believe so.
2   Q. Okay. If you'll take a look at Exhibit 9,
3   that is the communication as it was sent to Mr. Leyman
4   and then he forwarded it to Tricon. Correct?
5   A. That's the e-mail trail here, that's correct.
6   Q. That is the same communication that you had
7   drafted in Exhibit 45?
8   A. That's correct.
9   Q. And your proposal in this e-mail is both for
10  U.S. origin material to be delivered at Korea or Taiwan
11  by no later than the 15th of September. Correct?
12  A. Yes.
13  Q. Take a look at Exhibit 18, which I think we've
14  looked at earlier. Now, in that e-mail, Mr. Lockwood is
15  proposing to deliver U.S. origin MX that has an ETA of
16  September the 6th. Is that correct, sir?
17  A. That's correct.
18  Q. And you did not accept that proposal?
19  A. That's correct.
20  Q. Mr. Wilson, is it true that the price of MX
21  continued to drop through July and August of 2008?
22  A. I don't remember.
23  Q. Okay. Is it true that it was very difficult
24  to find anyone interested in buying any MX during that
25  period of time in 2008?

459

1   A. I did not sell any. I can say that.
2   Q. If you will take a look at Exhibit 46,
3   Dr. Wilson. It appears to be instant message
4   communications between you and Ed Leyman. Correct, sir?
5   A. Yes.
6   Q. If you will take a look at about two thirds of
7   the way down. It says, "Ed Leyman, MOAB Oil, any buying
8   interest FOB USGC?" Have you found that, sir?
9   A. Yes.
10  Q. And your response is, "Re: Buying interest not
11  today. Customers are hiding."
12  A. That's right.
13  Q. Did I read that correctly, sir?
14  A. You did.
15  Q. Are you telling Mr. Leyman that there are no
16  customers buying MX when these communications took
17  place?
18  A. I don't remember the intent of the
19  conversation, but that's what the words would suggest.
20      EXAMINATION
21  BY MR. LEE:
22  Q. Do you know for certain whether the receipt of
23  the e-mail from Mr. Pascu on July 31st at 1:43 was the
24  first time that you became aware that Tricon had a
25  different understanding of this alleged transaction?

38  (Pages 456 to 459)

ARBITRATION HEARING - SEPTEMBER 21, 2010

460

1    A.  Is that the first time?  I can't say that, no.
2    Q.  Okay.  Are you aware of any other written
3    communication that was sent to you prior to July 31st at
4    1:39 p.m. that would have -- that discussed Tricon's
5    claim that it could provide Asian origin MX?
6    A.  No, but usually if there were an issue -- I
7    mean, in this case, I just don't remember.  The standard
8    was to call me Laurentiu to call me rather than send me an e-mail.
9    Q.  Okay.  And so it's very possible that the
10   first time you actually found out about this from
11   Mr. Pascu was on the afternoon of July 31, 2008.
12   Correct?
13   A.  I can't state unequivocally the exact time
14   that I discovered that there was a -- there was an
15   issue, but I remember the emotional part of discovering
16   there was an issue because, you know, you look back and
17   you see the pieces that weren't quite right and, you
18   know, it hits you.  So exactly what time I got that
19   information was -- I just can't tell you.  I don't know.
20        Say that again.  Mr. Leyman --
21   Q.  Did Mr. Leyman tell you that as part of his
22   broker service that he recorded phone calls?
23   A.  Yes, he did.
24   Q.  Okay.  Does it -- does it surprise you to find
25   out that there are no tape recordings of this

461

1    transaction?
2    A.  Yes.
3        (This is the end of the playback of the
4    edited version of the videotaped deposition of Richard
5    W. Wilson, Ph.D., that was originally taken on
6    August 30, 2010.)
7        JUDGE BENTON:  All right.  Let's take
8    about a ten-minute break.
9        (Recess from 1:49 p.m. to 2:04 p.m.)
10       JUDGE BENTON:  Okay.  Back on the record.
11   Call your next witness.
12       MR. DIAZ-ARRASTIA:  Our next witness is
13   Steve Simpson.
14       JUDGE BENTON:  Mr. Simpson, if you will
15   you raise your right hand.
16       (At this time the witness was duly sworn
17   by Judge Benton.)
18       MR. DIAZ-ARRASTIA:  Members of the Panel,
19   Mr. Simpson's report was previously submitted to the
20   panel, but it's also in the Tricon Exhibit Book under
21   Tricon Exhibit 36, 36.
22       JUDGE BENTON:  Tricon 36.
23
24
25

462

1            STEVE SIMPSON,
2    having been first duly sworn, testified as follows:
3        DIRECT EXAMINATION (2:05 p.m.)
4    BY MR. DIAZ-ARRASTIA:
5    Q.  Mr. Simpson, could you state your name for the
6    record, please?
7    A.  Steve C. Simpson.
8    Q.  And tell us a little bit about your background
9    and experience trading petrochemicals?
10   A.  After college and a short time in the Army, I
11   went with a company called Kerr McGee.  I started there
12   in the accounting group.  And after 12 and a half years,
13   I had moved up to manager of international trading and
14   transportation, bought crude oils and --
15   Q.  Could you raise your voice a little bit,
16   please?
17   A.  Sure.  I was manager of international trading
18   and transportation for them.  From there -- after 12 and
19   a half years, I left Kerr McGee and went to Northeast
20   Petroleum.  Northeast Petroleum, I was VP of products --
21   of crude oil supply and then of products supply later
22   and manned the supply group for a couple of years.
23       At that time they were sold to Charter
24   Oil.  And I worked for about a year in Houston at
25   Charter Oil as vice president of product supply.  And

463

1    then I moved to London for about two and a half, almost
2    three years, senior trader.
3        I moved back from London, started a
4    company called Petrotex and I traded petroleum futures
5    as well as other futures, wheat, corn on the futures
6    markets.
7        Then in '89 I went to work for -- back to
8    work for Kerr-McGee in the Houston office in the
9    refining group.  And what I did there is I traded the
10   futures for them for about six or eight months and then
11   the man that had their petrochemicals got killed in a
12   balloon accident and they offered me that job and I took
13   the petrochemicals over.
14       About nine months later, they offered me
15   specialty products, and I did that until they sold their
16   refineries in 1995.  In 1995, I went to work for a
17   trading company called Rio Energy.  I wanted to do
18   aromatics and gasoline feedstocks.  And I did that for
19   about a year and then I decided I didn't want to be in
20   that business.
21       I left there and I went to Valero Energy
22   in '97.  And in 2008, I retired from Valero Energy.  I
23   started there as manager of petrochemicals.  We had a
24   big fractionation unit to produce xylenes.  And I did
25   that and then I did a lot of different specialty

                                39  (Pages 460 to 463)

ARBITRATION HEARING - SEPTEMBER 21, 2010

464

1    products, did a lot of aromatics.
2        And then in 2001, we bought Diamond
3    Shamrock.  At that time I became director of
4    petrochemicals which handled aromatics and propylenes.
5    And then I ended up retiring as executive director of
6    petrochemicals.
7        Q.   And are you still involved in the
8    petrochemicals markets, sir?
9        A.   Yes.  I retired May 31st.  And June 1st I went
10   to work for Valero as a consultant on a part-time basis
11   on a project where you reduce the benzene in the
12   gasoline pool, and that project will probably be over
13   around the first quarter of 2011, a lot of capital
14   expense so we kind of do those things.
15       And then also I write a weekly trading
16   report for the aromatics group on what they should be on
17   the trading side, if they should buy or sell or do
18   nothing, hold.
19       Q.   And during your career that you have
20   described, sir, have you been actively involved as a
21   trader?
22       A.   Yes.
23       Q.   And on how many trades have you personally
24   performed?
25       A.   At Valero, I've done over a thousand trades.

465

1        Q.   And how much of your trading experience has
2    been with aromatics?
3        A.   I'd say probably 50 percent of it.
4        Q.   And what are some of the other materials that
5    you have traded?
6        A.   Propylene is a big material we traded a lot
7    of.  I've done all the gasoline blend stocks from MTB to
8    methanol, LPG's.  I've bought natural gas.  I've done
9    anything that goes into or out of a refinery as a bulk
10   material.
11       Q.   And have you also managed traders?
12       A.   Yes.
13       Q.   While you managed traders, were you also
14   personally doing trades?
15       A.   Yes.
16       Q.   Okay.  When was the last time that you
17   personally made a mixed xylenes trade?
18       A.   I believe that was in March of 2009.
19       Q.   Mr. Simpson, in trading -- in petrochemicals
20   trading, is it common to use brokers when making deals?
21       A.   Yes.
22       Q.   And when brokers are used, is it customary
23   that the same broker will represent both sides of the
24   transaction?
25       A.   Yes, sir.

466

1        Q.   And is it also customary that the principals
2    do not communicate directly with each other but only
3    through the broker?
4        A.   It can be customary to do that or communicate
5    with each other afterwards or even during it sometimes,
6    but it's customary.  I mean, it's fine.  A lot of people
7    don't talk to each other.  They just do it through a
8    broker.
9        Q.   Mr. Simpson, someone just pointed out to me.
10   Was the last time you personally made an MX trade in
11   March of 2008 or March of 2009?
12       A.   2008.  Did I say '8?
13       Q.   I think you might have said '9.
14       A.   Oh, I'm sorry.  It's 2008, right before I
15   retired.
16       Q.   Okay.  Mr. Simpson, do you know Ed Leyman?
17       A.   Yes.
18       Q.   Who is Ed Leyman?
19       A.   He's a broker.  He's been in the industry.
20   Sometime in the '90s is the first time I ran across him.
21       Q.   Okay.  Was he the first broker in the U.S. to
22   deal in MX?
23       A.   I believe so.  He started out doing specialty
24   products where something would be off-spec and he'd
25   broker those.  He was good at understanding the chemical

467

1    makeups of different products and so he would broker
2    those.  And then he started trading in benzene, toluene
3    and xylene.
4        Q.   And how many brokers deal in U.S. -- in MX in
5    the U.S.?
6        A.   I think there's about three to five now.  Some
7    people come in.  Some people go back out so...
8        Q.   What is Mr. Leyman's reputation in the
9    petrochemicals trading industry?
10       A.   I think he's an extremely good broker, does a
11   good job at what he does.  If he didn't, people wouldn't
12   trade with him.
13       Q.   Have you personally used Mr. Leyman to broker
14   trades?
15       A.   Yes, sir.
16       Q.   And did you find that his reputation was
17   deserved?
18       A.   Yes, very good.
19       Q.   And let me ask you, Mr. Simpson, if a broker
20   favored one side over another in a deal, would that
21   broker stay in business long?
22       A.   No, sir.
23       Q.   Why?
24       A.   Not at all.  Because you want a fair playing
25   field.  You don't want the other party to know

40  (Pages 464 to 467)

ARBITRATION HEARING - SEPTEMBER 21, 2010

468

1  everything going on and you know nothing. So if you
2  felt like they were leaning one way or the other, you
3  just wouldn't talk to them.
4      Q.  And obviously a broker has to bring parties
5  together.  Correct?
6      A.  Yes, sir.
7      Q.  If --
8      A.  That's all he's doing is just bringing two
9  parties together.
10     Q.  A broker who has a reputation of favoring one
11 party is going to have a hard time bringing the other
12 party along.  Correct?
13     A.  Correct.
14     Q.  Can you tell me how long Mr. Leyman has been
15 in business?
16     A.  I just knew of him sometime in the '90s.
17     Q.  Sir, in petrochemicals trading, is it a
18 general expectation that traders have that a broker will
19 not disclose the identity of a counterparty before a
20 deal is made?
21     A.  Say that again, please.
22     Q.  Is it a general expectation in petrochemicals
23 trading that a broker will not disclose a trader's
24 identity before a deal is made?
25     A.  No.  Only if he's asked not to.  And if he's

469

1  asked not to, he won't disclose it.
2      Q.  Okay.  And sometimes it happens that a trader
3  may ask that his identity not be disclosed?
4      A.  Yes.
5      Q.  And the broker would respect that?
6      A.  Yes.
7      Q.  What happens if the trader does not request
8  confidentiality?
9      A.  A lot of times when I would talk to him and
10 he'd make -- he'd have something out there that I was
11 really interested in doing, I would ask him probably who
12 the party was.
13     Q.  And would he tell you?
14     A.  If it wasn't confidential, if they didn't say
15 not to tell me, he'd tell me.
16     Q.  And does it sometimes happen that one side
17 requests confidentiality and the other one does not?
18     A.  Yes, sir.
19     Q.  Is that unusual?
20     A.  No.  It can be -- it's pretty general.  I
21 mean --
22     Q.  And what happens?
23     A.  I usually never ask for confidentiality and
24 some of the companies did and so Ed wouldn't tell you.
25     Q.  What happens when one side requests

470

1  confidentiality and the other one does not?
2      A.  I don't believe there's anything that happens.
3  I believe he's -- he's still fair to both parties.  He
4  just doesn't tell what your name is, who's out there
5  doing what.
6      Q.  So he may disclose one side but not the other?
7      A.  Yes.
8      Q.  And that's not unusual?
9      A.  Not unusual at all.
10     Q.  Tell me, sir, what is meant by an indication?
11     A.  That's where you talk to a broker or to
12 another party saying, "I might be an interested seller
13 of mixed xylenes.  I might be interested buyer of mixed
14 xylenes.  I might want to sell 20,000 barrels.  I might
15 want to sell 5,000 tons or I might want to buy those."
16        It's not a firm offer.  It doesn't tell a
17 party, "I'm here to do this deal."  It's just a
18 discussion matter.
19     Q.  And so like I might be interested in buying or
20 I might be interested in selling, but I'm not making a
21 commitment?
22     A.  Correct.
23     Q.  And then tell me what a firm bid is.
24     A.  That is where you are committing to do
25 whatever you tell them it is.  And you always tell them

471

1  it's a firm bid.  And if it's -- and it's -- usually
2  what you have included in that is quantity, quality,
3  price, the real idea of what you're trying to do with
4  that product that you're dealing with.
5      Q.  Okay.  Firm bid, does that come from the
6  buyer's side?
7      A.  Yes.
8      Q.  Okay.  So a firm bid is when a buyer says, "I
9  will buy on these terms"?
10     A.  Yes, sir.
11     Q.  And it's a commitment?
12     A.  Yes.
13     Q.  Okay.  What is a firm offer?
14     A.  It's from the seller's side.  He makes a firm
15 offer that he'll do this and that if this number...
16 That's it.
17     Q.  Same thing from the seller's side?
18     A.  Yes.
19     Q.  Okay.  And in petrochemicals trading, do
20 traders give brokers authority to make a deal by giving
21 the broker a firm offer or a firm bid?
22     A.  Yes, sir.
23     Q.  And we've talked a little bit about that, but
24 what usually is contained in a firm offer or a firm bid?
25     A.  Well, you might not know the party at first,

41 (Pages 468 to 471)

ARBITRATION HEARING - SEPTEMBER 21, 2010

472

1  but you will, but then you will know what the product
2  is, the quantity, the quality usually of the product
3  because that might have -- there's different qualities.
4       So the quantity on -- and you try to -- Ed
5  always works to try to get both sides saying the same
6  thing on volumes, so if it's metric tons or barrels.
7  You have your price, which is one of the important
8  things, which are fixed or floating. You have your --
9  usually your payment terms. And pretty standard in our
10  industry is 30 days with and LC if it's required by
11  whoever's selling department requires it.
12      Q. Now, if there is something else special that a
13  trader has such as "I need a particular origin for my
14  material," is that also putting a firm bid or firm
15  offer?
16      A. If you want a specific origin, you definitely
17  put that in your firm bid or your firm offer.
18      Q. And I think you stated in the report that if
19  you -- that origin of material is an up-front term in
20  any negotiation. Do you recall that?
21      A. Yes, sir.
22      Q. Why is it important that origin be an up-front
23  term?
24      A. If it's not an up-front term, then you could
25  have different origins that you move the product from.

473

1  As in this case, I mean, it was going to Asia. You have
2  a very -- you had a lot of timing issues there and so
3  you'd need to know that up front to know that you can
4  supply those barrels.
5      Q. Okay. Now, in petrochemicals trading, is it
6  common for buyers to be concerned with the origin of a
7  product?
8      A. Only if their -- they think their customer
9  would require it.
10     Q. Well, is it -- in most of the petrochemical
11  trades that you have done, more than 1,000 trades, was
12  origin something that the buyer was concerned with?
13     A. No, not really.
14     Q. Okay. Is it a common thing that --
15     A. Majority of the time origin is never
16  discussed.
17     Q. Okay. And why is it that it's never
18  discussed? Is it because MX is a commodity?
19     A. MX is traded as a commodity. It's -- you have
20  a couple of different specs that you can use, most of it
21  Gulf Coast barrels traded with 5211 20 bromine. Europe
22  might produce that, Asia can produce that and so you
23  just need to know if it's a requirement up front.
24     Q. Yeah. Within a certain spec, is MX that's
25  manufactured in the U.S. or in Asia or Europe or in

474

1  Brazil all the same, within a certain spec?
2      A. Within a certain spec, yes, sir, it is.
3      Q. Now, Mr. Simpson, in an industry -- when is it
4  considered that a deal is made in the trade industry?
5      A. If you're working direct, two parties just
6  confirm that it's a -- it's a done deal and the deal is
7  done right then. If it's through a broker like Ed
8  Leyman, it's whenever Ed Leyman gets both sides lined up
9  and he says the deal's done.
10     Q. If the firm bid meets the firm offer, you have
11  a deal?
12     A. Yes, sir, if you -- as long as you give them
13  the authority.
14     Q. And you give them that authority by making a
15  firm bid or a firm offer?
16     A. You give them that authority up front.
17     Q. Now, if a broker is used, is it customary for
18  the broker to send a written confirm?
19     A. In today's market, yes, it is. That probably
20  changed from the last ten years. Ten years ago you
21  didn't have written confirms.
22     Q. Is it important for the trader to review the
23  written confirm right away?
24     A. Yes, sir.
25     Q. And why is that important?

475

1      A. Just to make sure both parties have the same
2  terms and know what they're doing.
3      Q. Okay. Can we -- will you take a look at Joint
4  Exhibit No. 4, sir, in the Joint Exhibit notebook in
5  front of you?
6           And we will also put it on the screen.
7  Let's look at the second page of that please, sir.
8      A. No. 4?
9      Q. Yes, Joint Exhibit No. 4, second page.
10     A. Okay.
11     Q. Is that an example of a broker confirm?
12     A. Yes, sir.
13     Q. What happens if there is a mistake in the
14  confirm?
15     A. Usually contact the broker and then you
16  usually are -- and/or contact the other party to make
17  sure everybody knows there's a mistake in it, to get it
18  corrected and get it out -- get it back out as quick as
19  you can.
20     Q. And would you then expect to see an amended or
21  corrected confirm?
22     A. Yes.
23     Q. And we're not going to put them up on the
24  screen, Mr. Simpson, but if you would take a look at
25  Joint Exhibits 3 and 2 just ahead of the one you were

ARBITRATION HEARING - SEPTEMBER 21, 2010

476

1  looking at. And I think you've seen these before in
2  this case. Correct, sir?
3      A. Yes, sir.
4      Q. Okay. And those appear to be -- these three
5  joint exhibits, 2, 3 and 4, appear to be a series of
6  confirms relating to the same deal for that and contain
7  some corrections and changes?
8      A. Yes, sir.
9      Q. And there's nothing unusual about that in
10 petrochemicals trading, is there?
11     A. Not -- no, sir, there isn't. It's just is
12 your clerk in a hurry when they type it up? Did they --
13 did you scribble too bad so they couldn't read exactly
14 what you did? Did -- you also maybe just wrote the
15 wrong price down.
16     Q. Okay. And none of exhibits -- Joint Exhibit
17 2, 3 or 4 say anything about the origin of the material.
18 Is that correct?
19     A. No, sir, they do not.
20     Q. What does that mean in the industry?
21     A. It's open origin.
22     Q. Is it the standard in the industry that if
23 material is to be of open origin it has to be put in the
24 confirm, but if it's a specific origin it can be left
25 blank?

477

1      A. Yes.
2      Q. Listen to my question.
3      A. Oh, okay. You said it backwards --
4      Q. Is it --
5      A. -- from what I thought you were going to say.
6      Q. Is it standard in the industry that if
7  material is open origin it must be specified in the
8  confirm?
9      A. No, sir.
10         MR. LEE: Objection. Leading.
11     Q. (BY MR. DIAZ-ARRASTIA) But if it's --
12         JUDGE BENTON: It's overruled.
13     Q. (BY MR. DIAZ-ARRASTIA) But if it's of
14 specific origin, it can be left blank, or is it the
15 other way around?
16     A. If it's --
17     Q. Or is it the other way around?
18     A. If it's of specific origin, it will be
19 included in the confirm.
20     Q. Okay. Can we --
21     A. If it's an open origin, you won't ever find it
22 in there.
23     Q. Okay. Take a look at the Tricon Exhibit
24 notebook.
25     A. Which one?

478

1      Q. The notebook that says Tricon Exhibits.
2      A. Oh.
3      Q. First look at Tricon Exhibit No. 1.
4         MR. DIAZ-ARRASTIA: And if you can make
5  it --
6      Q. (BY MR. DIAZ-ARRASTIA) And, Mr. Leyman, is
7  that an example of a confirm -- Mr. Simpson, is that an
8  example of a confirm that specifies origin?
9      A. No, sir.
10     Q. Exhibit No. 1 in the Tricon book, if you would
11 take a look at the screen, sir, and we'll see where
12 we're looking at.
13         JUDGE WOOD: That may be too far for him.
14         MS. LARSON: Under the quality line.
15         JUDGE WOOD: He's going to need to look at
16 the book.
17     Q. (BY MR. DIAZ-ARRASTIA) Under the quality
18 line.
19     A. Oh, I see it in the quality line. At the end
20 of the quality line is what you're saying.
21     Q. At the end of the quality line, it says, "To
22 be U.S. origin"?
23     A. Yes, sir.
24     Q. Is that an example of a broker confirm that
25 specifies a particular origin?

479

1      A. Yes, sir, and that -- and that's usually where
2  you put it.
3      Q. Okay. And take a look now at the next
4  exhibit, Tricon Exhibit No. 2.
5      A. Okay.
6      Q. In the quality line there, it says, "Product
7  must be non-Iranian or Chinese origin"?
8      A. Yes, sir.
9      Q. Is that another example of a confirm that
10 specifies a particular origin, this time saying it must
11 not be of a particular origin?
12     A. Yes, sir.
13     Q. And you see things like that also?
14     A. Yes.
15     Q. And also take a look at Tricon Exhibit No. 3,
16 the next one, the same place. It says in the quality
17 line, "No Iranian or Chinese origin"?
18     A. Yes, sir.
19     Q. Okay. Again, this is another example of the
20 confirm that specifies the origin?
21     A. Yes, sir.
22     Q. And that is what you would expect to see if
23 origin is an important part of the deal or a term of the
24 deal?
25     A. Yes, sir, it would be included.

43 (Pages 476 to 479)

ARBITRATION HEARING - SEPTEMBER 21, 2010

480

```
1      Q.  Is it also customary in petrochemicals trading
2   that after a deal is made the parties will send their
3   terms and conditions of sale?
4      A.  Yes, sir.
5      Q.  Is that sometimes called passing papers?
6      A.  That was my term.  My -- I say we pass paper
7   back and forth to each other.  Both parties usually send
8   paper and it will have other conditions and terms in
9   there.  It will be spelled out at a little more in
10  detail.
11         Sometimes Homeland -- well, in the last
12  two or three years, Homeland Security has put some
13  requirements so people put those in there now.
14     Q.  Now, when the parties pass paper, do they --
15  in the petrochemicals industry, do they intend to cancel
16  the deal that had just been made?
17     A.  No, sir.
18         MR. LEE:  Objection.  Calls for
19  speculation.
20         JUDGE BENTON:  It's overruled.
21     Q.  (BY MR. DIAZ-ARRASTIA)  What is the intention
22  of passing papers?
23     A.  To add the rest of the terms and conditions in
24  there.
25     Q.  Add terms to the contract?
```

481

```
1      A.  Right.
2      Q.  And does it sometimes happen that the parties
3   do not reach agreement on some or all of these
4   additional terms?
5      A.  Yes, sir.
6      Q.  And does that mean that there is no deal?
7      A.  No, sir.  I've disagreed with people on the
8   total terms and conditions and we still sold the barrels
9   or bought the barrels.
10     Q.  Okay.  If there is agreement on these
11  additional terms, do they become part of the deal?
12         MR. LEE:  Objection.  Calls for a legal
13  conclusion.
14         JUDGE BENTON:  It's overruled.
15     Q.  (BY MR. DIAZ-ARRASTIA)  Well, in your
16  understanding as a trader, sir, if the side -- if the
17  parties agree on these additional terms, is it your
18  understanding that they become a part of the deal?
19     A.  Yes, sir.
20     Q.  Let's take a look back in the Joint Exhibit
21  notebook, sir, Joint Exhibit No. 5, and again beginning
22  on the second page of that exhibit.
23     A.  Page 2.  Okay.
24     Q.  Yes, sir.  And actually let's turn to one more
25  page after that.  And is that an example of additional
```

482

```
1   terms and conditions of sale that are passed between the
2   parties after a deal is made?
3      A.  Yes, sir.
4      Q.  Okay.  Now, let's take a look at the last page
5   of Exhibit No. 5.  Do you see where there are spaces for
6   signatures?
7      A.  Yes, sir.
8      Q.  And have you seen paper that is passed that
9   has spaces for signatures at the end?
10     A.  Yes, sir.
11     Q.  Okay.  And is it customary for these
12  additional terms to be signed or not to be signed?
13     A.  In my view, it's customary that they not be
14  signed.
15     Q.  Okay.  Is there a difference whether the deal
16  might be a long-term contract or a spot deal?
17     A.  Yes, sir.  If it's a long-term contract,
18  they're usually signed.  When I say a long-term
19  contract, I'm talking about a year or longer, what you
20  do with a third party.
21     Q.  Okay.  And what's a spot deal?
22     A.  That's usually a one-time or two-time or
23  three-time deal, but it's just very, very prompt --
24     Q.  And --
25     A.  -- very quick.
```

483

```
1      Q.  Do you usually see additional terms signed in
2   spot deals?
3      A.  I never have, no, sir.  I've never signed any.
4   You know, people will send them to me, but I don't sign
5   them.
6      Q.  In petrochemicals -- when you were trading
7   petrochemicals and you ran petrochemicals trading
8   operations, was it common for the terms and conditions
9   of sale to be negotiated by the operations specialists?
10     A.  Yes, sir.
11     Q.  Okay.  And what is an operations specialist?
12     A.  In our world, we call them schedulers.  They
13  schedule the product.  They move the product.  They
14  really take it from you and make sure it's completed and
15  done.
16     Q.  And, Mr. Simpson, if your operations
17  specialist or scheduler were to learn that some aspect
18  of the deal that was very important to the trader, if
19  they were to learn from the counterparty that that was
20  not necessarily going to be provided, in your experience
21  how long would it take for that operations specialist to
22  inform the trader?
23     A.  In my experience, it would take less than
24  30 seconds because it would probably take them that much
25  time to get off the phone and get your attention that
```

44  (Pages 480 to 483)

ARBITRATION HEARING - SEPTEMBER 21, 2010

484

1   you had a problem.
2       Q.   Would the operations specialist wait a day and
3   a half to inform the trader?
4       A.   No, sir.
5       Q.   Now, Mr. Simpson, in petrochemicals trading,
6   do the terms -- well, let me ask you this.  What does
7   product origin mean?
8       A.   Where the product was produced.
9       Q.   And we have also during the course of this
10  hearing heard the term "loading port" or "port of
11  loading."  What does that mean?
12      A.   It means where you're going to physically load
13  the product from.
14      Q.   Is it understood in petrochemicals trading
15  that origin and load port mean different things?
16      A.   Yes, sir.
17      Q.   Is it possible to load MX at a U.S. Gulf port
18  that is not of U.S. origin?
19      A.   Yes, sir.
20      Q.   And tell us how that can work.
21      A.   You just work it with customs.  And as you
22  imported it -- it really wasn't imported.  You just put
23  it in a bonded tank and work through U.S. customs to
24  make sure they knew it wasn't being imported and that
25  way it could be exported.

485

1       Q.   Take a look at -- again, in the Joint Exhibit
2   notebook, Joint Exhibit No. 8, if we could put that on
3   the screen.
4       A.   8?
5       Q.   8.
6       A.   Okay.
7       Q.   I want you to take a look at Re: Origin sort
8   of in the middle -- lower middle of the page.  Can you
9   see where Tracy is highlighting some language on the
10  screen?
11      A.   Yes, sir.
12      Q.   Okay.  And that appears to be an e-mail from
13  Rick Wilson to Eduardo Anaya on July 25, 2008, at
14  10:33 a.m.  Do you -- do you see where I'm referring to?
15      A.   Yes, sir.
16      Q.   Okay.  And Mr. Willis telling Mr. Anaya, "Re:
17  Origin, we won't know until we declare discharge port.
18  Most likely USG."
19      A.   Yes, sir.
20      Q.   Let me ask you something else, sir.  In the
21  petrochemicals industry, is there a difference between
22  most likely and guarantee?
23      A.   Yes, sir, definitely.
24      Q.   Does most -- does most likely mean that it is
25  guaranteed or that it might be but it won't be

486

1   guaranteed?
2       A.   No, sir.  It doesn't mean it's guaranteed.
3       Q.   What does it mean?
4       A.   It's just that it means it might come from
5   there.  It might not come from there.
6       Q.   Now, when Mr. Wilson uses the word, "Re:
7   Origin, we won't know until we declare discharge port,"
8   to someone in the industry is he talking about the
9   loading port or is he talking about where the material
10  was manufactured?
11      A.   He's talking about where the material was
12  manufactured.
13      Q.   Okay.  And when Mr. Wilson says, "Most likely
14  USG," what does that mean to someone in the industry
15  with regard to a guarantee of origin?
16      A.   It's not a guarantee.
17      Q.   Does this mean to somebody in the industry
18  that there is no guarantee?
19      A.   That's the way I would read it totally.  I
20  think the whole industry would.
21          JUDGE DAVIDSON:  I assume the U.S. in USG
22  stand for United States.  What does the G --
23          THE WITNESS:  U.S. Gulf Coast.
24          JUDGE DAVIDSON:  U.S. Gulf Coast.  Got it.
25          JUDGE BENTON:  Are you passing?

