# <u>APPENDIX TAB J</u>

Vinmar's Post Hearing Brief

AMERICAN ARBITRATION ASSOCIATION
HOUSTON, TEXAS

Tricon Energy, Ltd.,                          :
                                              :
                        Claimant,             :
                                              :
            – against –                       :        Case No. 70 198 Y 00168 09
                                              :
Vinmar International, Ltd.,                    :
                                              :
                        Respondent.           :

## RESPONDENT'S POST HEARING BRIEF

**TO THE HONORABLE PANEL:**

Respondent Vinmar International, Ltd. ("Vinmar") serves its Post Hearing Brief as directed by the Panel and would show as follows:

From the beginning, Vinmar has objected to this proceeding because the Panel does not have jurisdiction to hear this dispute or to enter an enforceable award against Vinmar.  Vinmar's appearance, including its participation in the hearing and the filing of this Post Hearing Brief, is subject to and without waiver of its objection to jurisdiction on the basis that there is no agreement to arbitrate.  In denying Vinmar's motion to dismiss for lack of jurisdiction, the Panel noted its decision was without prejudice to a later determination that either there was no contract or that the contract did not contain an arbitration clause.  (Hearing Transcript pp. 47-48).[1]

The evidence adduced at the hearing confirms the Panel's lack of jurisdiction. Vinmar renews its motion to dismiss because the Panel is without jurisdiction to hear or

---

[1]      Tricon Energy, Ltd. ("Tricon") and Vinmar jointly filed a copy of the hearing transcript on the same date as this filing.  The transcript will be cited herein as (Witness Name/Page Number).

decide this dispute. Because Tricon elected the forum and ignored Vinmar's repeated objections, Tricon also should be ordered to pay all costs of this proceeding. Only in the unlikely event the Panel rejects Vinmar's motion to dismiss and subject to and without waiver of its jurisdictional challenge, Vinmar urges the entry of an award rejecting Tricon's claims in their entirety because there is no contract between the parties or, alternatively, because Tricon did not sustain any damages as a result of any alleged breach.

## I.
## FACTS ESTABLISHED AT HEARING

The testimony and exhibits introduced during the hearing confirmed that the Panel does not have jurisdiction to decide this case because there is no contract and, even if there was a contract, there is no agreement to arbitrate. The evidence also establishes that Vinmar did not breach the alleged agreement and Tricon did not sustain any damages. For any one of these reasons, Tricon's claim should be dismissed.

### The Firm Bid and the Firm Offer Did Not Match

All of the witnesses who were asked agreed that a broker has no authority to "match" a firm bid with a firm offer unless all of the terms in the firm bid and the firm offer are identical. (Lockwood p. 110; Leyman p. 278; Simpson pp. 494-95). Tricon's industry witness, Steve Simpson ("Simpson"), conceded that a deal did not exist if the broker matched a firm bid with terms that were different than the firm offer. (Simpson pp. 494-95). That is precisely what happened here. The broker purported to match Vinmar's bid with Tricon's offer, but the evidence revealed the bid and offer were not

identical.  Therefore, there never was a deal, despite what Leyman represented to both parties.

On July 22, 2008, Dr. Rick Wilson ("Wilson"), Vinmar's aromatics trader, contacted Edward Leyman ("Leyman"), a chemicals broker, to obtain leads for the purchase of mixed xylenes ("MX").  (Wilson p. 391-92).  Wilson testified clearly and directly that he only authorized Leyman to purchase on Vinmar's behalf U.S. origin MX. (Wilson p. 397) ("Mr. Leyman had specific instructions to buy U.S. origin material only on my behalf.").

On the same day, Brad Lockwood ("Lockwood"), Tricon's aromatics trader, contacted Leyman looking for opportunities to sell MX.  (Joint Ex. 10).  Wilson and Lockwood never spoke directly on July 22, 2008, nor did they exchange any direct communications on that day.  (Lockwood p. 59).  Instead, Leyman acted as the intermediary, trading offers and bids between Tricon and Vinmar.  (Leyman pp. 242-43). The first series of communications were captured in instant messages.  (Joint Ex. 10 contains Leyman's communications with Lockwood & Joint Ex. 11 contains Leyman's communications with Wilson).  Those communications confirm that U.S. origin MX was central to the discussions and Vinmar's willingness to purchase MX.  For example, on the morning of July 22, 2008, Wilson told Leyman that Vinmar was looking to purchase MX to Asia.  (Joint Ex. 11, Wilson entry at 9:22:19AM).  The only purchase offers Leyman communicated to Vinmar in writing were U.S. origin offers.  (Joint Ex. 11) ("have firm offer for 5kt mx fob h/tc corpus. . . ." "second mx seller asking if buyer would purchase cfr main asian ports. .5kt mx. . .arrival basis loading usgc 1h aug?").

After exchanging bids and offers for MX originating from the United States, the negotiations went "off-line" and were carried out entirely by telephone. (Leyman p. 274). Incredibly, Leyman never produced any notes or other writings of these phone conversations or the terms he was authorized to communicate and accept on either party's behalf. Further, although he told Wilson all phone conversations were recorded, Leyman never produced any audio recordings from July 22, 2008. (Wilson p. 392; Leyman pp. 274-75).

Sometime around noon on July 22, 2008, Leyman separately informed Vinmar and Tricon that a deal had been concluded. (*See, e.g.*, Joint Ex. 10, Leyman entry at 12:09:39PM). Wilson testified that the deal required Tricon to supply U.S. origin MX, which was in keeping with his firm bid through Leyman. (Wilson p. 397). Lockwood, on the other hand, testified that Tricon never intended to supply U.S. origin MX and a guarantee of U.S. origin MX was never accepted by Tricon. (Lockwood p. 110). Wilson's and Lockwood's testimony establishes there was no agreement between Vinmar and Tricon because the terms of the firm bid did not match the terms of the firm offer. Leyman exceeded his authority in claiming a deal had been concluded. (Simpson p. 495).

Leyman is the only witness who testified that Vinmar's firm bid did not include a requirement that Tricon supply U.S. origin MX. (Leyman p. 263). He did so almost two years after the alleged deal and without the benefit of notes or tape recordings. Leyman's testimony is not credible and, in fact, conflicts with Lockwood's version of the July 22, 2008 negotiations and the documentary evidence. Leyman first testified U.S. origin

never came up during the negotiations on July 22, 2008. (Leyman p. 259). Then, he later admitted a discussion of the product origin did take place, but it was after the deal allegedly concluded. (Leyman pp. 283-84). On the other hand, Lockwood testified that product origin was discussed before Leyman informed the parties a deal had been concluded. (Lockwood p. 115). Lockwood's testimony is consistent with an instant message he sent to Leyman on August 6, 2008 in which Lockwood claimed Tricon rejected Vinmar's product origin requirement on July 22, 2008. (Vinmar Ex. 9 at TRI 000048, Lockwood entries on 8/6/08 at 2:39PM). Of course, Lockwood had no personal knowledge of the discussions that took place between Leyman and Wilson. (Lockwood pp. 107-08). But, his testimony is instructive because it proves product origin was discussed before Leyman announced a deal and it shows that Leyman's memory was faulty and his testimony unreliable.

Not only did he forget that U.S. origin was indeed discussed before the alleged completion of a deal, Leyman incorrectly recorded the terms of the alleged deal in the only "writing" he prepared. Leyman's handwritten "confirmation" documented the price at $1,110 per metric ton even though the discussed price was $1,310 per metric ton. (Vinmar Ex. 1). Leyman had no explanation for the $1 million error, other than to admit he is not perfect, which is precisely the point. (Leyman p. 277). If Leyman could make a $1 million error in the price, he certainly was capable of incorrectly informing the parties a deal had been concluded when there was no agreement on the origin of the MX.

