# APPENDIX TAB M

Tricon's Response to Vinmar's Supplemental Motion to Dismiss (without exhibits)

American Arbitration Association
Dallas, Texas

---------------------------------------------------X
Tricon Energy, Ltd., :
              Claimant, :
              - against - :    Case No. 70 198Y 00168 09
Vinmar International, Ltd., :
              Respondent. :
---------------------------------------------------X

## TRICON ENERGY, LTD.'S RESPONSE TO RESPONDENT'S SUPPLEMENTAL MOTION TO DISMISS

Pursuant to the Panel's August 3, 2010 Order, claimant Tricon Energy Ltd. ("Tricon") hereby submits this Response to Respondent's Supplemental Motion to Dismiss ("Motion") and would respectfully show the Panel as follows:

### SUMMARY OF THE ARGUMENT

Respondent's Motion is based on the faulty premise that Tricon was required to obtain a court order prior to proceeding to arbitration. Texas law imposes no such burden on parties seeking to enforce arbitration agreements and instead requires parties objecting to the proceedings, like Respondent, to file a motion to stay. Absent such a motion, this Panel undoubtedly has jurisdiction to consider both Respondent's objection to arbitration, as well as the substance of Tricon's claims. Because the arbitrability of this dispute is inextricably intertwined with the merits of Tricon's claims, Tricon respectfully requests that both issues be addressed next month at the evidentiary hearing.

If the Panel elects to address the issue of arbitrability prior to the hearing, Vinmar's Motion should be denied in its entirety. The parties entered into a binding contract on July 22,

{00109427.DOC; 1}

2008, which was codified in a written agreement on July 23, 2008. Subsequently, the parties agreed to modify that agreement to include additional terms, including an arbitration provision. Under basic U.C.C. contract law, Vinmar is bound to that provision.

## STATEMENT OF RELEVANT FACTS

As addressed more thoroughly in Tricon's Amended Specification of Claims and Prehearing Brief, this is a straightforward breach of contract case. On July 22, 2008, Brad Lockwood on behalf of Tricon and Rick Wilson on behalf of Vinmar International Ltd. ("Vinmar") entered into negotiations, facilitated by a third-party broker, for Tricon's sale of 5,000 metric tons of mixed xylene ("MX") to Vinmar. By mid-afternoon on the same day that they began negotiations, the parties reached an agreement on the material terms of their contract, and the broker sent both parties a confirmatory memorandum memorializing the contract (the "Broker's Confirmation"). (Ex. A). Shortly thereafter, Vinmar requested to change the payment terms from 30 days after the bill of lading date to an at-sight letter of credit. After Tricon agreed to this change, the Broker sent out an "Amended Contract" reflecting the amended payment terms. (Ex. B). Due to a typo as to the agreed upon price, the next morning the broker sent both parties an amended confirmatory memorandum (the "Amended Broker's Confirmation"). (Ex. C).

The next day, Tricon sent Vinmar a letter confirming this agreement and also proposing some additional terms (the "Tricon Letter"). (Ex. D). On July 29, 2008, Vinmar sent Tricon an email proposing minor changes to the overall transaction. Other than these minor edits, Vinmar agreed to Tricon's proposed terms, including arbitration. (Ex. E). Tricon promptly

accepted all of Vinmar's "comments," except for Vinmar's request to change the demurrage time bar.[1] (Ex. F).

On July 31, 2008, after the price of MX had fallen precipitously, Vinmar *for the first time* demanded a guarantee that the MX it had purchased be "USA origin." (Ex. G). Tricon reminded Vinmar that it never made any guarantee with respect to origin and, in any event, could not as a practical matter guarantee USA origin and at the same time satisfy the contract's material delivery terms. *Id.* Then, on August 6, 2008, Vinmar, through the Broker, sent Tricon an email reiterating its new demand for a guarantee of USA origin and asserting for the first time that the parties did not have a deal. (Ex. H).

Vinmar thereafter proceeded to breach the parties' agreement by refusing to declare a discharge port and continuing to assert that the parties did not have a contract. After advising Vinmar that it would resell the cargo on the open market, Tricon opted to use the product to satisfy an existing contract it had with a third party, as no other buyers could be found. Tricon suffered significant damages when the replacement contract ended up being significantly less profitable.[2] These arbitral proceedings followed shortly thereafter.

