# APPENDIX TAB N

Tricon's Closing Statement and Post-Arbitration Brief
(without exhibits)

American Arbitration Association
Dallas, Texas

-----------------------------------------------------X

Tricon Energy, Ltd.,                          :

            Claimant,              :

      - against -                         :          Case No. 70 198Y 00168 09

Vinmar International, Ltd.,                    :

           Respondent.           :

-----------------------------------------------------X

## TRICON ENERGY, LTD.'S CLOSING STATEMENT
## AND POST-ARBITRATION BRIEF

Claimant Tricon Energy Ltd. ("Tricon") hereby submits this Closing Statement and Post-Arbitration Brief and would respectfully show the Panel as follows:

### I.     INTRODUCTION

In this straightforward breach of contract case, Vinmar International, Ltd. ("Vinmar") contracted to buy mixed xylene ("MX") from Tricon. When the transaction became unprofitable for Vinmar, it sought to renege on the agreement by concocting a story regarding an alleged missing term in the contract. Vinmar's version of the facts is not only internally inconsistent, it is in conflict with both the documentary evidence and the English language. Tricon respectfully requests that this Honorable Panel hold Vinmar liable for its breach of contract and award Tricon damages accordingly.

### II.     FACTUAL BACKGROUND

This case involves Vinmar's breach of a contract to purchase MX from Tricon. MX is a type of petrochemical known to have a very volatile price. (Tr. 488:2-3). Accordingly, contracts for the sale of MX must be executed quickly in order to capture the going market price, which

can change significantly from day to day. *See* Ex. T32. During the time period relevant here, the price of MX fell precipitously almost every day. From July 22, 2008 to September 15, 2008, the price of MX fell by approximately 28%, and by the end of the year, the price of MX had fallen by approximately 62%. (Ex. T32; Tr. 77:20-&8:14).

On July 22, 2008, Brad Lockwood[1] on behalf of Tricon and Rick Wilson on behalf of Vinmar entered into negotiations, facilitated by third-party broker Ed Leyman[2] of Moab Oil, Inc. ("Moab"), for Tricon's sale of 5,000 metric tons, plus or minus 5%, of MX to Vinmar. Both parties gave Leyman the authority to enter into a transaction on their behalf. (Tr. 243:7-245:11; Tr. 248:22-249:13 (Leyman)). Consistent with industry custom and practice, shortly after the parties reached an agreement on the material terms[3] the broker sent both parties a confirmatory memorandum memorializing the contract (the "Broker's Confirmation"). (Ex. J2). After receiving and reviewing the Broker's Confirmation, Vinmar requested to change the payment terms from 30 days after the bill of lading date to an at-sight letter of credit. (Ex. J11 at 7/22 4:09:37 PM). Tricon agreed to this change (Ex. J10 at 7/22 4:16:13 PM), and the Broker sent out a second memorandum reflecting amended payment terms. (Ex. J3). Consistent with a provision of the memoranda instructing the parties to contact Leyman "[i]f there [wa]s anything outlined contrary to [their] understanding of [the] agreement," Tricon immediately notified Leyman of a typo regarding the agreed upon price. (Tr. 65:1-24). Leyman therefore sent out another amended memorandum (the "Amended Broker's Confirmation") to correct the error. (Ex. J4). All three memoranda were sent on the broker's official letterhead. (Exs. J2-J4, Tr.

---

[1] Mr. Lockwood had been a trader for approximately six years, and has personally made over 900 trades. (Tr. 55:7-21). This is the first time a trade he has made with a U.S. counterparty has not been performed. (Tr. 55:25-56:6).
[2] Ed Leyman is known in the industry as being one of the best, most reputable brokers dealing with aromatics such as MX. (Tr. 467:8-18 (Simpson); Tr. 58:23-59:3 (Lockwood)). He has been brokering transactions of this type for over twenty years. (Tr. 240:19-20).
[3] The material terms of a contract to purchase MX are: the parties, price, quantity, quality, delivery, and

254:16-23; 255:21-22; 259:5-6 (Leyman)).  None mentioned origin, because origin "was not discussed in negotiations."[4]  (Tr. 259:24 (Leyman)).

Shortly after the parties reached an agreement, Wilson inquired with Leyman as to the origin of the MX.  Because origin had not previously been discussed, Leyman asked Lockwood, who informed him that the MX would "most likely" be U.S. origin, but he could not guarantee this.  (Tr. 283:23-284:6 (Leyman); 113:1-116:8 (Lockwood)).   Leyman relayed this information to Wilson, who made no objection.  (Tr. 284:7-9; 286:16-25).

On July 24, 2008, Tricon sent Vinmar a letter confirming this agreement and also proposing additional terms (the "Tricon Letter").[5]  (Ex. J5).  The Tricon Letter did not conflict with any of the terms of the Amended Broker's Confirmation.  (Tr. 428:18-432:1 (Wilson)). Like the Amended Broker's Confirmation, the Tricon Letter did not contain any reference to the origin of the MX.  *See* Ex. J5.  Included among the proposed terms was a provision regarding interest for non-payment and an agreement to submit any disputes to arbitration.  *Id.* at ¶¶ 9, 12. Wilson forwarded the letter to his colleague, Laurentiu Pascu, informing him that he had "bough[t] MX from Tricon" and asking him to "please contact them and make necessary arrangements."  (Ex. J6).

Later that same day, another colleague at Vinmar, Eduardo Anaya, emailed Wilson informing him that "[t]o complete [the] order we just need the port of origin of this product." (Ex. J8).  Consistent with his earlier conversation with Leyman, Wilson responded: "Re Origin,

---

payment window.  (Simpson Report, Ex. T36 at ¶ 4).
   [4] Where origin is important to either the buyer or seller, it must be included as an up front term, because it affects the possible delivery window.  (Tr. 67:4-22; Ex. T36 at ¶ 7).  In such cases, it is unambiguously included in the broker's confirmation under product quality.  (Exs. T1, T2, T3, T28, T30, T31; Tr. 478:21-479:25 (Simpson); 534:7-25 (Cofran)).
   [5] It is common in the industry for parties to exchanges letters of this type following the conclusion of a deal, a custom known as "passing paper."  (Tr. 480:1-10 (Simpson)).  These letters, which generally contain various terms and conditions, are not meant to cancel the deal, *see* Tr. 480:14-481:1 (Simpson), but only to replace the

{00113333.DOC; 1}

We wont [sic] know until we declare discharge port. Most likely USG [U.S. Gulf Coast]." *Id.* Anaya replied: "Ok, that is what we wrote on the PO." *Id.* The "PO" to which Anaya referred was Purchase Order 4529980 dated July 24, 2008 (the "Vinmar P.O."). (Tr. 361:10-17). The Vinmar P.O. repeated the same material terms as those set forth in the Amended Broker's Confirmation and the Tricon Letter, including the choice of law and arbitration clause according to which the parties agreed to settle any dispute by arbitration under the laws of Texas and the rules of the American Arbitration Association.[6] (Ex. T10). Notably, the Vinmar P.O. included a section for designating product "ORIGIN," but Vinmar left that section blank. *Id.*

Pascu subsequently made a few handwritten changes to the Tricon Letter with Vinmar's suggested changes. Pascu ran those changes by Wilson and, after being instructed to do so by Wilson, forwarded Vinmar's "comments" to Vuk Rajevac at Tricon on July 29, 2008. (Exs. T14, J13). Pascu's email was sent from his Vinmar email account and included his electronic signature. (Ex. J13). Other than these minor edits, Vinmar accepted Tricon's proposed terms, including arbitration. *Id.* None of Pascu's edits referenced the origin of the MX. *See id.*; Tr. 444:1-3. On July 29, Vuk Rajevac on behalf of Tricon promptly accepted all of Vinmar's comments, except for a request to change the demurrage time bar,[7] noting that "[y]our comments on the contract [are] well noted and accepted. . . ." (Ex. J14). In his email, Rajevac informed Vinmar unambiguously that there was a chance Tricon might supply Vinmar with Asian origin cargo. *Id.* Like Pascu's email, Rajevac's response included his email signature. *See id.*

---

documentation and expand upon it with some additional terms. (Tr. 321:6-25 (Rajevac); Tr. 73:10-19 (Lockwood); Ex. T36 at ¶ 6, Conc. ¶ 3).
    [6] The Vinmar P.O. was never sent to Tricon and is not part of the parties' contract. It is, however, strong evidence of Vinmar's state of mind.
    [7] The demurrage time bar is not at issue in this arbitration.

{00113333.DOC; 1}

On the morning of July 31, 2008, after the price of MX had fallen precipitously,[8] Wilson sent Lockwood an instant message, offering to sell back the MX it had purchased from Tricon and thereby "wipe the slate clean." (Ex. J12). Wilson made no reference to Rajevac's comment that the MX may be of Asian origin. *See id.* Tricon refused Vinmar's resale attempt and, a few hours later, Vinmar *for the first time* demanded a guarantee that the MX it had purchased be "USA origin." (Ex. J15). Tricon rejected Vinmar's request for a new term, as origin had never been discussed and Tricon could not simultaneously guarantee USA origin and satisfy the contract's delivery window.[9] *See id.* Then, on August 6, 2008, Vinmar, through Leyman, sent Tricon an email reiterating its new demand for a guarantee of USA origin and asserting for the first time that the parties did not have a deal.[10] (Ex. J18).

Pursuant to the Broker's Confirmation, Amended Broker's Confirmation, and Tricon Letter, Vinmar was required to declare a discharge port on August 8, 2008. (Exs. J2, J4, J5). By late afternoon that day, however, Vinmar still had not declared a discharge port and so Tricon sent an email reminding Vinmar of its contractual obligation. (Ex. J21). Tricon also informed Vinmar that if it did not make its declaration by the end of the day, Tricon would hold Vinmar in breach of contract and reserved the right to resell the product on the open market. *Id.* Tricon repeated this warning at 5:13 PM later that same day. *Id.* Although Vinmar acknowledged

---

[8] The market price of MX experienced a "historic fall" in 2008, dropping from $1355.50 per metric ton, as reported by Platts, on July 22, 2008 to $1258/mt on July 31, 2008. (Ex. T32; Tr. 76:11-5). This represented a fall of approximately 7%. (Tr. 77:15-19). The price continued to fall throughout 2008, declining approximately 28% to $983/mt by September 15, the time by which Vinmar was scheduled to take delivery, and 62% to $502/mt by December 15. (Ex. T32; Tr. 77:20-78:14). The price of MX tends to track the price of crude oil, which dropped from $147 per barrel to approximately $30 per barrel in the same time period. (Tr. 78:15-22; 488:4-6).

[9] During negotiations, Wilson had informed Leyman that the delivery window was particularly important. (Tr. 273:8-12; 286:4-11.).

[10] Vinmar stated it would proceed only if Tricon would change the terms of the contract to guarantee U.S. origin *and* allow Vinmar an extra week by which to declare the discharge port, while still insisting on delivery by September 15. (Ex. J18). As Vinmar knew, Tricon could not accept this proposal. It takes 30 to 45 days for MX to move from the Gulf of Mexico to Asia, and it can take longer if there is a delay passing through the Panama Canal. *See* Tr. 85:23-86:4; 334:8-13; 500:21-23; Ex. J15. If Vinmar did not declare the discharge port until August 15, it would be impossible for Tricon to guarantee delivery by September 15. (Tr. 85:9-86:4). Wilson's claim that this offer shows Vinmar's alleged "good faith" is both inaccurate and misleading.

{00113333.DOC; 1}

receipt of Tricon's emails, it refused to declare a discharge port on August 8, 2008 and thereby breached the parties' contract. *See id.*

Tricon thereafter attempted to find another buyer for the MX it had sold Vinmar.[11] However, because of the precipitously falling price of MX, the market was effectively frozen. When no buyer materialized, Tricon used the product to satisfy an existing contract it had with a third party, KP Chemical Corp. ("KP Chemical"). Specifically, three days after Vinmar's breach, Tricon elected to supply 5,000 metric tons of the MX on a C.F.R. basis to KP Chemical based on a previously existing long-term contract, for the weekly average of the daily price postings during the month of September. (Exs. T4, J22). Ultimately, this price ended up being $995.50 per metric ton. (Ex. T4). When the market continued to fall, KP Chemical requested, and Tricon agreed, to reduce the amount of MX KP Chemical purchased to 3230 metric tons. *See* Ex. J27. Because of the continuous price drop and frozen market, Tricon was unable to sell the remaining MX. (Tr. 89:19-90:8; 101:17-23).

