# **APPENDIX TAB O**

Tricon's First Amended Specification of Claims (without exhibits)

American Arbitration Association
Dallas, Texas

---------------------------------------------X

Tricon Energy, Ltd.,

               Claimant,      :   Case No. 70 198Y 00168 09

       - against -

Vinmar International, Ltd.,

             Respondent.

---------------------------------------------X

## TRICON ENERGY LTD.'S
## FIRST AMENDED SPECIFICATION OF CLAIMS

Claimant Tricon Energy, Ltd. ("Tricon") is a leading marketer of petroleum, petrochemical, and chlor-alkali products worldwide. As such, it is a buyer, supplier and transporter of industrial chemicals, petrochemicals and motor gasoline components. Respondent Vinmar International, Ltd. ("Vinmar") is a global buyer and supplier of polymers and petrochemicals.

This arbitration arises out of Vinmar's breach of the parties' written contract according to which Vinmar agreed to purchase from Tricon 5,000 metric tons, plus or minus 5% at Tricon's option, of a petrochemical known as mixed xylene ("MX"). Soon after the parties formed their sales contract, the market price of MX fell precipitously. Vinmar then repudiated the parties' contract, and as a direct result of Vinmar's breach, Tricon sustained damages of approximately $1,391,672 plus interest.

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and the December 2, 2009 Scheduling Order (as revised on March 31, 2010) that

governs this arbitration, Tricon hereby specifies its breach of contract claim against Vinmar in this First Amended Specification of Claims.

## The Parties

1. Tricon is a global buyer, supplier and transporter of industrial chemicals, petrochemicals and motor gasoline components. In particular, Tricon facilitates global commerce by aligning suppliers and buyers and taking full responsibility for the fulfillment of the transaction. Tricon's global headquarters are located at 777 Post Oak Blvd., Suite 650, Houston, Texas 77056.

2. Upon information and belief, Vinmar is a global buyer and supplier of polymers and petrochemicals. Vinmar's global headquarters are located at 16800 Imperial Valley Drive, Suite 499, Houston, Texas 77060.

## The Parties' Agreement to Arbitrate and Choice of Texas Law

3. The parties' contract includes their agreement to arbitrate any and all disputes that might arise from their contract. In particular, the parties agreed: "Any and all differences and disputes of whatsoever nature arising out of this Agreement shall be put to arbitration in Houston, Texas, in English pursuant to the laws relating to arbitration there in force, and, to the extent not inconsistent with this Agreement, the Commercial Arbitration Rules of the American Arbitration Association, or under the rules of such other arbitration association as the parties may mutually agree, before a board of three persons, consisting of one arbitrator to be appointed by Seller, one by Buyer and one by the two so chosen." (Ex. A ¶ 9)

4. The parties also agreed to allow the arbitrators to "grant any relief which they, or a majority of them, deem just and equitable and within the scope of the agreement of the parties," including costs and "a reasonable allowance for attorney's fees...." (*Id.*)

5. Finally, the parties agreed that Texas law would govern any dispute arising out of their contract. Specifically, they agreed: "This contract and the rights and duties of the parties arising out of this contract shall be governed by and construed, enforced, and performed in accordance with the laws of the state of Texas, including, without limitation, the Uniform Commercial Code as in effect in the state of Texas, as the same may be amended from time to time, without regard to principles of conflicts of Law. The parties agree that this agreement shall be accepted and formed in the state of Texas according to the procedures herein set forth." (*Id.* ¶ 3)

### The Formation of the Parties' Contract

6. On July 22, 2008, Brad Lockwood on behalf of Tricon and Rick Wilson on behalf of Vinmar entered into negotiations for Tricon's sale of 5,000 metric tons, plus or minus 5% at Tricon's option, of MX to Vinmar.

7. MX is a type of petrochemical that is known in the oil and gas industry to have a volatile price. Accordingly, contracts for the sale of MX are executed quickly in order to capture the going market price, which can change significantly from day to day.

