IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
-------------------------------------------------  X
IN THE MATTER OF THE ARBITRATION
BETWEEN:                                           :

TRICON ENERGY, LTD.,                               :

          Petitioner,                              :

     - and -                                       :        CIVIL ACTION NO. 4:10-cv-05260

VINMAR INTERNATIONAL, LTD.,                        :

          Respondent.                              :
-------------------------------------------------  X
```

## TRICON ENERGY, LTD.'S RESPONSE TO VINMAR INTERNATIONAL, LTD.'S MOTION TO VACATE

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

I.      NATURE AND STAGE OF PROCEEDINGS ................................................. 1

II.     STATEMENT OF THE ISSUES AND STANDARD OF REVIEW ................ 2

III.    SUMMARY OF THE ARGUMENT ................................................................ 3

IV.     FACTUAL BACKGROUND ........................................................................... 4

V.      ARGUMENT AND AUTHORITIES ............................................................... 7

        A.      This Court Has Subject Matter Jurisdiction ......................................... 7

        B.      Vinmar's Motion to Vacate Should be Denied ..................................... 9

                1.      The Panel Had Authority to Determine Its Own Jurisdiction ..................... 9

                2.      The Panel Correctly Determined That the Parties Had an Enforceable
                        Contract That Contained an Arbitration Provision ................................... 10

                        a.      After Initial Negotiations, the Parties Agreed to Additional
                                Terms, Including an Arbitration Provision ...................................... 10

                        b.      Vinmar Signed the Tricon Letter ................................................... 12

                        c.      Pascu Had Authority to Bind Vinmar ............................................ 15

                        d.      The Tricon Letter Did Not Cancel the Party's Agreement ............ 16

                        e.      Vinmar's Conduct Further Establishes the Existence
                                of a Contract .................................................................................. 18

VI.     CONCLUSION ................................................................................................ 19

{00119369.DOC; 2}

## TABLE OF AUTHORITIES

### Cases

*Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696 (Tex. App.—Houston [1st Dist.] 1988, writ denied) ................................................................................................ 14

*Am. Laser Vision v. Laser Vision,* 487 F.3d 255 (5th Cir. 2007) .................................... 2

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) ................................................................ 2

*Axelson, Inc. v. McEvoy-Willis*, 7 F.3d 1230 (5th Cir. 1993) ...................................... 17

*Central Power & Light Co. v. Del Mar Conservation Dist.*, 594 S.W.2d 782 (Tex. App.—San Antonio 1980, writ ref'd n.r.e.) ...................... 12

*China Nat'l Bldg. Material Inv. Co., Ltd. v. BNK Int'l LLC*, No. A-09-CA-488-SS, 2009 WL 4730578 (W.D. Tex. Dec. 4, 2009) ...................... 3

*Cloud Corp. v. Hasbro, Inc.,* 314 F.3d 289 (7th Cir. 2002) .......................................... 13

*Cox Eng'g, Inc. v. Funston Mach. & Supply Co.*, 749 S.W.2d 508 (Tex. App.—Fort Worth 1988, no writ) .................................... 12

*D & M Edwards, Inc. v. Bio-Cide Int'l, Inc.*, No. 3:08-CV-0670-L, 2009 WL 102732 (N.D. Tex. Jan. 4, 2009) ...................... 13

*D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95 (2d Cir. 2006) ................................ 3

*Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*, 992 F. Supp. 913 (S.D. Tex. 1998) .................................................................. 10

*Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.) .................... 16

*Ensco Offshore v. Titan Marine*, 370 F. Supp. 2d 594 (S.D. Tex. 2005) ................... 8, 9

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ........................... 2, 3, 10

*Freudensprung v. Offshore Technical Services, Inc.,* 379 F.3d 327 (5th Cir. 2004) ............... 8, 9

*Galtney v. KPMG LLP*, No. Civ.A. H05583, 2005 WL 1214613 (S.D. Tex. May 19, 2005) ........................................................ 8

*Gilmore v. Transit Grain & Comm'n Co.*, 213 S.W.2d 880 (Tex. Civ. App.–Fort Worth 1944, no writ) .............................. 14

*Gulf Petro Trading Co., Inc. v. Nigerian Nat. Petroleum Corp.*, 512 F.3d 742 (5th Cir. 2008) .......................................................................... 3

{00119369.DOC; 2}

*Hall Street Assoc., L.L.C. v. Mattel, Inc.,* 552 U.S. 576 (2008) ...................................................... 2

*In re Bunzl USA, Inc.*, 155 S.W.3d 202 (Tex. App.—El Paso 2004,
    orig. proceeding) ............................................................................................................. 13, 14

*In re Laibe Corp.*, 307 S.W.3d 314 (Tex. 2010)...................................................................... 11, 17

*In re Rio Grande Xarin II, Ltd.*, Nos. 13-10-00115-CV, 13-10-00116-CV,
    2010 WL 2697145 (Tex. App.—Corpus Christi July 6, 2010, pet. dism'd) ............................. 9

*Jiangsu Changlong Chems., Co., Inc. v. Burlington Bio-Medical & Scientific Corp.*,
