ARBITRATION HEARING - SEPTEMBER 20, 2010

1

AMERICAN ARBITRATION ASSOCIATION

DALLAS, TEXAS

TRICON ENERGY, LTD.,          )
                              )
          Claimant,           )
                              )          CASE NO.
     - against -              )     70 198Y 00168 09
                              )
VINMAR INTERNATIONAL, LTD.,   )
                              )
          Respondent.         )


TRANSCRIPT OF PROCEEDINGS


BE IT KNOWN THAT the above-entitled matter came on for

arbitration at 8:50 a.m. on the 20th day of September,

2010, at the Houston Club, 811 Rusk, 10th Floor, Travis

Room, Houston, Texas, before the Honorable Levi Benton,

Presiding, the Honorable Sharolyn Wood and the Honorable

Mark Davidson, Arbitrators, and the following

proceedings were had:



PLAINTIFF'S
EXHIBIT
O

ARBITRATION HEARING - SEPTEMBER 20, 2010

2

```
 1   A P P E A R A N C E S :
 2
 3   THE PANEL OF ARBITRATORS:
         Honorable Levi Benton, Chair
 4       Honorable Sharolyn Wood
         Honorable Mark Davidson
 5
 6   FOR THE CLAIMANT, TRICON ENERGY, LTD.:
         Mr. George R. Diaz-Arrastia
 7       Ms. Tracy D. Larson
         SCHIRRMEISTER, DIAZ-ARRASTIA & BREM, LLP
 8       700 Milam, 10th Floor
         Houston, Texas  77002
 9       Tel: (713) 221-2500
         FAX: (713) 228-3510
10       gdarrastia@sdablaw.com
         tlarson@sdablaw.com
11
12   FOR THE RESPONDENT, VINMAR INTERNATIONAL, LTD.:
         Mr. Stephen H. Lee
13       Mr. R. Blake Runions
         PORTER & HEDGES, LLP
14       1000 Main Street, 36th Floor
         Houston, Texas  77002-6336
15       Tel: (713) 226-6000
         FAX: (713) 226-6286
16       slee@porterhedges.com
         brunions@porterhedges.com
17
18   ALSO PRESENT:
         Mr. Mark S. Antonvich
19       Ms. Dana Hodges
         Mr. Brad Lockwood
20       Ms. Myra Mendez
         Ms. Petrice Podlesny
21
22
23
24
25
```

3

```
 1              I N D E X
                                      PAGE
 2
     Appearances...........................  2
 3
     Opening Remarks on Behalf of The Respondent......  20
 4
     Opening Remarks on Behalf of The Claimant........  26
 5
     Opening Remarks on Behalf of The Respondent......  49
 6
 7   PRESENTATION ON BEHALF OF THE CLAIMANT
 8   BRAD JASON LOCKWOOD
         Direct Examination by Mr. Diaz-Arrastia.....  54
         Cross-Examination by Mr. Lee...............  106
 9       Redirect Examination by Mr. Diaz-Arrastia...  222
10   EDWARD LEYMAN (VIA VIDEOTAPE PLAYBACK)..........  238
11   VUK RAJEVAC
         Direct Examination by Mr. Diaz-Arrastia.....  288
12
     Reporter's Certificate Page.....................  310
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1              JOINT EXHIBITS
 2   NUMBER AND DESCRIPTION                 PAGE
 3   Exhibit 1.................................  --
          12-11-07 Contract between Tricon
 4        Energy and KP Chemical Corp.
          TRI 286-290
 5
 6   Exhibit 2.................................  --
          7-22-08 Fax to Rick Wilson attaching
 7        first MOAB Confirmation
          VIN 21-23, Exhibit 2
 8   Exhibit 3.................................  --
          7-22-08 Fax to Rick Wilson attaching
 9        second MOAB Confirmation
          VIN 19-20, Exhibit 3
10
11   Exhibit 4.................................  --
          7-23-08 Fax to Rick Wilson attaching
12        third MOAB Confirmation
          VIN 17-18, Exhibit 4
13   Exhibit 5.................................  --
          7-23-08 Email string between Brad
14        Lockwood and Rick Wilson, cc'ing
          others and attaching letter from
15        Tricon Energy
          TRI 6-10, Exhibit 15
16
17   Exhibit 6.................................  --
          7-24-08 Email from Rick Wilson to
18        Laurentiu Pascu, cc'ing Brad Lockwood,
          attaching letter from Tricon Energy
19        VIN 85-89, Exhibit 29
20   Exhibit 7.................................  --
          7-22-08 Vinmar's SAP Data
21        VIN 91-A-VIN 91-B, Exhibit 32-33
22   Exhibit 8.................................  --
          7-25-08 Email string between Eduard
23        Anaya and Rick Wilson, cc'ing others
          VIN 90, Exhibit 31
24
25
```

5

```
 1        JOINT EXHIBITS (Continued)
 2   NUMBER AND DESCRIPTION                 PAGE
 3   Exhibit 9.................................  --
          7-29-08 Email from Laurentiu Pascu to
 4        Rick Wilson
          VIN 98-99, Exhibit 36
 5   Exhibit 10.................................  --
          7-22-08 - 7-31-08 Instant message
 6        communications between Brad Lockwood
          and Ed Leyman
 7        MOAB 4-14, Exhibit 1
 8   Exhibit 11.................................  --
          7-22-08 - 7-31-08 Instant message
 9        communications between Ed Leyman and
          Rick Wilson
10        MOAB 15-16, Exhibit 6, 43
11   Exhibit 12.................................  --
          7-31-08 Instant message communications
12        between Brad Lockwood and Rick Wilson
          VIN 24, Exhibit 42
13   Exhibit 13.................................  --
          7-31-08 Email from Laurentiu Pascu to
14        Rick Wilson, forwarding edits to
          letter from Tricon Energy
15        VIN 3-8, Exhibit 35
16   Exhibit 14.................................  --
          7-31-08 Email from Laurentiu Pascu to
17        Rick Wilson, forwarding email from Vuk
          Rajevac
18        VIN 9-10, Exhibit 37
19   Exhibit 15.................................  --
          7-31-08 Email string between Vuk
20        Rajevac, Rick Wilson and Laurentiu
          Pascu, cc'ing others
21        TRI 17-18, Exhibit 17
22   Exhibit 16.................................  --
          7-31-08 E-mail from Rick Wilson to
23        Devang Mehta
          VIN 65, Exhibit 44
24
25
```

2  (Pages 2 to 5)

ARBITRATION HEARING - SEPTEMBER 20, 2010

**6**

JOINT EXHIBITS (Continued)

| NUMBER AND DESCRIPTION | PAGE |
|---|---|
| Exhibit 17.................................. -- | |
| 8-6-08 Email string between Vuk Rajevac, Rick Wilson and Laurentiu Pascu, cc'ing others | |
| VIN 81-82 | |
| Exhibit 18.................................. -- | |
| 8-6-08 Email from Ed Leyman to Brad Lockwood, forwarding email from Rick Wilson | |
| TRI 21, Exhibit 9 | |
| Exhibit 19.................................. -- | |
| 8-6-08 Email from Ed Leyman to Brad Lockwood, forwarding email from Rick Wilson | |
| MOAB 62 | |
| Exhibit 20.................................. -- | |
| 8-8-08 Email from Ed Leyman to Brad Lockwood, forwarding email from Rick Wilson | |
| MOAB 64 | |
| Exhibit 21.................................. -- | |
| 8-9-08 Email string between Brad Lockwood, Mark Antonvich and Vuk Rajevac, cc'ing others | |
| VIN 40-42 | |
| Exhibit 22.................................. -- | |
| 8-11-08 Email from Brad Lockwood to individuals at KP Chemical Corp. | |
| TRI 291 | |
| Exhibit 23.................................. -- | |
| 8-12-08 Email string between Brad Lockwood and Mark Antonvich, cc'ing others | |
| VIN 49-50 | |

**8**

TRICON EXHIBITS (Continued)

| NUMBER AND DESCRIPTION | PAGE |
|---|---|
| Exhibit 4.................................. -- | |
| 7-20-08 Contract between Tricon Energy and KP Chemical Corp., attaching average MX price for September | |
| TRI 36-40 | |
| Exhibit 5.................................. -- | |
| 7-22-08 - 8-6-08 Instant message communications between Brad Lockwood and Ed Leyman | |
| TRI 43-51, Exhibit 5, 8 | |
| Exhibit 6.................................. -- | |
| 7-22-08 - 7-23-08 Instant message communications between Brad Lockwood and Ed Leyman | |
| TRI 30-33 | |
| Exhibit 7.................................. -- | |
| 7-23-08 Fax to Rick Wilson attaching letter from Tricon Energy | |
| VIN 12-16 | |
| Exhibit 8.................................. -- | |
| 7-23-08 Email string between Jason Luoh and Rick Wilson, cc'ing others | |
| VIN 138-139, Exhibit 40 | |
| Exhibit 9.................................. -- | |
| 7-23-08 Email string between Jason Luoh and Rick Wilson, cc'ing others | |
| VIN 140 | |
| Exhibit 10.................................. -- | |
| 7-24-08 Vinmar International Purchase Order | |
| VIN 95-97, Exhibit 34 | |
| Exhibit 11.................................. -- | |
| 7-24-08 Vinmar International SAP Data | |
| VIN 91a-91b, Exhibit 32-33 | |
| Exhibit 12.................................. -- | |
| 7-24-08 Vinmar International SAP Data | |
| VIN 91, Exhibit 30 | |

**7**

JOINT EXHIBITS (Continued)

| NUMBER AND DESCRIPTION | PAGE |
|---|---|
| Exhibit 24.................................. -- | |
| 9-22-08 Contract between Tricon Energy and J&J Chemtrading Co. | |
| TRI 98-100 | |
| Exhibit 25.................................. -- | |
| 10-2-08 E-mail string between Gigi Ren and W.S. Shim, cc'ing others | |
| TRI 2544-2548 | |
| Exhibit 26.................................. -- | |
| 10-6-08 Email from Brad Lockwood to Rick Wilson and Mark Antonvich, attaching invoice | |
| TRI 41-42 | |
| Exhibit 27.................................. -- | |
| 10-20-08 Commercial Invoice from Tricon to Lotte Bussan for sale of MX | |
| TRI 316-318 | |
| Exhibit 28.................................. -- | |
| 11-4-08 Job Transaction Summary Report of Tricon Energy purchase of MX | |
| TRI 319-322 | |

TRICON EXHIBITS

| NUMBER AND DESCRIPTION | PAGE |
|---|---|
| Exhibit 1.................................. -- | |
| 10-23-07 MOAB Confirmation | |
| TRI 259 | |
| Exhibit 2.................................. -- | |
| 10-23-07 MOAB Confirmation | |
| TRI 260 | |
| Exhibit 3.................................. -- | |
| 10-29-07 MOAB Confirmation | |
| TRI 257 | |

**9**

TRICON EXHIBITS (Continued)

| NUMBER AND DESCRIPTION | PAGE |
|---|---|
| Exhibit 13.................................. -- | |
| 7-29-08 Email string between Vuk Rajevac and Laurentiu Pascu, attaching edits to letter from Tricon Energy | |
| VIN 27-31 | |
| Exhibit 14.................................. -- | |
| 7-29-08 Email string between Rick Wilson and Laurentiu Pascu | |
| VIN 116-117, Exhibit 41 | |
| Exhibit 15.................................. -- | |
| 8-4-08 Email string between Rick Wilson and Devang Mehta | |
| VIN 58 | |
| Exhibit 16.................................. -- | |
| 8-6-08 Email string between Brad Lockwood, Ed Leyman and Rick Wilson, cc'ing others | |
| MOAB 25-26 | |
| Exhibit 17.................................. -- | |
| 8-6-08 Email from Rick Wilson to Hermant Goradia, cc'ing others | |
| VIN 59, Exhibit 45 | |
| Exhibit 18.................................. -- | |
| 8-7-08 Email from Rick Wilson to Mark Antonvich, forwarding email string between Rick Wilson, Vuk Rajevac and Laurentiu Pascu | |
| VIN 35-37, Exhibit 46 | |
| Exhibit 19.................................. -- | |
| 8-10-08 Email string between TS Kim and Rick Wilson, cc'ing others | |
| VIN 156-158 | |
| Exhibit 20.................................. -- | |
| 9-3-08 Email string among Sa Uk Chang, W.S. Shim and Gigi Ren, cc'ing others | |
| TRI 2555-2558 | |

3  (Pages 6 to 9)

ARBITRATION HEARING - SEPTEMBER 20, 2010

## 10

TRICON EXHIBITS (Continued)
NUMBER AND DESCRIPTION                    PAGE

Exhibit 21.................................   --
   9-3-08 Email from Brad Lockwood to
   Sa Uk Chang
   TRI 2559

Exhibit 22.................................   --
   9-4-08 Email from Sa Uk Chang to Brad
   Lockwood, forwarding email from
   MJ Hwang
   TRI 2553-2554

Exhibit 23.................................   --
   10-2-08 Email string between WS Shim
   and Gigi Ren, cc'ing others
   TRI 2618-2628

Exhibit 24.................................   --
   10-20-08 Invoices, inspection reports,
   bills of lading, and certifications
   reflecting purchase of MX by Tricon
   Energy
   TRI 303-315

Exhibit 25.................................   --
   10-20-08 Bill of lading and
   certificates of inspection reflecting
   transfer of MX
   TRI 2557-2584

Exhibit 26.................................   --
   12-1-08 MX price quotations
   TRI 35

Exhibit 27.................................   --
   2-10-09 MOAB Confirmation
   TRI 209

Exhibit 28.................................   --
   2-20-09 MOAB Confirmation
   TRI 207

Exhibit 29.................................   --
   3-9-09 Letter from George
   Diaz-Arrastia to Stephen Lee
   N/A

## 12

TRICON EXHIBITS (Continued)
NUMBER AND DESCRIPTION                    PAGE

Exhibit 39.................................   --
   9-13-10 Amended Expert Report of Chuck
   Matthews
   N/A

Exhibit 40.................................   --
   C.V. of Chuck Matthews
   N/A

Exhibit 41.................................   538
   Handwritten calculations made during
   the arbitration

