## Explain Trading of Petrochemicals

1. Companies buy and sell products among themselves. Purchasers and sellers can be three types of companies. All these companies own (take title) and take physical possession of the products plus pay for the product.
    1. Producer of a petrochemical
    2. Consumers of a petrochemical
    3. A company that may purchase or sell petrochemicals for profit, Trading Company

    All these, the producers, consumers and traders can be both buyers of and/or sellers of petrochemicals with long or short positions.

2. A Broker is a third party/company that finds a buyer and a seller for petrochemical products. Brokers do not take title or possession of the product and only receive a commission for putting a buyer and seller together. The Broker concludes a deal by getting both parties to agree to the primary terms of the contract and then sending a written confirmation of the contract.

3. Mixed Xylene is a specific petrochemical that has numerous uses. The name, Mixed Xylene, is derived because it contains different types of Xylenes. (para-Xylene, meta-Xylene and ortho-Xylene) It is primarily produced from naphtha into reformate by reformers, to Mixed Xylene in Sulfolane or UDEX Unit in a refinery or chemical facility. It is bought and sold by the above types of companies. It can have different types of specifications. The standard being ASTM 5211 or ASTM 843. Other required specifications are usually placed on this product, such as Max Bromine Index of 20 or higher non-aromatics.

    a. Producers can sell the Mixed Xylene to other producing or consuming companies or trading companies.
    b. Consumers can purchase this product for use in various chemical processes.
    c. Mixed Xylene can also be used as a gasoline blend component.
    d. Pricing of Mixed Xylene always has an alternate value to the chemical market such as a gasoline component.
    e. The use in gasoline is the value for blend value. (premium gasoline price less regular gasoline price divided by 6 (this is the octane difference; 93 octane less 87 octane) and then a vapor pressure value).

The pricing for Mixed Xylene can be and is at times extremely volatile. Mixed Xylene prices are normally priced in cents per gallons or dollars per metric ton. In the US it is priced in cents per gallon and in the rest of the world it is priced in dollars per metric ton. Prices can move as fast as the price of gasoline or crude oil moves on the New York Merc futures exchange. In a day, prices can stay stable or move as much as $30 or more per metric ton. In periods of price volatility buyers are unwilling to make an offer to purchase. This can freeze a market for several

1



days. An example is when companies want to buy Mixed Xylene but believe there are a lot of willing sellers. If they wait a few days the market may fall as much as $75 to $150 or more per metric ton on no buying activity.

The major markets for Mixed Xylene are the United States, Europe and Asia.

4. The essential terms of a contact to buy and sell petrochemicals in the petroleum industry are:
   a. Parties – the buyer and seller
   b. Price
   c. Quantity
   d. Quality
   e. Delivery
   f. Payment terms
   When all the above terms are agreed upon by both parties you have a contract.

5. If using a broker, it is customary during the negotiations of a contract for the parties not to communicate directly with one another and only communicate through the broker. When this happens the broker represents both the buyer and seller. Once the broker confirms the buyer and seller have agreed to the essential terms of the contract, the broker will send a confirmation in writing to both parties. If there is a mistake or omission in the written confirmation it is the parties' responsibility to immediately inform the broker of any possible error.

6. After a contract is concluded and the broker's confirmation is sent, it is customary for the parties to send confirming letters or pass paper between each other with additional terms that the parties may or may not agree to. However whether the parties agree to additional terms or not, it does not change that a contract has been concluded. These confirming letters frequently contain lines for signatures of the parties, but it is very unusual for these confirming letters to ever be signed by either party unless it is a long term contract which is not the case here.

7. The origin of the product may or may not be important to the buyer. If the origin of the product is important to the buyer then the buyer would ask for a specific origin as an *upfront* item during the negotiations. This is because on a delivered product, origin affects the timing of the delivery. If origin is not mentioned in the upfront negotiation then it is not important to the buyer. If the seller agrees to a specific origin, then the origin of the product would be included in the delivery term.

8. In the chemical and petroleum industry it is normal to agree to sell something you do not yet own (short sale or will be produced) or purchase product to deliver even if you own other like product. Trading companies make profits from either being long or selling short. A trader usually does not hold physical inventory because storing product has such a high cost. When a trader refers to "inventory" it normally refers

to product that has been purchased whether or not delivery has been taken. Inventory is only a minor reason for a trader to make a trade. It is common for traders to buy when they are long and to sell when they are short. Because your book shows you are long does not mean you need to or want to sell or should sell.

