1

1    AMERICAN ARBITRATION ASSOCIATION
                 HOUSTON, TEXAS
2

3    TRICON ENERGY, LTD.,            )
                                     )
4        CLAIMANT,                   )
                                     )
5          -AGAINST-                 ) CASE NO. 70 198 Y 00168 09
                                     )
6    VINMAR INTERNATIONAL, LTD.,     )
                                     )
7        RESPONDENT.                 )

8

9

10

11

12          ------------------------------------

13                 ORAL DEPOSITION OF

14                 STEPHEN SIMPSON

15                 AUGUST 25, 2010

16          ------------------------------------

17

18       ORAL DEPOSITION OF STEPHEN SIMPSON, produced as a
     witness at the instance of the Respondent, and duly
19   sworn, was taken in the above-styled and numbered cause
     on AUGUST 25, 2010, from 9:23 a.m. to 1:07 p.m., before
20   Stephanie W. Wells, CSR, in and for the State of Texas,
     reported by machine shorthand, at the law offices of
21   Schirrmeister Diaz-Arrastia Brem, LLP, 700 Milam,
     Pennzoil Place, North Tower, Houston, Texas  77002,
22   pursuant to the Rules of the American Arbitration
     Association and the provisions stated on the record or
23   attached hereto.

24

25

PLAINTIFF'S
EXHIBIT
Q (Pg 1)
tabbies

ORAL DEPOSITION OF STEPHEN SIMPSON

8

1  benzene out of the gasoline.

2      Q.   Okay.  Okay.  And what was the subject of your

3  testimony?

4      A.   I really don't remember.

5      Q.   Okay.  All right.  So, you've never acted as

6  an expert before in --

7      A.   No.

8      Q.   -- in a lawsuit or an arbitration?

9      A.   No.

10      Q.   This is the first time?

11      A.   Yes.  (Witness nods head.)

12           (Exhibit No. 38 marked.)

13      Q.   (BY MR. RUNIONS)  I'm going to go ahead and

14  show you what's been marked as Exhibit 38, which I

15  believe is a copy of the report that you submitted, if

16  you could just look through that quickly and confirm

17  that.

18      A.   (Perusing document.)  Yes, the report and my

19  resume.

20      Q.   Exactly.  And as you've already mentioned, the

21  last two pages of that is your resume.  Is that a

22  current and accurate resume?

23      A.   Yes.

24      Q.   Okay.  Let's start by just talking a little

25  bit about your educational background.  Tell me what

168

ORAL DEPOSITION OF STEPHEN SIMPSON

CHANGES AND SIGNATURE

WITNESS NAME:
Steve
~~STEPHEN~~ SIMPSON

DATE OF DEPOSITION:

August 25, 2010

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 11 | 20 | McGee | misspelled |
| 11 | 25 | '' | '' |
| 12 | 24 | '' | '' |
| 13 | 17 | '' | '' |
| 21 | 23 | AND | left out Supply and Trading. |
| 26 | 16 | Yes | I believe I always answered even when Stan my Atl. |
| 36 | 5 | Blue | correct name. |
| 37 | 6 | Raffinate | misspell. |
| 48 | 9-14 | Matt G | another trader but (forgot) human relations |
| 59 | 21 | March 12 - Sept 1 | Just did not recall correct time line. |
| 60 | 9 | March | Forgot exact time line. |
| 101+102 | 23-4 | Buyer + Seller backwards. | Just misspoke - got backwards |
| 125 | 1 | the phone | Reporter missed it and mumbled. |
| 142 | 1 | Terms Contract | '' '' '' '' and mumbled. |
|  |  | ~~Term~~ Not Terms of the contract |  |

RECEIVED SEP 1 7 2010

ORAL DEPOSITION OF STEPHEN SIMPSON



Steve

1    I, STEPHEN SIMPSON, have read the foregoing
     deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3

4

5
Steve ___STEPHEN SIMPSON_____
6    Job No. 87379

7    THE STATE OF Texas )
     COUNTY OF Harris )
8
        Before me, Steve Simpson_____, on this day
9    personally appeared STEPHEN SIMPSON, known to me (or
     proved to me under oath or through
10        Tx_____) (description of identity
     card or other document)) to be the person whose name is
11   subscribed to the foregoing instrument and acknowledged
     to me that they executed the same for the purposes and
12   consideration therein expressed.
        Given under my hand and seal of office this
13   17th____ day of September_____, 2010___.

14

15

16   _____
     NOTARY PUBLIC IN AND FOR
17
     THE STATE OF Texas
18   COMMISSION EXPIRES: 5-24-2014

19

20

21

22                MAYRA MENDEZ
                My Commission Expires
23                  May 24, 2014

24

25                      RECEIVED SEP 1 7 2010

Sunbelt Reporting & Litigation Services
Houston   Austin   Bryan/College Station   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio

ORAL DEPOSITION OF STEPHEN SIMPSON

1    AMERICAN ARBITRATION ASSOCIATION
                HOUSTON, TEXAS
2

3    TRICON ENERGY, LTD.,          )
                                   )
4        CLAIMANT,                 )
                                   )
5         -AGAINST-                )  CASE NO. 70 198 Y 00168 09
                                   )
6    VINMAR INTERNATIONAL, LTD.,   )
                                   )
7        RESPONDENT.               )

8

9

10

11              REPORTER'S CERTIFICATION
             DEPOSITION OF STEPHEN SIMPSON
12                  AUGUST 25, 2010

13

14       I, Stephanie W. Wells, Certified Shorthand Reporter

15   in and for the State of Texas, hereby certify to the

16   following:

17       That the witness, STEPHEN SIMPSON, was duly sworn

18   by the officer and that the transcript of the oral

19   deposition is a true record of the testimony given by

20   the witness;

21       That the deposition transcript was submitted on

22   September 1, 2010 to the witness or to the

23   attorney for the witness for examination, signature and

24   return to me by September 30, 2010 ;

25       That the amount of time used by each party at the

```
 1   deposition is as follows:
 2       MR. R. BLAKE RUNIONS:   03 HOURS:31 MINUTE(S)
         MR. DIAZ-ARRASTIA:      00 HOURS:00 MINUTE(S)
 3
 4       That pursuant to information given to the
 5   deposition officer at the time said testimony was taken,
 6   the following includes counsel for all parties of
 7   record:
 8       MR. STEPHEN LEE, MR. R. BLAKE RUNIONS, Attorneys
             for Respondent
 9       MR. GEORGE DIAZ-ARRASTIA, MS. TRACY LARSON,
         Attorneys for Claimant
10
11       I further certify that I am neither counsel for,
12   related to, nor employed by any of the parties or
13   attorneys in the action in which this proceeding was
14   taken, and further that I am not financially or
15   otherwise interested in the outcome of the action.
16       Certified to by me this 31st day of August,
17   2010.
18
19
20       Stephanie W. Wells, Texas CSR 2700
         Expiration Date:  12-31-11
21
22
23
24
25   Job No. 87379
```

ARBITRATION HEARING - SEPTEMBER 20, 2010

98

1  July the 21st, the day before the Vinmar deal, and the
2  other deal that you're referring to was done on July the
3  23rd, the day after the Vinmar deal.
4      Q.  Okay.  And why would a buy-sell deal not be an
5  appropriate resell contract?
6      A.  When you're buying and selling at the same
7  price, you're making a buy-sell agreement for logistics
8  reasons saying, "I give it to you now and you give it to
9  me later."
10         The price is arbitrary.  You could choose
11 any price that you want.  I can sell it to you for a
12 dollar a metric ton and you could sell it back to me for
13 a dollar a metric ton or you could sell it to me for a
14 million dollars a metric ton and I'll buy it back from
15 you.  The market price is irrelevant to what price you
16 choose on a buy-sell.
17     Q.  And you said you might do a buy-sell for
18 logistics reasons.  What might be some of these
19 logistics reasons?
20     A.  If the end user is really tight on inventory
21 and he's asking you to please let him borrow some now,
22 he'll give it back to him later in the future when it's
23 more convenient for him to do so.
24     Q.  Might there also be a situation where you use
25 it just as a way to store material for a while?

99

1      A.  For sure.
2      Q.  Does Vinmar own any storage capacity?
3      A.  Does Vinmar --
4      Q.  I'm sorry.  Does Tricon own any storage
5  capacity?
6      A.  We do on other products, yes.
7      Q.  But not on MX?
8      A.  Not on MX.
9      Q.  Now, we've talked about the price under the KP
10 contract was the average Platts price in September.
11 What would have happened to the price under the MX --
12 under the KP contract if instead of continuing to go
13 down through September the price of MX had turned around
14 and started to go up?
15     A.  As high as the price went, the damages would
16 go down.  The higher the price would go, the lower the
17 damages would go.
18     Q.  When the KP contract was selected, did you
19 know what was going to happen to the price of MX in
20 September?
21     A.  If I did, I would already be retired.
22     Q.  At what point, sir, did KP request a reduction
23 in the volume that was going to be sold under their
24 contract?
25     A.  It wasn't really a request.  They kind of

100

1  forced it upon me.
2      Q.  And why did they make a request for a lower
3  volume?
4      A.  KP had already had other deliveries scheduled
5  from me to them and it became obvious to everyone in the
6  market that every day the market would fall in price so
7  that because I was selling them at an average price the
8  average was always going to be higher than the next
9  day's price because in a trailing -- in a falling
10 market, the average is always going to be higher than
11 the next day's price.  So they knew if they could force
12 me to reduce the volume that I owed them under the
13 contract they would have less exposure to the market
14 falling.
15     Q.  Okay.  Did KP want to buy any volume at all?
16     A.  They begged me not to exercise the option.
17     Q.  Okay.  But they had a contractual obligation
18 to do it?
19     A.  Yes, they did.
20     Q.  Now, why did you agree to let them reduce
21 their volume?
22     A.  I had had a contract with them since 2006 and
23 sometimes in subtle ways the consumer will say, "If you
24 don't agree to help us, then it may make it more
25 difficult to have a contract for next year."  So based

101

1  on that, I took the subtle hint and agreed to reduce the
2  volume.
3      Q.  Okay.  And what did you reduce the volume to?
4      A.  I reduced it to either 3200 or 3400 because we
5  had around 1600 metric tons or 1800 metric tons at that
6  buy-sell agreement where I had taken delivery -- I had
7  delivered in to them earlier and they were giving it
8  back to me -- or excuse me.
9         I had taken it earlier and then I was
10 giving it back to them at the price so that they were
11 taking the volume, which I believe was 16 or 1800 metric
12 tons at the high price and then adding that to the 32 or
13 the 3400 tons at the September price to come up with a
14 volume of 5,000 because they did not want me to deliver
15 64 or 68, you know.  They wanted to reduce the overall
16 volume to 5,000 tons.
17     Q.  Mr. Lockwood, even after you designated the KP
18 contract, did you continue to look for other possible
19 replacement mixed xylene sales in the spot market?
20     A.  Sure.
21     Q.  And what happened?
22     A.  As you stated earlier, the market was frozen
23 and the buyers had just disappeared.
24     Q.  Take a look at Joint Exhibit No. 26,
25 Mr. Lockwood.

26  (Pages 98 to 101)

ARBITRATION HEARING - SEPTEMBER 20, 2010

102

1   A. Okay.
2   Q. Tell us what that is.
3   A. Is this the repudiation invoice?
4   Q. Yes, sir.
5   A. Okay. Basically what we had done is we took
6   the volume of 5,000 metric tons, which we had the option
7   to give them 5,000 tons plus or minus 5 percent. I took
8   these September FOB Korea Platts average once that was
9   finally calculated, which I believe came out to around
10  $995 a metric ton.
11      I took the price that I sold Vinmar at
12  1310. I subtracted the 995. I took that difference and
13  multiplied it by the quantity.
14      JUDGE BENTON: Mr. Diaz-Arrastia, I said
15  we'd go until about noon before we took a break, but
16  let's take a very short break now and then we'll come
17  back. How much more do you have of this witness?
18      MR. DIAZ-ARRASTIA: Not very much, Your
19  Honor, if you --
20      JUDGE WOOD: Let's give the witness five
21  minutes.
22      JUDGE BENTON: Let's take about a
23  five-minute break and then we'll come back and finish.
24      MR. DIAZ-ARRASTIA: That's fine.
25      JUDGE BENTON: We're off the record.

103

1       (Recess from 10:58 a.m. to 11:06 a.m.)
2       JUDGE BENTON: Okay. We're back on the
3   record. Let's proceed.
4       Q. (BY MR. DIAZ-ARRASTIA) Okay. And,
5   Mr. Lockwood, I guess my question is, is Joint
6   Exhibit 66, is that a demand for payment on Vinmar?
7   A. Yes, it is.
8   Q. And what is the date on it?
9   A. The date was October the 6th, 2008.
10  Q. Has Vinmar paid?
11  A. Not at all.
12  Q. And has Tricon had to hire an attorney --
13  A. Yes.
14  Q. -- to pursue this matter?
15  A. Yes, we have.
16      MR. DIAZ-ARRASTIA: And I would also just
17  like to point out to the panel that Tricon Exhibit 29 is
18  a letter that I delivered to Mr. Lee. It's also a
19  demand. And this is for purpose of satisfying the
20  requirement of Chapter 38 with regard to attorneys'
21  fees.
22      And actually I don't recall if the parties
23  have advised the panel, but the parties have reached an
24  agreement that we will submit our attorneys' fee
25  evidence in writing so that we don't have to take up

104

1   hearing time on it, but I just did want to point that
2   out to the panel while we were on the subject.
3       Q. (BY MR. DIAZ-ARRASTIA) Now, Mr. Lockwood,
4   later in the hearing we're going to hear from Chuck
5   Matthews regarding the calculation of Tricon's damages.
6   But can you tell the panel who Mr. Matthews is?
7   A. He is the controller of Tricon.
8   Q. And did you ask him the calculate the amount
9   of Tricon's damages in this case?
10  A. Yes, I did.
11  Q. Did Mr. Matthews have any involvement in the
12  transaction with Vinmar back in July, August,
13  September 2008?
14  A. No, he did not.
15  Q. Were you the person who gave Mr. Matthews the
16  information on the facts of the transaction that he
17  needed to make his calculations?
18  A. Yes, I was.
19  Q. Now, Mr. Matthews, as we will see later, made
20  his calculation based not on 5,000 metric tons but on
21  5,250 metric tons. Were you the person who told him to
22  do that?
23  A. Yes, I was.
24  Q. And why did you tell him to do that?
25  A. Because when you have a sale and the plus or

105

1   minus 5 percent that's in the seller's option, when the
2   market is in your favor you also always maximize to the
3   highest drop to get the most value out of your sale.
4   Q. And to sort of go back on that, the deal that
5   was made with Vinmar was 5,000 metric tons plus or minus
6   5 percent?
7   A. In the seller's option, that's correct.
8   Q. Okay. And the 250 is 5 percent of 5,000?
9   A. That's correct.
10  Q. Do you believe that it is appropriate to use
11  5,250 metric tons as the correct amount to calculate
12  damages?
13  A. Yes, I do.
14  Q. And why is that?
15  A. Since it was in our option, we have -- we have
16  every right to be able to deliver as much as we can
17  under the contract. And since we were making money
18  against the sale, we wanted to maximize the sale.
19  Q. The price of the material was going down?
20  A. That's correct.
21  Q. You had made a very good deal?
22  A. That's correct.
23  Q. And if you could maximize your material, you
24  would make an even better deal?
25  A. That's correct.

**27 (Pages 102 to 105)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

106

1  Q. And you had the option to do it?
2  A. That's correct.
3  Q. Okay. Back in July, August, September of
4  2008, could Tricon have easily found enough mixed xylene
5  to supply both the KP sale and the Vinmar sale?
6  A. Everyone in the world wanted to sell so it
7  would be no problem to find it.
8      MR. DIAZ-ARRASTIA: I pass the witness.
9      JUDGE BENTON: Mr. Lee, cross-examination?
10     MR. LEE: Thank you.
11     CROSS-EXAMINATION (11:10 a.m.)
12 BY MR. LEE:
13 Q. Mr. Lockwood, let me start by asking, do you
14 still have a bonus payment hinging on the outcome of
15 this case?
16 A. I do.
17 Q. The alleged deal that was negotiated on
18 July 22nd, 2008, just to be clear, you talked only to Ed
19 Leyman. Correct?
20 A. That's correct.
21 Q. You did not speak directly to Rick Wilson on
22 July 22nd, 2008?
23 A. No, I did not.
24 Q. And you didn't speak to Dr. Wilson at Vinmar
25 anytime between July 22nd and August the -- let's say

107

1  12th, 2008. Correct?
2  A. That's not correct.
3  Q. You did speak to him?
4  A. Oh, through the Yahoo when he contacted me.
5  Q. Okay. Other than the instant message exchange
6  that you've testified about earlier today, you never
7  spoke directly to Dr. Wilson between July 22nd, 2008,
8  and August 12th, 2008. Correct?
9  A. You mean like over the phone?
10 Q. Yes, sir.
11 A. No, I did not.
12 Q. Okay. And the only exchange that you had with
13 Dr. Wilson any -- at any point this time between
14 July 22nd, 2008, and mid August of 2008 was either
15 through this one instant message exchange on July 31th.
16 Correct?
17 A. Or e-mail.
18 Q. Or an e-mail?
19 A. That's correct.
20 Q. All right. You weren't a party to any of the
21 conversations between Mr. Leyman and Dr. Wilson.
22 Correct?
23 A. That's correct.
24 Q. And you don't know what Ed Leyman told
25 Dr. Wilson on July the 22nd, 2008, do you?

