226

1  that's what we submitted to the panel and he can talk
2  about it later in this hearing.  Do you know what was
3  the effect on the measure of damages for Tricon of the
4  reduction of the KP volume?
5  **A.  It hurt very bad.**
6  Q.  Okay.  It reduced the damages.  Correct, sir?
7  **A.  You're saying --**
8  Q.  Because KP Chemicals did not take the 5,000
9  they were obligated to take under the contract, did that
10  increase or decrease our measure of damages in this
11  case?  It decreased it, did it not?
12  **A.  Can you rephrase the question?  I'm sorry.**
13  Q.  My question to you was, what was the
14  consequence on the damages measured by Mr. Matthews for
15  Tricon in this case of the fact that KP only took 3220
16  metric tons?
17  **A.  Yeah.  That hurt.  That hurt Tricon, yeah.**
18  Q.  It reduced the damages that we could claim?
19  **A.  That's correct.**
20  JUDGE DAVIDSON:  Well, wait a minute.  If
21  it reduced the damages you can claim, then it helped
22  Tricon.
23  JUDGE WOOD:  No.  It helped Vinmar.
24  MR. DIAZ-ARRASTIA:  No.  If -- no, no.  If
25  KP had taken the entire 5,000 our measure of damages

227

1  calculation would have been a larger number.
2  JUDGE DAVIDSON:  Right, because your
3  damages weren't as great.
4  MS. LARSON:  No, but we would have made
5  both sets.
6  MR. DIAZ-ARRASTIA:  No, but we would have
7  made both sets.
8  JUDGE DAVIDSON:  Okay.
9  MR. DIAZ-ARRASTIA:  You'll see that when
10  Mr. Matthews testifies.
11  Q.  (BY MR. DIAZ-ARRASTIA)  Could you -- let's
12  take a look at Vinmar 23.  And let's see.  Let's go down
13  a little bit.  Right there.  A couple of pages further.
14  At this point here.
15  JUDGE DAVIDSON:  What exhibit?
16  MR. DIAZ-ARRASTIA:  Vinmar 23.
17  Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Mr. Lockwood,
18  looking at Vinmar 23, Mr. Lee asked you a lot of
19  questions about this specific with regard to the 1600
20  metric tons?
21  **A.  That's correct.**
22  Q.  Okay.  And the price for those 1600 metric
23  tons were 1235 per metric ton.  Correct?
24  **A.  That's correct.**
25  Q.  And your testimony has been that that was a

228

1  buy-sell?
2  **A.  That is correct.**
3  Q.  And that is why it does reflect an accurate
4  market price?
5  **A.  That's correct.**
6  Q.  Okay.  It also says that that's a spot deal.
7  Correct?
8  **A.  That's what his word was, yes.**
9  Q.  And can you tell me, when was the deal, the
10  sale involving those 1600 metric tons?
11  **A.  Prior to the Vinmar transaction.**
12  Q.  Okay.  Which is the reason why the price was
13  high?
14  **A.  That's right.**
15  Q.  Go to Joint Exhibit 21.  It's the --
16  JUDGE WOOD:  21?
17  MR. DIAZ-ARRASTIA:  Joint Exhibit 21.
18  Q.  (BY MR. DIAZ-ARRASTIA)  And Mr. Lee made --
19  asked you questions about Joint Exhibit 22 and just
20  where -- I think that's correct if I'm looking at the
21  correct right book.  Yeah.
22  Mr. Lee also asked you questions about
23  Joint Exhibit 22 where -- is where you notified KP that
24  you were going to sell them their 5,000 metric tons in
25  the month of September?

229

1  **A.  That's correct.**
2  Q.  But, now, Joint Exhibit -- Mr. Lee asked
3  you whether Vinmar had been given a copy of that and
4  they had not.  Correct?
5  **A.  That's what he said, yes.**
6  Q.  Now, Joint Exhibit 23 is where Mr. Rajevac
7  tells Mr. Wilson that if they don't perform the material
8  will be resold on the open market?
9  **A.  That's correct.**
10  Q.  That is notice of intent to resell.  Correct?
11  **A.  That is correct.**
12  Q.  And if we scroll up to the e-mail that you
13  sent to Mr. Antonvich later that same day, you again
14  tell Mr. Antonvich that if Vinmar does not perform
15  Tricon intends to resell.
16  **A.  That's correct.**
17  Q.  And these e-mails were sent to Vinmar?
18  **A.  That's correct.**
19  Q.  Go to Joint Exhibit No. 10, please.  And if --
20  let's go to the page that is MOAB 13.  These are instant
21  messages between you and Mr. Leyman?
22  **A.  That's correct.**
23  Q.  And since this is indicated as a MOAB
24  document, is it your understanding that that's a
25  document that was produced by Mr. Leyman?



PLAINTIFF'S EXHIBIT Q (Part 5)

DepoTexas
888.893.3767

ARBITRATION HEARING - SEPTEMBER 20, 2010

230

1     A.  Yes.
2     Q.  So these are his records?
3     A.  That's correct.
4     Q.  Okay.  Take a look at 1:15:27 p.m.
5         MR. DIAZ-ARRASTIA:  Can you focus in on
6  that, please?
7     A.  What exhibit -- what exhibit are we on?
8     Q.  (BY MR. DIAZ-ARRASTIA)  It is Joint Exhibit
9  No. 10, Page MOAB 13 --
10    A.  Okay.
11    Q.  -- which is just a few pages in.
12    A.  Okay.
13    Q.  1:15:27 p.m.
14    A.  That's correct.
15    Q.  Can you see where Mr. Leyman is telling you,
16  "You have a problem with Vinmar"?
17    A.  Yes.
18    Q.  Is this where Mr. Wilson -- where Mr. Leyman
19  told you that Mr. Wilson had informed him that he
20  required U.S. origin?
21    A.  That's correct.
22    Q.  Okay.  Now, Mr. Leyman's office is in
23  Connecticut.  Correct?
24    A.  That's correct.
25    Q.  So his IM records would reflect eastern time.

231

1  Correct?
2     A.  That's correct.
3     Q.  Okay.  Now, let's look at Joint Exhibit
4  No. 15.  And this is where we have an e-mail that
5  Mr. Wilson is telling Mr. Rajevac, "We must have" -- no,
6  that's not the one I want.  Excuse me.
7         MR. DIAZ-ARRASTIA:  Which is the one --
8  no.  I'm looking for the one where Laurentiu forwards
9  Wilson --
10        THE WITNESS:  Exhibit 13?
11        MR. DIAZ-ARRASTIA:  Hold on a second.  No,
12  this isn't the one.
13        (Brief discussion off the record.)
14        MR. DIAZ-ARRASTIA:  Excuse me a moment.
15  I'm looking for another exhibit.
16    Q.  (BY MR. DIAZ-ARRASTIA)  That's right.  Joint
17  Exhibit 13.  Excuse me.  And this is the e-mail where
18  Mr. Rajevac tells Mr. Pascu that Asian origin might be
19  supplied.  Correct?
20    A.  Which e-mail are you referring to?
21    Q.  Joint Exhibit No. 13.  No, this isn't it
22  either.
23    A.  That's not it.
24    Q.  Where is that?  Oh, here it is.  It's Joint
25  Exhibit 14.  I apologize.  I apologize.  It's Joint

232

1  Exhibit No. 14.  And that is the e-mail -- that is the
2  e-mail where Mr. Rajevac informs Mr. Pascu that Asian
3  origin might be supplied?
4     A.  I think you're wrong again.  I think it's 15.
5     Q.  No.  It's -- no.  It's 14?
6         MS. LARSON:  No. 3.
7     A.  14?
8     Q.  (BY MR. DIAZ-ARRASTIA)  14.
9     A.  Vinmar what at the bottom?
10    Q.  Right.  Vuk Rajevac to Laurentiu Pascu on
11  July 29th, 2008.  Are you in the Joint Exhibit book?
12    A.  Okay.  Yeah, I'm in the Joint Exhibit book.
13    Q.  Okay.
14    A.  On No. 009 at the bottom?
15    Q.  009 at the bottom.
16    A.  Okay.  Yes.  I'm on No. 3 at the bottom.
17    Q.  That's right.
18    A.  Okay.  I see it.
19    Q.  Okay.  You see that.  And during Mr. Lee's
20  questioning, he pointed out that on top of that there is
21  an e-mail from Mr. Pascu to Mr. Wilson forwarding
22  Mr. Rajevac's e-mail?
23    A.  That's correct.
24    Q.  And I think your testimony was that we do not
25  know when Mr. Rajevac -- when Mr. Pascu would have

233

1  informed Wilson of Pascu's comments?
2     A.  That's correct.
3     Q.  Let me ask you something, Mr. Lockwood.  If
4  the operations specialist learned of something that was
5  considered a critical term of your deal, how long should
6  it take for them to report that to the trader?
7         MR. LEE:  Objection.  Calls for
8  speculation.
9         JUDGE BENTON:  It's overruled.
10    Q.  (BY MR. DIAZ-ARRASTIA)  What do you do -- what
11  do you do within Tricon?
12    A.  Within two seconds.
13    Q.  Okay.  And let me point out to you the e-mail
14  to -- Mr. Pascu sent to Mr. Wilson.  Let's look at the
15  date on that.  It was July 31st, 2008, at 1:39 p.m.
16  Correct?
17    A.  That's correct.
18    Q.  Now, at 1:00 -- and that would be central time
19  because both Vinmar and Tricon are located in Houston.
20  Right?
21    A.  That's correct.
22    Q.  If we go back to Joint Exhibit 10, MOAB 13,
23  where we were earlier, Mr. Leyman is telling you that
24  you have a problem regarding origin at 1:15:27 p.m.
25  eastern time --

**59  (Pages 230 to 233)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

234

1    **A.  That's correct.**
2    Q.  -- on the same day?
3    **A.  That's correct.**
4    Q.  So Mr. Wilson had told Mr. Leyman that he
5    wanted U.S. origin and Mr. Leyman had told it to you
6    about an hour and 15 minutes before Mr. Pascu forwarded
7    Mr. Rajevac's e-mail to Mr. Wilson?
8    **A.  That's very surprising that you point that**
9    **out, but, yes, you're correct.**
10   Q.  So there's no way that Mr. Wilson first found
11   out about Mr. Rajevac's communication at 1:39 p.m.
12   central time on July 31st?
13   **A.  You're exactly right.**
14         **(The time is 3:03 p.m.)**
15         **MR. DIAZ-ARRASTIA:  I pass the witness.**
16         JUDGE BENTON:  Mr. Lee, anything else for
17   Mr. Lockwood?
18         MR. LEE:  I don't think so.
19         JUDGE BENTON:  Okay.  You may step down,
20   Mr. Lockwood.
21         Call your next witness, Mr. Diaz-Arrastia.
22         MR. DIAZ-ARRASTIA:  The next witness is
23   going to be Ed Leyman who will be presented through
24   video.
25         JUDGE BENTON:  Okay.  How long is that?

235

1          MR. DIAZ-ARRASTIA:  It's an hour and two
2    minutes.
3          JUDGE BENTON:  Okay.  Let's see here.
4          JUDGE DAVIDSON:  Why don't we watch it for
5    a half an hour since we're used to watching television
6    in half-hour segments and then take a break and then
7    watch the last part.
8          MR. DIAZ-ARRASTIA:  And something to
9    inform the panel.  We ended up with different exhibit
10   numbers in the depositions than in the books that we
11   have been referring to so far.
12         What we have tried to do to resolve that
13   is you also have a book in front of you that has each
14   deposition transcript with the exhibits attached as
15   numbered in the depositions.  So if you would follow in
16   that, that would help.  Have y'all -- have y'all found
17   that?
18         JUDGE BENTON:  That's nice to know.
19         MR. LEE:  I don't think we need to take --
20         JUDGE BENTON:  About a half hour.
21         MR. LEE:  -- have her take it down.  Do
22   we?
23         MR. DIAZ-ARRASTIA:  Well, we have a
24   transcript.
25         JUDGE WOOD:  So the A's have the -- one on

236

1    the witness and it has the exhibit numbers behind it?
2          MR. DIAZ-ARRASTIA:  Correct.  The --
3          JUDGE WOOD:  These have the second
4    witness --
5          MR. DIAZ-ARRASTIA:  That's correct.
6          JUDGE WOOD:  -- and it has the exhibits
7    behind it.
8          MR. DIAZ-ARRASTIA:  There will be three
9    witnesses who will be presented by video.
10         JUDGE BENTON:  Okay.
11         MR. DIAZ-ARRASTIA:  A should be
12   Mr. Leyman's deposition and you'll have both the
13   transcript of the deposition I think with the cuts
14   marked in it and then the exhibits will be numbered as
15   they were referred to in the deposition.
16         JUDGE BENTON:  Okay.
17         MR. LEE:  And if I could make one other
18   comment about the depositions.  What we have done is we
19   exchanged designations and agreed that it would be a lot
20   easier for everyone involved if we just play it all the
21   way through from beginning to end so this would include
22   our offer of Mr. Leyman's testimony as well.
23         MR. DIAZ-ARRASTIA:  That is correct.
24         MR. LEE:  I think we've got it all right.
25   There may be a glitch here and there, but I think

237

1    that --
2          MR. DIAZ-ARRASTIA:  We -- mistakes can
3    always be made, but they have been reviewed by several
4    eyes.
5          MR. LEE:  Yes.  And we took out the
6    objections.  I don't know that it makes a whole lot of
7    sense for us to interrupt for objections.  I think that
8    the panel is all experienced lawyers and judges and
9    understands --
10         JUDGE WOOD:  Thank y'all so much.
11         MR. LEE:  I don't think you need to take
12   it down.  We have --
13         JUDGE DAVIDSON:  We have this.
14         JUDGE WOOD:  Sometimes the reporters like
15   to go ahead and take it down if they're going to have to
16   type it later and it just depends on your preference.
17   Because if you have to prepare this, you will have to
18   include this.
19         JUDGE DAVIDSON:  Yeah, but if you have --
20   if this is on a disk, all you've got to give her is the
21   disk and she can go --
22         JUDGE WOOD:  This is true.
23         JUDGE DAVIDSON:  -- copy, paste, insert.
24         MR. LEE:  Yeah.
25         THE REPORTER:  It's up to y'all.

**60  (Pages 234 to 237)**

238

1    MR. DIAZ-ARRASTIA: It is not necessary
2  for you to write it down.
3    (At this time the edited version of the
4  videotaped deposition of Richard Leyman that was
5  originally taken on April 29, 2010, was played in the
6  arbitration. The court reporter at the arbitration
7  reported such proceedings and this is her transcription
8  of same.)
9    MR. LEE: George, before you get started,
10 I have just an objection for the record.
11    Vinmar is participating in this deposition
12 subject to and without waiver of its continuing
13 objection to Triple A's jurisdiction in this case. As
14 we've made it clear, we don't think there's an
15 arbitration agreement, but -- so our participation is
16 subject to and without waiver of that objection.
17    RICHARD LEYMAN,
18  having been first duly sworn, testified as follows:
19    EXAMINATION
20 BY MR. DIAZ-ARRASTIA:
21    Q.  Could you state your full name for the record,
22 please?
23    A.  It's Edward Leyman.
24    Q.  Okay.  Mr. Leyman, I am George Diaz-Arrastia.
25 I am the lawyer that represents Tricon in this case.

239

1  Now, have you and I ever met before today?
2    A.  No.
3    Q.  Have we ever had any conversations?
4    A.  No.
5    Q.  I think that you have had one telephone
6  conversation with a lawyer in my office called Christi
7  Guerrini.  Do you recall that?
8    A.  I believe so.  I'm not sure.  I think she
9  called to see -- well, let me rephrase that.  No, I
10 don't really --
11    Q.  Do you --
12    A.  I really don't remember her calling, but I
13 assume she did because she made contact with John.
14    Q.  Okay.  Have you ever spoken with Mr. Lee?
15    A.  No.
16    Q.  Have you ever spoken with anyone in his
17 office?
18    A.  No.
19    Q.  Sir, how long have you been employed by MOAB,
20 Inc.?
21    A.  I've been associated with MOAB for
22 approximately six years.
23    Q.  You say you're associated with MOAB.  What's
24 the nature of that association?
25    A.  I have my own company, and it's associated

240

1  with MOAB Oil.
2    Q.  Your company has a contract with MOAB Oil?
3    A.  Yes.
4    Q.  And basically it involves that you broker
5  deals and you get commissions, that sort of thing?
6    A.  Yes.  And they provide telephone service,
7  computer service, administrative service.
8    Q.  How would you describe what you do with MOAB?
9    A.  Brokering is bringing a buyer and seller
10 together.  My area of specialty is petrochemicals and
11 gasoline blend stocks.  There are other people in MOAB
12 that do other products.  I speak to potential buyers,
13 potential sellers, and then negotiate an agreement where
14 one purchases a product from the other.
15    Q.  Okay.  It would be fair to say that what you
16 do -- your mode of employment is that you broker deals
17 in petrochemicals and gas blend stocks?
18    A.  Yes.
19    Q.  And how long have you been doing that, sir?
20    A.  I've been doing it for over 20 years.
21    Q.  And before that July 22nd, 2008, deal, had you
22 brokered deals with Tricon before?
23    A.  Yes.
24    Q.  Many?  A few?
25    A.  I don't know how to best answer that.

241

1    Q.  Okay.  Had you also brokered deals with
2  Vinmar?
3    A.  Yes.
4    Q.  With what --
5    A.  My answer -- I guess a less frequent number of
6  deals with Vinmar than with Tricon.
7    Q.  Okay.  Before July 22, 2008, did you know Brad
8  Lockwood?
9    A.  Yes.
10    Q.  Did you also know Rick Wilson before --
11    A.  Yes.
12    Q.  -- July 22, 2008?
13    Had you brokered deals with both of them
14 before July 22, 2008?
15    A.  Yes.
16    Q.  And I guess the way that you knew them is
17 through brokering deals.  Would that be correct?
18    A.  Yes.
19    Q.  It was not a personal friendship?  You knew
20 them in your business?
21    A.  Yes.
22    Q.  And what is your educational background, sir?
23 How far did you get in school?
24    A.  I have a degree in chemical engineering and an
25 MBA in marketing.

61  (Pages 238 to 241)

242

1    Q. And when did you get your chem-E degree?
2    **A. 1967.**
3    Q. Where did you get it?
4    **A. New York University School of Engineering.**
5    Q. And your MBA, when did you get that?
6    **A. Approximately 1972.**
7    Q. And what institution granted it?
8    **A. And it was Iona College.**
9    Q. Sir, is there a -- is it common or customary
10   in your industry for the parties in a commodity
11   transaction of this kind, like mixed xylene, not to
12   speak directly with each other, but to have their
13   communications happen through a broker such as yourself?
14   **A. Both are common. Some companies deal directly**
15   **with each other. Others deal through brokers.**
16   Q. When a broker is involved in the transaction,
17   is it common for the communications to always be through
18   the broker instead of directly between the buyer and
19   seller?
20   **A. Yes.**
21   Q. Is that what happened in the transaction
22   regarding mixed xylene on July 22nd, 2008, between
23   Vinmar and Tricon?
24   **A. Yes. When the deal was negotiated on**
25   **July 22nd, I was speaking to both parties and, to my**

243

1    knowledge, they were not speaking to each other.
2    Q. In a transaction where the parties do not
3    speak to each other but speak only through the broker,
4    does the broker then communicate the terms of the deal
5    to each of the parties?
6    **A. Yes.**
7    Q. And does the broker have authority from each
8    of the parties to do that?
9    **A. Yes.**
10   Q. In the July 22nd, 2008, transaction between
11   Tricon and Vinmar, did you have authority from Rick
12   Wilson and Vinmar to communicate with Tricon and Brad
13   Lockwood?
14   **A. Yes.**
15   Q. How did you get that authority?
16   **A. Mr. Wilson gave me a firm bid over the phone**
17   **to purchase the mixed xylenes.**
18   Q. So it was given to you over the telephone?
19   **A. Yes.**
20   Q. And when you say that Mr. Wilson gave you a
21   firm bid, what does that mean?
22   **A. He specified the product, the price, the**
23   **quality, the timing of what he was looking to purchase,**
24   **and all those commercial terms were incorporated in a**
25   **firm bid, which I then called and showed to Brad**

244

1    Lockwood at Tricon.
2    Q. Okay. I guess what I'm trying to find out is
3    what is -- what do you mean when you use the words "firm
4    bid"?
5    **A. That means it is a commitment in this case by**
6    **the buyer. It's not an indication. In the brokering**
7    **business, you can get an indication, which is just, as**
8    **stated, an indication. I'd like to buy this product at**
9    **this price, but there's no firm commitment to do so. A**
10   **firm bid is that firm commitment to do so.**
11   Q. So it would be fair to say that a firm bid is,
12   "If these terms are met, we have a deal"?
13   **A. Yes.**
14   Q. Did Rick Wilson give you authority to
15   communicate that firm bid to Brad Lockwood at Tricon?
16   **A. Yes.**
17   Q. And he gave that to you over the telephone?
18   **A. Yes.**
19   Q. And did you also have authority from Brad
20   Lockwood and Tricon to communicate with Rick Wilson --
21   **A. Yes.**
22   Q. -- at Vinmar?
23        And how did Brad give you that authority?
24   **A. Brad gave me a firm offer on mixed xylenes,**
25   **again specifying quantity, quality, delivery time,**

245

1    price.
2    Q. Was this firm offer in response to the firm
3    bid?
4    **A. No. I think the offer came first, and then**
5    **the bid was the reply to it.**
6    Q. Okay. And did Mr. Lockwood also communicate
7    this authority to you over the telephone?
8    **A. Yes.**
9    Q. And you had authority from Mr. Lockwood to
10   make this firm offer?
11   **A. Yes.**
12   Q. And that is a -- is that normal and typical
13   way that you do business?
14   **A. Yes.**
15   Q. Does that, in general, describe the way you do
16   business in all of the transactions you have done here
17   at MOAB?
18   **A. Yes.**
19   Q. Mr. Leyman, I'd like to call your attention to
20   what has been marked as Exhibit No. 1 to your
21   deposition. It is a document that was given to me by
22   your counsel. That's why at the bottom it has the
23   legend MOAB. And this document begins with MOAB No. 4
24   and ends with MOAB No. 14. Do you see that, sir?
25   **A. Yes.**

**62 (Pages 242 to 245)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

246

1    Q. Do you recognize what this document is?
2    A. It's the IM communication between myself and
3    Brad Lockwood.
4    Q. Okay. And on top of the first page, it
5    says, "Brad Lockwood." And that would indicate that
6    these were communications with Mr. Lockwood?
7    A. Yes.
8    Q. And then right under that, there's the date
9    7-22-08.
10   A. Yes.
11   Q. Do you see that, sir?
12   A. Yes.
13   Q. And does that indicate that these are instant
14   messages between you and Mr. Lockwood that took place on
15   July 22, 2008?
16   A. Yes.
17   Q. If you would turn to the page -- to MOAB 5 and
18   go towards the bottom of the page, really the last line
19   on that page, which says "10:48:31 a.m." Do you see
20   that, sir?
21   A. Yes.
22   Q. Okay. And I suppose that that refers to this
23   is a communication that is happening at 10:48 and 31
24   seconds in the morning on July 22, 2008. Would that be
25   the right way to read that?

