ARBITRATION HEARING - SEPTEMBER 21, 2010

**400**

1   anything to that effect?
2      A.  He said that the port in the U.S. was still
3   open.
4      Q.  Where did you get your understanding that
5   Tricon would be selling out of at least at that time
6   USG?
7      A.  They would be loaded -- the origin -- my
8   understanding was that the origin that called -- the
9   origin of the cargo was United States --
10      Q.  Okay.
11      A.  -- which may be the U.S. Gulf.
12      Q.  If Mr. Leyman had told you that Tricon was not
13   guaranteeing U.S. origin, what would you have done?
14      A.  I wouldn't have bought the cargo. I had no
15   place to sell it. I couldn't count on the Asian traders
16   taking it.
17      MR. LEE:  I'm going to mark Exhibit 39.
18      Q.  (BY MR. LEE)  Take a look at that, if you
19   would, sir.
20      MR. LEE:  I had two of those. Sorry.
21      (The following was a comment made by
22   Mr. Lee during the playback.)
23      MR. LEE:  That's also Vinmar Exhibit 2.
24      (End of comment made by Mr. Lee.)
25      Q.  (BY MR. LEE)  Do you recognize Exhibit 39?

**401**

1      A.  Yeah.
2      Q.  And are those e-mails that you exchanged with
3   a gentleman named Nicholas Smith?
4      A.  That's right.
5      Q.  Who is Nicholas Smith?
6      A.  I believe he's a ship charterer. I just don't
7   remember the name of the company that he dealt with.
8      Q.  Was -- how was Mr. Smith aware that you were
9   in the market to buy MX on July 22nd, 2008?
10      A.  Well, because the first thing you need to do
11   if you're guaranteeing a physical delivery is to make
12   sure that you have the ship. So before you tell a
13   customer, "I'm going to deliver on such and such date,"
14   you'd be better able to deliver it.
15      So essentially what I did was I put on
16   hold a ship that could pick up material in the United
17   States.
18      Q.  Let me approach it this way, mister -- or
19   Dr. Wilson. Why would you have been in contact with
20   Mr. Smith on July 22nd to arrange shipping?
21      A.  So that I could ship MX to Asia from the
22   United States.
23      Q.  At the last e-mail, which is at the top of
24   Exhibit 39, you mentioned to Mr. Smith that the seller
25   is handling freight?

**402**

1      A.  Uh-huh. That's right.
2      Q.  And was that -- what's that based on?
3      A.  If -- a CFR deal means that the seller
4   arranges freight so I didn't need to.
5      Q.  Then you went on to tell him lifting is first
6   week of August. So they already had shipping arranged.
7   What do you mean they -- the lifting was to be the first
8   week of August?
9      A.  I meant that the -- my understanding of the
10   deal with Tricon was that the material is going to be
11   U.S. origin and that the pick-up was going to be in
12   August.
13      And the reason that was important was that
14   I knew that Formosa had two windows of opportunity. The
15   first -- I believe the first in September so I needed to
16   ensure that the material actually arrived in September.
17   It takes time to sail from the United States to Taiwan.
18      Q.  Just so that we're all clear, I want to make
19   sure I understand the terminology. What do you mean by
20   lifting?
21      A.  I mean the pick-up at the -- pick-up at the
22   port, the lifting by the ship of the cargo, moving it
23   from the tank into the cargo hold.
24      Q.  Who had told you that Tricon had already
25   arranged the shipping?

**403**

1      A.  I think that was part of the CFR deal.
2      Q.  What does this -- Exhibit 39, what does that
3   tell us about your understanding of the deal that you
4   thought had been concluded between Tricon and Vinmar?
5      A.  My understanding was it was U.S. origin.
6      Q.  Let me show you what's previously been marked
7   as Exhibit 15.
8      (The following was a comment made by
9   Mr. Lee during the playback.)
10      MR. LEE:  It's Joint Exhibit 5.
11      (End of comment made by Mr. Lee.)
12      Q.  (BY MR. LEE)  Do you recognize this e-mail
13   exchange between you and Mr. Lockwood?
14      A.  Yes, vaguely.
15      Q.  Okay. What I want to ask you about right now
16   is the e-mail that you sent to Mr. Lockwood there on
17   July 23rd at about 3:28, so it's the one in the middle.
18      A.  Uh-huh.
19      Q.  And you asked, "Brad, could you please send me
20   the RCAP for the shipping you arranged for this cargo?"
21   What is -- what do you mean by RCAP?
22      A.  RCAP. So what that means is that the broker
23   will supply, "Here's the ship. Here's the details."
24   And I did that on the belief that the material was
25   loading very soon in order for it to get to Asia in



DepoTexas
888.893.3767

ARBITRATION HEARING - SEPTEMBER 21, 2010

404

1  time.
2      Q.  Now, Mr. Lockwood's response is that "We have
3  a couple of different options to use."  Do you see that?
4      A.  Yeah.
5      Q.  Was that consistent with your understanding of
6  the deal as it had been relayed to you on July 22nd,
7  2008?
8      A.  There is nothing in the statement that
9  contradicts my understanding of the deal, and that was
10 that he was going to provide to me U.S. origin material,
11 but there was flexibility, specifically at what port in
12 the United States that MX would be picked up at.
13     Q.  As of July 23rd, 2008, what was your
14 understanding of the deal that purportedly had been
15 concluded between Tricon and Vinmar?
16     A.  My understanding was that purchasing U.S.
17 origin material of MX to arrive in Taiwan in
18 September -- to arrive in Asia in September.  I don't
19 remember the details.  I may not have nominated the port
20 because I was reluctant to -- I was reluctant to
21 disclose who my buyer was.
22     Q.  Let me show you what's previously been marked
23 as Exhibit 31.  And this is a -- an e-mail exchange
24 between you and a gentleman by the name of Eduardo
25 Anaya.  Correct?

405

1      A.  That's right.
2      Q.  And who is Mr. Anaya?
3      A.  I believe he was the gentleman responsible for
4  entering the terms of the deal into the SAP system.
5      Q.  In the first e-mail down at the bottom of the
6  page from Mr. Anaya to you at 4:03 p.m., he asked you --
7  first of all, he tells you he's going to do the
8  follow-up from the logistics point of view.
9          And then he says, "To complete the order,
10 we just need the port of origin of this product."  Do
11 you see that?
12     A.  Uh-huh.
13     Q.  What was your understanding of what he was
14 asking you?
15     A.  He needed the specific port where the material
16 would load out of.
17     Q.  Do you know why?
18     A.  Because the SAP system requires it.
19     Q.  Okay.  And when you say "specific port," you
20 mean actually where the product would be picked up?
21     A.  That's right.
22     Q.  You responded the next day to Mr. Anaya's
23 e-mail and said, "Re: Origin.  We won't know until we
24 declare discharge port.  Most likely USG."  Do you see
25 that?

406

1      A.  That's right.
2      Q.  Okay.  And what is it that you were saying to
3  Mr. Anaya at that time?
4      A.  That I didn't know the port that the material
5  was going to load out of.
6      Q.  Was this a comment on the origin of the
7  material?
8      A.  Yeah.  I -- what I said was most likely a port
9  in the U.S. Gulf.  That's correct.
10     Q.  Had Tricon provided to you any information
11 about the port where this product would be loaded as of
12 July 25th, 2008?
13     A.  No, I don't believe so.
14     Q.  And when you responded to Mr. Anaya's
15 question -- I just want to be clear on this.  What --
16 what question were you responding to?
17     A.  The question I am responding to was, "We need
18 the port of origin of this product," and I didn't know.
19     Q.  What was your understanding as of July 25th
20 about the origin of the product?
21     A.  My understanding of the origin, it was from
22 the United States and that it could be picked up at any
23 port at the choice of Tricon in the United States.
24     Q.  I don't want to -- I don't want to pry into
25 your personal details, Dr. Wilson, but as I understand

407

1  it in the summer of 2008, in addition to your work
2  responsibilities, you were also dealing with some family
3  medical issues.  Is that correct?
4      A.  Several family issues, yes.
5      Q.  Do you recall during this period of time
6  between the 22nd of July and the end of July that you
7  were, in fact, dealing with some of those medical --
8      A.  Yes, I was actually.
9      Q.  Okay.
10     A.  I may have actually let one of the secretaries
11 know that I wasn't very available.
12     Q.  And how did that impact your day-to-day work
13 routine?
14     A.  I think I unfortunately became completely
15 unplugged from the day-to-day operations of my -- my
16 job.
17     Q.  And that was during this period of time in
18 late July?
19     A.  That's right.
20     Q.  If you look at the e-mail from Vuk Rajevac to
21 Laurentiu down at the bottom of the third page, in
22 Item 3, Paragraph No. 3 there, Mr. Rajevac makes the
23 comment, "As far as the shipment details, we sold on a
24 CFR basis with arrival windows.  So once you declare the
25 discharge port by August 8th, we will be able to decide

25  (Pages 404 to 407)

ARBITRATION HEARING - SEPTEMBER 21, 2010

**408**

1   whether to give you a deep sea cargo, which at that
2   point will mostly already be on the water, or on Asian
3   origin cargo."  Do you see that?
4       A.  Yes.
5       Q.  What does that mean to you, that Tricon might
6   provide a deep sea or Asian origin cargo?
7       A.  That they were not going to necessarily
8   deliver the U.S. origin material that I required in
9   order to execute the sale that I was able to sell.
10      Q.  And receiving this e-mail from Mr. Pascu, is
11  that when you first learned that Tricon was claiming
12  that it required -- that it was not required to sell
13  Vinmar U.S. origin MX?
14      A.  I don't remember the exact moment of my
15  discovery, no.
16      Q.  Was it around July 31st?
17      A.  I believe it was in this timeframe, yeah.
18      Q.  What did you mean when you said, "We cannot
19  accept open origin for this material.  It must be from
20  the USA"?
21      A.  I meant that the material had to originate in
22  the United States --
23      Q.  And --
24      A.  -- for us to accept the deal.  That's my
25  understanding of the deal.

**409**

1       Q.  Why did you go back to Mr. Leyman on the 31st
2   and tell him that there was an issue with Tricon?
3       A.  I don't remember my thinking at the time.  I
4   can only infer what I would do if I had to do it today,
5   which would be to go bring the issue up to the broker
6   who made the mistake.
7       Q.  Okay.  Do you remember that in the days
8   following July 22nd, 2008, that the price for MX fell
9   fairly considerably?
10      A.  I do remember that.  It was actually a big
11  surprise to me.
12      Q.  Why was that?
13      A.  Because the U.S. was tight.
14      Q.  Let me I guess ask from the -- in the first
15  perspective, were the terms that you mentioned in this
16  e-mail to Mr. Leyman that you had originally
17  expressed to him on July 22nd, 2008?
18      A.  That's right.
19      Q.  Why is it that Vinmar was still willing to buy
20  U.S. origin MX at 1310 a metric ton on August the 6th,
21  2008?
22      A.  Well, I don't know that it was Vinmar.  It was
23  Rick Wilson.
24      Q.  Okay.
25      A.  And the way I saw this was I knew I was on the

**410**

1   losing side of a trade, but I thought I was very clear
2   what the terms were and that I recognized that while I
3   would suffer the consequence in terms of my compensation
4   and my relationship with the owners of Vinmar, I decided
5   that I was better off in the long run sticking to what I
6   originally thought were the terms of this agreement,
7   taking a loss, in the interest of preserving my
8   relationship and my reputation.
9       Q.  Did Tricon ever accept the terms that you put
10  forward --
11      A.  No.
12      Q.  -- on Exhibit 9?
13      A.  I don't believe they did.
14      Q.  And do you agree that there was no origin
15  guarantee on the MX?
16      A.  No.
17      Q.  Now, there are two alternatives that are
18  presented in this e-mail by Mr. Lockwood to you.  The
19  first one is U.S. origin at 843 spec.  Is that a
20  different spec than 5211?
21      A.  It is a different spec, yes.
22      Q.  Okay.  And then there is the second
23  alternative, which is U.S. origin, but it wouldn't
24  arrive until October 15th, 2008.  Were either one of
25  these alternatives acceptable to you?

**411**

1       A.  No.
2       Q.  Why not?
3       A.  Because the only -- the only sales I knew I
4   could actually make were in September.  And, number one,
5   in terms of the timing of the second -- the 843, also, I
6   didn't -- I wasn't aware of any customers willing to
7   accept that specification.  I believe it's a lesser
8   specification, less stringent quality.
9       Q.  Is Exhibit 10 in response to Mr. Lockwood's
10  e-mail which was Exhibit 18?
11      A.  I don't remember specifically the e-mail, but
12  the -- but it would appear that's the case, yes.
13      Q.  Let me show you Exhibit 11 and ask if that is
14  an e-mail that you sent to Mr. Leyman on August the 8th,
15  2008.
16      A.  I don't remember sending e-mails from two
17  years ago, but it would appear that this was an e-mail
18  from me.
19      Q.  Do you believe --
20      A.  Certainly this is in the spirit of my
21  understanding of what would have happened in the course
22  of this trade.  Yes.  As soon as there was an issue, you
23  will let all parties know.  You would have been clear
24  about your rejection to the offer.
25      Q.  Okay.  Is your understanding that Tricon

26  (Pages 408 to 411)

ARBITRATION HEARING - SEPTEMBER 21, 2010

412

1   never agreed to meet Vinmar's terms for this post sale?
2       A.  That's my understanding.  Tricon never agreed
3   to the terms that I thought were in place.
4       Q.  After you left Vinmar's employment, did you
5   receive a call from Brad Lockwood at Tricon?
6       A.  I did.
7       Q.  What did Mr. Lockwood say to you?
8       A.  He called me and questioned whether there was
9   an issue about this trade.  And he asked me about the
10  nature of my employment with Vinmar.  He asserted that
11  it's a very difficult place to work.  He said that it
12  would be very beneficial for him if he could -- if I
13  could side on the side of Tricon, it would be my
14  opportunity to get back at Vinmar.
15      Q.  Why would it be beneficial to him; did he tell
16  you?
17      A.  He said because his bonus is based on it and
18  he has a family to support.
19      Q.  And what did you say to Mr. Lockwood?
20      A.  I think my response to him was that I
21  agreed -- I agreed that the reality is Vinmar is a very
22  difficult place to work, but I actually thought it was a
23  go ahead experience for me, from a professional
24  perspective, and I couldn't help him.
25      Q.  Did you explain to Mr. Lockwood in that

413

1   conversation that it was your view that the deal
2   required U.S. origin MX?
3       A.  I believe so, yes.
4           EXAMINATION
5   BY MR. DIAZ-ARRASTIA:
6       Q.  My name is George Diaz-Arrastia.  I am the
7   Laurentiu that represents Tricon in this matter.  Have
8   you and I ever met before?
9       A.  I don't believe so, no.
10      Q.  Have we ever spoken on the telephone?
11      A.  No.
12      Q.  Okay.  Have you ever spoken on the telephone
13  with anybody from my office?
14      A.  Yes.
15      Q.  Do you remember who you spoke with on the
16  telephone?
17      A.  It was a woman.
18      Q.  Do you remember what you-all talked about?
19      A.  She called me and threatened to subpoena me at
20  her convenience.  Yes.
21      Q.  Okay.  Was there any discussion about the
22  facts of this case?
23      A.  I believe I told her that I did not believe
24  there was a deal to purchase non-U.S. origin MX.
25      Q.  Did you meet Mr. Lee before this morning?

414

1       A.  Yes.
2       Q.  Okay.  When did you meet Mr. Lee?
3       A.  Yesterday.
4       Q.  Okay.  And about what time yesterday?
5       A.  1:00 p.m.
6       Q.  Okay.  Did you and he talk about what was
7   going to happen during the deposition?
8       A.  What we did was we went through the documents
9   and he familiarized me with them.
10      Q.  Okay.  And how long did that meeting last?
11      A.  Till roughly 3:30, 4:00 o'clock.
12      Q.  Okay.  So two and a half to three hours?
13      A.  That's right.
14      Q.  Okay.  Mr. Lee sometime in the past asked you
15  to sign an affidavit in this case, did he not?
16      A.  He did.
17      Q.  And you did not sign the affidavit?
18      A.  That's correct.
19      Q.  Why did you not sign the affidavit?
20      A.  My wife reminded me that she didn't think that
21  Vinmar could be trusted and that I shouldn't sign any
22  document that they presented me without first seeking
23  legal counsel and that we didn't want to spend the money
24  on legal counsel so we ignored it.
25      Q.  Okay.  Mr. Wilson, when you -- Dr. Wilson,

415

1   when you bought MX from Tricon in this transaction
2   that's the subject of this matter, was there a specific
3   buyer that you were going to sell that MX to?
4       A.  Yes.
5       Q.  Okay.  And what was that buyer?
6       A.  Formosa.
7       Q.  Okay.  And Formosa is the name of a company?
8       A.  That's right.
9       Q.  Okay.  And what's the full name of that
10  company?
11      A.  I don't remember.
12      Q.  Okay.  Dr. Wilson, if you would take a look at
13  Exhibit No. 40.  If you would look at the second page of
14  Exhibit 40, sir.
15      A.  Okay.
16      Q.  And it is an e-mail between you and Jason
17  Luoh?
18      A.  That's right.
19      Q.  You have to say -- he is the -- Vinmar's agent
20  in Asia?
21      A.  That's right.
22      Q.  Okay.  And is the firm offer for 1325 CFR
23  Taiwan or Korea, is that referring to the sale that you
24  had in mind when you bought the Tricon MX?
25      A.  Well, apparently I never bought this, but that

27  (Pages 412 to 415)

ARBITRATION HEARING - SEPTEMBER 21, 2010

**416**

1   was the sale I was trying to make, yes.
2       Q.   Okay.  And if you will look at the -- and
3   given the price was 1325 and you were paying 1310 to
4   Tricon if this sale had been made, you would have turned
5   a profit on the deal?
6       A.   That's right.
7       Q.   Okay.  And if you will look at the first page
8   of Exhibit 40.
9       A.   Uh-huh.
10      Q.   And at the bottom of the page, Mr. Luoh is
11  telling you, "We can't join -- blank -- tender."  It was
12  redacted.  "We didn't present our firm offer in time."
13  So you lost that sale?
14      A.   Yes.
15      Q.   That is because you didn't get your firm offer
16  in on time?
17      A.   That's right.  Jason was not able to get into
18  the offices of Formosa in time, that's correct.
19      Q.   Was this an -- if you'll look at the very top
20  of Exhibit 40, sir, Mr. Luoh is again telling you in
21  this case what the winning bid was.  Correct?
22      A.   That's correct.
23      Q.   It was 1305?
24      A.   That's correct.
25      Q.   And that is less than the price that Tricon

**417**

1   was going to sell you?
2       A.   That's right.
3       Q.   And you learned that you were not going to
4   make the 13.5 sale to Formosa on July 23rd at about
5   11:48 a.m.  Is that correct?
6       A.   Yep.
7       Q.   That's -- sir, did you already have your job
8   offer from Cobalt Technologies when you left Vinmar?
9       A.   No.
10      Q.   When did you get the job offer from Cobalt?
11      A.   It was very close to the time that I started.
12      Q.   And when did you start?
13      A.   The very end of October.
14      Q.   And you left Vinmar October the 3rd?
15      A.   I believe that was the date, yes.
16      Q.   Did you spend maybe about three weeks where
17  you didn't have a job lined up?
18      A.   That's right.
19      Q.   You had done deals using Ed Leyman as a broker
20  prior to the deal that's the subject matter of this
21  case.  Correct?
22      A.   Yes.
23      Q.   Okay.  About how many?
24      A.   Small number.  Less than five.
25      Q.   Okay.  Well, I think you did say that he was a

**418**

1   mutual broker.  Didn't you say that, sir?
2       A.   I'd say he was a broker doing a deal between
3   two counterparties.
4       Q.   Okay.  And the counterparties did not speak to
5   each other; they communicated only through the broker.
6   Correct, sir?
7       A.   That was the nature of the relationship, yes.
8       Q.   And that meant that Mr. Leyman represented
9   both sides to the transaction.  Is that your
10  understanding?
11      A.   That's my understanding.
12      Q.   If you can look at Exhibit No. 2, Mr. Wilson,
13  do you remember getting this document on July 22nd from
14  MOAB Oil?
15      A.   I remember seeing it before.  I don't remember
16  specifically getting it on that date.
17      Q.   Okay.  Ed Leyman worked for MOAB Oil.
18  Correct?
19      A.   That's right.
20      Q.   Now, the purpose of Exhibit No. 2 is to
21  confirm the transaction that Mr. Leyman had brokered
22  between Tricon and Vinmar.  Correct?
23      A.   Yes.
24      Q.   And you saw Exhibit No. 2.  Correct?
25      A.   Yes.

**419**

1       Q.   Did you see it on July 22nd?
2       A.   I do not remember the exact date that I saw
3   it.
4       Q.   Okay.  Did you find Mr. Leyman to be a
5   competent broker, sir, when you used him?
6       A.   Yes.
7       Q.   If you would take a look at the second page of
8   Exhibit No. 2, sir, near the -- near the bottom, right
9   above where it says Page 1 of 2 on the right hand --
10  lower right-hand corner.
11          It says, "If there is anything outlined
12  contrary to your understanding of our agreement, please
13  notify us immediately."
14      A.   I see that, yes.
15      Q.   Did you see that back on July 22nd?
16      A.   This is -- I don't remember seeing it.
17      Q.   Had you seen that in the prior confirms that
18  Mr. Leyman had sent you in other deals?
19      A.   I don't remember seeing it, no.
20      Q.   Now, Mr. Leyman, after receiving this initial
21  confirm, you requested a change on the payment terms for
22  this transaction.  Do you recall that, sir?
23      A.   Yes.
24      Q.   The payment terms on Exhibit 2 refer to
25  30 days.  Correct, sir?

**28  (Pages 416 to 419)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

420

1    A.  That's what's represented.  That's correct.
2    Q.  And you had -- you had requested to change
3  that to an on site letter of credit.  Do you remember
4  that?
5    A.  I believe originally I was seeking 45-day
6  terms.  And then once there was a CFR deal, there --
7  there was some changes.  I don't remember the details.
8    Q.  Okay.  And was it an on site letter of credit?
9    A.  I believe one of the documents you provided me
10  indicated that it was.  That was a request, but I don't
11  remember making that request.
12    Q.  Okay.  Let me show you what's been previously
13  marked as Exhibit No. 6.  And these appear to be instant
14  messages between yourself and Ed Leyman --
15    A.  That's correct.
16    Q.  -- on July 22, 2008?
17    A.  That's right.
18    Q.  Okay.  And if you look towards the bottom of
19  the page at 4:09:37 p.m.  Do you see that, sir?
20    A.  That's right.
21    Q.  Where it says Rick -- I guess that's you --
22  asking Mr. Leyman, "Did you get the LC site terms?"
23    A.  That's correct.
24    Q.  And then Mr. Leyman says, "Not yet.  We'll
25  recheck."  And then at 4:18:07 he says that "Tricon okay

421

1  with LC site.  Will send out amendment."  Did I read
2  that correctly, sir?
3    A.  That's right.
4    Q.  I'll show you what has been previously marked
5  as Exhibit 3, two of these.  And that is another MOAB
6  confirm.  Correct?
7    A.  That's correct.
8    Q.  It's also dated July 22, 2008?
9    A.  That's correct.
10    Q.  And if you will take a look at the second
11  page, the payment terms have been changed to payment
12  outside by document or letter of credit?
13    A.  That's correct.
14    Q.  Did you receive Exhibit No. 3, sir?
15    A.  I don't remember receiving it, but the e-mail
16  evidence would suggest that's the case.
17    Q.  Now, if we look at the same place near the
18  bottom of the second page of Exhibit 3, it also contains
19  the statement, "If there is anything outlined contrary
20  to your understanding of our agreement, please notify us
21  immediately by facsimile."
22    A.  I see that.  Yes.
23    Q.  And, Mr. Wilson, do you recall that there was
24  also an issue about a mistake made on the price term in
25  these first two confirms?

