**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TRICON ENERGY, LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:10-cv-05260 |
| | § | |
| VINMAR INTERNATIONAL, LTD., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Tricon Energy, Inc. filed this petition under 9 U.S.C. § 207 to confirm an arbitration award against Vinmar International Ltd. The award arose from an alleged breach of a contract for Vinmar to purchase 5000 metric tons of mixed xylene ("MX") from Tricon for delivery in Asia. A three-judge arbitration panel empaneled by the American Arbitration Association concluded that Vinmar had contracted to purchase the chemical from Tricon and had breached its contractual obligations by failing to declare a discharge port. The panel found Vinmar liable for breach of contract and awarded $1,338,776.72 in damages, plus prejudgment interest, costs, and fees. In response to the petition to confirm the award, Vinmar filed a counterclaim seeking to vacate. Vinmar also filed a motion to vacate in Texas state court, which Tricon removed. The actions have been consolidated in this court.

Vinmar argues that this court lacks subject matter jurisdiction over these proceedings under the enabling statute for the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), 9 U.S.C. §§ 201 *et seq.*, because there is an insufficient commercial relationship to a foreign state to meet the statutory requirement for jurisdiction. Vinmar

also argues that the AAA arbitration panel lacked jurisdiction to resolve the parties' dispute because there was no contract and no agreement to arbitrate between the parties. Vinmar asks this court to remand to the Texas state court. In the alternative, Vinmar asks this court to vacate the award or to find that there are disputed fact issues material to whether an arbitration agreement was formed and to hold a jury trial to resolve those issues. Tricon responds that this court has subject matter jurisdiction because the parties' contract required delivery of the chemical in Asia; that the record shows that, as a matter of law, the parties' contract included an arbitration clause; and that there is no authority to support a jury trial even if there are disputed facts material to determining whether an arbitration agreement existed.

This court heard oral argument on the parties' motions. Based on the parties' pleadings; the motions, responses and replies; the record; the arguments of counsel; and the applicable law, this court denies the motion to remand and denies the motion to vacate. The reasons for these rulings are explained below.

## I.    Background

On July 22, 2008, Rick Wilson, Vinmar's aromatics trader, and Brad Lockwood, Tricon's aromatics trader, negotiated the purchase and sale of MX through a third-party broker, Ed Leyman. Leyman sent Wilson and Lockwood a two-page memorandum confirming "the . . . transaction as per our telecon." (Docket Entry No. 20-3, at 2). The memorandum identified Tricon as the seller, Vinmar as the buyer, MX as the product, and summarized the contract terms. The memorandum stated that delivery was "CFR basis one safe berth/port major ports Taiwan or Ulsan Korea" and that "[b]uyer shall declare discharge port not later than August 8, 2008." (*Id.*). The memorandum also stated that "[i]f there is anything outlined contrary to your understanding of our agreement,

please notify us immediately by facsimile.  Many thanks for allowing us, as brokers, to arrange this transaction for you."  (*Id.*, at 2–3).

After reviewing the memorandum, both parties requested changes.  Vinmar asked that the payment term be changed from 30 days after the bill of lading date to an at-sight documentary letter of credit.  (Docket Entry No. 17-1, at 65).  Tricon agreed to this change.  (*Id.*).  The broker sent out a second memorandum reflecting the amended payment terms.  (Docket Entry No. 20-4).  Tricon then notified the broker of a typographical error in the statement of the purchase price.  The broker sent out a third memorandum correcting this error.  (Docket Entry No. 20-5).  Both the second and the third memoranda stated "AMENDED CONTRACT" in the top right corner of the first page.  (Docket Entries No. 20-4, 20-5).

On July 23, 2008, after the broker sent out the third memorandum, Lockwood sent Wilson the following email: "I'm pleased to attach a copy of our sales contract to you for the mixed xylenes deal from yesterday.  Please let Vuk [Rajevac] know the contact details for your logistics colleague, so he can be sure to arrange everything properly on this.  Thanks for the business."  (Docket Entry No. 20-6, at 1).  The attached four-page sales contract "confirm[ed] th[e] agreement between Brad Lockwood of Tricon Energy, Ltd. (Seller) and Rick Wilson of Vinmar International, Ltd (Buyer) on July 22, 2008" and stated "[t]his following sets forth the entire agreement of the parties."  (*Id.*, at 2).  The sales contract provided for delivery "CFR Ulsan [Korea]/Taiwan," (*id.*), consistent with the confirming memoranda from the broker.  The sales contract incorporated most of the terms in the broker's memoranda and  included additional terms.  One additional term was a clause calling for arbitration of all disputes arising under the purchase agreement in Houston, Texas.  (*Id.*, at 4).  The sales contract also contained a "broker clause," which stated that "[t]his [document] cancels and