487

1           MR. DIAZ-ARRASTIA:  Not yet, sir, but I
2   don't have much longer.
3       Q.   (BY MR. DIAZ-ARRASTIA)  Mr. Simpson, what does
4   it mean to be long or short on a product like MX?
5       A.   When you're long on a product, it means you
6   bought the material.  You might not have it in your
7   possession, but you have an obligation to purchase the
8   material, and that means you're going to have 5,000
9   metric tons that you're long material on.  When you're
10  short, you've sold the product.
11      Q.   But you don't yet own it?
12      A.   But you probably don't yet own it.
13      Q.   Is it customary for a trader to sell a product
14  it does not yet own?
15      A.   Yes, sir.
16      Q.   Can that be an important way for a trader to
17  make money in petrochemicals trading?
18      A.   That's usually about the -- that's not the
19  only way, but it's the main way they do make money.
20      Q.   Okay.  So do traders sell when they are short
21  sometimes?
22      A.   Yes, sir.
23      Q.   And do they also sometimes buy when they are
24  long?
25      A.   Yes, sir.  The cost of carrying physical

45 (Pages 484 to 487)

ARBITRATION HEARING - SEPTEMBER 21, 2010

488

1  inventory is just too prohibitive for a trader.
2      Q.  Tell me, sir, is the price of MX volatile?
3      A.  Extremely.
4      Q.  Is -- the price of MX, does it track -- tend
5  to track the price of crude oil?
6      A.  Over a long period of time, yes, sir, it will.
7      Q.  And what can happen to the price -- well, let
8  me put it this way.  When the price of MX falls rapidly,
9  what can happen to the market?
10     A.  I use the term it freezes, which means there's
11  really no spot buyers out there.  You still have
12  contract agreements between people, and those are
13  usually floating prices.  And they usually have a
14  mechanism that forces that -- get a price fixed for that
15  contract, and it's usually a contract month --
16     Q.  Okay.  And --
17     A.  -- but a --
18     Q.  And let me -- let me interrupt you there a
19  moment.
20     A.  Okay.
21     Q.  You're familiar with the sale that Tricon made
22  to KP Chemicals --
23     A.  Yes, sir.
24     Q.  -- which was the replacement sale in this
25  contract?

489

1          Is that the sort of deal you're talking
2  about?
3      A.  Yes, sir.
4      Q.  Okay.
5      A.  As a term agreement, they don't -- they don't
6  know what the price is, but they know what the terms and
7  conditions of the pricing are.
8      Q.  And what happens to spot sales when the market
9  freezes?
10     A.  I just believe you can't find a buyer.  You
11  can always find a buyer, but what price?  It's sort of
12  like it might cost you $200 a metric ton to get someone
13  to step up and buy it.
14     Q.  And how long can the market stay frozen this
15  way?
16     A.  I've seen it up to three or four months.
17     Q.  And can you tell us what happened to the price
18  of MX in the period of July 22, 2008, through
19  September 30, 2008?
20     A.  It went straight down almost.  Not totally
21  down but it went -- fell very hard.
22     Q.  Let's take a look at Tricon Exhibit 32 in the
23  Tricon notebook.
24     A.  Oh, Tricon.
25     Q.  And there's a chart of MX prices.

490

1      A.  Yes, sir.
2      Q.  Okay.  And do you -- is that what you remember
3  happening in the second half of 2008 for the MX prices?
4      A.  Yes, sir.
5      Q.  And what was happening to the price of crude
6  oil at that same time?
7      A.  It went from $147 a ton down to about $32 -- I
8  mean $147 a barrel to $32 a barrel in a four-month
9  period.
10     Q.  There was a precipitous decline in crude?
11     A.  Very.
12     Q.  And a precipitous decline in MX tended to
13  track it?
14     A.  Yes.
15     Q.  Does it surprise you that under those
16  conditions Tricon was not able to find a replacement
17  buyer for the Vinmar MX in the spot market in all of
18  September of 2008?
19     A.  No, sir, not at all.
20     Q.  Now, sir, have you reviewed Mr. Wilson's
21  testimony in this case?
22     A.  Yes, sir.
23     Q.  Do you remember if Mr. Wilson said whether he
24  had a specific sale that he was going to match to the
25  Tricon MX?

491

1      A.  He was trying to match a sale to Formosa and
2  he had a sales rep -- sales representative, something
3  like that that he called him, that was going to their
4  office to try to be involved with the bid that Formosa
5  was putting out, but he got there too late and he missed
6  that bid.
7      Q.  So is it your understanding that Mr. Wilson
8  lost the specific sale that he wanted to match to the
9  Tricon MX?
10     A.  Yes, sir.
11     Q.  Do you know Formosa?
12     A.  I know of them, yes.  Met them before.
13     Q.  What is Formosa?
14     A.  It's a consumer of xylene.  Mainly an
15  paraxylene producer.  They do other things, but that's
16  one of the things that they do.
17     Q.  Does Formosa buy Asian origin MX?
18     A.  Yes, sir.  Primarily most -- I would say most
19  of their product is Asian origin.
20     Q.  In fact, do buyers in Asia buy Asian origin
21  MX?
22     A.  Yes, sir.
23     Q.  They do that all the time?
24     A.  All the time.
25     Q.  Do traders in Asia trade on Asian origin MX?

46  (Pages 488 to 491)

ARBITRATION HEARING - SEPTEMBER 21, 2010

492

1    A.  Yes, sir.
2    Q.  Mr. Simpson, in your opinion what would happen
3  to the petrochemicals trading industry if the Tricon
4  Vinmar deal in this case is not enforceable?
5    A.  Then most of the deals that we do would not be
6  enforceable.
7         MR. DIAZ-ARRASTIA:  Pass the witness.
8         JUDGE BENTON:  Mr. Lee?
9         MR. LEE:  Yes.  Thank you.
10        CROSS-EXAMINATION (2:40 p.m.)
11  BY MR. LEE:
12    Q.  Mr. Simpson, how are you today?
13    A.  Good, sir.  You?
14    Q.  You and I have never met.  Right?
15    A.  No, sir.
16    Q.  Let me ask you a couple of questions.  I may
17  jump around a little bit.  But you had -- in the Joint
18  Exhibit notebook, you were asked about Joint Exhibit
19  No. 8, which was an e-mail exchange between Mr. Wilson
20  and a gentleman by the name of Eduardo Anaya.  Correct?
21    A.  Yes, sir.
22    Q.  Now, just to be clear about all this, I think
23  it's obvious but I should ask you a couple of questions
24  for the record.  You weren't involved in the
25  negotiations of this transaction that we're talking

493

1  about.  Correct?
2    A.  No, sir.
3    Q.  And you don't know Mr. Wilson, do you?
4    A.  No, never met him.
5    Q.  You don't know Eduardo Anaya, do you?
6    A.  No, sir.
7    Q.  Now, you do know that this e-mail exchange is
8  an e-mail exchange internal at Vinmar.  Correct?
9    A.  Yes, sir.
10    Q.  Okay.  You testified that there was a
11  difference between origin and load port?
12    A.  Yes, sir.
13    Q.  Right?
14    A.  Yes, sir.
15    Q.  That means two different things.  Correct?
16    A.  Yes, sir.
17    Q.  Okay.  Now, if we look at the e-mail from
18  Mr. Anaya to Mr. Wilson, he asked Mr. Wilson at the
19  bottom of the page, "To complete the order, we need the
20  port of origin."  Correct?
21    A.  Yes, sir.
22    Q.  Now, you don't know whether he meant the
23  origin of the product or the port of loading, do you?
24    A.  I would assume he's talking about the origin
25  of the product.

494

1    Q.  You don't know that, though, do you?
2    A.  No.  I don't know their system.
3    Q.  I mean, he asked for port of origin.  Correct?
4    A.  Right.
5    Q.  Okay.  And so it's very possible that what
6  Mr. Wilson was responding to is that he didn't know what
7  port it was going to be loaded from.  Correct?
8    A.  Could be.
9    Q.  Okay.  It is common for people in the industry
10  to use brokers to trade petrochemicals.  Correct?
11    A.  Yes, sir.
12    Q.  And you would agree with me that in order for
13  there to be a deal between the parties, the firm bid
14  must match precisely the firm offer.  Correct?
15    A.  Yes, sir.
16    Q.  And if the broker tells two parties that they
17  have a deal but the firm bid did not match the firm
18  offer, then the broker's wrong.  Correct?
19    A.  Correct.
20    Q.  There is no deal on that situation.  Correct?
21    A.  Depending on what the term was or what you
22  were talking about.
23    Q.  Well, if it's in the firm bid and it doesn't
24  match the firm offer, there's no deal.  Right?
25    A.  That I don't know.  That's something legal.

495

1    Q.  Well, I'm just asking your understanding in
2  the industry.  If you in a firm bid say, "This is what I
3  want," and the firm offer on the other side doesn't
4  match the firm bid precisely, then you don't have a
5  deal, do you, sir?
6    A.  Probably wouldn't.
7    Q.  And the broker shouldn't put two parties
8  together like that.  Correct?
9    A.  He probably wouldn't.
10    Q.  Okay.  And if he does, he exceeded his
11  authority, did he not?
12    A.  He did.
13    Q.  Okay.  It's possible -- you know brokers make
14  mistakes.  Right?
15    A.  Yes, sir.
16    Q.  That's one of the reasons they put in their
17  broker confirmation, "If anything in this confirmation
18  is contrary to your understanding, please let me know"?
19    A.  Uh-huh.
20    Q.  And, in fact, we know in this deal that
21  Mr. Leyman made a mistake, at least one.  Right?
22    A.  No.
23    Q.  Oh, we know he made at least one mistake,
24  didn't he?
25    A.  No.  He made two.

47 (Pages 492 to 495)

ARBITRATION HEARING - SEPTEMBER 21, 2010

496

1    Q.  Two?
2    A.  I think the -- whoever typed it up got it
3    wrong.
4    Q.  Well, we know he made one mistake for sure.
5    Correct?
6    A.  Which was?
7    Q.  He got the price wrong.
8    A.  Okay.
9    Q.  You know that.  Right?
10   A.  Well, he corrected it, yes.
11   Q.  Okay.  But when he originally wrote his notes,
12   he got the price wrong.  It was a -- it was a million
13   dollar mistake?
14   A.  Okay.
15   Q.  Do you recall that?
16   A.  Yes.
17   Q.  Okay.  So, I mean, it happens that brokers
18   make mistakes?
19   A.  Yes.
20   Q.  Do you -- did you believe that a broker has
21   the responsibility to ensure that the parties have a
22   clear understanding of what the terms are that he says
23   they agreed to?
24   A.  Say that again, please.
25   Q.  Do you believe that a broker has a

497

1    responsibility to ensure that the parties have a clear
2    understanding of the terms that he believes they agreed
3    to?
4    A.  Yes, sir.
5    Q.  And do you have -- do you also think the
6    broker has the responsibility to correct someone if they
7    have a misunderstanding about the terms that he believes
8    he's negotiated?
9    A.  I believe they do.
10   Q.  Okay.  Is it -- is it your understanding of
11   this transaction between Vinmar and Tricon that Tricon
12   was not required to load this product from any specific
13   location?
14   A.  Right.
15   Q.  So they could load it from wherever they
16   wanted to.  Correct?
17   A.  (Nods head)
18   Q.  Is that --
19   A.  Yes, sir.
20   Q.  Okay.  Would you flip to Joint Exhibit No. 11,
21   please, sir?  And you've seen these documents.  Correct?
22   These -- this is the instant message exchange between
23   Mr. Wilson and Mr. Leyman.  The first page is the
24   conversation on July 22nd, 2008.  Correct?
25   A.  Yes, sir.

498

1    Q.  Okay.  And you've seen this before?
2    A.  Yes.
3    Q.  All right.  And is it your understanding that
4    while there were some instant message exchanges on the
5    morning of July 22nd between Mr. Leyman and Mr. Lockwood
6    on one hand and Mr. Wilson or Dr. Wilson and Mr. Leyman
7    on the other that ultimately the deal that Mr. Leyman
8    claims he brokered was done over the phone?
9    A.  I believe he probably finalized it over the
10   phone.
11   Q.  And you haven't seen --
12   A.  You don't see it in here.
13   Q.  That was my question.  You don't see anywhere
14   in these instant messages where Mr. Leyman has captured
15   all of the terms of what he believes the deal was.
16   Correct?
17   A.  No.
18   Q.  Okay.  And you do know that mister -- or
19   Dr. Wilson and Mr. Lockwood never spoke on July 22nd,
20   2008?
21   A.  Correct.  I never saw that in anything.
22   Q.  Now, was it -- is it your recollection that
23   Mr. Leyman told Mr. Lockwood somewhere around
24   12:00 o'clock in the afternoon or July 22nd that a deal
25   had been completed?

499

1    A.  I don't remember what the time was.  I just
2    remember there was a notation in the instant messages
3    where he said "Deal done" or something like that.
4    Q.  Okay.  Keep your finger on that.  Just flip to
5    the exhibit right in front of it, which is Joint Exhibit
6    No. 10.
7    A.  Okay.
8    Q.  And this should be the instant messages
9    between Mr. Lockwood and Mr. Leyman.  Correct?
10   A.  Yes, sir.
11   Q.  And you've seen those before?
12   A.  Yes.
13   Q.  And if we go to the third page of exhibit --
14   Joint Exhibit No. 10, which at the right-hand corner is
15   MOAB 6.
16   A.  Yes, sir.
17   Q.  At 12:08:59 p.m. Mr. Leyman says, "Will be
18   done calling."  And then at 12:09:39 p.m. Mr. Leyman
19   says to Mr. Lockwood, "All done but call me."
20        Okay.  Now, is it your understanding that
21   at that point the transaction was concluded?
22   A.  I believe so, yes.
23   Q.  And that transaction, as you understood it,
24   did not require Tricon to load out of any specific
25   location.  Correct?

48  (Pages 496 to 499)

ARBITRATION HEARING - SEPTEMBER 21, 2010

500

1    A.  No, sir, it did not.
2    Q.  Joint 11 -- Joint Exhibit No. 11 then, as you
3    said, are the e-mails -- or the instant messages between
4    Dr. Wilson and Mr. Leyman.  And at 12:57:20 p.m. -- so
5    that's after Mr. Leyman has told Mr. Lockwood a deal is
6    done.  Correct?
7    A.  At 12:57.  Okay.
8    Q.  You see that?
9        And what Mr. Wilson asked at 12:57, he
10   says, "Ed, given that Brad is selling out of U.S. Gulf
11   Coast, am I getting 45 days from BL or 30, hopefully
12   45."  Do you see that?
13   A.  Yes, sir.
14   Q.  Now, you understand that the question that's
15   being asked there is since the product is being loaded
16   out of the U.S. Gulf Coast, can I have 45 days from the
17   bill of lading to pay the invoice because it's going to
18   take about that long to get over there?  That's what
19   that question means.  Right?
20   A.  He's asking about changing the payment terms.
21   Q.  Correct.  Because that's how long it's going
22   to take to get from the U.S. Gulf Coast to Asia.
23   A.  It takes about 40, 45 days.
24   Q.  Right.  And he would not want to pay the
25   invoice until he could have a chance to sell the product

501

1    on the other end.  And that would be the best case
2    scenario?
3    A.  That's the best case scenario, yes.
4    Q.  Okay.  Now, you don't see where Mr. Leyman
5    corrected Rick Wilson's statement about selling out of
6    the U.S. Gulf Coast, do you?
7    A.  No.
8    Q.  Okay.  But that's not -- you didn't understand
9    the deal to be a requirement that they sell out of the
10   U.S. Gulf Coast.  Right?
11   A.  Correct, I did not.
12   Q.  Did you -- I see in the -- in the documents
13   that you obtained in this case or the documents that you
14   reviewed that you did obtain and review copies of
15   Vinmar's SAP data.  Did you remember doing that?  Take a
16   look at --
17   A.  I'm not sure I did.
18   Q.  Okay.  Well, it's in the -- it's in the
19   statement.  In your report, there's a series of
20   documents reviewed and that would include the documents
21   containing Vinmar's SAP computer-generated data.  Do you
22   remember looking at that?
23   A.  I probably did.  You might have to refresh my
24   memory.
25   Q.  Okay.  Well, one -- we can look at a couple of

502

1    different places just to see if this refreshes your
2    memory or not.  Joint Exhibit No. 7.  So, Mr. Simpson, I
3    think that's the -- not that one.  That one, yes, sir,
4    right there.
5    A.  This one?
6    Q.  Yes, sir.
7    A.  No. 7.  Okay.
8    Q.  Here's some of the SAP data.  Do you recall
9    reviewing this information?
10   A.  I remember seeing it.  Your copy is much
11   better than mine.
12   Q.  Okay.  I just -- I just want to know if you
13   recalled seeing it or not.
14   A.  Yes, I -- yes, I saw it.
15   Q.  And that -- do those documents play any role
16   in your opinion here today?
17   A.  No, they probably don't.
18   Q.  If Vinmar's documentations showed that they
19   believed the country of origin was USA, would that have
20   any bearing on your opinion as to what the deal terms
21   were?
22   A.  Well, I know they believed they had that.
23   Q.  So that would be consistent with your
24   understanding of Vinmar's position.  Correct?
25   A.  Yes, sir.

503

1    Q.  You said that you had never signed a contract
2    on a spot deal.  Is that correct?
3    A.  Yes.
4    Q.  But you have signed what you call long-term
5    deals, something that's a year or longer?
6    A.  Usually a year or longer.
7    Q.  Can -- but you do know that you've seen a lot
8    of different terms and conditions and paper in the
9    industry.  Most of those contain signature blanks.
10   Correct?
11   A.  I'll say most of the aromatics don't.
12   Q.  They don't contain signature blanks?
13   A.  Not that I -- most of them.
14   Q.  Right.
15   A.  The definition of most of them is probably the
16   tough part.
17   Q.  Okay.  More than three --
18   A.  I would say the majority of them do not
19   contain signature blanks.  I can just tell you Valero's
20   never did.
21   Q.  Valero's never even had a place for somebody
22   to sign.  Correct?
23   A.  No, sir.
24   Q.  You said that if there was a mistake in a
25   trade and somebody became aware of it that it wouldn't

49  (Pages 500 to 503)

ARBITRATION HEARING - SEPTEMBER 21, 2010

504

1  take them -- it wouldn't take an ops person more than 30
2  seconds to get ahold of a trader?
3      A.  Yes, sir.
4      Q.  Okay.  Now, that of course is assuming that
5  the trader is available.  Right?
6      **A.  Assuming they're available.  They're going to**
7  **try to find out where they are if they're not there.  If**
8  **it's in the middle of the night, they'll try to do that.**
9  **They'll get ahold of him as soon as possible.**
10     Q.  Right.  They'll get ahold of him as soon as
11 possible?
12     A.  And it's usually immediately.
13     Q.  And if the trader is not available, then as
14 soon as possible may take some time.  Right?
15     A.  It could.
16     Q.  So is it your opinion that the -- you
17 testified that you believe that a deal had been done.  I
18 just want to make sure I understand.  It's your opinion
19 that a deal was done on July 22nd, 2008?
20     **A.  Yes, I believe that's the date.**
21     Q.  And did -- you reviewed the broker
22 confirmation, which was Joint Exhibit No. 4.  Correct?
23     **A.  Yes.**
24     Q.  And is it your understanding that that
25 document -- did that document accurately reflect the

505

1  agreement as you understand it?
2      **A.  That's what I understood.**
3      Q.  Is it your understanding that all of the terms
4  that were included in Joint Exhibit No. 4 had been
5  discussed and agreed to by the parties?
6      **A.  By both parties?**
7      Q.  Yes, sir.
8      **A.  Yes.  That's what was in Ed Leyman's**
9  **deposition.  Do you remember if origin was included?  He**
10 **said it wasn't.**
11     Q.  Okay.  But my -- I guess my question was a
12 little different.  I just want to --
13     **A.  Okay.**
14     Q.  -- make sure I understand.  The document,
15 Joint Exhibit No. 4, it's your opinion that that
16 document included all the terms that the parties had
17 agreed to?
18     **A.  Well, there's other terms and conditions that**
19 **they agreed to later, yes.**
20     Q.  Well, but is this document --
21     **A.  The pertinent ones.  The pertinent ones --**
22     Q.  And you've --
23     **A.  -- that conclude a deal.  In my mind that**
24 **conclude a deal.**
25     Q.  Right here, Joint Exhibit No. 4?

506

1      A.  Yes.
2      Q.  Okay.  And you've actually told us this
3  afternoon that you've done deals where there was no
4  paper other than this confirmation because people didn't
5  agree?
6      **A.  They didn't agree upon general terms and**
7  **conditions.**
8      Q.  Right.  So there was no other paper than this
9  confirmation?
10     **A.  What I'm trying to say is I will do a deal.**
11 **You've got to get it in a con -- and I'm using Valero.**
12 **You have to get in the contract system so you have to**
13 **send something down there that gets it in the system and**
14 **then that releases the barrels for the refineries or the**
15 **terminal or whoever to release the barrels.**
16 **       So something came through, but we didn't**
17 **pass paper.  We didn't get paper from each party.  We**
18 **might not have got paper from a broker if you're using a**
19 **broker.**
20     Q.  Okay.  So there are a variety of different
21 ways that a deal may be done and ultimately performed?
22     **A.  Right.**
23     Q.  It's your opinion that a broker earns his
24 commission when he concludes a deal.  Correct?
25     **A.  Yes, sir.**

507

1      Q.  When he -- when he puts a firm bid with a firm
2  offer, the broker has earned his commission?
3      **A.  Yes, sir.**
4      Q.  And he should be paid for that commission.
5  Correct?
6      **A.  Yes, sir.**
7      Q.  Did you know that Tricon had been sent a
8  commission invoice by MOAB?
9      **A.  No.**
10     Q.  Did you know they didn't pay it?
11     **A.  No.**
12     Q.  They don't have any intent of paying it?
13         MR. DIAZ-ARRASTIA:  I object that that
14 clearly mistakes Mr. Lockwood's testimony.
15         MR. LEE:  I'm sorry.  Let me --
16         JUDGE BENTON:  It's overruled.  The panel
17 remembers the testimony.
18     Q.  (BY MR. LEE)  Tricon has postponed --
19         MR. DIAZ-ARRASTIA:  I don't think it
20 misleads the witness.
21         MR. LEE:  And I'll withdraw the question
22 and I'll ask it again.
23     Q.  (BY MR. LEE)  The testimony was that the
24 payment of the invoice has been postponed?
25     **A.  I didn't --**

50  (Pages 504 to 507)

ARBITRATION HEARING - SEPTEMBER 21, 2010

508

1    Q.  Are you aware of that?
2    A.  No, I didn't know that.
3    Q.  Do you see anything in the broker confirmation
4  or have you seen any documents in this case that
5  would -- that state an agreement between MOAB and Tricon
6  that Tricon has the right to postpone paying the
7  commission until somebody performs?
8    A.  It doesn't say it in the agreement, no.
9    Q.  Did -- were you aware that Mr. Leyman did not
10  send a commission invoice to Vinmar?
11   A.  No, sir.
12   Q.  Wouldn't that be a comment on what he thought
13  about whether the deal was final or not?
14   A.  I can't say what he thought -- what he thought
15  about sending out an invoice or not.
16      MR. LEE:  I'll pass the witness.
17      JUDGE BENTON:  Anything else,
18  Mr. Diaz-Arrastia?
19      MR. DIAZ-ARRASTIA:  I have just a couple
20  of questions.
21      REDIRECT EXAMINATION (2:58 p.m.)
22  BY MR. DIAZ-ARRASTIA:
23   Q.  Mr. Simpson, Mr. Lee asked you a little bit
24  about, you know, the scheduler or ops specialist trying
25  to get ahold of his trader --

509

1    A.  Yes.
2    Q.  -- and what happens if the trader is not
3  available.
4       How long does it take to send an e-mail to
5  your trader?
6    A.  Ten seconds, 15 seconds.
7    Q.  Okay.  Now, let's take a look at Joint
8  Exhibit 11, those IM's that Mr. Lee was questioning you
9  about.
10   A.  No. 11, Joint Exhibit?
11   Q.  Joint Exhibit No. 11, and in particular the
12  line at 12:57:20 where Mr. Wilson is saying, "Given Brad
13  is selling out of USG."
14   A.  I'm not there.
15   Q.  12:57:20.
16   A.  Okay.
17   Q.  Have you found it?
18   A.  Yes.
19   Q.  Do you remember that Mr. Lee questioned you
20  about that for a little while?
21   A.  Yes, sir.
22   Q.  Now, you have also read Mr. Lockwood's
23  deposition in this case, have you not, sir?
24   A.  Yes.
25   Q.  And is it your understanding that after --

510

1      JUDGE DAVIDSON:  One second.  We need to
2  take a break.
3      JUDGE BENTON:  We'll just take a -- let's
4  just take a ten-minute break here.
5      MR. DIAZ-ARRASTIA:  Okay.
6      (Recess from 3:00 p.m. to 3:16 p.m.)
7      JUDGE BENTON:  We're back on the record.
8  We'll break this evening about 4:45, 4:50 at the latest.
9  Okay?
10      MR. DIAZ-ARRASTIA:  Okay.
11      JUDGE BENTON:  All right.  With that, you
12  were in the middle of a question, I believe.
13      MR. DIAZ-ARRASTIA:  Yes, I was.
14      JUDGE BENTON:  You may proceed.
15   Q.  (BY MR. DIAZ-ARRASTIA)  And let me get back to
16  that.  Okay.  Mr. Simpson, I was calling your attention
17  to Joint Exhibit 11 and the entry at 12:57:20 where
18  Mr. Wilson says, "Ed, given Brad is selling out of USG,
19  am I getting 45 days from BL or 30?"
20      I think the question that I was asking you
21  at the very moment that we broke was whether you had an
22  opportunity to review Mr. Lockwood's deposition in this
23  case.
24   A.  Yes.
25   Q.  And is it your understanding that

511

1  Mr. Lockwood's testimony has been that after the deal
2  was made Mr. Leyman asked him where he was likely to get
3  his supply, and that his response was, "Most likely from
4  the U.S. Gulf."
5    A.  Yes.
6    Q.  So that is very consistent with what statement
7  that Mr. Lockwood made, "Most likely U.S. Gulf"?
8    A.  Yes, sir.
9    Q.  But as I think we established a moment ago, is
10  mostly likely U.S. Gulf a guarantee of U.S. origin?
11   A.  No, sir.
12   Q.  And anyone who is experienced in the industry
13  would understand that?
14   A.  Yes, sir.
15   Q.  Let me ask you another thing, sir.  We talked
16  a little bit about -- I can't remember what the exhibit
17  number was.  It was that e-mail between Mr. Anaya and
18  Mr. Wilson.
19      I'll tell you what.  We'll just look at
20  J 11.  We don't have to see it, but I just want to ask
21  you this question, sir.  In your opinion as someone who
22  has been, what, more than 20 years in the industry and
23  been an active trader, would someone with experience in
24  the petrochemical industry -- in the petrochemical
25  trading industry use the word "origin" when they really

51  (Pages 508 to 511)

ARBITRATION HEARING - SEPTEMBER 21, 2010

512

1  meant load port?
2      A.  No, sir.
3          MR. DIAZ-ARRASTIA:  I pass the witness.
4          JUDGE BENTON:  Mr. Lee?
5          MR. LEE:  Just a couple of quick
6  questions.
7          RECROSS-EXAMINATION (3:18 p.m.)
8  BY MR. LEE:
9      Q.  Did you read Dr. Wilson's testimony on that
10  e-mail?
11     A.  Yes, sir.
12     Q.  You know what he said about it.  Right?
13     A.  Yes, sir.
14     Q.  And he said he was answering the question
15  about the port of load.  Correct?
16     A.  I understood that.
17     Q.  You just don't believe that he -- that that's
18  really what he meant?
19     A.  No.  I was just reading what he said.
20     Q.  Okay.  That's your interpretation of what he
21  meant --
22     A.  That's my interpretation.
23     Q.  We have his testimony as to what he meant when
24  he wrote it.  Correct?
25     A.  Yes.

513

1      Q.  A couple of quick questions.  Joint Exhibit
2  No. 10, which are these instant messages between
3  Mr. Lockwood and Mr. Leyman, if you'll go to MOAB 12,
4  which is July 31, 2008.
5      A.  Okay.
6      Q.  Did you investigate why Tricon was in the
7  market to buy mixed xylenes on July 31st, 2008?
8      A.  No.
9      Q.  Okay.  But did you know that they were in the
10  market to buy mixed xylenes on July 31st?
11     A.  From this, yes.
12     Q.  Okay.  And what Mr. Lockwood had suggested to
13  Mr. Leyman on July 31, 2008, is maybe you can work a
14  cheap book out for me with Vinmar.  Right?
15     A.  Yes, sir.
16     Q.  In other words, do a paper transaction.
17  Correct?
18     A.  Yes, sir.
19     Q.  Trading companies don't make the product.
20  Right?
21     A.  No, sir.
22     Q.  So like Tricon doesn't make mixed xylenes?
23     A.  Correct.
24     Q.  They have to buy it to deliver it.  Correct?
25     A.  Yes, sir.

514

1          MR. LEE:  I'll pass the witness.
2          (The time is 3:19 p.m.)
3          JUDGE BENTON:  Mr. Diaz-Arrastia?
4          MR. DIAZ-ARRASTIA:  Nothing further.
5          JUDGE BENTON:  Call your next witness.
6          MR. DIAZ-ARRASTIA:  May he be excused?
7          JUDGE BENTON:  Yeah, you may be excused,
8  sir.
9          MR. SIMPSON:  Okay.  Thanks.
10          MR. DIAZ-ARRASTIA:  Mr. Lee and I were
11  talking during the break about the manner of proceeding
12  with the rest of the case, and this is what we would
13  like to do.
14          My next witness was going to be Chuck
15  Matthews who's our -- the person who calculated our
16  damages for us.  He has submitted a report which you
17  have seen in advance and is also in the exhibit book
18  that's Tricon Exhibit -- I think it's 39.  Is it 39?
19          Yes, Tricon Exhibit 39 with a couple of
20  additions.  His CV is Tricon Exhibit 40.  And very
21  quickly the -- and there is also some -- there it is.
22  There is some information that he relied on to make one
23  of his schedules, information that he had taken from
24  Platts, which is Tricon Exhibit 33, and that's what
25  backs up one of the schedules in his report.