Leyman's documents also reveal that U.S. origin was a term of Vinmar's firm bid. Tricon's industry witness agreed that a broker has a responsibility to correct any

misunderstandings about the terms of a negotiated deal. (Simpson p. 497). Less than an hour after Leyman announced a deal, Wilson relayed his understanding that Tricon was selling out of the U.S. Gulf Coast. (Joint Ex. 11, Wilson entry at 12:57PM). Wilson's statement is contrary to the position Leyman later espoused in his testimony in this case. (Leyman p. 263). On July 22, 2008, however, Leyman said nothing to correct Wilson's statement. (*See* Joint Ex. 11). He did not say anything because he knew Vinmar required U.S. origin MX. The very next day, in describing Vinmar's possible interest in reselling the MX it believed it had purchased from Tricon, Leyman informed Lockwood that Vinmar was interested in selling because it "had no additional interest in usgc" MX. (Joint Ex. 10 at MOAB 000010, Leyman entry at 1:41:14PM). And, on August 6, 2008, Leyman again related his understanding of Vinmar's desire to purchase MX by referring to product originating in the United States: "however Vinmar's interest in the usgc . . . any with u on cfr was always 5211." (Vinmar Ex. 9 at TRI 000051, Leyman entry at 6:14:54PM). The reference to 5211 also is instructive since that is, as Leyman testified, the standard quality of MX in the U.S. Gulf Coast. (Leyman p. 269).

Leyman's contemporaneous writings reveal his understanding that Vinmar was only interested in purchasing U.S. origin MX. Those writings are consistent with Wilson's testimony and establish there was no agreement between Tricon and Vinmar. It is unsurprising that Leyman would now choose to "remember" the alleged deal terms to support Tricon's claim. Leyman has brokered more than 300 trades for Lockwood and earned significant commissions from those trades. (Lockwood pp. 160-61). In contrast, Leyman brokered only a handful of deals for Vinmar and none since the disputed trade

with Tricon.  (Leyman pp. 240-41 & 266).  Lockwood left nothing to chance.  When he claimed to have first learned of the dispute, Lockwood told Leyman his support for Tricon was expected.  (Vinmar Ex. 9 at TRI 000047, Lockwood entry at 3:51:26PM ("I'm glad I have you in case this ends up in court.")).  More than once, Leyman was told his assistance was expected and critical to Lockwood's efforts to extract his money from Vinmar.  (Vinmar Ex. 9 at TRI 000048, Lockwood entry at 2:37:35PM ("glad you would vouch for me if it comes to that")) (Vinmar Ex. 16 at TRI 000282, Lockwood entry at 12:26:23 ("be prepared. . . .somehow you will be needed to help me get my money from Vinmar")).  And, then there is the instant message exchange between Lockwood and Leyman on February 4, 2009.  (Vinmar Ex. 16 at TRI 000285, Lockwood entry at 15:44:06).  While Lockwood was attending mediation in this dispute, and with Vinmar's counsel and representatives in the next room, Lockwood messaged Leyman to ensure that he 'remembered' that his records were not available because his computer hard drive had crashed.  (*Id.*).  Having "refreshed" Leyman's memory, Lockwood then warned that Vinmar might call to discuss the alleged transaction.  (*Id.* at 16:10:34).  Lockwood's concern over Leyman's files is highly suspicious because Leyman never mentioned an alleged hard drive malfunction when he was asked why his audiotapes were not produced. (Leyman p. 275).

In the end, the only credible testimony was from Wilson.  When he was deposed, he was no longer employed by Vinmar and had not been for more than a year.  (Wilson p. 384).  Unlike Lockwood and Leyman, Wilson has no economic interest in the outcome of

this dispute.[2]  Wilson testified that Leyman was authorized to broker the purchase of U.S. origin MX.  (Wilson p. 393).  Leyman and Lockwood both admitted that Wilson had been clear and unwavering on this point from the beginning.  (Leyman p. 263; Lockwood p. 119).  Lockwood even attempted to persuade Wilson to get back at Vinmar by changing his story to say there was a deal.  (Wilson p. 412).  Wilson rejected Lockwood's proposal and remained steadfast that U.S. origin MX was a term Vinmar required before a deal would exist:

> I do not believe there was ever a deal with Tricon.  We never agreed on the terms.  I required U.S. origin.  Tricon didn't want U.S. origin.  There was never an agreement.

(Wilson p. 424).

**Papers are exchanged but a deal is never concluded**

After informing the parties of a concluded deal, Leyman sent a letter to Vinmar and Tricon confirming the alleged agreement.  (Joint Ex. 2).  The first letter Leyman sent contained the wrong price.  Leyman sent a second letter with altered payment terms, but the price was still wrong.  (Joint Ex. 3).  Finally, on the third try, Leyman sent a letter containing terms satisfactory to Tricon.  (Joint Ex. 4).  None of Leyman's letters contain an agreement to arbitrate.  (Leyman p. 277; Lockwood p.123).

Immediately after Leyman issued his third and final letter, Tricon sent a proposed sales contract to Vinmar.  (Joint Ex. 5).  This was in keeping with Tricon's standard practices and procedures, which require a sales contract when selling product.

---

[2]  Lockwood still has a bonus hinging on the outcome of this dispute.  (Lockwood p. 106).  According to Lockwood's testimony, Leyman's commission also is contingent upon the outcome of this dispute.  (Lockwood p. 126).

(Lockwood p. 135). As Vuk Rajevac ("Rajevac") confirmed, Tricon's sales contract is important because its terms and conditions have significant economic value to Tricon. (Rajevac pp. 290, 316). Now that he is a trader, Rajevac testified that he always ensures Tricon's sales contract is in place when Tricon is selling product. (Rajevac pp. 318-19).

Tricon's proposed sales contract purported to change some of the terms from Leyman's letter. For example, the option to increase or decrease the delivered volume was changed from "seller's option" to "vessel's option," the guaranteed delivery deadline was absent, and inspection costs were changed from a shared cost to one borne entirely by Tricon. (*Compare* Joint Ex. 4 *with* Joint Ex. 5). To ensure that its sales contract would govern, Tricon included a provision to cancel Leyman's letter. The provision unambiguously shows that Tricon did not intend to be bound by Leyman's letter:

> Broker – This cancels and supercedes any broker correspondence in relation to this transaction which shall be for the sole purpose of documenting commission, if any.

(Joint Ex. 5 at TRI 000009). The sales contract also contained signature blanks specifically for Lockwood and Wilson. (*Id.* at TRI 000010). Neither Lockwood nor Wilson ever signed the contract. (Lockwood p. 137). Although Lockwood claimed the signature blanks were meaningless and had no purpose, Tricon's industry witness testified that industry custom was not to include signature spaces in documents exchanged after a broker confirmation was issued. (Simpson p. 503). In fact, Simpson testified he never included signature blanks in his paperwork. (*Id.*). Tricon's decision to break with industry custom and include spaces for both parties to sign the sales contract

is proof of Tricon's intent not to be bound until, and unless, its terms and conditions were in place.

On July 29, 2008, Vinmar's logistics specialist, Laurentiu Pascu ("Pascu"), forwarded some handwritten "comments" on the sales contract to his logistics counter-party at Tricon. (Joint Ex. 13). Pascu had no authority to negotiate or change the commercial terms of any agreement. (Pascu p. 543). Pascu did not sign the contract and did not "comment" on all of the provisions in the sales contract. He also did not say Vinmar accepted the contract or any of the terms. Instead, he noted his disagreement with several logistics provisions and also advised that Vinmar's purchase order would follow. (Joint Ex. 13) ("We shall revert soon with our Purchase Order for your review"). Pascu testified that the purchase order required the approval of Wilson before it could be sent to Tricon. (Pascu pp. 551-552). The purchase order was never finalized, approved, or sent to Tricon because Vinmar discovered the disagreement over product origin. (Pascu p. 553).