## ARGUMENT AND AUTHORITIES

### A. The Panel Has Jurisdiction to Proceed

Contrary to Vinmar's Motion, Texas law does not require a party to obtain a court order prior to proceeding to arbitration. For months, Vinmar has had the option of filing a motion to stay, but has chosen not to do so. It cannot use that failure to impose an obligation on Tricon to institute court proceedings. The AAA rules specifically provide that an arbitration panel has the

---

[1] The demurrage time bar is not at issue in this arbitration.

[2] The price of Tricon's "cover" contract was the average price of MX, as published by Platt's, for the month of September 2008. (Ex. I). This price ended up being significantly less than the price in the Vinmar

power to determine its own jurisdiction, including the existence of an arbitration agreement. Vinmar's contention that this Panel lacks jurisdiction to proceed is therefore entirely meritless.

The Corpus Christi Court of Appeals recently addressed this precise issue in *In re Rio Grande Xarin II, Ltd.*, 2010 WL 2697145 (Tex. App.—Corpus Christi July 6, 2010, no pet. h.). In *Rio Grande*, Wolverine attempted to vacate an arbitral ruling, contending that "Rio Grande did not first file a lawsuit in state court and obtain an order from the trial court to proceed with arbitration." *Id.* at *6. Wolverine had asserted that the dispute was not arbitrable throughout the proceedings and argued that "private arbitration must be preceded by a judicial order compelling the arbitration if arbitrability is disputed in advance." *Id.* The court summarily rejected this argument—nearly identical to the one Vinmar puts forth in its Motion—and held that a party need not obtain a court order prior to arbitration, regardless of whether the opposing party contests arbitrability. Indeed, the court held that "[r]equiring a party who is initiating arbitration pursuant to contract to institute litigation prior to arbitration is *nonsensical.*" *Id.* (emphasis added). Such an illogical procedure "deprives the parties of the benefits of the contracted-for arbitration clause and defeats the purpose of providing a rapid, inexpensive alternative to traditional litigation." *Id.* (internal quotation marks omitted).

The court noted that, although both the Texas and federal arbitration statutes permit a party to institute court proceedings to obtain an order compelling arbitration, "they do not require it." *Id.* at *7; *see also Perry Homes v. Cull*, 258 S.W.3d 580, 592 (Tex. 2008) (noting that "parties may begin arbitration without a court order. . . . But Texas procedure also contemplates that parties may file suit in order to compel arbitration."). Critically, both statutes also "contemplate that parties seeking to avoid arbitration may also seek a remedy in court." *Rio*

---

contract at issue here because the price of MX continued to fall through September 2008. That could not have been known at the time Tricon designated the existing contract as its "cover contract."

*Grande*, 2010 WL 2697145, at *7 (citing 9 U.S.C. § 16(a)(1)(A); TEX. CIV. PRAC. & REM. CODE § 171.098(a)(2)). There would be no need for such a remedy if the party favoring arbitration were required to first have sought a court order.[3]

Tellingly, Vinmar cites absolutely no authority for its erroneous contention that Tricon is required to obtain a court order. The cases on which it relies support only the unremarkable position that, where a party files either a motion to compel or motion to stay arbitration, the court will decide arbitrability as a threshold issue. *See Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (discussing proper procedure to follow in context of motion to compel arbitration and stay litigation); *ODL Servs., Inc. v. ConocoPhillips Co.*, 264 S.W.3d 399, 403 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (addressing standard for court to apply in motion to compel and motion to stay); *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 129 (Tex. 2005) (discussing proper standard in motion to compel). Tricon does not dispute that, had Vinmar filed a motion to stay, a court would have had the authority to determine arbitrability. However, Vinmar has not filed any such motion, making those cases plainly inapplicable.

Correspondingly, the fact that Vinmar can seek a motion to vacate *after* arbitral proceedings conclude has no bearing on this Panel's jurisdiction to proceed. Indeed, the cases cited by Vinmar *support* the fact that no court order is required. For example, in *Burlington Resources Oil & Gas Co. v. San Juan Basin Royalty Trust*, 249 S.W.3d 34 (Tex. App.—Houston [1st Dist.] 2007, pet. denied), the respondent had objected to arbitration throughout the proceedings. It was not until the respondent affirmatively invoked the judicial process through its motion to vacate that the court addressed the issue of arbitrability. Notably, nowhere did the court find that the arbitration panel had acted improperly by proceeding without a court order.