On Oct. 6, 2008, Tricon sent Vinmar an invoice for an amount described as "DAMAGES BASED ON VINMAR'S REPUDIATION OF OUR SALES CONTRACT." (Ex. J26). Payment on the invoice was due on October 15, 2008. *See id.* To date, however, Vinmar has not made any payment towards this invoice. Tricon therefore instituted these arbitral proceedings to recover its losses.

---

[11] Tricon also offered Vinmar several commercial resolutions, such as (1) providing U.S origin MX of a similar specification with an estimated (but not guaranteed) first half September arrival; (2) providing U.S. origin MX of the identical specification by October 15, 2008; and (3) providing U.S. origin MX of the identical specification with an estimated (but not guaranteed) arrival date in the first half of September. (Exs. J21; J23). Without providing any rationale, Vinmar rejected all of these proposals. Given that Vinmar had lost the sale that it had intended to match to the Tricon MX purchase (Tr. 394:1-13) and had no buyers requiring U.S. origin MX at that time, its refusal to accept Tricon's offers based solely on Tricon's inability to guarantee first-half of September delivery is further illustrative of Vinmar's bad faith.

{00113333.DOC; 1}

### III.   ARGUMENT AND AUTHORITIES

This dispute is governed by the Texas Uniform Commercial Code - Sales, TEX. BUS. & COM. CODE § 2.101 *et seq.*, ("Texas UCC") because it arises out a conflict over a contract, formed and accepted in Texas, for the sale of goods. *See* TEX. BUS. & COM. CODE § 2.102.[12] Under the Texas UCC, there can be no dispute that the parties had a binding and enforceable contract for the sale of 5,000 metric tons of MX, plus or minus 5% at Tricon's option. There also can be no dispute that Tricon is entitled to damages for Vinmar's breach, as well as interest, costs, and attorney's fees.

### A.   This Panel Has Jurisdiction

As a threshold matter, Vinmar's contention that the Panel does not have jurisdiction to hear this dispute because Vinmar contests the existence of an arbitration agreement is both meritless and in direct conflict with governing Texas law. In *In re Rio Grande Xarin II, Ltd.*, Nos. 13-10-00115-CV, 13-10-00116-CV, 2010 WL 2697145 (Tex. App.—Corpus Christi July 6, 2010, pet. filed), the Corpus Christi Court of Appeals recently rejected an attempt to vacate an arbitral ruling based on the mere fact that the plaintiff did not first seek permission from a trial court to proceed with arbitration, even though the respondent had denied arbitrability from the outset. The court concluded that "[r]equiring a party who is initiating arbitration pursuant to contract to institute litigation prior to arbitration is *nonsensical*" as it "deprives the parties of the benefits of the contracted-for arbitration clause and defeats the purpose of providing a rapid, inexpensive alternative to traditional litigation." *Id.* at *6 (emphasis added and internal quotation

---

[12] Moreover, according to the parties' contract, they agreed that: "This contract and the rights and duties of the parties arising out of this contract shall be governed by and construed, enforced, and performed in accordance with the laws of the state of Texas, including, without limitation, the Uniform Commercial Code as in effect in the state of Texas...." (Ex. J5 ¶ 3); *see also* Respondent's Answer at 3 ("The Uniform Commercial Code applies to the alleged transaction at issue in this case...."). Accordingly, the Texas UCC governs this dispute.

{00113333.DOC; 1}

marks omitted).  Indeed, "[t]he purpose of an arbitration provision or agreement is to prevent subjecting the parties to litigation in the event of a dispute." *Id.*

Although both the Texas and federal arbitration statutes permit a party to institute court proceedings to obtain an order compelling arbitration, Texas law is clear that "they do not require it." *Id.* at *7; *see also Perry Homes v. Cull*, 258 S.W.3d 580, 592 (Tex. 2008) (noting that "parties may begin arbitration without a court order. . . ."). Both statutes also "contemplate that parties seeking to avoid arbitration may also seek a remedy in court." *Rio Grande*, 2010 WL 2697145, at *7 (citing 9 U.S.C. § 16(a)(1)(A); Tex. Civ. Prac. & Rem. Code § 171.098(a)(2)). Vinmar has chosen not to exercise its option to pursue a motion to stay.

Vinmar attempts to save its "nonsensical" argument by pointing to the unremarkable proposition that, *if* a party has filed either a motion to compel or motion to stay arbitration with a court of competent jurisdiction, then that court decides arbitrability as a threshold issue. *See Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (discussing proper procedure to follow in context of motion to compel arbitration and stay litigation); *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 129 (Tex. 2005) (discussing proper standard in motion to compel); *ODL Servs., Inc. v. ConocoPhillips Co.*, 264 S.W.3d 399, 403 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (addressing standard for court to apply in motion to compel and motion to stay). However, in this case no such motion has ever been filed. As held by the *Rio Grande* court, Vinmar does not obtain a stay of these arbitral proceedings by *not filing* a motion to stay with any court. *See Rio Grande*, 2010 WL 2697145, at *7.[13]

_____

[13] "Our decision on this issue is further compelled by the factual circumstances underlying this matter. Rio Grande first indicated its intention to institute arbitration proceedings on February 27, 2009. On March 23, the AAA notified the parties that it would proceed with administration of arbitration 'in the absence of an agreement by the parties or a court order staying this matter.' On April 1, Wolverine acknowledged its ability to file suit to avoid arbitration, yet failed to file suit until July 7, the eve of arbitration and more than three months after the AAA instituted proceedings, and, in fact, never sought to stay the arbitration."

{00113333.DOC; 1}

It is immaterial that, *after* an arbitral award is made, this panel's arbitrability decision is "subject to independent review by the courts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947, 115 S. Ct. 1920 (1995). No one disputes that, but it is totally irrelevant to whether the panel has jurisdiction to proceed. Vinmar can point to *no* case holding that an arbitration panel lacks the authority to decide its own jurisdiction where the judicial process has not been invoked by any party.[14] To the contrary, the AAA Commercial Arbitration Rules further confirm this Panel's authority to proceed. The Rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Commercial Arbitration Rule R-7(a). This Panel unquestionably has jurisdiction to determine both arbitrability and the merits of Tricon's claims.[15]

**B.     The Parties' Have an Enforceable Contract That Contains an Arbitration Provision and Satisfies the Statute of Frauds**

    **1.     The Parties Had an Enforceable Contract by July 23, 2008**

The parties had an enforceable contract no later than July 23, 2008, the date that Leyman sent out the Amended Broker's Confirmation.[16] The Texas UCC represents a practical approach to contract formation that reflects how parties deal with each other in the real world. *See, e.g., Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 198 (Tex. App.–Austin 1992, no writ) ("One policy goal of the UCC is to liberalize the formation of contracts so

---

[14] *See id.; see also Burlington Res. Oil & Gas Co. v. San Juan Basin Royalty Trust*, 249 S.W.3d 34 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (only after respondent affirmatively invoked the court through a motion to vacate did the court address arbitrability); *Holcim (Tex.) Ltd. P'ship v. Humboldt Wedag, Inc.*, 211 S.W.3d 796 (Tex. App.—Waco 2006, no pet.) (arbitration proceeded without court order despite respondent's objections to arbitrability).

[15] Vinmar's attorney, Mr. Lee, admitted that, if the Panel were to find in favor of Vinmar, he would view that as an enforceable award. (Tr. 41:22-42:7).

[16] The Amended Broker's Confirmation did not contain an arbitration provision, but as shown below, an arbitration provision was added to the contract on July 29, 2008. *See, infra*, Part III(B)(2).

{00113333.DOC; 1}

that the parties' intentions are not frustrated by the difficulties of fitting a transaction into the traditional common-law model of offer and acceptance."). Thus, a contract for the sale of goods "may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." TEX. BUS. & COM. CODE § 2.204(a); *see also id.* § 2.207(c) ("Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale . . . ."). Further, § 2.204 provides that a contract is enforceable even if the precise "moment of its making" is undetermined and even if it leaves open one or more terms so long as there is a "reasonably certain basis for giving an appropriate remedy." *Id.* § 2.204(b)-(c).

Under the Texas UCC, a broker's confirmation constitutes a binding contract. In *Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*, 992 F. Supp. 913 (S.D. Tex. 1998), a case strikingly similar to the instant dispute, defendant Hydro agreed to sell propane to plaintiff Statoil in two separate transactions brokered by Gasteam USA. *Id.* at 914. Following the conclusion of each deal, the broker telephoned the parties and sent each of them a confirming fax setting forth the material terms regarding quality, quantity, delivery, price and payment. *Id.* When the time came for Hydro's performance of the first deal, however, the price of propane had dropped, and so Hydro attempted to repudiate both contracts on the ground that the faxes were mere offers. *Id.* Relying on § 2.204(a), the court rejected Hydro's argument, holding that "[t]he only reasonable interpretation of the facts is that contracts were formed. Gasteam conveyed Statoil's offers to Hydro and Hydro's acceptance to Statoil. It then confirmed the transactions by telephone and fax. That is simple contract formation—offer and acceptance—occurring through a broker and documented in faxes." *Id.* at 915. Moreover, even if the faxes were mere offers, the court

{00113333.DOC; 1}

noted, Hydro did not object to them and thereby accepted them because "Hydro's silence in the face of 'confirming telefaxes' is acceptance." *Id.* The court thus concluded that Hydro breached the contracts by refusing to perform under them. *Id.*

Similarly, here, the parties negotiated a contract for the sale of MX via a broker who on July 22, 2008, the same date that the parties entered the contract, memorialized it by faxing both parties a memorandum "confirm[ing] the . . . transaction as per our telecom on: 7/22/2008" and setting forth a number of the material terms of the parties' contract, including product, price, quantity, and quality, as well as payment, inspection, title, commission, and delivery terms. (Ex. J2). Although the memorandum contained a typo as to price, Lockwood notified the Broker of the error, and Leyman corrected it in the Amended Broker's Confirmation that he faxed both parties the next day. (Ex. J4). As in *Den Norke*, these facts demonstrate "simple contract formation—offer and acceptance—occurring through a broker and documented in faxes." 992 F. Supp. at 915. There can be no serious doubt that the Amended Broker's Confirmation was an enforceable contract.

   2.   **The Tricon Letter, Including the Arbitration Provision, Became an Enforceable Contract When it Was Accepted by Vinmar**

      a.   **The Amended Broker's Confirmation Was Modified and Added to by the Tricon Letter**

The parties had an enforceable agreement no later than July 23, 2008, the date the broker sent out the Amended Broker's Confirmation reflecting the correct terms to which the parties had agreed. However, the parties plainly were free to subsequently add to or modify those terms. *See* TEX. BUS. & COM. CODE § 2.209(a) ("An agreement modifying a contract within this chapter needs no consideration to be binding."). Indeed, Vinmar took advantage of this right to modify when it requested that Tricon agree to change the payment terms to an at-sight letter of

{00113333.DOC; 1}

credit. (Ex. J11 at 7/22 4:09:37). The broker subsequently sent out the "amended contract" reflecting the newly negotiated term. (Ex. J3). Thus, pursuant to § 2.209, the terms of the Tricon Letter to which Vinmar assented in its July 29, 2008 email to Tricon —including the arbitration provision—became binding on the parties. *See* Ex. J13.

In a similar case, *In re Laibe Corp.*, 307 S.W.3d 314 (Tex. 2010), the plaintiff argued against enforcement of a forum selection clause contained in a later agreement, where the original purchase order did not have any such provision. The Supreme Court of Texas disagreed, citing § 2.209(a). According to the Court, "an agreement modifying a contract for the sale of goods requires no new consideration to be binding." *Id.* at 317. Because the contract as a whole did not lack consideration, the new terms contained in the later agreement, including the forum selection provision, governed.[17] *Id.*; *see also Graybar Elec. Co., Inc. v. LEM & Assocs., L.L.C.*, 252 S.W.3d 536, 546 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The Court further noted that "a contract can consist of more than one document. Documents 'pertaining to the same transaction may be read together,' even if they are executed at different times and do not reference each other, and 'courts may construe all the documents as if they were part of a single, unified instrument.'"[18] *In re Laibe*, 307 S.W.3d at 317 (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000)).