8. Consistent with industry custom and practice, the parties' negotiations were facilitated by a third-party broker, Ed Leyman of MOAB Oil, Inc. (the "Broker"). Thus, the parties did not communicate directly with each other; instead, through a series of instant messages and telephone calls, each party communicated its respective requirements to the Broker, who in turn relayed the information to the other party.

9. Mr. Lockwood had the authority to enter into an agreement on behalf of Tricon and authorized the Broker to broker the parties' transaction.

10. Likewise, Mr. Wilson had the authority to enter into an agreement on behalf of Vinmar and authorized the Broker to broker the parties' transaction. (Ex. B at 13:1-14:10)

11. By mid-afternoon on the same day that they began negotiations, the parties reached an agreement on the material terms of their contract. Less than two hours later, the Broker sent Tricon a confirmatory memorandum memorializing the parties' contract (the "Broker's Confirmation"). (Ex. C) Vinmar received a copy of the Broker's Confirmation at approximately 2:16 PM. (*Id.*)

12. The Broker's Confirmation began: "We are pleased to confirm the following transaction as per our telecon on: 7/22/2008." It then set forth the material terms of the parties' contract, including product, price, quantity, and quality, as well as payment, inspection, title, commission, and delivery terms. With respect to the delivery terms in particular, the parties agreed that Vinmar would be required to declare a discharge port no later than August 8, 2008, and that Tricon would deliver the MX to Vinmar from the identified discharge port between September 1 and 15, 2008. (*Id.*)

13. Notably, the Broker's Confirmation did not include any provision regarding product origin. (*Id.*)

14. The Broker's Confirmation concluded: "If there is anything outlined contrary to your understanding of our agreement, please notify us immediately by facsimile. Many thanks for allowing us, as brokers, to arrange this transaction for you." (*Id.*)

15. Shortly thereafter, Vinmar requested to change the payment terms from 30 days after the bill of lading date to an on-site letter of credit. Tricon agreed to this change. (Ex. B at 21:24-24:6; Ex. D at 7/22/2008 3:12:25 PM)

{00100203.DOC; 4}

16. The Broker thus sent out an "Amended Contract" reflecting the amended payment terms, which Vinmar received at approximately 3:57 PM. (Ex. E) This revised contract similarly concluded: "If there is anything outlined contrary to your understanding of our agreement, please notify us immediately by facsimile. Many thanks for allowing us, as brokers, to arrange this transaction for you." (*Id.*)

17. Consistent with this provision, Tricon immediately notified the Broker that the Broker's Confirmation and Amended Contract contained a typo regarding the agreed-upon price.

18. Thus, the next morning the Broker sent Tricon an amended confirmatory memorandum that was identical to the original except that it recited the correct price (the "Amended Broker's Confirmation"). (Ex. F) The Broker also sent Vinmar a copy of the Amended Broker's Confirmation, which it received at approximately 8:23 AM. (Ex. G)

19. The Amended Broker's Confirmation concluded: "If there is anything outlined contrary to your understanding of our agreement, please notify us immediately by facsimile. Many thanks for allowing us, as brokers, to arrange this transaction for you." (Exs. F-G)

20. Tricon did not notify the Broker of any error in the Amended Broker's Confirmation or otherwise object to any part of it. Upon information and belief, Vinmar also did not notify the Broker of any error in the Amended Broker's Confirmation or otherwise object to any part of it.