    399 F. Supp. 2d 165 (E.D.N.Y. 2005) ................................................................................. 3

*John Wood Group USA, Inc. v. ICO, Inc.*,
    26 S.W.3d 12 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ................................... 15, 17

*Koons v. Impact Sales & Mktg. Group, Inc.*,
    No. 2-07-001-CV, 2007 WL 4292423 (Tex. App.—Fort Worth Dec. 6, 2007) ....................... 14

*Lamle v. Mattel, Inc.*, 394 F.3d 1355 (Fed. Cir. 2005) ................................................................. 13

*Lander Co. v. MMP Investments, Inc.*, 107 F.3d 476 (7th Cir. 1997) ............................................. 8

*Lummus Global Amazonas S.A. v. Aguaytia Energy Del Peru, S.R. Ltda.*,
    256 F. Supp. 2d 594 (S.D. Tex. 2002) ................................................................................. 3

*Matabang v. Carnival Corp.*, 630 F. Supp. 2d 1361 (S.D. Fla. 2009) ............................................. 9

*Migerobe, Inc. v. Certina USA, Inc.*, 924 F.2d 1330 (5th Cir. 1991) ............................................. 16

*Millmaker v. Brusco*, No. H-07-3837, 2008 WL 219551 (S.D. Tex. Jan. 25, 2008) ...................... 8

*MPJ v. Aero Sky, L.L.C.*, 673 F. Supp. 2d 475 (W.D. Tex. 2009) ............................................... 2, 3

*Pillar to Post, Inc. v. Weible*, No. H-09-3227, 2010 WL 2636121 (S.D. Tex. June 29, 2010) .. 2, 3

*Saipem Am. v. Wellington Underwriting Agencies Ltd.*,
    335 F.App'x 377 (5th Cir. 2009) ......................................................................................... 2

*Scaife v. Associated Air Center Inc.*, 100 F.3d 406 (5th Cir. 1996) ............................................. 14

*Taggart v. Crews*, 521 S.W.2d 703 (Tex. App.—San Antonio 1975,
    writ ref'd n.r.e.) ............................................................................................................... 13

## Statutes

15 U.S.C. § 7001(a)(1) ............................................................................................................... 13

9 U.S.C. § 201 ............................................................................................................................ 7

{00119369.DOC; 2}

9 U.S.C. § 202 ................................................................................................... 3, 7, 8

TEX. BUS. & COM. CODE § 1.201 .................................................................... 12

TEX. BUS. & COM. CODE § 1.201(b)(37) ....................................................... 12, 13

TEX. BUS. & COM. CODE § 2.102 .................................................................... 12

TEX. BUS. & COM. CODE § 2.201 .................................................................... 12, 13

TEX. BUS. & COM. CODE § 2.204(a) ............................................................... 18

TEX. BUS. & COM. CODE § 2.207 .................................................................... 11, 17

TEX. BUS. & COM. CODE § 2.209(a) ............................................................... 11

{00119369.DOC; 2}

TO THE HONORABLE UNITED STATES DISTRICT JUDGE LEE ROSENTHAL:

Tricon Energy, Ltd. ("Tricon") respectfully files this Response to Vinmar International, Ltd.'s ("Vinmar") Motion to Vacate and would show the Court as follows:[1]

## I.    NATURE AND STAGE OF PROCEEDINGS

This action arises out of a straightforward breach of contract case.  Communicating through a third-party broker, Vinmar contracted to purchase 5,000 metric tons of mixed xylene ("MX") from Tricon for delivery in Asia.  Following the initial broker correspondence, the parties engaged in direct negotiations where they agreed to several additional terms, including an arbitration provision.  Several days later the price of MX began to fall dramatically, so Vinmar sought to renege on its commitment.  When Tricon refused Vinmar's repeated attempts to resell the MX, Vinmar unilaterally declared that there was no agreement and refused to perform.  The price of MX continued to plummet, and Tricon ultimately suffered a loss of $1,338,776.72.

Pursuant to the arbitration provision, Tricon instituted arbitral proceedings to recover its losses.  Vinmar objected to arbitration, but did not seek to stay the proceedings and participated voluntarily.  The proceedings were conducted by an American Arbitration Association tribunal, comprised of Judges Mark Davidson, Levi Benton, and Sharolyn Wood (the "Panel").  After a two-day evidentiary hearing, post-arbitration briefing, and closing arguments, on November 29, 2010 the Panel issued a unanimous award in favor of Tricon for $2,008,867.80[2] plus costs, interest, and contingent attorneys' fees for proceedings to confirm, if needed (the "Award").  *See* Ex. A.[3]  Tricon filed an application to confirm this award on December 13, 2010.  Vinmar

---

[1]  Tricon incorporates the facts and argument set forth in its Petition to Confirm Arbitration Award ("Petition") and Reply in Support of Petition to Confirm Arbitration Award ("Reply").

[2]  The award included $1,338,776.72 in compensatory damages, $246,298.30 in prejudgment interest, and $423,793.78 for attorneys' fees and costs.

[3]  For ease of reference, Tricon is using the same exhibit labels as were used in its Petition and Reply.

{00119369.DOC; 2}

responded to that action on January 10, 2011 with an answer and counterclaim to vacate. Vinmar filed a second request to vacate on February 24, 2011. On February 25, 2011, Vinmar filed a third Motion to Vacate in Texas state court. Tricon removed that action to federal court and requested that it be consolidated with these proceedings.