VINMAR EXHIBITS

NUMBER AND DESCRIPTION                    PAGE

Exhibit 1...................................   --
   7-22-08 MOAB's Handwritten Note
   MOAB 1, Depo Ex. 7

Exhibit 2...................................   --
   7-22-08 Email from R. Wilson to
   N. Smith regarding MX
   VIN 118-VIN 119

Exhibit 3...................................   --
   7-22-08 Email from B. Lockwood to
   H. Chapa regarding Vinmar/Rick Wilson
   TRI 1-TRI 2, Depo Ex 13

Exhibit 4...................................   --
   7-24-08 Vinmar's SAP Data
   VIN 91; VIN 93-VIN 94

Exhibit 5...................................   --
   7-29-08 Email from R. Wilson to
   L. Pascu with V. Rajevac contact
   information
   VIN 116-VIN 117

## 11

TRICON EXHIBITS (Continued)
NUMBER AND DESCRIPTION                    PAGE

Exhibit 30.................................   --
   11-11-09 MOAB Confirmation
   TRI 186

Exhibit 31.................................   --
   11-25-09 MOAB Confirmation
   TRI 179

Exhibit 32.................................   --
   12-16-09 Email from Ben Morse to Brad
   Lockwood, attaching daily MX pricing
   TRI 58-61

Exhibit 33.................................   --
   6-15-10 Email string between Benjamin
   Morse and Chuck Matthews
   N/A

Exhibit 34.................................   --
   6-21-10 Vinmar's Responses to Tricon's
   Fourth Requests for Production
   N/A

Exhibit 35.................................   --
   6-21-10 Vinmar's Responses to Tricon's
   Fourth Interrogatory Requests
   N/A

Exhibit 36.................................   --
   7-12-10 Expert Report of Steve Simpson
   N/A

Exhibit 37.................................   --
   1-22-09 - 8-16-10 Tricon's Attorneys'
   Fees Invoices
   TRI 2791-2859

Exhibit 38.................................   --
   9-13-10 Tricon's August Attorneys'
   Fees Invoices
   TRI 2878-2885

## 13

VINMAR EXHIBITS (Continued)
NUMBER AND DESCRIPTION                    PAGE

Exhibit 6...................................   --
   7-31-08 Email from D. Mehta to
   E. Leyman regarding US origin MX
   MOAB 20-MOAB 21

Exhibit 7...................................   --
   8-6-08 Email from R. Wilson to
   H. Goradia regarding Tricon
   Communication: Draft to discuss
   VIN 59

Exhibit 8...................................   --
   8-6-08 Email from R. Wilson to
   B. Lockwood re Vinmar MX Purchase Sale
   VIN 180-VIN 181

Exhibit 9...................................   --
   8/25/08 Email from B. Lockwood to
   B. Lockwood regarding Yahoo
   correspondence between E. Leyman and
   B. Lockwood
   TRI 43-TRI 51

Exhibit 10.................................   --
   8-8-08 Email from B. Lockwood to
   M. Antonovich regarding Vinmar/Tricon
   MX Contract
   TRI 22-TRI 23

Exhibit 11.................................   --
   8-11-08 Email from B. Lockwood to
   M. Antonovich regarding vessel
   nomination
   VIN 43-VIN 48

Exhibit 12.................................   --
   8-22-08 Email from B. Lockwood to
   M. Antonovich regarding Vessel
   Nomination 5000 MT MX under Contract
   SA1230-0708HOU
   TRI 27-TRI 29

**4  (Pages 10 to 13)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

**14**

```
1         VINMAR EXHIBITS (Continued)
2    NUMBER AND DESCRIPTION          PAGE
3    Exhibit 13.............................  --
          7-23-08 - 9-30-08 Tricon redacted
4         Inventory Log
          TRI 353-TRI 391
5
6    Exhibit 14.............................  --
          6-15-10 Letter from T. Larson to
7         S. Lee re: Discovery
          N/A
8    Exhibit 15.............................  --
          7-22-08 MOAB Oct. 2, 2008 invoice
9         TRI 97
10   Exhibit 16.............................  --
          8-11-08 - 2-4-09 Lockwood/Leyman IMs
11        TRI 277-TRI 285
12   Exhibit 17.............................  --
          7-20-08 Tricon/KP Chemical Corp.
13        contract
          TRI 299-TRI 302
14
15   Exhibit 18.............................  --
          9-24-08 Email from J. Lee to
16        B. Lockwood, S. Chang re Sales
          confirmation for MX SKT in 2H October
17        TRI 780-TRI 784
18   Exhibit 19.............................  --
          9-23-08 Email from P. Kyle to G. Ren,
          V. Rajevac, A. Bansal, B. Lockwood,
19        S. Chang regarding Ship nomination
          request
20        TRI 2549
21   Exhibit 20.............................  --
          10-20-08 Commercial Invoice from J&J
22        Chemtrading to Tricon for 3,200 MT of
          Mixed Xylene
23        TRI 2199
24
25
```

**16**

```
1        (8:50 a.m.)
2        JUDGE BENTON:  Let's go ahead and go on
3    the record.  We're now on the record in the arbitration
4    matter of Tricon Energy, Limited, Claimant, versus
5    Vinmar International, Limited, Respondent.
6        I am Levi Benton, the panel chair, joined,
7    of course, this morning by two other arbitrators.  To my
8    right, Judge Sharolyn Wood, to my left, Judge Mark
9    Davidson.
10       Before we get into other housekeeping
11   matters, Mr. Diaz-Arrastia, you are -- you represent the
12   claimant.  Why don't you announce yourself on the record
13   and tell us who's with you?
14       MR. DIAZ-ARRASTIA:  Thank you, Judge
15   Benton.  I am George Diaz-Arrastia.  I represent the
16   claimant, Tricon Energy, Limited.  With me is Tracy
17   Larson from my office, Mr. Brad Lockwood, who is the
18   representative of Tricon, and Ms. Dana Hodges and
19   Ms. Myra Mendez from my office.
20       JUDGE BENTON:  Okay.  Mr. Lee?
21       MR. LEE:  Yes, Your Honor.  And do you
22   mind if we -- okay.  I want to make sure we do it right.
23   Stephen Lee on behalf of Vinmar.
24       And I need to go ahead and make sure that
25   the record is clear.  I think we've objected to
```

---

**15**

```
1         VINMAR EXHIBITS (Continued)
2    NUMBER AND DESCRIPTION          PAGE
3    Exhibit 21.............................  --
          10-20-08 Commercial Invoice from J&J
4         Chemtrading to Tricon for 570.042 MT
          of Mixed Xylene
5         TRI 2203
6    Exhibit 22.............................  --
          10-23-08 Commercial Invoice from J&J
7         Chemtrading to Tricon for 950.010 MT
          of Mixed Xylene
8         TRI 2204
9    Exhibit 23.............................  --
          10-27-08 Email from W. Shim to G. Ren,
10        V. Rajevac, C. Trammell, B. Lockwood &
          S. Chang re Vessel nomination 5KT MX
11        TRI 2585-TRI 2590
12   Exhibit 24.............................  --
          2-22-10 Tricon Energy, Ltd.'s
13        Objections and Responses to Vinmar
          International, Ltd.'s First Request
14        for Admissions
          N/A
15
16   Exhibit 25.............................  --
          2-22-10 Tricon Energy, Ltd.'s
17        Objections and Responses to Vinmar
          International, Ltd.'s First
18        Interrogatory Requests
          N/A
19   Exhibit 26.............................  --
          Blank July 2008 Calendar
20        N/A
21   Exhibit 27.............................  214
          Handwritten calculations made during
22        the arbitration
23   Exhibit 28.............................  219
          Handwritten calculations made during
24        the arbitration
25
```

**17**

```
1    arbitration from the very beginning.  Our presence here
2    is subject to and without waiver of that arbitration
3    objection.
4        JUDGE BENTON:  Right.
5        MR. LEE:  I would really like to dispense
6    with having to object all the way through if I could get
7    the panel's acknowledgment that we've at least filed an
8    objection and that everybody is aware of that.
9        JUDGE BENTON:  It is so acknowledged and
10   we're going to address that in just a few minutes.
11       MR. LEE:  Thank you.  Stephen Lee.  I'm
12   lead counsel for Vinmar.  Blake Runions from my office
13   is an associate, will be helping us.  And Mark
14   Antonvich, who is the general counsel at Vinmar, is here
15   as a representative.
16       JUDGE BENTON:  Yeah.  And I'll -- whatever
17   happens following the hearing of your motion to dismiss
18   in the event that -- I'm going to say this now because I
19   might forget.  In the event that we conclude that your
20   motion to dismiss is without merit, you have a running
21   objection throughout these proceedings so that you need
22   not continue to assert it.  And you are fine with that.
23   Correct, Mr. Diaz-Arrastia?
24       MR. DIAZ-ARRASTIA:  Yes, Your Honor.
25   That's fine.
```

**5  (Pages 14 to 17)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

**18**

1    JUDGE BENTON:  All right.  Just kind of --
2  I guess I'll call it housekeeping.  To give you a sense
3  of where we want to go this morning, we do want to first
4  hear argument.  And if you -- if it's your desire to put
5  on evidence, I guess we want to hear that related to the
6  motion to dismiss.
7    I don't know whether you intend to put on
8  any evidence to support your motion to dismiss, but
9  whatever time it takes for -- well, let's assume that we
10  will --
11    MR. DIAZ-ARRASTIA:  Your Honor, if I may
12  interject, it is our intention to put on evidence to
13  address the jurisdiction of this panel.  The problem
14  that we have, as we have pointed out various times, is
15  that in order for us to put on the evidence to address
16  jurisdiction really requires putting on all of the
17  evidence on the merits of the case excepting the damages
18  evidence and that's why we have believed that the
19  jurisdictional issue should be carried with the merits
20  and decided together.
21    JUDGE BENTON:  I understand that.
22    MR. DIAZ-ARRASTIA:  Now, we do have
23  argument -- and I can show you some of the documents
24  that we think are important and I'm prepared to do that
25  this morning.

**19**

1    JUDGE BENTON:  I understand your
2  perspective.  Let me tell you how we're going to
3  proceed.  We're going to -- inasmuch as it's their
4  motion to dismiss, we're going to give Vinmar the
5  opportunity to put on their motion to dismiss.
6    It is their motion to dismiss.  And so to
7  the extent they wish to put on evidence in support of
8  their motion to dismiss, we'll afford them the
9  opportunity to do that.  When they rest on their motion
10  to dismiss, you in turn will have the right to put on
11  evidence of -- or evidence in opposition to their motion
12  to dismiss.
13    I understand now that it may well be -- or
14  we understand now that it may well be that your desire
15  is to put on the entire case -- your entire case on the
16  merits.  We need not answer now as to liability --
17    (Brief discussion off the record.)
18    JUDGE BENTON:  Right.  The merits of the
19  case less liability.
20    On the other hand, at the conclusion of
21  the presentation -- or their presentation on their
22  motion to dismiss, you might change your mind about
23  whether or not you want to put on your entire case.  We
24  shall see.
25    MR. DIAZ-ARRASTIA:  Okay.

**20**

1    JUDGE BENTON:  It's almost 9:00 o'clock.
2  We would like to take a restroom break about 10:30
3  unless we have taken a break before then.  We'll
4  likely -- depending on how the day goes, we'll likely
5  break for lunch around noon and then we'll just see
6  where we are from there.
7    Judge Wood, anything you want to add?
8  Judge Davidson?
9    JUDGE DAVIDSON:  Let's go.
10    JUDGE BENTON:  Okay.  Do you want to make
11  a brief open relating to your motion to dismiss,
12  Mr. Lee, or do you just want to roll your sleeves up and
13  get going?
14    And, by the way, it's a little warm to me
15  in here.  You're welcome to remove coats at any time.
16  You need not ask our permission.
17    OPENING REMARKS ON BEHALF OF THE RESPONDENT
18    MR. LEE:  Thank you, Your Honor.  I
19  would -- I think instead of just giving you a brief
20  opening, I'm prepared to argue the motion.
21    I think the evidence that I need is
22  already before the panel.  Tricon bases its claim in
23  this case -- a breach of contract case against Vinmar
24  and their entire case is based on the argument that an
25  agreement was formed on July the 22nd, 2008.

**21**

1    A broker by the name of Ed Leyman -- this
2  is sort of an unusual situation in that the parties
3  never talked.  All of the communications were done
4  through a broker, a gentleman by the name of Ed Leyman,
5  MOAB Oil.  And Mr. Leyman purported to arrange a deal
6  between the parties.
7    It's our contention that he missed a
8  crucial term and that the terms didn't match and there
9  was, in fact, no mutual assent.  But importantly for the
10  motion to dismiss is the fact that Mr. Leyman claimed
11  that a contract existed between the parties.  He sent
12  out a written confirmation of that agreement and Tricon
13  bases claim on that document.
14    The request for admission responses say
15  that the -- they believe that the confirmation is a
16  binding contract.  Their pleadings, the specification of
17  claims that's before the panel says that the
18  confirmation is a binding contract.
19    The confirmation itself does not contain
20  an arbitration agreement and everybody's admitted that.
21  There is no arbitration agreement in the four corners of
22  the broker confirmation that Tricon bases its entire
23  case upon.  Texas law is clear.  If you claim that a
24  contract was formed at the time the contract is formed,
25  there -- you can't supplement that document with

6  (Pages 18 to 21)

ARBITRATION HEARING - SEPTEMBER 20, 2010

22

1  additional contract claims.
2       Tricon's position is we have a
3  confirmation but then we sent a sales contract and the
4  sales contract contained an arbitration provision and so
5  we're going to supplement the confirmation with our
6  terms of the sales contract.
7       And there's a couple of big problems with
8  that.  One, 2-207, which is the first argument that
9  Tricon put out there, which is the battle that forms UCC
10  provision, Texas law, there's a number of cases that we
11  cite in our motion to dismiss that say that you cannot
12  resort to Section 2-207, the battle forms section if, in
13  fact, there is already an agreement.
14       And Tricon's case is and claim is that
15  there was already an agreement that was documented by
16  the broker.  They claim that that broker confirmation
17  satisfies the statute of fraud.  So if they're correct
18  and that's what their case is based on, the contract
19  claim is the broker confirmation without an arbitration
20  provision.
21       In addition to that, you cannot read the
22  sales contract that Tricon sent in conjunction with the
23  broker confirmation because the sales contract itself on
24  its face says, "This document cancels and supersedes the
25  broker confirmation."