## Conclusion

This portion of the report is based upon the documents and depositions provided to me for review of this arbitration and 18 years of petrochemical trading experience of Mixed Xylene, toluene, benzene as well as other petrochemicals. I also have a total of 35 years of experience trading crude oil, petroleum products, petroleum futures and specialty products. At Valero I have concluded over 1,000 trades similar to the one in this case.

1. Tricon and Vinmar made the contract with Moab as the broker. Both companies gave Moab the authority to conclude a contract for 5,000 MT +/- 5% of Mixed Xylene. Moab sent out a written confirmation to both parties when the contract was concluded. This is a binding contract in the Petrochemical Industry.

2. This is a very typical contract within the Petrochemial Industry for trading of Mixed Xylene or any aromatic product. The price correction was an inadvertent error. The payment term change was agreed by both the parties. Any agreement for the product origin to be US should have been completed during upfront contract negotiations. Product origin should have been requested by Vinmar as an upfront item during the initial negotiations. Moab was not requested by Vinmar to include product origin during the original negotiations. If a contract item such as origin was omitted from the broker confirmation, the parties should immediately bring it to the broker's attention.

3. It is customary for traders like Tricon to send out their terms and conditions. This does not void the contract but just proposes additional terms. This process is customary and well understood in the Petrochemical Industry. Tricon and Vinmar agreed to additional terms and conditions except for demurrage. It can be common in the industry that the parties may fail to agree on an item such as demurrage. The failure to agree on demurrage does not mean that the parties do not have a contract for the terms that they did agree too. Vinmar and Tricon had a completed deal. There may be things one party requests later but this does not void the contract if the other party does not agree. To sell Mixed Xylene in the Petrochemical Industry all the basic terms were stipulated in Moab's confirmation.

4. In conclusion, this was a binding contract between Vinmar and Tricon for the sale of 5,000 MT +/- 5% of Mixed Xylene CFR into Korea/Taiwan. If this is not a binding contract for Mixed Xylene in the Petrochemical Industry, a great many of the contracts in the industry would not be valid and this would cause chaos in the industry.

Steve C. Simpson
Date: July 12, 2010

4

## Documents Reviewed

- Specification of Claims with Exhibits
- TRI 1-61
- TRI 97-100
- TRI 174-352
- VIN 1- 65
- VIN 81-108
- MOAB 1-64
- Agreed Revised Scheduling Order
- Deposition of Ed Leyman and Exhibits
- Deposition of Brad Lockwood and Exhibits
- Deposition of Laurentiu Pascu and Exhibits
- First Amended Specification of Claims with Exhibits
- Tricon's Prehearing Brief

**Steve C. Simpson**
8607 Fair Oaks Pkwy
Fair Oaks Ranch, TX 78015
Cell: (210) 865-4760
Email: steve.simpson@txmnsat.com

---

## SUMMARY

Eighteen years of trading Aromatics (mixed xylene, toluene and benzene) and other Petrochemicals. Thirty plus years experience trading in petrochemicals, refined products, crude oil and specialty products associated with world markets. Responsible for all transportation associated with the above products. Possess excellent record of accomplishments in domestic and international markets including petrochemical, refined products, crude oil trading, marketing and supply as well as specialty products marketing, high level negotiations on long term and short term (spot) contracts in addition to new projects which include commercial development of petrochemical projects. Demonstrated strong trading, marketing, purchasing, decision making and leadership skills at the executive level.

## PROFESSIONAL EXPERIENCE

**TEXAS MOON NIGHT dba, CONSULTANT – San Antonio, Texas**          2008 – Present
Advises and recommends possible trading opportunities for Valero's aromatics group. Responsible for MSAT II benzene marketing and transportation for Valero's new project. This project moves Aromatic Concentrate from 4 refineries to its Corpus Christi refinery to remove benzene from gasoline.