108

1  A. I was not on the phone with him, no.
2  Q. Okay. And you don't know -- other than what
3  Mr. Leyman has told you, you don't know what Dr. Wilson
4  may have said to Ed Leyman. Correct?
5  A. Only what Ed told me.
6  Q. Is there one document in this case that you
7  believe accurately reflects the agreement that
8  Mr. Leyman was authorized to accept on behalf of Tricon?
9  A. Can you re --
10     MR. DIAZ-ARRASTIA: I object to the
11 question to the extent it's asking, is there one
12 document that contains the contract? Mr. Lockwood's not
13 a lawyer and the law is that several documents
14 constitute a contract.
15     JUDGE BENTON: I'm going to let him ask
16 the question.
17 Q. (BY MR. LEE) Just to be clear, my question,
18 Mr. Lockwood, is there one single document that you're
19 aware of that you believe accurately reflects the
20 agreement that you authorized Ed Leyman to accept on
21 behalf of Tricon?
22 A. Are you talking about only what I authorized
23 Ed or the agreement in general?
24 Q. I'm asking, is there a document that you are
25 aware of that you claim contains the terms of the deal

109

1  that you authorized Mr. Ed -- Mr. Leyman to accept on
2  behalf of Tricon?
3  A. I would say it would be the final confirmation
4  for holdout.
5  Q. And is that -- let's take a look at that. Is
6  that Joint Exhibit No. 4?
7  A. That's correct.
8  Q. And it's your testimony that this Joint
9  Exhibit 4 accurately reflects the agreement that you
10 authorized Mr. Leyman to accept on Tricon's behalf?
11 A. That's correct.
12 Q. All the terms?
13 A. All the terms that were important.
14 Q. Well, did you agree that Mr. Leyman had the
15 authority on behalf of Tricon to agree to all of the
16 terms that are contained in Joint Exhibit No. 4?
17 A. Yes, he did.
18 Q. Okay. Everything that's written on this piece
19 of paper. Correct, sir?
20 A. That's correct.
21 Q. Now, you do agree that when you use a broker
22 the broker must match all of the essential terms of a
23 firm bid with a firm offer before he can tell the
24 parties they have a deal. Correct?
25 A. Yes, he does.

28  (Pages 106 to 109)

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

110

1    Q.  And if the firm bid and the firm offer don't
2  match up, then you don't have a deal, do you?
3    A.  That's correct.
4    Q.  And in this -- in the negotiations with
5  Mr. Leyman, you were the only person at Tricon who
6  negotiated that deal.  Correct?
7    A.  That's correct.
8    Q.  And you did not guarantee U.S. origin mixed
9  xylenes to Vinmar.  Is that right?
10    A.  I guaranteed mixed xylenes, just not delivery
11  of U.S. origin in the first half of September.
12    Q.  My question was, you did not guarantee
13  U.S. origin mixed xylenes to Vinmar.  Correct?
14    A.  I didn't hear you say the word U.S. origin
15  initially in the first question.  So, no, I did not
16  guarantee U.S. origin.
17    Q.  Okay.  And you don't believe that U.S. origin
18  was a term of the deal with Vinmar.  Correct?
19    A.  Most definitely.
20    Q.  Now, you -- obviously you know that Vinmar
21  claims that U.S. origin was a required term?
22    A.  Nine days after the deal, yes.
23    Q.  Okay.  You don't agree with that, do you?
24    A.  That's correct.
25    Q.  If Vinmar had told Mr. Leyman on July 22nd,

---

111

1  2008, in its firm bid that U.S. origin was required, we
2  don't have a deal, do we?
3    A.  He would have relayed that to me and then it
4  would have been my decision at that time to accept it or
5  not.
6    Q.  If Vinmar had told Ed Leyman --
7    A.  That's correct.
8    Q.  -- on July 22nd that U.S. origin was required,
9  we wouldn't have a deal, would we?
10    A.  I can't answer that because I was never given
11  the option to choose whether or not to accept that as a
12  bid.
13    Q.  Okay.  But it's not -- it was not a firm offer
14  that you had made.  Correct?  You did not make a firm
15  offer to Mr. Leyman to supply U.S. origin MX?
16    A.  I accepted Vinmar's firm bid is what I did.
17    Q.  As you understood it when it was communicated
18  by Mr. Leyman to you?
19    A.  That's correct.
20    Q.  We don't have a record of that prior to it
21  being communicated to you, do we?
22    A.  I do not, no.
23    Q.  The negotiations or your conversations with
24  Mr. Leyman started on July 22nd through instant
25  messages.  Correct?

---

112

1    A.  That's correct.
2    Q.  But then it went to telephone conversations?
3    A.  Correct.
4    Q.  And when the deal that you claim was
5  consummated between Tricon and Vinmar, those
6  negotiations at that time were done entirely by phone
7  between you and Mr. Leyman.  Correct?
8    A.  Correct.
9    Q.  And is it your understanding that Mr. Leyman
10  was also talking to Dr. Wilson by phone during that
11  period of time?
12    A.  Definitely.
13    Q.  Do you believe that a broker like Mr. Leyman,
14  that he has a responsibility to ensure that both sides
15  to the deal have a clear understanding of the agreed
16  upon terms?
17    A.  Yes.  That's why I use him.
18    Q.  Okay.  And if the broker knows that one party
19  has a different understanding of the terms, you would
20  agree with me that the broker ought to do something
21  about that.  Right?
22    A.  That's correct.
23    Q.  Now, you say that product origin was not
24  discussed on July 22nd, 2008.  I believe you testified
25  to that just a few minutes ago.  Correct?

---

113

1    A.  It was not discussed during the time of the
2  deal.  I was asked the question after the deal was done,
3  What was the origin?  And I said, Most likely U.S. but I
4  can't guarantee it because I'm already guaranteeing the
5  first half September window.  And Ed went and talked to
6  Mr. Wilson and then he said, No problem.
7    Q.  Okay.  So hang on a second.  Let's make --
8  let's make sure we understand this.  Is it -- it's your
9  testimony that U.S. origin did come up on July 22nd --
10    A.  No.
11    Q.  -- 2008?
12    A.  No.
13    Q.  It did not?
14    A.  No.
15    Q.  Okay.  So on July 22nd, 2008, when Mr. Leyman
16  was talking to you and Mr. Leyman was talking to
17  Dr. Wilson, it's your testimony that at no point in time
18  did U.S. origin come up in those discussions?
19    A.  No.  Like I said, after the deal was done I
20  was asked, What is the origin?  It was not specified
21  U.S.  It was just, What is the origin, as a question.
22    Q.  Well, was that on July 22nd --
23    A.  Yes.
24    Q.  -- 2008?
25    A.  Yes, it was.

---

**29  (Pages 110 to 113)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

**114**

1  Q.  Okay.  What time did that come up?
2  A.  That was after the deal.
3  Q.  What time was the deal done --
4  A.  I don't remember.
5  Q.  -- according to you?
6  A.  I don't have the exact time.
7  Q.  Well, when you say it came up after the deal
8  was done, what do you mean by that?
9  A.  When I accepted this firm bid and Rick -- Ed
10  went back to close everything with Rick, saying that I
11  had accepted his firm bid, he called me back and asked,
12  What is the origin of the product?
13  I said, "Most likely the U.S. but I can't
14  guarantee it since I'm already guaranteeing the first
15  half of September delivery window."
16  He went and called Rick Wilson.  Rick
17  Wilson said, "Okay."  And Ed came back and said, "Okay.
18  Everything's done."
19  Q.  Okay.  First of all, let's make something
20  clear.  You don't know what Dr. Wilson said to
21  Mr. Leyman.  Correct?
22  A.  That's correct.
23  Q.  You don't know what Mr. Leyman said to
24  Dr. Wilson?
25  A.  That's correct.

---

**115**

1  Q.  Okay.  So it's your testimony that at some
2  point in time on -- during the day on July 22nd, 2008,
3  Mr. Leyman called you and said, You have a deal?
4  A.  That's correct.
5  Q.  And at that point in time, it is your belief
6  that a contract existed between Vinmar and Tricon.
7  Correct?
8  A.  Definitely.
9  Q.  And then after this discussion but at a time
10  when you believe that Mr. Leyman went to Dr. Wilson and
11  talked to him, Mr. Leyman came back to you and
12  said, What is the origin of the product?  Correct?
13  A.  Let me correct.  It was before Ed had said,
14  Everything is all done.  He had asked me what the origin
15  is.  I had accepted the firm bid as it was presented to
16  me.
17  He said, "Okay.  Let me call Rick and tell
18  him everything is done."
19  When he called Rick Wilson, he came back
20  to me then with the question, "What is the origin of the
21  product?"  And I said, "Most likely U.S. Gulf, but I
22  can't guarantee it since I'm already guaranteeing the
23  first half window."
24  And he probably said, "Okay."  He went and
25  called Rick Wilson and he calls me back and he said,

---

**116**

1  "Everything is all done."
2  So it's semantics in the sense that I
3  accepted the firm bid as it was presented to me.  So in
4  my mind, everything was done at that point.  But when
5  the question was raised to me, "What is the origin,"
6  that's when I answered it like I've just told you.  And
7  then after him speaking to Rick Wilson he calls me back
8  and said, "Everything is all done."
9  Q.  Is it possible that Mr. Leyman didn't
10  communicate the terms of Vinmar's firm bid accurately to
11  you?
12  A.  The odds are extremely low.
13  Q.  Is it possible?
14  A.  In theory, yes.
15  Q.  What you do know is that in the -- in the
16  conversations around the time at which Mr. Leyman had
17  said that you had a deal there was also a question about
18  U.S. origin.  Correct?
19  A.  No.  As I stated, the answer is no to that
20  question.  I was asked, "What is the origin?"  That's a
21  big difference from saying, "Was it U.S. origin?"  What
22  is the origin is a different question.
23  Q.  And so did you understand that to be a
24  question requesting a guarantee of U.S. origin?
25  A.  Not at all.  It was more of an inquiry basis.

---

**117**

1  What is the origin of the product?  If I had guaranteed
2  something or a guarantee was a part of the firm bid, he
3  would never have asked the question.
4  Q.  Mr. Leyman would never have asked you that
5  question?
6  A.  That's correct.
7  Q.  Okay.  So let's -- okay.  Let me ask you to
8  take a look at Vinmar Exhibit 9, which is in the
9  Vinmar -- you should have a notebook.
10  Now, do you recognize Vinmar Exhibit 9 as
11  instant message exchanges between you and Ed Leyman from
12  July 22nd, 2008, through August 6th, 2008?
13  A.  That's correct.
14  Q.  Okay.  And this is not a complete copy of all
15  of the instant message communications that you had with
16  Mr. Leyman concerning this alleged deal, is it?
17  A.  I gave everything I could find.
18  Q.  But you've seen that Mr. Leyman has additional
19  instant messages --
20  A.  Yes.
21  Q.  -- that you didn't produce.  Correct?
22  A.  That's correct.
23  Q.  All right.  So this isn't a complete set; it's
24  just what you had?
25  A.  That's correct.

---

**30  (Pages 114 to 117)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

118

1    Q.  All right.  Let me ask you to look at the page
2    labeled -- down at the right-hand corner of the Bates
3    label, it's TRI 48, which would also be Page 6 of the
4    document.
5    A.  Okay.
6    Q.  And about midway down the page, you'll see
7    there's a -- where it starts with August 6th, 2008?
8    A.  Okay.
9    Q.  Do you see that?
10   A.  Yes.
11   Q.  Okay.  Now, this is at a point where by August
12   the 6th, 2008, you know that Vinmar has taken the
13   position that this alleged deal required Tricon to
14   supply U.S. origin MX.  Correct?
15   A.  That's correct.  I'm sorry.  I was reading
16   while I was listening to you.  Can you repeat that
17   question?
18   Q.  Sure.  By August the 6th, 2008, you knew that
19   Vinmar claimed that the alleged deal required Tricon to
20   produce or supply --
21   A.  That's correct.
22   Q.  -- U.S. origin MX?
23   A.  That's correct.
24   Q.  Okay.  And on August the 6th, you're having a
25   series of communications with Mr. Leyman about that

119

1    fact.  Correct?
2    A.  That's correct.
3    Q.  And, now, at 2:39 on August the 6th, which is
4    about five or six lines down, you ask Mr. Leyman, The
5    first time he -- and that's Dr. Wilson.  Correct?
6    A.  Correct.
7    Q.  The first time he raised this origin issue was
8    on July 29th, and you have a question mark.  Correct?
9    A.  That's correct.
10   Q.  Okay.  Were you asking him that, Mr. Leyman?
11   A.  Yes.
12   Q.  Okay.  And then you go on to say, "Outside of
13   when he asked for it at the time of the deal and we did
14   not agree to give it to him."  Do you see that?
15   A.  Yes.
16   Q.  Okay.  So is it your testimony that Vinmar
17   specifically asked for in its firm bid U.S. origin and
18   you did not agree to that?
19   A.  Absolutely not.
20   Q.  Okay.  Well, that's what that says.  Right?
21   Outside of when he asked for it at the time of the deal
22   and we did not agree to give it to him?
23   A.  That's not what I was saying.
24   Q.  Well, does that -- did I read that correctly?
25   A.  You read the words correctly --

120

1    Q.  Okay.
2    A.  -- but not the meaning.
3    Q.  And you knew as of August the 6th -- I mean,
4    certainly you knew prior to August 6th that Vinmar
5    needed U.S. origin?
6    A.  That's correct.
7    Q.  And you knew that on July the 22nd, 2008?
8    A.  That's not correct.
9    Q.  Okay.  So just to be clear, your testimony is
10   that there, in fact, was no U.S. origin guarantee?
11   A.  Definitely.
12   Q.  And if Mr. Leyman didn't tell that to
13   Dr. Wilson, then Mr. Leyman didn't do his job, did he?
14   A.  And he wouldn't be in business today.
15   Q.  Now, you're the -- you're Tricon's
16   representative in this case.  Correct?
17   A.  Yes, I am.
18   Q.  Okay.  And it's your understanding that Tricon
19   claims that Vinmar breached a contract?
20   A.  That's correct.
21   Q.  And you're the person that's most familiar
22   with Tricon's claims in the case.  Correct?
23   A.  Definitely.
24   Q.  Can you tell us from your understanding, sir,
25   what document or documents set forth the terms of the

121

1    contract that Tricon bases its claim upon?
2    A.  I'm not a lawyer to be able to know which
3    documents specifically to point to, but I know what the
4    terms were that were agreed to.
5    Q.  Well, I mean, I'm just curious as to what your
6    belief is as to what is the contract?  What's the
7    document or documents that set forth the claim that
8    Tricon is suing upon in this case?
9    A.  I think if you'll look at our Tricon letter as
10   well as the MOAB confirmation, all the key terms match
11   up so you can choose whichever one you prefer.
12   Q.  So it's either one?
13   A.  The same.  The key terms that were agreed to,
14   they both match up, so I don't know which one you would
15   prefer me to choose.
16   Q.  Well, I'm asking you.  I mean, you're Tricon's
17   representative and you're suing Vinmar for breach of
18   contract.
19   A.  That's correct.
20   Q.  What is the document -- what's the contract
21   that Tricon bases its claims on?
22   A.  Since I'm not a lawyer, I can't tell you which
23   one is most accurate.  I just know that the first page
24   with all the material terms on our letter match the MOAB
25   confirmation so in my mind there's no difference.

31 (Pages 118 to 121)

ARBITRATION HEARING - SEPTEMBER 20, 2010

122

1    Q.  What if there's a difference between the
2  term -- one of these as you say essential terms in the
3  MOAB letter and the Tricon letter?  Which one controls?
4    A.  Again, I'm not a lawyer so I don't know.
5    Q.  What if there's a difference in the Tricon --
6  in the terms that Tricon submitted to Vinmar after the
7  MOAB confirmation came out?  Is there still an agreement
8  in your opinion?
9    A.  Definitely.
10    Q.  Okay.  But you can't tell me which document
11  would control in that situation?
12    A.  The material terms are the material terms.
13  Anything we proposed afterwards was proposed for
14  additional terms which Pascu agreed to.  So, again, it's
15  your call on which you want to use.
16    Q.  Well, but if there's a change in the
17  material -- if there's a difference in the material
18  terms between the confirmation and this sales letter
19  that Tricon sent --
20    A.  Please show me -- please show me the
21  difference in --
22    Q.  I'm just asking the question.  Which document
23  do you think this controls?
24    A.  There are no differences so it's a moot
25  question.

123

1    Q.  If there was, do you have an opinion on that?
2    A.  I'm not a lawyer so I don't have an opinion.
3    Q.  Now, you believe that an agreement was formed
4  at the time that Mr. Leyman told you you're all done?
5    A.  That's correct.
6    Q.  And when Mr. Leyman told you that a deal had
7  been concluded, there had been no discussion between
8  Tricon and Vinmar about arbitrating a dispute.  Correct?
9    A.  That is correct.
10    Q.  And, in fact, we can go through it, but I
11  think you'll agree with me there's no agreement to
12  arbitrate in any of the correspondence that you received
13  from Ed Leyman.  Correct?
14    A.  Only the one from Vinmar, not from MOAB.
15    Q.  You didn't receive a document from Vinmar?
16    A.  I'm saying receiving it after the fact through
17  legal proceedings, seeing that they had the arbitration
18  association clause in their purchase order, not --
19  that's the only time I've seen it.
20    Q.  Okay.  But that wasn't my question.  My
21  question was, the confirmation letters that you obtained
22  from MOAB did not contain an agreement to arbitrate?
23    A.  No.
24    Q.  Correct?
25    A.  He never includes arbitration in his clauses.

124

1    Q.  Okay.  And this purchase order that you've
2  referred to, that was never sent to you.  Correct?
3    A.  It was, but it was after the fact through
4  legal matters.
5    Q.  Right.  You got it -- you obtained it through
6  discovery in this case?
7    A.  That's correct.
8    Q.  You -- Vinmar never sent that document to you?
9    A.  No.  They promised they would, but they didn't
10  come through on that promise.
11    Q.  Okay.  Let's go through -- I want to ask you a
12  couple of questions about the documentation if we can.
13  I'll start with -- there may be -- I may jump around
14  just a little bit.  But if we take a look at Vinmar
15  Exhibit No. 1.
16    A.  Okay.
17    Q.  Now, you recognize this exhibit as the -- as
18  Mr. Leyman's handwritten confirmation on -- that he
19  filled out on July 22nd, 2008.  Correct?
20    A.  This is my first time to have ever seen one of
21  these, but, yes, I know it's from Ed.
22    JUDGE BENTON:  Did you say Vinmar 1?
23    MR. LEE:  Yes, Your Honor.
24    JUDGE BENTON:  It has Chemicals on it?
25    MR. LEE:  Yes.

125

1    JUDGE BENTON:  All right.
2    THE WITNESS:  The word MOAB I believe was
3  cut off on the fax.
4    JUDGE DAVIDSON:  The first letter.
5    THE WITNESS:  Yeah.
6    Q.  (BY MR. LEE)  Now, does this handwritten
7  document, does that accurately reflect the agreement
8  that you claim exists between Tricon and Vinmar?
9    A.  Not even close.
10    Q.  Why do you say that?
11    A.  The price is $1 million too low.
12    Q.  Okay.  Okay.  Anything else?
13    A.  Yes.
14    Q.  What's that?
15    A.  I'm just saying it looks correct.
16    Q.  Okay.  And just to be clear, the price, the
17  1110, is not the price that you authorized Ed Leyman to
18  accept on Tricon's behalf?
19    A.  Right.  When I say 1 million, I'm using 1310
20  minus 1110 is 200.  200 times 5,000 equals 1 million so
21  it should be 1310.
22    Q.  Okay.  So he made -- Mr. Leyman made a
23  million-dollar mistake in his handwritten note.
24  Correct?
25    A.  That's correct.