247

1    A. Yes.
2    Q. And it is an instant message being sent to you
3    by Mr. Lockwood?
4    A. Yes.
5    Q. Because it says "Brad" right after the time.
6    Correct?
7    A. Correct.
8    Q. Okay. And it says, "I'd like to show
9    you" -- "I'd like to show Vinmar the offer and bring in
10   a firm bid." Do you see that, sir?
11   A. Yes.
12   Q. Is this when Mr. Lockwood gave you the firm
13   offer that you talked about a moment ago? Would this --
14   it appear to be at about this time?
15   A. It was shortly thereafter. This particular
16   offer was not acceptable to Vinmar because of the
17   quality, and there was a subsequent offer made to Vinmar
18   with a different xylene quality.
19   Q. Okay. So at the time while there were IM
20   discussions going on between you and Mr. Lockwood, there
21   were also telephone discussions going on between you and
22   Mr. Lockwood?
23   A. Yes.
24   Q. And at this same time, there were also IM
25   discussions going on between you and Mr. Wilson and also

248

1    telephone discussions between you and Mr. Wilson?
2    A. Yes.
3    Q. If you would look at 12:09:39 where it says,
4    "Ed." And that would be you?
5    A. Yes.
6    Q. Okay. So this would be a communication -- an
7    IM communication that you sent to Mr. Lockwood at
8    12:09:39 p.m.?
9    A. Yes.
10   Q. And it said, "All done but call me"?
11   A. Yes.
12   Q. What do you mean "All done but call me"?
13   A. That there was an agreement of Vinmar -- with
14   Vinmar that Tricon had made a proposal. Vinmar had
15   countered the proposal and Brad accepted the proposal.
16   And going back to Mr. Wilson at Vinmar, there was
17   acceptance and a summary of all the terms and conditions
18   being discussed by me with both parties.
19   Q. Okay. When you say "All done," do you mean
20   the deal is all done?
21   A. Yes.
22   Q. Okay. So by 12:09:39 p.m., in your mind there
23   had been a firm offer from Tricon, Brad Lockwood, and a
24   firm bid from Rick Wilson at Vinmar?
25   A. Yes.

249

1    Q. Let me put it to you this way. At
2    12:09:39 p.m., had Mr. Wilson given you a firm bid to
3    take to Tricon?
4    A. Yes.
5    Q. And by 12:09:39 p.m., had Mr. Wilson
6    authorized you to make that firm bid?
7    A. Yes.
8    Q. And, similarly, by 12:09:39 p.m., had Brad
9    Lockwood given you a firm offer to take to Vinmar?
10   A. Yes.
11   Q. And by 12:09:39 p.m., had Mr. Lockwood
12   authorized you to communicate that firm offer to Vinmar?
13   A. Yes.
14   Q. You say, "But call me." Why did you want
15   Mr. Lockwood to call you?
16   A. To go over all the terms and conditions that
17   both parties had just agreed to.
18   Q. Okay. Right after the next entry from you on
19   Exhibit 1, you say, "Vinmar is asking to declare
20   discharge port no later than August 15th." Do you see
21   that, sir?
22   A. Yes.
23   Q. What happened here?
24   A. After the deal was negotiated, two points were
25   not discussed during the negotiation. One was at what

**63 (Pages 246 to 249)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

250

1   point does the buyer declare to the seller where he
2   wants the product to be delivered.  And Rick Wilson
3   proposed nominating August 15th as that day of
4   notification.
5       Q.  Okay.  And, sir, if you will go down a few
6   lines.  Look at 12:39:24 p.m. "Ed."
7       A.  Yeah.
8       Q.  And there are a few lines ahead of that, and
9   there's some back and forth on the dates for the
10  declaration of discharge port?
11      A.  Yes.
12      Q.  Do you see that?
13      A.  Yes.
14      Q.  But at 12:39:24 p.m., it says, "Ed," which is
15  you.  Correct?
16      A.  Yes.
17      Q.  It says, "Friday, the 8th, is okay"?
18      A.  Yes.
19      Q.  And just a few seconds later is it Brad
20  saying, "Okay"?
21      A.  Yes.
22      Q.  Does this reflect an agreement on Friday, the
23  8th of August, as the date to declare the discharge
24  port?
25      A.  Yes.

251

1       Q.  Okay.  And, again, had Mr. Lockwood authorized
2   you to communicate to Mr. Wilson that the 8th was okay
3   with him?
4       A.  Yes.
5       Q.  And had Mr. Wilson authorized you to
6   communicate to Mr. Lockwood that the 8th was okay with
7   him?
8       A.  Yes.
9       Q.  Was an agreement reached on the 8th?
10      A.  Yes.
11      Q.  Just a few lines down after that, if you look
12  at 1:06:31 p.m., again, Ed, it says, "Vinmar asking if
13  you are agreeable to do LC site."  Do you see that, sir?
14      A.  Yes.
15      Q.  Do you recall what that was about?
16      A.  Yes.  The second point that was not negotiated
17  initially was the payment terms.  Subsequent to being
18  all done, the parties agreed on 30 days after a bill of
19  lading date.
20          Subsequently Rick came back requesting
21  that payment be made with a documentary LC, to do LC at
22  site, and I communicated that to Brad at Tricon.
23      Q.  Okay.  So there had -- there had been a
24  discussion between you and Mr. Lockwood and you and
25  Mr. Wilson regarding a 30-day payment period?

252

1       A.  Yes.
2       Q.  And that would be over the telephone; it's not
3   reflected in the IM's?
4       A.  That's correct.
5       Q.  And Mr. Lockwood had agreed you -- had
6   authorized you -- let me put it this way.  Had
7   Mr. Lockwood authorized you to agree on the 30-day
8   payment period?
9       A.  Yes.
10      Q.  And had Mr. Wilson similarly authorized you to
11  agree on the 30-day payment period?
12      A.  Yes.
13      Q.  And was it after that that Mr. Wilson
14  said, "Can we change it to an on site LC"?
15      A.  Yes.
16      Q.  And did he authorize you to communicate that
17  to Mr. Lockwood?
18      A.  Yes.
19      Q.  And that's what you did --
20      A.  Yes.
21      Q.  -- here in this IM?
22          If you will go to the next page, sir, if
23  you would look just a little below the middle of the
24  page at 4:12:27 p.m. from Brad.
25      A.  Yes.

253

1       Q.  Where it says -- again, immediately before
2   that at 4:11:52 p.m., Ed, you, is saying, "Vinmar asking
3   again on payment terms.  LC site, question mark."
4   Correct?
5       A.  Yes.
6       Q.  Then Brad's response at 4:12:27 p.m. is that,
7   "Yes, we accept LC at site"?
8       A.  Yes.
9       Q.  Okay.  Is this where Mr. Lockwood told you,
10  "Yes, it's okay with me to change the payment terms to a
11  letter of credit on site"?
12      A.  Yes.
13      Q.  And did Mr. Lockwood authorize you to
14  communicate that to Mr. Wilson?
15      A.  Yes.
16      Q.  And did you do that?
17      A.  Yes.
18      Q.  And did Mr. Wilson accept that?
19      A.  Yes.
20      Q.  Mr. Leyman, after -- is it your custom after a
21  deal is made the way we've been talking about to send
22  some kind of written confirmation to the parties?
23      A.  Yes.
24      Q.  Is that something you always do?
25      A.  Yes.

64  (Pages 250 to 253)

ARBITRATION HEARING - SEPTEMBER 20, 2010

254

1  Q.  I show you what's marked as Exhibit 2 to your
2  deposition, sir.  Do you recognize that document?
3      A.  Yes.
4      Q.  Is this the confirmation that you sent on
5  July 22, 2008 -- or I should say the first confirmation
6  that you sent?
7      A.  Yes.
8      Q.  And this reflects the 30-day payment term that
9  was initially agreed to?
10     A.  Yes.
11     Q.  If you would look at the first page of
12  Exhibit 2, it appears to have been e-mailed to Rick
13  Wilson?
14     **A.  Okay.  Yes.  This would have been sent to**
15  **Vinmar.**
16     Q.  If you look at Exhibit 2, second page, is
17  that -- it says "MOAB Oil, Inc.," on top.  Is this MOAB
18  Oil's letterhead?  I just want to find out if that's
19  MOAB Oil's letterhead.
20     **A.  Oh, I'm sorry.  Yes.**
21     Q.  Is this a form that you always use for these
22  transactions?
23     A.  Yes.
24     Q.  Let me ask you this.  In the -- initially
25  there was an -- you said there was an agreement on

255

1  30-day term, which was later changed, and then there was
2  discussion about discharge port as well?
3      A.  Yes.
4      Q.  And was it your testimony that both of these
5  discussions occurred after you believed that there was a
6  deal made, that a firm bid had been made and a firm
7  offer had been made?
8      A.  Yes.
9      Q.  In the industry, can deals be made although
10  there may be some terms that are left to be negotiated
11  between the parties?
12     A.  Yes, sometimes.
13     Q.  I'm showing you now what's Exhibit 3.  Do you
14  recognize that document, Mr. Leyman?
15     A.  Yes.
16     Q.  Is this also a confirmation?
17     A.  Yes.
18     Q.  And did you send this confirmation to both
19  Rick Wilson and Brad Lockwood?
20     A.  Yes.
21     Q.  Okay.  And is it also on MOAB's letterhead?
22     A.  Yes.
23     Q.  And if you would look sort of a third of the
24  way down where it says "Amended payment terms."  Do you
25  see that, sir?

256

1      A.  Yes.
2      Q.  Okay.  Is this the confirmation that was sent
3  after agreement was reached on the letter of credit as
4  opposed to the 30 days?
5      A.  Yes.
6      Q.  Sir, does either Exhibit 2 or Exhibit 3
7  refer -- actually on the -- on the delivery side, both
8  of these refer to the August 8th declaration of
9  discharge port.  Correct, sir?
10     A.  Yes.
11     Q.  Is Exhibit 3 also on MOAB's letterhead?
12     A.  Yes.
13     Q.  With regard to both Exhibit 2 and Exhibit 3,
14  sir, did you draft them?
15     A.  Yes.
16     Q.  Did you draft them on behalf of both parties,
17  Vinmar and Tricon?
18     A.  Yes.
19     Q.  And did you draft them to represent the terms
20  of the deal that you had negotiated for them?
21     A.  Yes.
22     Q.  At the bottom of both Exhibit 2 and Exhibit 3,
23  there is a statement that says, "If there is anything
24  outlined contrary to your understanding of our
25  agreement, please notify us immediately."  Do you see

257

1  that, sir?
2      A.  Yes.
3      Q.  That's in both Exhibit 2 and Exhibit 3?
4      A.  Yes.
5      Q.  Is that always in the confirmation memos that
6  you send?
7      A.  Yes.
8      Q.  And why do you include that?
9      **A.  Well, everyone is human.  And on a rare case**
10  **where there is a misunderstanding or miscommunication,**
11  **it gives everyone the opportunity to see if there's any**
12  **mistakes and to correct them immediately.**
13     Q.  Okay.  And would it be your expectation that
14  if you made a mistake one of the parties would call it
15  to your attention?
16     **A.  Yes.  Or I would notice the mistake as well.**
17     Q.  And, in fact, someone did call you to point
18  out a mistake on Exhibit 2 and Exhibit 3.  Isn't that
19  so?
20     A.  Yes.
21     Q.  And what was that mistake?
22     **A.  It was the price.**
23     Q.  Who pointed out a mistake on the price to you?
24     **A.  Brad Lockwood advised me of the price**
25  **difference.**

**65  (Pages 254 to 257)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

---

258

1    Q.  Did Mr. Wilson also advise you that there was
2  a mistake on the price?
3    A.  No.
4    Q.  If you would turn back to Exhibit 1, the IM's,
5  sir.  And look at Page MOAB 9.
6    A.  Yes.
7    Q.  If you would look just a little bit below the
8  middle of the page at 10:41:09 a.m., a message from
9  Brad, where it says, "Please correct that Vinmar thing."
10   A.  Yes.
11   Q.  And right afterwards you reply, "Was sent out
12  this a.m."?
13   A.  Yes.
14   Q.  Is he referring to the mistake on the price?
15   A.  Yes.
16   Q.  And what you're saying was sent out this a.m.
17  is the correction?
18   A.  Yes.
19   Q.  Okay.  Mr. Leyman, after getting our papers
20  straight, let me now hand you what is the real
21  Exhibit 4.  And is that the confirmation that reflects
22  the corrected price?
23   A.  Yes.
24   Q.  And about a third of the way down on Exhibit 4
25  you see the legend Amended Price?

---

259

1    A.  Yes.
2    Q.  And this is the correct price that was agreed
3  to between the parties?
4    A.  Yes.
5    Q.  And, again, is Exhibit 4 on MOAB letterhead?
6    A.  Yes.
7    Q.  Was Exhibit 4 drafted by you?
8    A.  Yes.
9    Q.  Was it drafted by you on behalf of both
10  parties?
11   A.  Yes.
12   Q.  And was it drafted to reflect the terms of
13  their agreement?
14   A.  Yes.
15   Q.  The agreement that the parties authorized to
16  communicate to each other?
17   A.  Yes.
18   Q.  Now, Mr. Leyman, do Exhibits 2, 3 or 4 say
19  anything about whether the product needed to have --
20  needed to be made of U.S. origin?
21   A.  No.
22   Q.  Why do not they -- why do they not say
23  anything about that?
24   A.  Because it was not discussed in negotiations.
25   Q.  If you will turn back to Exhibit 1, the IM's.

---

260

1  And look again at MOAB 9, near the bottom of the page of
2  MOAB 9.  Do you see at 1:39:30 p.m. where it
3  says "Ed" -- and that would be you.  Correct?
4    A.  Yes.
5    Q.  It says, "Yep.  Would you have any interest in
6  buying back the 5 KT MX you sold to Vinmar"?
7    A.  Yes.
8    Q.  Tell me what that's about.
9    A.  That's just being a broker.  Sometimes on a
10  Monday someone would sell.  On Tuesday they would buy
11  back.  I was just inquiring there if Tricon was still on
12  a sale side or possibly buying.
13   Q.  Did Mr. Wilson or anybody at Vinmar contact
14  you to tell you that you might be -- that they might be
15  interested in selling the MX they had just bought?
16   A.  I don't have any recollection of Mr. Wilson
17  asking me to try to sell -- resell his cargo.  In fact,
18  I don't recall speaking to Mr. Wilson that day, but I
19  assume that I did because being a broker -- he had been
20  the buyer on Monday.  I would see if he would be a
21  potential buyer on Tuesday.  But I don't have any
22  recollection of actually speaking to him.
23   Q.  Okay.  And, Mr. Leyman, is Exhibit 4 the last
24  confirmatory memoranda that you sent to the parties on
25  this deal?

---

261

1    A.  Yes.
2    Q.  And you sent it to both Vinmar and Tricon?
3    A.  Yes.
4    Q.  If you would now go to Page MOAB 12 in
5  Exhibit 1.  On the top of that page is the date 7-31-08.
6  Do you see that, sir?
7    A.  Yes.
8    Q.  Are these instant messages between you and
9  Mr. Lockwood on July 31st?
10   A.  Yes.
11   Q.  A little over a week after the transaction?
12   A.  Yes.
13   Q.  If you would look at about the middle of the
14  page where it says 10:19:09 a.m.?
15   A.  Yes.
16   Q.  It says, "Ed."  That is you.  It
17  says, "Vinmar's MX still available but has no interest
18  in selling anywhere close to your price ideas."
19   A.  Yes.
20   Q.  Do you see that, sir?
21   A.  Yeah.
22   Q.  What are you referring to when you say that?
23   A.  After these earlier messages, I called Rick
24  Wilson, asked him if the cargo that he bought from
25  Tricon was still available.  He said it was.  I told him

---

66  (Pages 258 to 261)

ARBITRATION HEARING - SEPTEMBER 20, 2010

262

1  that Tricon is indicating interest in buying xylenes.
2       I gave him the indicated price.  He
3  indicated that he would look to resell the barrels but
4  at a profit, and indicated 1350 as the sales price.
5       Q.  Okay.  And that is -- when you say -- in the
6  next line where you say, "Ed, at 1300 plus he would
7  consider"?
8       A.  Yes.
9       Q.  "He" being Mr. Wilson?
10      A.  Yes.
11      Q.  And these are communications you are having
12  with Mr. Lockwood?
13      A.  Yes.
14      Q.  These were telephone conversations that you
15  had with Mr. Wilson about whether they would sell the MX
16  they had just bought?
17      A.  Yes.
18      Q.  And Mr. Wilson communicated to you that he
19  would at that price where they would make a profit?
20      A.  Yes.
21      Q.  Would Mr. Wilson be able to sell mixed xylene
22  if he had not bought it?
23      A.  Theoretically you can sell, sure.  That was
24  not the purpose of the call, though.
25      Q.  Okay.  Well, what was the purpose of the call?

263

1       A.  To see if he specifically wanted to resell the
2  barrels he bought from Tricon.
3       Q.  And his response was?
4       A.  He indicated that he would sell the barrels if
5  he could obtain a price of 1350.
6       Q.  And he -- and he couldn't sell those barrels
7  unless he had bought them.  Would that be right?
8       A.  Again, just a point of clarification.  One --
9  in commodity trading, one can sell a product that they
10  don't necessarily own.
11      Q.  Mr. Leyman, when did you first hear that
12  Vinmar was saying that the mixed xylene had to be of
13  U.S. origin?
14      A.  On the afternoon of the 31st of July.
15      Q.  Okay.  And how did you hear that?
16      A.  Mr. Wilson sent me an instant message asking
17  me to call him.  I called him.  And he told me that the
18  xylenes he purchased from Tricon needed to be of U.S.
19  origin.
20      Q.  Okay.  And what was your response to him?
21      A.  I told him that that was not what was
22  negotiated, that it was not discussed, and the sale was
23  based on a delivered CFR first half September basis with
24  no origin guarantee.
25      Q.  Okay.  Well, look then -- let's go back to

264

1  Exhibit 1 then, which is the MOAB document.  And take a
2  look at Page MOAB 14, which is the last page in the
3  exhibit.
4       A.  Okay.
5       Q.  Okay.  And if you would flip back a couple of
6  pages, this appears to still be the IM's between you and
7  Mr. Lockwood --
8       A.  Right.
9       Q.  -- on July 31st?
10      A.  Yes.
11      Q.  That's correct?
12      A.  Yes.
13      Q.  And at the top of MOAB 14 at 4:45:59 p.m., is
14  that a message from you that says, "Ed, got a call from
15  Vinmar"?
16      A.  Uh-huh.
17      Q.  Is this the call that you were talking about a
18  moment ago that Mr. Wilson gave you about the U.S.
19  origin?
20      A.  Yes.
21      Q.  Okay.  And was this when you let Mr. Lockwood
22  know that you had received that call?
23      A.  Yes.
24      Q.  Had you received that call close in time to
25  4:45:59 p.m. on July 31st?

265

1       A.  There were one or two calls that afternoon.
2  They would probably be close to that time.
3       Q.  On 4:46:42 p.m., you say, "Ed, want any
4  discussions to go through MOAB since we brokered the
5  deal?"  Do you see that, sir?
6       A.  Yes.
7       Q.  Tell me what that was about.
8       A.  Vinmar requested that any discussions
9  regarding the U.S. origin be done through MOAB, that
10  they preferred speaking through MOAB than speaking
11  directly to Tricon.
12      Q.  So they wanted to do it just the way the deal
13  had originally been put together?
14      A.  Yes.
15      Q.  Where you would be an agent for both sides?
16      A.  Yes.
17      Q.  About halfway down the page,
18  4:50:34 p.m., "Ed, I repeated that that was not
19  negotiated and a guarantee of U.S. origin only was not
20  agreed upon."  Do you see that, sir?
21      A.  Yes.
22      Q.  You're telling Mr. Lockwood what you had told
23  Mr. Wilson over the telephone.  Is that right?
24      A.  That is correct.
25      Q.  And that's at 4:50, just a few minutes after

67  (Pages 262 to 265)

ARBITRATION HEARING - SEPTEMBER 20, 2010

266

1    the IM's at the top of the page.  Correct?
2        A.  Yes.
3        Q.  So the best of your recollection is that these
4    IM's are occurring a short time after your conversation
5    with Mr. Wilson --
6        A.  Yes.
7        Q.  -- over the telephone?
8        A.  Yes.
9        Q.  Mr. Leyman, do you still broker deals with
10   Vinmar today?
11       **A.  Yeah.  I haven't done anything recently, but I**
12   **still deal with Vinmar.**
13       Q.  Did you broker deals with Vinmar after the
14   July 22, 2008, deal with Tricon?
15       A.  No.
16       Q.  Do you still deal with them to see if there
17   are deals to be made?
18       A.  Yes.
19       Q.  Do you have any problem with working with
20   Vinmar?
21       A.  No.
22              **EXAMINATION**
23   BY MR. LEE:
24       Q.  Okay.  Mr. Leyman, it's my turn to ask you
25   some questions.  I introduced myself a little bit

267

1    earlier.  My name is Stephen Lee.  I represent Vinmar.
2    You and I have never met.  Correct?
3        A.  **That's correct.**
4        Q.  Do you recognize Exhibit 6?
5        A.  Yes.
6        Q.  What is it, sir?
7        A.  **It's IM messages between myself and Rick**
8    **Wilson.**
9        Q.  Okay.  And the first page of Exhibit 6 are IM
10   messages between you and Mr. Wilson on July 22, 2008.
11   Correct?
12       A.  Yes.
13       Q.  And then the second page would be instant
14   message exchanges between you and Mr. Wilson on July 31,
15   2008?
16       A.  Yes.
17       Q.  As I read these instant messages -- and it
18   starts with you talking to Mr. Wilson around 9:19 in the
19   morning on July the 22nd where Rick is asking you if
20   there's any MX available.  Correct?
21       A.  Yes.
22       Q.  And then if you pick up on Exhibit 1, which is
23   your instant message exchanges with Mr. Lockwood
24   starting at 9:25.  Do you see that?  Right here, sir.
25       A.  **Yeah.**

268

1        Q.  You tell Mr. Lockwood, "See possible 5 KT FOB
2    H/TC any August.  MX buyer indicated paying 4 to 402
3    range."  Right?
4        A.  Yes.
5        Q.  Now, was that a reference to your conversation
6    with Mr. Wilson that he may be willing to buy 5 KT of MX
7    FOB H/TC?
8        A.  Yes.
9        Q.  Okay.  "H" being Houston?
10       A.  Yes.
11       Q.  And "TC" being Texas City?
12       A.  Yes.
13       Q.  First of all, at 9:29:04 a.m., Mr. Lockwood
14   says he would offer 5 KT FOB Houston, Texas City,
15   Corpus, any August at $4.10 a gallon.  P and C basis not
16   reported.
17       A.  Yes.
18       Q.  Now, is that a -- is that a firm offer?
19       A.  Yes.
20       Q.  All right.  Where did the -- you mentioned to
21   Mr. Wilson in his -- in your instant message to him at
22   9:34 that the quality would be 52 -- that's 5211/20 BR,
23   which I take it is -- 5211 would be the reference to the
24   ASTM --
25       A.  Yes.