422

1    A.  I do remember that, yes.
2    Q.  Okay.  Had you noticed that mistake in the
3  price term -- in the price term?
4    A.  At some point -- at some point in the -- at
5  some point in this I did recognize there was an error in
6  the price, yes.
7    Q.  Okay.  And did you notify Mr. Leyman about it?
8    A.  I don't remember that.
9    Q.  I'll show you now what has previously been
10  marked as Exhibit 4.  If you'll look in the second page
11  of Exhibit 4, the price term has been changed from 1110
12  per metric ton to 1310 per metric ton.  Is that right,
13  sir?
14    A.  Yes.
15    Q.  And 1310 was the correct price.  Isn't that
16  so?  That was agreed to?
17    A.  I believe so.
18    Q.  And, again, on Exhibit 4, near the bottom in
19  the same place where we saw it in the other two
20  exhibits, it also contains the statement, "If there is
21  anything outlined contrary to your understanding of our
22  agreement, please notify us immediately by facsimile."
23    A.  That's right.
24    Q.  Nowhere in Exhibits 2, 3 or 4 is there a term
25  that says "U.S. origin must be guaranteed for this MX."

423

1  Isn't that right?
2    A.  The -- all these confirms are silent on the
3  issue of origin.
4    Q.  They don't say anything about it?
5    A.  They don't say anything.
6    Q.  Okay.  Did you ever call Mr. Leyman to
7  say, "Hey, this doesn't say that it has to be U.S.
8  origin"?
9    A.  At some point I did call Mr. Leyman and tell
10  him that.
11    Q.  Okay.  But you did not do it on July 22nd?
12        MR. BERGESON:  Objection.
13    Q.  (BY MR. DIAZ-ARRASTIA)  You didn't do that on
14  July 22nd, did you, sir?
15    A.  No.
16    Q.  And you didn't it do it on July 23rd?
17    A.  No.
18    Q.  You didn't do it until July 31st.  Right, sir?
19    A.  This was a delay.  That's right.
20    Q.  And on July 22nd, you told Mr. Leyman you
21  wanted the payment terms changed?
22    A.  That's right.
23    Q.  You did do that.  Correct, sir?
24    A.  That's right.
25    Q.  And there was also a change in the price term,

**29  (Pages 420 to 423)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

424

1  an amendment. Correct, sir?
2      A.  That's correct.
3      Q.  During all these iterations of Exhibits 2, 3
4  and 4, you never said, "Hey, U.S. origin is not part of
5  the terms of this deal that's written out"?
6      A.  I never objected to a term that wasn't
7  included on these confirms. It was -- in retrospect, I
8  should have, but it was MOAB's mistake, not mine.
9      Q.  Is it your belief that on July 22nd, 2008, you
10  did buy MX from Tricon, you meaning in your capacity as
11  the representative of Vinmar?
12         I'm just asking --
13         MR. BERGESON:  I understand.
14      Q.  (BY MR. DIAZ-ARRASTIA) -- what your
15  understanding is.
16      A.  I do not believe there was ever a deal with
17  Tricon. We never agreed on the terms. I required U.S.
18  origin. Tricon didn't want U.S. origin. There was
19  never an agreement.
20      Q.  If you could take a look at Exhibit 39 from
21  this stack, sir. And you talked about this with Mr. Lee
22  about the middle of the page your writing to
23  Mr. Nicholas Smith, you say, "I bought CFR so I don't
24  need to arrange shipping."
25      A.  That's right.

425

1      Q.  When you say you bought CFR, you're referring
2  to the Tricon transaction. Correct?
3      A.  That's right.
4      Q.  So you're telling Mr. Smith that you bought MX
5  from Tricon. Correct, sir?
6      A.  That's what I told them, yes.
7      Q.  i'm going to show you now what's been
8  previously marked as Exhibit 29. Do you recognize that
9  document, sir?
10      A.  No.
11      Q.  Okay. Well, it appears to be an e-mail that
12  you're sending to Laurentiu Pascu.
13      A.  That's right.
14      Q.  And you've already talked about Mr. Pascu. He
15  worked with you at Vinmar. Correct?
16      A.  That's correct.
17      Q.  Okay. And it is dated on July 24th, 2008, at
18  10:15. Correct?
19      A.  That's correct.
20      Q.  And you tell Mr. Pascu, "Laurentiu, I bought
21  MX from Tricon. Please make -- please contact them and
22  make the necessary arrangements. Rick." Did I read
23  that correctly, sir?
24      A.  That's correct.
25      Q.  And you're attaching to Mr. Pascu a letter

426

1  that you received from Mr. Lockwood that's dated
2  July 22nd. Correct, sir?
3      A.  I don't remember if this was attached.
4      Q.  Do you remember receiving the letter from
5  Mr. Lockwood?
6      A.  I don't remember, no.
7      Q.  I think Mr. Pascu's job at Vinmar was a supply
8  chain specialist. Is that correct?
9      A.  It's one way you could describe his work, yes.
10      Q.  What is the job of a supply chain specialist?
11      A.  He is -- his role is to make sure that the
12  terms of the agreement -- that the terms of the
13  agreement are consistent with what we've agreed to.
14      Q.  Okay. Once a trader makes a deal, is it the
15  job of the supply chain specialist to complete the
16  transaction?
17      A.  Yes.
18      Q.  And this frees the trader to do more deals.
19  Correct?
20      A.  That's right.
21      Q.  Okay. The trader's job is to make deals and
22  the supply chain specialist, or whatever you want to
23  call that person, their job is to complete the
24  transaction. Is that correct, sir?
25      A.  Well, that's a -- there's many elements of

427

1  completing a transaction. Clearly they're not engaged
2  in shipping or chartering but all the financial and
3  contractual agreements, you know, it's their
4  responsibility to execute them.
5      Q.  They complete the financial and contractual
6  agreements?
7      A.  That's right. Where they enter them into the
8  system, right.
9      Q.  Let me now show you what's been previously
10  marked as Exhibit 15, and if I could call your attention
11  to the bottom of the page. It's an e-mail from Brad
12  Lockwood to you dated July 23, 2008, at 10:57 in the
13  morning.
14      A.  Uh-huh.
15      Q.  And Mr. Brad Lockwood says, "Rick, I am
16  pleased to attach a copy of our sales contract to you
17  for the mixed xylenes."
18      A.  That's right.
19      Q.  And if you would look at the second page of
20  Exhibit No. 15, it appears to be the same letter that
21  was in Exhibit 29. Is that correct?
22      A.  I'm not sure. Okay. They appear to be the
23  same.
24      Q.  Does this refresh your recollection about
25  receiving Mr. Lockwood's July 22, 2008, letter?

30  (Pages 424 to 427)

ARBITRATION HEARING - SEPTEMBER 21, 2010

428

1   A.   I remember seeing this contract before.
2   Q.   Does this refresh your recollection that
3   Mr. Lockwood sent it to you on July 23rd, 2008?
4   A.   That's the time stamp on this, that's correct.
5   Q.   And Exhibit 29 indicates that you forwarded it
6   to Mr. Pascu on July 24th at 10:15 a.m.?
7   A.   Again, I don't remember forwarding it, but I
8   believe its accurate.
9   Q.   Sir, if you would, take a look at Exhibit 15,
10  which is the last one that we were talking about.
11  A.   Okay.
12  Q.   And the second page, I think it's the one you
13  have in front of you.
14  A.   Yeah.
15  Q.   And if you would then pull out Exhibit 4 and
16  look at the second page of that.
17  A.   Okay.
18  Q.   And I would like to compare the two on some of
19  the essential terms of the deal.  First, you see where
20  it says "Product" on Exhibit 15?
21  A.   Yep.
22  Q.   And it says "Mixed xylenes."  Correct?
23  A.   That's correct.
24  Q.   And it says -- and that is the same as what it
25  says on Exhibit 4.  Correct?

429

1   A.   That's correct.
2   Q.   Let's look where it says "Quantity" on
3   Exhibit 15.  And it says, "5,000 metric tons plus or
4   minus 5 percent."  Correct, sir?
5   A.   That's right.
6   Q.   And quantity on Exhibit 4 also says, "5,000
7   metric tons plus or minus 5 percent."  So they're the
8   same?
9   A.   Yes.
10  Q.   Let's go to the next.  Quality is the next one
11  on Exhibit 15.  And it says, "ASTM D-5211 with BL max
12  20."  Correct?
13  A.   That's correct.
14  Q.   And over on Exhibit 4, you have to skip a
15  line.  There's also a quality line and it says, "Mixed
16  xylenes meeting ASTM D-5211, latest revisions with 52
17  maximum bromide index," which is the same thing.
18  Correct?
19  A.   That's right.
20  Q.   Price on Exhibit 15, it says, "USD 1310.00 per
21  metric ton."  Correct, sir?
22  A.   That's right.
23  Q.   And on Exhibit 4 price, that's the same,
24  "USD 1310 per metric ton, CFR basis."  Correct, sir?
25  A.   I don't see CFR basis.  Oh, yeah, I do.  Yes.

430

1   Q.   It's the same?
2   A.   Yes.
3   Q.   On delivery in Exhibit 15, there is a line
4   that says "Incoterm."  That says, "CFR Ulsan/Taiwan."
5   You understand that to be referring to the delivery.
6   Correct?
7   A.   That's correct.
8   Q.   And the delivery on Exhibit 4 says, "CFR basis
9   Taiwan or Ulsan Korea."  Correct, sir?
10  A.   That's right.
11  Q.   In -- in Exhibit 15 there's a line that says,
12  "Ship period, September 1, 2008, to September 15, 2008,"
13  correct, sir, on Exhibit 15?
14  A.   Yes.
15  Q.   Okay.  And if you look under the delivery
16  terms in Exhibit 4, second line -- starting from the end
17  of the first line, second line, it says, "At buyer's
18  option via barge/vessel provided seller 9-1-2008 to
19  9-15-2008, seller's option."  Correct?
20  A.   That's correct.
21  Q.   They're the same again?
22  A.   Uh-huh.
23  Q.   So all of these terms that we have talked --
24  and -- excuse me.
25       Finally, if you'll look at the payment

431

1   term and credit terms, they both talk about a payment by
2   an on site letter of credit.  Correct, sir?
3   A.   That's correct.
4   Q.   So those -- all of these terms that we have
5   discussed are the same in Exhibit 15 and in Exhibit 4?
6   A.   That's correct.
7   Q.   Okay.  And Exhibit 15, Mr. Lockwood's letter,
8   again, does not say anything about the origin of the
9   material?
10  A.   It does not.
11  Q.   Although Exhibit 15 contains terms that are
12  not included in Exhibit 4, it doesn't contain any terms
13  that are different from the ones on Exhibit 4.  Is that
14  correct, sir?
15       Is that right?
16  A.   There is nothing on the confirm that is not
17  included in the contract, that's correct.
18  Q.   And Exhibit 15 has more terms than the
19  confirm?
20  A.   That's right.
21  Q.   But nothing in the -- Exhibit 15 contradicts
22  something that's in the confirm.  Isn't that right, sir?
23  A.   Say that again.
24  Q.   Nothing that -- nothing that is in Exhibit 15
25  contradicts a term that's stated on Exhibit 4?

31  (Pages 428 to 431)

ARBITRATION HEARING - SEPTEMBER 21, 2010

432

1    A.  No, except that there's additional terms.
2    Q.  Okay.  If you would take a look at Exhibit 31,
3  sir.  We looked at that earlier.
4       (Playback of videotaped was stopped at
5  this time.)
6       MR. LEE:  Stop there.
7       JUDGE BENTON:  Why don't you stop?  Let's
8  go ahead and stop it and we'll go to lunch.
9       MR. DIAZ-ARRASTIA:  I think this is a good
10  place to break.
11       JUDGE BENTON:  We'll break for lunch until
12  about 1:00 o'clock.  We're at lunch.  We're off the
13  record.
14       (Recess from 11:56 a.m. to 1:03 p.m.)
15       JUDGE BENTON:  We're back on the record.
16  And we'll -- let's see.  We have about an hour -- about
17  45 minutes left.  Right?
18       MR. RUNIONS:  That's what I've got, about
19  45 minutes.
20       Let's pick up with the deposition
21  testimony.
22       (Playback of videotape was started again
23  at this time.)
24    Q.  (BY MR. DIAZ-ARRASTIA)  If you would take a
25  look at Exhibit 31, sir.  We looked at that earlier.

433

1  It's your e-mail chain with Mr. Anaya.
2    A.  31 did you say?
3    Q.  31, yes, sir.
4    A.  All right.
5    Q.  And on July 24th, Mr. Anaya tells you, "To
6  complete the order, we just need the port of origin for
7  this product."
8       Do you remember talking about that with
9  Mr. Lee?
10    A.  That's right.
11    Q.  And your response was, "Re: Origin, we won't
12  know until we declare discharge port.  Most likely USG,"
13  meaning U.S. Gulf.
14    A.  That's correct.
15    Q.  Okay.  And you understand that most likely
16  doesn't mean a guarantee?
17    A.  I didn't need a guarantee from the U.S. Gulf.
18  I needed a guarantee from the USA.
19    Q.  Sir, my question to you was, in your mind, if
20  something says, "Something is most likely of a certain
21  origin," that is different from saying, "It's guaranteed
22  to be of that origin."  Would you agree me about that?
23    A.  That's correct.
24    Q.  And Mr. Anaya responds to you saying, "Okay.
25  That is what we wrote on the PO," meaning purchase

434

1  order.  Correct, sir?
2    A.  That's right.
3    Q.  And then you respond to him a few minutes
4  later saying, "There is also a .5 per -- I guess that's
5  MT -- broker charge."  Right, sir?
6    A.  That's correct.
7    Q.  And you say, "And I may not sell it in
8  Taiwan"?
9    A.  That's right.
10    Q.  And that's because you already knew at the
11  sale that you had in your mind you had lost.  Correct,
12  sir?
13    A.  That's right.
14    Q.  And then you say in your last line,
15  "Otherwise, it's fine."  Do you see that, sir?
16    A.  Yeah.
17    Q.  Okay.  And -- well, what I'm trying to
18  understand, sir, is when you say, "Otherwise, it's
19  fine," are you saying that the purchase order that
20  Mr. Anaya prepared is fine other than the --
21    A.  I don't remember the details of what I was
22  thinking at the time.  I'm sorry.
23    Q.  Before you wrote the e-mail at the top of
24  Exhibit 31, had you seen the purchase order that
25  Mr. Anaya had prepared?

435

1    A.  I don't remember seeing it.
2    Q.  Okay.  Mr. Wilson, I am showing you what's
3  been previously marked as Exhibit 34.  Is that the
4  purchase order that was prepared for the Tricon deal at
5  Vinmar?
6    A.  I don't remember it, no.
7    Q.  You don't know if you had seen that before you
8  replied to Mr. Anaya, "Otherwise, it's fine"?
9    A.  I just don't remember reviewing it.  I'm
10  sorry.
11    Q.  Is this the standard purchase order form that
12  Vinmar used around July 24th, 2008?
13    A.  I can't comment on if every line here is
14  consistent, which usually is.
15    Q.  I'm sorry.  I didn't hear the last part of
16  your answer.
17    A.  I'm sorry that you couldn't hear me.  My point
18  was that I can't comment and I can't say without doubt
19  that every -- every term that is typically on a purchase
20  order from Vinmar is on this specific example.
21    Q.  Okay.  I understand.  It was not your job as a
22  trader to prepare purchase orders?
23    A.  That's right.
24    Q.  That was either Mr. Anaya or Mr. Pascu's job?
25    A.  That's right.

32  (Pages 432 to 435)

ARBITRATION HEARING - SEPTEMBER 21, 2010

436

1     Q. They took care of that part of the
2 transaction?
3     **A. That's right.**
4     Q. If you would take a look at the second page of
5 Exhibit 34, sir. That's the one we were just looking at
6 right there. You see near the top where there's a place
7 for origin?
8     **A. That's right.**
9     Q. Okay. And it's left blank?
10     **A. That's right.**
11     Q. And if you'll look at the bottom of the second
12 page, do you see where it says, "Law and arbitration"?
13     **A. Yes, I see that.**
14     Q. Now, it says, "Law of the state of Texas, USA,
15 to apply. All disputes arising in connection with the
16 present contract shall be finally settled under the
17 rules of conciliation and arbitration of the American
18 Arbitration Association by one or more arbitrators
19 in accordance with the said rules." Did I
20 read that correctly, sir?
21     **A. You did read that correctly.**
22     Q. Okay. Is that law and arbitration provision
23 one that was contained in the purchase orders that
24 Vinmar was using on or around July 2008?
25     **A. I don't remember.**

437

1     Q. Again, that's because that's not your job,
2 it's Mr. Pascu's and Mr. Anaya's job?
3     **A. I just don't remember.**
4     Q. But dealing with that part of the transaction
5 was not your job as the trader; it was the job of
6 Mr. Anaya or Mr. Pascu as the specialists?
7     **A. I don't remember the detailed roles and**
8 **responsibility. I'm sorry.**
9     Q. Dr. Wilson, let me show you what was
10 previously marked as Exhibit 36. And this is an e-mail
11 from Mr. Pascu to you dated July 29th, 2008?
12     **A. Yes, sir. I've read it.**
13     Q. Well, that's what it is. It's an e-mail from
14 Mr. Pascu to you dated July 29th, 2008?
15     **A. That's correct.**
16     Q. And Mr. Pascu says, "Rick, please find my
17 comments on this sales contract." Do you understand
18 that to be a reference to Exhibit 15, the letter from
19 Mr. Lockwood to you? Let me repeat my question.
20     **A. Yeah. Could you, please?**
21     Q. My question was, is it your understanding,
22 sir, that when Mr. Pascu says, "Please find my comments
23 on this sales contract," Mr. Pascu is referring to
24 Exhibit 15, the letter from Mr. Lockwood to you with the
25 additional terms?

438

1     **A. I can't confirm that. May be.**
2     Q. And at the bottom of the text of this e-mail,
3 Mr. Pascu says, "If you have a right contact person
4 would be great. I can make contacts and discuss that."
5 Do you see that, sir?
6     **A. Yes, I see that.**
7     Q. And, Mr. Wilson, Exhibit 36 was July 29th,
8 2008, at 11:54 a.m. Correct?
9     **A. That's correct.**
10     Q. And the document we have just marked
11 Exhibit 41 is an e-mail from you to Mr. Pascu on
12 July 29th, 2008, at 11:59 a.m., just a few minutes
13 later. Correct?
14     **A. That's correct.**
15     Q. And essentially you tell him, "Laurentiu, the
16 contact is Vuk Rajevac."
17     **A. That's correct.**
18     Q. And you gave him his e-mail address and
19 cellphone number. Correct, sir?
20     **A. That's what's in the e-mail, yes.**
21     Q. Okay. If you would take a look at Exhibit 15,
22 again, sir, the first page of that exhibit. In
23 Mr. Lockwood's e-mail to you at the bottom of that first
24 page, in the second sentence, he tells you, "Please let
25 Vuk know the contact details for your logistics

439

1 colleague." Do you understand that Vuk means Vuk
2 Rajevac?
3     **A. Do I understand now? Yes. I don't -- I'm not**
4 **sure I understand at that time.**
5     Q. Well, how did you know to tell Mr. Pascu that
6 the contact person he needed to get ahold of us was Vuk
7 Rajevac?
8     **A. I don't remember.**
9     Q. All right. Mr. Lockwood had to have told you.
10 Right?
11     **A. I don't remember.**
12     Q. Let me bring your attention now, sir, to what
13 has been previously been marked as Exhibit 35. And if
14 you'll look at the bottom half of the first page of
15 Exhibit 35, it appears to be an e-mail from Mr. Pascu to
16 Mr. Rajevac dated July 29th, 2008, at 4:08 in the
17 afternoon. Is that correct, sir?
18     **A. That's correct.**
19     Q. And Mr. Pascu says, "Please enclose our
20 comments on your sale confirmation. We shall revert
21 soon with our purchase order for your review." Did I
22 read that correctly?
23     **A. You did.**
24     Q. Okay. And the purchase order that he's
25 referring to would be what we saw as Exhibit 34?

**33 (Pages 436 to 439)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

440

1    A.  **Maybe.**
2    Q.  You don't get involved with purchase orders?
3    A.  **No.  I think that -- I don't remember the**
4    **details of what happened over two years ago.**
5    Q.  Okay.  If you will look over on the third page
6    of Exhibit 35, sir.  And this appears to be a copy of
7    Mr. Lockwood's letter like what we have on Exhibit 15
8    except that there's some handwriting on it.  Do you see
9    that, sir?
10   A.  **That's correct.**
11   Q.  Is that Mr. Raj -- Mr. Pascu's handwriting?
12   A.  **I don't know.**
13   Q.  If you would look at the top right-hand
14   corner, there's a number handwritten in there.
15   A.  **That's correct.**
16   Q.  Do you see that it's 4529980?
17   A.  **That's correct.**
18   Q.  If you will take a look at Exhibit 34, sir.
19   That's the purchase order.
20   A.  **Okay.**
21   Q.  There's a purchase order number on Exhibit 34.
22   Correct, sir?
23   A.  **That's right.**
24   Q.  And that's also 4529980.  Correct, sir?
25   A.  **452 -- that's correct.**

441

1    Q.  Okay.  So this handwritten number appears to
2    be a reference to the Vinmar purchase order.  Will you
3    agree with that?
4    A.  **It does.**
5    Q.  I'm sorry.  Did Mr. Pascu discuss with you his
6    comments before he sent them to Mr. Rajevac?
7    A.  **I don't remember.**
8    Q.  Well, did you see this document with the
9    handwritten notes --
10   A.  **On what date?**
11   Q.  -- before Mr. Pascu forwarded it to
12   Mr. Rajevac?
13   A.  **I don't remember.**
14   Q.  Some of the changes that are made in
15   handwriting on Exhibit 34 -- for example, where you see
16   the credit terms, there is something scratched out.  Do
17   you see that, sir?
18   A.  **That's right.**
19   Q.  And what's scratched out I think is where he
20   says, "Irrevocable and confirmed."  He scratched out
21   "and confirmed"?
22   A.  **I can't even read this but --**
23   Q.  Let's take a look at Exhibit 15, which is
24   clearer, the second page of Exhibit 15.
25   A.  **"Irrevocable and confirmed" document, I see**

442

1    that's right.
2    Q.  So "and confirmed" is scratched out?
3    A.  **That's right.**
4    Q.  Take a look at Exhibit 36 again, Mr. Pascu's
5    e-mail to you.  And if you will look -- I think it's the
6    second sentence.  He says, "Also, we do not have to open
7    a confirmed LC."  Do you see where he says that?
8    A.  **Yes.**
9    Q.  And that's making a reference to scratching
10   out "and confirmed."  Correct?
11   A.  **It would appear to be the case.**
12   Q.  Okay.  And that's the sort of thing that
13   Mr. Pascu would take care of; that's part of his job?
14   A.  **Yes.**
15   Q.  If you will look at the next page on
16   Exhibit 35.  It's VIN No. 6, 00006.
17   A.  **6.  All right.  Five, six.  Yeah.**
18   Q.  Okay.  Do you see under Demurrage, Mr. Rajevac
19   wants to change the demurrage time bar.  Correct?
20   A.  **Right.**
21   Q.  Yes, sir?
22   A.  **That's what it says.**
23   Q.  And that's also part of what mister -- I said
24   Mr. Rajevac.  Mr. Pascu says that he wants to change the
25   demurrage time bar.  Correct?