3

supercedes any broker correspondence in relation to this transaction which shall be for the sole purpose of documenting commission, if any." (*Id.*). The last page of the Tricon sales contract contained signature blocks for Lockwood and Wilson. Below the signature blocks, the sales contract stated "[p]lease advise your agreement by signing the foregoing and returning via fax . . . within 24 hours. In the event we do not receive your reply as requested, then this contract shall be the governing instrument." (*Id.*, at 5). Neither Lockwood nor Wilson filled in the signature blocks.

Wilson forwarded the sales contract received from Tricon to another Vinmar employee, Laurentiu Pascu, a supply-chain specialist, the following day. Wilson's email to Pascu stated, "Laurentiu, I bough[t] MX from Tricon please contact them and make necessary arrangements." (Docket Entry No. 20-7, at 1). In the arbitration proceeding, Wilson testified that Pascu's role was to "make sure . . . that the terms of the agreement are consistent with what we've agreed to" and "to execute" "all the financial and contractual agreements." (Docket Entry No. 17-2, at 31). After reviewing the Tricon document and making handwritten notes on the document with Vinmar's suggested changes (none of which related to the arbitration clause), Pascu scanned the marked-up sales contract and emailed it to Vuk Rajevac, his counterpart at Tricon. Pascu's July 29, 2008 email to Rajevac stated as follows:

> Subject:  PO4529980 – 5000Mts of MX
>
> Dear Vuk,
>
> Please find enclose[d] our comments on your Sale Confirmation. We shall revert soon with our Purchase Order for your review.[1]
>
> Please advise:

---

[1]  The purchase order Vinmar was preparing, which was never sent to Tricon, also contained an arbitration clause. (Docket Entry No. 20-10, at 2).

– Advising Bank where the LC should be open (Kindly look to the option and see if possible to have this sale done on Net 30 Days so that unnecessary banking costs could be avoid[ed])
– advise when shipment is expected – be informed that no shipment can take place without us being informed (for Insurance Purpose) and without presence of an Independent Surveyor (out of SGS or ITS) – in this order please let us have:
> – vessel details –
> – port of loading –

Your prompt feedback on the above shall be much appreciated, thank you

Best regards,
Laurentiu Pascu

Vinmar International Ltd.

(Docket Entry No. 17-11, at 2).  Rajevac's same-day reply stated as follows:

Subject: RE:  PO4529980 – 5000Mts of MX

Hi Laurentiu,

To answer your questions:

> 1) Your comments on the contract well noted and accepted except for Demurrage time bar which is 90 days as per industry wide standard
> 2) I will let you know which advising bank we will be using once I know which cargo we will be giving to Vinamar. Also, the deal was done on At Sight basis and the only way we can do 30 days is if we are compensated for the cost of capital for the additional 30 days.
> 3) As far as the shipment details, we sold on CFR basis with arrival window, so once you declare the discharge port (by Aug 8th) we will be able to decide whether to give you a deep sea cargo (which at that point will most likely already be on the water) or an Asian origin cargo.  Unfortunately, with deep sea Asia trade it is not always possible to know which cargo will be the delivered since the ETAs are hard to keep (due to Panama crossing, weather in the Pacific, etc) and since we guarantee the arrival window, we always have to keep a few options open in order to perform.

If you have any questions, let me know.  Thanks!

Best Regards!

Vuk Rajevac
TRICON ENERGY, Ltd.

(Docket Entry No. 20-9, at 1).

In the arbitration hearing, Tricon presented expert testimony about the contracting process in the aromatics trade industry.  Steve Simpson, Tricon's aromatics-industry expert, testified that petrochemicals are commonly bought and sold through a broker serving as intermediary.  (Docket Entry No. 17-2, at 41).  Simpson explained that a buyer submits a firm bid to the broker.  A bid is a commitment to buy if the essential terms specified in the bid are met and the seller submits a firm offer.  Such an offer is a commitment to sell if the essential terms specified in the offer are met.  (*Id.*, at 42).  A contract is reached once the broker matches the buyer's bid with the seller's offer.  When that occurs, the broker sends the parties a confirmation that a deal has been made.  (*Id.*, at 43).  Simpson testified that it is customary for the buyer and seller to"pass paper back and forth to each other" after a deal is made through the broker.  (*Id.*, at 45).  Through the process of "passing paper," the parties may negotiate additional terms that were not part of the bid and offer.  (*Id.*).  Simpson testified that the paper-passing is not meant to cancel the deal or to change the essential terms agreed to in the bid and offer, but to replace the documentation and to expand on it with additional terms. (*Id.*).  Lockwood and Rajevac testified consistent with Simpson's testimony.  Lockwood testified that after a deal is reached through a broker, the contracting parties pass paper to propose additional terms and that it is common for the parties not to agree to some of the proposed additional terms but to proceed with the deal.  (Docket Entry No. 17-1, at 20).  Rajevac testified that the parties'