515

1          We have agreed that for our damages
2  evidence we would submit the report and Mr. Matthews
3  will not testify live.  All that I would do would be
4  have him walk the panel through the report and we can
5  get the panel to read it, and Mr. Lee is in agreement
6  with that.
7          JUDGE BENTON:  Let's see.  Judge Woods
8  probably graduated with an economics, I'm a CPA and
9  Judge Davis knows everything.
10          JUDGE DAVIDSON:  I was -- I was a math
11  major.
12          MR. DIAZ-ARRASTIA:  I'm sure you could
13  handle it very well.
14          MR. LEE:  And just to be clear, obviously
15  we don't agree with the report, but we -- I agree that
16  that's what he would testify to.  And I think rather
17  than spending an hour having him do that that we might
18  be able to speed this up.
19          MR. DIAZ-ARRASTIA:  The --
20          JUDGE WOOD:  And so, therefore, your
21  closing -- I'm sorry.
22          MR. DIAZ-ARRASTIA:  Well, not --
23          JUDGE WOOD:  If I could ask a question.
24  Therefore, your closing remarks are you would sum up
25  with how you interpret his report and we would hear from

52  (Pages 512 to 515)

ARBITRATION HEARING - SEPTEMBER 21, 2010

516

1  Mr. Lee as to his comments?
2       MR. DIAZ-ARRASTIA:  I suppose we could
3  both do that.
4       JUDGE WOOD:  Thank you.
5       MR. DIAZ-ARRASTIA:  The other evidence
6  that I would have to present is we do have a claim for
7  attorneys' fees.  We had an agreement before the hearing
8  that the attorneys' fee evidence would be submitted in
9  writing.
10       The panel already has a copy of my
11  attorneys' fee invoices in this matter through the month
12  of August.  I will prepare a report updating it through
13  the end of the hearing and going into perhaps any
14  enforcement proceedings.
15       We talked about dates during the break.
16  Mr. Lee is going to be out of town next week so I think
17  where we ended up is that I would prepare -- present the
18  report to the panel by August the 30th and he would --
19  I'm sorry, September the 30th, and he would give
20  whatever response in writing by the 8th of October, if
21  that's okay with the panel.
22       JUDGE BENTON:  The 8th of what?
23       MR. DIAZ-ARRASTIA:  October.
24       JUDGE BENTON:  Well, let me ask you a
25  question.  We have not yet talked about closing

517

1  arguments.  Do you contemplate making closing arguments
2  orally or do you prefer to have them in writing?
3       MR. DIAZ-ARRASTIA:  Well, I have a closing
4  argument prepared, but we also discussed that and we
5  decided to ask you what you would want to hear since
6  you're the ones who matter.
7       JUDGE WOOD:  Let's hear from Mr. Lee.
8       MR. LEE:  Well, I would -- there's a
9  couple of things on that.  I certainly think that it
10  would be beneficial to the panel if we presented some
11  briefing on some of the legal issues, particularly the
12  damages, if that's informative to the panel.
13       And so whether -- I'd like to make a
14  closing argument, but if you don't find that useful we
15  can do it in the legal submissions.
16       JUDGE BENTON:  Well, you know what?  Just
17  one second.  I have on each day we've been here talked
18  to the court reporter and I am informed that -- my
19  understanding is that you are going to get the record
20  from the court reporter in the normal course of events
21  once the evidence kindly closes.
22       If it would help you to have the evidence
23  to prepare closing and writing me, that might help, but
24  give us a second to huddle.  Why don't we take --
25       MR. DIAZ-ARRASTIA:  One -- before we go

518

1  into that, the final bit of evidence would be in our
2  cause we have also agreed the deposition of Mr. Gary
3  Cofran, who is Vinmar's expert, would be submitted in
4  evidence in its entirety.  However, I would -- I have
5  maybe about ten minutes of some sections that I would
6  like to read to the panel to highlight them.
7       Once I do that, my case would rest.  And I
8  think that Mr. Lee then has Mr. Pascu who will testify.
9  And I think then we would be done with the evidence.
10       JUDGE DAVIDSON:  Okay.  I just want to
11  make sure -- well, two things.  First of all, some of
12  how we proceed depends upon whether y'all wanted a
13  reasoned ruling or a ruling and -- you know, and we
14  asked y'all to let us know by the time you close and I
15  haven't -- I haven't heard an answer yet.
16       MR. DIAZ-ARRASTIA:  No.  I don't think we
17  have given you one.
18       JUDGE BENTON:  Yeah, but that's okay
19  because the record --
20       MR. DIAZ-ARRASTIA:  We have not discussed
21  that.
22       MR. LEE:  We haven't huddled on that.
23       JUDGE BENTON:  But that's okay because for
24  Triple A rules the record will not be closed until we
25  get the last piece of paper there -- that is due us,

519

1  whether that be the briefing or whatever it is.
2       So, I mean, if we leave here today or
3  tomorrow, that doesn't start the clock running.
4       JUDGE DAVIDSON:  I know that.  As long as
5  y'all know that the effect of --
6       MR. DIAZ-ARRASTIA:  I understand a
7  reasoned ruling takes more work.
8       JUDGE DAVIDSON:  Yes.
9       MR. DIAZ-ARRASTIA:  A lot more work.
10       JUDGE DAVIDSON:  Perhaps.
11       MR. DIAZ-ARRASTIA:  Perhaps.
12       MR. LEE:  I certainly appreciate that.
13  We'll -- let us talk about that.
14       JUDGE DAVIDSON:  Okay.  We're going to go
15  huddle.  You're going to talk about that.
16       MR. LEE:  Can I make one other suggestion?
17       JUDGE DAVIDSON:  Sure.
18       MR. LEE:  I have done a couple of
19  arbitrations where we have finished the evidence, gotten
20  the record, submitted briefing and then had a closing
21  argument, both evidentiary and legal, and answered
22  whatever questions the panel have.  We certainly could
23  do that if you wanted to.  It just depends on what the
24  panel wants.
25       MR. DIAZ-ARRASTIA:  Fine.

53  (Pages 516 to 519)

ARBITRATION HEARING - SEPTEMBER 21, 2010

520

1    MR. LEE: I'm prepared to do a closing
2  or --
3        JUDGE BENTON: Okay. Give us three
4  minutes. And we're off the record, of course.
5        (Recess from 3:26 p.m. to 3:35 p.m.)
6        JUDGE BENTON: We're back on the record.
7        Let's see here. What are you giving us on
8  the 30th?
9        MR. DIAZ-ARRASTIA: What I would give you
10 on the 30th is a report on my attorneys' fees.
11       JUDGE BENTON: Okay.
12       MR. DIAZ-ARRASTIA: And as I said, you
13 already have in Tricon Exhibit 37 all my bills in this
14 case through --
15       MS. LARSON: 37 and 38.
16       MR. DIAZ-ARRASTIA: Oh, 37 and 38. I'm
17 sorry.
18       JUDGE BENTON: Okay.
19       MR. DIAZ-ARRASTIA: You have all of those
20 through actually --
21       JUDGE BENTON: Well, yeah. I --
22       MR. DIAZ-ARRASTIA: We'd need to update
23 it, of course.
24       JUDGE BENTON: You've given me more than I
25 need --

521

1        MR. DIAZ-ARRASTIA: Right.
2        JUDGE BENTON: -- by my question.
3        MR. DIAZ-ARRASTIA: Okay. That's what I
4  would do by the 30th.
5        JUDGE BENTON: Okay. If it was our desire
6  to accommodate what Mr. Lee suggests, and that is get
7  some post evidentiary briefing and thereafter have oral
8  argument, would you be able to provide us with your side
9  of the closing briefing on the 30th also? If not --
10       MR. DIAZ-ARRASTIA: Well, we were just
11 talking with the reporter and she can get us -- it will
12 take her about a week to have the record transcribed and
13 I would like -- I think ideally what you would like is
14 if you have a written closing, I'd like us to be able to
15 make record references. So we're probably not going to
16 be getting the record until just a day or two before the
17 30th.
18       JUDGE BENTON: Okay. So what date would
19 work for you?
20       MR. DIAZ-ARRASTIA: Let me look at my
21 calendar.
22       And is it -- would you contemplate that
23 both sides would file their close at the same time or
24 that I would go first and then he would go second?
25       JUDGE BENTON: At the same time.

522

1        MR. DIAZ-ARRASTIA: At the same time.
2  Well, keeping in mind that he will be out of town next
3  week, I would like to accommodate that as well.
4        JUDGE BENTON: That's right. I forgot
5  about that. Through the 8th. Right?
6        MR. LEE: Well, it's out next week. I do
7  have the some depositions the first part of -- I mean,
8  ideally if that's the idea maybe on the -- would we do
9  the 15th of October?
10       JUDGE BENTON: Submit them on the 15th?
11       MR. LEE: Yes.
12       JUDGE WOOD: What day would -- what day
13 would y'all anticipate doing the closing arguments?
14       JUDGE BENTON: Well, hold on a second.
15 Let's take their papers first. This is what we're
16 addressing.
17       MR. LEE: We're both going to file.
18       MR. DIAZ-ARRASTIA: The 15th is
19 acceptable --
20       JUDGE BENTON: Okay.
21       MR. DIAZ-ARRASTIA: -- to me. I mean, I
22 think I could do it a few days sooner, but if Steve
23 needs that long that's fine with me.
24       MR. LEE: Yeah. Unfortunately I am --
25       JUDGE DAVIDSON: No. And I can understand

523

1  that.
2        JUDGE BENTON: Okay. Hold on a second.
3  There's no need to apologize. So I think we're firm
4  then October 15 we'll submit the paper closing briefing
5  or brief closing.
6        All right. Now, given that, what date
7  works for you to do --
8        MR. DIAZ-ARRASTIA: Oral argument?
9        JUDGE BENTON: -- oral argument?
10       And let me just say right up front the
11 week of the 18th is probably not a good week for some of
12 us up here.
13       MR. DIAZ-ARRASTIA: Okay. I think the
14 primary consideration in that should be how long you-all
15 think you'll need to read everything?
16       JUDGE WOOD: We'll have -- we're going to
17 read.
18       JUDGE BENTON: If we're going to get it on
19 the 15th and we'll have it read the week of the 18th,
20 there's no doubt.
21       JUDGE DAVIDSON: How about the 25th, a
22 Monday?
23       JUDGE WOOD: 25th?
24       MR. DIAZ-ARRASTIA: 25th will work.
25       JUDGE BENTON: Mr. Lee?

54 (Pages 520 to 523)

ARBITRATION HEARING - SEPTEMBER 21, 2010

524

1    MR. LEE: That's fine with me. I would
2    suggest -- I will offer it. We have a conference room
3    in our office that has sort of a little round table and
4    a place to argue, but if everybody's -- George, if
5    you're comfortable doing it there --
6    MR. DIAZ-ARRASTIA: I am perfectly
7    comfortable going to your office.
8    MR. LEE: Okay. So we'll be happy to host
9    that and give you all day in the conference room if you
10   wanted to work after we leave so...
11   JUDGE BENTON: Okay. So Monday, the 25th.
12   Let's just say 9:00 a.m. Does that work for you, Judge
13   Wood?
14   JUDGE WOOD: Yes.
15   JUDGE BENTON: Judge Davidson?
16   JUDGE DAVIDSON: Monday, the 25th.
17   JUDGE BENTON: 9:00 a.m. Okay. So -- all
18   right. With that, back to you, Mr. Diaz-Arrastia.
19   JUDGE WOOD: Two minutes. Let me whisper
20   in his ear.
21   JUDGE BENTON: Okay. Mr. Diaz-Arrastia, I
22   will give it back to you -- I'm sorry. Mr. Lee is
23   rising.
24   MR. LEE: I'm sorry. May I make one more
25   comment? I think the agreement we have on agreement

525

1    fees is that Tricon would submit --
2    JUDGE BENTON: Theirs first.
3    MR. LEE: -- theirs on the --
4    JUDGE BENTON: 30th.
5    MR. LEE: -- 30th. And then we would file
6    response on October the 8th.
7    JUDGE BENTON: Right.
8    MR. LEE: Okay. So just on the attorneys'
9    fee issue as to what the amount is. And obviously we
10   don't agree that they're entitled to attorneys' fees,
11   but if we're going to submit counter --
12   JUDGE BENTON: Okay.
13   JUDGE WOOD: And do we want to have a time
14   that y'all let us know what kind of ruling you want?
15   Would that be a deadline that y'all can agree on --
16   MR. DIAZ-ARRASTIA: Well, I would --
17   JUDGE WOOD: -- or is that just --
18   MR. DIAZ-ARRASTIA: We've -- maybe we've
19   decided. We've decided on our side that we would like a
20   reasoned decision.
21   JUDGE WOOD: If somebody requests us do
22   it, we need to do it.
23   MR. DIAZ-ARRASTIA: And I think Mr. Lee
24   has indicated that he's okay with that.
25   MR. LEE: Right. I think that it's

526

1    Tricon -- I mean, obviously you understand where we are
2    on the jurisdictional issue and so --
3    JUDGE WOOD: I think under the rules if
4    one side requests it you get it so that's why we wanted
5    to know if anybody was going to request it.
6    JUDGE BENTON: Right.
7    MR. DIAZ-ARRASTIA: Well, I will request
8    it right now.
9    JUDGE WOOD: Got it.
10   JUDGE DAVIDSON: Easy.
11   JUDGE BENTON: All right. That takes care
12   of the scheduling stuff.
13   So do you have more evidence to put on?
14   MR. DIAZ-ARRASTIA: The other evidence to
15   put on, we are going to -- do we have copies? Let's go
16   get -- the agreement that we have made is that the
17   deposition of Mr. Gary Cofran, who is Vinmar's expert,
18   will be submitted in its entirety.
19   However, there are some excerpts from it.
20   And this deposition was not video'd, but there's some
21   experts -- excerpts from it that I would like to read to
22   the panel now. And if Ms. Larson would play the role of
23   Mr. Cofran, we can do that now. I think it will be
24   about ten minutes.
25   JUDGE DAVIDSON: Okay.

527

1    MR. LEE: And if I could make just one
2    comment. I have not been provided with the designation
3    so I think rather than trying to shuffle through and
4    figure out optional completeness, I will submit whatever
5    we need to submit in a brief -- in our closing brief.
6    JUDGE DAVIDSON: I just sort of thought it
7    was going to be -- that we could consider it in its
8    entirety.
9    JUDGE BENTON: Yeah.
10   MR. DIAZ-ARRASTIA: Well, you can consider
11   it in its entirety, but there are some parts that I want
12   to emphasize.
13   JUDGE DAVIDSON: Fine. In other words, I
14   will read this entire deposition. I will give all
15   panels -- all portions of this deposition equal weight.
16   How does that sound?
17   JUDGE WOOD: That's what I show as the
18   Rule 11 agreement.
19   MR. DIAZ-ARRASTIA: Correct. That is
20   correct.
21   JUDGE DAVIDSON: I see his --
22   JUDGE WOOD: My question is, how are we
23   going to get a copy of this to the court reporter? Now,
24   make sure that she gets a copy.
25   MR. DIAZ-ARRASTIA: We will make sure that

55  (Pages 524 to 527)

ARBITRATION HEARING - SEPTEMBER 21, 2010

528

1     she -- that she gets a copy.
2          MS. LARSON:  I've got a copy right now.
3          MR. DIAZ-ARRASTIA:  Yeah.  And, like I
4     said, it was like this -- frankly, yesterday evening, I
5     still really believed that he was going to be called,
6     but that has changed.
7          Why don't you get your part and we will
8     read it.
9          MR. LOCKWOOD:  Do you want her to sit over
10    there?
11         MR. DIAZ-ARRASTIA:  Yes.  Why don't you
12    sit on the stand to make it easier?
13         JUDGE BENTON:  All right,
14    Mr. Diaz-Arrastia.
15         MR. DIAZ-ARRASTIA:  We are -- we are going
16    to start on Page 5, Line 12 through Line 21.
17         MS. LARSON:  They have it.
18         MR. DIAZ-ARRASTIA:  Oh, okay.  I will -- I
19    will read it out loud so the panel can follow along.  So
20    Page 5, Lines 12 through 21.
21         (At this time excerpts of the transcript
22    of the deposition of Gary Cofran that was taken on
23    September 16, 2010, were read into the record.  The
24    questions were read by Mr. Diaz-Arrastia.  The answers
25    were read by Ms. Larson.)

529

1              GARY COFRAN,
2     having been first duly sworn, testified as follows:
3              EXAMINATION
4     BY MR. DIAZ-ARRASTIA:
5          Q.  Good afternoon, Mr. Cofran.
6          A.  Good afternoon.
7          Q.  My name is George Diaz-Arrastia.  I am one of
8     the attorneys for Tricon in this case.  I guess let's
9     get right in.  First, could you state your full name for
10    the record?
11         A.  It's Gary Cofran.
12         Q.  Okay.  And have you been hired by Vinmar in
13    this case to be an expert witness?
14         A.  Yes.
15         MR. DIAZ-ARRASTIA:  Next is on Page 23,
16    Lines 7 through 13.
17         Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  When -- who --
18    back when you were --
19         JUDGE WOOD:  Just a minute.
20         Q.  (BY MR. DIAZ-ARRASTIA) -- doing trades --
21         JUDGE WOOD:  Just a minute.  Let Mr. Lee
22    get to that spot.
23         MR. DIAZ-ARRASTIA:  Oh, I'm sorry.
24         JUDGE WOOD:  That's okay.  We're just
25    making sure everybody gets to the spot before we start

530

1     reading.  Let's --
2          MR. DIAZ-ARRASTIA:  Page 23, Line 7
3     through 13.
4          Are we ready?
5          Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  When -- who --
6     back when you were doing trades, would you have
7     considered the -- who would you have considered the
8     leading brokers in the U.S. dealing in aromatics?
9          A.  There was a two or three-man brokerage company
10    out of New York.  They at one time went by the name of
11    InterCapital, if I remember correctly.  There was Ed
12    Leyman's company.
13         MR. DIAZ-ARRASTIA:  Next we are on
14    Page 39, Line 14 through Page 40, Line 1.
15         Now, are we ready?
16         Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Fair enough.
17    If you're making a firm bid, what you put -- what you
18    state in your firm bid are the things that you want.
19    Would that be correct?
20         A.  Yes.
21         Q.  And, similarly, when you make a firm offer,
22    what you include in your firm offer are the things that
23    you're able to do, correct, or that you're committed to
24    do let's say?
25         A.  Yes.

531

1          Q.  When a trader tells a broker that he is giving
2     a firm bid, does that mean the broker has authority to
3     go take that firm bid to the sellers?
4          A.  Yes.
5          MR. DIAZ-ARRASTIA:  Now, on 40 --
6          MR. LEE:  Well, I would -- I can't help
7     myself.  I would like to offer one piece as optional
8     completeness, and that would be at Page 40, Line 7
9     through Line 10, where the question was, "And when the
10    terms of a firm bid meet the terms of a firm offer,
11    that's what you have when you have a deal.  Correct?"
12         Answer:  "If all the terms are the same."
13         JUDGE BENTON:  Okay.
14         MR. DIAZ-ARRASTIA:  And I pick up on
15    Line 11 on Page 40 through Line 14.
16         Q.  (BY MR. DIAZ-ARRASTIA)  Now, once a broker has
17    a firm bid and a firm offer that match, is it customary
18    for that broker to send some sort of written
19    confirmation?
20         A.  Yes.
21         MR. DIAZ-ARRASTIA:  On Page 41, Line 6
22    through Line 9.
23         Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Is it important
24    for the traders to review the written confirmations when
25    they receive them?

56 (Pages 528 to 531)

ARBITRATION HEARING - SEPTEMBER 21, 2010

532

1  A.  Yes.
2      MR. DIAZ-ARRASTIA:  Page 45, Line 15
3  through 21.
4      Q.  (BY MR. DIAZ-ARRASTIA)  After a deal is made
5  and a confirm is sent, was is it customary back when you
6  were trading for the parties to send each other their
7  general terms and conditions of sale?
8      A.  I don't know what other companies do.
9      Q.  Did you-all do that?
10     A.  Yes, we did.
11         MR. DIAZ-ARRASTIA:  Page 55, Lines 3
12  through 14.
13     Q.  (BY MR. DIAZ-ARRASTIA)  Where Mr. Pascu is
14  telling Mr. Rajevac, "We shall revert soon with our
15  purchase order for your review."  Do you see that, sir?
16     A.  Yes.
17     Q.  Back when you were trading, sir, would a buyer
18  send a purchase order if he thought there was no deal?
19     A.  Would a --
20     Q.  Would a buyer sell -- would a buyer send a
21  seller its purchase order if the buyer thought there was
22  no deal, if they were not going to buy?
23     A.  No.
24         MR. DIAZ-ARRASTIA:  Page 63, Lines 9
25  through 11.

533

1      Q.  (BY MR. DIAZ-ARRASTIA)  Origin means where
2  it's manufactured?
3      A.  That's correct.
4          MR. DIAZ-ARRASTIA:  Page 65, Lines 15
5  through 16.
6      A.  There's a difference between origin and
7  loading port.
8          MR. DIAZ-ARRASTIA:  Page 66, Line 19
9  through Page 67, Line 1.
10     Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Well, I think
11  when we left I had asked you the question whether any --
12  in your mind when somebody says material is most likely
13  U.S. origin, is that different from saying that it's
14  guaranteed U.S. origin?  Do you have an answer to that
15  question?
16     A.  Yes.
17     Q.  And what's the answer?  It's different?
18     A.  It's different, yeah.
19         MR. DIAZ-ARRASTIA:  Okay.  And then on
20  Page 67, Line 4 through 11.
21     Q.  (BY MR. DIAZ-ARRASTIA)  Now, sir, will you
22  agree with me that if Mr. Wilson wanted -- needed to buy
23  U.S. origin material, he needed to include that in his
24  firm bid?
25     A.  Somewhere he has to tell that that's what he

534

1  wanted, yes.
2      Q.  Okay.  It's not enough that he was thinking
3  about it, he has to tell somebody, "I need U.S. origin"?
4      A.  That's right.
5          MR. DIAZ-ARRASTIA:  And Page 68, Line 11
6  through 15.
7      Q.  (BY MR. DIAZ-ARRASTIA)  And you've seen
8  confirms that contain a term saying it has to be of a
9  particular origin or it can't be of a particular origin,
10  haven't you, sir?
11     A.  Yes, I have.
12         MR. DIAZ-ARRASTIA:  Page 69, Lines 16 and
13  17.
14     Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  And if you
15  would look at Exhibit 43 under the quality line --
16         MR. DIAZ-ARRASTIA:  And these are Tricon
17  Exhibit 1.  Then I continue with the question on
18  Page 69, Line 23 through 70, Line 3.
19     Q.  (BY MR. DIAZ-ARRASTIA)  Do you see that, sir?
20  And there it specifically says "Product to be of U.S.
21  origin"?
22     A.  Yes.
23     Q.  And you've seen confirms like that before.
24  Correct, sir?
25     A.  Yes.

535

1          MR. DIAZ-ARRASTIA:  On Page 70, Line 16
2  through 22.  And now I'm referring to Tricon Exhibit 2.
3      Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  And there under
4  the quality line, this one states, "Product must be of
5  non-Iranian or Chinese origin."  Do you see that, sir?
6      A.  Yes.
7      Q.  You've seen that before in broker confirms,
8  have you not, language like that?
9      A.  I've seen it before, yes.
10         MR. DIAZ-ARRASTIA:  Okay.  Page 71,
11  Lines 1 through 7.
12     Q.  (BY MR. DIAZ-ARRASTIA)  And if you will look
13  at Exhibit 45 now --
14         MR. DIAZ-ARRASTIA:  That would be Tricon
15  Exhibit 3.
16     Q.  (BY MR. DIAZ-ARRASTIA)  Now, sir, this is
17  again similar to 43 and 44.  Correct, sir?
18     A.  Yes.
19     Q.  And you also haven't seen Exhibit 45 before
20  today?
21     A.  No.
22     Q.  Correct?
23         MR. DIAZ-ARRASTIA:  Okay.  Moving down to
24  Page 71, Line 11.
25     Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  And under the

57  (Pages 532 to 535)

ARBITRATION HEARING - SEPTEMBER 21, 2010

536

1  quality line, it also states "this time" in parentheses
2  "No Iranian or Chinese origin." Do you see that, sir?
3      A.  I see it.
4      Q.  And you've seen confirms similar -- that
5  contain similar language back when you were trading.
6  Correct, sir?
7      A.  Yes.
8          MR. DIAZ-ARRASTIA:  Page 75, Line 18
9  through 25.
10     Q.  (BY MR. DIAZ-ARRASTIA)  Back when you were a
11  trader, sir, was it common for traders to sell material
12  that they did not yet own?
13     A.  Yes.
14     Q.  Do traders sell material when they are short
15  on that material back when you were a trader?
16     A.  Yes.
17     Q.  Was that common?
18     A.  Some people did it.  It was a developing art
19  at that time.
20         MR. DIAZ-ARRASTIA:  Okay.  Page 76,
21  Line 15 through Page 77, Line 10.
22     Q.  (BY MR. DIAZ-ARRASTIA)  Now, hypothetically if
23  a trader sells a load of MX that he does not yet own --
24         MR. DIAZ-ARRASTIA:  And Mr. Cofran nodded
25  his head.

537

1      Q.  (BY MR. DIAZ-ARRASTIA) -- then after the sale
2  is made the price of MX begins to fall, that trader has
3  just made a good deal.  Right?
4      A.  Yes.
5      Q.  And that is because he has just sold high and
6  he is going to be able to buy low?
7      A.  Right.
8      Q.  And things like that happen all the time in
9  petrochemicals trading, don't they?
10     A.  Yes.
11     Q.  And it could also happen that you sell today
12  and then the price begins to go up and then you're going
13  to lose money?
14     A.  Yes.
15     Q.  Similarly, if you're a buyer of MX and you buy
16  today and the price begins to go down, you've just made
17  a bad deal?
18     A.  Hypothetically, yes.
19         MR. DIAZ-ARRASTIA:  Page 80, Line 3
20  through 10.
21     Q.  (BY MR. DIAZ-ARRASTIA) Have you ever heard
22  the term "the market freezes"?
23     A.  Yes.
24     Q.  And what does that mean?
25     A.  That there's no activity.

538

1      Q.  And when there's no activity, it's very hard
2  to find a buyer.  Correct?
3      A.  Yes.
4          MR. DIAZ-ARRASTIA:  And those are the
5  selections that we wanted to read.
6          JUDGE BENTON:  All right.
7          MR. DIAZ-ARRASTIA:  And at this moment --
8          JUDGE BENTON:  You're going to read some
9  after all?
10         MR. LEE:  No, I'm not.  I think that -- I
11  had the one optional completeness.  And I'm sure that
12  y'all will read it if you want to and --
13         JUDGE DAVIDSON:  I will read it, I
14  promise, all of it.
15         MR. DIAZ-ARRASTIA:  Well, the only thing
16  that I want to do before I rest is that yesterday
17  Mr. Lockwood wrote -- made some calculations on this
18  board and we would like to mark them as an exhibit for
19  the arbitration.  It will be Tricon Exhibit 41.
20         JUDGE BENTON:  All right.  Very good.
21         MR. DIAZ-ARRASTIA:  Let me just find a
22  pen.
23         (Tricon Exhibit 41 marked.)
24         MR. DIAZ-ARRASTIA:  And at this moment the
25  claimant rests.

539

1          JUDGE BENTON:  All right.  Just to
2  address -- Mr. Lee, again, it's my understanding that
3  the parties have submitted the entirety of Mr. Cofran's
4  deposition so it is our intent to read it unless you
5  don't want us to read it.
6          MR. LEE:  Well --
7          JUDGE WOOD:  No, but the Rule 11 was that
8  we would read it.
9          MR. LEE:  I guess what I would say is
10  you're certainly -- it's in the evidence if you want to
11  read it.  I intend to pull out any testimony that I
12  would rely upon in our briefing.  So if it's something
13  that's important that I think you need to know, I'll
14  certainly put it in my briefing, but it's there for you
15  to read if you want to.  I guess that's the way I
16  would --
17         JUDGE WOOD:  And I noticed -- if you have
18  seen what's been given to us -- there are exhibits
19  attached and I think they're the exhibits that are
20  referenced in the deposition.
21         MR. LEE:  Okay.
22         JUDGE WOOD:  So I just wanted that clear
23  on the record --
24         MR. DIAZ-ARRASTIA:  That is correct.
25         JUDGE WOOD:  -- that we have these

58  (Pages 536 to 539)

ARBITRATION HEARING - SEPTEMBER 21, 2010

540

1  exhibits.
2         MR. DIAZ-ARRASTIA: That is correct.
3         JUDGE DAVIDSON: But I'd like to make it
4  clear that at least for the copy of the deposition I
5  got, the copies of the handwritten exhibits are not of
6  the highest quality. If those same exhibits are already
7  in evidence in either the Vinmar, the Tricon or the
8  Joint, then it doesn't matter.
9         MR. DIAZ-ARRASTIA: Not all the exhibits
10 are the same. There are some exhibits to the deposition
11 that --
12        JUDGE DAVIDSON: This one --
13        MS. LARSON: Some of the ones that we got
14 were very difficult to read as well.
15        MR. DIAZ-ARRASTIA: They're -- the ones I
16 have are not a lot better.
17        JUDGE DAVIDSON: Okay. In that case, it
18 is what it is.
19        MR. LEE: Those are Gary's --
20        JUDGE DAVIDSON: Well, it is -- the stuff
21 is tight.
22        MS. LARSON: This has the same pages in
23 there.
24        JUDGE DAVIDSON: Yeah. It is actually a
25 little better.

541

1         MS. LARSON: Here, I'll give you these.
2         JUDGE WOOD: Well, it's those notes that
3  are Vinmar notes.
4         MS. LARSON: These are slightly better.
5  I'll pass them out.
6         JUDGE DAVIDSON: I need one.
7         MR. LEE: And if -- I can go check to see
8  if we've got a better copy.
9         JUDGE WOOD: Some of them are darker than
10 others.
11        JUDGE BENTON: Okay. With that --
12        MS. LARSON: It's not terribly better.
13 It's marginally better.
14        JUDGE BENTON: And with that, Tricon
15 rests?
16        MR. DIAZ-ARRASTIA: Tricon rests.
17        JUDGE BENTON: All right. Very good.
18 Mr. Lee, you ready to proceed?
19        MR. LEE: Yes, Your Honor. We will call
20 Laurentiu Pascu, who I hope is out in the hallway.
21        JUDGE BENTON: Laurentiu Pascu. And is
22 the traditional oath appropriate?
23        MR. LEE: Yes.
24        JUDGE BENTON: Mr. Pascu, if you'll raise
25 your right hand, please.

542

1         (At this time the witness was duly sworn
2  by Judge Benton.)
3         JUDGE BENTON: Mr. Lee, you may proceed.
4              LAURENTIU PAUL PASCU,
5  having been first duly sworn, testified as follows:
6              DIRECT EXAMINATION (3:57 p.m.)
7  BY MR. LEE:
8     Q. Okay. Mr. Pascu, you don't know this, but
9  earlier today we heard from you in your deposition and
10 so I'm not going to spend a whole lot of time running
11 back through things that were covered, but -- so we
12 might just cut through it, but I would like for you to
13 introduce yourself to the panel, please.
14    A. My name is Laurentiu Pascu. I am working
15 currently for Vinmar International in Houston and --
16    Q. Okay. And, Mr. Pascu, what is it that you do
17 for Vinmar?
18    A. I'm a supply chain specialist.
19    Q. And could you describe what that means at
20 Vinmar?
21    A. I am handling the logistics and the operations
22 portion of the business.
23    Q. Are you -- are you a trader?
24    A. No.
25    Q. Do you get involved in negotiating the

543

1  commercial terms of an agreement?
2     A. No.
3     Q. How long have you been with Vinmar?
4     A. I started January 2006.
5     Q. And, again, I think we saw some of this, but
6  do you mind just telling the panel a little bit about
7  your background, where you grew up?
8     A. I'm originally from Romania. I moved to
9  Houston in January 2006 since I've been with Vinmar
10 and --
11    Q. And how long have you been with Vinmar?
12    A. Five years. Ever since I've been in Houston,
13 I've been with Vinmar.
14    Q. You have had some schooling in the United
15 States?
16    A. Yes. I have done my master in business
17 administration at the University of Houston.
18    Q. As you understand it, Mr. Pascu, what
19 authority do you have to negotiate commercial terms of a
20 deal with Vinmar?
21    A. No authority.
22    Q. What authority do you have to change
23 commercial terms?
24    A. No authority.
25    Q. You do know that at some point in time in the

59 (Pages 540 to 543)

ARBITRATION HEARING - SEPTEMBER 21, 2010

544

1   summer of 2008 that Rick Wilson informed you of what he
2   thought was a deal with Tricon. Correct?
3       A.   Correct.
4       Q.   And what did you understand about the terms of
5   this deal?
6       A.   I understood that there could be a shipment
7   of -- a potential shipment of mixed xylene.
8       Q.   What understanding did you have of the origin
9   of the mixed xylenes?
10      A.   That it's going to come from USA.
11      Q.   Where did you obtain that understanding?
12      A.   From -- from discussion that I have had with
13  Rick.
14           JUDGE BENTON:  From discussions you had
15  with?
16           THE WITNESS:  Rick Wilson.
17           JUDGE BENTON:  Okay.
18      Q.   (BY MR. LEE)  Now, as the logistics specialist
19  at Vinmar, you supervised the entry of the terms or
20  information into Vinmar's SAP system?
21      A.   Yes.  I do supervise the entry of the data
22  into SAP system in Vinmar for chemicals.
23      Q.   And what is -- what is the SAP system?
24      A.   It's the system that serves for entering all
25  the data, I suppose for all management.  I'm not really

545

1   sure exactly what means SAP so...
2       Q.   You know it requires you to enter some data?
3       A.   Right.  It requires me to enter -- actually it
4   requires to enter all the data referring to that
5   business or that shipment.
6       Q.   All right.  Let me ask you to take a look at
7   Joint Exhibit No. 7.  Mr. Pascu, there's three notebooks
8   in front of you.  It's going to be the one on the top on
9   your left right there.
10      A.   Okay.
11      Q.   And if you'll turn to Tab 7.
12      A.   Okay.
13      Q.   And what are the documents contained within
14  Joint Exhibit 7?
15      A.   It is the print screen of the tabs in SAP.
16      Q.   And this refers to -- there's a name at the
17  top -- E. Anaya.  Do you see that?
18      A.   Yes.
19      Q.   And was that -- or who was that?
20      A.   Mr. Eduardo Anaya was at the time a commercial
21  trainee and he was helping -- actually under the
22  training of logistic under my supervision at that time.
23      Q.   All right.  And is Mr. Anaya still employed at
24  Vinmar?
25      A.   No.