Tricon elicited testimony about Vinmar's purchase order and various data entries that were made in Vinmar's computer system. Vinmar's conduct was consistent with its understanding that a deal had been concluded on the terms Wilson had authorized Leyman to accept, namely the supply of U.S. origin MX. Leyman told Wilson a deal had been concluded. Wilson understood the terms were consistent with the terms of Vinmar's firm bid. There is no evidence that anyone at Vinmar was aware prior to July 29, 2008 that Tricon did not believe the alleged deal required it to supply U.S. origin MX. Tricon points to Leyman's letters, which were silent on origin, as proof that Vinmar knew

the purported agreement did not require the supply of U.S. origin MX.  However, Wilson testified that he did not expect the documents to contain any reference to origin until Tricon selected the precise U.S. loading port.  (Wilson pp. 444-45).  Wilson's writings are consistent with his testimony.  During the negotiations, Tricon demanded that Vinmar declare the ultimate location for delivery in early August.  The negotiated deadline was consistent with shipment from the United States.  Expecting shipment in the first week of August, Wilson immediately inquired about the shipping details (Joint Ex. 5) and informed Vinmar's shipping agent that Tricon would ship the first week of August, which would allow sufficient time to pass through the Panama Canal and arrive in Asia in the first half of September.  (Vinmar Ex. 2).

In addition, Vinmar's computer data proves it understood the deal required U.S. origin MX.  Tricon utilized only a portion of Vinmar's SAP computer data in a misleading attempt to show U.S. origin was not mentioned.  (Joint Ex. 7).  However, Tricon omitted several pages of data obtained from Vinmar's SAP system which prove that Vinmar did believe the purported deal required U.S. origin material.  Vinmar Exhibit 4 consists of these additional pages from Vinmar's system and reveal Vinmar's understanding that the product would, in fact, originate from the United States.  (Vinmar Ex. 4).  Tricon also made much of the fact that Vinmar's purchase order left the "origin" blank.  However, Pascu testified that the purchase order process was not complete and the "origin" text would not have been completed in SAP and printed until the port of loading had been identified.  (Pascu p. 570).  Pascu's testimony is consistent with his July 29, 2008 e-mail in which he asked Tricon for the port of loading.  (Joint Ex. 13).

In response to Pascu's comments and his inquiries concerning shipping details, Tricon agreed to some, but not all, of Pascu's initial comments. (Joint Ex. 14). Tricon flatly refused to agree to accept Pascu's alteration to the demurrage time bar provision, and the witnesses admitted that the sales contract was never signed.

**A Dispute Arises**

Sometime between July 29, 2008 and the afternoon of July 31, 2008, Wilson was informed that Tricon had a different understanding of the alleged deal. Upon his discovery, Wilson notified Tricon of the apparent misunderstanding and Vinmar's requirement for U.S. origin MX. (Joint Ex. 15). Wilson's notification and objection to Tricon's understanding came before any deadline for performance under the purported deal. Further, Tricon offered no evidence that it took any action in furtherance of the alleged contract. In response to Wilson's notification, Tricon claimed the deal did not require the supply of U.S. origin MX and Tricon refused to guarantee the delivery of US origin MX. (Joint Ex. 15).

**Tricon Attempts to Manufacture Damages**

Even though MX prices fell dramatically in the days following July 22, 2008 and even though a deal had never been concluded, Vinmar reiterated its willingness to abide by the deal it originally authorized Leyman to conclude, which was the purchase of 5,000 metric tons of U.S. origin MX, meeting ASTM 5211, at $1,310 per metric ton ("MT"), delivery in Asia first half of September. (Wilson p. 409) (Joint Ex. 18). If Tricon accepted Vinmar's August 6, 2008 offer, Tricon had the ability to make approximately $387,500 based on existing market prices. (Joint Ex. 32). In contrast, Vinmar would

have sustained a loss in at least that amount, yet Wilson was willing to abide by his original commitment.  (Wilson pp. 409-410).

Leyman recognized the immediate profit available to Tricon and urged Lockwood to accept Vinmar's offer.  (Vinmar Ex. 9 at TRI 000051).  Leyman acknowledged that Vinmar was not running away or disavowing its commitment to purchase MX on the original terms Vinmar authorized.  (Leyman p. 281) (Vinmar Ex. 9 at TRI 000051, Leyman entry at 6:12:16PM).  Even so, Tricon refused to accept Vinmar's offer, choosing instead to manufacture a claim for damages well in excess of any profit Tricon could have made under the alleged deal.  The reason is obvious.  Tricon did not have MX available to supply the alleged agreement and its other commitments.  By claiming that Vinmar breached the agreement, Tricon solved its supply dilemma and created a damage claim without any corresponding obligation to perform.

In furtherance of its scheme, Tricon claimed that it resold the MX it would have sold to Vinmar to another customer, KP Chemtrading Corp. ("KP Chem").  (Lockwood p. 90).  Under the alleged deal with Vinmar, Tricon would have had to purchase MX no later than September 15, 2008 in order to supply Vinmar on or before September 15, 2008.  (Lockwood p. 184).  The MX Tricon supplied to the alleged replacement sale, however, was not purchased until September 22, 2008, seven days after the last possible delivery deadline under the alleged Vinmar contract!  (Lockwood p. 205).

Further, Tricon made more money on the alleged replacement sale than it would have made under even the most advantageous view of the evidence.  Vinmar Exhbit 27

provides the details of Tricon's sale to KP Chem, which included Tricon's purchase of

MX from J&J Chemtrading:

| Tricon Sale to KP Chem: | | | | | | |
|---|---|---|---|---|---|---|
| **Volume** | | | **Price** | | **Subtotal** | |
| 3,230 | MT | $ | 995.50 | per MT | $ | 3,215,465 |
| 1,520 | MT | $ | 1,235.00 | per MT | $ | 1,877,200 |
| | | | | Revenue from Sale to KP Chem: | $ | 5,092,665 |
| Tricon Purchase from J&J: | | | | | | |
| **Volume** | | | **Price** | | **Subtotal** | |
| 3,230 | MT | $ | 676.63 | per MT | $ | 2,185,515 |
| 570.042 | MT | $ | 676.63 | per MT | $ | 385,708 |
| 950.010 | MT | $ | 676.63 | per MT | $ | 642,805 |
| | | | | Cost of MX Purchased from J&J: | $ | 3,214,028 |
| | | | | **Net Profit to Tricon on Sale to KP Chem:** | $ | **1,878,637** |

(Vinmar Ex. 27).  Accepting all of Tricon's arguments about the alleged Vinmar deal,

including the additional 5% in volume and using the lowest possible price during the

relevant time period to purchase MX to supply Vinmar resulted in a hypothetical profit of

$1,850,625, before expenses and other costs were deducted.  In other words, Tricon made

more money on its replacement sale than it ever hoped to make on the alleged deal with

Vinmar.  As a result, Tricon is not an aggrieved seller and did not sustain any damages,

even if Vinmar did breach the alleged agreement.

## II.
## ARGUMENT AND AUTHORITIES

Vinmar incorporates by reference the arguments and authorities cited in its Pre-

Hearing Brief.  Those arguments will not be repeated here except where necessary.