---

[3] The court also found it significant that, like Vinmar, Wolverine had participated in the arbitral proceedings for months, albeit under protest, yet never filed a motion to stay the proceedings. *Id.*

*See also Holcim (Tex.) Ltd. P'ship v. Humboldt Wedag, Inc.*, 211 S.W.3d 796 (Tex. App.—Waco 2006, no pet.) (arbitration proceeded without court order despite respondent's objections to arbitrability).

This case has been pending for well over a year. Throughout that time, Vinmar has been free to file a motion to stay and have a court determine arbitrability prior to an arbitral hearing. Indeed, on April 2, 2009, the AAA advised Vinmar of its obligation to seek a court order staying the arbitration if it wished to delay the proceedings. *See* Ex. J ("[I]n the absence of an agreement by the parties or a court order staying this matter, the Association will proceed with administration pursuant to the rules."). It cannot now take advantage of its failure to do so. *See Rio Grande*, 2010 WL 2697145, at *7.[4] Because Vinmar has not sought to stay these proceedings, this Panel has jurisdiction to address both the threshold issue of arbitrability, as well as the merits of Tricon's claims. *See* Rule R-7(a) of the AAA Commercial Arbitration Rules ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.").

**B.   Because Arbitrability is Inextricably Intertwined With the Merits, It Should be Addressed at the Evidentiary Hearing**

Vinmar's substantive defense to this matter rests almost entirely on its erroneous contention that it did not have a binding contract with Tricon for the purchase of MX. Similarly, its objection to arbitrability also is based on its assertion that the Tricon Letter is not a binding contract. Because both the threshold issue of arbitrability and the merits of Tricon's claims turn on the same factual issues, arbitrability should be addressed at the evidentiary hearing scheduled

---

[4] "Our decision on this issue is further compelled by the factual circumstances underlying this matter. Rio Grande first indicated its intention to institute arbitration proceedings on February 27, 2009. On March 23, the AAA notified the parties that it would proceed with administration of arbitration 'in the absence of an agreement by the parties or a court order staying this matter.' On April 1, Wolverine acknowledged its ability to file suit to avoid arbitration, yet failed to file suit until July 7, the eve of arbitration and more than three months after the AAA instituted proceedings, and, in fact, never sought to stay the arbitration."

to begin on September 20, 2010. Tricon therefore respectfully requests that this Panel not grant a hearing on this matter prior to that date.

## C. Vinmar's Objection to Arbitrability is Without Merit

Should the Panel elect to address arbitrability prior to the evidentiary hearing, Vinmar's motion to dismiss should be denied. Vinmar accepted most of the additional terms proposed in the Tricon Letter, so those terms—including the arbitration provision—became part of the parties' agreement. Indeed, under almost any view of the facts, Vinmar is bound by the arbitration provision. If, as Tricon asserts and Texas law and industry custom and practice support,[5] the Amended Broker's Confirmation is binding, then the Tricon Letter was a valid modification of that agreement under TEX. BUS. & COM. CODE § 2.209(a). Alternatively, if, as Vinmar contends, the Amended Broker's Confirmation is *not* binding, then the Tricon Letter was a written confirmation of the informal agreement reached through the broker, and the arbitration provision is binding under TEX. BUS. & COM. CODE § 2.207(a). Finally, even if the agreement reached through the broker was not an enforceable contract—which would be inconsistent with both the law and Vinmar's actions—then the Tricon Letter was an offer that subsequently was accepted by Vinmar pursuant to TEX. BUS. & COM. CODE § 2.207(a). Because, under any of these scenarios, the Tricon Letter's arbitration provision is binding, Vinmar's Motion must be denied.

### 1. The Amended Broker's Confirmation Was a Binding Contract, to Which the Tricon Letter Proposed Additional Terms

The parties had an enforceable agreement no later than July 23, 2008, the date the broker sent out the Amended Broker's Confirmation, reflecting the correct terms to which the parties

---

[5] *See, e.g., Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*, 992 F. Supp. 913 (S.D. Tex. 1998); *see also* Ex. K at ¶ 6.

7

{00109427.DOC; 1}

had agreed. However, the parties plainly were free to subsequently add to or modify those terms. *See* TEX. BUS. & COM. CODE § 2.209(a) ("An agreement modifying a contract within this chapter needs no consideration to be binding."). Indeed, Vinmar took advantage of this right to modify when it requested that Tricon agree to change the payment terms to an at-sight letter of credit. (Ex. L at 4:09:37). The broker subsequently sent out the "amended contract" reflecting the newly negotiated term. (Ex. B). Thus, regardless of whether § 2.207 applies, the terms of the Tricon Letter became binding when it was accepted by Vinmar.