Vinmar can cite no authority holding that parties cannot modify a binding agreement. In prior pleadings, the best it could muster were cases where a party never agreed to the additional

---

[17] The Court also found it significant that the later contract contained a merger clause, stating that "this Contract is the entire agreement." *Id.* The Tricon Letter contains a similar provision, noting that "[t]his [contract] cancels and supercedes any broker correspondence in relation to this transaction. . . ." (Ex. J5). Vinmar's attempt to transform this standard merger provision into some sort of repudiation is inconsistent with Texas law, as well as industry custom and practice. *See* Ex. T36 at ¶ 6, Conclusion ¶ 3.

[18] Vinmar attempts to argue that, because Tricon asserts that the Amended Broker's Confirmation is a binding contract, then terms not contained therein cannot be a part of the agreement. This is directly contrary to Texas law, as—like the court noted in *In re Laibe*—a contract can consist of multiple documents. Tricon noted this in its responses to Vinmar's Requests for Admission, stating unequivocally that the Amended Broker's confirm did

{00113333.DOC; 1}

terms contained in the later agreement because they were included on a shipping label or other unilateral document.[19]   Here, in contrast, Vinmar accepted most of the terms in the Tricon Letter—including the arbitration provision—in its July 29, 2008 email to Tricon.  (Ex. J13). Tricon promptly accepted Vinmar's proposals, noting that "your comments on the contract [are] well noted and accepted. . . ." (Ex. J14).   Having negotiated and agreed to the additional terms proposed in the Tricon Letter, including arbitration, Vinmar cannot now escape enforcement of those terms. *See In re Laibe*, 307 S.W.3d at 317.

      **b.**    **Alternatively, the Tricon Letter is an Enforceable Contract Pursuant to Article 2.207**

Even if the Amended Broker's Confirmation was not a binding contract—and it plainly was—the result is no different, as the Tricon Letter is a binding contract under TEX. BUS. & COM. CODE § 2.207(a).   Under § 2.207(a), "[a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon. . . ." According to Comment 1 to this section, it "is intended to deal with two typical situations." *Id.* cmt. 1.  The first is where the writing constitutes a written confirmation of an agreement that has been reached either orally or by informal correspondence between the parties. *Id.* Under this scenario, the written confirmation can "add[] terms not discussed."

---

*not* set forth all of the terms of the parties' contract.  (Ex. V24).

[19] *See Tubelite v. Risica & Sons, Inc.*, 819 S.W.2d 801, 802 (Tex. 1991) (agreement to pay interest contained on "acknowledgement" and shipping invoices, which the Defendant never reviewed or commented on); *Int'l Metal Sales, Inc. v. Global Steel Corp.*, No. 03-07-00172-CV, 2010 WL 1170218, at *4 (Tex. App.—Austin March 24, 2010, pet. filed) (forum selection clause included on invoice sent with goods); *Axelson, Inc. v. McEvoy-Willis*, 7 F.3d 1230, 1232 (5th Cir. 1993) (cancellation term included on purchase order sent six months after contact formation that the defendant never responded or commented on); *Migerobe, Inc. v. Certina USA, Inc.*, 924 F.2d 1330, 1335 (5th Cir. 1991) (additional terms contained on purchase order that was never commented or acted upon by recipient and jury found was not binding); *Contractor's Source Inc. v. Hanes Cos., Inc.*, No. 09-cv-0069, 2009 WL 6443116, at *1 (S.D. Tex. Dec. 29, 2009) (limitation of liability contained on invoice mailed *after* goods had been received); *Enpro Sys., Ltd. v. Namasco Corp.*, 382 F. Supp. 2d 874, 883 (S.D. Tex. 2005) (additional terms contained on delivery ticket and invoice without comment or assent from defendant; ticket was not even sent to department that had placed the order).

{00113333.DOC; 1}

*Id.* The second situation is "offer and acceptance," where the "acceptance" contains new or different terms from the offer. *Id.* Depending on whether the Panel finds that the agreement negotiated by the broker was a binding contract, the Tricon Letter satisfies either situation.

### i. If the Amended Broker's Confirmation is Not Binding, the Tricon Letter was a Written Confirmation of the Parties' Informal Agreement

Under industry custom and practice, Tricon and Vinmar had an enforceable contract when the broker obtained the assent of both parties to the material terms of the deal. (Ex. T36 at ¶ 4, 6, Conc. ¶ 1; Tr. 248:13-18 (Leyman)). Where the deal is negotiated through a broker, the broker has authority to act on behalf of both the buyer and seller. Ex. T36 at ¶ 5; *Den Norske*, 992 F. Supp. at 915. If for some reason the Panel concludes that the Amended Broker's Confirmation is not a satisfactory written memorial of that agreement sufficient to satisfy the statute of frauds, then the Tricon Letter is a binding contract under the first § 2.207(a) situation—a written confirmation of a prior oral and/or informal agreement.

It is immaterial whether the parties had discussed arbitration prior to Vinmar's receipt of the Tricon Letter, as § 2.207 specifically permits the written confirmation to "state[] terms additional to or different from those offered or agreed upon. . . ." TEX. BUS. & COM. CODE § 2.207(a). Whether those additional terms became part of the parties' contract is dependent on § 2.207(b). *See id.* cmt. 3. Under that provision, the additional terms, including the arbitration provision, became part of the agreement unless: "(1) the offer expressly limits acceptance to the terms of the offer; (2) they materially alter it; or (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." TEX. BUS. & COM. CODE § 2.207(b). None of these exceptions apply. The offer did not did not expressly limit acceptance to the terms provided therein (indeed both parties

{00113333.DOC; 1}

consented to minor changes requested by the other), neither the arbitration provision nor the other suggested terms materially altered the transaction, and no objection to the majority of the terms ever was received until Tricon instituted these proceedings.  To the contrary, Vinmar agreed to the bulk of the proposed terms, including the arbitration provision,[20] in its July 29, 2008 email to Tricon.  (Ex. J13).  Thus, those terms became part of the parties' agreement.  *See Ceco Corp. v. Steves Sash & Door Co., Inc.*, 714 S.W.2d 322, 327 (Tex. App.— San Antonio 1986), *mod'd and rev'd in part on other grounds by*, 751 S.W.3d 473 (Tex. 1988).

### ii.    Vinmar Accepted the "Offer" in the Tricon Letter

Even if the brokered transaction did not result in a binding contract—which, under Texas law, it plainly did—under § 2.207(a), the Tricon Letter constitutes an offer and Vinmar's July 29, 2008 email agreeing to most of the terms set forth therein—including the arbitration provision—constitutes the acceptance.  To the extent Vinmar's July 29, 2008 email proposed any changes to the terms of the Tricon Letter, those proposed changes are relevant only in identifying the final terms of the contract under TEX. BUS. & COM. CODE § 2.207(b).  They do not alter the conclusion that a contract was formed.  *See Tri-State Petroleum Corp. v. Saber Energy, Inc.*, 845 F.2d 575, 578-79 (5th Cir. 1988) (where a written contract sent by the first party is returned by the second party, but altered by additional or different terms, § 2.207(a) allows the return of the contract to act as acceptance of the offer with the alterations as proposals for additions to the contract); *see also Westech Eng'g*, 835 S.W.2d at 198-99.  Significantly, Tricon then accepted all of Vinmar's proposed changes, except for demurrage time bar, which is not at issue in this case. (Tr. 303:15-21; Ex. J14).

---

[20] Indeed, Vinmar's own internal purchase order also reflected an arbitration provision.  (Ex. T10).

{00113333.DOC; 1}

To avoid any doubt, Vinmar's own conduct conclusively establishes that it believed it had entered an enforceable contract.[21]  For example, on July 24, 2008, Rick Wilson forwarded the Tricon Letter to Pascu noting that he had "bough[t] MX from Tricon," and asking him to "please contact them and make necessary arrangements."  (Ex. J6).  Wilson similarly emailed a ship charterer, Nicklas Smith, on July 22, 2008, noting that he had "bought CFR."  (Ex. V2).  Vinmar also drafted a purchase order and entered data into its SAP system to internally memorialize the deal.  (Exs. T10, T11, T12).  Significantly, the Vinmar P.O. (Ex. T10) also contains an arbitration provision identical in all its material terms to the arbitration provision in the Tricon Letter, showing that Vinmar agreed to arbitration.  (Ex. T10).  Later, on July 31, 2008, Rick Wilson instant messaged Brad Lockwood attempting to re-sell the MX Vinmar had committed to purchase from Tricon by requesting to "wipe the slate clean."  (Ex. J12).  There can be no serious doubt that Vinmar believed it had entered into a binding contract with an arbitration provision.

### 3.    The Contract Satisfies the Statute of Frauds

Both the Amended Broker's Confirmation and Tricon Letter satisfy the Texas UCC's statute of frauds.  Contrary to Vinmar's contentions, the UCC does not require that the parties take pen to paper and write their names for the writing to be "signed."  Rather, the UCC defines "signed" broadly as "using any symbol executed or adopted with present intention to adopt or accept a writing."  TEX. BUS. & COM. CODE § 1.201(b)(37); *see also id.* § 2.201 cmt. 1 (the term "signed" "includes any authentication which identifies the party to be charged.").[22]

---

[21] "Conduct by both parties which recognizes the existence" of the contract is evidence of formation of the contract. TEX. BUS & COM CODE § 2.204(a).

[22] *See also id.* ("The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. It may be written in lead pencil on a scratch pad. It need not indicate which party is the buyer and which the seller. The only term which must appear is the quantity term. . . .").

{00113333.DOC; 1}

Texas courts have held that invoices, letterhead, and letters discussing the agreement all can satisfy the statute of frauds. *See, e.g. Cox Eng'g, Inc. v. Funston Mach. & Supply Co.*, 749 S.W.2d 508, 511 (Tex. App.—Fort Worth 1988, no writ) (invoice letterhead constituted signature under § 1.201); *Lone Star Gas Co. v. EFP Corp.*, 63 S.W.3d 463, 468 (Tex. App.—Waco 2000), *rev'd on other grounds*, 92 S.W.3d 417 (Tex. 2001) (invoices printed on party's letterhead "are sufficient to satisfy the statute of frauds. . . ."); *Central Power & Light Co. v. Del Mar Conservation Dist.*, 594 S.W.2d 782, 790 (Tex. App.—San Antonio 1980, writ ref'd n.r.e.) ("[A] valid memorandum of the contract may consist of letters and telegrams signed by the party to be charged and addressed to his agent or the other party to the contract, or even to a third party. . . ."); *Taggart v. Crews*, 521 S.W.2d 703, 708 (Tex. App.—San Antonio 1975, writ ref'd n.r.e.) (same).

Vinmar's assent to both the Amended Broker's Confirmation and the Tricon Letter is abundantly clear. First, Vinmar "signed" the Amended Broker's Confirmation, as the broker was authorized to enter into the transaction on Vinmar's behalf. *See* Tr. 249:1-7 (Leyman). As Leyman testified, the Amended Broker's Confirmation was sent on behalf of both parties. (Tr. 256:16-18; 259:9-11). It was sent on the broker's official letterhead, which constitutes a signature under the plain language of the Texas UCC. *See* TEX. BUS. & COM. CODE § 1.201(b)(37); *Cox Eng'g.*, 749 S.W.2d at 511; Tr. 254:16-23; 255:21-22; 259:5-6 (Leyman). Indeed, the comments to TEX. BUS. & COM. CODE § 1.201 specifically provide that the signature "may be printed, stamped or written; it may be by initials or by thumbprint. It may be on any part of the document and in appropriate cases *may be found in a billhead or letterhead.*" TEX. BUS. & COM. CODE § 1.201 cmt. 37 (emphasis added).

{00113333.DOC; 1}

In *Den Norske, supra,* the court agreed that nearly identical faxed broker's confirmations satisfy the statute of frauds. *See* 992 F. Supp. at 915. The court rejected Hydro's attempt to escape the effects of an unprofitable contract pursuant to the statute of frauds, noting that "Gasteam was the broker for both parties and acted with the authority of both parties. ... Gasteam prepared, signed, and delivered the faxes to both parties. Each fax constitutes 'a writing ... signed by ... [an] authorized agent or broker.' ... Gasteam had the authority to convey information between the parties. Gasteam sent signed, confirming faxes to the parties. The statute of frauds requires nothing more." *Id.* The same is true here. Leyman was acting under the authority of both Vinmar and Tricon. He prepared, signed, and delivered the faxes to both parties. Under Texas law, nothing more is required.