21. According to industry custom and practice and the applicable Texas law, a contract for the sale of MX is formed no later than when the broker provides both parties a confirmation setting forth the material terms of the contract and neither party objects to it. Accordingly, the parties entered a binding contract no later than July 23, 2008, the date that the

Broker sent both parties the Amended Broker's Confirmation. (*See* Ex. B, Leyman depo., at 18:19-19:6)

22. On July 23, 2008, shortly after receiving the Amended Broker's Confirmation, Tricon sent Vinmar a letter "confirm[ing] this agreement between Brad Lockwood of Tricon Energy, Ltd. (Seller) and Rick Wilson of Vinmar International, LTD (Buyer) on July 22, 2008" (the "Tricon Letter"). (Ex. H) The Tricon Letter did not conflict with any part of the Amended Broker's Confirmation. Rather, it merely repeated the same material terms as those set forth in the Amended Broker's Confirmation and otherwise proposed additional terms on matters such as invoicing and taxes as well as an agreement to arbitrate any disputes that might arise. (*Id.*)

23. One of the additional terms proposed in the Tricon Letter was Vinmar's agreement to pay interest on amounts due to Tricon under the contract. Specifically, the provision provides: "If the Total Price or any other amounts due by Buyer to Seller under this Contract are not paid when due, the Interest shall accrue and shall be paid on all amounts outstanding until payment in full is received by the Seller in its designated bank. Seller reserves the right to charge the maximum allowable interest as per U.S. law for all late payments. ... In the event the Buyer fails to make payment on the due date as expressed on Tricon's invoice, the Buyer is subject to an additional interest expense calculated at 8.5% per annum, beginning on the due date listed on the invoice." (*Id.* ¶¶ 11-12)

24. Notably, the Tricon Letter did not include any provision regarding product origin. (*Id.*)

25. On July 24, 2008, one day after receiving the Tricon Letter, Mr. Wilson forwarded it to a colleague at Vinmar, Laurentiu Pascu. In so doing, Mr. Wilson informed Mr.

Pascu that he had "bough[t] MX from Tricon" and asked Mr. Pascu to "please contact them [Tricon] and make necessary arrangements." (Ex. I)

26. Later that same day, another colleague at Vinmar, Eduardo Anaya, informed Mr. Wilson that he would "do the follow up from the logistics point of view of this operation." Mr. Anaya told Mr. Wilson that "[t]o complete [the] order we just need the port of origin of this product," to which Mr. Wilson responded, "Re Origin, We wont [sic] know until we declare discharge port. Most likely USG [U.S. Gulf Coast]." Mr. Anaya replied: "Ok, that is what we wrote on the PO." (Ex. J)

27. The "PO" to which Mr. Anaya was referring was Purchase Order 4529980 dated July 24, 2008 (the "Vinmar P.O."). (Ex. K at 38:11-14) The Vinmar P.O. began: "We are pleased to acknowledge the following purchase transaction" for the sale of 5,000 metric tons of MX from Tricon to Vinmar. The Vinmar P.O. then repeated the same material terms as those set forth in the Amended Broker's Confirmation and the Tricon Letter, including the choice of law and arbitration clause according to which the parties agreed to settle any dispute by arbitration under the laws of Texas and the rules of the American Arbitration Association. (Ex. L)

28. Notably, the Vinmar P.O. included a section for designating product "ORIGIN," but Vinmar left that section blank. (*Id.*)

29. Pursuant to Mr. Wilson's direction to Mr. Pascu to "please contact [Tricon] and make necessary arrangements," on July 29, 2008, Mr. Pascu sent Tricon an email setting forth Vinmar's "comments" to the additional terms proposed by Tricon in the Tricon Letter, which Mr. Pascu referred to as the "Sale Confirmation." Those comments consisted of a few handwritten notes proposing minor changes to the overall transaction. They also included a handwritten reference to "4529980," the Vinmar P.O. number. Vinmar assented to most of

{00100203.DOC; 4}

the additional terms by either explicitly noting Vinmar's approval through check marks, or by failing to object to those terms. Vinmar promised to "revert soon with our Purchase Order for your review."[1] (Ex. A)

30. That same day, Tricon responded by email to Vinmar's "comments." Tricon accepted all of the minor changes proposed by Vinmar except that it did not accept a 60 day demurrage time bar. Tricon noted that "[y]our comments on the contract [are] well noted and accepted. . . ." (Ex. M)

31. As a result of this exchange, per the operation of the Texas Uniform Commercial Code ("Texas U.C.C."), the parties' contract came to include all the terms set forth in the Tricon Letter except the provision regarding the demurrage time bar. The demurrage time bar is not an issue in this arbitration.