## II.   STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

A threshold question before this Court is whether the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("New York Convention") provides subject matter jurisdiction over a contract that required performance in Asia. Subject-matter jurisdiction involves a court's power to hear a case and can never be forfeited or waived. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party. *Id.*

Second, the Court must decide whether to confirm the unanimous arbitration Award. Under well-settled law, judicial review of arbitration awards is "exceedingly deferential." *Saipem Am. v. Wellington Underwriting Agencies Ltd.*, 335 F.App'x 377, 379 (5th Cir. 2009) (quoting *Am. Laser Vision v. Laser Vision Institute, L.L.C.*, 487 F.3d 255, 258 (5th Cir. 2007)). The proceedings should receive "streamlined treatment" and "expedited review." *MPJ v. Aero Sky, L.L.C.*, 673 F. Supp. 2d 475, 484 (W.D. Tex. 2009) (quoting *Hall Street Assoc., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 582 (2008)). However, the question of whether an arbitration agreement existed is subject to independent review by this Court. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Under the Federal Arbitration Act ("FAA"), a party opposing confirmation of an arbitration award bears the burden of establishing that a basis for vacatur exists. *See Pillar to*

{00119369.DOC; 2}

*Post, Inc. v. Weible*, No. H-09-3227, 2010 WL 2636121, at *1 (S.D. Tex. June 29, 2010) (citing *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006); *Lummus Global Amazonas S.A. v. Aguaytia Energy Del Peru, S.R. Ltda.*, 256 F. Supp. 2d 594, 604 (S.D. Tex. 2002) (Rosenthal, J.)). "Vacatur of arbitral awards under the FAA should occur only in 'unusual circumstances.'" *MPJ*, 673 F. Supp. 2d at 484 (quoting *First Options*, 514 U.S. at 944). Similarly, under the New York Convention, "the party resisting confirmation bears the burden of showing one of the circumstances warranting denial of enforcement, as set forth in the New York Convention, is present." *China Nat'l Bldg. Material Inv. Co., Ltd. v. BNK Int'l LLC*, No. A-09-CA-488-SS, 2009 WL 4730578, at *2 (W.D. Tex. Dec. 4, 2009). Article V of the New York Convention enumerates the exclusive grounds on which an enforcing court may refuse recognition and enforcement of an award. *See id.* (citing *Gulf Petro Trading Co., Inc. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 747 (5th Cir. 2008)). The grounds are strictly limited and are narrowly construed. *Id.* (citing *Jiangsu Changlong Chems., Co., Inc. v. Burlington Bio-Medical & Scientific Corp.*, 399 F. Supp. 2d 165, 168 (E.D.N.Y. 2005)).

## III.   SUMMARY OF THE ARGUMENT

Under the plain language of the New York Convention, as well as Fifth Circuit precedent, this Court has subject matter jurisdiction over these proceedings because the contract "envisage[d] performance . . . abroad." *See* 9 U.S.C. § 202. Pursuant to this authority, the Court should confirm the Award and deny Vinmar's motion to vacate. Under basic contract law, Tricon and Vinmar had an enforceable agreement that included an arbitration provision. Although the initial broker correspondence was silent regarding arbitration, consistent with industry custom and practice, the parties later agreed to additional terms including arbitration. Vinmar's Motion to Vacate disregards the facts, applicable Texas law, and common sense. The

3

{00119369.DOC; 2}

Court should decline Vinmar's offer to further prolong these proceedings and confirm the well-reasoned, unanimous arbitration Award.

## IV.    FACTUAL BACKGROUND

This case involves Vinmar's breach of a contract to purchase MX from Tricon.  MX is a type of petrochemical known to have a very volatile price.  (Ex. O, Hearing Transcript,[4] at 488:2-3).  Accordingly, contracts for the sale of MX must be executed quickly in order to capture the going market price, which can change significantly from day to day.  Ex. P, Simpson Report,[5] at ¶ 3.  During the time period relevant here, the price of MX fell precipitously almost every day. From July 22, 2008 to September 15, 2008, the price of MX fell by approximately 28%, and by the end of the year, the price of MX had fallen by approximately 62%. (Tr. 77:20-78:14).

On July 22, 2008, Brad Lockwood on behalf of Tricon and Rick Wilson on behalf of Vinmar entered into negotiations, facilitated by third-party broker Ed Leyman ("Broker"), for Tricon's sale to Vinmar of 5,000 metric tons, plus or minus 5%, of MX for delivery in Taiwan or Korea.  Both parties gave the Broker the authority to enter into a transaction on their behalf.  (Tr. 243:7-245:11; Tr. 248:22-249:13 (Leyman)).  Consistent with industry custom and practice, shortly after the parties reached an agreement on the material terms the Broker sent both parties a confirming memorandum memorializing the contract.  (Ex. B).[6]  After receiving and reviewing the confirming memorandum, Vinmar requested to change the payment terms from 30 days after

---

[4]   Citations to the hearing transcript will be noted by "Tr. Page number: Line number."

[5]   This report was authenticated in the deposition of Steve Simpson.  *See* Ex. Q at 8:13-19.

[6]   Exhibits B-H previously were authenticated by Brad Lockwood in Tricon's Petition.

the bill of lading date to an at-sight letter of credit.  (Tr. 251:11-22).  Tricon agreed to this change (*id.* at 253:1-17), and the Broker sent out a second memorandum reflecting the amended payment terms.  (Ex. C).  After Lockwood notified the Broker of a typo as to the agreed upon price, he sent out another amended memorandum to correct the error.  (Ex. D).  All the confirming memoranda specifically provide for delivery on a "CFR basis . . . major ports Taiwan or Ulsan Korea."

On July 24, 2008, Tricon sent Vinmar a letter confirming this agreement and also proposing additional terms (the "Tricon Letter").[7]  (Ex. E).  The Tricon Letter did not conflict with any of the terms of the broker's amended confirming memornadum.  (Tr. 428:18-432:1 (Wilson)).  It also provided for delivery "C.F.R. Ulsan [Korea]/Taiwan."  (Ex. E).  Included among the proposed additional terms was a provision regarding interest for non-payment and an agreement to submit any disputes to arbitration.  *Id.* at ¶¶ 9, 12.  Wilson forwarded the Tricon Letter to his colleague at Vinmar, Laurentiu Pascu, informing him that he had "bough[t] MX from Tricon" and asking him to "please contact them and make necessary arrangements."  (Ex. F).  Wilson testified that it was Pascu's job to complete the financial and contractual parts of the deal (Tr. 426:14-427:8).

Pascu subsequently made a few handwritten notations on the Tricon Letter with Vinmar's suggested changes.  Pascu ran those changes by Wilson and, after being instructed to do so by Wilson, forwarded Vinmar's "comments" to Vuk Rajevac at Tricon on July 29, 2008.  (Exs. R,[8] G).  Pascu's email was sent from his Vinmar email account and included his electronic signature.