23

1       So if -- you can't read them together.
2  They cannot be read as a -- the sales contract as a
3  supplement to the confirmation.  But the jurisdictional
4  problem that we have is Texas case law makes it clear
5  that gateway matters such as whether there is an
6  arbitration agreement or not is a matter that is
7  reserved exclusively for the Courts.
8       A Court has to make a decision, Is there a
9  contract?  And if there is, is there an arbitration
10  provision?  And those decisions must be made before a
11  panel has arb -- has jurisdiction to hear this claim.
12  And that's -- it goes back to the fundamental premise of
13  arbitration, which is that it's an -- it's a breach of
14  contract.
15       The parties have to agree to arbitrate and
16  you can't force arbitration upon somebody that hasn't
17  agreed to that.  And so the question under Texas law --
18  and we've cited a number of cases that deal with this
19  issue, when the question is whether there is an
20  agreement in the first place.  That question is for the
21  Courts to decide.
22       And even if there's an agreement, then the
23  next question is, what is -- what does the agreement
24  include?  Does it include an arbitration provision or
25  not?  And in this case, it's really a fairly -- it's a

24

1  fundamental question for the panel and certainly
2  something that first must be decided by a Court because
3  the case is entirely based on a broker confirmation --
4  an agreement on July the 22nd between the parties orally
5  that was confirmed by a broker confirmation.  That's
6  what the case is based upon.
7       There's no arbitration provision.  And so
8  I don't even think they get to the question of, well, do
9  you include the sales contract?  Do you include other
10  terms?  Well, that's a matter for a Court to decide.
11       We've been very clear about this from the
12  beginning, that we objected to arbitration.  Texas law
13  provide -- and we've been clear about our remedies, too,
14  that if they wanted to proceed in arbitration they were
15  doing so at the risk of our ability to move to vacate
16  the panel's award if it was against us because there was
17  never jurisdiction in the first place.
18       And so I think that the fundamental
19  question here and where we are is Tricon puts the cart
20  before the horse.  They want to run into arbitration and
21  try the whole case and see if they can get the panel to
22  give them relief when the question of whether the panel
23  has jurisdiction or not has not been decided.
24       And so I think, Your Honors, with the
25  specification of claims making it clear that their case

25

1  is based on broker confirmation, all of the testimony
2  from their witnesses, their request for admission
3  responses, their interrogatory answers all say, "Yes, we
4  believe the broker confirmation" -- the one-page broker
5  confirmation that they say outlines the terms of the
6  deal is a binding contract and there is no arbitration
7  agreement in that document.
8       And I would just point you to -- it's
9  already in the record in their pleadings, but if you
10  were to look at Joint Exhibit No. 4 in your binders,
11  this is the final confirmation from the broker and we
12  can all look at it.  There is no arbitration provision
13  in that document.
14       So we believe that the appropriate remedy
15  here is for the panel to dismiss this case until Tricon
16  deals with the jurisdictional question.  And because the
17  Court is going to decide a number of issues that may or
18  may not be -- that will impact arbitration one way or
19  the other -- either the Court decides there is no
20  agreement and there never was an agreement so there's no
21  arbitration or the Court may define what the contract is
22  and if that contract includes an arbitration provision,
23  then we will have an arbitration hearing.
24       But what you try in arbitration, how it's
25  tried and the scope of that all needs to be decided

7  (Pages 22 to 25)

ARBITRATION HEARING - SEPTEMBER 20, 2010

26

1   first by a Court and otherwise I don't see how you can
2   get to a point where you can come to an award that is
3   based on jurisdiction.
4        JUDGE BENTON:  Judge Wood, any questions
5   for Mr. Lee?
6        JUDGE WOOD:  Not at this time.
7        JUDGE BENTON:  Judge Davidson?
8        JUDGE DAVIDSON:  Not now.
9        JUDGE BENTON:  Mr. Lee, do you I suppose
10  therefore rest on your motion to dismiss?
11       MR. LEE:  Yes, Your Honor.
12       JUDGE BENTON:  Mr. Diaz-Arrastia?
13       MR. DIAZ-ARRASTIA:  Thank you, Your Honor.
14       OPENING REMARKS ON BEHALF OF THE CLAIMANT
15       MR. DIAZ-ARRASTIA:  Let me first address
16  the question of jurisdiction.  There is no question
17  under Texas law that this panel has the authority to
18  decide its own jurisdiction.  That is clearly stated in
19  the Triple A rules and it is also the Texas law.
20       If Vinmar had filed a motion to stay this
21  arbitration, then Mr. Lee is correct that the Court
22  would decide whether this case was subject to
23  arbitration, but Vinmar has chosen not to do that.  It
24  is very clearly not the law in Texas that where the
25  opponent to arbitration chooses not to go to Court to

27

1   seek a stay, the proponent, Tricon in this case, has an
2   obligation to seek an order compelling it.
3        This case was actually -- this issue was
4   specifically addressed just in July by the Corpus
5   Christi Court of Appeal in the In Re: Rio Grande Xarine
6   case, which was cited in our brief in response to the
7   motion to arbitration and we've actually done a
8   supplemental brief to the panel that I will hand to you
9   right now, but it's mostly based on the Rio Grande case.
10       And the conclusion of the Rio Grande case
11  with regard to the argument that Mr. Lee is making -- I
12  hate to say it, but it's one word.  They said it was
13  nonsensical.
14       MR. LEE:  Do you have --
15       JUDGE WOOD:  Does Mr. Lee have a copy?
16       MR. LEE:  -- a copy for me?
17       MR. DIAZ-ARRASTIA:  Oh, I'm sorry.
18       What they said is it was nonsensical.
19  This panel can decide its own jurisdiction and this
20  panel does not have to wait for a Court to tell it it
21  has jurisdiction.  Tricon as the proponent of
22  arbitration has no obligation to first institute
23  litigation in a Court to get an order compelling the
24  arbitration.
25       Let me address now the merits of Mr. Lee's

28

1   argument.  If we could turn on the projector, I will be
2   showing the panel some of the documents.  This is a very
3   simple UCC breach of contract case.
4        What happened here is that Vinmar bought
5   mixed xylenes, which we've referred to as MX, betting
6   that the price would go up, but what happened instead is
7   that the price went into a long and precipitous decline.
8   By the delivery date that was negotiated in the
9   contract, the price of MX had fallen more than
10  25 percent.
11       By the end of the year of 2008, the price
12  of MX had fallen to more than 65 percent.  It was really
13  a precipitous decline.  And the price fell almost every
14  day.  MX tends to track the price of crude oil and we
15  all know what happened to crude oil in the second half
16  of 2008.
17       Vinmar refused to accept the MX on a very
18  bad deal and they didn't perform, but that's a breach of
19  contract.  Let's look at the -- at the arguments.  And
20  it is correct, first of all, the UCC very much favors
21  the sale -- the formation of contracts and this favors
22  formality.
23       If you could take a look at 2-204(A).  And
24  there it says it very clearly.  This is the policy of
25  the UCC with regard to contract formation.  A contract

29

1   for the sale of goods may be made in any manner
2   sufficient to show agreement, including conduct by both
3   parties which recognizes the existence of such a
4   contract.
5        Mr. Lee is right.  Here the contract was
6   made through a broker and the parties did not
7   communicate with each other prior to the deal being
8   made.  That is not unusual in petrochemicals trading and
9   there will be evidence of that from testimony.
10       In this case, the parties had the
11  broker -- the broker, I'm sorry, was the agent for both
12  sides.  And we have actually cited in our prehearing
13  briefing the Den Norske case, which was a decision by
14  Judge Hughes in the Southern District of Texas, where he
15  said that's exactly right.
16       And what that means is that when the
17  broker says that there's a deal there's a deal and
18  that's an enforceable contract.  The broker in this case
19  was Mr. Ed Leyman.  We're going to see him by a video
20  deposition.  He is probably the leading MX trader in the
21  United States.
22       On July 22, 2008, through instant message
23  communications and telephone communications, Mr. Leyman
24  brokered a deal.  The terms of the deal was that Tricon
25  was going to sell MX to Vinmar.  Both of these parties

8 (Pages 26 to 29)

30

1  are trading companies. It was 5,000 metric tons of MX
2  at the price of 1310 -- $1,310 per metric ton, a tight
3  delivery window, some -- in the first half of September,
4  between September 1st and September 15th, CFR Korea or
5  Taiwan with Vinmar to declare the discharge port,
6  meaning where in Korea or Taiwan the MX was going to be
7  unloaded by the 8th of August.
8       And the evidence that you're going to hear
9  from Mr. Leyman and Mr. Lockwood is the delivery window
10 was particularly important, particularly important.
11 That is important because it takes 30 to 45 days to move
12 a vessel from the Gulf of Mexico to Korea or Taiwan and
13 can take longer than that if you have delays in the
14 Panama Canal, if you have bad weather.
15      So if you're going to be declaring your
16 discharge port and you have a guaranteed delivery by the
17 15th of September, you have a very tight window, and
18 that is why we believe that we had to keep the option to
19 substitute Asian origin if our vessel slipped.
20      This is an extension of frauds case. It
21 involves more than $500, and that means that we need a
22 writing and we need a signature. As we know, a writing
23 is not required under the law to be a single document
24 and here we have several documents that form all of the
25 contracts.

31

1       Second is the signature, but under the UCC
2  signature is very, very broad. If we can take a look at
3  2-201, Comment 1, please. Let's see. It must be
4  signed. It must be signed, a word which includes any
5  authentication which identifies the party to be charged.
6       Let's look at 1201(37). This is the
7  definition of signed under the UCC. Signed includes
8  using any symbol executed or adopted with present
9  intention to adopt or accept a writing.
10      Now let's take a look at Comment 37.
11 There you go -- Signed does not require a complete
12 signature. The symbol may be printed, stamped or
13 written. And in an appropriate case, it may be found on
14 a billhead or letterhead.
15      So it's very, very clear that for the UCC
16 a signature doesn't mean that somebody took a pen and
17 wrote his name down on a piece of paper. It can be even
18 just a letterhead. Let's take a look at some of the key
19 documents here.
20      Let's first look at Joint Exhibit No. 2.
21 Is there any way so that we can get that on the screen
22 all at once? Fit to page. There you go.
23      That is the principal document. That is
24 the initial confirm that was --
25      MS. LARSON: Your Honors, they're in the

32

1  binders as well under Joint Exhibit 2. It's difficult
2  to read the copy.
3       MR. DIAZ-ARRASTIA: It is the initial
4  confirm that was sent by Mr. Leyman to both Vinmar and
5  Tricon on July 22nd after the deal was made. It
6  contains all of the essential terms of the contract,
7  quantity, quality, delivery, payment, terms and a number
8  of other things, everything required to make a deal.
9       I will point out on the top right-hand
10 corner there's the MOAB letterhead. That's a signature
11 under the UCC. Under the UCC, a signature may be
12 anywhere on a piece of paper and it can be a billhead or
13 a letterhead and MOAB was the agent for both sides so
14 that is official.
15      That was Judge Hughes' decision in the Den
16 Norske case, exactly that. Nothing in here talks about
17 U.S. origin. And there will be evidence that if
18 U.S. origin was a critical term of the deal it would be
19 in the confirm, it would be in the firm bid given by
20 Vinmar and it would be in the deal.
21      And let me just give you an example of a
22 case where that is done. If we can look at Tricon
23 Exhibit 1 quickly, please.
24      MR. LEE: If I may just make one
25 statement. I hate to interrupt his presentation, but we

33

1  do have some objections to their exhibits, including
2  this one. I just want to note that for the panel. I
3  don't think this has anything to do with this
4  proceeding, but I didn't want him to show that without
5  at least noting the objection.
6       JUDGE BENTON: All right.
7       MR. DIAZ-ARRASTIA: Okay. And if you --
8  Tracy, if you could highlight during quality and maybe
9  zoom in on that.
10      Product to be U.S. origin. That's the way
11 it's done if origin is important. It is important -- if
12 origin is important to the buyer it would be put up
13 front because it affects delivery. As I said before, if
14 you were loading a vessel on August the 8th in the Gulf
15 and you needed to get it to Taiwan by September 15th,
16 you might not make it.
17      Now, there are actually three confirms in
18 this case. Let's first take a look at Joint Exhibit 3.
19 The evidence is going to be that after the first confirm
20 on July 22nd, on the same day, Mr. Wilson, the trader
21 for Vinmar, requested a change in the payment terms from
22 a 30-day to an at site letter of credit. That was
23 agreed to by Mr. Lockwood and the deal was modified.
24      JUDGE BENTON: Yeah, let me -- let me
25 interrupt just for a second. Providing -- I don't

9  (Pages 30 to 33)

ARBITRATION HEARING - SEPTEMBER 20, 2010

34

1    know -- I don't -- I don't want to prejudice your
2    presentation, but to the extent you could partition
3    these issues of the merits and the jurisdictional
4    argument, it would really help us to focus.
5            MR. DIAZ-ARRASTIA:  Well, Your Honor, the
6    problem that we have is that it's very hard to do that.
7    One of the reasons why Vinmar claims that a contract was
8    never made is because U.S. origin was a material term of
9    that contract that was not agreed to so I have to
10   address it.
11           JUDGE BENTON:  All right.  Very good.
12           MR. DIAZ-ARRASTIA:  And I'm trying to go
13   in chronological order through the documentation.
14           JUDGE BENTON:  Okay.
15           MR. DIAZ-ARRASTIA:  But in any event,
16   there was one modification on July 22nd to change the
17   payment terms, but even on this second confirm that was
18   again sent to both sides, again there's no mention of
19   U.S. origin.
20           Then let's go to Joint Exhibit No. 4, and
21   this is the last confirm, which is the one that was
22   referred to by Mr. Lee, also exchanged by both parties.
23   And what happened here is that Mr. Lockwood noticed that
24   there was a mistake on the price term.
25           The price on the initial two confirms