**VALERO ENERGY CORPORATION – Houston, Texas and San Antonio, Texas**          1997 – 2008
Executive Director – Petrochemicals   (2001-2008)
Responsible for trading, marketing and supply of 110,000 barrels per day of Valero's Petrochemical products, including P & L responsibility. Over 1,000 spot and long term trades in the 11 years with Valero. Managed staff to secure smooth operations within the Valero system.
- Responsible for petrochemical products from 18 refineries within the Valero system. Products include mix xylene, toluene, benzene, toluene concentrate, aromatic concentrate, refinery grade propylene and chemical grade propylene).
- Developed new products and projects for Valero's refining system
- Integrated newly acquired refineries or sold refineries into or out of the Valero refining system

Director – Petrochemicals   (2000-2001)
Responsible trading, marketing and supply of 65,000 barrels per day of Valero's Petrochemical products, including P & L responsibility. Managed staff to secure smooth operations within the Valero system.
- Responsible for petrochemical products from 6 refineries within the Valero system
- Products included mix xylene, toluene, benzene, aromatic concentrate, raffinate, mineral spirits, petroleum coke, sulfur, methanol, MSO and pseudocumene, MTBE, natural gas, and various other products
- Developed new products and projects for Valero's refining system
- Integrated newly acquired refineries into the Valero refining system

Manager – Petrochemical   (1997-2000)
Traded, marketed and supplied petrochemical products and specialty products in the Valero system.
- Integrated newly acquired refineries into the Valero system
- Worked with various refineries to develop new products with higher value for sale
- Developed new projects for Valero's refining system such as pseudocumene and mineral spirits

**RIO ENERGY INTERNATIONAL, INC – Houston, Texas**  1996 – 1996
Trader - Petrochemicals
Responsible for establishing, developing and trading petrochemicals and gasoline blendstocks
- Developed the trading of mix xylene, toluene, methanol, benzene, MTBE, reformate and gasoline blendstocks
- Increased net profits notably in 1996

**KERR-McGEE REFINING CORPORATION – Houston, Texas**  1989 - 1995
General Manager – Specialty Products Division (1990 – 1995)
Responsible for the marketing of specialty products which includes Petrochemicals (mixed xylene, toluene and benzene), Solvents, LPG's, Fuel Oil, Asphalt and other products produced by the three refineries. Responsible for purchasing octane blend stocks, methanol, and other specialty chemicals and products, including P & L responsibility for the Specialty Products.
- Proposed, developed and contracted for the commercialization of cyclohexane unit resulting in a net profit of over $5 million for the first year of operation
- Organized, developed, implemented, hired and supervised the staff for Specialty Products with a budget of $2.5 million which resulted in the $6.6 million profit increase
- Developed and implemented the marketing of propylene at the Corpus Refinery which resulted in increased profits from $1.5 million to$ 4.5 million per year
- Traded over 48,000 BPD of products which generated revenues of over $350 million per year.
- Directed and managed the increase of sales and profits from the Cotton Valley's solvent refinery which resulted in over $2.5 million profit per year

Manager – Petrochemicals and Manager – Risk Management (1989-1990)
Responsible for the purchases and sales of all petrochemicals in addition to risk management and hedging program using futures trading.
- Marketed all petrochemicals with sales in excess of $150 million annually.
- Improved company's hedging market position by $1.7 million in less than four months
- Managed risk management position of over 5,000 futures contracts

**PETROTEX CORPORATION – Houston, Texas and London, England**  1985 - 1989
President / Owner / Trader / Consultant

**CHARTER OIL COMPANY – London, England and Houston, Texas**  1983 - 1985
Senior Trader – London (1983 – 1984)
Vice President – Product Supply and Distribution – Houston (1983)

**NORTHEAST PETROLEUM CORPORATION – Houston, Texas**  1981 - 1983
Vice President – Products and Crude Oil

**KERR-McGEE CORPORATION – Oklahoma City, Oklahoma**  1968 - 1981
Manager – International Crude Oil Supply & Transportation (1976 – 1981)
Supply Analyst (1974 – 1976)
Marketing Assistant – AG Chemical Division (1972 – 1974)
Pricing Specialist – Wholesale and Retail Product Pricing (1969 – 1972)
Senior Accounting Clerk – Marketing and Accounts Payable (1968 – 1969)

### EDUCATION
B.S. Marketing/Business Administration-Southwestern Oklahoma State University, Weatherford, OK (1968)
Mid-level Management – Kerr-McGee Corporation, Oklahoma City, Oklahoma (1979)
Market Profile – Market Logic School, Chicago, Illinois and Sacramento, California (1987 – 1988)

### PROFESSIONAL AFFILIATIONS
Southwest Chemical Association
Northeast Chemical Association
National Petrochemical and Refiners Association