32  (Pages 122 to 125)

ARBITRATION HEARING - SEPTEMBER 20, 2010

126

1    Q.  Have you seen any other notes from Mr. Leyman
2  other than this one document?
3    A.  No.
4    Q.  Now, at the bottom of this exhibit, Vinmar
5  Exhibit No. 1, Mr. Leyman states that "As agreed, a
6  commission of USD .50 per metric ton shall be paid to
7  MOAB Oil, Inc., by both Tricon and Vinmar." Is that
8  correct?
9    A.  That's correct.
10   Q.  Is that correct, that both Tricon and Vinmar
11 were obligated to pay MOAB a commission of basically
12 50 cents per metric ton?
13   A.  That's correct.
14   Q.  And, in fact, MOAB sent Tricon a commission
15 invoice for this alleged transaction, didn't it?
16   A.  That's correct.
17   Q.  And that's Vinmar Exhibit 15.  Take a look at
18 that tab.  Is that the commission invoice that MOAB sent
19 to Tricon?
20   A.  That's correct.
21   Q.  Now, you refused to pay MOAB's commission.
22 Correct?
23   A.  No, that's not correct.  I said the moment
24 Vinmar performs we'll pay it.
25   Q.  So you refused to pay this commission

127

1  statement.  Correct?
2    A.  No.  I said we're postponing it until Vinmar
3  performs.  There's a difference in refusing to pay
4  versus saying, "We'll pay once we get performance."
5    Q.  Okay.  You haven't paid?
6    A.  That's correct.
7    Q.  And you don't intend to pay unless Vinmar is
8  ordered to perform on the contract?
9    A.  If Vinmar performs, I'll gladly pay it.
10   Q.  What do you mean by perform?
11   A.  If Vinmar was to have performed on the
12 contract.  So in this case I guess if we win the
13 arbitration then I would be happy to pay his commission.
14 That would be in affect the same as Vinmar compensating
15 for their non-performance is what I imagine.
16   Q.  So it's your view that Mr. Leyman did not do
17 what he was authorized to do on your behalf?
18   A.  No.  He did.
19   Q.  So he earned a commission?
20   A.  He did.
21   Q.  You just don't want to pay it unless Vinmar
22 performs?
23   A.  He brought the buyer and seller together, but
24 the seller -- the buyer ran away so --
25   Q.  Okay.  And unless the buyer is ordered to do

128

1  something, you don't intend to pay Mr. Leyman.  Correct?
2    A.  I guess that's correct.
3    Q.  Did you know Mr. Leyman did not send an
4  invoice to Tricon -- to Vinmar?
5    A.  That's news to me.
6    Q.  Does that surprise you?
7    A.  It could be a clerical error.  I don't know.
8    Q.  You would have expected that he would have
9  sent an invoice to Vinmar if he believed that he had
10 done his job and concluded a deal between Vinmar and
11 Tricon.  Right?
12   A.  I don't think Ed actually sends out invoices.
13 I'm sure he's got an accounting person to do that.
14   Q.  You would have expected somebody at MOAB to
15 have sent an invoice to Vinmar if Mr. Leyman had done
16 his job and put Vinmar and Tricon together in a deal?
17     MR. DIAZ-ARRASTIA:  I object that he
18 doesn't know what MOAB does.
19     MR. LEE:  I'm just asking for his
20 expectation.
21     JUDGE BENTON:  We're going to allow it.
22 Let's proceed.
23   A.  I expected him to send a confirmation, which
24 he told me he did.  Beyond that, I don't have any idea.
25   Q.  (BY MR. LEE)  Okay.  Let's look then at Joint

129

1  Exhibit 2.
2     MR. LEE:  And to everybody, I apologize
3  for jumping back and forth.  I really did try not to do
4  that, but there's no easy way to do this so...
5    Q.  (BY MR. LEE)  We've looked at Joint Exhibit 2
6  earlier today.  Correct?
7    A.  That's correct.
8    Q.  And this is the first confirmation letter that
9  Mr. Leyman sent out.  Correct?
10   A.  That's correct.
11   Q.  And if we look at the terms of this first
12 confirmation, does this document accurately set forth
13 the terms that you believe have been agreed to between
14 Vinmar and Tricon?
15   A.  Not at all.
16   Q.  What's wrong with it?
17   A.  The price is $200 a metric ton shown too low.
18   Q.  So we have this price discrepancy.  Correct?
19   A.  That's correct.  Which I notified him
20 immediately after receiving this document.
21   Q.  Okay.  Everything else do you agree with?
22   A.  Appears so.
23   Q.  And other than the price, is it your testimony
24 that Mr. Leyman had the authority on Tricon's behalf to
25 agree to the terms that are contained in Joint Exhibit

33  (Pages 126 to 129)

ARBITRATION HEARING - SEPTEMBER 20, 2010

130

1  No. 2?
2      A. Yes.
3      Q. Now, if we look at Joint Exhibit 3, this is
4  the second confirmation letter sent by MOAB. Correct?
5      A. That's correct.
6      Q. And as we see, the price is still USD 1110.
7  Correct?
8      A. Which I pointed out immediately.
9      Q. Okay. That's what the document says.
10 Correct?
11     A. That's correct.
12     Q. And that's not right?
13     A. That's correct.
14     Q. So this document, Joint Exhibit No. 3, does
15 not contain the agreement that you believe exists
16 between Vinmar and Tricon?
17     A. That's correct.
18     Q. Now, when did you point out to Mr. Leyman that
19 his price term was incorrect?
20     A. Within seconds of receiving both documents.
21     Q. Did you ask him how he got the price wrong?
22     A. No. He just apologized for the error.
23     Q. So he had made a mistake. Correct?
24     A. That's correct.
25     Q. It's certainly possible for Mr. Leyman, as

131

1  good as you say he is, to make mistakes. Correct?
2      A. Anybody that types in a keyboard can hit a 1
3  instead of a 3 at any point in time, so, yes, that's
4  possible for anybody to make a mistake like that.
5      Q. Well, the mistake wasn't a keyboard mistake,
6  was it? I mean, you saw --
7      A. It was --
8      Q. -- in the handwritten confirmation it was
9  actually Mr. Leyman's written mistake. Right?
10     A. That's correct.
11     Q. Okay. It's possible for somebody like
12 Mr. Leyman, even if he's a good broker, to make
13 mistakes?
14     A. No one's perfect.
15     Q. Now, let's look at Joint Exhibit 4. That
16 would be the next document in the -- in your binder
17 there now. Does this -- I think you've already told me
18 that this document, Joint Exhibit 4, does, in fact,
19 accurately set forth the agreement that you claim exists
20 between Tricon and Vinmar?
21     A. These have all the material terms that I
22 agreed to, yes.
23     Q. And you agree that every provision set forth
24 in Joint Exhibit 4 is binding on Tricon. Correct?
25     A. Can you repeat the question?

132

1      Q. Sure. Every provision set forth in Joint
2  Exhibit No. 4 is binding on Tricon. Correct?
3      A. Anything I agree to is always binding. So as
4  long as these are the terms that I agreed to, I'm always
5  bound by them.
6      Q. Did you agree to all of the terms contained in
7  Joint Exhibit 4?
8      A. Yes, I did.
9      Q. And did you intend to honor all of those terms
10 on Tricon's behalf?
11     A. I always honor my contracts, yes.
12     Q. You were asked earlier today if you were aware
13 of a situation where Tricon had a U.S. counterparty in a
14 deal that you had done through the broker where you had
15 had a dispute with a U.S. counterparty. Do you remember
16 that testimony?
17     A. That's correct.
18     Q. You've had disputes with non-U.S.
19 counterparties in broker deals. Correct?
20     A. That's correct.
21         JUDGE BENTON: Did you say "nine"?
22         MR. LEE: Non-U.S. counterparties --
23         JUDGE BENTON: Oh, non.
24         MR. LEE: Yes.
25         JUDGE BENTON: N-O-N?

133

1          MR. LEE: Yes.
2          JUDGE BENTON: Okay.
3      Q. (BY MR. LEE) Now, this final confirmation
4  letter was not sent out until Wednesday, July the 23rd.
5  Correct?
6      A. I don't know if it was the afternoon of the
7  22nd or early on the 23rd. I'm not sure.
8      Q. Well, if we -- Joint Exhibit No. 4 at least
9  indicates that it was sent to Rick Wilson on Wednesday,
10 July 23rd, 2008?
11     A. Right, at 8:23.
12     Q. Okay. Are you aware of it going out before
13 that?
14     A. I don't know when it was sent to me. I don't
15 know.
16     Q. And after you received Joint Exhibit No. 4,
17 which as you said finally had all of the terms that you
18 agreed to on Tricon's behalf, you then prepared a sales
19 contract. Correct?
20     A. I believe we prepared it prior to even
21 receiving this amended confirmation.
22     Q. You didn't send it to Vinmar until after you
23 had received the amended confirmations. Correct?
24     A. Yeah, it appears so. You're correct.
25     Q. Okay. And earlier -- let's take a look at, if

34 (Pages 130 to 133)

ARBITRATION HEARING - SEPTEMBER 20, 2010

134

1　we could, Joint Exhibit No. 5. Now, you talked about
2　this document earlier today and I think you referred to
3　it as a sales letter. But isn't this a sales contract?
4　　　A. That's the word that I used here in this
5　e-mail.
6　　　Q. Okay. I'm just -- okay. So you prepared the
7　sales contract because that's something that is in
8　keeping with Tricon's standard practice. Correct?
9　　　A. It's standard industry practice, not just for
10　Tricon.
11　　　Q. But it's Tricon's standard practice. Correct?
12　　　A. We are a participant in the industry so, yes,
13　we go by industry standards.
14　　　Q. But I just asked you about your standards.
15　Okay?
16　　　A. Okay.
17　　　Q. You're not here testifying on behalf of
18　anybody else, are you?
19　　　A. No, sir.
20　　　Q. You're Tricon's representative?
21　　　A. That's correct.
22　　　Q. Okay. So let me ask you about Tricon's
23　standard practice.
24　　　A. Okay.
25　　　Q. It was Tricon's standard practice to prepare a

135

1　sales contract. Correct?
2　　　A. We pass sales letters to companies, yes.
3　　　Q. This is passed as a sales contract?
4　　　A. Or an e-mail. Yes.
5　　　Q. Is there a difference between a contract and a
6　letter to you?
7　　　A. I'm not a lawyer so I don't know the answer to
8　that.
9　　　Q. Well, I'm just curious. You keep referring to
10　a letter. Your e-mail said contract. Are you trying to
11　make a distinction between the two?
12　　　A. I'm not trying to make any distinctions, no.
13　　　Q. Tricon's procedures, in fact, require a sales
14　contract. Correct?
15　　　A. On any deal that you do with a counterparty,
16　you should pass some paper to the other side on either a
17　purchase or a sale, but whether you do so you still have
18　a deal.
19　　　Q. And the deal is as set forth in that
20　confirmation. Correct?
21　　　A. If you and I were to do a deal on a napkin
22　right now, we would have a deal.
23　　　Q. Okay. My question was, the deal would be the
24　deal as it's set forth in the confirmation, correct, in
25　this case?

136

1　　　A. That's correct.
2　　　Q. Okay. But my original question was, Tricon's
3　procedures require a sales contract. Correct?
4　　　A. We're supposed to pass paper to the other
5　side, that's correct.
6　　　Q. And the paper that you passed was a sales
7　contract in this case?
8　　　A. It's here in Vinmar No. 5.
9　　　Q. And, you know, in fact, Mr. Leyman knew that
10　you would be sending a sales contract as well, didn't
11　he?
12　　　A. It's standard industry practice, yes.
13　　　Q. You didn't intend to conclude a deal with
14　Vinmar until your sales contract was in place and
15　signed. Correct?
16　　　A. That's definitely incorrect.
17　　　Q. Okay. You prepared the sales contract?
18　　　A. I believe in this case -- I'm not sure if I
19　did or Vuk did.
20　　　Q. I believe that you testified that you prepared
21　it.
22　　　A. I don't remember, but --
23　　　Q. It wouldn't surprise you if you did?
24　　　A. Not at all.
25　　　Q. You included a signature blank for yourself.

137

1　Correct?
2　　　A. That's what's printed from our system.
3　　　Q. And it's got your name on it? If we turn to
4　Joint Exhibit 5, the last page, it's got -- you filled
5　in the date, July 22nd, 2008, didn't you?
6　　　A. The system generated that date, yes.
7　　　Q. And then put your name, Brad Lockwood. Right?
8　　　A. Again, generated by the system, yes.
9　　　Q. And your signature blank?
10　　　A. That's correct.
11　　　Q. Which you didn't sign. Correct?
12　　　A. That's correct.
13　　　Q. You never signed this sales contract.
14　Correct?
15　　　A. That's correct.
16　　　Q. It also had a spot for Rick Wilson at Vinmar
17　to sign. Correct?
18　　　A. That's correct.
19　　　Q. And he didn't -- he's never signed it, has he?
20　　　A. That's correct.
21　　　Q. Now, I just want to be clear. I want to make
22　sure I understand what your testimony is, Mr. Lockwood,
23　about this document and the MOAB confirmation because
24　you had -- you are Tricon's representative in this case.
25　　　　　What document contains the contract that

35  (Pages 134 to 137)

ARBITRATION HEARING - SEPTEMBER 20, 2010

138

1    Tricon sues upon in this case?
2        A.  I believe, again, like I said earlier, if you
3    look at the Tricon letter and MOAB confirmation, the key
4    points of product, quantity, quality, price, Incoterms,
5    delivery period and payment terms all match, which are
6    the material terms of any deal.
7        So when we have the letter here having
8    additional terms, that's why Mr. Rajevac asked for Pascu
9    to agree to all those terms, which he later did.  So the
10   material terms are here shown on the first page and the
11   additional terms are what Mr. Pascu agreed to later.
12       MR. LEE:  I'll object.  Nonresponsive.
13       Q.  (BY MR. LEE)  My question is, what document --
14       MR. LEE:  I object to the question -- the
15   answer as nonresponsive and ask that it be stricken.
16       JUDGE BENTON:  It's overruled.
17       Q.  (BY MR. LEE)  What document contains the
18   contract that Tricon bases its claim on?
19       A.  Again, I'm not a lawyer so all I can say is
20   that anything that lists the product, quantity, quality,
21   price, Incoterm, delivery period and payment terms,
22   that's what the contract is.  So if Ed had been at a
23   restaurant writing my firm offer or Rick Wilson's firm
24   bid on a napkin and walking it over to my table and me
25   accepting it on a napkin, it wouldn't matter what kind

139

1    of piece of paper it's on.  As long as the material
2    terms are shown, that's the -- that's the deal.  And,
3    again, when you're saying which one, I'm not a lawyer so
4    I don't know which one to point to.  I just know that
5    the material terms on our letter match the confirmation.
6        Q.  Well, but you -- you've asked the panel to
7    award Tricon money on a contract.  Correct?
8        A.  That's correct.
9        Q.  And is it -- you can't tell the panel which
10   document you're asking them to enforce?
11       A.  Well, the beautiful thing is that Pascu
12   accepted all of our additional terms so really it's a
13   moot point in my opinion.
14       Q.  So is it -- is it your testimony that the
15   document that Tricon seeks to enforce in this case is
16   this sales contract, Joint Exhibit 5, that you sent to
17   Vinmar?
18       A.  You'd have to direct that question to a
19   lawyer.  I'm not a lawyer so...
20       Q.  Well, do you know?
21       MR. DIAZ-ARRASTIA:  Your Honor, this
22   question has been asked five times.  I think
23   Mr. Lockwood has given the same answer every time.
24       JUDGE BENTON:  That is -- that is a fair
25   observation, but I'm going to give Mr. Lee some leeway

140

1    so let's proceed.
2        MR. LEE:  Thank you.
3        Q.  (BY MR. LEE)  And if you don't know the
4    answer -- I mean, the question is --
5        A.  I'm not sure.
6        Q.  -- do you have -- I mean, do you know what
7    document that you as Tricon's representative are asking
8    the panel to enforce in this case?
9        A.  I'm not an expert on damages or a lawyer so I
10   don't know the answer to that question.
11       Q.  Why did you include a signature blank for
12   yourself?
13       A.  That's generated by our system for any deal
14   that's done so it's automatically generated, whether or
15   not I planned to sign it or not.
16       Q.  So it's just something that's automatically
17   generated?
18       A.  That's correct.
19       Q.  And you chose not to sign it in this case?
20       A.  That's correct.
21       Q.  The reason you didn't sign it is so that you
22   could later claim that there was no agreement if the
23   price went against you.  Isn't that right?
24       A.  That's absolutely false.
25       Q.  Why have the signature blank for Brad Lockwood

141

1    on a sales contract unless you intended to sign it?
2        A.  As I testified earlier, when asked by other
3    counterparties on spot deals to sign deals, if it's
4    really important to them, then I've signed it, but
5    otherwise there's no point in signing it if it's not
6    necessary from the other person's side.
7        Q.  Okay.  What if there are inconsistencies
8    between the confirmation from MOAB, Joint Exhibit No. 4,
9    and the sales contract that you sent on July 23rd, which
10   is Joint Exhibit 5?
11       A.  Please show me the inconsistencies.
12       Q.  I just said if there -- if there are any
13   inconsistencies or inconsistent terms, do you know how
14   that would be interpreted in this case?
15       A.  I guess you would have to show me what you're
16   referring to.
17       Q.  Okay.  Is it your testimony that there are no
18   terms that are inconsistent between the sales contract
19   and the MOAB sales confirmation?
20       A.  Can you repeat the question or rephrase the
21   question?
22       Q.  Sure.  Is it your testimony that there are no
23   inconsistent provisions between the MOAB letter and the
24   sales contract you sent?
25       A.  If you look at the product, the quantity, the

36  (Pages 138 to 141)

ARBITRATION HEARING - SEPTEMBER 20, 2010

142

1  quality, the price, the Incoterm, the delivery period
2  and the payment terms, they all match.  So if you're
3  wanting to point out something else, you'll have to be
4  more specific or show me what you're referring to.
5      Q.  Well, I mean, I think my question was a little
6  broader than that.  I just said are you -- do you think
7  there are any inconsistent provisions between the MOAB
8  letter and the sales contract?
9      A.  And your broad question was asked to be more
10  specific so you'd have to show me what you're referring
11  to.
12      Q.  So you can't answer that question?
13      A.  I can't answer that broad a question, no.
14      Q.  Okay.  Well, let's take a look then at --
15  let's look at both of them.  Okay?
16      A.  Okay.
17      Q.  Joint Exhibit 4 is the MOAB letter.  Right?
18  And -- correct?
19      A.  That's correct.
20      Q.  Now, MOAB's confirmation under quantity says,
21  "5,000 metric tons plus or minus 5 percent, seller's
22  option."  Do you see that?
23      A.  That's correct.
24      Q.  That means, as you've testified earlier, that
25  Tricon in this case would have the option to increase

143

1  the quantity or reduce the quantity as it sees fit
2  within that 5 percent leeway.  Correct?
3      A.  That's correct.
4      Q.  All right.  Now, if we look at Exhibit 5,
5  which is the document you prepared, under the quantity
6  that says, "5,000 metric tons plus or minus 5 percent,
7  vessel's option," does it not?
8      A.  That's correct.
9      Q.  So in that case, it would be the ship owner
10  who is shipping the product who would decide whether the
11  quantity loaded would be 5,000 or whether it would be
12  plus or minus 5 percent.  Correct?
13      A.  That's incorrect.
14      Q.  Isn't that what that says?
15      A.  It says, "the vessel's option," but I had to
16  charter a vessel on a CFR so I would never fix the
17  vessel giving that option to the vessel.
18      Q.  But my question on the document itself is,
19  this says, "vessel's option."  Correct?
20      A.  It says that, yes.
21      Q.  And that's different than seller's option.
22  Correct?
23      A.  In the case that I am the seller, what matters
24  is that I am the one that's going to be chartering the
25  vessel and I have the option whether or not to give it

144

1  to the vessel.  So from the buyer's perspective, there
2  is no difference.  They're not in control of the plus or
3  minus 5 percent.
4      Q.  That wasn't my question.  My question is,
5  there is a difference between seller's option and
6  vessel's option.  Correct?
7      A.  Right.  And since I would be chartering the
8  vessel, there would be no difference.
9          JUDGE BENTON:  I think the panel
10  understands each of you.  Let's --
11      Q.  (BY MR. LEE)  Now, let's take a look at the
12  title and risk provision on the MOAB confirmation.  Now,
13  that says, "Title and risk to pass from seller to buyer
14  as the product passes the barge/vessel's flange at load
15  port."  Do you see that?
16      A.  That's correct.
17      Q.  Okay.  Now, in your sales contract, if we
18  looked at Page 2, what you -- what you put under
19  Paragraph 7, it says, "Transfer title and risk.
20  Transfer title of the product will pass from seller to
21  buyer upon payment in full of the total price and
22  then -- and interest, if any."  Right?
23      A.  That's correct.
24      Q.  Okay.  So not until Vinmar pays for it will
25  they get title under this document.  Correct?