269

1        Q.  -- standard?
2            And then 20 would be a maximum of 20
3    bromine?
4        A.  **Bromine index.**
5        Q.  Bromine index.  Okay.  Is that an indication
6    of max 20?
7        A.  Yes.
8        Q.  Where did that quality reference come from?
9        A.  **How best to answer that?  That was Vinmar's**
10   **requirement for the quality and that's one of the**
11   **standard qualities of mixed xylenes in the Gulf Coast.**
12       Q.  And so you made -- you made the firm offer to
13   Vinmar at 9:34 on July the 22nd.  Correct?
14       A.  Yes.
15       Q.  And that would be for FOB.  Explain what FOB
16   Houston, Texas City, Corpus means.
17       A.  **Houston, Texas City, Corpus would be the**
18   **possible load ports of the product, Houston, Texas City,**
19   **or Corpus Christi, Texas.  FOB I guess -- I'm not**
20   **totally aware of what the Incoterms mean, but I think**
21   **it's free on board or something similar to that.**
22       Q.  In other words, the product would be delivered
23   to Vinmar or to the buyer at one of those locations and
24   the buyer would be responsible for freight?  Is that
25   your understanding?

**68  (Pages 266 to 269)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

270

1    A.  Yes.  The buyer would be responsible for --
2    if -- yeah, to load a vessel.
3    Q.  Okay.  And Mr. Wilson doesn't respond with a
4    "Yes" or "No."  Correct?
5    A.  Yes, that's correct.
6    Q.  All right.  He says he's on the phone.  He's
7    talking with his salesperson.  And at 9:57 you tell
8    Mr. Wilson that energy is moving lower; the seller is
9    asking for a counterbid.  Correct?
10    A.  Yes.
11    Q.  The seller in this instance would be Tricon?
12    A.  Yes.
13    At 10:00 o'clock you tell Mr. Wilson that
14    there's a second MX seller asking if buyer would
15    purchase CFR main Asian ports, arrival basis loading
16    USGC first half of August?
17    A.  Yes.
18    Q.  Do you know who that second MX seller was that
19    you were referring to?
20    A.  That was also Tricon.
21    Q.  And where did you get that information?  From
22    Mr. Lockwood?
23    A.  Yes.
24    Q.  Loading USGC, is that a reference to the U.S.
25    Gulf Coast?

271

1    A.  Yes.
2    Q.  All right.  And the CFR, that's a different
3    freight term than the FOB.  Correct?
4    A.  Yes.
5    Q.  CFR -- is it your understanding that CFR means
6    that the seller is responsible to ship the product even
7    though the buyer is still paying for shipping?
8    A.  Yes.
9    Q.  First of all, this back and forth that we see
10    on Exhibit 1 and Exhibit 6, is this fairly typical of
11    how your day might go when you're working a deal?
12    A.  Yes.
13    Q.  All right.  And there may be various offers
14    and various bids that may take -- it may take days, it
15    may take hours, it may take minutes to bring two parties
16    together?
17    A.  Yes.
18    Q.  And sometimes you're successful and sometimes
19    you're not.  Right?
20    A.  Yes.
21    Q.  Okay.  And when I'm -- sir, if I'm looking
22    back then I guess at Exhibit 1, which is Mr. Lockwood's
23    exchanges with you, and we see that -- we first started
24    off talking about 5 KT FOB and now we're talking about
25    selling 5 -- KT metric tons.  Correct?

272

1    A.  Yes.
2    Q.  All right.  Now we're talking about selling
3    5 metric tons on a FCC basis.  At least that's what you
4    reported to Mr. Wilson at 10:00 o'clock, that there was
5    somebody that was interested in that.  Correct?
6    A.  Yes.
7    Q.  At the 10:00 o'clock instant message to
8    Mr. Wilson, is that what you would call an indication of
9    an offer or is it actually a firm offer at that point?
10    A.  The --
11    Q.  When you say, "Second MX seller asking if
12    buyer would purchase"?
13    A.  That's an indication.
14    Q.  All right.  And then you ask Mr. Wilson at
15    10:05 whether he has any bid.  Correct?
16    A.  Yes.
17    Q.  Are you asking him if he wants to bid against
18    this indication -- or make a bid against the indication
19    for the CFR delivery?
20    A.  Yes.  Prior to that, I spoke to Rick by
21    telephone and he did not have any interest any longer in
22    buying FOB the Gulf Coast.  His preference was to buy
23    something on a delivered CFR basis to either Korea or
24    Taiwan.  He indicated that he had two possible buyers
25    and he would prefer seeing offers on a delivered basis.

273

1    Q.  Okay.
2    A.  I spoke to Tricon and he said he would be able
3    to sell or offer on a CFR basis.
4    Q.  All right.  And did Tricon -- is this
5    Mr. Lockwood?  He also told you that it would be loading
6    out of the U.S. Gulf Coast, at least what you reported
7    to mister -- correct?
8    A.  That was his indication, that he can load
9    barrels first half August out of the Gulf Coast and sell
10    it on a delivery basis to Asia.  That was not acceptable
11    to Wilson.  He indicated the timing was very important,
12    that he needed a guarantee arrival of September 15.
13    Q.  All right.
14    A.  So that offer was not pursued on that basis.
15    Q.  And then if we go all the way down to 10:38
16    where you see Mr. Lockwood saying, "Show Vinmar" --
17    A.  Yes.
18    Q.  -- "I can sell" --
19    A.  Yes.
20    Q.  -- "1360 a metric ton."
21    And he goes on to report a very -- a
22    number of different aspects of an offer.  Correct?
23    A.  Yes.
24    Q.  Is that a firm offer?
25    A.  Yes.

**69  (Pages 270 to 273)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

274

1    Q.  All right.  What Mr. Lockwood was offering was
2  a product quality that met the ASTM D843?
3    A.  That's correct.
4    Q.  All right.  And you've already told us this
5  morning that Vinmar was not interested in that
6  particular quality.  Correct?
7    A.  That's correct.
8    Q.  They wanted the ASTM 5211?
9    A.  Yes.
10    Q.  All right.  At -- so then as I look at this,
11  Mr. Leyman, there's a couple of different exchanges
12  between you and Mr. Lockwood, but I don't see anything
13  else really until 12:09:39, where you say, "All done but
14  call me."
15    A.  Yes.
16    Q.  And there's nothing between you and Mr. Wilson
17  after 10:00 o'clock before 12:49.  Correct?
18    A.  Yes.
19    Q.  All right.  Were you talking to Mr. Wilson by
20  telephone?
21    A.  Yes.
22    Q.  Were you talking to Mr. Lockwood by phone as
23  well?
24    A.  Yes.
25    Q.  Does MOAB record phone conversations?

275

1    A.  They do, but the system apparently doesn't
2  allow -- or doesn't work.  I know John told me there was
3  a request --
4    Q.  Okay.  Don't --
5    A.  -- and there was a possible --
6    Q.  Don't tell me what counsel said.  I guess the
7  question is, have you looked for or has somebody at MOAB
8  looked to determine --
9    A.  Yes.
10    Q.  -- whether there are any phone recordings?
11    A.  My understanding, they did.
12    Q.  All right.  And you haven't been able to find
13  any?
14    A.  That's correct.
15        MR. CANNAVINO:  On the record.  We were
16  requested to check for phone records.  We had the IT
17  people do that, And anything that may have existed was
18  overridden so there was nothing.  But we did check that
19  as part of our response to the subpoena.
20    Q.  (BY MR. LEE) So the -- just to be clear then,
21  the deal that you negotiated was done over the phone?
22    A.  Yes.
23    Q.  In separate conversations with Mr. Wilson on
24  one hand and Mr. Lockwood on the other?
25    A.  Yes.

276

1    Q.  All right.  Mr. Leyman, I've handed you what's
2  been marked as Exhibit 7.  Could you tell us what that
3  is, please, sir?
4    A.  That's the confirmation I sent out to both
5  parties concerning this transaction.
6    Q.  Okay.  This looks to me like it's the -- it's
7  your internal worksheet.
8    A.  Yes, it is.
9    Q.  All right.  This document, Exhibit 7, wasn't
10  actually sent to the parties.  Correct?
11    A.  That's correct.  It's a draft that I sent to
12  someone who's responsible for sending out the
13  confirmations.
14    Q.  Okay.  So -- and I -- that was -- you
15  anticipated one of the questions I had for you.  You
16  were asked earlier if you actually prepared the
17  typewritten confirmations that were sent to the parties.
18        And is it your practice to prepare this
19  handwritten sheet and then give it to someone else who
20  would actually input the information --
21    A.  Yes.
22    Q.  -- to be sent?
23    A.  Yes.
24    Q.  All right.  Do you know when Exhibit 7 was
25  prepared?

277

1    A.  Sometime in the afternoon of the 22nd.
2    Q.  Where did you get the price of 1110 a metric
3  ton?
4    A.  Well, 1110 is incorrect.  What was agreed to
5  after the negotiation was 1310.  That is a typo.
6    Q.  And I'm just curious if you recall where
7  that -- where you came up with that number.
8    A.  It was something that just was a mistake that
9  was put down on the paper.  No idea where it came from.
10    Q.  All right.  It's your understanding that all
11  of the terms that are listed on Exhibit 4 on your
12  confirmation were agreed terms?
13    A.  Yes.
14    Q.  There's no arbitration provision in that
15  clause -- in that confirmation.  Correct?
16    A.  Correct.
17    Q.  Did you ever discuss with Mr. Wilson
18  arbitration?
19    A.  No.
20    Q.  Did you discuss with Mr. Lockwood arbitration?
21    A.  No.
22    Q.  Well, what did Mr. Wilson tell you on July
23  the 31st when he said he had a problem with the deal?
24    A.  He said that he needed a guarantee of U.S.
25  origin on the xylenes.

70  (Pages 274 to 277)

ARBITRATION HEARING - SEPTEMBER 20, 2010

278

1    Q.  Now, when you -- when you broker a deal,
2    Mr. Leyman, do the offer and the bid -- in order for
3    them to have a deal between the parties, the offer and
4    the bid need to match.  Correct?
5    A.  Yes.
6    Q.  Okay.  And if -- I'm going to ask you to make
7    an assumption with me for a minute, Mr. Leyman.  If
8    Mr. Wilson -- if the evidence shows that Mr. Wilson
9    believed he was purchasing a guaranteed MX U.S. origin
10   but Tricon wasn't willing to sell that, you don't have a
11   deal, do you?
12   A.  That's correct.
13   Q.  Okay.  Because you've got to match a bid with
14   an offer on those terms.  Correct?
15   A.  Well, the terms must stay the same.
16   Q.  Okay.  Let me ask you to turn to the second
17   page of this -- of Exhibit 8.  At the very -- near the
18   top, Mr. Leyman, there's a reference at 2:55:25 p.m.
19   from you.
20        It says, "Again, is it possible for you to
21   substitute a U.S. origin cargo in order to avoid a legal
22   hassle?"  Do you see that?
23   A.  Yes.
24   Q.  Do you recall asking Mr. Lockwood that
25   question?

279

1    A.  Yes.
2    Q.  All right.  And did he ever explain to you why
3    it was not possible for Tricon to substitute a U.S.
4    origin cargo?
5    A.  I don't know if it was specifically at this
6    time, but in the period between July 31st and August 6th
7    Mr. Lockwood proposed or came up with the ideas of
8    several things to try to keep the deal in place.
9        One was a different quality xylene.  One
10   was a U.S. origin cargo with a guarantee of arriving by
11   September 30th.  Even though it had an ETA prior to the
12   15th, it was not a guaranteed delivery by the 15th.  And
13   I guess this was another possibility that he was
14   throwing out to satisfy Vinmar's request for the cargo.
15   Q.  Okay.  But did -- I guess my question, did he
16   ever -- did Mr. Lockwood ever explain to you why he
17   would not provide U.S. origin MX --
18   A.  Oh, no.  I'm sorry.
19   Q.  -- for a guaranteed first half of September
20   delivery?
21   A.  No --
22   Q.  Okay.
23   A.  -- other than the fact that it was not
24   negotiated and that was not part of the original
25   agreement.

280

1    Q.  That was Mr. Lockwood's position.  Correct?
2    A.  Yes.
3    Q.  Okay.  If you'll go to the next page of
4    Exhibit 8.
5    A.  Okay.
6    Q.  At about 5:51:31 p.m., there's a message from
7    Mr. Lockwood.  Do you see that?
8    A.  Yes.
9    Q.  No.  He was.  Right?  I mean, he asked you,
10   "How did we go from that quality, being the D843, to
11   5211"?
12   A.  The only thing I ever discussed -- there was a
13   buying interest by Vinmar, but it was only for 5211
14   spec.
15   Q.  Right.  And that's what you told him.  I
16   guess -- I'm just asking you -- I mean, certainly he
17   asked the question, correct, how did we go from that
18   quality, being a reference to the D43, to 5211?
19   Correct?
20   A.  Yeah.
21   Q.  And you told him the negotiations were for
22   only 5211/20 bromine?
23   A.  Yes.
24   Q.  Okay.  And Mr. Lockwood even asked you a
25   couple of lines down, "Basically he bid on 5211 only

281

1    basis, I guess," with a question mark?
2        And you answered, "Yes.  Never bid or
3    showed any interest for 843 spec"?
4    A.  That's correct.
5    Q.  Let me -- let me approach it this way.  When
6    this issue arose between Vinmar and Tricon, is it your
7    recollection, Mr. Leyman, that Tri -- that Vinmar was
8    willing to proceed with the deal at the price, 1310 a
9    metric ton, so long as Tricon guaranteed U.S. origin MX
10   for first half delivery in September?
11   A.  Vinmar sent an e-mail proposing that they go
12   forward with the deal on the original negotiated terms
13   and conditions.  In the e-mail, there was also -- which
14   I didn't understand -- the phraseology "contract
15   form," acceptable contract form, whatever that meant,
16   but that is what they proposed on August 6th.
17   Q.  Okay.  I mean, I -- and so my question,
18   Mr. Leyman, was it your understanding in the days
19   following July 31st that Vinmar was still willing to
20   purchase MX at the 1310 metric ton price if this U.S.
21   origin issue had been resolved?
22   A.  Yes.
23   Q.  Okay.  Before we leave Exhibit 8, I just want
24   to ask you about -- on the last page.  You had mentioned
25   you weren't clear as to the price, and I just wanted to

71  (Pages 278 to 281)

ARBITRATION HEARING - SEPTEMBER 20, 2010

282

1  ask you -- at the very top, you make the statement on
2  August the 6th, 2008, "The fact that Vinmar is still
3  willing to pay 1310 in a market that is much lower
4  suggests that they are just not walking or running away
5  from the deal."  Do you see that?
6      A.  Yes.
7      Q.  Does that refresh your recollection that as of
8  August the 6th, 2008, the price of MX was less than the
9  price that was originally negotiated?
10     A.  Yes.
11     Q.  If somebody refers in an -- in an instant
12 message exchange to "USG," does that have a meaning to
13 you?
14     A.  It means U.S. Gulf.
15     Q.  Have you talked to Brad Lockwood about this
16 case?
17     A.  No, not recently.
18     Q.  Okay.  When is the last time you talked to him
19 about this dispute between Tricon and Vinmar?
20     A.  I don't have a specific date.  But somewhere
21 since August 8th or maybe August 15th, he told me in
22 part of other conversations that the dispute was going
23 to arbitration and that was the extent of the
24 conversation.
25     Q.  Have you talked to anybody at Tricon other

283

1  than Mr. Lockwood about this dispute?
2      A.  No.
3      Q.  Exhibit 1 is the instant message exchanges
4  between you and Mr. Lockwood over the course of several
5  days.  We've obviously looked at it already a few times
6  today, but I wanted to ask a couple of questions just
7  for my own understanding.
8          At Page 3, which is MOAB 6, midway down at
9  12:21:51, do you see that?
10     A.  Yes.
11     Q.  You write to Mr. Lockwood, "He is concerned if
12 MX on water and near Panama" -- it should be canal.
13 "We will not have enough time to declare discharge
14 port.  He has more than potential customer."  Do you
15 see that?
16     A.  Yes.
17     Q.  Are you referring to Mr. Wilson and Vinmar in
18 that instant message exchange?
19     A.  Yes.
20     Q.  All right.  And what was the concern?  That it
21 would be hard to get it through the Panama Canal in
22 time?
23     A.  No.  That was part of the discussion in
24 declaring the date of the discharge port.  After we
25 concluded the transaction, Mr. Wilson asked me what --

284

1  the origin of the xylenes, and this was after I recapped
2  and summarized all the terms and conditions.
3          I subsequently called Brad, also recapped
4  the terms and conditions, and asked him that question.
5  And his response, "The origin was most likely U.S.
6  origin."
7          I in turn called back Rick, passed that
8  information on to him, and then we got into a discussion
9  of when to declare the discharge port.
10     Q.  Let me ask you so we're -- I'm sorry.  Back to
11 Exhibit 1, Mr. Leyman, if you could go to MOAB 12.  And
12 this is July 31, 2008, at the top.  You see that?
13     A.  Yes.
14     Q.  And this is an exchange -- at the very top an
15 exchange between you and Mr. Lockwood where it looks to
16 me like Mr. Lockwood is now in the market to buy MX.  Is
17 that correct?
18     A.  Yes.
19     Q.  And, in fact, one of the things he asked you
20 is, "Could you go back to Vinmar and see if I could buy
21 some MX from them"?
22     A.  Yes.
23     Q.  All right.  Did Mr. Lockwood tell you why he
24 was interested in buying MX on July 31, 2008?
25     A.  No.

285

1          EXAMINATION
2  BY MR. DIAZ-ARRASTIA:
3      Q.  Mr. Leyman, I have just a few questions.  You
4  had talked to Mr. Lee about Exhibits 2, 3 and 4 for a
5  little while and there were some terms from those
6  documents that I think you referred to as boilerplate.
7  Do you recall that --
8      A.  Yes.
9      Q.  -- back and forth?
10     A.  Yes.
11     Q.  I think you had told me that you had brokered
12 a deal with Mr. Wilson and Mr. Lockwood before
13 July 22nd, 2008?
14     A.  Yes.
15     Q.  Had you -- in those deals, had you sent
16 confirming memos like the ones --
17     A.  I did.
18     Q.  -- that are Exhibit 2, 3 and 4?
19     A.  I did.
20     Q.  Did those also contain the same boilerplate?
21     A.  Yes.
22     Q.  Mr. Lockwood and Mr. Wilson knew your
23 boilerplate?
24     A.  I assume so.
25     Q.  They had seen it before --

72  (Pages 282 to 285)

ARBITRATION HEARING - SEPTEMBER 20, 2010

286

1    A.  Yes.
2    Q.  -- from prior transactions?
3    A.  Yes.
4    Q.  During the back and forth of the negotiations
5  on the July 22nd deal, was it important to Vinmar and
6  Mr. Wilson that delivery be in Asia between
7  September 1st and September 15th?
8    A.  Yes.
9    Q.  Did Mr. Wilson tell you that that was an
10 important part of the deal for him?
11   A.  Yes.  And he bid accordingly.
12   Q.  I think your testimony was in the course of
13 discussions the FOB H/TC became no longer a major
14 concern for Mr. Wilson.  Is that right?
15   A.  He had no interest in buying on that basis.
16   Q.  All right.  You testified that there was some
17 discussion between you and Mr. Lockwood that the MX
18 Tricon would sell was likely U.S. Gulf origin.  Do you
19 remember that?
20   A.  Yes.
21   Q.  And you conveyed that to Mr. Wilson?
22   A.  Yes, I did.
23   Q.  Did Mr. Wilson ever say that it was necessary
24 to guarantee U.S. origin?
25   A.  No, he did not.

287

1    Q.  On August the 6th and thereafter when there
2  were discussions between Tricon and Vinmar that you were
3  copied on or listened in on and -- at that time did
4  Mr. Lockwood ever tell you that he could not guarantee
5  U.S. origin and also guarantee delivery in Asia between
6  September 1st and September 15th?
7    A.  I don't recall him saying that.  Only that
8  that was not what the original agreement was.
9        (This is the end of the playback of the
10   edited version of the videotaped deposition of Richard
11   Leyman that was originally taken on April 29, 2010.)
12       (The time is 4:26 p.m.)
13       JUDGE BENTON:  Would that be the complete
14 offer of both parties?
15       MR. DIAZ-ARRASTIA:  Yes.
16       JUDGE BENTON:  Call your next witness.
17       MR. DIAZ-ARRASTIA:  The next witness
18 is Vuk Rajevac.  He's waiting outside.
19       JUDGE BENTON:  Vuk Rajevac.  Do you know
20 if the traditional oath is going to be appropriate?
21       MR. DIAZ-ARRASTIA:  Excuse me?
22       JUDGE BENTON:  The traditional oath, will
23 it be appropriate?
24       JUDGE DAVIDSON:  Does he need to be sworn,
25 affirmed or does he have a problem with being sworn or

288

1  affirmed?
2        MR. DIAZ-ARRASTIA:  He did it in his
3  deposition.
4        JUDGE BENTON:  Mr. Rajevac, if you'll
5  raise your right hand, please, sir.
6        (At this time the witness was duly sworn
7  by Judge Benton.)
8        JUDGE BENTON:  All right.  You may be
9  seated.
10       Mr. Lee, you may proceed.
11       JUDGE DAVIDSON:  Mr. Diaz-Arrastia?
12       JUDGE BENTON:  I'm sorry.  That is the
13 third time that it won't happen again.
14       MR. DIAZ-ARRASTIA:  Okay.
15               VUK RAJEVAC,
16 having been first duly sworn, testified as follows:
17       DIRECT EXAMINATION (4:26 p.m.)
18 BY MR. DIAZ-ARRASTIA:
19   Q.  Mr. Rajevac, good afternoon.  Could you state
20 your full name for the record, please?
21   A.  First name, Vuk, V-U-K, last name, Rajevac,
22 R-A-J-E-V-A-C.
23   Q.  Okay.  Can you tell us a little bit about your
24 background and education, sir?
25   A.  I hold a bachelor's degree, double major from

289

1  Rice University, one in economics and one in psychology.
2    Q.  Okay.  And you have an unusual name.  Can you
3  tell us a little bit about your name?
4    A.  I come from Serbia.  I moved here in 1999.
5  Played tennis for Rice on a scholarship and then got a
6  job at Tricon right after I graduated in 2004.
7    Q.  Okay.  And you are still employed by Tricon?
8    A.  That is correct.
9    Q.  What is your position at Tricon today?
10   A.  I am currently a trader.
11   Q.  Okay.  And back in July 2008, what was your
12 position?
13   A.  I was an operations specialist.
14   Q.  And did you work on the Vinmar transaction?
15   A.  I did.
16   Q.  Excuse me?
17   A.  I did.
18   Q.  Okay.  Tell me what an operations specialist
19 does.
20   A.  After the trader does the deal, the
21 transaction moves over to us, gets to free up the trader
22 to do more trades and worry about other stuff.  So we
23 become the face of the company and deal with the
24 counterparties on both sides, purchase and sales side,
25 to bring the transaction to an end basically.

73  (Pages 286 to 289)

ARBITRATION HEARING - SEPTEMBER 20, 2010

290

1    Q.  And does the operations specialist negotiate
2   contract terms?
3    A.  We're allowed to, yes, negotiate the general
4   terms and conditions, correct.
5    Q.  Are some of these contract terms that the ops
6   specialists negotiate, are they important to whether
7   Tricon can make or lose money on a deal?
8    A.  Oh, very much, yes, sir.
9    Q.  Tell me, sir, when you first became involved
10  in the Vinmar transaction.
11   A.  When I found out that Brad had done a deal
12  with Vinmar, sold, and that's -- I don't recall exactly
13  the date and time but --
14   Q.  You have some notebooks on the table in front
15  of you.  There's a Joint Exhibit notebook, a Tricon
16  Exhibit notebook and a Vinmar Exhibit notebook.
17   A.  Right.
18   Q.  Let me ask you to take out the Joint Exhibit
19  notebook --
20   A.  Got it.
21   Q.  -- and turn to Exhibit J 5.  And let's look at
22  the second page of Exhibit J 5.
23   A.  Okay.
24   Q.  Is that Tricon's sales slip?
25   A.  Yes, that is.