443

1    A.  **That's apparently the case.**
2    Q.  And that's also part of Mr. Pascu's job?
3    A.  **That's correct.**
4    Q.  Otherwise, would Mr. Pascu have the authority
5    to go forward and complete the transaction as part of
6    his job?
7    A.  **He can't change the terms, no.**
8    Q.  But he can negotiate things like not needing a
9    confirmed letter of credit?
10   A.  **He would have to propose it and -- you know, a**
11   **demurrage letters of credit are commercial terms.  He**
12   **would normally bring those to my attention.**
13   Q.  Okay.  And do you think he did in this case?
14   A.  **And I think he did or didn't?**
15   Q.  Do you think he did in this case?
16   A.  **I don't remember him doing, it, no.**
17   Q.  In looking again at Exhibit 35, none of the
18   handwritten notations on Mr. Lockwood's letter say
19   anything about origin of the material.  Correct?
20   A.  **And which page is that?  It's exhibit --**
21   Q.  Exhibit 35.
22   A.  **35.**
23   Q.  We have a part where we have handwritten
24   notations on Mr. Lockwood's July 22nd letter.
25   A.  **Okay.**

34 (Pages 440 to 443)

ARBITRATION HEARING - SEPTEMBER 21, 2010

444

1    Q.  None of those handwritten notations relate to
2    the origin of the material?
3        A.  No.
4        Q.  And, similarly, in the cover e-mail from
5    Mr. Pascu to Mr. Rajevac, there's no mention of origin
6    on the material either?
7        A.  That's correct.  But as a point of
8    clarification, this deal -- they would not have notified
9    the port of origin because they wanted us to nominate a
10   discharge port and time first so you wouldn't have that
11   information on these contracts at this point.
12       Q.  Is it your testimony, sir, that if U.S. origin
13   was an essential term of the deal that you wanted to
14   make, it would not be mentioned in any of the
15   documentation?
16       A.  My point is that if it was open origin it
17   would have been in the contract.  It was not.
18       Q.  Your testimony is that if you make a deal
19   where the origin of the material from the United States
20   is an essential term of what you wanted, it would be a
21   normal thing for you to see no mention of that in any of
22   the paperwork?  Is that your testimony?
23       A.  My testimony is once the origin has been
24   determined, the specific port, not the origin, the
25   specific port, it will on the contract and it will be in

445

1    the purchase order system.
2        Q.  But your testimony is that if you believed
3    origin from the U.S. was essential to what you wanted,
4    it would be a normal thing for you to see no mention of
5    it in any of your paperwork.  Is that what you believe?
6        A.  I believe the communications were silent on
7    origin and I expected that once the exact port has been
8    identified that they would appear on the contract.
9            So in retrospect, you know, it's easy to
10   see that had I gone back in time I didn't catch it, and
11   that was my mistake.  It's actually Tricon's mistake,
12   but I didn't catch it.  And -- but that doesn't change
13   the fact that I never asked for non-U.S. material.  I
14   never gave Ed Leyman the authority to purchase non-U.S.
15   material.
16       Q.  Let's take a look at exhibit -- what's been
17   previously marked as Exhibit 37.  And the bottom is an
18   e-mail from Mr. Rajevac to Mr. Pascu dated July 29th,
19   2008, at 4:43.  Correct?
20       A.  That's right.
21       Q.  And that is, oh, just a little -- just a
22   little over 30 minutes after Mr. Pascu's e-mail to him
23   that was in Exhibit 35.  Correct?
24       A.  Say that again.  I'm sorry.
25       Q.  Exhibit 37 is dated July 29th, 2008, at 4:43.

446

1    That's just a little over 30 minutes after Mr. Pascu's
2    July 29, 2008, 4:08 p.m. e-mail that was in Exhibit 35?
3        A.  It is.
4        Q.  Did you see this e-mail on July 29th?
5        A.  I don't remember exactly.
6        Q.  Is this something that would have been part of
7    Mr. Pascu's job to take care of?
8        A.  I think it would have been Mr. Pascu's
9    responsibility to bring up any issues he saw as a result
10   of this communication --
11       Q.  Okay.
12       A.  -- which I believe he did.
13       Q.  And it says -- on No. 1, Mr. Rajevac tells
14   Mr. Pascu, "Your comments on the contract are well noted
15   and accepted except for demurrage time bar, which is
16   90 days as per industry standard."  Correct, sir?
17       A.  That's what it says.
18       Q.  Let's go back to Exhibit 37.  Near the bottom
19   of that page in Mr. Rajevac's e-mail under Point No. 3
20   on the first page, Mr. Rajevac says, "As far as the
21   shipment details, we sold on CFR basis with arrival
22   window.  So once you declare the discharge port by
23   August 8, we will be able to decide whether to give you
24   a deep sea cargo, which at that point will most likely
25   be in the water, or an Asian origin cargo."  Did I read

447

1    that correctly, sir?
2        A.  That's what I see.
3        Q.  And it is not uncommon to sell cargo that's
4    already in the water.  Correct?
5        A.  It's not uncommon.
6        Q.  And that's what he means by a deep sea cargo?
7        A.  That's right.
8        Q.  But certainly, sir, this is a clear statement
9    on Mr. Rajevac's part that they may -- would not
10   necessarily give you U.S. origin material.  Correct?
11       A.  Yes, it is.
12       Q.  Did Mr. Pascu inform you of this when he got
13   it?
14       A.  At some point I -- it was brought to my
15   attention.  And it appears here that Laurentiu forwarded
16   this to me on July 31st because there was some period of
17   discovery.  I just don't remember the details.
18       Q.  Do you recall telling Mr. Pascu that you had
19   to have U.S. origin before July 29th?
20       A.  Yes.
21       Q.  Mister -- Dr. Wilson, calling your attention
22   to Exhibit 42, that appears to be a series of instant
23   messages between you and Brad Lockwood?
24       A.  Appears to be.
25       Q.  Okay.  And in this set of instant messages,

35 (Pages 444 to 447)

ARBITRATION HEARING - SEPTEMBER 21, 2010

448

1  you're asking Mr. Lockwood whether Tricon would be
2  interested in buying back the MX that Vinmar had bought.
3  Correct?
4      A.  I don't remember if that's what it was about.
5      Q.  Okay.  Well, take a look at the last entry
6  from Rick Wilson at the bottom, which is the next from
7  the last.  It says, "RickWilson@sbcglobal.net,
8  7-31-2008, 9:41:27 a.m."
9          And it said, "Brad, if you want to wipe
10  the slate clean, we can do that.  Otherwise, I have
11  contract obligations.  I supply info."  Did I read that
12  correctly, sir?
13      A.  Yes.
14      Q.  Okay.  So when you say, "wipe the slate
15  clean," that means buy back what you sold me.  Correct?
16      A.  I don't know that that's what this was in
17  reference to --
18      Q.  What --
19      A.  -- in essence so --
20      Q.  What does "wipe the slate clean" mean when you
21  said that?
22      A.  I don't remember.
23      Q.  Now, you state that you have other contractual
24  obligations that you can use the material to satisfy.
25  Correct?

449

1      A.  That's what this says.
2      Q.  The communication between Mr. Rajevac and
3  Mr. Pascu is July 29, isn't it, sir?
4      A.  That's correct.
5      Q.  Okay.  Two days later, you're telling
6  Mr. Lockwood that you would buy the material back and
7  that you have other contracts you can fulfill?
8      A.  That's what the IM suggests, yes.
9      Q.  I'll show you now what's previously marked as
10  Exhibit 17.  And near the bottom of it is an e-mail
11  communication from you to Mr. Rajevac.  Correct?
12      A.  That's correct.
13      Q.  Okay.  And that is where you say, "Vuk, we
14  cannot accept open origin from this -- for this
15  material.  It must be from the USA"?
16      A.  That's right.
17      Q.  Is this the first time that you made that
18  communication to Mr. Rajevac?  Let me put it this way.
19  Is this the first --
20      A.  To Mr. Rajevac I believe this is the first
21  time I personally communicated that to him.
22      Q.  Okay.  And this is also the first time that
23  you had communicated to anybody at Tricon -- you
24  yourself had communicated to anybody at Tricon that the
25  material had to be from the USA?

450

1      A.  I don't remember.
2      Q.  Do you remember telling Mr. Lockwood before
3  July 31st at 1:43 p.m. that the material had to be from
4  the USA?
5      A.  I don't remember.
6      Q.  And that is at 1:43 p.m., several hours after
7  you had offered to buy the material back and told
8  Mr. Lockwood that you had other obligations you could
9  fulfill.  Correct?
10      A.  I don't know if this IM is in relation --
11  necessarily in relation to this refusal.
12      Q.  I'll show you now, Dr. Wilson, what's
13  previously marked as Exhibit No. 12.  If you would take
14  a look a few pages in to the page marked TRI 00045, near
15  the bottom of the page.
16          It appears to be communications between
17  Mr. Leyman and Mr. Lockwood by instant message?
18      A.  Yes.
19      Q.  If you will look at the first line on the day
20  7-23 at 9:28 a.m. 53.  It's a communication by
21  Mr. Leyman.  He says, "No MX or NPX buyers yet.  Asia
22  got beaten up last night."
23          Do you recall that the price for MX and
24  NPX in Asia started to fall in the night of July 22nd?
25      A.  I know it is a historical fact.  I don't

451

1  remember if I recognized it at the time.
2      Q.  But it did happen?
3      A.  Yes.
4      Q.  And that's what Mr. Leyman means when he says,
5  "Asia got beaten up last night"?  Well, is that what you
6  understand it says?
7      A.  "Asia got beaten up."  That's a term that
8  would suggest that prices went down but it's not -- it's
9  not specific in terms of what prices.
10      Q.  Okay.  I think you testified earlier that was
11  a surprise to you; you actually expected the price of MX
12  in Asia to go up?
13      A.  That's right.
14      Q.  Okay.  Dr. Wilson, if I can call your
15  attention to Exhibit 43, which appears to be in --
16  instant message communications between you and
17  Mr. Leyman.  Is that what it appears to be?
18      A.  That's correct.
19      Q.  On July 31st, 2008, between 9:30 and about
20  10:18 in the morning or about 1:00 -- well, beginning at
21  9:26:08 a.m. and ending at 1:02 in the afternoon.
22  Correct?
23      A.  That's -- that's correct.
24      Q.  If you will look at the second line at
25  9:26:42 a.m., Mr. Leyman is asking you, "Is your 5 KT

36  (Pages 448 to 451)

ARBITRATION HEARING - SEPTEMBER 21, 2010

452

1   CFR 1 H Sept BBLS still available?"  Do you see that,
2   sir?
3       A.  Yes.
4       Q.  Is that referring to the five metric tons
5   purchased from Tricon?
6       A.  I don't know.
7       Q.  Well, at 10:16:43 a.m., you asked Mr. Leyman,
8   "Price for 1H September MX."  Do you see that, sir?
9       A.  Yes.
10      Q.  And he responds, "Seller had indicated 1250
11  early this morning."
12          Your response is, "I'll wait."
13          Then Mr. Leyman says, "What price will you
14  be looking for?"
15          And your response is, "It would be nice to
16  profit."
17          Did I read that all correctly, sir?
18      A.  That's correct.
19      Q.  Calling your attention now to Exhibit 44,
20  Dr. Wilson, this appears to be an e-mail from you to
21  Devang Mehta on July 31st at 9:30 -- 2008 at 9:31 p.m.
22  Is that correct sir?
23      A.  Yep.
24      Q.  Who is Devang Mehta?
25      A.  Devang is in charge of chemicals trading.

453

1       Q.  Okay.  He would have been your boss?
2       A.  That's right.
3       Q.  What was the purpose of this e-mail that you
4   sent Mr. Mehta?
5       A.  I think they were at -- Vinmar I imagine was
6   asking me what was going on so I was advising them.
7       Q.  Okay.  If you'll look at the very last two
8   lines on Exhibit 44, sir.  See where it says, "7:30,
9   Rick note to Vuk operations.  We cannot accept open
10  origin for this material.  It must be from USA.  Surely
11  you own this product.  Please advise regarding shipment
12  details."
13      A.  Shipping, yeah.
14      Q.  Shipping details.  That appears to be a
15  quotation from Exhibit 17.
16      A.  I believe it's a -- I believe it was a copy
17  from an e-mail, yeah.
18      Q.  Okay.  And the reason that I ask, sir, is
19  because if you note on Exhibit 44, the date that you put
20  on that is 7:30, but Exhibit 17 is dated July 31.  My
21  question is, did you just make a mistake and put 7:30
22  when it should have been 7:31?
23      A.  I don't remember.
24      Q.  You agree that your e-mail to Mr. Rajevac that
25  is at the bottom of Exhibit 17 is dated July 31?

454

1       A.  That's correct.
2       Q.  And the statement that appears on the last two
3   lines of Exhibit 44 is just a quotation from that
4   e-mail?
5       A.  I believe that was the intent.
6       Q.  Okay.  And if you would look at the first
7   written time, 7:22.  You say, "Devang, here is a summary
8   of the communications with Tricon I had -- here is a
9   summary of the communications with Tricon that I had
10  had."
11          On the first line it says, "7:22."  Do you
12  see that, sir?
13      A.  Uh-huh.
14      Q.  And is -- and that's a "yes"?
15      A.  I see that, yes.
16      Q.  Okay.  And that is July 22, which is the day
17  that the deal was originally made?
18      A.  If that's the fact.
19      Q.  Let's take a look at all the way back in the
20  beginning.  I think it was 2.  Yeah, take a look at
21  Exhibit 2.
22      A.  Okay.  No, it's not there.  3, 4, 6, 9, 10,
23  15, 18, 17.  Oh, here we go.  Okay.  Can you repeat
24  that, please?
25      Q.  Yeah.  If you would just look at Exhibit 2,

455

1   that is the first MOAB confirm.  Correct?
2       A.  I believe so.
3       Q.  Okay.  The date on that is July 22 --
4       A.  That's right.
5       Q.  -- 2008?
6       A.  That's right.
7       Q.  So my question to you is, when you write to
8   Mr. Mehta, "7-22, MOAB confirm," you're making a
9   reference to Exhibit No. 2?
10      A.  I believe that was the intent.
11      Q.  Okay.  I think even the amended confirms are
12  all also dated July 22.  Correct, sir?
13      A.  July 22.
14      Q.  3 and --
15      A.  No. 3.
16      Q.  No. 3 and No. 4 are the amended MOAB confirms
17  and they're also dated July 22.  Correct?
18      A.  Yes.
19      Q.  And when you tell Mr. Mehta, "7-22, MOAB
20  confirm, P equals 110 CFR" -- P meaning price.  Correct?
21      A.  That's right.
22      Q.  T -- "T/C 30 days, 1 to 15 September, seller's
23  option."  What does -- is it TIC or T -- or TK probably?
24  I'm having a hard time reading what it says, but that's
25  referring to the payment terms.  Correct, sir?

37  (Pages 452 to 455)

ARBITRATION HEARING - SEPTEMBER 21, 2010

456

1    THE REPORTER: To the what? Excuse me.
2    MR. DIAZ-ARRASTIA: Payment terms.
3    A.  Actually I'm not sure.
4    Q.  (BY MR. DIAZ-ARRASTIA)  You're not sure.
5    Okay.  "Seller's option declared by August 8th," and
6    then you write in parentheses, "No requirement for load
7    port."  You see that, sir?
8    A.  Uh-huh.
9    Q.  Okay.  Is that a "yes"?
10   A.  Yes.  Load port.
11   Q.  Yeah.  And it is true that you could load --
12   that there could be foreign MX in storage at a U.S. port
13   and you could load MX in a U.S. port that was not of
14   U.S. origin.  Is that correct?
15   A.  The origin is determined at the point of -- at
16   the load point so where the physical balance coming --
17   came from.  I've never seen that happen, but in concept
18   it could.
19   Q.  Calling your attention to Exhibit 45,
20   Dr. Wilson.  It's an e-mail communication from you to
21   Hermant Goradia, is that correct, sir --
22   A.  That's right.
23   Q.  -- on August the 6th?
24      And the subject is Tricon communication
25   draft to discuss.  Correct?

457

1    "Yes," sir?  I'm sorry.
2    A.  That's correct.
3    Q.  Who is Mr. Goradia?
4    A.  He is one of the owners of Vinmar.
5    Q.  Okay.  What was the purpose of this e-mail?
6    A.  The purpose of the e-mail was -- what we
7    wanted to do was stick to the original terms of the
8    deal.  And at this point in time, doing so was going to
9    incur considerable loss to Vinmar.  So I was notifying
10   the owners.
11   Q.  What's going on in Exhibit 45 is you are
12   drafting an e-mail.  Correct?
13   A.  Yes.
14   Q.  Okay.  And you were going to send the e-mail
15   to Ed Leyman?
16   A.  Or Tricon, yeah.
17   Q.  Why were you running a draft of your
18   communication by Mr. Goradia, Mr. Antonvich and
19   Mr. Mehta?
20   A.  Because it's their company.
21   Q.  Did they ask you to draft that communication?
22   A.  No.
23   Q.  It was your idea to send this communication?
24   A.  Yes.
25   Q.  And did you actually send that communication?

458

1    A.  I believe so.
2    Q.  Okay.  If you'll take a look at Exhibit 9,
3    that is the communication as it was sent to Mr. Leyman
4    and then he forwarded it to Tricon.  Correct?
5    A.  That's the e-mail trail here, that's correct.
6    Q.  That is the same communication that you had
7    drafted in Exhibit 45?
8    A.  That's correct.
9    Q.  And your proposal in this e-mail is both for
10   U.S. origin material to be delivered at Korea or Taiwan
11   by no later than the 15th of September.  Correct?
12   A.  Yes.
13   Q.  Take a look at Exhibit 18, which I think we've
14   looked at earlier.  Now, in that e-mail, Mr. Lockwood is
15   proposing to deliver U.S. origin MX that has an ETA of
16   September the 6th.  Is that correct, sir?
17   A.  That's correct.
18   Q.  And you did not accept that proposal?
19   A.  That's correct.
20   Q.  Mr. Wilson, is it true that the price of MX
21   continued to drop through July and August of 2008?
22   A.  I don't remember.
23   Q.  Okay.  Is it true that it was very difficult
24   to find anyone interested in buying any MX during that
25   period of time in 2008?

459

1    A.  I did not sell any.  I can say that.
2    Q.  If you will take a look at Exhibit 46,
3    Dr. Wilson.  It appears to be instant message
4    communications between you and Ed Leyman.  Correct, sir?
5    A.  Yes.
6    Q.  If you will take a look at about two thirds of
7    the way down.  It says, "Ed Leyman, MOAB Oil, any buying
8    interest FOB USGC?"  Have you found that, sir?
9    A.  Yes.
10   Q.  And your response is, "Re: Buying interest not
11   today.  Customers are hiding."
12   A.  That's right.
13   Q.  Did I read that correctly, sir?
14   A.  You did.
15   Q.  Are you telling Mr. Leyman that there are no
16   customers buying MX when these communications took
17   place?
18   A.  I don't remember the intent of the
19   conversation, but that's what the words would suggest.
20            EXAMINATION
21   BY MR. LEE:
22   Q.  Do you know for certain whether the receipt of
23   the e-mail from Mr. Pascu on July 31st at 1:43 was the
24   first time that you became aware that Tricon had a
25   different understanding of this alleged transaction?

38  (Pages 456 to 459)

460

1      A.  Is that the first time?  I can't say that, no.
2      Q.  Okay.  Are you aware of any other written
3   communication that was sent to you prior to July 31st at
4   1:39 p.m. that would have -- that discussed Tricon's
5   claim that it could provide Asian origin MX?
6      A.  No, but usually if there were an issue -- I
7   mean, in this case, I just don't remember.  The standard
8   was Laurentiu to call me rather than send me an e-mail.
9      Q.  Okay.  And so it's very possible that the
10  first time you actually found out about this from
11  Mr. Pascu was on the afternoon of July 31, 2008.
12  Correct?
13     A.  I can't state unequivocally the exact time
14  that I discovered that there was a -- there was an
15  issue, but I remember the emotional part of discovering
16  there was an issue because, you know, you look back and
17  you see the pieces that weren't quite right and, you
18  know, it hits you.  So exactly what time I got that
19  information was -- I just can't tell you.  I don't know.
20        Say that again.  Mr. Leyman --
21     Q.  Did Mr. Leyman tell you that as part of his
22  broker service that he recorded phone calls?
23     A.  Yes, he did.
24     Q.  Okay.  Does it -- does it surprise you to find
25  out that there are no tape recordings of this

461

1   transaction?
2      A.  Yes.
3         (This is the end of the playback of the
4   edited version of the videotaped deposition of Richard
5   W. Wilson, Ph.D., that was originally taken on
6   August 30, 2010.)
7         JUDGE BENTON:  All right.  Let's take
8   about a ten-minute break.
9         (Recess from 1:49 p.m. to 2:04 p.m.)
10        JUDGE BENTON:  Okay.  Back on the record.
11  Call your next witness.
12        MR. DIAZ-ARRASTIA:  Our next witness is
13  Steve Simpson.
14        JUDGE BENTON:  Mr. Simpson, if you will
15  your raise your right hand.
16        (At this time the witness was duly sworn
17  by Judge Benton.)
18        MR. DIAZ-ARRASTIA:  Members of the Panel,
19  Mr. Simpson's report was previously submitted to the
20  panel, but it's also in the Tricon Exhibit Book under
21  Tricon Exhibit 36, 36.
22        JUDGE BENTON:  Tricon 36.
23
24
25

462

1                STEVE SIMPSON,
2   having been first duly sworn, testified as follows:
3         DIRECT EXAMINATION (2:05 p.m.)
4   BY MR. DIAZ-ARRASTIA:
5      Q.  Mr. Simpson, could you state your name for the
6   record, please?
7      A.  Steve C. Simpson.
8      Q.  And tell us a little bit about your background
9   and experience trading petrochemicals?
10     A.  After college and a short time in the Army, I
11  went with a company called Kerr McGee.  I started there
12  in the accounting group.  And after 12 and a half years,
13  I had moved up to manager of international trading and
14  transportation, bought crude oils and --
15     Q.  Could you raise your voice a little bit,
16  please?
17     A.  Sure.  I was manager of international trading
18  and transportation for them.  From there -- after 12 and
19  a half years, I left Kerr McGee and went to Northeast
20  Petroleum.  Northeast Petroleum, I was VP of products --
21  of crude oil supply and then of products supply later
22  and manned the supply group for a couple of years.
23        At that time they were sold to Charter
24  Oil.  And I worked for about a year in Houston at
25  Charter Oil as vice president of product supply.  And

463

1   then I moved to London for about two and a half, almost
2   three years, senior trader.
3         I moved back from London, started a
4   company called Petrotex and I traded petroleum futures
5   as well as other futures, wheat, corn on the futures
6   markets.
7         Then in '89 I went to work for -- back to
8   work for Kerr-McGee in the Houston office in the
9   refining group.  And what I did there is I traded the
10  futures for them for about six or eight months and then
11  the man that had their petrochemicals got killed in a
12  balloon accident and they offered me that job and I took
13  the petrochemicals over.
14        About nine months later, they offered me
15  specialty products, and I did that until they sold their
16  refineries in 1995.  In 1995, I went to work for a
17  trading company called Rio Energy.  I wanted to do
18  aromatics and gasoline feedstocks.  And I did that for
19  about a year and then I decided I didn't want to be in
20  that business.
21        I left there and I went to Valero Energy
22  in '97.  And in 2008, I retired from Valero Energy.  I
23  started there as manager of petrochemicals.  We had a
24  big fractionation unit to produce xylenes.  And I did
25  that and then I did a lot of different specialty

39  (Pages 460 to 463)

ARBITRATION HEARING - SEPTEMBER 21, 2010

464

1   products, did a lot of aromatics.
2       And then in 2001, we bought Diamond
3   Shamrock.  At that time I became director of
4   petrochemicals which handled aromatics and propylenes.
5   And then I ended up retiring as executive director of
6   petrochemicals.
7       Q.  And are you still involved in the
8   petrochemicals markets, sir?
9       A.  Yes.  I retired May 31st.  And June 1st I went
10  to work for Valero as a consultant on a part-time basis
11  on a project where you reduce the benzene in the
12  gasoline pool, and that project will probably be over
13  around the first quarter of 2011, a lot of capital
14  expense so we kind of do those things.
15      And then also I write a weekly trading
16  report for the aromatics group on what they should be on
17  the trading side, if they should buy or sell or do
18  nothing, hold.
19      Q.  And during your career that you have
20  described, sir, have you been actively involved as a
21  trader?
22      A.  Yes.
23      Q.  And on how many trades have you personally
24  performed?
25      A.  At Valero, I've done over a thousand trades.