correspondence after the broker confirms a deal replaces the broker's confirmation and expands on it with additional terms, but does not change the deal already made.  (Docket Entry No. 17-2, at 5).

On July 31, 2008—after the price of MX had fallen by approximately 7% since July 22, 2008, the date of the initial broker confirmation—Wilson sent Lockwood an instant message stating, "I hear [you are] looking for mx in asia."  (Docket Entry No. 26-1).  Lockwood replied, "if we can work out a fair number, then let's talk."  (*Id.*).  Wilson wrote, "if you want to wipe the slate clean we could do that, otherwise I have contract obligations Ill [sic] supply into."  Lockwood rejected this offer to sell back the MX, stating: "no worries, I'll supply then, no prob."  (*Id.*).  After Lockwood rejected Wilson's offer to "wipe the slate clean," Wilson emailed Rajevac that Vinmar "can not accept open origin for this material, it must [be] from the USA."  (Docket Entry No. 26-3, at 1).  Neither the broker confirmations nor the sales contract Tricon sent to Vinmar specified that the MX had to have been manufactured in the United States.  Tricon asserts that this email was the first time Vinmar had demanded that the MX it had purchased be "USA origin."  (Docket Entry No. 20, at 11).  Rajevac responded that Tricon "did not guarantee USA origin."  (Docket Entry No. 26-3, at 1).  Tricon explains that it could not both satisfy this demand and satisfy the contract's delivery window.  (Docket Entry No. 20, at 11).

On August 6, 2008, Wilson informed Leyman, the broker,  that Vinmar and Tricon had failed "to conclude a deal so far."  (Docket Entry No. 26-4).  Wilson's email listed the product qualities Vinmar was "prepared to accept," which included U.S. origin for the MX.  Wilson's email stated: "We have yet to reach agreement on the terms noted above and have submitted comments previously to Tricon on its proposed form, which have not been resolved.  Once the above-referenced commercial terms are agreed and the form contract issues are resolved, as signified by signature of

7

the parties, we will have a deal." (*Id.*).  According to Tricon and consistent with the email exchanges between the parties, this was the first time Vinmar stated that no deal had been reached.

After Vinmar refused to declare a discharge port on August 8, 2008, the date specified in the broker's confirmation and Tricon's sales contract, Tricon sold 3230 of the 5000 metric tons of MX it had planned to sell Vinmar to an existing client at a lower price.  Tricon could not find a buyer for the remaining 1770 metric tons.  In August 2009, Tricon initiated arbitration proceedings against Vinmar, alleging breach of contract.  A three-judge arbitration panel concluded that the parties entered into a binding contract when they negotiated the MX transaction through their broker and that the terms of the contract were those summarized in the broker's last revised memorandum. (Docket Entry 20-2, at 2).  Under this contract, Vinmar agreed to purchase 5000 metric tons of MX from Tricon at a price of $1310 per metric ton for delivery to a to-be-designated discharge port in Asia by the middle of September 2008.  (*Id.*).  The arbitration panel concluded that Tricon proposed additional contract terms when it sent Vinmar its sales contract and that most of the additional terms—including the arbitration clause—became part of the parties' agreement when Rajevac accepted Pascu's comments to Tricon's sales contract.  (*Id.*, at 13).  The panel awarded actual damages in the amount of $1,338,776.72, the difference between the Vinmar contract price and the price for the MX Tricon was able to sell, plus attorney's fees, prejudgment interest, and costs in the amount of $670,091.08, for a total award of $2,008,867.80.

Tricon filed a petition to confirm the arbitration award under 9 U.S.C. § 207.  Vinmar counterclaimed and filed this motion to vacate the award.  Vinmar argues that this court lacks

subject matter jurisdiction over Tricon's petition and that the parties did not agree to arbitrate their disputes. Each argument is addressed below.