546

1       Q.   To the extent that Mr. Anaya entered any
2   information into the SAP system at Vinmar that had
3   anything to do with this transaction, was he doing that
4   under your supervision?
5       A.   Yes.
6       Q.   Now, Joint Exhibit 7, that doesn't contain all
7   of the information that was in Vinmar's SAP system, does
8   it?
9       A.   No.  Each of the tabs have -- contains a
10  certain portion of the information.
11      Q.   Okay.  Now, I'd ask you to take a look at the
12  notebook, Vinmar Exhibits.  Okay?  And if you'll turn to
13  Vinmar Exhibit No. 4, so it's going to be Tab 4 there,
14  sir.
15      A.   Okay.
16      Q.   Okay.  Now, do you recognize the pages
17  contained within Vinmar Exhibit No. 4?
18           JUDGE BENTON:  Just a second.
19           MR. DIAZ-ARRASTIA:  I have an objection to
20  two of the pages on this exhibit.
21           And I understand the panel will consider
22  everything, but I just wanted to explain why I do not
23  believe its reliable.  In particular, I have an
24  objection to the last two pages of your exhibit, VIN 93
25  and 94.

547

1           These are screens that as you see were
2   entered by Mr. Eduardo Anaya.  We requested Mr. Anaya's
3   deposition but were told we could not have it because he
4   no longer works for the company, he now lives in Mexico
5   and they didn't know where he lived anymore, so he was
6   not available.
7           We do not know when the information in
8   these screens was entered, but we have reason to think
9   that it was after this dispute.  And I can get into that
10  with Mr. Pascu when I take him on cross-examination.
11           JUDGE BENTON:  We understand your concerns
12  and we'll let you take it up on cross.  All right.
13      Q.   (BY MR. LEE)  Okay.  Mr. Pascu, do you
14  recognize the documents contained in Vinmar Exhibit
15  No. 4?
16      A.   Yes.  It is a print screen of the SAP tab.
17           (Brief interruption.)
18           JUDGE BENTON:  Hold on one second.
19      Q.   (BY MR. LEE)  And as I understand it, the SAP
20  system contains a number of different tabs and entries
21  that you would drill down into.  Correct?
22      A.   Correct.
23      Q.   Okay.  Pages 2 and 3 of Vinmar Exhibit No. 4,
24  is it your understanding that those two pages, in fact,
25  are contained within Vinmar's SAP system?

60   (Pages 544 to 547)

ARBITRATION HEARING - SEPTEMBER 21, 2010

548

1      A.  Yes.
2      Q.  Okay.  And can you tell us what -- so this
3  would be -- how would this reside in the system?  Where
4  would we find this documentation?
5      A.  Let -- on the screen, there are three tabs.
6  The first tab is describing delivery and all the
7  other -- all the terms like payment terms, Incoterms,
8  currency.  There is a second tab that, going back to
9  Page No. 1, is describing the product, the quantity, the
10  date of delivery.  And there is a third tab in the
11  additional tabs that have the delivery details, again
12  repeating the Incoterms, the country of origin and --
13      Q.  Okay.  And what does the -- there's a
14  statement on here about midway down on the SAP data that
15  says, "C-T-R-Y dash Origin."  Do you see that?
16      A.  Yes.
17      Q.  What does that stand for?
18      A.  Country of origin.
19      Q.  And what was put in the blank?
20      A.  USA.
21      Q.  What does that signify?
22      A.  That the origin is USA.
23      Q.  Okay.  And where did you obtain that
24  understanding?
25      A.  From my discussion with Rick Wilson.

549

1          JUDGE DAVIDSON:  I'm sorry.  From your
2  discussion with?
3          THE WITNESS:  With Rick Wilson.  Sir, you
4  want me to speak louder?
5          JUDGE DAVIDSON:  No, no, no, no.  I just
6  missed that one --
7          THE WITNESS:  Okay.
8          JUDGE DAVIDSON:  -- that word.
9          THE WITNESS:  Sorry.
10      Q.  (BY MR. LEE)  And what is the date of this
11  document according to the print screen?
12      A.  24th of July.
13          JUDGE BENTON:  Where is that located?
14          THE WITNESS:  If you look on any tab, it's
15  going to be on the right-hand side upper -- upper side,
16  dock date.  Next besides Tricon Energy, LLC.
17          JUDGE BENTON:  Okay.  Let's proceed.
18      Q.  (BY MR. LEE)  And the last page of Vinmar
19  Exhibit No. 4, what does that reflect about the country
20  of origin?
21      A.  That the origin is USA.
22      Q.  Okay.  And, again, where was that
23  understanding obtained?
24      A.  From my discussion with the trader, Rick
25  Wilson.

550

1      Q.  Now, if we -- if we look at -- I'll have to
2  make you change notebooks for a second to the Tricon
3  exhibit notebook.  And if you'll turn to Tab No. 10.
4          So that's going to be the bottom notebook.
5  Now, Mr. Pascu, what is the document contained in Tab
6  No. 10?
7      A.  Printout of the SAP entry.
8      Q.  I'm sorry?
9      A.  Printout of the SAP entry.
10      Q.  Okay.
11      A.  Printout of the SAP.
12      Q.  Okay.  Now -- well, if we go to Page 2,
13  there's a blank for origin.  You see that?
14      A.  Yes.
15          JUDGE DAVIDSON:  What is --
16          THE WITNESS:  Sorry?
17          JUDGE BENTON:  This is Tricon.
18          MR. LEE:  Oh, I'm sorry.  Tricon
19  Exhibit 10.  My apologies.
20          JUDGE DAVIDSON:  Tricon, the purchase
21  order.
22      Q.  (BY MR. LEE)  Now, at Page 2 of Tricon -- now,
23  let me ask you, the entry of data into the SAP system,
24  that is something that you do as a logistics specialist?
25      A.  Yes.

551

1      Q.  And the initial preparation of a purchase
2  order, is that something that you do?
3      A.  Correct.
4      Q.  Who reviews the purchase order or is the
5  purchase order reviewed before it would be sent to the
6  counterparty?
7      A.  The purchase order is required to be reviewed
8  by the trader.  Actually there is a requirement even if
9  in the system for having it to be released by the
10  trader.
11      Q.  All right.  So while you or somebody within
12  your group may prepare the data into SAP and the
13  purchase order before it is sent, the trader will review
14  it?
15      A.  Correct.
16      Q.  Now, at Page 2 of this purchase order, do you
17  see the -- a line for origin?
18      A.  Yes.
19      Q.  And it's blank, is it not?
20      A.  Yes, it is blank.
21      Q.  Can you explain why it is blank?
22      A.  At the time that purchase order was still
23  under preparation.  We were waiting clarification from
24  the trader and we were waiting for clarification
25  actually on what is going to be the loading port.

61  (Pages 548 to 551)

ARBITRATION HEARING - SEPTEMBER 21, 2010

552

1      As that information never came, we never
2  got to a stage where we had finalized the data into the
3  system.
4      Q.  Why is the loading port important?
5      A.  Loading ports -- loading port is very
6  important for two reasons.  One, that it's helping us
7  understanding where should we set up the inspection
8  instructions, the surveyor, where we should send the
9  surveyor to inspect the cargo before it gets into the
10  vessel.
11      And, secondly, that it is a requirement
12  under -- on the letter of credit to stipulate the port
13  of loading.
14      Q.  Now, but we just saw a couple of pages from
15  Vinmar's SAP records that reflect the country of origin
16  as USA.  Why wasn't that entered into this purchase
17  order at this time; do you know?
18      A.  We were still waiting on the port of loading
19  information so that we can put all these details
20  together.
21      Q.  Is the -- is the data that is entered into the
22  purchase order, is it manually entered or is it simply
23  the computer takes it from SAP and puts it into the
24  form?
25      A.  These specific places are manually entered.

553

1      Q.  And just to be clear, this purchase order was
2  never sent to Tricon.  Correct?
3      A.  No.
4      Q.  No, it was not sent.
5      A.  No, it was not sent.  Sorry.
6      Q.  When you -- you sent an e-mail to Vuk Rajevac
7  at Tricon and you mentioned to Mr. Rajevac that you
8  would be sending at some point in time a purchase order.
9  Do you recall that?
10      A.  Yes, I do.
11      Q.  Was the purchase order that you were referring
12  to, was it -- would it be something ultimately like what
13  we see in Vinmar Exhibit No. 10?
14      A.  Yes.
15      Q.  Now, as to what terms were included in that
16  purchase order, who would make the decision about that?
17      A.  As mentioned, the trader has the final review
18  of the -- of the purchase order and he's going to be
19  reviewing the terms and he's going to be agreeing on
20  each of these terms before it's sent -- it gets sent to
21  the other counterparty.
22      Q.  And if so terms are removed from the purchase
23  order or added to the purchase order, that would be
24  something that the trader would make the decision on?
25      A.  We would be acting -- on the operation level,

554

1  we would be acting on the trader's requirements.
2      MR. LEE:  I'll pass the witness.
3      JUDGE BENTON:  Mr. Diaz-Arrastia?
4      MR. DIAZ-ARRASTIA:  Okay.
5      CROSS-EXAMINATION (4:14 p.m.)
6  BY MR. DIAZ-ARRASTIA:
7      Q.  Mr. Pascu, do you remember when we took your
8  deposition a couple of months ago?
9      A.  Yes, sir, I do.
10      Q.  And you did your best to answer my questions
11  truthfully then, didn't you?
12      A.  Yes, sir, I did.
13      Q.  Now, we have looked at Joint Exhibit 10, which
14  is the purchase order, and we have noted, as we did
15  during the deposition that I had taken, the line for
16  origin --
17      A.  Which one?
18      Q.  Tricon Exhibit No. 10, the purchase order.
19      A.  Okay.  The one that we are looking at.
20      Q.  Right.  We just talked about it.  But Mr. Lee
21  has noted, just as I noted during my deposition, that
22  the lines for origin is blank.
23      A.  Correct.
24      Q.  And the line for origin is blank even though
25  we saw in Vinmar Exhibit No. 4 in the second two pages

555

1  that the SAP system in those documents had an entry for
2  origin.
3      A.  Correct.
4      Q.  And it is your testimony that the purchase
5  order is generated automatically by the SAP system?
6      A.  There are two portions on this.  One, if you
7  look on the front page, you'll find seller, buyer and
8  many other data before the text.  So before total terms
9  and total value, subject to tolerance, USD.  That is
10  coming automatic from the system.
11      Then the text from down -- from down to
12  bottom from terms, he used -- until the signature
13  portion, Best Regards, Rick Wilson, that is manual
14  entries that is coming from the system.
15      Q.  But you remember telling me during your
16  deposition that the purchase order was automatically
17  generated when you hit the print button on the SAP
18  system?
19      A.  Right.  I'm describing to you the process what
20  it takes, the data, how it takes when it gets generated
21  from the SAP.
22      JUDGE DAVIDSON:  Wait a minute.  I want to
23  make sure I understand that.
24      Are you saying that when a bid comes in
25  the contents of that bid somehow get projected on to the

62  (Pages 552 to 555)

ARBITRATION HEARING - SEPTEMBER 21, 2010

556

1  spreadsheet that is -- that are on those computer
2  screens without any manual input?
3          THE WITNESS: Let me clarify. Everything
4  is manual. Now, we are -- we are entering manual in
5  each tab. What I'm suggesting is that -- what I'm
6  saying is that this text from the Terms For the Above PO
7  are as follows till the end where the signature portion
8  is.
9          These as well are entered manual but --
10         JUDGE DAVIDSON: Okay.
11         THE WITNESS: -- they are not like -- they
12 are not coming directly from the -- you know, like the
13 price, I'm not doing anything manual after the tab is
14 entered, but from the text you still can modify it.
15         JUDGE DAVIDSON: Okay. I just misund -- I
16 think I misunderstood what you said when you said it was
17 automatically input off of a fax. I was going to
18 wonder --
19         THE WITNESS: No, no.
20         JUDGE DAVIDSON: -- how did you manage to
21 do that. Okay.
22         THE WITNESS: Sorry.
23         JUDGE DAVIDSON: Okay. Sorry to
24 interrupt. It just occurred --
25         Q. (BY MR. DIAZ-ARRASTIA) Mr. Pascu, let me hand

557

1  you a transcript of the deposition that you gave me.
2          A. Okay.
3          Q. And we're going to talk a little bit about
4  that.
5          A. Okay.
6          Q. If you will turn to Page 48.
7          A. 48 did you say?
8          Q. Page 48. There are for pages to a side on
9  that document.
10         A. Okay.
11         Q. Okay. Do you remember when I asked you -- and
12 I think in your deposition, Exhibit 34 to your
13 deposition was Tricon Exhibit 10 in this hearing. It's
14 the same document, the purchase order.
15         So do you remember when I asked you, "How
16 was Exhibit No. 34," which is the purchase order, now
17 Exhibit 10, "or documents like that -- how are Vinmar's
18 purchase order confirmation prepared?"
19         A. Okay.
20         Q. Do you remember when I asked you that? And
21 you said, "What do you mean?"
22         I went back. "Well, generally how are
23 they prepared?"
24         And you say, "Data is entered in this
25 case."

558

1          And then I said, "And that automatically
2  generates a purchase order confirmation?"
3          And you said, "Upon printing of this
4  document."
5          A. Okay.
6          Q. Do you remember giving me that testimony?
7          A. Okay.
8          Q. And what you're saying is that you didn't give
9  me a full answer because the origin part of the purchase
10 order is actually not generated automatically? That's
11 your story today?
12         A. No.
13         MR. LEE: I object to the question. That
14 is not -- his testimony is entirely consistent today --
15         MR. DIAZ-ARRASTIA: Well --
16         MR. LEE: -- with what he said in his --
17         JUDGE BENTON: Just a second. Are you
18 finished?
19         MR. LEE: Yes, Your Honor.
20         JUDGE BENTON: You can take it up in
21 redirect. Let's proceed.
22         **A. Okay. What I'm saying -- what I'm saying**
23 **is the following. There are three -- if we can go back to**
24 **the -- to the print screens of the -- of the SAP. Okay.**
25 **I don't know where --**

559

1          JUDGE WOOD: Is that these blue things?
2          THE WITNESS: Yeah. We --
3          MR. LEE: Tab 7.
4          JUDGE WOOD: Tab 7, Joint.
5          MR. LEE: It's in the top notebook?
6          THE WITNESS: This one.
7          MR. LEE: No. I'm sorry. That one. Yes.
8          **A. Okay. Whenever we are getting the data,**
9  whether it's coming through e-mail or broker, we are --
10 we are entering the data into SAP. And you see there is
11 a top tab called text, third -- third one from the
12 left-hand side on top. It's called -- it's called the
13 tab Text.
14         There is where the text gets written into
15 it. And it's showing up after printing on this -- on
16 this paperwork, Exhibit No. 10. So -- okay. So what
17 I'm -- what I'm referring, that all -- this tab, Text,
18 contains all the data from the terms of the above field
19 are as follows till the signature portion.
20         Okay. And those terms are for something
21 that can be modified, whether the trader requires or
22 not. And once you get printed, that automatically --
23 that text is coming on the -- on the paper.
24         Q. (BY MR. DIAZ-ARRASTIA) Okay.
25         A. It's placed on the paper.

63  (Pages 556 to 559)

560

1    Q.  Okay.  Mr. Pascu, now take a look at Page 54.
2        Okay.  Look at Line 5 of Page 54.  And I
3  asked you again -- do you remember this question?
4        "Okay.  I understand that no one actually
5  gets down and writes or types in all of this
6  information, it's automatically created by the system."
7    A.  Okay.
8    Q.  And you understand that we're referring to the
9  purchase order.  And you say, "Okay"?
10       And then I asked you, "And when you hit
11 the print PO button it just generates this depending on
12 what information was entered?"
13       And you say, "Okay."
14       Now, I say, "Is that all true?"
15       And you say, "Yes."
16       Do you remember that?
17   A.  Okay.
18   Q.  So I asked you a second time whether the
19 purchase order was generated automatically and you said
20 "Yes" without any qualifications.
21   A.  I'm saying yes as well today.  I'm not -- I'm
22 not -- I'm not disputing what I'm saying.  What I'm
23 trying to say to you -- you are trying to say something
24 and I'm saying the same thing, said with different
25 words.

561

1        What I'm trying to say is the following.
2  I'm trying to say that this text as it is here, okay, is
3  something that the system allows you to change at any
4  point in time, depending on what -- the way that -- the
5  way that the process is, we are working on this text as
6  we are -- as we are going to the trader.
7        We are -- the trader is reviewing the
8  paperwork and he's going to come back to us with any
9  modifications that he's going to require.  Then we go
10 back into a system, apply the modification and issue the
11 purchase order.  This is the process.  So I'm not saying
12 that is --
13   Q.  Okay.  Now, Mr. Pascu, remember that so far I
14 had asked you questions in general about how the
15 purchase order was generated.  Do you remember that I
16 also asked you some specific questions about it?  Do you
17 recall --
18   A.  About what?
19   Q.  -- that?
20       It was some time ago.  You may not
21 remember.
22   A.  Okay.
23   Q.  I want you to take a look at Page 55.
24   A.  Okay.
25   Q.  In Page 55, I asked you -- Line 1, I asked you

562

1  the question, "All right.  That's fine.  Look at the
2  second Page of Exhibit 34."
3    A.  Okay.
4    Q.  And that is the second page of the purchase
5  order.  Correct?
6    A.  Okay.  Correct.
7    Q.  Now, this is where you're now saying this is
8  entered manually.  Right?
9    A.  Now --
10       MR. LEE:  I don't believe that's what he
11 said.
12       JUDGE DAVIDSON:  Let --
13       MR. LEE:  Okay.  I'm --
14       JUDGE DAVIDSON:  Please let him answer.
15 I'm sorry.
16   A.  Here was --
17   Q.  (BY MR. DIAZ-ARRASTIA)  I'm asking, is the
18 information beginning on the --
19   A.  No.
20   Q.  -- second page, is that now entered manually?
21   A.  No.  All the data initially is entered
22 manually.  There is no such a system that is picking up
23 the data from somewhere.  All the data is entered
24 manually.
25       What I'm trying to say is that you have on

563

1  the Tab No. 3, which is -- which is showing on the --
2  right now I'm looking to this screen.  Okay.  This I'm
3  not entering any text manually.  I'm just having a
4  dropdown list and I'm taking that dropdown list and I'm
5  putting, okay, it is your USA origin.  I'm USA origin.
6  So that -- this is how manually it's entered.
7        Then on the text it's something that I can
8  type in and therefore I am saying it's manual typing.
9  Let's put it manual typing if that is going to avoid the
10 confusions that we are seeing.
11       JUDGE WOOD:  Could we get for the record
12 what exhibit number the witness is holding up so we can
13 look at the same one?
14       JUDGE BENTON:  The witness is holding
15 up --
16       MR. LEE:  Joint Exhibit 7.
17       MR. DIAZ-ARRASTIA:  Joint Exhibit 7.
18       JUDGE WOOD:  Okay.  And exactly which
19 page?  You know, don't say "that VIN thing down at the
20 bottom."  Is this 91-B?
21       THE WITNESS:  91-A.
22       JUDGE WOOD:  A.
23       MR. LEE:  A.
24       JUDGE WOOD:  A.  Thank you.
25   Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Mr. Pascu --

64  (Pages 560 to 563)

ARBITRATION HEARING - SEPTEMBER 21, 2010

564

1    A.  I will -- one second.  I will go back also to
2  the screens that we were showing.  Okay.  The initial
3  Vinmar --
4    Q.  Vinmar 4?
5    A.  Yeah, Vinmar 4.  Same thing here.  Okay?  So,
6  again, this -- if you look here on VIN 93, okay, this
7  is -- again is a dropdown list that we have to pick on.
8  Okay.  And we are just scrolling down, pick the right
9  information and this is how it gets inserted into the --
10  into the system.
11    Q.  Okay.  Now, let's continue on Page 55.
12    A.  On the tab Text, however, this starts as blank
13  and this is where we are entering this text.
14    Q.  Let's continue on Page 55.  My next question
15  to you was, "Do you see where there is a line that says
16  origin on the purchase order?"
17        And your answer is, "Yes."
18        "And it is blank.  Correct?"
19        Your answer is, "Yes."
20        And then my question was, "And would that
21  be because no origin was entered into the system prior
22  to this being printed?"
23        And your answer was, "It would have been
24  that the word here was not entered into the system,
25  yes."

565

1        "Before this was printed?"
2        "Before this was printed."
3        Do you remember telling me that back then?
4    A.  One second.  Let me -- okay.  I read this.
5    Q.  That's what you told me back then?
6    A.  Okay.
7    Q.  And you told that under oath?
8    A.  I'm not disputing it.
9    Q.  Now, let's take a look at these screens that
10  are VIN Exhibit No. 4, the second two pages, VIN 93 and
11  94.  And these were prepared by Eduardo Anaya.  Is that
12  correct?
13    A.  Yes.
14    Q.  The gentleman that doesn't work for Vinmar
15  anymore.  Correct?
16    A.  Correct.
17    Q.  No one knows where he is anymore?
18    A.  I am not able to answer that question.
19    Q.  And you testified that he entered country of
20  origin, USA, on 7-24?
21    A.  Correct.
22        MR. DIAZ-ARRASTIA:  Put this on the
23  screen, Tracy, will you?
24    Q.  (BY MR. DIAZ-ARRASTIA)  Will you take a look
25  at Joint Exhibit No. 8?  Look at Mr. Wilson's e-mail.

566

1        MR. DIAZ-ARRASTIA:  Highlight that from
2  Rick Wilson.  Let's start with the date.
3        MR. LEE:  May I make sure he has the
4  exhibit in front of him?
5        JUDGE DAVIDSON:  Sure.
6        MR. DIAZ-ARRASTIA:  Sure.  Joint
7  Exhibit 8.
8        MR. LEE:  Joint Exhibit 8.
9    Q.  (BY MR. DIAZ-ARRASTIA)  Do you have that in
10  front of you, sir?
11    A.  Yes.
12    Q.  And we talked about this during your
13  deposition also.  Remember?
14    A.  I do remember.
15    Q.  And this is an e-mail from Rick Wilson?
16        MR. DIAZ-ARRASTIA:  Can you bring back the
17  highlighting, Tracy?
18    Q.  (BY MR. DIAZ-ARRASTIA)  From Rick Wilson to
19  Eduardo Anaya and you and Ana Campos.  Correct?
20    A.  Seems so, yes.
21    Q.  And I think you testified in your deposition
22  that Ana Campos was another person you supervised?
23    A.  Correct.
24    Q.  Okay.  And Mr. Wilson is responding to a
25  request from Mr. Anaya in which he asks, "We need the

567

1  origin to complete the purchase order."  Isn't that what
2  he asks for?
3    A.  "He's asking to complete the order, we need
4  port of origin."  This is what is written.
5    Q.  And Mr. Wilson responds, "Re: Origin, we won't
6  know until we declare discharge port.  Most likely USG."
7  That's what he says.  Right?
8    A.  Again, I know that the question for Eduardo
9  was, "What is the port of origin?"
10    Q.  What it says is, "Re: Origin, we won't know
11  until we declare discharge port.  Most likely USG."
12  Correct?  That's what it says?
13    A.  Again, Eduardo and I asked for port of origin
14  as a -- as a step into our process.  Okay?
15    Q.  And Wilson is giving Mr. Anaya and you and
16  Ms. Campos that information on July 25.  Correct?
17    A.  No.  Again, Eduardo Anaya and I asked port of
18  origin.  Okay?  Asked Rick from where this cargo shall
19  be shipped from?  What is the port of origin in the USA
20  that the cargo shall be shipped from?  And this is what
21  Eduardo and I asked.
22    Q.  Okay.  But Mr. Wilson gives Mr. Anaya his
23  answer on July 25?
24    A.  Okay.
25    Q.  Correct?  That's what that says?

65 (Pages 564 to 567)

ARBITRATION HEARING - SEPTEMBER 21, 2010

568

1    A. He's showing that the answer was given on
2  July 25.
3    Q. But somehow Mr. Anaya already knew on the 24th
4  that the country of origin was the U.S.
5    A. Again, and I re -- I'm coming back to you.
6  I'm saying that the origin was known. What we are -- we
7  are clarifying what -- what is the port of loading. And
8  Mr. Eduardo Anaya is asking the question, "What is the
9  port of loading?" And this is what I think that
10  Mr. Rick Wilson is trying to answer to Mr. Anaya.
11    Q. Okay. And Mr. Anaya's response to Mr. Wilson
12  was, "Okay. That is what you wrote on the PO"?
13    A. Okay.
14    Q. Now, let's take a look at the PO. The PO has
15  a line for origin. Right?
16    A. Okay.
17    Q. It has that. Right?
18        MR. DIAZ-ARRASTIA: Let's put that up,
19  Tracy, Tricon Exhibit 10.
20    Q. (BY MR. DIAZ-ARRASTIA) It has a line for
21  origin. Correct?
22    A. Origin was already put. Remember that I was
23  telling you that whenever we are entering the PO we
24  are -- we have entered the origin of the cargo as a
25  requirement of our system. So the origin of the -- of

569

1  the -- of the cargo was already shown into SAP and this
2  is what Eduardo is saying.
3        If you are looking to this one, it's
4  showing the origin USA. So this is what we have shown.
5  Now, the port of loading was never clarified and
6  therefore we only want to complete the data.
7    Q. Mr. Pascu, on your purchase order next to
8  origin, there's just a big blank. Right?
9    A. Again --
10    Q. Can you answer my question?
11    A. What question?
12    Q. Next to origin there's a big blank?
13    A. Again, you are -- you are asking me --
14        JUDGE BENTON: Just a second.
15  Irrespective of what the witness says, the panel can
16  read. And it is apparent to the panel what the document
17  says.
18        MR. DIAZ-ARRASTIA: All right.
19        JUDGE BENTON: Let's proceed.
20    Q. (BY MR. DIAZ-ARRASTIA) Then let's ask you one
21  more question, Mr. Anaya.
22    A. No, Pascu.
23    Q. Mr. Pascu. I'm sorry. On your purchase
24  order, Joint Exhibit No. 10, is there any line in there
25  for port of origin?

570

1    A. Sorry?
2    Q. Is there any line in the Vinmar purchase order
3  that says port of origin -- I'm sorry -- I mean port of
4  loading?
5    A. So say again.
6    Q. I'm sorry.
7        JUDGE BENTON: Yeah. Ms. Larson is trying
8  to script it for you. Let's try it one more time.
9        MR. DIAZ-ARRASTIA: Yeah.
10    Q. (BY MR. DIAZ-ARRASTIA) Mr. Pascu, on Tricon
11  Exhibit 10, the Vinmar purchase order, is there any line
12  for port of loading?
13    A. Port of loading is not shown on the purchase
14  order because it was never revealed to me; therefore,
15  it's not shown.
16        MR. DIAZ-ARRASTIA: I pass the witness.
17        JUDGE DAVIDSON: Mr. Lee?
18        MR. LEE: No further questions.
19        JUDGE BENTON: You're excused.
20        THE WITNESS: Okay.
21        JUDGE WOOD: Could I ask just one --
22        JUDGE BENTON: Just one second. You're
23  excused.
24        THE WITNESS: Okay.
25        JUDGE BENTON: Call your next witness.

571

1        MR. LEE: We have no more witnesses.
2        Subject to the briefing schedule that we
3  discussed and the opportunity to respond to their
4  attorneys' fees.
5        JUDGE BENTON: Okay. So the live
6  testimony is concluded. But for the record, the
7  evidence is not concluded. The record is not closed.
8  And so there will be no need to convene tomorrow.
9  Correct?
10        MR. DIAZ-ARRASTIA: There will be no need
11  to meet tomorrow, but let me ask something. I
12  understand that the record is not closed because
13  obviously there's going to be argument, but is there
14  contemplation that there will be additional evidence
15  presented in writing?
16        JUDGE BENTON: Yeah. The evidence is --
17        JUDGE DAVIDSON: Attorneys' fees.
18        MR. DIAZ-ARRASTIA: Oh, my attorneys'
19  fees.
20        MR. LEE: But other than that --
21        MR. DIAZ-ARRASTIA: Other than that, the
22  evidence is --
23        JUDGE DAVIDSON: Well, and he may want
24  to --
25        MR. LEE: And my response.

66 (Pages 568 to 571)

ARBITRATION HEARING - SEPTEMBER 21, 2010

572

1    JUDGE DAVIDSON:  And he may want to rebut
2  your attorneys' fees?
3    MR. DIAZ-ARRASTIA:  Okay.  But we're
4  talking about just the attorneys' fees?
5    MR. LEE:  Correct.
6    MR. DIAZ-ARRASTIA:  I just wanted to
7  clarify.
8    MR. LEE:  I mean, certainly I would -- I
9  might have evidence in response to his attorneys'
10 fees.
11   JUDGE BENTON:  As I -- I think I got it
12 right the first time.
13   MR. DIAZ-ARRASTIA:  Yes, you did, Your
14 Honor.
15   JUDGE BENTON:  Anything else?
16   MR. DIAZ-ARRASTIA:  Nothing else here.
17 And there will be not be a need to meet tomorrow.
18   JUDGE BENTON:  Okay.
19   MR. LEE:  One housekeeping matter, and
20 it's entirely up to the panel.  Would you like for us to
21 submit a revised exhibit list and pull out or just keep
22 everything that you got and leave it?
23   Okay.  Then --
24   JUDGE WOOD:  I'm afraid if you changed any
25 of these numbers I'd be totally lost.

573

1    MR. DIAZ-ARRASTIA:  It will make things
2  more --
3    MS. LARSON:  The transcript would be
4  impossible.
5    MR. DIAZ-ARRASTIA:  It would make things
6  more difficult.
7    JUDGE WOOD:  I know that.
8    JUDGE BENTON:  Okay.  We're still on the
9  record.  We're probably giving the reporter a problem.
10   Anything else before we go off the record?
11   MR. DIAZ-ARRASTIA:  I'm done.
12   JUDGE BENTON:  Okay.  Mr. Lee?
13   MR. LEE:  I'm done.  I guess just -- there
14 were some exhibits that weren't discussed, but as I
15 understand it are they in?
16   JUDGE BENTON:  They're in.
17   MR. LEE:  Okay.
18   JUDGE DAVIDSON:  All of yours, all of his,
19 all of joints.
20   JUDGE BENTON:  Judge Wood, anything else
21 you need?
22   Judge Davidson?
23   JUDGE DAVIDSON:  I'm as happy as a pig in
24 slop.
25   JUDGE BENTON:  All right.  We're off the

574

1  record.
2    (Proceedings concluded at 4:37 p.m.)