1.    **The Panel Does Not Have Jurisdiction[3]**

A.    **Tricon Has Not Met its Burden to Establish an Agreement to Arbitrate**

Although parties may, evidenced by clear and unmistakable intent, agree to allow

an arbitration panel to decide its own jurisdiction, it is well settled that when one party

disputes the formation of any agreement, the Panel does not have jurisdiction to

determine the arbitrability of the parties' dispute. *First Options of Chicago, Inc. v.*

*Kaplan*, 514 U.S. 938, 944-45, 115 S. Ct. 1920, 1924-25 (1995); *see also In re Morgan*

*Stanley & Co., Inc.*, 293 S.W.3d 182, 188-89 (Tex. 2009) (stating that "a challenge to

whether any agreement was ever concluded" is "a threshold inquiry for the court"). The

party seeking arbitration is burdened with establishing that an agreement to arbitrate

exists. *In re Morgan Stanley*, 293 S.W.3d at 185; *In re Bank One, N.A.*, 216 S.W.3d 825,

826 (Tex. 2007) (noting that bank met its burden to establish agreement to arbitrate by

producing bank signature card incorporating arbitration clause by reference and signed by

customer); *Cantella & Co. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996); *EZ Pawn*

*Corp. v. Mancias*, 934 S.W.2d 87, 91 (Tex. 1996). In Texas, that burden is to produce an

agreement to arbitrate that meets all of the requisites of a contract—offer, acceptance,

meeting of the minds, consent to the terms, and execution with the intent that the

agreement be mutual and binding. *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 606

(Tex. 2005); *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999,

pet. denied).

---

[3]    Please see Part I (pages 1 through 7) of Vinmar's Brief in Support of its Supplemental Motion to Dismiss for Lack of Jurisdiction, and, Subject thereto, its Prehearing Brief for additional arguments and authorities establishing the Panel's lack of jurisdiction.

When the party seeking to arbitrate cannot identify the document through which it claims its right to arbitrate and the opposing party asserts that it did not execute an arbitration agreement, the dispute regards formation, and the threshold issue is not whether the parties agreed to arbitrate, but whether the parties entered into any agreement at all. *Will-Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211, 216–17 (5th Cir. 2003); *see also In re Beyond the Arches*, No. 09-04-126 CV, 2004 WL 1699900, at *2–3 (Tex. App.—Beaumont July 29, 2004, no pet.) (holding that where employer could produce no document with arbitration clause signed by employee, employer failed to establish meeting of minds on agreement to arbitrate); *Lee v. Red Lobster Inns of Am., Inc.*, 92 Fed. Appx. 158, 161-63 (6th Cir. 2004) (holding that where Red Lobster could not identify document it considered to be written arbitration agreement between itself and employee, there was no agreement to arbitrate).

For example, in *Jolley v. Welch*, the brokerage firm that sought to arbitrate a dispute with a client could not produce any document with the client's signature showing that the client had to agreed to arbitrate. 904 F.2d 988, 994 (5th Cir. 1990). Because the brokerage firm failed to produce any evidence of an agreement, it did not meet its burden of establishing that the client had agreed to arbitration. *Id.* Thus, the court could not reach even its first task of determining whether the parties had agreed to allow an arbitrator to decide their dispute. *Id.*

In contrast, in the case relied upon by Tricon neither party disputed that the other had executed an earnest money contract containing an arbitration agreement. *In re Rio Grande Xarin II, Ltd. v. Wolverine Robstown, L.P.*, No. 13-10-00115-CV, 2010 WL

2697145, at *1 (Tex. App.—Corpus Christi, July 6, 2010, pet. pet. dism'd) (mem. op.). In that case, after the sale of a shopping center a dispute arose as to whether Rio Grande or Wolverine owned accrued rents. *Id.* Rio Grande produced the earnest money contract, invoked the arbitration provision, and notified Wolverine of its intent to arbitrate their dispute. *Id.* Wolverine disputed that the earnest money contract was still in effect after the sale had closed. *Id.* The court held that Rio Grande had, by producing the earnest money contract, met its burden of establishing the existence of an agreement to arbitrate, the arbitration provision survived the closing of the sale, and the parties' dispute fell within the scope of the provision. *Id.* at *5.

In this case, Vinmar disputes that it formed any agreement with Tricon and asserts that Tricon has not met its burden to produce an agreement to arbitrate. Lockwood, admittedly Tricon's representative and the person who is most familiar with Tricon's claims, refused to identify the contract upon which Tricon's claims rest. (Lockwood pp. 120-123). In a series of questions directed at having Lockwood tell the Panel what document or documents constitute the contract Tricon seeks to enforce, Lockwood attempted to hedge his answers by invoking either Leyman's confirmation or the Tricon proposed sales contract "whichever one you prefer." (Lockwood p. 121). The problem, of course, is that Leyman's confirmation does not contain an agreement to arbitrate. (Joint Ex. 3). Lockwood's "whichever one you prefer" answer is, as in *Jolley*, a patent refusal to identify the document on which it bases its right to arbitration.[4]   Moreover,

---

[4]   Lockwood's refusal to commit is an obvious ploy to avoid committing to a particular document in the event this Panel agrees that it lacks jurisdiction.

unlike *Rio Grande*, there is no foundation agreement which both Tricon and Vinmar agree that they had executed from which this Panel can conclude that Vinmar has agreed to arbitration. This Panel should conclude that Tricon has failed to meet its burden of establishing an agreement to arbitrate.

### B.   Vinmar Has not Waived its Right to Resort to the Courts

Vinmar has preserved its claim of no jurisdiction by asserting its objection in this forum. *See First Options*, 514 U.S. at 946, 115 S. Ct. at 1925; *Roe v. Ladymon*, No. 05-08-00417-CV, 2010 WL 2978293, at *9 (Tex. App.—Dallas July 30, 2010, no pet. h.) (holding that party has right to present objections to arbitrator without waiving right to judicial determination of dispute). At the heart of its objection is Vinmar's denial of the existence of any agreement between itself and Tricon. Tricon has refused to identify the document establishing such an agreement. As a result, the parties' dispute over the existence of any agreement is one for the courts, not this Panel, to decide. *See In re Morgan Stanley*, 293 S.W.3d at 188-89.

### 2.   There Was No Contract[5]

Subject to and without waiver of its objection to arbitration and the Panel's jurisdiction, in the unlikely event that the Panel concludes it has jurisdiction to decide this dispute, Vinmar urges the Panel to conclude that no enforceable contract was created because the parties never agreed to the essential terms or signed a contract.

---

[5]   Please see Part II (pages 7 through 15) of Vinmar's Brief in Support of its Supplemental Motion to Dismiss for Lack of Jurisdiction, and, Subject thereto, its Prehearing Brief.

### A.    Mutual Assent is Lacking

"The sine qua non of a valid contract is a meeting of the minds of the parties upon every essential term of the agreement." *Quaker Oats Co. v. Brinkley Dryer & Storage Co.*, 164 F. Supp. 761, 768 (E.D. Ark. 1958); *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450 (Tex. 2008) ("A meeting of the minds is necessary to form a binding contract."). In this case, the evidence establishes that Vinmar negotiated to purchase U.S. origin MX, while Tricon negotiated to sell open origin MX.  Vinmar was not willing to purchase anything except U.S. origin MX, and Tricon was not willing to sell anything but open origin MX.  Absent a meeting of the minds on this essential term, there was no contract. *See Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 75 (Tex. App.—Houston [14th Dist.] 2010, pet. filed)  ("The minds of the parties must also meet with respect to the agreement's subject matter and essential terms").  Without a contract, Tricon's claim fails.