The Texas Supreme Court recently addressed this issue in *In re Laibe Corp.*, 307 S.W.3d 314 (Tex. 2010). In *Laibe*, the plaintiff argued against enforcement of a forum selection clause contained in a later agreement, where the original purchase order did not have any such provision. The Court disagreed, citing § 2.209(a). According to the Court, "an agreement modifying a contract for the sale of goods requires no new consideration to be binding." *Id.* at 317. Because the contract as a whole did not lack consideration, the new terms contained in the later agreement, including the forum selection provision, governed.[6] *Id.*; *see also Graybar Elec. Co., Inc. v. LEM & Assocs., L.L.C.*, 252 S.W.3d 536, 546 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The Court further noted that "a contract can consist of more than one document. Documents 'pertaining to the same transaction may be read together,' even if they are executed at different times and do not reference each other, and 'courts may construe all the documents as if they were part of a single, unified instrument.'" *In re Laibe*, 307 S.W.3d at 317 (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000)).

---

[6] The Court also found it significant that the later contract contained a merger clause, stating that "this Contract is the entire agreement." *Id.* The Tricon Letter contains a similar provision, noting that "[t]his [contract] cancels and supercedes any broker correspondence in relation to this transaction. . . ." (Ex. D). Vinmar's attempt to transform this standard merger provision into some sort of repudiation is inconsistent with Texas law, as well as industry custom and practice. *See* Ex. K at ¶ 6, Conclusion ¶ 3.

Vinmar cites no authority for the erroneous contention that parties cannot modify a binding agreement. Indeed, all of the cases on which it purports to rely involve a situation where a party never agreed to the additional terms contained in the later agreement because they were included on a shipping label or other unilateral document.[7] Here, in contrast, Vinmar accepted most of the terms in the Tricon Letter—including the arbitration provision—in its July 29, 2008 email to Tricon, proposing a few minor changes to the overall transaction, but otherwise agreeing to the additional terms. (Ex. E). Tricon promptly accepted Vinmar's proposals, noting that "your comments on the contract [are] well noted and accepted. . . ." (Ex. F). Having negotiated and agreed to the additional terms proposed in the Tricon Letter, Vinmar cannot now escape enforcement of those terms. *See In re Laibe*, 307 S.W.3d at 317.

### 2. Alternatively, the Tricon Letter is an Enforceable Contract Pursuant to Article 2.207

In the unlikely event that the Panel concludes that the Amended Broker's Confirmation is not a binding contract, the result is no different, as the Tricon Letter is a binding contract under either prong of TEX. BUS. & COM. CODE § 2.207(a). Under § 2.207(a), "[a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon. . . ." According to Comment 1 to this section, it "is intended to deal with two typical situations." *Id.* cmt. 1. The first is where the writing

---

[7] *See Tubelite v. Risica & Sons, Inc.*, 819 S.W.2d 801, 802 (Tex. 1991) (agreement to pay interest contained on "acknowledgement" and shipping invoices, which the Defendant never reviewed or commented on); *Int'l Metal Sales, Inc. v. Global Steel Corp.*, 2010 WL 1170218, at *4 (Tex. App.—Austin March 24, 2010) (forum selection clause included on invoice sent with goods); *Axelson, Inc. v. McEvoy-Willis*, 7 F.3d 1230, 1232 (5th Cir. 1993) (cancellation term included on purchase order sent six months after contact formation that the defendant never responded or commented on); *Migerobe, Inc. v. Certina USA, Inc.*, 924 F.2d 1330, 1335 (5th Cir. 1991) (additional terms contained on purchase order that was never commented or acted upon by recipient and jury found was not binding); *Contractor's Source Inc. v. Hanes Cos., Inc.*, 2009 WL 6443116, at *1 (S.D. Tex. Dec. 29, 2009) (limitation of liability contained on invoice mailed *after* goods had been received); *Enpro Sys., Ltd. v. Namasco Corp.*, 382 F. Supp. 2d 874, 883 (S.D. Tex. 2005) (additional terms contained on delivery ticket and invoice without comment or assent from defendant; ticket was not even sent to department that had placed the order).

constitutes a written confirmation of an agreement that has been reached either orally or by informal correspondence between the parties. *Id.* Under this scenario, the written confirmation can "add[] terms not discussed." *Id.* The second situation is "offer and acceptance," where the "acceptance" contains new or different terms from the offer. *Id.* Depending on whether the Tribunal finds that the agreement negotiated by the broker was a binding contract, the Tricon Letter satisfies either situation.