Vinmar next "signed" the Tricon Letter in its July 29, 2008 email to Tricon, agreeing to most of its terms, including the arbitration provision. (Ex. J13).[23] Pascu not only made handwritten comments to the Tricon Letter, he signed the memorandum to Rajevac with his email signature, "Laurentiu Pascu, Vinmar International, Ltd." *Id.* This easily satisfies the statute of fraud's flexible requirements. *See* TEX. BUS. & COM. CODE § 1.201(b)(37); *id.*

---

[23] Vinmar's attempt to dismiss Pascu's email agreeing to the Tricon Letter as the unilateral act of a logistics employee fails as both a legal and factual matter. Wilson testified unequivocally that it was Pascu's job to complete "all the financial and contractual agreements" necessary to finalize the transaction. (Tr. 426:14-427:8). Tricon rightfully relied on Pascu's authority to negotiate additional terms, as individuals like Pascu become "the face of the company" after the traders agree upon the material terms of a deal and turn the remaining details over to them to enable the trader to focus on entering into more transactions. (Tr. 289:20-25 (Rajevac)). Additionally, Pascu's acceptance of the Tricon Letter was made after consulting Wilson, and it was Wilson who instructed Pascu to contact Mr. Rajevac. (Ex. T14; Tr. 377:12-21). Pascu undoubtedly possessed actual authority to bind Vinmar to the Tricon Letter. *See Disney Enters., Inc. v. Esprit Fin., Inc.,* 981 S.W.2d 25, 30 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.) ("Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess.").

Even if actual authority did not exist, Pascu plainly had apparent authority, as Tricon was cc'ed on Wilson's email to Pascu instructing him to complete the arrangements for the transaction. (Ex. J6); *see also Disney,* 981 S.W.2d at 30 ("Apparent agency exists where the principal's conduct would lead a reasonably prudent person to believe that the agent possessed the authority to act on behalf of the principal."); *Migerobe, Inc. v. Certina USA, Inc.,* 924 F.2d 1330, 1336 (5th Cir. 1991).

{00113333.DOC; 1}

cmt. 37; TEX. BUS. & COM. CODE § 2.201; *see also D & M Edwards, Inc. v. Bio-Cide Int'l, Inc.*, No. 3:08-CV-0670-L, 2009 WL 102732, at *3 (N.D. Tex. Jan. 4, 2009) (granting leave to amend pleadings to attach e-mail that would be sufficient to satisfy the statute of frauds); *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295-96 (7th Cir. 2002) ("[T]he sender's name on an e-mail satisfies the signature requirement of the statute of frauds."); *Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1362 (Fed. Cir. 2005) (name on email satisfies the statute of frauds); 15 U.S.C. § 7001(a)(1) ("[A] signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form.").

That neither party's signature appears in the Tricon Letter's signature block is irrelevant. Under Texas law "the question of whether a written contract must be signed to be binding is a question of the parties' intent." *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, orig. proceeding). "[I]f the parties have unconditionally assented to terms stated in an unsigned document, the document constitutes a binding written contract, regardless of whether it is signed." *Id.* Notably, "a proper signature is by no means the only way a party can manifest assent to a contract." *Id.* at 210; *see also Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 410 (5th Cir. 1996) ("The issue of whether the parties required that the agreement be signed to be considered binding is one of intent, and, therefore, the issue is normally a fact question for the jury to decide."). Here, it never was expected that either party would sign the Tricon Letter. As Steve Simpson, an expert who has participated in over 1,000 petrochemical trades, testified, he has never seen additional terms signed on spot deals. (Tr. 482:11-483:5; *see also* Ex. T36 at ¶ 6). Similarly, Brad Lockwood testified that the signature blanks are generated automatically by the system. (Tr. 136:25-137:8; 140:11-15). He never expected Vinmar to sign the contract, as contracts for "spot purchases" are virtually

{00113333.DOC; 1}

never signed.   (Tr. 74:15-75:4; *see also* Tr. 319:6-20 (Rajevac)).   Tellingly, Vinmar

introduced no evidence to the contrary.   Both the Amended Broker's Confirmation and the

Tricon Letter easily satisfy the statute of frauds.   Accordingly, Vinmar is bound to the terms

included therein, including the arbitration provision.

**C.      The Parties' Contract Did Not Include a Guarantee of U.S. Origin**

> **1.      The Plain Language of the Contract Establishes That There Was no Origin
> Guarantee**

Under industry custom, where origin is agreed upon, that information is included clearly

and unambiguously in the broker's confirmation under the "quality" heading.   *See* Exs. T1, T2,

T3; *see also* Tr. 478:24-479:25 (Simpson); Tr. 534:7-536:7 (Cofran).   Here, the parties have an

unambiguous written agreement, comprised of the broker's confirmations, the Tricon Letter, and

the correspondence finalizing the terms of the deal.   Nowhere, in *all* of this documentation, is

there any mention of the origin of the MX.   (Tr. 422:24-423:5).   The reason for this is patently

obvious.   As the broker unequivocally testified, origin "was not discussed in negotiations."   (Tr.

259:24; *see also* Tr. 263:11-14; 283:23-284:9; 286:23-25).   Even Wilson admitted that he did not

comment on the fact the origin was not included in the contractual documentation for *nine* days,

until after the price of MX had dramatically fallen.   (Tr. 423:6-19).

The only "evidence" Vinmar has of its purported request for U.S. origin MX is the

testimony of a trader who admitted to being distracted and "completely unplugged from the day-

to-day operations of [his] job."   (Tr. 407:14-16).   Wilson's testimony cannot withstand even

minimal scrutiny.   The evidence is undisputed that Wilson received three separate confirmations,

none of which included a guarantee of U.S. origin.   (Exs. J2-J4).   Under industry custom, this

means that the contract was for open origin MX.   (Tr. 476:16-21 (Simpson)).   Wilson cannot

deny he reviewed the confirmations, as he requested a change in the payment terms after

{00113333.DOC; 1}

receiving the first confirmation. (Ex. J11). Wilson also testified that he noticed the error in price. (Tr. 422:2-6). Wilson then received the Tricon Letter, which is similarly silent on origin. (Ex. J5). Vinmar took advantage of the opportunity to suggest changes to the Tricon Letter, but none of its requested changes referenced the origin of the material. (Ex. J13; Tr. 378:5-8). These edits were sent to Tricon only after they were reviewed by Wilson, and it was Wilson who instructed Pascu to contact Rajevac. (Ex. T14). The edits also were made by an individual who Wilson now claims was aware of the purported need for U.S. origin material. (Tr. 447:18-20).

Vinmar's own purchase order and internal correspondence further confirm that a U.S. origin guarantee was never part of the deal. (Exs. J8, T10). On July 25, 2008, Vinmar's Eduardo Anaya emailed Wilson informing him that "[t]o complete the order we just need the port of origin of this product." (Ex. J8). Wilson replied unequivocally that he did not know the origin of the MX stating, "Re origin, we won[']t know until we declare discharge port. Most likely USG [U.S. Gulf]."[24] *Id.* At the eleventh hour,[25] Vinmar attempted to explain away this damaging email, alleging that by stating "origin," Anaya and Wilson actually meant "load port."[26] Aside from being wholly unsupported the plain language of the email, Vinmar's concocted explanation defies logic. Anaya stated that he needed the origin information to complete the purchase order. The purchase order he was referring to was Vinmar P.O. 4529980. (Tr. 361:10-17). This purchase order contains a blank for "origin," which was conspicuously left

---

[24] As Wilson admitted—and common sense dictates—stating that something is "most likely" of a specific origin is not equivalent to saying it is guaranteed. (Tr. 433:19-23). Additionally, Mr. Simpson testified that someone in the industry would read Anaya and Wilson's emails to be referring to where the material was produced. (Tr. 486:6-12).
[25] Vinmar's specious explanation appeared nowhere in its answer or prehearing brief. It also was not mentioned by Pascu in his deposition, although he attempted to alter his testimony at the hearing to accommodate Vinmar's late-developed story. *Compare* Tr. 381:22-383:15 *with* Tr. 551:16-552:3.
[26] As Vinmar's expert, Gary Cofran, admitted, origin and load port are entirely different terms, and origin refers to where the product is manufactured. (Tr. 533:1-7). In contrast, load port refers to where the material is loaded onto the vessel for shipping. (Tr. 484:9-13 (Simpson)). It is entirely possible for material of Asian origin to nonetheless be loaded from a port in the United States. (Tr. 339:18-25 (Rajevac); 484:17-19 (Simpson): 456:11-18 (Wilson)).

{00113333.DOC; 1}

blank. (Ex. T10). Nowhere does the Vinmar P.O. contain *any* reference or blank for the loading port.[27] *See id.*

Pascu's original testimony likewise verifies that Vinmar never believed it had purchased MX with a guarantee of U.S. origin. Pascu testified that the information in the Vinmar P.O. is based on input from the SAP system. (Tr. 364:21-25; 366:15-18). The Vinmar P.O. cannot be printed until the information contained therein is first approved by the trader. (Tr. 366:21-367:16). In this case, the origin of the material was left blank because nothing was entered into the system regarding origin before the P.O. was printed. (Tr. 369:15-25). Pascu also testified that the reason nothing was entered with respect to origin was that no one told him that the MX had to be U.S. origin:

> Q. Before July 29th, 2008, did anyone ever tell you that the MX that Vinmar was buying from Tricon had to be of U.S. origin?
>
> A. As mentioned, as a supply chain specialist, we are handling the data that is provided by the commercial person. We have entered the data and the data is -- appear exactly what you see here in these -- in this (indicating).
>
> Q. And what we saw is that no data was ever entered about the origin of the material?
>
> A. Right.
>
> Q. So my question to you is, does that mean that no one ever told you that the MX had to be U.S. origin?
>
> A. Should be the case. Whatever data we get, we are inputting it into the system.
>
> Q. The only thing that you were told about the origin of the material is that you would know it once the discharge port was declared. Right?

---

[27] Wilson's testimony that the SAP system required information on load port thus fails as a factual matter. *See* Tr. 405:15-21.

{00113333.DOC; 1}

> A.   Again, whenever we are inputting, yes, the data, we want to make sure that the data
>
> is correct.  We -- most likely, we did not get information about the date of origin;
>
> therefore, we did not input.

Tr. 382:20-383:16.[28]

Pascu later attempted to retract this unequivocal testimony, claiming that he had been informed by Wilson that the MX was going to be of U.S. origin.  (Tr. 544:8-13).  To save this newly minted argument, Pascu pointed to screen shots allegedly made of Vinmar's SAP system. (Tr. 548:13-25).  These highly suspect screen shots should not be given credence by the Panel. On their face, they state that they were created by Eduardo Anaya, not Pascu.  *See* Ex. V4. Tricon attempted to take Anaya's deposition, but was told by Vinmar's counsel that he had left Vinmar and Vinmar was unable to locate him.  Additionally, the screen shots are purportedly dated July 24, 2008, but Wilson's response to Anaya's email requesting information on the "port of origin" of the MX is dated a day later, July 25, 2008, and Wilson's response was that the origin would not be known until the discharge port was declared (not until August 8).  (Ex. J8). More damning, the screen shots conflict with Pascu's earlier testimony that the Vinmar P.O. was silent on origin because nothing was entered into the SAP system regarding that term.  (Tr. 369:15-25).  Pascu was wholly unable to explain this glaring inconsistency in his testimony.[29] *See, e.g.*, Tr. 568:20-570:15.

Vinmar's story also requires the Panel to believe that Vinmar would have made *no* mention that there was a problem with the transaction for almost two days after it learned— through Rajevac's unambiguous email—that Tricon might be delivering Asian origin MX.

---

[28] *See also* Tr. 369:15-25 ("Q: Do you see where there is a line that says "origin"?  A: Yes.  Q: And it is blank. Correct?  A: Yes.  Q: And would that be because no origin was entered into the system prior this being printed?  A: It would have been that the word here was not entered into the system, yes.  Q: Before this was printed?  A: Before this was printed.").