### Vinmar's Resale Attempts

32. Following the formation of the parties' contract on July 23, 2008, Vinmar twice acknowledged that it had an enforceable contract with Tricon when it attempted to sell back to Tricon the 5,000 metric tons of MX it had just purchased from Tricon.

33. First, on the same day that Vinmar received the Amended Broker's Confirmation and the Tricon Letter, the Broker asked Tricon whether it would "have any interest in buying back the 5kt mx u sold to vinmar." Upon information and belief, Vinmar instructed the Broker to make this inquiry of Tricon. (Ex. D at 7/23/2008 12:40:03 PM)

34. Notably, in the one day that had passed since Vinmar's purchase of the MX and its first resale offer, the market price of MX had dropped precipitously. (Ex. N)

35. Tricon rejected Vinmar's resale offer.

---

[1] Although the Vinmar P.O. is relevant to Vinmar's understanding of the terms of the parties' contract, Vinmar did not subsequently send the Vinmar P.O. to Tricon and so the Vinmar P.O. is not part of the contract documentation.

36. Then, on July 31, 2008, Vinmar again asked to resell to Tricon the MX it had purchased. Specifically, in an instant message sent from Vinmar's Rick Wilson directly to Tricon's Brad Lockwood, Vinmar offered to sell back the MX it had bought from Tricon and thereby "wipe the slate clean." (Ex. O at 7/31/2008 9:41:27 AM)

37. Conspicuously, in the time that had passed since Vinmar's purchase of the MX and its second resale offer, the market price of MX had dropped approximately $100 per metric ton. (Ex. N)

38. As before, Tricon rejected Vinmar's resale offer.

### Vinmar's Breach

39. Upon information and belief, due to the steep drop in the market price of MX in the days following the formation of the parties' contract, Vinmar began taking steps to avoid the contract.

40. In particular, on July 31, 2008, only a few hours after Tricon rejected Vinmar's second resale offer, Vinmar – *for the very first time* – demanded a guarantee that the MX it had purchased from Tricon would be USA origin. (Ex. P)

41. In a response sent the same day, Tricon rejected Vinmar's proposal for an additional term guaranteeing USA origin. In so doing, Tricon reminded Vinmar that it had never made any guarantee with respect to origin and, in any event, that it could not as a practical matter guarantee USA origin and at the same time satisfy the material delivery terms set forth in the Amended Broker's Confirmation and repeated in the Tricon Letter. (*Id.*)

42. Also that day, the Broker himself told Vinmar that "a guarantee of us origin only was not agreed upon." (Ex. D at 7/31/2008 3:51:09 PM; *see also* Ex. B, Leyman Depo., at 39:2-18)

43. Pursuant to the Broker's Confirmation, Amended Broker's Confirmation, and Tricon Letter, Vinmar was required to declare a discharge port on August 8, 2008. (Exs. A, C, E-H) By late afternoon that day, however, Vinmar still had not declared a discharge port and so Tricon sent an email reminding Vinmar of its contractual obligation. Tricon also informed Vinmar that if it did not make its declaration by the end of the day, Tricon would hold Vinmar in breach of contract and reserved the right to resell the product on the open market. (Ex. Q)

44. Although Vinmar acknowledged receipt of Tricon's email, it refused to declare a discharge port on August 8, 2008 and thereby breached the parties' contract. (*Id.*)

### Tricon's Resale and Damages

45. Vinmar having breached the parties' contract, Tricon attempted to find another buyer for the MX it had sold Vinmar. When no buyer materialized due to the steadily falling price of MX, Tricon used the product to satisfy an existing contract it had with a third party, KP Chemicals. (Ex. R-S) Specifically, three days after Vinmar's breach, Tricon elected to supply 4,998.995 metric tons of the MX to KP Chemicals, for the weekly average of the daily price postings during the month of September. (Ex. R) Ultimately, this price ended up being $995.50 per metric ton. (*Id.*) When the market continued to fall, KP Chemicals requested, and Tricon agreed, to reduce the amount of MX KP Chemicals purchased to 3230 metric tons.[2] (Ex. T) Thus, as a result of Vinmar's breach, Tricon suffered a loss under TEX. BUS. & COM. CODE § 2.706 for those 3230 metric tons in the amount of $1,015,835, which is the difference between the price under the contract with Vinmar and the resale price under the contract with KP Chemicals, plus interest.