---

[7]   It is common in the industry for parties to exchanges letters of this type following the conclusion of a deal, a custom known as "passing paper."  (Tr. 480:1-10 (Simpson)).  These letters, which generally contain various terms and conditions, are not meant to cancel the deal, *see* Tr. 480:14-481:1 (Simpson), but only to replace the documentation and expand upon it with some additional terms.  (Tr. 321:6-25 (Rajevac); Tr. 73:10-19 (Lockwood)).

[8]   This email was authenticated in the deposition of Laurentiu Pascu.  *See* Ex. J at 66:2-67:9

{00119369.DOC; 2}

(Ex. G).   Other than these minor edits, Vinmar accepted Tricon's proposed terms, including arbitration.   *Id.*   On July 29, Vuk Rajevac on behalf of Tricon promptly accepted all of Vinmar's comments, except for a request to change the demurrage time bar,[9] noting that "[y]our comments on the contract [are] well noted and accepted. . . ."   (Ex. H).   Rajevac's email to Pascu likewise included his email signature.   *See id.*

On the morning of July 31, 2008, after the price of MX had fallen precipitously,[10] Wilson sent Lockwood an instant message, offering to sell back the MX Vinmar had purchased from Tricon and thereby "wipe the slate clean."   (Ex. S).[11]   Tricon refused Vinmar's resale attempt and, a few hours later, Vinmar *for the first time* demanded a guarantee that the MX it had purchased be "USA origin."   (Ex. U).[12]   Tricon rejected Vinmar's request for a new term, as origin had never been discussed and Tricon could not simultaneously guarantee USA origin and satisfy the contract's delivery window.   *See id.*   Then, on August 6, 2008, Vinmar, through the Broker, sent Tricon an email reiterating its new demand for a guarantee of USA origin and asserting for the first time that the parties did not have a deal.   (Ex. V).[13]   Vinmar proceeded to breach the parties' agreement by refusing to declare a discharge port.   Because the price of MX continued to plummet, Tricon struggled to find a replacement buyer.   (Tr. 89:19-23).   Ultimately, Tricon was able to use a portion of the MX to satisfy an existing contract, but at a price

---

[9]   The demurrage time bar is not at issue in this case.

[10]   The market price of MX experienced a "historic fall" in 2008, dropping from $1355.50 per metric ton, as reported by Platts, on July 22, 2008 to $1258/mt on July 31, 2008.   (Tr. 76:11-5).   This represented a fall of approximately 7%.   (Tr. 77:15-19).   The price continued to fall throughout 2008, declining approximately 28% to $983/mt by September 15, the time by which Vinmar was scheduled to take delivery, and 62% to $502/mt by December 15.   (Tr. 77:20-78:14).   The price of MX tends to track the price of crude oil, which dropped from $147 per barrel to approximately $30 per barrel in the same time period.   (Tr. 78:15-22; 488:4-6).

[11]   This communication was authenticated in the deposition of Richard Wilson.   *See* Ex. T at 104:4-20.

[12]   This email was authenticated in the deposition of Richard Wilson.   *See* Ex. T at 47:12-48:10.

[13]   This email was authenticated in the deposition of Richard Wilson.   *See* Ex. T at 50:23-51:2.

{00119369.DOC; 2}

significantly below the Vinmar contract.  It was unable to sell the remaining MX.  (Tr. 89:19-90:8; 101:17-23).  Ultimately, this resulted in a loss to Tricon of $1,338,776.72.  Tricon therefore instituted the arbitral proceedings to recover these losses.

## V.      ARGUMENT AND AUTHORITIES

**A.      This Court Has Subject Matter Jurisdiction**

This Court has jurisdiction pursuant to the New York Convention because the contract required performance in Asia.  Under the FAA, the New York Convention "shall be enforced in United States courts in accordance with this chapter."  9 U.S.C. § 201.  An arbitration agreement "falls under the Convention" if it "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title. . . ."  9 U.S.C. § 202.  Where, as here, the agreement "is entirely between citizens of the United States" it falls under the New York Convention if "that relationship involves property located abroad, *envisages performance or enforcement abroad*, or has some other reasonable relation with one or more foreign states."  *Id.* (emphasis added).

Here, the parties' contract specified that delivery of the MX Vinmar purchased would be made in either Ulsan, Korea or Taiwan.  *See* Ex. B-H; *see also* Ex. A, Award, at 5.  Specifically, "Tricon [was] contractually obligated to deliver 5,000 MT of mixed xylene to Asia in the first half of September. . . ."  Ex. A at 5.  There is no question that "performance abroad" was not only contemplated, but required.  Thus, the clear language of Section 202 and the undisputed facts[14] establish federal jurisdiction.

---

[14]   Although Vinmar disputes that the Broker's confirming memoranda and the Tricon Letter form an enforceable contract, it does not dispute that Ex.'s B-H are true and correct copies of the confirming memoranda and the Tricon Letter or that they specifically require delivery in Taiwan or Ulsan, Korea.