35

1    said -- was 1110 a metric ton when everybody agreed that
2    it was 1310.  Mr. Lockwood called Mr. Leyman and said,
3    "Hey, there's a mistake on the price.  Can you fix
4    that?"  And it was fixed and that resulted in the third
5    confirm.
6            Three confirms exchanged between the
7    parties on July 22nd.  They contain all of the essential
8    terms of the deal.  And it is our position that the
9    contract was initially made on July 22nd and it is
10   memorialized in writing with a signature in these
11   documents, but it is not true that once that happens the
12   parties are bound or are prevented by Texas law from
13   modifying the contract or adding additional terms.
14           If we could take a look at UCC 2-209.  And
15   there you go.  An agreement -- Under the UCC, an
16   agreement modifying the contract within this chapter
17   needs no consideration to be binding.  So under the UCC,
18   the parties can modify their contract at any time and
19   there's no requirement for consideration or any other
20   formality.  The policy of the US -- UCC disfavors
21   formality.
22           What happens in this case is that
23   additional terms were negotiated and there were
24   modifications made and certainly one of the
25   modifications made was that Vinmar requested for a

36

1    change in the payment terms and that was agreed to.
2    There's nothing that says that the parties can't agree
3    to modifications if that's what they want to do.
4            And this is what happened.  On
5    July 23rd -- let's go to Exhibit J 5, please, Joint
6    Exhibit 5, and actually let's start there on that page
7    there towards the bottom of it where it Brad's e-mail to
8    Rick Wilson.
9            On July 23rd, the day after the deal was
10   initially made, Tricon sends its sale contract -- and we
11   have been referring to that in the briefing as Tricon
12   letter, but sends this to Rick Wilson.  There's the
13   cover e-mail that we're looking at right now.  And I am
14   just pointing that out to you to show you the date and to
15   also show you that it is signed.  There's an e-mail
16   signature that is a sufficient signature under the UCC.
17           Let's go to the first page after that.
18   Here it contains the essential terms.  And it does not
19   change the essential terms of the contract, the price,
20   quantity, delivery, payment, et cetera.  It does not
21   change that from the MOAB confirms.  It's the same
22   thing.
23           We'll go to the next page.  It does
24   contain the general terms and conditions of sale,
25   additional terms to the contract.  There is going to be

37

1    evidence that this is a very common thing to do in
2    petrochemicals trading, that after you do the confirm
3    and you have a deal you pass paper between yourselves.
4    You send the terms and conditions of sale.  Arbitration
5    is contained here, Paragraph 9 of the terms and
6    conditions of sale.
7            On July 24th, the following day,
8    Mr. Wilson gives this letter to Laurentiu Pascu who
9    we'll hear from a video.  He was Vinmar's operations
10   specialist.  They take care of the deal once the trader
11   makes it to free up the trader to do more deals.
12           Take a look at Exhibit J 9, Joint
13   Exhibit 9.  This is Mr. Pascu's e-mail back to Rick Wilson in
14   the morning of July 29th, a few days after he received
15   the terms and conditions containing arbitration.  He is
16   informing Mr. Wilson of his comments on the additional
17   terms.
18           JUDGE WOOD:  Give me that exhibit number
19   again.
20           MR. DIAZ-ARRASTIA:  It's Joint Exhibit 9.
21           A few hours later, Mr. Pascu sends his
22   comments to Vuk Rajevac, who we will also hear from.
23   Mr. Rajevac is Tricon's operations specialist in this
24   period, Mr. Pascu's counter-partner.
25           We can look at Joint Exhibit 13 now.  And

10   (Pages 34 to 37)

ARBITRATION HEARING - SEPTEMBER 20, 2010

**38**

1 that's what Mr. Pascu tells Mr. Rajevac.  Please enclose
2 our comments under sale confirmation.  We shall revert
3 soon with our purchase order for your review.
4 Now, there's going to be evidence that no
5 one prepares and sends a pur -- says, "I'll send a
6 purchase order," if they didn't think they had a deal.
7 Obviously Mr. Rajevac thinks they had a deal.  Let's
8 take a look at what Mr. Rajevac enclosed with this
9 e-mail on July 29.
10 What -- I would also point out that -- I'm
11 sorry.  Mr. Pascu.  I would also point out that
12 Mr. Pascu's e-mail is signed.  That's that signature
13 within the UCC.  If we could put it full -- so that we
14 can see it on the full page.
15 And we're going to go over this during the
16 evidence phase, but there is evidence that all -- that
17 that handwriting that you see on the Tricon letter on
18 the additional terms and conditions is Mr. Pascu's
19 handwriting.  As you can see, he is scratching some
20 things out.  He is asking for some things to be changed.
21 Look in the next page.  Again,
22 more changes and comments that Mr. Pascu makes on the
23 Tricon terms and conditions.  If you will look at the
24 next page on Paragraph 9, nothing on arbitration.  He
25 does not have a problem with it.  And nowhere in here is

**39**

1 there any mention of origin.
2 About 30 minutes later we get to
3 exhibit -- Joint Exhibit 14.  And this is their response
4 that Mr. Rajevac sends to Mr. Pascu.  And that is it.
5 He says, "Your comments on the contract are well noted
6 and accepted except for demurrage time bar which is 90
7 days."  And, again, it's signed.
8 So at this moment, what we have is we have
9 a contract that was initially made on July 22nd and
10 which was modified by agreement of the parties on
11 July 29th.  Some of the things that are contained in it
12 were requested by Tricon.  Some of the things were
13 requested by Vinmar, but everything was agreed to with
14 the sole exception being demurrage.  There was no
15 agreement on the demurrage time bar, but that is not
16 relevant in this case.  There was never any demurrage.
17 Let's talk about 2-207, if you could go
18 back to that for a moment, just UCC 2-207.  If you could
19 look at 2-207(B), additional terms are to be construed
20 as proposals for addition to the contract.  Let's look
21 at 2-207(C), beginning Conduct by both parties which
22 recognizes the existence of a contract is sufficient to
23 establish a contract for sale although the writings of
24 the parties do not otherwise establish a contract.  In
25 such case, the terms of the particular contract consist

**40**

1 of those terms on which the writings of the parties
2 agree, but not the ones you don't agree to.
3 So as of July 29th, 2008, there was a
4 contract that consisted of all of the terms that the
5 parties agreed to and not the terms that they did not
6 agree to.  Nowhere in there was there an agreement about
7 U.S. origin.  There absolutely was an agreement about
8 arbitration.  And the only term that the parties
9 discussed that they didn't agree to was demurrage time
10 bar.  That's just not part of the contract, but that
11 doesn't mean that there is no contract.
12 As I said, Your Honor, I have alluded to
13 some of the evidence that is going to be heard.  It is
14 intertwined with the merits of this case in a way
15 they -- if we want to create a full record of how this
16 contract was made, you're going to have to hear all of
17 the evidence except for my damages evidence, but this is
18 a preview of what you're going to hear.
19 JUDGE BENTON:  All right.  Any questions,
20 Judge Wood, for Mr. Diaz-Arrastia?
21 JUDGE WOOD:  Not at this time.
22 JUDGE BENTON:  Judge Davidson?
23 JUDGE DAVIDSON:  Nope.
24 JUDGE BENTON:  Mr. Diaz-Arrastia, do
25 you -- excuse me -- for the purposes of the record, rest

**41**

1 on your response to their motion to dismiss?
2 MR. DIAZ-ARRASTIA:  Your Honor, if you
3 want to hear evidence on how this contract was formed,
4 then I have to put my witnesses on.  I have given you a
5 preview of what I am going to say, but I am not able to
6 present my evidence on jurisdiction --
7 JUDGE BENTON:  Okay.
8 MR. DIAZ-ARRASTIA:  -- without
9 simultaneously presenting my underlying merits.
10 JUDGE BENTON:  I think what we would like
11 to do then is take a short recess for ten to 15 minutes
12 to deliberate upon the arguments that you each have
13 made.  And then depending what the two or three of us
14 agree to, we'll come back and announce how we'll --
15 JUDGE DAVIDSON:  Could I ask a question of
16 Mr. Lee?
17 JUDGE BENTON:  Certainly.  Excuse me.
18 JUDGE DAVIDSON:  You've indicated it's
19 your client's position that this panel has no
20 jurisdiction.  Correct?
21 MR. LEE:  Yes, Your Honor.
22 JUDGE DAVIDSON:  Which, if I -- as I
23 understand the laws of jurisdiction therefore, that
24 would mean that should we go through the entire hearing
25 on the merits and determine that you win, make a

**11 (Pages 38 to 41)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

42

1  determination on the merits that your client owes
2  nothing to Tricon, your argument would be that this
3  panel was without jurisdiction to make such a ruling?
4         MR. LEE:  No, Your Honor, because -- well,
5  actually what I would say is the award is enforceable
6  against Tricon because they elected to proceed in this
7  forum.
8         JUDGE DAVIDSON:  But jurisdiction isn't
9  something that can be given to anybody by conduct, can
10  it?
11        MR. LEE:  I agree, Your Honor, with the
12  exception of it's really two issues.  One, it's invited
13  error.  I mean, they initiated this proceeding and
14  insisted that it go forward in Triple A.  And so if -- I
15  think they're precluded from arguing against an award
16  that the panel might render against them.
17        It doesn't deal -- I don't think it does
18  away with the jurisdiction issue.  I think we have a
19  jurisdiction issue that stays with the case throughout,
20  but certainly from Tricon's perspective I think a Court
21  would be fair in saying, "You elected this forum.  You
22  invited the panel to make the error.  You have to live
23  with that error" --
24        JUDGE DAVIDSON:  Okay.
25        MR. LEE:  -- as opposed to us -- may I

43

1  make one other just quick comment before we break
2  because I think that the question was summed up at the
3  very end of Tricon's presentation, how the contract was
4  formed.  That's what counsel said.
5         That question is fundamentally a question
6  for a Court to decide, how the contract was formed.  Is
7  there a contract and what terms are included?  That's a
8  decision that is for a Court.  There are a number of
9  cases that have addressed that.  The Rio Grande case is
10  distinguishable for two reasons.
11        Number one, there was no question there
12  was an arbitration agreement in the document that both
13  parties signed.  The issue that the complaining party
14  raised is that that document had lapsed.  And the Court
15  first found that the arbitration panel had that power to
16  make that decision and then secondly said but, you know,
17  you didn't have to go to Court first.
18        Here we have a separate issue, the
19  fundamental question.  Most of the presentation was we
20  had an agreement on July 22nd.  The broker confirm
21  satisfies the statute of frauds.  That's what we're
22  suing on.
23        This modification argument, by the way,
24  has never -- it's not in any of the pleadings.  It's
25  something that came up when we moved to dismiss, but

44

1  modification requires all of the elements of contract
2  formation, offer and acceptance to form a modification.
3  Whether there's consideration or not, the UCC says
4  that's not required, but it does require an offer and
5  acceptance.
6         And that question, whether there was an
7  acceptance, whether you could modify the agreement and,
8  two, whether there was an acceptance, that is an issue
9  for a Court to decide.
10        JUDGE WOOD:  What is the -- is there a
11  joint exhibit number or where in the exhibits is the
12  document that your client sent on their letterhead?
13        MR. LEE:  There is no document.
14        JUDGE WOOD:  Was there one that Vinmar
15  sent?
16        MR. DIAZ-ARRASTIA:  Your Honor, there is a
17  purchase order that Vinmar --
18        JUDGE WOOD:  Purchase order.
19        MR. DIAZ-ARRASTIA:  -- prepared but did
20  not send.
21        JUDGE WOOD:  Thank you.
22        MR. DIAZ-ARRASTIA:  Now, if we could look
23  at that because we do have it and we do intend to
24  present it.
25        JUDGE WOOD:  That's in somebody's

45

1  exhibits?
2         MR. DIAZ-ARRASTIA:  Let's take a look at
3  the Vinmar purchase order.  Do you remember what that
4  is?
5         JUDGE WOOD:  I remember reading -- I
6  remember reading it.
7         MR. DIAZ-ARRASTIA:  Let's look at it.
8         JUDGE WOOD:  My second question,
9  Mr. Lee --
10        MR. DIAZ-ARRASTIA:  Now, there was -- and
11  Mr. Lee talked about the offer and acceptance.  When the
12  Tricon letter was sent by Mr. Lockwood and Mr. Wilson,
13  that's the proposal for a modification.  Then when
14  Mr. Pascu commented on that, he accepted some of those
15  terms and made a proposal for modification on other
16  terms.  And then when Mr. Rajevac said "Your comments
17  are all accepted," you have an acceptance.
18        JUDGE WOOD:  My second question for
19  Mr. Lee goes to -- and I apologize for not having the
20  case.  Okay?  But are you familiar with the case that's
21  been decided -- and I thought it was this year.  Y'all
22  can figure out probably why.  That was in the probate
23  cases.  But a recent holding in Texas is that the
24  arbitration panel has to determine whether or not the
25  person that is alleged to contract who may be deceased

12  (Pages 42 to 45)

ARBITRATION HEARING - SEPTEMBER 20, 2010

46

1  now or may now be incompetent, whether that person had
2  capacity to contract by law in Texas now is decided by
3  the arbitrators and not a probate court.  I don't know
4  if you would have ran into that case and I don't know
5  where it's even reported.  I just -- I just happen to
6  know it was decided.
7        MR. DIAZ-ARRASTIA:  Your Honor --
8        JUDGE WOOD:  And y'all can figure out why
9  so you can probably find the Court and then find it --
10        MR. DIAZ-ARRASTIA:  Your Honor --
11        JUDGE WOOD:  It's out of Probate Court
12  No. 2 and it's Houston Court of Appeals.  I don't
13  remember the first --
14        MR. DIAZ-ARRASTIA:  Well --
15        JUDGE WOOD:  But I just didn't know if
16  anybody had been following these cases that -- trying to,
17  trying to go back and forth maybe something will --
18        MR. DIAZ-ARRASTIA:  I don't know that
19  case, Your Honor, but the Vinmar purchase order --
20        JUDGE WOOD:  There it is.
21        MR. DIAZ-ARRASTIA:  -- which was prepared
22  but not sent is Tricon Exhibit 10.  And if you could
23  look -- Tracy, go down to the dispute resolution
24  provision.  I think it is significant that it has the
25  law and arbitration -- and arbitration provision