145

1      A.  That's the proposal for additional terms.
2      Q.  Okay.  Well, that's different than what
3  Mr. Leyman had put in his confirmation.  Correct?
4      A.  And that's why we proposed it as an additional
5  term.
6      Q.  Okay.  So -- and that's an inconsistency
7  between the two documents, is it not?
8      A.  It's a difference on the proposal for the
9  additional term, yes.
10      Q.  That's a different term of the deal.  Correct?
11      A.  It's a proposal for an additional term.
12          JUDGE DAVIDSON:  Can I ask a question?
13          MR. LEE:  Sure.
14          JUDGE DAVIDSON:  Under -- do you mind?
15  It's right on this.
16          MR. LEE:  Absolutely.
17          JUDGE DAVIDSON:  On Paragraph 7 of
18  Exhibit 5, there seems -- there are two different
19  risk -- transfer of risk provisions.  There's that first
20  sentence and then there's that second paragraph with the
21  A and B.  You see where I'm going?
22          MR. LEE:  Yes.
23          JUDGE DAVIDSON:  And I don't understand in
24  the trade the difference between those two separate
25  provisions.  I mean, I can read them.  I just -- it

37  (Pages 142 to 145)

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

146

1  seems to be two different provisions for transfer of
2  risk.  If somebody could --
3           JUDGE BENTON:  Let the witness -- let the
4  witness explain it.
5           JUDGE DAVIDSON:  -- explain it.
6           THE WITNESS:  Okay.  Sure.  If the look at
7  the MOAB confirmation, it says, "Title and risk to pass
8  from seller to buyer as the product passes the
9  barge/vessel's flange at load port."  What that means is
10 that I'm loading the vessel for Vinmar because I've
11 agreed to pay the freight to move it to Asia.  That's
12 what CFR means.
13          So I'm going to pull the vessel up to
14 let's say hypothetically Exxon's dock to load.  The
15 moment I start to pump that product onto the vessel, the
16 moment it's crossed over the vessel's railing onto the
17 vessel, it's Vinmar's product, but I'm still obligated
18 to move it for him to the discharge port.  I'm paying
19 the freight, but they have the title on the risk of the
20 product once it's on board the vessel.
21          So, for example, if the vessel was to sink
22 when it's out on the way -- on the way to Asia, Vinmar
23 would have to be the one claiming the damages to their
24 insurance company because they owned the product once it
25 was on the vessel.

---

147

1           JUDGE DAVIDSON:  Okay.  I just picked it
2  up.  There's a distinction between transfer of title and
3  transfer of risk.  That's the key.  I didn't --
4           THE WITNESS:  Right.
5           JUDGE DAVIDSON:  I didn't pick up the
6  distinction between them.
7           THE WITNESS:  On the CFR, it says, "Risk
8  of damage to or loss of product shall pass from seller
9  to buyer at the flange connection between the loading
10 hose."
11          JUDGE DAVIDSON:  But there's two different
12 transfer types in this -- on this -- in Exhibit 5.  The
13 first is for transfer of title and the second is for
14 transfer of risk and they would appear to be at two
15 different times.
16          THE WITNESS:  Right.  And that's just our
17 proposal.  It's standard for additional terms, just
18 passing that as a proposal.
19          JUDGE DAVIDSON:  Okay.
20          THE WITNESS:  So I guess you would say the
21 risk matches with MOAB.  They're just -- the title
22 proposal is different than MOAB's.
23          JUDGE DAVIDSON:  Got it.
24          THE WITNESS:  That's probably clarifying
25 what you're saying.

---

148

1           JUDGE DAVIDSON:  Yeah.
2           JUDGE BENTON:  Mr. Lee, is this a good
3  time?  I know --
4           MR. LEE:  Sure.
5           JUDGE BENTON:  1:00 --
6           JUDGE DAVIDSON:  1:00 o'clock?
7           JUDGE BENTON:  Okay.  1:00 o'clock work or
8  do you need more time?
9           MR. DIAZ-ARRASTIA:  1:00 o'clock is fine.
10          JUDGE BENTON:  Very good.  We're off the
11 record.
12          (Recess from 11:59 a.m. to 1:01 p.m.)
13          JUDGE BENTON:  Okay.  We're back on the
14 record.
15          Do you-all have an agreement on the
16 exhibits coming into evidence save and except for those
17 that you specifically object to or is there an agreement
18 only on the joint exhibits?
19          MR. LEE:  I think from my perspective
20 certainly the joint exhibits we've agreed to.  On the
21 individual exhibits, there are a few that I have an
22 objection to.  I think I've raised a couple of those.
23          I think the bigger issue with the
24 individual exhibits is there's some duplication that
25 we've noticed over the weekend.  I think we probably

---

149

1  want to pull some of that out when it's over, but --
2           MR. DIAZ-ARRASTIA:  There -- I know
3  there's at least one of the Vinmar exhibits that -- we
4  have an objection in this sense.  I think in an
5  arbitration the panel will see the evidence and will
6  give it the proper weight.
7           JUDGE DAVIDSON:  The question is, do
8  you-all need to make a formal tender or offer of
9  documents in order for it to be --
10          MR. DIAZ-ARRASTIA:  I would.
11          JUDGE DAVIDSON:  -- before us because
12 nobody -- you've been using exhibits as if they were
13 already in evidence.  We can assume that -- y'all can
14 keep doing that and we'll --
15          MR. DIAZ-ARRASTIA:  Yeah.  I --
16          JUDGE DAVIDSON:  -- and we'll consider
17 them or not.
18          MR. DIAZ-ARRASTIA:  I have thought that's
19 what would be done.  There is one -- two documents, and
20 I don't know if Mr. Lee tends to present them or not,
21 where if he does I would just like to point out what I
22 think are some shortcomings in the documents if he does.
23          I don't know that he will.  But I -- it --
24 I don't -- I was not contemplating that we would be
25 sifting through the exhibits and hear objections on

---

**38 (Pages 146 to 149)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

150

1   them.
2          JUDGE DAVIDSON:  Okay.
3          JUDGE WOOD:  I think our concern is just
4   so that you know that if y'all reference a document
5   we're going to read the document.  Okay.
6          MR. LEE:  Correct.  And I think that's --
7   I guess the joint exhibits, I certainly think they
8   should be admitted.  I guess the only thing I would say
9   about the -- each individual set of exhibits is if
10  they're not used during the arbitration then they
11  probably shouldn't come in, but to the extent they're
12  used and there's no objection they ought to -- I mean, I
13  don't --
14         JUDGE WOOD:  So maybe we can at the end
15  reconcile everybody's list.
16         JUDGE BENTON:  That's what I was going to
17  do.
18         MR. DIAZ-ARRASTIA:  That would be fine.
19         JUDGE BENTON:  Okay.  Let's see.  We'll
20  try to go until about 2:30 before we take a break, but
21  if any one of you needs a break before that time, just
22  let us know.
23         And anything else, Judge Davidson?
24         JUDGE DAVIDSON:  Let's do it.
25         JUDGE BENTON:  Judge Wood?

151

1          JUDGE WOOD:  No.
2          JUDGE BENTON:  Mr. Lee?
3          MR. LEE:  Thank you.
4       Q.  (BY MR. LEE)  Mr. Lockwood, let me just -- a
5   couple of other quick questions on this -- the
6   difference between the MOAB confirmation and the sales
7   contract, which are in your joint book, Exhibit 4 and
8   Exhibit 5.
9          I think I'll just ask you one more
10  question as opposed to going through all of them.  In
11  the Joint Exhibit No. 4, the MOAB confirmation, there's
12  a provision for inspection.  Correct?
13      A.  That's correct.
14      Q.  Now, what the confirm says is that the
15  inspection cost will be paid equally between buyer and
16  seller.  Correct?
17      A.  That's correct.
18      Q.  So those would be shared.  Right?
19      A.  That's correct.
20      Q.  The sales contract from -- that you sent to
21  Mr. Wilson or Dr. Wilson actually says on the cost of
22  inspection that it will be 100 percent to Tricon.
23  Correct?
24      A.  That's correct.
25      Q.  And is that what you intended, that Tricon

152

1   would pay 100 percent of the inspection cost?
2       A.  Yes, I did.
3       Q.  Is that so that Tricon could supply product
4   that had already been shipped?
5       A.  It was simply -- the industry standard that
6   I've seen on the CFR deals has been a hundred percent
7   seller at load and the buyer pays at discharge.  So if
8   Vinmar wanted to share in the cost 50/50, I would
9   welcome them paying 50 percent of it, but I thought they
10  would be happy with me paying a hundred percent.
11      Q.  Okay.  That's different.  Right?
12      A.  It's different than Ed Leyman's, yes.
13      Q.  Okay.  And my question, is that so that Tricon
14  would have the right to supply product under this
15  contract that was already on the water?
16      A.  It had no bearing on product on the water.  It
17  was simply me offering to pay a hundred percent of the
18  costs.
19      Q.  You do agree it was possible for Tricon
20  to under this contract go ahead and ship MX to Asia
21  prior to the time that Vinmar had declared a discharge
22  port.  Correct?
23      A.  Of course.
24      Q.  And you could have arranged with your shipping
25  company a guaranteed arrival.  Correct?

153

1       A.  That never happens.
2       Q.  Is it possible for you to have arranged that?
3       A.  If a ship owner would be crazy enough to
4   guarantee it, yes, but that never happens.
5       Q.  So it's possible to arrange a guaranteed
6   delivery date?
7       A.  In theory, yes.
8       Q.  Now, you've said -- and I want to just move on
9   to another point.  But you've said several times today
10  that Mr. Pascu from Vinmar accepted Tricon's sales
11  contract?
12      A.  He --
13      Q.  You testified to that?
14      A.  He accepted it except for three points.
15      Q.  Have you testified to that?
16      A.  I believe that's what I said earlier.
17      Q.  Okay.  And when you say he accepted Tricon's
18  sales contract, what you're referring to is an e-mail
19  that Mr. Pascu sent to Vuk Rajevac.  Correct?
20      A.  That's correct.
21      Q.  I mean, you've never talked to Mr. Pascu?
22      A.  Never talked to him.
23      Q.  And you don't know whether he's ever talked to
24  Mr. Rajevac, do you?
25      A.  I'm sure he must have spoken to him, but I

**39 (Pages 150 to 153)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

154

1   don't know when.
2       Q. And we can turn to the exhibit, but I just --
3   let me ask you. The e-mail that you're talking about is
4   an e-mail where Mr. Pascu says, "Here are some comments.
5   We'll revert with our purchase order." Correct?
6       A. Which exhibit is that?
7       Q. How about Joint Exhibit 13? Okay. Mr. Pascu
8   says to Mr. Rajevac, "Please find enclosed our comments
9   on your sales confirmation." Correct?
10      A. That's correct.
11      Q. And then he says, "We shall revert soon with
12  our purchase order for your review"?
13      A. That's correct.
14      Q. All right. And the purchase order never was
15  sent, was it?
16      A. That's correct.
17      Q. Is this the document that you claim is the
18  acceptance of Tricon's sales contract?
19      A. Again, I'm not a lawyer. I'm just looking at
20  the fact that on Exhibit 13 on Tricon's sales letter the
21  purchase order from Vinmar's number has been written at
22  the top.
23          You have different checkmarks written on
24  there. You have the LC -- letter of credit opening
25  date, the expiring date, the cost for them to open a

155

1   letter of credit and all of the different checkmarks on
2   our letter. That's what I'm referring to.
3       Q. Okay. But I guess my question was, is this
4   what you claim to be an acceptance?
5       A. I'm claiming their comments and changes and
6   checkmarks on our letter as being what he said he was
7   writing on our sales letter.
8       Q. But you don't know whether that's an
9   acceptance or not, do you?
10      A. I'm not aware, no.
11      Q. Okay. Now, you do know that Mr. Rajevac
12  responded to Mr. Pascu's e-mail. Correct?
13      A. That's correct.
14      Q. And, by the way, you never heard from
15  Dr. Wilson, who was the person at Vinmar who you
16  understood had negotiated this alleged deal. Right?
17      A. Other than him trying to sell it back, no.
18      Q. Okay. And Mr. Rajevac -- it's the next
19  exhibit, Joint Exhibit 15.
20      A. 14?
21      Q. I'm sorry. 14.
22      A. Okay.
23      Q. Now, Mr. Rajevac says that "Your comments on
24  the contract well noted and accepted except for
25  demurrage time bar, which is 90 days as per industrywide

156

1   standard." Do you see that?
2       A. That's correct.
3       Q. Okay. And there never was an agreement on the
4   demurrage time bar. Correct?
5       A. That's correct.
6       Q. And you never signed the sales contract?
7       A. That's correct.
8       Q. And mister -- Dr. Wilson never signed the
9   sales contract. Correct?
10      A. That's -- if you're talking about a written
11  signature, no.
12      Q. Now, you became aware on July 31st -- by the
13  way, you were asked some questions earlier about an
14  exchange between you and Dr. Wilson on the morning of
15  July 31st and the -- that exchange followed -- you first
16  went to Ed Leyman on the morning of July 31st and asked
17  if there was any MX available. Correct?
18      A. That's correct.
19      Q. And, in fact, you suggested to Mr. Leyman that
20  "You might be interested in buying back the MX that you
21  believe you had sold to Vinmar"?
22      A. That's correct.
23      Q. And you even indicated a price of around
24  1230 metric tons?
25      A. I think it was 1220.

157

1       Q. Okay. And an indication to Mr. Leyman that
2   you'd be interested in buying this Vinmar -- this MX
3   that you believe you had sold to Vinmar back --
4       A. That's correct.
5       Q. -- around that price range. Correct?
6       A. That's correct.
7       Q. And that's why -- and you understand that
8   Mr. Leyman picked up a conversation with mister -- or
9   Dr. Wilson on that -- on the morning of July 31st.
10  Correct?
11      A. That's correct.
12      Q. And it was following those discussions that
13  Rick Wilson then sent you an instant message. And we
14  had a conversation about that. Correct?
15      A. That's correct.
16      Q. All right. That all took place on the morning
17  of July 31st?
18      A. That's right.
19      Q. Prior to -- if you'll just take a look at
20  Joint Exhibit 14, the top e-mail is from Mr. Pascu to
21  Rick Wilson on July 31, 2008. That's at 1:39 p.m.
22  Correct?
23      A. That's correct.
24      Q. Your exchange with Dr. Wilson occurred prior
25  to 1:39 p.m. on July 31st. Correct?

40   (Pages 154 to 157)

ARBITRATION HEARING - SEPTEMBER 20, 2010

158

1    A.  Yes, it did.
2    Q.  And you don't know when it is that Dr. Wilson
3  was informed that Tricon had a different version of the
4  contract than he did, do you?
5    A.  No, I don't.
6    Q.  Okay.  What you do know is that according to
7  Joint Exhibit No. 15, some four minutes after receiving
8  an e-mail from Laurentiu Pascu, Dr. Wilson wrote to Vuk
9  Rajevac, "Vuk, we cannot accept open origin for this
10  material.  It must be from the USA."  Correct?
11    A.  That's correct.
12    Q.  All right.  So by July the 31st in the
13  afternoon, you were aware that there was a disagreement
14  between Tricon and Vinmar about the terms of this
15  alleged deal?
16    A.  Which I believe that is two days after Vuk
17  told Laurentiu, yes, that's correct.
18    Q.  Well, if you want to do that, let's just go
19  back.  It's five minutes after Mr. Pascu sent Mr. Wilson
20  Vuk Rajevac's e-mail.  Correct?  Take a look at Joint
21  Exhibit 14.
22    A.  That's correct.
23    Q.  So as of 1:43 p.m. on July 31st, you were
24  aware that Vinmar -- there was a disagreement between
25  Vinmar and Tricon as to the terms of this alleged deal?