291

1    Q.  Did you receive a copy of Exhibit J 5 from
2   Mr. Lockwood?
3    A.  Yes, I did.
4    Q.  And if you will look at the second page of
5   that sales letter, are those Tricon's standard terms and
6   conditions of sale?
7    A.  Yes.
8    Q.  Let me tell you to take a look also at J 4.
9    A.  Joint 4?
10   Q.  Oh, I'm sorry.  Second page.  And that is a
11  copy of the last MOAB confirm for this transaction.
12  Mr. Rajevac, did you also receive a copy of Joint
13  Exhibit No. 4?
14   A.  I don't specifically remember receiving it,
15  but I'm pretty certain I would have because it's part of
16  the file and it usually goes behind our letter in the --
17  in the file folder.
18   Q.  Okay.  And I will ask you if you can turn
19  again to the first page of the letter, TRI 7.  And if
20  you would compare that to --
21   A.  Oh, that's on --
22   Q.  Exhibit 5.
23   A.  Okay.
24   Q.  Compare that to the second page of Joint
25  Exhibit 4, which is VIN 18.  And tell me, sir, if the

292

1   essential terms of the deal in Joint Exhibit 5, which
2   was a Tricon letter, and Joint Exhibit 4, the last
3   MOAB -- 4, the last MOAB confirm, are the essential
4   terms the same in both?
5    A.  Yes.  As far as I can tell, they are.
6    Q.  Is it your job as the operations specialist at
7   Tricon to negotiate the terms and conditions of sale?
8    A.  Yes.  That's part of -- part of my job, the
9   general terms and conditions of the sale, yes.
10   Q.  Take a look at the last page of exhibit --
11  Joint Exhibit No. 5.  Do you see where there are
12  signature lines on that page?
13   A.  I do.
14   Q.  Have your ever seen these lines signed on a
15  spot deal?
16   A.  No.  I can't recall ever seeing them signed on
17  a spot deal, no.  On a term deal -- on a longer term
18  deal I have in the past but not on a spot deal.
19   Q.  Okay.  Let me ask you also, Mr. Rajevac, when
20  Vinmar sends its terms and conditions to its
21  counterparty, is it its intention to cancel the deal
22  that was made with the broker?
23      MR. LEE:  I think the question was did
24  Vinmar.  I think --
25      MR. DIAZ-ARRASTIA:  I'll ask the

293

1   question --
2       MR. LEE:  I object, but I think you messed
3   up.
4       MR. DIAZ-ARRASTIA:  Excuse me.  I
5   apologize.
6       JUDGE BENTON:  It's like calling him
7   Mr. Lee.
8       MR. DIAZ-ARRASTIA:  Like calling me
9   Mr. Lee.  I apologize.  Let me rephrase.
10   Q.  (BY MR. DIAZ-ARRASTIA)  Mr. Rajevac, when
11  Tricon sends its terms and conditions of sale to its
12  counterparty, is it its intention to cancel the deal
13  that had been made with the broker?
14   A.  No.
15   Q.  What is the intention?
16   A.  The intention is to expand on the terms that
17  are -- that have been agreed already between the trader
18  and propose the new terms and conditions.
19   Q.  To propose additional terms?
20   A.  Right.
21   Q.  And does it sometimes happen that some of the
22  additional terms are not agreed to?
23   A.  It happens, yes.
24   Q.  Does it sometimes happen that none of the
25  original -- none of additional terms are agreed to?

74  (Pages 290 to 293)

294

1    A. Very rarely. I can't recall where none of
2  them had been agreed to.
3    Q. But in any event, does that mean that there's
4  no deal?
5    A. No. The deal is still in place.
6    Q. Let's turn now to Joint Exhibit No. 13. I
7  will call your attention to the bottom half. It's an
8  e-mail from Laurentiu Pascu to you on July 29th, 2008.
9  Do you see that, sir?
10   A. I do.
11   Q. Do you know who Laurentiu Pascu is?
12   A. Yes. He is my counterpart at Vinmar.
13   Q. So he would have been ops specialist at
14 Vinmar?
15   A. Correct.
16   Q. And if we can focus in on that, what is
17 Mr. Pascu telling you in his cover e-mail?
18   A. "Find enclosed our comments on your sale
19 confirmation. We shall revert soon with our -- we
20 should soon -- revert soon with our purchase order for
21 your review. Please advise. Advising bank where the
22 LC" --
23   Q. Okay.
24   A. -- "should be open." Do you want me to read
25 the whole thing?

295

1    Q. No. I think that's enough. Now, let me ask
2  you something. As an operations specialist, do you
3  prepare a purchase order if you think your deal has just
4  been canceled?
5    A. No.
6    Q. Turn to the next page on Joint Exhibit 13.
7  Actually another couple of pages. Did you receive this
8  document attached to the e-mail that you just looked at?
9    A. Yes, I did.
10   Q. And it contains some changes on the letter
11 that was sent --
12   A. Correct.
13   Q. -- by Mr. Lockwood. Correct?
14   A. Correct.
15   Q. Let's go over a couple of the changes.
16   A. Okay.
17   Q. Where it says "Ship Period," do you see that
18 ship has been scratched out and words have been written
19 in?
20   A. Right.
21   Q. Where it says, "Arrival at destination"?
22   A. Correct.
23   Q. Do you see that, sir?
24   A. Yes, I do.
25   Q. That was something that you received from

296

1  Mr. Pascu?
2    A. Yes.
3    Q. Now, although he has changed that,
4  Mr. Rajevac, in your mind does ship period and arrival
5  at destination really mean the same thing?
6    A. Yes, in this case it does. It's just -- it's
7  just language of our system calls it ship period.
8    Q. Okay. Let's go down to where it says credit
9  terms. Do you see that, sir?
10   A. Yes.
11   Q. And that's referring to the on -- at site
12 letter of credit that was supposed to be prepared?
13   A. Correct.
14   Q. And do you see where Mr. Rajevac -- Mr. Pascu
15 scratched out the words "and confirmed"?
16   A. I do see that.
17   Q. Okay. Is -- whether the letter of credit
18 needs to be confirmed, is that a logistics issue?
19   A. That's a credit issue.
20   Q. And do operations specialists negotiate credit
21 issues?
22   A. Yes, amongst others.
23   Q. Okay. Let's turn to the next page. And let's
24 go down to Paragraph No. 7 first and I'll jump around
25 here a little bit.

297

1    A. No. 7?
2    Q. No. 7.
3    A. Okay.
4    Q. And first Transfer of Title and Risk. Do you
5  see that, sir?
6    A. I do.
7    Q. And Mr. Pascu has made a few changes. He has
8  scratched out a few words in the second line and added
9  "As per Incoterm 2000."
10   A. Yes.
11   Q. And under the A section under that, there's
12 also places where he has scratched out some language?
13   A. Yes.
14   Q. Do you see that, sir?
15   A. Yes, I do.
16   Q. Again, let me ask you, is transfer of title
17 and risk a logistics issue?
18   A. No, I wouldn't call it a logistics issue, no.
19   Q. Okay. Let's also look at some of the other
20 marks that Mr. Pascu has made. He -- first, No. 3, law
21 and jurisdiction. Do you see where there's a checkmark
22 there?
23   A. Yes, I do.
24   Q. Is law and jurisdiction a logistics issue?
25   A. No.

75  (Pages 294 to 297)

ARBITRATION HEARING - SEPTEMBER 20, 2010

298

1    Q.  It involves the law.  Correct?
2    A.  Correct.
3    Q.  Is that the sort of provision that an ops
4  specialist would negotiate?
5    A.  Absolutely.
6    Q.  Let's take a look at additional collateral,
7  No. 4?
8    A.  Uh-huh.
9    Q.  There's also a checkmark there?
10    A.  Right.
11    Q.  Is additional collateral a logistics issue?
12    A.  No.  That's another credit/finance issue.
13    Q.  Okay.  And he does mention up in No. 2
14  demurrage.  He wants to change it from 90 days to
15  60 days.  Correct?
16    A.  Yes.
17    Q.  Okay.  Let's also come to the next page and
18  look at Paragraph No. 9.
19    A.  Okay.
20    Q.  That's the dispute resolution provision.
21  Correct, sir?
22    A.  Yes.
23    Q.  And that's what provides for arbitration and
24  that why we're here today?
25    A.  Right.

299

1    Q.  Is dispute resolution one of the terms that an
2  operations specialist would negotiate?
3    A.  Yeah, it is.
4    Q.  Now, Mr. Pascu, have you subsequently learned
5  that the terms and conditions of Vinmar's standard
6  purchase order also contain essentially the same
7  arbitration clause?
8    A.  I have learned since, yes.
9    Q.  I am sorry.  I keep calling you Pascu.  I
10  guess it's because Rajevac -- Pascu is easier to say
11  than Rajevac.
12    A.  Right.
13    Q.  I apologize for that.  But you have
14  subsequently learned that, have you not, sir?
15    A.  Yes, I have.  I have subsequently learned
16  that.
17    Q.  Take a look at Tricon Exhibit folder, No. 10.
18    A.  No. 10?
19    Q.  No. 10.  Do you see that, sir?
20    A.  I do.
21    Q.  And I will represent to you that that is the
22  Vinmar purchase order for this transaction.
23    A.  Okay.
24    Q.  Will you take a look at -- on the upper
25  right-hand corner, you see where the purchase order

300

1  number is found?
2    A.  4529980?
3    Q.  Yes, sir.
4    A.  Yeah.
5    Q.  If you would now flip back to Joint Exhibit
6  No. 13, the second page -- third page actually.  Now, is
7  that the same number that you see handwritten on top of
8  Joint Exhibit 13?
9    A.  Yes, sir.
10    JUDGE BENTON:  Hold on a second.  What
11  exhibit number is that right there?
12    MR. DIAZ-ARRASTIA:  That is joint -- that
13  would be Tricon Exhibit No. 10.
14    JUDGE BENTON:  Okay.  All right.
15    Q.  (BY MR. DIAZ-ARRASTIA)  If we could go down on
16  Tricon Exhibit No. 10 to where it says law and
17  arbitration.  Tell me when you find it.  There you go.
18    And that is something that you have seen
19  since this matter started being arbitrated, correct --
20    A.  Yes, since.
21    Q.  -- with Mr. Rajevac?
22    A.  This is correct.
23    Q.  It provides for arbitration before the
24  Triple A pretty much like we're doing right now?
25    A.  That's what it says here.

301

1    Q.  Okay.  And let me also just scroll up a little
2  bit.  There's a place in this purchase order for origin.
3  Correct, sir?
4    A.  Yes, I do see that.
5    Q.  And it is left blank?
6    A.  Correct.
7    Q.  Okay.  Let's take a look now at Joint Exhibit
8  No. 14.  And look at the lower half of this first page.
9  Tell us which one Exhibit No. 14 is.
10    A.  It is my answer to Mr. Pascu's e-mail that we
11  just looked at in one of the other exhibits where he was
12  requesting some changes.
13    Q.  Okay.  This is your response to Joint
14  Exhibit 13.  Correct?
15    A.  Yes, that's correct, 13.
16    Q.  And you sent it on July 29, 2008, at
17  4:43 p.m.?
18    A.  Yep.  That's what it says here.
19    Q.  And your statement on No. 1 is "Your comments
20  on the contract are well noted and accepted except for
21  demurrage time bar, which is 90 days as per industrywide
22  standard."  Is that correct, sir?
23    A.  Yes, that is correct.
24    Q.  Was it your intention to tell Mr. Pascu that
25  you were in agreement with all of his proposed changes

**76 (Pages 298 to 301)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

302

1    except for demurrage time bar?
2        A.  Yes.  That was my full intention.
3        Q.  And that's, in fact, what you said?
4        A.  Yes, exactly.
5        Q.  Okay.  Now, later on down in No. 3, this is
6    where you state -- specifically state to Mr. Pascu that
7    Asian origin cargo might be used to supply this
8    contract?
9        A.  Yes, that is correct.
10       Q.  Okay.  And what it says is, "As far as the
11   ship details, we sold on a CFR basis with arrival
12   window.  So once you declare the discharge port by
13   August 8th, we will be able to decide whether to give
14   you a deep sea cargo, which at that point will most
15   likely be on the water, or an Asian origin cargo."
16           And then at the very end, you say, "Since
17   we guarantee the arrival window, we always have to keep
18   a few options open in order to perform."
19       A.  That is correct.
20       Q.  Now, when you say "deep sea cargo," sir, what
21   does that mean?
22       A.  It just means the cargo.  In this case it's --
23   Asia is the final destination.  It means it's not coming
24   from Asia.  It will be coming from the U.S. or Europe
25   or --

303

1        Q.  When you refer to deep sea cargo, was that
2    most likely to be U.S. origin cargo?
3        A.  Yes.
4        Q.  And actually what you tell Mr. Pascu is,
5    "Unfortunately, with deep sea Asia trade, it is not
6    always possible to know which cargo will be delivered
7    since the ETA's are hard to keep due to Panama
8    crossing," meaning the Panama Canal.  Correct?
9        A.  Correct.
10       Q.  "Weather in the Pacific, et cetera."  And then
11   you say, "And since we guarantee the arrival window, we
12   always have to keep a few options open in order to
13   perform."  Correct?
14       A.  That is correct.
15       Q.  Was it your understanding when you sent this
16   e-mail on July 29th, 2008, at 4:43 p.m. that Tricon and
17   Vinmar have now agreed on all the additional terms
18   except for demurrage?
19           MR. LEE:  Objection.  Leading.
20           JUDGE BENTON:  Overruled.
21       A.  Yes, it was my understanding.
22       Q.  (BY MR. DIAZ-ARRASTIA)  Does the Tricon terms
23   and conditions say anything about the origin of the
24   material?
25       A.  No.

304

1        Q.  Do any of Mr. Pascu's comments on Joint
2    Exhibit 13 say anything about origin of material?
3        A.  I'm uncertain.  Let me look real quick.  No.
4        Q.  When was the first time that you were told
5    that Vinmar required U.S. origin material?
6        A.  I don't remember specifically.  It was a
7    couple of years ago but it was --
8        Q.  Well, let's look at the document.  Let's look
9    at Joint Exhibit No. 15.
10       A.  Joint --
11       Q.  If you will look at it in the book, sir.
12       A.  Joint 15.
13       Q.  Okay.  Here we're looking at an e-mail that
14   Mr. Wilson sends you on July 31st, 2008, at 1:43 p.m.
15       A.  Uh-huh.  I see that.
16       Q.  Okay.  And that's where he says, "Vuk, we
17   cannot accept open origin for this material"?
18       A.  Yes.
19       Q.  Was that the first time you were told that
20   Vinmar required U.S. origin?
21       A.  I'm pretty certain that was the first time,
22   yes.
23       Q.  Okay.  And how long after your communication
24   with Mr. Pascu on Exhibit 14 did this come to you?  Take
25   a look at Exhibit 14.

305

1        A.  Okay.  Exhibit 14, I replied on July 29th.
2        Q.  At 4:43 p.m.?
3        A.  Right.  And Mr. Wilson replied to me two days
4    later on the 31st.
5        Q.  Okay.  As an operations specialist,
6    Mr. Rajevac, if you were informed by a counterparty that
7    they were not necessarily going to meet something that
8    was of critical importance to Tricon in the deal, when
9    would you inform your trader?
10       A.  Can you repeat that?
11       Q.  As an operations specialist -- operations
12   specialists work with the traders.  Correct?
13       A.  Right.
14       Q.  Traders make the deals, the operations
15   specialists complete the transaction.  Correct?
16       A.  Right.
17       Q.  As an operations specialist, if you had just
18   learned from your counterparty that something that your
19   employer, Tricon, considered to be -- and this is a
20   hypothetical question, something that Tricon considered
21   to be a very important thing that they needed in the
22   deal and the counterparty just told you that they would
23   not necessarily meet that, how much time would it take
24   you to report that to your trader?
25       A.  I would do it immediately.

**77  (Pages 302 to 305)**

ARBITRATION HEARING - SEPTEMBER 20, 2010

**306**

1   Q.  Take a look now -- well, first of all, did
2   Tricon -- did Vinmar, I'm sorry, declare a discharge
3   port on August the 8th?
4   **A.  No, it did not.**
5   Q.  Okay.  And what happened after that?
6   **A.  I believe I sent an e-mail telling them**
7   **they're in a breach of contract.**
8   Q.  Okay.  Take a look at Joint Exhibit 21 towards
9   the end of that exhibit.  It begins on Page VIN 41 at
10  the bottom.
11  **A.  Okay.**
12  MR. DIAZ-ARRASTIA:  Run up a little bit so
13  he can see the e-mail.  There you go.
14  Q.  (BY MR. DIAZ-ARRASTIA)  And this is an e-mail
15  that you --
16  MR. DIAZ-ARRASTIA:  Oh, you lost it.
17  Q.  (BY MR. DIAZ-ARRASTIA) -- you are sending to
18  Mr. Wilson on August the 8th at 3:42 p.m.?
19  **A.  Uh-huh.  I see that.**
20  Q.  And it says, "Will you remind him that he has
21  to declare a discharge port that day?"
22  **A.  Yes.**
23  Q.  Okay.  And let's take a look at the following
24  page at the very bottom.  And you tell Mr. Wilson,
25  "Furthermore, if your discharge port declaration is not

**307**

1   given by 5:00 p.m. CST today, Vinmar will be in breach
2   of the contract and we reserve the right to resell the
3   cargo in open market and will hold Vinmar liable for all
4   damages, including but not limited to the difference
5   between the price at which we sold to Vinmar and the
6   price obtained for the cargo in the open market."
7   **A.  Right.**
8   Q.  And did Mr. Lockwood ask you to send this
9   notice?
10  **A.  I don't specifically remember if he did or**
11  **not, but I would assume we discussed it.**
12  JUDGE BENTON:  I would assume -- I'm
13  sorry.  I would assume what?
14  THE WITNESS:  That we discussed --
15  JUDGE BENTON:  Okay.
16  THE WITNESS:  -- the fact that it was the
17  8th, almost 4:00 o'clock, and we haven't heard from
18  Vinmar.
19  MR. DIAZ-ARRASTIA:  I pass the witness.
20  JUDGE BENTON:  You want to go for about
21  five, ten minutes or do you want to just pick up in the
22  morning?  What's your pleasure?
23  MR. LEE:  It may be easier to pick up in
24  the morning.  I can get my notes.
25  JUDGE BENTON:  Okay.

**308**

1   MR. LEE:  I don't think I have a terribly
2   long cross-examination but it may be a lot more
3   efficient if we do it that way.
4   JUDGE BENTON:  All right.
5   MR. LEE:  Besides, my back is killing me.
6   JUDGE BENTON:  Very good.  Just a little
7   note.  Who you calling next after Mr. Rajevac?
8   MR. DIAZ-ARRASTIA:  After Mr. Rajevac, we
9   will play the deposition of Mr. Pascu.
10  JUDGE BENTON:  Okay.
11  MR. DIAZ-ARRASTIA:  We will then play the
12  deposition of Mr. Wilson.  Then we will call Mr. Steve
13  Simpson who is an expert on customs and practices in the
14  industry and then we will call Mr. Matthews to go over
15  the calculation of the damages.
16  JUDGE BENTON:  Okay.
17  MR. DIAZ-ARRASTIA:  And that will be our
18  evidence.
19  JUDGE BENTON:  Let's --
20  JUDGE DAVIDSON:  Can we leave our stuff
21  here overnight or do we need to take it or do we need
22  to --
23  MR. DIAZ-ARRASTIA:  We have the room.  I
24  intended to leave my binders and things here.
25  JUDGE DAVIDSON:  Then I'll do the same.

**309**

1   JUDGE BENTON:  Very good.  We'll be in
2   recess until tomorrow morning.
3   We're off the record.
4   (Proceedings recessed at 4:50 p.m.)