465

1       Q.  And how much of your trading experience has
2   been with aromatics?
3       A.  I'd say probably 50 percent of it.
4       Q.  And what are some of the other materials that
5   you have traded?
6       A.  Propylene is a big material we traded a lot
7   of.  I've done all the gasoline blend stocks from MTB to
8   methanol, LPG's.  I've bought natural gas.  I've done
9   anything that goes into or out of a refinery as a bulk
10  material.
11      Q.  And have you also managed traders?
12      A.  Yes.
13      Q.  While you managed traders, were you also
14  personally doing trades?
15      A.  Yes.
16      Q.  Okay.  When was the last time that you
17  personally made a mixed xylenes trade?
18      A.  I believe that was in March of 2009.
19      Q.  Mr. Simpson, in trading -- in petrochemicals
20  trading, is it common to use brokers when making deals?
21      A.  Yes.
22      Q.  And when brokers are used, is it customary
23  that the same broker will represent both sides of the
24  transaction?
25      A.  Yes, sir.

466

1       Q.  And is it also customary that the principals
2   do not communicate directly with each other but only
3   through the broker?
4       A.  It can be customary to do that or communicate
5   with each other afterwards or even during it sometimes,
6   but it's customary.  I mean, it's fine.  A lot of people
7   don't talk to each other.  They just do it through a
8   broker.
9       Q.  Mr. Simpson, someone just pointed out to me.
10  Was the last time you personally made an MX trade in
11  March of 2008 or March of 2009?
12      A.  2008.  Did I say '8?
13      Q.  I think you might have said '9.
14      A.  Oh, I'm sorry.  It's 2008, right before I
15  retired.
16      Q.  Okay.  Mr. Simpson, do you know Ed Leyman?
17      A.  Yes.
18      Q.  Who is Ed Leyman?
19      A.  He's a broker.  He's been in the industry.
20  Sometime in the '90s is the first time I ran across him.
21      Q.  Okay.  Was he the first broker in the U.S. to
22  deal in MX?
23      A.  I believe so.  He started out doing specialty
24  products where something would be off-spec and he'd
25  broker those.  He was good at understanding the chemical

467

1   makeups of different products and so he would broker
2   those.  And then he started trading in benzene, toluene
3   and xylene.
4       Q.  And how many brokers deal in U.S. -- in MX in
5   the U.S.?
6       A.  I think there's about three to five now.  Some
7   people come in.  Some people go back out so...
8       Q.  What is Mr. Leyman's reputation in the
9   petrochemicals trading industry?
10      A.  I think he's an extremely good broker, does a
11  good job at what he does.  If he didn't, people wouldn't
12  trade with him.
13      Q.  Have you personally used Mr. Leyman to broker
14  trades?
15      A.  Yes, sir.
16      Q.  And did you find that his reputation was
17  deserved?
18      A.  Yes, very good.
19      Q.  And let me ask you, Mr. Simpson, if a broker
20  favored one side over another in a deal, would that
21  broker stay in business long?
22      A.  No, sir.
23      Q.  Why?
24      A.  Not at all.  Because you want a fair playing
25  field.  You don't want the other party to know

**40  (Pages 464 to 467)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

468

1  everything going on and you know nothing.  So if you
2  felt like they were leaning one way or the other, you
3  just wouldn't talk to them.
4      Q.  And obviously a broker has to bring parties
5  together.  Correct?
6      A.  Yes, sir.
7      Q.  If --
8      A.  That's all he's doing is just bringing two
9  parties together.
10     Q.  A broker who has a reputation of favoring one
11 party is going to have a hard time bringing the other
12 party along.  Correct?
13     A.  Correct.
14     Q.  Can you tell me how long Mr. Leyman has been
15 in business?
16     A.  I just knew of him sometime in the '90s.
17     Q.  Sir, in petrochemicals trading, is it a
18 general expectation that traders have that a broker will
19 not disclose the identity of a counterparty before a
20 deal is made?
21     A.  Say that again, please.
22     Q.  Is it a general expectation in petrochemicals
23 trading that a broker will not disclose a trader's
24 identity before a deal is made?
25     A.  No.  Only if he's asked not to.  And if he's

469

1  asked not to, he won't disclose it.
2      Q.  Okay.  And sometimes it happens that a trader
3  may ask that his identity not be disclosed?
4      A.  Yes.
5      Q.  And the broker would respect that?
6      A.  Yes.
7      Q.  What happens if the trader does not request
8  confidentiality?
9      A.  A lot of times when I would talk to him and
10 he'd make -- he'd have something out there that I was
11 really interested in doing, I would ask him probably who
12 the party was.
13     Q.  And would he tell you?
14     A.  If it wasn't confidential, if they didn't say
15 not to tell me, he'd tell me.
16     Q.  And does it sometimes happen that one side
17 requests confidentiality and the other one does not?
18     A.  Yes, sir.
19     Q.  Is that unusual?
20     A.  No.  It can be -- it's pretty general.  I
21 mean --
22     Q.  And what happens?
23     A.  I usually never ask for confidentiality and
24 some of the companies did and so Ed wouldn't tell you.
25     Q.  What happens when one side requests

470

1  confidentiality and the other one does not?
2      A.  I don't believe there's anything that happens.
3  I believe he's -- he's still fair to both parties.  He
4  just doesn't tell what your name is, who's out there
5  doing what.
6      Q.  So he may disclose one side but not the other?
7      A.  Yes.
8      Q.  And that's not unusual?
9      A.  Not unusual at all.
10     Q.  Tell me, sir, what is meant by an indication?
11     A.  That's where you talk to a broker or to
12 another party saying, "I might be an interested seller
13 of mixed xylenes.  I might be interested buyer of mixed
14 xylenes.  I might want to sell 20,000 barrels.  I might
15 want to sell 5,000 tons or I might want to buy those."
16         It's not a firm offer.  It doesn't tell a
17 party, "I'm here to do this deal."  It's just a
18 discussion matter.
19     Q.  And so like I might be interested in buying or
20 I might be interested in selling, but I'm not making a
21 commitment?
22     A.  Correct.
23     Q.  And then tell me what a firm bid is.
24     A.  That is where you are committing to do
25 whatever you tell them it is.  And you always tell them

471

1  it's a firm bid.  And if it's -- and it's -- usually
2  what you have included in all that is quantity, quality,
3  price, the real idea of what you're trying to do with
4  that product that you're dealing with.
5      Q.  Okay.  Firm bid, does that come from the
6  buyer's side?
7      A.  Yes.
8      Q.  Okay.  So a firm bid is when a buyer says, "I
9  will buy on these terms"?
10     A.  Yes, sir.
11     Q.  And it's a commitment?
12     A.  Yes.
13     Q.  Okay.  What is a firm offer?
14     A.  It's from the seller's side.  He makes a firm
15 offer that he'll do this and that if this number...
16 That's it.
17     Q.  Same thing from the seller's side?
18     A.  Yes.
19     Q.  Okay.  And in petrochemicals trading, do
20 traders give brokers authority to make a deal by giving
21 the broker a firm offer or a firm bid?
22     A.  Yes, sir.
23     Q.  And we've talked a little bit about that, but
24 what usually is contained in a firm offer or a firm bid?
25     A.  Well, you might not know the party at first,

41  (Pages 468 to 471)

ARBITRATION HEARING - SEPTEMBER 21, 2010

472

1  but you will, but then you will know what the product
2  is, the quantity, the quality usually of the product
3  because that might have -- there's different qualities.
4        So the quantity on -- and you try to -- Ed
5  always works to try to get both sides saying the same
6  thing on volumes, so if it's metric tons or barrels.
7  You have your price, which is one of the important
8  things, which are fixed or floating.  You have your --
9  usually your payment terms.  And pretty standard in our
10  industry is 30 days with and LC if it's required by
11  whoever's selling department requires it.
12        Q.  Now, if there is something else special that a
13  trader has such as "I need a particular origin for my
14  material," is that also putting a firm bid or firm
15  offer?
16        A.  If you want a specific origin, you definitely
17  put that in your firm bid or your firm offer.
18        Q.  And I think you stated in the report that if
19  you -- that origin of material is an up-front term in
20  any negotiation.  Do you recall that?
21        A.  Yes, sir.
22        Q.  Why is it important that origin be an up-front
23  term?
24        A.  If it's not an up-front term, then you could
25  have different origins that you move the product from.

473

1  As in this case, I mean, it was going to Asia.  You have
2  a very -- you had a lot of timing issues there and so
3  you'd need to know that up front to know that you can
4  supply those barrels.
5        Q.  Okay.  Now, in petrochemicals trading, is it
6  common for buyers to be concerned with the origin of a
7  product?
8        A.  Only if their -- they think their customer
9  would require it.
10        Q.  Well, is it -- in most of the petrochemical
11  trades that you have done, more than 1,000 trades, was
12  origin something that the buyer was concerned with?
13        A.  No, not really.
14        Q.  Okay.  Is it a common thing that --
15        A.  Majority of the time origin is never
16  discussed.
17        Q.  Okay.  And why is it that it's never
18  discussed?  Is it because MX is a commodity?
19        A.  MX is traded as a commodity.  It's -- you have
20  a couple of different specs that you can use, most of it
21  Gulf Coast barrels traded with 5211 20 bromine.  Europe
22  might produce that, Asia can produce that and so you
23  just need to know if it's a requirement up front.
24        Q.  Yeah.  Within a certain spec, is MX that's
25  manufactured in the U.S. or in Asia or Europe or in

474

1  Brazil all the same, within a certain spec?
2        A.  Within a certain spec, yes, sir, it is.
3        Q.  Now, Mr. Simpson, in an industry -- when is it
4  considered that a deal is made in the trade industry?
5        A.  If you're working direct, two parties just
6  confirm that it's a -- it's a done deal and the deal is
7  done right then.  If it's through a broker like Ed
8  Leyman, it's whenever Ed Leyman gets both sides lined up
9  and he says the deal's done.
10        Q.  If the firm bid meets the firm offer, you have
11  a deal?
12        A.  Yes, sir, if you -- as long as you give them
13  the authority.
14        Q.  And you give them that authority by making a
15  firm bid or a firm offer?
16        A.  You give them that authority up front.
17        Q.  Now, if a broker is used, is it customary for
18  the broker to send a written confirm?
19        A.  In today's market, yes, it is.  That probably
20  changed from the last ten years.  Ten years ago you
21  didn't have written confirms.
22        Q.  Is it important for the trader to review the
23  written confirm right away?
24        A.  Yes, sir.
25        Q.  And why is that important?

475

1        A.  Just to make sure both parties have the same
2  terms and know what they're doing.
3        Q.  Okay.  Can we -- will you take a look at Joint
4  Exhibit No. 4, sir, in the Joint Exhibit notebook in
5  front of you?
6        And we will also put it on the screen.
7  Let's look at the second page of that please, sir.
8        A.  No. 4?
9        Q.  Yes, Joint Exhibit No. 4, second page.
10        A.  Okay.
11        Q.  Is that an example of a broker confirm?
12        A.  Yes, sir.
13        Q.  What happens if there is a mistake in the
14  confirm?
15        A.  Usually contact the broker and then you
16  usually are -- and/or contact the other party to make
17  sure everybody knows there's a mistake in it, to get it
18  corrected and get it out -- get it back out as quick as
19  you can.
20        Q.  And would you then expect to see an amended or
21  corrected confirm?
22        A.  Yes.
23        Q.  And we're not going to put them up on the
24  screen, Mr. Simpson, but if you would take a look at
25  Joint Exhibits 3 and 2 just ahead of the one you were

**42  (Pages 472 to 475)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

476

1   looking at.  And I think you've seen these before in
2   this case.  Correct, sir?
3       A.  Yes, sir.
4       Q.  Okay.  And those appear to be -- these three
5   joint exhibits, 2, 3 and 4, appear to be a series of
6   confirms relating to the same deal for that and contain
7   some corrections and changes?
8       A.  Yes, sir.
9       Q.  And there's nothing unusual about that in
10  petrochemicals trading, is there?
11      A.  Not -- no, sir, there isn't.  It's just is
12  your clerk in a hurry when they type it up?  Did they --
13  did you scribble too bad so they couldn't read exactly
14  what you did?  Did -- you also maybe just wrote the
15  wrong price down.
16      Q.  Okay.  And none of exhibits -- Joint Exhibit
17  2, 3 or 4 say anything about the origin of the material.
18  Is that correct?
19      A.  No, sir, they do not.
20      Q.  What does that mean in the industry?
21      A.  It's open origin.
22      Q.  Is it the standard in the industry that if
23  material is to be of open origin it has to be put in the
24  confirm, but if it's a specific origin it can be left
25  blank?

477

1       A.  Yes.
2       Q.  Listen to my question.
3       A.  Oh, okay.  You said it backwards --
4       Q.  Is it --
5       A.  -- from what I thought you were going to say.
6       Q.  Is it standard in the industry that if
7   material is open origin it must be specified in the
8   confirm?
9       A.  No, sir.
10          MR. LEE:  Objection.  Leading.
11      Q.  (BY MR. DIAZ-ARRASTIA)  But if it's --
12          JUDGE BENTON:  It's overruled.
13      Q.  (BY MR. DIAZ-ARRASTIA)  But if it's of
14  specific origin, it can be left blank, or is it the
15  other way around?
16      A.  If it's --
17      Q.  Or is it the other way around?
18      A.  If it's of specific origin, it will be
19  included in the confirm.
20      Q.  Okay.  Can we --
21      A.  If it's an open origin, you won't ever find it
22  in there.
23      Q.  Okay.  Take a look at the Tricon Exhibit
24  notebook.
25      A.  Which one?

478

1       Q.  The notebook that says Tricon Exhibits.
2       A.  Oh.
3       Q.  First look at Tricon Exhibit No. 1.
4          MR. DIAZ-ARRASTIA:  And if you can make
5   it --
6       Q.  (BY MR. DIAZ-ARRASTIA)  And, Mr. Leyman, is
7   that an example of a confirm -- Mr. Simpson, is that an
8   example of a confirm that specifies origin?
9       A.  No, sir.
10      Q.  Exhibit No. 1 in the Tricon book, if you would
11  take a look at the screen, sir, and we'll see where
12  we're looking at.
13          JUDGE WOOD:  That may be too far for him.
14          MS. LARSON:  Under the quality line.
15          JUDGE WOOD:  He's going to need to look at
16  the book.
17      Q.  (BY MR. DIAZ-ARRASTIA)  Under the quality
18  line.
19      A.  Oh, I see it in the quality line.  At the end
20  of the quality line is what you're saying.
21      Q.  At the end of the quality line, it says, "To
22  be U.S. origin"?
23      A.  Yes, sir.
24      Q.  Is that an example of a broker confirm that
25  specifies a particular origin?

479

1       A.  Yes, sir, and that -- and that's usually where
2   you put it.
3       Q.  Okay.  And take a look now at the next
4   exhibit, Tricon Exhibit No. 2.
5       A.  Okay.
6       Q.  In the quality line there, it says, "Product
7   must be non-Iranian or Chinese origin"?
8       A.  Yes, sir.
9       Q.  Is that another example of a confirm that
10  specifies a particular origin, this time saying it must
11  not be of a particular origin?
12      A.  Yes, sir.
13      Q.  And you see things like that also?
14      A.  Yes.
15      Q.  And also take a look at Tricon Exhibit No. 3,
16  the next one, the same place.  It says in the quality
17  line, "No Iranian or Chinese origin"?
18      A.  Yes, sir.
19      Q.  Okay.  Again, this is another example of the
20  confirm that specifies the origin?
21      A.  Yes, sir.
22      Q.  And that is what you would expect to see if
23  origin is an important part of the deal or a term of the
24  deal?
25      A.  Yes, sir, it would be included.

43  (Pages 476 to 479)

ARBITRATION HEARING - SEPTEMBER 21, 2010

480

1    Q.  Is it also customary in petrochemicals trading
2  that after a deal is made the parties will send their
3  terms and conditions of sale?
4    A.  Yes, sir.
5    Q.  Is that sometimes called passing papers?
6    A.  That was my term.  My -- I say we pass paper
7  back and forth to each other.  Both parties usually send
8  paper and it will have other conditions and terms in
9  there.  It will be spelled out at a little more in
10  detail.
11         Sometimes Homeland -- well, in the last
12  two or three years, Homeland Security has put some
13  requirements so people put those in there now.
14    Q.  Now, when the parties pass paper, do they --
15  in the petrochemicals industry, do they intend to cancel
16  the deal that had just been made?
17    A.  No, sir.
18         MR. LEE:  Objection.  Calls for
19  speculation.
20         JUDGE BENTON:  It's overruled.
21    Q.  (BY MR. DIAZ-ARRASTIA)  What is the intention
22  of passing papers?
23    A.  To add the rest of the terms and conditions in
24  there.
25    Q.  Add terms to the contract?

481

1    A.  Right.
2    Q.  And does it sometimes happen that the parties
3  do not reach agreement on some or all of these
4  additional terms?
5    A.  Yes, sir.
6    Q.  And does that mean that there is no deal?
7    A.  No, sir.  I've disagreed with people on the
8  total terms and conditions and we still sold the barrels
9  or bought the barrels.
10    Q.  Okay.  If there is agreement on these
11  additional terms, do they become part of the deal?
12         MR. LEE:  Objection.  Calls for a legal
13  conclusion.
14         JUDGE BENTON:  It's overruled.
15    Q.  (BY MR. DIAZ-ARRASTIA)  Well, in your
16  understanding as a trader, sir, if the side -- if the
17  parties agree on these additional terms, is it your
18  understanding that they become a part of the deal?
19    A.  Yes, sir.
20    Q.  Let's take a look back in the Joint Exhibit
21  notebook, sir, Joint Exhibit No. 5, and again beginning
22  on the second page of that exhibit.
23    A.  Page 2.  Okay.
24    Q.  Yes, sir.  And actually let's turn to one more
25  page after that.  And is that an example of additional

482

1  terms and conditions of sale that are passed between the
2  parties after a deal is made?
3    A.  Yes, sir.
4    Q.  Okay.  Now, let's take a look at the last page
5  of Exhibit No. 5.  Do you see where there are spaces for
6  signatures?
7    A.  Yes, sir.
8    Q.  And have you seen paper that is passed that
9  has spaces for signatures at the end?
10    A.  Yes, sir.
11    Q.  Okay.  And is it customary for these
12  additional terms to be signed or not to be signed?
13    A.  In my view, it's customary that they not be
14  signed.
15    Q.  Okay.  Is there a difference whether the deal
16  might be a long-term contract or a spot deal?
17    A.  Yes, sir.  If it's a long-term contract,
18  they're usually signed.  When I say a long-term
19  contract, I'm talking about a year or longer, what you
20  do with a third party.
21    Q.  Okay.  And what's a spot deal?
22    A.  That's usually a one-time or two-time or
23  three-time deal, but it's just very, very prompt --
24    Q.  And --
25    A.  -- very quick.

483

1    Q.  Do you usually see additional terms signed in
2  spot deals?
3    A.  I never have, no, sir.  I've never signed any.
4  You know, people will send them to me, but I don't sign
5  them.
6    Q.  In petrochemicals -- when you were trading
7  petrochemicals and you ran petrochemicals trading
8  operations, was it common for the terms and conditions
9  of sale to be negotiated by the operations specialists?
10    A.  Yes, sir.
11    Q.  Okay.  And what is an operations specialist?
12    A.  In our world, we call them schedulers.  They
13  schedule the product.  They move the product.  They
14  really take it from you and make sure it's completed and
15  done.
16    Q.  And, Mr. Simpson, if your operations
17  specialist or scheduler were to learn that some aspect
18  of the deal that was very important to the trader, if
19  they were to learn from the counterparty that that was
20  not necessarily going to be provided, in your experience
21  how long would it take for that operations specialist to
22  inform the trader?
23    A.  In my experience, it would take less than
24  30 seconds because it would probably take them that much
25  time to get off the phone and get your attention that

ARBITRATION HEARING - SEPTEMBER 21, 2010

484

1  you had a problem.
2      Q.  Would the operations specialist wait a day and
3  a half to inform the trader?
4      A.  No, sir.
5      Q.  Now, Mr. Simpson, in petrochemicals trading,
6  do the terms -- well, let me ask you this.  What does
7  product origin mean?
8      A.  Where the product was produced.
9      Q.  And we have also during the course of this
10 hearing heard the term "loading port" or "port of
11 loading."  What does that mean?
12     A.  It means where you're going to physically load
13 the product from.
14     Q.  Is it understood in petrochemicals trading
15 that origin and load port mean different things?
16     A.  Yes, sir.
17     Q.  Is it possible to load MX at a U.S. Gulf port
18 that is not of U.S. origin?
19     A.  Yes, sir.
20     Q.  And tell us how that can work.
21     A.  You just work it with customs.  And as you
22 imported it -- it really wasn't imported.  You just put
23 it in a bonded tank and work through U.S. customs to
24 make sure they knew it wasn't being imported and that
25 way it could be exported.

485

1      Q.  Take a look at -- again, in the Joint Exhibit
2  notebook, Joint Exhibit No. 8, if we could put that on
3  the screen.
4      A.  8?
5      Q.  8.
6      A.  Okay.
7      Q.  I want you to take a look at Re: Origin sort
8  of in the middle -- lower middle of the page.  Can you
9  see where Tracy is highlighting some language on the
10 screen?
11     A.  Yes, sir.
12     Q.  Okay.  And that appears to be an e-mail from
13 Rick Wilson to Eduardo Anaya on July 25, 2008, at
14 10:33 a.m.  Do you -- do you see where I'm referring to?
15     A.  Yes, sir.
16     Q.  Okay.  And Mr. Willis telling Mr. Anaya, "Re:
17 Origin, we won't know until we declare discharge port.
18 Most likely USG."
19     A.  Yes, sir.
20     Q.  Let me ask you something else, sir.  In the
21 petrochemicals industry, is there a difference between
22 most likely and guarantee?
23     A.  Yes, sir, definitely.
24     Q.  Does most -- does most likely mean that it is
25 guaranteed or that it might be but it won't be

486

1  guaranteed?
2      A.  No, sir.  It doesn't mean it's guaranteed.
3      Q.  What does it mean?
4      A.  It's just that it means it might come from
5  there.  It might not come from there.
6      Q.  Now, when Mr. Wilson uses the word, "Re:
7  Origin, we won't know until we declare discharge port,"
8  to someone in the industry is he talking about the
9  loading port or is he talking about where the material
10 was manufactured?
11     A.  He's talking about where the material was
12 manufactured.
13     Q.  And when Mr. Wilson says, "Most likely
14 USG," what does that mean to someone in the industry
15 with regard to a guarantee of origin?
16     A.  It's not a guarantee.
17     Q.  Does this mean to somebody in the industry
18 that there is no guarantee?
19     A.  That's the way I would read it totally.  I
20 think the whole industry would.
21         JUDGE DAVIDSON:  I assume the U.S. in USG
22 stand for United States.  What does the G --
23         THE WITNESS:  U.S. Gulf Coast.
24         JUDGE DAVIDSON:  U.S. Gulf Coast.  Got it.
25         JUDGE BENTON:  Are you passing?