## II.      Subject Matter Jurisdiction

In 1970, Congress enacted enabling legislation for the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208 (the "Convention Act"). "The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520 n. 15 (1974) (citation omitted). The Convention Act grants district courts subject matter jurisdiction over actions to confirm arbitral awards to which the Convention applies. *See* 9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding . . . ."); 9 U.S.C. § 207 ("Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration."); *see also Vaden v. Discover Bank*, 129 S. Ct. 1262, 1272 n. 9 (2009) ("[The Convention Act] does expressly grant federal courts jurisdiction to hear actions seeking to enforce an agreement or award falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards."); *Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 212 (4th Cir. 2002) ("[T]he Convention and its implementing legislation . . . give federal district courts original jurisdiction over actions to compel or confirm

9

foreign arbitration awards."); *Daihatsu Motor Co., Ltd. v. Terrain Vehicles, Inc.*, 13 F.3d 196, 198 (7th Cir. 1993) (stating that "§ 203 of the Convention's enabling statute . . . along with § 207, vests district courts with the authority to confirm foreign arbitral awards"). The Convention applies to arbitral awards "arising out of a legal relationship, whether contractual or not, which is considered as commercial" and that is not entirely between United States citizens. 9 U.S.C. § 202. When an arbitral award arises out of a "relationship which is entirely between citizens of the United States," it "shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." *Id.*

Vinmar does not dispute that the arbitral award in favor of Tricon arose out of a commercial relationship between the parties: an alleged contract for the purchase of MX. Vinmar argues that the award does not fall under the Convention because Vinmar and Tricon are both United States companies. Vinmar argues that "[a]lthough the alleged contract does contemplate ultimate discharge of the product in Asia, every other aspect of the alleged deal relates solely to domestic activities." (Docket Entry No. 29, at 2–3). This argument fails to recognize the expansive definition of arbitral awards falling under the Convention.

An arbitral award that arises out a commercial relationship between two United States citizens falls under the Convention if that relationship "envisages performance . . . abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202. Because the parties' commercial relationship envisaged delivery of the MX in Taiwan or Korea, Tricon's arbitral award falls under the Convention. *Cf. Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 340–41 (5th Cir. 2004) (holding that an arbitration agreement between two U.S. citizens that

called for arbitration in Houston fell under the Convention because the parties' agreement called for "the performance of pipefitting services on . . . barges in West Africa"); *Lander Co., Inc. v. MMP Invs., Inc.*, 107 F.3d 476, 478–82 (7th Cir. 1997) (holding that an arbitration agreement between two U.S. citizens that called for arbitration in New York fell under the Convention because the parties' commercial relationship required one of the parties to distribute shampoos and other products in Poland); *Heather Trading Corp. v. Voest-Alpine Trading U.S.A. Corp.*, Nos. 85 Civ. 0823 (SWK), 85 Civ. 0913 (SWK), 1986 WL 4542, at *2 (S.D.N.Y. 1986) (holding that an arbitration agreement between two United States citizens fell under the Convention because the parties' contract called for delivery of crude oil in Ecuador).

The cases Vinmar cites in support of its argument are distinguishable because they do not involve contracts between commercial entities that contemplate performance abroad; such contracts are clearly recognized as falling under the Convention. *See, e.g., Access Info. Mgmt. of Haw., LLC v. Shred-It Am., Inc.*, No. 10-00622 JMS/KSC, 2010 WL 4642045, at *5 (D. Haw. Nov. 2, 2010) ("The Franchise Agreement did not involve property, performance, or enforcement in Canada—rather, the Agreement is between two U.S. entities, contemplates the grant of certain rights to SIH for SIH's use in the United States, and provides that disputes are governed by California and/or federal law and should be brought in California."); *Matabang v. Carnival Corp.*, 630 F. Supp. 2d 1361, 1366–67 (S.D. Fla. 2009) (holding that the Convention did not apply to an employment contract that "contain[ed] no references to performance abroad or any foreign state"); *Ensco Offshore Co. v. Titan Marine L.L.C.*, 370 F. Supp. 2d 594, 600 (S.D. Tex. 2005) ("Congress did not envision American companies with a dispute just off the Gulf Coast with eventual performance in Texas to be property, performance, or enforcement 'abroad.'").