575

1  STATE OF TEXAS    )
2  COUNTY OF HARRIS  )
3
4    I, Diana Ramos, a Certified Shorthand Reporter
5  in and for the State of Texas, do hereby certify that
6  the above and foregoing pages contain a full, true and
7  correct transcription of my shorthand notes taken upon
8  the occasion set forth in the caption hereof, as reduced
9  to writing by me and under my supervision.
10   I further certify that the transcription of my
11 notes truly and correctly reflects the exhibits offered
12 into evidence, if any; that I am neither counsel for nor
13 related to any party in this cause and am not
14 financially interested in the outcome.
15   Certified to by me on this 28th day of
16 September, 2010.
17
18
19 _____
   Diana Ramos CSR
   Texas CSR No. 3133
20 Expiration Date:  12-31-2010
   DEPOTEXAS
21 Firm Registration No. 95
   13101 Northwest Freeway, Suite 210
22 Houston, Texas  77040
   Tel: (281) 469-5580
23 FAX: (713) 460-2525
24
25

67  (Pages 572 to 575)

1

AMERICAN ARBITRATION ASSOCIATION
DALLAS TEXAS

TRICON ENERGY, LTD.,            )
          Claimant,            )
                               )
vs.                            ) CASE NO. 70 198Y 00168 09
                               )
VINMAR INTERNATIONAL, LTD.,    )
          Respondent.          )

*******************************************************

CLOSING ARGUMENTS

October 28, 2010

*******************************************************

BE IT KNOW THAT the above-entitled matter came on for

arbitration on Thursday, October 28, 2010, from 9:28 a.m.

to 12:13 p.m., at the offices of PORTER & HEDGES, L.L.P.,

1000 Main Street, Suite 3600, Houston, Texas 77002, before

the Honorable Levi J. Benton, Presiding, the Honorable

Sharolyn Wood and the Honorable Mark Davidson,

Arbitrators, and the following proceedings were had:

CLOSING ARGUMENTS

**2**

1  APPEARANCES
2
PANEL OF ARBITRATORS:
3
   Honorable Levi J. Benton, Chair,
4  Honorable Sharolyn Wood
   Honorable Mark Davidson
5
6
7  REPRESENTING CLAIMANT TRICON ENERGY, LTD.:
8     Mr. George R. Diaz-Arrastia
      Ms. Tracy D. Larson
9     SCHIRRMEISTER, DIAZ-ARRASTIA & BREM, L.L.P.
      700 Milam, Tenth Floor
10    Houston, Texas 77002
      Tel:  713.221.2500
11    FAX:  713.228.3510
      gdarrastia@sdablaw.com
12    tlarson@sdablaw.com
13
14 REPRESENTING RESPONDENT VINMAR INTERNATION, LTD.:
15    Mr. Stephen H. Lee
      Mr. R. Blake Runions
16    PORTER & HEDGES, L.L.P.
      1000 Main Street, Suite 3600
17    Houston, Texas 77002
      Tel:  713.226.6000
18    FAX:  713.228.1331
      slee@porterhedges.com
19    brunions@porterhedges.com
20
21 ALSO PRESENT:
22    Mr. Brad Lockwood
      Mr. Mark Antonvich
23    Ms. Amy Falcon
24
25

**3**

1              I N D E X
2                           PAGE
3
4          CLOSING ARGUMENTS
5
6  ON BEHALF OF THE CLAIMANT
7  Mr. Diaz-Arrastia              15
8
9
10 ON BEHALF OF THE RESPONDENT
11 Mr. Lee                        38
12
13
14
15 Reporter's Certificate        105
16
17
18
19
20
21
22
23
24
25

**4**

1          JUDGE BENTON:  We are back on the record in
2  the matter of Tricon Energy, Limited versus Vinmar
3  International, Limited.  We're proceeding today and, as
4  the Panel understands what -- well, rather, what we
5  understand -- let me express where we contemplate we'll go
6  today.
7          The Panel contemplates that we'll have some
8  discussion maybe about the Claimants attorneys' fees
9  evidence if the Claimant wishes to address its attorneys'
10 fees evidence and/or if the Respondent so desires.  If
11 neither side wishes to discuss the issue of attorneys'
12 fees, then we'd like an indication from both sides that
13 the evidentiary record is closed.
14         Upon announcement that the evidentiary
15 record is closed, then we'll proceed to closing arguments
16 and while the Panel has read the very well prepared
17 written closing briefs, we invite you to amplify such
18 matters in the closing papers as you desire and -- and
19 then at that -- at the conclusion of that, at the
20 conclusion of any questions that the Panel might have,
21 we'd like announcements that the entirety of the record is
22 thereafter closed.  That's kind of where we see it going.
23 Mr. Diaz-Arrastia, is that consistent with --
24         MR. DIAZ-ARRASTIA:  That will be fine, your
25 Honor.

**5**

1          JUDGE BENTON:  Okay.  Mr. Lee?
2          MR. LEE:  Certainly.
3          JUDGE BENTON:  Very well.  Anything you
4  wish to say about attorneys' fees?
5          MR. DIAZ-ARRASTIA:  I think my attorneys'
6  fees are fairly well covered in the written submissions
7  made.  If the Panel has particular questions, I'm very
8  pleased to answer them about the attorneys' fees or any
9  other part of the record for the law.  The way that I
10 anticipated this hearing is, given that there has been so
11 much written material presented in summing up, I felt that
12 we would spend a lot of time seeing where is it that you
13 as the decision-makers have a question.
14         With regard to the evidentiary record,
15 there is one aspect of the evidentiary record that came
16 up.  Well, it was raised by the closing statement and post
17 hearing brief submitted by Vinmar.  A criticism was made
18 of Mr. Chuck Matthews' report for not considering as an
19 avoidable cost the inspection cost.  As you'll recall, we
20 made the agreement right at the end of the prior
21 evidentiary hearing that we would submit Mr. Matthews'
22 report and he will not testify live.
23         The question of the inspection costs was
24 actually raised to Mr. Matthews during the deposition that
25 Mr. Runions took of him and he was specifically asked why

2  (Pages 2 to 5)

CLOSING ARGUMENTS

6

1    he did not consider that inspection costs were an
2    avoidable cost and he answered that question during his
3    deposition.  Do we have that deposition that we can put up
4    on the screen, Tracy?
5         And the quick answer is that it is
6    customary that inspection costs will be picked up by the
7    supplier.  In fact, that is what happened in the
8    replacement sale, the KP sale, and that is the reason why
9    Mr. Matthews did not consider that inspection costs was an
10   avoidable cost because it's a cost that would not have
11   been incurred since the supplier would pick it up.
12        It is on Page 91 of Mr. Matthews'
13   deposition at Line 10 through Line 15 and then again on
14   Page 92, Lines 8 through 14, and this is Mr. Runions,
15   counsel for Vinmar, asking the questions.  I would just
16   like to read that into the record and that would be the
17   only additional evidence that I would like to submit, and
18   I have copies also to provide the Panel.
19        JUDGE BENTON:  Okay.
20        MR. DIAZ-ARRASTIA:  I am running short,
21   unfortunately.  If I could just read that.  Like I said,
22   on Page 90 -- on Page 91 of Mr. Matthews' deposition, the
23   question is asked --
24        MR. LEE:  Just, I don't want to interrupt
25   too much, but I do want to make the Panel aware I object

7

1    to this and I'll tell you why when we're finished, but I
2    didn't want to let this start without at least noting my
3    objection to trying to introduce evidence from
4    Mr. Matthews based on the agreement that we had reached at
5    the hearing.
6         JUDGE BENTON:  Okay.  I'll come back and
7    give a ruling on the objection in a second.
8         MR. DIAZ-ARRASTIA:  And if I could just
9    quickly address that, the only reason why I wanted to
10   bring that up is because of the issue of why he did not
11   consider inspection costs was specifically raised in the
12   post hearing brief filed by Vinmar.  That specific
13   question was specifically answered in Mr. Matthews'
14   deposition and I think it's only fair that the Panel be
15   aware of what that answer is.
16        And the question was asked by Mr. Runions:
17   "How about inspection costs?"  And Mr. Matthews' response
18   was:  "Inspection costs are -- our assumption at the time
19   is that we would be able to get suppliers to pick up those
20   inspection costs, is what happens in the market from time
21   to time.  It's my understanding that's a norm in the
22   market."
23        On Page 92 there is, again, on Line 8:
24   "No, there's -- we didn't think we would incur
25   inspections," and Mr. Runions asked him:  "And that's

8

1    based upon -- based on Mr. Lockwood's telling you that?"
2         "Based on thinking that the supplier is
3    going to pick it up," and there is some more testimony
4    about demurrage costs, which was not raised in Vinmar's
5    brief and I'm not submitting that, but with that
6    additional evidence, from Tricon's point of view, the
7    evidentiary record is closed.
8         JUDGE BENTON:  Very well.  Mr. Lee?
9         MR. LEE:  Let me first address the -- this
10   testimony from Mr. Matthews and the agreement that we
11   reached was that the report would come in as it stood and
12   they didn't put on any evidence from Mr. Matthews beyond
13   the report.  He didn't deal with that in his report.
14   That's an omission from his calculation.  So I object
15   putting that testimony now because the agreement was we
16   just stick the report in.  Had I known that this was going
17   to happen, I would have cross-examined him at the hearing.
18        The other thing I would point out, and I
19   didn't know that this was going to happen, but
20   Mr. Matthews testified in his deposition over and over
21   again that he had no personal knowledge, in fact, didn't
22   have any knowledge of any of this stuff, and all of his
23   report and his testimony was based entirely on what
24   Mr. Lockwood had told him.  In fact, just the little piece

9

1    that they had showed you, if you had read the next line on
2    Page 92, he -- the question was:  "And that's based on
3    what Mr. Lockwood told you?"  Answer:  "Yes."
4         So I -- if the Panel's going to consider
5    that testimony, I would like the opportunity to supplement
6    with other excerpts from Mr. Matthews' deposition, making
7    it clear that he does not have any personal knowledge and
8    I -- I could do that in a day or two, but I'm not ready --
9    I don't have it right now.  I would have had it if I had
10   known, but I needed a day to pull that together and submit
11   the testimony from Mr. Matthews on his lack of personal
12   knowledge and expertise.
13        JUDGE BENTON:  Okay.  Anything else?
14        MR. LEE:  On the attorneys' fees, the only
15   thing I would say about the attorneys' fees is the Panel
16   has the discretion to award an amount based on the factors
17   announced by the Supreme Court and the disciplinary rules
18   and I think that that should be it, if, in fact, we get to
19   an award and if, in fact, there is an award to Tricon,
20   that the attorneys' fees should bear some relationship to
21   the ultimate damage award.  And with that, I think the
22   record is closed, subject to our right to provide
23   testimony from Mr. Matthews.
24        JUDGE BENTON:  How much was the inspection
25   costs?  I don't remember.

3  (Pages 6 to 9)

CLOSING ARGUMENTS

10

1    MS. LARSON:  We didn't incur any.
2    MR. DIAZ-ARRASTIA:  We don't know because
3  we didn't pay it.
4    JUDGE BENTON:  Right.
5    MR. DIAZ-ARRASTIA:  If you look at the
6  documents that were submitted in the record, and these are
7  Exhibits 24 and 28, just with regard to the replacement
8  sale, KP, all that it says is in the inspection costs were
9  zero and in the KP contract the inspection costs was
10  supposed to be divided 50-50 between buyer and seller, but
11  the supplier paid all of them because that's customary.
12  So we don't know what the inspection costs were because we
13  did not pay them.
14    JUDGE BENTON:  Yeah.
15    MR. DIAZ-ARRASTIA:  The -- if I could
16  address a couple of things, with regard to cross-examining
17  Mr. Matthews on the issue of inspection costs, this was
18  their cross-examination.  That was -- I did not ask any
19  questions during Mr. Matthews' deposition.
20    JUDGE BENTON:  That's -- I mean, with
21  respect to that, I mean, that's a little -- whether you
22  call -- it's your offer.  They don't have an offer.
23    MR. DIAZ-ARRASTIA:  I understand.
24    JUDGE BENTON:  Yeah.
25    MR. DIAZ-ARRASTIA:  I understand, but, like

11

1  I said, the only reason that I brought it up is because it
2  was specifically raised in their papers saying that
3  Mr. Matthews did not discuss that.
4    JUDGE BENTON:  Yeah.
5    MR. DIAZ-ARRASTIA:  They knew why he did
6  not discuss that and I wanted to tell the Panel why that
7  was the case.
8    JUDGE BENTON:  Fair enough.  Tell you what
9  we'll do, then.  We'll permit the offer of the evidence
10  and we'll permit you the opportunity, Mr. Lee, to further
11  supplement.  Although it does --
12    JUDGE DAVIDSON:  If you didn't pay it --
13    JUDGE BENTON:  That seems to be
14  inconsequential.
15    JUDGE DAVIDSON:  I don't see receiving it
16  into evidence increases or decreases your award.
17    JUDGE BENTON:  Well, they make some
18  argument in their papers about the consequences of the
19  reliability or something about it.  I don't fully
20  remember, but I do think, sitting here, it's going to be
21  inconsequential, but since this is our last time to be
22  together, just tell us when you'll have that
23  supplemental --
24    MR. LEE:  I'll submit it tomorrow and it
25  will be very short.  I'll just submit a couple of pages

12

1  from his deposition and that -- that's it, so --
2    JUDGE BENTON:  All right.
3    MR. DIAZ-ARRASTIA:  And I'm sorry.  And my
4  only response to that is Mr. Matthews, as an expert
5  witness and he was designated as an expert witness, is
6  entitled to rely on hearsay information if experts would
7  rely on that.
8    The task that was put to him was just
9  calculate what the damages are and he understood that one
10  of the things that he had to do was reduce from the
11  damages those costs that were avoided by reason of not
12  making the sale to Vinmar.  He had to find out what those
13  were, and the reason that he made the decision not to
14  include inspection costs as a cost that was avoided is
15  because he was informed that it was the norm in the
16  industry that the supplier would pick those up, and,
17  therefore, was not a cost that would have been avoided.
18  Although the contract said Tricon would pay the costs, the
19  reality is that their supplier would pick that up.  It's
20  normally done in, in fact, is what was done in the
21  replacement sale.
22    JUDGE BENTON:  Okay.  Understood.  So go
23  ahead, Mr. Lee.
24    MR. LEE:  I just want to make one comment
25  to that.  There's no evidence in the record that Tricon

13

1  did, in fact, pay or that KP Chem paid the inspection
2  costs on the -- the MX that Tricon supplied to KP Chem.
3  So, I mean, that -- there's no evidence of that either.
4    MR. DIAZ-ARRASTIA:  KP Chem didn't pay it.
5  The supplier paid it.  There is evidence on the record J &
6  J, the supplier, paid it and Exhibit 28 is the J & J
7  contract that says that they would pay the inspection
8  costs.  So there is evidence that the supplier paid the
9  inspection costs in the replacement sale.  I'm sorry.
10  Exhibit 24 is the contract that says J & J, the supplier
11  for the KP sale, would pay the inspection costs and
12  Exhibit 28 is Tricon's internal control about what were
13  the costs that it had in connection with that sale and it
14  said that inspection costs was zero because Tricon didn't
15  pay it.  J & J paid it.
16    JUDGE BENTON:  Okay.  With that, Tricon
17  announces that it does hereby completely rests on all
18  evidentiary issues.  Correct?
19    MR. DIAZ-ARRASTIA:  That is correct, your
20  Honor.
21    JUDGE BENTON:  Okay.  And, likewise,
22  Vinmar, subject to the supplement pertaining to
23  Mr. Matthews which we should expect to receive by the
24  close of business tomorrow, subject to that, Vinmar
25  likewise announces that it hereby rests on all evidentiary

4  (Pages 10 to 13)

CLOSING ARGUMENTS

14

1    issues.  Correct, Mr. Lee?
2            JUDGE WOOD:  An electronic submission is
3    sufficient for me.  Thank you.
4            MR. LEE:  Okay.
5            JUDGE DAVIDSON:  The same.
6            MR. LEE:  Correct, and I will send it by
7    e-mail and it will be very brief.
8            JUDGE WOOD:  And we'll make sure that the
9    court reporter's included on that e-mail so that he gets a
10   copy.
11           JUDGE BENTON:  All right.  I don't think
12   that we have any questions on the attorneys' fees, but in
13   any event, Mr. Diaz-Arrastia, how much time would you like
14   to present your closing and how much time do you think
15   you'll want for rebuttal?
16           MR. DIAZ-ARRASTIA:  My closing is going to
17   be brief, unless the Panel has questions or they want to
18   hold it until later.  I'd say ten or 15 minutes, at the
19   most.
20           JUDGE BENTON:  Okay.
21           JUDGE WOOD:  Well, then, let me ask if you
22   would address contract formation, liability and damages.
23   I'm sure you probably have it broken down that way, too.
24           MR. DIAZ-ARRASTIA:  Some of the issues that
25   I want to touch upon deal with those questions.

15

1            JUDGE WOOD:  Thank you.
2            MR. DIAZ-ARRASTIA:  If there's specific
3    issues that your Honor has or specific questions, I would
4    be very pleased to address that.
5            JUDGE WOOD:  No specifics.
6            JUDGE BENTON:  Okay.  I'll tell you what
7    we'll do, because I doubt it's rather -- it's likely that
8    both sides will be very brief.  We'll just let you go and
9    we'll interrupt you as we see fit.
10           MR. DIAZ-ARRASTIA:  Okay.  That seems fair.
11           JUDGE BENTON:  You may proceed.
12           MR. DIAZ-ARRASTIA:  And, like I said, I
13   don't really want to rehash the whole case.  I think we
14   have gone over it many times.  However, there are some
15   statements that were made in Vinmar's post hearing brief
16   on the state of the record that I believe are just wrong
17   and go to some of the issues that Judge Wood asked about
18   and I would like to address those briefly, just as sort of
19   a response to that.
20           The first matter that I want to talk to has
21   to do with the issue of U.S. origin that I think is an
22   important issue here.  I just want to reiterate that the
23   record is very clear that there is no evidence in this
24   record other than Mr. Wilson's own unsupported testimony
25   that U.S. origin was ever discussed in connection with

16

1    this deal until well after the deal was made.
2            In Vinmar's post hearing brief, they point
3    to Exhibit 11, Joint Exhibit 11, which are some IMs
4    between Mr. Leyman and Mr. Wilson, and in particular they
5    point to some IMs at 9:34 in the morning and then again at
6    10:00 o'clock, the 9:34 talking about FOB HTC Corpus,
7    which is Houston, Texas City, Corpus, and at 10:00 o'clock
8    Mr. Leyman talking about a second MX seller for a first
9    half of August delivery.  The -- they are trying to
10   suggest that this means that U.S. origin was being
11   discussed from the beginning.
12           The first thing that I would point out is
13   that these discussions are a good two, two and a half
14   hours, before the deal was made, which was made at about
15   noon.  Mr. Leyman clearly stated in his testimony that was
16   presented to the Panel, as is evident from the IMs
17   themselves, that these were indications that were
18   presented to Mr. Wilson, and as you will recall, an
19   indication is a thought, a proposal.  It is not a binding
20   offer.
21           They are indications that were proposed to
22   Mr. Wilson.  One of them was for an FOB sale.  This was a
23   CFR sale and Mr. Leyman's testimony was very clear that
24   Mr. Wilson had no interest in any FOB sale.  Second, it
25   was a proposal for delivery in the first half of August

17

1    and Mr. Leyman's testimony was again very clear that
2    Mr. Wilson had no interest in a first half of August
3    delivery.  He needed first half of September delivery and,
4    for that reason, neither of those indications were
5    pursued.  Mr. Wilson had no interest in them and he would
6    not bid against those indications.
7            And if we can take a look at Mr. Leyman's
8    testimony at the hearing, it's Pages 272 to 273 of the
9    hearing transcript, Page 272 beginning with Line 14.
10   We're going to be going to Line 11, Line 11, Page 272.
11   Okay.  And here Mr. Leyman's being questioned about the
12   exhibit that's Exhibit 11.  He is asked:  "Where you say,
13   'Second MX seller asking if buyer would purchase'" -- this
14   is at 10:00 o'clock, two hours before the deal was made,
15   now dealing with the second indication, and Mr. Leyman
16   says:  "That's an indication."  The following question:
17   "All right.  And then you ask Mr. Wilson at 10:05 whether
18   he has any bid.  Correct?"
19           Mr. Leyman says:  "Yes."
20           "Are you asking him if he wants to bid
21   against this indication -- or make a bid against the
22   indication for the CFR delivery," and Mr. Leyman's answer
23   is very clear:  "Yes.  Prior to that, I spoke to Rick by
24   telephone and he did not have any interest any longer in
25   buying FOB the Gulf Coast.  His preference was to buy

5  (Pages 14 to 17)

CLOSING ARGUMENTS

18

1    something on a delivered CFR basis to either Korea or
2    Taiwan.  He indicated he had two possible buyers and he
3    would prefer selling on a delivered basis."
4         If we could now go to Page 273, beginning
5    on Line 4, and the question is:  "All right.  And did
6    Tricon -- is this Mr. Lockwood?  He also told you that it
7    would be loading out of the U.S. Gulf Coast, at least when
8    you reported to mister -- correct?"
9         And Mr. Leyman's response:  "That was his
10   indication, that he can load barrels between first half
11   August out of the Gulf Coast and sell it on a delivery
12   basis to Asia.  That was not acceptable to Mr. Wilson.  He
13   indicated that it was -- that the timing was very
14   important, that he needed a guarantee of arrival of
15   September 15."
16        Question:  "All right."
17        "So that offer was not pursued on that
18   basis."
19        So the record is actually very clear that
20   this discussion about a -- you know, indications about a
21   possible U.S.G. loading, whether FOB or the first half of
22   August, were indications specifically rejected by
23   Mr. Wilson and not pursued and all of these were two hours
24   before the deal was made, which is a lifetime in this
25   trading.

19

1         In addition to that, it is very clear that
2    the discussion where Mr. Wilson asked after the deal was
3    made:  "Well, where do you think you're going to supply
4    from," it is very clear from Mr. Lockwood's testimony that
5    the inquiry about, "Where do you think you're going to
6    load from" came after the deal was made.
7         And if we could take a look at Page 115 of
8    the hearing transcript, beginning on Line 15, well, there
9    he goes.  Yeah, on Line 15, Mr. Lockwood said:  "I had
10   accepted the firm bid as it was presented to me."
11        JUDGE BENTON:  Can we back up so that we
12   can see the question that is asked?
13        MR. DIAZ-ARRASTIA:  Oh, sure
14        JUDGE BENTON:  Okay.  Right.
15        MR. DIAZ-ARRASTIA:  And then the question
16   was:  "But after this discussion, at a time when you
17   believe that Mr. Leyman went to Dr. Wilson and talked to
18   him, Mr. Leyman came back to you and said, What is the
19   origin of the product?  Correct?"
20        Mr. Lockwood said:  "Let me correct.  It
21   was before Ed had said everything was done.  He had asked
22   me what the origin is.  I had accepted the firm bid as it
23   was presented to me.  He said:  'Okay.  Let me call Rick
24   and tell him everything is done.'  When he called Rick
25   Wilson, he came back to me then with the question, 'What

20

1    is the origin of the product?'  And I said, 'Most likely
2    U.S. Gulf, but I can't guarantee it since I am already
3    guaranteeing the first half window.'"
4         And this has been Mr. Lockwood's position
5    consistently throughout this entire proceeding, that it
6    was likely that he would supply U.S. Gulf material but he
7    couldn't guarantee it in order to also meet the first half
8    of September window, and a guarantee of U.S. origin is not
9    in the deal.  Even Mr. Cofarn, Vinmar's own expert,
10   testified that, yes, it is well understood in the business
11   that "most likely" and "guaranteed" mean two completely
12   different things.
13        Vinmar's insistence that it had to be
14   guaranteed U.S. origin or they would not accept delivery
15   is a breach of the contract
16        JUDGE BENTON:  Okay.  But this testimony
17   really touches on the communications between Mr. Lockwood
18   and Mr. Leyman, and can you -- can you -- and you've
19   already talked about the communications between Dr. Wilson
20   and Mr. Leyman that happened two hours -- a lifetime in
21   the business, but can you -- can you touch on or remind us
22   what's in the record on communications between Wilson and
23   Leyman that firm up that Wilson has abandoned or
24   acquiesced on open origin?
25        MR. DIAZ-ARRASTIA:  The -- the testimony

21

1    from Mr. Leyman is first what we just saw a moment ago.
2         JUDGE BENTON:  The two hours --
3         MR. DIAZ-ARRASTIA:  That the discussion
4    from two hours ago, Mr. Wilson absolutely rejected that
5    and abandoned that as a concept.  Subsequent to that,
6    there was testimony from Mr. Leyman that the origin of the
7    product was just not discussed at all between him and
8    Mr. Wilson on the discussions that led to the deal that's
9    the subject of this claim.
10        JUDGE BENTON:  Okay.  So they had talked
11   two hours earlier and so then -- so maybe two hours later
12   they have another discussion and they are not touching on
13   origin at all?
14        MR. DIAZ-ARRASTIA:  That is what Mr. --
15   that is Mr. Leyman's testimony.  Mr. Leyman's testimony
16   was very clear that he said there was no discussion about
17   origin at all before the deal was made.  What page is
18   that?
19        MS. LARSON:  283, 282.
20        JUDGE BENTON:  It appears to be 283.
21        MR. DIAZ-ARRASTIA:  Okay.
22        Yes.  And Mr. Wilson is -- he's being
23   questioned about that.  Mr. Leyman is being questioned
24   about that, and so it's part of the discussion of the date
25   for declaration of discharge, and if you'll look at

6  (Pages 18 to 21)

CLOSING ARGUMENTS

**22**

1  Line 23 at Page 283, Mr. Leyman is saying -- well, the
2  question is: "All right.  And what was the concern?  That
3  it would be hard to get it through the Panama Canal in
4  time?"
5          And the answer is: "No.  That was part of
6  the discussion in declaring the date for the discharge
7  port.  After we concluded the transaction -- after we
8  concluded the transaction, Mr. Wilson asked me what is the
9  origin of the xylenes, and this was after I had recapped
10  and summarized all the terms and conditions.  I
11  subsequently called Brad, also recapped the terms and
12  conditions, and asked him that question.  And his response
13  was, 'The origin was most likely U.S. original.'  I in
14  turn called back Rick, passed that information on to him,
15  and then we got into a discussion of when to declare the
16  discharge port."
17          So Mr. Leyman's testimony in that regard is
18  completely consistent with Mr. Lockwood's testimony.  The
19  only person who has ever stated that Mr. Leyman was told
20  that U.S. origin was a requirement of the deal is
21  Mr. Wilson himself.  He said that in his testimony, but
22  you have to consider that Mr. Wilson also received three
23  different confirms from MOAB, Mr. Leyman's company, none
24  of which mention the origin of the material.
25          Mr. Wilson asked that they be modified

**23**

1  because he wanted the payment terms modified, and that was
2  done.  Mr. Wilson also testified that he had noticed that
3  there was a mistake in the price term, which was also
4  correct.  So through three different confirms, no mention
5  of U.S. origin.  In addition to that, he then passes -- he
6  receives the Tricon letter from Mr. Lockwood that also
7  does not mention it, passes that on to Mr. Pascu.
8          He is asked by Mr. Anaya what is the origin
9  of this product and Mr. Wilson's response -- and this is
10  going to Exhibit No. 8.  Yes, he is asked by Mr. Anaya:
11  "You know, what is the port of origin of this product?"
12  And Mr. Wilson's response on July 25th is, "Gray origin.
13  We will know when we declare discharge port, most likely
14  U.S. Gulf."  The same thing that Mr. Lockwood said, the
15  same thing that Mr. Leyman said.  Now, this is also
16  important because this is one of the places where Vinmar's
17  post hearing brief contains something that's just wrong.
18          JUDGE BENTON:  Just a second.  And this is
19  three days after the --
20          MR. DIAZ-ARRASTIA:  This is --
21          JUDGE BENTON:  Two days.
22          MR. DIAZ-ARRASTIA:  Well, Mr. Anaya makes
23  the question two days later.
24          JUDGE BENTON:  The answer is three days?
25          MR. DIAZ-ARRASTIA:  The answer is three

**24**

1  days.
2          JUDGE BENTON:  Okay.
3          MR. DIAZ-ARRASTIA:  In Vinmar's post
4  hearing brief they say that Mr. Anaya asked Mr. Wilson
5  what is the loading port, but as you can see, that is not
6  at all the question.  The question is what is origin.
7          There was testimony at the hearing from
8  everybody that "origin" and "loading port" mean two
9  completely different things.  Even Mr. Cofarn, Vinmar's
10  own expert, had to admit that, in the industry, "origin"
11  and "loading" are not the same concept.  They are
12  completely different concepts and the reason is because
13  you can have foreign origin MX put in a bonded tank in
14  Texas City and you can load it in Texas City but it's not
15  of U.S. origin.  It's not Texas City origin, and that
16  was thoroughly explained in the record.  Everybody agreed
17  on that.  Even Mr. Wilson himself said, you know, that
18  could happen, although he said he wasn't aware of it, but
19  everybody else -- both expert witnesses agreed on that.
20  Both expert witnesses agreed that it would make no sense
21  for anybody in this industry to use the word "origin" when
22  they really meant "load".  So two days after the deal
23  Mr. Wilson specifically asked what's the origin, and he
24  gives the same answer that Mr. Lockwood gave.  "We don't
25  know yet.  We will know when" --

**25**

1          JUDGE WOOD:  Hang on just a minute.
2          JUDGE BENTON:  Hang on.  Excuse us, please.
3          JUDGE WOOD:  Thank you.
4          MR. DIAZ-ARRASTIA:  That's fine.
5          What he said, he -- two days after the
6  transaction is finished or the deal was made, the
7  transaction was not finished because additional terms were
8  being negotiated, but two days later he's given the
9  specific question, "What's the port of origin," and he
10  says he won't know until we declare discharge port.  Most
11  likely but not guarantee U.S., exactly the answer that was
12  given by Mr. Lockwood and exactly what Mr. Leyman said in
13  his testimony, and Mr. Anaya's question was about the
14  origin, not about the load.  The idea that the discussion
15  between Mr. Wilson and Mr. Anaya refer only to where would
16  the material be loaded from is obviously something that
17  they came up with after the fact to try to justify their
18  breach.
19          I want to talk a little bit about one issue
20  that came up on contract formation and this has to do with
21  the signature lines.  And, as you will recall, there was
22  a -- the three MOAB confirms, which we believe created a
23  binding agreement.  If they don't create a binding
24  agreement, we still have under UCC 2207 an agreement is
25  made with a Tricon letter, but we believe it's a binding

7 (Pages 22 to 25)

CLOSING ARGUMENTS

26

1  agreement and the Tricon letter is a proposal to modify
2  that agreement which can be done without consideration
3  under the UCC.
4        The Tricon letter had spaces at the end for
5  signatures. Mr. Lockwood's testimony was that's just
6  something that the -- their system automatically
7  generates, that in spot deals of this kind, those pages --
8  those signatures are never filled out. They are never
9  signed with somebody taking a piece of paper to it.
10        Vinmar made a suggestion in its post
11  hearing brief that Steve Simpson, Tricon's expert, gave
12  testimony that it is not customary in the industry to have
13  signatures on paper that is passed like the Tricon letter
14  and that if there were signatures on the piece of paper
15  you would expect them to be signed. That is actually the
16  exact opposite of what Mr. Simpson's testimony was.
17        First, let me point out Mr. Simpson's
18  report which is in the record, and specifically
19  Paragraph 6 of this report. He specifically addresses the
20  question of the signature spaces. I'm sorry. It is
21  Exhibit -- Tricon Exhibit 36, Paragraph 6. If you will
22  see the last sentence there, he says these confirming
23  letters. Can you highlight that part, Tracy? It's the
24  last sentence on Paragraph 6, these confirming letters:
25  "These confirming letters frequently contain lines for

27

1  signatures of the parties, but it is very unusual for
2  these confirming letters to ever be signed by either party
3  unless it is a long-term contract which is not the case
4  here."
5        Let's see what Mr. Simpson testified to
6  during the hearing, and if we can look at Page 482 of the
7  hearing transcript, 482, beginning at Line 4, and the
8  question is: "Okay. Now, let's take a look at the last
9  page of Exhibit No. 5," which was the Tricon letter. "Do
10  you see where there are spaces for signatures?"
11        "Yes, sir."
12        "And have you seen paper that is passed
13  that has spaces for signatures at the end?"
14        "Yes, sir." He has seen that in the
15  industry.
16        "Okay. And is it customary for these
17  additional terms to be signed or not to be signed?"
18        "In my view, it is customary that they not
19  be signed." So it is very clear that Mr. Simpson's
20  testimony is that, although there are signature spaces, it
21  is customary in the industry that those not be signed.
22        Vinmar cites a number of cases in their
23  post hearing brief that says that the presence of
24  signature lines can be considered evidence that the
25  parties intended that those be filled in, and I will have

28

1  to say that that's probably true. It is some evidence of
2  that, but it's not conclusive evidence of it. In this
3  record there is overwhelming evidence that, for a spot
4  deal like this one in this industry, it was not
5  uncommon -- in fact, it frequently happened -- that paper
6  that was passed contained signature lines but that it was
7  not customary that they actually be signed.
8        The evidence is that the intention of the
9  parties in this case was to be bound even if the signature
10  lines were not filled in. Now, certainly, when a proposal
11  for additional terms is made, it is necessary that the
12  opposing party assent to those additional terms, but under
13  the UCC, that assent can be given in any reasonable way,
14  and in this case we have the e-mail from Mr. Pascu saying,
15  "Here are my comments. We will revert soon with our
16  purchase order." Even Mr. Cofarn, their own expert,
17  testified that you would not issue a purchase order if you
18  did not believe that there was a deal.
19        Why don't we take a look at Page 532 of the
20  hearing transcript, beginning at Line 13, and this is from
21  Mr. Cofarn's deposition. Beginning on Line 13 there is a
22  question by me: "Where Mr. Pascu is telling" -- yeah:
23  "Where Mr. Pascu is telling Mr. Rajevac, 'We will revert
24  soon with our purchase order for your review.' Do you see
25  that, sir?"