Absent mutual assent, a court cannot enforce a contract because there has been no "meeting of the minds" and the parties have not evidenced an intent to be bound.  *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *see Lerer v. Lerer*, No. 05-02-00124-CV, 2002 WL 31656109, at *3 (Tex. App.—Dallas Nov. 26, 2002, pet. denied) ("Intent to be bound is essentially a question of whether there was a meeting of the minds of the parties.") (citing to *Angelou v. African Overseas Union*, 33 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ("The term 'meeting of the minds' refers to the parties' mutual understanding and assent to the expression of their agreement.")).  In a contract for the sale of goods, essential terms include delivery

terms such as shipping location, mode of shipping, time of delivery, and manner of delivery. *See Novelly Oil Co. v. Mathy Constr. Co.*, 433 N.W.2d 628, 631 (Wis. Ct. App. 1988); *Judal Industries, Inc. v. Welsbach Elec. Corp.*, 526 N.Y.S.2d 154, 156 (N.Y. App. Div. 2nd 1988); *Lomaglio Assocs. Inc. v. LBK Marketing Corp.*, No. 94 CIV. 3208(KTD), 199 WL 705208 (S.D.N.Y. Sept. 10, 1999) (citing to *Judal*). Thus, where there is no mutual assent to an essential shipping term, there can be no contract. *T.O. Stanley Boot*, 847 S.W.2d at 221; *see Dow Chem. Co. v. General Electric Co.*, No. 04-10275-BC, 2005 WL 1862418, at *31 (E.D. Mich. 2005) (holding that lack of mutual assent on the key terms of pricing and product quality specifications resulted in no contract based on the "emails, drafts and surrounding comments" exchanged between parties).

The writings of Tricon and Vinmar demonstrate that they never agreed on the essential term of origin. At the inception of the negotiation process, Wilson's instant messages to Leyman clearly indicate that Vinmar wanted to purchase U.S. origin MX. Tricon did not agree to supply U.S. origin MX. Leyman, however, informed the parties' a deal had been concluded even though the terms did not match. Although the parties exchanged some communications and certain internal notations were made, when it became clear through those communications that there was no agreement on the origin of the MX, Vinmar notified Tricon of the failure to reach an agreement. (Joint Ex. 15). The exchange of e-mails between Wilson and Rajevac on July 31, 2008 confirm the lack of agreement on the essential term of origin. Without mutual assent on this essential term,

there was no meeting of the minds or intent to be bound, and, thus, no contract. *See T.O. Stanley Boot*, 847 S.W.2d at 221.

Mutual assent may be absent even where other writings of the parties suggest that the parties believed they had an agreement. For example, in *Dow Chem.*, Dow and GE entered into negotiations for an agreement for Dow to become GE's exclusive supplier of a product. 2005 WL 1862418, at *1. The agreement to negotiate was signed by Dow and GE and "evidenced a desire of the parties to proceed only by written agreement with appropriate management approval." *Id.* at *2. The parties then exchanged numerous emails and drafts of the agreement and had frequent discussions regarding the agreement. Internal communications of Dow and GE indicated that each thought they had reached an agreement. *Id.* at *29. Despite these communications, the court found that the party's writings did not demonstrate a meeting of the minds on two essential terms of the agreement and held that no contract was formed by their writings. *Id.* at 34.[6]

Here, although some communications between Tricon and Vinmar may suggest that each thought that a contract had been formed, during the course of their continued discussions, it became obvious that they had not agreed on the essential term of product origin. As in *Dow Chem.*, Tricon's and Vinmar's "internal celebrations" or other communications demonstrating that they thought a contract had been formed, are irrelevant where their writings indicate a disagreement on a material term. Because there was no meeting of the minds on the essential term of product origin, this Panel should

---

[6]    Although the court concluded that Dow's and GE's writings did not form a contract, it determined that fact issues remained as to whether Dow's performance against the terms of one of the documents created an enforceable agreement. *Dow Chem.*, 2005 WL 1862418 at *2.

find that no contract was formed between Tricon and Vinmar. *See T.O. Stanley Boot*, 847 S.W.2d at 221.

**B.      No Intent to Be Bound.**

Since Leyman's confirmations do not contain an agreement to arbitrate, the Panel cannot award any relief to Tricon based solely on his confirmation letter.  To support jurisdiction in this forum, Tricon first attempts to incorporate the terms of its proposed sales contract into Leyman's letter.

> 1.      <u>Tricon's Sales Contract Demonstrates that it Did not Intend to Be Bound by Leyman's Letter.</u>

Vinmar's prehearing brief sets forth the reasons Tricon's attempt to incorporate its sales contract as additional terms to the Leyman letter fails under Article 2.207 of the UCC.[7] The testimony and documents established another reason Tricon's argument fails. A legally enforceable contract consists of (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with *the intent that it be mutual and binding. Parker Drilling*, 316 S.W.3d at 72 (emphasis added).

The sales contract unambiguously manifested Tricon's lack of present intent to be bound by Leyman's confirmation.  Tricon sent its proposed sales contract with the introductory clause stating that the contract "sets forth the entire agreement of the parties." (Joint Ex. 5).  Tricon also included a paragraph, entitled "Broker," stating "This *cancels and super[s]edes any broker correspondence* in relation to this transaction which

---

[7]        Please see Part II, ¶ 1 (pages 9 through 11) of Vinmar's Brief in Support of its Supplemental Motion to Dismiss for Lack of Jurisdiction, and, Subject thereto, its Prehearing Brief.

shall be for the sole purpose of documenting the commission, if any." (*Id.*) (emphasis added). Supersede is defined as "[o]bliterate, set aside, annul, replace, make void, inefficacious or useless, repeal. To set aside, render unnecessary, suspend, or stay." *See Aldridge v. Young*, 689 S.W.2d 342, 347 (Tex. App.—Fort Worth 1985, no writ) (quoting BLACK'S LAW DICTIONARY 1289 (5th ed. 1979)). Courts construe as a matter of law the unambiguous words, susceptible of a definite meaning, used by parties in drafting contracts. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). "Cancels and super[s]edes any broker's correspondence" is susceptible only of one meaning; that is, Tricon did not intend to be bound by Leyman's confirmation.

Despite Tricon's assertions that Leyman's letter created a contract that was supplemented by the terms of its proposed sales contract, the express language of the proposed sales contract defeats this contention. There simply is no way to harmonize or read the documents as one when the alleged supplement claims to cancel and supersede the original document.

Vinmar's contention also is supported by Tricon's disregard for some of the terms contained in Leyman's letter. For example, Leyman's letter called for the inspection of product quality at the loadport. (Joint Ex. 4). When questioned about this requirement, Rajevac admitted that Tricon did not necessarily intend to give Vinmar the right to inspect the product before loading. (Rajevac p. 335). Indeed, Rajevac's responses to these questions suggest that he understood the purported deal was intended to originate from the United States. (Rajevac pp. 333-335) (emphasis added). Accordingly, this

Panel should find that the sales contract is not a supplement to or confirmation of a prior agreement created by Leyman's confirmation .

**C.     Tricon's Proposed Sales Contract Did Not Create a Binding Contract.**

Tricon alternatively claims that its proposed sales contract was an enforceable contract.  Tricon is wrong for at least two reasons, the proposed agreement was never signed by either party and there was no mutual agreement between the parties on the essential terms.  For either reason, Tricon's claim must be dismissed.

1.     Tricon Required Vinmar to Sign the Proposed Sales Contract

"Language illustrating that more is needed to bring the agreement to fruition rebuts the notion that the instrument is a confirmation." *Edwards v. Dumas Co-Op Elevators & General Mercantile*, No. 07-98-0035-CV, 1999 WL 40944, at *2 (Tex. App.—Amarillo Feb. 1, 1999, no pet.) (mem. op.); *Great Western Sugar Co. v. Lone Star Donut Co.*, 567 F. Supp. 340, 342 (N.D. Tex. 1983).   In Texas, when the offeror unambiguously requests that the offeree take specific action to accept an offer, no contract is formed until the offeree takes the specified action. *See Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 706 (Tex. App.—Houston [1st Dist.] 1988, writ denied); *Great Western*, 567 F. Supp. at 342.  For example, parties may contemplate the execution of a formal, signed contract. *See Foreca, S.A. v. GRD Development Co.*, 758 S.W.2d 744, 745 (Tex. 1988) (quoting extensively from Corbin on Contracts).  In determining whether the parties intended not to be bound until the execution of a formal, written contract, courts may consider a number of factors, including whether the contract is of a type usually put in writing, whether the agreement needs a formal writing for full expression,

and whether the amount involved is large or small. *Id.* at 746, n.2.