### a. If the Amended Broker's Confirmation is Not Binding, the Tricon Letter was a Written Confirmation of the Parties' Informal Agreement

Under industry custom and practice, Tricon and Vinmar had an enforceable contract when the broker obtained the assent of both parties to the material terms of the deal. (Ex. K at ¶ 4, 6, Conc. ¶ 1; Ex. M, Leyman Dep. at 18:19-19:6). Where the deal is negotiated through a broker, like the Tricon/Vinmar transaction was, the broker has authority to act on behalf of both the buyer and seller. Ex. K at ¶ 5; *Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*, 992 F. Supp. 913, 915 (S.D. Tex. 1998) ("Gasteam [the Broker] conveyed Statoil's offers to Hydro and Hydro's acceptance to Statoil. It then confirmed the transactions by telephone and fax. That is simple contract formation—offer and acceptance—occurring through a broker and documented in faxes."). If for some reason the Panel concludes that the Amended Broker's Confirmation is not a satisfactory written memorial of that agreement sufficient to satisfy the statute of frauds, then the Tricon Letter is a binding contract under the first § 2.207(a) situation—a written confirmation of a prior oral and/or informal agreement.

It matters not whether the parties had discussed arbitration prior to Vinmar's receipt of the Tricon Letter, as § 2.207 specifically permits the written confirmation to "state[] terms additional to or different from those offered or agreed upon...." TEX. BUS. & COM. CODE

10

{00109427.DOC;1}

§ 2.207(a). Whether those additional terms became part of the parties' contract is dependant on § 2.207(b). *See id.* cmt. 3. Under that provision, the additional terms, including the arbitration provision, became part of the agreement unless: "(1) the offer expressly limits acceptance to the terms of the offer; (2) they materially alter it; or (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." TEX. BUS. & COM. CODE § 2.207(b). None of these exceptions apply. The offer did not did not expressly limit acceptance to the terms provided therein (indeed both parties consented to minor changes requested by the other), neither the arbitration provision nor the other suggested terms materially altered the transaction, and no objection to the arbitration provision ever was received until Tricon instituted these proceedings. To the contrary, Vinmar agreed to the arbitration provision in its July 29 email to Tricon (Ex. E), and Vinmar's own internal purchase order also reflected an arbitration provision. (Ex. N). Thus, the arbitration provision became part of the parties' agreement. *See Ceco Corp. v. Steves Sash & Door Co., Inc.*, 714 S.W.2d 322, 327 (Tex. App.—San Antonio 1986), *mod'd and rev'd in part on other grounds by*, 751 S.W.3d 473 (Tex. 1988) ("Since the purchase order was Ceco's confirmation of the prior agreement, it contained no objection to additional terms proposed by Steves. Under . . . § 2.207(b) the 'no charge-back' term would become part of the contract.").

### b. Vinmar Accepted the "Offer" Contained in the Tricon Letter

Alternatively, in the unlikely event that the Panel concludes that the brokered transaction did not result in a binding contract, under § 2.207(a), the Tricon Letter constitutes an offer and Vinmar's July 29, 2008 email agreeing to most of the terms set forth in the Tricon Letter—including the arbitration provision—constitutes the acceptance. To the extent Vinmar's July 29, 2008 email proposed any changes to the terms of the Tricon Letter, those

{00109427.DOC;1}

proposed changes are relevant only in identifying the final terms of the contract under TEX. BUS. & COM. CODE § 2.207(b). They do not alter the conclusion that a contract already had been formed. *See Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 198-99 (Tex. App.–Austin 1992, no writ) (finding that a contract had been formed, at the latest, when the plaintiff sent its purchase agreement to the defendant, and to the extent that any terms in the purchase agreement were new or different from those in the parties' previously exchanged documents, those terms were merely proposed additions to the parties' already-existing contract); *see also Tri-State Petroleum Corp. v. Saber Energy, Inc.*, 845 F.2d 575, 578 (5th Cir. 1988) (where a written contract sent by the first party is returned by the second party, but altered by additional or different terms, § 2.207(a) allows the return of the contract to act as acceptance of the offer with the alterations as proposals for additions to the contract).