{00113333.DOC; 1}

Rajevac's email was received at 4:43 P.M. on July 29, 2008, yet neither Wilson nor Pascu made any mention of the need for U.S. origin until 1:43 PM on July 31, even though Wilson engaged in instant message communications with Lockwood earlier that day. *See* Exs. J12, J14, J15. This defies credulity. Both Wilson and Pascu now assert that Pascu was aware of Vinmar's need for U.S. origin from the outset. (Tr. 447:18-20; Tr. 544:4-13). As Simpson and Rajevac testified, had origin actually been a material term required by Vinmar, it would have taken Pascu less than a minute to alert Wilson to the problem. (Tr. 483:16-484:1; Tr. 233:3-12). Even if Wilson had been unavailable by telephone, as the Panel is undoubtedly aware, it would have taken less than thirty seconds for Pascu to have sent Wilson an email discussing the problem.[30] (Tr. 509:4-6).

All of the credible evidence in this case substantiates Leyman's unambiguous testimony that Vinmar did not specifically request U.S. origin MX when it authorized him to enter into the contract with Tricon on its behalf. The panel should reject Vinmar's attempt to distort the facts by concocting a story that conflicts with the plain meaning of the English language and relies on highly suspect documents.

### 2. Assuming Vinmar Required U.S. Origin, Vinmar Made a Unilateral Mistake By Neglecting to Include that Term in the Contract

Wilson testified that, by July 23, 2008, the day of the final Amended Broker's Confirmation, the sale that Vinmar had anticipated matching with the Tricon purchase had fallen

---

[29] At his deposition, Pascu could not answer simple questions, like whether Rick Wilson was a trader (Tr. 349:19-350:10) or whether there was a dispute between Tricon and Vinmar. (Tr. 351:3-8).

[30] Vinmar argues unconvincingly that Wilson was made aware of Mr. Rajevac's email only minutes before he sent his response demanding U.S. origin by pointing to Exhibit J14, in which Pascu forwards Mr. Rajevac's email to Wilson. Aside from requiring the Panel to believe that the operations specialist would have withheld such critical information for almost two days, this version of the facts is directly refuted by the documentary evidence. Over an hour earlier, Vinmar already had contacted Leyman to claim that there was a "problem." *See* Ex. T5 at 7/31/08 12:16:02 PM). Thus it is plainly *not* the case that Wilson only learned of Mr. Rajevac's response to Vinmar upon receipt of Pascu's July 31 email. Indeed, even Wilson refused to testify that he had been made aware of Tricon's email that late. (Tr. 459:22-460:1).

{00113333.DOC; 1}

through. (Tr. 394:1-13). Vinmar had no September delivery contracts requiring U.S. origin MX,[31] so it did not require MX of U.S. origin to satisfy any pending sales.[32] Its eleventh hour demand for U.S. origin was thus nothing but a thinly veiled subterfuge to renege on what turned out to be an unprofitable transaction. However, even assuming Wilson made a mistake regarding the inclusion of a guarantee of U.S. origin in the contract, Vinmar is still bound by the parties' written agreement, which makes no origin guarantee. Consistent with the broker's confirmations and Tricon Letter, Tricon believed it was selling open origin MX. *See* Tr. 83:16-18; 110:17-19. Any mistake was therefore unilateral on the part of Vinmar and does not entitle Vinmar to relief.

Under Texas law, "a unilateral mistake by one party to an agreement is not a ground for relief when the mistake was not known to the other party or induced by the other party." *Kendziorski v. Saunders*, 191 S.W.3d 395, 407 (Tex. App.—Austin 2006, no pet.). To be entitled to equitable relief on the grounds of unilateral mistake, a party must show that: (1) the mistake is of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake was made regardless of the exercise of ordinary care; *and* (4) the parties can be placed in status quo in the equity sense; *i.e.*, rescission must not result in prejudice to the other party. *Id.*

Plainly, Vinmar cannot satisfy this test. If indeed Wilson made a mistake, it was not known to Tricon and Tricon did nothing to induce it. The contract was not unconscionable. To the contrary, it was reflective of the market price at the time of contracting. *See* Ex. T32. In

---

[31] In response to Tricon's Fourth Requests for Production, Vinmar agreed to produce "documents pertaining to any sales or possible sales of U.S. origin MX into Asia by Rick Wilson during the relevant time period." *See* Ex. T34. Tellingly, Vinmar had *no* contracts requiring U.S. origin MX.

[32] Wilson's assertion that he needed U.S. origin MX to supply to Asian purchasers in order to break a purported "monopoly" is not credible. The companies to which Vinmar was attempting to supply, such as Formosa, purchase Asian origin MX "all the time." (Tr. 491:17-24 (Simpson)). MX is a commodity, so as long as the material meets the required specification, it is completely irrelevant where the material was produced. (Tr. 473:24-474:2 (Simpson)). For that reason, origin is rarely important to either party in a transaction for MX. (Tr. 473:10-23).

{00113333.DOC; 1}

fact, Vinmar had hoped to resell the MX it bought from Tricon to another party for $15 more per metric ton, which would have netted Vinmar approximately $75,000. (Tr. 416:2-6). Origin also is not a material feature of a contract for the sale of MX. *See* Ex. T36 at ¶¶ 4, 7. Wilson did not exercise ordinary care if he failed to realize that origin was omitted from the contract. *See Turberville v. Upper Valley Farms, Inc.*, 616 S.W.2d 676, 679 (Tex. Civ. App.—Corpus Christi 1981, no writ) (no relief for unilateral mistake where reasonably prudent person would have noticed mention of right-of-way in deed and investigated its implications); *see also* Tr. 531:23-532:1 (Cofran testifying that it is important for traders to review broker's confirmations). Indeed, Wilson testified that he was distracted at the time of the transaction and was "completely unplugged from the day-to-day operations" of his job. (Tr. 407:14-16). Finally, the parties cannot be placed in status quo, as Tricon ultimately purchased and resold the MX at a much lower price. (Exs. J24, T4).

There is no evidence of a mutual mistake and no evidence that Tricon was aware of Vinmar's alleged unilateral mistake. Vinmar therefore is bound by the terms of the parties' written agreement, which do not include any guarantee of U.S. origin. *See Wentwood Woodside I, LP v. GMAC Comm. Mortgage Corp.*, 419 F.3d 310, 316 (5th Cir. 2005) ("Under Texas law, the unilaterally mistaken party alone bears responsibility for the consequences of its error.").

Even assuming Wilson told the broker he required U.S. origin and the broker neglected to inform Tricon—something the evidence firmly refutes—that mistake is not imputed to Tricon. Vinmar's failure to notify anyone that neither the broker's confirmations nor the Tricon Letter contained any reference to the origin of the material was another unilateral mistake on the part of Vinmar. There is no dispute that Tricon never believed it had made any guarantee regarding origin, so Vinmar is bound by the parties' written agreement.

{00113333.DOC; 1}

In an analogous case, *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754 (5th Cir. 2002), the plaintiff argued, *inter alia*, that the parties made a mutual mistake in neglecting to include an additional insured provision in their insurance contract entered into through an insurance broker. Relying on Texas law, the Fifth Circuit disagreed. According to the court, a party alleging mutual mistake must prove "that the parties 'reached a definite and explicit agreement understood in the same sense by both'" that was incorrectly reduced to writing. *Id.* at 761-62 (quoting *Zurich Ins. Co. v. Bass*, 443 S.W.2d 371, 374 (Tex. App.—Dallas 1969, no writ)). The only evidence to which the plaintiff could point, however, was evidence that the *broker* may have believed that the policy contained an additional insured provision. The court held that this was insufficient: "Although TIG presented evidence of [the broker's] mistaken beliefs about the contract, TIG did not provide a shred of evidence that [the principal] shared those beliefs." *Id.* at 762. Because the broker's beliefs could not be imputed to the principal, there was no evidence that the parties "shared an antecedent agreement." *Id.*

Here, Vinmar can point to no evidence Tricon believed Vinmar required U.S. origin MX. The best it can muster is an unsupported contention that the *broker* knew U.S. origin was a term that Vinmar desired. Without any evidence that *Tricon* knew that Vinmar believed there was an origin guarantee, however, any purported "mistake" remains unilateral. *See id.*

Moreover, nine days passed from the time the initial Broker's Confirmation was sent until Vinmar first asserted that U.S. origin was required, during which time the price of MX dropped precipitously. Even assuming Vinmar believed the parties agreed to a guarantee of U.S. origin, Vinmar was negligent in not reading the unambiguous documentation, which indisputably makes no mention of origin. (Exs. J2-J5). *See Turberville*, 616 S.W.2d at 679. Wilson's testimony that he was "disconnected" from his job responsibilities at this time plainly does not

{00113333.DOC; 1}

excuse his failure to review the contract documentation, particularly where additional terms subsequently were negotiated and agreed upon by the parties. *See* Exs. J3, J13.

Vinmar cannot deny that Wilson reviewed the broker's confirmations, as he requested a change in the payment terms included in the first confirmation (Tr. 252:13-253:19 (Leyman); Tr. 419:20-421:13 (Wilson); Ex. J11 at 7/22 4:09:37 PM), and testified that he noticed the error in the price. (Tr. 422:2-6). Tellingly, Wilson never made any request to include an origin guarantee. Indeed, Vuk Rajevac of Tricon unambiguously informed Vinmar on July 29, 2008 that the MX may be of Asian origin. (Ex. J14). Vinmar made *no* objection to Rajevac's statement until 1:43 PM on July 31, even though Wilson engaged in an instant message conversation with Lockwood earlier that day in which he attempted to resell the MX to Tricon. (Exs. J12, J15). Vinmar also had an opportunity to make comments on the Tricon Letter and add any terms it wanted to include in the transaction and, in fact, did so with respect to the ship period, credit terms, and demurrage time bar. (Ex. J13). However, it never requested that an origin guarantee be added to the explicit terms set forth in either the Amended Broker's Confirmation or the Tricon Letter. *See id.* Vinmar's disingenuous attempt to demand a new term over a week after the contract was consummated should be rejected. [33]

**D.     Tricon is Entitled to Recover Damages for Vinmar's Breach of Contract**

**1.     Tricon is Entitled to Damages Pursuant to Section 2.706**

**a.     Tricon's Sale to KP Chemical is a Proper Replacement Sale**

Under Texas law, where a buyer, like Vinmar, "wrongfully rejects or revokes acceptance of goods . . . or repudiates with respect to a part or the whole, then with respect to any goods

---

[33] Vinmar's late request to change the terms of the contract undoubtedly was nothing but a thinly veiled attempt to get out of an unprofitable deal. As Mr. Lockwood testified, it was impossible for Tricon to simultaneously guarantee U.S. origin while still satisfying the contract's express delivery terms, particularly considering that Vinmar demanded an additional week in which to declare a discharge port. (Tr. 85:9-86:4).

{00113333.DOC; 1}

directly affected and, if the breach is of the whole contract [], then also with respect to the whole undelivered balance, the aggrieved seller may," *inter alia*, "resell and recover damages as hereafter provided (Section 2.706) [or] recover damages for non-acceptance (Section 2.708)...." TEX. BUS. & COM. CODE § 2.703.  Under Section 2.706, a seller may resell the rejected or repudiated goods in a private sale, including sale by way of "identification to an existing contract of the seller." *Id.* § 2.706(b).  In so doing, "it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach" so long as the resale is done "in good faith and in a commercially reasonable manner" and the seller has given the buyer reasonable notice of his intention to resell. *Id.* § 2.706 (a)-(c), cmt. 2.  When a seller has satisfied these resale requirements, he may recover in damages the difference between the resale price and the contract price plus any incidental damages, but less any expenses saved. *Id.* § 2.706(a).