---

[2] Tricon agreed to the reduction as a concession to a party with whom it frequently does business. KP's request for this accommodation highlights the extreme difficulty of finding any buyers for MX during this time of precipitous decline in price.

46. Because of the precipitous price drop, Tricon was unable to sell the remaining MX. Thus, Tricon suffered a further loss for an additional 2020 metric tons[3] in the amount of the difference between the price at which it contracted to sell MX to Vinmar and the market price of the MX at the time and place of tender pursuant to TEX. BUS. & COM. CODE § 2.708. The parties' contract required Tricon to make 5,000 metric tons, plus or minus 5% at Tricon's option, of MX available to Vinmar on a "C.F.R." Ulsan or Taiwan basis. (Exs. A, C, E-H) As defined by Incoterms 2000, which controlled the contract,[4] "C.F.R." is shorthand for "Cost and Freight" and means that the seller delivers when the goods at issue pass the ship's rail at the port of shipment.[5] Thus, the time and place of tender here would have been the date that Tricon would have loaded the MX for Vinmar at the port of shipment, which would have been either Ulsan, South Korea or Taiwan depending on the discharge port that Vinmar identified, and the earliest date that Tricon would have been able to load the MX for Vinmar would have been Monday, August 11, 2008. The latest date Tricon could have loaded the MX and met the contract's September 1-15, 2008 delivery window is September 15, 2008. Using the average daily price of MX during that time period in both Ulsan and Taiwan, or $1123.942 per metric ton (Ex. N), Tricon thus suffered a further loss in the amount of $375,837 plus interest for the 2,020 metric tons it was unable to sell.

---

[3] The contract between Tricon and Vinmar obligated Vinmar to purchase "5,000 MT plus/minus five percent, seller's option." *See* Exs. F-G. Similarly, the Tricon Letter referred to "5,000 Metric Tons +/- 5% (Vessel's Option)." *See* Ex. A. Given the value of the Vinmar contract relative to the falling market price, Tricon undoubtedly would have elected to sell Vinmar the full volume contemplated by the contract, 5,250 metric tons.

[4] The Broker's Confirmation and Amended Broker's Confirmation provided for delivery on a "CFR basis one safe berth/port major ports Taiwan or Ulsan Korea, at buyer's option," the Tricon Letter provided for "Incoterm: CFR Ulsan/Taiwan," and paragraph 5 of the Tricon Letter stated that "[a]ny situations not specifically addressed by this confirmation will be governed by Incoterms 2000 or latest published Incoterms (to the extent applicable) as in effect at the time of this agreement is entered into." (Exs. A ¶ 5, C, E-H) Because Incoterms 2000 was in effect in 2008 when the contract was entered into, *see http://www.iccwbo.org/incoterms/id3042/index.html*, Incoterms 2000 governs the contract.

[5] *See, e.g.*, http://www.iccwbo.org/incoterms/id3038/index.html; *B.P. Oil Int'l, Ltd. v. Empresa Estatal Petoleos de Ecuador*, 332 F.3d 333, 338 (5th Cir. 2003). This meaning is also consistent with paragraph 7 of the Tricon Letter, which provides that risk of damage and loss would pass to Vinmar "at the flange connection" between the ship and the loading hose at the loading terminal. (Ex. A ¶ 7)

47. In the alternative, Tricon suffered a loss in the amount of the difference between the price at which it contracted to sell MX to Vinmar and the market price of the MX at the time and place of tender for the entire 5,250 metric tons of MX. Using the average daily price of MX in both Ulsan and Taiwan during the time period in which Tricon would have loaded the MX (August 11, 2008 through September 15, 2008), or $1123.942 per metric ton[6] (Ex. N), if Tricon's entire damages are calculated according to TEX. BUS. & COM. CODE § 2.708, Tricon suffered a loss in the amount of $976,803 plus interest.