7

Although relatively few courts have interpreted this language in Section 202, those that have uniformly hold that when the contract in question specifically requires some performance in a foreign country the New York Convention applies, even though all the parties to the contract are U.S. citizens.  In *Freudensprung v. Offshore Technical Services, Inc.,* 379 F.3d 327 (5th Cir. 2004), two United States citizens entered into an agreement in which one party agreed to perform consultant services on barges in offshore Nigeria.  As in this case, the agreement contained a Texas choice-of-law provision and an arbitration clause requiring arbitration of any dispute in Houston, Texas.   Applying 9 U.S.C. § 202, the Fifth Circuit concluded that, because the agreement "envisage[d] performance . . . abroad," the arbitral clause was enforceable under the New York Convention even though both parties were U.S. citizens.  *Id.* at 340.  Similarly, in *Lander Co. v. MMP Investments, Inc.*, 107 F.3d 476 (7th Cir. 1997), the Seventh Circuit found jurisdiction under the New York Convention where both parties were U.S. citizens, the arbitration was to take place in the United States, and the only foreign connection to the parties' relationship was that the distribution contract required performance in Poland.  *Id.* at 481-82. Other courts in this District have held the same. *See Millmaker v. Brusco*, No. H-07-3837, 2008 WL 219551, at *3 (S.D. Tex. Jan. 25, 2008) (finding jurisdiction where agreement required party to "furnish its 'best advice, information, judgment and knowledge' regarding the development of oil and natural gas reserves in West Africa" and noted that the services "will include significant travel outside of the United States"); *Galtney v. KPMG LLP*, No. Civ.A. H05583, 2005 WL 1214613, at *3 (S.D. Tex. May 19, 2005) (finding jurisdiction where the agreement expressed a party's intent borrow funds from a Cayman Islands bank).  No courts have held to the contrary.

The cases that have found no federal jurisdiction under the New York Convention deal with agreements that do not involve any performance in a foreign country.  For example, in

{00119369.DOC; 2}

*Ensco Offshore v. Titan Marine*, 370 F. Supp. 2d 594 (S.D. Tex. 2005), the court found that the New York Convention did not apply to "a dispute just off the Gulf Coast with eventual performance in Texas. . . ." *Id.* at 600; *see also id.* at 601 (noting that the dispute was between "two American companies with no connection to any foreign country. . . ."). Significantly, the court noted that, had performance been required offshore in *foreign* waters, the result would be different. *Id.* at 601. Similarly, *Matabang v. Carnival Corp.*, 630 F. Supp. 2d 1361 (S.D. Fla. 2009), involved an employment contract for a performer on a cruise ship. That contract "contain[ed] no references to performance abroad or any foreign state," and the employee "wasn't even required to set foot on [foreign] soil, [as] he performed while the boat was at sea." *Id.* at 1366-67. The relevant "legal relationship" was the "employment contract, which does not reasonably relate to a foreign state." *Id.* at 1367. For that reason, the New York Convention did not apply. [15] *See id.* In sharp contrast, the contract at issue here explicitly required that the MX was to be delivered in Asia. (Exs. D-E). Performance abroad was mandated, so there can be no dispute that this Court has subject matter jurisdiction. *See Freudensprung*, 379 F.3d at 340.

## B.     Vinmar's Motion to Vacate Should be Denied

### 1.     The Panel Had Authority to Determine Its Own Jurisdiction

As addressed in Part III(C)(1) of Tricon's Reply, Vinmar's contention that the Panel lacked authority to determine its own jurisdiction is both meritless and in direct conflict with governing Texas law. In *In re Rio Grande Xarin II, Ltd.*, Nos. 13-10-00115-CV, 13-10-00116-CV, 2010 WL 2697145 (Tex. App.—Corpus Christi July 6, 2010, pet. dism'd), the Corpus Christi Court of Appeals rejected an attempt to vacate an arbitral ruling based on the mere fact

---

[15] After the February 24 hearing in this Court, counsel for Tricon asked counsel for Vinmar to identify the cases that caused counsel for Vinmar to have doubts about federal jurisdiction in this case. *Ensco* and *Matabang* are the only cases that counsel for Vinmar identified.

{00119369.DOC; 2}

that the plaintiff did not first seek permission from a trial court to proceed with arbitration, concluding that "[r]equiring a party who is initiating arbitration pursuant to contract to institute litigation prior to arbitration is *nonsensical*" as it "deprives the parties of the benefits of the contracted-for arbitration clause and defeats the purpose of providing a rapid, inexpensive alternative to traditional litigation." *Id.* at *6 (emphasis added and internal quotation marks omitted). Indeed, "[t]he purpose of an arbitration provision or agreement is to prevent subjecting the parties to litigation in the event of a dispute." *Id.*

It does not matter that the panel's arbitrability decision is now "subject to independent review by the courts." *First Options*, 514 U.S. at 947. No one disputes that, but it is totally irrelevant to whether the panel had jurisdiction to proceed. Indeed, the AAA Commercial Arbitration Rules confirm the Panel's authority to proceed, providing that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Commercial Arbitration Rule R-7(a). The Panel unquestionably had jurisdiction to determine both arbitrability and the merits of Tricon's claims.[16]

## 2. The Panel Correctly Determined That the Parties Had an Enforceable Contract That Contained an Arbitration Provision

### a. After Initial Negotiations, the Parties Agreed to Additional Terms, Including an Arbitration Provision

Under Texas law, the parties had an enforceable agreement by no later than July 23, 2008, the date the broker sent out a confirming memorandum reflecting the correct terms to

---

[16] At the evidentiary hearing, Vinmar's attorney admitted that, if the Panel were to find in favor of Vinmar, he would view that as an enforceable award. (Tr. 41:22-42:7).