47

1  essentially like the one we're here before you-all.
2        JUDGE WOOD:  My question got answered as
3  to why I had read that document and nobody had talked
4  about it.  I appreciate that.  I think that's it.
5        MR. LEE:  I wanted to address real quick.
6  As counsel said, that document was never sent, but I
7  think, Your Honor -- I'm not familiar with the specific
8  case on the probate, but I do understand there is a lot
9  of cases --
10        JUDGE WOOD:  And I haven't read it either.
11        MR. LEE:  -- that talk about if your issue
12  is to the capacity or to duress, that's one issue as
13  opposed to basic contract formation.  So there is a
14  distinction that the cases recognize.
15        JUDGE BENTON:  I have 9:35 so let's --
16  let's just say at 9:50 we'll resume and see where we go
17  from there.  All right?
18        (Recess from 9:34 a.m. to 9:51 a.m.)
19        JUDGE BENTON:  Okay.  We are back on the
20  record.
21        The panel has arrived at a unanimous
22  determination and that determination will be announced
23  by Judge Davidson.
24        JUDGE DAVIDSON:  The panel will decline to
25  grant the motion to dismiss.  We find that the issues of

48

1  contract formation and what the terms of any contract
2  are will require presentation of evidence to the panel.
3        We make this determination without
4  prejudice to a later determination that either there was
5  no contract or that the contract did not contain an
6  arbitration clause.  Given that finding, it will be
7  necessary for us to proceed to hear evidence.
8        JUDGE BENTON:  And with that,
9  Mr. Diaz-Arrastia, we are prepared to proceed.  As I
10  alluded to earlier this morning, our schedule -- I guess
11  it's almost 10:00 o'clock now.  Rather than break at
12  about 11:30, which would be an hour and a half, maybe
13  we'll go to noon and then break for lunch then unless we
14  need a break sooner.
15        And if we -- so do you wish to make
16  further opening or are you prepared to make -- call your
17  first witness?  And if your answer is you're prepared to
18  call your first witness, I want you to pause because I
19  want to address Mr. Lee.
20        MR. DIAZ-ARRASTIA:  I think you have
21  mostly heard my opening.  I have something sort of
22  previewing what our measure of damages is going to be,
23  but I don't know if that's really that necessary to
24  present.  So it probably would make more sense just to
25  go ahead with my first witness.

49

1        JUDGE BENTON:  Okay.  Do you want to make
2  further opening, Mr. Lee, or do you want to reserve
3  until they rest?
4        MR. LEE:  I think it would be helpful if I
5  made just a couple of brief comments because I addressed
6  just the motion to dismiss, but if you would indulge me.
7  I'll keep it very short, but I do think there's a couple
8  of things I want to say.
9        Just so I can keep the record clear, I
10  appreciate the running objection.  I just want to note
11  that we obviously respectfully disagree, but we're going
12  to continue to participate subject to the objection to
13  the panel's jurisdiction.  And as I understand it, I do
14  not need to continue from here to raise that and waste
15  time doing that all day and every day?
16        JUDGE BENTON:  That's correct.
17        MR. LEE:  Okay.  Thank you.
18        OPENING REMARKS ON BEHALF OF THE RESPONDENT
19        MR. LEE:  If I can just make a couple of
20  quick comments.  The contract requires a number of
21  elements, but two very key ones are you must have mutual
22  assent, in other words, you must agree on what it is
23  that is the subject of the contract and you must have
24  mutual intent to be bound.
25        We think both of those are lacking in this

13  (Pages 46 to 49)

ARBITRATION HEARING - SEPTEMBER 20, 2010

50

1    case. There was never an agreement on the terms of a
2    contract. This deal was all done through a broker,
3    Mr. Leyman. You are going to hear testimony from
4    Mr. Wilson at Vinmar who said that his firm terms of the
5    deal included U.S. origin MX.
6        Apparently Tricon's witness will say that
7    their term was open origin MX. Those two terms do not
8    match up. Nevertheless, Mr. Leyman, acting as a broker
9    and without authority to match the parties, went ahead
10   and matched the parties, told each side, "You have an
11   agreement."
12       Vinmar reasonably believed it did have an
13   agreement and an agreement on its terms. And so yes,
14   there is action within Vinmar on the days following the
15   discussion with Mr. Leyman where there's contract
16   discussions. There are things put in SAP. There are
17   actions taken in furtherance of what Vinmar believed to
18   be a deal.
19       The evidence will show you that on
20   July 31st, several days after the discussions with
21   Mr. Leyman, a Tricon representative informed Vinmar that
22   it very well may supply Asian origin mixed xylenes. And
23   the immediate response from Vinmar was, No, no, no, no.
24   This is a U.S. origin deal. You must supply U.S. origin
25   MX.

51

1        And so if there -- there never was mutual
2    assent between the parties. Tricon refused to give
3    U.S. origin. Vinmar demanded U.S. origin. Mr. Leyman
4    and all the witnesses agree that if the broker does not
5    have identical deal terms then there is no agreement and
6    so we believe that the evidence that we will present to
7    you will show that there was a lack of mutual assent on
8    the key term of the agreement, what is the product?
9        The other issue is mutual intent to be
10   bound. Both parties must intend to be bound by an
11   agreement and the fact that we're here today I think
12   demonstrates very clearly that Tricon never intended to
13   be bound by the broker confirmation, the document sent
14   by Mr. Leyman which does not have an arbitration
15   provision. They didn't intend to be bound by it.
16       They're here in arbitration. What they're
17   saying is, "No, no, no. Our sales contract is the
18   document that governs this relationship now. The sales
19   contract makes it clear that it must be signed and it's
20   signed by both parties." Mr. Lockwood never signed the
21   agreement for Tricon. Mr. Wilson never signed the
22   agreement for Vinmar and there never was agreement on
23   all of the terms of the sales contract.
24       So you don't have mutual assent from the
25   very get-go, in which case you never have an agreement.

52

1    And certainly, the way that Tricon has approached this
2    case, they didn't -- they evidenced their intent not to
3    be bound by the broker confirmation and the sales
4    contract never resulted in an agreement on all of the
5    terms and it was never signed.
6        We also -- we'll get in -- I'll wait on
7    the damages, but we certainly have a position on the
8    damages. We don't believe that Tricon has been damaged
9    in this case. It didn't have mixed xylenes in
10   inventory. It didn't do anything in furtherance of this
11   agreement when Vinmar told them, Wait a minute. We've
12   had a misunderstanding.
13       And at the end of the day, that's really
14   what this is all about, it's a misunderstanding. The
15   broker messed up on the communications. There are no
16   notes from the broker. There are no tape recordings,
17   although he testified and told our trader that he, in
18   fact, recorded tape -- phone conversations. Those are
19   missing. We don't have anything from the broker except
20   for a handwritten confirmation that he said he prepared
21   and that's wrong.
22       It makes a million dollar mistake on the
23   price. And so it's our contention that the broker
24   mangled the terms. He told us, "You have a deal on your
25   terms." He told Tricon they had a term on their -- or a

53

1    deal on their terms. There was some interaction between
2    the parties, both sides believing that their agreement
3    was the agreement.
4        And as soon as it became an issue, as soon
5    as Tricon -- Vinmar was aware that Vinmar had a
6    different understanding, had been told something else by
7    the broker, within six or seven business days, depending
8    upon how you count it, Tricon -- or Vinmar said, "We
9    don't have a deal. We never came to shore on the
10   principal product."
11       And so with that, I will rest at this
12   point.
13       JUDGE BENTON: Okay. Mr. Diaz-Arrastia,
14   you want to call your first witness?
15       MR. DIAZ-ARRASTIA: Yes, Your Honor.
16   I will call Mr. Brad Lockwood.
17       JUDGE BENTON: Mr. Lockwood. If you will
18   raise your right hand.
19       (At this time the witness was duly sworn
20   by Judge Benton.)
21       JUDGE BENTON: All right. Very good.
22   Mister --
23       MR. DIAZ-ARRASTIA: It's
24   Mr. Diaz-Arrastia.
25       JUDGE BENTON: Diaz-Arrastia. Did I make

**14 (Pages 50 to 53)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

54

1    that mistake earlier?
2              MR. DIAZ-ARRASTIA: Yes, but that's all
3    right.  You know, when you have a name like mine, you
4    respond to most noises.
5              JUDGE BENTON: All right,
6    Mr. Diaz-Arrastia.
7              MR. DIAZ-ARRASTIA: I knew you meant me.
8              JUDGE BENTON: I was looking at you when I
9    said it.
10             MR. DIAZ-ARRASTIA: Yes.  I knew you meant
11   me.
12             JUDGE BENTON: Very good.
13             BRAD JASON LOCKWOOD,
14   having been first duly sworn, testified as follows:
15             DIRECT EXAMINATION (10:00 a.m.)
16   BY MR. DIAZ-ARRASTIA:
17   Q.   Good morning, Mr. Lockwood.
18   A.   Good morning.
19   Q.   Could you state your full name for the record,
20   please?
21   A.   Sure.  Brad Jason Lockwood.
22   Q.   Okay.  And please tell the panel a little bit
23   about your education and background.
24   A.   Okay.  I got a marketing degree from Texas A&M
25   in College Station.  I graduated in May of 1997.

55

1    Q.   And, sir, are you now employed by Tricon
2    Energy?
3    A.   Yes, I am.
4    Q.   And what is your position at Tricon?
5    A.   I am both one of the owners of the company and
6    a partner as well as the trader -- a trader.
7    Q.   And how long have you been a trader, sir?
8    A.   Full time since January of 2005.  Part time as
9    I was transitioning out of my operations specialist role
10   at the end of 2004.
11   Q.   Okay.  And is it normal at Tricon that people
12   start out as operations specialists and then go on to
13   become traders if they're successful?
14   A.   Yes.
15   Q.   And what materials or products do you trade,
16   sir?
17   A.   I handle -- on the aromatics side, I trade
18   both mixed xylene, paraxylene, orthoxylene and toluene.
19   Q.   And how many trades have you personally made
20   in your career?
21   A.   900.
22   Q.   Now, that's a very precise number.  Did you
23   look that up over the weekend?
24   A.   Yes, I did.
25   Q.   And tell me, Mr. Lockwood, how many trades

56

1    have you been personally involved in with a U.S.
2    counterparty where the trade has not been performed in
3    the end?
4    A.   One.
5    Q.   Is it this trade?
6    A.   Yes, it is.
7    Q.   Tell me a little bit about mixed xylenes,
8    sometimes referred to as MX.  Correct, sir?
9    A.   Yes.
10   Q.   Is that a commodity product?
11   A.   Yes, it is.
12   Q.   What are the principal places in the world
13   where mixed xylenes are produced?
14   A.   It's produced in the U.S.  It's produced in
15   Asia.  It's produced in Europe, the Middle East.  It's
16   basically produced all over the world.
17   Q.   And is it correct, sir, that within a certain
18   specification, since it's a commodity, MX produced in
19   the U.S., is it the same as MX produced in Asia or
20   Europe or wherever?
21   A.   Yes, it is.
22   Q.   When Tricon trades on MX and sells MX, does it
23   take title to the product before it sells it?
24   A.   Yes, we do.
25   Q.   Okay.  And I understand that there will be

57

1    testimony that you could enter into a contract to sell
2    MX before you own it?
3    A.   Yes.  That's when we're selling short.
4    Q.   But do you have to take title before you can
5    actually deliver it?
6    A.   Yes, you do.
7    Q.   Okay.  So Tricon is not just a middle man
8    then?
9    A.   That's correct.
10   Q.   Is Tricon exposed to market risk?
11   A.   Every day.
12   Q.   If you're buying and the price falls, you can
13   make money.  If you're buying and the price rises, you
14   lose money?
15   A.   You need to rephrase that, please.
16   Q.   I'm sorry.  I said it backwards.
17   A.   You were incorrect in what you said.
18   Q.   Yeah.  If you -- in this case we're the
19   seller.  If you sell MX and the price falls, you've made
20   a good deal.  You've made money?
21   A.   That's correct.
22   Q.   And selling in this deal -- if after you sell
23   the price rises you've lost money because you have to go
24   get it?
25   A.   That's correct.

**15  (Pages 54 to 57)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

58

1    Q.   That's the market risk?
2    A.   That's correct.
3    Q.   Let's talk about the transaction that is the
4  subject of our dispute.  Did you deal through a broker,
5  sir?
6    A.   Yes, I did.
7    Q.   And was that broker Ed Leyman?
8    A.   Yes, he was.
9    Q.   Did you know Mr. Leyman before the Vinmar
10  transaction?
11    A.   Yes, I did.
12    Q.   Had you made deals with Mr. Leyman before?
13    A.   I have.
14    Q.   Tell us, sir, how many brokers in the U.S.
15  deal in MX?
16    A.   I'd say as of today there are three, Ed Leyman
17  at MOAB, Kevin Kilkeary at a company called Blue Ocean
18  and -- I'm forgetting the third name, but he works at a
19  company called Fusion.  So those are the three that
20  trade MX or broker MX.
21    Q.   And do you deal with all of them, sir?
22    A.   Yes, I do.
23    Q.   Tell me, what is Mr. Layman's reputation in
24  the industry as a broker?
25    A.   He -- I think he's one of the most senior

59

1  brokers, having the most experience, so I think
2  everybody counts on him as being one of the most
3  reliable and senior brokers in the industry.
4    Q.   In your personal dealings with Mr. Leyman,
5  have you found that reputation to be deserved?
6    A.   Definitely.
7    Q.   Now, who was the trader on the Vinmar side of
8  the transaction in this deal?
9    A.   Dr. Rick Wilson.
10    Q.   And did you know Rick Wilson before this
11  transaction?
12    A.   Yes, I did.
13    Q.   How did you know him before this transaction?
14    A.   Once he joined Vinmar, we took him to lunch to
15  discuss opportunities that we could do together on
16  business.
17    Q.   And was this your first deal with Mr. Wilson?
18    A.   Yes, it was.
19    Q.   Before the deal was made, did you communicate
20  directly with Mr. Wilson or did you communicate only
21  through Mr. Leyman, the broker?
22    A.   Only through Mr. Leyman.
23    Q.   Is that commonly the way things are done in MX
24  trading?
25    A.   Yes.