159

1    A.  That would be assuming that Vuk told me at the
2  same time.
3    Q.  Well, you learned it that day.  Correct?
4    A.  Well, that would mean that Rick Wilson learned
5  it on the 29th as well.
6    Q.  No.  That's not my question, Mr. Lockwood.  My
7  question is, did you not learn on July 31st that there
8  was a disagreement between Vinmar and Tricon about the
9  terms of the alleged deal?
10    A.  I'm saying if I apply the same logic that I
11  learned on an e-mail that I was not copied on the same
12  day that it was sent, then that would mean Rick Wilson
13  learned on the 29th as well on an e-mail he was not
14  copied on.
15         MR. LEE:  Object as nonresponsive to my
16  question.
17         JUDGE BENTON:  That is sustained.  Ask the
18  question again, please.
19         MR. LEE:  Yes, sir.
20    Q.  (BY MR. LEE)  Mr. Lockwood, my question is,
21  isn't it true that on July 31st, 2008, you learned that
22  there was a disagreement between Tricon and Vinmar as to
23  the terms of the alleged deal?
24    A.  Yes, because my scheduler told me immediately.
25    Q.  Now, let's go to Vinmar Exhibit No. 9.  And I

160

1  want to focus on the page that's labeled at the bottom
2  right-hand corner TRI 48.
3    A.  48?
4    Q.  Yes.
5    A.  This is Vinmar -- okay.  Vinmar exhibits.
6  Sorry.  14?
7    Q.  9.
8    A.  9.
9    Q.  And it's TRI 48.  It's Page 6 of 9.
10    A.  Okay.  I have it.
11    Q.  Okay.  Now, you've done at least 300 deals
12  with Ed Leyman?
13    A.  Approximately, yes.
14    Q.  Has that number increased since the time you
15  were deposed?
16    A.  Yes, it has.
17    Q.  You've done a number of deals using Mr. Leyman
18  as a broker.  Correct?
19    A.  Since I was deposed.
20    Q.  Just in general.
21    A.  Oh, yes.
22    Q.  A large number?
23    A.  Over the course of my career, around 300 or
24  so.
25    Q.  Paid him substantial commissions.  Correct?

161

1    A.  Whatever the market price was I paid him.
2    Q.  You told -- let's start on August the 6th
3  there.  You asked Mr. Leyman -- these are again instant
4  message conversations.
5         JUDGE DAVIDSON:  What exhibit?
6         MR. LEE:  I'm sorry.  It's Vinmar
7  Exhibit 9.
8         JUDGE DAVIDSON:  Okay.
9         MR. LEE:  The -- Page 6 of 9.  It's
10  TRI 48.  I'm sorry.
11         JUDGE DAVIDSON:  No.  I'm just -- okay.
12  Got it.
13         MR. LEE:  And it's TRI 48.
14    A.  At the bottom you have to see TRI 48.
15    Q.  (BY MR. LEE)  And I want to start midway down
16  there on August the 6th, 2008.  You see that?  You pick
17  up a conversation with Mr. Leyman at 2:36 p.m.?
18    A.  Okay.
19    Q.  You see that?
20         And you -- the first thing you say is,
21  "July 22nd."
22         He responds, "Phone."
23         Now, what you were asking Mr. Leyman is
24  whether he had any notes or instant messages with Vinmar
25  that would document the terms of the deal that you

41  (Pages 158 to 161)

ARBITRATION HEARING - SEPTEMBER 20, 2010

162

1  believe he had negotiated. Correct?
2      **A.  Let me read the context of that response.**
3  **Okay.  Can you repeat the question for me?**
4      Q.  Sure.  You started by saying, "July 22nd," and
5  he responded, "Phone."  And what you wanted to know is
6  were there any notes or recordings or anything that
7  might contain the terms of the deal that Mr. Leyman had
8  been authorized by Vinmar to accept?
9      **A.  Where did I ask that?  I don't see --**
10     Q.  I'm just asking, isn't that what you're asking
11 him about here?
12     **A.  I have no idea.  I can't -- I don't see**
13 **anything that says that.**
14     Q.  Okay.  Well, you respond -- when he says,
15 "Phone," you respond and say, "It's okay.  You know the
16 truth.  You know what was agreed in your confirmation
17 and my contracts prove that."  You see that?
18     **A.  I see that sentence, yes.**
19     Q.  And weren't you first asking him, do you have
20 anything in paper between you and Mr. Wilson that will
21 demonstrate what terms he authorized you to accept?
22     **A.  No.  Actually I think I was referring to the**
23 **fact when the deal was done and I said, "July 22nd."**
24        **He said, "On the phone."**
25     Q.  Okay.

163

1      **A.  So that's what I was referring to.**
2      Q.  And then you tell him that you're glad you
3  would vouch for me -- you meaning Ed Leyman -- if it
4  comes to that.  Right?
5      **A.  That's correct.**
6      Q.  And you -- several times throughout these
7  instant messages beginning on July 31st and throughout
8  August the 6th you made several references to the fact
9  that you would -- you were very glad that Mr. Leyman is
10 there and that he'll vouch for you.  Right?
11     **A.  That's correct.**
12     Q.  Were you trying to make it clear to him that
13 you expected him to support Tricon's position?
14     **A.  I just knew that he knew the truth as long as**
15 **I did -- as well as I did so I was glad that somebody**
16 **else knew the truth.  That's all.**
17     Q.  Let me ask you to -- you can keep this
18 notebook open.  I'm going to come back to it, but I
19 wanted to make a jump real quick to -- actually I'm
20 sorry.  No, no, no.  Same notebook.  I've got three of
21 those.  Vinmar exhibits, let's go to 16.
22        Now, Vinmar Exhibit 16 contains a number
23 of instant messages between you and Ed Leyman starting
24 on August 11th and going through February 4, 2009.
25 Correct?

164

1      **A.  Through when did you say?**
2      Q.  Through February.  I think the last one in
3  here is February 4th, 2009.
4      **A.  It looks like February the 11th is out of**
5  **order.  February the 11th, 2010.**
6      Q.  I'm sorry.  The February 11th reference,
7  though, is not between you and Mr. Leyman.  That -- it
8  was produced -- if you'll see the Bates labels in the
9  bottom right-hand corner, they're produced in that order
10 but your conversation on February 11th was not with
11 Mr. Leyman.  Correct?
12     **A.  Okay.  Yeah, you're right.  February 4th,**
13 **you're correct.**
14     Q.  Okay.  Now, if you go to -- let's see the
15 page -- TRI 282.
16     **A.  Okay.**
17     Q.  And this is an instant message exchange
18 between you and Mr. Leyman on October 17th, 2008.
19 Correct?
20     **A.  That's correct.**
21     Q.  All right.  And you tell Mr. Leyman, "Be
22 prepared.  Somehow you will be needed to help me get my
23 money from Vinmar."  Do you see that?
24     **A.  I do.**
25     Q.  Okay.  And what you were referring to when you

165

1  said "my money," is that a reference to the bonus that
2  you expect to receive?
3      **A.  No.  It meant for the company for Vinmar to**
4  **perform on the deal.**
5      Q.  You wanted to make sure that Mr. Leyman knew
6  that you'd need his help.  Right?
7      **A.  It looks like you're saying that the invoice we**
8  **had invoiced Vinmar for repudiation was due on Wednesday**
9  **and surely they probably won't pay so be ready because**
10 **we'll be going through arbitration and we'll want him to**
11 **speak the truth.**
12     Q.  What you said was, "Somehow you will be needed
13 to help me get my money from Vinmar."  Right?
14     **A.  That's correct.**
15     Q.  Okay.  And if you go to the next page, now,
16 you did -- you called Rick Wilson several months after
17 he had left Vinmar's employment.  Right?
18     **A.  I don't know the exact time, but, yes, I did**
19 **call him.**
20     Q.  You called him after he had left Vinmar's
21 employment?
22     **A.  That's correct.**
23     Q.  And, in fact, here on IM -- on Page 238 -- I'm
24 sorry, 283, these are instant message exchanges again
25 between you and Mr. Leyman, this time on January 30,

**42  (Pages 162 to 165)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

166

1    2009. Right?
2        A. Yeah.
3        Q. And you ask Mr. Leyman, "Where did Rick Wilson
4    go?"
5        A. That's correct.
6        Q. And what you tell Mr. Leyman is, "I really
7    want to try and contact him again today," him being
8    Dr. Wilson. Right?
9        A. That's right.
10       Q. And you say, "Since he's no longer with
11   Vinmar, I'm hoping that he would admit that he thought
12   we had a deal"?
13       A. That's correct.
14       Q. Okay. So were you hoping that -- were you
15   under the impression that Vinmar had told Dr. Wilson
16   that he needed to take the position that there was no
17   deal?
18       A. I had no way -- no understanding of why
19   somebody would not perform, if it was by his own
20   volition or the company pressuring him, but my hope was
21   that by contacting him outside of the company that was
22   not performing that he would be able to speak the truth.
23       Q. You were hoping that maybe he had an axe to
24   grind against Vinmar. Right?
25       A. No. I just wanted the truth.

167

1        Q. Didn't -- when you called him, didn't you
2    suggest to him that Vinmar wasn't a great place for him
3    to work?
4        A. Not at all.
5        Q. No? Didn't you suggest to Dr. Wilson that he
6    could help you get his bonus back?
7        A. No. That's not what I said.
8        Q. You did ask him if he thought that the deal
9    required U.S. origin. Right?
10       A. I did.
11       Q. And he told you yes, that was his
12   understanding?
13       A. That's what he said.
14       Q. And he's never wavered from that, has he?
15       A. That's the only time I've spoken to him.
16       Q. Now, when you -- you had told Mr. Leyman on
17   July 31st that you would need his help and you've
18   continued that throughout. At what point in time did
19   you ask Mr. Leyman to preserve his records relating to
20   this alleged transaction?
21       A. I don't ever remember discussing his records.
22       Q. You know that MOAB records phone
23   conversations. Correct?
24       A. I did not know that until this deal.
25       Q. Okay. You have never asked Mr. Leyman about

168

1    that before?
2        A. Never had a need to.
3        Q. Did you ask him after the transaction came
4    into dispute?
5        A. I thought my lawyers had asked, if I remember.
6        Q. Okay. Do you remember at any point in time
7    between July 22nd, 2008, and -- at any point after that
8    where you asked Mr. Leyman for his records?
9        A. I may have tried to help gather documents for
10   the lawyers, but I don't remember.
11       Q. Okay. You don't remember approaching
12   Mr. Leyman requesting documents?
13       A. Not specifically, no.
14       Q. The last page of your instant messages, this
15   is on TRI 285.
16       A. Okay.
17       Q. Again, this is Vinmar Exhibit 16.
18       A. Okay.
19       Q. And on February 4th, 2009, if you'll look
20   midway down, you said, "Did you ever tell Rick Wilson or
21   Vinmar that your hard drive crashed?"
22           Do you see that?
23       A. Yes, I do.
24       Q. And then you say, "I.e., did they ever ask you
25   to produce information/communication regarding our

169

1    deal?"
2        A. Okay.
3        Q. Why did you put that in parentheses? Does
4    that have some special meaning in an instant message?
5        A. Not really, no.
6        Q. All right. When did Mr. Leyman tell you that
7    his hard drive had crashed?
8        A. I don't remember if he told me or our lawyers
9    directly, but we found out that his hard drive had
10   crashed.
11       Q. And what did you find out?
12       A. That whatever he had on his hard drive had
13   been overwritten or something to that effect.
14       Q. Okay. And you said, "Meaning Rick Wilson
15   never asked you to reproduce Yahoo communications,
16   et cetera," and then you said, "Like when I asked you
17   but you said your hard drive crashed"?
18       A. Okay.
19       Q. When did you ask him?
20       A. I have no idea.
21       Q. Okay. And you had -- you reminded him that he
22   had told you his hard drive crashed. Right?
23       A. That's right.
24       Q. And then you told him later, "Hey, there's a
25   chance that Vinmar may try to call you today."

43 (Pages 166 to 169)

ARBITRATION HEARING - SEPTEMBER 20, 2010

170

1    A.  Where do you see that?
2    Q.  A little bit further down at 16:10:34,
3  "There's a chance Vinmar may try to call you now from
4  our mediation session."  Do you see that?
5    A.  Right.  I see that.
6    Q.  Is there a reason why you felt the need to
7  tell -- to remind Mr. Leyman that his hard drive had
8  crashed before telling him that Vinmar might be calling
9  him?
10    A.  No.
11    Q.  Let's go back to Vinmar Exhibit 9.
12    A.  Okay.
13    Q.  And, again, these are the additional instant
14  message communications between you and Mr. Leyman and I
15  want to go to the page that's marked TRI 50 --
16    A.  Okay.
17    Q.  -- which is Page 8 of 9 in the exhibit.
18    A.  Okay.
19    Q.  And at 5:50:35 p.m., so it's about a quarter
20  of the way down the page, you start with the statement,
21  "Let me ask you a question."  Do you see that?
22    A.  Uh-huh.
23    Q.  And you said -- this is, again, to Mr. Leyman.
24  Right?
25    A.  Right.

171

1    Q.  You said, "Let me ask you a question.  Here
2  was my original offer to you on Yahoo."
3    A.  Right.
4    Q.  And then you mentioned a deal that was a CFR
5  meeting ISO -- "Asia isomer spec 843."  Do you see that?
6    A.  I do.
7    Q.  And then you ask, "How did we go from that
8  quality to 5211?"
9    A.  Right.
10    Q.  Right.  Now, what you're referring to there is
11  that you -- in your instant message exchanges with
12  Mr. Leyman back on July 22nd you had made an offer to
13  sell mixed xylenes with a ASTM quality 843.
14    A.  With the additional parameters, yes.
15    Q.  Okay.  And that was -- that is different than
16  the quality that ended up in the confirmation.  Correct?
17    A.  People make firm offers and bids all the time
18  that are not accepted.  This is a perfect example.
19    Q.  I'm sorry.  My question was, isn't that
20  different than what ended up in the confirmation?
21    A.  And I just said I made a firm offer that was
22  not accepted so this is a perfect example of that
23  situation.
24        JUDGE DAVIDSON:  So the answer is "Yes"?
25    A.  The answer is yes.

172

1    Q.  (BY MR. LEE)  Okay.  And so the offer that you
2  had made started with a quality of 843?
3    A.  That's correct.
4    Q.  Right.  And the ASTM, the 5211, is a different
5  quality mixed xylene.  Correct?
6    A.  That's correct.
7    Q.  Okay.  Now, were you confused about what had
8  transpired on July 22nd?
9    A.  Not at all.
10    Q.  You asked him, how did we go from my original
11  offer to something different?
12    A.  I remember it very clearly.
13    Q.  Mr. Leyman then responded to you
14  and he said, "Look, the negotiations were for only 5211
15  so the quality that Vinmar was interested in was always
16  the ASTM 5211 quality."  Correct?
17    A.  That's correct.
18    Q.  And you -- in fact, you even asked, "Basically
19  he bid on 5211 only basis, I guess"?
20    A.  That's correct.
21    Q.  And Mr. Leyman said, "Yes.  Never bid or
22  showed any interest for 843 spec"?
23    A.  That's correct.
24    Q.  Right.  Okay.  You testified earlier today
25  that Vinmar on August the 6th went back to Mr. Leyman.

173

1  And even though the price had fallen of mixed xylenes
2  Vinmar went back and said, "Recommitted to the deal at
3  the same price."  Correct?
4    A.  Can you show me that exhibit?
5    Q.  Sure.  It's Joint Exhibit 18.  I think we
6  looked at that this morning.  And I'm going to come back
7  to these instant messages so if you keep your hand
8  there, but this is the Joint Exhibit No. 18 which I
9  believe you looked at this morning.
10    A.  Okay.  I see it now.
11    Q.  And all I want you to see here, Mr. Lockwood,
12  is that, in fact -- I understand that you testified this
13  morning that Mr. Wilson made or Dr. Wilson made
14  additional changes that you didn't agree with, but he
15  did tell Mr. Leyman on August the 6th he recommitted the
16  price of 1310.  Right?
17    A.  With additional changes of the declaration
18  date, yes.
19    Q.  I understand that.  And I just -- I just
20  wanted to acknowledge here that it was the same price
21  even though the mixed xylene market had fallen by this
22  time.  Right?
23    A.  This is the non-good faith offer that I
24  referred to because of the change in declaration.
25    Q.  Got you.  And you said -- you testified this

44  (Pages 170 to 173)

ARBITRATION HEARING - SEPTEMBER 20, 2010

174

1  morning that you responded.  You gave a proposal to
2  Vinmar to supply two different types of mixed xylene.
3  Correct?
4      **A.  I did, yes.**
5      Q.  And we can look at it, but don't you remember
6  the first option that you presented, this one that you
7  testified this morning that was mixed xylenes that would
8  have an ETA of the first half of September, the quality
9  in that mixed xylene was the 843 and not the 5211?
10  Correct?
11      **A.  With the additional parameters that met the**
12  **standard Asia spec, that's correct.**
13      Q.  It was 843 spec, not 5211?
14      **A.  You cannot say 843 by itself.  You have to**
15  **point out the additional parameters as well.**
16      Q.  Okay.  Well, it says 843 and additional
17  parameters versus the 5211 that was in the confirmation.
18  Correct?
19      **A.  That's correct.**
20      Q.  Okay.  And then the second offer that you made
21  on August the 6th was to deliver U.S. origin MX, meaning
22  the 5211 quality standard, but it wouldn't arrive in
23  Asia until mid October.  Correct?
24      **A.  That's correct, but one thing to point out in**
25  **the first one it also was U.S. origin as well.**

175

1      Q.  Sure, but it was a different quality.
2  Correct?
3      **A.  Right, but you mentioned U.S. origin in the**
4  **second so I just wanted to point that out.**
5      Q.  I'm sorry.  I didn't mean to omit that.
6  You're correct.
7          Now, if you go back to Vinmar Exhibit
8  No. 9, which again is instant message exchanges between
9  you and Mr. Leyman again.
10      MR. LEE:  And I apologize for jumping back
11  and forth but --
12          JUDGE DAVIDSON:  I'm up to the challenge
13  and I know they are.
14      Q.  (BY MR. LEE)  Now, what you pick up with --
15  here again, this is the -- the discussion that's really
16  going on here -- and this is TRI 50, it's Page 8 of 9 on
17  August the 6th in the late afternoon.  What you're
18  discussing with Mr. Leyman is the fact that Vinmar
19  didn't accept the proposals that you had offered.
20  Correct?
21      **A.  Which part are you saying?**
22      Q.  Well, I'm just saying that that -- isn't that
23  what's really happening here, that you were questioning
24  hey, didn't I originally bid 843 and Mr. Leyman is
25  saying, "Yes, but Vinmar has never shown an interest in