**78  (Pages 306 to 309)**

310

```
 1   STATE OF TEXAS    )
 2   COUNTY OF HARRIS  )
 3
 4        I, Diana Ramos, a Certified Shorthand Reporter
 5   in and for the State of Texas, do hereby certify that
 6   the above and foregoing pages contain a full, true and
 7   correct transcription of my shorthand notes taken upon
 8   the occasion set forth in the caption hereof, as reduced
 9   to writing by me and under my supervision.
10        I further certify that the transcription of my
11   notes truly and correctly reflects the exhibits offered
12   into evidence, if any; that I am neither counsel for nor
13   related to any party in this cause and am not
14   financially interested in the outcome.
15        Certified to by me on this 28th day of
16   September, 2010.
17
18
                    _____
19                  Diana Ramos CSR
                    Texas CSR No. 3133
20                  Expiration Date:  12-31-2010
                    DEPOTEXAS
21                  Firm Registration No. 95
                    13101 Northwest Freeway, Suite 210
22                  Houston, Texas  77040
                    Tel:  (281) 469-5580
23                  FAX:  (713) 460-2525
24
25
```

79  (Page 310)

311

AMERICAN ARBITRATION ASSOCIATION

DALLAS, TEXAS

TRICON ENERGY, LTD.,              )
                                  )
          Claimant,               )
                                  )       CASE NO.
     - against -                  )   70 198Y 00168 09
                                  )
VINMAR INTERNATIONAL, LTD.,  )
                                  )
          Respondent.             )

TRANSCRIPT OF PROCEEDINGS

BE IT KNOWN THAT the above-entitled matter came on for arbitration at 8:47 a.m. on the 21st day of September, 2010, at the Houston Club, 811 Rusk, 10th Floor, Travis Room, Houston, Texas, before the Honorable Levi Benton, Presiding, the Honorable Sharolyn Wood and the Honorable Mark Davidson, Arbitrators, and the following proceedings were had:

ARBITRATION HEARING - SEPTEMBER 21, 2010

312

1  A P P E A R A N C E S :
2
3  THE PANEL OF ARBITRATORS:
      Honorable Levi Benton, Chair
4     Honorable Sharolyn Wood
      Honorable Mark Davidson
5
6  FOR THE CLAIMANT, TRICON ENERGY, LTD.:
      Mr. George R. Diaz-Arrastia
7     Ms. Tracy D. Larson
      SCHIRRMEISTER, DIAZ-ARRASTIA & BREM, LLP
8     700 Milam, 10th Floor
      Houston, Texas  77002
9     Tel: (713) 221-2500
      FAX: (713) 228-3510
10    gdarrastia@sdablaw.com
      tlarson@sdablawl.com
11
12 FOR THE RESPONDENT, VINMAR INTERNATIONAL, LTD.:
      Mr. Stephen H. Lee
13    Mr. R. Blake Runions
      PORTER & HEDGES, LLP
14    1000 Main Street, 36th Floor
      Houston, Texas  77002-6336
15    Tel: (713) 226-6000
      FAX: (713) 226-6286
16    slee@porterhedges.com
      brunions@porterhedges.com
17
18 ALSO PRESENT:
      Mr. Mark S. Antonvich
19    Ms. Angie Gossen
      Mr. Brad Lockwood
20    Ms. Petrice Podlesny
21
22
23
24
25

313

1                I N D E X
                              PAGE
2
   Appearances...................................... 312
3
   PRESENTATION ON BEHALF OF THE CLAIMANT (Continued)
4
   VUK RAJEVAC
5     Cross-Examination by Mr. Lee................ 314
      Redirect Examination by Mr. Diaz-Arrastia... 336
6     Recross-Examination by Mr. Lee.............. 340
7  LAURENTIU PAUL P ASCU (VIA VIDEOTAPE PLAYBACK)... 345
8  RICHARD W. WILSON, Ph.D. (VIA VIDEOTAPE PLAYBACK) 384
9  STEVE SIMPSON
      Direct Examination by Mr. Diaz-Arrastia..... 462
10    Cross-Examination by Mr. Lee................ 492
      Redirect Examination by Mr. Diaz-Arrastia... 508
11    Recross-Examination by Mr. Lee.............. 512
12 GARY COFRAN (VIA DEPOSITION EXCERPTS READBACK)... 529
13
14 PRESENTATION ON BEHALF OF THE RESPONDENT
15
   LAURENTIU PAUL PASCU
16    Direct Examination by Mr. Lee............... 542
      Cross-Examination by Mr. Diaz-Arrastia...... 554
17
18 Reporter's Certificate Page...................... 574
19
20
21
22
23
24
25

314

1                (8:47 a.m.)
2           JUDGE BENTON:  We're on the record now.
3  When we left, I believe we were ready to begin the
4  cross-examination by Mr. Lee.
5           If you're ready, you may proceed, sir.
6           MR. LEE:  Thank you.
7                VUK RAJEVAC,
8  having been previously duly sworn, testified as follows:
9           CROSS-EXAMINATION (8:47 a.m.)
10 BY MR. LEE:
11    Q.  Mr. Rajevac, how are you this morning?
12    **A.  Good.  Yourself?**
13    Q.  I'm doing fine.  Thank you.  Yesterday when
14 you testified about your role as an operations
15 specialist, you were describing that role that you
16 perform at Tricon.  Correct?
17    **A.  Yes.**
18    Q.  And your only experience is working at Tricon?
19    **A.  This is correct.**
20    Q.  Okay.  So what you've told us yesterday is how
21 you handled your job at Tricon?
22    **A.  Yes.**
23    Q.  Okay.
24    **A.  That's correct.**
25    Q.  Okay.  You were not involved in the

315

1  negotiations between the traders and the broker for the
2  transaction at issue, were you?
3     **A.  No, I was not.**
4     Q.  And you first heard about the alleged deal
5  through Mr. Lockwood.  Is that correct?
6     **A.  Yes, that would be correct.**
7     Q.  Would you take a look at -- in the joint
8  exhibit notebook, Exhibit No. 5.  And do you
9  recognize -- well, we'll give everybody a chance to get
10 to that.  We've got so many notebooks.
11          Do you recognize the second page through
12 the rest of the exhibit as Tricon's sales contract?
13    **A.  I recognize the document, yes.**
14    Q.  Is that Tricon's sales contract?
15    **A.  That's -- we call it Tricon's letter.**
16    Q.  Okay.  Well --
17    **A.  It includes the main terms and the proposed**
18 **additional terms on it.**
19    Q.  Okay.  Mr. Lockwood referred to it as a
20 contract in his e-mail to Mr. Wilson on the first page,
21 is that right, the first e-mail at the bottom?
22    **A.  Yes, he did.**
23    Q.  Okay.  So I'm just -- that's what this
24 document is.  Correct?
25    **A.  I -- you can make that decision.  One says**

2  (Pages 312 to 315)

ARBITRATION HEARING - SEPTEMBER 21, 2010

316

1 e-mail. I call it differently but --
2     Q. You testified about terms and conditions
3 yesterday?
4     A. Yes, correct.
5     Q. But does Joint Exhibit 5 contain Tricon's
6 terms and conditions?
7     A. Yes, it does.
8     Q. And so yesterday when you said that -- you
9 testified that the terms and conditions are very
10 important to Tricon and to a deal, you were referring to
11 the terms and conditions contained within Joint
12 Exhibit 5. Correct?
13     A. Yes, correct.
14     Q. And, in fact, I think you said that the terms
15 and conditions -- Tricon's terms and conditions have
16 significant economic impact to a deal. Correct?
17     A. I wasn't referring specifically to Tricon's
18 conditions. Just general terms and conditions of any
19 deal have a significant economic impact on that specific
20 transaction, yeah.
21     Q. And certainly the additional terms and
22 conditions that are included in Joint Exhibit 5 would
23 have some economic benefit to Tricon potentially.
24 Correct?
25     A. Potentially, yes, correct.

317

1     Q. You consider them to be valuable terms and
2 conditions?
3     A. I do.
4     Q. You're a trader now?
5     A. I am.
6     Q. Have you ever done a deal through Ed Leyman?
7     A. I have.
8     Q. Would you take a look at Joint Exhibit 4? And
9 if you'll take a look at the second page of that
10 exhibit.
11     A. Yes.
12     Q. Do you recognize this as a confirmation that
13 Mr. Leyman might send out?
14     A. I do.
15     Q. You do?
16     A. Yes.
17     Q. You've seen these before?
18     A. Yes, I have.
19     Q. Have you ever done a deal while you've been at
20 Tricon solely on the broker confirmation?
21     A. I'm not sure how you mean. The broker
22 confirmation comes in first when you're dealing with a
23 broker.
24     Q. Correct.
25     A. And then it's expanded upon with the other,

318

1 with the letter.
2     Q. Okay. Has Tricon to your knowledge ever
3 performed a transaction solely on the basis of a
4 confirmation like we see in Exhibit 4?
5     A. Can you repeat that? Has Tricon ever --
6     Q. To your knowledge, has Tricon ever performed a
7 transaction solely on the basis of a confirmation like
8 we see in Joint Exhibit No. 4?
9     A. I mean, I don't know how to answer that
10 question yes because it's -- that's what -- that's where
11 the deal is agreed to. So everything that's agreed to,
12 that's where it started so it is based on that.
13     Now, if your question is has the -- has a
14 transaction ever happened without other documents being
15 passed, I wouldn't be able to recall that, but this is
16 the essence of the transaction, so, yes, it's based on
17 that.
18     Q. And --
19     A. That's where the deal was agreed to.
20     Q. Okay. In every transaction that you have
21 brokered through a broker where Tricon was selling a
22 product to somebody else --
23     A. Okay.
24     Q. -- isn't it the case that you always have
25 Tricon's sales contract in place?

319

1     A. I -- personally with my trades, yes, I do.
2     Q. All right. And the sales contract would be?
3     A. Similar to this.
4     Q. Similar to Joint Exhibit 5?
5     A. Correct.
6     Q. All right. I believe your testimony is that
7 you've never seen one of Tricon's sales contracts
8 signed?
9     A. On the spot deals, yes, that's correct.
10     Q. And you'll agree with me that Joint Exhibit
11 No. 5, the last page, contains places for both
12 Mr. Lockwood and Mr. Wilson to sign. Correct?
13     A. Correct, correct.
14     Q. But it's your testimony that those signature
15 blanks are meaningless?
16     A. I never said they're meaningless. I'm just
17 saying that I don't see them signed in spot deals.
18     Q. And you've never seen them signed?
19     A. On spot deals, I don't recall ever seeing them
20 signed.
21     Q. And do you know why signature blanks are in
22 there?
23     A. I can only speculate it's an industry
24 standard -- not standard but industry I guess custom.
25 I can speculate that because whoever sends it I guess

3  (Pages 316 to 319)

ARBITRATION HEARING - SEPTEMBER 21, 2010

320

1   doesn't sign it first, waits for the other people's
2   comments and probably the signatures get lost somewhere
3   in that process, but that hasn't stopped the deal from
4   happening in the past.
5       Q.  The answer is you don't know why --
6       A.  No, I don't know exactly why, no.
7       Q.  Okay.  And did I -- did you testify yesterday
8   that the Tricon sales contract was not intended to
9   cancel the confirmation letter that had been sent by the
10  broker?
11      A.  Yes, I did.
12      Q.  Would you take a look at Page 3 of Joint
13  Exhibit 5?  This is Page 3 of the sales contract.
14      A.  Okay.
15      Q.  And at the bottom -- and, again, this is the
16  sales contract that Tricon sent to Vinmar.  Correct?
17      A.  Correct.
18      Q.  At the very bottom, there's a statement in the
19  sales contract.  It says, "Broker."  Do you see that?
20      A.  Yes, I do.
21      Q.  Okay.  It says, "This cancels and supercedes
22  any broker correspondence in relation to this
23  transaction and shall be for the sole purpose of
24  documenting commission, if any."  Do you see that?
25      A.  Yes, I do.

321

1       Q.  Okay.  So the -- so the sales contract says it
2   cancels and supercedes any broker correspondence it
3       A.  Yes, it does.  It says that.
4       Q.  Okay.  It's your testimony that that
5   profession has no meaning?
6       A.  My testimony is that I understand that
7   provision as that this is a document that is re --
8   replaces -- it doesn't cancel the deal.  It replaces the
9   documentation or the correspondence that a broker in
10  this case, MOAB, would send and obviously it expands
11  upon with some terms that the brokers don't deal with.
12          Brokers deal with the main terms of the
13  deal.  So I understand this here is a document that
14  expands upon and replaces the document that MOAB sent
15  so...
16      Q.  Okay.  But it says --
17      A.  It doesn't say that it cancels the deal.  I
18  don't see that if that's what you mean.
19      Q.  Well, that's not.  My question was, doesn't it
20  say that it cancels and supercedes the broker
21  confirmation?
22      A.  Broker correspondence.
23      Q.  Which would include the confirmation.
24  Correct?
25      A.  The document, yes.

322

1       Q.  Okay.  Now, some of these terms in the sales
2   contract that Tricon sent, I just want to ask a couple
3   of things about the -- these provisions.  If you take a
4   look at Page 2 of the sales contract, Paragraph No. 8
5   under taxes.
6       A.  Uh-huh, yes.
7       Q.  Do you see that, sir?
8       A.  Yes.
9       Q.  Now, what this provision says is that if there
10  are any taxes that are imposed as a part of this
11  transaction that the buyer will pay for those taxes.  Is
12  that correct?
13      A.  Let me read through it real quick.  Yes.
14      Q.  Okay.  And it says that if the -- if the taxes
15  are for the seller -- so that would be Tricon.  So if
16  Tricon is required to pay any taxes on this transaction,
17  then Tricon has the right to pass those taxes on to
18  Vinmar in this situation.  Correct?
19      A.  Yes.
20      Q.  All right.  That type of provision is not
21  included in the confirmation from the broker.  Correct?
22      A.  I would assume that's correct.
23      Q.  And it's certainly possible under this
24  situation or any other situation that there might be
25  taxes that would increase the amount that Vinmar was

323

1   required to pay under this deal?
2       A.  Yes.
3       Q.  The force majeure provision at Paragraph 6, is
4   that something that Tricon considers to be important?
5       A.  Yes.
6       Q.  What about Page 3 of the sales contract under
7   product use?  Now, what this provision in the sales
8   contract says is that Vinmar in this case that we're
9   talking about, something that was sent to Vinmar, so if
10  we assume Vinmar's the buyer.
11          It says, "Vinmar represents and warrants
12  that the product purchased hereunder shall be used for
13  other than gasoline blending purposes in the United
14  States."
15      A.  Uh-huh.
16      Q.  Do you see that?
17      A.  Yes, I do.
18      Q.  Now, that was not included in the broker
19  confirmation.  Correct?
20      A.  No.
21      Q.  And, in fact, as you understand the
22  transaction, Vinmar had used -- if it purchased the
23  mixed xylenes, it could use that product for whatever
24  reason it wanted to.  Correct?
25      A.  As far as I understood, yes.

4  (Pages 320 to 323)

ARBITRATION HEARING - SEPTEMBER 21, 2010

324

1    MR. LEE:  Do you need to take a --
2    JUDGE BENTON:  No.  I'm fine.
3    Q.  (BY MR. LEE)  And, in fact, if that's going to
4  happen, Vinmar under this contract is required to notify
5  Tricon as soon as possible.  Correct?
6    A.  This is correct.
7    Q.  And is that because -- I mean, that has some
8  benefit to Tricon.  Correct?  They want to make sure
9  that the product is not being used for other than
10  gasoline blending purposes in the United States?
11    **A.  Tricon has no -- I believe -- I'm not sure.**
12  **You would know that better as a lawyer.  I believe there**
13  **was some kind of a provision about not using**
14  **petrochemicals or aromatics and gasoline for gasoline**
15  **blending purposes.  This has nothing to do with Tricon.**
16  **Tricon doesn't really care what Vinmar**
17  **uses the product for.  I think this is a problem with**
18  **either state or federal law or some kind of a provision.**
19    Q.  But it's included in the form of a
20  sales contract?
21    **A.  It's a form of protection --**
22    Q.  Right.
23    **A.  -- for Tricon, that's correct.**
24    Q.  Yesterday you were asked to look at Joint
25  Exhibit No. 4 and Joint Exhibit No. 5 so that's the

325

1  confirm and the sales contract.  And the question that
2  you were asked is, are all of the essential terms
3  identical?
4    A.  Yes.
5    Q.  Do you remember that question?
6    A.  Yes.
7    Q.  What were the essential terms that you were
8  referring to between the two documents?
9    **A.  I was talking about the purchasing party,**
10  **Vinmar in this case, the product, the quantity, the**
11  **quality, the price.  In this case, there was a promised**
12  **delivery window, which was the first half of September**
13  **in either Ulsan or Taiwan, that's about it.**
14    Q.  Okay.  So just to make sure, you said
15  purchasing party, product, quality, quantity, price and
16  delivery window?
17    **A.  Correct.**
18    Q.  And you've identified those as the essential
19  terms?
20    **A.  Yes.  I would say those are the essential**
21  **terms.**
22    Q.  Okay.  Now, you'll agree with me that if you
23  look at the confirmation and the sales contract and you
24  compare those provisions they're not identical, are
25  they?

326

1    **A.  As far as I can see yesterday, they were, but**
2  **did you want to tell me --**
3    Q.  Well, I mean, let's just, for instance, look
4  at the quantity.  In the Joint Exhibit 4, the quantity
5  says that it's "5,000 metric tons plus or minus
6  5 percent, seller's option."  Right?
7    **A.  Correct.**
8    Q.  That's the language in the --
9    **A.  In the MOAB confirmation.**
10    Q.  -- MOAB confirmation.
11    Now, if you look at the Tricon's sales
12  contract under quantity, it says, "5,000 metric tons
13  plus or minus 5 percent, vessel's option"?
14    **A.  This is correct.**
15    Q.  It's not the same language, is it?
16    **A.  You're right, it's not the same language.**
17    Q.  Okay.  And then if we look at the delivery
18  term under the confirmation, which is Joint Exhibit 4,
19  so flip back to MOAB's letter.  It says -- well, it's
20  got three paragraphs there.  Correct?
21    **A.  Tell me which one you're looking at.**
22    Q.  Under delivery.
23    **A.  Okay.  Yes, I do.**
24    Q.  "CFR basis one safe berth/port major ports
25  Taiwan or Ulsan Korea."

327

1    A.  Uh-huh.
2    Q.  Okay.  Now, the terms in the Tricon sales
3  contract, they're not the same completely, are they?
4    **A.  That's just the verbiage that we have.  In the**
5  **Ulsan Taiwan, we have all these set ports in our system**
6  **that we can pick from.  You can't just type in.  And**
7  **Ulsan Taiwan versus Taiwan or Ulsan Korea, I don't see a**
8  **big difference there.**
9    Q.  Well --
10    **A.  Actually, in fact, Ulsan Taiwan versus Taiwan**
11  **Ulsan so --**
12    Q.  Well, I'm just -- is it your testimony that
13  the delivery term in the confirmation is identical to
14  the delivery terms in the sales contract?
15    **A.  Essentially it is.  I mean, the wording,**
16  **obviously there's three lines here and it expands upon**
17  **it a little more versus ours is just one line, but**
18  **essentially they're the same as far as I can see, yes.**
19    Q.  The -- you understand that Mr. Lockwood told
20  you that there was a guaranteed first half of September
21  delivery into Asia.  Correct?
22    **A.  Yes, this is correct.**
23    Q.  And you will not find anything in the Tricon
24  sales contract that guarantees delivery first half of
25  September?

5  (Pages  324  to  327)

ARBITRATION HEARING - SEPTEMBER 21, 2010

---

328

1    A.  I think -- I think we've already touched upon
2  this.  Ship period in our system means when -- in a CFR
3  case, especially for Asia when there is a guaranteed
4  window, that means -- it says here, "September 1 to
5  September 15th."
6        That means what the delivery window is,
7  between September 1st and September 15th SO --
8    Q.  That's Tricon's system.  I'm just asking, will
9  I see any -- is there anything in the contract itself
10  that says that it is guaranteed first half September?
11    A.  Yes, the ship period.
12    Q.  Okay.  Do you see anywhere -- the confirmation
13  required Tricon to give Vinmar a minimum of five working
14  days notice of actual discharge date.  Do you see that?
15    A.  Do you want to point it out to me?
16    Q.  Under the delivery term.
17    A.  "Minimum of five working days notice of actual
18  discharge date," yes.
19    Q.  Okay.  And do you see that in Tricon's sales
20  contract?
21    A.  No, I did not see that in Tricon's sales
22  contract.
23    Q.  Let me ask you now about Joint Exhibit 14.
24  And I think you testified about this document yesterday.
25  And this was your response to Mr. Pascu's e-mail of the

---

329

1  same day.  Correct?
2    A.  This is correct.
3    Q.  Did you -- you know that Laurentiu Pascu was
4  Vinmar's logistics person?
5    A.  I did know he was, yes.
6    Q.  Okay.  And you also knew that Mr. Pascu did
7  not negotiate any of the terms of this alleged agreement
8  through Ed Leyman?
9    A.  I didn't know that.  I could have assumed --
10    Q.  Okay.
11    A.  -- but I didn't know that he didn't.
12    Q.  Did you ever talk to Mr. Pascu in the days
13  between July 22nd and July 31st, 2008?
14    A.  I don't recall ever talking to him on the
15  phone.  I believe the only correspondence between him
16  and I were -- were -- they're in the e-mails.
17    Q.  Okay.  Now, in your first point on your e-mail
18  to Mr. Pascu, you say, "Your comments on the contract
19  well noted and accepted."  Right?
20    A.  That's correct.
21    Q.  And you were referring to some handwritten
22  comments that Mr. Pascu had sent you on this sales
23  contract?
24    A.  Yes, I was.
25    Q.  Now, we can look at it, but I think you'll

---

330

1  remember, didn't Mr. Pascu tell you in his e-mail, which
2  is on this next page, that he would send you Vinmar's
3  purchase order?
4    A.  Yeah, I believe he did mention that.
5    Q.  So he sent you an e-mail, said, "Here's some
6  comments on the sales contract.  I will be sending you a
7  purchase order"?
8    A.  Yes, I believe that's what he says.
9    Q.  The purchase order was never sent to you.
10  Correct?
11    A.  I never received it, no.
12    Q.  Before the purchase order was sent, you heard
13  from Rick Wilson that he understood the deal required
14  U.S. origin mixed xylenes.  Correct?
15    A.  Yeah.  I believe a couple of days after my
16  e-mail to Pascu he did say something about believing it
17  would be U.S. origin, yes.
18    Q.  All right.  And my question was, before you
19  every received a purchase order from Vinmar you heard
20  from Mr. Wilson that his understanding of the deal was
21  it required Tricon to supply U.S. origin?
22    A.  Yeah, but it's different.  We never received
23  the first order so everything -- any correspondence
24  would be before then so --
25    Q.  Okay.  And you had responded to Mr. Wilson's

---

331

1  e-mail by saying, "No, we didn't guarantee U.S. origin
2  mixed xylenes"?
3    A.  Correct.
4    Q.  And it's your understanding that Tricon never
5  intended to supply U.S. origin mixed xylenes?
6    A.  Absolutely.
7    Q.  Okay.  Now, you didn't accept all of
8  Mr. Pascu's comments on the sales contract.  Correct?
9    A.  Correct.
10    Q.  In fact, you say, "We don't agree to the
11  demurrage time bar"?
12    A.  Yes.
13    Q.  And that was never resolved, was it?
14    A.  Yes.  Never heard back from Mr. Pascu.
15    Q.  And you've never seen a signed copy of the
16  sales contract?
17    A.  This is correct.
18    Q.  Now, on Joint Exhibit 4 under the inspection
19  provision, this confirmation says that "The quantity and
20  quality of the mixed xylenes will be inspected at the
21  load port by an independent inspector mutually agreed
22  upon with costs to be shared equally between buyer and
23  seller"?
24    A.  Uh-huh.
25    Q.  What that means is that before the mixed

---

6  (Pages 328 to 331)

ARBITRATION HEARING - SEPTEMBER 21, 2010

332

1    xylenes is loaded onto a ship, Vinmar has the right to
2    ensure that the quality and the quantity comply with the
3    proposed agreement?
4        A.  No.  It says that they can pay for half of the
5    inspector and agree to it together with us.
6        Q.  Right.  But it's supposed to be done before
7    it's loaded.  Right?
8        A.  Correct, in an ideal situation, yes.
9        Q.  Right.  And the purpose of that is to ensure
10   that the product that is delivered meets the quality
11   specification.  Correct?
12       A.  Having an inspector there, yes, that is the --
13   that is the purpose.
14       Q.  Right.  I mean, the inspector is the one that
15   tests the product to confirm that it meets this
16   ASTM 5211 standard?
17       A.  Right.  And issues a certificate of analysis,
18   correct.
19       Q.  Right.  And also the inspector would quantify
20   or test the quantity, make sure that it met the proposed
21   contract?
22       A.  Yes, this is correct.
23       Q.  And, again, that's to be done at the load port
24   prior to loading onto the ship?
25       A.  Correct.