487

1          MR. DIAZ-ARRASTIA:  Not yet, sir, but I
2  don't have much longer.
3      Q.  (BY MR. DIAZ-ARRASTIA)  Mr. Simpson, what does
4  it mean to be long or short on a product like MX?
5      A.  When you're long on a product, it means you
6  bought the material.  You might not have it in your
7  possession, but you have an obligation to purchase the
8  material, and that means you're going to have 5,000
9  metric tons that you're long material on.  When you're
10 short, you've sold the product.
11     Q.  But you don't yet own it?
12     A.  But you probably don't yet own it.
13     Q.  Is it customary for a trader to sell a product
14 it does not yet own?
15     A.  Yes, sir.
16     Q.  Can that be an important way for a trader to
17 make money in petrochemicals trading?
18     A.  That's usually about the -- that's not the
19 only way, but it's the main way they do make money.
20     Q.  Okay.  So do traders sell when they are short
21 sometimes?
22     A.  Yes, sir.
23     Q.  And do they also sometimes buy when they are
24 long?
25     A.  Yes, sir.  The cost of carrying physical

45  (Pages 484 to 487)

ARBITRATION HEARING - SEPTEMBER 21, 2010

488

1    inventory is just too prohibitive for a trader.
2        Q.  Tell me, sir, is the price of MX volatile?
3        A.  Extremely.
4        Q.  Is -- the price of MX, does it track -- tend
5    to track the price of crude oil?
6        A.  Over a long period of time, yes, sir, it will.
7        Q.  And what can happen to the price -- well, let
8    me put it this way.  When the price of MX falls rapidly,
9    what can happen to the market?
10       A.  I use the term it freezes, which means there's
11   really no spot buyers out there.  You still have
12   contract agreements between people, and those are
13   usually floating prices.  And they usually have a
14   mechanism that forces that -- get a price fixed for that
15   contract, and it's usually a contract month --
16       Q.  Okay.  And --
17       A.  -- but a --
18       Q.  And let me -- let me interrupt you there a
19   moment.
20       A.  Okay.
21       Q.  You're familiar with the sale that Tricon made
22   to KP Chemicals --
23       A.  Yes, sir.
24       Q.  -- which was the replacement sale in this
25   contract?

489

1            Is that the sort of deal you're talking
2    about?
3        A.  Yes, sir.
4        Q.  Okay.
5        A.  As a term agreement, they don't -- they don't
6    know what the price is, but they know what the terms and
7    conditions of the pricing are.
8        Q.  And what happens to spot sales when the market
9    freezes?
10       A.  I just believe you can't find a buyer.  You
11   can always find a buyer, but what price?  It's sort of
12   like it might cost you $200 a metric ton to get someone
13   to step up and buy it.
14       Q.  And how long can the market stay frozen this
15   way?
16       A.  I've seen it up to three or four months.
17       Q.  And can you tell us what happened to the price
18   of MX in the period of July 22, 2008, through
19   September 30, 2008?
20       A.  It went straight down almost.  Not totally
21   down but it went -- fell very hard.
22       Q.  Let's take a look at Tricon Exhibit 32 in the
23   Tricon notebook.
24       A.  Oh, Tricon.
25       Q.  And there's a chart of MX prices.

490

1        A.  Yes, sir.
2        Q.  Okay.  And do you -- is that what you remember
3    happening in the second half of 2008 for the MX prices?
4        A.  Yes, sir.
5        Q.  And what was happening to the price of crude
6    oil at that same time?
7        A.  It went from $147 a ton down to about $32 -- I
8    mean $147 a barrel to $32 a barrel in a four-month
9    period.
10       Q.  There was a precipitous decline in crude?
11       A.  Very.
12       Q.  And a precipitous decline in MX tended to
13   track it?
14       A.  Yes.
15       Q.  Does it surprise you that under those
16   conditions Tricon was not able to find a replacement
17   buyer for the Vinmar MX in the spot market in all of
18   September of 2008?
19       A.  No, sir, not at all.
20       Q.  Now, sir, have you reviewed Mr. Wilson's
21   testimony in this case?
22       A.  Yes, sir.
23       Q.  Do you remember if Mr. Wilson said whether he
24   had a specific sale that he was going to match to the
25   Tricon MX?

491

1        A.  He was trying to match a sale to Formosa and
2    he had a sales rep -- sales representative, something
3    like that that he called him, that was going to their
4    office to try to be involved with the bid that Formosa
5    was putting out, but he got there too late and he missed
6    that bid.
7        Q.  So is it your understanding that Mr. Wilson
8    lost the specific sale that he wanted to match to the
9    Tricon MX?
10       A.  Yes, sir.
11       Q.  Do you know Formosa?
12       A.  I know of them, yes.  Met them before.
13       Q.  What is Formosa?
14       A.  It's a consumer of xylene.  Mainly an
15   paraxylene producer.  They do other things, but that's
16   one of the things that they do.
17       Q.  Does Formosa buy Asian origin MX?
18       A.  Yes, sir.  Primarily most -- I would say most
19   of their product is Asian origin.
20       Q.  In fact, do buyers in Asia buy Asian origin
21   MX?
22       A.  Yes, sir.
23       Q.  They do that all the time?
24       A.  All the time.
25       Q.  Do traders in Asia trade on Asian origin MX?

46  (Pages  488  to  491)

ARBITRATION HEARING - SEPTEMBER 21, 2010

492

1    A. Yes, sir.
2    Q. Mr. Simpson, in your opinion what would happen
3  to the petrochemicals trading industry if the Tricon
4  Vinmar deal in this case is not enforceable?
5    A. Then most of the deals that we do would not be
6  enforceable.
7        MR. DIAZ-ARRASTIA: Pass the witness.
8        JUDGE BENTON: Mr. Lee?
9        MR. LEE: Yes. Thank you.
10        CROSS-EXAMINATION (2:40 p.m.)
11  BY MR. LEE:
12    Q. Mr. Simpson, how are you today?
13    A. Good, sir. You?
14    Q. You and I have never met. Right?
15    A. No, sir.
16    Q. Let me ask you a couple of questions. I may
17  jump around a little bit. But you had -- in the Joint
18  Exhibit notebook, you were asked about Joint Exhibit
19  No. 8, which was an e-mail exchange between Mr. Wilson
20  and a gentleman by the name of Eduardo Anaya. Correct?
21    A. Yes, sir.
22    Q. Now, just to be clear about all this, I think
23  it's obvious but I should ask you a couple of questions
24  for the record. You weren't involved in the
25  negotiations of this transaction that we're talking

493

1  about. Correct?
2    A. No, sir.
3    Q. And you don't know Mr. Wilson, do you?
4    A. No, never met him.
5    Q. You don't know Eduardo Anaya, do you?
6    A. No, sir.
7    Q. Now, you do know that this e-mail exchange is
8  an e-mail exchange internal at Vinmar. Correct?
9    A. Yes, sir.
10    Q. Okay. You testified that there was a
11  difference between origin and load port?
12    A. Yes, sir.
13    Q. Right?
14    A. Yes, sir.
15    Q. That means two different things. Correct?
16    A. Yes, sir.
17    Q. Okay. Now, if we look at the e-mail from
18  Mr. Anaya to Mr. Wilson, he asked Mr. Wilson at the
19  bottom of the page, "To complete the order, we need the
20  port of origin." Correct?
21    A. Yes, sir.
22    Q. Now, you don't know whether he meant the
23  origin of the product or the port of loading, do you?
24    A. I would assume he's talking about the origin
25  of the product.

494

1    Q. You don't know that, though, do you?
2    A. I don't know their system.
3    Q. I mean, he asked for port of origin. Correct?
4    A. Right.
5    Q. Okay. And so it's very possible that what
6  Mr. Wilson was responding to is that he didn't know what
7  port it was going to be loaded from. Correct?
8    A. Could be.
9    Q. Okay. It is common for people in the industry
10  to use brokers to trade petrochemicals. Correct?
11    A. Yes, sir.
12    Q. And you would agree with me that in order for
13  there to be a deal between the parties, the firm bid
14  must match precisely the firm offer. Correct?
15    A. Yes, sir.
16    Q. And if the broker tells two parties that they
17  have a deal but the firm bid did not match the firm
18  offer, then the broker's wrong. Correct?
19    A. Correct.
20    Q. There is no deal on that situation. Correct?
21    A. Depending on what the term was or what you
22  were talking about.
23    Q. Well, if it's in the firm bid and it doesn't
24  match the firm offer, there's no deal. Right?
25    A. That I don't know. That's something legal.

495

1    Q. Well, I'm just asking your understanding in
2  the industry. If you in a firm bid say, "This is what I
3  want," and the firm offer on the other side doesn't
4  match the firm bid precisely, then you don't have a
5  deal, do you, sir?
6    A. Probably wouldn't.
7    Q. And the broker shouldn't put two parties
8  together like that. Correct?
9    A. He probably wouldn't.
10    Q. Okay. And if he does, he exceeded his
11  authority, did he not?
12    A. He did.
13    Q. Okay. It's possible -- you know brokers make
14  mistakes. Right?
15    A. Yes, sir.
16    Q. That's one of the reasons they put in their
17  broker confirmation, "If anything in this confirmation
18  is contrary to your understanding, please let me know"?
19    A. Uh-huh.
20    Q. And, in fact, we know in this deal that
21  Mr. Leyman made a mistake, at least one. Right?
22    A. No.
23    Q. Oh, we know he made at least one mistake,
24  didn't he?
25    A. No. He made two.

47 (Pages 492 to 495)

ARBITRATION HEARING - SEPTEMBER 21, 2010

496

1    Q.  Two?
2    A.  I think the -- whoever typed it up got it
3    wrong.
4    Q.  Well, we know he made one mistake for sure.
5    Correct?
6    A.  Which was?
7    Q.  He got the price wrong.
8    A.  Okay.
9    Q.  You know that.  Right?
10   A.  Well, he corrected it, yes.
11   Q.  Okay.  But when he originally wrote his notes,
12   he got the price wrong.  It was a -- it was a million
13   dollar mistake?
14   A.  Okay.
15   Q.  Do you recall that?
16   A.  Yes.
17   Q.  Okay.  So, I mean, it happens that brokers
18   make mistakes?
19   A.  Yes.
20   Q.  Do you -- did you believe that a broker has
21   the responsibility to ensure that the parties have a
22   clear understanding of what the terms are that he says
23   they agreed to?
24   A.  Say that again, please.
25   Q.  Do you believe that a broker has a

497

1    responsibility to ensure that the parties have a clear
2    understanding of the terms that he believes they agreed
3    to?
4    A.  Yes, sir.
5    Q.  And do you have -- do you also think the
6    broker has the responsibility to correct someone if they
7    have a misunderstanding about the terms that he believes
8    he's negotiated?
9    A.  I believe they do.
10   Q.  Okay.  Is it -- is it your understanding of
11   this transaction between Vinmar and Tricon that Tricon
12   was not required to load this product from any specific
13   location?
14   A.  Right.
15   Q.  So they could load it from wherever they
16   wanted to.  Correct?
17   A.  (Nods head)
18   Q.  Is that --
19   A.  Yes, sir.
20   Q.  Okay.  Would you flip to Joint Exhibit No. 11,
21   please, sir?  And you've seen these documents.  Correct?
22   These -- this is the instant message exchange between
23   Mr. Wilson and Mr. Leyman.  The first page is the
24   conversation on July 22nd, 2008.  Correct?
25   A.  Yes, sir.

498

1    Q.  Okay.  And you've seen this before?
2    A.  Yes.
3    Q.  All right.  And is it your understanding that
4    while there were some instant message exchanges on the
5    morning of July 22nd between Mr. Leyman and Mr. Lockwood
6    on one hand and Mr. Wilson or Dr. Wilson and Mr. Leyman
7    on the other that ultimately the deal that Mr. Leyman
8    claims he brokered was done over the phone?
9    A.  I believe he probably finalized it over the
10   phone.
11   Q.  And you haven't seen --
12   A.  You don't see it in here.
13   Q.  That was my question.  You don't see anywhere
14   in these instant messages where Mr. Leyman has captured
15   all of the terms of what he believes the deal was.
16   Correct?
17   A.  No.
18   Q.  Okay.  And you do know that mister -- or
19   Dr. Wilson and Mr. Lockwood never spoke on July 22nd,
20   2008?
21   A.  Correct.  I never saw that in anything.
22   Q.  Now, was it -- is it your recollection that
23   Mr. Leyman told Mr. Lockwood somewhere around
24   12:00 o'clock in the afternoon or July 22nd that a deal
25   had been completed?

499

1    A.  I don't remember what the time was.  I just
2    remember there was a notation in the instant messages
3    where he said "Deal done" or something like that.
4    Q.  Okay.  Keep your finger on that.  Just flip to
5    the exhibit right in front of it, which is Joint Exhibit
6    No. 10.
7    A.  Okay.
8    Q.  And this should be the instant messages
9    between Mr. Lockwood and Mr. Leyman.  Correct?
10   A.  Yes, sir.
11   Q.  And you've seen those before?
12   A.  Yes.
13   Q.  And if we go to the third page of exhibit --
14   Joint Exhibit No. 10, which at the right-hand corner is
15   MOAB 6.
16   A.  Yes, sir.
17   Q.  At 12:08:59 p.m. Mr. Leyman says, "Will be
18   done calling."  And then at 12:09:39 p.m. Mr. Leyman
19   says to Mr. Lockwood, "All done but call me."
20       Okay.  Now, is it your understanding that
21   at that point the transaction was concluded?
22   A.  I believe so, yes.
23   Q.  And that transaction, as you understood it,
24   did not require Tricon to load out of any specific
25   location.  Correct?

48  (Pages  496 to 499)

ARBITRATION HEARING - SEPTEMBER 21, 2010

500

1    A.  No, sir, it did not.
2    Q.  Joint 11 -- Joint Exhibit No. 11 then, as you
3  said, are the e-mails -- or the instant messages between
4  Dr. Wilson and Mr. Leyman.  And at 12:57:20 p.m. -- so
5  that's after Mr. Leyman has told Mr. Lockwood a deal is
6  done.  Correct?
7    A.  At 12:57.  Okay.
8    Q.  You see that?
9        And what Mr. Wilson asked at 12:57, he
10  says, "Ed, given that Brad is selling out of U.S. Gulf
11  Coast, am I getting 45 days from BL or 30, hopefully
12  45."  Do you see that?
13    A.  Yes, sir.
14    Q.  Now, you understand that the question that's
15  being asked there is since the product is being loaded
16  out of the U.S. Gulf Coast, can I have 45 days from the
17  bill of lading to pay the invoice because it's going to
18  take about that long to get over there?  That's what
19  that question means.  Right?
20    A.  He's asking about changing the payment terms.
21    Q.  Correct.  Because that's how long it's going
22  to take to get from the U.S. Gulf Coast to Asia.
23    A.  It takes about 40, 45 days.
24    Q.  Right.  And he would not want to pay the
25  invoice until he could have a chance to sell the product

501

1  on the other end.  And that would be the best case
2  scenario?
3    A.  That's the best case scenario, yes.
4    Q.  Okay.  Now, you don't see where Mr. Leyman
5  corrected Rick Wilson's statement about selling out of
6  the U.S. Gulf Coast, do you?
7    A.  No.
8    Q.  Okay.  But that's not -- you didn't understand
9  the deal to be a requirement that they sell out of the
10  U.S. Gulf Coast.  Right?
11    A.  Correct, I did not.
12    Q.  Did you -- I see in the -- in the documents
13  that you obtained in this case or the documents that you
14  reviewed that you did obtain and review copies of
15  Vinmar's SAP data.  Did you remember doing that?  Take a
16  look at --
17    A.  I'm not sure I did.
18    Q.  Okay.  Well, it's in the -- it's in the
19  statement.  In your report, there's a series of
20  documents reviewed and that would include the documents
21  containing Vinmar's SAP computer-generated data.  Do you
22  remember looking at that?
23    A.  I probably did.  You might have to refresh my
24  memory.
25    Q.  Okay.  Well, one -- we can look at a couple of

502

1  different places just to see if this refreshes your
2  memory or not.  Joint Exhibit No. 7.  So, Mr. Simpson, I
3  think that's the -- not that one.  That one, yes, sir,
4  right there.
5    A.  This one?
6    Q.  Yes, sir.
7    A.  No. 7.  Okay.
8    Q.  Here's some of the SAP data.  Do you recall
9  reviewing this information?
10    A.  I remember seeing it.  Your copy is much
11  better than mine.
12    Q.  Okay.  I just -- I just want to know if you
13  recalled seeing it or not.
14    A.  Yes, I -- yes, I saw it.
15    Q.  And that -- do those documents play any role
16  in your opinion here today?
17    A.  No, they probably don't.
18    Q.  If Vinmar's documentations showed that they
19  believed the country of origin was USA, would that have
20  any bearing on your opinion as to what the deal terms
21  were?
22    A.  Well, I know they believed they had that.
23    Q.  So that would be consistent with your
24  understanding of Vinmar's position.  Correct?
25    A.  Yes, sir.

503

1    Q.  You said that you had never signed a contract
2  on a spot deal.  Is that correct?
3    A.  Yes.
4    Q.  But you have signed what you call long-term
5  deals, something that's a year or longer?
6    A.  Usually a year or longer.
7    Q.  Can -- but you do know that you've seen a lot
8  of different terms and conditions and paper in the
9  industry.  Most of those contain signature blanks.
10  Correct?
11    A.  I'll say most of the aromatics don't.
12    Q.  They don't contain signature blanks?
13    A.  Not that I -- most of them.
14    Q.  Right.
15    A.  The definition of most of them is probably the
16  tough part.
17    Q.  Okay.  More than three --
18    A.  I would say the majority of them do not
19  contain signature blanks.  I can just tell you Valero's
20  never did.
21    Q.  Valero's never even had a place for somebody
22  to sign.  Correct?
23    A.  No, sir.
24    Q.  You said that if there was a mistake in a
25  trade and somebody became aware of it that it wouldn't

49  (Pages 500 to 503)

ARBITRATION HEARING - SEPTEMBER 21, 2010

504

1    take them -- it wouldn't take an ops person more than 30
2    seconds to get ahold of a trader?
3        A.  Yes, sir.
4        Q.  Okay.  Now, that of course is assuming that
5    the trader is available.  Right?
6        A.  Assuming they're available.  They're going to
7    try to find out where they are if they're not there.  If
8    it's in the middle of the night, they'll try to do that.
9    They'll get ahold of him as soon as possible.
10       Q.  Right.  They'll get ahold of him as soon as
11   possible?
12       A.  And it's usually immediately.
13       Q.  And if the trader is not available, then as
14   soon as possible may take some time.  Right?
15       A.  It could.
16       Q.  So is it your opinion that the -- you
17   testified that you believe that a deal had been done.  I
18   just want to make sure I understand.  It's your opinion
19   that a deal was done on July 22nd, 2008?
20       A.  Yes, I believe that's the date.
21       Q.  And did -- you reviewed the broker
22   confirmation, which was Joint Exhibit No. 4.  Correct?
23       A.  Yes.
24       Q.  And is it your understanding that that
25   document -- did that document accurately reflect the

505

1    agreement as you understand it?
2        A.  That's what I understood.
3        Q.  Is it your understanding that all of the terms
4    that were included in Joint Exhibit No. 4 had been
5    discussed and agreed to by the parties?
6        A.  By both parties?
7        Q.  Yes, sir.
8        A.  Yes.  That's what was in Ed Leyman's
9    deposition.  Do you remember if origin was included?  He
10   said it wasn't.
11       Q.  Okay.  But my -- I guess my question was a
12   little different.  I just want to --
13       A.  Okay.
14       Q.  -- make sure I understand.  The document,
15   Joint Exhibit No. 4, it's your opinion that
16   document included all the terms that the parties had
17   agreed to?
18       A.  Well, there's other terms and conditions that
19   they agreed to later, yes.
20       Q.  Well, but is this document --
21       A.  The pertinent ones.  The pertinent ones --
22       Q.  And you've --
23       A.  -- that conclude a deal.  In my mind that
24   conclude a deal.
25       Q.  Right here, Joint Exhibit No. 4?

506

1        A.  Yes.
2        Q.  Okay.  And you've actually told us this
3    afternoon that you've done deals where there was no
4    paper other than this confirmation because people didn't
5    agree?
6        A.  They didn't agree upon general terms and
7    conditions.
8        Q.  Right.  So there was no other paper than this
9    confirmation?
10       A.  What I'm trying to say is I will do a deal.
11   You've got to get it in a con -- I'm using Valero.
12   You have to get in the contract system so you have to
13   send something down there that gets it in the system and
14   then that releases the barrels for the refineries or the
15   terminal or whoever to release the barrels.
16       So something came through, but we didn't
17   pass paper.  We didn't get paper from each party.  We
18   might not have got paper from a broker if you're using a
19   broker.
20       Q.  Okay.  So there are a variety of different
21   ways that a deal may be done and ultimately performed?
22       A.  Right.
23       Q.  It's your opinion that a broker earns his
24   commission when he concludes a deal.  Correct?
25       A.  Yes, sir.

507

1        Q.  When he -- when he puts a firm bid with a firm
2    offer, the broker has earned his commission?
3        A.  Yes, sir.
4        Q.  And he should be paid for that commission.
5    Correct?
6        A.  Yes, sir.
7        Q.  Did you know that Tricon had been sent a
8    commission invoice by MOAB?
9        A.  No.
10       Q.  Did you know they didn't pay it?
11       A.  No.
12       Q.  They don't have any intent of paying it?
13            MR. DIAZ-ARRASTIA:  I object that that
14   clearly mistakes Mr. Lockwood's testimony.
15            MR. LEE:  I'm sorry.  Let me --
16            JUDGE BENTON:  It's overruled.  The panel
17   remembers the testimony.
18       Q.  (BY MR. LEE)  Tricon has postponed --
19            MR. DIAZ-ARRASTIA:  I don't think it
20   misleads the witness.
21            MR. LEE:  And I'll withdraw the question
22   and I'll ask it again.
23       Q.  (BY MR. LEE)  The testimony was that the
24   payment of the invoice has been postponed?
25       A.  I didn't --

**50  (Pages 504 to 507)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

508

1    Q.  Are you aware of that?
2    **A.  No, I didn't know that.**
3    Q.  Do you see anything in the broker confirmation
4  or have you seen any documents in this case that
5  would -- that state an agreement between MOAB and Tricon
6  that Tricon has the right to postpone paying the
7  commission until somebody performs?
8    **A.  It doesn't say it in the agreement, no.**
9    Q.  Did -- were you aware that Mr. Leyman did not
10  send a commission invoice to Vinmar?
11    **A.  No, sir.**
12    Q.  Wouldn't that be a comment on what he thought
13  about whether the deal was final or not?
14    **A.  I can't say what he thought -- what he thought**
15  **about sending out an invoice or not.**
16    MR. LEE:  I'll pass the witness.
17    JUDGE BENTON:  Anything else,
18  Mr. Diaz-Arrastia?
19    MR. DIAZ-ARRASTIA:  I have just a couple
20  of questions.
21    REDIRECT EXAMINATION (2:58 p.m.)
22  BY MR. DIAZ-ARRASTIA:
23    Q.  Mr. Simpson, Mr. Lee asked you a little bit
24  about, you know, the scheduler or ops specialist trying
25  to get ahold of his trader --

509

1    A.  Yes.
2    Q.  -- and what happens if the trader is not
3  available.
4      How long does it take to send an e-mail to
5  your trader?
6    **A.  Ten seconds, 15 seconds.**
7    Q.  Okay.  Now, let's take a look at Joint
8  Exhibit 11, those IM's that Mr. Lee was questioning you
9  about.
10    **A.  No. 11, Joint Exhibit?**
11    Q.  Joint Exhibit No. 11, and in particular the
12  line at 12:57:20 where Mr. Wilson is saying, "Given Brad
13  is selling out of USG."
14    **A.  I'm not there.**
15    Q.  12:57:20.
16    **A.  Okay.**
17    Q.  Have you found it?
18    **A.  Yes.**
19    Q.  Do you remember that Mr. Lee questioned you
20  about that for a little while?
21    **A.  Yes, sir.**
22    Q.  Now, you have also read Mr. Lockwood's
23  deposition in this case, have you not, sir?
24    **A.  Yes.**
25    Q.  And is it your understanding that after --

510

1    JUDGE DAVIDSON:  One second.  We need to
2  take a break.
3    JUDGE BENTON:  We'll just take a -- let's
4  just take a ten-minute break here.
5    MR. DIAZ-ARRASTIA:  Okay.
6    (Recess from 3:00 p.m. to 3:16 p.m.)
7    JUDGE BENTON:  We're back on the record.
8  We'll break this evening about 4:45, 4:50 at the latest.
9  Okay?
10    MR. DIAZ-ARRASTIA:  Okay.
11    JUDGE BENTON:  All right.  With that, you
12  were in the middle of a question, I believe.
13    MR. DIAZ-ARRASTIA:  Yes, I was.
14    JUDGE BENTON:  You may proceed.
15    Q.  (BY MR. DIAZ-ARRASTIA)  And let me get back to
16  that.  Okay.  Mr. Simpson, I was calling your attention
17  to Joint Exhibit 11 and the entry at 12:57:20 where
18  Mr. Wilson says, "Ed, given Brad is selling out of USG,
19  am I getting 45 days from BL or 30?"
20      I think the question that I was asking you
21  at the very moment that we broke was whether you had an
22  opportunity to review Mr. Lockwood's deposition in this
23  case.
24    **A.  Yes.**
25    Q.  And is it your understanding that

511

1  Mr. Lockwood's testimony has been that after the deal
2  was made Mr. Leyman asked him where he was likely to get
3  his supply, and that his response was, "Most likely from
4  the U.S. Gulf."
5    **A.  Yes.**
6    Q.  So that is very consistent with what statement
7  that Mr. Lockwood made, "Most likely U.S. Gulf"?
8    **A.  Yes, sir.**
9    Q.  But as I think we established a moment ago, is
10  mostly likely U.S. Gulf a guarantee of U.S. origin?
11    **A.  No, sir.**
12    Q.  And anyone who is experienced in the industry
13  would understand that?
14    **A.  Yes, sir.**
15    Q.  Let me ask you another thing, sir.  We talked
16  a little bit about -- I can't remember what the exhibit
17  number was.  It was that e-mail between Mr. Anaya and
18  Mr. Wilson.
19      I'll tell you what.  We'll just look at
20  J 11.  We don't have to see it, but I just want to ask
21  you this question, sir.  In your opinion as someone who
22  has been, what, more than 20 years in the industry and
23  been an active trader, would someone with experience in
24  the petrochemical industry -- in the petrochemical
25  trading industry use the word "origin" when they really

**51 (Pages 508 to 511)**

## 512

1    meant load port?
2        A.  No, sir.
3            MR. DIAZ-ARRASTIA:  I pass the witness.
4            JUDGE BENTON:  Mr. Lee?
5            MR. LEE:  Just a couple of quick
6    questions.
7            RECROSS-EXAMINATION (3:18 p.m.)
8    BY MR. LEE:
9        Q.  Did you read Dr. Wilson's testimony on that
10   e-mail?
11       A.  Yes, sir.
12       Q.  You know what he said about it.  Right?
13       A.  Yes, sir.
14       Q.  And he said he was answering the question
15   about the port of load.  Correct?
16       A.  I understood that.
17       Q.  You just don't believe that he -- that that's
18   really what he meant?
19       A.  No.  I was just reading what he said.
20       Q.  Okay.  That's your interpretation of what he
21   meant --
22       A.  That's my interpretation.
23       Q.  We have his testimony as to what he meant when
24   he wrote it.  Correct?
25       A.  Yes.