This court has subject matter jurisdiction under 9 U.S.C. § 203 over Tricon's § 207 petition to confirm the arbitral award.[2]

## III.    The Arbitration Agreement

Vinmar argues that the arbitral award should be vacated because it never agreed to arbitrate disputes arising under the alleged contract with Tricon.   "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).  "A dispute is arbitrable only if the parties contractually bind themselves to arbitrate it." *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405–06 (2d Cir. 2009).  "If . . . the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently." *First Options*, 514 U.S. at 943; *see also China Minmetals Import and Export Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 289 (3d Cir. 2003) ("[U]nder the rule of *First Options*, a party that opposes enforcement of a foreign arbitration award under the Convention on the grounds that the alleged agreement containing the arbitration clause on which the arbitral panel rested its jurisdiction was void *ab initio* is entitled to present evidence of such invalidity to the district court, which must make an independent determination of the agreement's validity and therefore of the arbitrability of the dispute, at least in the absence of a waiver precluding the defense.").  "When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."

---

[2]  On February 25, 2011, after Tricon filed its petition to confirm the arbitral award in this court, Vinmar filed an action to vacate the arbitral award in state court.  Tricon removed the case to federal court and Vinmar filed a motion to remand arguing that this court lacks subject matter jurisdiction.  On April 11, 2011, this court ordered the two cases consolidated. Vinmar's motion to remand, filed in Civil Action No. 4:11-cv-00712, is denied for the reasons discussed above.

*First Options*, 514 U.S. at 944; *see also Will–Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003) ("Where the very existence of any agreement is disputed, it is for the courts to decide at the outset whether an agreement was reached, applying state-law principles of contract.").

Because the alleged contract between the parties is for the sale of goods, the contract-formation principles of the Texas Uniform Commercial Code apply. *See Howell Crude Oil Co. v. Tana Oil & Gas Corp.*, 860 S.W.2d 634, 637 (Tex. App.—Corpus Christi 1993, no writ) ("[A]s a transaction in goods, a contract for the sale of oil falls within the scope of the Texas Uniform Commercial Code."). Under the Code, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." TEX. BUS. & COM. CODE ANN. § 2.204(a) (West 2009). Once a contract is formed, "[a]n agreement modifying [that] contract . . . needs no consideration to be binding." *Id.* § 2.209(a).

Although the UCC does not define the term "offer," the Fifth Circuit has "held that '[a]n offer is an act that leads the offeree reasonably to believe that assent (i.e., acceptance) will conclude the deal.'" *J.D. Fields & Co., Inc. v. U.S. Steel Int'l, Inc.*, No. 10-20217, 2011 WL 1935476, at *4 (5th Cir. May 19, 2011) (quoting *Axelson, Inc. v. McEvoy–Willis*, 7 F.3d 1230, 1232 (5th Cir. 1993)). "Unless otherwise unambiguously indicated by the language or circumstances . . . an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." TEX. BUS. & COM. CODE ANN. § 2.206(a)(1). "The Code assumes that transactions between professionals in a given field"—such as Wilson and Lockwood, the parties' aromatics traders, who qualify as merchants under the Code—"require special and clear rules which may not apply to a casual or inexperienced seller or buyer." *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W.2d 295, 299 (Tex. 1981). "Thus, the same course of

13

conduct which might establish a contract between merchants might be insufficient to evidence a consumer contract." *Id.*

For the purpose of this proceeding, Vinmar does not challenge the arbitration panel's conclusion that the parties reached a contract on July 22, 2008, when the broker matched Vinmar's firm bid with Tricon's firm offer. Vinmar notes that it denies the existence of such a contract, but it "reserve[s] its arguments for another day." (Docket Entry No. 16, at 5). Assuming that the parties entered into a contract on July 22, 2008, Vinmar argues that this contract did not contain an arbitration clause and that Vinmar never agreed to a modification to include the arbitration clause that was among the additional terms in Tricon's July 23, 2008 sales contract. This argument does not take into account either the parties' communications or the testimony about the industry custom and practice.

The record evidence shows that Vinmar assented to the additional terms—including the arbitration clause—proposed in the Tricon sales contract that was attached to the July 24, 2008 email from Lockwood at Tricon to Wilson at Vinmar. Lockwood and Wilson were the aromatics traders. Wilson forwarded this email and the attached sales contract to Pascu to complete the financial and contractual parts of the deal that had been reached. Pascu in turn made some comments on the Tricon sales contract and sent it to Vuk Rajevac at Tricon. None of the comments related to the arbitration clause. On July 29, Rajevac on behalf of Tricon accepted all of Vinmar's comments except for a request to change the demurrage time bar. Rajevac's email to Pascu stated, "[y]our comments on the contract [are] well noted and accepted." (Docket Entry No. 17-12, at 2).