29

1        And Mr. Cofarn says: "Yes."
2        "Back when you were trading, sir, would a
3  buyer send a purchase order if he thought there was no
4  deal?"
5        "Would a --
6        "Would a buyer sell -- would a buyer send a
7  seller its purchase order if the buyer thought there was
8  no deal, if they were not going to buy?" And his question
9  is very clearly no.
10        So it is very clear from Mr. Pascu's
11  e-mail -- and I can't remember what exhibit that was --
12  that he accepted the additional terms. He made some
13  changes to the Tricon letter which Mr. Rajevac immediately
14  accepted, accepting only demurrage, which is not at issue
15  here. This is also very important because the only part
16  of the additional terms that's really important to this
17  case is the arbitration clause, because all of the basic
18  commercial terms were the same -- I'm sorry -- the
19  arbitration and the interest clauses. All of the other
20  basic commercial terms were the same. It is important the
21  purchase order that was prepared by Mr. Pascu contain
22  essentially the same arbitration clause.
23        There is no doubt on this record that there
24  is plenty of evidence that Vinmar intended to accept the
25  Tricon letter and specifically intended to accept the

8  (Pages 26 to 29)

CLOSING ARGUMENTS

---

**30**

1  arbitration provisions of the Tricon letter. The idea
2  that the parties intended not to be bound until the
3  signatures were actually written with a pen to paper, it's
4  just not supported in this record.
5      I would like to just briefly say one more
6  thing regarding Mr. Rajevac. There is a suggestion made
7  that Mr. Rajevac intended not to comply with the contract
8  because he intended not to permit Vinmar to inspect the
9  material, which is the term in the contract, and
10 Mr. Rajevac just clearly did not say that. And let's take
11 a look at his testimony, which are on Page 335 and 336 of
12 the hearing transcript, and starting on Line 13, the
13 question was: "We may give you something of Asian
14 origin"?
15     And Mr. Rajevac's answer was: "Correct, in
16 this case if it was Asian origin we would be more than
17 happy to let Vinmar participate in the inspection. There
18 would have been plenty of time to do so."
19     "Okay."
20     "It was only deep sea cargo which would
21 likely -- in which case we would likely have to give them
22 already issued certificates of quality and quantity for
23 the xylene load."
24     So Mr. Rajevac's testimony -- and if you
25 recall, this was the e-mail on the 29th of July where

---

**31**

1  Mr. Rajevac very clearly stated that Asian origin might be
2  a way that Vinmar was -- that Tricon was going to fulfill
3  this contract, where he said, "We may give you a deep sea
4  cargo already in the water, but if you're not happy with
5  that, we might just give you an Asian origin cargo." With
6  an Asian origin cargo, which the contract clearly
7  permitted, there would have been plenty of time for Vinmar
8  to inspect or to be present at the inspection. If they
9  insisted on that, if they were not happy accepting a
10 certificate of inspection, they could have been present at
11 inspection, fulfilling all of the terms of the contract
12 with an Asian origin cargo.
13     The -- the final thing that I want to talk
14 about is just the idea of our damages, and Vinmar has
15 argued rather strongly that Tricon was not harmed in this
16 case. The evidence here is that we -- that just after
17 July 22nd, 2008, when this contract was made, the price of
18 MX went into a sustained and precipitous decline. The
19 evidence was by the end of the year the price had declined
20 some 62 percent. Vinmar's theory is that when you as a
21 seller have just nabbed a fixed price contract at today's
22 price and from that moment on the price begins to go down
23 at a significant rate, when your buyer breaches that
24 contract, you're not harmed at all. That's absurd. Of
25 course, you're harmed.

---

**32**

1      In that connection, a case that is cited by
2  Vinmar in their brief is actually very helpful to Tricon's
3  position. This is the Islamic Republic of Iran against
4  Boeing case, and in that case, the Court makes very, very
5  clear that all that a seller need show in order to say,
6  "You know, we could make the sale on the contract that was
7  breached and we could have also made the replacement sale"
8  is enough evidence to show that both sales could have been
9  made. The evidence is here. The evidence is clear that
10 the price was going down. Even Mr. Wilson himself said
11 everybody had stopped buying. The buyers are hiding, if
12 you'll remember that testimony from Mr. Wilson.
13     What that meant is that somebody who has a
14 fixed price contract at a high price is going to have no
15 difficulty buying all of the MX that they can in order to
16 fulfill that contract and any other contract that they may
17 be able to -- to scrounge up. The replacement sale here,
18 the KP sale, was pursuant to a preexisting one-year
19 contract where KP had agreed back at the beginning of 2008
20 to accept 5,000 metric tons of -- you know, plus or minus
21 5 percent -- of MX every single month based upon the
22 average price for the preceding month, and that is the
23 reason that Vinmar was able to -- I'm sorry -- that Tricon
24 was able to find a replacement sale at all, because there
25 were no buyers.

---

**33**

1      But the suppliers were desperate to make
2  sales and Mr. Lockwood gave the testimony right at the end
3  of his direct examination that it would have been no
4  problem to find all the MX that you wanted. Suppliers
5  were desperate to make sales. Tricon could have sold the
6  Vinmar contract and it could have also sold the
7  preexisting contract with KP. There is no doubt about
8  that. There is plenty of evidence. There is no evidence
9  to the contrary.
10     What the Islamic Republic of Iran case is
11 cited for in Vinmar's brief is the proposition. As you
12 will recall, KP asked for a discount, for a reduction in
13 the volume on their contract, and it was given to them
14 because we had a long-term relationship with them.
15 Vinmar cites the Islamic Republic of Iran case with the
16 proposition that if we had to give Vinmar a reduction --
17 I'm sorry -- if we had to give KP a reduction in volume,
18 then Vinmar also gets a credit for that. That is just not
19 the holding of that case at all, not even close to it.
20     What happened in the Islamic Republic of
21 Iran case is that Iran had bought airplanes from Boeing
22 and breached, didn't take delivery, and the evidence was
23 that the price that was given Iran was -- I think was a
24 certain number of millions of dollars subject to a
25 reduction by a credit memo. Then there was a replacement

---

9  (Pages 30 to 33)

CLOSING ARGUMENTS

34

1    sale which had the same structure and there was evidence
2    that that was common in aircraft sales where there was a
3    stated price, also subject to a reduction by a credit
4    memo.
5            In that case, Iran had argued, "Well, when
6    you calculate the price we were going to pay under the
7    contract, you have to reduce the credit memo from the
8    stated price, but when you go look at the replacement sale
9    you don't reduce the credit memo from the stated price,"
10   and the Court just said, "No. Wait a minute. If both
11   contracts had a stated price subject to a credit, you do
12   the credit in both contracts." That's not the case here.
13   That's not the case here.
14           It is just not -- it doesn't say that if we
15   have to give a credit to the replacement sale we must also
16   extend it to Vinmar. What it does say is that if there is
17   evidence that both sales could have been made, as there
18   is, then we're entitled to the benefit of both sales, and
19   clearly we are. There is no doubt that Vinmar could have
20   made the Tricon -- that Tricon could have made the Vinmar
21   sale for which they had a binding contract and could have
22   also made the KP sale for which they also had a binding
23   contract.
24           Now, let's talk a little bit about what is
25   the proper measure of damages. The first thing is that

35

1    the profit that would have been made on the sale is just
2    not the measure of contracts provided -- well, the measure
3    of damages provided by the UCC. Frankly, I wish it was,
4    because as even Mr. Lee's own evidence demonstrated, the
5    profit that Tricon would have made had Vinmar performed
6    under a reasonable set of assumptions would have been
7    about $1.8 million, which is more than the damages we're
8    asking for. Under the UCC, damages are calculated by
9    comparing the, you know, price under the -- you know,
10   money that would have been paid under the breached
11   contract to the money that was paid under the replacement
12   sale and the difference between the two are your damages
13   and that comes out to about $1.6 million. The profit
14   would have been more.
15           I wished that lost profits was the measure
16   of damages, but it is not. The fact that a profit was
17   also made on the KP sale is irrelevant because we were
18   entitled to the benefit of both contracts that were
19   binding contracts. We could have made both sales.
20   Suppliers were desperate to make sales. There was plenty
21   of supply. People would have been very happy to sell at
22   almost any price.
23           There is a -- the UCC provides two
24   measures. Under 2706 you actually compare the money that
25   would have been made under the breach in contract to the

36

1    money that would have been made -- that was made on the
2    replacement sale. That is our preferred measure of
3    damages. Under 2708 there is an alternative measure of
4    damages where you compare the money that would have been
5    made under the sale that -- contract that was breached to
6    the market price, to a theoretical sale at the market
7    price at the time and place of tender, and we presented
8    alternative measures of damages. Under 2708, our measure
9    of damages is slightly less. Tracy, what -- well, it's
10   slightly less.
11           JUDGE DAVIDSON: I would like the figure
12   that you claim.
13           MR. DIAZ-ARRASTIA: It's in the -- it's in
14   Mr. Matthews' report. It is his almost $1.4 million, one
15   point --
16           MS. LARSON: No.
17           MR. DIAZ-ARRASTIA: I'm sorry. Well -- but
18   that's before we put an interest on the --
19           MS. LARSON: Before interest, yeah.
20           MR. DIAZ-ARRASTIA: It's in Mr. Matthews'
21   report. It's slightly less.
22           We believe that the 2706 report -- well,
23   first, the law, I believe, gives us, the Claimant, the
24   option about how to proceed, but more than that, I think
25   it is just because I think in order to be fully

37

1    compensated you need to take a look at the difference
2    between what we would have made had Vinmar performed and
3    what -- and the best that we were able to do under the
4    circumstances.
5            There is a market price reflected by plats
6    and that's what we were -- what we used in the
7    calculation, but there was also plenty of evidence that,
8    although certainly there were some sales of MX going on in
9    the period of time of August and September 2008, buyers
10   were extremely difficult to find, and although some prices
11   were being reported, the reality of the situation is that
12   most people who wanted to sell weren't able to.
13           The only way that we were able to match a
14   sale was by looking at a sale that was already made,
15   already contracted for, and even there, showing how hard
16   it was to find buyers, we had to reduce the volume. So
17   under those circumstances, the market price doesn't really
18   reflect our damages. A better reflection of our damages
19   is what is the best thing that we were actually able to
20   do, and that is why we believe the 2706 measure is a
21   better measure of damages.
22           That is really what I have as far as my
23   closing, but if you have additional questions about
24   contract formation or any other issue in the case, I would
25   be very happy to address them.

10  (Pages 34 to 37)

CLOSING ARGUMENTS

### 38

1      JUDGE BENTON: Judge Wood?
2      JUDGE WOOD: No questions
3      JUDGE BENTON: Judge Davidson?
4      JUDGE DAVIDSON: No questions.
5      JUDGE BENTON: All right. Before we hear
6  from you, Mr. Lee, how about a five-minute restroom break.
7      MR. LEE: You've read my mind. Thank you.
8      JUDGE BENTON: Okay. A short break. Off
9  the record.
10      (Recess from 10:23:05 a.m. to 10:33:55
11      a.m.)
12      JUDGE BENTON: Mr. Lee, are you ready, sir?
13      MR. LEE: Yes.
14      JUDGE BENTON: Mr. Diaz-Arrastia, are you
15  ready?
16      MR. DIAZ-ARRASTIA: Yes.
17      JUDGE BENTON: All right. We are back on
18  the record, and, Mr. Lee, you may proceed.
19      MR. LEE: Thank you. Let me apologize in
20  advance that the change in weather is -- I've got some
21  allergies, but I'm going to do my best.
22      The -- I'm going to address -- I try to
23  address four main points: Jurisdiction, the issue of
24  mutual assent, mutual intent to be bound, and the damages,
25  and we'll jump around a little bit and maybe pick up a few

### 39

1  things that counsel said this morning, but I think the
2  first point I want to make, if you sort of think about the
3  record and what we've seen in this case, what's -- what's
4  really clear is that Tricon really wants to say there was
5  a deal, but they only want to do it on their terms. It's
6  a deal only on their terms. In fact, this morning we
7  heard that even after the broker confirmation came out,
8  the transaction wasn't finalized. There was still
9  negotiation.
10      They don't want to commit to anything. Is
11  it the confirm? Is it the sales contract? I asked
12  Mr. Lockwood, the sales representative, and the
13  representative for Tricon at the hearing, "What -- what's
14  the contract that you're asking to be enforced?" He
15  wouldn't answer it. He refused to answer it. At the end
16  of it he said, "It's whatever you want it to be, whichever
17  one you prefer." Well, that doesn't get them there in
18  this case because we have a jurisdictional issue. It has
19  to be something other than the confirm, but Mr. Lockwood
20  wouldn't agree to that.
21      Is it a signature or is it not a signature?
22  We have signature blanks on the agreement. They claim
23  that they're meaningless, they weren't signed, nobody ever
24  signed them. They're there. They're there for a reason,
25  and if you -- you know, the inspection, we -- that came up

### 40

1  this morning. Mr. Rajevac's testimony was, when I asked
2  him pointblank, "Did you intend to allow Vinmar to inspect
3  the product," he said no. And his answer there was
4  instructive and interesting when you think about this
5  whole U.S. origin issue, which is what this case comes
6  down to in a lot of ways. But he went on with this long
7  answer about the discharge, declaration date and certainly
8  it seemed from his answer that he was expecting to ship
9  this product from the United States, and that testimony's
10  at Page 333 and 334 of the record where he talks about the
11  fact that there's a minimum of 35 days of sailing time
12  between the U.S. Gulf and Asia, and if you really want to
13  inspect it, then you need to change the discharge date and
14  there's a lot of testimony from Mr. Rajevac about his
15  understanding that this might be coming from the U.S.
16      JUDGE DAVIDSON: It was shipped from the
17 · U.S. Wasn't it?
18      MR. LEE: No. There was no -- remember,
19  there was no shipment in this case.
20      JUDGE DAVIDSON: But it was supposed to be
21  shipped -- it was USG.
22      MR. LEE: It was supposed to be shipped
23  from the United States, yes.
24      JUDGE DAVIDSON: Right. That's clear in
25  the record. Nobody disputes that.

### 41

1      MR. LEE: And that was part of the
2  contract.
3      JUDGE DAVIDSON: Okay.
4      MR. LEE: But if I -- let me deal with the
5  arbitration and the jurisdiction issue at the outset,
6  which is, if you -- Tricon has now made it very clear in
7  their brief. They say that the broker confirmation is an
8  enforceable contract. That's what they say. We know the
9  broker confirmation does not have an arbitration
10  agreement. It's undisputed and we can all look at the
11  document itself, and there's also testimony in the record
12  from the witnesses on the deal that arbitration was never
13  discussed or agreed to. So under that notion the Panel
14  cannot have jurisdiction; there is no arbitration
15  agreement; it was not discussed; it was not agreed to and
16  it's not contained in the broker confirmation.
17      Tricon advances one argument to try to get
18  jurisdiction in this case, and that is that under 2209 of
19  the USC -- UCC, the contract was modified by the sales
20  contract. That's a brand new argument, by the way. It's
21  not in their Statement of Claim. They argue a number of
22  things in the Statement of Claim. They reference a number
23  of UCC provisions. Not once did they mention modification
24  under 2209, but the evidence on modification and what the
25  law says is a modification works just like a contract.

11 (Pages 38 to 41)

CLOSING ARGUMENTS

42

1    You have to have offer and acceptance. An acceptance has
2    to be a definite, seizable expression of assent to the
3    terms.
4            The only evidence that they have offered in
5    support of that is Mr. Pascu's e-mail, which I'll -- I'll
6    put up on the board in a minute, but Mr. Pascu's e-mail
7    says, "Here are my comments to your sales contract. We
8    will send a purchase order for your review." Not a single
9    word in that e-mail about -- no word of acceptance, no
10   signature on the document, no statement that we accept the
11   sales contract, and instead what he says is, "I'm sending
12   you a purchase order."
13           JUDGE BENTON: So we can't infer from that
14   that that's acceptance of the terms of the Tricon letter?
15           MR. LEE: Not based on the language, your
16   Honor. The language of the e-mail -- and can -- why don't
17   we put that up there. It's slide 10. Do you mind if I
18   stand up every once in a while?
19           JUDGE BENTON: Sure.
20           MR. LEE: What Mr. Pascu says -- and, by
21   the way, Mr. Pascu did not negotiate the deal --
22           JUDGE BENTON: Sure.
23           MR. LEE: -- and was not in any way
24   involved in that.
25           The signature blanks on the contract itself

43

1    specifically identified Rick Wilson and Brad Lockwood as
2    the signatories, but what Mr. Pascu said is: "Please find
3    enclosed our comments on your sales confirmation." Now,
4    those comments were several handwritten scatches on the
5    sales letter, the sales contract that Tricon had sent. He
6    doesn't say, "We accept your sales contract. We accept
7    all other terms in the shales contract." He says: "Here
8    are our comments. And, oh, by the way, I'm going to send
9    you a purchase order for your review. So I'm sending you
10   my terms which will be forthcoming."
11           Now, he never sends those purchase
12   orders -- that purchase order because we found out that
13   there never was mutual assent. Mr. Wilson -- Dr. Wilson
14   discovered between this date and before the purchase order
15   was ever sent that, "Wait a minute. We don't have mutual
16   understanding on the key term of the deal," which is U.S.
17   origin MX, but this e-mail does not use any acceptance
18   language. It doesn't say, "We -- we agree with it. We
19   accept it. I sign it." It simply says, "Here are some
20   comments. We will send you a purchase order for your
21   review," and then he goes on to ask some questions and ask
22   for this prompt feedback.
23           So that document is not acceptance, and on
24   top of that, your Honor, there are cases that talk about
25   the -- the most obvious manifestation of acceptance is a

44

1    signature, which the sales contract required a signature.
2    There are no signatures from either Mr. Lockwood or
3    Dr. Wilson. So for both reasons, even if you were to
4    conclude that that document could rise to the level of a
5    acceptance, you still have the signature issue, which I'll
6    come to in just a second.
7            Let me deal with this mutual assent issue
8    and -- because I think that's really where things start.
9    Was there an agreement between these parties to purchase
10   mixed xylenes? Certainly, we agree that there were a
11   number of things that the parties did agree to. I mean,
12   there's no question about the fact that Dr. Wilson had
13   given Ed Leyman, the broker, authority to make a purchase
14   on certain terms and was told by Mr. Leyman that those
15   terms had been accepted by Tricon, but there's a key
16   missing term from our perspective and from Mr. Wilson's
17   testimony, and that is, our requirement and our firm bid
18   was U.S. origin, mixed xylenes.
19           Contract law is clear that in order to have
20   a contract you have to have mutual assent. The parties
21   must agree on the essential terms. The testimony also is
22   clear that a broker like Mr. Leyman cannot match a firm
23   bid with a firm offer unless those terms are identical and
24   all the witnesses have said that and so did Mr. Simpson,
25   their expert, and this is an excerpt from his testimony at

45

1    Page 495, Lines 1 through 12. We asked him -- I asked
2    him: "If you -- if you say in your firm bid, 'This is
3    what I want,' and the firm offer on the other side doesn't
4    match the firm bid, you don't have a deal, do you?"
5            He said: "Probably wouldn't."
6            And I said, well: "The broker shouldn't
7    put the two parties together like that. Correct?"
8            Answer: "He probably wouldn't."
9            "And if he does, he exceeded his authority,
10   did he not?"
11           Answer: "He did."
12           The testimony from the traders, Dr. Wilson
13   and Mr. Lockwood, confirm there is no deal. Mr. Wilson
14   said at Page 397: "Mr. Leyman had specific instructions
15   to buy U.S. origin material only on my behalf," and he
16   says that several times throughout his testimony, that he
17   authorized Mr. Leyman to purchase U.S. origin MX and U.S.
18   origin MX only. And Mr. Lockwood said at Page 110 that he
19   didn't guarantee U.S. origin and he doesn't believe that
20   that's a term of the deal.
21           So if you accept the testimony of
22   Dr. Wilson and the testimony of Mr. Lockwood, there's no
23   mutual assent because Mr. -- Dr. Wilson made it clear it
24   was U.S. origin mixed xylenes. That's what Vinmar
25   required.

12 (Pages 42 to 45)

CLOSING ARGUMENTS

46

1    JUDGE DAVIDSON:  Didn't Dr. Wilson testify
2  that the fact that he didn't bring this up in any of the
3  ongoing discussions on the correction of the price, you
4  know, the continuing discussion on terms, was his mistake,
5  that it was a mistake that he made?
6    MR. LEE:  He said a couple of things about
7  that, your Honor.  He said --
8    JUDGE DAVIDSON:  But didn't he say that?
9    MR. LEE:  Ultimately, he said, "Maybe I
10  should have caught it sooner."  He said it was MOAB,
11  Mr. Leyman's mistake.
12    He also, though, did testify that he did
13  not expect the confirmation to contain a statement about
14  origin and he also said that in the contract documentation
15  he didn't expect to see anything about origin until Tricon
16  had selected the specific port.  He had given testimony
17  that Tricon did not want to agree to a specific port in
18  the United States.
19    JUDGE DAVIDSON:  So to make it clear, if I
20  do a search of Dr. Wilson's testimony, it will not say
21  that -- the word "mistake" will not appear?
22    MR. LEE:  No, your Honor.  He did -- he did
23  at one point say --
24    JUDGE DAVIDSON:  "Mines"?
25    MR. LEE:  -- "I made a mistake, too.  I

47

1  should have caught it sooner."
2    JUDGE DAVIDSON:  Did he say "too"?
3    MR. LEE:  He said -- and then he corrected
4  that answer and said it was really Tricon's mistake,
5  actually, and I'll find that testimony.  But I -- he did
6  say that he made a mistake, that he should have caught it
7  sooner.  We'll concede that, but he also in that same
8  answer corrected himself and said it was Vinmar's
9  mistake -- I mean, Tricon's mistake.
10    But it doesn't change, your Honor, the fact
11  that at the time that the deal was negotiated -- and, by
12  the way, these negotiations, as we all know, went entirely
13  through Mr. Leyman.  He's the only person that
14  communicated with both parties, and the testimony from
15  Dr. Wilson was, "I required U.S. origin."  Mr. Lockwood
16  said, "I wouldn't agree to U.S. origin."  So if you accept
17  the testimony from the witnesses, the two people who
18  authorized -- one made the firm bid and one made the firm
19  offer -- those offers don't match.  There's no mutual
20  assent, and the testimony from Mr. Simpson makes it clear
21  that the brokers shouldn't match the firm bid that doesn't
22  match a firm offer.
23    So what you're left with, Tricon's case, is
24  it hinges entirely on Mr. Leyman's testimony about what he
25  claims to have negotiated on July the 22nd.  He does so

48

1  without the benefit of any notes.  He does so without the
2  benefit of any tape recordings, although he had told
3  Dr. Wilson and Dr. Wilson testified that one of the
4  reasons he used Mr. Leyman in the first place is because
5  he tape recorded conversations.  Those have disappeared.
6  We don't have any notes from Mr. Leyman about what he did
7  and what terms he authorized.  We have some Instant
8  Messages early on in the day, and those are clearly
9  discussions about product originating in the United
10  States.
11    There's a firm bid, not just indications.
12  If you go back and look at Joint Exhibit 11, the very
13  first offer that's made to Vinmar is, in fact, a firm bid
14  for product leaving from Corpus, Houston or Texas City,
15  and all of the discussions in those IMs are based on U.S.
16  origin product.
17    JUDGE DAVIDSON:  Mr. Diaz-Arrastia argued,
18  as I understood it, that FOB or shipping point is
19  different from origin and that the emphasis was being
20  shipped from the United States and not being -- not having
21  origin in the United States.  Do you remember him arguing
22  that?
23    MR. LEE:  I do.
24    JUDGE DAVIDSON:  Response?
25    MR. LEE:  I do.  Mr. -- Dr. Wilson's

49

1  testimony was, "I required U.S. origin."  The Instant
2  Messages are -- I point to those because it's evidence
3  that there clearly was discussion about the origin of the
4  product.
5    Dr. Wilson made it very clear that he
6  required U.S. origin MX, and here's the testimony from
7  Dr. Wilson.  It was at Page 445 of the record:  "I
8  believe" -- he answered:  "I believe the communications
9  were silent on origin and I expected that once the exact
10  port has been identified that they would appear on the
11  contract.  So in retrospect, you know, it's easy to see
12  had I gone back in time I didn't catch it, and it was my
13  mistake.  It was actually Tricon's mistake, but I didn't
14  catch it.  But that doesn't change the fact that I never
15  asked for non-U.S. material.  I never gave Ed Leyman the
16  authority to purchase non-U.S. material."
17    That brings us to this, the basic point,
18  which is if -- if the authority that the broker is
19  provided is to purchase not -- or purchase U.S. origin MX
20  and he strikes a deal that does not, in fact, include an
21  origin guarantee, as the witnesses have testified, there's
22  no deal.  We never agreed to it.  There's no mutual assent
23  and the broker's exceeded his authority if he puts two
24  parties together that have different terms.
25    We have a -- we have a real conflict here

13  (Pages 46 to 49)

CLOSING ARGUMENTS

50

1    in terms of what the testimony is from Mr. Leyman and
2    Mr. Lockwood about when U.S. origin came up, and if -- and
3    counsel touched on this a little bit today, but this is
4    Mr. Leyman's testimony.  He was first asked about whether
5    U.S. origin came up and he said, "No, it was never
6    discussed in the negotiations."  That was his first answer
7    in his testimony, it wasn't discussed in the negotiations.
8    Then he was asked later in his deposition about a
9    statement in one of the Instant Messages and he said:
10   "Oh.  Okay.  Well, it did come up, but it came up only
11   after we had concluded the transaction, and, in fact, it
12   was a discussion around the discharge port declarations."
13        So Mr. Leyman's version, it came up after
14   the deal had been concluded, but Mr. Lockwood actually
15   said it came up before the deal had been concluded.  We
16   looked at this testimony earlier today, but we skipped
17   over the very first thing he said: "Let me correct.  It
18   was before Ed had said everything else is all done.  He
19   asked me what the origin is," and he goes on to talk about
20   the fact that there was a discussion about origin prior to
21   Mr. Leyman saying everything is all done.  Go to the next
22   page of that because it spills over.  So this is the same,
23   continuing on with the answer, and he says: "And so there
24   was a discussion about it and then, apparently, after he
25   talked to Dr. Wilson, he called me back and said

51

1    everything is all done."
2        So there -- there was a discussion about
3    U.S. origin.  Mr. Leyman's memory is faulty.  He said,
4    first of all, it never came up and then he said, "Well, it
5    came up after the deal was concluded."  Mr. Lockwood said,
6    "No.  It came up before everything was done," which would
7    be absolutely consistent with Dr. Wilson's testimony that
8    I told them it had to be U.S. origin material.
9        We know that Mr. Leyman made other
10   mistakes, Vinmar Exhibit No. 1.  The only handwritten
11   document we have from Mr. Leyman is a draft confirmation.
12   He got the price wrong and he carried that price.  In two
13   separate confirmations he got them wrong.  And so
14   Mr. Leyman, without the benefit of any notes and without
15   the benefit of any tape recordings, testifies clearly
16   that, first of all, MX wasn't in the negotiation, U.S.
17   origin MX was not negotiations.  Then he says, "Well,
18   maybe it came up after the fact."
19        That conflicts with what Mr. Lockwood had
20   said, and we know that he made other mistakes, and what
21   the record shows here is that the testimony from the two
22   traders is they never had an agreement on origin and you
23   cannot have a contract if you don't have mutual assent.
24   if there's no agreement on the essential terms, there's no
25   contract.

52

1         JUDGE WOOD:  Could I ask a question?
2         MR. LEE:  Yes.
3         JUDGE WOOD:  And maybe this is just assumed
4    by everybody else, but what is the feasibility of
5    declaring your destination on, what, August the 8th and
6    having a shipment that is U.S. Gulf origin delivered in
7    Asia in the first half of September?
8         MR. LEE:  First of all, the testimony is
9    it's about 35 days to get from the United States to Asia.
10   So there's --
11        JUDGE WOOD:  So you have a two-day leeway?
12   You have a two-day window?
13        MR. LEE:  Well, there's time to make it
14   from there.  Well, there's two reasons.  First of all, it
15   was not U.S. Gulf.  It's U.S. origin, and that was one of
16   the issues that Tricon made clear to the broker.  They
17   didn't want to declare the specific port.  There's a lot
18   of different places you can ship the product from to
19   shorten the time.
20        JUDGE WOOD:  Other than Corpus, Texas City?
21        MR. LEE:  Yes.  You can ship it from the
22   West Coast.  You can ship it from the East Coast, as long
23   as it is U.S. origin product, number one.  Two, the --
24        JUDGE WOOD:  U.S. origin ship or U.S.
25   origin product?