In contracts for the sale of goods subject to the UCC, a request for special action by the offeror removes the parties' dealings from the more flexible contract formation provisions of the UCC and imposes the common law requirements of formal offer and acceptance. *Gasmark, Ltd. v. Kimball Energy Corp.*, 868 S.W.2d 925, 928 (Tex. App.— Fort Worth 1994, no writ) (citing to *Great Western*). For example, in *Adams*, the court held that a writing labeled by the seller as a "confirm" but providing a blank signature line and requesting the buyer to sign if the "confirm" was in accord with his understanding," was not a UCC confirmation of a prior contract but an offer that was never accepted when the buyer did not sign it. 754 S.W.2d at 706. Also, in *Great Western*, the court held that that the seller's letter, which he labeled a "confirmation," providing a blank signature line and stating, "please sign and return to me . . . signaling your acceptance of the above agreement," was not a UCC confirmation. 567 F. Supp. at 343. The court, noting that "[a] true confirmation requires no response," held that the plain language required the buyer to accept by signing his agreement. *Id.* at 342–43. The buyer never signed and thus no contract was formed. *Id.* at 342. These cases illustrate that "[u]nder standard contract principles, the presence or absence of signatures on a written contract is relevant to determining whether the contract is binding on the parties." *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, pet. denied). And, when a contract contemplates signatures, the parties may negotiate, even in writing, without forming an agreement and either party will have the right to insist upon the

condition. *Foreca, S.A.*, 758 S.W.2d at 745; *Simmons & Simmons Const. Co. v. Rea*, 286 S.W.2d 415, 418 (Tex. 1955).

The evidence establishes that Tricon desired a more formal contract formation process than that allowed under the UCC. Indeed, Tricon's own actions conclusively establish that, as in *Adams* and *Great Western*, absent a signed contract by both parties, there would be no enforceable agreement. Tricon's proposed sales contract states, "The parties agree that this agreement shall be accepted and formed in the State of Texas *according to the procedures herein set forth*." (Joint Ex. 5). The procedures "herein set forth" by Tricon were that the agreement was to specifically be "between Brad Lockwood of Tricon Energy, Ltd. (Seller) and Rick Wilson of Vinmar International, LTD (Buyer)," who were to sign in the specially prepared signature spaces. Above these spaces, Tricon wrote "Please advise your agreement by signing the foregoing" and faxing the signed offer back to Tricon. Above Wilson's signature block, Tricon additionally included the statement "Accepted Date:_____." The plain language of the proposed sales contract establishes the importance of the parties' signatures and the absence of an agreement until both parties signed. This conclusion is reinforced by the testimony of Tricon's industry witness who said that industry custom is to "pass paper" without signature blanks. (Simpson p. 503). Tricon's break with industry custom signifies its intent not to be bound until signatures are securely affixed to the agreement. Here, neither Tricon nor Vinmar ever signed the proposed agreement.

Consider, in *Scaife v. Associated Air Center, Inc.*, the court found there was no contract because the parties never signed the purported agreement. 100 F.3d 406 (5th

2052859v1                                             26

Cir. 1996). "If an agreement has been reduced to writing . . . an assent to the writing must be manifested.   Manifestation of assent 'commonly consists of signing and delivery.'"  *Id.* at 410-11 (citations omitted).  In rejecting a claim that a writing simply was a confirmation of a prior oral agreement, the First Court of Appeals has similarly relied on the fact that the purported confirmation required signatures, which were lacking:

> Despite the use of the word "confirmation" in the body of the writing, we conclude here, as a matter of law, that there is unambiguous language in the writing that precludes a construction that it was a confirmation of a prior oral contract. The writing specifically states that *if* the stated "arrangements" were "in accord" with Adams' understanding, that Adams was to *sign* and to *return* one copy of the letter to Petrade.   There followed, in capital letters, the word "ACCEPTED" and a blank signature line for compliance with these instructions.

*Adams*, 754 S.W.2d at 706; *see also Koons v. Impact Sales & Marketing Group, Inc.*, 2007 WL 4292423 at *3 (recognizing blank signature block required further action to commence transaction).  When Tricon *chose* to include on the proposed sales contract not just signature spaces but spaces specifically for Wilson and Lockwood, Tricon dictated the process for acceptance of its offer.  Because neither party signed the proposed sales contract, no enforceable agreement was formed.

Moreover, when a party prescribes signatures as a condition to formation of a contract, at any time before the document signed, either party can withdraw from further negotiations or discussions. *Gasmark, Ltd.*, 868 S.W.2d at 928.  Vinmar exercised its unfettered right to do just that when it withdrew from further negotiations without either

party having signed Tricon's sales contract.  Accordingly, Tricon has no claim against Vinmar based on the unsigned sales contract.

2.    Vinmar Did Not Accept Tricon's Sales Offer

To create a contract, there must be an offer followed by an acceptance in accordance with the offer's terms.  *Parker Drilling Co.*, 316 S.W.3d at 73-74.  An acceptance that changes or qualifies an offer's essential terms constitutes a rejection and a counteroffer.  *Id.*  The UCC requires the basic common law requirements of offer, acceptance and consideration to form a binding contract.  *See, e.g., Echo, Inc. v. Whitson Co*, 121 F.3d 1099, 1103 (7th Cir. 1997).  In addition to the lack of signatures, Tricon's reliance on the proposed sales contract is misplaced because Vinmar did not accept Tricon's offer.

The emails exchanged between Rajevac and Pascu do not support a finding that Vinmar accepted Tricon's proposed sales contract.  To properly interpret the emails, this Panel must consider Tricon's desired level of formality in executing the contract (i.e., Wilson's and Lockwood's signatures on the contract).  *See J.D. Fields & Co., Inc. v. U.S. Steel International, Inc.*, 690 F. Supp. 2d 487, 499 (S.D. Tex. 2010).  Pascu's email plainly states that he was responding with "comments" to the proposed sales contract and would follow-up by sending Vinmar's own purchase order "for [Tricon's] review." (Joint Ex. 13).  Pascu's e-mail and his handwritten notations did not amount to an objective manifestation of acceptance.  Pascu's e-mail did not use the vocabulary of acceptance, nor does it purport to commit Vinmar to the agreement.  To the contrary, Pascu merely comments on the document and asks specific clarifying questions.  His

specific reference to Vinmar's purchase order further demonstrates that Pascu was not accepting Tricon's proposed sales contract. After all, if Pascu intended to accept Tricon's proposed sales contract, there would be no reason to send a purchase order.

In any event, Tricon did not accept Vinmar's comments. (Joint Ex. 14).

## 3.     Tricon Suffered No Damages

Subject to and without waiver of its objection to arbitration and the Panel's jurisdiction, in the unlikely event the Panel concludes it has jurisdiction to decide this dispute and determines that a contract was formed and a breach occurred, Vinmar urges the Panel to conclude that Tricon suffered no damages or, in the alternative, that Tricon's damage calculations are inaccurate.

### A.     The UCC Does Not Allow Tricon to Reap a Windfall

The "basic philosophy" of the Texas Uniform Commerce Code is that an "'aggrieved party may be put in as good a position as if the other party had fully performed' but not in a better posture." *See Nobs Chem., U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 215 (5th Cir. 1980) (citing J. White & R. Summers, Uniform Commercial Code § 7-12, at 232 (1972) (now J. White & R. Summers, Uniform Commercial Code § 7-12, at 495 (1996) (hereinafter cited as "White & Summers"))); *see also* TEX. BUS. & COM. CODE § 1.305(a). The measure of damages for breach of contract is the amount necessary to place a plaintiff in a financial position equivalent to the position it would be in if the contract had been fully performed. *See Little Darling Corp. v. Ald, Inc.*, 566 S.W.2d 347, 349 (Tex. Civ. App.—Dallas 1978, no writ); *see also Nobs Chem.*, 616 F.2d at 215 (citing *Little Darling Corp.*). It is a fundamental tenet of contract law that a "non-

breaching party may not be placed in a better position than if the contract had been performed." *See Employees Retirement System of Tex. v. Putnam, LLC*, 294 S.W.3d 309, 321 (Tex. App.—Austin 2009, no pet.). The evidence presented at the hearing makes clear that Tricon is attempting to reap a windfall profit by recovering damages from Vinmar which will place Tricon in a better position than if the contract had been performed.