### 3. Vinmar's Email Accepting Most of Tricon's Proposed Terms Constitutes its Signature under the Texas U.C.C.

That neither party's signature appears in that signature block contained in the Tricon Letter does not alter the conclusion that Vinmar entered into a binding contract as to all of the terms of the Tricon Letter on which the parties agreed. Under the Texas Uniform Commercial Code, Vinmar "signed" the Tricon Letter when it emailed its acceptance of it to Tricon on July 29, 2008. *See* TEX. BUS. & COM. CODE § 1.201(b)(37) (defining "signed" broadly as "using any symbol executed or adopted with present intention to adopt or accept a writing"); *see also id.* cmt. 37 ("[A]s the term 'signed' is used in the Uniform Commercial Code, a complete signature is not necessary. The symbol may be printed, stamped or written; it may be by initials or by thumbprint. It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead."); TEX. BUS. & COM. CODE § 2.201 cmt. 1 ("The required writing need not contain all the material terms of the contract and such material

terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. It may be written in lead pencil on a scratch pad. It need not indicate which party is the buyer and which the seller. The only term which must appear is the quantity term. . . ."); *id.* (the term "signed" "includes any authentication which identifies the party to be charged."); *Cox Eng'g, Inc. v. Funston Mach. & Supply Co.*, 749 S.W.2d 508, 511 (Tex. App.—Fort Worth 1988, no writ) (invoice letterhead constituted signature under § 1.201).

Vinmar cites nothing to the contrary. In *In re Bunzl USA, Inc.*, 155 S.W.3d 202 (Tex. App.—El Paso 2004, orig. proceeding), a case on which Vinmar relies, the court explicitly held that "if the parties have unconditionally assented to terms stated in an unsigned document, the document constitutes a binding written contract, regardless of whether it is signed." *Id.* at 209. Indeed, "a proper signature is by no means the only way a party can manifest assent to a contract." *Id.* at 210 (quoting *Stinson v. America's Home Place, Inc.*, 108 F. Supp. 2d 1278, 1283 (M.D. Ala. 2000)). Where no formal signature appears, other evidence may be relied upon to prove a party's assent. *Id.* at 209. Similarly, in *Scaife v. Associated Air Center Inc.*, 100 F.3d 406 (5th Cir. 1996), another case relied upon by Vinmar, the court noted that "[t]he issue of whether the parties required that the agreement be signed to be considered binding is one of intent, and, therefore, the issue is normally a fact question for the jury to decide." *Id.* at 410; *see also Koons v. Impact Sales & Mktg. Group, Inc.*, 2007 WL

4292423, at * 2 (Tex. App.—Fort Worth Dec. 6, 2007 (noting that the Code defines "signed" as "any symbol executed or adopted with present intention to adopt or accept a writing.").[8]

Here, there is an abundance of evidence manifesting Vinmar's assent. Most notably, of course, is Vinmar's July 29 email to Tricon, agreeing to most of the terms in the Tricon Letter, including the arbitration provision. (Ex. E). Although Vinmar attempts to dismiss this email as the unilateral act of a logistics employee, Laurentiu Pascu, the evidence establishes that his acceptance of the Tricon Letter was made only after consulting Rick Wilson, the trader who negotiated the deal. *See* Ex. O; *see also* Ex. E (Pascu forwarding email accepting majority of Tricon Letter's terms to Wilson). Pascu thus had actual authority to bind Vinmar to the Tricon Letter. *See Disney Enterprises, Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 30 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.) ("Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess."). Even if he had not consulted Wilson, Pascu undoubtedly had apparent authority to act on Vinmar's behalf. Tricon originally sent the Tricon Letter to Wilson himself (Ex. D), and it was Vinmar who elected to have Pascu issue Vinmar's response. (Ex. P); *see also Disney*, 981 S.W.2d at 30 ("Apparent agency exists where the principal's conduct would lead a reasonably prudent person to believe that the agent possessed the authority to act on behalf of the principal."); *Migerobe, Inc. v. Certina USA, Inc.*, 924 F.2d