Here, Tricon satisfied each of the resale requirements of § 2.706.  Tricon unequivocally gave Vinmar "reasonable notice of [its] intention to resell" in satisfaction of § 2.706(c). Specifically, on August 8, 2008, Vuk Rajevac informed Vinmar that, "if your discharge port declaration is not given by 5PM CST today, Vinmar will be in breach of the contract and we reserve the right to resell the cargo in open market and will hold Vinmar liable for all damages ...." (Ex. J21).  A few hours later, Lockwood advised that "you are now in breach of contract and [we] reserve our right to resell the cargo." *Id.*  That is all that is required by the plain language of Section 2.706(c).  The notification requirements are flexible and, "[w]here the resale is to be by private sale . . . [n]otification of the time and place of this type of sale is not required." *Id.* cmt. 8; *see also Plano Lincoln Mercury, Inc. v. Roberts*, 167 S.W.3d 616, 622 (Tex. App.— Dallas 2005, no pet.) ("[G]iving best notification or full and complete notification is not

{00113333.DOC; 1}

required."). Thus, it was not necessary for Tricon to have notified Vinmar of the specific sale that it was designating as its resale contract. *See Cooper's Mobile Homes, Inc. v. Simmons*, 617 P.2d 415, 420 (Wash. 1980) ("The Simmons claimed that Cooper's failure to notify them when it resold the home was unfair. But Cooper's had notified them that it intended to resell the home. That is all that is required by RCW 62A.2-706(3)."); [34] *see also In re Ashby Enter., Ltd.*, 262 B.R. 905, 909, 911 (D. Md. 2001) (notice that seller "would resell the inventory and hold [buyer] responsible for any deficiency in the proceeds received from such a sale" sufficient to satisfy notice requirement); *Computer Sales Int'l, Inc. v. Family Guardian Life Ins. Co.*, 860 S.W.2d 826, 830-31 (Mo. App. 1993) (letter stating that plaintiff intended to resell the product "within ten days" and would hold buyer "liable for the difference between the contract price and the sale price" held sufficient notice).

Tricon also resold the MX in good faith and in a commercially reasonable manner. Specifically, Tricon tried in good faith to find another buyer for the MX it had sold Vinmar. However, the price of MX was steadily dropping and so, as is typically the case with a commodity losing value, no buyer materialized. Rather than do nothing and let the price continued to decline, Tricon prudently accounted for the rejected MX by using it to satisfy an existing contract for MX it had with third party, KP Chemical, as is specifically allowed by Section 2.706. *See id.* § 2.706(b) (resale may be made by "identification to an existing contract of the seller."). Thus, Tricon exercised its option to sell KP Chemical 5,000 metric tons of MX having similar quality specifications as that identified in the Vinmar contract, thereby sufficiently identifying the rejected MX to the KP Chemical contract. [35] When the price of MX

---

[34] The Washington statute at issue in *Cooper's* is identical to Section 2.706, as both are modeled after the Uniform Commercial Code.

[35] Although there was a slight difference in the quality specifications in the Vinmar and KP Chemical contracts, that difference would not have affected the price. (Tr. 95:11-14). Regardless, the MX ultimately acquired

{00113333.DOC; 1}

continued to drop precipitously, Tricon agreed to KP Chemical's request to reduce the amount of MX that KP Chemical was obligated to purchase to 3,230 metric tons as a concession to a longstanding business partner.[36] Because of the ongoing price decline, there were no available buyers willing to purchase the remaining 2,020 metric tons.[37] The price at which Tricon sold the MX to KP Chemical – the weekly average of the daily price postings during the month of September, which turned out to be $995.50 per metric ton – was reasonable given that a monthly price average would soften any major price swings that might occur during the course of that month. Moreover, Tricon could not have known at that time whether the price of MX would increase or continue to decline. It was entirely possible that the price could have ended up being *higher* than the price at which Tricon contracted with Vinmar. Calculating damages in accordance with TEX. BUS. & COM. CODE § 2.706, then, Tricon suffered a loss in the amount of $1,015,835 for the 3,230 metric tons that Tricon sold to KP Chemical.

**b. Tricon Was Unable to Sell the Remaining MX, so the Remainder of its Damages Should be Calculated Pursuant to Section 2.708**

Because the price of MX continued to plummet, there were no spot buyers available and Tricon was unable to sell the remaining 2,020 metric tons.[38] As Steve Simpson testified, in

---

from J&J Chemtrading Co. and sold to KP Chemical would have satisfied the Vinmar contract. (Tr. 95:15-18; Ex. T24).

[36] At the hearing, there was some dispute whether it was Tricon or KP Chemical that requested the reduction in volume. Given the continual price decline, Tricon stood to make a large profit on the sale, and was hurt by the reduction. Emails suggesting that Tricon requested the reduction likely represent Tricon putting into writing KP Chemical's telephonic request for a reduction. (Tr. 194:5-7). Regardless, Vinmar cannot be heard to complain about the reduction in volume, as it served to *reduce* the amount of damages that Tricon can claim in this matter. *See* Tr. 225:25-227-8. Had Tricon sold the full 5,250 metric tons to KP Chemical, it would have been able to claim $1,651,125, plus interest, from Vinmar pursuant to § 2.706.

[37] The Amended Broker's Confirmation obligated Vinmar to purchase "5,000 MT plus/minus five percent, seller's option." (Ex. J4). Similarly, the Tricon Letter referred to "5,000 Metric Tons +/- 5% (Vessel's Option)." (Ex. J5). As Tricon was the chartering party, these terms are effectively synonymous. (Tr. 143:15-144:8; 338:24-339:3). Wilson agreed, testifying that the two clauses were the same. (Tr. 429:2-9). Given the favorable price of the Vinmar contract relative to the steadily falling market price of MX, Tricon undoubtedly would have exercised its contractual right to sell Vinmar the full 5,250 metric tons. (Tr. 104:25-106:2).

[38] The fact that there were no spot buyers available negates the argument set forth in Vinmar's expert report that Tricon should have mitigated its damages by re-selling the MX at an earlier date. Because of the continually declining price, no spot purchases were being made. Moreover, the KP Chemical contract price was based on the

situations where the price is continually dropping—as it was here—the market is "frozen" and no spot buyers are available. (Tr. 488:10-15; 489:8-13; 490:15-19 (Simpson)). Wilson agreed, admitting that he too was unable to make any sales of MX after reneging on the Tricon transaction. (Tr. 458:23-459:1). As Wilson put it in an instant message to Leyman that Wilson forwarded to Antonvich on August 7, 2008, "Re: buying interest, not today. Customers are hiding." (Ex. T18).

Vinmar disingenuously points to a delivery of MX that Tricon made to KP Chemical in October 2008 that is plainly irrelevant to the computation of Tricon's damages. As Lockwood's uncontroverted testimony established, the contract to sell that MX had been entered into months earlier, and is thus not reflective of the market after Vinmar's breach. (Tr. 97:10-98:3). The evidence clearly reflects that this contract was entirely separate from the replacement sale, as it is referenced prior to Tricon and KP Chemical agreeing to reduce the volume on the 5,000 metric

---

average daily price of MX in the month of September. (Ex. T4). At the time Tricon designated the KP Chemical sale as its replacement contract on August 11, 2008, it did not know what the price ultimately would end up being. (Tr. 99:18-21). It is entirely possible that the market could have reversed, and the KP Chemical price could have ended up being *higher* than the Vinmar contract price. Regardless, Vinmar presented *no* evidence that Tricon could have found a buyer at a price higher than what it ultimately sold the MX to KP Chemical for, particularly considering the large discount below the published market price that would have been required to induce anyone to purchase in a falling market. Mr. Simpson testified one might be required to take hundreds of dollars off the "market" price in order to sell MX in this type of environment. (Tr. 489:8-13; *see also* Tr. 537:21-538:3 (Cofran)). Under Texas law, Vinmar, as the breaching party, "had the burden of proving that damages could have been mitigated." *Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 139 (Tex. App.—Houston 14th Dist.] 2000, pet. dism'd); *see also Young v. Thota*, 271 S.W.3d 822, 830 (Tex. App.—Fort Worth 2008, pet. denied) ("The party that asserts the injured party's failure to mitigate has the burden of proving the failure to mitigate and must show the extent to which the damages were increased by the failure to mitigate."). Tellingly, Vinmar offered no evidence on mitigation of damages.
    Moreover, the UCC is unambiguous that damages are measured by the replacement sale, *not* the market price at the time of breach. *See* TEX. BUS & COM. CODE § 2.706; *see also id.* cmt. 3 ("Evidence of market or current prices at any particular time or place is relevant only on the question of whether the seller acted in a commercially reasonable manner in making the resale."). Similarly, under § 2.708, "the seller is entitled in a suit for damages because of anticipatory breach of contract by the buyer to await the time for the tender by buyer of the contract price and recover the difference between the contract price and the market value then ascertainable." *Harris v. Gunner*, 545 S.W.2d 856, 858 (Tex. App.—Fort Worth 1976, no writ). Indeed, it is black letter Texas law that an aggrieved party is not required to accept an anticipatory repudiation of contract but may instead "treat the repudiation as inoperative and sue for damages as they accrue when the time for performance under the contract is due." *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 626 (Tex. App.—San Antonio 1996, writ den'd).

{00113333.DOC; 1}

tons.[39]  *See* Exs. T20, V19.  Moreover, regardless of when that contract was entered into, it was a
buy/sell agreement.  (Tr. 98:4-16).  In this type of transaction, where the parties "swap" the MX
at different time period, the "price" is essentially meaningless, as they are exchanging the same
amount regardless of what the market does.  (Tr. 98:4-16).  Again, the documents support
Lockwood's testimony, as a September 4, 2008 email from M.J. Hwang at KP Chemical
unambiguously refers to the transaction with the price of $1235 as a "swap."  (Ex. T22).  It
would be irrational to use the price of a buy/sell swap entered into weeks prior to Vinmar's
breach as a means to measure Tricon's damages.

Because Tricon did not make another sale of MX in this time period, Tricon's remaining
damages should be calculated in accordance with TEX. BUS. & COM. CODE § 2.708.  *See* TEX.
BUS. & COM. CODE § 2.706 cmt. 2 (noting that a seller may recover under Section 2.708 if
Section 2.706 damages are unavailable to him).  Under Texas law, an aggrieved seller may
recover under both Sections 2.706 and 2.708 if he resells only a portion of the goods.  In *Serna,
Inc. v. Harman*, 742 F.2d 186 (5th Cir. 1984), for example, a cattle seller brought suit against a
buyer for breach of an agreement to purchase four cows and their calves.  The seller resold two
of the cows, but retained the other two.  *Id.* at 188.  The court held that the seller was entitled to
damages under § 2.706 for the cow resold in accordance with the statute[40] and § 2.708 for the
cows that were retained.  *Id.* at 189-90.  The same result is warranted here.  Tricon is entitled to

---

[39] Vinmar's insinuation that Tricon "moved" some of the MX from the September average price to the
significantly higher spot price is both illogical and disproved by the evidence.  First, it defies logic that KP Chemical
would agree to purchase *more* MX at $1235/metric ton in September, when the price had dropped so dramatically.
Moreover, the evidence is undisputable that Tricon *also* reduced the amount of MX KP was obligated to purchase at
$1235 from the 6021.766 metric tons contemplated on September 1, 2008 to 5750 metric tons on September 3,
2008.  (Ex. T20; Tr. 196:19-25).
[40] The seller failed to give notice of the resale for the second cow, and thus was not entitled to Section
2.706 damages for that portion of the breached contract.  *Id.* at 190-91.  The court remanded the action for the trial
court to determine whether Section 2.708 damages were available for that cow.  *Id.* at 191.

{00113333.DOC; 1}

damages pursuant to § 2.706 for the 3,230 metric ton of MX it ultimately sold to KP Chemical, and § 2.708 for the remaining 2,020 metric tons that it could not resell.

Pursuant to § 2.708, Tricon is entitled to recover from Vinmar the difference between the price under the contract with Vinmar and the market price of the MX at "the time and place for tender." TEX. BUS. & COM. CODE § 2.708(a). The time and place for tender is determined by reference to § 2.503, as well as the other Texas UCC provisions regarding international sales terms. *Id.* cmt. 1. Section 2.503 provides that "[t]ender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." *See* TEX. BUS. & COM. CODE § 2.503(a). Here, the contract required Tricon to make 5,000 metric tons, plus or minus 5% at Tricon's option, of MX available to Vinmar on a C.F.R. basis in Ulsan, Korea or Taiwan. (Exs. J4, J5). "C.F.R." is shorthand for "Cost and Freight" and means that the seller delivers when the goods at issue pass the ship's rail at the port of shipment.[41] Thus, for purposes of § 2.708, the time and place of tender here is the date that Tricon would have loaded the MX for Vinmar at the port of shipment.