48. On Oct. 6, 2008, Tricon sent Vinmar an invoice for an amount described as "DAMAGES BASED ON VINMAR'S REPUDIATION OF OUR SALES CONTRACT." Payment on the invoice was due on October 15, 2008. (Ex. U) To date, however, Vinmar has not made any payment towards this invoice. Thus, by operation of paragraphs 11-12 of the Tricon Letter, Tricon is entitled to interest in the amount of $201,259 if Tricon's damages are calculated in accordance with TEX. BUS. & COM. CODE § 2.706 for the 3230 metric tons sold to KP Chemicals and § 2.708 for the remaining 2,020 metric tons or $141,262 if Tricon's damages are calculated in accordance with TEX. BUS. & COM. CODE § 2.708 for the entire 5,250 metric tons.

## Application of the Texas Uniform Commercial Code

49. The Texas Uniform Commercial Code - Sales, TEX. BUS. & COM. CODE § 2.101 *et seq.*, governs this dispute because it arises out a conflict over a contract, formed and accepted in Texas, for the sale of goods.

50. TEX. BUS. & COM. CODE § 2.204 provides: "(a) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which

---

[6] The price was significantly higher at the beginning of this period than at the end. Because of this steady and precipitous decline in price, Tricon was unable to find any other buyers. By September 15, 2008, the price had

recognizes the existence of such a contract. (b) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined. (c) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

51. TEX. BUS. & COM. CODE § 2.207 provides: "(a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms. (b) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (1) the offer expressly limits acceptance to the terms of the offer; (2) they materially alter it; or (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received. (c) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title."

52. TEX. BUS. & COM. CODE § 2.703 provides: "Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract [], then also with respect to the whole undelivered

---

fallen to approximately $983 per metric ton, and it continued to decline thereafter. (Ex. N)

balance, the aggrieved seller may," *inter alia*, "resell and recover damages as hereafter provided (Section 2.706) [or] recover damages for non-acceptance (Section 2.708). . . ."

53. TEX. BUS. & COM. CODE § 2.706 provides: "Under the conditions stated in Section 2.703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this chapter (Section 2.710), but less expenses saved in consequence of the buyer's breach." Further: "resale may be at public or private sale including sale by way of one ore more contracts to sell or of identification to an existing contract of the seller. . . . The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach."

54. TEX. BUS. & COM. CODE § 2.708 provides: "[T]he measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this chapter (Section 2.710), but less expenses saved in consequence of the buyer's breach."

55. TEX. BUS. & COM. CODE § 2.710 provides: "Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach."

### Tricon's Claim for Breach of Contract

56. Tricon repeats and realleges each and every allegation set forth in the preceding paragraphs.

{00100203.DOC; 4}

57. No later than July 23, 2008, Tricon and Vinmar entered into a binding contract according to which Vinmar agreed to purchase from Tricon 5,000 metric tons, plus or minus 5% at Tricon's option, of mixed xylene. The contract included all material terms regarding product, price, quantity, and quality, as well as payment, inspection, title, commission, and delivery terms. With respect to the delivery terms in particular, the parties agreed that Vinmar would declare a discharge port no later than August 8, 2008.

58. On July 29, 2008, the parties agreed to supplement their contract with all but one of the terms proposed by Tricon following the contract's formation. The additional terms concerned such matters as interest, invoicing, and taxes as well as an agreement to arbitrate any disputes that might arise. Vinmar agreed to all of these additional terms but one, making them part of the parties' agreement. Under Comment 6 to this § 2.207, "[i]f no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to." Thus, even if Vinmar had not explicitly assented to each additional term proposed by the Tricon letter, its failure to object is construed as acceptance. The one term proposed by Tricon that did not become part of the parties' contract concerned the demurrage time bar.