{00119369.DOC; 2}

which the parties had agreed. *See Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*, 992 F. Supp. 913, 915 (S.D. Tex. 1998) ("[Broker] conveyed Statoil's offers to Hydro and Hydro's acceptance to Statoil. It then confirmed the transactions by telephone and fax. That is simple contract formation-offer and acceptance-occurring through a broker and documented in faxes."). However, the parties plainly were free to subsequently add to or modify those terms. *See* TEX. BUS. & COM. CODE § 2.209(a) ("An agreement modifying a contract within this chapter needs no consideration to be binding."); *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (forum selection clause contained in later agreement binding, even though original purchase order did not have any such provision). The additional terms proposed by Tricon in the Tricon Letter, including arbitration, were accepted by Vinmar and therefore became a part of the contract.[17]

Consistent with industry custom and practice, after the traders agreed on the material terms of the deal, they turned the transaction over to their schedulers, Pascu on behalf of Vinmar and Rajevac on behalf of Tricon, to negotiate the remaining details. As Wilson testified, it was Pascu's job to complete the transaction in order to free the trader to do more deals. (Tr. 426:14-20). Indeed, Wilson testified that "all the financial and contractual agreements, you know, it's their responsibility to execute them." *Id.* at 427:2-4. Rajevac concurred, testifying that "[a]fter the trader does the deal the transaction moves over to us, gets to free up the trader to do more trades and worry about other stuff. So we become the face of the company and deal with the counterparties on both sides, purchase and sale side, to bring the transaction to an end basically." *Id.* at 289:20-25. To accomplish that end, schedulers are "allowed to . . . negotiate the general

---

[17] As set forth in Tricon's Reply, even if the Court concludes that the broker correspondence was not binding, the Tricon Letter was a binding contract pursuant to TEX. BUS. & COM. CODE § 2.207. *See* Reply at Part III(C)(2)(b).

11

terms and conditions, correct." *Id.* at 290:3-4.  Tricon's expert witness, Steve Simpson, agreed, stating that it was common for the terms and conditions of sale to be negotiated by the schedulers. *Id.* at 483:6-10; *see also* Ex. A, Award, at 3 ("Operations Specialists are schedulers who job is to make sure the deal is completed.  Both the buyer and seller will have Operations Specialists to work out the additional terms of the sale necessary to accomplish the trade as agreed.").  Thus, when Pascu assented to the additional provisions proposed in the Tricon Letter, *see* Ex. G, including the arbitration provision, Vinmar because bound to those terms.

### b.     Vinmar Signed the Tricon Letter

Under the Texas Uniform Commercial Code ("UCC"),[18] Vinmar signed the Tricon Letter in its July 29, 2008 email.  Contrary to Vinmar's contentions, parties need not take pen to paper and write their names for the writing to be "signed."  Rather, the Texas UCC defines "signed" broadly as "using any symbol executed or adopted with present intention to adopt or accept a writing."  TEX. BUS. & COM. CODE § 1.201(b)(37); *see also id.* § 2.201 cmt. 1 (the term "signed" "includes any authentication which identifies the party to be charged.").[19]  Texas courts have held that invoices, letterhead, and letters discussing the agreement all can satisfy the UCC's statute of frauds.  *See, e.g. Cox Eng'g, Inc. v. Funston Mach. & Supply Co.*, 749 S.W.2d 508, 511 (Tex. App.—Fort Worth 1988, no writ) (invoice letterhead constituted signature under § 1.201); *Central Power & Light Co. v. Del Mar Conservation Dist.*, 594 S.W.2d 782, 790 (Tex. App.—San Antonio 1980, writ ref'd n.r.e.) ("[A] valid memorandum

---

[18]   The Texas version of the Uniform Commercial Code is the relevant law because the contract in question involves the sale of goods. TEX. BUS. & COM. CODE § 2.102.  Texas law applies both because the contract specifically calls for Texas law and because Tricon and Vinmar are both Texas residents.

[19]   *See also id.* ("The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. It may be written in lead pencil on a scratch pad. It need not indicate which party is the buyer and which the seller. The only term which must appear is the quantity term. . . .").

{00119369.DOC; 2}

of the contract may consist of letters and telegrams signed by the party to be charged and addressed to his agent or the other party to the contract, or even to a third party. . . ."); [20] *Taggart v. Crews*, 521 S.W.2d 703, 708 (Tex. App.—San Antonio 1975, writ ref'd n.r.e.) (same).

Vinmar's assent to the Tricon Letter is abundantly clear. It "signed" the Tricon Letter in its July 29, 2008 email to Tricon, agreeing to most of its terms, including the arbitration provision. (Ex. G). Pascu not only made handwritten comments to the Tricon Letter, he signed the memorandum to Rajevac with his email signature, "Laurentiu Pascu, Vinmar International, Ltd." *Id.* This easily satisfies the Texas UCC's statute of fraud's flexible requirements. *See* TEX. BUS. & COM. CODE § 1.201(b)(37); *id.* cmt. 37; TEX. BUS. & COM. CODE § 2.201; *see also D & M Edwards, Inc. v. Bio-Cide Int'l, Inc.*, No. 3:08-CV-0670-L, 2009 WL 102732, at *3 (N.D. Tex. Jan. 4, 2009) (granting leave to amend pleadings to attach e-mail that would be sufficient to satisfy the statute of frauds); *Cloud Corp. v. Hasbro, Inc.,* 314 F.3d 289, 295-96 (7th Cir. 2002) ("[T]he sender's name on an e-mail satisfies the signature requirement of the statute of frauds."); *Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1362 (Fed. Cir. 2005) (name on email satisfies the statute of frauds); 15 U.S.C. § 7001(a)(1) ("[A] signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form.").

That neither party's signature appears in the Tricon Letter's signature block is irrelevant. As acknowledged in the cases on which Vinmar errantly relies, "the question of whether a written contract must be signed to be binding is a question of the parties' intent." *In*

---

[20] Vinmar attempts to argue that, because Tricon asserts that the broker's confirmation is a binding contract, then terms not contained therein cannot be a part of the agreement. This is directly contrary to Texas law, as—like the court noted in *In re Laibe*—a contract can consist of multiple documents.