60

1    Q.   When that happens, does the broker work for
2  both sides of the deal?
3    A.   Yes, he does.
4    Q.   When you were working on this deal, had you
5  requested that Mr. Leyman keep your name confidential?
6    A.   I did.
7    Q.   And why is that, sir?
8    A.   The market was starting to become weak and I
9  did not want to have my name out there as being one of
10  the sellers.
11    Q.   Are you the only trader who does this?
12    A.   No.
13    Q.   Is that a common request that's made to
14  brokers?
15    A.   Yes, it is.
16    Q.   Do you sometimes not request confidentiality?
17    A.   Yes, I do.
18    Q.   If you do not request confidentiality, do you
19  expect that your identity will not be disclosed?
20    A.   Can you --
21    Q.   If you -- if you do not request
22  confidentiality, what do you think is going to happen?
23    A.   I think if the other side asks who's on the
24  other side that they'll tell them by name.
25    Q.   And do you think that happens even if the

61

1  other side requested confidentiality but you did not?
2    A.   Sure.
3    Q.   And has it ever happened to you that
4  Mr. Leyman has refused to disclose the identity of a
5  counterparty in the deal?
6    A.   All the time.
7    Q.   Now, even if he disclosed your identity
8  because you did not request --
9    A.   That's correct.
10    Q.   -- confidentiality?
11    A.   That's correct.
12    Q.   Now, let me ask you, Mr. Lockwood, during the
13  negotiation of this deal when you were working with
14  Mr. Leyman and Mr. Leyman was working with Mr. Wilson,
15  was there any mention or discussion of the mixed xylene
16  having to be of U.S. origin?
17    A.   No, there wasn't.
18    Q.   What did you-all discuss during the
19  negotiation of the deal?
20    A.   We discussed the price, the quality, the
21  quantity, the fact that Vinmar needed flexibility on the
22  discharge port, wanting both Korea or Taiwan.  He wanted
23  that in his option.  We discussed the Incoterms being
24  CFR and we discussed the payment terms.
25    Q.   Okay.  Was there specific discussion of the

16  (Pages 58 to 61)

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

**62**

1 delivery window?

2     A. Yes, there was.

3     Q. Okay. And that was Mr. Wilson was asking for

4 first half of September?

5     A. Yes. He needed a very narrow window, first

6 half of September.

7     Q. Was that term very important to Mr. Wilson?

8     A. Yes, it was.

9         MR. LEE: Objection. Calls for

10 speculation.

11     Q. (BY MR. DIAZ-ARRASTIA) Well, did Mr. Leyman

12 tell you that was very important to Mr. Wilson?

13         MR. LEE: Objection. Leading.

14     A. Yes, he did.

15         JUDGE BENTON: It's overruled.

16     A. He did.

17     Q. (BY MR. DIAZ-ARRASTIA) Mr. Lockwood, you have

18 some notebooks in front of you and they are labeled

19 Joint Exhibits, Tricon Exhibits and Vinmar Exhibits. If

20 you will take a look at the joint exhibits and go to

21 No. 2, Joint Exhibit No. 2. That's at the second page.

22         MR. DIAZ-ARRASTIA: Tracy, could you put

23 that in full page?

24     Q. (BY MR. DIAZ-ARRASTIA) And, Mr. Lockwood, is

25 that the confirm that you received from Ed Leyman after

---

**63**

1 the deal was made?

2     A. This was the initial confirm, yes.

3     Q. Did you learn that after this initial confirm

4 was sent out Mr. Wilson requested through Mr. Leyman for

5 a change in the payment terms?

6     A. Yes, I did.

7     Q. And what was that change that was requested?

8     A. We had agreed to 30 days from loading as the

9 payment terms and he requested to be changing to LC

10 documentary -- or a documentary letter of credit at site

11 for payment terms.

12     Q. Okay. And did you agree to that modification?

13     A. After a discussion internally, I did agree to

14 it, yes.

15     Q. Okay. And you heard about it from Mr. Leyman.

16 Is that correct?

17     A. That's correct.

18     Q. And you told Mr. Leyman, "Yes, we're okay with

19 that"?

20     A. Yes.

21     Q. Okay. Could we now turn the page? Go to

22 Joint Exhibit No. 3. And is this the confirm

23 that you received after that modification in the payment

24 terms?

25     A. That's correct.

---

**64**

1     Q. Okay. And let me ask you, Mr. Lockwood, did

2 you think it was unusual to receive an amended confirm

3 when there was a modification in the terms?

4     A. I expected it.

5     Q. Now, if you could take a look at the note near

6 the bottom.

7         MR. DIAZ-ARRASTIA: Tracy, see if you can

8 zoom in on that, please.

9     Q. (BY MR. DIAZ-ARRASTIA) Okay. And it says,

10 "If there is anything outlined contrary to your

11 understanding of our agreement, please notify us

12 immediately by facsimile." Did you see that when you

13 received these two confirms?

14     A. Yes, I did.

15     Q. And, sir, do traders review confirms as soon

16 as they get them?

17     A. They're required to.

18     Q. Okay. And why is that important?

19     A. Because you must review what the broker is

20 saying you agreed to.

21     Q. Now, when you reviewed Joint Exhibits 2 and 3,

22 did you find something that was contrary to your

23 understanding?

24     A. Definitely.

25     Q. And what was that?

---

**65**

1     A. The price was shown $1 million below what I

2 agreed to.

3     Q. And let's take a look at it. If you just look

4 at -- well, if we can go to J 2 first. There you go.

5 We went over it. Price -- that's right. I'm sorry.

6 1,110 per metric ton.

7         And what had -- what was the price that

8 had been agreed to?

9     A. 1310 a metric ton.

10     Q. Okay. Did you communicate that to Mr. Leyman?

11     A. I did even prior to him requesting the payment

12 change. So when I received the second confirmation, I

13 pointed out to Ed Leyman that price is still shown

14 as incorrect.

15     Q. Okay. And can we go over and see joint --

16 look at Joint Exhibit 4? And if we could look at the

17 price term.

18         MR. DIAZ-ARRASTIA: And if you could zoom

19 in on that, Tracy.

20     Q. (BY MR. DIAZ-ARRASTIA) And here Mr. Leyman

21 corrected the price term?

22     A. Yes.

23     Q. And Mr. Wilson agreed with this. Correct?

24     A. That's correct.

25     Q. Mr. Lockwood, in any of these three

---

**17   (Pages 62 to 65)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

66

1  confirms -- and let me ask you something.  Were all of
2  these confirms delivered by Mr. Leyman to the parties on
3  July 22nd?
4      **A.  The 22nd or the morning of the 23rd, but I**
5  **believe it was the 22nd.**
6      Q.  And do any of these three confirms mention
7  anything about the origin of the product?
8      **A.  No, they do not.**
9      Q.  And when we talk about origin of the product,
10 what does that mean?
11     **A.  Where the product was produced.**
12     Q.  Okay.  Where it's manufactured?
13     **A.  That's correct.**
14     Q.  Okay.  Now, Mr. Lockwood, does it ever happen
15 that sometimes a trader may specify a particular product
16 origin in his deal?
17     **A.  I have done so myself.**
18     Q.  Okay.  And tell me about that or tell the
19 panel about that.  Excuse me.
20     **A.  Okay.  When I've had product that I've sold**
21 **into Mexico, I've had to buy U.S. origin specifically so**
22 **that I could comply with NAFTA Treaty because the U.S.**
23 **is given preferential treatment delivering product into**
24 **Mexico to avoid duties going into Mexico.**
25     **So if you have product that was produced**

67

1  in the U.S. when you deliver it to Mexico, you avoid a
2  certain duty on the import into Mexico because of the
3  NAFTA treaty between the two countries.
4      Q.  Okay.  Now, if you need a product with a
5  particular origin, is that something that has to be
6  dealt with up front in your negotiations?
7      **A.  Definitely.**
8      Q.  And why is that, sir?
9      **A.  It's impossible to negotiate with people after**
10 **the facts.  If you -- if you need something up front,**
11 **you have to ask for it so the producer knows that they**
12 **have to guarantee something that was produced in the**
13 **U.S. versus giving you some other supply.**
14     Q.  If you have to guarantee the origin of the
15 product, can that affect your ability to meet a delivery
16 date?
17     **A.  Can you repeat that?**
18     Q.  If you have to guarantee the origin of a
19 product, can that -- can that affect your ability to
20 meet a specific delivery date that you guarantee?
21     **A.  Definitely, because it limits your ability to**
22 **substitute the cargo with other origins.**
23     Q.  Okay.
24         JUDGE DAVIDSON:  This is going to sound
25 simple.  Maybe I should have looked it up before we came

68

1  here.  Would somebody please tell me and get on the
2  record what MX is actually used for --
3         THE WITNESS:  Sure.
4         JUDGE DAVIDSON:  -- what its everyday
5  usage is?
6         MR. DIAZ-ARRASTIA:  Excuse me.  That's a
7  good thing to talk about.
8         JUDGE BENTON:  Everybody knows that, Mark.
9         JUDGE DAVIDSON:  Okay.  Well --
10     Q.  (BY MR. DIAZ-ARRASTIA)  Mr. Lockwood, could
11 you explain to the panel --
12     **A.  Sure.**
13     Q.  -- what MX is used for?
14     **A.  Mixed xylene has two primary uses.  The first**
15 **is going into making paraxylene which then goes into**
16 **making -- I'll just say paraxylene is used in the making**
17 **of polyester.**
18     **It goes into making polyester, which is**
19 **obviously a substitute for cotton.  So the number one**
20 **use is predominantly in Asia to produce polyester.**
21         JUDGE DAVIDSON:  Okay.
22     **A.  The number two use is to go into gasoline**
23 **blending.  Mixed xylene has an octane rating of 104 so**
24 **sometimes when people are trying to blend up gasolines**
25 **so that you have an octane of 87, 89 or 93 at your pump,**

69

1  they can add mixed xylene to the gasoline which blends
2  up the octane to meet the rating at the pump.
3         JUDGE DAVIDSON:  Thank you.
4      Q.  (BY MR. DIAZ-ARRASTIA)  Now, Mr. Lockwood, if
5  you would take a look at the notebook that is marked as
6  the Tricon Exhibits.
7      **A.  Yes.**
8      Q.  First look at Tricon Exhibit No. 1.
9         MR. LEE:  And if I may, I object to the
10 relevance of this document.  It has nothing to do with
11 this transaction and Vinmar certainly was not a party to
12 whatever this document purports to be.
13         JUDGE BENTON:  Is this used for
14 demonstrative --
15         MR. DIAZ-ARRASTIA:  It is for
16 demonstrative purposes, Your Honor.  The purpose is to
17 show what a confirm looks like when the parties required
18 origin in the negotiations.
19         JUDGE BENTON:  I'm going to -- we're going
20 to allow it.  It's received.
21     Q.  (BY MR. DIAZ-ARRASTIA)  Now, Mr. Lockwood, if
22 you would look at Tricon Exhibit 1.  And this is a MOAB
23 confirm in another deal that Tricon has done with
24 mister -- with MOAB.  Correct?
25     **A.  Yes.**

**18  (Pages 66 to 69)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

70

1    Q.  And if you would look in the quality portion
2  of this document, does it specifically say product to be
3  of U.S. origin?
4    A.  Yes, it does.
5    Q.  And that is what you would expect to see in
6  the confirm if origin was discussed during the initial
7  negotiation leading to the confirm?
8    A.  Yes, I would.
9    Q.  If origin is important to you as a buyer,
10  would you put that in the firm bid that you submit to
11  the broker?
12    A.  You would have to.
13    Q.  Now, let's take a look at Exhibit T 2, Tricon
14  Exhibit No. 2.  And this is another similar MOAB
15  confirm?
16    MR. LEE:  I have the same objection.
17    JUDGE BENTON:  Same objection?
18    Yeah.  We're going to -- we'll allow it.
19    Q.  (BY MR. DIAZ-ARRASTIA)  And this is another
20  MOAB confirm in another deal that Tricon did with MOAB.
21  Correct, sir?
22    A.  Yes, it is.
23    Q.  And on the quality term, what does that say
24  about origin?
25    A.  99.70 minimum paraxylene purity.  Product must

71

1  be non-Iranian or Chinese origin.
2    Q.  And let's just take another look -- quick look
3  at T 3, Tricon Exhibit 3.
4    And, again, sir, this is another example
5  of what happens when origin is discussed in negotiation
6  and this one says, "No Iranian or Chinese origin."
7  Correct, sir?
8    A.  Yes, that's correct.
9    Q.  If you would now go back to the Joint Exhibit
10  notebook, Mr. Lockwood, and open up Joint Exhibit No. 5.
11    JUDGE BENTON:  And just a second.  I
12  thought I understood Mr. Runions to have objected
13  earlier to something.  Am I -- did I make a mistake?
14  Have you -- during a question I thought Mr. Runions had
15  objected earlier on this witness.
16    Have you had this witness this whole time?
17  Are you going to have -- are you going to do the cross
18  on this witness?
19    MR. LEE:  Yes.
20    JUDGE BENTON:  Okay.  I thought it was
21  Mr. Runions' witness.
22    MR. LEE:  No.  I'm sorry.  No, no, no,
23  Your Honor.  I believe it was me and I just was
24  objecting to the --
25    JUDGE BENTON:  Now, there was a question

72

1  earlier in the examination and I thought Mr. Runions had
2  piped up.
3    MR. LEE:  No, no.  That was me.  I think I
4  objected to speculation but --
5    JUDGE BENTON:  All right.  Thanks.  Let's
6  proceed.
7    Q.  (BY MR. DIAZ-ARRASTIA)  And let's look in
8  the -- at the bottom part of the first page of Joint
9  Exhibit 5.  Tell us what this is, Mr. Lockwood.
10    A.  I attached our sales letter to Rick Wilson
11  with a copy to my colleagues and just telling him,
12  "Thank you for the business and here's a copy of our
13  letter for proposing additional terms."
14    Q.  Okay.  And if you could turn to the second
15  page of Joint Exhibit 5, that is what you referred to as
16  your sales letter?
17    A.  That's correct.
18    Q.  And does this sales letter -- beginning on
19  the -- first let's talk about the first page.  Are the
20  terms spelled out in the first page of this Tricon
21  letter the same terms that were contained in the MOAB
22  confirm?
23    A.  They are, yes.
24    Q.  And let's now look at the second page.  And
25  beginning with the second page, Mr. Lockwood, are these

73

1  Tricon's terms and conditions of sale?
2    A.  They are, yes.
3    Q.  In your industry, is it common that after a
4  deal is made you send a letter with these terms and
5  conditions of sale to your counterparty?
6    A.  Yes.  Both sides typically pass paper as they
7  call it.
8    Q.  It's sometimes called passing paper?
9    A.  Yes.
10    Q.  When you sent Exhibit 5, was it your intention
11  to say, "The deal that we had before with Ed Leyman,
12  that's canceled.  This is the new deal"?
13    A.  Not at all.
14    MR. LEE:  Objection.  Leading.
15    JUDGE BENTON:  It's overruled.
16    Q.  (BY MR. DIAZ-ARRASTIA)  What were you doing
17  with Exhibit 5?
18    A.  Just proposing additional terms, which is
19  standard for people to do.
20    Q.  Does it sometimes happen in the industry that
21  you propose additional terms but some of those
22  additional terms are not agreed to?
23    A.  Yes.  It happens quite often actually.
24    Q.  Does it sometimes happen in the industry that
25  you propose additional terms and none of the additional

19  (Pages 70 to 73)

ARBITRATION HEARING - SEPTEMBER 20, 2010

**74**

1  terms are agreed to?