176

1  anything other than mixed xylenes meeting the ASTM 5211
2  standard"?
3      **A.  Okay.**
4      Q.  We just went through that.  I'm just trying to
5  get a placeholder.  Is that what you recall as sort of
6  the general --
7      **A.  I can't remember the general conversation.  I**
8  **can read the words, but tell me what you're asking**
9  **specifically.**
10      Q.  Well, isn't that what you start this
11  conversation off with on -- I mean, we can go back to
12  the question you said at 5:51 p.m., "How did we go from
13  that quality to 5211?"
14          And Mr. Leyman says, "The negotiations
15  were only for 5211."
16      **A.  That's correct.**
17      Q.  Okay.  And -- now, what Mr. Leyman -- at 6:02
18  on August the 6th, it's about three quarters of the way
19  down, 6:02:57 p.m., Mr. Leyman says, "If he doesn't have
20  it sold."  He's talking about Dr. Wilson.  Correct?  Are
21  you with me?
22      **A.  That's right, yes.**
23      Q.  Okay.  "If he doesn't have it sold."  That's
24  Dr. Wilson.  Right?
25      **A.  That's right.**

177

1      Q.  "Why would they reconfirm today a desire to
2  buy first half September U.S. origin at 1310 a metric
3  ton?"
4      **A.  I see that.**
5      Q.  And you responded, "He's only changing the
6  terms of the deal.  That's all he's trying to do."
7  Right?
8      **A.  I do.**
9      Q.  Okay.  And Mr. Leyman responds to that at
10  6:07 p.m. and says, "But if the MX market is lower than
11  on July 22nd, and it is, why would he send in writing a
12  firm proposal to buy at 1310?"
13      **A.  Okay.  I see that.**
14      Q.  Okay.  And, again, you respond and say, "You
15  can't change the terms of the deal."  Right?
16      **A.  Yes, that's correct.**
17      Q.  Okay.  And at the top of the next page at
18  6:12, Page 9 of 9, Mr. Leyman again says to you, "The
19  fact that Vinmar is still willing to pay 1310 in a
20  market that is much lower suggests that they are not
21  just walking or running away from the deal."  Right?
22      **A.  That's what Ed wrote, that's correct.**
23      Q.  Okay.  You don't agree with that, do you?
24      **A.  That's why Ed's a broker, not a trader.**
25      Q.  Okay.  In fact, he says a little bit further

**45  (Pages 174 to 177)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

178

1  down at 6:13 p.m., "They didn't come back with an
2  argument that there is no deal, but they would still buy
3  the 5 KT but at 1250 or 1225 or whatever.  They repeated
4  1310."  Right?
5      A.  That's what he wrote, yes.
6      Q.  Okay.  And you said, "Well, I don't understand
7  why they wouldn't accept No. 1 alternative"?
8      A.  Uh-huh.
9      Q.  And what you're referring to there is the
10  offer that you made in your letter on October -- or on
11  August the 6th in which you offered ASTM 843 MX.  Right?
12     A.  With the additional parameters, yes.
13     Q.  Okay.  And Mr. Leyman responded, "Don't know
14  enough about Asia buyers to answer.  However, Vinmar's
15  interest in the USGC, any with U on CFR was also 5211."
16  Do you see that?
17     A.  I do.
18     Q.  And USGC, that's -- you understand that to be
19  U.S. Gulf Coast.  Right?
20     A.  That's correct.
21     Q.  And then Mr. Leyman at 6:18 again comes back
22  to you and says, "Given the fact that they will still
23  pay 1310 in a falling market, even if you perceive it as
24  changing the deal after the fact, it commercially makes
25  sense to you if you can supply the U.S. origin cargo for

---

179

1  first half September."  You see that?
2      A.  I do.
3      Q.  Okay.  You didn't agree with Mr. Leyman, did
4  you?
5      A.  Because he obviously is not taking into
6  account the risk of the shipping so that's again why I
7  say he's a broker, not a trader.
8      Q.  And we see that on August the 8th, 2008, you
9  testified this morning that you declared Vinmar in
10  breach of the contract.  Correct?
11     A.  On which date?
12     Q.  August the 8th.
13     A.  I believe you're correct, yes.
14     Q.  Okay.  And so at that point you said, "Vinmar,
15  you've breached the agreement and we have the right to
16  resell it."
17     A.  That's correct.
18     Q.  And if I understand your testimony correctly,
19  your claim is that you on August the 11th identified the
20  mixed xylene that you intended to supply to Vinmar, you
21  identified that to a separate contract?
22     A.  That's correct.
23     Q.  Okay.  And that was on the morning of August
24  the 11th?  And let's go to Joint Exhibit 22.  I'm sorry.
25  Yeah, Joint Exhibit 22.  So --

---

180

1      A.  Oh, joint.  Okay.
2      Q.  Monday, August 11th at 3:02 a.m.  Right?
3      A.  That's right.
4      Q.  Now, is this the document that you claim
5  constitutes the notice of a replacement sale?
6      A.  This was me declaring the option under my
7  contract at that time.  I'm not sure if that was the
8  replacement sale or not, but that was me exercising the
9  option.
10     JUDGE BENTON:  22?
11     MR. LEE:  I'm sorry.  It's Joint
12  Exhibit 22.
13     JUDGE BENTON:  Got it.
14     Q.  (BY MR. LEE)  Okay.  So this was not
15  necessarily you identifying this mixed xylene that you
16  believe you had sold to Vinmar to a separate contract?
17     A.  Once they didn't declare the discharge port as
18  per the contract on August the 8th, I knew I needed to
19  exercise the option to at least give myself a chance.
20     Q.  Okay.  And is that what you were doing here?
21     A.  Yes, I was.
22     Q.  Okay.
23     JUDGE BENTON:  Just a second.  Who's this
24  e-mail to?
25     THE WITNESS:  The problem is with the

---

181

1  Koreans, their e-mail addresses don't show up in
2  English.  It shows up as question marks.  So if you
3  double-click on those question marks --
4      JUDGE BENTON:  Okay.
5      THE WITNESS:  -- you would see their
6  Korean e-mail addresses.
7      JUDGE BENTON:  Okay.
8      THE WITNESS:  So those are -- those are
9  individuals at KP Chemical.
10     JUDGE BENTON:  All right.  Very good.
11     Q.  (BY MR. LEE)  Okay.  So just to be clear,
12  Vinmar wasn't copied on this e-mail.  Correct?
13     A.  Definitely not.
14     Q.  And, in fact, Vinmar isn't even mentioned
15  anywhere in it?
16     A.  No, they weren't.
17     Q.  And -- but is this the replacement sale?  Is
18  this the identification of the replacement sale?
19     A.  Yes, it was.
20     Q.  All right.  Let's talk about that, your
21  agreement with KP Chem.
22     A.  Okay.
23     Q.  And if we go to Joint Exhibit No. 1.  Okay.  I
24  want to make sure I understand this.  Joint Exhibit 1 is
25  the contract between Tricon and KP Chem?

---

**46  (Pages 178 to 181)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

182

1    A.  That's right.
2    Q.  And it's your testimony, if I wrote it down
3  correctly this morning, that you -- there was an option
4  in the document that allowed the parties to -- let me
5  make sure I understood this correctly.  That KP Chem was
6  given an option to load material whenever it wanted?
7    A.  KP -- if you look on Exhibit A at the end
8  of -- at the end of Exhibit 1, the first clause in that
9  says, "Tricon to declare FOB or CFR on or by the 10th of
10 the prior month."
11   Q.  Right.
12   A.  And KP -- I don't know if that's actually
13 written correctly because KP is really the one that
14 decided whether or not they wanted to load FOB.  I was
15 really only deciding whether or not I would exercise my
16 CFR option.
17   Q.  Okay.  Well, but you don't see anywhere in
18 this contract that there -- that there's an option for
19 KP Chem to decide whether they wanted to take product or
20 not?
21   A.  "Resale policy on FOB Shipments:  KP Chemicals
22 has the right to resell the barrels on the condition of
23 giving Tricon Energy the first right of refusal."
24       I don't think it's spelled out clearly,
25 no.

183

1    Q.  Okay.  In fact, if you look at the first page
2  of the Joint Exhibit No. 1, it says the Incoterm is,
3  "FOB Texas Gulf coast or Lake Charles, L -- Louisiana or
4  CFR Ulsan, Korea, all in supplier's option."  Right?
5    A.  That's correct.
6    Q.  That's you?  That's Tricon?
7    A.  That's right.
8    Q.  And the contract says that it requires Tricon
9  to supply KP Chem with 5,000 metric tons of MX every
10 month for 12 months.  Correct?
11   A.  That's correct.
12   Q.  All right.  There is no option in this
13 contract.  Correct?
14   A.  I've had this contract with them since 2006
15 and every year we change certain clauses so I'm not sure
16 if this was written correctly at the time, but I'm
17 pretty sure that I recall for the year of 2008 the whole
18 reason they had the contract was they had the
19 flexibility whether to load or not.
20       And if it isn't spelled out correctly
21 here, I'm sure we changed it later.  It doesn't show
22 that here, but I know that's what occurred.
23   Q.  Okay.  So what we have here doesn't show that
24 option.  Correct?
25   A.  I think so.  You're right.

184

1    Q.  All right.  And, in fact, as you pointed out
2  in Exhibit A to the contract, it says that Tricon has
3  the right to declare FOB or CFR?
4    A.  That's correct.
5    Q.  I think this morning you had testified that it
6  was -- that Tricon only had the right to declare CFR but
7  KP Chem had the right to declare FOB deals?
8    A.  I said that we had the right to trump their
9  FOB no matter what.  If they want the product FOB, we
10 can still trump that with the CFR option.
11   Q.  Okay.  But this document, as I read it, says
12 that it's all up to Tricon as to whether they want --
13 Tricon wants to declare an FOB or a CFR option.
14 Correct?
15   A.  Right.
16   Q.  Now, this document, this sales contract
17 between KP Chem and Tricon is very similar in format to
18 the sales contract that Tricon sent to Vinmar.  Correct?
19   A.  I believe so.
20   Q.  And in this one, we see that you actually
21 signed the document, Page 4.  Right?
22   A.  Yes, I did.
23   Q.  Okay.  Tricon does not make mixed xylenes?
24   A.  That's correct.
25   Q.  So in order to supply -- in order to supply MX

185

1  to Vinmar under the alleged transaction, Tricon would
2  have had to get that from someplace.  Correct?
3    A.  By September 15th, yes.
4    Q.  Okay.  And the same thing for this KP Chem
5  contract.  In order for Tricon to supply mixed xylenes
6  to KP Chem under this contract, Tricon would have to go
7  purchase it from someplace else?
8    A.  Just like Vinmar.  You can sell before you
9  buy.  So, yes, this is what this is.
10   Q.  Okay.  So, again, you have to buy it before
11 you could deliver it.  Right?
12   A.  But not before you sell it.
13   Q.  I understand.  That wasn't my question.  My
14 question was, in order to actually deliver product under
15 this contract or under the alleged deal with Vinmar
16 Tricon would have to purchase it from someplace.
17 Correct?
18   A.  That's correct.
19   Q.  Because you don't make it?
20   A.  That's correct.
21   Q.  And just so that I make sure I understand how
22 this KP Chem contract works, if you declare a -- if you
23 nominate cargo for CFR delivery, the nomination would be
24 in August.  I mean, let's just use the August --
25   A.  Okay.

47  (Pages 182 to 185)

ARBITRATION HEARING - SEPTEMBER 20, 2010

186

1      Q. -- we have in front of us. The nomination
2  would be in August?
3      A. That's correct.
4      Q. The mixed xylenes would actually be delivered
5  in October but they would be priced in September?
6      A. That's exactly right.
7      Q. Okay.
8      A. That's what they preferred.
9      Q. Okay. Now, the alleged deal between Vinmar
10  and Tricon required Tricon to deliver mixed xylenes to
11  Vinmar on or before September 15th, 2008?
12      A. That's correct.
13      Q. And so to supply that contract, Tricon would
14  have had to go out someplace to get the mixed xylenes.
15  Correct?
16      A. That's correct.
17      Q. And that would have to be done before
18  September 15th, 2008?
19      A. That's correct.
20      Q. Now, even if we assume that under Tricon's
21  alleged version of the contract, which means you could
22  supply it from anywhere. Is that correct?
23      A. That's correct.
24      Q. Isn't it true that you would have certainly
25  purchased it sometime prior to September 15th, 2008?

187

1      A. No, that's not correct.
2      Q. So you might have waited until September 15th,
3  2008, to supply that?
4      A. If I was feeling particularly risky, yes, I
5  could have.
6      Q. Okay. And -- but certainly by September 15th,
7  2008, you would have had to have MX in your hands to
8  deliver to Vinmar?
9      A. I would have had to purchase it at least by
10  that day.
11      Q. Okay. Now, I believe your testimony this
12  morning was that Tricon only delivered 3400 metric tons
13  of mixed xylenes to KP Chem under this September CFR?
14      A. 32 or 3400. I don't remember exactly.
15      Q. I'll say 34. I think the invoice was less
16  5 percent, but I'm going to show you some documents in a
17  minute --
18      A. Okay.
19      Q. -- that talk about 3400 metric tons.
20      A. Okay.
21      Q. So it's your testimony then that the actual
22  delivery was 3,230 metric tons?
23      A. I have no idea. I just know it was around
24  3400.
25      Q. Okay. And it's your testimony that KP Chem is

188

1  the one that requested the decreased volume?
2      A. That's correct.
3      Q. Okay. And that Tricon elected to agree to
4  that request?
5      A. After being forced to, yes.
6      Q. Well, isn't -- isn't it the case that Tricon
7  was actually behind on its volume requirements to
8  KP Chem?
9      A. What are you referring to?
10      Q. Well, I'm just asking, isn't it the case that
11  it wasn't KP Chem forcing you to deliver less, that
12  actually as of September of 2008 Tricon was behind on
13  the volume it was required to supply to KP Chem under
14  this contract?
15      A. Not at all.
16      JUDGE BENTON: Just a second. I thought
17  you said that you reduced it not because you were forced
18  to but you just made a business decision to -- in order
19  to please a long-term customer.
20      THE WITNESS: But I was saying that there
21  was a lot of subtle pressure for them to push me to
22  reduce it because they said if I did not agree then that
23  would -- could affect negatively next year's contract
24  beyond that.
25      JUDGE BENTON: Okay.

189

1      THE WITNESS: So KP knew that by me
2  reducing the volume that was beneficial for them because
3  that meant they were taking less product in a falling
4  market.
5      JUDGE BENTON: Okay. But you really
6  weren't forced to? I mean, you could have stood on the
7  contract?
8      THE WITNESS: Nobody held a gun to me
9  but --
10      JUDGE BENTON: You could have stood on the
11  contract?
12      THE WITNESS: I could have -- I could have
13  stayed, yes.
14      JUDGE BENTON: Okay. All right. Mr. Lee,
15  you may proceed.
16      MR. LEE: Thank you.
17      Q. (BY MR. LEE) I document -- the question I had
18  asked you just a second ago, Mr. Lockwood, was, isn't it
19  true that Tricon was behind on its volume under the
20  contract?
21      A. And, again, I believe I answered no, that's
22  not correct.
23      Q. Why don't we take a look at -- now we're in
24  Tricon's exhibit notebook.
25      A. Okay.

48  (Pages 186 to 189)

ARBITRATION HEARING - SEPTEMBER 20, 2010

190

1    Q.  And we're going to turn to Tricon Exhibit 20.
2  So Tricon Exhibit 20.  You with me?
3    A.  I am, yes.
4    Q.  Now, this is four pages of e-mails between
5  some folks at Tricon and people at KP Chem.  Correct?
6    A.  That's correct.
7    Q.  And if we start with the second page, which is
8  the 2556 down in the right-hand column.
9    A.  Okay.
10    Q.  The e-mail at the bottom of the page from
11  Chang S at Tricon Energy --
12    A.  Okay.
13    Q.  And this is Monday, September -- I'm sorry.
14  Yeah, Monday, September 1, 2008.
15    A.  Okay.
16    Q.  And Mr. Chang, that's Sa Uk Chang, he's a
17  Tricon employee.
18    A.  Employee.
19    Q.  Right?
20    A.  That's correct.
21    Q.  And he is writing an e-mail to Min Way -- or
22  Min Jae Hwang who is with KP Chem?
23    A.  That's correct.
24    Q.  All right.  And what Mr. Chang says is -- he
25  says, "We -- Tricon would like to request to divide

191

1  quantity as below."  All right.
2    A.  That's correct.
3    Q.  And he says, "We wish you" -- and that's
4  "Tricon wishes that KP Chem understand our situation we
5  are forced to request in our sincere efforts to meet our
6  commitment to you in the last month"?
7    A.  Okay.
8    Q.  Okay.  You see that?
9    A.  Uh-huh.
10    Q.  And then it talks about the fact that there's
11  a number of shipments that need to be provided to
12  KP Chem.  Correct?
13    A.  Okay.
14    Q.  And, in fact, I think there's handwriting out
15  here that shows 15,771.  That's metric tons.  Correct?
16    A.  That's correct.
17    Q.  And then it talks about how those shipments
18  from that volume will be supplied to KP Chem?
19    A.  Okay.
20    Q.  Correct?
21    A.  That's correct.
22    Q.  Okay.  And isn't that an indication that
23  Tricon was, in fact, behind on its contract with
24  KP Chem?
25    A.  How do you figure?

192

1    Q.  I'm asking you, sir.  Isn't it -- isn't that
2  the case, there are -- they have 15,000 metric tons as
3  of September 1, 2008?
4    A.  Not if we're delivering it when we said we
5  would so how -- where do you see the delivery date that
6  we owed?
7    Q.  I'm asking you under the contract, sir, that
8  by September the 1st, 2008, if you're 15,000 metric tons
9  behind, why are you -- you're behind, aren't you?
10    A.  My point to you is no, we were not behind.  We
11  were delivering right when we said we were.
12    Q.  Okay.  So it's your testimony you were not
13  behind?
14    A.  That's correct.
15    Q.  Now, at the bottom of that e-mail, it says,
16  "Bow Pride:  Parcel 2:  5,000 metric tons plus or minus
17  5 percent at Platts September FOB Korea average."  Do
18  you see that?
19    A.  I do.
20    Q.  Now, that's the 5,000 metric tons that you
21  claim was originally earmarked for Vinmar?
22    A.  That's correct.
23    Q.  All right.  So at September 1st, it's 5,000
24  metric tons?
25    A.  That's correct.