333

1        Q.  Now, I'm going to ask you to flip back to
2    Joint Exhibit 14.  And if we look at the second page of
3    that e-mail, Mr. Pascu's e-mail to you on
4    July 29th, 2008.  And he -- in the second paragraph, he
5    asks a couple of questions.  Correct?
6             He says, "Please advise."  First he asks
7    about the advising bank.  But then the second question
8    he asks is, "Advise when shipment is expected."  Right?
9        A.  Uh-huh.
10       Q.  "Be informed that no shipment can take place
11   without us being informed for insurance purpose and
12   without presence of an independent surveyor" --
13       A.  Uh-huh.
14       Q.  -- "in this order.  Please let us have vessel
15   details and port of loading."  Right?
16       A.  Uh-huh.
17       Q.  And so what he's asking for is we need to know
18   where you're going to load it and when it's going to be
19   loaded so we can inspect it?
20       A.  Correct.
21       Q.  Now, if -- but Tricon didn't necessarily
22   intend to allow Vinmar to inspect the quality before it
23   was loaded?
24       A.  Oh, we would have been more than happy to let
25   Vinmar inspect the -- before the loading.  What you have

334

1    to keep in mind is that we promised a window of 15 days
2    arrival in Asia.  And in order to comply with that
3    promise in performing our deal, we had to leave
4    ourselves -- give ourselves option where -- you also
5    have to keep in mind August 8th was the day that -- by
6    which Vinmar was supposed to declare their discharge
7    port.
8             Well, there is a minimum of 35 days of
9    sailing time between the U.S. Gulf and Asia.  Well, by
10   the time you find a vessel, load it and leave after the
11   8th declaration, there's a huge chance we wouldn't have
12   made it to Korea, Taiwan, whatever the -- whatever
13   Vinmar had declared.
14            So we had to leave ourselves with the
15   option to either give the cargo that would be on the
16   water already or give the cargo of a closer origin, i.e.
17   Asian origin.  That doesn't mean that we wouldn't have
18   given Vinmar all the documentation that would have been
19   issued by an independent inspector at that load port,
20   including quality and quantity.
21            That's just the nature of the business.
22   When you're asking for a guaranteed window, you have to
23   realize that, especially with declaration, it's so close
24   to the -- to the potential loading date, say the
25   U.S. Gulf, that you can't always be present and be able

335

1    to have your inspector and all that if you're going to
2    require that window so that's what happened here.
3        Q.  So, I mean, if the deal required Vinmar or
4    gave Vinmar the opportunity to inspect it prior to
5    loading, you didn't necessarily intend to give them that
6    right.  Correct?
7        A.  Correct.
8        Q.  Okay.  And that's what you're referring to
9    in -- when you answered this question on the
10   page before, Joint Exhibit No. 14, No. 3, where you
11   said, "Hey, we may give you a deep sea cargo"?
12       A.  Correct.
13       Q.  "We may even give you something of Asian
14   origin"?
15       A.  Correct, in which case if it was Asian origin
16   we would have been more than happy to let Vinmar
17   participate in the inspection.  There would have been
18   plenty of time to do so.
19       Q.  Okay.
20       A.  It was only deep sea cargo which would --
21   which would likely -- in which case we would likely have
22   to give them already issued certificates of quality and
23   quantity for the -- for the xylene load.
24            MR. LEE:  Pass the witness.
25            JUDGE BENTON:  Mr. Diaz-Arrastia?

7  (Pages 332 to 335)

ARBITRATION HEARING - SEPTEMBER 21, 2010

336

1    MR. DIAZ-ARRASTIA:  Thank you, Your Honor.
2    REDIRECT EXAMINATION (9:13 a.m.)
3  BY MR. DIAZ-ARRASTIA:
4    Q.  I have a few questions.  Mr. Pascu, let me
5  just pick up with this inspection issue that you -- I'm
6  sorry.  Mr. Rajevac.
7    JUDGE BENTON:  Okay.  You're ahead of me.
8    MR. DIAZ-ARRASTIA:  I'm ahead of you now,
9  Judge.
10    Q.  (BY MR. DIAZ-ARRASTIA)  Mr. Rajevac, on this
11  inspection issue we just finished talking about -- and I
12  think it's what you just finished saying.  Now, if after
13  Mr. Pascu had seen your note that said, "We could give
14  you a deep sea cargo already on the water" or "We could
15  give you Asian origin," if Mr. Pascu had said, "Look, we
16  absolutely, positively have to be there at the
17  inspection," what would you have done?
18    A.  I would have said, "You're going to have to
19  declare your discharge port earlier so that we can
20  arrange for that."
21    Q.  Or you could have said, "We'll give you Asian
22  origin if you can inspect" --
23    A.  Exactly.  Those are the two options.
24    Q.  Okay.  Now, a moment ago I think Mr. Lee asked
25  you that Tricon never intended to deliver U.S. origin MX

337

1  and you agreed with that.  Now, is that completely
2  right?  Is it that you were not going --
3    A.  I didn't understand --
4    Q.  -- that you absolutely --
5    A.  -- it as didn't intend to.  I understood it as
6  at this point -- we didn't guarantee.  Maybe I misheard.
7    Q.  Yeah.
8    A.  There was no intention to deliver any specific
9  or no intention to deliver -- there was no -- at that
10  point there was no specific decision on what's going to
11  be delivered.
12    Q.  There was no -- there was no guarantee of U.S.
13  origin?
14    A.  Right, exactly.  There was no guarantee.
15    Q.  But you might supply U.S. origin?
16    A.  Oh, absolutely.
17    Q.  And, in fact, when you told Mr. Pascu that you
18  may provide a deep sea cargo, you meant something that
19  would most likely be U.S. origin?
20    A.  Correct.
21    Q.  Or you would do Asian origin?
22    A.  Correct.
23    Q.  Now, with regard to Joint Exhibit 5, if you
24  could take a look at that, sir.  And that is the Tricon
25  terms and conditions.  Mr. Lee asked you about

338

1  Paragraph 8 that had -- has to do with taxes --
2    A.  Uh-huh.
3    Q.  -- Paragraph 6 that has to do with force
4  majeure, I think Paragraph 10 that has to do with
5  product use.
6    A.  Correct.
7    Q.  Now, let me ask you, sir, could -- after
8  looking at Joint Exhibit 6, with regard to any of those
9  paragraphs, could Mr. Pascu have just told you, "Well, I
10  don't agree to that" or "I want to change it"?
11    A.  He could have.
12    Q.  Okay.  And, in fact, that's what he did with
13  transfer of title and risk?  He asked for that to be
14  changed?
15    A.  Correct.
16    Q.  So if he doesn't ask to be changed, that means
17  it's okay with him.  Right?
18    A.  That's how I understood it, yes.
19    Q.  Now, let's take a look at the language
20  that you talked about when you compared Joint Exhibit 4
21  to Joint Exhibit 5 and Mr. Lee asked you about seller's
22  option versus vessel's option, different words.
23    A.  Right.
24    Q.  As a practical matter in this deal, did
25  that -- does that have the same effect?

339

1    A.  In a CFR deal, yes, it does, because we're the
2  ones selecting the vessel and negotiating the quantity
3  to be loaded on the vessel.
4    Q.  And, similarly, with regard to ship period
5  versus arrival at destination, isn't that exactly what
6  Mr. Pascu asked to be changed?
7    A.  Yeah.  He asked to change the wording that we
8  had that our system used and I believe I agreed to it.
9    Q.  Yeah, I think you agreed to it and that's
10  because you thought it meant the same thing?
11    A.  Yeah, absolutely.
12    Q.  Mr. Rajevac, have -- when you used to work as
13  an ops specialist, did you ever have occasion where you
14  loaded material from a U.S. Gulf port that had been
15  stored with foreign materials stored in a bonded tank?
16    A.  Yes, I have.
17    Q.  Okay.  Can you tell me about that experience?
18    A.  I had an instance of a different product, MEG,
19  where the product was of Mexican origin and it was
20  intended for sale in Europe.  And there was a -- there
21  was no vessel directly sailing from Mexico to Europe so
22  what we did is we took a vessel that met the timing that
23  we agreed to with the supplier, brought it into the U.S.
24  Gulf, stored it in a bonded tank, which preserved the
25  Mexican origin.

8  (Pages 336 to 339)

ARBITRATION HEARING - SEPTEMBER 21, 2010

**340**

1    We stored it for probably three or four
2    days and then a different vessel from U.S. Gulf to
3    Europe loaded it and sent it to Europe and we still got
4    the benefit of bringing the Mexican origin cargo into
5    Europe.
6        Q.   And that is because on that second vessel,
7    that second vessel loaded it in a U.S. port.  That was
8    the load port?
9        A.   Correct.
10       Q.   But the material was still of Mexican origin,
11   not U.S. origin?
12       A.   Correct.
13           MR. DIAZ-ARRASTIA:  Pass the witness.
14           JUDGE BENTON:  Mr. Lee?
15           MR. LEE:  Just a few follow-up questions,
16   if I may.
17           RECROSS-EXAMINATION (9:18 a.m.)
18   BY MR. LEE:
19       Q.   Looking at this Joint Exhibit No. 5, the sales
20   contract, if the counterparty -- and let's look at
21   Page 2 of 4.  If a counterparty struck through the
22   provision law and jurisdiction, instead of saying "Texas
23   law" they put the "law of Singapore," that's something
24   that you could agree to on behalf of Tricon?
25       A.   Yes.

**341**

1        Q.   Okay.  If the counterparty struck through the
2    provision additional collateral requirement, that's
3    something that you could accept on Tricon's behalf?
4        A.   Yes.
5        Q.   Same thing for the Incoterms?
6        A.   Correct.
7        Q.   Same thing for force majeure?
8        A.   Correct.
9        Q.   Same thing for transfer title and risk?
10       A.   Correct.
11       Q.   Taxes?
12       A.   Correct.
13       Q.   Arbitration on the next page?
14       A.   Yes.
15       Q.   Product use?
16       A.   Yes.
17       Q.   Price and payment?
18       A.   Yes.
19       Q.   Interest?
20       A.   Yes.
21       Q.   So if a counterparty -- what if a counterparty
22   struck every one of these provisions?  Do you have the
23   authority to accept that on behalf of Tricon?
24       A.   Well, I have the authority, yes.  Whether I
25   would do it, the answer is probably not.  I would have

**342**

1    to talk to somebody.  I've never -- I've never been in
2    such a situation so I don't really know how to answer
3    that.
4        Q.   Okay.  What if somebody came back -- and let's
5    go back to my example then on number -- let's look at
6    No. 3 on Page 2.  If they struck through Texas law and
7    said Singapore law, would you have to ask -- would you
8    ask somebody within Tricon as to whether that was
9    acceptable?
10       A.   More than likely what I would do at first is,
11   yes, I would check with somebody and, say, "Hey, they're
12   asking for Singapore instead of Texas."  And I would
13   say, "The transaction has nothing to do with Singapore
14   so there's no reason to accept that," but if somebody --
15   if Brad agreed to accept it, I would be happy to go back
16   and accept it.
17       Q.   So you would go back to the trader in that
18   situation and ask him?
19       A.   If he was available.
20       Q.   You'd ask somebody within Tricon.  Correct?
21       A.   More than likely, yes.
22       Q.   And that would be true with all of these
23   provisions if somebody struck through them.  Correct?
24       A.   No, it wouldn't be.
25       Q.   Certainly with force majeure?

**343**

1        A.   If somebody struck out force majeure
2    completely?
3        Q.   Yes.
4        A.   Yes.  I would probably check with somebody on
5    that one.
6        Q.   What about on the taxes?
7        A.   Probably.
8        Q.   Arbitration?
9        A.   Same thing.
10       Q.   You'd check with somebody first?
11       A.   Yeah.
12       Q.   And is that because you understand that that
13   might have an impact on how the deal was carried out?
14       A.   Correct.
15           (The time is 9:21 a.m.)
16           MR. LEE:  I'll pass the witness.
17           JUDGE BENTON:  Mr. Diaz-Arrastia?
18           MR. DIAZ-ARRASTIA:  I have no further
19   questions.
20           JUDGE BENTON:  Mr. Rajevac, bad news.
21   You're excused.
22           THE WITNESS:  Okay.  Thank you very much.
23           JUDGE BENTON:  Your next witness is a
24   depo, I understand.
25           MR. DIAZ-ARRASTIA:  The next witness is

9  (Pages 340 to 343)

**344**

1 the depo of Mr. Pascu.
2     JUDGE BENTON: And it lasts how long?
3     MR. DIAZ-ARRASTIA: It's 45 minutes.
4     JUDGE BENTON: Okay. Perfect. All right.
5 Very good.
6     MR. LEE: And just to -- we have not
7 included -- we did not at this point intend to bring
8 Mr. Pascu to testify.
9     JUDGE BENTON: Okay. Very good.
10     MR. LEE: He will testify live so this
11 would be their --
12     JUDGE BENTON: Very good.
13     MR. LEE: -- their submissions.
14     JUDGE BENTON: Understood.
15     MR. LEE: Thank you.
16     JUDGE BENTON: All right. Let's proceed.
17     MR. LEE: And we expect to have our -- I
18 think the next thing is the video --
19     MR. DIAZ-ARRASTIA: The incomes video is
20 Mr. Wilson, who will also be by video.
21     MR. LEE: And somebody from my office is
22 going to help us. We did those cuts so she should be
23 here, but we might want to take a break after this so
24 that she can set it up. It shouldn't take very long,
25 but if we can sit through this if that's okay and then

**345**

1 take a break.
2     JUDGE BENTON: Okay. Yeah, that's what
3 our plan is to break after this one.
4     MR. LEE: I apologize.
5     JUDGE BENTON: No problem.
6     MS. LARSON: Is it possible to take a
7 three-minute recess?
8     JUDGE BENTON: Perfect. We're off the
9 record for a short break.
10     (Recess from 9:25 a.m. to 9:29 a.m.)
11     JUDGE BENTON: Let's proceed.
12     (At this time the edited version of the
13 videotaped deposition of Laurentiu Paul Pascu that was
14 originally taken on May 27, 2010, was played in the
15 arbitration. The court reporter at the arbitration
16 reported such proceedings and this is her transcription
17 of same.)
18     LAURENTIU PAUL PASCU,
19 having been first duly sworn, testified as follows:
20     EXAMINATION
21 BY MR. DIAZ-ARRASTIA:
22     Q. Sir, could you state your full name for the
23 record, please?
24     **A. Laurentiu Paul Pascu.**
25     Q. Tell me where you went to school, sir.

**346**

1     **A. I went to school in Romania. I did my high**
2 **school in Romania and then I done university studies in**
3 **Romania. I've done my master's study in Houston at**
4 **University of Houston.**
5     Q. Are you a native of Romania?
6     **A. Correct, yes.**
7     Q. And you attended university in Romania?
8     **A. Yes.**
9     Q. Okay. Where did you attend university in
10 Romania?
11     **A. Academy of Academic Studies.**
12     Q. And where is that; what city?
13     **A. In Bucharest.**
14     Q. Did you get a degree?
15     **A. Yes.**
16     **MR. DIAZ-ARRASTIA: Can you possibly --**
17     **A. Bachelor degree.**
18     **(This is the end of the playback of the**
19 **edited version of the videotaped deposition of Laurentiu**
20 **Paul Pascu that was originally taken on May 27, 2010.)**
21     **MR. DIAZ-ARRASTIA: Are you able --**
22     JUDGE BENTON: Yeah, we can hear.
23     JUDGE DAVIDSON: We need more volume.
24     MR. DIAZ-ARRASTIA: Well, that's the
25 problem we're having. The speakers aren't working.

**347**

1 It's coming from the computer.
2     JUDGE DAVIDSON: You need another minute
3 or two to work on the speakers?
4     MR. DIAZ-ARRASTIA: Yes, I think we do
5 probably.
6     JUDGE DAVIDSON: Then take -- I mean --
7     MR. DIAZ-ARRASTIA: My apologies.
8     JUDGE BENTON: All right. We're off the
9 record again for a short break.
10     (Recess from 9:30 a.m. to 9:36 a.m.)
11     JUDGE BENTON: All right. We're back on
12 the record. Let's proceed.
13     (At this time the edited version of the
14 videotaped deposition of Laurentiu Paul Pascu that was
15 originally taken on May 27, 2010, was played in the
16 arbitration. The court reporter at the arbitration
17 reported such proceedings and this is her transcription
18 of same.)
19     LAURENTIU PAUL PASCU,
20 having been first duly sworn, testified as follows:
21     EXAMINATION
22 BY MR. DIAZ-ARRASTIA:
23     Q. Okay. Tell me where you went to school, sir.
24     **A. I went to school in Romania. I did my high**
25 **school in Romania and then I done the university studies**

**10 (Pages 344 to 347)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

348

1   in Romania.  I done my master's study in Houston at the
2   University of Houston.
3       Q.  Are you a native of Romania?
4       A.  Correct, yes.
5       Q.  You attended university in Romania?
6       A.  Yes.
7       Q.  Okay.  Where did you attend university in
8   Romania?
9       A.  Academy of Economic Studies.
10      Q.  And where is that, what city?
11      A.  In Bucharest.
12      Q.  Did you get a degree?
13      A.  Yes.
14      Q.  What was that degree?
15      A.  Bachelor degree.
16      Q.  In what year?
17      A.  2001.
18      Q.  Did you have an area of concentration in your
19  studies?
20      A.  Yes.
21      Q.  And what was that?
22      A.  Merchandise science and quality management.
23      Q.  Okay.  And you said you have a master's degree
24  from the University of Houston?
25      A.  Yes.

349

1       Q.  Okay.  What master's degree is that?
2       A.  Master's of Business Administration.
3       Q.  Okay.  And when did you get that degree?
4       A.  In 2009.
5       Q.  Okay.  Are you currently employed by Vinmar?
6       A.  Yes.
7       Q.  Okay.  How long have you worked for Vinmar?
8       A.  Starting end of January 2006.
9       Q.  And when you went to work for Vinmar, what did
10  you do for them?
11      A.  What is my position?
12      Q.  Well, what is your position at Vinmar today?
13      A.  Supply chain specialist.
14      Q.  How long have you worked at Vinmar as a supply
15  chain specialist?
16      A.  From end of January 2006.
17      Q.  So that's the only job you have had at Vinmar?
18      A.  Yes.
19      Q.  Do you remember when Rick Wilson was a trader
20  at Vinmar?  Rick Wilson?
21      A.  Do I remember if when --
22      Q.  Do you remember him?
23      A.  I do remember him.
24      Q.  Okay.  And He was a trader at Vinmar?
25      A.  I don't know his position.  He -- he -- I

350

1   think that he was a trader in Vinmar.  I am not -- I am
2   not sure, but from my perspective, I think that he was a
3   trader at Vinmar.
4       Q.  All right.  He worked at Vinmar?
5       A.  He worked at Vinmar.
6       Q.  You're not sure whether he was a trader, but
7   you think he was?
8       A.  He was having commercial responsibilities.
9       Q.  Okay.  What does that mean to you?
10      A.  I'm not sure.
11      Q.  Well, I think you said earlier that you
12  believed that Rick Wilson was a trader.  Is that
13  correct?
14      A.  Yes, I said that.
15      Q.  Was Rick Wilson located -- when he worked at
16  Vinmar, was Rick Wilson located in the same office where
17  you were?
18      A.  As a job perspective?
19      Q.  Well, is that where he -- well, did he work in
20  the same office where you worked?
21      A.  Yes.
22      Q.  Okay.  Are you aware that a dispute has arisen
23  between Tricon and Vinmar regarding a sale of mixed
24  xylenes that occurred in July of 2008?
25      A.  Can you repeat that?

351

1       Q.  Are you --
2       A.  Sorry.
3       Q.  Are you aware that there is a dispute between
4   Tricon and Vinmar about a transaction involving mixed
5   xylenes in July of 2008?
6       A.  I'm aware that I have entered data for a
7   business in 2008 about mixed xylene and the entity was
8   Tricon.  I'm not sure whether there is a dispute or not.
9       Q.  Mr. Pascu, if you would please look at the
10  document that has been marked as Exhibit 29, which
11  appears to be, if you'll look at the top, an e-mail sent
12  by Rick Wilson to you.
13      A.  Okay.
14      Q.  And I think it says, "Laurentiu, I bought MX
15  from Tricon.  Please contact them and make the necessary
16  arrangements.  Rick."
17          Did I read that correctly, sir?
18      A.  This phrase is saying what you read, yes.
19      Q.  Do you remember getting this e-mail from
20  Mr. Wilson?
21      A.  Yes.
22      Q.  Do you understand that MX refers to mixed
23  xylenes?
24      A.  Yes.
25      Q.  And is this the -- is this the first time that

11  (Pages 348 to 351)

ARBITRATION HEARING - SEPTEMBER 21, 2010

352

1  you became involved in this -- with these mixed xylenes
2  that Mr. Wilson bought from Tricon?  Is this when you
3  first heard about it?
4      A.  Might have been, yes.
5      Q.  You say it might have been.  Might you have
6  heard about it before?
7      A.  I don't think that I've heard about it before,
8  but it was two years ago so --
9      Q.  Okay.  If you had heard about it before, how
10 would you have heard about it before?
11     A.  By e-mail, phone or person-in-person.
12     Q.  Well, this is the only e-mail like this that I
13 have seen.  Is it your -- well, let me put it this way.
14         Is it your testimony that the best that
15 you can remember today, this is the first time you heard
16 about this transaction?
17     A.  Yes, sir.
18     Q.  Okay.  Is this the typical way that you were
19 told about transactions for which data needed to be
20 entered?
21     A.  It is not unusual.
22     Q.  Okay.  And when he says "make the necessary
23 arrangements," what does Mr. Wilson mean by that?
24     A.  I don't know.  From my perspective as a
25 logistic person, it is to get the data entered into the

353

1  system, making sure that the ship or the shipment gets
2  arranged, and all the necessary, like the inspection,
3  payment terms were -- all the items are in place for
4  this shipment to go.
5      Q.  Okay.  Is that what you understand by "the
6  necessary arrangements"?
7      A.  From my point of view as a logistic
8  dispatching specialist, yeah.
9      Q.  And that is entering the data in the ERB
10 system?
11     A.  Correct, into SAP.  Let's put it SAP.
12     Q.  Okay.
13     A.  It's called SAP.
14     Q.  Okay.  And that would include price?
15     A.  Any data that is required by the system,
16 correct.
17     Q.  And that data would include price?
18     A.  Among the multiple data is the price.
19     Q.  Okay.  It would also include quantity?
20     A.  The quantity, correct.
21     Q.  Would it include date of delivery?
22     A.  Correct.
23     Q.  Quality of the material?
24     A.  Correct.
25     Q.  Payment method?

354

1      A.  Correct.
2      Q.  Payment terms?
3      A.  Correct.
4      Q.  Okay.
5      A.  But besides these are datas required for a
6  purchase order as the system is calling to be entered.
7      Q.  Okay.  Excuse me.  Can you repeat that?
8      A.  Besides the terms that you mentioned --
9      Q.  Yes.
10     A.  -- there are other datas that the system
11 requires to be entered.
12     Q.  Okay.  And what would that be?
13     A.  There are -- there are many.
14     Q.  Give me some of them.
15     A.  It is the -- it is called seller into the
16 system, if we are buying.
17     Q.  So the name of the seller?
18     A.  Right.
19     Q.  Or for the name of the buyer, if you are
20 selling?
21     A.  If -- so if I'm entering the purchase
22 confirmation, it's -- the name of the seller is a
23 requirement is the company -- is the -- so the company
24 that is --
25     Q.  Okay.  And did you understand that in this

355

1  case Mr. Wilson was telling you about a transaction
2  where Tricon -- Vinmar would be buying?
3      A.  In this one, I understand that there is going
4  to be a shipment of MX from Tricon to Vinmar.
5      Q.  Okay.  Tricon is the seller; Vinmar is the
6  buyer?
7      A.  That we are going to have a shipment from
8  Tricon of MX --
9      Q.  Okay.
10     A.  -- to Vinmar.
11     Q.  And did you understand that Mr. Wilson was
12 telling you that Tricon would be the seller and Vinmar
13 would be the buyer?
14     A.  For that, yes, as the process system.
15     Q.  In this transaction?
16     A.  As the process system, yes.
17     Q.  Now, if you would turn to the second page of
18 Exhibit 29, Mr. Pascu, this document -- these documents
19 were produced to us by Vinmar in this order.  And my
20 question to you is, did you receive the documents that
21 follow the first page of Exhibit 29 as an attachment to
22 the e-mail that is the first page?
23     A.  Should have been.
24     Q.  Okay.  You believe that you received all of
25 these documents together?