## 513

1        Q.  A couple of quick questions.  Joint Exhibit
2    No. 10, which are these instant messages between
3    Mr. Lockwood and Mr. Leyman, if you'll go to MOAB 12,
4    which is July 31, 2008.
5        A.  Okay.
6        Q.  Did you investigate why Tricon was in the
7    market to buy mixed xylenes on July 31st, 2008?
8        A.  No.
9        Q.  Okay.  But did you know that they were in the
10   market to buy mixed xylenes on July 31st?
11       A.  From this, yes.
12       Q.  Okay.  And what Mr. Lockwood had suggested to
13   Mr. Leyman on July 31, 2008, is maybe you can work a
14   cheap book out for me with Vinmar.  Right?
15       A.  Yes, sir.
16       Q.  In other words, do a paper transaction.
17   Correct?
18       A.  Yes, sir.
19       Q.  Trading companies don't make the product.
20   Right?
21       A.  No, sir.
22       Q.  So like Tricon doesn't make mixed xylenes?
23       A.  Correct.
24       Q.  They have to buy it to deliver it.  Correct?
25       A.  Yes, sir.

## 514

1            MR. LEE:  I'll pass the witness.
2        (The time is 3:19 p.m.)
3            JUDGE BENTON:  Mr. Diaz-Arrastia?
4            MR. DIAZ-ARRASTIA:  Nothing further.
5            JUDGE BENTON:  Call your next witness.
6            MR. DIAZ-ARRASTIA:  May he be excused?
7            JUDGE BENTON:  Yeah, you may be excused,
8    sir.
9            MR. SIMPSON:  Okay.  Thanks.
10           MR. DIAZ-ARRASTIA:  Mr. Lee and I were
11   talking during the break about the manner of proceeding
12   with the rest of the case, and this is what we would
13   like to do.
14           My next witness was going to be Chuck
15   Matthews who's our -- the person who calculated our
16   damages for us.  He has submitted a report which you
17   have seen in advance and it is also in the exhibit book
18   that's Tricon Exhibit -- I think it's 39.  Is it 39?
19           Yes, Tricon Exhibit 39 with a couple of
20   additions.  His CV is Tricon Exhibit 40.  And very
21   quickly the -- and there is also some -- there it is.
22   There is some information that he relied on to make one
23   of his schedules, information that he had taken from
24   Platts, which is Tricon Exhibit 33, and that's what
25   backs up one of the schedules in his report.

## 515

1            We have agreed that for our damages
2    evidence we would submit the report and Mr. Matthews
3    will not testify live.  All that I would do would be
4    have him walk the panel through the report and we can
5    get the panel to read it, and Mr. Lee is in agreement
6    with that.
7            JUDGE BENTON:  Let's see.  Judge Woods
8    probably graduated with an economics, I'm a CPA and
9    Judge Davis knows everything.
10           JUDGE DAVIDSON:  I was -- I was a math
11   major.
12           MR. DIAZ-ARRASTIA:  I'm sure you could
13   handle it very well.
14           MR. LEE:  And just to be clear, obviously
15   we don't agree with the report, but we -- I agree that
16   that's what he would testify to.  And I think rather
17   than spending an hour having him do that that we might
18   be able to speed this up.
19           MR. DIAZ-ARRASTIA:  The --
20           JUDGE WOOD:  And so, therefore, your
21   closing -- I'm sorry.
22           MR. DIAZ-ARRASTIA:  Well, not --
23           JUDGE WOOD:  If I could ask a question.
24   Therefore, your closing remarks are you would sum up
25   with how you interpret his report and we would hear from

**52  (Pages  512  to  515)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

516

1  Mr. Lee as to his comments?
2          MR. DIAZ-ARRASTIA:  I suppose we could
3  both do that.
4          JUDGE WOOD:  Thank you.
5          MR. DIAZ-ARRASTIA:  The other evidence
6  that I would have to present is we do have a claim for
7  attorneys' fees.  We had an agreement before the hearing
8  that the attorneys' fee evidence would be submitted in
9  writing.
10         The panel already has a copy of my
11 attorneys' fee invoices in this matter through the month
12 of August.  I will prepare a report updating it through
13 the end of the hearing and going into perhaps any
14 enforcement proceedings.
15         We talked about dates during the break.
16 Mr. Lee is going to be out of town next week so I think
17 where we ended up is that I would prepare -- present the
18 report to the panel by August the 30th and he would --
19 I'm sorry, September the 30th, and he would give
20 whatever response in writing by the 8th of October, if
21 that's okay with the panel.
22         JUDGE BENTON:  The 8th of what?
23         MR. DIAZ-ARRASTIA:  October.
24         JUDGE BENTON:  Well, let me ask you a
25 question.  We have not yet talked about closing

517

1  arguments.  Do you contemplate making closing arguments
2  orally or do you prefer to make them in writing?
3          MR. DIAZ-ARRASTIA:  Well, I have a closing
4  argument prepared, but we also discussed that and we
5  decided to ask you what you would want to hear since
6  you're the ones who matter.
7          JUDGE WOOD:  Let's hear from Mr. Lee.
8          MR. LEE:  Well, I would -- there's a
9  couple of things on that.  I certainly think that it
10 would be beneficial to the panel if we presented some
11 briefing on some of the legal issues, particularly the
12 damages, if that's informative to the panel.
13         And so whether -- I'd like to make a
14 closing argument, but if you don't find that useful we
15 can do it in the legal submissions.
16         JUDGE BENTON:  Well, you know what?  Just
17 one second.  I have on each day we've been here talked
18 to the court reporter and I am informed that -- my
19 understanding is that you are going to get the record
20 from the court reporter in the normal course of events
21 once the evidence kindly closes.
22         If it would help you to have the evidence
23 to prepare closing and writing me, that might help, but
24 give us a second to huddle.  Why don't we take --
25         MR. DIAZ-ARRASTIA:  One -- before we go

518

1  into that, the final bit of evidence would be in our
2  cause we have also agreed the deposition of Mr. Gary
3  Cofran, who is Vinmar's expert, would be submitted in
4  evidence in its entirety.  However, I would -- I have
5  maybe about ten minutes of some sections that I would
6  like to read to the panel to highlight them.
7          Once I do that, my case would rest.  And I
8  think that Mr. Lee then has Mr. Pascu who will testify.
9  And I think then we would be done with the evidence.
10         JUDGE DAVIDSON:  Okay.  I just want to
11 make sure -- well, two things.  First of all, some of
12 how we proceed depends upon whether y'all wanted a
13 reasoned ruling or a ruling and -- you know, and we
14 asked y'all to let us know by the time you close and I
15 haven't -- I haven't heard an answer yet.
16         MR. DIAZ-ARRASTIA:  No.  I don't think we
17 have given you one.
18         JUDGE BENTON:  Yeah, but that's okay
19 because the record --
20         MR. DIAZ-ARRASTIA:  We have not discussed
21 that.
22         MR. LEE:  We haven't huddled on that.
23         JUDGE BENTON:  But that's okay because for
24 Triple A rules the record will not be closed until we
25 get the last piece of paper there -- that is due us,

519

1  whether that be the briefing or whatever it is.
2          So, I mean, if we leave here today or
3  tomorrow, that doesn't start the clock running.
4          JUDGE DAVIDSON:  I know that.  As long as
5  y'all know that the effect of --
6          MR. DIAZ-ARRASTIA:  I understand a
7  reasoned ruling takes more work.
8          JUDGE DAVIDSON:  Yes.
9          MR. DIAZ-ARRASTIA:  A lot more work.
10         JUDGE DAVIDSON:  Perhaps.
11         MR. DIAZ-ARRASTIA:  Perhaps.
12         MR. LEE:  I certainly appreciate that.
13 We'll -- let us talk about that.
14         JUDGE DAVIDSON:  Okay.  We're going to go
15 huddle.  You're going to talk about that.
16         MR. LEE:  Can I make one other suggestion?
17         JUDGE DAVIDSON:  Sure.
18         MR. LEE:  I have done a couple of
19 arbitrations where we have finished the evidence, gotten
20 the record, submitted briefing and then had a closing
21 argument, both evidentiary and legal, and answered
22 whatever questions the panel have.  We certainly could
23 do that if you wanted to.  It just depends on what the
24 panel wants.
25         MR. DIAZ-ARRASTIA:  Fine.

53  (Pages 516 to 519)

ARBITRATION HEARING - SEPTEMBER 21, 2010

520

1      MR. LEE:  I'm prepared to do a closing
2    or --
3          JUDGE BENTON:  Okay.  Give us three
4    minutes.  And we're off the record, of course.
5          (Recess from 3:26 p.m. to 3:35 p.m.)
6          JUDGE BENTON:  We're back on the record.
7    Let's see here.  What are you giving us on
8    the 30th?
9          MR. DIAZ-ARRASTIA:  What I would give you
10   on the 30th is a report on my attorneys' fees.
11         JUDGE BENTON:  Okay.
12         MR. DIAZ-ARRASTIA:  And as I said, you
13   already have in Tricon Exhibit 37 all my bills in this
14   case through --
15         MS. LARSON:  37 and 38.
16         MR. DIAZ-ARRASTIA:  Oh, 37 and 38.  I'm
17   sorry.
18         JUDGE BENTON:  Okay.
19         MR. DIAZ-ARRASTIA:  You have all of those
20   through actually --
21         JUDGE BENTON:  Well, yeah.  I --
22         MR. DIAZ-ARRASTIA:  We'd need to update
23   it, of course.
24         JUDGE BENTON:  You've given me more than I
25   need --

521

1          MR. DIAZ-ARRASTIA:  Right.
2          JUDGE BENTON:  -- by my question.
3          MR. DIAZ-ARRASTIA:  Okay.  That's what I
4    would do by the 30th.
5          JUDGE BENTON:  Okay.  If it was our desire
6    to accommodate what Mr. Lee suggests, and that is get
7    some post evidentiary briefing and thereafter have oral
8    argument, would you be able to provide us with your side
9    of the closing briefing on the 30th also?  If not --
10         MR. DIAZ-ARRASTIA:  Well, we were just
11   talking with the reporter and she can get us -- it will
12   take her about a week to have the record transcribed and
13   I would like -- I think ideally what you would like is
14   if you have a written closing, I'd like us to be able to
15   make record references.  So we're probably not going to
16   be getting the record until just a day or two before the
17   30th.
18         JUDGE BENTON:  Okay.  So what date would
19   work for you?
20         MR. DIAZ-ARRASTIA:  Let me look at my
21   calendar.
22         And is it -- would you contemplate that
23   both sides would file their close at the same time or
24   that I would go first and then he would go second?
25         JUDGE BENTON:  At the same time.

522

1          MR. DIAZ-ARRASTIA:  At the same time.
2    Well, keeping in mind that he will be out of town next
3    week, I would like to accommodate that as well.
4          JUDGE BENTON:  That's right.  I forgot
5    about that.  Through the 8th.  Right?
6          MR. LEE:  Well, it's out next week.  I do
7    have the some depositions the first part of -- I mean,
8    ideally if that's the idea maybe on the -- would we do
9    the 15th of October?
10         JUDGE BENTON:  Submit them on the 15th?
11         MR. LEE:  Yes.
12         JUDGE WOOD:  What day would -- what day
13   would y'all anticipate doing the closing arguments?
14         JUDGE BENTON:  Well, hold on a second.
15   Let's take their papers first.  This is what we're
16   addressing.
17         MR. LEE:  We're both going to file.
18         MR. DIAZ-ARRASTIA:  The 15th is
19   acceptable --
20         JUDGE BENTON:  Okay.
21         MR. DIAZ-ARRASTIA:  -- to me.  I mean, I
22   think I could do it a few days sooner, but if Steve
23   needs that long that's fine with me.
24         MR. LEE:  Yeah.  Unfortunately I am --
25         JUDGE DAVIDSON:  No.  And I can understand

523

1    that.
2          JUDGE BENTON:  Okay.  Hold on a second.
3    There's no need to apologize.  So I think we're firm
4    then October 15 we'll submit the paper closing briefing
5    or brief closing.
6          All right.  Now, given that, what date
7    works for you to do --
8          MR. DIAZ-ARRASTIA:  Oral argument?
9          JUDGE BENTON:  -- oral argument?
10         And let me just say right up front the
11   week of the 18th is probably not a good week for some of
12   us up here.
13         MR. DIAZ-ARRASTIA:  Okay.  I think the
14   primary consideration in that should be how long you-all
15   think you'll need to read everything?
16         JUDGE WOOD:  We'll have -- we're going to
17   read.
18         JUDGE BENTON:  If we're going to get it on
19   the 15th and we'll have it read the week of the 18th,
20   there's no doubt.
21         JUDGE DAVIDSON:  How about the 25th, a
22   Monday?
23         JUDGE WOOD:  25th?
24         MR. DIAZ-ARRASTIA:  25th will work.
25         JUDGE BENTON:  Mr. Lee?

**54  (Pages 520 to 523)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

**524**

1  MR. LEE: That's fine with me. I would
2  suggest -- I will offer it. We have a conference room
3  in our office that has sort of a little round table and
4  a place to argue, but if everybody's -- George, if
5  you're comfortable doing it there --
6  MR. DIAZ-ARRASTIA: I am perfectly
7  comfortable going to your office.
8  MR. LEE: Okay. So we'll be happy to host
9  that and give you all day in the conference room if you
10  wanted to work after we leave so...
11  JUDGE BENTON: Okay. So Monday, the 25th.
12  Let's just say 9:00 a.m. Does that work for you, Judge
13  Wood?
14  JUDGE WOOD: Yes.
15  JUDGE BENTON: Judge Davidson?
16  JUDGE DAVIDSON: Monday, the 25th.
17  JUDGE BENTON: 9:00 a.m. Okay. So -- all
18  right. With that, back to you, Mr. Diaz-Arrastia.
19  JUDGE WOOD: Two minutes. Let me whisper
20  in his ear.
21  JUDGE BENTON: Okay. Mr. Diaz-Arrastia, I
22  will give it back to you -- I'm sorry. Mr. Lee is
23  rising.
24  MR. LEE: I'm sorry. May I make one more
25  comment? I think the agreement we have on agreement

**525**

1  fees is that Tricon would submit --
2  JUDGE BENTON: Theirs first.
3  MR. LEE: -- theirs on the --
4  JUDGE BENTON: 30th.
5  MR. LEE: -- 30th. And then we would file
6  response on October the 8th.
7  JUDGE BENTON: Right.
8  MR. LEE: Okay. So just on the attorneys'
9  fee issue as to what the amount is. And obviously we
10  don't agree that they're entitled to attorneys' fees,
11  but if we're going to submit counter --
12  JUDGE BENTON: Okay.
13  JUDGE WOOD: And do we want to have a time
14  that y'all let us know what kind of ruling you want?
15  Would that be a deadline that y'all can agree on --
16  MR. DIAZ-ARRASTIA: Well, I would --
17  JUDGE WOOD: -- or is that just --
18  MR. DIAZ-ARRASTIA: We've -- maybe we've
19  decided. We've decided on our side that we would like a
20  reasoned decision.
21  JUDGE WOOD: If somebody requests us do
22  it, we need to do it.
23  MR. DIAZ-ARRASTIA: And I think Mr. Lee
24  has indicated that he's okay with that.
25  MR. LEE: Right. I think that it's

**526**

1  Tricon -- I mean, obviously you understand where we are
2  on the jurisdictional issue and so --
3  JUDGE WOOD: I think under the rules if
4  one side requests it you get it so that's why we wanted
5  to know if anybody was going to request it.
6  JUDGE BENTON: Right.
7  MR. DIAZ-ARRASTIA: Well, I will request
8  it right now.
9  JUDGE WOOD: Got it.
10  JUDGE DAVIDSON: Easy.
11  JUDGE BENTON: All right. That takes care
12  of the scheduling stuff.
13  So do you have more evidence to put on?
14  MR. DIAZ-ARRASTIA: The other evidence to
15  put on, we are going to -- do we have copies? Let's go
16  get -- the agreement that we have made is that the
17  deposition of Mr. Gary Cofran, who is Vinmar's expert,
18  will be submitted in its entirety.
19  However, there are some excerpts from it.
20  And this deposition was not video'd, but there's some
21  experts -- excerpts from it that I would like to read to
22  the panel now. And if Ms. Larson would play the role of
23  Mr. Cofran, we can do that now. I think it will be
24  about ten minutes.
25  JUDGE DAVIDSON: Okay.

**527**

1  MR. LEE: And if I could make just one
2  comment. I have not been provided with the designation
3  so I think rather than trying to shuffle through and
4  figure out optional completeness, I will submit whatever
5  we need to submit in a brief -- in our closing brief.
6  JUDGE DAVIDSON: I just sort of thought it
7  was going to be -- that we could consider it in its
8  entirety.
9  JUDGE BENTON: Yeah.
10  MR. DIAZ-ARRASTIA: Well, you can consider
11  it in its entirety, but there are some parts that I want
12  to emphasize.
13  JUDGE DAVIDSON: Fine. In other words, I
14  will read this entire deposition. I will give all
15  panels -- all portions of this deposition equal weight.
16  How does that sound?
17  JUDGE WOOD: That's what I show as the
18  Rule 11 agreement.
19  MR. DIAZ-ARRASTIA: Correct. That is
20  correct.
21  JUDGE DAVIDSON: I see his --
22  JUDGE WOOD: My question is, how are we
23  going to get a copy of this to the court reporter? Now.
24  make sure that she gets a copy.
25  MR. DIAZ-ARRASTIA: We will make sure that

55 (Pages 524 to 527)

**528**

1  she -- that she gets a copy.
2      MS. LARSON: I've got a copy right now.
3      MR. DIAZ-ARRASTIA: Yeah.  And, like I
4  said, it was like this -- frankly, yesterday evening, I
5  still really believed that he was going to be called,
6  but that has changed.
7      Why don't you get your part and we will
8  read it.
9      MR. LOCKWOOD: Do you want her to sit over
10  there?
11      MR. DIAZ-ARRASTIA: Yes.  Why don't you
12  sit on the stand to make it easier?
13      JUDGE BENTON: All right,
14  Mr. Diaz-Arrastia.
15      MR. DIAZ-ARRASTIA: We are -- we are going
16  to start on Page 5, Line 12 through Line 21.
17      MS. LARSON: They have it.
18      MR. DIAZ-ARRASTIA: Oh, okay.  I will -- I
19  will read it out loud so the panel can follow along.  So
20  Page 5, Lines 12 through 21.
21      (At this time excerpts of the transcript
22  of the deposition of Gary Cofran that was taken on
23  September 16, 2010, were read into the record.  The
24  questions were read by Mr. Diaz-Arrastia.  The answers
25  were read by Ms. Larson.)

**529**

1      GARY COFRAN,
2  having been first duly sworn, testified as follows:
3      EXAMINATION
4  BY MR. DIAZ-ARRASTIA:
5  Q.  Good afternoon, Mr. Cofran.
6  A.  Good afternoon.
7  Q.  My name is George Diaz-Arrastia.  I am one of
8  the attorneys for Tricon in this case.  I guess let's
9  get right in.  First, could you state your full name for
10  the record?
11  A.  It's Gary Cofran.
12  Q.  Okay.  And have you been hired by Vinmar in
13  this case to be an expert witness?
14  A.  Yes.
15      MR. DIAZ-ARRASTIA: Next is on Page 23,
16  Lines 7 through 13.
17  Q.  (BY MR. DIAZ-ARRASTIA) Okay.  When -- who --
18  back when you were --
19      JUDGE WOOD: Just a minute.
20  Q.  (BY MR. DIAZ-ARRASTIA) -- doing trades --
21      JUDGE WOOD: Just a minute.  Let Mr. Lee
22  get to that spot.
23      MR. DIAZ-ARRASTIA: Oh, I'm sorry.
24      JUDGE WOOD: That's okay.  We're just
25  making sure everybody gets to the spot before we start

**530**

1  reading.  Let's --
2      MR. DIAZ-ARRASTIA: Page 23, Line 7
3  through 13.
4      Are we ready?
5  Q.  (BY MR. DIAZ-ARRASTIA) Okay.  When -- who --
6  back when you were doing trades, would you have
7  considered the -- who would you have considered the
8  leading brokers in the U.S. dealing in aromatics?
9  A.  There was a two or three-man brokerage company
10  out of New York.  They at one time went by the name of
11  InterCapital, if I remember correctly.  There was Ed
12  Leyman's company.
13      MR. DIAZ-ARRASTIA: Next we are on
14  Page 39, Line 14 through Page 40, Line 1.
15      Now, are we ready?
16  Q.  (BY MR. DIAZ-ARRASTIA) Okay.  Fair enough.
17  If you're making a firm bid, what you put -- what you
18  state in your firm bid are the things that you want.
19  Would that be correct?
20  A.  Yes.
21  Q.  And, similarly, when you make a firm offer,
22  what you include in your firm offer are the things that
23  you're able to do, correct, or that you're committed to
24  do let's say?
25  A.  Yes.