The undisputed testimony in the record makes clear that, consistent with industry custom and practice, after the aromatics traders agreed on the material terms of the deal, they turned the

14

transaction to their operations specialists, Pascu and Rajevac, to complete the documentation, including additional terms and conditions.  As Wilson testified, it was Pascu's job to complete the transaction in order to free the trader to do more deals.  (Docket Entry No. 17-2, at 31).  Rajevac concurred, testifying that "[a]fter the trader does the deal, the transaction moves over to us, gets to free up the trader to do more trades and worry about other stuff.  So we become the face of the company and deal with the counterparties on both sides, purchase and sales side, to bring the transaction to an end basically." (Docket Entry No. 17-1, at 74).  Simpson, Tricon's expert witness, agreed, stating that it is common in aromatics trading for the final terms and conditions to be negotiated by the operations specialists, such as Pascu and Rajevac.  (Docket Entry No. 17-2, at 45).

Wilson and Lockwood reached agreement through the broker no later than July 23 on the essential terms of the sale and purchase of the MX: product, price, time window for delivery, and geographic area of delivery.  Tricon's sales contract, which Lockwood emailed to Wilson on July 23, 2008, proposed additional terms, including the arbitration clause.  Wilson forwarded the proposed sales contract to Pascu, who made hand-written comments and returned the marked-up copy to Rajevac.  Neither Pascu's comments on the sales contract nor the text of his transmittal email referred to the arbitration clause.  In light of the industry custom of having operations specialists negotiate additional terms of an agreement after the essential terms are reached through a broker, Pascu's email operated both as an acceptance of the terms in the Tricon sales contract to which he neither objected nor modified and as a counteroffer as to those terms identified in his comments.  Because Pascu did not object to or otherwise comment on the arbitration clause in his July 29 email that included Vinmar's "comments" on Tricon's sales contract, Pascu, on Vinmar's behalf,  agreed to the arbitration clause as an additional term of the parties' contract.  Rajevac, in

turn, agreed to the modified terms—except the demurrage time bar provision—when he wrote back that "[Vinmar's] comments on the contract [are] well noted and accepted except for Demurrage time bar which is 90 days as per industry wide standard."  (Docket Entry No. 20-9, at 1).  Contrary to Vinmar's argument, Pascu's email operated as an acceptance of the additional terms in the Tricon sales contract.  Read as a whole, his email and the accompanying marked-up sales contract—which struck out some language, inserted some language, and checkmarked some clauses in the contract—conveyed Vinmar's assent to the un-objected to additional terms in the sales contract.

Pascu's statement that Vinmar "shall revert soon with [its] Purchase Order for Tricon's review" does not change this result.  Vinmar argues that "if Pascu intended to accept Tricon's proposed modification, there would be no reason to further respond with Vinmar's own purchase order."  (Docket Entry No. 16, at 17).  Pascu's email made it clear that Vinmar accepted the proposed modifications except for those identified in his comments on the sales contract  and in the email.  And Rajevac's response makes it clear that these comments were a counteroffer only as to the additional terms set out in the Tricon sales contract.  Rajevac in turn accepted all the comments on the sales contract except for the request to change the demurrage time bar.  There was no oral communication.  The parties' written communications make it clear that the sales contract was an offer by Tricon to modify the existing agreement by adding some terms, including the arbitration clause; that Vinmar accepted those terms to which no comment was made; and that Tricon accepted Vinmar's comments with one exception that did not affect the modification to add the arbitration clause.  *See Pennzoil Co. v. F.E.R.C.*, 789 F.2d 1128, 1144 (5th Cir. 1986) ("[T]he UCC requires no 'formal' offer and acceptance for a contract modification to be effective as between the parties.").

16

Vinmar argues that the absence of signatures defeats the enforceability of the sales contract terms as modification of the original deal.  Vinmar argues that "Tricon's proposed sales contract makes it clear signatures were required before the modifications would become binding" because "Tricon's . . . document contain[ed] specially prepared signature spaces for both Vinmar and Tricon." (Docket Entry No. 16, at 17).  "Under standard contract principles, the presence or absence of signatures on a written contract is relevant to determining whether the contract is binding on the parties."  *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, no pet).  A contract need not be signed by the parties to be binding, but the parties may insist upon signing as a condition precedent to contract formation.  *Simmons & Simmons Constr. Co. v. Rea*, 286 S.W.2d 415, 418 (Tex. 1956).  "[T]he question of whether a written contract must be signed to be binding is a question of the parties' intent."  *In re Bunzl*, 155 S.W.3d at 209.  "[I]f the parties have unconditionally assented to terms stated in an unsigned document, the document constitutes a binding written contract, regardless of whether it is signed."  *Id.* (citation omitted).