53

1         MR. LEE:  U.S. origin mixed xylenes.  It
2    has to be U.S. origin.
3         JUDGE BENTON:  For that matter, you could
4    have shipped from Asia?
5         MR. LEE:  If it was U.S. origin.
6         JUDGE BENTON:  Right.
7         MR. LEE:  And what brought up the concern
8    is Mr. Rajevac's e-mail where he said Asian origin cargo.
9    That's the first time that Vinmar realized that Tricon had
10   a different understanding of this deal, but, your Honor,
11   just to come back, there was time just under the discharge
12   date -- and there was negotiation on that.  By the way,
13   the record shows we were asking for a little bit later
14   time to declare the discharge date.  Tricon wanted it
15   earlier.  They wanted it even sooner, number one.  Two,
16   there is time in the record, as the witnesses have
17   testified, to ship it from the United States to Asia even
18   if it --
19        JUDGE WOOD:  So if it was a West Coast
20   shipment, then it could have gotten to Asia first half
21   September?
22        MR. LEE:  It could have gotten there.
23   Also, as the testimony is, that they could have shipped it
24   before, even before the discharge date was declared --
25        JUDGE WOOD:  The --

14  (Pages 50 to 53)

CLOSING ARGUMENTS

54

1  MR. LEE: -- and told the charter, the
2  ship, "It's going to go to one of two places, you'll find
3  out on the 8th, but head to Asia," which sometimes
4  happens.
5      JUDGE WOOD: So do you think that was part
6  of the deal?
7      MR. LEE: No. I think that the deal was
8  they had to get U.S. origin delivered by -- on or before
9  September 15th in to Asia. However they did that was up
10 to them, as long as it was U.S. origin MX and they
11 complied with the other terms of the contract which
12 included our right to inspect the quality.
13     JUDGE WOOD: So if your client never gave
14 them a destination on August the 8th, how do you know they
15 could not have complied with the deal as you outlined to
16 have delivered U.S. origin MX to Asia first half September
17 if they never had a destination declared?
18     MR. LEE: Well, we knew before August the
19 8th, your Honor, that we didn't have an agreement. They
20 told us that they would not -- we wrote back. When they
21 said Asian origin, we wrote back and said, "No. It's got
22 to be U.S. origin MX," and they said, "We're not going to
23 supply U.S. origin MX. We're not going to guarantee it."
24 So there was -- before August the 8th it was clear that
25 there was no agreement between the parties. There was no

55

1  contract. We never had mutual assent.
2      JUDGE WOOD: Are we talking assent or
3  breach or are you considering that they breached the deal?
4  Because you thought the deal was U.S. origin, and so your
5  contention is that they breached the deal because then
6  they said, "No, we will not deliver U.S. origin."
7      MR. LEE: Well, I think that the record we
8  have in front of us is there is no mutual assent. We
9  never had an agreement.
10     JUDGE DAVIDSON: Wasn't there the
11 communication that, "We will go ahead with the deal if you
12 reduce the price?"
13     MR. LEE: No. We offered to -- to continue
14 the deal on the terms that we had originally offered which
15 was at the price, the thirteen ten, but it required U.S.
16 origin MX and they never -- they responded with something
17 else.
18     JUDGE WOOD: I think we all want to make
19 something very clear on the record. There was never a
20 destination declared. Correct?
21     MR. LEE: Correct. That is correct.
22
23     JUDGE DAVIDSON: There wasn't a request for
24 a price reduction?
25     MR. LEE: No, no. The --

56

1      JUDGE BENTON: There was a request to wipe
2  the slate clean.
3      MR. LEE: There was a discussion about --
4  prior to this issue coming up, there was a discussion
5  between the traders Tricon was looking for MX and we
6  offered to provide MX to them. We thought there was a
7  deal, we'd give it back to you, and then the U.S. origin
8  issue raised its head.
9      We realized that there was no agreement,
10 but we came back that -- I think what Judge Davidson is
11 asking about is on August the 6th we wrote an offer and
12 said, "We will continue with the same price, but it has to
13 be U.S. origin." In other words, we reconfirmed the
14 original offer we made to the broker. There was not a
15 price reduction in that offer --
16     JUDGE DAVIDSON: Okay.
17     MR. LEE: -- and Tricon's response was to
18 provide different delivery dates and different quality mix
19 xylenes.
20     But this is -- the one other point I want
21 to make about the U.S. origin issue and what -- what
22 Mr. -- Dr. Wilson's perspective was, as shown by his
23 conversation with Mr. Leyman -- this is an excerpt from
24 the Instant Messages between Mr. Leyman and Dr. Wilson on
25 July the 22nd. Now, 12:57 p.m. is about 50 minutes after

57

1  they claim a deal had been concluded and Dr. Wilson asked
2  Mr. Leyman specifically: "Given that Brad, Tricon is
3  selling out of the USG, am I getting 45 days from the bill
4  of lading or 30?" And Ed said: "No, spoke to him, 30
5  days." Never said, "Oh, I'm sorry. There's no
6  requirement that they provide anything from U.S. Gulf or
7  U.S. origin," nothing. It was simply, "No. You're going
8  to get 30 days from the bill of lading date."
9      JUDGE BENTON: I'm sorry. I'm missing it,
10 but that selling out of U.S. Gulf is not the same as
11 saying U.S. origin?
12     MR. LEE: I'm not -- I'm not saying that
13 this document is the firm bid, your Honor.
14     What I'm saying is it shows what
15 Dr. Wilson's understanding is, is that this product was
16 U.S. origin coming from the United States. And, more
17 importantly, as I asked Mr. Simpson at trial, this is a
18 statement about where he expects the MX to be shipped from
19 and there -- and Tricon's position is, "We weren't
20 required to ship it from anywhere, any specific location.
21 We can ship it from any place we wanted to," and
22 Mr. Leyman didn't bother to correct Dr. Wilson's, what he
23 now says is a misunderstanding about the terms of the
24 deal.
25     The point of all of this is there is a

15 (Pages 54 to 57)

CLOSING ARGUMENTS

58

1  great deal of confusion from the documentation on the --
2  when you look at what was discussed on July the 22nd and
3  when you look at the Instant Messages even after that
4  where Mr. Leyman made several references to Vinmar didn't
5  have any additional interest in the U.S. Gulf Coast.
6  Dr. Wilson's testimony was very clear: "I authorized U.S.
7  origin MX," and Mr. Leyman testifies:  "Well, that was
8  never part of the deal," but there's plenty of
9  documentation surrounding it that clearly shows it was
10 discussed; it was raised; and Mr. Leyman's credibility and
11 his -- and, frankly, his memory is faulty.
12       JUDGE BENTON:  But you also have Dr. Wilson
13 who said that he was -- I can't quote him exactly but that
14 he himself was distracted during this time for some
15 personal reasons.
16       MR. LEE:  Right.  I think the testimony was
17 that he was out of the office and distracted in the days
18 that -- when the documents were coming in, which is one of
19 the reasons why he didn't look at them closely.  I mean,
20 yes.
21       JUDGE BENTON:  Okay.  But -- okay.  But
22 just as the documentary evidence memorializes that
23 Mr. Leyman was not tidy in memorializing the deal,
24 isn't -- it can't -- isn't it reasonable to -- to find
25 that Dr. Wilson by his own distractions maybe didn't

59

1  really tell Leyman that it had to be U.S. origin?  And
2  this doesn't really say, given -- I mean, this is -- this
3  could just as easily be inferred as a statement about
4  where he's shipping out of, not that it's U.S. origin.  I
5  mean --
6        MR. LEE:  Well -- but this statement is
7  inconsistent with the position that Mr. Leyman took in his
8  deposition and Tricon's taking in this case, which is we
9  weren't required to ship it from anywhere, and the point
10 is Mr. Leyman -- or Dr. Wilson makes the statement within
11 the hour after this transaction is allegedly concluded and
12 Mr. Leyman does nothing to correct it.  He doesn't say,
13 "Rick, you've got it wrong.  Be aware they're not required
14 to ship it from the U.S. Gulf Coast or anywhere else, for
15 that matter."
16       JUDGE BENTON:  Mr. Lockwood had previously
17 in a text message said, "Most likely USG."
18       MR. LEE:  No.  There's no evidence prior to
19 on July the 22nd that there was any statement made to
20 either Mr. Leyman or Dr. Wilson that it was most likely
21 USG.
22       JUDGE BENTON:  Okay.
23       MR. LEE:  That's not in the record.  What
24 the testimony is, that that was an oral conversation --
25       JUDGE BENTON:  Ah.

60

1        MR. LEE:  -- between Mr. Leyman and
2  Mr. Lockwood that did not include Dr. Wilson.
3        JUDGE BENTON:  Okay.
4        MR. LEE:  So we have one half of the
5  conversation but not the other half.
6        Your Honor, if you look at the evidence on
7  July the 31st, the -- Mr. -- Dr. Wilson clearly says this
8  was supposed to be U.S. origin and he's been consistent in
9  his testimony throughout this case that he authorized only
10 U.S. origin MX.
11       JUDGE BENTON:  Okay.
12       MR. LEE:  And, you know, Mr. Leyman, who
13 not only has he -- didn't have any notes, but he -- we
14 know he has a substantial business relationship with
15 Tricon.  There's plenty of evidence that as soon as this
16 issue came out there are a number of Instant Messages from
17 Mr. Lockwood to Mr. Leyman making it clear that he's
18 expected to assist him and he's expected to testify on his
19 behalf and confirm this agreement on the terms that Tricon
20 was asking for.
21       JUDGE BENTON:  Yeah, yeah.  Yeah, I do want
22 to -- when we hear the final comments from
23 Mr. Diaz-Arrastia, I do want to talk about the suggestions
24 that Mr. Lockwood has attempted to influence the testimony
25 of Mr. Leyman, but we've interrupted your train of thought

61

1  a lot.
2        MR. LEE:  That's fine.  I'm happy -- I want
3  to make sure that we, you know, answer any questions that
4  you have, but when you look at the credibility and when
5  you look at the testimony of these various witnesses and
6  is it Mr. -- is it Dr. Wilson or is it Mr. Leyman, because
7  you have to make that decision.  Their testimony
8  conflicts.  So is it Dr. Wilson's testimony or
9  Mr. Leyman's testimony, and there are a number of Instant
10 Messages back and forth where, again, Mr. Lockwood is
11 making it clear that he expects his assistance and
12 cooperation.
13       And the other thing that has come out of
14 this is there's two people who have a financial interest
15 in the outcome and one that doesn't, and Mr. --
16 Dr. Wilson's no longer at Vinmar.  He's been gone for a
17 long time.  He has no stake in this.  We had to subpoena
18 him to get him to testify.  He testified the way he
19 testified, but we know that Mr. Lockwood still has a bonus
20 hinging on the outcome of this case, is what he told us in
21 his testimony, and he also said that Mr. Leyman has a
22 commission that's hinging on the outcome of this case.  He
23 made it very clear that, although Mr. Leyman had sent a
24 commission invoice to Tricon, he was not going to pay it
25 unless Vinmar was ordered to perform.

16  (Pages 58 to 61)

CLOSING ARGUMENTS

62

1  And so until this Panel or somebody else
2  finds out and says there's an agreement, Mr. Leyman
3  doesn't get paid. So Mr. Leyman has a financial interest
4  in the outcome. Mr. Lockwood has a financial interest in
5  the outcome and I think you should keep that in mind as
6  you, as you look at the testimony from the witnesses as to
7  what was done on July the 22nd, because the testimony from
8  the parties is clear that if you don't have that agreement
9  at the outset, then the broker has no authority to put the
10  parties together.
11  Let's talk about the -- another element of
12  contract formation which is a requirement that both
13  parties intend to be bound and in this case the evidence
14  is overwhelming, I think, that Tricon did not consider the
15  broker confirmation to be a binding contract. We wouldn't
16  be here in arbitration if they felt like the broker
17  confirmation was a binding contract. There's no
18  arbitration provision in there. Instead, they sent a
19  sales contract and the testimony on that sales contract is
20  that it's their standard practice. There are valuable
21  terms for Tricon. In fact, I think Mr. Rajevac testified
22  that it was a form of protection for Tricon.
23  All of these other terms, this document,
24  has value to Tricon. We know that that document, that
25  sales contract, has a specific provision that expressly

63

1  cancels and supersedes the broker confirmation. The only
2  purpose that the broker confirmation serves is to be a
3  commission statement. It doesn't exist anymore. This
4  sales contract has cancelled it, superseded it. And so
5  you're -- you're at a point, then, where you have to have
6  some acceptance of this sales contract and there's two
7  points on that. First of all, we've talked about
8  Mr. Pascu's e-mail, but I want to come back to it real
9  quick.
10  Again, this is Vinmar, Mr. Pascu responding
11  to Vuk Rajevac saying, "Here are my comments and I'll be
12  sending you a purchase order for your review." Nothing
13  about, "I accept. We accept. We'll sign it. We sign it.
14  Dr. Wilson has looked at it and he agrees with it and he
15  accepts it." Nothing. Instead it's, "I have some
16  comments and I'll be sending you a purchase order."
17  Mr. Lockwood -- I asked Mr. Lockwood if he
18  believed that this was an acceptance and his testimony at
19  Page 155 said: "But you don't know whether that's an
20  acceptance or not, do you?"
21  Answer: "I'm not aware, no."
22  So Tricon's representative, when he
23  testified, wasn't able to say that Mr. Pascu's e-mail was
24  an acceptance. And, in fact, we know that they were still
25  haggling over terms even on that sales contract because

64

1  Mr. Pascu's e-mail, the comments that he made, there were
2  a number of revisions and handwritings and scratchouts
3  made to that document and Mr. Rajevac, when he responded,
4  didn't accept all of those terms.
5  He said, "Well, we don't like your
6  demurrage time bar claim, so we're not going to agree to
7  that. So we never even had an agreement on all of the
8  terms of this sales contract," but Mr. Pascu's e-mail is a
9  comment. It's not acceptance. And there's a case that we
10  cited in our opening brief, and I think we even put it in
11  our post hearing brief and it came in that big stack of
12  original cases, but it's the Echo case, which was at
13  Tab 25 of our -- those cases that we provided sometime
14  ago. I mean, I'm happy to provide the case again, but
15  that case talks about acceptance language in it, a letter
16  that was written, and they talk about, "Look, there's no
17  vocabulary of acceptance here. It's not an acceptance."
18  But we also have the issue over this
19  signature and the -- we know that the sales contract had
20  specific signature blanks made for Mr. Lockwood and for
21  Dr. Wilson. It even had a place for him to say accepted
22  and we know that that was never done, and let's go to the
23  next page because we've talked -- counsel talked about
24  Mr. Simpson's testimony earlier today and he read from his
25  report, but this is what Mr. Simpson said on

65

1  cross-examination and this is exactly what we're talking
2  about here. I asked him at Page 503 of his testimony. I
3  said: "Most of these other documents, they contain
4  signature blanks. Don't they?" And he said: "I'll say
5  most of the aromatics don't."
6  Mixed xylene is an aromatic, and I said:
7  "They don't contain signature blanks?"
8  Answer: "Not that I -- most of them. The
9  definition of most of them is probably the tough part."
10  He says: "I would say the majority of them do not contain
11  signature blanks. I can tell you Valero's never
12  did," and, as you may recall from Mr. Simpson's testimony,
13  that's where he spent his career, at Valero.
14  So what he said here is the custom in the
15  industry is you don't have a signature blank on a sales
16  contract or this passing paper after a broker confirm.
17  You don't have them, but this one did and the
18  communication is very clear, if you're going to break from
19  industry custom and include signature blanks. And it's
20  not just a preprinted signature blank. It's a signature
21  blank for -- specifically for Brad Lockwood and one for
22  Rick Wilson with a spot for Mr. Wilson to sign where he
23  accepted. He didn't accept it, never signed it.
24  Mr. Lockwood never even signed it.
25  JUDGE DAVIDSON: Is your argument that the

17  (Pages 62 to 65)

CLOSING ARGUMENTS

66

1  presence of the signature blanks and the drafts going back
2  and forth is evidence that signatures are required in
3  order for there to be a binding contract?
4          MR. LEE: Yes, yes, in addition to the --
5  the whole issue of assent.
6          JUDGE DAVIDSON: If the price of the
7  xylenes had tripled between July the 4th and August the
8  8th, therefore, they would have had the right to back out
9  by just refusing to sign?
10         MR. LEE: I think that's exactly why they
11 didn't sign it. They -- two points, two reasons why
12 Tricon didn't sign that document before they sent it to
13 us. Number one is we know they're not going to do this
14 deal unless their terms and conditions are in place.
15 They've made it very clear that those are valuable terms
16 for their protection.
17         JUDGE DAVIDSON: So if the price of xylene
18 had gone up, it's your position that your client -- that
19 they were under no obligation to sell to your client at
20 the contract -- at the e-mailed price that Leyman
21 confirmed to both sides?
22         MR. LEE: Well, I don't think there was
23 ever a deal, your Honor, so -- because we never came to a
24 mutual assent. So correct.
25         JUDGE DAVIDSON: Okay.

67

1          MR. LEE: And I also think under this --
2  this record, yes, it required signatures before there was
3  a binding agreement.
4          JUDGE DAVIDSON: Okay. The presence of the
5  signature blanks and the drafts going back and forth, in
6  your opinion, is evidence that signatures were required as
7  a condition of the deal going forward?
8          MR. LEE: Yes, your Honor.
9          JUDGE DAVIDSON: Thank you.
10         MR. LEE: And, you know, another
11 interesting point on this whole question of whether there
12 was -- whether they intended to be bound and whether there
13 really was an agreement is the question of MOAB's
14 commission, and Mr. Simpson, their expert, testified at
15 page 506. I asked him: "It's your opinion that a broker
16 earns his commission when he concludes a deal?"
17         He said: "Yes, sir."
18         "When he puts a firm bid with a firm offer,
19 the broker earns his commission?"
20         "Yes, sir."
21         "And he should be paid for that
22 commission?"
23         "Yes, sir."
24         And I asked him whether he -- he said he
25 didn't know that Tricon had been sent a commission

68

1  statement and he didn't know that they hadn't paid it, but
2  his testimony is as soon as the broker puts two people
3  together, he's earned his commission, and he -- the
4  testimony from Mr. Lockwood had been that they didn't
5  refuse to pay it. They just weren't going to pay it until
6  somebody ordered Vinmar to perform, and so I asked him
7  about whether he had knew of anything in this case that
8  there was an agreement between MOAB and Tricon. But
9  what's interesting is Mr. Simpson says very clearly the
10 broker earns his commission when he puts them together.
11 They never paid the commission and, in fact, MOAB never
12 even sent a commission statement to Vinmar.
13         JUDGE WOOD: I'm sorry. So what is your
14 interpretation of the language "puts together"?
15         MR. LEE: When he -- when the broker claims
16 that he has matched a firm bid with a firm offer.
17         JUDGE WOOD: He's entitled to a commission?
18         MR. LEE: He's done his job.
19         JUDGE WOOD: And isn't that a contract?
20         MR. LEE: If he matches a firm bid.
21         JUDGE WOOD: To a firm offer.
22         MR. LEE: The same exact terms.
23         JUDGE WOOD: Firm bid, firm offer, he puts
24 them together, deal's done, broker gets commission.
25         MR. LEE: If it meet -- if the terms match

69

1  and he has not exceeded his authority, yes.
2          JUDGE WOOD: So if he puts the deal -- if
3  he puts the parties together, he puts the deal together,
4  he gets a commission?
5          MR. LEE: Yes.
6          JUDGE WOOD: So the term, the usage of
7  "puts together" means deal done?
8          MR. LEE: If he puts a firm bid with a firm
9  offer, yes.
10         JUDGE WOOD: How are you qualifying "puts
11 together"?
12         MR. LEE: I'm not qualifying it other than
13 to say that we've got to make sure that the firm bid and
14 the -- all of the terms of the firm bid match all of the
15 terms of the firm offer.
16         JUDGE WOOD: In your description of this,
17 do you -- is there a way in which a broker puts the
18 parties together and earns a commission in which there is
19 not an enforceable agreement?
20         MR. LEE: Yes.
21         JUDGE WOOD: So the broker can earn a
22 commission even though there is not a trade done?
23         MR. LEE: Possibly, and this is the
24 scenario I'm thinking of. It's this case where the party
25 that's trying to sue on the contract has made it clear

18  (Pages 66 to 69)

CLOSING ARGUMENTS

70

1    that they never intended to be bound by the confirm in the
2    first place, but I think the broker --
3         JUDGE WOOD:  You can't have --
4         MR. LEE:  -- has earned his commission.
5         JUDGE WOOD:  -- a breach if there's not a
6    contract.  So that's why I'm back to my deal, is it's
7    Vinmar's position that there was a breach.  So, therefore,
8    you get to walk and there was never a deal.
9         MR. LEE:  Never a deal.
10        JUDGE WOOD:  Okay.
11        MR. LEE:  Never a deal.  And the fact that
12   Tricon didn't pay the commission and the fact that the
13   broker never sent us a commission is evidence that there
14   was never a deal because the broker, if under Tricon's
15   case, if the broker -- Mr. Leyman earned his commission
16   under their case.  He did what he was supposed to do.
17   That's what Mr. Simpson said.  They didn't pay it.  He
18   never -- and Mr. Leyman didn't even send us a commission
19   statement.
20        So whether you look at it from mutual
21   assent, whether you look at it from the contract
22   documentation, you end up with no contract.  There is no
23   contract because their lack of mutual assent, and there
24   is no contract because Tricon did not intend to be bound
25   by the confirm and we never came to shore on a sales

71

1    contract, never signed, never accepted.
2         JUDGE BENTON:  Five minutes ago we had a
3    banter about this issue of wiping the slate clean.  Would
4    you have Mr. Runions put up Exhibit J-12?
5         Now, if you read -- if you read these text
6    messages -- I think that's what they are.  Correct?
7         MR. LEE:  Instant Messages, yes, your
8    Honor.
9         JUDGE BENTON:  Instant Messages, yeah.
10   Just a second.
11        I mean, if you read these messages, I don't
12   remember what Mr. Wilson -- Dr. Wilson's testimony was
13   about this and you're invited to refresh my memory --
14   maybe Judge Davidson and Judge Wood would remember, but
15   can't this be -- can't this reasonably be read to -- to
16   mean that Wilson recognized he's in a pickle and is asking
17   Mr. Lockwood, "Hey, let's just -- let's just wipe the
18   slate clean.  Let's undo the deal.  Let's undo the deal we
19   have.  This is not -- we don't have a deal.  Let's undo
20   the deal."
21        MR. LEE:  Your Honor, actually, I would
22   disagree with that, and here's why.
23        This conversation -- you have to go back
24   and also look at Vinmar Exhibit No. 9, which is the
25   Instant Messages between Mr. Lockwood and Mr. Leyman, and

72

1    this conversation, what happens before this is
2    Mr. Lockwood went to Mr. Leyman and said, "I'm looking to
3    buy MX in Asia."  Okay?
4         JUDGE BENTON:  Right
5         MR. LEE:  Or, "I'm looking to buy MX,
6    period," and there's a discussion about Tricon's interest
7    in buying MX on that day, that Mr. Leyman then reaches out
8    to Rick Wilson to indicate that there's an interest on
9    Tricon's behalf in buying mix xylenes.  This
10   conversation -- it's our position that this conversation
11   in Joint Exhibit 12 occurred prior to the time that
12   Mr. Leyman -- I mean, Dr. Wilson had been advised by
13   Tricon that the product was not necessarily U.S. origin
14   cargo, so that at this time --
15        JUDGE BENTON:  This is a month later?
16        MR. LEE:  No, no, no.  This is the -- this
17   is a morning --
18        JUDGE BENTON:  Oh, yeah yeah, yeah.
19        MR. LEE:  This is July the 31st --
20        JUDGE BENTON:  July 31st.
21        MR. LEE:  -- in the morning.
22        JUDGE BENTON:  Excuse me.  A week later.
23        MR. LEE:  It's several hours later where
24   Dr. Wilson sends his e-mail.  He first calls Mr. Leyman
25   and says, "We have a problem," and then sends an e-mail to

73

1    Tricon saying, "Wait a minute.  You had to guarantee U.S.
2    origin."
3         JUDGE BENTON:  Okay.  All right.  I'll make
4    a note.  This is on the 31st, 9:40 -- 9:40.  Okay.
5         MR. LEE:  Yes.  And you have to be careful
6    when you look at the various Instant Messages, because, if
7    it's an Instant Message produced by Mr. Lockwood, it's
8    going to be Central Time and if it's an Instant Message
9    produced by Mr. Leyman it will be Eastern Time.  So
10   there'll be -- the times don't always match up
11   specifically.
12        JUDGE BENTON:  And who --
13        MR. LEE:  This was from Mr. Lockwood.  So
14   this will be --
15        JUDGE BENTON:  Central Time?
16        MR. LEE:  -- Central Time.
17        JUDGE BENTON:  Okay.
18        MR. LEE:  But -- and I would also say that
19   if Dr. Wilson felt like he had a problem on the morning of
20   July the 31st when the price of MX had fallen so far below
21   the price of the deal, there's no reason why he would have
22   offered to wipe the slate clean, knowing that he was in
23   trouble.  There would have been a different response had
24   he known that there was an issue with the contract.
25        So I -- I don't think that it's reasonable

19  (Pages 70 to 73)

CLOSING ARGUMENTS

74

1 to infer that he knew that there was a problem and that
2 he's trying to get out of it. I think the reality is he
3 had -- he thought that he still had MX from Tricon. He
4 thought there was a deal on his terms and he was offering
5 to give it back to him at the price that he had agreed to
6 buy it, and it wasn't later that he learned that there was
7 an issue on the origin of the mix xylenes.
8        JUDGE BENTON: Mr. Lee, we -- we have asked
9 a lot of questions and you may have had some other things
10 you wanted to amplify to that and --
11        JUDGE WOOD: May I ask one more question?
12        JUDGE BENTON: -- for that reason and
13 because I need to take a restroom break, after Judge
14 Wood's question and your answer, we're taking a restroom
15 break.
16        JUDGE WOOD: Claimant has relied on
17 Exhibit 8 which is some e-mails back and forth between
18 Mr. Anaya and Mr. Wilson, I believe, and I would
19 appreciate your analysis --
20        MR. LEE: Sure.
21        JUDGE WOOD: -- or your view.
22        MR. LEE: And thank you for reminding me
23 because I had a note about that. Exhibit 8, the e-mails
24 first from Mr. Anaya on July the 24th, and I think that
25 you have to pay very careful attention to the question

75

1 that he asked. He asked the port of origin. He doesn't
2 just ask the origin. He says, "Where is this coming from?
3 What port are we loading this," and the reason for that is
4 because there is an inspection obligation. We need to
5 know where the product will load.
6        Dr. Wilson testified about this document
7 and gave you his testimony and his understanding of what
8 he was being asked, which was what's the loading port.
9 That's what he was responding to when he said, "We don't
10 know until they'll declare the discharge port." He's --
11 he wrote the e-mail. He received it. He wrote it and his
12 response was, "I was answering the question port of
13 origin, the loading port, where is this going to be loaded
14 onto the ship," and, again, the SAP reason for that is,
15 "So we know where to inspect the product," and in fact, if
16 you look at Mr. Pascu's e-mail, which is Joint Exhibit 13,
17 that's one of the questions that he asked: "Where are
18 we -- where is this going to be loaded? I need all the
19 loading stuff so I can get the inspector there. So get
20 back to me on that," so which is consistent with
21 Dr. Wilson's testimony that it was U.S. origin, that
22 Tricon was not ready to commit to the precise loading
23 port.
24        JUDGE BENTON: Let's take another short
25 break. I apologize.

76

1        MR. LEE: And I just have one more area to
2 cover and I'll try to do it very quickly.
3        (Recess from 11:26:24 a.m. to 11:32:43
4        a.m.)
5        JUDGE BENTON: Mr. Lee, are you ready, sir?
6        MR. LEE: Yes.
7        JUDGE BENTON: I hope that gave you an
8 opportunity to regather where you wanted to go because I
9 asked so many questions and so thanks for accommodating
10 me. You may proceed.
11        MR. LEE: That's what we're here for, to
12 try to answer whatever questions you have, and I just want
13 to make one point to be clear on something.
14        There's no question that Dr. Wilson from
15 his perspective had been told by Mr. Leyman the deal had
16 been done and there are communications between July the
17 22nd and July the 31st internally where Dr. Wilson
18 believes that he has concluded a deal, and so the
19 difference here is that Dr. Wilson had been told that a
20 deal had been concluded on his terms.
21        JUDGE BENTON: On his terms. And so those
22 internal celebrations are of no moment, as I think your
23 position is, as to what they say the terms are?
24        MR. LEE: Correct.
25        JUDGE BENTON: Because they are celebrating

77

1 what they think are their terms?
2        MR. LEE: Correct.
3        JUDGE BENTON: All right.
4        MR. LEE: And at the point in time in which
5 he learns that that's not the case --
6        JUDGE BENTON: Right.
7        MR. LEE: -- that the broker had exceeded
8 his authority by not --
9        JUDGE BENTON: They blow out the candles.
10        MR. LEE: We raised an issue. We didn't
11 get it resolved.
12        JUDGE BENTON: Right. He put the party
13 mode -- the party stuff up.
14        MR. LEE: Yes.
15        The last thing I want to touch on, unless
16 we have questions on other issues, is the damages and, you
17 know, if the Panel first finds that it has jurisdiction,
18 and that's a -- you've got to get to the point where
19 somehow this sales contract becomes part of this deal for
20 the Panel to have any jurisdiction whatsoever, and if you
21 conclude that there is a -- an enforceable contract, which
22 we disagree with, I think that you have to look carefully
23 at the damages.
24        And the fact is that Tricon has made it
25 clear that their damage model is based under the resale

20  (Pages 74 to 77)

CLOSING ARGUMENTS

78

1  method under 2706 of the UCC, and if you look at that
2  provision, that provision says you resell the goods
3  concerned. So, "I'm -- I'm selling the goods that I had
4  earmarked for you. I'm going to sell them to somebody
5  else," and the UCC is also clear that, in order to be
6  entitled to damages, it's very much like a contract case.
7  You have to have damages. You have to be an aggrieved
8  seller. That's what 2703 says, which is the intro to the
9  seller's remedies. You have to be an aggrieved seller,
10  and it's our position that Tricon made more money on its
11  resale using the goods that they claim to have earmarked
12  for Vinmar. They resold them to somebody else for more
13  money than they could have possibly made under any
14  scenario under the Vinmar contract, and we put this --
15  this was what I went through with Mr. Lockwood, and
16  this -- this is the resale. This is the sale to KP Chem
17  and the evidence is they delivered the 5,000 metric tons
18  to KP Chem in October, and that's what they were paid,
19  $5 million. That's the alleged resale. But the evidence
20  also is -- the only evidence in the record, by the way, is
21  that they purchased this mix xylenes that was to be
22  supplied, the resale, seven days after the last possible
23  date to comply with this alleged Vinmar agreement.
24         The Vinmar agreement that they claim said
25  delivery was to be made on or before September the 15th.