### B.      Tricon is not an Aggrieved Seller

#### 1.      The UCC Provides Damages Only to Aggrieved Sellers.

The UCC provides that an *aggrieved seller* may, among other options, resell and recover damages as provided in Section 2.706. *See* TEX. BUS. & COM. CODE § 2.703. It is only an aggrieved seller that has a right to such recovery.[8] The evidence, however, established that Tricon is not an aggrieved seller, but rather accepted the benefit of a higher profit on its identified resale than it could have received from the purported Vinmar transaction. In fact, because of this higher profit, "the breach was a godsend," conferring a windfall gain on Tricon, which it now would like to double with the help of the Panel. *See Chronister Oil Co. v. Unocal Refining and Marketing*, 34 F.3d 462, 465-66 (7th Cir. 1994) (refusing to award actual damages where plaintiff received a windfall gain after breach).

---

[8]      An "Aggrieved party" means a party entitled to pursue a remedy. TEX. BUS. & COM. CODE § 1.201(b)(2).

2.   Tricon's Profits on its Replacement Sale Exceeded Potential Profits on Sale to Vinmar.

The purported agreement provided that Tricon would sell 5,000 MT of MX at $1,310 per MT.  If Tricon is given the benefit of the most aggressive possible calculation of the absolute best case scenario (which is not realistic or supported by any evidence), Tricon's highest, most aggressive profit on its alleged deal with Vinmar amounts to $1,850,625.[9]  (Vinmar Ex. 28).[10]  As reflected on Vinmar Exhibit 27, however, Tricon realized an actual profit of $1,878,637 on the sale to KP Chem that it identified as its replacement sale.  (Vinmar Ex. 27).  As a result, even under this hyper-aggressive, unrealistic example of Tricon's potential profit from the alleged Vinmar deal, Tricon still realized a benefit as a result of replacing the purported Vinmar sale with the KP Chem sale.

Tricon cannot now argue that it could have sold the "goods concerned," the MX, twice.  First, Tricon purchased the MX for sale to KP Chem on September 22, 2008, seven days after the latest delivery date in the purported agreement with Vinmar.  (Joint Ex. 4).[11]  Tricon did not possess the MX that it sold to KP Chem on the date it would have been required to supply the MX to Vinmar.  It therefore follows that Tricon could not have completed both sales.  Second, Tricon presented no documentary evidence that

---

[9]   Revenues calculated as: 5,250 MT at $1,130 per MT = $6,877,500.  (Vinmar disputes Tricon's right to artificially inflate the volume by 5%.)  The lowest price for MX between July 22, 2008 and September 15, 2008 was $957.50 on September 10-11.  (Tricon Ex. 32).  Therefore, cost is calculated as: 5,250 MT at $957.50 per MT = $5,026,875.  $6,877,500 in revenues less $5,026,875 in costs = $1,850,625.

[10]   Tricon's damages witness actually computed the best case scenario for Tricon as $976,802.88.  (Tricon Ex. 39 at ¶ 15).

[11]   Joint Ex. 24 is the September 22, 2010 purchase contract wherein Tricon purchased MX from J&J Chemtrading Co., Ltd. to supply to KP Chem.

it had the ability to procure and supply the MX for two separate sales. Tricon presented no evidence of inventory or storage records to demonstrate that it would have the capacity to have made two separate sales. Tricon presented no evidence of its available credit (or cash positions) that would indicate that it had the ability to finance the purchase of MX inventory for two sales. Third, in selecting the sale to KP Chem as its replacement sale pursuant to Section 2.706, Lockwood testified that it "was impossible to find buyers with the market falling as fast as it was" and "the market was frozen and the buyers had just disappeared." (Lockwood pp. 89 and 101). Lockwood's admission confirms that the KP Chem sale was not a sale *in addition* to the purported Vinmar sale, but a direct replacement sale when no possible alternatives were available. Tricon designated the sale to KP Chem as its replacement sale of the goods concerned and realized a profit on that sale, confirming that it was not an aggrieved seller.

### 3.   The UCC Does Not Allow Tricon to Recover a Double Profit.

Tricon, having already realized a profit of $1,878,637 on the sale to KP Chem, now seeks an additional $1,607,560.37 from Vinmar as a purported replacement sale loss. While the remedies provided by the UCC are to be "liberally administered" with the goal of placing an aggrieved party in as good a circumstance as if the other party had fully performed, "an award should not put a plaintiff in a better position than he would have been in if the contract had been fully performed." *See Shoop v. DaimlerChrysler Corp.*, 864 N.E.2d 785, 790 (Ill. App. 1st Dist. 2007). Both traditional Texas contract law and the general purpose of the UCC aim to put an aggrieved party in as good a position as if the other party had fully performed but not in a better posture. *See Nobs Chem.*, 616 F.2d

at 215-16. An application of the Texas UCC that provides windfall to the plaintiff should be avoided. *Id.*

Tricon is likely to argue that Section 2.706(f), providing that the seller is not accountable to the buyer for any profit made on a resale, precludes the profit on the KP Chem sale from netting against its recovery from Vinmar. Such an interpretation is without support. Section 2.706(f) merely establishes that the seller is entitled to retain its profit on the resale, if any. *See* TEX. BUS. & COM. CODE § 2.706, cmt. 11. White & Summers agree, commenting that 2.706(f) establishes that the seller's right to the excess, "[p]resumeably because the seller is the 'owner,' the basic rules in 2-706 allow the seller to keep the resale proceeds." *See* White & Summers § 7-6, at 474. Clearly, Vinmar is not making a claim to recover the excess profit Tricon realized on its sale to KP Chem. Instead, Vinmar asserts that because the actual resale profit exceeds the possible profit Tricon could have realized from a sale to Vinmar, Tricon is not an aggrieved seller and has no claim for damages under 2.706. *Id.* As noted by White and Summers, a resale resulting in a net benefit to the seller should *never be litigated* because such a beneficial resale "means that the aggrieved seller is no longer 'aggrieved' and has no claim against the buyer under Section 2-706." *Id.*

Tricon has already profited to the tune of over $1 million on the goods concerned in this dispute. Now, Tricon asks the Panel to more than double its profits and recover twice on the same sale. The UCC does not allow a seller to obtain a windfall over and above what it would have received had the disputed contract been performed. As such, in

the unlikely case that the Panel finds there was a breach, Tricon has not demonstrated that it is an aggrieved seller and is due any damages as a result of that breach.

**C.     In the Alternative, Tricon's Damage Calculations are Inaccurate**

In the alternative, if the Panel determines that Tricon is owed damages, Vinmar asserts that Tricon's damage calculations are inaccurate and must not be accepted.