---

[8] The other cases cited by Vinmar have little or no relevance to this case. In *Gasmark, Ltd. v. Kimball Energy Corp.*, 868 S.W.2d 925 (Tex. App.—Fort Worth 1994, no writ), for example, the parties had agreed "to operate under the common-law requirements of a formal offer and acceptance rather than under article 2 of the UCC." *Id.* at 928. Plainly, the case has no applicability to the instant dispute, which Vinmar concedes is governed by the Texas U.C.C. Similarly, in *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696 (Tex. App.—Houston [1st Dist.] 1988, writ denied), the "appellees concede[d] that no such writing [sufficient to satisfy the statute of frauds] exists," and instead argued that their case fell within the Code's "merchant exception." *Id.* at 706. Here, *multiple* writings exist that satisfy the Statute of Frauds, so the merchant's exception is irrelevant. Finally, in *Birenbaum v. Option Care, Inc.*, 971 S.W.2d 497 (Tex. App.—Dallas 1997, pet. denied), the court explicitly noted that it based its

1330, 1336 (5th Cir. 1991) ("Apparent authority exists when the principal clothes his agent with the semblance of authority such that a reasonably prudent person having knowledge of the business involved would be justified in believing, that the agent has the power the person assumes that he has.").

Vinmar's conduct further evidenced its belief that it had an enforceable contract when, on July 31, 2008, Rick Wilson instant messaged Brad Lockwood asking to "wipe the slate clean" by Tricon re-purchasing the MX. (Ex. Q). Plainly, there would be no slate to wipe clean if the parties did not already have an enforceable contract. *See Crest Ridge Constr. Group, Inc. v. Newcourt Inc.*, 78 F.3d 146, 150 (5th Cir. 1996) (finding that parties had a valid contract following their exchange of a price quotation and purchase order, as confirmed by the parties subsequent discussions concerning the details of the project). Indeed, Vinmar's internal documents also establish its understanding that it had a binding contract as early as July 24, 2008. After receiving the Tricon Letter, Rick Wilson forwarded it to Pascu noting that he had "bough[t] MX from Tricon," and asking him to "please contact them and make necessary arrangements." (Ex. P).

Critically, it was never expected that either party would affix its signature to the Tricon Letter. As Steve Simpson, an industry expert who has participated in over 1,000 transactions similar to this one, testified, "it is very unusual for these confirming letters to ever be signed by either party unless it is a long term contract which is not the case here." (Ex. K at ¶ 6). Similarly, Brad Lockwood testified that he never intended for Vinmar to sign the contract. (Ex. R, Lockwood Dep. at 67:2-4). Indeed, the language of the Tricon Letter itself reflects that it was not necessary for Vinmar to formally affix its signature. According

---

decision *not* on whether the fax header constituted a signature, but rather whether it indicated that a contract existed between the parties. *Id.* at 501-02.

to the contract, "[i]n the event we [Tricon] do not receive your response as requested, then this contract shall be the governing instrument." (Ex. D).

Finally, for the avoidance of any doubt, Vinmar's internal documents establish that it believed it had a binding contract that contained an arbitration agreement. Vinmar's own purchase order included an arbitration provision, stating that "[a]ll disputes arising in connection with the present contract shall be finally settled under the Rules of Conciliation and Arbitration of the American Arbitration Association and by one or more arbitrators appointed in accordance with the said rules." (Ex. N). Given this plethora of evidence establishing that Vinmar intended to be bound by its acceptance of the Tricon Letter's arbitration provision, regardless of whether it formally affixed its signature to the document, there can be no doubt that this dispute is properly before this Honorable Panel. Accordingly, Vinmar's Motion should be denied.

## CONCLUSION

For the reasons stated above, this Panel has jurisdiction to determine both arbitrability and the merits of Tricon's claims. Tricon respectfully requests that the Panel decline to entertain Respondent's Motion prior to the September evidentiary hearing, as arbitrability cannot be separated from the substantive merits of the case. Alternatively, Tricon requests that Respondent's Motion be denied in its entirety and that Tricon be awarded any such other and further relief to which it may show itself to be justly entitled.

Respectfully submitted,

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP

By: *(signature)*
George R. Diaz-Arrastia
Tracy D. Larson
Pennzoil Place, North Tower
700 Milam St., 10th Floor
Houston, Texas 77002
Tele: (713) 221-2500
Fax: (713) 228-3510
Email: gdarrastia@sdablaw.com

ATTORNEYS FOR CLAIMANT TRICON ENERGY, LTD.

Dated: August 11, 2010

{00109427.DOC; 1}