Because Vinmar was not required to identify the discharge port until the close of business on Friday, August 8, 2008, the earliest date that Tricon would have been able to load the MX for Vinmar would have been Monday, August 11, 2008, although for logistical reasons the loading probably could not have occurred until later that week. The latest Tricon could have loaded the MX would have been September 15, 2008. Thus, using the average daily price of MX in both Ulsan and Taiwan during this time period, or $1,123.942 per metric ton, under § 2.708, Tricon suffered an additional loss in the amount of $375,837 for the 2,020 metric tons it was unable to sell. *See* Ex. T39 at Schedule 1.

{00113333.DOC; 1}

### c.    Tricon Has Accounted For its Expenses Saved by the Breach

Under § 2.706(a), Tricon is required to deduct the "expenses saved in consequence of [Vinmar's] breach" from its damages calculation.  However, When Tricon resold the MX to KP Chemical, it incurred many of the same expenses that it would have incurred had Vinmar not reneged on the parties' agreement.   Therefore, the only avoidable costs are the broker's commission and the difference in the expenses from the KP Chemical sale versus what would have been expended in the Vinmar sale.

Courts applying the U.C.C. have recognized the commonsense fact that, where the replacement contract contains the same shipping terms as the original contract, there generally are no expenses saved.   In *Milwaukee Valve Co., Inc. v. Mishawaka Brass Mfg., Inc.*, 319 N.W.2d 885 (Wis. Ct. App. 1984), for example, Mishawaka breached its contract by providing non-conforming goods to Milwaukee Valve.  Milwaukee Valve entered into a cover contract and sought to recover damages pursuant to the U.C.C. for the difference between the original and cover contracts.  *Id.* at 887.  In determining whether Milwaukee Valve's damages should be reduced by expenses saved, the court noted that both Milwaukee Valve's contract with Mishawaka and its cover contract required shipping to be "F.O.B. Del'd." *Id.* at 890.[42]  Thus, "because both Mishawaka and the cover vendor agreed to pay shipping expenses, Milwaukee Valve saved no expenses by covering." *Id.*; *see also Panhandle Agri-Serv., Inc. v. Becker*, 644 P.2d 413, 419 (Kan. 1982) ("If the buyer seeks a replacement of the merchandise at the shipping point, he would incur replacement shipping costs roughly equivalent to those on the original contract. Thus, by comparison with such a replacement contract there would be no expenses saved in consequence of the seller's breach because we assume the buyer must pay the expenses

---

[41] *See, e.g., B.P. Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 338 (5th Cir. 2003).
[42] This meant that the goods would be delivered by the seller at its expense to the shipping address. *See id.*

{00113333.DOC; 1}

for shipment under the new contract as well."); James J. White & Robert S. Summers, Uniform Commercial Code § 8-6 at p. 356 (6th ed. 2010);[43] id. § 7-4 at p. 301-02.[44]

Tricon's contract with Vinmar obligated Vinmar to purchase 5,000 metric tons, plus or minus five percent, of MX on a C.F.R. Korea or Taiwan basis. (Exs. J4, J5). Because Tricon also would be purchasing the MX to supply to Vinmar on a C.F.R. basis, its costs would included any commission due to the broker, obtaining a letter of credit in order to acquire the MX, negotiation fees associated with the letter of credit, and cargo insurance.[45] See Ex. T39 at Schedule 5. Similar to the Vinmar contract, Tricon's contract with KP Chemical obligated it to supply 5,000 metric tons of MX, plus or minus five percent, on a C.F.R. Korea basis. (Ex. T4). Tricon therefore incurred many of the same expenses in its sale to KP Chemical that it would have incurred in the sale to Vinmar. (Ex. T39 at Schedule 5; see also Ex. J28). However, because Tricon agreed to reduce the volume to 3,230 metric tons, the associated expenses also were reduced. For example, Tricon "saved" $4,628.95 on the letter of credit and $1,751.99 on the cargo insurance due to the reduced volume, as well as the lower sales price. (Ex. T39 at Schedule 5). Tricon also "saved" the $2,500 broker's commission that would have been due under the Vinmar contract, as the contract with KP Chemical did not involve a broker. Id. Because the negotiation fees associated with the letter of credit are fixed irrespective of volume,

---

[43] "Assume . . . that a New York seller sells 1,000 embroidered pot holders at a contract price of $1,000, F.O.B. buyer's plant, to a New York buyer. The buyer breaches and the seller resells to another New York party for $900, F.O.B. buyer's plant. The costs of shipping ($60) are the same under both contracts. If seller incurs no additional costs in reselling the pot holders, the seller will recover $100 (the difference between the resale price and the contract price."

[44] "When the goods are never shipped as under an F.O.B. shipping point contract, market price is measured as of the place for tender, the seller's place of business. The general assumption, expressed in Comment 1 to 2–713, is that the buyer will search for a replacement contract at the shipping point. If buyer seeks a replacement at the shipping point, he would incur replacement shipping costs roughly equivalent to those on the original contract. Thus by comparison with such a replacement contract there would be no expenses 'saved' in consequence of the seller's breach because we are assuming that the buyer must pay the expenses for shipping under the new contract as well."

[45] Although the contract required Tricon to pay inspection fees, Tricon would have been able to pass those costs onto its supplier, as it did with the replacement sale. See Exs. J24, J28.

{00113333.DOC; 1}

Tricon did not save any negotiation expenses. *Id.*  Tricon thus "saved" $8,880.94 in the sale to KP Chemical, and its damages under § 2.706 are $1,390,790.60.

**2.      Alternatively, Tricon is Entitled to Damages Pursuant to Section 2.708**

In the alternative, if this Panel finds that Tricon did not satisfy all the prerequisites of § 2.706 as to the 3,230 metric tons sold to KP Chemical, Tricon's damages as to all 5,250 metric tons should be calculated in accordance with TEX. BUS. & COM. CODE § 2.708. *See* TEX. BUS. & COM. CODE § 2.706 cmt. 2 ("Failure to act properly under this section deprives the seller of the measure of damages here provided and relegates him to that provided in Section 2-708."); *see also Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 139 (Tex. App.— Houston 14th Dist.] 2000, pet. dism'd) ("[F]ailure to comply with the procedural provisions of [section 2.706] still leaves the seller its remedy under UCC section 2.708.").  Using the average daily price of MX during the time period when Tricon could have loaded the MX, or $1,123.942 per metric ton, under § 2.708(a), Tricon suffered $976,803 in damages.  Tricon also would have "saved" all of the expenses associated with the sale, or $14,243.12.  (Ex. T39 at Schedule 6).  Thus, under § 2.708(a), Tricon suffered a loss of $962,559.76.

However, where damages pursuant to § 2.708(a) would be "inadequate to put the seller in as good a position as performance would have done," the seller is entitled to damages pursuant to § 2.708(b).  This section, which generally is applied to "lost volume" sellers like Tricon,[46] entitles Tricon to "the profit . . . which the seller would have made from full performance by the buyer. . . ." TEX. BUS. & COM. CODE § 2.708(b); *see also Tri-State Petroluem Corp. v. Saber Energy, Inc.*, 845 F.2d 575, 580-81 (5th Cir. 1988).  As demonstrated by Mr. Lee during his

---

[46] A lost volume seller is one who "would have had the benefit of both the original contract and subsequent contracts had there not been a breach." *Lone Star Ford, Inc. v. McCormick*, 838 S.W.2d 734, 740 (Tex. App.— Houston [1st Dist.] 1992).  Tricon easily satisfies this test.  MX is a commodity, so the product it would have

{00113333.DOC; 1}

cross-examination of Lockwood, had Vinmar performed under the contract, Tricon could have acquired MX to supply to it at the market price of $957.50 per metric ton.[47] (Tr. 218:11-15). It then would have sold that MX to Vinmar for $1310 per metric ton, for a total profit of $1,850,625. (Ex. V28; Tr. 218:21-219:3; *see also* Ex. T41). Taking into account the $14,243.12 in expenses Tricon "saved" through Vinmar's non-performance, this amount is reduced slightly to $1,836,381.88.

### 3. Any Profit Tricon Made on its Resale to KP Chemical is Irrelevant Under Both Section 2.706 and Section 2.708

Vinmar attempts to confuse the issue, pointing to the fact that—due to the continual decline in the market price of MX—Tricon ultimately profited on its resale of the MX to KP Chemical. Under the U.C.C., however, that is entirely irrelevant to calculating damages where a resale occurs. Section 2.706 provides that an aggrieved seller's damages are "the difference between the resale price and the contract price together with any incidental damages . . ., but less expenses saved in consequence of the buyer's breach." Tex. Bus. & Com. Code § 2.706(a). Noticeably absent from this provision is any reference to the anticipated profit or the profit made on the resale. *See id.* Quite the contrary, the statute unambiguously provides that "[t]he seller is *not* accountable to the buyer for any profit made on any resale." *Id.* § 2.706(f) (emphasis added).

Any profit from the KP Chemical transaction is equally irrelevant under § 2.708. Because Tricon is a lost volume seller, Vinmar is not entitled to a credit for the proceeds from the resale. Indeed, "it is *universally agreed* that in a case where after the buyer's default a seller resells the goods, the proceeds of the resale are not to be credited to the buyer if the seller is a

---

supplied to Vinmar was not unique. Mr Lockwood gave uncontroverted testimony that he easily could have made both the KP Chemical and Vinmar sales, had Vinmar not reneged. (Tr. 106:3-7).

[47] It is likely Tricon actually could have acquired the MX for a *lower* price, as buyers typically can obtain MX significantly below the published market price when, as here, the market is frozen due to continually falling prices. (Tr. 489:8-13; *see also* Tr. 217:14-218:5).

{00113333.DOC; 1}

lost volume seller." *Teradyne, Inc. v. Teledyne Indus., Inc.*, 676 F.2d 865, 868 (1st Cir. 1982) (emphasis added). That is because "lost volume status . . . is inconsistent with a credit for the proceeds of resale. . . . To require a credit for the proceeds of resale is to deny the essential element that entitles the lost volume seller to § 2-708(2) in the first place—the mutual independence of the contract and the resale." *Nat'l Control, Inc. v. Commodore Bus. Machs., Inc.*, 163 Cal.App.3d 688, 698 (Call. App. 1985) (quoting *Snyder v. Herbert Greenbaum & Assocs.*, 380 A.2d 618, 625 (Md. App. 1977)); *see also* 67A Am. Jur. 2d Sales § 1000 ("Under the Uniform Commercial Code, a seller is not accountable for any profit made on any resale following a buyer's repudiation or refusal to accept goods under a contract. This means that, under the Code, a seller may resell at a profit and retain the profit, and then recover damages based on the difference between market and contract price, assuming that the market price has dropped since the seller learned of the buyer's breach and resold the goods.").

As Lockwood testified, Tricon easily could have supplied to both KP Chemical *and* Vinmar, had Vinmar not reneged on the contract. (Tr. 106:3-7; 222:20-225:17). The fact that Tricon ultimately profited on the sale to KP Chemical only highlights just how profitable sales of MX were during that time period and how severely Tricon was damaged by Vinmar's breach. Indeed, had Vinmar performed, Tricon stood to make a total profit of $2,881,641 on the two sales.[48] (Tr. 224:14-225:17; Ex. T41).

4.     **Tricon is Not a "Jobber"**

Vinmar has incorrectly argued that Tricon's recovery is limited because it is did not maintain actual possession of the MX in which it deals. This is incorrect as both a factual and

---

[48] Mr. Lockwood's calculation removed the paper "profit" Tricon made on the buy/sell transaction. (Tr. 224:15-18-225:17). Even without this necessary adjustment, Tricon stood to make a profit of $1,850,625 on the Vinmar sale by Vinmar's counsel's own calculation. (Tr. 218:11-219:7; *see also* Exs. V28, T41).

{00113333.DOC; 1}

legal matter.  Under the Texas UCC, "it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach."  TEX. BUS. & COM. CODE § 2.706(b).  Both Sections 2.706 and 2.708 are explicit in the method by which damages are calculated, and neither requires Tricon to have had the MX in physical inventory prior to Vinmar's breach.  Indeed, such a rule would make it virtually impossible for a petrochemicals trader to seek breach of contract damages, as trading companies generally do not hold physical inventory due to the prohibitive cost of storage.  (Tr. 487:25-488:1).  It is common in the industry for traders to "sell short," as "in commodity trading, one can sell a product that they don't necessarily own."  (Tr. 263:8-10 (Leyman); *see also* 487:13-488:1) (Simpson); 536:10-16 (Cofran)).