59. On August 8, 2008, Vinmar breached the parties' contract by refusing to declare a discharge port on that date as required by the parties' contract.

60. Anticipating Vinmar's breach, Tricon had warned Vinmar earlier that day that if Vinmar did not make its declaration as required by the parties' contract, Tricon would hold Vinmar in breach and reserved the right to resell the product on the open market.

61. Accordingly, Tricon resold the product to a third party at a substantial loss to Tricon. Tricon's resale was made in good faith and in a commercially reasonable manner and was reasonably identified as referring to the parties' contract.

62. As a result of Vinmar's breach, Tricon is entitled to an award of damages plus interest.

63. If Tricon's damages are calculated in accordance with TEX. BUS. & COM. CODE § 2.706 for the 3230 metric tons sold to KP Chemicals and § 2.708 for the remaining 2,020 metric tons, Tricon suffered damages in the amount of $1,391,672 plus $201,259 in interest,[7] for a total of $1,592,930.

64. In the alternative, if Tricon's entire damages are calculated in accordance with TEX. BUS. & COM. CODE § 2.708, Tricon suffered damages in the amount of $976,803 plus $141,262 in interest, for a total of $1,118,065.

65. Prior to Vinmar's breach, all conditions precedent under the contract between the parties had been satisfied.

66. Tricon is represented in this matter by George Diaz-Arrastia, an attorney at law. On March 9, 2009, Mr. Diaz-Arrastia presented Vinmar's attorney, Stephen Lee, with Tricon's claim under the contract. (Ex. V) To date, Vinmar has not tendered payment for the just amount owed and it has been more than 30 days since Tricon presented its claim to Vinmar. Accordingly, Tricon seeks recovery of its attorneys' fees, as provided by the parties' contract and TEX. CIV. PRAC. REM. CODE § 38.001 *et seq.*

## Relief

67. Tricon seeks an award against Vinmar as follows:

---

[7] The interest figures are calculated as of June 28, 2010. Interest continues to accrue on a daily basis, and these numbers will be updated at the hearing.

{00100203.DOC; 4}

(a) damages of $1,391,672 pursuant to TEX. BUS. & COM. CODE §§ 2.706 and 2.708, or in the alternative, $976,803 pursuant to TEX. BUS. & COM. CODE § 2.708, plus any incidental damages pursuant to TEX. BUS. & COM. CODE § 2.710.

(b) pre-judgment interest in the amount of $201,259 if Tricon's damages are calculated in accordance with both TEX. BUS. & COM. CODE § 2.706 and § 2.708, or $141,262 if Tricon's damages are calculated solely in accordance with TEX. BUS. & COM. CODE § 2.708, as provided by the parties' contract;

(c) post-judgment interest, as provided by the parties' contract and TEX. FIN. CODE § 304.001 *et seq.*;

(d) a monetary award of attorneys' fees and expenses incurred by Tricon in connection with this arbitration, as provided by the parties' contract and TEX. CIV. PRAC. REM. CODE § 38.001 *et seq.*;

(e) costs incurred by Tricon in connection with this arbitration, as provided by the parties' contract and TEX. CIV. PRAC. REM. CODE § 38.001 *et seq.*;

(f) such other relief as this Arbitration Tribunal deems appropriate in the circumstances.

{00100203.DOC; 4}

Respectfully submitted,

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP

By: _____
George R. Diaz-Arrastia
Tracy D. Larson
Pennzoil Place, North Tower
700 Milam St., 10th Floor
Houston, Texas 77002
Tele: (713) 221-2500
Fax: (713) 228-3510
Email: gdarrastia@sdablaw.com

ATTORNEYS FOR CLAIMANT TRICON ENERGY, LTD.

Dated: June 28, 2010

{00100203.DOC;4}