{00119369.DOC; 2}

re *Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, orig. proceeding). "[I]f the parties have unconditionally assented to terms stated in an unsigned document, the document constitutes a binding written contract, regardless of whether it is signed." *Id.* Notably, "a proper signature is by no means the only way a party can manifest assent to a contract." *Id.* at 210; *see also Gilmore v. Transit Grain & Comm'n Co.*, 213 S.W.2d 880, 881-82 (Tex. Civ. App.–Fort Worth 1944, no writ) (finding an enforceable contract based on the written confirmation sent by the plaintiff to the defendant notwithstanding the fact that the defendant did not sign the accompanying transmittal letter, as requested by the plaintiff). Where no formal signature appears, other evidence may be relied upon to prove a party's assent. *Bunzl*, 155 S.W.3d at 209; *see also Koons v. Impact Sales & Mktg. Group, Inc.*, No. 2-07-001-CV, 2007 WL 4292423, at * 2 (Tex. App.—Fort Worth Dec. 6, 2007) (noting that the Code defines "signed" as "any symbol executed or adopted with present intention to adopt or accept a writing."). *Scaife v. Associated Air Center Inc.*, 100 F.3d 406 (5th Cir. 1996), which is relied on by Vinmar, is not to the contrary. There, the court found that a formal signature was required only because, unlike in this case, there was deposition testimony establishing that the parties contemplated that such signatures would be required and took steps to ensure that representatives were available to make and deliver the signatures.[21] *See id.* at 411.

---

[21] The other case relied on by Vinmar, *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696 (Tex. App.—Houston [1st Dist.] 1988, writ denied), is irrelevant to this case. There, the "appellees concede[d] that no such writing [sufficient to satisfy the statute of frauds] exists," and instead argued that their case fell within the UCC's "merchant exception." *Id.* at 706.

Here, in sharp contrast, it never was expected that either party would sign the Tricon Letter. As Steve Simpson, an expert who has participated in over 1,000 petrochemical trades, testified, he has never seen additional terms signed on spot deals.[22] (Tr. 482:11-483:5; *see also* Ex. P, Simpson Report, at ¶ 6). Brad Lockwood testified that the signature blanks are generated automatically by the system. (Tr. 136:25-137-8; 140:11-15). He never expected Vinmar to sign the contract, as contracts for "spot purchases" are virtually never signed. (Tr. 74:15-75:4; *see also* Tr. 319:6-20 (Rajevac)). Tellingly, Vinmar introduced no evidence or testimony to the contrary. *See* Ex. A, Award, at 10 ("There was no credible testimony that the custom in the industry was that the presence of a signature block required execution to be valid. The credible testimony was to the contrary."). Vinmar assented to the Tricon Letter through Pascu's email,[23] so Vinmar is bound to the terms included therein, including the arbitration provision. *See id.* ("In this process of 'passing paper,' the agreed additional terms, including an arbitration clause, became part of the Tricon-Vinmar trade.").

c.    **Pascu Had Authority to Bind Vinmar**

Vinmar's attempt to dismiss Pascu's email agreeing to the Tricon Letter as the unilateral act of a logistics employee fails as both a legal and factual matter. Wilson testified unequivocally that it was Pascu's job to complete "all the financial and contractual agreements" necessary to finalize the transaction. (Tr. 426:14-427:8). Tricon rightfully relied on Pascu's

---

[22]  A "spot deal" is a contract negotiated for a one- or two-time sale. (Tr. 482:21-23). In contrast, a long-term deal involves a commitment over the course of a year or more. (*Id.* at 482:15-20).

[23]  Tricon responded to Pascu's email noting that "your comments are duly noted and accepted." (Ex. H). The sole issue the parties did not agree upon was the demurrage time bar, which is not at issue in this case. Under Texas law, the fact that the parties have not reached agreement on a nonessential term will not prevent a contract from being formed. *See, e.g., John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 19 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) ("[A] binding contract may be formed if the parties agree on the material terms, even though they leave open other provisions for later negotiation."); *see also* Tr. 481:2-19 (Simpson testifying that, in the petrochemical trading industry, the fact that some additional terms are not agreed upon does not negate that a contract has been formed).

{00119369.DOC; 2}

authority to negotiate additional terms, as individuals like Pascu become "the face of the company" after the traders agree upon the material terms of a deal and turn the remaining details over to them to enable the trader to focus on entering into more transactions. (Tr. 289:20-25 (Rajevac)). Additionally, Pascu's acceptance of the Tricon Letter was made after consulting Wilson, and it was Wilson who instructed Pascu to contact Mr. Rajevac. (Ex. F; Ex. W,[24] Tr. 377:12-21). Pascu undoubtedly possessed actual authority to bind Vinmar to the Tricon Letter. *See Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 30 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.) ("Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess.").

Even if actual authority did not exist, Pascu plainly had apparent authority, as Tricon was cc'ed on Wilson's email to Pascu instructing him to complete the arrangements for the transaction. (Ex. F); *see also Disney*, 981 S.W.2d at 30 ("Apparent agency exists where the principal's conduct would lead a reasonably prudent person to believe that the agent possessed the authority to act on behalf of the principal."); *Migerobe, Inc. v. Certina USA, Inc.*, 924 F.2d 1330, 1336 (5th Cir. 1991) ("Apparent authority exists when the principal clothes his agent with the semblance of authority such that a reasonably prudent person having knowledge of the business involved would be justified in believing, that the agent has the power the person assumes that he has."). Under both Texas law and industry custom and practice, Pascu's email assenting to the Tricon Letter bound Vinmar to the terms included therein. Accordingly, the Panel properly concluded that Vinmar was bound to the arbitration provision.

---

[24] This document was authenticated in the deposition of Richard Wilson. *See* Ex. T at 89:6-23.