2     **A.  I would say that would be pretty rare because**

3  **some -- most of the time these are pretty boilerplate**

4  **additional terms that both sides usually do, but I guess**

5  **in theory it's possible.**

6     Q.  And does that mean that you don't have a deal?

7     **A.  Not at all.**

8     Q.  Let's take a look at the last page of this

9  letter.  Well, first of all, let's look at Paragraph 9

10  on this J 5.  Is that the arbitration provision, sir?

11     **A.  Yes, it is.**

12     Q.  Now, let's look at the last page.  And there

13  are a couple of signature lines.  Correct, sir?

14     **A.  Yes, there are.**

15     Q.  Did you expect that Exhibit 5 would be signed

16  by you and Mr. Wilson?

17     **A.  No.  I never sign my contracts.**

18     Q.  Okay.  Are these documents ever signed?

19     **A.  Unless they're a long-term contract with the**

20  **company over a period of a year usually, then they're**

21  **usually never signed.**

22     Q.  Okay.  They're treated differently whether

23  you're dealing with a long-term contract or a spot

24  contract.  Is that what you mean?

25     **A.  In theory, once you agree to all the material**

**75**

1  **terms even on a long-term contract you don't have to**

2  **sign it.  It's just that people like the formality on a**

3  **long-term contract of signing it, but on spot deals I**

4  **rarely ever see those signed, ever.**

5     Q.  Have you ever signed Tricon's terms and

6  conditions of sales in a spot deal?

7     **A.  When I've been asked to, I have.**

8     Q.  Have you -- has that actually happened?

9     **A.  Yes, it has.**

10     Q.  What did you do in this transaction,

11  Mr. Lockwood, after you sent Exhibit 5 to Mr. Wilson?

12     **A.  It's standard practice for me, once I've**

13  **agreed to all the material terms, to pass it to my**

14  **operations specialist who then takes care of everything**

15  **from Point A to Z afterwards.**

16     Q.  Okay.  And who is that operations specialist?

17     **A.  At the time it was Mr. Vuk Rajevac.**

18     Q.  And why do you turn the transaction over to

19  the op specialist?

20     **A.  It's a -- it's a matter of time and**

21  **efficiency.  It allows me to focus on making more deals**

22  **while he takes care of what I've already done.**

23     Q.  Does the operations specialist negotiate

24  contract terms?

25     **A.  Yes, he does.**

**76**

1     Q.  Give me some examples of the contract terms

2  that an operation specialist would negotiate.

3     **A.  Inspection fees, interest, demurrage, law and**

4  **jurisdiction, title and risk, those kind of things.**

5     Q.  Would the operations specialist negotiate the

6  dispute resolution provisions?

7     **A.  Sure.**

8     Q.  And what about credit terms, what needs to be

9  in the letter of credit, things like that?

10     **A.  Yes, definitely.**

11     Q.  Mr. Lockwood, what happened to the price of

12  mixed xylenes after July 22nd, 2008?

13     **A.  Through what time period?**

14     Q.  Well, let's say for the rest of that year.

15     **A.  It was a historical fall.**

16     Q.  Okay.  Can we -- can you take a look at

17  Exhibit 32 in the Tricon exhibit book, Exhibit

18  Tricon 32.  And if you could go to the next page.

19        Mr. Lockwood, is this information about

20  the price of MX that you obtained from Platts?

21     **A.  Yes, I did.**

22     Q.  Tell us what Platts is.

23     **A.  Platts is a recording agency that basically**

24  **assesses the market price at the end of each day in**

25  **whatever region they're covering.  So at the end of each**

**77**

1  **day, they'll look at either deals that were done and if**

2  **there's no -- if there are no deals that are done, they**

3  **assess the average of the bid and the offer for the day**

4  **that day.**

5     Q.  And, Mr. Lockwood, what does this chart tell

6  you about what happened to the price of MX after

7  July 22nd, 2008?

8     **A.  A rapid decline in the price.**

9     Q.  If you will take a look at the price that

10  Platts reports on July 22.

11     **A.  Yes.**

12     Q.  And then take a look at the price on

13  July 31st, 2008.

14     **A.  Okay.**

15     Q.  Can you tell me by how much the price had

16  declined between July 22 and July 31st?

17     **A.  Around a hundred dollars a metric ton.**

18     Q.  That's about 7 percent?

19     **A.  Yes, that's correct.**

20     Q.  And then take a look at the price that Platts

21  reports for September 15th, which was the last delivery

22  date under the contract with Vinmar.

23     **A.  Okay.**

24     Q.  And can you tell me by how much that price had

25  declined from July 22 to September 15th?

**20  (Pages 74 to 77)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

78

1      A.   It looks like around $360 a metric ton.
2      Q.   That's about 28 percent?
3      A.   I think roughly, yes.
4      Q.   And now take a look at the -- at the very end.
5  I think the last day on this chart is the 16th of
6  December.
7      A.   Yes.
8      Q.   Tell us what had happened to the price of MX
9  by the 16th of December of 2008.
10     A.   It had just collapsed.
11     Q.   Okay.  About a 62 percent decline?
12     A.   Yeah.  It was a huge collapse.
13     Q.   From 1354 to 501?
14     A.   That's correct.
15     Q.   Does mixed -- does the price of mixed xylene
16  tend to track the price of crude oil?
17     A.   Yes, it does.
18     Q.   What happened to the price of crude oil after
19  July 22nd, 2008?
20     A.   At some point in July, the crude oil hit a
21  record high of $147 a barrel and it proceeded to drop
22  all the way down into the 30's, $30 a barrel.
23     Q.   Now, Mr. Lockwood, after you sold the MX to
24  Vinmar on July 22nd, 2008, did Mr. Wilson approach you
25  to sell it back to you?

79

1      A.   Yes, he did.
2      Q.   Can we take a look at Joint Exhibit No. 15,
3  please?  And if we could go -- did I get that right?
4           It looks like we have the wrong exhibit.
5  Excuse me for a moment.  Could we -- I'm sorry.  It's
6  Joint Exhibit No. 12, Mr. Lockwood.
7      A.   Okay.
8      Q.   Mr. Lockwood, Joint Exhibit 12 is -- at the
9  top of Joint Exhibit 12 is an e-mail that you're sending
10  yourself.  Correct?
11     A.   That's correct.
12     Q.   But if you look down, there's some -- are
13  those instant messages that we see?
14     A.   They are, yes.
15     Q.   Okay.  And they are between you and
16  Mr. Wilson?
17     A.   Yes.
18     Q.   And what is the date of those instant
19  messages?
20     A.   July 31st, 2008.
21     Q.   Okay.  And if you will go down at the instant
22  message that Mr. Wilson sends you at 9:41 and 27 seconds
23  into the morning.
24     A.   Okay.
25     Q.   And what does Mr. Wilson tell you?

80

1      A.   Brad, if you want to wipe the slate clean, we
2  could do that.  Otherwise, I have contract obligations
3  I'll supply into.
4      Q.   And what is Mr. Wilson referring to?
5      A.   He's saying that he'll --
6           MR. LEE:  Calls for speculation.
7           JUDGE BENTON:  Why don't you rephrase your
8  question?
9      Q.   (BY MR. DIAZ-ARRASTIA)  Okay.  Mr. Lockwood,
10  at the time that you were having these instant messages
11  with Mr. Wilson, what were you and he discussing?
12     A.   This instant message is actually Rick Wilson
13  following up with me directly after we tried to conclude
14  another deal through Ed Leyman.
15     Q.   Okay.  And were you discussing the MX that he
16  had bought from you on July 22nd?
17     A.   Yes, I was.
18     Q.   Okay.  And what was your understanding of what
19  Mr. Wilson said when he said "We could wipe the slate
20  clean"?
21     A.   He was offering to sell the material back to
22  me at the same price that he purchased, which was at
23  1310 a metric ton.
24     Q.   And did you accept that?
25     A.   No way.

81

1      Q.   And why not?
2      A.   The market had already fallen 450,000 or $90 a
3  metric ton at the time that he was talking to me.
4      Q.   And, sir -- if you'll go down to Joint
5  Exhibit No. 14, sir.  Did you later learn that
6  Mr. Rajevac had sent this e-mail to Mr. Wilson on
7  July 29th?
8      A.   Yes, I did.
9      Q.   I'm sorry.  Mr. Rajevac had sent that e-mail
10  to Mr. Pascu on July 29th?
11     A.   Yes.
12     Q.   And if we could look at No. 3, is this where
13  Mr. Rajevac is telling Mr. Pascu that they may supply --
14  that Tricon may supply an Asian origin cargo?
15     A.   That's correct.
16     Q.   Okay.  And why does he say that an Asian
17  origin cargo may have to be supplied?
18     A.   Well, he's saying that we guaranteed an
19  arrival of September 1 through 15, so in case the vessel
20  incurs any delays which would cause the estimated time
21  of arrival to be outside of the 15th of September, which
22  we guaranteed, then we would have to substitute it with
23  an Asian origin cargo which would have a two to
24  three-day delivery timing to be able to meet the
25  guarantee that we gave.

**21  (Pages 78 to 81)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

82

```
 1        Q.  Okay.  Mr. Brad Lockwood, how much -- let's
 2   look at the date of this e-mail.  It's July 29th, 2008,
 3   about 5:00 in the afternoon.
 4        A.  Okay.
 5        Q.  Let's go back to Joint Exhibit 12.  That
 6   interchange that you had with Mr. Wilson was on July the
 7   31st, 2008, in the morning?
 8        A.  That's correct.
 9        Q.  How much time had passed between Exhibit 14
10   when Mr. Rajevac says, "We may need to substitute Asian
11   origin" and the conversations that you are having with
12   Mr. Wilson on July 31st?
13        A.  Around a day and a half.
14        Q.  In the course of these conversations, did
15   Mr. Wilson ever tell you, "Hey, we can't take Asian
16   origin MX"?
17        A.  Never mentioned it.
18        Q.  In fact, what he did say is, "Can I sell it
19   back -- can I sell it back to you?"
20        A.  That's correct.
21        Q.  What happened after July 31st or let -- or
22   what happened later on July 31st?
23        A.  After I would not agree to buy back the
24   product at the same price that I sold it to them for, in
25   the afternoon I was called by Ed Leyman to say that we
```

83

```
 1   have a problem.
 2        Q.  Okay.  Can we look at Joint Exhibit No. 15?
 3   You later learned that Mr. Rajevac received this e-mail
 4   from Mr. Wilson.  Is that --
 5        A.  That's correct.
 6        Q.  And what's the date on that?
 7        A.  July the 31st in the afternoon.
 8        Q.  Okay.  At 1:43 p.m.?
 9        A.  Yes.
10        Q.  About how many hours after the IM exchange
11   that you had had that morning?
12        A.  I'd say around four to five hours.
13        Q.  Okay.  And Mr. Wilson says, "Vuk, we cannot
14   accept open origin.  It must be from the USA."
15        A.  That's correct.  That's what he says.
16        Q.  Is this the first time that Tricon heard
17   anything about the MX having to have U.S. origin?
18        A.  Yes, it was.
19        Q.  Mr. Lockwood, you told me earlier that when we
20   talk about the origin of a product, if mixed xylene is
21   of U.S. origin that means it was manufactured in the
22   U.S.?
23        A.  That's correct.
24        Q.  Do you remember that?
25             Is there a difference between referring to
```

84

```
 1   MX being of your U.S. origin and MX having a United
 2   States loading port?
 3        A.  Definitely there's a difference.
 4        Q.  What is the difference between origin and
 5   loading port?
 6        A.  Loading port is just exactly that.  It's just
 7   the port that it was actually loaded from for export.
 8   Origin is actually where it was manufactured.
 9        Q.  Is it possible for mixed xylene to be loaded
10   in the U.S. Gulfport but not be of U.S. origin?
11        A.  Yes.  Somebody could import material from a
12   foreign country and store it in a bonded tank, therefore
13   maintaining its foreign origin status.  And when it's
14   loaded from that port, it will still be known as the
15   foreign origin status.
16        Q.  Okay.  Now, after Mr. Wilson informed
17   Mr. Rajevac and Mr. Leyman that he would not accept
18   U.S. origin, did you try to negotiate a resolution with
19   Vinmar?
20        A.  I tried, yes.
21        Q.  Take a look at Joint Exhibit No. 18, sir.  I
22   got on the wrong exhibit again.  Here it is.  I'm sorry.
23   Excuse me.
24             Now, Mr. Lockwood, did you -- is this a
25   proposal for a resolution that was -- that you received
```