193

1    Q.  Okay.  And on the first page of Tricon
2  Exhibit 20, go to the very top e-mail.
3    A.  Okay.
4    Q.  And, again, this is Mr. Chang, who's a Tricon
5  employee.  Right?
6    A.  Okay.
7    Q.  And he asks his counterparty at KP Chem, he
8  says, "We'd like to adjust our request to declare
9  quantities."  Do you see that?
10    A.  I do.
11    Q.  He says, "Because there are no buyers anywhere
12  for MX, both in Asia and in USA, and our customer,
13  KP" -- that's KP Chem -- "is selling into the market, we
14  needed to take drastic measures to reduce to fixed price
15  exposure."  Right?
16    A.  Okay.
17    Q.  That's a reference to Tricon.  Correct?
18    A.  That's correct.
19    Q.  And then it's Tricon that suggests a change in
20  the way that the product would be delivered.  Correct?
21    A.  I don't think that's correct because if you
22  look right below it -- let's see.  We don't have a --
23  you don't have all the e-mails between KP directly to
24  Tricon.
25    Q.  Well, sir, I have what your -- what y'all

49 (Pages 190 to 193)

ARBITRATION HEARING - SEPTEMBER 20, 2010

194

1    produced in this case.  So what I'm asking you is, based
2    on this document, is it not true that Mr. Chang is the
3    one that reduces the metric tons on Parcel 2 from 5,000
4    to 3400 metric tons?
5        A.  It must have been a phone conversation from KP
6    to Sa Uk so in that sense he was responding in writing
7    with what they requested over the phone.
8        Q.  Okay.  Well, what Mr. Chang said in his e-mail
9    is that Tricon needed to take drastic measures to reduce
10   fixed price exposure.  So "We," Tricon, "are hoping,
11   based on our supplier's idea, that KP Chem would be able
12   to load other contract cargo from your U.S. supplier in
13   Baton Rouge on to the Bow Pride in order to utilize our
14   space to prevent dead freight and allow us to not face
15   further price down on September MX sales price versus
16   fixed price purchase."  Do you see that?
17       A.  I do.
18       Q.  So it's Tricon's response to KP Chem to adjust
19   the volumes, is it not?
20       A.  That's what it appears here.
21       Q.  Okay.  And, in fact, you wrote this e-mail
22   from Mr. Chang, didn't you?
23       A.  No, because that would not have been my
24   language.
25       Q.  Well, look at Exhibit 21 in the same document,

195

1    the very next document.  This is an e-mail from you to
2    Mr. Chang, Wednesday, September 3rd, at 2:49 a.m.,
3    some --
4        A.  Where is that?
5        Q.  Well, it's the very next document, right,
6    Tricon Exhibit 21?  You see that?
7        A.  Okay.
8        Q.  And you sent that to Mr. Chang on Wednesday,
9    September 3rd, at 2:49 a.m.  Mr. Chang sent his e-mail
10   to KP Chem at 3:01 a.m.  Right?
11       A.  That's right.
12       Q.  And you're the one that suggested to Mr. Chang
13   the quantities and even gave him the language based on
14   there being no buyers anywhere for MX -- and we can read
15   the whole paragraph, but it's virtually identical to the
16   paragraph that Mr. Chang sent to KP Chem later that day.
17   Right?
18       A.  Okay.  You're right.  I'm still reading.
19       Q.  So it certainly appears, according to these
20   documents, that it's -- that it's Tricon that reduced
21   the volume from 5,000 metric tons to 3,400 metric tons?
22       A.  That's what the document suggests, yes.
23       Q.  Okay.  And also, though, what Tricon did in
24   that same document is they increased -- they reduced the
25   amount to be supplied at the September Platts FOB price

196

1    but increased the amount of MX to be supplied to KP Chem
2    at the higher price of 1235 a metric ton.  Isn't that
3    right?
4        A.  Where do you see that?
5        Q.  I'm looking at Bow Pride Parcel 1,
6    1595.665 metric tons at 1235, and then 3400 metric tons
7    at the September price.  That's 5,000 metric tons more
8    or less.  Correct?
9        A.  I believe you're incorrect because if you look
10   at -- on --
11       Q.  Well, hang on.
12       A.  -- Page 25 --
13       Q.  Stay with me.  My question, Mr. Lockwood, is,
14   isn't 3400 plus 1595 close to 5,000?
15       A.  I'm just saying you said that we increased the
16   1235 and I'm saying you're incorrect in that statement.
17       Q.  No.  I said you increased the volume to be
18   supplied at the price of 1235 on the Bow Pride.
19       A.  But you have to look at both shipments
20   together.  So if you look on Page 2556 and you take the
21   Selendang Sarl, you get 5,021.  And you add it to a
22   thousand, that's 6,021 metric tons at 1235.
23           If you flip back the page to 2555 and you
24   add 4154 to 1595, that comes out to around 5700, so it
25   was actually reduced --

197

1        Q.  So --
2        A.  -- so you are incorrect.
3        Q.  So to prevent the -- one of the drastic
4    measures that Tricon took to reduce the fixed price
5    measure or exposure was to ask KP Chem to reduce the
6    total volume that Tricon was obligated to supply KP Chem
7    from the 15,771 to now it's down to 14,000.  Right?
8        A.  No.  What you're saying makes zero sense and
9    the reason why is because these are all sales.  So any
10   sale that you had at that time you would want to
11   maximize.
12           We would never want to minimize in a
13   falling market.  You would want to maximize.  So the
14   fact that we were changing it from 15,771 to 14,267,
15   that actually hurt us by selling less in a falling
16   market.  So what you're saying is absolutely incorrect.
17       Q.  So were you not telling the truth to KP Chem?
18       A.  Not at all.  Where did I not tell the truth?
19       Q.  I just asked.  Are you not telling the truth
20   to KP Chem when you said we needed to take drastic
21   measures to reduce fixed priced exposure?
22       A.  Talking about what I had on the purchase side
23   versus what I had on the sales side are two different
24   things.
25       Q.  All right.

50  (Pages 194 to 197)

ARBITRATION HEARING - SEPTEMBER 20, 2010

198

1   A.  **This is dealing with the sales side.**
2   Q.  Well, let me come back to my original question
3   on this e-mail here.  Is it not true that on the Bow
4   Pride, at least as of September 3rd, Tricon would be
5   supplying close to 5,000 metric tons of mixed xylene,
6   1600 of it at 1235 a metric ton and 3400 at the
7   September price?
8   A.  **Again, I guess I'm not understanding your**
9   **question.**
10  Q.  Well, according to Tricon Exhibit 20, the
11  e-mail from Mr. Chang, does it not say that on the Bow
12  Pride -- that's a ship.  Correct?
13  A.  **That's correct.**
14  Q.  Parcel 1, I just rounded up to 1600 so I don't
15  have to read all the numbers, but it's close to
16  1600 metric tons to be sold at 1235 a metric ton.
17  Correct?
18  A.  **That's right.**
19  Q.  And then 3400 metric tons to be sold at the
20  September price.  Correct?
21  A.  **That's correct.**
22  Q.  The two of those together add up to close to
23  5,000 metric tons?
24  A.  **That's correct.**
25  Q.  Okay.

199

1   A.  **And what's the question?**
2   Q.  That was the question.
3   A.  **Okay.  I just didn't understand the point.**
4   Q.  Now -- okay.  I hate to make you switch to
5   another binder, but now we're going to go to Vinmar
6   Exhibit Binder number -- and it's going to be
7   Exhibit 23.
8       Now, did the ship that was nominated to
9   deliver product to KP Chem, did that change from the Bow
10  Pride to the Crystal Sambu?
11  A.  **I believe so, yes.**
12  Q.  Okay.  Now, the -- Vinmar Exhibit 23 is a
13  series of e-mails again between folks at Tricon and
14  people at KP Chem.  Right?
15  A.  **Exhibit 23?**
16  Q.  Yes, sir.
17  A.  **Yes, it is.**
18  Q.  Okay.  And if you'll look at Page 4 of 6,
19  which is TRI 2588.
20      JUDGE BENTON:  2596?
21      MR. LEE:  TRI 2588, which is Page 4 of 6.
22      JUDGE BENTON:  Got it.
23  Q.  (BY MR. LEE)  The e-mail at the bottom of that
24  page is from someone at KP Chem to Gigi Ren and others,
25  including you, at Tricon.  Right?

200

1   A.  **That's correct.**
2   Q.  Now, this is October 1, 2008.  Right?
3   A.  **That's correct.**
4   Q.  And it says, "Re:  Vessel nomination for the
5   5 KT of MX."  Right?
6   A.  **That's correct.**
7   Q.  Now, this is again the 5 KT of MX that is
8   being supplied to KP Chem under the CFR designation that
9   was made in August.  Correct?
10  A.  **That's correct.**
11  Q.  All right.  And so now what KP Chem says is --
12  to Tricon, "Regarding your vessel nomination, I'd like
13  to check unit price and quantity for each shipment."
14  Correct?
15  A.  **That's correct.**
16  Q.  "As I know, shipments should be separated as
17  below."  You see that?
18  A.  **Okay.**
19  Q.  Then it says, "Spot 1600 metric tons at 12 --
20  at 1235 a metric ton."
21  A.  **That's correct.**
22  Q.  "And then 3400 metric tons at this September
23  price."  Correct?
24  A.  **That's correct.**
25  Q.  That's 5,000 metric tons?

201

1   A.  **That's correct.**
2   Q.  And at the top of that page, Gigi at Tricon
3   confirmed both the unit price and the quantity.
4   Correct?
5   A.  **I don't see the unit price for the September.**
6   Q.  It says at the top, "We are pleased to confirm
7   below unit price and quantity."
8   A.  **Right.  I understand.  I don't see the FOB**
9   **Korea price mentioned anywhere.**
10  Q.  Okay.  Well, she's certainly confirming that
11  1600 metric tons are to be delivered at 1235 a metric
12  ton.  Right?
13  A.  **That's correct.**
14  Q.  And that the other 3,400 metric tons are going
15  to be delivered at the FOB Korea monthly average?
16  A.  **That's correct.**
17  Q.  All right.  And you agreed to that.  Correct?
18  A.  **That's correct.**
19  Q.  And that's, in fact, what was delivered to
20  KP Chem.  Correct?
21  A.  **I believe so, yes.**
22  Q.  So there was 3400 metric tons delivered at the
23  contract price and 1600 metric tons delivered at the
24  1235 a metric ton?
25  A.  **Which was the buy-sell price we had agreed to.**

**51 (Pages 198 to 201)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

202

1    Q.  Now, if you look at Joint Exhibit 27.
2        JUDGE BENTON:  Joint 27?
3        MR. LEE:  Joint 27.
4    Q.  (BY MR. LEE)  Now, this is the invoice that
5 Tricon sent to KP Chem for the delivery of the contract
6 slip?
7    A.  That's correct.
8    Q.  And just so that we're clear on this, the --
9 where it says, "Sold To: Lotte Bussan," that was an
10 agent of -- receiving agent for KP Chem?
11   A.  No.  That's the parent company, I guess their
12 name Lotte.  It's part of the parent company so it's the
13 same company.
14   Q.  All right.  It's the same company.  The name
15 is different but it's all the same?
16   A.  That's correct.
17   Q.  Okay.  And so this is -- now, we saw on the
18 prior e-mail it was 4300 metric tons.  What was actually
19 delivered was the 3230.  Correct?
20   A.  Okay.
21   Q.  Which is the -- you can do the math if you
22 want.  I've got a calculator, but it's the 5 percent --
23 it's 3400 less 5 percent?
24   A.  Okay.
25   Q.  Is that what your understanding is?

203

1    A.  I don't have a calculator but that seems
2 right.
3    Q.  And that was priced at 995.50?
4    A.  That's correct.
5    Q.  For a total of 3,215,465?
6    A.  That's correct.
7    Q.  That's what Vinmar -- I mean Tricon was paid
8 for the 3200 -- 3230 metric tons that were delivered to
9 KP Chem?
10   A.  That's correct.
11   Q.  Now, we don't have the invoice for the
12 delivery of the other 1600 metric tons, but it was
13 delivered.  Correct?
14   A.  That's correct.
15   Q.  And the delivery price was 1235 a metric ton?
16   A.  That was the buy-sell price, yes.
17   Q.  Okay.  And the -- we can do the math.  I can
18 give you a calculator, but if you do 1600 metric tons
19 times 1235 a metric ton, you get 1,976,000?
20   A.  Okay.
21   Q.  You think that's right?
22   A.  I -- like I said, the buy-sell price earlier
23 is immaterial.  It could be $1.  It wouldn't really
24 matter.
25   Q.  Well, but the fact is that there is an e-mail

204

1 and you've already told me that, in fact, Tricon
2 delivered 1600 metric tons of MX to KP Chem at the price
3 of $1235 a metric ton.  Right?
4    A.  Which we also bought from KP at the same
5 price.  That's why I'm saying it doesn't matter what
6 price you chose.  If they were willing to sell us at a
7 dollar a metric ton earlier, then we have to return it
8 at a dollar a metric ton.  If they wanted --
9    Q.  Where is that documentation?
10   A.  It was not -- it is not part of this deal.
11   Q.  We don't have any documentation showing that
12 there was, in fact, an agreement that they would buy it
13 back from you at the same price that you sold it?
14   A.  No.  We took delivery prior to the Vinmar deal
15 ever being done.
16   Q.  Took delivery of what?
17   A.  The sale side from KP to Tricon.  This is
18 returning the cargo at the same price.
19   Q.  But we don't have those documents, do we?
20   A.  I'm not sure whether the lawyers passed it to
21 you.
22   Q.  You haven't seen it in any of the documents
23 that you've looked at in preparing for this hearing,
24 have you?
25   A.  Not today, no.

205

1    Q.  Well, in preparing for the hearing, have you
2 seen those documents?
3    A.  Well, of course.  I was the one that did the
4 agreement of the buy-sell.
5    Q.  Have you seen them in any of the exhibits?
6    A.  I haven't looked for them.  No.
7    Q.  Didn't Tricon buy 5,000 metric tons of mixed
8 xylenes from J & J Chemical or Chemtrading on
9 September 22nd, 2008?
10   A.  That's correct.
11   Q.  And that's Joint Exhibit 24.  Right?
12   A.  That's correct.
13   Q.  Now, this agreement with J & J Chemtrading was
14 at least seven days after the date -- the latest date
15 that Tricon could have purchased MX to supply the
16 alleged deal with Vinmar.  Right?
17   A.  I wasn't supplying Vinmar at this point.  I
18 was supplying KP.
19   Q.  That wasn't my question.  My -- I think my
20 question is pretty simple, Mr. Lockwood.  Isn't
21 September 22nd, 2008, seven days later than the very
22 last day that Tricon could have purchased MX to supply
23 to Vinmar under the alleged deal?
24   A.  Sure.
25   Q.  Okay.  This purchase from J & J Chemtrading on

**52 (Pages 202 to 205)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

206

1  September 22nd, 2008, the 5,000 metric tons of MX mixed
2  xylenes that Tricon bought from J & J Chemtrading was
3  actually delivered to KP Chem. Correct?
4      **A. Yes, it was.**
5      Q. And 3400 of those metric tons was at the
6  995.50 price. The other 1600 metric tons was to supply
7  this 1235 metric ton price. Correct?
8      **A. That's correct.**
9      Q. Okay. So just to be clear about this then, on
10 the 22nd of September, you on behalf of Tricon entered
11 into a deal with J & J Chemtrading to obtain 5,000
12 metric tons?
13     **A. That's correct.**
14     Q. That you then turned around and supplied to
15 KP Chem under the -- what you claim is a replacement
16 sale in this case?
17     **A. That's correct.**
18     Q. Okay. And all 5,000 metric tons that you
19 purchased from J & J Chemtrading was delivered to
20 KP Chem?
21     **A. That's correct.**
22     Q. All right. And 3230 or 3400 -- we can look at
23 the documents, but it's that plus or 5 -- plus or minus
24 5 percent that we get hung up on, but it's basically
25 3400 metric tons was at one price and the remainder was

207

1  at the other price. Correct?
2      **A. That's correct.**
3      Q. And if you look at --
4          JUDGE BENTON: We're off the record.
5          (Recess from 2:12 p.m. to 2:25 p.m.)
6          JUDGE BENTON: All right. Let's proceed.
7          MR. LEE: Do you mind if I stand up? I
8  want to --
9          JUDGE BENTON: I don't mind --
10         MR. LEE: Thank you.
11         JUDGE BENTON: -- because I've got to
12 stand up from time to time just to keep my blood going.
13     Q. (BY MR. LEE) Okay. Mr. Lockwood, I want to
14 see if we can't get a couple of these things on the --
15 on the board. So we talked -- before we took a break,
16 we talked about Tricon's sale to KP Chem. Right?
17     **A. That's correct.**
18     Q. And what we saw was that the -- we had an
19 invoice for 3,230 metric tons at 995.50?
20     **A. That's correct.**
21     Q. Do you remember that?
22         Okay. So we did it at 995.50. Right?
23     **A. That's right.**
24     Q. And you can look at the invoice, but I'll
25 represent to you that the amount was 3,215,465. Does

208

1  that sound right?
2      **A. I trust your math so that's fine.**
3      Q. 3,215,465. Now, we know that -- we also saw
4  where another 1600 metric tons was sold at 1235 a metric
5  ton?
6          (Brief interruption.)
7          JUDGE BENTON: Hold on a second, Mr. Lee.
8  The witness --
9          MR. DIAZ-ARRASTIA: Yes, Your Honor. That
10 is Vuk Rajevac. And I just told him to please wait
11 outside.
12         JUDGE BENTON: He wasn't -- he hadn't been
13 in the room 30 seconds. Okay.
14         JUDGE WOOD: He was checking in.
15     Q. (BY MR. LEE) We also saw 1600 metric tons
16 were sold at 1235 a metric ton. Right?
17     **A. And generally we don't refer to as sold when**
18 **it's a buy-sell, but the price was 1235.**
19     Q. Okay. And do you think that it was
20 actually -- instead of the 1600 that you delivered it
21 was 1600 less 5 percent?
22     **A. I have no idea.**
23     Q. Okay. Well, we do know that the amount that
24 was bought from J & J was sent to KP Chem. Correct?
25     **A. Yes.**

209

1      Q. Okay. And I'll -- when we get to those
2  invoices, I'll tell you I think it's 1520 so I'm going
3  to --
4      **A. Okay.**
5      Q. So if you're all right -- so that's actually
6  less than the 1600. Right?
7      **A. That's correct.**
8      Q. And that price was 1235.
9      **A. What is --**
10     Q. Right?
11     **A. What is 1520 of 1600? Do you know the**
12 **percent? Is it minus 5?**
13     Q. It's minus 5 percent.
14     **A. Okay.**
15     Q. I'm happy to do the math or let you do it.
16     **A. I trust you.**
17     Q. And that -- if I --
18     **A. That makes sense because if you add the two**
19 **together it's 4750, so 5,000 minus 5 percent. That**
20 **makes sense.**
21     Q. If I do 1,520 times 1235, I get 1,877,200?
22     **A. Okay.**
23     Q. And would you agree with me that 1,877,200
24 plus 3,215,465 equals 5,092,665?
25     **A. That looks correct.**

**53 (Pages 206 to 209)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

210

1    Q.  Okay.  And so that's the almost 5,000 metric
2  tons of MX that were supplied to KP Chem in October.
3  Correct?
4    A.  That's correct.
5    Q.  And before we broke, we were talking about
6  J & J Chemtrading.  Tricon purchased 5,000 metric tons
7  from J & J Chemtrading on September 22nd, 2008, and all
8  of that volume was sent to KP Chem to supply the 3230
9  and the 1520?
10    A.  That's correct.
11    Q.  All right.  Okay.  So if we look at Vinmar
12  exhibit -- this is back in my Vinmar exhibit book.
13  Let's first take a look at Vinmar Exhibit 20.  That's an
14  invoice that J & J Chemtrading sent to Tricon.  Correct?
15    A.  That's correct.
16    Q.  And we see here that the party that actually
17  received the material was this Lotte International,
18  which is KP Chem?
19    A.  That's correct.
20    Q.  Okay.  And this is the first -- this is the
21  3,320 metric tons.  Right?
22    A.  That's correct.
23    Q.  That was supplied by Tricon.  You sold it to
24  KP Chem at 995.50?
25    A.  That's correct.