12  (Pages 352 to 355)

ARBITRATION HEARING - SEPTEMBER 21, 2010

356

1   A.  Yes.
2   Q.  Mr. Pascu, can you tell me what Exhibit No. 30
3  is?
4   A.  This is a view of our SAP data entry.
5   Q.  Okay.  Did you enter the data that is in this
6  document?
7   A.  I don't remember at that point of time.  I
8  think that might not have been me, but I don't remember.
9   Q.  Okay.  But if you look at the very top where
10  it says "Standard PO 4529980, created by Laurentiu"?
11   A.  Right.
12   Q.  Is that you when it is referring --
13   A.  Correct.
14   Q.  -- to Laurentiu?
15   A.  Correct.
16   Q.  So this says that this document is created by
17  you?
18   A.  Okay.  The initial input -- I'm not sure how
19  this system works, but most likely the initial input at
20  the time that the PO was created initially was created
21  by me.
22   Q.  Well, I'm asking you just about what we see in
23  this document, Exhibit 30 that you have in front of you.
24  Did you enter this data in the system?
25   A.  If this is correct, "Created by Laurentiu,"

357

1  I have entered the initial data, correct.
2   Q.  Okay.  Do you have any reason to think anybody
3  changed it after it was first entered by you?
4   A.  I don't remember.  Should not be.
5   Q.  Would it be fair to say that in Exhibit 29,
6  this document, Mr. Wilson was giving you the attachment
7  so that you would know what data needed to be entered
8  and what arrangements needed to be made?
9   A.  As a supply chain specialist, whenever I am
10  receiving a document, and as we see here, I would start
11  the necessary arrangements, which is including the data,
12  so most likely it would have been that I seen this
13  document and I have entered the data in SAP.
14   Q.  Okay.  Would Mr. Wilson tell you that he had
15  bought MX from Tricon if he had not?
16   A.  I don't know.
17   Q.  Mr. Pascu, who is Eduardo Anaya?
18   A.  At that time, he was a commercial trainee.
19   Q.  And by "the time," you mean in July of 2008?
20   A.  At the time of July 24th, 2008.
21   Q.  Commercial trainee?
22   A.  He was at that time a commercial trainee, but
23  he was in his period of getting the logistic training as
24  part of this part of training.
25   Q.  Okay.  Tell me, what is a commercial trainee?

358

1   A.  I don't know.
2   Q.  Okay.  You said Mr. Anaya was a commercial
3  trainee, but you don't know what that means?
4   A.  He was introduced to me as commercial trainee.
5  I don't know what that means.
6   Q.  Okay.  Did you work with Mr. Anaya?
7   A.  Right.
8   Q.  What work did you and Mr. Anaya do together?
9   A.  At this point of time, he was getting the
10  logistic training.  As a part of that logistic training,
11  he was working under my supervision to get the logistic
12  of the shipment going on.
13   Q.  So you were showing him how to do the
14  logistical side of the business?
15   A.  Correct.
16   Q.  And with that work, you would give him certain
17  assignments to do and then you would see how he did
18  them?  You would supervise his work?
19   A.  I would supervise his logistic work, yes.
20   Q.  Mr. Pascu, if you would look at Exhibit 31.
21  Let's start from the bottom of the document going up.
22  And at the bottom, does that appear to be an e-mail from
23  Mr. Anaya to Mr. Wilson and you and Ana Campos?
24   A.  You are asking me whether this e-mail is
25  addressed to me?

359

1   Q.  Well, yes.  Is it addressed to you and Ms. --
2  well, is it -- let me put it this way.
3       At the bottom, does that appear to you to
4  be an e-mail from Eduardo Anaya that is addressed to
5  Mr. Wilson, to you and to Ana Campos?
6   A.  Correct.
7   Q.  Do you remember receiving this e-mail?
8   A.  Should have been.
9   Q.  Okay.  By the way, who is Ana Campos?
10   A.  Is -- she is our logistic -- I don't know the
11  exact function that she -- but she is working with me
12  for this project, logistic duties.
13   Q.  Okay.  Is she your superior or somebody who
14  works under you or at the same level?
15   A.  I think that we are on the same level, but she
16  is still under my supervision.
17   Q.  So Ms. Campos is under your supervision?
18   A.  Yes.
19   Q.  In this e-mail, at the bottom is dated also
20  July 24th at 4:03 in the afternoon.
21   A.  Okay.
22   Q.  Is that correct?
23   A.  It seems that it was transmitted, was recorded
24  as 4:03 in the afternoon.
25   Q.  Okay.  So it is in the same day as Exhibit 29,

**13  (Pages 356 to 359)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

360

1  but while Exhibit 29 is at 10:15 in the morning,
2  Exhibit 31 is about 4:00 in the afternoon?
3      A.  Seems to be recording July 24th.
4      Q.  Okay.  Did you instruct Mr. Anaya to get in
5  touch with Mr. Wilson to get information?
6      A.  I don't remember, but most likely.
7      Q.  Okay.  And Mr. Anaya tells Mr. Wilson, "Rick,
8  I will do the follow-up from the logistics point of view
9  of this operation."
10          Did you give Mr. Anaya that assignment, to
11  do the follow-up from the logistics --
12     A.  Yes.
13     Q.  -- point of view of this operation?
14          And then he says, "To complete the order,
15  we just need the port of origin of this product."  Do
16  you see where it says that?
17     A.  Yes.
18     Q.  Is that information that would be entered into
19  this ERB or SAP system we've talked about?
20     A.  It is -- the port of origin is required for
21  our arrangements for the shipments.
22     Q.  Okay.  And if you will look at the note, the
23  next note above, which appears to be a note from
24  Mr. Wilson addressed to Mr. Anaya and to you and to
25  Ms. Campos.

361

1      A.  Okay.
2      Q.  And it appears to be a reply to the e-mail
3  from Mr. Anaya that we were just talking about.
4  Correct?
5      A.  Correct.
6      Q.  Dated on July 25 at 10:33 in the morning, the
7  next morning, after the e-mail at the bottom of
8  Exhibit 31.  Correct?
9      A.  Correct.
10     Q.  And all -- and all of these are referring
11  PO 459980, which is the same PO referred to in
12  Exhibit 30.  Correct?
13     A.  Correct.
14     Q.  So all of this appears to be relating to the
15  sale by Tricon to Vinmar.  Would that be correct?
16     A.  It appears to be related to this purchase
17  confirmation.
18     Q.  Okay.  And Mr. Wilson says to -- well, first,
19  do you remember receiving this e-mail from Mr. Wilson,
20  the one from July 25th, 2008, at 10:33 a.m.?
21     A.  I should have --
22     Q.  Okay.
23     A.  -- received it.
24     Q.  Okay.  And he tells Mr. Anaya, "Re: Origin, We
25  won't know until we declare discharge port."

362

1      A.  Okay.
2      Q.  "Most likely USG"?
3      A.  Okay.
4      Q.  Do you remember getting that?
5      A.  I should have got this e-mail.
6      Q.  So just to be clear, Exhibits 30, 33 and 32
7  are all different parts of the same document that would
8  appear on your computer screen?
9      A.  Yes, sir.
10     Q.  That -- and in order to see the entire
11  document, you would have to scroll from left to right on
12  your computer screen?
13     A.  This screen, yes.
14     Q.  Am I correct?
15     A.  Yes.
16     Q.  And the image that you would see on the
17  left-hand side of your computer screen would be
18  Exhibit 30.  Correct?
19     A.  This would be the first screen.
20     Q.  Okay.
21     A.  And then you have to roll -- scroll to get to
22  the 32 and 33.
23     Q.  All right.  So Exhibit 30 would be on the
24  left-hand side of your computer screen.  And then as you
25  scroll to the right, you would first see Exhibit 32 and

363

1  eventually you would get to Exhibit 33?
2      A.  Correct.
3      Q.  Is there anything in Exhibits 30, 32 or 33
4  that indicate the origin of the product?
5      A.  It shows here.
6      Q.  Yes.  In this document --
7      A.  In these documents?
8      Q.  In these documents, is there anything that
9  indicates the origin of the product?
10     A.  In these three papers?
11     Q.  In these three papers.
12     A.  Nothing.
13     Q.  Mr. Pascu, where did you get the information
14  that you would input into Exhibits 30, 32 and 33?
15     A.  Might have been from these (indicating).
16     Q.  Exhibit 29?
17     A.  Paperwork, yes.
18     Q.  Would it have come from Rick Wilson in any
19  case?
20     A.  Might have been from this paperwork.
21     Q.  Would the information that was put into things
22  like Exhibits 32, 33 and -- Exhibits 30, 32 and 33
23  generally come from the trader?
24     A.  Correct.
25     Q.  And in this transaction, Mr. Wilson was the

14  (Pages 360 to 363)

ARBITRATION HEARING - SEPTEMBER 21, 2010

364

1  trader?
2      A.  In my perspective, yes.
3      Q.  Mr. Pascu, have you seen Exhibit 34 before
4  today?
5      A.  Yes.
6      Q.  Okay.  What is Exhibit 34?
7      A.  It is a purchase confirmation.
8      Q.  Okay.  And it relates to PO No. 4529980.
9  Right?
10     A.  Correct.
11     Q.  Which we have established is the purchase
12 order for the transaction between Tricon and Vinmar that
13 we're here about.  Correct?
14     A.  It is the data as entered as -- in the SAP for
15 the purchase confirmation.
16     Q.  Did you prepare Exhibit 34?
17     A.  I don't remember.
18     Q.  How was Exhibit No. 34 or documents like --
19 how are Vinmar's purchase order confirmations prepared?
20     A.  What do you mean?
21     Q.  Well, generally, how are they prepared?
22     A.  Data is entered in this case.
23     Q.  And that automatically generates a purchase
24 order confirmation?
25     A.  Upon printing this document.

365

1      Q.  So Exhibit 34 is Vinmar's purchase order
2  confirmation for the mixed xylenes that Rick Wilson
3  bought that are the subject of the July 24th e-mail to
4  you that's Exhibit No. 29?
5      A.  I know there is a paperwork called purchase
6  confirmation that is issued by SAP system whenever we
7  press the print button.
8      Q.  Okay.  And you say purchase confirmation, but
9  the title of this document actually says Purchase Order
10 Confirmation, does it not, sir?
11     A.  Okay.  Sorry.
12     Q.  Am I right?
13     A.  We name it as PO.
14     Q.  Okay.
15     A.  But the name of the document as shows here
16 Purchase Order Confirmation or the data that you are
17 referring is named Purchase Order Confirmation.
18     Q.  Okay.  But within Vinmar, this is the document
19 that you refer to as your PO?
20     A.  Correct.
21     Q.  And what I am asking you -- what I asked you a
22 moment ago was whether this PO, Exhibit 34, is the PO
23 that was generated in connection with the transaction
24 where Rick Wilson bought MX from Tricon that he informed
25 you about in Exhibit 29?

366

1      A.  It was the document that was generated based
2  on the input on the exhibit.
3      Q.  For this transaction?
4      A.  Basis of the input that Rick Wilson has
5  provided to us.
6      Q.  Well, my question is, Exhibits 29 and 34
7  relate to the same transaction?
8      A.  I don't know.  I'm saying that the data
9  entered into SAP relates to the attachment that Rick
10 Wilson has sent to us and was processed through SAP.
11 This is what I know.
12     Q.  And the attachment that Rick Wilson sent to
13 you is the attachment that is in Exhibit 29.  Correct?
14     A.  Right.
15     Q.  And Exhibit 34 relates to the attachment that
16 is part of Exhibit 29?
17     A.  It is based on the -- on the input data from
18 Exhibit 29.
19     Q.  29?
20     A.  Yes.
21     Q.  So if -- within Vinmar if you wanted to print
22 a PO, what would you do?
23     A.  You first have to get the approval of the
24 trader that that data is correct.
25     Q.  Okay.  And then what do you do?

367

1      A.  We send these for his review and approval.
2      Q.  Well, physically what do you do?  Is there
3  some buttons in your computer that you have to push to
4  print a PO?
5      A.  Yes, you have to push a button.
6      Q.  That says like "Print PO" or something like
7  that?
8      A.  Yes.
9      Q.  Okay.  And before you do that, you have to get
10 approval from the trader that the information is
11 correct?
12     A.  Correct.
13     Q.  And it is the practice of Vinmar not to print
14 a purchase order until the logistics people confirm with
15 the trader that the information is correct?
16     A.  I would say yes.
17        MR. LEE:  May I have --
18     Q.  Would you --
19        MR. LEE:  -- one moment to --
20     Q.  (BY MR. DIAZ-ARRASTIA)  If you would take a
21 look at --
22        (Playback of videotaped was stopped at
23 this time.)
24        MR. LEE:  I just want to make an offer of
25 optional completeness at this point.  There was a skip.

15  (Pages 364 to 367)

ARBITRATION HEARING - SEPTEMBER 21, 2010

368

1   And if -- for the record, I think to understand the
2   testimony, it's helpful just on Page 52 of Mr. Pascu's
3   deposition at Line 19 through Line 25, that little
4   section was omitted where the question was, "Was that
5   done before Exhibit 34 was printed?"
6           Answer:  "I don't remember."
7           Question:  "Okay.  You don't remember if
8   you printed it?"
9           Answer:  "I don't remember if I printed
10  it, yes, sir."
11          Question:  "If it was not you who printed
12  it, who would have?"
13          "Anyone that has access to the
14  information."
15          JUDGE BENTON:  Okay.  Very good.
16          MR. LEE:  Thank you.
17          (Playback of videotape was started again
18  at this time.)
19      Q.  (BY MR. DIAZ-ARRASTIA)  -- Exhibit 34, like I
20  said again -- I think we have already established that
21  it relates to PO 4529980?
22      A.  Correct.
23      Q.  And the date next to it is July 24, 2008.
24          What late -- what date does that refer to?
25      A.  I don't know.  I think that is the date when

369

1   the data into SAP was entered and the date where the
2   save button was pressed.
3       Q.  I understand that the docu -- that no one
4   actually gets down and writes or types in all of this
5   information.  It's automatically created by the system?
6       A.  Okay.
7       Q.  And when you hit the "Print PO" button, it
8   just generates this, depending on what information was
9   entered?
10      A.  Okay.
11      Q.  Is that all correct?
12      A.  Yes.
13      Q.  Fine.  Look at the second page of Exhibit 34.
14      A.  Okay.
15      Q.  Do you see where there is a line that says
16  "Origin"?
17      A.  Yes.
18      Q.  And it is blank.  Correct?
19      A.  Yes.
20      Q.  And would that be because no origin was
21  entered into the system prior to this being printed?
22      A.  It would have been that the word here was not
23  entered into the system, yes.
24      Q.  Before this was printed?
25      A.  Before this was printed.

370

1       Q.  Okay.  If you will look at the bottom --
2       A.  Okay.
3       Q.  Well, let me ask you.  Is this a standard form
4   that Vinmar uses for all its PO's?
5       A.  As far to my knowledge, yes.
6       Q.  All right.  You've seen a lot of PO's that
7   Vinmar has generated, have you not, sir?
8       A.  Yes.
9       Q.  Okay.  And they all look pretty much like
10  this?  That's their standard form?
11      A.  For chemical, I would say yes.
12      Q.  And if you would look at the bottom of Page 2.
13      A.  Okay.
14      Q.  You see where it says, "Law and arbitration"?
15      A.  Okay.
16      Q.  Okay.  Well, what I'm trying to figure out,
17  sir, it's the language that we find, and let me read it
18  for you and please confirm that I've read it correctly.
19          It says, "Law and arbitration:  Law of the
20  State of Texas, USA, to apply.  All disputes arising in
21  connection with the present contract shall be finally
22  settled under the Rules of Conciliation and Arbitration
23  of the American Arbitration Association by one or more
24  arbitrators appointed in accordance with the said
25  rules."

371

1           Did I read that correctly, sir?
2       A.  You read what is -- what is written here, yes.
3       Q.  Now, Mr. Pascu, if you would look at
4   Exhibit 35.  And I would call your attention to the
5   bottom half of the first page of Exhibit 35.
6       A.  Okay.
7       Q.  Okay.  And that is an e-mail from you to
8   somebody at Tricon Energy whose address is
9   vuk@triconenergy.com.  Is that correct, sir?
10      A.  It appears to be, yes.
11      Q.  Okay.  I believe that gentleman is Vuk
12  Rajevac.  Are you familiar with that name?
13      A.  I think that -- yes.
14      Q.  Okay.  And it's an e-mail dated July 29th,
15  2008, which you are sending at 4:08?
16      A.  It seems to be this way.
17      Q.  Okay.  And it says, "Dear Vuk, Please find
18  enclosed our comments on your sale confirmation.  We
19  shall revert soon with our purchase order for your
20  review."  Did I read that correctly, sir?
21      A.  You stated this way, yes.
22      Q.  Now, if you would turn a couple of pages, the
23  page at the bottom says VIN 5.  Do you see that, sir?
24      A.  VIN 00 --
25      Q.  Several zeroes and 5.

**16  (Pages 368 to 371)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

372

1    A.  Okay.
2    Q.  Okay.  That is the -- what you are enclosing
3  on the e-mail to Mr. Rajevac, is it not, to Vuk?
4    A.  Whatever this document it is here --
5    Q.  It says you are enclosing and sending to Vuk?
6    A.  I know that I have attached document.  It
7  seems like it could be this one.  Now, but you are
8  asking me this one.  I don't know.
9    Q.  Okay.  If you would compare, sir, this
10  document, beginning on Page VIN 5, to the document that
11  is on the second page of Exhibit 29.
12    A.  Okay.
13    Q.  Okay.  And, in particular, if you will look at
14  the top of both documents where there is a fax line.
15    A.  Okay.
16    Q.  They both say, "July 23, 2008, 10:53 a.m.,
17  Tricon Energy, 713-963-9030."
18    A.  Correct.
19    Q.  Okay.  And does it appear that except for some
20  handwriting that there is an Exhibit 35 -- the
21  attachment to Exhibit 35 and the attachment to
22  Exhibit 29 are the same document?
23    A.  Now, without checking line by line, it seems
24  that it could be the same document, yes.
25    Q.  Okay.  Do you think they are the same

373

1  document?
2    A.  If you allow me to check line by line.
3    Q.  Sure.  Go ahead.
4    A.  Then it appears to be the same document.
5  However, I'm not yet in my state of mind to check each
6  line to make sure, but it seems to be the same document,
7  yes.
8    Q.  Okay.  You don't have any reason to think they
9  are different documents?
10    A.  I would -- I would not have reason.
11    Q.  Okay.  Do you recognize the handwriting that
12  is on Exhibit 35 -- on the attachment on Exhibit 35?
13    A.  Yes.
14    Q.  Is it yours?
15    A.  I recognize that this modification, this
16  handwriting here is mine.
17    Q.  Okay.
18    A.  That this one -- the top one and the bottom
19  one are not mine.  And on the second page, seems that it
20  is mine, mine and yes.
21    Q.  Okay.  Just to make the record clear, on the
22  first page some writing that is on the left margin of
23  the document that says, "Arrival at destination" --
24    A.  Okay.
25    Q.  -- you believe that is your handwriting?

374

1    A.  Yes.
2    Q.  Okay.  But the numbers that appear on the top
3  right-hand corner you think are not yours?
4    A.  I think they are not mine.
5    Q.  Do you know whose handwriting that is?
6    A.  No.
7    Q.  Okay.  The numbers on the top right-hand
8  corner are 4529980.  Correct?
9    A.  Correct.
10    Q.  Which is the same as the PO number that we
11  have been looking at?
12    A.  Correct.
13    Q.  Okay.  And you also think that the numbers on
14  the lower left-hand corner are not yours?
15    A.  Correct.
16    Q.  Okay.  And do you know whose handwriting that
17  is?
18    A.  No.
19    Q.  If you will look under the credit terms.
20    A.  Okay.
21    Q.  It's a little hard to see, but there is some
22  words that were scratched out.  Do you see that?
23    A.  Yes.
24    Q.  Did you do that?
25    A.  Yes.

375

1    Q.  Then on the second page under No. 2,
2  Demurrage, there is the word -- someone wrote in "Time
3  bar is 60 days."
4    A.  Correct.
5    Q.  Is that your handwriting?
6    A.  Yes.
7    Q.  Okay.  Under 7, Transfer of Title and Risk, it
8  says, "As per Incoterms 2000."  Is that your
9  handwriting?
10    A.  Correct, yes.
11    Q.  Okay.  And, again, there are on paragraphs --
12  on Page 2 of the document, which is VIN No. 6, there are
13  checkmarks by Paragraphs 1, 2, 3, 4 and 5.  Correct?
14    A.  I can see those checkmarks, yes.
15    Q.  Are those yours?
16    A.  Seems to be, yes.
17    Q.  Okay.  And on 7 and 7-A there again is some
18  language that has been crossed out.  Do you see that,
19  sir?
20    A.  Yes, I do see.
21    Q.  Did you do that?
22    A.  I might have done, yes.
23    Q.  Okay.  Does that look like your mark?
24    A.  Yes.
25    Q.  And I think that is all the handwriting on the

17  (Pages 372 to 375)

ARBITRATION HEARING - SEPTEMBER 21, 2010

376

1  document. Is that correct?
2      A. Yes, seems to be.
3      Q. Okay. So -- are the -- is the handwriting
4  that we have been looking at, is that what you referred
5  to as your comments on the sale confirmation?
6      A. Correct.
7      Q. But my question, sir, was, if you didn't
8  scratch anything out, if you didn't make a
9  Mark, if you didn't write anything, that meant that you
10 had no comment about that. Is that so?
11     A. As the ones mentioned before, on all the other
12 ones I did not have any comment from a logistic point of
13 view.
14     Q. Okay. All right. And you sent this to Vuk at
15 Tricon on July 29th at 4:08 in the afternoon. Correct?
16     A. Seems to be, yes.
17     Q. Okay, Mr. Pascu, let's take a look now at
18 Exhibit 36.
19     A. Okay.
20     Q. It appears to be an e-mail from you to Rick
21 Wilson. Is that correct, sir?
22     A. It appears to be, yes.
23     Q. And it's dated July 29th, 2008, at 11:54 a.m.?
24     A. Okay.
25     Q. And the subject is PO 4529980, 5,000 metric

377

1  tons of MX. Correct?
2      A. Correct.
3      Q. That is, by the way, the same subject line as
4  you used in Exhibit 34, the e-mail to mister to -- Vuk
5  Rajevac. Correct?
6      A. You are asking me whether the same subject --
7      Q. Same subject line?
8      A. -- line as -- okay. Yes.
9      Q. Okay. And you tell Mr. Wilson, "Please find
10 my comments on this sale contract." Correct?
11     A. Correct. It's written this way, yes.
12     Q. Yes. It appears to me that what you are
13 sending Mr. Wilson with your e-mail at -- on July 29th,
14 2008, at 11:54 is what you also sent Mr. Rajevac later
15 in that day, is that correct, your comments on this
16 sales contract?
17     A. It appears to be, yes.
18     Q. Okay. So just before noon on July 29th, you
19 had shown Mr. Wilson the comments that you later gave to
20 Vuk Rajevac at 4:00 in the afternoon the same day?
21     A. Appears to be, yes.
22     Q. Now, in your comments on Exhibit 35, is there
23 anything in there that talks about the origin of the
24 product or the material?
25     A. You are asking me whether this document is --

378

1      Q. Yeah. Do your comments in Exhibit 35 say
2  anything about the origin of the MX?
3      A. My comments are referring strictly to a
4  shipment.
5      Q. Okay. Do they say anything about the origin
6  of the MX?
7      A. My comments do not say anything about the
8  origin.
9      Q. Okay. Going back to Exhibit 36, if you will
10 look right before the sign-off on your e-mail to
11 Mr. Wilson, it says, "If you have a right contact person
12 would be great. I can make contact and discuss. Thank
13 you."
14     A. Okay.
15     Q. You are asking Mr. Wilson to tell you who the
16 contact person at Tricon should be?
17     A. Logistic person, yes.
18     Q. Yeah. And that would have been Mr. Rajevac?
19     A. I have been told that Mr. Rajevac is going to
20 handle the logistics.
21     Q. Okay. So did Mr. Wilson tell you that you
22 should be contacting Vuk Rajevac?
23     A. I don't remember whether it was Rick or -- but
24 it might have been Rick. I don't remember how I got to
25 know that Mr. Rajevac is the logistics person.