**531**

1  Q.  When a trader tells a broker that he is giving
2  a firm bid, does that mean the broker has authority to
3  go take that firm bid to the sellers?
4  A.  Yes.
5      MR. DIAZ-ARRASTIA: Now, on 40 --
6      MR. LEE: Well, I would -- I can't help
7  myself.  I would like to offer one piece as optional
8  completeness, and that would be at Page 40, Line 7
9  through Line 10, where the question was, "And when the
10  terms of a firm bid meet the terms of a firm offer,
11  that's what you have when you have a deal.  Correct?"
12      Answer:  "If all the terms are the same."
13      JUDGE BENTON: Okay.
14      MR. DIAZ-ARRASTIA: And I pick up on
15  Line 11 on Page 40 through Line 14.
16  Q.  (BY MR. DIAZ-ARRASTIA) Now, once a broker has
17  a firm bid and a firm offer that match, is it customary
18  for that broker to send some sort of written
19  confirmation?
20  A.  Yes.
21      MR. DIAZ-ARRASTIA: On Page 41, Line 6
22  through Line 9.
23  Q.  (BY MR. DIAZ-ARRASTIA) Okay.  Is it important
24  for the traders to review the written confirmations when
25  they receive them?

**56  (Pages 528 to 531)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

532

1      A.  Yes.
2          MR. DIAZ-ARRASTIA:  Page 45, Line 15
3   through 21.
4      Q.  (BY MR. DIAZ-ARRASTIA)  After a deal is made
5   and a confirm is sent, was is it customary back when you
6   were trading for the parties to send each other their
7   general terms and conditions of sale?
8      A.  I don't know what other companies do.
9      Q.  Did you-all do that?
10     A.  Yes, we did.
11         MR. DIAZ-ARRASTIA:  Page 55, Lines 3
12  through 14.
13     Q.  (BY MR. DIAZ-ARRASTIA)  Where Mr. Pascu is
14  telling Mr. Rajevac, "We shall revert soon with our
15  purchase order for your review."  Do you see that, sir?
16     A.  Yes.
17     Q.  Back when you were trading, sir, would a buyer
18  send a purchase order if he thought there was no deal?
19     A.  Would a --
20     Q.  Would a buyer sell -- would a buyer send a
21  seller its purchase order if the buyer thought there was
22  no deal, if they were not going to buy?
23     A.  No.
24         MR. DIAZ-ARRASTIA:  Page 63, Lines 9
25  through 11.

533

1      Q.  (BY MR. DIAZ-ARRASTIA)  Origin means where
2   it's manufactured?
3      A.  That's correct.
4          MR. DIAZ-ARRASTIA:  Page 65, Lines 15
5   through 16.
6      A.  There's a difference between origin and
7   loading port.
8          MR. DIAZ-ARRASTIA:  Page 66, Line 19
9   through Page 67, Line 1.
10     Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Well, I think
11  when we left I had asked you the question whether any --
12  in your mind when somebody says material is most likely
13  U.S. origin, is that different from saying that it's
14  guaranteed U.S. origin?  Do you have an answer to that
15  question?
16     A.  Yes.
17     Q.  And what's the answer?  It's different?
18     A.  It's different, yeah.
19         MR. DIAZ-ARRASTIA:  Okay.  And then on
20  Page 67, Line 4 through 11.
21     Q.  (BY MR. DIAZ-ARRASTIA)  Now, sir, will you
22  agree with me that if Mr. Wilson wanted -- needed to buy
23  U.S. origin material, he needed to include that in his
24  firm bid?
25     A.  Somewhere he has to tell that that's what he

534

1   wanted, yes.
2      Q.  Okay.  It's not enough that he was thinking
3   about it, he has to tell somebody, "I need U.S. origin"?
4      A.  That's right.
5          MR. DIAZ-ARRASTIA:  And Page 68, Line 11
6   through 15.
7      Q.  (BY MR. DIAZ-ARRASTIA)  And you've seen
8   confirms that contain a term saying it has to be of a
9   particular origin or it can't be of a particular origin,
10  haven't you, sir?
11     A.  Yes, I have.
12         MR. DIAZ-ARRASTIA:  Page 69, Lines 16 and
13  17.
14     Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  And if you
15  would look at Exhibit 43 under the quality line --
16         MR. DIAZ-ARRASTIA:  And these are Tricon
17  Exhibit 1.  Then I continue with the question on
18  Page 69, Line 23 through 70, Line 3.
19     Q.  (BY MR. DIAZ-ARRASTIA)  Do you see that, sir?
20  And there it specifically says "Product to be of U.S.
21  origin"?
22     A.  Yes.
23     Q.  And you've seen confirms like that before.
24  Correct, sir?
25     A.  Yes.

535

1          MR. DIAZ-ARRASTIA:  On Page 70, Line 16
2   through 22.  And now I'm referring to Tricon Exhibit 2.
3      Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  And there under
4   the quality line, this one states, "Product must be of
5   non-Iranian or Chinese origin."  Do you see that, sir?
6      A.  Yes.
7      Q.  You've seen that before in broker confirms,
8   have you not, language like that?
9      A.  I've seen it before, yes.
10         MR. DIAZ-ARRASTIA:  Okay.  Page 71,
11  Lines 1 through 7.
12     Q.  (BY MR. DIAZ-ARRASTIA)  And if you will look
13  at Exhibit 45 now --
14         MR. DIAZ-ARRASTIA:  That would be Tricon
15  Exhibit 3.
16         MR. DIAZ-ARRASTIA:  Now, sir, this is
17  again similar to 43 and 44.  Correct, sir?
18     A.  Yes.
19     Q.  And you also haven't seen Exhibit 45 before
20  today?
21     A.  No.
22     Q.  Correct?
23         MR. DIAZ-ARRASTIA:  Okay.  Moving down to
24  Page 71, Line 11.
25     Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  And under the

57 (Pages 532 to 535)

ARBITRATION HEARING - SEPTEMBER 21, 2010

536

1   quality line, it also states "this time" in parentheses
2   "No Iranian or Chinese origin." Do you see that, sir?
3       A.   I see it.
4       Q.   And you've seen confirms similar -- that
5   contain similar language back when you were trading.
6   Correct, sir?
7       A.   Yes.
8           MR. DIAZ-ARRASTIA:  Page 75, Line 18
9   through 25.
10      Q.   (BY MR. DIAZ-ARRASTIA) Back when you were a
11  trader, sir, was it common for traders to sell material
12  that they did not yet own?
13      A.   Yes.
14      Q.   Do traders sell material when they are short
15  on that material back when you were a trader?
16      A.   Yes.
17      Q.   Was that common?
18      A.   Some people did it. It was a developing art
19  at that time.
20          MR. DIAZ-ARRASTIA:  Okay. Page 76,
21  Line 15 through Page 77, Line 10.
22      Q.   (BY MR. DIAZ-ARRASTIA) Now, hypothetically if
23  a trader sells a load of MX that he does not yet own --
24          MR. DIAZ-ARRASTIA:  And Mr. Cofran nodded
25  his head.

537

1       Q.   (BY MR. DIAZ-ARRASTIA) -- then after the sale
2   is made the price of MX begins to fall, that trader has
3   just made a good deal. Right?
4       A.   Yes.
5       Q.   And that is because he has just sold high and
6   he is going to be able to buy low?
7       A.   Right.
8       Q.   And things like that happen all the time in
9   petrochemicals trading, don't they?
10      A.   Yes.
11      Q.   And it could also happen that you sell today
12  and then the price begins to go up and then you're going
13  to lose money?
14      A.   Yes.
15      Q.   Similarly, if you're a buyer of MX and you buy
16  today and the price begins to go down, you've just made
17  a bad deal?
18      A.   Hypothetically, yes.
19          MR. DIAZ-ARRASTIA:  Page 80, Line 3
20  through 10.
21      Q.   (BY MR. DIAZ-ARRASTIA) Have you ever heard
22  the term "the market freezes"?
23      A.   Yes.
24      Q.   And what does that mean?
25      A.   That there's no activity.

538

1       Q.   And when there's no activity, it's very hard
2   to find a buyer. Correct?
3       A.   Yes.
4           MR. DIAZ-ARRASTIA:  And those are the
5   selections that we wanted to read.
6           JUDGE BENTON:  All right.
7           MR. DIAZ-ARRASTIA:  And at this moment --
8           JUDGE BENTON:  You're going to read some
9   after all?
10          MR. LEE:  No, I'm not. I think that -- I
11  had the one optional completeness. And I'm sure that
12  y'all will read it if you want to and --
13          JUDGE DAVIDSON:  I will read it, I
14  promise, all of it.
15          MR. DIAZ-ARRASTIA:  Well, the only thing
16  that I want to do before I rest is that yesterday
17  Mr. Lockwood wrote -- made some calculations on this
18  board and we would like to mark them as an exhibit for
19  the arbitration. It will be Tricon Exhibit 41.
20          JUDGE BENTON:  All right. Very good.
21          MR. DIAZ-ARRASTIA:  Let me just find a
22  pen.
23          (Tricon Exhibit 41 marked.)
24          MR. DIAZ-ARRASTIA:  And at this moment the
25  claimant rests.

539

1           JUDGE BENTON:  All right. Just to
2   address -- Mr. Lee, again, it's my understanding that
3   the parties have submitted the entirety of Mr. Cofran's
4   deposition so it is our intent to read it unless you
5   don't want us to read it.
6           MR. LEE:  Well --
7           JUDGE WOOD:  No, but the Rule 11 was that
8   we would read it.
9           MR. LEE:  I guess what I would say is
10  you're certainly -- it's in the evidence if you want to
11  read it. I intend to pull out any testimony that I
12  would rely upon in our briefing. So if it's something
13  that's important that I think you need to know, I'll
14  certainly put it in my briefing, but it's there for you
15  to read if you want to. I guess that's the way I
16  would --
17          JUDGE WOOD:  And I noticed -- if you have
18  seen what's been given to us -- there are exhibits
19  attached and I think they're the exhibits that are
20  referenced in the deposition.
21          MR. LEE:  Okay.
22          JUDGE WOOD:  So I just wanted that clear
23  on the record --
24          MR. DIAZ-ARRASTIA:  That is correct.
25          JUDGE WOOD:  -- that we have these

**58  (Pages 536 to 539)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

540

1    exhibits.
2         MR. DIAZ-ARRASTIA: That is correct.
3         JUDGE DAVIDSON: But I'd like to make it
4    clear that at least for the copy of the deposition I
5    got, the copies of the handwritten exhibits are not of
6    the highest quality. If those same exhibits are already
7    in evidence in either the Vinmar, the Tricon or the
8    Joint, then it doesn't matter.
9         MR. DIAZ-ARRASTIA: Not all the exhibits
10   are the same. There are some exhibits to the deposition
11   that --
12        JUDGE DAVIDSON: This one --
13        MS. LARSON: Some of the ones that we got
14   were very difficult to read as well.
15        MR. DIAZ-ARRASTIA: They're -- the ones I
16   have are not a lot better.
17        JUDGE DAVIDSON: Okay. In that case, it
18   is what it is.
19        MR. LEE: Those are Gary's --
20        JUDGE DAVIDSON: Well, it is -- the stuff
21   is tight.
22        MS. LARSON: This has the same pages in
23   there.
24        JUDGE DAVIDSON: Yeah. It is actually a
25   little better.

541

1         MS. LARSON: Here, I'll give you these.
2         JUDGE WOOD: Well, it's those notes that
3    are Vinmar notes.
4         MS. LARSON: These are slightly better.
5    I'll pass them out.
6         JUDGE DAVIDSON: I need one.
7         MR. LEE: And if -- I can go check to see
8    if we've got a better copy.
9         JUDGE WOOD: Some of them are darker than
10   others.
11        JUDGE BENTON: Okay. With that --
12        MS. LARSON: It's not terribly better.
13   It's marginally better.
14        JUDGE BENTON: And with that, Tricon
15   rests?
16        MR. DIAZ-ARRASTIA: Tricon rests.
17        JUDGE BENTON: All right. Very good.
18   Mr. Lee, you ready to proceed?
19        MR. LEE: Yes, Your Honor. We will call
20   Laurentiu Pascu, who I hope is out in the hallway.
21        JUDGE BENTON: Laurentiu Pascu. And is
22   the traditional oath appropriate?
23        MR. LEE: Yes.
24        JUDGE BENTON: Mr. Pascu, if you'll raise
25   your right hand, please.

542

1         (At this time the witness was duly sworn
2    by Judge Benton.)
3         JUDGE BENTON: Mr. Lee, you may proceed.
4         LAURENTIU PAUL PASCU,
5    having been first duly sworn, testified as follows:
6         DIRECT EXAMINATION (3:57 p.m.)
7    BY MR. LEE:
8         Q. Okay. Mr. Pascu, you don't know this, but
9    earlier today we heard from you in your deposition and
10   so I'm not going to spend a whole lot of time running
11   back through things that were covered, but -- so we
12   might just cut through it, but I would like for you to
13   introduce yourself to the panel, please.
14        A. My name is Laurentiu Pascu. I am working
15   currently for Vinmar International in Houston and --
16        Q. Okay. And, Mr. Pascu, what is it that you do
17   for Vinmar?
18        A. I'm a supply chain specialist.
19        Q. And could you describe what that means at
20   Vinmar?
21        A. I am handling the logistics and the operations
22   portion of the business.
23        Q. Are you -- are you a trader?
24        A. No.
25        Q. Do you get involved in negotiating the

543

1    commercial terms of an agreement?
2         A. No.
3         Q. How long have you been with Vinmar?
4         A. I started January 2006.
5         Q. And, again, I think we saw some of this, but
6    do you mind just telling the panel a little bit about
7    your background, where you grew up?
8         A. I'm originally from Romania. I moved to
9    Houston in January 2006 since I've been with Vinmar
10   and --
11        Q. And how long have you been with Vinmar?
12        A. Five years. Ever since I've been in Houston,
13   I've been with Vinmar.
14        Q. You have had some schooling in the United
15   States?
16        A. Yes. I have done my master in business
17   administration at the University of Houston.
18        Q. As you understand it, Mr. Pascu, what
19   authority do you have to negotiate commercial terms of a
20   deal with Vinmar?
21        A. No authority.
22        Q. What authority do you have to change
23   commercial terms?
24        A. No authority.
25        Q. You do know that at some point in time in the

**59 (Pages 540 to 543)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

**544**

1  summer of 2008 that Rick Wilson informed you of what he
2  thought was a deal with Tricon.  Correct?
3      A.  Correct.
4      Q.  And what did you understand about the terms of
5  this deal?
6      A.  I understood that there could be a shipment
7  of -- a potential shipment of mixed xylene.
8      Q.  What understanding did you have of the origin
9  of the mixed xylenes?
10     A.  That it's going to come from USA.
11     Q.  Where did you obtain that understanding.
12     A.  From -- from discussion that I have had with
13  Rick.
14         JUDGE BENTON:  From discussions you had
15  with?
16         THE WITNESS:  Rick Wilson.
17         JUDGE BENTON:  Okay.
18     Q.  (BY MR. LEE)  Now, as the logistics specialist
19  at Vinmar, you supervised the entry of the terms or
20  information into Vinmar's SAP system?
21     A.  Yes.  I do supervise the entry of the data
22  into SAP system in Vinmar for chemicals.
23     Q.  And what is -- what is the SAP system?
24     A.  It's the system that serves for entering all
25  the data, I suppose for all management.  I'm not really

**545**

1  sure exactly what means SAP so...
2      Q.  You know it requires you to enter some data?
3      A.  Right.  It requires me to enter -- actually it
4  requires to enter all the data referring to that
5  business or that shipment.
6      Q.  All right.  Let me ask you to take a look at
7  Joint Exhibit No. 7.  Mr. Pascu, there's three notebooks
8  in front of you.  It's going to be the one on the top on
9  your left right there.
10     A.  Okay.
11     Q.  And if you'll turn to Tab 7.
12     A.  Okay.
13     Q.  And what are the documents contained within
14  Joint Exhibit 7?
15     A.  It is the print screen of the tabs in SAP.
16     Q.  And this refers to -- there's a name at the
17  top -- E. Anaya.  Do you see that?
18     A.  Yes.
19     Q.  And was that -- or who was that?
20     A.  Mr. Eduardo Anaya was at the time a commercial
21  trainee and he was helping -- actually under the
22  training of logistic under my supervision at that time.
23     Q.  All right.  And is Mr. Anaya still employed at
24  Vinmar?
25     A.  No.

**546**

1      Q.  To the extent that Mr. Anaya entered any
2  information into the SAP system at Vinmar that had
3  anything to do with this transaction, was he doing that
4  under your supervision?
5      A.  Yes.
6      Q.  Now, Joint Exhibit 7, that doesn't contain all
7  of the information that was in Vinmar's SAP system, does
8  it?
9      A.  No.  Each of the tabs have -- contains a
10  certain portion of the information.
11     Q.  Okay.  Now, I'd ask you to take a look at the
12  notebook, Vinmar Exhibits.  Okay?  And if you'll turn to
13  Vinmar Exhibit No. 4, so it's going to be Tab 4 there,
14  sir.
15     A.  Okay.
16     Q.  Okay.  Now, do you recognize the pages
17  contained within Vinmar Exhibit No. 4?
18         JUDGE BENTON:  Just a second.
19         MR. DIAZ-ARRASTIA:  I have an objection to
20  two of the pages on this exhibit.
21         And I understand the panel will consider
22  everything, but I just wanted to explain why I do not
23  believe this is reliable.  In particular, I have an
24  objection to the last two pages of your exhibit, VIN 93
25  and 94.

**547**

1  These are screens that as you see were
2  entered by Mr. Eduardo Anaya.  We requested Mr. Anaya's
3  deposition but were told we could not have it because he
4  no longer works for the company, he now lives in Mexico
5  and they didn't know where he lived anymore, so he was
6  not available.
7          We do not know when the information in
8  these screens was entered, but we have reason to think
9  that it was after this dispute.  And I can get into that
10  with Mr. Pascu when I take him on cross-examination.
11         JUDGE BENTON:  We understand your concerns
12  and we'll let you take it up on cross.  All right.
13     Q.  (BY MR. LEE)  Okay.  Mr. Pascu, do you
14  recognize the documents contained in Vinmar Exhibit
15  No. 4?
16     A.  Yes.  It is a print screen of the SAP tab.
17         (Brief interruption.)
18         JUDGE BENTON:  Hold on one second.
19     Q.  (BY MR. LEE)  And as I understand it, the SAP
20  system contains a number of different tabs and entries
21  that you would drill down into.  Correct?
22     A.  Correct.
23     Q.  Okay.  Pages 2 and 3 of Vinmar Exhibit No. 4,
24  is it your understanding that those two pages, in fact,
25  are contained within Vinmar's SAP system?

**60  (Pages 544 to 547)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

548

1    A. Yes.
2    Q. Okay. And can you tell us what -- so this
3 would be -- how would this reside in the system? Where
4 would we find this documentation?
5    A. Let -- on the screen, there are three tabs.
6 The first tab is describing delivery and all the
7 other -- all the terms like payment terms, Incoterms,
8 currency. There is a second tab that, going back to
9 Page No. 1, is describing the product, the quantity, the
10 date of delivery. And there is a third tab in the
11 additional tabs that have the delivery details, again
12 repeating the Incoterms, the country of origin and --
13    Q. Okay. And what does the -- there's a
14 statement on here about midway down on the SAP data that
15 says, "C-T-R-Y dash Origin." Do you see that?
16    A. Yes.
17    Q. What does that stand for?
18    A. Country of origin.
19    Q. And what was put in the blank?
20    A. USA.
21    Q. What does that signify?
22    A. That the origin is USA.
23    Q. Okay. And where did you obtain that
24 understanding?
25    A. From my discussion with Rick Wilson.

549

1         JUDGE DAVIDSON: I'm sorry. From your
2 discussion with?
3         THE WITNESS: With Rick Wilson. Sir, you
4 want me to speak louder?
5         JUDGE DAVIDSON: No, no, no, no. I just
6 missed that one --
7         THE WITNESS: Okay.
8         JUDGE DAVIDSON: -- that word.
9         THE WITNESS: Sorry.
10    Q. (BY MR. LEE) And what is the date of this
11 document according to the print screen?
12    A. 24th of July.
13         JUDGE BENTON: Where is that located?
14         THE WITNESS: If you look on any tab, it's
15 going to be on the right-hand side upper -- upper side,
16 dock date. Next besides Tricon Energy, LLC.
17         JUDGE BENTON: Okay. Let's proceed.
18    Q. (BY MR. LEE) And the last page of Vinmar
19 Exhibit No. 4, what does that reflect about the country
20 of origin?
21    A. That the origin is USA.
22    Q. Okay. And, again, where was that
23 understanding obtained?
24    A. From my discussion with the trader, Rick
25 Wilson.

550

1    Q. Now, if we -- if we look at -- I'll have to
2 make you change notebooks for a second to the Tricon
3 exhibit notebook. And if you'll turn to Tab No. 10.
4         So that's going to be the bottom notebook.
5 Now, Mr. Pascu, what is the document contained in Tab
6 No. 10?
7    A. Printout of the SAP entry.
8    Q. I'm sorry?
9    A. Printout of the SAP entry.
10    Q. Okay.
11    A. Printout of the SAP.
12    Q. Okay. Now -- well, if we go to Page 2,
13 there's a blank for origin. You see that?
14    A. Yes.
15         JUDGE DAVIDSON: What is is --
16         THE WITNESS: Sorry?
17         JUDGE BENTON: This is Tricon.
18         MR. LEE: Oh, I'm sorry. Tricon
19 Exhibit 10. My apologies.
20         JUDGE DAVIDSON: Tricon, the purchase
21 order.
22    Q. (BY MR. LEE) Now, at Page 2 of Tricon -- now,
23 let me ask you, the entry of data into the SAP system,
24 that is something that you do as a logistics specialist?
25    A. Yes.

551

1    Q. And the initial preparation of a purchase
2 order, is that something that you do?
3    A. Correct.
4    Q. Who reviews the purchase order or is the
5 purchase order reviewed before it would be sent to the
6 counterparty?
7    A. The purchase order is required to be reviewed
8 by the trader. Actually there is a requirement even if
9 in the system for having it to be released by the
10 trader.
11    Q. All right. So while you or somebody within
12 your group may prepare the data into SAP and the
13 purchase order before it is sent, the trader will review
14 it?
15    A. Correct.
16    Q. Now, at Page 2 of this purchase order, do you
17 see the -- a line for origin?
18    A. Yes.
19    Q. And it's blank, is it not?
20    A. Yes, it is blank.
21    Q. Can you explain why it is blank?
22    A. At the time that purchase order was still
23 under preparation. We were waiting clarification from
24 the trader and we were waiting for clarification
25 actually on what is going to be the loading port.

**61 (Pages 548 to 551)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

552

1    As that information never came, we never
2  got to a stage where we had finalized the data into the
3  system.
4    Q.  Why is the loading port important?
5    A.  Loading ports -- loading port is very
6  important for two reasons.  One, that it's helping us
7  understanding where should we set up the inspection
8  instructions, the surveyor, where we should send the
9  surveyor to inspect the cargo before it gets into the
10  vessel.
11    And, secondly, that it is a requirement
12  under -- on the letter of credit to stipulate the port
13  of loading.
14    Q.  Now, but we just saw a couple of pages from
15  Vinmar's SAP records that reflect the country of origin
16  as USA.  Why wasn't that entered into this purchase
17  order at this time; do you know?
18    A.  We were still waiting on the port of loading
19  information so that we can put all these details
20  together.
21    Q.  Is the -- is the data that is entered into the
22  purchase order, is it manually entered or is it simply
23  the computer takes it from SAP and puts it into the
24  form?
25    A.  These specific places are manually entered.