The record does not support Vinmar's argument that the parties intended that the Tricon sales contract be signed before the additional terms became binding.  Lockwood testified that the signature blocks were automatically generated by Tricon's computer system and that he never expected Vinmar to have someone sign on the signature block line.  (Docket Entry No. 17-1, at 21, 36).  Simpson testified that it is customary in the petrochemical trading industry for additional terms to be agreed to without signatures.  (Docket Entry No. 17-2, at 45).  And the Tricon sales contract stated, under the signature blocks, that the "contract shall be the governing instrument" if Vinmar did not return a signed copy of the contract to Tricon via fax within 24 hours.  (Docket Entry No. 17-10, at 5).  Other than the signature blocks in the Tricon sales contract, Vinmar points to no other

17

evidence to support its argument that the parties' signatures were required before the additional terms became binding.

Contrary to Vinmar's argument, neither *Adams v. Petrade International*, 754 S.W.2d 696 (Tex. App.—Houston [1st Dist.] 1988, writ denied), nor *Scaife v. Associated Air Center Inc.*, 100 F.3d 406 (5th Cir. 1996), compel a different conclusion.   In *Adams*, the Texas Court of Appeals considered whether a letter sent by a seller to a buyer was a confirmation of a prior agreement or an offer to enter into a contract.   754 S.W.2d at 706.   Although the seller termed the letter a "confirmation," the letter stated that "if the stated 'arrangements' were 'in accord' with [the buyer's] understanding, [the buyer] was to sign and to return one copy of the letter to [the seller].   There followed, in capital letters, the word 'ACCEPTED' and a blank signature line for compliance with these instructions."   *Id.*   The court explained that because the "components of the letter clearly required further action by [the buyer]," the letter was an offer to enter into an agreement rather than a confirmation of a prior agreement.   *Id.*   In *Scaife*, the Fifth Circuit considered whether a written agreement that contained signature blocks for the parties "was accepted and became a binding contract without the signatures of the parties."   100 F.3d at 410.   After reviewing the summary judgment evidence, the court concluded "that the parties contemplated the formation of a binding agreement to include the signatures of both parties."   *Id.* at 411.   Because "the parties intended to manifest their assent to th[e] agreement through a formal written contract signed by both parties," the court held that "no contract was ever formed."   *Id.*   This case is distinguishable from *Adams* and *Scaife* because the record evidence shows that the parties did not intend to require a signature on the sales contract to show their assent to its terms.   Although the Tricon sales contract contains signature

18

blocks, the contract clearly states that it "shall be the governing instrument" notwithstanding the parties' failure to sign it.  (Docket Entry No. 17-10, at 5).

Even assuming that the parties' signatures were required before the additional terms became binding, Pascu and Rajevac "signed" the contract modifications.  The Texas Uniform Commercial Code defines "signed" broadly as "using any symbol executed or adopted with present intention to adopt or accept a writing."  TEX. BUS. & COM. CODE ANN. § 1.201(b)(37).  The comment to the UCC's definition states, in relevant part:

> This provision also makes it clear that, as the term "signed" is used in the Uniform Commercial Code, a complete signature is not necessary.  The symbol may be printed, stamped or written; it may be by initials or by thumbprint.  It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead.  No catalog of possible situations can be complete and the court must use common sense and commercial experience in passing upon these matters.  The question always is whether the symbol was executed or adopted by the party with present intention to adopt or accept the writing.

*Id.* at cmt. 37.  Courts have held that an exchange of e-mails between contracting parties is a "signed" writing that may satisfy the UCC statute of frauds.  *See, e.g., Copeland Corp. v. Choice Fabricators Inc.*, 345 F. App'x 74, 77 (6th Cir. 2009) (holding that an email that identified the sender by name was a signed writing under Ohio's enactment of the UCC); *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002) (holding that an e-mail satisfied the UCC's statute of frauds because neither the UCC's words nor purpose require a handwritten signature); *Int'l Casings Grp., Inc. v. Premium Standard Farms, Inc.*, 358 F. Supp. 2d 863, 873 (W.D. Mo. 2005) ("[I]t is clear that [the e-mail senders], by hitting the send button, intended to presently authenticate and adopt the content of the e-mails as their own writing.  This is enough to satisfy the UCC given the breadth of its definition of signature . . . .").  Both Pascu and Rajevac typed their full names at the bottom of

19

their emails.  There is no evidence in the record indicating that Pascu and Rajevac did not intend to adopt the content of their emails as their own writing.  The emails represent signed writings under the Texas UCC.