79

1  Well, the goods, if you follow the MX -- because Tricon
2  doesn't make mix xylenes. They've got to purchase it to
3  get it. So in order to supply this alleged Vinmar deal,
4  they had to go out and buy mix xylenes from somebody else
5  to supply it. There's no evidence in the record that that
6  was ever done.
7         Instead, the evidence is that seven days
8  after the last possible delivery date under this agreement
9  with Vinmar is when they entered into an agreement with
10  J&J to purchase mix xylenes, the goods concerned, under
11  the resale. And they made $1.878 million. That's the
12  profit on that transaction with KP Chem, the resale, and
13  we looked at -- I went through a scenario with
14  Mr. Lockwood and I gave him the benefit of every argument
15  that they had made, which was let's increase the volume --
16  if you go to the next slide -- we'll increase the volume
17  under this alleged Vinmar contract to about 5 percent to
18  fifty-two fifty metric tons. I'll give you the absolute
19  lowest price that you can find in your market data between
20  July 22nd and September 15th, and we did a calculation and
21  under that -- under the best possible scenario, they would
22  have made a million eight five, so $1,850,000 under a deal
23  with Vinmar. They still profited on the KP Chem resale by
24  $30,000 -- 28,000. They made more money on the resale
25  than they would have ever made under any scenario, no

80

1  matter how unrealistic under this Vinmar deal, and the UCC
2  is clear, you know, you can't put somebody in a better
3  position than they would be in if performance had
4  occurred.
5         And so we also looked at -- let's see what
6  they would have made under their expert, which is
7  Exhibit 39, his market price calculation. So if you're
8  looking at what their reasonable expectation to --
9  remember, because they had to buy the MX, that was
10  $976,000. That's what their damage claim is under market
11  differential. So if you use that scenario, they made
12  $900,000 on the resale. What is -- and what's interesting
13  about this is -- so we've -- I've looked for cases. There
14  is a statement in 2706 that says that the seller is not
15  accountable for profits earned on a resale. What does
16  that mean?
17         Well, I'll tell you what we have been able
18  to uncover. The old common law was that if you -- if a
19  buyer breached a contract, the seller acted as sort of the
20  agent for the buyer in trying to resell. You're having to
21  mitigate -- it's part of the mitigation of damages. So
22  you're acting as the buyer's agent. You're out there
23  selling and you have to do the best job you can and you
24  have the right to sue the buyer for whatever is not
25  recovered, and what the UCC is saying here is, "Well,

81

1  let's make it clear that if you profit from that resale
2  transaction, the buyer doesn't have a claim against you
3  for the profit." They can't come back and say, "Hey, you
4  did better, so I want you to give me the profit under this
5  sort of agency theory that existed in common law." White
6  & Summers tells you, though, that in a resale
7  transaction -- and White & Summers is -- I think everybody
8  recognizes is a leading UCC treatise out there.
9         What do they say about 2706? They say that
10  it will never be litigated. This profit statement will
11  never be litigated in a 2706 case because the resale above
12  the contract price means that the aggrieved seller's no
13  longer aggrieved and has no claim against the buyer, no
14  damages. I've made more on my resale than I could have
15  ever made under the Vinmar deal. So why -- have I been
16  damaged? I haven't been damaged. That's what White &
17  Summers says. That's what the evidence shows on the
18  resale. They've claimed that they resold this mix xylenes
19  and the evidence is they made more money than they would
20  have ever made under any deal with Vinmar.
21         So what we've seen now, the way they try to
22  get around that is, "Oh, wait a minute. We're now going
23  to claim we're a lost volume seller." It's not in their
24  pleadings, it's not in their expert report, and I don't
25  think I heard a single bit of testimony about lost volume

21  (Pages 78 to 81)

CLOSING ARGUMENTS

82

1  seller. It's not -- it's not in the record. But that's
2  what they've come up with now to try to get around this
3  issue of, "Okay. We've made more money than we could have
4  ever possibly made." But the lost volume seller takes
5  more than just saying, "Oh, I could have done another
6  transaction." You have to prove that you've had the
7  capacity. Where is the evidence that they had the ability
8  to do the transaction? Where is the evidence that they
9  had the financial resources? They've talked a lot about
10  this market being frozen. Where is the evidence that they
11  could, in fact, have located mix xylenes to supply both of
12  these contracts or other contracts? There's no evidence.
13        JUDGE BENTON: Well, they've said there was
14  no buyers. There's --
15        JUDGE WOOD: No sellers.
16        JUDGE BENTON: There isn't -- there's not
17  evidence of a lack of sellers.
18        MR. LEE: Your Honor, there's no evidence
19  at all of -- of sellers.
20        JUDGE BENTON: All right.
21        MR. LEE: There's no evidence of their
22  ability to get it. There's no evidence of their ability
23  to handle another transaction and, in fact, your Honor,
24  there's evidence in the record that I went through with
25  Mr. Lockwood, a series of e-mails between Tricon and KP

83

1  Chem where Tricon is trying to figure out, "How we're
2  going to get all this volume of mixed xylenes that we owe
3  to you? How are we going to get it to you?"
4        So there's a record that they're obviously
5  having some problems with mix xylenes. There's no record,
6  no evidence, that they had the capacity, the
7  financial resources, the storage, all of those things that
8  were required to show that, "Hey, I could have done this
9  transaction and all these other transactions."
10        JUDGE BENTON: Well, capacity and storage
11  are of no moment for the type of business you're in, but I
12  think the Panel might agree that the record is devoid of
13  the financial capacity to otherwise execute on the
14  transaction.
15        So I think I'll invite you to -- to go to
16  another point because I think -- I think that there are
17  some challenges for Tricon in that regard, but storage and
18  capacity to produce are not it because they're not in the
19  production business.
20        MR. LEE: No. Right. And when I say
21  "capacity", I didn't mean capacity to produce. I meant
22  the ability, the capacity to do this transaction.
23        JUDGE BENTON: The financial capacity?
24        MR. LEE: From a financial perspective to
25  be able to handle these transactions and others, but I

84

1  also say that the lost volume seller theory is
2  inconsistent with a claim of resale.
3        A lost volume seller is someone, "I can't
4  make up this sale because I have lost it, and so I'm
5  entitled to damages," and the case is under lost volume
6  seller cases that deal with 2708 which is the market
7  differential model, not the resale. The resale, you've
8  got to start from what 2706 says, and it says I'm
9  reselling the goods concerned, and the only evidence in
10  the record is -- the only MX that they had was MX that
11  they bought seven days after this transaction.
12        JUDGE DAVIDSON: But this is a commodity
13  and you presumably can almost always buy any commodity at
14  the then market price and sell it at the then market
15  price. True?
16        JUDGE BENTON: I think what -- what Mr. Lee
17  is saying is there needed to put on some evidence that the
18  commodity was there and on Bavex before the deadline to
19  provide your MX, there needed to be evidence that they had
20  the line of credit, the cash available to go out in the
21  commodity market to buy it, is what you're saying.
22        MR. LEE: That is what I'm saying and I'm
23  also saying that as part -- the evidence that we do have
24  is that they didn't buy any -- they didn't have any MX
25  until seven days later. So if you're looking for evidence

85

1  in the record, the inference to be drawn from that,
2  they've said it's a frozen market.
3        Now, I understand that the question to me
4  was, "Well, aren't there -- can't you buy it?" But what's
5  the evidence in the record? It's a frozen market and we
6  didn't get any MX at all until September the 22nd.
7        JUDGE BENTON: Yeah. There is no evidence
8  in the record that the Sharolyn Wood MX entity had xylene,
9  that they were ready, willing and able to sell.
10        MR. LEE: Correct.
11        JUDGE WOOD: And I would like your
12  explanation on the dispute over this bidding process
13  coming about before the declaration of destination date so
14  that there was never a declaration of destination.
15        Why is it that you claim that then Tricon
16  had to have the goods on hand in a contract in order to be
17  able to prove damages, that there was never a declaration
18  of destination?
19        MR. LEE: Well, I don't think I'm saying --
20  and maybe I'm not being entirely clear.
21        I'm not saying that they had to have the
22  goods onhand by August the 8th or whenever, but the
23  record -- the testimony and what the evidence has shown is
24  that they didn't have -- they had not taken any steps in
25  reliance upon a claimed deal with Vinmar.

22 (Pages 82 to 85)

CLOSING ARGUMENTS

86

1       JUDGE WOOD:  What does the UCC require a
2  seller to do if, prior to the date they were to load
3  the -- the fact situation is presented here develops?
4       MR. LEE:  Well, the UCC actually doesn't
5  require --
6       JUDGE WOOD:  I guess if there's a contract,
7  then you're under anticipatory repudiation?
8       MR. LEE:  Correct.
9       JUDGE WOOD:  And your position is no
10  contract?
11       MR. LEE:  No contract, and what the UCC
12  says is it gives you two different modes of damages.  One
13  is the resale, which is sort of a cover, or 2708, which
14  is, if you don't cover, we're going to give you this
15  market differential.
16       JUDGE WOOD:  So if there's no contract,
17  then we're not talking about damages?
18       MR. LEE:  Correct.
19       JUDGE WOOD:  If there is a contract, then
20  we're talking about a situation where there's an
21  anticipatory repudiation by the buyer in advance of the
22  next contract.  If there was a contract, the next contract
23  requirement was the designation of destination?
24       MR. LEE:  Correct.
25       JUDGE WOOD:  Okay.  And we did not reach

87

1  that point in this -- in this deal?
2       JUDGE DAVIDSON:  Because Vinmar declined to
3  name --
4       JUDGE WOOD:  Did not give a destination.
5       JUDGE DAVIDSON:  -- a destination.
6       JUDGE WOOD:  Okay.
7       MR. LEE:  Correct.  But, I mean, to go
8  back, I mean, the election here in this case has been that
9  they've taken the position that they resold and so you
10  have to look at that transaction and based on the
11  evidence, but the 2708 -- and just to -- I have touched on
12  this in our brief.  I won't waste a lot of time on it, but
13  there are a number of cases including the Fifth Circuit
14  which has held that there's two sections in 2708.  There
15  is section (a) which addresses the basic rule that the
16  damage is the difference between the contract price and
17  the market price.  2708 (b) talks about a situation that
18  if the seller is undercompensated under A, then they have
19  the right to seek lost profits.
20       There have been a number of cases,
21  including the Knobs Chemical case from the Fifth Circuit,
22  which has applied that to also mean in a situation where
23  the seller is overcompensated so that we're not giving the
24  seller a windfall, which is exactly -- if you go back to
25  the same analysis, the only MX that is in the record that

88

1  they had was sold at a profit well in excess of everything
2  that they could have ever earned.  And so 2708 (b) would
3  operate to end up with no damages if you look at the
4  market differential for the very same reason, and that's
5  the Knobs Chemical and Union Carbide case I think we cite
6  in our brief.  And the Knobs case, by the way, talks about
7  jobbers, and a jobber is someone who hasn't bought the
8  product yet, which is exactly what we have here.  They
9  didn't buy it, and what the Court talked about in that
10  situation is let's look at 2708 (b) and whether there's
11  overcompensation if we award the plaintiff damages.
12       What -- I'll sort of close on this kind of
13  overview of their damages if you get beyond the fact that
14  they're -- they're not damaged, but look at what they did
15  in calculating their damages.  It's all about trying to
16  tweak it just to get it as high as we can.  They increased
17  the volume by 5 percent, even though the contract that I
18  guess we're talking about now says it's the vessels
19  option.  They claimed this resale to get a higher claim
20  amount.  If you -- the price that they claim in their
21  damage model is considerably higher than a market
22  differential.
23       We had this long conversation about the KP
24  Chem situation at trial and that the claim was that KP
25  Chem is the one that forced the reduction of the inventory

89

1  to -- on the sale in October.  But, actually, what the
2  documents revealed is -- I went through them with
3  Mr. Lockwood, is that it was Tricon that was upside down.
4  It was Tricon asking KP Chem to accept a lower volume of
5  MX, and they also talked about how Tricon had the option
6  to declare FOB or CFR under that KP Chem contract.  We
7  went through that contract.  It's not there.
8       Another way that they tried to avoid having
9  to account for the full 5,000 metric tons that they sold
10  to KP Chem in October was to claim that there was some
11  swap.  There's no evidence of the swap.  There's no
12  evidence in the record of a contract or an agreement
13  between KP Chem and Tricon for a swap.  The fact is -- the
14  record is and the evidence is they bought 5,000 metric
15  tons from J&J Chemical and took all of that and supplied
16  it to KP Chem.  The prices were different and the reason
17  for that is that Tricon, as they explain in their e-mails,
18  they were asking for relief under various agreements or
19  whatever it is they had, but at the end of the day they
20  settled on, "We'll send this much at this price and we'll
21  send the rest of it at another price."  They ended up with
22  5,000 metric tons being sent to KP Chem.
23       You know, at the end of the day, I think
24  that -- I think it's clear that they did not have any
25  damages.  They profited greatly on this other transaction.

23  (Pages 86 to 89)

CLOSING ARGUMENTS

90

1  Obviously, we don't think there's a contract and no
2  jurisdiction.
3        JUDGE BENTON: Questions of Mr. Lee? Okay.
4  Mr. Diaz-Arrastia?
5        MR. DIAZ-ARRASTIA: Mr. Lee has covered a
6  lot of ground. I will try to be as brief as I can.
7        And, really, where I wanted to start out is
8  just that I -- frankly, I'm a little upset that it seems
9  like their entire -- Vinmar's entire defense here is to
10  say that Ed Leyman, there's evidence that he is the Dean
11  of Aromatics Brokers in the United States, has been in the
12  business forever, is highly respected and he would lie to
13  make a commission of $2500. That's what they want you to
14  believe, that Mr. Leyman lied to make a commission of
15  $2500, the most respected aromatics trader in the United
16  States, somebody whose entire business depends on being
17  able to bring desperate parties together and have both
18  sides trust that he's going to treat them fairly. That is
19  just not credible. Mr. Leyman's not going to lie.
20        Let me talk about the damages for a moment.
21  It takes some real mental gymnastics to try to conclude
22  that Tricon was not damaged in this case. It's very
23  obvious that they were damaged. Judge Wood asked a couple
24  of questions about what the UCC requires or doesn't
25  require. It is very clear that the UCC does not require

92

1  2008 every year. January the 1st of 2008, every year, and
2  they had an obligation to buy that volume every month.
3  That is a contract. They had it in the bag and then they
4  also had the Vinmar contract in the bag. They were going
5  to make both sales. They were going to make both profits.
6  Vinmar breaches. They were damaged because they did not
7  get to make the Vinmar sale, although Vinmar was
8  contractually obligated to perform on that sale.
9        They put up White & Summers, and again,
10  it's plain words. What White & Summers said is that if
11  the resale is at a price that is above the contract price,
12  then there are no damages. I agree, but that's not our
13  case. The contract price for the Vinmar contract was
14  thirteen ten per metric ton. The resale price under the
15  KP contract was 995 per metric ton. The resale price was
16  less than the contract price in our case and, therefore,
17  we have damages.
18        Very quickly about the Knobs Chemical case.
19  It doesn't apply. A jobber is just not someone who
20  doesn't yet have the material. A jobber is somebody who
21  never exposes himself to market risk. That is in the
22  Knobs case. I'm sorry. From the Transworld case, well, a
23  jobber is a person who has their price fixed in advance
24  and never exposes himself to market risk.
25        The evidence in this record is that Tricon

91

1  that the seller have the goods in existence prior to the
2  breach. That is not a requirement, and in this business,
3  as Judge Benton has indicated, the trading's going back
4  and forth all of the time. It's very common to sell
5  material before you own it. It happens all the time and
6  the UCC does not require that Tricon have 5,000 metric
7  tons of MX before Vinmar breaches in order to suffer
8  damages.
9        There's also no obligation under the UCC
10  that I have to make my replacement sale during the type
11  of -- during the time of performance for the contract that
12  was breached. That is not a requirement. I make my
13  replacement sale during a commercially reasonable period
14  of time, and that was done, especially in a market where
15  you couldn't get buyers.
16        He keeps talking about the market being
17  frozen. Everybody made very clear that the market was
18  frozen because no one was buying, not because no one
19  wanted to sell. Everybody was desperate to try to sell.
20  There is definitely evidence on this record that Tricon
21  could have made both the KP sale, a sale that was made
22  pursuant to a preexisting contract executed on January the
23  1st of 2008.
24        MS. LARSON: '7.
25        MR. DIAZ-ARRASTIA: I'm sorry. 2000 -- of

93

1  always takes title to the MX it's going to sell before it
2  actually delivers it, and, therefore, it is exposed to
3  market risk. In this case, if instead of going down, the
4  price of MX would have gone up after this deal was made,
5  Tricon would have lost money. It had the good fortune
6  that it went the other way. Vinmar would have lost money,
7  and that's why we breached the contract. Tricon buys and
8  sells aromatics like MX and other petrochemicals all the
9  time. There has never been a question of Tricon's
10  financial ability to trade every day.
11        JUDGE BENTON: That may be true, but
12  there's no evidence about that in the record.
13        MR. DIAZ-ARRASTIA: The evidence in the
14  records -- Mr. Lockwood was asked, "Would you have been
15  able to supply both the KP contract and the Vinmar
16  contract?" And his unequivocal answer was, "Yes, we could
17  have," and that was never challenged.
18        JUDGE BENTON: Okay.
19        MR. DIAZ-ARRASTIA: Let's talk about a
20  couple of other things very, very quickly. Let's talk
21  about this whole question of mutual assent.
22        JUDGE BENTON: But before you talk about
23  that -- and I do want you to talk about that -- I want you
24  to just -- there is suggestion in the record of
25  Mr. Lockwood's attempt to influence Mr. Leyman's

24  (Pages 90 to 93)

Sunbelt Reporting & Litigation Services
Houston   Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio

CLOSING ARGUMENTS

94

1  testimony, and you've touched on this, the suggestion that
2  he would lie for a 2500-dollar commission, but there is
3  that evidence in the record.  There was some -- it might
4  be read, rather, I should say, that he's trying to
5  influence it and there's also in the record that
6  Mr. Leyman hasn't sent a bill.
7          JUDGE DAVIDSON:  No.  He sent the bill.
8          MR. DIAZ-ARRASTIA:  He sent the bill.
9          JUDGE BENTON:  It hasn't been paid.
10         MR. DIAZ-ARRASTIA:  It hasn't been paid,
11  and I think it's not surprising that, given the trade
12  hasn't been made, he hasn't been paid and we have always
13  been very upfront that if we are successful in this case
14  and we are able to collect from Vinmar, he will be paid,
15  and I think that's just fair.
16         JUDGE DAVIDSON:  But the argument that I
17  heard from Mr. Lee was that the failure -- that if the --
18  if a deal being made is the only prerequisite of paying
19  the commission to Mr. Leyman, the fact that you haven't
20  paid a commission to Mr. Leyman, can that be read as some
21  evidence that you think there was no deal?
22         MR. DIAZ-ARRASTIA:  Absolutely not.  It
23  just means that we haven't made any money on this deal.
24         JUDGE DAVIDSON:  But wait a minute.  You're
25  not -- but you're -- I mean, you would have owed the money

95

1  to Mr. Leyman if you had lost money on the deal?
2          MR. DIAZ-ARRASTIA:  Well, that is correct,
3  but the trade has not been made.
4          JUDGE DAVIDSON:  But if it's your -- if
5  it's your position that the debt was owed to Mr. Leyman
6  when the deal was made, regardless of whether the trade
7  was -- whether the actual, you know, xylenes were shipped,
8  you have --
9          MR. DIAZ-ARRASTIA:  I mean, our position is
10  not there.  Our position is a broker earns their
11  commission when they put the parties together and they
12  make a trade.  A trade has not been made.  If we're
13  successful in this case, we will owe the commission, but
14  if the result of this case is that no deal was ever made,
15  then we don't owe the commission.
16         JUDGE DAVIDSON:  Okay.
17         MR. DIAZ-ARRASTIA:  But with regard to
18  Mr. Lockwood's communications with Mr. Leyman, the only
19  evidence that exists is that after it came up, that Vinmar
20  was saying that they would not perform because there was
21  no deal because they required U.S. origin.  Mr. Lockwood
22  called Mr. Leyman to ask him, "What do you remember about
23  this?"  It seems to me only a natural thing to do.
24         The record also is that Mr. Lockwood called
25  Mr. Wilson and said, "Rick, what's going on?  Why are you

96

1  saying this?"  It seems only a natural thing to do to find
2  out, you know, if you're saying that this is what
3  happened, "Ed, it's not what you remember because it's not
4  what I remember.  Rick, it's not what you remember because
5  it's not what I remember."  It seems a very natural thing
6  to do.
7          JUDGE BENTON:  Okay.
8
9          MR. DIAZ-ARRASTIA:  Let's talk about mutual
10  assent for a moment.
11         Again, the -- the only evidence here that
12  U.S. origin was -- that anyone told Mr. Leyman that U.S.
13  origin was required is Mr. Wilson's own unsupported
14  statement.  The evidence is very clear that any discussion
15  about what might be the loading port occurred after the
16  deal was made.  That is both what Mr. Wilson -- I'm sorry.
17  That's both what Mr. Lockwood said and what Mr. Leyman
18  said after the deal was made, and in both cases what they
19  said was, "Well, I think it most likely would be U.S.
20  Gulf, but I'm not going to guarantee it."  That is what
21  Leyman said and that is what Lockwood said in their
22  testimony.
23         And this is what's really interesting.
24  Let's put up exhibit -- Joint Exhibit 8 for a second
25  because this is an important document because I think the

97

1  Panel recognizes -- no.  8.  There we go.  You know, two
2  days after the deal was made when Mr. Wilson is asked by
3  Mr. Anaya what's the origin of this material, what does he
4  say?  Exactly the same thing that Mr. Lockwood and
5  Mr. Leyman said:  "We don't really know, but it's most
6  likely going to be U.S. Gulf."
7          Now, would anybody say that if they were
8  under the impression that they had a guarantee of U.S.
9  origin?  Of course not.  And the attempt to fudge together
10  loading and origin just doesn't work.  Everybody agrees
11  that in this industry those are two completely different
12  concepts.  Even Mr. Cofarn, their own expert, testified.
13  We don't really need to put it up.  It's just a brief
14  statement, but I asked Mr. Cofarn -- it's on the Page 533
15  of the record in this case.  I asked:  "Origin means where
16  it's manufactured," and his answer is:  "Yes, that's
17  correct.  There's a difference between origin and loading
18  port."  That was Mr. Cofarn's answer.
19         The only way that somebody who is familiar
20  with aromatics trading can interpret Joint Exhibit 8 is
21  that on the 25th of July Mr. Wilson was very aware that he
22  did not have a guarantee of U.S. origin.  Clearly, there
23  was a meeting of the minds, and when Mr. Anaya says,
24  "Okay.  That's what we will put in the PO," referring to
25  Vinmar's purchase order, remember the PO.  Nowhere in

25  (Pages 94 to 97)

CLOSING ARGUMENTS

98

1    their PO is there a blank for loading port. There's only
2    a place for origin and it was left blank because there was
3    no guarantee of origin.
4            Judge Wood asked about the feasibility of
5    delivering in Asia in the first half of September if the
6    discharge port was not going to be declared until the
7    8th of August, and there is evidence Mr. Lee made a lot of
8    speculation about what might happen, but the only evidence
9    in the record is that it would be very risky to guarantee
10   U.S. origin and load it in the U.S. Gulf by August the
11   8th.
12           Even more than that, when Vinmar said,
13   "Look, we will still pay that -- the contract price if you
14   will guarantee U.S. origin," it was just not the same
15   deal. They said, "We want you to guarantee U.S. origin.
16   We want you to guarantee delivery in Asia by the first
17   half of September. Oh, and we also want you to push back
18   the discharge declaration until August 15th."
19           That was an impossible thing to perform
20   under, and Vinmar had already let it be known that they
21   were not going to accept a cargo already on the water
22   because they wanted to be there when the inspection
23   occurred. The only way that you could possibly
24   establish -- provide a first half of September delivery
25   with Vinmar being present at the inspection unloading and

99

1    that would not be -- and the discharge port would not be
2    declared until August 15th is by providing the nation of
3    origin MX.
4            Let's also talk about Joint Exhibit 12.
5    This is the wipe the slate clean. Judge Benton, you were
6    interested in that. Now, this is what's interesting about
7    that. Those conversations happened on the 31st of July.
8    Do you remember what happened two days before on the
9    29th of July? Joint Exhibit 14. That is when Mr. Pascu
10   very unequivocally -- when Mr. Rajevac very unequivocally
11   tells Mr. Pascu, "We may supply nation of origin MX." On
12   the day that Mr. Wilson was offering to wipe the slate
13   clean, Vinmar had been told two days prior that Asian
14   origin MX was a possibility. Vinmar would like you to
15   believe that Mr. Pascu sat there for two days not telling
16   Mr. Wilson.
17           Every witness who testified said that is
18   incredible. If you believed that that was an important
19   part of your deal and your operation specialist found out
20   that that was not going to be supplied, you -- it would
21   maybe take two seconds for your op specialist to let you
22   know that. He had to have known by then, but the problem
23   is, just as shown in Joint Exhibit 8, Mr. Wilson
24   understood that he did not have a guarantee of U.S.
25   origin. He understood that it would likely be loaded in

100

1    the U.S. Gulf but not a guarantee and that the origin
2    would not be ascertained until the discharge port was
3    declared, which never happened. That's what he said in
4    response to Mr. Anaya's question.
5            And I think Mr. Lee touched on a number of
6    things, but I think I have hit the most important points
7    and, if you have questions, I would be very happy to
8    answer them.
9            JUDGE DAVIDSON: I do. Mr. Lee made the
10   argument -- and I thought I tried to refine his argument a
11   little bit -- that your expert said that in the contracts
12   that he dealt with at his former employer, they never had
13   signature lines on the forms and he made the argument that
14   the presence of the signature blanks on these contracts
15   was an indication that the signatures were necessary in
16   order for the deal to go forward. That was what I thought
17   I got Mr. Lee to agree to.
18           MR. DIAZ-ARRASTIA: I thank you for
19   pointing that out. I was looking through my notes because
20   I thought I forgot something, and that was it.
21           JUDGE DAVIDSON: And I want you to respond
22   to that specific argument.
23           MR. DIAZ-ARRASTIA: Well, the first thing
24   is that what Mr. Simpson said is the paper that himself
25   used at Valero did not include signature blocks, but that

101

1    in trading he frequently saw paper that had signature
2    blocks and that, in spot deals, it was customary not to
3    sign them.
4            So the evidence is that in the business
5    sometimes the paper has signature blocks and sometimes it
6    does not, but the custom is that, in spot deals like this
7    one, they are not signed. In addition to that, obviously,
8    there has to be some evidence of assent, but the only --
9    but signing it is not the only way to give assent and here
10   there was assent by an e-mail from Mr. Pascu saying, "Here
11   are the comments. I'm going to revert with a purchase
12   order soon, the purchase order containing the same terms,
13   including the arbitration term," and you have the
14   testimony from Vinmar's own expert that said Mr. Pascu
15   would never have said, "I'll revert with a PO if it was
16   not," because he believed that a deal was made.
17           JUDGE DAVIDSON: Okay.
18           JUDGE BENTON: Okay.
19           JUDGE DAVIDSON: That's my question.
20           JUDGE BENTON: Judge Wood?
21           JUDGE WOOD: That's it.
22           JUDGE BENTON: While she's -- all right.
23   I'll ask out loud something that I -- it's a question
24   directed to these two, really. The court reporter -- not
25   Mr. Plair -- but the other court reporter, as I recall,

26 (Pages 98 to 101)

CLOSING ARGUMENTS

## 102

1  has physical position of the paper exhibits.  Would it
2  serve us to ask the parties, since they have the exhibits
3  electronically, to send us the exhibits electronically?
4         JUDGE DAVIDSON:  We've got paper copies.
5         JUDGE BENTON:  We have one set that we
6  don't --
7         JUDGE WOOD:  I have paper copies.  We got
8  them.
9         JUDGE DAVIDSON:  We got them before.  I've
10 got some of them right here.
11        JUDGE BENTON:  Oh, that's right.
12        MR. DIAZ-ARRASTIA:  Everybody has their own
13 set.
14        JUDGE BENTON:  That's Right
15        MS. LARSON:  It won't be a problem to send
16 them electronically.
17        MR. DIAZ-ARRASTIA:  We can easily send you
18 another copy.
19        JUDGE BENTON:  No.  I forgot.  I forgot we
20 have them in the notebook.
21        JUDGE WOOD:  But let us have a short
22 meeting.
23        (Discussion off the record)
24        JUDGE BENTON:  Let's do one set of the
25 electronic exhibits just --

## 103

1         JUDGE DAVIDSON:  Well, to him.  I don't
2  need it on my computer.
3         MR. DIAZ-ARRASTIA:  We will do that.
4         JUDGE BENTON:  He needs it.
5         MR. DIAZ-ARRASTIA:  Just to Judge --
6         JUDGE WOOD:  We have had two court
7  reporters here and we are all trusting Judge Benton to
8  have a set electronically, and then if there's a question,
9  we have it.
10        JUDGE BENTON:  The other -- the other
11 housekeeping point is the evidentiary record is closed,
12 save and except for the supplement of Chuck Matthews' --
13        MR. LEE:  Right.
14        JUDGE BENTON:  -- testimony.
15        Do the parties want to direct Mr. Plair as
16 to when he should have this part of the transcript
17 prepared and made available to the parties and to the --
18        JUDGE WOOD:  Do y'all need it?
19        MR. DIAZ-ARRASTIA:  I think it's more for
20 your benefit than ours.
21        JUDGE DAVIDSON:  I don't need it.
22        JUDGE BENTON:  Judge Wood?  Okay.  Very
23 good.  We don't need it.
24        MR. DIAZ-ARRASTIA:  Well, I mean, I would
25 like to have it but at normal --

## 104

1         JUDGE DAVIDSON:  Normal times.
2         MR. DIAZ-ARRASTIA:  -- times.
3         JUDGE BENTON:  And then finally, for the
4  record, in as much as we contemplate today that the final
5  piece of evidence will be delivered by the close of
6  business tomorrow, our time under AAA Rules will begin to
7  run 30 days from tomorrow.  Correct, Mr. Lee?
8         MR. LEE:  Yes.
9         JUDGE BENTON:  Mr. Diaz-Arrastia?
10        MR. DIAZ-ARRASTIA:  That's understood.
11        JUDGE BENTON:  All right.
12        MR. LEE:  To the extent AAA applies.
13        JUDGE BENTON:  To the extent AAA applies.
14        JUDGE WOOD:  Well -- and we're operating
15 under those Rules for purposes of here, and if your point
16 is there's no jurisdiction, we would have that answer for
17 you within 30 days also.
18        MR. LEE:  Correct.  I was just teasing.
19 So, certainly, yes.
20        JUDGE BENTON:  All right.  There being
21 nothing else, we are off the record.
22        (Proceedings concluded at 12:13:04 p.m.)

## 105

1  STATE OF TEXAS
2  COUNTY OF HARRIS
3
4      I, JAMES M. PLAIR, the undersigned Certified Shorthand
   Reporter in and for the State of Texas, do hereby certify
5  that the above and foregoing pages contain a full, true,
   and correct transcription of my shorthand notes taken upon
6  the occasion set forth in the caption hereof as reduced to
   writing by me and under my supervision.
7
       I further certify that the transcription of my notes
8  truly and correctly reflects the exhibits offered into
   evidence, if any; that I am neither counsel for nor
9  related to any party in this cause and am not financially
   interested in the outcome.
10
       Certified to by me on this 24th day of November, 2010.
11
12
13
14
15      _____
        JAMES M. PLAIR, CSR, RPR
16      Texas CSR 4409
        Expiration: 12/31/2011
17      SUNBELT REPORTING & LITIGATION SERVICES
        1-800-666-0763
18
19
20
21
22
23
24
25  Job No. 89315

27  (Pages 102 to 105)