1.     The Economic Benefit on the Volume Reduction issued to KP Chem Must be Accounted to Vinmar.

In its replacement sale method damage calculation, Tricon included only 3,230 MT of MX (sold at $995.50) as part of its designated replacement sale to KP Chem. (Tricon Ex. 39, Schedule 1).   Tricon attempts to explain away its use of only 3,230 MT of MX (and its disregard of an additional 1,520 MT sold to KP Chem at $1,235) because KP Chem "insisted that [Tricon] reduce the volume on the delivery" and Tricon did so to "accommodat[e]" its customer.   (Tricon Ex. 39, at ¶ 6).   The testimony and exhibits, however, establish that Tricon actually delivered 5,000 MT to KP Chem.   (Vinmar Ex. 23 at TRI 0002588) (Lockwood p. 199-200).   It was then Tricon who requested and offered to KP Chem the reduction in volume because Tricon "needed to take drastic measures to reduce fixed price exposure."   (Tricon Ex. 20).   In fact, it was Lockwood himself who originally drafted the language offering KP Chem the volume reduction.   (Tricon Ex. 21) (Lockwood pp. 194–195).   It is clear that it was Tricon that offered the reduction in volume to KP Chem.   But, whether it was Tricon or KP Chem does not matter, because Tricon choose to reduce the volume and obtained a benefit for doing so.   (Lockwood p.

188-189). Tricon, however, failed to include a corresponding reduction in volume in its replacement sale method damage calculation.

Section 2.706 does not define "resale price." *See* Tex. Bus. & Com. Code § 2.706(a). Courts have defined this price to be the amount "realized" by the seller, net of expenses and other charges. *See Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1291 (9th Cir. 1985). Indeed, White and Summers expressly state that courts must account for credit terms when determining the correct resale price. *See* White & Summers § 7-6 at 472. Tricon's damage calculation is overstated to the extent it does not extend to Vinmar the same reduction in volume it issued to KP Chem. *See Boeing Co.*, 771 F.2d at 1291 (concluding Boeing's damages should reflect the credit issued).

If the volume reduction is properly factored into Tricon's replacement sale calculation, the amount of Tricon's purported damages is reduced by over $380,000, prior to adjustments for interest and the additional avoided costs discussed below.

2.   The Use of the Market Price Method is Inappropriate.

Tricon has claimed throughout this proceeding that it identified the sale to KP Chem as its replacement sale for the goods concerned in the purported agreement with Vinmar. (Lockwood pp. 89-93). Tricon had the burden to put on evidence of their claimed damages, and the only evidence proffered related to this replacement sale. As previously discussed, Tricon failed to present the Panel with any evidence of is ability or capacity to supply MX to both Vinmar and KP Chem. In fact, the evidence indicated that Tricon had significant issues with their ability to obtain and supply its existing contractual obligations. (Tricon Ex. 21 and 22) (Lockwood p. 188-195). As a result,

Tricon is not entitled to obtain a market differential pursuant to Section 2.708 because it elected to re-sell the goods concerned and failed to present evidence that it could have supplied both contracts. *See also*, White & Summers § 7-7 at 478-480.

Further, the Fifth Circuit has held that in a situation such as this, where a party does not have the product to supply, Section 2.708(b) applies to overcompensation just as it does to under compensation. *See Nobs Chem.*, 616 F.2d at 215-16. Remedies under Section 2.708(b) are available if the measure of damages provided by Section 2.708(a) "is inadequate to put the seller in as good a position as performance would have done." *See* TEX. BUS. & COM. CODE § 2.708(b). It also, however, operates to limit a potential recovery if it is demonstrated that a party has already been compensated beyond that it would have received had the contract been performed. *See Nobs Chem.*, 616 F.2d at 215-16. Therefore, similar to the analysis above, because Tricon took advantage of favorable conditions and realized a profit greater than it could have possibly received from the sale to Vinmar, the UCC does not allow Tricon to benefit over and above what it would have received had the disputed contract been performed.

### 3. Tricon Used Improper Assumptions in Its Calculations.

Tricon also used a number of improper and/or intentionally incorrect assumptions in calculating its damages and, as a result, its entire damage model should be disregarded by the Panel. Tricon unilaterally inflated the volume of MX in its damages calculations by 5%. (Tricon Ex. 39, ¶¶ 8 and 14). Yet, the purported contract that Tricon relies upon expressly states that it is not Tricon's option to inflate the volume, but is exclusively the

"Vessel's Option." (Joint Ex. 5). Tricon's artificial increase of the volume is yet another attempt to improperly inflate its purported damages.

Tricon also omitted certain costs in its calculation of "avoided costs" in order to increase its potential recovery in this case. Tricon's schedule of avoided costs includes no amount for inspection costs. (Tricon Ex. 39, Schedules 5 and 6). The document relied on by Tricon, however, specifically states that Tricon would pay 100% of the inspection costs and Lockwood testified that he intended that Tricon would pay 100% of the inspection costs. (Joint Ex. 5) (Lockwood pp. 151–152). Yet, Tricon does not include the avoided inspection costs in its damages calculations. (Tricon Ex. 39, Schedules 5 and 6). This is clearly error in Tricon's damages calculations.

As a result, Tricon's damage calculations are overstated and reflect an intent to manipulate its calculations to the highest amounts possible, even in the face of contrary documentary evidence.

**D.** **The Panel Has no Legal Basis on which to Award Attorney's Fees to Tricon.**

In a breach of contract action, attorney's fees are available to a party who both prevails on its claim and recovers damages. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 2002); *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).

1. <u>Tricon has not established Any Basis for an Award of Attorneys' Fees.</u>

Vinmar has established that no contract was formed because Tricon and Vinmar never came to a meeting of the minds on the essential term of product origin. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 281, 221 (Tex. 1992). Accordingly,

2052859v1                               37

because Tricon cannot prevail on its breach of contract claim, this panel should not award Tricon any attorney's fees. *Green Int'l*, 951 S.W.2d at 390.

Vinmar has also established that even if a contract was formed between Tricon and Vinmar, Tricon has incurred no actual damages as a result of any breach by Vinmar because Tricon made a *greater* profit on the resale than it would have on the Vinmar sale. *See Nobs Chem.*, 616 F.2d at 215–16. Having suffered no actual or incidental damages, there is simply no basis on which Tricon can recover its attorney's fees pursuant to section 38.001. Accordingly, this Panel should not award Tricon any attorney's fees.

2. <u>If the Panel Awards Attorney's Fees to Tricon, It Must Consider the Result Obtained and the Complexity of the Dispute.</u>

Section 38.001 allows this panel to award "reasonable" attorney's fees. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001. In determining the reasonableness of the fees asserted by Tricon, the Panel must consider certain factors including the result obtained and the complexity of the dispute. *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

The Panel has the discretion to consider the amount of damages awarded in determining the reasonableness of attorneys' fees. Tricon originally demanded almost $1.6 million, and presented a claim in this arbitration for $1.8 million. (Joint Ex. 26). Vinmar has established that Tricon, by its own evidence, actually profited from any breach by Vinmar and suffered no actual or incidental damages. As a result, the Panel should carefully consider the nature of the cause, the amount in controversy, and the results obtained in determining the amount awarded as attorneys' fees. *See Jack Roach*

*Ford v. De Urdanavia*, 659 S.W.2d 725, 730 (Tex. App.—Houston [14th Dist.] 1983, no writ) (finding the attorneys' fees excessive in comparison to actual damages awarded).

WHEREFORE, Respondent respectfully requests that the Panel grant the motion to dismiss for lack of jurisdiction or, alternatively, dismiss Tricon's claims, assess all costs against Tricon and grant Vinmar such other and further relief to which it may be entitled.

Respectfully submitted,

PORTER & HEDGES, L.L.P.

By: _____
      Stephen H. Lee
      R. Blake Runions
      1000 Main Street, 36th Floor
      Houston, Texas  77002
      Telephone: (713) 226-6000
      Facsimile: (713) 228-1331

ATTORNEYS FOR RESPONDENT
VINMAR INTERNATIONAL, LTD.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was sent to the following via electronic mail and U.S. First Class Mail on this the 19th day of October, 2010:

George Diaz-Arrastia
Tracy D. Larson
Schirrmeister Diaz-Arrastia Brem LLP
Pennzoil Place - North Tower
700 Milam, 10th Floor
Houston, Texas 77002
Email: gdarrastia@sdablaw.com
Email: tlarson@sdablaw.com

R. Blake Runions