The case on which Vinmar relies, *Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc.*, 616 F.2d 212 (5th Cir. 1980), is plainly inapposite.  *Nobs Chemical* involved a seller who was acting as a middleman.  It had entered into a fixed-price contract with its own supplier for purchase of the goods it was selling to the party it was suing.  Thus, its profit was fixed in advance by the two contracts.  As the court noted, "the difference between the fallen market price and the contract price is [not] necessary to compensate the plaintiffs for the breach.  Had the transaction been completed, their 'benefit of the bargain' would not have been affected by the fall in market price. . . ." *Id.* at 215.

The court limited itself to cases involving "jobbers," which Black's Law Dictionary defines as "[o]ne who buys from a manufacturer and sells to a retailer; a wholesaler or middleman," or "[a] middleman in the exchange of securities among brokers."  BLACK'S LAW DICTIONARY (8th ed. 2004); *see also Nobs Hill*, 616 F.2d at 215.  Tricon is not a jobber or middleman, but rather an active trader of chemicals.  It takes possession of the chemicals in

{00113333.DOC; 1}

which it transacts on the water from its suppliers and delivers them to its purchasers.[49]   (Tr. 56:22-57:9).   It seeks to earn a profit by, quite simply, buying low and selling high and is exposed to market risk every day.[50]   (Tr. 57:10-11).

The Second Circuit found *Nobs Chemical* irrelevant in a situation strikingly similar to this one.   In *Trans World Metals, Inc. v. Southwire Co.*, 769 F.2d 902 (2d Cir. 1985), a buyer reneged on its contract following a dramatic fall in market price.   The buyer argued that the seller was being overcompensated by the U.C.C.'s measure of damages, relying primarily on *Nobs Hill*.   *Id.* at 908.   The court disagreed, concluding that *Nobs Hill* is limited to circumstances where "it would [be] unfair to permit the seller to reap a riskless benefit."   *Id.*   In *Trans World*, in contrast, "the benefit of the bargain under a completed contract would have been affected by the fall in aluminum prices."   *Id.* at 908-09.   Thus, "[b]ecause Trans World accepted the risk that prices would rise, it is entitled to benefit from their fall."   *Id.* at 909.

Here, Tricon contracted on July 22, 2008 to sell 5,000 metric tons, plus or minus 5%, of MX to Vinmar at $1310 per metric ton.   Had the market price increased prior to the time Vinmar took delivery in early September, Tricon would have lost money on the transaction.   Conversely, if the market price dropped—as it did—Tricon stood to make a substantial gain.   Thus, this is not a case like *Nobs Hill* where Tricon's profit was fixed in advance.  Instead, as in *Trans World*, Tricon "accepted the risk that price would rise."   *Id.* at 909.   It is therefore similarly "entitled to benefit from their fall," and *Nobs Hill* has no bearing on the correct assessment of damages.   *Id.*

---

[49] Indeed, there is no dispute that Tricon took possession of the MX that it ultimately sold to KP Chemical in the transaction Tricon used as its replacement sale. (Exs. T24, T25).   Tricon's reliance on a cover sale further distinguishes this case from *Nobs Hill*, where the court noted that "[t]he plaintiffs never acquired the goods from their Brazilian supplier, and . . . an action for the purchase price or resale was therefore unavailable." 616 F.2d at 215.

[50] Vinmar similarly seeks to buy low and sell high.   When Wilson entered into the transaction with Tricon, he did so speculating that the price of MX would rise and he would be able to sell the MX at a profit because "the U.S. was tight." (Tr. 409:7-13).

{00113333.DOC; 1}

Even if Tricon *could* somehow be considered a "jobber," *Nobs Chemical* still would not serve to diminish Tricon's damages. There, the court refused to award damages pursuant to § 2.708(a) because to do so would have overcompensated the plaintiff. *Id.* at 215-16. Instead, the plaintiff was relegated to recovering its lost profits under § 2.708(b), which were dramatically lower. *See id.* Here, in contrast, Tricon's lost profits are *higher* than the amount of damages to which they are entitled under either § 2.706 *or* § 2.708(a). As established by Mr. Lee in his cross-examination of Brad Lockwood, Tricon could have made a potential profit of $1,850,625 had Vinmar performed on the contract. (Tr. 218:11-219:7; *see also* Exs. V28, T41).[51] Far from limiting Tricon's damages, "relegating" Tricon to damages pursuant to § 2.708(b) would actually *increase* Tricon's damages. As discussed above, Tricon easily could have made both the sale to Vinmar and the sale to KP Chemical. (Tr. 106:3-7; 222:20-225:17). It therefore would be improper to reduce Tricon's "lost profits" by the profits recovered in the KP Chemical transaction.[52] *See Nat'l Controls, Inc.,* 163 Cal App. 3d at 698; *Teradyne, Inc.,* 676 F.2d at 868.

5.    **Tricon is Entitled to Prejudgment Interest**

In addition to its damages under Tex. Bus. & Com. Code §§ 2.706 and 2.708, Tricon is entitled to interest. One of the additional terms proposed in the Tricon Letter concerned Vinmar's agreement to pay interest in the event of Vinmar's non-payment. (Ex. J5 at ¶ 12). That provision provides:

> If the Total Price or any other amounts due by Buyer to Seller under this Contract are not paid when due, the Interest shall accrue and shall be paid on all amounts

---

[51] Taking into account the $14,243.12 in expenses Tricon "saved" through Vinmar's non-performance, this amount is reduced slightly to $1,836,381.88.

[52] Even if Tricon were not a lost volume seller, it still lost significant profits on the sale to KP Chemical compared to what it would have made had Vinmar performed. As Mr. Lee established, Tricon stood to make a potential profit of $1,850,625 on the Vinmar transaction. It made only $1,029,950.10 on the replacement sale to KP Chemical. *See* Ex. V27. As discussed above, the "profit" shown on the buy/sell transaction entered into weeks prior to Vinmar's breach cannot be considered when calculating Tricon's actual profit.

{00113333.DOC; 1}

outstanding until payment in full is received by the Seller in its designated bank. Seller reserves the right to charge the maximum allowable interest as per U.S. law for all late payments. . . . In the event the Buyer fails to make payment on the due date as expressed on Tricon's invoice, the Buyer is subject to an additional interest expense calculated at 8.5% per annum, beginning on the due date listed on the invoice.

When Vinmar accepted this provision in its July 29, 2008 email to Tricon, it became part of the parties' contract. *See* Ex. J13.

On Oct. 6, 2008, Tricon sent Vinmar an invoice for an amount described as "DAMAGES BASED ON VINMAR'S REPUDIATION OF OUR SALES CONTRACT." Payment on the invoice was due on Oct. 15, 2008. To date, however, Vinmar has not made any payment toward this invoice. Thus, by operation of paragraph 12 of the Tricon Letter, Tricon is entitled to pre-judgment and post-judgment interest on its damages in the amount of 8.5% per annum since Oct, 15, 2008. *See Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 123-24 (Tex. App.–Corpus Christi 1999, pet. denied). This comes to $235,074.40 if Tricon's damages are calculated in accordance with § 2.706 for the 3,230 metric tons sold to KP Chemical and § 2.708 for the remaining 2,020 metric tons, $163,635.16 if Tricon's damages are calculated in accordance only with § 2.708(a), and $312,184.92 if Tricon's damages are calculated pursuant to § 2.708(b).[53]

---

[53] For purposes of this Post-Arbitration Brief, interest is calculated as of October 15, 2010. Interest continues to accrue on a daily basis at a rate of $322.02 per day under § 2.706 and $224.16 per day under § 2.708(a). (Ex. T39 at Schedule 3). Using the same formula applied by Mr. Matthews, under § 2.708(b) interest accrues at a rate of $427.65 per day.

43

{00113333.DOC; 1}

### 6.    Tricon is Entitled to Costs and Attorney's fees

Finally, pursuant to Texas law, Tricon is entitled to its attorney's fees and costs incurred in litigating this dispute. Texas law provides for the recovery of reasonable attorney's fees and costs with respect to a claim for an oral or written contract where the party is represented by an attorney and presented the claim to his opponent, and his opponent has not yet paid the amount due although it has been over 30 days since the claim was presented. TEX. CIV. PRAC. & REM. CODE §§ 38.001-38.002.    Tricon is represented in this matter by George Diaz-Arrastia, an attorney at law.   On March 9, 2009, Mr. Diaz-Arrastia presented Vinmar's attorney, Stephen Lee, with Tricon's claim under the contract. (Ex. T29).  To date, well over 30 days have elapsed since Tricon presented its claim to Vinmar, and Vinmar has not tendered payment.  Thus, Tricon is statutorily entitled to recover both its attorney's fees and costs incurred in litigating this dispute.

In addition, the parties' contract explicitly allows the arbitrators in this action to "grant any relief which they, or a majority of them, deem just and equitable and within the scope of the agreement of the parties," including costs and "a reasonable allowance for attorney's fees. . . ." (Ex. J5 at ¶ 9).  Thus, Tricon also is contractually entitled to an award of attorney's fees and costs.  The amount of attorney's fees to which Tricon is entitled is addressed more thoroughly Mr. Diaz-Arrastia's September 30, 2010 affidavit and the accompanying documentation.

In addition, Tricon is entitled to recover costs of the arbitration pursuant to AAA Commercial Arbitration Rule R-43(c).  Under Rule R-43, Tricon may recover the fees provided in Rules R-49, R-50, and R-51.  These include administrative fees, the expenses of witnesses, the

{00113333.DOC; 1}

neutral arbitrator's compensation, and "[a]ll other expenses of the arbitration." These amounts also are detailed in Mr. Diaz-Arrastia's affidavit.[54]

<div align="center">**RELIEF**</div>

For the reasons stated above, Tricon respectfully requests a ruling from this Panel that Tricon and Vinmar had an enforceable contract, which contained a provision obligating them to resolve any disputes in arbitration. Tricon further requests a ruling that Vinmar breached that contract, entitling Tricon to an award of the following:

(a)     damages of $1,382,790.60 pursuant to TEX. BUS. & COM. CODE § 2.706 and § 2.708, or in the alternative, $962,559.76 pursuant to TEX. BUS. & COM. CODE § 2.708(a) or $1,850,625.00 pursuant to TEX. BUS. & COM. CODE § 2.708(b).

(b)     pre-judgment interest in the amount of $235,074.40 if Tricon's damages are calculated in accordance with both TEX. BUS. & COM. CODE § 2.706 and § 2.708, $163,635.16 if Tricon's damages are calculated solely in accordance with TEX. BUS. & COM. CODE § 2.708(a), or $312,184.92 if Tricon's damages are calculated solely in accordance with TEX. BUS. & COM. CODE § 2.708(b) as provided by the parties' contract;

(c)     post-judgment interest, as provided by the parties' contract and TEX. FIN. CODE § 304.001 *et seq.*;

(d)     a monetary award of attorney's fees and expenses incurred by Tricon in connection with this arbitration, as provided by the parties' contract and TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq.*;

---

[54] In addition to the amounts detailed in Mr. Diaz-Arrastia's affidavit, Tricon incurred an additional $3,850 in AAA expenses on October 11, 2010.

{00113333.DOC; 1}

(e)     costs incurred by Tricon in connection with this arbitration, as provided by the parties' contract, Tex. Civ. Prac. & Rem. Code § 38.001 *et seq.*, and AAA Rules R-43(c), R-49, R-50, and R-51; and

(f)     any such other relief as this Arbitration Panel deems appropriate in the circumstances.

Respectfully submitted,

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP

By:

George R. Diaz-Arrastia
Tracy D. Larson
Pennzoil Place, North Tower
700 Milam St., 10th Floor
Houston, Texas 77002
Tele: (713) 221-2500
Fax: (713) 228-3510
Email: gdarrastia@sdablaw.com

ATTORNEYS FOR CLAIMANT TRICON ENERGY, LTD.

Dated: October 19, 2010

{00113333.DOC; 1}