{00119369.DOC; 2}

### d.     The Tricon Letter Did Not Cancel the Party's Agreement

Under Texas law, as well as industry custom and practice, Tricon did not "cancel" the parties' agreement by sending the Tricon Letter.  Although the Tricon Letter stated that it "cancels and supercedes any broker correspondence," this is little more than a standard merger provision, commonly found in contracts.  *See Axelson, Inc. v. McEvoy-Willis*, 7 F.3d 1230, 1231-33 (5th Cir. 1993) (finding that contract was formed prior to circulation of a purchase order purporting to be the parties' "entire contract" and limiting acceptance to only its terms); *see also In re Laibe*, 307 S.W.3d at 317 (provision "stating that 'this Contract is the entire agreement' of the parties and 'no other oral or written agreements, terms or promises' shall be binding" termed a "standard merger clause.").  As Rajevac testified, the purpose of the Tricon Letter is to replace the broker's correspondence as the operative written document and expand upon it with additional terms; it is not intended to cancel or supersede the parties' agreement itself.  (Tr. 321:6-18).  Similarly, Brad Lockwood testified that his intent in sending the Tricon Letter was not to repudiate the agreement made through the Broker, but simply to propose additional terms, as is standard in the industry.  (Tr. 73:10-19; *see also* Tr. 293:10-20 (Rajevac); Tr. 480:14-481:1 (Simpson); Ex. P, Simpson Report, at ¶ 6 & Conc. ¶ 3).  Consistent with this intent, Wilson admitted that the Tricon Letter does not conflict in any way with the Broker's correspondence, but merely proposes new and additional terms.  (Tr. 431:11-432:1).

Regardless, even if the Tricon Letter did somehow void the Broker's correspondence it would not change the outcome, as Vinmar assented to the Tricon Letter through Pascu's email. *See* Ex. G.  That the parties failed to reach agreement on one non-essential term, the demurrage time bar, does not void this assent.  *See John Wood Group*, 26 S.W.3d at 19-20; *see also* Tr. 481:2-19 (Simpson); Tr. 73:20-74:7 (Lockwood); Tr. 293:21-294:5 (Rajevac).  Under Texas law,

{00119369.DOC; 2}

the contract is simply made up of the terms to which the parties agreed, including arbitration. *See* TEX. BUS. & COM. CODE § 2.207(a)-(b); *see also* Tr. 481:10-19 (Simpson).

### e.    Vinmar's Conduct Further Establishes the Existence of a Contract

To avoid any doubt, Vinmar's own conduct conclusively establishes that it believed it had entered an enforceable contract that contained an arbitration agreement.[25] For example, on July 24, 2008, Rick Wilson forwarded the Tricon Letter to Pascu noting that he had "bough[t] MX from Tricon," and asking him to "please contact them and make necessary arrangements." (Ex. F). Wilson similarly emailed a ship charterer, Nicklas Smith, on July 22, 2008, noting that he had "bought CFR." (Ex X).[26] In the e-mail returning his "comments" to Tricon, Pascu refers to the Tricon Letter as a "Sale Confirmation" (Ex. G), thus Pascu believed that a sale had been made. Pascu also prepared a purchase order and entered data into Vinmar's SAP system to internally memorialize the deal. (Exs. I, Y, Z).[27] Pascu hand-wrote the identifying number of the Vinmar P.O. on the copy of the Tricon Letter that he returned to Rajevac with his comments. (Ex. G). Significantly, the Vinmar P.O. also contains an arbitration provision identical in all its material terms to the arbitration provision in the Tricon Letter, showing that Vinmar agreed to arbitration. (Ex. I;[28] *see also* Ex. A, Award, at 10 (noting that the Vinmar P.O. contained an arbitration provision)). Later, on July 31, 2008, Rick Wilson instant messaged Brad Lockwood attempting to re-sell the MX Vinmar had committed to purchase from Tricon by requesting to "wipe the slate clean." (Ex. S). Plainly, there would be no slate to wipe clean if Vinmar was not

---

[25]  "Conduct by both parties which recognizes the existence" of the contract is evidence of formation of the contract. TEX. BUS & COM CODE § 2.204(a).

[26]  This email was authenticated in the deposition of Richard Wilson. *See* Ex. T at 37:15-20.

[27]  Exhibits Y and Z were authenticated in the deposition of Laurentiu Pascu. *See* Ex. J at 39:12-15.

[28]  This exhibit previously was authenticated in Tricon's Reply.

{00119369.DOC; 2}

aware it was obligated to purchase the MX from Tricon.  There can be no serious doubt that Vinmar believed it had entered into a binding contract containing an arbitration provision.

## VI.    CONCLUSION

Vinmar's strategy throughout these proceedings has been not to win, but to delay the inevitable payment of the money a unanimous arbitration tribunal has determined Tricon is owed.  Vinmar contracted to purchase 5,000 metric tons of MX from Tricon for delivery in Asia and agreed to arbitrate any disputes.  When that contract turned out to be unprofitable, Vinmar reneged on its obligation.  It now seeks to likewise breach its arbitration agreement.  Tricon respectfully requests that this Court deny Vinmar's motion to vacate and grant Tricon's Petition to Confirm Arbitration Award.  Tricon additionally requests any such other and further relief to which it may show itself to be justly entitled.

{00119369.DOC; 2}

Respectfully submitted,

SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP

By: _____
George R. Diaz-Arrastia
State Bar No. 05805600
S.D. Texas Bar No. 12
Pennzoil Place - North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
Telephone: (713) 221-2500
Facsimile: (713) 228-3510
E-Mail: gdarrastia@sdablaw.com

ATTORNEY-IN-CHARGE FOR DEFENDANT
TRICON ENERGY, LTD.

OF COUNSEL

Tracy D. Larson
State Bar No. 24055410
S. D. Texas Bar No. 840430
Pennzoil Place - North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
Telephone: (713) 221-2500
Facsimile: (713) 228-3510
E-Mail: tlarson@sdablaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 2011 a copy of the foregoing was electronically served and/or delivered via first-class mail to:

Stephen H. Lee
Daniel K. Hedges
R. Blake Runions
PORTER & HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002

_____
Tracy D. Larson

20

{00119369.DOC; 2}