85

```
 1   from Mr. Wilson?
 2        A.  Yes, it is.
 3        Q.  And he dealt through Mr. Leyman.  Correct?
 4        A.  That's correct.
 5        Q.  And he is essentially saying, "I will do the
 6   deal that was negotiated on July 22 provided that you
 7   guarantee U.S. origin and guarantee first half of
 8   September delivery."  Correct?
 9        A.  But there is one noticeable change.  He's
10   asking for another seven days for him to be able to
11   declare the discharge port.
12             JUDGE DAVIDSON:  To declare the what?
13             THE WITNESS:  The discharge port, whether
14   or not they would like the product discharged in either
15   Korea or Taiwan.  He's asking for another seven days
16   because contractually we had agreed to August 8th and
17   he's asking for another seven days to declare where he
18   wants the product discharged.
19        Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Did you accept
20   this proposal?
21        A.  No, I did not.
22        Q.  Why did you not accept this proposal?
23        A.  It was clearly not a good faith proposal based
24   on the fact that he was asking for another seven days to
25   declare the discharge port.  And if he's asking for USA
```

22   (Pages 82 to 85)

ARBITRATION HEARING - SEPTEMBER 20, 2010

86

1  product guaranteed in the first half with a 30 to 45-day
2  transit time, there was a very high likely possibility
3  that I would not be able to perform on this contract as
4  he -- as he proposed.
5      Q.  If you will now look at Tricon Exhibit No. 16,
6  Mr. Lockwood.  Was this a proposal that you made to
7  Mr. Wilson trying to come to resolution of the matter?
8      A.  Yes, it was.
9      Q.  And what did you propose?
10     A.  I tried to give him two options, hopefully --
11  hoping that one of them he would choose.  The first is
12  that I was saying that I would be giving you a vessel
13  that had U.S. origin.  The ETA to Korea was September
14  the 6th.  The ETA to Taiwan was September 12-13th.
15        So the estimated time of arrival was
16  exactly within the window that he had requested of one
17  through 15.  And although I would not guarantee a first
18  half September arrival, I was giving him something that
19  had been estimated time of arrival during the window he
20  wanted.
21        JUDGE WOOD:  What's this exhibit number
22  again?
23        MR. DIAZ-ARRASTIA:  It is Tricon
24  Exhibit --
25        JUDGE DAVIDSON:  16.

87

1        MR. DIAZ-ARRASTIA:  -- No. 16.
2      Q.  (BY MR. DIAZ-ARRASTIA)  Did Mr. Wilson accept
3  these proposals?
4      A.  No, he did not.
5      Q.  Did Vinmar declare a discharge port on August
6  the 8th?
7      A.  No.  They failed to do so.
8      Q.  What did you do then?
9      A.  I tried to find other buyers in the market.
10     Q.  Take a look at Joint Exhibit No. 21, beginning
11  there and going on to the next page.  And this is an
12  e-mail that Mr. Rajevac sent to Mr. Wilson on August the
13  8th at 3:42.  Is that correct, sir?
14     A.  That's correct.
15     Q.  Did you instruct Mr. Rajevac to send this to
16  Mr. Wilson?
17     A.  Yes, I did.
18        MR. DIAZ-ARRASTIA:  And, Tracy, if you
19  could zoom in on the highlighted section.
20     Q.  (BY MR. DIAZ-ARRASTIA)  And Mr. Rajevac says,
21  "Furthermore, if your discharge port declaration is not
22  given by 5:00 p.m. CST today, Vinmar will be in breach
23  of the contract and we reserve the right to resell the
24  cargo in the open market and will hold Vinmar liable for
25  all damages, including but not limited to the difference

88

1  between the price at which we sold to Vinmar and the
2  price obtained for the cargo in the open market."
3      A.  That's correct.
4      Q.  Okay.  And that is what you had instructed
5  Mr. Rajevac to say?
6      A.  Yes, I did.
7      Q.  Okay.  And if you will look in the first page
8  of exhibit -- Joint Exhibit No. 21.  Later on
9  August 8th, did you also send an e-mail to
10  Mr. Antonvich?
11     A.  Yes, I did.
12     Q.  And if you will look at where it says,
13  "Therefore," "Therefore, Vinmar is in breach of
14  contract and we reserve our right as a result of this
15  breach."
16     A.  That's correct.
17     Q.  That's what you told Mr. Antonvich on July the
18  8th --
19     A.  Yes.
20     Q.  -- at 5:13 p.m.?
21     A.  Yes.
22     Q.  I'm sorry.  On August the 8th at 5:13 p.m.?
23     A.  That's correct.
24     Q.  Okay.  And did you also set -- tell
25  Mr. Antonvich that you reserve your right to resell the

89

1  cargo?
2      A.  Yes, I did.
3      Q.  Mr. Lockwood, after Vinmar said that they
4  would not perform the contract, did Tricon still hope
5  that it would perform?
6      A.  Of course.
7      Q.  When was it that Tricon decided that Vinmar
8  probably would not perform?
9      A.  I think it was most evident when we gave a
10  vessel nomination showing that you had U.S. origin for a
11  product that would be ETA arriving in the first half and
12  they rejected it as a new proposal when all we were
13  trying to do was to get a vessel nomination as per the
14  contract.
15     Q.  And y'all notified Vinmar that you considered
16  the contract null on August the 8th when the discharge
17  port was not declared per the contract?
18     A.  That's correct.
19     Q.  Did you then try to find a replacement sale?
20     A.  I tried.
21     Q.  And what happened?
22     A.  It was impossible to find buyers with the
23  market falling as fast as it was.
24     Q.  And does it sometimes happen that when the
25  price is falling rapidly it's very difficult to

23  (Pages 86 to 89)

ARBITRATION HEARING - SEPTEMBER 20, 2010

90

1  impossible to find spot buyers?
2      A.  Sure.
3      Q.  Okay.  Is that called the market freezes?
4      A.  Yes, because if -- from a buyer's point of
5  view if I don't buy today and I wait until tomorrow most
6  likely the price will continue to fall so why buy today
7  what you can get cheaper tomorrow?  So the buyers don't
8  do anything.
9      Q.  Okay.  Did you eventually select a replacement
10  sale --
11     A.  Yes, I did.
12     Q.  -- for the Vinmar sale?
13         And what was that sale?
14     A.  I exercised my option under my long-term
15  contract with KP where I forced them to take a 5,000
16  metric ton cargo because it was in my option.
17     Q.  Okay.  You -- and to back up, you sold -- you
18  selected a sale to KP Chemical --
19     A.  That's correct.
20     Q.  -- as the replacement sale?
21     A.  That's correct.
22     Q.  What is KP Chemical?
23     A.  KP Chemical is the largest mixed xylene buyer
24  in the world.  They're based in Korea with their main
25  discharge in Ulsan.

91

1          JUDGE WOOD:  What exhibit number is that?
2          MR. DIAZ-ARRASTIA:  It is first -- Your
3  Honor, we're going to show those now.  It is Tricon
4  Exhibit 4.
5          JUDGE WOOD:  The one that's up now?
6          MR. DIAZ-ARRASTIA:  That would be Joint
7  Exhibit --
8          MS. LARSON:  1.
9          MR. DIAZ-ARRASTIA:  -- 1.
10         JUDGE WOOD:  Thank you.
11         MR. DIAZ-ARRASTIA:  Is the one that is up
12  now.
13     Q.  (BY MR. DIAZ-ARRASTIA)  And, Mr. Lockwood,
14  calling your attention to Joint Exhibit No. 1, is that a
15  copy of the contract with KP Chemical Company?
16     A.  Yes, it is.
17     Q.  Now, take also a look, Mr. Lockwood, at Tricon
18  Exhibit 4 --
19     A.  Okay.
20     Q.  -- which also appears to be a copy of the KP
21  contract, but this one is dated July the 20th, 2008,
22  whereas Joint 1 is dated December 11th, 2007.
23     A.  That's correct.
24     Q.  Do you know why we have two of these?
25     A.  I believe somebody internally mistakenly

92

1  entered the contract again not realizing it had already
2  been entered in the system in December of '07.
3      Q.  Was the KP contract in place during all of
4  2008?
5      A.  Yes, it was.
6      Q.  And describe to me what the KP contract
7  required.
8      A.  KP was basically given the option in their
9  option to show up and load FOB from the U.S., meaning
10  they have to load it, they have to pick it up themself,
11  but if the price did not make sense for them to load in
12  the U.S. against a U.S. based price and add freight to
13  then take it to their port in Asia, if it did not make
14  financial sense, they would not exercise their right to
15  load the product.
16         However, I negotiated the option to have a
17  couple CFR options in my option so that regardless of
18  the fact that either KP did not want to load the cargo
19  or if they wanted to load it FOB I could override them
20  and force them to take the cargo on a CFR basis.
21     Q.  So under the KP contract, if you were -- if
22  you were willing to sell on a CFR basis KP would be
23  obligated to take MX every month of the year?
24     A.  No.  I believe I was only given three or four
25  options a year to be able to do a CFR.

93

1      Q.  Did you have -- in July and September -- in
2  July and August of 2008, was there an option available
3  to be exercised?
4      A.  Yes, there was.
5      Q.  And did you exercise that option?
6      A.  I did, yes.
7      Q.  Okay.  And the Vinmar sale was also a CFR sale
8  to Asia.  Correct?
9      A.  That's correct.
10     Q.  Can you tell me when you selected the KP
11  contract as the replacement contract?
12     A.  After Vinmar failed to declare the discharge
13  port on August 8th, my option with KP, I exercised it
14  either on August the 10th or the 11th.  I'm not sure
15  which.
16     Q.  If you will take a look at Joint Exhibit
17  No. 22.  And is that where you made your selection, sir?
18     A.  That's correct.
19     Q.  And that is dated August 11th, 2008, at
20  3:02 a.m.?
21     A.  That's correct.
22     Q.  Why did you select the K -- the sale under the
23  KP contract as the replacement sale?
24     A.  Based upon my contract with KP, it was the
25  average price of September, which was the same time I

24  (Pages 90 to 93)

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

**94**

1  was supposed to be delivering to Vinmar, so I knew that
2  whatever the price was that I was selling to KP it would
3  be a market-based price at the time of delivery to
4  Vinmar.
5       Q.  Okay.  And let's just go over a couple of
6  things.  Under the KP contract, you were selling mixed
7  xylenes.  Correct?
8       A.  That's correct.
9       Q.  And they were going to be delivered in Asia?
10      A.  That's correct.
11      Q.  In Korea?
12      A.  In Korea.
13      Q.  And the quantity that they were required to
14  take was 5,000 metric tons?
15      A.  That's correct.
16      Q.  The same as under the Vinmar contract?
17      A.  That's correct.
18      Q.  And, as you said, it was -- the price was the
19  average Platts price in September?
20      A.  It was the September FOB Korea Platts average
21  for the month of September.
22      Q.  Okay.  And why did you think that made it a
23  particularly suitable sale?
24      A.  With my delivery window being September 1
25  through 15, I knew that the average price for the month

---

**95**

1  would be included in that sales price to KP so that it
2  would be a fair price.
3       Q.  Okay.  Was there a difference in the MX
4  specification between the KP contract and the Vinmar
5  contract?
6       A.  They were very similar.
7       Q.  Okay.  There was a slight difference?
8       A.  There was, yes.
9       Q.  Were they nonetheless very similar?
10      A.  They were.
11      Q.  Did that difference in the spec affect the
12  price of the MX being sold to KP versus that being sold
13  to Vinmar?
14      A.  No.
15      Q.  Can you tell me whether the MX that you used
16  to supply the KP contract, did it ultimately meet the
17  Vinmar spec?
18      A.  Yes, it did.
19      Q.  Was -- did Tricon make any other sales to
20  Asia -- of mixed xylenes to Asia in the September to
21  October 2008 timeframe?
22      A.  Make any sales at what time?
23      Q.  That means -- well, let me do it this way.
24  Did Tricon deliver any other MX in Asia in the September
25  to October timeframe?

---

**96**

1       A.  Yes, we did.
2           MR. LEE:  I'm going to object to this
3  question and the next -- where I think he's going.  One
4  of the -- one of the issues that the panel may recall,
5  we asked for position sheet information about -- that
6  would disclose Tricon's inventory.
7           Mr. Lockwood, in his deposition, was
8  unable to answer anything about what Tricon actually had
9  in inventory and they refused to produce any
10 documentation for their position sheets.
11          And so I think it's un -- improper and --
12 for him to testify now that he had other MX in avail --
13 in availability to sell someplace else.  They have
14 refused to produce the documents.  He testified in his
15 deposition he was unable to answer those questions so we
16 should stick with the record that we have.
17          MR. DIAZ-ARRASTIA:  Your Honor, this is
18 not MX that they had in inventory.
19          JUDGE BENTON:  This is not a what?
20          MR. DIAZ-ARRASTIA:  This is not MX that
21 they had in inventory.  What I am referring to is
22 delivery of MX that was made to KP in October of 2008.
23 Documents about that were produced and Mr. Runions
24 questioned Mr. Matthews about those documents in his
25 deposition.

---

**97**

1           And I just wanted Mr. Lockwood to explain
2  although that was delivered in October at a price of I
3  think around 1320 per metric foot that was based on a
4  contract that was made in July.  And that's the only
5  thing that I want to --
6           MR. LEE:  And I mis -- with that -- I
7  misunderstood the question.  I thought he was going
8  someplace else.  I have no problem with this line.  I
9  apologize.
10      Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Mr. Lockwood,
11 what my question to you just is, were there other MX
12 deliveries that Tricon made to Asia in September to
13 October 2008?
14      A.  Yes, there were.
15      Q.  Okay.  And this was that October delivery that
16 I just mentioned?
17      A.  We had two deliveries, one of which was
18 done -- it was buy-sell agreement done prior to the
19 Vinmar transaction and the other one was the one that
20 you mentioned, yes.
21      Q.  Okay.  Which was based on a contract that had
22 been made in July at the price in July?
23      A.  That's correct.
24      Q.  Do you remember what date in July?
25      A.  I believe the buy-sell agreement was done on

---

**25  (Pages 94 to 97)**