211

1    Q.  You actually purchased it from J & J
2  Chemtrading at 676.63 a metric ton.  Right?
3    A.  That's correct.
4    Q.  So if we do 3,230 metric tons at -- and that
5  was 676.63.  Right?
6    A.  676.63, that's correct.
7    Q.  For a total of 2,185,515.  Right?
8    A.  That's correct.
9        JUDGE DAVIDSON:  514.90 to be exact.
10      MR. LEE:  Correct.
11    Q.  (BY MR. LEE)  Do you mind if I round up,
12  Mr. Lockwood?
13    A.  No problem.
14    Q.  Okay.  So that's the purchase that Tricon made
15  from J & J for the first 3200 --
16    A.  That's correct.
17    Q.  -- 30 metric tons?
18        If you take a look at the next exhibit,
19  Vinmar Exhibit 21, this is yet another invoice from
20  J & J Chemtrading to Tricon.  This is for 570.042 metric
21  tons.  Correct?
22    A.  That's correct.
23    Q.  And this is part of that total 5,000 metric
24  tons that Tricon purchased from J & J.  Correct?
25    A.  That's correct.

212

1    Q.  And, again, this price was 676.63?
2    A.  That's correct.
3    Q.  And the invoice is 385 -- the invoice amount
4  is 385,707.52?
5    A.  That's correct.
6    Q.  Is that right?
7    A.  That's correct.
8    Q.  So that's 570.042 metric tons at again 676.63.
9  And this one was for 385,708 if we round up?
10    A.  That's fine.
11    Q.  Right?
12    A.  That's correct.
13    Q.  And then if we take a look at Tricon -- Vinmar
14  Exhibit No. 22, this is yet another invoice from J & J
15  Chemtrading to Tricon for the remaining balance of the
16  5,000 metric tons of mixed xylenes that Tricon had
17  purchased from J & J.  Correct?
18    A.  That's correct.
19    Q.  And that's -- this 950 metric tons was also
20  supplied to KP Chem?
21    A.  That's correct.
22    Q.  Okay.  And so if we -- so that was 950.010
23  metric tons.  And, again, that price is 676.63.
24  Correct?
25    A.  That's correct.

213

1    Q.  For a total of 642,805 if we round -- we're
2  going to round down this time.  Right?
3    A.  That's correct.
4    Q.  Okay.  So if we add -- this is what -- the
5  three of these would represent what Tricon paid J & J to
6  obtain the mixed xylenes that it supplied to KP Chem as
7  the replacement sale.  Right?
8    A.  That's correct.
9    Q.  So we take the 2,185,515 plus 385,708 plus
10  642,805, we get -- I get 3,214,028.  Would you like to
11  check that or does that sound right?
12    A.  That sounds fine.
13    Q.  Okay.  So you supplied it for $5 million.  You
14  paid 3.2 million.  Correct?
15    A.  That's correct.
16    Q.  That's a million -- that's a difference of
17  1,878,637?
18    A.  That looks correct.
19    Q.  Is that right?
20    A.  It looks correct, yes.
21    Q.  Okay.  That would be the amount that Tricon
22  realized on its sale to KP Chem and supplying it from
23  J & J Chemtrading.  Correct?
24    A.  That's correct.
25    Q.  Now, do these numbers look right to you?

**54  (Pages 210 to 213)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

214

1   A.  That's correct.
2       (Vinmar Exhibit 27 marked.)
3       MR. LEE:  I would offer this as Vinmar
4   Exhibit 27.
5       MR. DIAZ-ARRASTIA:  The panel -- the panel
6   has seen it so I guess we'll consider it, but I will
7   point out that the profit made on the replacement sale
8   is not the measure of damages.  It's totally irrelevant
9   to this case.
10      JUDGE BENTON:  Okay.  We understand.  And
11  I'm sure we'll hear --
12      MR. DIAZ-ARRASTIA:  But I understand the
13  panel has seen it and will consider it.
14      JUDGE BENTON:  Right.
15      MR. LEE:  Do you mind if I write Vinmar
16  Exhibit 27 or --
17      JUDGE BENTON:  Sure.  It's your exhibit.
18      MR. LEE:  Okay.
19  Q.  (BY MR. LEE)  Now, if we take the -- as I
20  understand the claim here, Tricon says it sold 5,000
21  metric tons of mixed xylenes to Vinmar at 1310 a metric
22  ton?
23  A.  That's correct.
24  Q.  And I believe that Mr. Matthews will testify
25  that he's going to increase the amount of mixed xylenes

215

1   by 5 percent?
2   A.  That's correct.
3   Q.  Now, I don't agree with that, okay, but I'm
4   going to -- we're going to use that number.
5   A.  Okay.
6   Q.  I just see what the numbers look like here.
7   So if we increase 5,000 metric tons by 5 percent, that's
8   another 250.  Right?
9   A.  Okay.
10  Q.  Is that right?
11  A.  It sounds right.
12  Q.  So I'm just going to put Vinmar over here so
13  you and I don't get in an argument about what I call the
14  chart so we're just going to call it Vinmar.  Okay?
15  A.  Sure.
16  Q.  And if we say 5,250 metric tons at the claim
17  price of 1310 a metric ton, that would have been -- and
18  we can do the math, but it's 6,877,500?
19  A.  Okay.
20  Q.  Is that --
21  A.  Sounds right.
22  Q.  Do you agree with that?
23  A.  I don't have a calculator but it looks right.
24  Q.  And Tricon would have had to purchase MX on or
25  before September 15th, 2008, to supply Vinmar.  Correct?

216

1   A.  That's correct.
2   Q.  And you looked at some MX pricing data from
3   Platts, I believe, earlier today.  And I think that is
4   Tricon Exhibit 32.
5   A.  Okay.
6   Q.  And it's your testimony that the -- Tricon
7   Exhibit 32 presents evidence of the market price for
8   mixed xylenes during the relevant time period?
9   A.  That's correct.
10  Q.  And we're going to look at dates I guess
11  really from -- the claim is that the deal was done on
12  July the 22nd, 2008.  Correct?
13  A.  That's correct.
14  Q.  And it's your testimony that if you were
15  feeling really risky you could have waited all the way
16  to September 15th, 2008, to buy the mixed xylenes to
17  supply the alleged contract.  Right?
18  A.  That's correct.
19  Q.  So if you want to look at prices from July
20  22nd, 2008, all the way to September 15th, 2008, I think
21  you will agree with me that the lowest price that is
22  shown on Tricon Exhibit 32 would be 957.50?
23  A.  Through the 15th?
24  Q.  Yes.
25  A.  957.50, that looks correct, yes.

217

1   Q.  Do you agree with that?
2   A.  That's correct.
3   Q.  That's the lowest possible market price for
4   mixed xylenes during the period of time that Tricon
5   would have had to act to supply Vinmar?
6   A.  That's correct.
7   Q.  So that's 957.50.  Correct?
8   A.  Correct.
9   Q.  So if you had purchased 5,250 metric tons to
10  supply Vinmar -- you had to buy it.  Right?
11  A.  Right.
12  Q.  And you had purchased it at the lowest
13  possible price during that period of time --
14  A.  Lowest published price.  There's a difference.
15  Q.  Okay.  Well, the lowest price that's available
16  to the panel, you've testified that these are
17  the records of market pricing of mixed xylenes?
18  A.  This is where Platts assesses the market at.
19  It's not necessarily what deals can be done.
20  Q.  Do you not agree with this data?
21  A.  I agree this is Platts data, no doubt, but I'm
22  saying deals don't necessarily transact at what they
23  assess the market at.
24  Q.  Is it your testimony that Tricon Exhibit 32
25  does not reflect the market price of mixed xylenes

55 (Pages 214 to 217)

ARBITRATION HEARING - SEPTEMBER 20, 2010

218

1  during the relevant time period?
2      A.  No.  This definitely reflects the market.
3      Q.  Okay.  So the --
4      A.  In theory I could have bought cheaper is all
5  I'm saying.
6      Q.  Well, the data that we have in front of us
7  reflects a market price -- the lowest possible market
8  price for mixed xylenes during this period of time at
9  957.50.  Correct?
10     A.  That's correct.
11     Q.  And so if Tricon had purchased mixed xylenes
12 to supply Vinmar -- and I'm going to give you the lowest
13 price.  According to the data you have, that would have
14 been 5,250 metric tons times 957.50.  Right?
15     A.  Uh-huh.
16     Q.  And I'll show you.  My calculator says that's
17 5,026.875.
18     A.  Okay.
19     Q.  Do you agree with that?
20     A.  Yes.
21     Q.  So if we just take what the sale price was
22 according to Tricon and we subtract what -- the
23 possibility of what it might cost to obtain the mixed
24 xylenes to supply here, we get a profit of -- or a
25 difference of 1,850,625?

219

1      A.  Okay.
2      Q.  Is that -- do you agree with that?
3      A.  I do.
4      Q.  And do you agree this is a possible -- this is
5  representative of a possible scenario that Tricon could
6  have employed to supply this alleged deal with Vinmar?
7      A.  Definitely possible.
8      Q.  Okay.  I would move for -- hang on.  Let me
9  figure out what number I'm on.
10         (Vinmar Exhibit 28 marked.)
11     MR. LEE:  I would move for admission of
12 this document as Vinmar Exhibit 28.
13     JUDGE BENTON:  Okay.
14     MR. DIAZ-ARRASTIA:  The panel has seen it
15 and will consider it, but it is an irrelevant issue.
16     JUDGE WOOD:  It's helpful to put that
17 number on these exhibits that have gone into the record.
18     MR. DIAZ-ARRASTIA:  Let me --
19     JUDGE WOOD:  It's helpful to put those
20 exhibit numbers on there.
21     JUDGE BENTON:  By the measure of
22 damages --
23     MR. DIAZ-ARRASTIA:  My point is that the
24 UCC tells us how you measure the damages in a situation
25 like this and it is not by comparing the profits.

220

1      JUDGE WOOD:  He's marking the sheets of
2  paper and we all see that --
3      MR. DIAZ-ARRASTIA:  I understand that.
4      JUDGE WOOD:  And that's helpful so we can
5  refer back to it later.
6      THE WITNESS:  Would the --
7      JUDGE BENTON:  Yes, sir.
8      THE WITNESS:  When he is done, would the
9  panel allow me to draw some things on a piece of paper
10 as well?
11     JUDGE DAVIDSON:  No, but I'll let you come
12 up --
13     JUDGE WOOD:  I think your lawyer --
14     JUDGE DAVIDSON:  I think we'll let you
15 have your own piece of paper that you can start with a
16 blank piece of paper and you can copy everything he
17 wrote and then you can write whatever you want on your
18 piece of paper.
19     THE WITNESS:  Just tell me when I'm --
20     JUDGE WOOD:  Your lawyer will let you do
21 it.
22     THE WITNESS:  Tell me when I'm allowed to
23 do that.
24     JUDGE DAVIDSON:  I shall.  We'll let --
25     JUDGE BENTON:  Mr. Diaz-Arrastia will lead

221

1  you to --
2      JUDGE WOOD:  He'll let you know.
3      JUDGE BENTON:  He'll guide you through.
4      JUDGE WOOD:  Okay.  We've got that marked.
5      MR. LEE:  Okay.  Thank you.
6      Q.  (BY MR. LEE)  And, Mr. Lockwood --
7      JUDGE BENTON:  What's that movie?
8  Everything that guy said, I disagree with.
9      JUDGE DAVIDSON:  No, no, that isn't what
10 the line from the movie was.
11     JUDGE BENTON:  Yeah.
12     MR. LEE:  Okay.  I watch that movie before
13 I try every case.  I love it.
14     JUDGE WOOD:  We love it.
15     JUDGE BENTON:  I got the line wrong, but
16 that's okay.
17     Q.  (BY MR. LEE)  So if we -- if we just compare
18 the numbers that we came up with on Vinmar Exhibit 27,
19 we've got a million 878,637.  Right?
20     A.  That's correct.
21     Q.  On the sale to KP Chem and the purchase from
22 J & J.
23         On what you've agreed is a representative
24 example of how Tricon could have supplied this alleged
25 deal, we show 1 million 850.  Correct?

56  (Pages 218 to 221)

ARBITRATION HEARING - SEPTEMBER 20, 2010

222

1    A.  That's correct.
2    Q.  Okay.  So this number on Exhibit 27 is greater
3    than the number on Exhibit 28.  Correct?
4    A.  Correct.
5         MR. LEE:  Pass the witness.
6         JUDGE BENTON:  Mr. Diaz-Arrastia?
7         MR. DIAZ-ARRASTIA:  Thank you.
8         JUDGE BENTON:  Any redirect?
9         MR. DIAZ-ARRASTIA:  Yes, there is, brief.
10         REDIRECT EXAMINATION (2:45 p.m.)
11    BY MR. DIAZ-ARRASTIA:
12    Q.  Mr. Lockwood, first let me ask you this.  The
13    KP Chem sale, was that pursuant to a long-term contract?
14    A.  The September FOB Korea average?
15    Q.  Yes.
16    A.  Yes, it was.
17    Q.  And that was a contract where Tricon had the
18    option to compel KP to purchase.  Correct?
19    A.  That's correct.
20    Q.  Okay.  And I think you testified earlier that
21    given the conditions on the market Tricon could have
22    easily supplied both the KP contract and the Vinmar
23    contract?
24    A.  As many sales as I could make I could find
25    product to cover it.

223

1    Q.  If Vinmar had performed on this contract,
2    would Tricon have been able to make both the KP sale and
3    the Vinmar sale?
4    A.  Definitely, and that's what I wanted to be
5    able to have the opportunity to write on a piece of
6    paper.
7    Q.  Okay.  And you'll get that opportunity in a
8    moment, but if I could approach the panel.  What that
9    means -- the board.  What that means is that if Vinmar
10    had performed on its contract Tricon would have made
11    both the 1.878 million dollars that it made with KP and
12    the 1.85625 that it could have made on the Vinmar sale
13    under a potential scenario if they had performed?
14    A.  That's correct.
15    Q.  Okay.  Now, you wanted to write something on
16    the board and I'm not sure what that was, but I'll
17    invite you to do that.
18         THE WITNESS:  Okay.  Could I borrow your
19    calculator?  Does anybody --
20         JUDGE WOOD:  But not -- as Judge Davidson
21    said, not on that piece of paper.
22         JUDGE DAVIDSON:  Not on their board.  He
23    can start with a fresh piece of paper and write anything
24    he wants.
25         THE WITNESS:  Do you have a calculator I

224

1    can borrow?
2         JUDGE WOOD:  I've got one.
3         MR. DIAZ-ARRASTIA:  You know, my --
4         JUDGE WOOD:  No.  I've got one if I have
5    it with me.
6         MR. DIAZ-ARRASTIA:  The BlackBerry has a
7    calculator.  I'll be happy to run the numbers.
8         JUDGE WOOD:  And I think it will turn on
9    when you punch a button or something.
10         THE WITNESS:  Okay.  Thank you.
11         JUDGE BENTON:  Yeah.  Don't write on --
12         THE WITNESS:  I'm not going to write on
13    that one.  Don't worry.
14         What your -- what my counsel was saying I
15    think is exactly correct.  The one thing that I would
16    point out is that you can't consider the 1235 price
17    because, like I said, it could have been one dollar a
18    metric ton.
19         So the fact that I was only able to
20    deliver 3230 at 995 and a half, I think what we have to
21    do is say 3230 at 995 and a half, subtract the 3230 I
22    bought from J & J at 676.63.  995.5 minus 676.3 times
23    3230 equals 1,031,016.
24         Then, as my counsel suggested, if Vinmar
25    had performed, 1310 per metric ton minus 5250 at 957.50,

225

1    so 1310 minus 99 -- or excuse me.  1310 minus 957.5
2    times 5,250, 1,850,625.
3         Adding that to the number up above plus
4    1,031,016, what my counsel was saying was accurate
5    except for the fact that I don't think it's fair to
6    include the buy-sell because had I included the buy-sell
7    it could have been at one million dollars a metric ton,
8    which would greatly overstate the damages.  Or if I had
9    bought it at -- if I had sold it at $1 a metric ton, the
10    damages would be a lot more.
11         So the point is you can only really
12    consider what I was able to deliver against the contract
13    price versus what I bought.  Here's how much I could
14    have made in addition to this amount right here had
15    Vinmar performed.  So you add the two together.  It's
16    2,881,641 that could have been possibly made.  Thank you
17    very much.
18    Q.  (BY MR. DIAZ-ARRASTIA)  And, Mr. Lockwood, we
19    talked a lot about KP's request or demand for a
20    reduction of their volume?
21    A.  That's correct.
22    Q.  Now, you have seen the damage calculation of
23    Chuck Matthews prepared, have you not?
24    A.  That's correct.
25    Q.  And that's in the report that Mr. Matthews --

57 (Pages 222 to 225)