379

1      Q. But somebody had to tell you that?
2      A. Right.
3      Q. Okay. And so somebody had to respond to your
4  e-mail at 11:54 a.m. -- that's Exhibit 36 -- to tell
5  you, "Contact Vuk Rajevac"?
6      A. There is a way that I got information that Vuk
7  is the logistics person, yes, you are correct.
8      Q. You don't remember how?
9      A. I don't remember how.
10     Q. But somebody had to give you that information?
11     A. Somebody gave me that information.
12     Q. And somebody gave you that information after
13 you sent Exhibit 36?
14     A. Appears to be, yes.
15     Q. Because you need to send it to Mr. Rajevac at
16 4:00 that afternoon?
17     A. Correct.
18     Q. Okay. If you would look now, Mr. Pascu, at
19 Exhibit No. 37. And, again, I would call your attention
20 to the bottom half of the first page --
21     A. Okay.
22     Q. -- which appears to be an e-mail from Vuk
23 Rajevac to you. Correct?
24     A. Correct.
25     Q. Dated July 29th, 2008, at 4:43 p.m.?

18  (Pages 376 to 379)

ARBITRATION HEARING - SEPTEMBER 21, 2010

380

1      A.   Appears to be recorded this way, yes.
2      Q.   It's about -- oh, just a little over a
3  half-hour after you sent him Exhibit 35.  Correct?
4      A.   Seems to be this way, yes.
5      Q.   And the subject line is the same as in
6  Exhibit 35 and in Exhibit 36.  Correct?
7      A.   Seems to be, yes.
8      Q.   Re: PO 4529980, 5,000 metric tons of MX.
9  Correct?
10     A.   Appears to be, yes.
11     Q.   Okay.  And it says, "Hi Laurentiu, to answer
12  your questions:  No. 1, your comments on the contract
13  well noted and accepted except for demurrage time bar,
14  which is 90 days as per industrywide standard."
15          Did I read that correctly, sir?
16     A.   Yes.
17     Q.   Did you understand that to mean that
18  Mr. Rajevac was agreeing to all of your comments except
19  for the demurrage time bar period?
20     A.   I don't know what he meant.  I'm not Vuk to
21  state this.
22     Q.   Do you have an understanding of what it means
23  when somebody says, "Your comments on the contract well
24  noted and accepted"?
25     A.   No, I don't.

381

1      Q.   Okay.  You received Exhibit 37, didn't you,
2  sir?
3      A.   Appears to be, yes.
4      Q.   Let's look at the item that is numbered 3 --
5      A.   Okay.
6      Q.   -- on Exhibit 37 near the bottom of the page.
7      A.   Okay.
8      Q.   And Mr. Rajevac tells you, "As far as the
9  shipment details, we sold on CFR basis with arrival
10  window.  So once you declare the discharge port, by
11  August 8, we will be able to decide whether to give you
12  a deep sea cargo, which at that point will most likely
13  already be on the water, or an Asian origin cargo."
14          Did I read that correctly, sir?
15     A.   You read what appears to be here, yes.
16     Q.   Okay.  If you would look at Exhibit 31
17  quickly.
18     A.   31.
19     Q.   There you go.  Right in the middle of the page
20  where Mr. Wilson is responding to Mr. Anaya and you.
21     A.   Okay.
22     Q.   He says, "Re: Origin.  We won't know until we
23  declare discharge port."
24     A.   Okay.
25     Q.   Doesn't that mean exactly that Mr. Rajevac is

382

1  telling you?  "We will know origin when discharge port
2  is discharged (sic)"?
3          Aren't Mr. Rajevac and Mr. Wilson saying
4  the same thing?
5      A.   Now, again, you are asking me to comment on
6  something that I'm not involved with again.  And,
7  therefore, I would be cautious in understanding your
8  question.  But you are asking me -- let me put it this
9  way.
10          You are asking me whether Rick has
11  answered to Eduardo's and my message, and I can tell you
12  it appears to be, yes.  Eduardo and I have asked Rick
13  Wilson, "What is the port of origin?"
14          And he asked -- "I don't know.  Most
15  likely it is going to be US Gulf Coast."
16     Q.   Okay.  Before July 29th, the date of
17  Exhibits 35, 36 and 37, before that date, did anyone
18  ever tell you that Vinmar had to have MX of U.S. origin?
19     A.   Tell me again.  I'm sorry.
20     Q.   Before July 29th, 2008, did anyone ever tell
21  you that the MX that Vinmar was buying from Tricon had
22  to be of U.S. origin?
23     A.   As mentioned, as a supply chain specialist, we
24  are handling the data that is provided by the commercial
25  person.  We have entered the data and the data is --

383

1  appear exactly what you see here in these -- in this
2  (indicating).
3      Q.   And what we saw is that no data was ever
4  entered about the origin of the material?
5      A.   Right.
6      Q.   So my question to you is, does that mean that
7  no one ever told you that the MX had to be U.S. origin?
8      A.   Should be the case.  Whatever data we get, we
9  are inputting it into the system.
10     Q.   The only thing that you were told about the
11  origin of the material is that you would know it once
12  the discharge port was declared.  Right?
13     A.   Again, whenever we are inputting, yes, the
14  data, we want to make sure that the data is correct.
15  We -- most likely, we did not get information about the
16  date of origin; therefore, we did not input.
17          (This is the end of the playback of the
18  edited version of the videotaped deposition of Laurentiu
19  Paul Pascu that was originally taken on May 27, 2010.)
20          JUDGE BENTON:  Okay.  Let's take about a
21  ten-minute break.  With that, we're off the record.
22          (Recess from 10:30 a.m. to 10:46 a.m.)
23          MR. DIAZ-ARRASTIA:  Okay.  We're on the
24  record.  Let's proceed.
25          (At this time the edited version of the

19  (Pages 380 to 383)

ARBITRATION HEARING - SEPTEMBER 21, 2010

384

1  videotaped deposition of Richard W. Wilson, Ph.D., that
2  was originally taken on August 30, 2010, was played in
3  the arbitration. The court reporter at the arbitration
4  reported such proceedings and this is her transcription
5  of same.)
6          RICHARD W. WILSON, Ph.D.,
7  having been first duly sworn, testified as follows:
8          EXAMINATION
9  BY MR. LEE:
10  Q.  Good morning, Dr. Wilson.  How are you today?
11  A.  Just fine.
12  Q.  Good.  Would you mind giving us your full
13  name, sir?
14  A.  Richard W. Wilson.
15  Q.  Okay.  And how old are you?
16  A.  51.
17  Q.  What is it that you do today?
18  A.  I'm the CEO of Cobalt Technologies & Renewable
19  Fuels & Chemicals Business.
20      THE REPORTER:  Renewable fuels and what?
21      THE WITNESS:  Chemicals Business.
22  Q.  (BY MR. LEE)  Do you mind telling me just a
23  little bit about what it is that Cobalt Technologies
24  does?
25  A.  Well, the companies develop the technology to

385

1  make bio fuels and biochemicals out of wood waste.  And
2  my role is to commercialize that technology globally.
3  Q.  Great.  How long have you been the CEO of
4  Cobalt Technologies?
5  A.  Two years.
6  Q.  And you live here in California?
7  A.  Palo Alto, California.
8  Q.  Where is Cobalt Technologies headquartered?
9  A.  Mountain View, California.
10  Q.  I'll ask you a little bit about your
11  background, Dr. Wilson.  Where did you grow up?
12  A.  I grew up in Philadelphia, Pennsylvania.
13  Q.  Where did you go to college?
14  A.  Undergrad chemistry degree, UC San Diego,
15  Ph.D. chemical engineering, Lehigh.  MBA, University of
16  Chicago.
17  Q.  When did you graduate from UC San Diego?
18  A.  1981.
19  Q.  And then there was another stop after UC in
20  San Diego?
21  A.  Lehigh, Ph.D. chemical engineering, '89.
22  Q.  And then what about after that?
23  A.  University of Chicago, 1997.
24  Q.  Was that an MBA or --
25  A.  MBA.

386

1  Q.  When were you first employed by Amoco?
2  A.  Hired in 1989.  And right around the merger
3  time in 19 -- in 2000 -- 1999, 2000, I -- I went into my
4  first trading role.
5  Q.  And that was with BP?
6  A.  BP.
7  Q.  And can you just generally describe what it
8  was that you were responsible for in your trading role
9  at BP?
10  A.  My first role was a -- I was -- I was
11  responsible for midback office.  Think accounting.
12  Think logistics.  And then I went into a trading role.
13  And then I was put in charge of all the trading
14  operations in Australasia for products that came out of
15  BP's refineries or BP's joint ventures.
16  Q.  When you served in the trading role, what
17  products were you buying, selling?
18  A.  Mostly blended gasolines and diesel fuel.
19  There was -- we did some exporting of blend stocks into
20  the U.S. West Coast.
21  Q.  Okay.  How long were you in a trading role at
22  BP?
23  A.  In trading roles, I went into trading 1999,
24  2000.
25  Q.  So from 1999 to about 2001, you were an

387

1  individual trader at BP?
2  A.  I first had a responsibility around midback
3  offices.  So the way you get into trading is you learn
4  the -- the ebbs and flows of the paperwork.
5  Q.  Okay.  And after you spent a few months in the
6  back office, then you went into trading.  Is that right?
7  A.  That's right.
8  Q.  And you served in that role until sometime in
9  2001?
10  A.  That's right.
11  Q.  So approximately two years of sort of
12  individual trading?
13  A.  Rating -- supporting individual trading.
14      THE REPORTER:  I'm sorry.  I didn't hear
15  you.
16      THE WITNESS:  Supporting individual
17  trading.
18  Q.  (BY MR. LEE)  And then after that two-year
19  stent as either logistics or trading, you then --
20  A.  Management.
21  Q.  -- went into management.  And you had a
22  trading operation that you were managing?
23  A.  That's right.
24  Q.  How many traders were you responsible for?
25  A.  18.

**20  (Pages 384 to 387)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

388

1    Q.  And was this primarily products in Asia?
2    A.  In Australasia, so Singapore, New Zealand and
3  Australia.
4    Q.  What were your basic management
5  responsibilities?
6    A.  I was -- I was responsible for P&L.  I was
7  responsible for control.
8    Q.  And how long were you in the -- in a
9  management role of the trading operation of BP?
10   A.  Well, I went -- it was circa 2001 into 2003.
11  And then at that point I moved back from -- I was in
12  Australia at the time.  I moved back to the United
13  States.  I went into the chemicals business.
14        My goal there was -- and my remit was to
15  bring trading skills to a part of the business that was
16  very dominated by technologists.  And I was chosen for
17  that role because of my technology and my trading
18  background.
19   Q.  Okay.  So the -- at least the concept was that
20  you would bring your trading skill set over to the
21  United States and --
22   A.  Well, into the chemical business and they were
23  a global chemical business.
24   Q.  Okay.  You mentioned you started at Vinmar in
25  December of 2006?

389

1    A.  I think that's right, yeah.
2    Q.  And how long were you there?
3    A.  Until October 2008.
4    Q.  What were you responsible for at Vinmar?
5    A.  Well, that changed over time.  I'd say that it
6  was really a business development role.  Before -- I
7  think before I went into -- before I went into aromatics
8  trading or before I had the remit of developing
9  aromatics trading, I was actually buying and selling
10  enzymes.
11        So these are renewable replacements for
12  chemicals.  And it was a variety of countries, Brazil,
13  Turkey, China and leveraged some of the supply resources
14  that Vijay Goradia had.
15   Q.  And then I think you mentioned you were put in
16  charge of the aromatics trading?
17   A.  That's right.
18   Q.  How did that happen?
19   A.  It was -- well, the enzyme business didn't
20  generate a multimillion dollar P&L fast enough so we
21  decided that we would progress aromatics trading.  And
22  that was, I mean, roughly late 2007.
23   Q.  And what -- what's included in the aromatics
24  family?
25   A.  Well, it was a remit to do anything.  I

390

1  focused on MX right away because the economics of MX are
2  closely tied to gasoline and I had experience in
3  understanding the value of gasolines given my experience
4  in Australia.
5    Q.  You said you left in October of 2008.  Why did
6  you leave Vinmar?
7    A.  Well, I had an opportunity to run a Silicon
8  Valley renewable chemical business as a CEO so I was
9  very much attracted to the opportunity to work on
10  something that had social impact.
11   Q.  I want to talk to you about the summer of
12  2008.  And I guess really to get into this, let me ask
13  you, where were you officing in the summer of 2008?
14   A.  The summer of 2008, I was at the home office
15  in Chicago.
16   Q.  Had that always been the case?
17   A.  No.
18   Q.  All right.
19   A.  I spent a year commuting to Houston.
20   Q.  So your first year at Vinmar, you --
21   A.  Commuted.
22   Q.  -- were in the Houston office but your family
23  was in Chicago?
24   A.  That's right.
25   Q.  Obviously, Dr. Wilson, I'm here to talk to you

391

1  about a dispute that exists between Tricon and Vinmar.
2  And I take it that you're aware that Tricon has sued
3  Vinmar over an alleged contract involving the sale of
4  MX?
5    A.  That's right.
6    Q.  Okay.  How were you involved in the events
7  leading up to this alleged contract?
8    A.  I was the trader responsible for the Vinmar
9  side of that trade.
10   Q.  Why were you interested in purchasing MX?
11   A.  Because I was -- well, first of all, the
12  trading that I was attempting to build was based on
13  purchasing in the United States and have MX into Asia.
14  Particularly, the arrangement I had was that Formosa, a
15  Taiwanese company, was frustrated that they were a big
16  buyer of MX and the Asian traders -- well, what happens
17  is Asia is the suppliers will sell to certain traders
18  and those traders essentially will collectively push the
19  price up.
20        And my trading activity is all about
21  essentially breaking the back of that monopoly, and what
22  that did was that gave me privileged access to sell
23  material to Formosa in Taiwan, buy in the U.S., sell
24  to -- sell to Formosa and hopefully expand that to other
25  consumers of MX.

21  (Pages 388 to 391)

ARBITRATION HEARING - SEPTEMBER 21, 2010

392

1   Q.  Right.  And so how was the U.S. origin aspect
2   of the MX, how is that essential to doing business with
3   Formosa?
4       A.  Well, Formosa wanted material that didn't
5   originate in Asia.
6       Q.  Do you know why?
7       A.  Because they wanted to reduce their exposure
8   to Asian material so that they weren't subject to the --
9   to the dominant -- the dominant supply control of the
10  Asian traders.
11      Q.  Can you tell us why the -- why you approached
12  Ed Leyman to assist in the purchase of MX?
13      A.  Two reasons.  The first reason that -- was
14  that I recognized that through transacting with Ed I
15  would over time get exposure to all the supply sources
16  that were available in MX and -- number one.
17          So it was essentially an opportunity to
18  learn about what's really out there, recognizing that MX
19  is used in gasoline and also chemicals so it could
20  physically be anywhere.
21          The second reason I engaged Ed Leyman is
22  that Vinmar's control environment did not include
23  recorded tape recordings and Ed Leyman assured me that
24  recordings were taped so I saw that as my opportunity to
25  have some controlled environment over my activities.

393

1   Q.  Why was that important?
2       A.  Well, so there's no misunderstandings.
3       Q.  What -- I guess tape-recorded conversation, is
4   that something that you had had experience with at BP?
5       A.  It's BP best practice.
6       Q.  Was it your understanding that Mr. Leyman
7   would function as a neutral broker?
8       A.  Yes.
9       Q.  What does that -- what does that mean to you?
10      A.  That means he'll treat each party the same.
11  He will keep me anonymous should I require that.
12      Q.  And I guess the -- what I want to focus in on
13  today is this -- the discussions that you had with
14  Mr. Leyman on July the 22nd, 2008.  Okay?
15          And do you remember that on that day you
16  were in the market to purchase MX?
17      A.  That's right.
18      Q.  Okay.  What did you tell Mr. Leyman about the
19  origin of the MX that you wanted to purchase?
20      A.  I told Ed that I needed U.S. origin material
21  and that my customer would only accept U.S. origin
22  material.
23      Q.  And I think you told us earlier about your
24  experience with Formosa.  Was -- was this intended
25  Formosa?

394

1       A.  It was -- at the -- at the time that I was
2   originally doing the deal, I -- Formosa actually was
3   actively looking for product.  So my first hope was that
4   I can essentially do a back-to-back transition so --
5   transaction so that I buy and sell simultaneously so I
6   don't expose myself to market price moves.
7           But as the evening in Taiwan played out,
8   that was no longer a possibility.  It was the end of the
9   day.  I decided to buy anyway.  And the reason I decided
10  to buy was that there was particular tightness in the
11  United States at least in terms of gasoline blend
12  stocks.  So I was generally long and there were some
13  signs of weakness in Asia.
14      Q.  Did you have any interest in purchasing open
15  origin MX?
16      A.  No, because I had no place to sell it.
17      Q.  Were you willing to purchase MX if it wasn't
18  of U.S. origin?
19      A.  No.
20      Q.  Did you ever authorize Ed Leyman to purchase
21  anything but U.S. origin MX?
22      A.  Not that I remember.
23      Q.  If you had wanted -- let me ask you this.  If
24  you had wanted open origin MX, would you have gone to Ed
25  Leyman?

395

1       A.  If I wanted material from Asia, I would not
2   have gone to Ed Leyman, no.
3       Q.  Why?
4       A.  I would have went to an Asian broker who was
5   better aware of what the deal opportunities were so I
6   could have got a better price.
7       Q.  Where was Mr. Leyman located?
8       A.  I believe New York.
9       Q.  Do -- does Exhibit 6, does that appear to be
10  instant message exchanges between you and Ed Leyman?
11      A.  Appears to be, yes.
12      Q.  Having looked at that, does that -- do you
13  recall any of these discussions that you had with
14  Mr. Leyman on July 22nd, 2008?
15      A.  Vaguely.
16      Q.  Okay.  Around I guess it's 9:34 a.m.
17  Mr. Leyman tells you that he's got a firm offer for 5 KT
18  MX FOB H/TC Corpus, 5 KT any August at 4:10, 5211/20 BR.
19  Could you tell us what that meant to you?
20      A.  FOB means that I'm purchasing a parcel that's
21  at the port and that port is Houston, Texas City or
22  Corpus Christi, all which are in the United States,
23  5,000 metric tons.  I believe the -- any August refers
24  to the shipping date.  4.10 is the price.  5 -- 5211/20
25  is the specification.

22  (Pages 392 to 395)

ARBITRATION HEARING - SEPTEMBER 21, 2010

396

1  Q.  The -- what is the significance of his
2  reference to FOB H/TC or Corpus?
3      A.  It means that I'm buying material out of
4  Houston that originates out of Houston, Texas City or
5  Corpus Christi.
6  Q.  Would you consider that to be U.S. origin
7  material?
8      A.  Yes.
9  Q.  And was that consistent with your discussions
10 with Mr. Leyman?
11     A.  That's right.
12 Q.  I'm sorry.  What was your understanding on
13 July 22nd or at least at this point in time as to that
14 Formosa's interest was?
15     A.  They were -- they were looking to buy.
16 Q.  If you look down a couple of lines at
17 10:00 a.m., Mr. Leyman mentions a second MX seller
18 asking if the buyer would purchase CFR main Asian ports,
19 5 KT MX, arrival basis loading USGC.
20     A.  Uh-huh.
21 Q.  Again, what is -- first of all, did you ask
22 Mr. Leyman for CFR opportunities?
23     A.  No.  He proposed that as a counter.
24 Q.  What is -- what's a CFR offer?
25     A.  CFR means that you purchase it on a delivery

397

1  basis so you're incurring a price that includes shipping
2  costs, which means that you don't need to actually do
3  the shipping yourself.
4  Q.  What was the significance of -- if any, of
5  Mr. Leyman's comment about loading USGC?
6      A.  That indicated that the origin of this
7  material was the U.S. Gulf Coast and that pick-up
8  essentially the first half of August.
9  Q.  Did you believe that Mr. Leyman had the
10 authority to accept on Vinmar's behalf terms that were
11 different than those that you had authorized him to
12 accept?
13     A.  Mr. Leyman had specific instructions to buy
14 U.S. origin material only on my behalf.
15 Q.  Okay.  What was your understanding of the
16 origin of the MX for the deal that Mr. Leyman had
17 supposedly brokered?
18     A.  It was always that it was U.S. origin but that
19 it could come from a variety of different ports in the
20 United States.
21 Q.  What do you mean by that?
22     A.  The M -- the MX would need to be in a tank at
23 some port.  And I had afforded him the flexibility of
24 determining what port in the United States that material
25 could be picked up at.

398

1  Q.  When -- at that point in time did you learn
2  that the potential seller was Tricon?
3      A.  I believe after the deal was done.
4  Q.  Did you -- did you know anything about Tricon
5  before then?
6      A.  Yes.
7  Q.  What had you -- or what did you know about
8  Tricon?
9      A.  I had been advised by other traders to avoid
10 Tricon.
11 Q.  By other traders at Vinmar or outside of
12 Vinmar?
13     A.  Outside of Vinmar.
14 Q.  Okay.  And then were there also, though,
15 discussions about where Vinmar would want the MX
16 delivered?
17     A.  At some point -- well, in general -- so what
18 I -- I can't say specifically and I don't remember the
19 details, but what I do know, my agenda was to not
20 disclose who the seller was because of my concerns that
21 Vinmar was -- that, excuse me, Tricon was actually part
22 of the -- we'll call it the Asia trade of MX.
23 Q.  And the Asian trade being what we discussed
24 earlier, the folks that were --
25     A.  Cornering the market.

399

1  Q.  -- involving in trying to build the market
2  price in Asia up --
3      A.  That's right.
4  Q.  -- to artificial level?
5      A.  That's right.
6  Q.  "Ed, given Brad is selling out of USG, am I
7  getting 45 days from BL or 30, hopefully 45?"  Could you
8  tell us what that means, sir?
9      A.  What we're discussing are the payment terms
10 and the issue is that when you pick a material up in the
11 U.S. Gulf the clock starts ticking in terms of when you
12 have to make payment.  So it's a working capital issue.
13 So I am attempting to negotiate longer terms, I
14 believe.
15 Q.  And what did -- what did you mean by your
16 reference to USG?
17     A.  U.S. Gulf.
18 Q.  Was that your understanding of the purported
19 deal?
20     A.  The origin of the -- of material was -- my
21 understanding -- my understanding was that it was U.S.
22 origin and that doesn't necessarily mean U.S. Gulf.
23 Q.  Do you recall Mr. Leyman or anyone else
24 telling you on July 22nd that the product -- that the
25 product would likely originate from the Gulf Coast or

23  (Pages 396 to 399)