553

1    Q.  And just to be clear, this purchase order was
2  never sent to Tricon.  Correct?
3    A.  No.
4    Q.  No, it was not sent?
5    A.  No, it was not sent.  Sorry.
6    Q.  When you -- you sent an e-mail to Vuk Rajevac
7  at Tricon and you mentioned to Mr. Rajevac that you
8  would be sending at some point in time a purchase order.
9  Do you recall that?
10    A.  Yes, I do.
11    Q.  Was the purchase order that you were referring
12  to, was it -- would it be something ultimately like what
13  we see in Vinmar Exhibit No. 10?
14    A.  Yes.
15    Q.  Now, as to what terms were included in that
16  purchase order, who would make the decision about that?
17    A.  As mentioned, the trader has the final review
18  of the -- of the purchase order and he's going to be
19  reviewing the terms and he's going to be agreeing on
20  each of these terms before it's sent -- it gets sent to
21  the other counterparty.
22    Q.  And if so terms are removed from the purchase
23  order or added to the purchase order, that would be
24  something that the trader would make the decision on?
25    A.  We would be acting -- on the operation level,

554

1  we would be acting on the trader's requirements.
2    MR. LEE:  I'll pass the witness.
3    JUDGE BENTON:  Mr. Diaz-Arrastia?
4    MR. DIAZ-ARRASTIA:  Okay.
5    CROSS-EXAMINATION (4:14 p.m.)
6  BY MR. DIAZ-ARRASTIA:
7    Q.  Mr. Pascu, do you remember when we took your
8  deposition a couple of months ago?
9    A.  Yes, sir, I do.
10    Q.  And you did your best to answer my questions
11  truthfully then, didn't you?
12    A.  Yes, sir, I did.
13    Q.  Now, we have looked at Joint Exhibit 10, which
14  is the purchase order, and we have noted, as we did
15  during the deposition that I had taken, the line for
16  origin --
17    A.  Which one?
18    Q.  Tricon Exhibit No. 10, the purchase order.
19    A.  Okay.  The one that we are looking at.
20    Q.  Right.  We just talked about it.  But Mr. Lee
21  has noted, just as I noted during my deposition, that
22  the lines for origin is blank.
23    A.  Correct.
24    Q.  And the line for origin is blank even though
25  we saw in Vinmar Exhibit No. 4 in the second two pages

555

1  that the SAP system in those documents had an entry for
2  origin.
3    A.  Correct.
4    Q.  And it is your testimony that the purchase
5  order is generated automatically by the SAP system?
6    A.  There are two portions on this.  One, if you
7  look on the front page, you'll find seller, buyer and
8  many other data before the text.  So before total terms
9  and total value, subject to tolerance, USD.  That is
10  coming automatic from the system.
11    Then the text from down -- from down to
12  bottom from terms, he used -- until the signature
13  portion, Best Regards, Rick Wilson, that is manual
14  entries that is coming from the system.
15    Q.  But you remember telling me during your
16  deposition that the purchase order was automatically
17  generated when you hit the print button on the SAP
18  system?
19    A.  Right.  I'm describing to you the process what
20  it takes, the data, how it takes when it gets generated
21  from the SAP.
22    JUDGE DAVIDSON:  Wait a minute.  I want to
23  make sure I understand that.
24    Are you saying that when a bid comes in
25  the contents of that bid somehow get projected on to the

62  (Pages 552 to 555)

ARBITRATION HEARING - SEPTEMBER 21, 2010

556

1  spreadsheet that is -- that are on those computer
2  screens without any manual input?
3          THE WITNESS:  Let me clarify.  Everything
4  is manual.  Now, we are -- we are entering manual in
5  each tab.  What I'm suggesting is that -- what I'm
6  saying is that this text from the Terms For the Above PO
7  are as follows till the end where the signature portion
8  is.
9          These as well are entered manual but --
10         JUDGE DAVIDSON:  Okay.
11         THE WITNESS:  -- they are not like -- they
12 are not coming directly from the -- you know, like the
13 price, I'm not doing anything manual after the tab is
14 entered, but from the text you still can modify it.
15         JUDGE DAVIDSON:  Okay.  I just misund -- I
16 think I misunderstood what you said when you said it was
17 automatically input off of a fax.  I was going to
18 wonder --
19         THE WITNESS:  No, no.
20         JUDGE DAVIDSON:  -- how did you manage to
21 do that.  Okay.
22         THE WITNESS:  Sorry.
23         JUDGE DAVIDSON:  Okay.  Sorry to
24 interrupt.  It just occurred --
25         Q.  (BY MR. DIAZ-ARRASTIA)  Mr. Pascu, let me hand

557

1  you a transcript of the deposition that you gave me.
2          A.  Okay.
3          Q.  And we're going to talk a little bit about
4  that.
5          A.  Okay.
6          Q.  If you will turn to Page 48.
7          A.  48 did you say?
8          Q.  Page 48.  There are for pages to a side on
9  that document.
10         A.  Okay.
11         Q.  Okay.  Do you remember when I asked you -- and
12 I think in your deposition, Exhibit 34 to your
13 deposition was Tricon Exhibit 10 in this hearing.  It's
14 the same document, the purchase order.
15         So do you remember when I asked you, "How
16 was Exhibit No. 34," which is the purchase order, now
17 Exhibit 10, "or documents like that -- how are Vinmar's
18 purchase order confirmation prepared?"
19         A.  Okay.
20         Q.  Do you remember when I asked you that?  And
21 you said, "What do you mean?"
22         I went back.  "Well, generally how are
23 they prepared?"
24         And you say, "Data is entered in this
25 case."

558

1          And then I said, "And that automatically
2  generates a purchase order confirmation?"
3          And you said, "Upon printing of this
4  document."
5          A.  Okay.
6          Q.  Do you remember giving me that testimony?
7          A.  Okay.
8          Q.  And what you're saying is that you didn't give
9  me a full answer because the origin part of the purchase
10 order is actually not generated automatically?  That's
11 your story today?
12         A.  No.
13         MR. LEE:  I object to the question.  That
14 is not -- his testimony is entirely consistent today --
15         MR. DIAZ-ARRASTIA:  Well --
16         MR. LEE:  -- with what he said in his --
17         JUDGE BENTON:  Just a second.  Are you
18 finished?
19         MR. LEE:  Yes, Your Honor.
20         JUDGE BENTON:  You can take it up in
21 redirect.  Let's proceed.
22         A.  Okay.  What I'm saying -- what I'm saying is
23 the following.  There are three -- if we can go back to
24 the -- to the print screens of the -- of the SAP.  Okay.
25 I don't know where --

559

1          JUDGE WOOD:  Is that these blue things?
2          THE WITNESS:  Yeah.  We --
3          MR. LEE:  Tab 7.
4          JUDGE WOOD:  Tab 7, Joint.
5          MR. LEE:  It's in the top notebook?
6          THE WITNESS:  This one.
7          MR. LEE:  No.  I'm sorry.  That one.  Yes.
8          A.  Okay.  Whenever we are getting the data,
9  whether it's coming through e-mail or broker, we are --
10 we are entering the data into SAP.  And you see there is
11 a top tab called text, third -- third one from the
12 left-hand side on top.  It's called -- it's called the
13 tab Text.
14         There is where the text gets written into
15 it.  And it's showing up after printing on this -- on
16 this paperwork, Exhibit No. 10.  So -- okay.  So what
17 I'm -- what I'm referring, that all -- this tab, Text,
18 contains all the data from the terms of the above field
19 are as follows till the signature portion.
20         Okay.  And those terms are for something
21 that can be modified, whether the trader requires or
22 not.  And once you get printed, that automatically --
23 that text is coming on the -- on the paper.
24         Q.  (BY MR. DIAZ-ARRASTIA)  Okay.
25         A.  It's placed on the paper.

63  (Pages 556 to 559)

ARBITRATION HEARING - SEPTEMBER 21, 2010

560

1  Q.  Okay.  Mr. Pascu, now take a look at Page 54.
2       Okay.  Look at Line 5 of Page 54.  And I
3  asked you again -- do you remember this question?
4       "Okay.  I understand that no one actually
5  gets down and writes or types in all of this
6  information, it's automatically created by the system."
7  A.  Okay.
8  Q.  And you understand that we're referring to the
9  purchase order.  And you say, "Okay"?
10      And then I asked you, "And when you hit
11 the print PO button it just generates this depending on
12 what information was entered?"
13      And you say, "Okay."
14      Now, I say, "Is that all true?"
15      And you say, "Yes."
16      Do you remember that?
17 A.  Okay.
18 Q.  So I asked you a second time whether the
19 purchase order was generated automatically and you said
20 "Yes" without any qualifications.
21 A.  I'm saying yes as well today.  I'm not -- I'm
22 not -- I'm not disputing what I'm saying.  What I'm
23 trying to say to you -- you are trying to say something
24 and I'm saying the same thing, said with different
25 words.

561

1       What I'm trying to say is the following.
2  I'm trying to say that this text as it is here, okay, is
3  something that the system allows you to change at any
4  point in time, depending on what -- the way that -- the
5  way that the process is, we are working on this text as
6  we are -- as we are going to the trader.
7       We are -- the trader is reviewing the
8  paperwork and he's going to come back to us with any
9  modifications that he's going to require.  Then we go
10 back into a system, apply the modification and issue the
11 purchase order.  This is the process.  So I'm not saying
12 that is --
13 Q.  Okay.  Now, Mr. Pascu, remember that so far I
14 had asked you questions in general about how the
15 purchase order was generated.  Do you remember that I
16 also asked you some specific questions about it?  Do you
17 recall --
18 A.  About what?
19 Q.  -- that?
20      It was some time ago.  You may not
21 remember.
22 A.  Okay.
23 Q.  I want you to take a look at Page 55.
24 A.  Okay.
25 Q.  In Page 55, I asked you -- Line 1, I asked you

562

1  the question, "All right.  That's fine.  Look at the
2  second Page of Exhibit 34."
3  A.  Okay.
4  Q.  And that is the second page of the purchase
5  order.  Correct?
6  A.  Okay.  Correct.
7  Q.  Now, this is where you're now saying this is
8  entered manually.  Right?
9  A.  Now --
10      MR. LEE:  I don't believe that's what he
11 said.
12      JUDGE DAVIDSON:  Let --
13      MR. LEE:  Okay.  I'm --
14      JUDGE DAVIDSON:  Please let him answer.
15 I'm sorry.
16 A.  Here was --
17 Q.  (BY MR. DIAZ-ARRASTIA)  I'm asking, is the
18 information beginning on the --
19 A.  No.
20 Q.  -- second page, is that now entered manually?
21 A.  No.  All the data initially is entered
22 manually.  There is no such a system that is picking up
23 the data from somewhere.  All the data is entered
24 manually.
25      What I'm trying to say is that you have on

563

1  the Tab No. 3, which is -- which is showing on the --
2  right now I'm looking to this screen.  Okay.  This I'm
3  not entering any text manually.  I'm just having a
4  dropdown list and I'm taking that dropdown list and I'm
5  putting, okay, it is your USA origin.  I'm USA origin.
6  So that -- this is how manually it's entered.
7       Then on the text it's something that I can
8  type in and therefore I am saying it's manual typing.
9  Let's put it manual typing if that is going to avoid the
10 confusions that we are seeing.
11      JUDGE WOOD:  Could we get for the record
12 what exhibit number the witness is holding up so we can
13 look at the same one?
14      JUDGE BENTON:  The witness is holding
15 up --
16      MR. LEE:  Joint Exhibit 7.
17      MR. DIAZ-ARRASTIA:  Joint Exhibit 7.
18      JUDGE WOOD:  Okay.  And exactly which
19 page?  You know, don't say "that VIN thing down at the
20 bottom."  Is this 91-B?
21      THE WITNESS:  91-A.
22      JUDGE WOOD:  Okay.
23      MR. LEE:  A.
24      JUDGE WOOD:  A.  Thank you.
25 Q.  (BY MR. DIAZ-ARRASTIA)  Okay.  Mr. Pascu --

64  (Pages 560 to 563)

ARBITRATION HEARING - SEPTEMBER 21, 2010

564

1    A.  I will -- one second.  I will go back also to
2  the screens that we were showing.  Okay.  The initial
3  Vinmar --
4    Q.  Vinmar 4?
5    A.  Yeah, Vinmar 4.  Same thing here.  Okay?  So,
6  again, this -- if you look here on VIN 93, okay, this
7  is -- again is a dropdown list that we have to pick on.
8  Okay.  And we are just scrolling down, pick the right
9  information and this is how it gets inserted into the --
10 into the system.
11   Q.  Okay.  Now, let's continue on Page 55.
12   A.  On the tab Text, however, this starts as blank
13 and this is where we are entering this text.
14   Q.  Let's continue on Page 55.  My next question
15 to you was, "Do you see where there is a line that says
16 origin on the purchase order?"
17       And your answer is, "Yes."
18       "And it is blank.  Correct?"
19       Your answer is, "Yes."
20       And then my question was, "And would that
21 be because no origin was entered into the system prior
22 to this being printed?"
23       And your answer was, "It would have been
24 that the word here was not entered into the system,
25 yes."

565

1       "Before this was printed?"
2       "Before this was printed."
3       Do you remember telling me that back then?
4    A.  One second.  Let me -- okay.  I read this.
5    Q.  That's what you told me back then?
6    A.  Okay.
7    Q.  And you told that under oath?
8    A.  I'm not disputing it.
9    Q.  Now, let's take a look at these screens that
10 are VIN Exhibit No. 4, the second two pages, VIN 93 and
11 94.  And these were prepared by Eduardo Anaya.  Is that
12 correct?
13   A.  Yes.
14   Q.  The gentleman that doesn't work for Vinmar
15 anymore.  Correct?
16   A.  Correct.
17   Q.  No one knows where he is anymore?
18   A.  I am not able to answer that question.
19   Q.  And you testified that he entered country of
20 origin, USA, on 7-24?
21   A.  Correct.
22       MR. DIAZ-ARRASTIA:  Put this on the
23 screen, Tracy, will you?
24   Q.  (BY MR. DIAZ-ARRASTIA)  Will you take a look
25 at Joint Exhibit No. 8?  Look at Mr. Wilson's e-mail.

566

1       MR. DIAZ-ARRASTIA:  Highlight that from
2  Rick Wilson.  Let's start with the date.
3       MR. LEE:  May I make sure he has the
4  exhibit in front of him?
5       JUDGE DAVIDSON:  Sure.
6       MR. DIAZ-ARRASTIA:  Sure.  Joint
7  Exhibit 8.
8       MR. LEE:  Joint Exhibit 8.
9    Q.  (BY MR. DIAZ-ARRASTIA)  Do you have that in
10 front of you, sir?
11   A.  Yes.
12   Q.  And we talked about this during your
13 deposition also.  Remember?
14   A.  I do remember.
15   Q.  And this is an e-mail from Rick Wilson?
16       MR. DIAZ-ARRASTIA:  Can you bring back the
17 highlighting, Tracy?
18   Q.  (BY MR. DIAZ-ARRASTIA)  From Rick Wilson to
19 Eduardo Anaya and you and Ana Campos.  Correct?
20   A.  Seems so, yes.
21   Q.  And I think you testified in your deposition
22 that Ana Campos was another person you supervised?
23   A.  Correct.
24   Q.  Okay.  And Mr. Wilson is responding to a
25 request from Mr. Anaya in which he asks, "We need the

567

1  origin to complete the purchase order."  Isn't that what
2  he asks for?
3    A.  "He's asking to complete the order, we need
4  port of origin."  This is what is written.
5    Q.  And Mr. Wilson responds, "Re: Origin, we won't
6  know until we declare discharge port.  Most likely USG."
7  That's what he says.  Right?
8    A.  Again, I know that the question for Eduardo
9  was, "What is the port of origin?"
10   Q.  What it says is, "Re: Origin, we won't know
11 until we declare discharge port.  Most likely USG."
12 Correct?  That's what it says?
13   A.  Again, Eduardo and I asked for port of origin
14 as a -- as a step into our process.  Okay?
15   Q.  And Wilson is giving Mr. Anaya and you and
16 Ms. Campos that information on July 25.  Correct?
17   A.  No.  Again, Eduardo Anaya and I asked port of
18 origin.  Okay?  Asked Rick from where this cargo shall
19 be shipped from?  What is the port of origin in the USA
20 that the cargo shall be shipped from?  And this is what
21 Eduardo and I asked.
22   Q.  Okay.  But Mr. Wilson gives Mr. Anaya his
23 answer on July 25?
24   A.  Okay.
25   Q.  Correct?  That's what that says?

**65  (Pages 564 to 567)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

---

568

1    A.  He's showing that the answer was given on
2  July 25.
3    Q.  But somehow Mr. Anaya already knew on the 24th
4  that the country of origin was the U.S.
5    A.  Again, and I re -- I'm coming back to you.
6  I'm saying that the origin was known.  What we are -- we
7  are clarifying what -- what is the port of loading.  And
8  Mr. Eduardo Anaya is asking the question, "What is the
9  port of loading?"  And this is what I think that
10  Mr. Rick Wilson is trying to answer to Mr. Anaya.
11    Q.  Okay.  And Mr. Anaya's response to Mr. Wilson
12  was, "Okay.  That is what you wrote on the PO"?
13    A.  Okay.
14    Q.  Now, let's take a look at the PO.  The PO has
15  a line for origin.  Right?
16    A.  Okay.
17    Q.  It has that.  Right?
18        MR. DIAZ-ARRASTIA:  Let's put that up,
19  Tracy, Tricon Exhibit 10.
20    Q.  (BY MR. DIAZ-ARRASTIA)  It has a line for
21  origin.  Correct?
22    A.  Origin was already put.  Remember that I was
23  telling you that whenever we are entering the PO we
24  are -- we have entered the origin of the cargo as a
25  requirement of our system.  So the origin of the -- of

569

1  the -- of the cargo was already shown into SAP and this
2  is what Eduardo is saying.
3        If you are looking to this one, it's
4  showing the origin USA.  So this is what we have shown.
5  Now, the port of loading was never clarified and
6  therefore we only want to complete the data.
7    Q.  Mr. Pascu, on your purchase order next to
8  origin, there's just a big blank.  Right?
9    A.  Again --
10    Q.  Can you answer my question?
11    A.  What question?
12    Q.  Next to origin there's a big blank?
13    A.  Again, you are -- you are asking me --
14        JUDGE BENTON:  Just a second.
15  Irrespective of what the witness says, the panel can
16  read.  And it is apparent to the panel what the document
17  says.
18        MR. DIAZ-ARRASTIA:  All right.
19        JUDGE BENTON:  Let's proceed.
20    Q.  (BY MR. DIAZ-ARRASTIA)  Then let's ask you one
21  more question, Mr. Anaya.
22    A.  No. Pascu.
23    Q.  Mr. Pascu.  I'm sorry.  On your purchase
24  order, Joint Exhibit No. 10, is there any line in there
25  for port of origin?

570

1    A.  Sorry?
2    Q.  Is there any line in the Vinmar purchase order
3  that says port of origin -- I'm sorry -- I mean port of
4  loading?
5    A.  So say again.
6    Q.  I'm sorry.
7        JUDGE BENTON:  Yeah.  Ms. Larson is trying
8  to script it for you.  Let's try it one more time.
9        MR. DIAZ-ARRASTIA:  Yeah.
10    Q.  (BY MR. DIAZ-ARRASTIA)  Mr. Pascu, on Tricon
11  Exhibit 10, the Vinmar purchase order, is there any line
12  for port of loading?
13    A.  Port of loading is not shown on the purchase
14  order because it was never revealed to me; therefore,
15  it's not shown.
16        MR. DIAZ-ARRASTIA:  I pass the witness.
17        JUDGE DAVIDSON:  Mr. Lee?
18        MR. LEE:  No further questions.
19        JUDGE BENTON:  You're excused.
20        THE WITNESS:  Okay.
21        JUDGE WOOD:  Could I ask just one --
22        JUDGE BENTON:  Just one second.  You're
23  excused.
24        THE WITNESS:  Okay.
25        JUDGE BENTON:  Call your next witness.

571

1        MR. LEE:  We have no more witnesses.
2        Subject to the briefing schedule that we
3  discussed and the opportunity to respond to their
4  attorneys' fees.
5        JUDGE BENTON:  Okay.  So the live
6  testimony is concluded.  But for the record, the
7  evidence is not concluded.  The record is not closed.
8  And so there will be no need to convene tomorrow.
9  Correct?
10        MR. DIAZ-ARRASTIA:  There will be no need
11  to meet tomorrow, but let me ask something.  I
12  understand that the record is not closed because
13  obviously there's going to be argument, but is there
14  contemplation that there will be additional evidence
15  presented in writing?
16        JUDGE BENTON:  Yeah.  The evidence is --
17        JUDGE DAVIDSON:  Attorneys' fees.
18        MR. DIAZ-ARRASTIA:  Oh, my attorneys'
19  fees.
20        MR. LEE:  But other than that --
21        MR. DIAZ-ARRASTIA:  Other than that, the
22  evidence is --
23        JUDGE DAVIDSON:  Well, and he may want
24  to --
25        MR. LEE:  And my response.

**66 (Pages 568 to 571)**

ARBITRATION HEARING - SEPTEMBER 21, 2010

572

1    JUDGE DAVIDSON:  And he may want to rebut
2  your attorneys' fees.
3    MR. DIAZ-ARRASTIA:  Okay.  But we're
4  talking about just the attorneys' fees?
5    MR. LEE:  Correct.
6    MR. DIAZ-ARRASTIA:  I just wanted to
7  clarify.
8    MR. LEE:  I mean, certainly I would -- I
9  might have evidence in response to his attorneys'
10  fees.
11    JUDGE BENTON:  As I -- I think I got it
12  right the first time.
13    MR. DIAZ-ARRASTIA:  Yes, you did, Your
14  Honor.
15    JUDGE BENTON:  Anything else?
16    MR. DIAZ-ARRASTIA:  Nothing else here.
17  And there will be not be a need to meet tomorrow.
18    JUDGE BENTON:  Okay.
19    MR. LEE:  One housekeeping matter, and
20  it's entirely up to the panel.  Would you like for us to
21  submit a revised exhibit list and pull out or just keep
22  everything that you got and leave it?
23    Okay.  Then --
24    JUDGE WOOD:  I'm afraid if you changed any
25  of these numbers I'd be totally lost.

573

1    MR. DIAZ-ARRASTIA:  It will make things
2  more --
3    MS. LARSON:  The transcript would be
4  impossible.
5    MR. DIAZ-ARRASTIA:  It would make things
6  more difficult.
7    JUDGE WOOD:  I know that.
8    JUDGE BENTON:  Okay.  We're still on the
9  record.  We're probably giving the reporter a problem.
10  Anything else before we go off the record?
11    MR. DIAZ-ARRASTIA:  I'm done.
12    JUDGE BENTON:  Okay.  Mr. Lee?
13    MR. LEE:  I'm done.  I guess just -- there
14  were some exhibits that weren't discussed, but as I
15  understand it are they in?
16    JUDGE BENTON:  They're in.
17    MR. LEE:  Okay.
18    JUDGE DAVIDSON:  All of yours, all of his,
19  all of joints.
20    JUDGE BENTON:  Judge Wood, anything else
21  you need?
22    Judge Davidson?
23    JUDGE DAVIDSON:  I'm as happy as a pig in
24  slop.
25    JUDGE BENTON:  All right.  We're off the

574

1  record.
2    (Proceedings concluded at 4:37 p.m.)

575

1  STATE OF TEXAS    )
2  COUNTY OF HARRIS  )
3
4    I, Diana Ramos, a Certified Shorthand Reporter
5  in and for the State of Texas, do hereby certify that
6  the above and foregoing pages contain a full, true and
7  correct transcription of my shorthand notes taken upon
8  the occasion set forth in the caption hereof, as reduced
9  to writing by me and under my supervision.
10    I further certify that the transcription of my
11  notes truly and correctly reflects the exhibits offered
12  into evidence, if any; that I am neither counsel for nor
13  related to any party in this cause and am not
14  financially interested in the outcome.
15    Certified to by me on this 28th day of
16  September, 2010.
17
18
19  _____
    Diana Ramos CSR
20  Texas CSR No. 3133
    Expiration Date:  12-31-2010
21  DEPOTEXAS
    Firm Registration No. 95
22  13101 Northwest Freeway, Suite 210
    Houston, Texas  77040
23  Tel:  (281) 469-5580
    FAX:  (713) 460-2525
24
25

67  (Pages  572  to  575)