Vinmar argues that "Pascu had no authority to negotiate or change the commercial terms of any agreement."  (Docket Entry No. 16, at 15).  Under Texas law, "[w]ithout actual or apparent authority, an agent may not bind a principal."  *Tex. Soil Recycling, Inc. v. Intercargo Ins. Co.*, 273 F.3d 644, 650 (5th Cir. 2001).  "Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess."  *Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 30 (Tex. App.—San Antonio 1998, pet. dism'd w.o.j.).  Apparent authority arises when a principal "acts with such a lack of ordinary care as to clothe the individual with indicia of authority, leading a reasonably prudent person to believe the agent has authority to bind the principal."  *Kahn v. Imperial Airport, L.P.*, 308 S.W.3d 432, 440 (Tex. App.—Dallas 2010, no pet.).  The record supports a finding that Pascu had actual authority to bind Vinmar to the additional terms proposed in the Tricon sales contract, including the arbitration clause.  The record also supports a finding that Pascu had apparent authority to do so.  After Wilson and Lockwood had reached an agreement through the broker, Wilson received Tricon's sales contract.  Wilson forwarded the sales contract to Pascu attached to an email that described the deal and asked Pascu to "please contact [Tricon] and make necessary arrangements."  (Docket Entry No. 20-7, at 1).  Wilson copied Lockwood on this email to Pascu.  Wilson's statement to Pascu to "make necessary arrangements" is sufficient to lead a reasonably prudent person to believe that Pascu possessed the authority to negotiate additional terms on Vinmar's behalf.

Lastly, Vinmar argues that "[a]t the very least, Pascu's e-mail, Tricon's response and the lack of signatures on the proposed sales contract give rise to a genuine issue of material fact concerning contract modification" that entitles Vinmar to a jury trial. (Docket Entry No. 16, at 19). Under Texas law, "whether offer and acceptance have occurred is usually a question of law." *S & A Marinas, Inc. v. Leonard Marine Corp.*, 875 S.W.2d 766, 769 (Tex. App.—Austin 1994, writ denied). "Where 'negotiations' are in writing, the question of whether an offer was unconditionally accepted is primarily a matter of law for the court." *Gilbert v. Pettiette*, 838 S.W.2d 890, 893 (Tex. App.—Houston [1st Dist.] 1992, no writ). The parties negotiated the additional terms by exchanging written communications and the content of those communications is undisputed. Vinmar does not point to evidence in the record disputing the relevant custom and practice relating to such communications. Whether the record evidence shows that the parties modified their agreement to include an arbitration clause is a matter of law appropriate for this court to decide. For the reasons discussed above, this court concludes that the parties' agreement included the agreement to arbitrate.[3]

Vinmar's motion to vacate the arbitral award on the grounds that the parties did not enter into an agreement to arbitrate is denied.

## IV.    Conclusion

---

[3]  Tricon argues that Vinmar failed "to identify a single case where any federal court in the country has allowed a jury trial in the context of a motion to confirm and/or vacate an arbitration award." (Docket Entry No. 42, at 1). Tricon argues that although Section 4 of the Federal Arbitration Act allows jury trials in the context of motions to compel or stay arbitration, "Sections 9 and 10, which govern motions to confirm and vacate, indisputably do not." (*Id.*, at 2). Vinmar responds that a jury trial is required whenever "the very existence of an agreement to arbitrate is in issue," regardless of the procedural posture of the case. (Docket Entry No. 41, at 5). Because this court concludes, as a matter of law, that the parties agreed to modify their agreement to include the arbitration clause, there is no need to decide whether Vinmar would be entitled to a jury trial if there were genuine disputes material to determining whether the contract was modified.

Vinmar's motion to remand this proceeding and motion to vacate the arbitral award are denied. This court must confirm Tricon's arbitral award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." 9 U.S.C. § 207. The Convention lists seven grounds for refusing to enforce an arbitral award. *See Admart AG v. Stephen and Mary Birch Found., Inc.*, 457 F.3d 302, 307–08 (3d Cir. 2006) (listing the seven grounds). By **September 28, 2011**, Vinmar must inform this court whether any of these grounds apply in this case and, if so, propose a schedule for raising and resolving them.

SIGNED on September 21, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge